UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )  CIVIL FILE
Donald Sanders,               )  NO. 17-CV-5106 (ECT/KMM)
                              )
                Plaintiff,    )
                              )        **VOLUME I**
        vs.                   )
                              )
BNSF Railway Company,         )  Courtroom 3B
                              )  Monday, December 6, 2021
                Defendant.    )  St. Paul, Minnesota
                              )  8:45 A.M.
------------------------------------------------------------

<u>**JURY TRIAL PROCEEDINGS**</u>

**BEFORE THE HONORABLE ERIC C. TOSTRUD**
**UNITED STATES DISTRICT JUDGE**
**AND A JURY**

**A P P E A R A N C E S:**

**For the Plaintiff:**     **NICHOLS KASTER, PLLP**
                           By:  JAMES H. KASTER, ESQUIRE
                                LUCAS J. KASTER, ESQUIRE
                           4700 IDS Center - 80 South Eighth Street
                           Minneapolis, Minnesota  55402-2242


**For the Defendant:**     **ARTHUR CHAPMAN KETTERING SMETAK**
                           **& PIKALA, P.A.**
                           By:  SALLY J. FERGUSON, ESQUIRE
                           500 Young Quinlan Building
                           81 South Ninth Street
                           Minneapolis, Minnesota  55402-3214

                           **STINSON, LLP**
                           By:  TRACEY HOLMES DONESKY, ESQUIRE
                           50 South Sixth Street - Suite 2600
                           Minneapolis, Minnesota  55402


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

1          (8:45 a.m.)

2                    **P R O C E E D I N G S**

3                    **IN OPEN COURT**

4          THE COURT:  Good morning, everyone.  Please be

5   seated.

6          MR. JIM KASTER:  Good morning, Your Honor.

7          THE COURT:  This is Sanders versus BNSF Railway

8   Company, Civil File Number 17-5106.

9          Counsel, I understand there are a number of

10  issues -- or a couple of issues I should say -- that we need

11  to deal with before we call in the venire.

12         MR. LUCAS KASTER:  That's correct, Your Honor.

13         THE COURT:  Mr. Kaster.

14         MR. LUCAS KASTER:  Sure.  The one issue we wanted

15  to address was just follow-up to the Court's hearing on

16  Friday regarding the foundation for the recordings that we

17  intended to play.  We sent a declaration to Defendant

18  yesterday from our IT tech person that outlined what she

19  did, how she captured the information, how that was

20  recorded.  Then on a summary sheet that was produced to

21  defendant back in April 2020 -- the actual recordings

22  themselves were produced in April of 2018 -- that lays out

23  where she got the length of the recordings, the date, the

24  time.  And so we're hoping -- and we e-mailed that

25  information to the Court as well, so the Court was aware of

1    that.  We hope that that resolves any foundation issues.

2          THE COURT:  Who's going to be addressing that one?

3    Ms. Ferguson.

4          MS. FERGUSON:  Yes.  Thank you, Your Honor.

5          We continue to assert there is a lack of

6    foundation.  We've listened to every one of those tapes, and

7    nowhere on the tape is there any indication as to the time

8    or date.  So we're being asked to rely upon somebody in

9    Mr. Kaster's office as to the date and time of these.

10          This is a case that -- temporal proximity is

11    important here, and we have no independent way of knowing

12    whether those dates and times are accurate.  So we continue

13    to take the position we did in our motion *in limine*.

14          THE COURT:  Was this an issue that was raised

15    during discovery?

16          MS. FERGUSON:  We actually asked to have the

17    recorder, and we were refused because discovery was over.

18          THE COURT:  Okay.  So it sounds like the question

19    of trying to resolve the basis for this objection was -- I

20    guess was that issue that was raised during discovery?

21          MS. FERGUSON:  We raised foundation through the

22    entire -- every deposition that was taken where these tapes

23    were played that issue was strongly contested.

24          THE COURT:  I guess maybe what I'm asking is this:

25    It seems like BNSF's challenge is to the substance of the

1    affidavit that was filed.

2            MS. FERGUSON:  Yes, as well as the tapes.  I mean,

3    if the tapes had any indication as to a date or time -- but

4    completely absent.

5            THE COURT:  Well, from where I sit Mr. Sanders has

6    laid adequate foundation for those tapes, at least to the

7    extent that that affidavit addresses those issues.  I can

8    imagine there might be other issues that might surface upon

9    which BSNF might raise an objection to those tapes.  But

10   beyond that, I just don't see a basis to sustain that kind

11   of objection given the information that's since been filed.

12           So I guess what I'm saying is to the extent the

13   objection is to any substance in that affidavit, the

14   objection's overruled.  I'm not quite sure how else to

15   address that issue.

16           MS. FERGUSON:  Well, we'll just maintain for the

17   record our objection as it relates to the recordings as

18   lacking foundation.

19           THE COURT:  All right.  But there's two sides to

20   this foundation problem that I can think of.  And you all

21   tell me if you think I'm missing something.

22           One piece is how did the stuff that was produced

23   in discovery, how was it created.  The second piece is

24   asking Mr. Sanders the who, what, when, where, why, and how

25   for each of those recordings.  Right?  Tell me, when did you

1     make this recording, why did you make it, et cetera.  I

2     mean, that's a different issue.  And as I understand it,

3     that's not something that the affidavit addresses, at least

4     entirely.

5            So I guess what I'm saying is fine as to a

6     standing objection as to foundation with respect to the

7     information that's addressed in that affidavit, but to the

8     extent that there are other foundational objections that

9     might be raised, I just want to be clear that those are

10    things you're going to have to assert in realtime if you

11    continue to think that those are viable objections.

12           Any other issues that we need to deal with here

13    today?

14           MR. LUCAS KASTER:  None from us, Your Honor.

15    Thank you.

16           THE COURT:  How about from BNSF?

17           MS. DONESKY:  Your Honor, we wanted to follow up

18    or at least make a record, at minimum, but raise with Your

19    Honor an issue that arose, obviously, on Saturday where we

20    spoke, and then Your Honor issued an additional ruling

21    yesterday regarding Mr. Jones as a corporate representative.

22    And I understand it's a difficult situation the Court is in.

23    We all understand that.  Certainly no one wants the trial

24    further delayed, but there are a couple issues we at least

25    need to preserve a record, but we want to make objections to

1    Your Honor in terms of not just the remote testimony for

2    Mr. Jones, but him being here as a corporate representative.

3            We understand, obviously, this is not a criminal

4    trial, but there is a concept of being able to confront

5    one's accuser.  And Mr. Jones is clearly the witness or the

6    individual at BNSF who is the main witness for whom

7    Mr. Sanders has made allegations against primarily.  He's

8    the primary witness in that context.

9            And now, on the first day of trial, and of no

10   fault of anyone, unfortunately, he's not able to be here for

11   COVID reasons.  But there is now -- as of yesterday, he's

12   also not permitted to appear here as a corporate rep and,

13   therefore, the individual who's in the situation with these

14   allegations presented against him and the person most

15   factually close to the facts of the case is not able to now

16   hear the information that is coming in at trial for the next

17   two weeks.  And for those reasons we request and would

18   continue to renew our request that we made Saturday that he

19   be permitted, at minimum, to testify at a later time.

20           We have two weeks of trial.  He would be available

21   Friday to speak and to testify in court and, at minimum,

22   remotely as corporate rep to be -- I understand the

23   technology complications that might present, but there is a

24   level of prejudice here to the defendant given the

25   circumstances.  And if there's any way that he could appear

1    or at least orally -- there's a phone call, conference call

2    that he could, at minimum, be allowed to listen in on, that

3    there be some considerations there because, given his role

4    and the accusations being made, he should have the right and

5    BNSF should have the right to have him here and for him to

6    be able to hear the testimony as it comes in throughout

7    trial.

8            THE COURT:  Okay.  Let's take those issues sort of

9    one at a time and break them out.

10           On the testify later piece, so I'm going to

11   interpret that as a motion that Mr. Jones be allowed to

12   testify later.  And as we talked about on Saturday, I think

13   it was, I'll deny that motion for the simple reason that it

14   raises just as much risk to wait as it does to put Mr. Jones

15   in the position of having to testify remotely.  Other

16   witnesses are testifying remotely.  I understand Mr. Jones

17   is an important witness, but there's nothing inherently

18   wrong with remote testimony.

19           I worry about our technological capacities and

20   potential glitches there, but we'll cross those bridges if

21   and when we get to them.

22           But given Mr. Jones' circumstances, it seems to me

23   that there is just as much a risk or greater risk, if

24   anything, in waiting and allowing him to testify later.  He

25   may become sick, incapacitated, unable to testify in which

1    case the trial would be delayed.  And I'm not going to --

2    I'm not going to take that risk on with respect to his

3    testimony.

4         With respect to having a corporate representative

5    testify or present, I think there are two issues there.

6    One, I haven't heard any explanation for why BNSF couldn't

7    identify a substitute corporate representative.

8         I understand that Mr. Sanders is the important

9    person here and that he is the subject of these complaints.

10   I get that.  But insofar as the corporate representative

11   piece is concerned, I haven't heard any explanation or

12   justification for why someone else couldn't take his place.

13        With respect to him being unable to observe the

14   testimony of any other witnesses who are present here, I'm

15   sensitive to that concern.  I think it's a significant one.

16        Do you have authority that suggests that I am

17   violating Mr. Sanders' or BNSF's rights in some fashion by

18   proceeding with trial in his absence?

19        MS. DONESKY:  I don't at this very moment.  We

20   read the ruling last night.  I don't at this very moment.  I

21   would seek leave to present that to Your Honor.

22        THE COURT:  Well, but I mean, I think we talked

23   about it on Saturday.  And I get it, I understand it, but I

24   don't -- I am not aware of any authority in a civil case

25   that requires a trial to be delayed under circumstances

1    comparable to this, so that an individual may be present to

2    exercise something akin to a confrontation right, a Sixth

3    Amendment confrontation right.  If you find it and get it to

4    me, that's important.  I'd want to see it.

5              MS. DONESKY:  Okay.

6              THE COURT:  So I'm not suggesting that I'm

7    shutting that out, but --

8              MS. DONESKY:  On Your Honor's first point, just so

9    there's a record of that just in terms of identifying anyone

10   else, as Your Honor probably heard Friday and the record

11   reveals, there's -- many of the individuals in this case

12   have either retired or left BNSF.  And just the mere timing

13   of the situation arising we were not able to find another

14   corporate representative and had identified Mr. Jones as

15   being that.  So the challenges there are both timing and who

16   is involved and who remains at BNSF.

17             THE COURT:  Well, I mean, on that point, I get it.

18   It's not as though there's someone there who has -- apart

19   from Mr. Jones who may have personal, firsthand knowledge of

20   everything that's gone on here, but we just wrapped up a

21   trial about month or so ago and the corporate representative

22   had the least involvement of any individual who testified on

23   behalf of the defendant.  It just so happened that that

24   individual was the higher-up in the company who had primary

25   frontline responsibility for monitoring the case and its

1   progression.  And I certainly think that that's not an

2   uncommon way to handle that circumstance.

3          All right.  I had one other issue there that I

4   wanted to deal with.  Ah, the telephone conference piece.

5   Probably because we've been so used to Zoom now, but I

6   confess I didn't think about that, and I'm not sure it was

7   suggested when we talked on Saturday; if it was, I

8   apologize, I just missed it, but that might present a

9   different issue.  Let me look into that.

10          MS. DONESKY:  Thank you, Your Honor.

11          THE COURT:  That sort of old-fashioned technology

12   isn't something that's front of mind now after the last 18

13   months or so, and it should be.  So I apologize for that.

14   As I said, if it was brought up on Saturday, I missed it.

15          All right.  Anything further from BNSF?

16          MS. DONESKY:  The only other item, Your Honor --

17   and you may want to take it up later -- each party has

18   exchanged proposed limiting instructions per Your Honor's

19   request on Friday.  So we can take that up later if you

20   want.  We just wanted to make you aware that we can provide

21   each of our respective ones to each or we could speak and

22   maybe we can reach a joint language, but we've each

23   exchanged language.

24          THE COURT:  Okay.  Good.  I appreciate knowing

25   that you've exchanged that.  And this is with respect to the

1    limiting instruction regarding the administrative

2    proceedings?

3              MS. DONESKY:  Correct.  And the arbitration, yes.

4              THE COURT:  Yes.  Right.  And the arbitration,

5    correct.  Okay.  Terrific.

6              If I'm hearing you right, you're suggesting

7    perhaps there's some room for the parties to continue to

8    talk and work something out.  If that turns out not to be

9    possible, what I'd ask is that you submit both instructions

10   so that I can look at them before and consider them for at

11   least a short period of time before we argue about them here

12   in court.

13             MS. DONESKY:  Very good.

14             THE COURT:  Okay.  All right.  Thank you.

15             (Discussion off the record between Court and

16   clerk).

17             THE COURT:  All right.  So the first eight jurors,

18   for everyone's information, who will be in the courtroom to

19   start with are Mr. Grimwood, Ms. Esposito, Mr. Leech,

20   Mr. Martinson, Mr. Thompson, Mr. Cohen, and Ms. Dube,

21   D-U-B-E.  Could be "Dube."  We will find out.

22             MR. JIM KASTER:  So we're clear, Your Honor, you

23   skipped over Ms. Williams and -- or Mr. Williams --

24             THE COURT:  I did.

25             MR. JIM KASTER:  -- and Mr. Sanders.  Okay.

1            THE COURT:  I did.

2            MR. JIM KASTER:  Yeah.  Thank you.

3            THE COURT:  All right.

4            MR. JIM KASTER:  Your Honor, if the Court is

5     bringing the jury right in, I'm wondering if I could have

6     three minutes before we start.

7            THE COURT:  We're just waiting on one piece of

8     information here.  Sorry.

9         (Pause)

10           THE COURT:  We've got just a couple of things to

11    figure out here in terms if individuals are no-shows or if

12    they were instructed to show up later.  That's what we're

13    trying to figure out now.

14           But, Mr. Kaster, if there's something you need to

15    take care of, I suspect now would be a good time

16           MR. JIM KASTER:  Okay.  Thank you.  Thank you,

17    Your Honor.

18            THE COURT:  Certainly.

19           MR. LUCAS KASTER:  Your Honor, are you okay if

20    we're able to drink water bottles while we're in the

21    courtroom?

22            THE COURT:  I am.

23           MR. LUCAS KASTER:  Thank you.

24        (Pause)

25           MR. JIM KASTER:  Thank you, your Honor.

1            THE COURT:  All right.  Let me give you a heads-up

2      on something.  We've got a number of no-shows.  So of the 32

3      summoned jurors, 24 have shown up today at the appointed

4      time.  Looking at the list and who has not appeared, I find

5      that surprising.  I am thinking that there's something else

6      going on, that perhaps these individuals were under the

7      belief that they reported later or at a different time, but

8      that's just an educated guess.

9            (Court confers with the courtroom deputy)

10           THE COURT:  All right.  So we think what happened

11     is there was a glitch in our -- the same calling program

12     that every federal district court or most every federal

13     district court uses when alerting jurors.  And it sounds as

14     though there was some kind of glitch, and either some of

15     these individuals were left off, others may have been not

16     given a time when to report and, obviously, in some

17     circumstances -- well, we don't know which of those two it

18     could be.

19           I suspect that 24 will be enough and we can get to

20     14 from 24 based on my review of the questionnaires, but

21     we're going to call those individuals anyway and try to get

22     them in here as quickly as possible just in case.

23           Then we're prepared, correct?  Is Plaintiff

24     prepared to proceed?

25           MR. LUCAS KASTER:  Yes.  Yes, Your Honor.

```
 1              THE COURT:  BNSF?

 2              MS. FERGUSON:  Yes.

 3              THE COURT:  All right.  Thank you.

 4         (Pause)

 5         (Jury venire enters the courtroom)

 6                     *     *     *     *

 7         [ Jury Selection commences, not transcribed ]

 8                     *     *     *     *

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (2:55 p.m.)

2                          IN OPEN COURT

3          (Jury enters)

4              THE COURT:  Thank you, everyone.  Please be

5     seated.

6              Mr. Kaster.

7              MR. JIM KASTER:  Thank you, Your Honor.

8                   **PLAINTIFF'S OPENING STATEMENT**

9              MR. JIM KASTER:  May it please the Court, counsel,

10    Ladies and Gentlemen of the Jury:

11             Don Sanders got fired for standing his ground,

12    standing his ground doing the right thing, doing what was

13    required by BNSF's written policies (indicating) and what

14    was required by the law.

15             See, Don Sanders was a track inspector.  As a

16    track inspector, he was the eyes and ears of the public, of

17    BNSF, of the Federal Railway Administration, to keep the

18    tracks safe.  To make sure they were safe from defects, he

19    would issue -- defects like in the track, or the ties, or

20    the frog --

21             Am I doing that?

22             THE COURT:  You are.

23             MR. JIM KASTER:  Okay.  I'm going to try to stop

24    doing that.  Okay.  Or what's called a frog when the tracks

25    come together and then split apart.  These defects -- and he

1    would issue slow orders and maybe take a track out of

2    service.  These defects can cause derailments, serious

3    derailments of trains that weigh hundreds, if not thousands,

4    of tons, cause accidents, cause property damage and worse.

5             His reporting of these slow orders had this

6    effect:  It slowed down train traffic.  It hurt the one

7    thing that BNSF cares the most about, velocity, which is how

8    they make their profit.  And so when he did that, managers

9    became angry.  They would scream at him, threaten him, swear

10   at him, curse at him in the day and during the night, during

11   the middle of the night.

12            Don Sanders and his wife Christine are separated,

13   but he talks on a speakerphone because he doesn't put the

14   phone to his face, so his wife could hear these calls.  They

15   were relentless.

16            So finally in November of 2015, Don Sanders went

17   to HR and he made a complaint.  He had recordings of some of

18   the calls.  He gave the recordings to HR.

19            It didn't get better.  It got worse.  He tried to

20   transfer to another district and he was told that his

21   reputation preceded him.  It didn't get better.  It seemed

22   to get worse.  So he stayed in that district for only ninety

23   days or a little bit less.  And then when he transferred

24   back to his old district, within four days -- four days --

25   they rented a car, an unmarked rental car, and sat across

1    the tracks, his supervisor, and spied on him and contended

2    that he put more time on his daily log than he actually

3    worked for three days:  March 19th, March 25th, and 26th of

4    2016.  They accused him of payroll theft and fired him after

5    nine years because Don Sanders stood his ground, a payroll

6    that had not even closed yet.  It hadn't even closed when

7    they marched him off the premises.

8             So let's talk about this story in a little more

9    detail.  Let me introduce some of the characters, the

10   witnesses that you will see in this case, key names.  Keith

11   Jones, who was the division manager, Don Sanders' boss's

12   boss.  You'll hear from Mr. Jones -- the Court told you that

13   Mr. Jones is quarantined, so we will see him as a witness

14   shortly on the big screen.  He's apparently at his home.  So

15   he was the boss's boss.

16           Don Sanders' supervisor for most of his time was

17   the woman in the right-hand corner, Blaine Hoppenrath.  In

18   the top right is Doug Jensen.  He was Mr. Jones' boss.  And

19   Steve Chartier was the supervisor for that short period of

20   time when he went to Northtown, the 90-day period.  Now we

21   have Don Sanders, the track inspector.

22           Don Sanders, the evidence will show you, was a

23   hard worker.  He left home at the age of 16.  He has worked

24   at gas stations, bakeries, construction companies.  He

25   worked at the Ford plant until it closed.  The Ford plant,

1    St. Paul, we all recall that it closed in 2007.  It was then

2    that he went to BNSF and started working as a track laborer.

3          In 2010, he would get what he describes as the

4    best and most important job that he ever had as track

5    inspector.  He worked as a track inspector for six years.

6    Even Blaine Hoppenrath admits that he was good at track

7    inspecting, very good at identifying defects.

8          He actually would befriend the Federal Railway

9    Administration local representative who would walk with him

10   and make sure that he understood how to identify defects.

11   He got tier one, tier two, and tier three training.  He

12   carried this (indicating) book with him, which is the "Track

13   Safety Standards" by the Code of Federal Regulations.  He

14   looked at this book and consulted this book to make sure

15   that he was following the law when he made these reports.

16         This is important work.  Don Sanders will tell you

17   that his byline was if you see something, say something,

18   what we see at the airport.  He can be charged with a

19   willful violation of this law for failing to report.  He's

20   required to make these reports when he sees a track defect.

21   He thought of himself as being in the business of saving

22   lives.

23         And he was very diligent because he had seen the

24   results of the property damage.  He knew these trains go

25   through the neighborhoods.  You see, BNSF in this area owns

1   the track.  It's their responsibility to keep it safe -- not

2   just for BNSF, but for the neighborhoods it goes through for

3   transportation:  Amtrak, the passenger trains.  He's keeping

4   it safe for all of those people, and he thought of this as

5   extremely important work.

6          And he tried to get it right.  As I said and even

7   Blaine Hoppenrath will say, he was very good at identifying

8   defects.  See, because track inspectors sometimes get called

9   out on the track in middle of the night for the most tragic

10  circumstances.  And Don had seen these accidents.  And he

11  went to the track many times and found human body parts.

12         So he knew what was at stake when he was

13  inspecting track.  He knew how important this work was.  And

14  when I say he worked hard to get it right, he worked hard.

15  In 2015, he worked by the records -- and we'll show you some

16  of these records.  They're not that easy to read, as you can

17  see.  You have to sort of blow them up.  But when you look

18  at the records in detail, what you see is that he worked 310

19  days in 2015.  So if we break it down in that time frame,

20  July of 2015 he works every day but one, every single day.

21  August of 2015 he works every single day.  September of 2015

22  he worked every single day.

23         They were short-staffed for track inspectors and

24  there was a reason for that.  It's a very high-pressure job.

25  When you report a defect, especially on a weekend, your

1    co-employees have to come out and fix the defect sometimes

2    at odd hours, sometimes in the middle of the night.

3         And when you're reporting defects and taking

4    tracks out of service, you're hurting the one thing they

5    care most about:  velocity.  And you hear about it.  Don

6    Sanders heard about it.

7         In the latter part of 2015, a couple things are

8    happening.  First of all, all the oil that's coming from the

9    Bakken area of North Dakota, which the trains were hauling a

10   great deal of, was slowing down.  There was pressure to

11   increase revenue, and that pressure trickled down to Don

12   Sanders as a track inspector.  He was challenged, screamed

13   at, sworn at.  And, as I said, his wife -- and they're

14   separated now, but she'll testify in this case -- was a

15   witness to these conversations.  She heard them on the

16   speakerphone; others did as well.  But, as I mentioned, he

17   has recordings of some of these calls.

18        So he went to HR in November of 2015 and reported

19   them.  December 7th is when he met with human resources.  He

20   played the phone calls for them, some of the calls.

21        This complaint is supposed to be confidential.  A

22   couple things happened.  First of all, they tell him his

23   complaint of harassment and retaliation is not sustained.

24        Mr. Jones receives a letter of coaching, a

25   coaching letter.  Mr. Jones, when Mr. Sanders gets fired,

1   gets a congratulatory message in writing, and orally he's

2   congratulated for firing Don Sanders.

3          But this complaint that's supposed to be

4   confidential, this is what happens after he makes the

5   complaint:  They take his truck away, his work truck away,

6   which because he has to go to different locations makes his

7   job that much harder.  They change his hours, and they send

8   him home.  They bring other people out to do his job.

9          So he decides to transfer.  He decides I need to

10  do something when HR tells him that, and he transfers to

11  Northtown.  Within a few days, he reports slow orders

12  because there's frogs -- that area of the track that comes

13  together -- that need repair.  And these are particularly

14  sensitive areas.

15         He's called by Mr. Chartier, who calls a co-worker

16  and then calls him.  And, again, Don is on the speakerphone

17  so this call can be heard.  And pardon me for this, but

18  Mr. Chartier says to him, You're not going to pull the same

19  shit in this area that you pulled at Dayton's Bluff, and

20  screams at him for making these reports, these reports that

21  are required.

22         So he doesn't stay very long, because it doesn't

23  get better when he transfers.  It actually seems to be

24  getting worse.  And he's now in an area that he doesn't

25  fully know.  So that's more uncomfortable.  So he decides to

1  go back to Dayton's Bluff.  He is back there -- the first

2  day he's back there is March 15th of 2016, and then things

3  start happening very quickly.

4          But before I get to that key time frame, let me

5  talk to you about how the time entry system worked, because

6  this is important.  There's no time clock or at least there

7  wasn't at the time at BNSF.  They didn't have a place on

8  your phone you could push or anything like that.  You

9  reported your own time on a sheet of paper.  And you were

10 supposed to report it every day, but a lot of times you were

11 there working late at night, you didn't work the amount of

12 time that you thought you were going to work, you'd have to

13 go back and then put your time in.

14         So what people did and what you will hear was the

15 custom and practice of the employees at the time was they

16 would put in their time for a daily entry and then go back

17 and amend it, modify it before the payroll closed to make

18 sure that the time entries were correct.  People routinely

19 did that.  It is undisputed in this case.  Blaine Hoppenrath

20 admits that employees could do that.  When she was asked if

21 they could do that, she said simply, "Yup."  No exceptions,

22 yes.  You go back and modify your time before the payroll

23 closes to get it right.

24         So how does this work?  You enter your time in a

25 self-report.  You go back before the time closes.  You could

1    even amend your time after the payroll closes.  But you

2    could clearly do it -- undisputed you could do it before the

3    payroll closed.

4              So what are the policies that were in place, the

5    practices and policies that protected people around this

6    self-reporting of time?  First of all, the employee could

7    change his time, undisputed.  The employee -- the supervisor

8    would review the time before payroll closed.  That's number

9    two.  Three:  Typically, the supervisor would call the

10   employee if there was an issue about a time entry or two or

11   whatever.  They'd call and talk to him.

12             The Collective Bargaining Agreement requires

13   notice to the employee of any problem with their time,

14   notice that," I don't think you worked these three hours on

15   that day, Joe.  Let's talk about that."

16             There was also a common practice called a cut

17   letter.  And you could get a cut letter even months after

18   the payroll closed.  Employees might get a cut letter three

19   months later saying we're cutting your time for this.  We

20   don't think you worked all of those hours that you

21   self-reported on that time sheet.

22             And, by the way, changing your time is

23   specifically outlined in a policy, a written policy by BNSF.

24   It tells you how to change your time as an employee.

25             And then if you were called up on discipline, they

1   might give you a waiver.  In fact, for Mr. Jones --

2   Mr. Jones, who I talked about before, who was the

3   supervisor's supervisor -- has investigated and disciplined

4   two other employees for so-called time theft before, giving

5   both of them a waiver from discipline.  Mr. Sanders was not

6   offered a waiver.

7         BNSF will offer you evidence about, well, in this

8   other place at this other time, different employees have

9   been terminated.  We know very little about those cases.

10  What we do know is Mr. Jones had two similarly-situated

11  people that he disciplined and treated completely different.

12        So March 15th, this is sort of the heart of the

13  matter, March of 2016.  Mr. Sanders arrives back at Dayton's

14  Bluff on the 15th.

15        March 18th, a Friday, Ms. Hoppenrath decides to

16  ride along with him as his supervisor and rides with him

17  doing the track inspection.  Nothing remarkable happens on

18  the tracks.  She admits he's good at track inspecting.  But

19  she says he told her that he wanted to leave early that day.

20  And he was supposed to leave at 3:00 -- or she said, He told

21  me he was going to leave by 3:00.  And she looked around at

22  3 o'clock and he wasn't there, apparently, and so she says

23  she became suspicious that day for the first time that he

24  was writing down more time than he was actually working.

25        The next day, March 19th, a Saturday, Mr. Sanders

1    is working alone track inspecting.  On that day, across the

2    tracks in an unmarked rental car is Blaine Hoppenrath.  Her

3    entire job, apparently, is to watch Mr. Sanders to see if

4    anything is amiss.  She says she didn't see him at 8:30.

5    The evidence is going show that she was surfing the Internet

6    at 8:30 and posting on Instagram while she was apparently

7    surveilling Mr. Sanders.

8           Mr. Sanders actually went to Bridal Veil to clean

9    out his locker before he started his regular shift or

10   started his regular work that day.  That was part of his

11   work, but she told him he couldn't have a locker at Bridal

12   Veil.  Remember, he's just coming back to Dayton's Bluff.

13          She says she got suspicious enough that she

14   continued the unmarked car surveillance from across the

15   track.

16          On March 25th, the Friday before Easter, Sanders

17   is working alone track inspecting.  This is Good Friday to

18   some.  Mr. Sanders is going through some marital

19   difficulties at the time, says in retrospect -- said at the

20   time, "I probably shouldn't have been going in that day."

21   There's a full day entry for that day.  He did not work a

22   full day.

23          March 26th, the Saturday before Easter, Sanders is

24   again working alone track inspecting.  Again, there's a

25   full-day entry in for that day.  He did not work a full day.

He intended to change those in accordance with the normal practice, and payroll had not closed.  He has always said that.  He has never said anything else.

March 28th.  March 28th, that Tuesday [sic].  Mr. Sanders doesn't go in on Monday, March 28th -- or that's a Monday, I'm sorry, March 28th.  BNSF drafts notices of investigation seeking termination of Mr. Sanders for payroll theft, a payroll that has not even been paid yet.

In this case they're going to talk about it as time theft, because the payroll hasn't been paid when they accused him of theft.

March 29th Mr. Sanders goes in early in the morning.  He was always on time.  He was never late.  He gets there early.  There's a lot of hustle and bustle.  He's starting his workday, starting to make entries.  And they give him a notice of investigation seeking job termination and publicly accuse him of payroll theft and walk him out of the station house before the payroll has even closed.

April 1st the payroll closes for the last period of March.

What's the legal construct for this case?  The Court has already given it to you.  Mr. Sanders has to prove that his protected activity -- his reporting of these defects, his engaging in protected activity reporting to human resources, that's the protected activity; his

1      reporting of defects which were required by this

2      (indicating) law, this handbook he carried, and making the

3      report to human resources, that that played a part in their

4      decision to terminate him in whole or in part.

5             If he proves that, then the burden shifts to BNSF

6      to prove that they would've made the same decision anyway.

7      Mr. Sanders has to make out his burden by a preponderance of

8      evidence.  BNSF has to meet their burden by clear and

9      convincing evidence.  How will Mr. Sanders demonstrate this

10     in this case, that it was a contributing factor?

11            They gave him no opportunity -- these are all

12     standard practices.  They gave him no opportunity to modify

13     his time.  Actually, on that Tuesday, March 29th, he tried

14     to get his time right.  They escorted him off the property.

15     He still tried to get it right.  He knew it wasn't right.

16     And they blocked him.  They specifically blocked him from

17     putting in the correct entries.  No conversation with him,

18     no asking Don.

19            And, by the way, what we're talking about in the

20     evidence in this case for a man who worked 310 days and

21     every day of August and September, we're talking about less

22     than seven hours.  Six hours and 45 minutes is what they

23     contend that he put down on his daily sheet that he did not

24     actually work.  No conversation about that.  No notice to

25     him required by the Collective Bargaining Unit.  No cut

1    letter.  Nothing from BNSF saying, you know, we're just not

2    going to pay you for this extra time.  This doesn't look

3    like time you actually worked.  No offer of a waiver, which

4    was offered to similarly-situated people working for Keith

5    Jones.

6            That same evidence will go to the issue of whether

7    or not they can possibly meet their burden of the same

8    decision.  What they will say:  Well, they will tell you

9    that there was a fair and impartial hearing, a union hearing

10   where Mr. Sanders was found to have violated policies and

11   the terminations were upheld.  Remember I said they gave him

12   notices of investigation.  They actually gave him two

13   notices of investigation.

14           This is how that hearing works:  There's no

15   discovery.  You walk in.  You don't know what the company is

16   going to say.  You have no right to subpoena witnesses.  If

17   some of your co-employees decide that they're going to come

18   and testify for you against the company in front of the

19   managers, they don't get paid.

20           If the company calls the witnesses and they want

21   people to come, they come in and testify for the company

22   against Mr. Sanders, they do get paid.

23           You have no right to a lawyer.  You get a union

24   representative.  No one is placed under oath.  And the judge

25   in the case is a member of the management of BNSF.  That's

1    the sole judge, a BNSF manager.  As you can imagine, very

2    few employees win these hearings.

3           And what we'll be talking about in this case, by

4    the way, is intentional discrimination.  At the end of the

5    day, it's not an accident.  It's intentional.

6           The notices of investigation:  There were two, one

7    for the 19th, and the evidence I think will show you he

8    worked the entire day that he put down; and one for the 25th

9    and 26th.  They were coming after him with both barrels.

10   Each one of them gave rise to a different hearing making

11   sure -- as Mr. Sanders is never offered a waiver -- making

12   sure that Mr. Sanders will be terminated.

13          They also say that Fort Worth reviews those

14   investigations.  Just like the hearing officer, the Fort

15   Worth person is a BNSF employee looking at whether another

16   BNSF manager has made, in their view, some kind of mistake.

17          They will say that Mr. Sanders tried to change his

18   entries on the 29th and that that demonstrates his guilt.

19   Mr. Sanders was trying to get the time right.  That was what

20   he planned to do all along.  He has always said that.  He

21   has always said that.  Those were placeholder entries.  They

22   were not correct.  He has never maintained anything else.

23          And what was more significant about that sequence

24   is when they discovered he was in getting his time right

25   before the payroll closed, they shut him out.  They wouldn't

1    let him put in the correct time entries.

2          They will also say that Mr. Sanders recorded these

3    conversations and therefore he cannot be trusted.

4    Mr. Sanders did record conversations because he was afraid

5    for his job, because people were telling him things orally

6    that they would not put in writing, and he had lost trust.

7    So, yeah, he did record the conversations.

8          There's a Latin term, ad hominem, which just means

9    at the person.  It's not about the argument.  It's at the

10   person.  And I ask you to consider that as we go through the

11   case.

12         Before, way before, or way after are we talking

13   about what happened?  When BNSF raises questions, are we

14   talking about what happened in the sequence or are we

15   talking about something that happened long ago or before or

16   something that happened after?  And why are we talking about

17   that?

18         On the issue of damages, if Mr. Sanders proves his

19   case, he's entitled to damages.  He's entitled to back wages

20   to the date of this trial if you determine that those are

21   appropriate.

22         And I think they're going to say that he should've

23   tried harder or gotten a different position or did more.

24   Mr. Sanders has a family and children and responsibilities,

25   and he is a hard worker.  And the evidence will show you he

1     went through many jobs trying to replace the good and

2     important job that he had at BNSF.  He went through many

3     jobs.  He has done the best he could.

4          There's also one other component of damages for

5     you to consider and that's emotional distress.  And they

6     will say, well, he has other stressors in his life.  He has

7     heart problems; he does.  He has health issues.  They'll

8     say, well, he smokes or has smoked; shouldn't do that.  All

9     of that's probably right.  At the end of the day what

10    Mr. Sanders is here for is he lost the best and most

11    important job he ever had, marched out in front of his

12    co-workers, sent home to talk to his family about being

13    terminated for payroll theft before the payroll even closed

14    because he stood his ground.

15         Thank you.

16         THE COURT:  Ms. Ferguson.

17         MS. FERGUSON:  Thank you, Your Honor.

18              **DEFENDANT'S OPENING STATEMENT**

19         MS. FERGUSON:  May it please the Court, counsel,

20    Members of the Jury:

21         This is a case about time theft and time theft

22    alone.  Despite the effort to divert your attention, it's

23    about time theft.

24         Mr. Sanders was dismissed after two investigation

25    hearings produced evidence that established that he

1    falsified his payroll not once, not twice, but three times.

2           So you'll hear from various people throughout the

3    next several days.  Blaine Hoppenrath was his supervisor in

4    March of 2016, and she'll come here and testify and tell you

5    why she became suspicious and why she began to follow

6    Mr. Sanders.  And she'll tell you that on March 18, 2016

7    Mr. Sanders told her, "I have to leave by 3:00."

8           Now, track inspectors work very independently.

9    They're not followed.  But something caused her to want to

10   follow him, and that was he was gone before 3:00.  But when

11   she looked at the time records, he billed payroll for a full

12   eight hours, and she thought that's not right, I'm going to

13   check and see, so on March 19 she did.  She did just that.

14          Now, Mr. Sanders' home terminal at that point was

15   Dayton's Bluff.  So she got to Dayton's Bluff at 8 o'clock.

16   His typical hours were 7:00 to 3:00.  His car wasn't there.

17   The hi-rail truck -- you'll hear about how they do track

18   inspecting, and they use a hi-rail truck.  And before they

19   begin inspecting, they get authority to be on the track.

20          So his truck wasn't there.  The hi-rail wasn't

21   being used.  So she went back at 8:30.  No sign of him.  She

22   went back at 9:15 and she saw his vehicle in the parking lot

23   and the hi-rail was being warmed.

24          He worked that day from 9:15 -- or she observed

25   him from 9:15 until 1:53, less than five hours.  But yet he

1   submitted a payroll entry that day as final -- in final

2   form, not a draft -- for eight hours.

3          So she said to her boss, Keith Jones, What should

4   I do?  And Mr. Jones said, Call Labor Relations.  They can

5   direct you.  And Labor Relations said, Why don't you follow

6   him another time just to make sure this wasn't a fluke, and

7   so she did.

8          And so she followed him on March 25.  He arrived

9   that day at Dayton's Bluff at 7:00 a.m., and he left at

10   10:13, three hours and 13 minutes later.  But he marked his

11   time that day as final at 8.5 hours.

12          So she followed him again the next day.  This time

13   she didn't see him arrive on March 26th, but he left at

14   10:56 in his personal vehicle.  And the track records

15   indicate that he didn't track inspect for more than 2.5

16   hours.  But that day he put nine hours of work as final.

17          So based on this information, these three days of

18   payroll falsification, an investigation was held.

19          So what you need to know about this process is

20   that Mr. Sanders as a track inspector is a member of the

21   union.  And you'll hear about a Collective Bargaining Unit

22   that gives Mr. Sanders rights that other employees that

23   aren't union members don't have.

24          He has a right to notice of an investigation.  He

25   has a right to representation.  He has a right to call

1    witnesses.  He has a right to present evidence.  He has a

2    right to appeal.  He had all of those rights as a union

3    member.

4            And, interestingly enough, after the first

5    investigation notice is issued and before the hearing,

6    Mr. Sanders goes in and changes his time from March 25th.

7    But instead of getting it right, he gets it wrong.  He

8    changes his time to 4.5 hours, but, again, he only worked

9    three hours and thirteen minutes.

10           So then again he did the same thing for the next

11   day, March 26.  He changed his time that day and removed one

12   hour of overtime but still charged eight hours.

13           So you'll hear about two hearings that are held.

14   And Mr. Sanders, I expect, will tell you that his position

15   was at that first hearing, well, I wasn't at Dayton's Bluff.

16   I was at Bridal Veil cleaning out my locker.  And he

17   presented at the investigation GPS records which showed

18   where his truck was.  But guess what, there's no record of

19   it being at Bridal Veil.  And he says:  You know, after I

20   left Bridal Veil, I got in my own vehicle and I inspected

21   track.  But there's no record of any track authority that he

22   had before 9:00 that day.

23           He went to the next hearing on April 8, and what

24   he said as to the March 25 time entry, I was wrong.  But I

25   wanted to change it.  But he changed it and he still got it

1     wrong.  Same thing with March 26:  He knew he entered the

2     incorrect time.

3            Now, the decision to terminate doesn't end with

4     the investigation.  What happens at BNSF, they cannot

5     terminate an employee without a multi-step review process,

6     and that's what was held here.

7            So the first step in the process after the

8     investigation was Mr. Jones looked at the transcript.  And

9     based on what he saw, both the investigations, he

10    recommended termination.

11           That decision then went to his boss, Doug Jensen.

12    Doug Jensen recommended termination.  And then the next

13    person in the process is a person in Labor Relations at Fort

14    Worth, Texas.

15           Stephanie Detlefsen is going to come here and

16    testify and tell you what she does when she reviews

17    transcripts and is involved in the decision of termination.

18    And she says, I don't care what anybody else says.  I don't

19    care about Keith Jones' recommendation.  I'm going to review

20    the transcript and make sure that it supports dismissal.

21    And she said in this case it supported dismissal.

22           So it didn't end there, though.  So you'll hear

23    the union rep that represented Mr. Sanders, John Mozinski.

24    He appealed this decision to BNSF, and the decision to

25    terminate was upheld.  And then it was appealed to another

1    entity and the decision to terminate was upheld.  And that

2    entity was an independent third party.  And then there was a

3    complaint filed and the decision to terminate was still

4    upheld.

5              So to suggest that this is retaliation by Keith

6    Jones or anyone else simply falls apart because there are so

7    many layers to the review process.

8              Mr. Sanders wants you to believe in this case that

9    he was terminated because he reported track defects.

10   There's no credible evidence to support that.  His job is to

11   report track defects.  He worked that job from 2010 until he

12   was terminated.  He reported hundreds of track defects.  He

13   took tracks out of service a lot of times.  He placed slow

14   orders hundreds of times.  It's his job ensure the safe

15   passage of trains.

16             And here's why BNSF wants to make sure those

17   tracks are safe:  Because if they're not, there could be a

18   derailment which results in substantial property damage,

19   injury to person, and that disrupts trains, and that affects

20   velocity.  So they want to get it right.  They want the

21   proper defects reported.  His job was to identify the

22   defect, protect the track, whether that meant slowing down

23   the train or taking the tracks out of service.

24             You'll hear from Keith Jones and Steven Chartier

25   about the importance of reporting defects.  You'll also hear

1    from Justin Hughes out of Fort Worth.  He'll tell you about

2    BNSF's investment in ensuring that tracks are properly

3    inspected.

4         BNSF has what's called geometry cars.  And these

5    are cars, inspection cars, that are pulled by train across

6    the track specifically to find track defects.  Again,

7    they're trying to make sure that there aren't derailments.

8    So it makes no sense to suggest that Mr. Sanders shouldn't

9    report track defects because a geometry car could find it if

10   he didn't.

11        And there's another level of check on these track

12   inspectors and that is FRA, the Federal Railroad

13   Administration.  They've got their own track inspectors.

14   They inspect BNSF tracks.  If they find a defect, they write

15   it up.  So there's no way BNSF could discourage track

16   inspectors from properly reporting track defects.  The

17   evidence simply isn't there to substantiate this.

18        Now, there was reference made in opening about

19   incentive not to report.  And there'll be talk about

20   scorecards or dashboards and the importance of keeping

21   defects down and slow orders down.  It's simply not the

22   case.

23        You'll hear about scorecards as being a dashboard.

24   One witness will describe it as a one-stop document for

25   managers and directors to see how their territory is doing.

1    You might have a territory that's had floods and those

2    tracks are going to be in sad shape, and they need to find

3    the capital to put in that territory.  It's not unlike any

4    other business that measures efficiency and productivity.

5            You'll hear about ICP bonus.  Yes, BNSF managers

6    are paid a salary, and they're paid a bonus depending on how

7    the company does.  And the company does better if they don't

8    have derailments and damage to property and person.

9            You heard discussion in opening about the

10   reporting to HR, and Mr. Sanders feeling like he was

11   retaliated.  He did report to HR.  And you'll hear from the

12   people at HR about what their investigations were and his

13   complaints.

14           And you'll hear that Keith Jones actually received

15   a coaching and counseling letter.  You'll hear some

16   recordings.  And there is profanity used.  And BNSF said

17   that's not appropriate.  You can't do that.

18           And, interestingly enough, in an effort to save

19   his job after the first investigation, Mr. Sanders made

20   another complaint, hotline complaint, again reiterating the

21   complaints he'd made months earlier.  And those complaints

22   were investigated and not substantiated.

23           At the end of this case, we'll come before you and

24   ask you to make the only decision that makes sense based on

25   this evidence, and that is that Mr. Sanders was terminated

1    for time theft.  He falsified his payroll on three

2    occasions.

3            Thank you.

4            THE COURT:  Mr. Kaster, is Mr. Sanders prepared to

5    call his first witness?

6            MR. LUCAS KASTER:  Yes, Your Honor.  Mr. Sanders

7    calls -- sorry -- Mr. Keith Jones for adverse examination.

8            THE COURT:  Mr. Kaster, I understand we're going

9    to take just a five-minute break to set this up.

10           Members of the jury, we're going to set up the

11   video conference at this time.  We will take a very short

12   break to allow us to do that and continue when that's done.

13   So that'll be a break of about five minutes, I guess.

14           All right.  We'll adjourn.

15           THE LAW CLERK:  All rise.

16      (Recess taken at 3:41 p.m.)

17                        *     *     *     *

18      (3:50 p.m.)

19                       IN OPEN COURT

20           THE COURT:  All right.  Please be seated.

21           We'll begin by administering the oath.

22           THE COURTROOM DEPUTY:  Please state your full name

23   for the record, spelling your first and last name.

24           THE WITNESS:  Keith, K-E-I-T-H, David, Jones,

25   J-O-N-E-S.

 1              THE COURTROOM DEPUTY:  Please raise your right

 2     hand.

 3              **KEITH D. JONES, PLAINTIFF'S WITNESS, SWORN**

 4              THE WITNESS:  I do.

 5              THE COURTROOM DEPUTY:  Thank you.

 6              THE COURT:  Mr. Kaster.

 7              MR. LUCAS KASTER:  Thank you, Your Honor.

 8

 9                       **CROSS-EXAMINATION**

10     **By MR. LUCAS KASTER:**

11     Q.  Good afternoon, Mr. Jones.  My name is Lucas Kaster.

12     I'm one of the attorneys who's representing Mr. Sanders.

13              Obviously, we are all remote.  So if at any time I

14     break up, you can't hear me or understand me, just let me

15     know that.  Okay?

16     A.  Okay, and same for me as well.

17     Q.  Will do.

18              Mr. Jones, you were hired by BNSF in 1992, is that

19     right?

20     A.  That is correct.

21     Q.  And during your career you've held multiple different

22     positions, right?

23     A.  That is correct.  That is correct.

24     Q.  You started in a maintenance crew?

25     A.  Yeah.  I started on as a trackman laborer back in June

1    of '92.  Yes.

2    Q.  And that's a scheduled position, right?

3    A.  That is correct.

4    Q.  What does that mean, to be a scheduled position?

5    A.  Scheduled means you're actually doing the work.  So

6    you're in the union.  As you hire on, you've got a 60-day

7    trial period that you do the work.  They observe you, make

8    sure you can handle -- make you have the work -- the right

9    work ethic for BNSF, that you can handle -- the skills, you

10   can withstand the elements that we work in, the hours that

11   we work, and just see.  And after 60 days you start paying

12   union dues.  So you're protected by the bargaining

13   agreement.  And then you just kind -- at that point you

14   start your seniority.  And you just work your way up on

15   different positions, different things like that, based off

16   your skill set and what your ambitions are for BNSF.

17   Q.  You also served as an assistant roadmaster?

18   A.  That is correct.

19   Q.  And then you became a roadmaster?

20   A.  Yes.

21   Q.  And then you were the manager of roadway planning in the

22   Southwest Division, right?

23   A.  Yes, sir.

24   Q.  And then you became a division engineer?

25   A.  That is correct.

1    Q.  And you became a division engineer in 2013?

2    A.  Yes.

3    Q.  At what point -- because a division engineer is a

4    nonunion position, right?

5    A.  Yeah.  All the positions you named from assistant

6    roadmaster up were all nonunion.  They were all exempt is

7    what we call them.

8    Q.  Okay.  And you became a division engineer in the Twin

9    Cities East Division, is that right?

10   A.  That is correct.

11   Q.  And what's the geographic area the Twin Cities East

12   encompasses?

13   A.  It has portions of Superior up into the Duluth area,

14   goes across kind of the northern part of the state, across

15   what's called the lakes:  Casco, Grand Forks subdivision

16   over to a little town -- a little place called Benoit.  I

17   have the Staples sub that goes across -- kind of angles

18   across the state of Minnesota.  Frazee is as far west as I

19   go.  So that's geographically -- or mile post 200 on the

20   Staples sub.  And it goes all the way into Northtown, which

21   is in Minneapolis.  As far south as I go towards Chicago is

22   Hastings.  Down towards the south, you know, that's part of

23   the St. Paul.  And then I've got a little bit of the Wayzata

24   out towards the actual -- the town of Wayzata.  And then

25   I've got all the tracks in the middle of that.  Hinckley sub

1    that comes out of Minnesota -- or out of Twin

2    Cities/Minneapolis, and it goes up to Duluth and Superior

3    area.  So I have about 1,350 miles of track in that square

4    area that I kind of named.

5    Q.  And there's a division engineer that is over the Twin

6    Cities West Division as well, right?

7    A.  That is correct.

8    Q.  And I'm assuming that person has a separate geographic

9    area?

10   A.  Yep.  He picks up where I stop at Benoit.  He goes

11   farther west, and then he takes it -- Frazee, same deal.  He

12   goes farther west from there.

13   Q.  And there are only two division engineers in the Twin

14   Cities Division?

15   A.  No, sir.  There's a Twin Cities South as well.

16   Q.  How would you describe your duties and responsibilities

17   as a division engineer?

18   A.  Very challenging.  Very important.  A lot of moving

19   parts.  A lot of people to manage, you know, from the

20   schedule to the -- my direct reports, which I refer to them

21   as either FLS or frontline supervisors, roadmasters.  And

22   then I bring on new assistant roadmasters that work for me.

23   SES, which is a supervisor engineering support that does a

24   lot of work to support the FLS, the assistant roadmasters,

25   and the scheduled ranks as well.

1          So it's very challenging, and there's a lot of

2     moving parts, and there's a lot of changes.  You need to

3     understand the state policies, the federal policies, our

4     BNSF policies that change.  Make sure the training is going

5     off.  Make sure everybody understands.  Make sure

6     everybody's working safe.  Observe people on their

7     day-to-day travels, on their day-to-day work activities.

8     And then just, you know, spend the time with them in the

9     field.  And then make sure that my supervisor teams are

10    training appropriately, having the right monthly safety

11    meetings.  Making sure they're taking care of their

12    territories.  Making sure they're getting their capital

13    plans, meaning the forecasted plans for the next few years.

14    Making sure they're getting the right data captured.  That

15    way we can get upcoming rail relays, upcoming tie plans,

16    turnout replacements, all kinds of stuff.  They have to make

17    sure they're getting the right data put in and forecasting

18    ahead so we can stay ahead of the changes in the railroad --

19    you know, just how the things wear out over time.

20    Q.  You referenced FLS or frontline supervisors.  Those are

21    roadmasters, right?

22    A.  That is correct.

23    Q.  And roadmasters are your direct subordinates?

24    A.  That is correct.

25    Q.  And then you mentioned assistant roadmasters, who I'm

1    assuming are directly underneath roadmasters?

2    A.  Yeah.  It's kind of like an apprenticeship job.  So they

3    come in and then they fill in.  If a roadmaster has a lot of

4    work on their territory, they'll go help and assist or if

5    they're on vacation or something like that.

6          So they're just kind of developing for to the next

7    -- like if a roadmaster promotes up to the next position,

8    typically your FO -- or you're assistant roadmaster is

9    trained, ready to maybe fill that gap if he or she is

10   interested in that location.

11   Q.  And track inspectors would be supervised by roadmasters

12   or assistant roadmasters, right?

13   A.  That is correct.

14   Q.  So you would be the second level up from an inspector,

15   assuming there's no assistant roadmaster?

16   A.  That is correct for the most part, yes.

17   Q.  As a division engineer, do you monitor the hours the

18   employees under your direction are working, including their

19   overtime?

20   A.  Yeah, to a point.  I mean, we've got programs that we

21   run to see if overtime is high.  You know, it drills down to

22   people that show to be maybe having higher overtime or maybe

23   put in if they're out on a project or working a derailment

24   or work something like that you just kind of supervise.

25          So I have access to all the hours, if needed,

1    something that maybe seemed a little bit high or a little

2    bit excessive as opposed to the other locations or other

3    positions like that.

4    Q.  And you generally review hours for your subordinates on

5    a weekly basis, right?

6    A.  Yeah.  It varies.  It depends on how many moving parts.

7    A lot of times our busy season is -- obviously, once the

8    snow falls, the ground thaws and we're doing a lot of work.

9    So I'm look at the capital spend rates, making sure that

10   they're charged to appropriately, just making sure that

11   they're even charging to them because we get different

12   buckets of money for each project based not just off of our

13   operating allocations.  We get what's called AFEs or capital

14   authorities for expenditure.  So those have to be kind of

15   tracked and make sure that everything is reported

16   accurately.

17   Q.  Mr. Jones, I asked you before we started if you had a

18   copy of your deposition transcript.  Could you pull that out

19   for me.

20   A.  Yes.

21   Q.  And just turn to page 105.

22   A.  (Complies.)  I only go up to page 50 -- oh, sorry.  It's

23   the little bullet point.  Okay.  Hold on.  I was looking at

24   the top numbers at the top here.  Okay.

25   Q.  And do you see on line 14 you were asked this question:

1            "Q.   Okay.   Do you monitor the employees under

2       your direction, like their hours and how often they're

3       working and overtime?"

4            Your answer:  "Yeah, high level.   I mean, I --

5       like I said, reports of, you know, individuals putting in,

6       you know, high levels of overtime."

7            "Q.   How often do you check that, would you say?"

8            Your answer was:  "Maybe on a weekly basis one day

9       out of the week."

10           That was your answer in your deposition, right?

11      A.   Yeah, that's what it shows here.   Yes.

12      Q.   Now, as a division engineer you have a direct boss as

13      well, right?

14      A.   That is correct.

15      Q.   And that boss is a general director?

16      A.   Yes.

17      Q.   And there's one general director for the Twin Cities

18      division?

19      A.   That is correct.

20      Q.   And back in 2015, that general director was Doug Jensen,

21      right?

22      A.   That is correct.

23      Q.   And then after Mr. Jensen it was Robert Rindy?

24      A.   That is correct.

25      Q.   And what's the job title of the general director's boss?

1    A.  The general director's boss?

2    Q.  Correct.

3    A.  That's the North Lines AVP.  He just has a team of --

4    well, we're talking six years of changes here.  So we've

5    done away with some of the operating locations.

6              So I believe, you know, just high level, he

7    oversees the -- you know, just how the divisions are running

8    based off the GDM's roles and responsibilities.  That means

9    that they're training the signal managers, DEs, structures

10   managers at the time.  So he just oversees that we're doing

11   that training, setting expectations, things of that nature,

12   you know.

13             And then the AVP would be just double-checking

14   that -- the history or how well the territories are running

15   based off of safety and derailments.

16   Q.  You said before -- you said GDM.  I'm assuming that's

17   the general director of line maintenance?

18   A.  GDLM, yes.

19   Q.  Okay.  And that's Mr. Jensen and Mr. Rindy?

20   A.  That's correct.

21   Q.  And above them was the AVP.  Back in 2015, that was Dave

22   Hesterman, right?

23   A.  That is correct.

24   Q.  And in 2015 in the Twin Cities East Division, there was

25   a time when there was no roadmaster under your direction, is

1     that right?

2     A.  No roadmaster -- say that again.

3     Q.  Sure.  Back in 2015, while you were a division engineer,

4     in the Twin Cities East Division, was there a time without a

5     roadmaster?

6     A.  Back then I had six of them.  So I don't know what

7     particular you're asking.  There might've been a brief stint

8     at one of the places that may have promoted or done

9     something that I was in process of hiring new.  But I

10    wouldn't have been without any roadmasters, if that's what

11    you're asking.

12    Q.  Okay.  And I should've been more specific.  I appreciate

13    that.

14          In Dayton's Bluff, St. Paul, was there a period

15    when there was no roadmaster?

16    A.  Yeah.  As I said, it's a blur from the timeline of all

17    of this, lot of moving parts.  There was a time when William

18    Schumake was the roadmaster there when I first arrived on

19    the position.  I can't remember when he promoted out and

20    when Blaine actually come in.  There could've been a portion

21    of time whenever there was waiting for the approvals and

22    maybe her to finish up on her gang stuff or something like

23    that to come in.

24    Q.  And you referenced "Blaine."  Is that Blaine Hoppenrath?

25    A.  That is correct.

1    Q.  And when she became the roadmaster in Dayton's Bluff,

2    was that the first time that she was a roadmaster?

3    A.  Yes.  She was an assistant roadmaster on the capital

4    gang, one of the big production tie gangs.  But this would

5    be her first territory roadmaster job.

6    Q.  Now I want to switch gears a little bit and talk about

7    track inspectors.  Track inspectors are a federally-mandated

8    position, right?

9    A.  Well, the -- not the inspector job is federally

10   mandated, just making sure that we meet the timelines and

11   the requirements of inspecting track.  We can do that with

12   whatever position that is qualified to do that under the FRA

13   training and stuff like that.  So we can use foremans.  We

14   can do whatever.  But BNSF, you know, has the positions out

15   there that are track inspectors that primarily do our

16   inspections.

17   Q.  And whoever is doing those track inspections have to be

18   qualified under the federal regulations, right?

19   A.  That is correct.

20   Q.  And in Dayton's Bluff back in 2015, there were three

21   types of track inspectors.  There was a main line inspector,

22   there was a yard inspector, and then there was a thing

23   called a relief inspector, is that right?

24   A.  That's correct.

25   Q.  And a main line inspector's primary responsibility is to

1    ride along and inspect what are called the main line tracks?

2    A.  That is correct.

3    Q.  And the main line tracks are where all the traveling

4    trains travel along to get from, for example, Minneapolis to

5    Chicago?

6    A.  Yeah.  Typically, the main line are a little bit higher

7    speed and they're not doing any yard switching or anything

8    like that.  They're just kind of a through route, the main

9    thoroughfare.

10   Q.  And then the yard inspections are actually the locations

11   where the trains are loaded up and that the trains are

12   connected to each other and then taken out onto the main

13   line, is that right?

14   A.  That is correct.

15   Q.  And that's what we all would consider when we drive by

16   something and there's all of these train cars lined up kind

17   of sitting there still?  That would generally be considered

18   a yard?

19   A.  Yeah.  That or a siding or something like that, yes,

20   secondary.

21   Q.  And then what's the relief inspector?

22   A.  So back in this time when we had those out there, we

23   were -- with all of the oil traffic and things that was

24   running we just had -- you know, it was -- a lot of times

25   for a person to run seven days a week and things like that.

1    So they come in.  They would run the days off from the

2    normal main line inspector.  They just had the offset days.

3            So if an inspector would run through Monday

4    through Friday or let's say Tuesday through Saturday, the

5    other one would run Monday through Friday or however the

6    days intersected there.

7    Q.  And the job responsibilities of a track inspector are to

8    inspect the track for defects, to protect the track, and

9    then enter any slow orders that may be necessary?

10   A.  That is correct.

11   Q.  If we could pull up Exhibit 225.

12   A.  Do I have to look at these at the same time?  If I can

13   see them on the screen.

14   Q.  If you can see them on the screen, that's all you need.

15   I'll direct you to right where we need to look.  So that

16   might be easier for you.

17           If we can go to page 3 of this exhibit, please,

18   and blow up the very top section, 2.1.

19           Mr. Jones, this is part of something called the

20   Engineering Instructions.  What are the Engineering

21   Instructions?

22   A.  It's a higher level of instructions that BNSF puts out.

23   You know, we talked earlier about the FRA mandates and the

24   guidelines.  They're kind of a minimal standard.  So BNSF

25   will mirror some of those, but sometimes we have higher

1    standards.

2          So we have engineering instructions that we put

3    out there that gives direction on whatever.  Like this

4    Section 2 is basically for track inspection purposes.  It's

5    a guideline for inspectors to follow.  Section 4 may be over

6    temporary restrictions.  And Section 6 is over the rail.  So

7    it's just a big process manual for people to look at and

8    follow.

9    Q.  So this is BNSF's book regarding track inspections,

10   their rules and regulations?

11   A.  That is correct.

12   Q.  And this lays out the purpose for track inspectors like

13   Mr. Sanders?

14   A.  That is correct.

15   Q.  If we can take Exhibit 225 down.  And if we can pull up

16   Exhibit 13 and go to page 80, please.

17          While we're doing that, Mr. Jones, I'll ask you a

18   question.  So we saw the EI book or engineering instruction

19   book.  That's BNSF's rules.  You also reference that there

20   are FRA rules as well?

21   A.  That is correct.

22   Q.  And does the FRA have a separate book that lays out

23   their track inspecting rules and regulations?

24   A.  They do, yes.

25   Q.  And what is that?

1      A.  It's just the FRA book, like 213.  It's got different

2      sub parts, but it primarily covers the 213.9 segment of the

3      FRA, which is the track safety standards.

4      Q.  And I'm going to hold up a book because I think you can

5      see me.  Does this look like a small book of the federal

6      regulations?

7      A.  That is correct.

8      Q.  This lays out all the regulations that Federal Railway

9      Administration puts out regarding track inspections, right?

10     A.  Yes.

11     Q.  It indicates how often tracks need to be inspected?

12     A.  Yes, to a minimum when they have higher standards for

13     BNSF.  But, yes, that's the minimum amount that they would

14     require.

15     Q.  And as a track inspector are you required to fix the

16     actual defects?

17     A.  Yes, to an extent there's minimal repairs.  For

18     instance, like if they're out and there's a cotter key

19     that's missing out of the bolt, they can do that.  Knock a

20     wedge plate on.  They do carry tools.

21          We would never expect them to try to change out

22     ties or fix broken rails, but minor repairs that they would

23     document.

24          You would still want them to report the defect but

25     then make the repair and show it repaired before track or

1    whatever.  But they do make minor repairs, yes.

2    Q.  Because BNSF has separate entire crews that are

3    dedicated to actually doing the substantial repairs, right?

4    A.  Yes.

5    Q.  So if we look at what's on the screen now, Mr. Jones,

6    this is a page within that federal regulations manual.  And

7    under Section A of 213.233 about track inspections, it

8    references that all tracks shall be inspected in accordance

9    with the schedule prescribed within this section by a person

10   designated under 213.7.

11           Do you see that?

12   A.  Yes, sir.

13   Q.  Is that what you're referring to when somebody needs to

14   be qualified to track inspect?

15   A.  That is correct.

16   Q.  So it's designated under 213.7 as being qualified to

17   track inspect?

18   A.  That is correct.

19   Q.  Because not anybody on the railroad is qualified to go

20   out and inspect track, is that fair?

21   A.  Correct.  Yeah, not everybody.

22   Q.  And as a track inspector, you're typically inspecting

23   that track by yourself?

24   A.  I think when I was there in the beginning, I think

25   Mr. Heyer and Don Sanders would ride a lot together.  But,

1    yes, over time with the Northern Lines Agreement it was

2    typically just one track inspector was allowed to.

3              We used to have track -- used to be called track

4    maintainers and track inspectors.  They would ride together.

5    Q.  Are track inspectors required to follow all the rules

6    and regulations within the federal regulations book that we

7    just looked at?

8    A.  That is correct.

9    Q.  Are they required to follow all the rules and

10   regulations within BNSF's engineering instructions?

11   A.  That is correct.  To the best of their ability, yes.

12   Q.  By the way, how big is the engineering instructions?

13   A.  It's big.  I wouldn't know how many pages.  We've

14   amended stuff and added stuff.  It's several -- I think it's

15   20-some sections based off of the reporting system to

16   welding.  Yeah, it's pretty big.

17   Q.  Does it look kind of like this (indicating)?

18   A.  Yes.

19   Q.  In addition to actually inspecting the track, are track

20   inspectors required to do other things like pilot crews?

21   A.  Yes, to a minimum.  We try to work hand in hand.  If the

22   inspectors are caught up, are within frequency, if we have a

23   test truck or something like that we feel like they have the

24   ability -- if they feel like, hey, I'm behind on my

25   timelines, this may put me in a cramp or I may have to work

1    weekends and work overtime, then we just make it a mutual

2    agreement with the FLS and them working out their day-to-day

3    routines that if they have the time, they can and take rail

4    detectors, geo trucks, things like that across.  But if

5    they're not staying caught up or they feel like it may press

6    them a little bit, then usually find somebody else to pilot

7    them.

8    Q.  What does it mean to "pilot" a crew?

9    A.  So before you get set on the track you have to get time

10   from point A through B through the dispatching center down

11   in Fort Worth so they know where the traffic is, as far as

12   where the trains are at.

13          You will get positive protection, meaning you own

14   that piece of track.  If you sit on either a ride with,

15   let's say, a rail detector that's scanning our rail for rail

16   defects, you'll either get in and ride with them or you'll

17   sit on of one of our high-road vehicles and then set their

18   truck on and they just follow along knowing that we have

19   property protected.  And they can't go out of the limits

20   that we have for that piece.

21   Q.  You said a couple things now that I want to just flesh

22   out.  You've referenced "tracking time."  What is that?

23   A.  Just what it is.  There's different authorities of track

24   based off of locations.  But tracking time is primarily what

25   was down in the St. Paul area.  So that's what we call it.

1    It's whenever you call the dispatcher or you get on the

2    computer and you request time, it's called tracking time.

3              And that gives you authority.  When they grant

4    that and give you -- you go through a procedure of getting

5    it, sign off on it, repeating it back, and then they okay

6    it.  At that point you own that piece of track from, let's

7    say, point A to point B and no trains can run on that

8    segment of track when you have tracking time out there.

9    Q.  It's kind of like air traffic control?

10   A.  Yeah, kinda.

11   Q.  Just to make sure if a crew is on a section of track

12   doing repairs that a train doesn't come by and hit them?

13   A.  That is correct.

14   Q.  Do track inspectors at times also have to serve as

15   foremen for crews if a foreperson doesn't show up?

16   A.  There again, I mean, it's a rarity.  If an inspector is

17   like, hey, I've got time to come over here, I'll show them

18   what to do, what I'm seeing, whether this defect -- I want

19   this part gauged from here to here because, you know, things

20   are kind subject based off what people see:  where they mark

21   it at, where the exact location is, because there's no

22   perfect way to mark anything.

23              So they will maybe go and spend some time with a

24   section crew and say, hey, this is what I'm doing, if you

25   can just gauge this in a little bit or change these plates

1    out or change these broken spikes or whatever the details

2    are.  They could go by and assist them.

3            And, like I said, if they're caught up on their

4    inspections, they could stay there and work with them all

5    day.  But if they had work to go do and inspections to do or

6    tracks to walk, typically they just kind of get them set up

7    and go through what they're seeing and what they want, like

8    to see fixed.  And then they go off and finish their main

9    track inspection.

10   Q.  I want to go back to Exhibit 13, Mr. Jones, and look

11   back at this -- now look at Section B.  Can you read that

12   okay in front of you?  Maybe we can blow that Section B up a

13   little bit.

14   A.  Yup.

15   Q.  Thank you.

16   A.  That's too much.  Let's see.  Can you slide to -- I can

17   read it right there.

18   Q.  Okay.  We'll just be --

19   A.  Do you want me do parts 1 and 2 or just B only?

20   Q.  No, I don't need you to read it.  I just want to ask you

21   a couple questions about a specific section.

22   A.  Okay.

23   Q.  So it says here that each inspection shall be made on

24   foot or by riding over the track in a vehicle, right?

25   A.  Yes.

1    Q.  And if the track inspector is inspecting in a vehicle,

2    according to this provision, they can't go more than five

3    miles an hour while they're track inspecting, right?

4    A.  That's just over -- it says five miles an hour while

5    passing over track crossings and turnouts; otherwise, the

6    inspection vehicle shall be at the sole direction of the

7    inspector.

8          So that's just certain locations that they have to

9    do it at five miles an hour, not all tracks.  So a track

10   crossing would be like a diamond.  So these have two

11   different directions of route.  So you may have a foreign

12   railroad that has -- that goes one way and we go another.

13   So it's like a cross over the track.  So that's called a

14   track crossing.

15         And you want to go slow over that because our high

16   rear wheels will drop down in the slots, and sometimes it

17   can climb one side of it or it just hits it really hard.  So

18   those areas you want to go slow for that purpose.  And then

19   there's a lot of binding bolts and rails and stuff like

20   that, so you want to go slower over those locations.  That

21   way you can inspect it a little bit more thorough.

22   Q.  According to this section of the federal regulations, if

23   a track inspector is inspecting tracks from a vehicle, the

24   speed at which they do that inspection is at their sole

25   discretion, is that right?

1    A.  Yes.

2    Q.  If we can go to page 82 of this same exhibit.

3             Mr. Jones, do you see this chart?

4    A.  Yes.

5    Q.  And this is the chart that, according to the federal

6    regulation, lays out how often sections of track need to be

7    inspected, right?

8    A.  That is correct.

9    Q.  And so you just kind of follow this chart, right?  Top,

10   left-hand corner, accepted track and class 1, 2, and 3

11   track.  If it's a main line track or a siding, it needs to

12   be inspected weekly with at least three calendar days in a

13   row between inspections or before use, right?

14   A.  That is correct.

15   Q.  Going down on that kind of the first row but the third

16   column under "Required Frequency," it then says "or twice

17   weekly with at least one calendar day interval between

18   inspections if the track carries passenger trains with more

19   than 10 million gross tons of traffic during the preceding

20   calendar year."  Do you see that?

21   A.  Yes.

22   Q.  So the more traffic that goes over a track, the more

23   frequently it needs to be inspected?

24   A.  Yes.

25   Q.  We were talking about yard versus main line.  Is yard

1    considered accepted track or does it fall under one of these

2    different categories?

3    A.  You can have both.  It depends on what the usage is and

4    what we deem it as.

5    Q.  And then we see under the second row there's a second

6    classification other than main track and sidings.  Those

7    need to be inspected monthly with at least a

8    20-calendar-days interval between inspections, right?

9    A.  Correct.

10   Q.  What happens if that timing of those inspections is not

11   met according to the federal regulations?

12   A.  I believe remove them from service if you don't meet the

13   frequency or slow them down a class of track.

14   Q.  You can't just leave it as is, right?

15   A.  Correct.

16   Q.  When track inspectors find a defect, what are they

17   supposed to do?

18   A.  Like I said, definitely the most important thing is to

19   report the defects.  And that just gives us a running tally

20   of kind of what we've got going on.  But, you know, then if

21   they repair it, they just close it out showing repaired

22   before traffic once they report it.

23   Q.  And you've referenced reporting it.  Where do they

24   report it?

25   A.  Well, things have changed.  If we're talking about back

1    then, it would have been -- I don't know if -- either CORS

2    (ph) or TIMS back in this timeline.

3    Q.  What are those programs?

4    A.  TIMS is a track inspection maintenance system, I think,

5    is what it stood for.  It's just a reporting tool for them

6    to report where they was at, what asset they were inspecting

7    or what click number on track segment, and what they seen,

8    and what they measured or noted for that inspection.

9    Q.  If we can go to -- let me back up before I go there.

10          You referenced TIMS.  That's a BNSF program, is

11   that right?

12   A.  That is correct.

13   Q.  So if a track inspector finds a defect, they have to

14   report it into TIMS?

15   A.  That is correct.

16   Q.  And BNSF is required per the federal regulations to keep

17   those records, right?

18   A.  That is correct.

19   Q.  Back in 2015, did track inspectors like Mr. Sanders also

20   have to detail the defects that they found in nightly

21   reports?

22   A.  It wasn't a detail.  It was high level.  From what I had

23   seen -- you know, I would get a few of these nightly

24   reports, but it wasn't something that they had to type out

25   every little thing that they did.  It was mainly for

1    higher-level concerns, like we're starting to see a mud spot

2    here or this curve is starting to get a little bit wide,

3    something like that, that we really needed to get attention

4    on.  Not so much the small I found a bolt out here or a

5    loose wedge here or a missing clip.  Those weren't supposed

6    to be detailed.

7    Q.  Is there a BNSF policy that required nightly reports?

8    A.  No.  It was a supervisor expectation.

9    Q.  And what was the purpose of that expectation?

10   A.  To work together and partner together so we could make

11   sure the crews were being allocated in the right spots, we

12   were getting the right details put together.

13        You know, things changed dramatically out on the

14   railroad, so if we had a plan put together this week and

15   just to go out and take care of this and something majorly

16   changed that caused a bigger problem -- you know, if the

17   track inspector said, "Hey, I'm really concerned.  It was

18   good a couple weeks ago, but now I'm seeing a little

19   movement.  I'd like to do this."

20        A lot of times track inspectors worked hand in

21   hand with the FLS, the roadmasters.  And they could divert

22   the priority if they seen something changing at a high rate.

23   Q.  And if a track inspector refused to report something

24   that was an actual defect, they could be subjected to a

25   fine, is that right?

1    A.  That is correct.

2    Q.  If we could go to page 106 of Exhibit 13.

3              In this federal regulations book is a list of what

4    the violation fines could be if a defect is not reported,

5    right?

6    A.  That is correct.

7    Q.  Is there ever a time a track inspector should not report

8    a defect?

9    A.  No.  No.  If they find it, it should be reported no

10   matter how minimal it is.

11   Q.  And that's required by FRA standards?

12   A.  Yes, and BNSF.

13   Q.  And BNSF engineering instructions?

14   A.  Correct.

15   Q.  What's a slow order, Mr. Jones?

16   A.  So it's kind of like a temporary -- what it is from

17   point A to point b.  So if trains can run at a -- let's say

18   from mile post 10 to mile post 20, the normal track speed

19   is, let's say, 40.  And if an inspector goes out there and

20   finds what's called a dip -- so a dip is where both rails --

21   we want them kind of like on tangent track where you're

22   running smooth.  In a perfect world you want both rails the

23   same height.  If you start getting a mud spot or something

24   happens there -- a ballast washes out or whatever -- you'll

25   get one rail that will -- or both rails that will dip down.

1              Based on how far that dips down, that's what you

2       need to slow it down.  So let's say class four -- it's all

3       determined by speed.  At 40 miles an hour or 60, if it dips

4       down, let's say, over two inches, it may only be good for

5       class two.  So you would put a slower for a tenth of a mile

6       or whatever the inspector deemed necessary for a small

7       portion of that railroad.  They would slow the traffic down

8       to like the lower class of track, a lower speed.

9       Q.  And that slow order is intended to keep everybody safe?

10      A.  Absolutely.  Yes.

11      Q.  Keep the trains from derailing?

12      A.  Yes.

13      Q.  If we could go to page 76 of Exhibit 13.

14              And while we're doing that, Mr. Jones, when a

15      defect requires a slow order, that's also something that is

16      laid out in the federal regulations as well, right?

17      A.  Yes.  It gives the -- kind of the measurements and

18      standards for the type of defect identified and what would

19      be required for speed-wise.

20      Q.  So we see on this page at the bottom of the page,

21      Mr. Jones, there's a Section 213.137 and the heading is

22      "Frogs."  Do you see that?

23      A.  Yes.

24      Q.  What is a "frog"?

25      A.  Okay.  We've got a lot of jargon.  So a frog --

1    actually, it's a component on a turnout.  So what a turnout

2    does is it -- you've got to have ways for trains to bypass

3    each other.  So a turnout -- or a switch is the same thing.

4         It allows the dispatcher or throw it by hand a

5    train to divert its direction across a turnout, which in

6    turn runs over a frog, because that's the main component of

7    the turnout that lets the wheels stay straight down the

8    turnout, or when you throw the point section, it will run

9    over the frog to the diverging route and goes into either

10   the other main line, or the siding, or a yard track.

11        So a frog literally looks like maybe somebody run

12   over a frog on the highway and it just kind of squashes its

13   arms and its legs out.  That's kind of why we call them

14   "frogs."  It's kind of split with channels, if you will,

15   flangeways that allow the trains to go straight or through

16   the diverging route.

17   Q.  I've seen it -- or heard it depicted as, basically, a

18   big X.  It's the big metal piece in tracks that are going in

19   opposite directions.  Is that right?

20   A.  Yeah.  That's pretty fair to say.  Yes.

21   Q.  Under this section there are certain measurements as to

22   how a track should be measured, right?

23   A.  The frog itself, yes.

24   Q.  Okay.  And under Section B it says:  "If a frog point is

25   chipped, broken or worn more than five-eighths inch down and

1    six inches back, operating speed over the frog shall not be

2    more than ten miles per hour," right?

3    A.  That is correct.

4    Q.  And that's an example of the federally-mandated slow

5    order that we were just talking about?

6    A.  Yes.  One of many, yes.

7    Q.  And so if that measurement is there, track inspectors

8    don't have any discretion as to whether they can enter a

9    slow order, right?

10   A.  If it meets those standards, yes, it needs to slowed to

11   a ten.

12   Q.  And we see another version under Section C of when slow

13   orders should be entered for a frog, right?

14   A.  Yes.

15   Q.  And, like you said, there are many other times when slow

16   orders are required by the federal regulations as well,

17   right?

18   A.  That is correct.

19   Q.  Is there ever a time when a track inspector should not

20   enter a slow order?

21   A.  Not if the conditions meet that, no.  No.

22   Q.  Is there ever a time when a track inspector should delay

23   reporting a defect or a slow order?

24   A.  You can delay putting the defect in.  That's not

25   instrumental.  A lot of times they would put their defects

1    in at the end of the day.  They would just document.

2          The slow order needs to be done immediately if

3    they find that condition that the track needs to be slowed

4    down or doesn't meet the higher speed class of track.  It

5    needs to be put on before the next train goes over that

6    condition.

7    Q.  But track inspectors are supposed to report defects and

8    slow orders as soon as they possibly can, right?

9    A.  Slow orders immediately, defects when they get back to

10   do their reporting.

11   Q.  During Mr. Sanders' employment as a track inspector, did

12   you ever attempt to persuade him to not report a defect?

13   A.  No.

14   Q.  Did you ever attempt to persuade him to delay reporting

15   a slow order?

16   A.  No.

17   Q.  In your employment with BNSF, have you ever encouraged

18   any employee in any way to not document something that is a

19   defect?

20   A.  No.

21   Q.  Have you ever encouraged an employee in any way to delay

22   reporting a defect?

23   A.  No.

24   Q.  Mr. Jones, are you familiar with BNSF's EEO policy?

25   A.  Not 100 percent, no.

1    Q.  If we could pull up Exhibit 23.

2          Mr. Jones, this is BNSF's Corporate Equal

3    Employment Opportunity, Anti-Discrimination, and Harassment

4    Policy.

5          Do you see that?

6    A.  Yes.

7    Q.  Have you seen this before?

8    A.  Yes.

9    Q.  Under Policy Requirements, point A:  "BNSF Railway

10   employees must treat others with dignity and respect."

11          Do you see that?

12   A.  Yes.

13   Q.  Under C:  "Any form of discrimination or harassment of a

14   person, including sexual harassment by or towards any BNSF

15   railway employee, contractors, suppliers or customers is

16   prohibited," right?

17   A.  Yes.

18   Q.  And the last bullet point says -- or all of the bullet

19   points are examples of that type of harassment or

20   discrimination that is prohibited under BNSF's policy,

21   right?

22   A.  That is correct.

23   Q.  And the last bullet point reads:  "Any other verbal or

24   physical conduct that harasses, disrupts or interferes with

25   another's work environment or that creates an intimidating,

1   offensive or hostile work environment."

2          Do you see that?

3   A.  That is correct.

4   Q.  That's BNSF's written policy, right?

5   A.  Yes.

6   Q.  Let's talk about Mr. Sanders' employment under your

7   direction.  He was under your direction as a track inspector

8   in Dayton's Bluff -- or I should say in the Twin Cities

9   Division between 2013 and 2016, right?

10  A.  That is correct.

11  Q.  And during that time, Mr. Sanders had different bosses

12  as roadmasters.  You referenced Bill Schumake before?

13  A.  That is correct.

14  Q.  Are you aware that he had Luke Babler and Dale Johnson

15  as roadmasters prior to Mr. Schumake?

16  A.  Yeah.  They were on those positions prior to me, so yes,

17  I was aware.

18  Q.  And then Ms. Hoppenrath in 2015?

19  A.  Correct.

20  Q.  And you viewed Mr. Sanders as a track inspector as very

21  reliable, right?

22  A.  Yes.

23  Q.  He was willing to work overtime?

24  A.  That is correct.

25  Q.  When he was called, he came in?

1    A.  Yes.

2    Q.  And that was a problem sometimes?  If you needed sort of

3    last-second help, sometimes employees wouldn't show up if

4    they weren't scheduled, right?

5    A.  Yeah, there was times, depending on if it was holiday

6    timeline, weather was bad.  Some people come in and do their

7    job and that's kind of all they were interested in.

8    Q.  Mr. Sanders was willing to come in late at night?

9    A.  Yes.

10   Q.  He was willing to fill -- sorry.  Go ahead.

11   A.  No, I'm sorry.  I was just coughing.

12   Q.  He was willing to fill in when other people didn't show

13   up?

14   A.  That is correct.

15   Q.  And he had a passion to do the job that he was assigned

16   the best that he could?

17   A.  Yes.

18   Q.  That was your view of him?

19   A.  Yes.

20   Q.  Have you ever heard of something called a track

21   inspector evaluation?

22   A.  Yes.

23   Q.  And what is that?

24   A.  They were - the FLS, the roadmasters are required kind

25   of on a monthly basis based on how many miles of track, how

1    many inspectors they have, to go out and hi-rail with them

2    and just kind of do -- it's like 13 core competencies, like

3    running a level board, which is one of the tools that we use

4    to check like the dip earlier I was talking about or a

5    string line to check the points of a curve, if it's got a

6    flat spot or something like that.

7              So you go out and you spend time with them to

8    check their proficiency on all the tools and requirements to

9    do their job.

10   Q.   Okay.  If we can pull up Exhibit 225.

11             And while we're doing that, Mr. Jones, I'll ask

12   you a couple questions.

13             So you said that -- or let me ask it this way.

14   Who goes out and evaluates track inspectors?

15   A.   Typically the roadmaster.

16   Q.   And how does it typically occur?

17   A.   Probably they just schedule the day.  Like I'm sure the

18   roadmaster says, "Hey, tomorrow I'm going to hi-rail with

19   you over the St. Paul sub."  And we'll do the morning call

20   and set it on wherever, and we'll hi-rail.  And let's stop

21   and measure this frog at this switch.  Let's go up here and

22   let's check this cross-level spot and just do the different

23   various defects or procedures they're required to do.  They

24   just probably perform them through their hi-rail on rail

25   inspection.

1    Q.  So the roadmaster is actually physically riding along

2    with the track inspector watching what they're doing?

3    A.  That is correct.

4    Q.  If we can go to page 5 of Exhibit 225, please.

5              And on the bottom -- again, this is BNSF's

6    engineering instructions -- is a Section 2.2.2, Track

7    Inspector Evaluation.  Do you see that?

8    A.  Yes.

9    Q.  So track inspector evaluations are something that are

10   required by BNSF policy?

11   A.  Yes.

12   Q.  If we go to page 6 -- to the paragraph on the top of

13   page 6 -- if we could blow that up.  The last sentence in

14   this paragraph says:  "The evaluation process involves

15   spending an entire day with the track inspector with a focus

16   on the quality of the overall inspection process."

17             Do you see that?

18   A.  Yes.

19   Q.  If we could go to Exhibit 4, please.

20             And what's Exhibit 4?

21   A.  It looks like the form that they use for this evaluation

22   form.

23   Q.  And if we look at the top of the first page, it gives a

24   date of January 28, 2013 and the roadmaster is Dale Johnson.

25             Do you see that?

1    A.  Yes.

2    Q.  And this is an opportunity for Mr. Johnson to follow

3    Mr. Sanders as he's doing his job and to provide him

4    feedback if he sees anything that is going awry.

5    A.  They ride together.  I wouldn't say follow.  They're

6    riding together, in the truck together.

7    Q.  This is the opportunity for the roadmaster to give

8    Mr. Sanders input or feedback on the quality of his overall

9    inspection process, right?

10   A.  Correct.

11   Q.  And if we could go to the second page of this exhibit,

12   please.  And there's a bunch of red writing in the middle of

13   the page.  If we could just blow up that bottom half under

14   the red writing, please.

15          So this is where the roadmaster actually gives

16   specific feedback when they're doing individual inspections,

17   right?

18   A.  Where the comments are?

19   Q.  Correct.

20   A.  Yes.

21   Q.  So if a roadmaster is concerned, for example, how an

22   inspector is using their tools or measuring a specific

23   defect, they can say it here, right?

24   A.  Well, if you look at the top of that, it specifically

25   calls out turnout.  So it's not the overall -- he picked

1      this specific Highway 100.  This turnout said:  Highway 100

2      back track looks good.  So that particular spot the turnout

3      looked good based off of his comments.

4      Q.  So you're saying that Mr. Sanders didn't do any

5      inspections to ensure that it looked good on this day?

6      A.  I couldn't answer that based off of this.  All it

7      said -- it didn't say Mr. Sanders performed or I watched him

8      perform a check of that frog, measure a switch point, check

9      the gauge through the closure, you know, all the required

10     checks.  It just said:  Highway 100 back track turnout looks

11     good.  It didn't say Mr. Sanders did a great job on

12     inspecting that turnout at Highway 100.  It says the turnout

13     looked good.  It may be a brand-new turnout that was just

14     installed six months ago.

15     Q.  It also doesn't say Mr. Sanders doesn't know how to

16     measure this turnout, right?

17     A.  That's correct.  Yeah, very minimal details on this

18     form.

19     Q.  If we could go to page 4 of this form, please.

20              At the end of the document -- if we could blow up

21     that top half -- there's a section for general comments

22     under the roadmaster evaluation form, right?

23     A.  Correct.

24     Q.  And this is where, according to BNSF policy, roadmasters

25     are supposed to give inspectors feedback on the quality of

1    their overall inspection process, right?

2    A.  Correct.

3    Q.  And here we see some comments from Mr. Johnson that they

4    entered one slow order and Don has good curve notes and

5    staked.  Do you see that?

6    A.  Yes.

7    Q.  Nothing about Mr. Sanders doesn't know how to do his

8    job, he doesn't know how to measure defects, he's

9    over-reporting defects?  Nothing like that, right?

10   A.  The only thing I would bring up on these comments, one

11   slow order for tie condition, which will be handled -- I

12   can't tell if they put that on that day or if it was already

13   out there.  That would be my concerns with that write-up,

14   just not knowing all the details.

15   Q.  My question was slightly different.  Mr. Johnson's

16   comments don't say anything about how -- or allege that

17   Mr. Sanders doesn't know how to do his job, can't track

18   inspect, doesn't know what a defect is?  Doesn't say

19   anything like that, right?

20   A.  Not for that portion of track that they hi-railed for

21   that day and that specific timeline.  I don't see anything

22   in there that would say that.

23   Q.  Let's go to Exhibit 6.  This is a track inspector

24   evaluation form for Mr. Sanders done by Luke Babler, who is

25   a different roadmaster, right?

1    A.  Yes.

2    Q.  The date on this one is February 21st of 2013.

3            Do you see that?

4    A.  Okay.  I can now, yes.  That's correct.

5    Q.  Then if we could go to page 4 of this exhibit where the

6    general comments are.

7            No comments about how Mr. Sanders can't do his

8    job, doesn't know how to track inspect, doesn't know how to

9    report defects, right?  There's no comments at all?

10   A.  Right.  Based off this form, no.

11   Q.  Let's go to Exhibit 7, please.

12           This is a track inspector evaluation form again

13   from Mr. Babler in March of 2013.

14           If we can go to page 4.

15           Again, no comments about Mr. Sanders being bad at

16   track inspecting, right?

17   A.  Correct.  Based off of that form, correct.

18   Q.  Let's go to Exhibit 8.

19           Track inspector evaluation by William Schumake on

20   October 9th of 2013.

21           Do you see that?

22   A.  Yes, sir.

23   Q.  Let's go to page 4, please.

24           Here no comments about Mr. Sanders' ability to

25   track inspect, right?

1    A.  Correct.

2    Q.  Let's go to Exhibit 9.

3            Track inspector evaluation form for November of

4    2013, again by Mr. Schumake.

5            Do you see that?

6    A.  Yes, sir.

7    Q.  Okay.  Let's go to page 4.

8            No comments alleging that Mr. Sanders doesn't know

9    how to track inspect, right?

10   A.  That's correct.

11   Q.  Let's go to Exhibit 10.

12           Track inspector evaluation form dated

13   December 26th of 2013 by Mr. Schumake.

14           Do you see that?

15   A.  Yes, sir.

16   Q.  If we can go to page 4.

17           Again, no comments that Mr. Sanders is a bad track

18   inspector, doesn't know how to measure track defects,

19   anything like that, right?

20   A.  No, sir.

21   Q.  Let's go to Exhibit 11, please.  This is the final one.

22           Track inspector evaluation form from January of

23   2014, again by Mr. Schumake, right?

24   A.  Yes.

25   Q.  And if we can go to page 4.

1          No comments about Mr. Sanders' ability to track

2     inspect, right?

3     A.   That is correct.

4     Q.   From before 2015, is there any written document that you

5     can point me to that accused Mr. Sanders of not being able

6     to track inspect?

7     A.   No.  And I don't know, honestly, why we're going through

8     this.  Nobody said he couldn't track inspect.  There was a

9     few things that we coached him on that he may have been

10    classifying things different, but this isn't about him being

11    a good track inspector or not.

12    Q.   These coachings -- prior to 2015, is there a written

13    document somewhere of these coachings that you gave to

14    Mr. Sanders, apparently?

15    A.   It's just talking, spending time in the field saying,

16    "Hey, this is how you see it.  Maybe this is how it is."

17    It's just hands-on, in the field working together.

18          There was no reason for documentation because

19    there was no concern about his track inspecting ability.

20    There was just things to get better on.  There's things to

21    understand.  The eye is a little bit better.  Everything is

22    perception when we go out there and we hi-rail.

23          But one inspector may walk from mile post 5 to 6

24    and say there's 100 bad ties and everybody is going to get a

25    different count.  Ties are subjective.  Conditions are

1    different.  How you measure a frog is way different on how

2    you hold your straight edge versus the feeler gauge.  I

3    mean, everybody does things differently, and that's why it's

4    subjective.

5          We just work together to enhance it.  We find new

6    processes through all different inspectors.  There was never

7    a major concern with Don Sanders' track inspecting ability

8    or willing to come and do the job.

9    Q.  Let me ask you something.  Do track inspectors get an

10   annual review from their managers?

11   A.  No.  It's just through these forms and just on their

12   day-to-day.  I mean, a lot of times these are kind of

13   required, just something for tracking purposes, because if

14   you don't have a standard, some FLS roadmasters maybe won't

15   go out and do this because they're newer or maybe they don't

16   understand how to do everything that Mr. Sanders could.  So

17   maybe they feel intimidated to go out and hi-rail with that.

18         So there's other ways of going out.  And this

19   isn't the only time they spent with track inspectors, was

20   just doing these.  It was most of the seasoned -- the newer

21   or the seasoned would go out and hi-rail daily and may not

22   fill these things out just because they're wanting to learn

23   their territory or look at something different or put a plan

24   together with the inspector.  So these were just the bare

25   minimum.

1    Q.  These are the official written record of how Mr. Sanders

2    is performing; would you agree with that?

3    A.  Yes.  If you had a concern, this would be the place that

4    you'd want to say, "Hey, I coached so-and-so on how to do

5    work, or cross-level, or measure, or other defects."  You'd

6    want to capture that in here just to show that you are

7    spending time educating and training.

8    Q.  We can take down Exhibit 11.

9         In 2015, we've alluded to the fact that

10   Ms. Hoppenrath becomes the roadmaster in Dayton's Bluff,

11   right?

12   A.  Yeah, that's correct.

13   Q.  And she was a first-time roadmaster?

14   A.  Yes.

15   Q.  And how did she perform that first year, in your view?

16   A.  She had a lot to learn.  She was learning the territory,

17   learning how to put things together.  Very, very

18   high-tonnage traffic area at that time, so a lot of times it

19   was the adjustment of it seemed simple.  I want to go remove

20   these defects, this, this, and this, but you may have so

21   much traffic that the operating team wouldn't allow you to

22   do your plan.

23        So she was working very, very hard to learn the

24   territory, learn the people, their skills, develop her

25   training, her leadership style, and then develop all of her

1   team along the way.  So she was very busy and worked very

2   hard at trying to be the best that she could be.

3   Q.  You referenced a second ago something called the

4   operating team.  Do you remember that?

5   A.  Yes.

6   Q.  And that's separate from the maintenance team?

7   A.  That is correct.

8   Q.  Mr. Sanders and you are on the maintenance team?

9   A.  That is correct.

10  Q.  The operating team is the team that's responsible for

11  actually moving trains from point A to point B?

12  A.  That is correct.

13  Q.  And you referenced the fact that at times the

14  maintenance team has difficulty getting on the tracks

15  because the operating team is trying to move trains, is that

16  right?

17  A.  That is correct.

18  Q.  Because that's how the company makes money is moving

19  trains?

20  A.  That's a portion of it, yes.

21  Q.  And there are times when the operating team tells the

22  maintenance team, "You can't get on the tracks right now

23  because we're trying to move trains"?

24  A.  That is correct.

25  Q.  And so as a track inspector, Mr. Sanders has an assigned

1    schedule for his job, right?

2    A.  Yeah.  For the most part, yes.

3    Q.  But track inspectors always cannot actually get on the

4    track during that assigned schedule because the operating

5    team is trying to move trains, right?

6    A.  That is correct.

7    Q.  So track inspectors might have to come in on off

8    hours -- early in the morning, late at night -- in order to

9    do their required inspections, fair?

10   A.  With the approval of the supervisor they come up with an

11   alternative schedule as needed, yes.

12   Q.  And in 2015 there was a time when Mr. Sanders was doing

13   the work of both the main line and the yard inspector,

14   right?

15   A.  That is correct.

16             MR. LUCAS KASTER:  Your Honor, I'm switching gears

17   a little bit.  I'm not sure -- do you want me to keep going?

18             THE COURT:  How long do you anticipate this

19   section of your examination to last?

20             MR. LUCAS KASTER:  Ten minutes.

21             THE COURT:  Why don't we get through this and then

22   we'll call it a day.

23             MR. LUCAS KASTER:  Sure.

24             THE COURT:  All right.  Thank you.

25             MR. LUCAS KASTER:  Thank you.

1    BY MR. LUCAS KASTER:

2    Q.  And Mr. Sanders' assigned job in Dayton's Bluff in 2015

3    was as a yard inspector, right?

4    A.  I think that's the job that he was -- yeah, that he had

5    on bulletin.  Yes.

6    Q.  So that's his primary responsibility, is the yard

7    sections of track?

8    A.  Yes.

9    Q.  And in 2015 there was a period of time when there was no

10   main line inspector in Dayton's Bluff?

11   A.  That is correct.

12   Q.  And so Mr. Sanders was asked by you and Ms. Hoppenrath

13   to do the main line inspections as well?

14   A.  That is correct.

15   Q.  And because he was working both jobs, he was working a

16   lot of days, a lot of hours, right?

17   A.  That is correct.

18   Q.  Do you know how many days Mr. Sanders worked in 2015?

19   A.  You know, I do not know.  I heard the opening

20   statements.  It was a lot.

21   Q.  Do you recall Mr. Sanders working over 300 days in 2015?

22   A.  Potentially is accurate.  Like I said, I do not know

23   right offhand.

24   Q.  If we could bring up Exhibit 21, please, and the summary

25   exhibit of Exhibit 21, please.

1          Mr. Jones, this is an exhibit that was produced to

2    us in this case which is Mr. Sanders' time entries.

3          Do you see that?

4    A.  Yes.

5    Q.  And it starts on May 1st of 2015, right?

6    A.  Yes.

7    Q.  And in May of -- can you read the dates in the second

8    column in from the left?

9    A.  Yup.

10   Q.  I know they're a little small.

11         But if we look at May of 2015, Mr. Sanders worked

12   all but four days in that month, right?  If you look down

13   the days --

14   A.  That's correct.

15   Q.  -- he didn't work the 10th, the 15th or 16th, and the

16   24th, but he worked all other days, right?

17   A.  Yes.

18   Q.  Including he worked on May 25th of 2015.  There's an

19   entry for a code 24.  What is that?

20   A.  I don't know if that's -- honestly, I don't know off the

21   top of my head.

22   Q.  Is that holiday pay?

23   A.  It would be.  I think 12 is overtime, so it could be

24   holiday.

25   Q.  Is that the Memorial Day holiday?

1    A.  I would assume.  I don't --

2    Q.  If we can go down to June.  We see on the bottom of this

3    page Mr. Sanders worked on June 1st.  If we follow the days

4    going down in June of 2015, he worked all days but the 6th,

5    the 12th, the 13th, the 20th, and the 27th.  So he worked

6    all but five days in June, right?

7    A.  Very dependable individual, yes.

8    Q.  Let's go to July.  Mr. Sanders worked all but one day in

9    July.  The day he did not work was the 16th.  And he worked

10   the 4th of July holiday.  Right?

11   A.  Yeah.  Yeah.  Without scrubbing through each line, yes,

12   I would say that's probably accurate.

13   Q.  And if we look at August, Mr. Sanders worked every day

14   in August.

15   A.  (Reviewing).  Yes.  Yes, I would agree.

16   Q.  And he worked every day in September.

17   A.  (Reviewing).

18   Q.  Do you see that, Mr. Jones?

19   A.  Yes.

20   Q.  Including Labor Day holiday.

21   A.  Yes.

22   Q.  And by the way, when Mr. Sanders is working this amount

23   of time, you're his division engineer, right?

24   A.  That is correct.

25   Q.  So you know he's working this much?

1   A.  We had some conversations, yes, to make sure he felt

2   safe doing so and was willing to do it.

3   Q.  If we scroll down to November, Mr. Sanders worked

4   Thanksgiving on November 26th.

5            Do you see that?

6   A.  Yes.

7   Q.  He worked the day after Thanksgiving on November 27th?

8   A.  Yes.

9   Q.  If we scroll down to December, Mr. Sanders worked the

10   day before Christmas, Christmas, New Year's Eve, and New

11   Year's Day, right?

12   A.  Yes.

13   Q.  During Mr. Sanders' employment, he actually asked

14   Ms. Hoppenrath and you for time off on the holidays, right?

15   A.  I -- I would assume yes.  I don't recall the actual

16   conversations.

17   Q.  Do you recall a conversation with Mr. Sanders where he

18   told you he was being denied time off on the holidays?

19   A.  I don't recall.

20   Q.  Now, you told Mr. Sanders at one point that BNSF was

21   using him too much, right?

22   A.  Yes.

23   Q.  That he was the go-to track inspector in Dayton's Bluff?

24   A.  That is correct.

25   Q.  That he was, in your words, "not replaceable"?

1    A.  That is true.

2    Q.  If we can bring up Exhibit 214, please.  This is a

3    recording.  And I'm going to ask that we play the section at

4    10:12 to 10:58.

5         (Recording played, Exhibit 214)

6    BY MR. LUCAS KASTER:

7    Q.  We can stop there.

8             Mr. Jones, is that your voice on that recording?

9    A.  That is correct.

10   Q.  Is that Mr. Sanders' voice on that recording?

11   A.  Yes.

12   Q.  Is that a conversation that occurred between you and

13   Mr. Sanders during Mr. Sanders' employment with BNSF?

14   A.  It sounds familiar, yes.

15   Q.  And you told Mr. Sanders he was "not replaceable,"

16   right?

17   A.  Yes.  That is correct.

18             MR. LUCAS KASTER:  I'm done with this line of

19   questioning, Your Honor.

20             THE COURT:  All right.  I think it makes sense to

21   adjourn for the day.  It's 5:10 and for some of the jurors

22   and for some of us it's been a long day, so we'll adjourn at

23   this point.

24             Members of the Jury, let me just remind you I gave

25   you a bunch of rules earlier today.  I have no intention of

1   repeating all of them now, but you're about to leave the
2   courthouse for the first time since you've been impaneled as
3   a jury, and I just want to remind you that it is quite
4   important that you adhere to those rules that I gave you
5   earlier today.
6          We'll let you go now.  Please understand we'll
7   resume at 9:00 in the morning, so please be here in enough
8   time to start promptly at 9 o'clock.  Thank you again.
9          THE LAW CLERK:  All rise.
10         (Jury excused)
11                     **IN OPEN COURT**
12         THE COURT:  All right.  Please be seated.
13         Mr. Jones, if you were present here in court, I
14  would let you step off the witness stand and go back to
15  counsel table.  Since you're attending there and observing
16  that way, I'll let you just remain on the screen here.  I
17  think that makes the most sense.
18         Let me ask the lawyers, starting with Mr. Sanders'
19  counsel, is there anything that we need to be here for
20  before we begin again tomorrow morning at 9:00?
21         MR. JIM KASTER:  We don't think so.
22         MR. LUCAS KASTER:  No, Your Honor.
23         THE COURT:  How about for BNSF?
24         MS. FERGUSON:  No, Your Honor.
25         THE COURT:  All right.  Then please plan on being

1     here to resume with Mr. Jones' testimony at 9 o'clock

2     tomorrow, and we will adjourn for the day.  Thank you.

3           (Proceedings concluded for the day at 5:13 p.m.)

4                     *      *      *      *

**I  N  D  E  X**

                                                          **PAGE**

**Colloquy with counsel**                                    2


**PLAINTIFF'S Opening Statement**
     By Mr. James Kaster                                    15


**DEFENDANT'S Opening Statement**
     By Ms. Ferguson                                        31



                    *       *       *       *



**W  I  T  N  E  S  S  E  S:**

**KEITH D. JONES**

     Cross-Examination by Mr. Lucas Kaster                 40

C E R T I F I C A T E


I, **TIMOTHY J. WILLETTE,** Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.



*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224