UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )  CIVIL FILE
Donald Sanders,               )  NO. 17-CV-5106 (ECT/KMM)
                              )
                 Plaintiff,   )
                              )         **VOLUME II**
      vs.                     )
                              )
BNSF Railway Company,         )  Courtroom 3B
                              )  Tuesday, December 7, 2021
                 Defendant.   )  St. Paul, Minnesota
                              )  9:00 A.M.
------------------------------------------------------------

**<u>JURY TRIAL PROCEEDINGS</u>**

**BEFORE THE HONORABLE ERIC C. TOSTRUD**
**UNITED STATES DISTRICT JUDGE**
**AND A JURY**

**A P P E A R A N C E S:**

**For the Plaintiff:**   **NICHOLS KASTER, PLLP**
                          By:  JAMES H. KASTER, ESQUIRE
                               LUCAS J. KASTER, ESQUIRE
                          4700 IDS Center - 80 South Eighth Street
                          Minneapolis, Minnesota  55402-2242


**For the Defendant:**   **ARTHUR CHAPMAN KETTERING SMETAK**
                          **& PIKALA, P.A.**
                          By:  SALLY J. FERGUSON, ESQUIRE
                          500 Young Quinlan Building
                          81 South Ninth Street
                          Minneapolis, Minnesota  55402-3214

                          **STINSON, LLP**
                          By:  TRACEY HOLMES DONESKY, ESQUIRE
                          50 South Sixth Street - Suite 2600
                          Minneapolis, Minnesota  55402


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

1        (9:00 a.m.)

2                        **P R O C E E D I N G S**

3                        **IN OPEN COURT**

4        (Jury enters)

5            THE COURT:  Good morning, everyone.  Please be

6   seated.

7            Mr. Kaster?

8            MR. LUCAS KASTER:  Thank you, Your Honor.

9            THE COURT:  Mr. Jones, I should remind you you're

10  still under oath.

11           THE WITNESS:  Yes, sir.

12

13                   **CONTINUED CROSS-EXAMINATION**

14  BY MR. LUCAS KASTER:

15  Q.  Mr. Jones, can you hear me okay?

16  A.  Yes, sir.

17  Q.  I want to ask you a few follow-up questions on a couple

18  topics that we addressed yesterday.  One of them is the

19  difference between mainline tracks and yard tracks, okay?

20  A.  Okay.

21  Q.  And within a yard, what's the maximum speed that trains

22  can be moved at within the yard?

23  A.  I mean, you can designate them whatever speed you want

24  to based off conditions and location.  Primarily, most of it

25  is ten mph, ten miles an hour, in 90 percent of our yards, I

1     would say, yard tracks.

2     Q.  And so if a track inspector locates a defect within a

3     yard, they just have to report the defect, is that right?

4     A.  There's some out-of-service conditions.  There's a

5     difference between a nonclass which, you know, gives you 30

6     days to repair it, or there's out-of-service if the gauge is

7     wider than a certain amount that will cause an immediate

8     derailment and needs to be removed from service, or a broken

9     rail or something like that.

10    Q.  But yard track inspectors aren't entering slow orders

11    within the yard because the track speed is already max ten

12    miles per hour, right?

13    A.  On some tracks.  There is a few yard tracks that are

14    over ten mph that they would put, like, a TCM or report that

15    to, you know, like the yardmaster or the trainmasters and

16    say this track -- you know, on this particular track or lead

17    coming out of a yard they can do 20.  We need to slow them

18    to ten.  So it would be a different form of speed

19    restriction, but those are very rare and we only have just a

20    few of those locations.

21    Q.  So within a yard, as you said, I think, 90 percent of

22    those tracks, if there's a defect, you wouldn't be entering

23    a slow order, right?

24    A.  Correct, correct.

25    Q.  And then on the mainline, the maximum speed that trains

1    can travel is much higher, right?

2    A.  That is correct.

3    Q.  Because that's where the trains are actually traveling

4    from point A to point B as you said yesterday.

5    A.  Correct.

6    Q.  And what's the max speed that a train can travel on a

7    mainline track?

8    A.  Well, it depends what class it is.  If you're talking

9    around here, like 79 is about the fastest our commuter

10   traffic goes and that's out on the staples that's outside of

11   town.  On the St. Paul, I think the fastest is 60 down

12   towards the east part of the territory.

13   Q.  And so mainline track inspectors, if they find a defect

14   that warrants a slow order, they have to enter that slow

15   order, right?

16   A.  Yes, they need to place that slow order, yes.

17   Q.  And the lowest level of slow order that a track

18   inspector needs to place on a mainline is ten mph, is that

19   right?

20   A.  Yes.  If there's a condition that's less than ten mph,

21   they have to physically stay there and walk the train over

22   that condition.  Like, a broken rail, we can still walk

23   trains over a broken rail depending on how far it's gapped

24   or if it's not broke out that bad, you keep traffic moving,

25   and then once the train gets out of the way or clears, then

1    they give us time to repair it.  So, there is a slower

2    condition than ten, but it has to be physically on site and

3    have control of that train and walk them over that

4    condition.

5    Q.  And so if a track inspector on a mainline enters a slow

6    order to ten mph -- let's use as an example a 79 mile per

7    hour mainline track, that's a significant reduction in

8    speed, right?

9    A.  Yeah, for that portion, yes.

10    Q.  And when trains are meeting that slow order, they have

11    to start slowing down well in advance of when that slow

12    older section begins, right?

13    A.  Yeah.  We give them a two-mile advance warning sign that

14    tells them to start controlling their train, and then they

15    know based off train counts.  When they start that counter,

16    when they're going to come in on that condition, they slow

17    it down for that tenth of a mile and then they -- after they

18    get past the green board on the other side, they can pick

19    up -- resume back to normal speed.

20    Q.  Because trains can be upwards of a mile long in length,

21    right?

22    A.  Yes, that's correct.

23    Q.  And then as you stated, once a train gets past that

24    slow-order section, it takes them awhile to get back up to

25    full speed, right?

1    A.  It depends on the power that they have and the tonnage

2    of the train.  Some take a little longer, some not as long.

3    It's kind of minimal.

4    Q.  I'd like to switch gears now here, and you remember we

5    looked at some of Mr. Sanders' time entries for 2015.  Do

6    you recall that from yesterday?

7    A.  Yes.

8    Q.  If we could go to Exhibit 173, please.  If we could

9    start on page 11.

10         MR. LUCAS KASTER:  And Karla, if you can hear me,

11   we're not seeing anything.  Okay.  There we go.

12   Q.  Mr. Jones, I'm providing you this summary sheet which

13   lays out the various pay codes for BNSF.  Do you see that?

14   A.  Yes, sir.

15   Q.  So pay code 1 is regularly scheduled time, pay code 12

16   is overtime, 20 is double time, 24 is holiday, and then

17   there are some vacation codes after that.

18         Do you see that?

19   A.  Yes, sir.

20   Q.  If we could go back to the first page of Exhibit 173,

21   please.

22         So this is Mr. Sanders' time entries beginning on

23   October 1st of 2015.  Do you see that?

24   A.  Yes.

25   Q.  And I want to focus on the column which is column K.  Do

1    you see column K?

2    A.  Yes.

3    Q.  And that's Mr. Sanders' entered start time for the day,

4    right?

5    A.  Okay.  Yes.

6    Q.  And do you see that Mr. Sanders' start time at least in

7    the morning ranges between 5:30 or 5:00 a.m. to 6:30 a.m.?

8    Do you see that?

9    A.  Yes.

10   Q.  And if we can go to the next page.

11          Same thing through November 4th.  Mr. Sanders'

12   start time in the morning ranges from approximately 5:45 to

13   6:30 a.m.  Do you see that?

14   A.  Yes.

15   Q.  And if we can go to the next page.

16          Here we see time from November 5th through

17   November 23rd.  Again, same thing.  Start time ranging

18   between 5:30 and 6:30 a.m., right?

19   A.  Well, there's some 1:00 a.m.s, there's some -- depending

20   on what call times, if we had service interruptions, so it

21   varies, yes.

22   Q.  And I think you're referencing the entry on 11-20

23   regarding the 1 a.m. start time.  Do you see that?

24   A.  Yes.

25   Q.  Is that what you're referencing?

1    A.  I see -- 11-10 shows 5 a.m., so it's all over the map

2    depending on when he was called in.  And there's no reason

3    why -- I mean, it's not consistent when you have 6:30 and

4    then some you have at 5:30, so it could have been, you know,

5    some snow issues.  It could have been some other things that

6    were going on.

7    Q.  And we looked at before the pay code number 1.  That's

8    Mr. Sanders' regularly scheduled hours, right?

9    A.  Pay code 1, yes.

10   Q.  And even for pay code 1, Mr. Sanders' entered start time

11   is around 6 or 6:30, generally, according to these records,

12   right?

13   A.  Correct.

14   Q.  And like you said yesterday, these are time records that

15   you would have periodically reviewed for Mr. Sanders, fair?

16   A.  Yes.

17   Q.  I'm going to switch gears again, Mr. Jones.

18           You understand that there are some recordings in

19   this case between you and Mr. Sanders, right?

20   A.  Yes, sir.

21   Q.  And those are phone calls or discussions you had with

22   Mr. Sanders during his employment with BNSF.

23   A.  Yeah, a select few of them, yes.  It doesn't capture all

24   of them.

25   Q.  Why don't we pull up Exhibit 30, please.

1          Mr. Jones, Exhibit 30 is an email from Mr. Sanders

2    to you and Ms. Hoppenrath dated November 9th of 2015, if we

3    can just blow up the email section of this message, please.

4          Do you see that, Mr. Jones?

5    A.  Yes, sir.

6    Q.  And Mr. Sanders is sending you an email regarding a 10

7    mile per hour slow order that he put on a section of track,

8    right?

9    A.  Yes.

10   Q.  If we can go to the second page of this exhibit.

11         Mr. Sanders attaches a picture to his email,

12   right?

13   A.  Yes.

14   Q.  Is that something he typically did?

15   A.  There was occasions that he would send pictures to

16   support the condition.

17   Q.  Just so you could be fully aware of what he was seeing?

18   A.  Correct.

19   Q.  And if we look at the picture, there's two rails going

20   from left to right.  Do you see that?

21   A.  Yes.

22   Q.  And on the lower rail that's going from left to right,

23   we see two big bolts laying on the ground.  Do you see that?

24   A.  Yes, sir.

25   Q.  Those bolts are supposed to be in the rails, right?

1    A.  In those joint bars, yes.

2    Q.  And then if we look above that underneath the top rail

3    going from left to right, we see another big bolt out,

4    right?

5    A.  Correct.

6    Q.  And then if we go in the middle of the square, you see

7    the kind of triangle or trapezoid-looking area in the middle

8    of the two rails?

9    A.  Yes.

10   Q.  There's another big bolt that's missing, right?

11   A.  Correct.

12   Q.  And these bolts aren't just loose.  They're completely

13   out.

14   A.  That is correct.

15   Q.  If we could go to Exhibit 31, please, and if we could

16   blow up the top section of this email.

17          This is a separate email from Mr. Sanders to you

18   and Ms. Hoppenrath dated the same day, November 9th of 2015,

19   where Mr. Sanders is indicating to you that he placed a 25

20   mile per hour slow order on a separate section of track,

21   right?

22   A.  Correct.

23   Q.  If we could pull up Exhibit 209, please.  If we can play

24   from the start of this recording to one minute.

25          (Exhibit 209 played)

1   Q.  Mr. Jones, did you just hear that first minute of that

2   recording?

3   A.  Yes.

4   Q.  Is that you and Mr. Sanders talking about this defect in

5   Exhibit 30 that we just looked at?

6   A.  Yes.

7            MR. LUCAS KASTER:  If we could play from where you

8   left off, Karla, to one minute and 21 seconds.

9        (Exhibit 209 playback continues)

10  Q.  Mr. Jones, is that section of recording where you're

11  asking Mr. Sanders about the critical joint slow order that

12  Mr. Sanders placed on that we saw on Exhibit 31?

13  A.  Yes.

14  Q.  If we could play from one minute, 55 seconds to two

15  minutes and 45 seconds, please.

16       (Exhibit 209 playback continues)

17  Q.  Mr. Jones, is that your voice on this recording

18  swearing?

19  A.  That is correct.

20  Q.  And when you say that you were going to be taken off

21  your job, were you worried about being fired?

22  A.  No, I was just worried if -- you know, self-perceived

23  pressure.  You know, very prideful and wanting to do the

24  right thing, wanting to get guys to work together.  So, you

25  know, I just felt pressured myself.  Nobody had ever said

1    that you're going to be taken off of that.  I was just

2    trying to get some empathy from Mr. Sanders to work with me

3    and provide accurate details.

4    Q.  What was not accurate about what Mr. Sanders provided to

5    you?

6    A.  All I was asking in the pictures is that I couldn't see

7    it very well and I clearly stated on there that's a simple

8    fix.  We'll get to it.  We knew that diamond was up for

9    replacement and I just said we need to keep an eye on it.

10           And then technically, on the critical joint,

11   putting it on there, it's not about condition.  So what I

12   want to be clear to the jury is that that critical joint

13   when it goes to a slow order is based off days it was out

14   there.  It's not based off condition.  There was nothing

15   that was unsafe about that joint.  It was just -- between me

16   and Sanders, the difference was is he thought it was out

17   there past the 180 days, and I asked him when it was put in

18   the system or when it was installed in the track, because

19   that was the discrepancy on putting the ten on -- or the 25

20   was based off the days, not unsafe condition or saying

21   overlook anything that was unsafe.  It was just the

22   technicality on the days of reporting.  And if it goes past

23   those days, that's when it needs to be slow ordered.  So I

24   just asked him, you know, when was it put in and then not

25   saying we weren't going to get to it.  I just wondered if it

1    was accurate at the time that it needed the slow order based

2    off the days of when the joint was created in the track, not

3    anything about condition.

4    Q.  You interpret --

5    A.  Mr. Sanders was not concerned about the condition of the

6    joint.  It was about 180 days.  If you notice his email, it

7    says the days, the timeline, is why he was putting the slow

8    order on, not based, "Hey, I have concerns that this joint

9    is in bad shape.  It's got cracked bars, it's got loose

10   bolts."  It was based off the days of the joint and I simply

11   asked him what date was it created and put in the system.

12   Q.  You interpret the language you used in that section of

13   this recording as simply asking Mr. Sanders about the

14   defect; is that what you're telling the jury?

15   A.  I didn't say anything about how the tone was.  I just

16   asked, you know, what the condition was of the joint or when

17   it was input, and then I said about the diamond that it's a

18   simple fix .  So, I was --

19   Q.  Go ahead.

20   A.  Yeah.  I understand that the tone and the language

21   towards the end of the email was not appropriate.

22   Q.  When you're talking about the days for the slow order,

23   are you telling Mr. Sanders that he's wrong, that a slow

24   order isn't warranted?

25   A.  No, I didn't talk about the days of the slow order.  The

1    days of the joint.

2          So when you create a joint, it has so many days

3    before -- if you let it go 180 days back then, then it

4    required a slow order.  So it's based off reporting of the

5    joint and I asked him when it was input into the computer.

6    That's simply all I said.  There was no -- he didn't come to

7    me and say anything about, "Hey, this joint is in bad

8    shape," or, "I got cross-level" or, "I got a defect at this

9    joint."  At that point it wouldn't have been any concern.

10   I've never told him to overlook a condition.  It was a

11   technicality based off the reporting timeline of that joint,

12   not the condition that had anything to do with safety, and I

13   just simply asked him what was the date that it was

14   installed into the computer, which is what his concern was

15   is the timeline, not condition.

16   Q.  Mr. Jones, are you telling this jury that by telling

17   Mr. Sanders you're going to lose your job because he's

18   putting slow orders on the track, that that wasn't an

19   attempt by you to get Mr. Sanders to not put the slow orders

20   on?  Is that what you're telling the jury?

21   A.  That's not true.  I was asking him and I told him I felt

22   pressure because I felt like some of these slow orders were

23   a technicality, not based off of conditions and safety.  I

24   just simply asked him when it was input into the computer,

25   because that was what was driving the slow order, not safety

1    and not condition of the track.

2            And then I simply said on the diamond that it's a

3    simple fix and we'll get those taken care of.

4            But I did let my emotions take over towards the

5    end of the call because I just felt like as I was talking

6    with Mr. Sanders, there was things that had nothing to do

7    with track conditions and safety.  It was more technicality

8    and finding stuff.

9            And I simply -- what we don't capture is all the

10   times that I talked with Mr. Sanders about giving me

11   accurate information.  "Hey, I'm seeing this out here.  I

12   need this to help get things corrected."  And, you know, it

13   didn't seem like I was getting that help from Mr. Sanders.

14           And he was very reliable.  I did put a lot of

15   weight on him needing information, needing him to be the

16   eyes and ears out there, and sometimes that was my

17   frustration, that I didn't feel like he was helping me keep

18   the track safe.

19   Q.  Okay.  Well, why don't we go ahead and play two minutes

20   and 45 seconds to three minutes and 15 seconds.

21      (Exhibit 209 playback continues)

22   Q.  So Mr. Sanders' response to your comment is:  I'm just

23   doing what the rule book tells me to do, is that fair?

24   A.  Yes.

25   Q.  Why don't we play three minutes and 40 seconds to four

1    minutes and 12 seconds, please.

2          (Exhibit 209 playback continues)

3    Q.  Why don't we go ahead and play through four minutes and

4    22 seconds.

5          (Exhibit 209 playback continues)

6    Q.  Mr. Jones, Mr. Sanders is providing you information

7    about what the defect looks like, right?

8    A.  That is correct.

9    Q.  Why don't we go ahead and play four minutes and 22

10   seconds through five minutes and 45 seconds.

11         (Exhibit 209 playback continues)

12   Q.  Mr. Jones, during that section of the recording, you are

13   specifically telling Mr. Sanders to take two slow orders off

14   the track, right?

15   A.  No, that's -- I said that the conditions -- and we

16   retested it -- those need to come off or they could come off

17   and nobody wants to.  Nobody took anything off.  I just said

18   based off retesting it, getting the geo car over those --

19   that section that he was concerned about, we had another

20   layer of testing that proved that it didn't warrant the slow

21   order.

22   Q.  Let's talk about this geo car for a second.

23         If a geo car finds a defect, the track inspector

24   is required to go out and confirm it, right?

25   A.  Yes.  They have so many days to follow up behind it,

 1    yes.

 2    Q.  Because the federal regulations require a qualified

 3    person to inspect the track, right?

 4    A.  That is correct.

 5    Q.  Not a geo car, right?

 6    A.  It verifies that the geo car's measurements are

 7    accurate.

 8    Q.  Okay, but I'm asking about the federal regulations.  The

 9    federal regulations require a person to go out and measure

10    the tracks, right?

11    A.  Yes, but you get a more accurate measurement and test

12    based off the geo car data.  You just need to make sure that

13    the location is accurate and things like that to verify, but

14    once the measurements are there, it's a better measurement

15    than what employees can do.

16    Q.  Let me ask you something.  If a track inspector at BNSF

17    disagrees with what the geo car rating is or measurements

18    are, who wins?

19    A.  Typically, we just -- if we have a discrepancy, we meet

20    down there with the supervisors whatever the condition is,

21    and we all just kind of look at it together and see maybe

22    what's wrong.

23            We get ahold of the manager over at the geo car

24    desk and have him rerun the data, and we all just kind of

25    compile that together and decide, you know, based off of

1    what it's reading, where it is, and we just make a

2    comprehensive decision as a team based off of what the

3    inspector might be seeing, how they're measuring it and what

4    the geo car does.

5              And then ultimately, if there's anything that's

6    remotely close, you know, we don't take a chance.  You know,

7    a lot of these defects are based off fractions, you know,

8    from one speed to the next, so we don't -- you know, if

9    something is very close to a defect or needing a slow order,

10   that's the direction we go.  We don't put our weight in gold

11   on it being a sixteenth of an inch away from needing a slow

12   order.  We place it.

13   Q.  Why don't we play section 6:11 through 6:42, please.

14              (Exhibit 209 playback continues)

15   Q.  Mr. Jones, you just testified that if there's anything

16   close, you put the slow order on, right?

17   A.  That is correct.

18   Q.  Because BNSF says safety is number one, right?

19   A.  That is correct.  Yes.

20   Q.  So why would your boss, or why would you have your, as

21   you stated -- and I apologize to everybody -- your ass

22   ripped for a 10 mile an hour slow order if BNSF's sole

23   number one goal is safety?

24   A.  So what we need to put into context is what we're

25   saying, that the ten needs to come off, does not mean that

1    we do not correct the defect and take the ten off.  What it

2    means is when the condition is identified, the ten mph is

3    placed, we need to repair the defect, get the condition

4    fixed to get the ten mph off.  That does not anywhere

5    remotely mean that we're saying just leave the defect out

6    there and take the ten off.  That is what needs to be

7    cleared up in these comments right here.  It is not take the

8    ten off and leave the condition.  It's to repair what he's

9    identified and not let it stay out all weekend or overnight.

10   Q.  Because leaving a slow order --

11   A.  We would never -- the slow order, that's irrelevant as

12   far as how long it being on there.  The important piece is

13   if we identified a condition and that means that it needs to

14   be corrected, whether it's a frog, or it is a dip, a

15   cross-level, whatever other defects identified, that

16   condition needs to be fixed and then the ten needs to be

17   removed.  This is out of context saying that that ten needs

18   to be taken off and just leave the condition the way it is.

19   That is not what took place.

20   Q.  Those were your words on the recording, right?

21   A.  Yes.

22   Q.  Why don't we play section 10:14 through 10:49, please.

23       (Exhibit 209 playback continues)

24   Q.  Mr. Jones -- and again I apologize -- when you say:

25   "EI, big fuckin' deal," that's BNSF's engineering

1    instructions, right?

2    A.  That is correct.

3    Q.  And that's what you told Mr. Sanders in a call with him

4    that we just listened to, right?

5    A.  That is correct.

6    Q.  Why don't we continue playing until 11 minutes and 50

7    seconds.

8         (Exhibit 209 playback continues)

9    Q.  Mr. Jones, if safety is the number one priority at BNSF,

10   why would have having a slow order on a section of track

11   make the president of the railroad and your boss, in your

12   words, look like shit?

13   A.  What we need to understand is, I clearly say in our

14   conversation, is that there is -- we've tested that, there's

15   no unsafe -- what Don and I could not come to terms on is

16   when the joint was created.  Those joints were put in there,

17   nobody knew when they was created, nobody knew when they

18   were in there, and all of a sudden we wanted to put a ten on

19   those joints that were perfectly fine.  I was simply asking

20   him why all of a sudden when those joints have been out

21   there for a few months, they weren't out there 180, we

22   didn't know when they were created.  They were just put in

23   the system.  So I asked him why all of a sudden are we doing

24   this off of a technicality, not based off condition or

25   anything that was unsafe.

1           That's simply -- that's what was my frustration.

2    And maybe I used adjectives, like I said, trying to get

3    empathy for him to understand, you know, where I was coming

4    from, what I needed from him, which was accurate information

5    and us to work together.  It was never to leave anything

6    unsafe.  No way would I want the president of the railroad

7    going over an unsafe condition, but if it's a technicality

8    based off when the joints were safe, that's all I was asking

9    Don is to work with me and understand do we know when they

10   were created and, if they're not unsafe, did it need a slow

11   order.

12   Q.  Mr. Jones, why don't we go to Exhibit 32, if we could.

13          This is an email from Mr. Sanders to you and a

14   number of roadmasters from Mr. Sanders on November 10th of

15   2015, the next day, right?

16   A.  Yes.

17   Q.  And if we can blow up the written section of the email.

18          Now, we heard in the previous recording where

19   Mr. Sanders was asking for something in writing, that he's

20   being asked to do the mainline inspections even though he's

21   a yard inspector, right?

22   A.  Yes.  The left side of the screen has got that part of

23   it blocked with my picture and your picture, so I can't see

24   that right side of the message.

25   Q.  Mr. Jones, I was just asking about the recording that we

1    just listened to, not this email.

2    A.  Okay.

3    Q.  On the recording, Mr. Sanders referenced the fact that

4    he had asked for something in writing telling him to do the

5    mainline inspections and not his yard inspections, right?

6    A.  On the call or on this email?

7    Q.  On the call.

8    A.  I guess I blanked that out.  I didn't quite hear it,

9    but --

10   Q.  Well, let's look at this email.  Can you see the full

11   text now?

12   A.  No.

13   Q.  If we can move the email over to the right a little bit.

14   A.  Maybe a little more.

15   Q.  Mr. Sanders says at the beginning of the email:  "I

16   understand that we are short-handed again.  I would like an

17   official statement stating that I am to run mainline only

18   and not worry about yard tracks.  Also, from now on, before

19   I put up any type of track protection, I need to speak with

20   Blaine or Keith unless they don't answer after a few

21   attempts."

22          Is that what Mr. Sanders wrote to you on

23   November 10th?

24   A.  Yeah, it looks as if that -- yes.

25   Q.  And then if we go down further in the paragraph just

1    below where it says "four years," he writes:  "I will always

2    be" -- "I will be always following a direct order, would

3    just like them in writing from now on to protect myself when

4    I'm told to do other than my job requires.  I would like a

5    clear policy on what I am supposed to track inspect and also

6    how to go about protecting defects.  I have been told

7    numerous ways to report them and how to protect them

8    different from what the FRA and EI states.

9            Do you see that?

10   A.  Yes.

11   Q.  If we could go to Exhibit 195, please, and play 0

12   minutes to two minutes.

13      (Exhibit 195 playback commences)

14   Q.  Mr. Jones, is that your voice on a recording with

15   Mr. Sanders?

16   A.  That is correct.

17   Q.  And you said very early on in that recording when

18   Mr. Sanders asks for something in writing, that he's being

19   told to inspect the mainline tracks, your response was:

20   "That would be like me asking you to put something in

21   writing that you're never going to put another slow order

22   out on the tracks."

23           That was your response to Mr. Sanders, right?

24   A.  Yes.

25   Q.  If we can play from two minutes to four minutes and ten

1    seconds.

2         (Exhibit 195 playback continues)

3    Q.  At the end of that recording you told Mr. Sanders,

4    quote, "Don't be worried," right?

5    A.  That's correct.

6    Q.  At some point did you learn that Mr. Sanders contacted

7    the FRA about a potential defect?

8    A.  I'm not certain.  I think he's talked to them several

9    times.

10   Q.  Do you remember a phone call that we listened to in this

11   case during your deposition about Mr. Sanders contacting the

12   FRA?

13   A.  I do.

14   Q.  If we can go to Exhibit 182, please, and we can play

15   from the start of the recording to one minute and 58

16   seconds, please.

17        (Exhibit 182 playback commences)

18   Q.  Mr. Jones, at one point in that section of the recording

19   Mr. Sanders says to you:  "Have I ever called the FRA

20   because you have repeatedly told me to break the rules?"

21             Do you recall hearing that on the recording?

22   A.  I do.

23   Q.  And your response wasn't:  "Hold on, Don.  I've never

24   told you anything like that.  I'm not telling you to break

25   the rules."

1          That wasn't your response, right?

2     A.  Not on that recording, no.

3     Q.  Your response was:  "The maddest I've ever been is

4     finding out that you and potentially other track inspectors

5     are contacting the FRA."

6          That was your response, right?

7     A.  No, the response was that Mozinski was telling other

8     inspectors that I'm telling him to do stuff that was outside

9     the rules or whatever, which is not true at all, and his

10    perception of what he said on that call is not accurate.

11    Q.  When you tell an employee:  "EI, big fuckin' deal,"

12    you're not telling the employee to ignore BNSF's engineering

13    instructions; is that what you're saying?

14    A.  That is correct.

15    Q.  Why don't we play four minutes to four minutes and 27

16    seconds.

17       (Exhibit 182 playback continues)

18    Q.  Mr. Jones, you accused Mr. Sanders of not giving "two

19    shits" about BNSF on that section of the recording, right?

20    A.  That's what I said, yes.

21    Q.  Are BNSF employees able to call the FRA for guidance on

22    the rule book?

23    A.  Yes.

24    Q.  A track inspector like Mr. Sanders contacting the FRA

25    for clarification is not a violation of any BNSF policy,

1    right?

2    A.  That is correct.

3    Q.  If we can go to Exhibit 200, please.

4         THE COURT:  Mr. Kaster, while we're waiting for

5    that to come up, can I just ask:  We have a sequestration

6    order in place that was entered as part of the pretrial

7    hearing.  Do we have a witness in the back of the courtroom?

8         MR. LUCAS KASTER:  No, Your Honor, we don't.

9         THE COURT:  Okay.  Thank you very much.

10        MR. LUCAS KASTER:  Thank you for catching that.

11   BY MR. LUCAS KASTER:

12   Q.  So if we can play from the start of the recording to one

13   minute and 40 seconds, please.

14        (Exhibit 200 playback commences)

15   Q.  If we can continue playing to one minute 40 seconds,

16   please.

17        (Exhibit 200 playback continues)

18   Q.  Mr. Jones, is this another phone call between you and

19   Mr. Sanders where you are questioning him about his entry of

20   a slow order?

21   A.  No, I was asking about the condition of a frog because I

22   couldn't see very good from the picture.  Frogs are very

23   susceptible on how you measure them and there's different

24   things that pertain to -- if it's a chunk, the wheels got to

25   be making impact down in the breakout or whatever, so I was

1    just getting some clarification on what his gut feeling was,

2    if it was something that he was very concerned about or if

3    it was something that, you know, just looked ugly.  It was

4    no -- no question to him about it.  It's just asking

5    questions on what his feelings were and what his thoughts

6    were.

7    Q.  And Mr. Sanders said in the recording that he had put a

8    ten on it, right?

9    A.  Yes.  Yeah, he was being safe and placing a ten and then

10   sent me the picture and we looked through it together, and I

11   was just asking him some follow-up items about what he was

12   seeing and how it was measured.

13   Q.  If we can play two minutes and 50 seconds to three

14   minutes and 30 seconds, please.

15        (Exhibit 200 playback continues)

16   Q.  Questions about what, Mr. Jones?

17   A.  About why we -- these tens on these frogs kept popping

18   up, and that's what we need to clarify.

19             A frog is good for max speed or it's down to a ten

20   based off of the condition and the measurement.  And I

21   clearly state in there that I was bringing in extra welders

22   and putting them where he needed, and I was asking for his

23   help to tell me where the next frog was close, where it

24   needed to be.

25             And prior to this call I talked with him or the

1   day before and asked, I'm sure, where -- what our next

2   potential slow order on a frog would be and Lanthier (ph)

3   had been in the yard all day welding on something different

4   or doing something different where we could have had him

5   around this one if this one was next on Don's list or close.

6          So I was trying to get him help to avoid these

7   slow orders, because that's my job is to manage slow orders,

8   especially during peak season.  It's not a bad thing to have

9   tens, but I have a job to do, which is bring in resources

10  and get the information from Mr. Sanders on where to place

11  these guys to avoid these conditions popping up.

12  Q.  Why don't we go ahead and play five minutes and 58

13  seconds to six minutes and 40 seconds, please.

14       (Exhibit 200 playback continues)

15  Q.  If we can keep playing to six minutes and 40 seconds,

16  please.

17          MS. PATHMANN:  I'm sorry.  That is 6:40.  Another

18  five seconds?

19          MR. LUCAS KASTER:  Sure.

20       (Exhibit 200 playback continues)

21          MR. LUCAS KASTER:  Thank you.

22  Q.  Mr. Jones, in this section of the recording you're

23  saying you're going to bring in contractors to weld.  Did

24  you hear that?

25  A.  Yes.

1    Q.  So you're saying you're going to bring in outside

2    contractors to take the place and do the job of the welders

3    BNSF has already, right?

4    A.  If you heard, I said I put on three other welders and

5    they didn't want to come in and work, so I was to the point

6    where if we continued to have these conditions and these

7    frogs that we couldn't weld and didn't have the welders that

8    wanted to come in and do it, that I might be forced to look

9    for outside resources to help get caught up on these

10   conditions.

11   Q.  And you say you need a team of people who are willing to

12   protect their jobs.  Those were your words, right?

13   A.  That is correct.

14   Q.  If we can play 12 minutes and 12 seconds through 12

15   minutes and 30 seconds, please.

16        (Exhibit 200 playback continues)

17   Q.  Mr. Jones, it's a little hard to hear, but on that

18   section of the recording you told Mr. Sanders leaving a ten

19   on during peak season is, quote, "not good."

20        Did you hear that?

21   A.  Yes.

22   Q.  And then you said:  "I don't want our team to be the

23   team that causes BNSF to fail at peak season."

24        Is that what you said?

25   A.  That is correct.

1    Q.  Because of slow orders.

2    A.  That is correct.

3    Q.  If we could pull up Exhibit 36, please.

4         This is another series of emails dated

5    December 1st of 2015.  They go in reverse chronological

6    order, Mr. Jones, so the first email is on the bottom.

7         On Monday, November 30th, Mr. Sanders sends you

8    this email saying that he placed a ten mile per hour slow

9    order at St. Croix 1-A switch.  Do you see that?

10   A.  Yes, sir.

11   Q.  And your response is:  "I'm not really seeing a ten mph

12   condition," right?

13   A.  That is correct.

14   Q.  Did you go out physically to the location and do the

15   measurements like Mr. Sanders?

16   A.  I believe I did, yes.

17   Q.  Do you have any proof of that?

18   A.  No, I do not.

19   Q.  Okay.  Did you send Mr. Sanders any pictures in response

20   saying:  "Here's what I saw.  What did you see?"

21   A.  No, I would assume he'd text me a picture of it and I

22   run down there and looked at what he was seeing or how he

23   was measuring it or the condition of it.

24   Q.  Mr. Sanders responds at the top that he and a person

25   named Patrick measured it.  Do you see that?

1    A.  Yes.

2    Q.  Who was Patrick?

3    A.  He was an inspector that was down there, like, riding

4    with Don trying to get him to fill one of the other spots.

5    I don't know why I'm blanking his last name.

6    Q.  That's okay.

7    A.  Heinemann.  Heidemann.

8    Q.  Heinemann?

9    A.  Yeah, Heidemann or Heinemann, something like that.

10   Q.  So Mr. Sanders is telling you not only he, but another

11   track inspector, Patrick, identified this location as a

12   defect requiring a slow order, right?

13   A.  That is correct.

14   Q.  After seeing these emails and hearing your recordings,

15   are you still telling the jury that you in no way attempted

16   to dissuade Mr. Sanders from reporting a defect or reporting

17   a slow order?

18   A.  That is correct.  In here it says I'm not really seeing

19   a ten mph condition, just meaning based off of what I seen

20   or how I measured it, it didn't look like it.  Nowhere did I

21   say don't place the ten or don't do that or that I wouldn't

22   come out there and do it.

23          There was all kinds of follow-up questions and we

24   talk about what I'm seeing versus what he's seeing, but

25   every time the ten was left on and the welders were brought

1    in to weld it unless him and I agreed that maybe he did

2    measure it wrong or something wasn't right.  There was never

3    a time that the defect -- or the slows were ever removed.

4    It was just follow-up questions.

5    Q.  Now, you learn at some point that Mr. Sanders has gone

6    to HR, right?

7    A.  That is correct.

8    Q.  And you figure out that he's filed a complaint against

9    you.

10   A.  Through their investigation they did come and ask me

11   some questions.

12   Q.  If we could pull up Exhibit 40, please.

13          Again, this is a series of emails between you and

14   Mr. Sanders.  I'm sorry.  It's just a series of emails,

15   right?  And I'll direct you where I'm looking.

16          If we can blow up the first email on the bottom of

17   this first page just from the "from" line through just a

18   little -- "I'm back to looking at yards" above the red

19   section.  Great.  Thank you.

20          Mr. Jones can you see that?

21   A.  Yes.

22   Q.  Okay.  So this is an email from Mr. Sanders telling you

23   what his day was on 12-7 and the evening of 12-6, right?

24   A.  Yes.

25   Q.  And is this what we had talked about yesterday as a

1    nightly report?

2    A.  Yes.  This is an example.  They kind of vary in

3    different formats, but yes.

4    Q.  And Mr. Sanders says:  "I started at 6:30 at the Bluffs.

5    I ended at 16:30."  Do you see that?

6    A.  Yes.

7    Q.  Twelve-hour day?

8    A.  Yes.

9    Q.  And he says at 7, he says "Talk with HR," right?

10   A.  Yes.

11   Q.  He doesn't say anything about what he actually went to

12   HR for, right?

13   A.  Correct.

14   Q.  If we can go up and blow up the first email.

15            This is an email from you dated December 8th of

16   2015 at 3:56 a.m.  Do you see that?

17   A.  Yes.

18   Q.  And you don't respond to Mr. Sanders.  You send an email

19   to a Joseph Spire, a Terry Morgan, and Magenta Eggertsen, as

20   well as cc'g Doug Jensen.

21            Do you see that?

22   A.  Yes.

23   Q.  Doug Jensen is your direct boss?

24   A.  That is correct.

25   Q.  Mr. Spire, Mr. Morgan and Ms. Eggertsen are three HR

1    professionals at BNSF, right?

2    A.  That is -- that is correct.

3    Q.  And when you send this email, you have no idea why

4    Mr. Sanders went to HR, right?

5    A.  Based off the emails, I can't recall of him and I -- if

6    I called him and said, "Hey, I see you went to HR.  You

7    know, is there something that we need to talk about?" or

8    something like that.  I can't recall if there's something in

9    the middle.  Based off of my and Don's relationship and as

10   much as we talked and interacted, I would say I made a phone

11   call in between his nightly report and sending this email

12   to --

13   Q.  Okay.  So let's look at your email.  You say:  "I see

14   Don's end-of-the-day report that he visited HR today?",

15   right?

16   A.  Are you there?

17   Q.  Yeah, I'm here.  Did you get a call or something?

18   A.  I'm sorry.  My phone jumps in and out.  Let me turn this

19   off.  It takes over my earpiece when that happens.

20        Okay.  Based off of my and Don's interactions and

21   how much we communicated and talked, when I seen that

22   nightly report, I would assume that I probably called him

23   and said, "Hey, I see HR is on here.  Is there concerns or

24   anything like that that you and I can fix or address" and

25   probably had a conversation about it, but I don't recall

1   that and I don't have any proof of that.

2   Q.  And your email doesn't say that, right?  Your email

3   doesn't say:  "I talked to Mr. Sanders today and he alerted

4   me that he went to HR.  Let me give you my side," right?

5   A.  Correct.

6   Q.  And you send this email at 3:56 a.m., and you at this

7   point assume that Mr. Sanders went to HR to complain about

8   the recordings that we just heard, fair?

9   A.  I wasn't positive.  Yeah, I assume with our interactions

10  and just kind of how things were, you know, not going as

11  planned, we weren't working as good together, maybe

12  frustrations on my part, you know, I just wanted to clear up

13  that I was going to do things in my power to make sure Don

14  stopped feeling like, you know, things were going south for

15  him, this is anything to do with him.  It was more pressure

16  on my side.  So, you know, I wanted him to understand that I

17  had onus in the game and this was my corrective actions to

18  make Don start feeling more secure and not feel like there

19  was anything that was repercussions on him.

20  Q.  Was this your attempt to preempt Mr. Sanders' complaint

21  to HR?

22  A.  No.  I just -- I'm the type that -- I'm a people person

23  and I know sometimes my so-called passion is how I used to

24  rule it until I've learned that, you know, sometimes my

25  impact on others is a little bit different than what I -- my

1    intentions are.

2            So I just wanted to make sure that, you know, I

3    need Don, I need his help.  I've told him that relentlessly,

4    that I can't replace him.  He's one guy that would come in

5    all the time and I -- you know, we just got crossed on a few

6    misunderstandings and pressure of the job, me being new, and

7    I just wanted to make sure that everybody understood that

8    it's my job as a leader, manager, to correct things and make

9    everybody feel part of the team.  So that was my intentions

10   on making sure that everybody knew that, you know, I was

11   going to work with Don and make sure if I was being unclear

12   and not being, you know, precise, making him confused, that

13   I was going to clean that up and make sure Don felt

14   comfortable out there.  I don't need him distracted while

15   he's out protecting the railroad or doing his job.

16   Q.  So why don't you send that email back to Mr. Sanders as

17   opposed to the HR professionals?  Why don't you say, "Hey,

18   Don, I just want to clarify something to you.  I'm not

19   telling you to break the rules."  You don't even include

20   Mr. Sanders on the email, right?

21   A.  One thing that I -- like I said, I cannot give you proof

22   or I did record Don myself.  All these recordings that took

23   place I had -- was not aware that they were taking place,

24   which does not -- has anything to do with my conduct or some

25   of the language I used.  But I can assure you that there was

1   a conversation between Don and I as opposed to this HR, and,

2   you know, I felt like maybe my and Don's relationship was

3   pretty close.  We had some pretty candid conversations.  You

4   know, we were both passionate about what we needed to do,

5   what we need to work together on, and I can 100 percent

6   probably guarantee that Don and I had a conversation.  I

7   just didn't copy him on the email.  It was more face to face

8   with Don and I.

9   Q.  Mr. Jones, I'd like you to answer my question.

10             In your email you don't respond to Mr. Sanders and

11  tell him, "I haven't been telling you to break the rules,"

12  right?

13  A.  Not in the email, but face-to-face I can tell that we

14  had -- I guarantee we had that conversation.

15  Q.  And I just want to make sure I caught something

16  correctly.  Are you contending that the recordings we just

17  heard are simply evidence of misunderstandings between you

18  and Mr. Sanders?

19  A.  That's true.

20  Q.  If we can go to Exhibit 39, please.  If we can blow up

21  the summary -- I'm sorry -- the contact and first paragraph

22  of the summary section, please.  Thank you.

23             Mr. Jones, this is an email from Ms. Eggertsen on

24  12-7 at 5:09 p.m. to her bosses Terry Morgan and Joseph

25  Spire, the two other people you sent your email to.  And in

1    the email Ms. Eggertsen is outlining what Mr. Sanders and

2    she spoke about on December 7th, and that's what is pulled

3    up on the screen.

4          In the bottom of the first paragraph she

5    references that she met with Mr. Sanders on the morning of

6    December 7th to talk with him, right?

7    A.  That I did or she did?

8    Q.  That Ms. Eggertsen met with Mr. Sanders on the morning

9    of December 7th to talk with Mr. Sanders.  Do you see that,

10   the last line of the first paragraph?

11   A.  Yeah.  It's blocked due to my picture, but yes.

12   Q.  And then under "Summary," Ms. Eggertsen references that

13   Don was unhappy with how he is being treated by management

14   and that Mr. Sanders played for Ms. Eggertsen some of the

15   recordings of the conversations between you and Mr. Sanders.

16         Do you see that in her summary?

17   A.  Yes.

18   Q.  And he specifically names in his complaint you,

19   Mr. Jones, and Roadmaster Ms. Hoppenrath, right?

20   A.  Correct.

21   Q.  Mr. Jones, we looked at yesterday and this morning

22   Mr. Sanders' time records.

23         At anytime prior to this complaint by Mr. Sanders

24   on December 7, did you ever initiate any type of discipline

25   against Mr. Sanders for allegedly improperly recording his

1    time?

2    A.  No.  No.

3    Q.  Did you ever instruct Mr. Sanders to check the hours

4    that he had entered prior to his HR complaint on

5    December 7th of 2015?

6    A.  Not me personally.  I think there were some times where

7    the roadmasters on his nightly report, they would say,

8    "Okay.  I see you worked this many hours or this much

9    overtime.  Please explain what took place or what kept you

10   out there longer."  I know there was some of those

11   conversations.

12   Q.  Mr. Jones, I've held up a couple binders for you.

13   Here's (indicating) another one.  We have three binders like

14   this in this case of our exhibits.  Defendant has their own

15   binders.

16          Can you point me to a single document from before

17   December 7th that you raised a concern about Mr. Sanders'

18   overtime?

19   A.  No, not that I'm aware of, just personal conversations.

20   Q.  Before December 7th of 2015, did you ever instruct

21   someone to follow Mr. Sanders around to ensure that he was

22   reporting accurate hours?

23   A.  Before when?

24   Q.  Before December 7th.

25   A.  Not that I'm aware of that I wouldn't have -- I mean,

1   there could have been -- FLS do that all the time.  They go

2   out and see how their work crews -- see where they're at,

3   make sure track inspectors are going through road crossings.

4   So I wouldn't be privy to everything that FLS are doing

5   every day.

6   Q.  But did you ever instruct somebody to follow Mr. Sanders

7   around?

8   A.  No.

9   Q.  We saw this morning Mr. Sanders' time entries for

10  October and November of 2015, indicating that he started,

11  according to his entered start time, between 5 a.m. and

12  6:30 a.m. almost every day.

13          Do you recall seeing that?

14  A.  The majority of the time, yes.

15  Q.  Prior to December 7th, did you ever investigate

16  Mr. Sanders for starting before 7 a.m.?

17  A.  No.

18  Q.  If we can go to Exhibit 43, please.

19          And I just -- this is again a series of emails,

20  but I want to blow up the bottom one on the first page, an

21  email from Mr. Jones, please.

22          Mr. Jones, do you see this email?

23  A.  Yes.

24  Q.  Now, this is Monday December 7th, right?

25  A.  Yes.

1    Q.  Same day that Mr. Sanders went to HR, right?

2    A.  Yes.

3    Q.  And you in an email tell Mr. Sanders:  "Don, you need to

4    get the inspections in the yards and back tracks up to date.

5    Too many out of date," right?

6    A.  Yeah, that's what it says.

7    Q.  Let's go to Exhibit 41, please.  If we can blow up the

8    bottom email on this page.

9             Mr. Jones, this is an email from you to

10   Mr. Sanders dated December 8th, the following day, right?

11   A.  Yeah.

12   Q.  And here you say:  "With the focus on mainline

13   inspections, not sure why we are missing some segments?",

14   right?

15   A.  Correct.

16   Q.  Do you recall listening to the recording a few minutes

17   ago this morning where you told Mr. Sanders:  "Don't worry.

18   It's not like we're going to say you should be doing both

19   jobs at once."

20             Do you recall hearing that?

21   A.  That is correct.  This is talking about mainline

22   segments that were missing.

23   Q.  And you saw the email from the day before this one where

24   you're asking Mr. Sanders about the yard inspections, right?

25   A.  Yeah.  We had some that were out of date and we need to

1    come up with a plan to get them in frequency.  These missing

2    segments, we're talking about mainline, not yard.

3    Q.  Right, but the earlier email was about yard, right?

4    A.  Yes.

5    Q.  So on back-to-back days you're telling Mr. Sanders get

6    up to date on the mainline inspections, get up to date on

7    the yard inspections, right?

8    A.  No, it was simply a question:  With all the focus on the

9    mainline inspections, not sure why we were missing some

10   segments, so I was asking if -- without putting it all in

11   this, was there some computer issues?  Did something not

12   sync?  Just why did we miss some of that?  It wasn't

13   anything about you're not doing that, you didn't go over it.

14   I just needed to know why some of them were missing on the

15   frequency based off of what the computer was showing,

16   nothing about that he did something wrong.  I'm just not

17   sure why we're missing some segments.  It's out of context.

18   It's nothing hastily or mean about that.  It was just a

19   question why we're missing some segments.

20   Q.  If we could go to Exhibit 46, please.

21            Mr. Jones, after Mr. Sanders' HR complaint you got

22   this letter from HR, right?

23   A.  That is correct.

24   Q.  And if we could blow up the written portion of this

25   letter.

1           And this is a Retaliation Prohibited Letter to you

2      dated December 15th, 2015.  Do you see that?

3      A.  That is correct.

4      Q.  So this was a letter given to you by HR in response to

5      Mr. Sanders' HR complaint, right?

6      A.  That is correct.

7      Q.  And it tells you at the top:  "An employee under your

8      supervision recently filed a complaint of discrimination or

9      harassment against you," right?

10     A.  That is correct.

11     Q.  And then there's some bullet points, and in the first

12     line after the bullet points it says:  "Retaliation is

13     prohibited and will not be tolerated," right?

14     A.  That is correct.

15     Q.  Do you consider BNSF to have a zero-tolerance policy

16     with respect to retaliation?

17     A.  Yes.

18     Q.  Let's go to Exhibit 48, please.

19          Exhibit 48 is a letter to you dated December 22nd,

20     2015, from Mr. Doug Jensen, right?

21     A.  That is correct.

22     Q.  Mr. Jensen is your boss, right?

23     A.  Correct.

24     Q.  If we could blow up the first paragraph of the written

25     section.

1          So this is informing you of the results of the HR

2     investigation, right?

3     A.  That is correct.

4     Q.  And in this letter it specifically tells you by name

5     that Mr. Sanders filed the complaint against you, right?

6     A.  That is correct.

7     Q.  If we could blow up the second paragraph, please.

8          And in the middle of this paragraph on the

9     right-hand side there's a sentence that starts with "Your."

10         Do you see that, Mr. Jones, "Your use of

11    profanity ...."?

12    A.  Yes.

13    Q.  "Your use of profanity while expressing frustration with

14    respect to Mr. Sanders' contact with the FRA is not

15    acceptable and will not be tolerated."

16         Do you see that?

17    A.  Yes.

18    Q.  That's the sole reference to your actual conduct that

19    you were disciplined for in this letter, right?

20    A.  Correct.

21    Q.  Your use of profanity.  That was it, right?

22    A.  That's correct.

23    Q.  Did you at some point learn that after Mr. Sanders filed

24    this HR complaint that he also met with Mr. Jensen, your

25    boss?

1    A.  I may be aware.  I'm not a hundred percent sure.

2    Q.  If we could go to Exhibit 170, please, at page 25.

3              This is a series of emails between Mr. Sanders and

4    Mr. Jensen about meeting.  Do you see that?  It starts at

5    the bottom of the page?

6    A.  Yes.

7    Q.  And if we could blow up the top email.

8              This is an email from Mr. Jensen to you,

9    Mr. Morgan and Mr. Spire, the two HR people, right?

10   A.  Correct.

11   Q.  And Mr. Jensen tells you that he plans to meet with

12   Mr. Sanders the following Monday, right?

13   A.  Yes.

14   Q.  And this is dated January 8th of 2016, right?

15   A.  Yes.

16   Q.  So you know as of this date that Mr. Sanders is meeting

17   with your boss on January 11th, right?

18   A.  It says:  "Once we have a solid time."  I didn't see

19   where it said the 11th, but --

20   Q.  Well, Friday is the 8th and he's saying the following

21   Monday.  That would be the 11th, right?

22   A.  Okay.

23   Q.  Now, Mr. Sanders at some point transfers away from

24   Dayton's Bluff in January of 2016, right?

25   A.  Yeah, that sounds accurate, yes.

1   Q.  And he comes back to Dayton's Bluff on March 15th.  Do

2   you recall that?

3   A.  Yes.

4   Q.  If we can pull up Exhibit 156, please.

5           Mr. Jones, this is Mr. Sanders' employee

6   transcript.

7           And if we can blow up the last few lines of his

8   job assignments right above the black section.  Great.

9   Thank you.

10          This is BNSF's records regarding Mr. Sanders' job

11  assignments, and we see on the second line from the bottom

12  in the very left-hand corner it says 3-15, 2016, right?

13  A.  Yes.

14  Q.  That's an indication of when Mr. Sanders came from

15  Northtown and transferred back to Dayton's Bluff, right?

16  A.  Correct.

17  Q.  And on March 19th, four days later, Ms. Hoppenrath

18  follows Mr. Sanders around, right?

19  A.  She was coming in to have their conversation.  She had

20  rode with him the day that he come over and then had some

21  concerns that, you know, Don had left early that day, and so

22  she was going to come in that morning and talk with him and

23  found out that he wasn't there on the 19th, and that's kind

24  of when the investigation started as far as time entries.

25  Q.  On the 19th.

1    A.  Yes.  That was the first day.

2    Q.  And you talked to Ms. Hoppenrath before she followed

3    Mr. Sanders around on the 19th, right?

4    A.  That's correct, we talked.

5    Q.  And you gave her the approval to do that.

6    A.  They have the approval at anytime they want to look --

7    watch their employees at anytime.  This was not anything out

8    of context or anything specific.

9    Q.  Did you tell Ms. Hoppenrath, "Don't do that.  Don't

10   follow Mr. Sanders around"?

11   A.  No, because if she has concerns, that is her job, to

12   make sure people are doing what they're supposed to be doing

13   and following the rules.

14   Q.  And BNSF has all types of actual vehicles, right, work

15   vehicles?

16   A.  In the maintenance craft, yes.  We have pickups, to

17   hi-rail pickups, to boom trucks, grapples.  Yes, all kinds

18   of --

19   Q.  And you have regular trucks, for example, right?

20   A.  Correct.

21   Q.  But Ms. Hoppenrath didn't use a BNSF truck to follow

22   Mr. Sanders around.  She used an unmarked vehicle, right?

23   A.  She used a rental car that I had for the previous week.

24   Q.  Did you approve Ms. Hoppenrath to use the rental car on

25   March 19th to follow Mr. Sanders around?

1    A.  I told her that I had the rental car there at the GOB,

2    which is where my office is, because they were working on my

3    Suburban.  I said it wouldn't be turned in until next week,

4    so if you would like to use that rental, feel free.  You're

5    more than welcome to use it.

6    Q.  If we could go to Exhibit 98, page 98, please.  If we

7    can blow up line 1 through line 13.

8            Mr. Jones, this is Ms. Hoppenrath's testimony

9    during the subsequent administrative hearings into

10   Mr. Sanders' allegations about time theft.  You reviewed

11   this transcript, right?

12   A.  Correct.

13   Q.  And Ms. Hoppenrath was asked if she was in an unmarked

14   car.  She responded:  "Yes."

15           Mr. Mozinski asked:  "So I am guessing BNSF rented

16   the unmarked car, correct?"

17           Ms. Hoppenrath's answer:  "Yes."

18           "Question:  And you would need your supervisor's

19   approval for that, correct?"

20           Ms. Hoppenrath:  "To rent a car?"

21           Mr. Mozinski:  "Yeah."

22           Ms. Hoppenrath answered:  "Yes," right?

23   A.  Yes.

24   Q.  That was Ms. Hoppenrath's testimony during the

25   investigative hearing, correct?

1    A.  Correct.

2    Q.  By the way, did you pay Ms. Hoppenrath for her time

3    following Mr. Sanders around on March 19th?

4    A.  She's salaried, so it don't matter if she works five

5    days a week or whatever, as long as she's conducting her

6    business and doing what it is.  She's on salary.  She

7    doesn't get compensated for any -- so she can work weekends,

8    she can work Sunday through Thursday.  I mean, when you're

9    salaried you can kind of customize what you need to do.

10   Q.  And after the 19th, you approved Ms. Hoppenrath to

11   follow Mr. Sanders around on 3-25 and 3-26, right?

12   A.  I told her if she had concerns about what -- how he was

13   conducting business or anything that alarmed you, she has

14   the freedom to do whatever you need to make sure your people

15   are accountable.  So approval I guess.  Yes, that's her job

16   duties.

17   Q.  And you allowed Ms. Hoppenrath to use the rental car

18   again on the 25th and 26th to follow Mr. Sanders around.

19   A.  I am not certain if it was the same rental car or if

20   there was another one.  That I do not know.

21   Q.  But she did follow Mr. Sanders around in an unmarked

22   vehicle.

23   A.  She did observe his actions and his work practices on

24   those days, yes.

25   Q.  As far as you are aware, had Ms. Hoppenrath ever rented

1    an unmarked vehicle to follow an employee around to ensure

2    the time they were reporting was accurate?

3    A.  I don't recall the exact times.  I know there's been

4    rental cars reserved for workplace observations, stealth

5    testing, things like that, guys are out working, but

6    particularly for people's workdays, I'm not aware of any.

7    Q.  Okay.  If we could go back to Exhibit 98, please, and go

8    to page 101.  If you can blow up line 9 through 16.

9              This time Mr. Sanders asks Ms. Hoppenrath a

10   question:

11             "Well, in -- in a sting operation where you go and

12   rent a vehicle and then hide in a bush or across the -- uh,

13   you said 150 feet and I say it's ten railroad tracks, so

14   it's quite a few more football fields than 150 feet.  But in

15   a string operation where you rent a PE -- a vehicle to try

16   to manipulate a situation."

17             Ms. Hoppenrath asked:  "I think John already asked

18   that and I said this was the first time."

19             Right?

20   A.  Yes.  That's what it says.

21   Q.  And then at some point you make the decision to charge

22   Mr. Sanders with time theft, right?

23   A.  That is correct.

24   Q.  If we can go to Exhibit 91, please.

25             This is a letter dated March 28th, 2016, signed by

1    you, to Mr. Sanders accusing him of time theft, right?

2    A.  Allegations and your alleged responsibility, so it's not

3    accusing.  It's just a facts-finding event based off of what

4    we witnessed.

5    Q.  And you made the decision to draft this notice?

6    A.  You put it in a computer and it kind of generates

7    broad-based notice based off the rules and timelines and

8    locations.

9    Q.  But you made this decision to assert this allegation

10   against Mr. Sanders.

11   A.  Based off of the details that Blaine provided and

12   talking with LR about what we seen, we decided to issue the

13   investigation to find out the facts and the details.

14   Q.  So you talked to Labor Relations before you issued this

15   notice?

16   A.  Yes.

17   Q.  And what is Labor Relations?

18   A.  There are -- they kind of oversee the labor agreements

19   and, you know, just procedures and discipline procedures on

20   the railroad, so they're an expert group.

21   Q.  Mr. Jones, we looked at a minute ago the

22   anti-retaliation letter that you got in December of 2015

23   after Mr. Sanders filed an HR complaint against you, right?

24   Do you recall looking at that letter?

25   A.  Yes.

1   Q.  Why -- if you got a letter telling you that retaliation

2   was prohibited, why didn't you say to someone at Labor

3   Relations:  "I shouldn't be involved in this.  Mr. Sanders

4   within a couple months had just filed an HR complaint

5   against me.  We have an anti-retaliation policy.  I don't

6   want to be involved."

7           Why didn't you say that?

8   A.  Because his allegations do not deter me from doing my

9   job and I knew this was not retaliation.  This was

10  facts-finding based off of what we were doing, what we seen,

11  what was taking place, the entries of time when he was

12  showing up, when he was leaving.  That doesn't deter me --

13  even though that might have been the agenda, it doesn't

14  deter me from following up and holding my people accountable

15  and doing what I'm required to do.

16  Q.  Because there's some discretion as to whether or not a

17  manager issues a notice of investigation and how they do so,

18  right?

19  A.  That is correct.

20  Q.  For example, you allege that Mr. Sanders committed time

21  theft on March 19th, March 25th and 26th, right?

22  A.  That is correct.

23  Q.  And you could have issued one notice of investigation

24  for all three of those days, right?

25  A.  What we want to do is just make sure there wasn't a

1    pattern.  I mean, we give him the benefit of the doubt on

2    the 19th, thinking, well, maybe, you know, something come

3    up, something happened.  Let's just see, you know, what his

4    actions are, if he does go back and change time or does have

5    a communication with Blaine like, "Hey, I" -- you know, "I

6    know I wasn't here all day.  This is what I did."

7            So, we just thought, well, let's see -- let's give

8    himDI we thought let's give him the benefit of the doubt,

9    because, you know, we didn't have any proof prior to this.

10   With all the time that you talked about, all the hours

11   worked, he never had any issues of accurately reporting

12   time, so we just wanted to make sure why all of a sudden

13   would he come in as late as he did and leave as early as he

14   did and think that he was entitled to a full day's pay and

15   overtime.

16           So, we just wanted to be honest and open with him,

17   so we just said, okay, let's -- understand the 18th brought

18   some uncertainties and what we wanted to follow up on.  The

19   19th really, you know, set that into motion and we just

20   wanted to see, okay, then we know he works this next

21   weekend.  Let's just see if there's any follow-up or any

22   patterns here, and that's why we just kind of kept it

23   continuing.

24   Q.  Mr. Jones, I'd like you to answer my question.  You

25   could have issued one notice of investigation for all three

1   days, right?

2   A.  It was fair for him to have that opportunity to do the

3   right thing on the 19th.

4   Q.  I'm not sure what you mean.  What do you mean?

5   A.  By looking at the 19th, we realized that he had no

6   intentions on going back, so that's why we kept them

7   separate and separated them in two bins after the days got

8   past and there was no accurate or honest corrections on the

9   19th, so we separated the two events.

10  Q.  Because you had actually issued notices of investigation

11  to employees under your direction for multiple days of

12  alleged time discrepancies, right?

13  A.  On who?

14  Q.  Well, you had done that.  Do you recall?

15  A.  There's been some that we speculated.  We went through

16  the process and found out that they were not substantiated.

17  Q.  So let's look at Exhibit 92 first before we go there.

18  If we can blow up the written paragraph at the top.

19         This is a separate notice to Mr. Sanders accusing

20  him of falsifying payroll beginning on March 25th of 2016.

21  Do you see that?

22  A.  Yes.

23  Q.  And this is again a letter signed by you.

24  A.  That is correct.

25  Q.  So you make the decision to issue the two separate

1    notices, one for the 19th, one for the 25th, right?

2    A.  With the direction of LR, this is how we wanted to put

3    this together.

4    Q.  And you know that when you issue two separate notices,

5    Mr. Sanders has to go through two separate investigation

6    hearings, right?

7    A.  That is correct.  He needs to answer for both times to

8    give him the opportunity to keep them separate and give us

9    the facts and the details on what he might have been doing

10   or any explanation on what we had seen.

11              THE COURT:  Mr. Kaster, is this an appropriate

12   time to break?

13              MR. LUCAS KASTER:  Yes, Your Honor.

14              THE COURT:  All right.  Terrific.  We'll take a

15   15-minute break at this time.  We will adjourn and resume

16   proceedings when we return at about 11 o'clock.

17       (Jury excused)

18              THE COURT:  I did want to raise one issue before I

19   adjourn, which is that I think we had an Exhibit 156 to

20   which an objection had been made, relevance, but that had

21   been published first on the screen without going through the

22   paper process that I think we discussed earlier.  And I

23   wanted to note that I had overruled the relevance objection

24   based on the testimony, but I think we ought to be a bit

25   more diligent, all of us, about trying to catch that

1    beforehand if we could.

2              MR. LUCAS KASTER:  You're right, Your Honor.  And

3    the exhibit that was put up did have the section that was at

4    issue redacted, but I agree with your Honor.  I need to do a

5    better job of keeping track of that.

6              THE COURT:  Well, we all do.  All right.  Great.

7              Thank you, everyone.  We'll adjourn and, as I say,

8    we will resume proceedings at about 11 o'clock.  Thank you.

9              MR. LUCAS KASTER:  Thank you.

10        (Recess taken at 10:47 a.m.)

11                       *      *      *      *

12        (11:05 a.m.)

13                         IN OPEN COURT

14        (Jury enters)

15              THE COURT:  Please be seated, everyone.

16              Mr. Kaster?

17              MR. LUCAS KASTER:  Thank you, Your Honor.

18   BY MR. LUCAS KASTER:

19   Q.  Mr. Jones, I'd like you to grab one of the binders you

20   have, the binder that has Exhibits 222 and 223 in it,

21   please.

22   A.  Okay.

23   Q.  So if you could turn to Exhibit 222, please.

24              MS. FERGUSON:  Your Honor, just for the record, we

25   do have objections related to these.

1        THE COURT:  Yup.  Thank you.  I'm aware of that.

2   Q.  Mr. Jones, are you at Exhibit 222?

3   A.  Yes, I am.

4   Q.  And is this a notice of investigation that you issued

5   for an employee under your direction on November 4th of

6   2016?

7   A.  That is correct.

8   Q.  And that's your signature on the bottom.  Or your name

9   on the bottom I should say.

10  A.  My name, yes.

11  Q.  And then the second page is a waiver form for that same

12  individual, right?

13  A.  That is correct.

14        MR. LUCAS KASTER:  Move for the admission of

15  Exhibit 222.

16        MS. FERGUSON:  Objection.  Relevance and contains

17  confidential information about another employee.

18        THE COURT:  Mr. Kaster, is this an alleged

19  comparator?

20        MR. LUCAS KASTER:  Yes, Your Honor.

21        THE COURT:  Okay.  Objection's overruled and the

22  exhibit may be admitted and published.

23        MR. LUCAS KASTER:  Thank you, Your Honor.

24  BY MR. LUCAS KASTER:

25  Q.  If we could pull up Exhibit 222, please.  If we can blow

1     up the top half of this document.

2              So this is a notice to an individual for

3     falsifying payroll.  Do you see that?

4     A.  Allegedly, yes.

5     Q.  And this was on August -- or beginning on August 2nd,

6     2016, according to your letter, right?

7     A.  Yes.

8     Q.  And then you say:  "[A]nd continuing while working as a

9     truck driver," so it occurred on additional days after

10    August 2nd of 2016, right?

11    A.  That is correct.

12    Q.  And you decided to issue one notice of investigation to

13    this individual.

14    A.  That is correct.

15    Q.  And then if we can take down Exhibit 222, please.

16             And, Mr. Jones, I'll have you turn to Exhibit 223

17    in your binder, which should be the next one.

18    A.  Okay.

19    Q.  Is Exhibit 223 a notice of investigation for a different

20    individual under your direction dated February 22nd of 2017?

21    A.  That is correct.

22    Q.  And on the second page is a waiver form for that

23    individual dated March 14th of 2017.

24    A.  That is correct.

25             MR. LUCAS KASTER:  Move for the admission of

1      Exhibit 223.

2                MS. FERGUSON:  Objection.  Relevance, contains

3      confidential employee information.

4                THE COURT:  Mr. Kaster, is this individual also an

5      alleged comparator in Plaintiff's view?

6                MR. LUCAS KASTER:  Yes, Your Honor.

7                THE COURT:  Objection's overruled and that exhibit

8      is admitted and may be published.

9      BY MR. LUCAS KASTER:

10     Q.  If we could bring up Exhibit 223 and blow up the first

11     paragraph.

12               This is an allegation against one of your

13     subordinates for allegedly entering unapproved overtime on

14     multiple days in 2017, right?

15     A.  That is correct.

16     Q.  And you made the decision there to issue one notice of

17     investigation for all of the days, right?

18     A.  That is correct.

19     Q.  And after issuing the notices of investigation for

20     Mr. Sanders, you immediately cut off his access to the

21     payroll system, right?

22     A.  I don't know it was immediate.  It was after we decided

23     that, you know, we had enough evidence and thought what we

24     seen was accurate to go with the second investigation when

25     he was sent home, we shut down the access on his laptop.

1    Q.  By the way, payroll closes as BNSF on the 1st or the

2    16th, right?

3    A.  That is correct.

4    Q.  And so you issued the notices of investigation on

5    March 28th before payroll had even closed.

6    A.  That is correct.

7    Q.  If we could pull up Exhibit 93, please.  If we can blow

8    up the top email.

9            Mr. Jones this is an email from you dated

10   March 29th of 2016.  Do you see that?

11   A.  That is correct.

12   Q.  And indicating that Mr. Sanders had been pulled out of

13   service that day, right?

14   A.  That's correct.

15   Q.  And you asked that his access be removed ASAP, right?

16   A.  That's correct.

17   Q.  And then Mr. Sanders has the two separate investigation

18   hearings on April 3rd and April 8th.  Do you recall that?

19   A.  Yes, that's correct.

20   Q.  And you didn't testify at those hearings, right?

21   A.  No.

22   Q.  Ms. Hoppenrath did.

23   A.  That is correct.

24   Q.  And around the same time as those hearings took place,

25   Mr. Sanders filed another complaint with HR about you and

1   Ms. Hoppenrath's treatment of him, right?

2   A.  That sounds familiar.

3   Q.  And you provided a statement as part of that

4   investigation.

5   A.  If I was asked questions pertaining to it, yes, I would

6   have.

7   Q.  If we could go to Exhibit 99, please.

8            This is the hotline complaint that Mr. Sanders

9   made on April 5th of 2016.  If we could blow up the top half

10  of this, please.

11           See the date at the top that says April 5th of

12  2016?

13  A.  Yes, after the notices were issued, yes.

14  Q.  And then summary, the individual who received

15  Mr. Sanders' complaint says:

16           Track Inspector Don Sanders alleges Division

17  Engineer Keith Jones and Roadmaster Blaine Hoppenrath have

18  been harassing Donald for over two years, and he alleges

19  that you and Ms. Hoppenrath are retaliating against him for

20  filing complaints to human resources.

21           Do you see that?

22  A.  Yes.

23  Q.  And you provided the statement as part of this

24  investigation.  If we can go to Exhibit 113, please.

25           Is this an email dated April 19th, 2016 where you

1    respond by email to a Mr. Dane Freshour from human

2    resources?

3    A.  That is correct.

4    Q.  And your writing is in red on this exhibit?

5    A.  Yes.  I believe that's my replies.

6    Q.  So that's your statement regarding the HR investigation

7    that Mr. Sanders filed his complaint on, right?

8    A.  Correct.

9    Q.  Now, after the hearings you reviewed the transcript and

10   exhibits, right?

11   A.  Correct.

12   Q.  Did you look at them closely?

13   A.  Well, I probably didn't fine-tooth-comb them, but I did

14   look through them.

15   Q.  Well, you're making a recommendation to terminate after

16   reviewing the transcripts, right?

17   A.  Correct.

18   Q.  Do you take that responsibility seriously?

19   A.  Yes.

20   Q.  Do you understand your decision is affecting somebody's

21   life?

22   A.  That is correct.

23   Q.  You want to make sure you make the right decision,

24   right?

25   A.  That is correct.

1    Q.  And when you were issuing the termination decision for

2    Mr. Sanders, you only looked at the documents in the

3    investigation, correct?

4    A.  Yes, that -- yeah, based off of what is the facts and

5    stuff that are entered during the investigation is what you

6    use to make your determination.

7    Q.  You didn't look at outside information.

8    A.  Like what?

9    Q.  Things that weren't introduced during the hearing.

10   A.  If it was not brought forward, no.

11   Q.  You didn't speak to anybody else besides reading the

12   transcripts.

13   A.  Yes, I was working with LR and that group to make sure

14   what I was seeing was accurate and everything met timelines

15   and we were following the process.

16   Q.  And, Mr. Jones, maybe that was a bad question by me,

17   because at some point you issue or write an email to a PEPA

18   department where you recommend that Mr. Sanders is

19   terminated, right?

20   A.  Based off the facts from the investigation and the

21   bullet points that I put together, I recommended that due to

22   his theft of time, that I felt like it supported.  But with

23   the bargaining agreement, I can't solely -- there's too many

24   processes and too many layers of people reviewing it -- I

25   just can't terminate employees.

1    Q.  So between the time when you reviewed the transcripts

2    and exhibits and sent this email to PEPA, you didn't speak

3    to anybody else about your decision, right?

4    A.  I don't recall.

5    Q.  Mr. Jones, if you could pull up your deposition and go

6    to page 153, please.

7    A.  153?

8    Q.  Yes, please.

9    A.  Okay.

10   Q.  At line 10 you were asked the question:

11           "Did you speak to anybody from PEPA during that

12   period of time, from the dates of the investigation to

13   before you sent these emails?"

14           Your answer:  "Not that I recall."

15           Next question:  "Okay.  Did you speak to anybody

16   else during that specific period of time to make your

17   determination?"

18           Your answer was:  "No," right?

19   A.  In that specific time, no.

20   Q.  You made your decision solely based on the investigation

21   and the exhibits.

22   A.  I made my decision for recommendation to further the

23   process, have somebody else review it.

24   Q.  Based upon the investigation transcripts and the

25   exhibits.

1    A.  That is correct.

2    Q.  By the way, both of the hearings were in front of an

3    individual by the name of Jason Randash, right?

4    A.  That is correct.

5    Q.  Who is Jason Randash?

6    A.  At the time he was a roadmaster on the Twin Cities West

7    out of Fargo.

8    Q.  So he's in the exact same position or title as

9    Ms. Hoppenrath, right?

10   A.  That is correct.

11   Q.  I want to talk to you a minute about March 19th, what

12   was in the actual investigation that you reviewed, okay?

13   That was a Saturday, right?

14   A.  I believe so.

15   Q.  Do you know how many hours Ms. Hoppenrath alleged

16   Mr. Sanders had misreported on Saturday, March 19th?

17   A.  I would have to look at my books.  It's been so many

18   years.  I don't have it memorized.  I believe he showed up

19   at 9:00 and left at -- you know, yearly, and paid himself a

20   full day.

21   Q.  Ms. Hoppenrath testified that Mr. Sanders showed up at

22   Dayton's Bluff at 9:00, right?

23   A.  That is correct.

24   Q.  She didn't know where he was before 9 o'clock, right?

25   A.  His job is to be at Dayton's Bluff, so if he's not there

1    at his start time, then he is not at work without approval,

2    so all we can assume is he's not at work.

3    Q.  Mr. Jones, we looked at Mr. Sanders' time entries for

4    the two months of October and November.  Was there a single

5    entry showing that Mr. Sanders had started his day at

6    9 a.m.?

7    A.  Not based off of those records.

8    Q.  Every entry showed Mr. Sanders showed up between 5 a.m.

9    and 6:45 a.m., right?

10   A.  Yes, but with the details that we found, you know, we

11   wanted to know if those records were possibly accurate,

12   because nobody was, you know, seeing him out there at those

13   times.  So all we can speak of is the dates that we had

14   concern that he wasn't where he was supposed to be when he

15   was supposed to be based off visual inspections, or

16   eyewitnesses.

17   Q.  And Mr. Sanders said during the investigation for

18   March 19th that he actually started at 6:20 a.m. on

19   March 19th, right?

20   A.  I believe so.

21   Q.  And he said he started at Bridal Veil, a separate

22   location, right?

23   A.  That's what he claimed, yes.

24   Q.  And Ms. Hoppenrath or you had no information about

25   whether Mr. Sanders had actually reported to Bridal Veil

1    that day, right?

2    A.   That was not where he was supposed to be, so we would

3    have no reason to think he should be at Bridal Veil.

4    Q.   Was Mr. Sanders --

5    A.   He rode -- he rode the day before on the 18th with

6    Ms. Hoppenrath, and she talked to him about where to report,

7    other expectations, and that's why he was to be at Dayton's

8    Bluff, which is his start time and location that morning,

9    and he was not there.

10   Q.   Was Mr. Sanders terminated for showing up at a different

11   location at a different time?

12   A.   No, he was fired for putting in his time wrong and not

13   claiming accurate time.

14   Q.   And neither you nor Ms. Hoppenrath have any information

15   about whether Mr. Sanders' testimony during the

16   investigation that he arrived at 6:20 a.m., or approximately

17   thereabouts, on March 19th at Bridal Veil, you don't have

18   any information to contradict that, right?

19   A.   All we can go by is where he's instructed to be and

20   when his start time is and where his start location is.  If

21   he's to do something differently, he's to call his

22   supervisor and say, "Hey, I've got something I need to do

23   here" and get it approved.  All we can go by is what his

24   time is, what his instructions are, and he was not there at

25   that time.

1    Q.  Mr. Jones, if we could bring up Exhibit 98 and go to

2    page 27.  If we could please blow up lines 5 through 9.

3              This is Ms. Hoppenrath's testimony during the

4    investigation hearing.  She said that Mr. Sanders was

5    allegedly not there from 7 a.m. to 8:30, and then from 1400

6    to 1500, so 2 p.m. to 3 p.m. right?

7    A.  Yes.

8    Q.  And then she was asked the question:  "So two and a half

9    hours is what you're saying, right?"

10   A.  That is correct.

11   Q.  That was the sum total of the allegation against

12   Mr. Sanders, two and a half hours on March 19th.

13   A.  Based off the facts, yes.

14   Q.  By the way, when you reviewed this investigation and the

15   transcript and the exhibits, did you see the exhibits in the

16   transcript that showed Ms. Hoppenrath posting pictures on

17   Instagram at 8:30, 9:59 and 11:15 a.m., the same time she

18   was allegedly following Mr. Sanders?

19   A.  I knew those details are in there, but I don't

20   understand the relevancy of that.

21   Q.  If we can pull up Exhibit 29, please, and go to page 13.

22              By the way, Exhibit 29 is BNSF's Maintenance of

23   Way Operating Rules, right?

24   A.  That is correct.

25   Q.  These are the rules that govern employees, all

1   employees, at BNSF.

2   A.   Exempts are a little different on what you're about

3   ready to relate this together as.

4   Q.   "Rule 1.10, Games, Reading, or Electronic Devices.

5            "Use [of] electronic devices" -- the second bullet

6   point.  "Use of electronic devices [including] cellular

7   telephones [...] for other than business purposes except

8   when located in a predetermined place of safety during break

9   periods and not performing duties," right?

10   A.   That's correct.

11   Q.   So employees are not to be playing games, surfing the

12   Internet, while they're performing their duties, right?

13   A.   Yeah.  This is more for scheduled employees while

14   they're out performing -- paid by BNSF.  Scheduled employees

15   are different that are on salaried wages.

16   Q.   So scheduled employees can surf the Internet, post on

17   Instagram, while they're doing their job, but employees like

18   Mr. Sanders can't?

19   A.   If they're in a predetermined place of safety, they're

20   not in the middle of their work -- this was a weekend where

21   she come in just on her own time to look at it, she's

22   salaried, she doesn't get paid, she doesn't have to punch a

23   time clock, she wasn't out there on the track hi-railing,

24   she was just out there performing observations, so she has

25   the ability -- and I don't know if she was on her personal

1     phone or if it was a BNSF phone, but she has the ability to

2     be doing whatever she needs to do.

3     Q.  Was posting on Instagram what she needed to be doing for

4     her job?

5                MS. FERGUSON:  Objection.  Argumentative.

6                THE COURT:  Overruled.

7     Q.  Mr. Jones, was posting on Instagram what Ms. Hoppenrath

8     needed to be doing for her job that day?

9     A.  All she was in there was to do -- was to follow up with

10    Mr. Sanders and talk with him why he was not there.  She

11    chose to make a few posts and wait till he either showed up

12    or decided that she was going to go home and see where she

13    was at.  She was not doing anything wrong by being on her

14    phone making a couple posts.  It is not against the exempt

15    policies.

16    Q.  Mr. Jones, if we could go back to Exhibit 98, please,

17    and go to page 38.

18    A.  Is that my transcript?

19    Q.  That's the transcript.  And we should be able to pull it

20    up as well, Mr. Jones, if you need to see it.

21    A.  Okay.

22    Q.  If we could blow up line 6 through 17.

23                So during the investigation, Mr. Sanders says that

24    he's scheduled Tuesday through Saturday, 7 a.m. to 3 p.m.

25    That's the standard scheduled time, right?

1    A.  Correct.

2    Q.  And Mr. Sanders says that he reported to work around

3    6:20 at Bridal Veil, right?

4    A.  That is correct.

5    Q.  And if we can pick up and show Exhibit 85, please.

6            Exhibit 85 is the nightly report that Mr. Sanders

7    sent to Ms. Hoppenrath on March 19th, right?

8    A.  Yes.

9    Q.  And this is something that he's required to do as part

10   of his duties and responsibilities as a track inspector.

11   A.  That's what she requested, yes.

12   Q.  And is it typical that track inspectors send a nightly

13   report at the end of their sift detailing what they did that

14   day?

15   A.  Well, they can send it at some point, you know, whether

16   it's when they finish their shift, if they're typing it up

17   as they're going.  It can be submitted at any time that they

18   feel like there's nothing else to add.

19   Q.  And what time did Mr. Sanders send this email to

20   Ms. Hoppenrath?

21   A.  It shows 2:27.

22   Q.  And if Mr. Sanders showed up to work at 6:20 like he

23   just testified in the investigation and he sent this at

24   3:27 p.m., how many hours in between those two times?

25   A.  I struggle with public math, but --

1    Q.  Sure.

2    A.  -- couple hours.

3    Q.  As do I.  Apparently I did math incorrectly earlier.

4    But 6 a.m. to noon is six hours, right?

5    A.  Correct.

6    Q.  And then two more hours to 2:30 is an additional two

7    hours.

8    A.  Correct.

9    Q.  Eight hours, right?

10   A.  Based off of the report times and when he was supposed

11   to show up, yes.

12   Q.  If we could go back to Exhibit 98, please, and go to

13   page 119.

14          Page 119 is the exhibit that Ms. Hoppenrath

15   introduced during the investigation for March 19th, right?

16   A.  Correct.

17   Q.  This is a copy of Mr. Sanders' time entries according to

18   her, right?

19   A.  Correct.

20   Q.  And the amount of time that Mr. Sanders entered, if we

21   can blow up that yellow section there, for March 19th was

22   eight hours, right?

23   A.  That's what he put in, yes.

24   Q.  And after reading these transcripts and seeing these

25   exhibits, you accused Mr. Sanders of misreporting his time

1    on March 19th, right?

2    A.  That's correct.  Because the observations showed him

3    starting the truck a little bit before 9:00 and leaving

4    around 1 o'clock or something like that.  He can submit this

5    stuff when he gets at home and he doesn't get paid for

6    submitting nightly reports at his house.  So the truck had

7    stopped.  Your day does not continue until you feel like you

8    want to keep charging.  You have a set amount of hours, you

9    work your hours on the job, on property, not when you leave

10   and decide to do whatever you want to do and then pay

11   yourself whatever you want to pay yourself.

12   Q.  So you're saying Mr. Sanders doesn't get paid to do his

13   nightly report even though it's required; is that what

14   you're saying?

15   A.  It's part of his duties.

16   Q.  But he doesn't get paid for that time?

17   A.  That's correct.  So what I'm saying is he can't say that

18   he's done doing this and then decide to do his report at

19   midnight and claim time.  It's within his daily work and any

20   overtime that's approved or that -- has to be approved

21   through his supervisor.

22   Q.  Let's go to Exhibit 98 at page 11.  I'm sorry.  If we

23   could go to page 10 first.

24            On the bottom of the page, this is

25   Ms. Hoppenrath's testimony during the investigation.  The

1    very last line, line 26, she said that Mr. Sanders completed

2    his normal routine at 1:15 and was back at the depot, and

3    then he left the depot at 1:53.

4         Do you see that?

5    A.  Yes.

6    Q.  Now let's go to page 123 of this exhibit, please.

7         Exhibit 6 in the investigation, this is track

8    authority for Mr. Sanders on March 19th, right?

9    A.  That is correct.

10   Q.  If we blow up the last line, this says that Mr. Sanders

11   had track authority until 1:30 p.m., right?

12   A.  That's what it shows, yes.

13   Q.  And he indicated that he was clear from the track at

14   1:28, right.

15   A.  That's correct.

16   Q.  And this track authority was on the St. Croix, right?

17   A.  Yes.

18   Q.  Okay.  How far is that from Dayton's Bluff?

19   A.  Probably 20 -- 20 miles roughly.

20   Q.  We just looked at Ms. Hoppenrath's testimony where she

21   said that Mr. Sanders was back at the Dayton's Bluff depot

22   at 1:15, yet this record says he's 20-plus miles away at

23   1:28.

24        Do you see that?

25   A.  I do.  And I can explain that, because when you set off,

1   you can travel back and hold onto your time by the computer

2   and release it whenever you get back to the section house if

3   there's no trains coming or anything like that.  So you

4   physically don't have to be there to release that time.  And

5   it could be -- you can be putting the release time and it

6   may take awhile for the dispatch to physically grab that

7   and --

8   Q.  Okay.  Well, let's go to page 124 of Exhibit 98.

9          This is a readout for Mr. Sanders' hi-rail

10   vehicle, right?

11   A.  I believe so, yes.

12   Q.  And it says when the vehicle's turned on, when the

13   ignition is turned off, when Mr. Sanders is in hi-rail mode,

14   right?

15   A.  Correct.

16   Q.  And hi-rail mode is when Mr. Sanders is actually on the

17   tracks, right?

18   A.  You can leave the thumb-hold position on and it may

19   still show that you're on the track even if you're on the

20   highway.

21   Q.  Let's go to page 132 of this exhibit, please.

22          Now, Ms. Hoppenrath highlighted this during the

23   investigation, the section in the middle of the page with

24   the highlights, and under the column where it says "Hi-Rail

25   Mode" with the blue highlight which is in the middle of the

 1    page, right --

 2    A.  The blue --

 3    Q.  At the top of the page, the one right in the middle.

 4    A.  It's green and yellow.

 5    Q.  And the hi-rail mode switches from true to false at

 6    1:23 p.m., right?

 7    A.  Yes.

 8    Q.  And Ms. Hoppenrath testified in the investigation that

 9    that indicated when Mr. Sanders got off the tracks.  Do you

10    recall that?

11    A.  Yes.

12    Q.  And yet she also testified Mr. Sanders was back at the

13    depot at 1:15, right?

14    A.  I believe so.

15    Q.  And if we look under the "Ignition" column, the farthest

16    to the right, blue highlight, it says that Mr. Sanders --

17    the vehicle itself was turned off at 1:48.

18          Do you see that?

19    A.  1:48.  I don't see that one.

20    Q.  It's right above the pink under the blue time stamp.

21    It's the last entry.

22    A.  Okay.  Yes.

23    Q.  You see 1:48 and the ignition column goes from true to

24    false with the blue square around it.  Do you see that?

25    A.  True, yes.

1    Q.  So that's when Mr. Sanders turned the vehicle off

2    according to BNSF's records, right?

3    A.  Correct.

4    Q.  So there's approximately 25 minutes between, according

5    to BNSF records, Mr. Sanders stops hi-railing and turns his

6    vehicle off, right?

7    A.  That's true.

8    Q.  And it's approximately 25 miles between where

9    Mr. Sanders stopped hi-railing in St. Croix and the Dayton's

10   Bluff shack, right?

11   A.  That is correct.

12   Q.  Now let's switch to March 25th and 26th.  March 25th is

13   Good Friday, right?

14   A.  I believe so.

15   Q.  It's a holiday, right?

16   A.  Yes.

17   Q.  Not many other people working on a holiday, right?

18   A.  Correct.

19   Q.  And during the subsequent investigation about March 25th

20   and 26th, Mr. Sanders said:  I knew my time wasn't right.  I

21   didn't put it in correctly, right?

22   A.  That's what he said, yes.

23   Q.  And he said that he intended to go back and correct it,

24   right?

25   A.  That's what he stated, yes.

1  Q. And there's no official BNSF policy that requires hours

2  to be entered at the end of every day, right?

3  A. There's a written expectation from each roadmaster that

4  it needs to be put in at the end of the day or before

5  9 o'clock the next morning.

6  Q. But there's not an official BNSF policy that requires

7  that, right?

8  A. There's expectations from their supervisors.

9  Q. Mr. Jones, why don't you pull out your deposition,

10  please. If you could go to page 170. Please just let me

11  know when you're there.

12  A. I'm there.

13  Q. Line 13. You're asked a question:

14       "Is it written down anywhere that employees are

15  supposed to submit their time on a daily basis?"

16       Your answer: "I don't know if it's in the EIs

17  that says this is preferably when things need to be entered.

18  I know each FLS sets out a set of expectations that -- what

19  they recommend.

20       "Question: Have you ever seen an official BNSF

21  policy, a written policy, that says that?"

22       Your answer: "Not that I recall."

23       That's what you said in your deposition, right?

24  A. And that's what I just stated there, that it's written

25  expectations from the FLS.

1    Q.  Have you ever disciplined anybody for changing their

2    time after they put in an entry?

3    A.  No.

4    Q.  And in fact, there were statements in the investigation

5    on March 25th or for March 25th and 26th from two employees

6    who said that Mr. Sanders was intending to change his time

7    and needed some help with some codes, right?

8    A.  That's what they were claiming, yes.

9    Q.  And the allegation with respect to 3-25 was that

10   Mr. Sanders had misreported one and a half hours, right?

11   A.  I think it was more than that.  He paid himself all day,

12   eight hours, and it's -- I don't recall the time, but it was

13   more than that.

14   Q.  Okay.  Why don't we go to Exhibit 103 at page 45.  If we

15   could blow up lines 4 through 9.

16        "Question:  What was his time?  And all I'm

17   asking, he was paid for four hours and 30 minutes on that

18   paycheck.  What are you guys charging him with stealing?

19   From the four hours and 30 minutes, an hour and 15 minutes."

20        Right, for 3-25?

21   A.  Yeah.  From the four hours -- so there was four hours

22   and so many minutes and the one hour and 15 minutes of

23   overtime, I believe.

24   Q.  I'm confused.  I read this as saying Mr. Sanders entered

25   four and a half hours and so what they're claiming is an

1   hour 15 minutes of time that he did not work for 3-25.

2   A.  No, it says from the four and the minutes -- whatever

3   minutes.  I can't see it.

4   Q.  Okay.  Thirty minutes?

5   A.  Four hours and 30 minutes, an hour and 15 minutes.

6   Q.  So now you're saying Mr. Sanders was charged with four

7   and a half hours of time?

8   A.  And the hour and 15 based off of what he charged himself

9   from when he showed, ran his track and left.  He charged

10  that extra time, four hours and 30 minutes and then an hour

11  and 15 minutes.

12  Q.  So now it's five hours and 45 minutes that you're

13  charging Mr. Sanders with.

14  A.  I believe that's what it was, yes, the best that I can

15  recall.

16  Q.  Let's go to the next page, page 46, the bottom of the

17  page.  If we could blow up line 18 through 24.

18          Here, Ms. Hoppenrath is asked:  "How many hours

19  from March 26th?"  And she says:  "Three hours."

20          Do you see that?

21  A.  Yes.  It's still blocked a little bit.  Yeah, I see her

22  three hours, yes.

23  Q.  So even if you say it's five hours and 45 minutes on

24  March 25th and three hours on the 26th, it's less than ten

25  hours, right?

1    A.  Theft is theft, sir.  And if he worked all these other

2    hours and all these other days that you've went through your

3    testimony, he reported accurately from what we could tell.

4    He was very -- very proficient about putting his time in,

5    and when he put it in this time he saved it as final.  If

6    people have time go back and clean up while they had the

7    opportunity to go back and adjust their time, they put it in

8    as "Save Draft."

9           So, as we seen "Save Final," we knew he had

10   intentions on claiming that many times.  He was just going

11   to wait and see if he got questioned for it and then

12   potentially go back.  And when he was questioned on the one

13   day, he went and removed I believe one hour, but he didn't

14   accurately depict what he actually worked.  And when people

15   say "Draft," most of them are sectionmen and other positions

16   that will go back and change the accounting.

17          So, if we have a derailment or if they work

18   something different, there's different charges, different

19   authorities that they need to put in it.  So they put their

20   stuff in, "Save Draft," and then they're going to go back

21   and change the accounting.  Mr. Sanders never had different

22   accounting.  His was pretty straightforward and he's been

23   doing it for years and years and years on reporting

24   accurately and not sure what changed to these days here, why

25   he couldn't do so.

```
 1    Q.  Mr. Jones, I want to take you to Exhibit 108.

 2              This is your email to PEPA dated April 19th of

 3    2016 regarding Mr. Sanders' March 19th allegation, right?

 4    A.  That is correct.

 5    Q.  And you say that the allegation is substantiated and

 6    that you recommend termination, right?

 7    A.  That is correct.

 8    Q.  If we could blow up the third bullet point.

 9              You say here that he did not get authorization to

10    change his start time and end times and stated that he did

11    not believe he adjusted his work times even though he

12    testified he worked from 6:20 to 2:20, which does not line

13    up with the hours he was bulletined for bulletined for.

14              Do you see that?

15    A.  That is correct.

16    Q.  And we've already established that 6:20 to 14:40 is

17    eight hours, or more than eight hours, right?

18    A.  That is correct, but it wasn't approved for him to come

19    in at that time.  He was to be at Dayton's Bluff at 7:00.

20    Q.  Mr. Sanders wasn't terminated or investigated for

21    starting at a different time, right?

22    A.  He was investigated for when he didn't show up at his

23    work location and start location and what he paid himself

24    for that day.

25    Q.  Okay.  Mr. Jones, answer my question.  Was he
```

1    investigated for starting at a different time?

2    A.  No.  He was investigated for --

3    Q.  Was he terminated --

4    A.  -- putting in the wrong time.

5    Q.  -- for starting at a different time?

6    A.  No.

7    Q.  Go to Exhibit 109, please.

8         This is your email with respect to March 25th, the

9    second investigation, right?

10   A.  That looks accurate.

11   Q.  And again, you lay out your rationale to PEPA, and you

12   say that you're recommending dismissal based upon dishonesty

13   and theft of time.

14        Do you see that at the bottom of the page?

15   A.  That is correct.

16   Q.  So you made separate recommendations for the March 29th

17   and March 25th and 26th, right?

18   A.  The 19th, not 29th.

19   Q.  I'm sorry, the 19th and the 25th and 26th, right?

20   A.  That is correct.

21   Q.  You believed that they were independently justified

22   terminating Mr. Sanders, right?

23   A.  That's correct.

24   Q.  Could we go to Exhibit 218, please.

25        I'm sorry.  If we could take down Exhibit 218 for

1     the time being.

2            Mr. Jones, if you could open your notebook to 218.

3            Do you see Exhibit 218?

4     A.  I do.

5     Q.  This is a notice of investigation from you to an

6     employee under your direction who allegedly lied about being

7     denied track and time, right?

8     A.  That's correct.

9     Q.  You believed this employee was not working when that

10    employee said they were working, right?

11    A.  I believe he didn't give me the accurate facts on when I

12    asked him why he didn't repair that certain component.

13    Q.  You believed this individual was lying about the hours

14    that they were reporting.

15    A.  Not true.

16    Q.  Mr. Jones --

17    A.  I --

18    Q.  Mr. Jones, if you could pull out your deposition

19    transcript, please, and turn to page 212.

20    A.  Okay.

21    Q.  And let's actually start on line 25 on page 211.  You

22    were asked this question:

23            "Was Mr. Kramer terminated?"  That's the

24    individual who's in this notice on Exhibit 218, right?

25    A.  Correct.

1    Q.  Your answer was:  "No."

2            You were asked this question:  "You believed that

3    Mr. Kramer was lying, fair?"

4            Your answer was:  "Yes.

5            "Question:  Did you believe he was lying so he

6    could earn more money on overtime?"

7            Your answer was:  "I don't know about more money

8    on overtime, because he very rarely wanted to come in on

9    overtime.  He just didn't want to do his job throughout the

10   day and get paid for doing nothing.

11           "Did you consider this an isolated event?

12           "It could have been."

13           That was your testimony during your deposition,

14   right?

15   A.  Yes.

16   Q.  If we go to the next page, there's a waiver for

17   Mr. Kramer, right?

18   A.  That is correct.

19           MR. LUCAS KASTER:  Move for the admission of

20   Exhibit 218.

21           MS. FERGUSON:  Objection.  Relevance, contains

22   confidential employee information.

23           THE COURT:  Overruled.

24   BY MR. LUCAS KASTER:

25   Q.  Mr. Jones, you offered Mr. Kramer a waiver despite the

1   allegation, right?

2   A.  Based off his dishonesty to me, yes.  And I'll explain

3   the difference if you allow.

4   Q.  Exhibit 222 we looked at before was an allegation -- if

5   we could bring up Exhibit 222.

6           This was the allegation for the individual who

7   falsified payroll on August 2nd, 2016, and continuing.

8           Do you see that?

9   A.  Yes.

10  Q.  That was for a Mr. Klukas, right?

11  A.  That is correct.

12  Q.  You offered that individual a waiver, right?

13  A.  That is correct.

14  Q.  Exhibit 223, the individual who was alleged to have

15  entered unapproved overtime, right?

16  A.  That is correct.

17  Q.  You offered that individual a waiver.

18  A.  That is correct.

19  Q.  Did you ever offer a waiver to Mr. Sanders?

20  A.  No, not based off of the details and the egregious

21  actions.  The others had other details.

22  Q.  Had the others ever filed an HR complaint against you?

23  A.  No.

24  Q.  Mr. Jones, I'm going to switch gears now.

25          Have you ever heard of something called the

1    scorecard?

2    A.  Yes.

3    Q.  And I'm going to ask you to open your book to page 52,

4    please, or Exhibit 52.

5            Have you had a chance to review Exhibit 52?

6    A.  I'm looking at it now.

7    Q.  And is Exhibit 52 a scorecard for the Twin Cities East

8    Division from January 1st, 2015 to December 31st of 2015?

9    A.  That is correct.

10   Q.  And we see in the first kind of section of columns it

11   says TWCEW.  Is that the DE, or division engineer, in the

12   Twin Cities East Division?

13   A.  That's correct.

14   Q.  And then there's various metrics underneath where

15   there's a goal, an actual, and then a score, right?

16   A.  Correct.

17   Q.  And then from there the Twin Cities East Division is

18   broken down by each geographic region within the Twin Cities

19   East Division, right?

20   A.  That is correct.

21   Q.  And this is a document that is maintained within the

22   regular course of BNSF's business, right?

23   A.  It's out there for informational.

24   Q.  Okay.  You've seen this before.

25   A.  Yes, I have.

```
 1    Q.  And it's available on BNSF's website, or intranet.

 2    A.  Correct.

 3    Q.  Okay.

 4              MR. LUCAS KASTER:  Move for the admission of

 5    Exhibit 52.

 6              MS. FERGUSON:  Objection.  Relevance.

 7              THE COURT:  Overruled on relevance grounds.

 8              MR. LUCAS KASTER:  If we could bring up Exhibit

 9    52, please.

10              MS. FERGUSON:  And foundation also.

11              THE COURT:  All right.  Let's not publish it yet.

12    Hold on.

13              Do you intend to ask him about a specific category

14    on this?

15              MR. LUCAS KASTER:  Yeah.  I was going to show the

16    whole thing, but yes.

17              THE COURT:  All right.  Let's establish some

18    foundation with respect to the various items of information

19    that are included on this scorecard first.

20              MR. LUCAS KASTER:  Sure.

21    BY MR. LUCAS KASTER:

22    Q.  Mr. Jones, if we look under the metric column on the

23    left-hand side, we see various metrics under a safety

24    heading, a budget heading, and a service heading, right?

25    A.  Correct.
```

1    Q.  And it looks like there's one metric under safety, three

2    under budget, and then six under service, right?

3    A.  Correct.

4    Q.  And each of those various metrics then have the goal,

5    the actual, and the score, right?

6    A.  Yes.

7    Q.  And one of the metrics under the service section is

8    Corridor Slow Order Delays, right?

9    A.  That is correct.

10   Q.  And like I said, there are five other metrics under that

11   service section, right?

12   A.  Yes.

13          MR. LUCAS KASTER:  Move for the admission of

14   Exhibit 52.

15          MS. FERGUSON:  Same objection.

16          THE COURT:  Overruled.  It's admitted.

17          MR. LUCAS KASTER:  Thank you, Your Honor.

18   BY MR. LUCAS KASTER:

19   Q.  If we could bring up Exhibit 52, please.  And if we

20   could just blow up the whole top half from the top down to

21   the middle gray section.  Great.

22          And just so we're all clear about what we're

23   looking at, we see some big blue sections on the top.  Like

24   I said, on the farthest left we see TWCEW and then under

25   that DETCE, right?

1    A.  Yes.

2    Q.  That's Division Engineer in the Twin Cities East, right?

3    A.  That is correct.

4    Q.  That's you.

5    A.  That is correct.

6    Q.  And then to the right of that we see RDM Superior.

7    That's the roadmaster in Superior?

8    A.  That's correct.

9    Q.  And then from there over we see Grand Rapids and

10   Brainerd.  Those are the roadmasters there, right?

11   A.  Yes.

12   Q.  And then on the next page there's RDM Northtown and RDM

13   St. Paul, and the St. Paul one is Ms. Hoppenrath's division,

14   right?

15   A.  That is correct.

16   Q.  And each of the metrics on here is for that specific

17   geographic region, right?

18   A.  Correct.

19   Q.  So if we were to look at -- if we go back up to the

20   first page again, we see DE Twin Cities East.  Under

21   "Safety" it says "Frequency."  That's your frequency of

22   injuries within your region, right?

23   A.  That's correct.

24   Q.  And on down, Corridor Slow Order Delays, that's the slow

25   order minutes within your region, right?

1   A.  No, that's not correct.  That's a corridor for a

2   whole -- like Chicago to Portland or Chicago to LA.  It's

3   the whole corridor.

4   Q.  And that's within your region?

5   A.  I have a portion of it.

6   Q.  And then we see next to yours is RDM Superior.  We see a

7   slow order entry there that's different than yours, right?

8   A.  That's correct.

9   Q.  So that's for that specific roadmaster's area, right?

10  A.  It's for his portion of that corridor.  So you have a

11  Superior to -- I guess I'm not familiar maybe -- Wyoming.

12  It's an upper corridor for a coal route, so he has a

13  different corridor that he's responsible for, so it has a

14  different threshold for that corridor.

15  Q.  And then on the bottom we see a blue section that says

16  "Final Score," right?

17  A.  That is correct.

18  Q.  And yours shows 25.7, right?

19  A.  Actual -- yes.

20  Q.  So that's your score for that time period on the

21  scorecard.

22  A.  Correct.

23  Q.  And then that score translates to a ranking, right?

24  A.  That is correct.

25  Q.  And that's called the scorecard ranking.

1    A.  That is correct.

2    Q.  Mr. Jones, I'm going to have you look at Exhibit 57,

3    please.

4            And my question is:  Is this a copy of a scorecard

5    ranking for 2016?

6    A.  Yeah.  It looks like it's -- everybody else has been

7    pulled out of it.  It's just shows rankings and myself.

8    Q.  And the scorecard ranking ranks like against like, is

9    that fair?

10   A.  No.

11   Q.  It ranks all divisions --

12   A.  Yeah.  Each roadmaster has different -- it's apples to

13   oranges where some may have term poles, some may have main

14   lines.  So it's -- all it is is a reference on just how the

15   health of your territory is, what you can do to look at,

16   maybe help you focus on some things to work on, but that's

17   all the bearing it has.

18   Q.  You said this comparison -- let me back up before I go

19   there.

20           All division engineers are ranked against other

21   division engineers, right?

22   A.  They are based off of their metrics within their

23   scorecard, so not every one is based off of -- their perfect

24   score may not be a 100.  There may be an 80 out of a hundred

25   may be what they're required to get to be doing very well

1    within their roles and responsibility.  So everybody's

2    ranked different based off geographic, what they may have,

3    how many mainline models versus terminals, so there's no

4    cookie-cutter statement with this scorecard.

5    Q.  And as you said, you believe this comparison is apples

6    to oranges; did I catch that right?

7    A.  That's correct.

8    Q.  Mr. Jones, I'm going to read you a portion of a

9    deposition from a Mr. Shearer, who is a corporate

10   representative from BNSF, on the scorecards.

11          MS. FERGUSON:  I'm going to object.  It's improper

12   impeachment.

13          THE COURT:  I'll allow it.

14   Q.  Mr. Jones, page 22 of Mr. Shearer's deposition, starting

15   at line 6:

16          "And are these line items under 'Information' part

17   of the actual final score?

18          "No, they are not."

19          He's referring to the items underneath the gray

20   section.

21          "What are they used for, if anything?

22          "That's a good question.  The informational

23   tags -- let me just answer that by saying first a little bit

24   what the scorecard is used for.

25          "In a nutshell, the scorecard is kind of a

1    one-stop shop document for our managers and directors to

2    look at a territory kind of on an apples-to-apples

3    comparison."

4          That was Mr. Shearer's testimony, who's a

5    corporate designee by BNSF.  Do you disagree with

6    Mr. Shearer's testimony about the scorecard?

7    A.  Yes, I do.  Everybody has their different perception of

8    how the scorecard's used and how the information is and how

9    it's -- the algorithms and the metrics that they use to put

10   in it is clearly different based off of your territory on

11   what you're responsible for.

12   Q.  Let's go back to Exhibit 57.  So we see a ranking

13   starting for a director, right?

14   A.  Correct.

15   Q.  That's general director.  That's Mr. Rindy's or

16   Mr. Jensen's position, right?

17   A.  Correct.

18   Q.  And then we see a ranking under "Manager," under

19   "Bridge," "Signal" and "Track," right?

20   A.  That's correct.

21   Q.  And so you're under the track section, right?

22   A.  That is correct.

23   Q.  And your ranking is number four.

24   A.  At that time, yes.

25   Q.  And then if we turn to the next page, it goes on, breaks

1    down even further to supervisor by track, and that's where

2    Ms. Hoppenrath is, right?

3    A.  Yes, at that time.

4            THE COURT:  I'm sorry.  If I can make a

5    suggestion, which is that when Mr. Jones answers

6    questions -- Mr. Jones, I'm sorry to bother you with this,

7    but if you could when you answer questions be sure to be

8    looking at your screen so we can hear you a little better.

9    That would be very helpful.

10           THE WITNESS:  I'm sorry.

11           THE COURT:  Thank you.

12   A.  Yes, sir.  That's where these people ranked at the time

13   of this scorecard, yes.

14           MR. LUCAS KASTER:  Move for the admission of

15   Exhibit 57.

16           MS. FERGUSON:  Same objection as stated in the

17   motions *in limine*.

18           THE COURT:  Objection's overruled and that exhibit

19   is admitted.

20           MR. LUCAS KASTER:  Thank you, Your Honor.

21   BY MR. LUCAS KASTER:

22   Q.  And as we've talked about -- so there are -- let me just

23   clarify one thing.

24           Your boss is Mr. Rindy and Mr. Jensen.  They're

25   ranked only against other general directors across the

1    company, right?

2    A.  That is correct.

3    Q.  And the division engineers are ranked only against the

4    division engineers across the company, right?

5    A.  That is correct.

6    Q.  Your Honor, I probably have 20 minutes, but I'm going to

7    switch gears if Your Honor wants to take a break for lunch.

8              THE COURT:  No.  I think we got a little bit of a

9    late start or a late break in the morning.  Let's go closer

10   to 12:30 and I think that'll be just fine.

11             MR. LUCAS KASTER:  Great.  Thank you.

12   BY MR. LUCAS KASTER:

13   Q.  Mr. Jones, you also get performance reviews twice a

14   year, right?

15   A.  That is correct, a midyear and a year-end.

16   Q.  And your reviews are given by your bosses, either

17   Mr. Jensen or Mr. Rindy, back in 2015 and '16, right?

18   A.  That's correct.

19   Q.  Mr. Jones, if I could just have you pull up on your --

20   in front of you, look at Exhibit 19.

21             And my question is, Mr. Jones, is this your 2015

22   year-end performance review?

23   A.  Let me look real quick.

24   Q.  Sure.

25        (Pause - witness reviewing document)

```
 1    A.  Yes, I believe -- yes, it is.

 2    Q.  And if you turn to the fifth page of this exhibit, and

 3    as you're doing that, there's various categories of

 4    information that you're graded on by your superiors, right?

 5    A.  That is correct.

 6    Q.  So there's a leadership model objective, then the second

 7    one was safety, the third one was service velocity and

 8    reliability, then a few more before overall performance,

 9    right?

10    A.  Correct, yes.

11          MR. LUCAS KASTER:  Move for the admission of

12    Exhibit 19.

13          MS. FERGUSON:  Objection.  Hearsay.

14          THE COURT:  Overruled.  I'll allow it and it's

15    admitted.

16          MR. LUCAS KASTER:  Thank you, Your Honor.

17    BY MR. LUCAS KASTER

18    Q.  Mr. Jones, if we can go to page 5.

19    A.  Okay.

20    Q.  This is the section on velocity.  And velocity is how

21    fast trains move across the network, right?

22    A.  That is correct.

23    Q.  Whether trains are on time from point A to point B,

24    fair?

25    A.  That has some -- a little bit to do with it, yes.
```

1    Q.  A little bit, or is that what velocity is?

2    A.  They can make adjustments with -- I mean, yeah, in a

3    broad-based statement that's what velocity is, point A to

4    point B, getting there on time, but there's some things that

5    are behind the scenes.  If there's work being done in a

6    corridor or if there's other things going on, you know,

7    velocity things can be agreed upon.

8    Q.  And then on this review there's a section where you give

9    yourself a review and then a review by each of your

10   managers, right?

11   A.  That is correct.

12   Q.  If we can blow up Mr. Jones' self-review section, that

13   first paragraph on the top there where it says "Appraisal."

14   No, right in the middle of the page -- sorry -- appraisal by

15   Mr. Jones.  Right there, yeah.  Thank you.

16          And you specifically reference here that you're

17   gradually beginning to reduce slow orders across your side

18   of the division, right?

19   A.  This is correct.

20   Q.  And then if we could go down to the appraisal by

21   Mr. Jensen, the bottom paragraph.

22          He says:  "Very nice job by your entire time in

23   managing the velocity.  All-time four-year lows in slow

24   order minutes across the St. Paul, Staples, Brainerd,

25   Hinckley."  Then he referenced a different employee.  Then

1    he says:  "Would also like to see your side of the Wayzata

2    reduced."  Then Mr. Jensen says:  "There is no slow order

3    that is acceptable."

4              Do you see that?

5    A.  That is correct.

6    Q.  And then he says:  "The goal is O minutes," right?

7    A.  Correct.

8    Q.  Then if we can go to page 7 of this exhibit.

9              And the bottom section is your self-appraisal for

10   overall performance for the year.  Do you see that?

11   A.  Yes, sir.

12   Q.  And you say:  I am in the green in all measures except

13   for frequency, slow orders, and operating budget.

14              Do you see that?

15   A.  That is correct.

16   Q.  When you say "green," you're referring to the metrics on

17   the scorecard, right?

18   A.  That is correct.

19   Q.  And being in the green is good.

20   A.  That is correct.

21   Q.  Being in the red is bad.

22   A.  That is correct.

23   Q.  And so you're not in the green at the end of 2015 in

24   slow orders, right?

25   A.  It's an area of opportunity to work on.

```
 1    Q.  If we could go to Exhibit 56, please.

 2              And if you can look at Exhibit 56 -- sorry,

 3    Mr. Jones.  Just quickly, my question is, is this your

 4    end-of-the-year performance review for 2016?

 5    A.  Yes.

 6    Q.  And like before, you're rated on multiple different

 7    categories, right?

 8    A.  Yes.

 9    Q.  Including leadership, this time there's a business

10    objective section, innovation, service, velocity and

11    reliability, right?

12    A.  Yes.

13              MR. LUCAS KASTER:  Move for the admission of

14    Exhibit 56.

15              MS. FERGUSON:  Objection.  Hearsay.

16              THE COURT:  Overruled.  It's admitted.

17    BY MR. LUCAS KASTER:

18    Q.  Mr. Jones, I'd like to go to page 6 of this exhibit,

19    please.  And by the way, this review is given at the end of

20    2016, right?

21    A.  Yes.

22    Q.  So this is after Mr. Sanders has been terminated.

23    A.  Yes.

24    Q.  On page 6 is the review on service, velocity and

25    reliability.  If we can blow up Mr. Jones' self-review
```

1    section in the middle of the page.

2              MR. LUCAS KASTER:  Karla, if you're wondering, we

3    can't see Exhibit 56.

4         (Pause)

5              MR. LUCAS KASTER:  That's okay.  Karla, we're

6    getting some feedback.  If you could try to mute yourself.

7    BY MR. LUCAS KASTER:

8    Q.  Mr. Jones, I'll just read this to you and you can follow

9    along with me, okay?

10   A.  Okay.

11   Q.  So your self-review says in 2016, at the end of 2016,

12   you write:

13             "My end of the division has made huge strides to

14   reduce slow orders to help improve velocity.  I believe as a

15   whole we have made a ten to 12 percent improvement," right?

16   A.  Yes.

17   Q.  And then there's an appraisal by Mr. Jensen, right?

18   A.  That is correct.

19   Q.  And he writes:  "Good job in setting expectations and

20   follow-up on slow order minutes slash removal, right?

21   A.  That is correct.

22   Q.  And then he references:

23             "UPS business is back and we're receiving the

24   Amtrak incentive on a daily basis.  We have set the standard

25   with record reduced slow-order minutes.  This has now become

1    the norm thanks to you and your team," right?

2    A.  That is correct.

3    Q.  In addition to performance reviews, you also are

4    eligible for a bonus, right?

5    A.  That is correct.

6    Q.  Based upon what's called the incentive compensation

7    plan.

8    A.  That is correct.

9    Q.  And there are two aspects of your bonus.  A target goal

10   based upon overall company performance, right?

11   A.  That is correct.

12   Q.  And then a separate bonus kicker that is based upon your

13   end-of-the-year performance review grade, right?

14   A.  That is correct.

15   Q.  So the higher your grade on your performance review, the

16   greater your bonus, right?

17   A.  That is correct.

18   Q.  If we can go to Exhibit 74.  In each job title like

19   division engineer -- we can take this down.  It's not into

20   evidence yet.  Sorry.  I should have indicated that.

21          Has a target goal for a bonus, right?

22   A.  That is correct.

23   Q.  And you can receive up to 200 percent of that target,

24   right?

25   A.  I believe that's the cap.  It's been years since we've

1    ever seen anything like that, but I believe that's the

2    potential based off the company, which is -- you know, I

3    have a very, very small influence on that.

4    Q.  But one of the things that overall company performance

5    is graded on is velocity, right?

6    A.  Very minimal on my portion.  I have a small portion of

7    the graded corridor.

8    Q.  And I'm just referencing -- you said and we've agreed

9    that there's a bonus based upon overall company performance,

10   right?

11   A.  Yeah, the company, yes.

12   Q.  And within that calculation there's a consideration of

13   velocity, right?

14   A.  That is correct.

15   Q.  And then there's the separate portion, which is the

16   additional bonus that's based upon your performance review

17   grade, right?

18   A.  That's correct.

19   Q.  And we've seen in your performance review that you are

20   also graded on velocity, right?

21   A.  That is correct.

22   Q.  And if you get an "exceeds expectations" on your review,

23   you get an additional ten percent kicker on your bonus,

24   right?

25   A.  That is correct.

1    Q.  That's the maximum of the kicker percentage, right?

2    A.  That is correct.

3    Q.  And it goes down based upon your review grade from

4    there, right?

5    A.  Correct.

6    Q.  You can get no kicker at all if you get a "meets

7    expectations," right?

8    A.  Yeah, you can get a reduction if you get a "needs

9    improvement," too.

10   Q.  Mr. Jones, if you look at Exhibit 74, do you see that?

11   A.  Yes, I do.  Yes, I see it.

12   Q.  Is this your Incentive Compensation Plan target dollar

13   amount for 2016?

14   A.  That is correct.

15   Q.  Is this something you get in the regular course of

16   business at BNSF?

17   A.  At the end of the year.  It's a potential payoff based

18   off of company performance.

19              MR. LUCAS KASTER:  Move for the admission of

20   Exhibit 74.

21              MS. FERGUSON:  Objection.  Relevance.

22              THE COURT:  I'll allow it.  I understand the

23   objection.  I'll expect you to deal with that on direct.

24   BY MR. LUCAS KASTER:

25   Q.  If we can blow up the bottom square on the right-hand

1    side.

2            So this is your target bonus for 2016, right?

3    A.   That's correct.

4    Q.   And like you said, you can earn up to 200 percent of

5    that, so up to approximately $36,000 in a bonus, right?

6    A.   That would be based off the company as a whole, and that

7    would mean every potential peer of my group would get the

8    same amount, every exempt would get that amount.  It's not

9    individually paid out, that my efforts would get me a 200

10   percent.  It would be paid out companywide for every exempt

11   on the system, not individually.

12   Q.   And it's not guaranteed that you get a bonus, right?

13   A.   Correct.

14   Q.   The company can decide based upon performance we're not

15   paying any bonuses.

16   A.   That is correct.

17   Q.   But the better the company performs, the higher your

18   bonus according to the ICP, right?

19   A.   That is correct.

20   Q.   And the higher you perform on your individual

21   performance and your review grade, the higher your bonus

22   could be, right?

23   A.   Yeah, me being one of 27 DEs, you know, if we all

24   perform at the same, you know, high level, then it

25   definitely attributes to better performance for BNSF as a

```
 1    whole.

 2    Q.  Mr. Jones, you're still employed with BNSF, right?

 3    A.  That is correct.

 4    Q.  Still in the same position you were in when Mr. Sanders

 5    was employed.

 6    A.  That is correct.

 7    Q.  Haven't been demoted.

 8    A.  No, sir.

 9    Q.  Haven't been suspended.

10    A.  No, sir.

11    Q.  You're still managing track inspectors in the Twin

12    Cities East Division, right?

13    A.  That is correct.

14    Q.  If we can go back to Exhibit 56, please.  Go to page 9.

15           This is your 2016 end-of-the-year performance

16    review.

17           If we could blow up the first paragraph under the

18    appraisal by Mr. Jensen.  Down a little bit further.  Thank

19    you.

20           This is what Mr. Jensen writes in your 2016

21    end-of-the-year performance review:

22           "Keith:  Nice job by you and your team

23    year-to-date.  Your team is injury-free, slow orders are at

24    an all-time low, relationships are good.  Don Sanders is no

25    longer working for BNSF."
```

1          That's what Mr. Jensen wrote in your performance

2    review, right?

3    A.  That is correct.

4    Q.  And then he goes:

5          "Your team is number 7 on the scorecard

6    year-to-date.  You've bounced around between number 1 and

7    number 10 year-to-date.  Here nor there, being in the top

8    ten is a big deal."

9          Right?

10   A.  Yes.

11         MR. LUCAS KASTER:  I have no further questions at

12   this time, Your Honor.

13         THE COURT:  All right.  It's a good time for a

14   lunch break.

15         This is what we'll do:  We'll take a little

16   shorter break today to try to keep things moving.  We'll

17   take just a little more than 45 minutes and we will resume

18   proceedings at 1:15.

19         All right.  We're adjourned.

20         (Lunch recess taken at 12:27 p.m.)

21                    *     *     *     *

22      (1:15 p.m.)

23                        IN OPEN COURT

24      (Jury enters)

25         THE COURT:  Please be seated, everyone.

1    Ms. Ferguson?

2            MS. FERGUSON:  Thank you, Your Honor.

3

4                    **DIRECT EXAMINATION**

5    BY MS. FERGUSON:

6    Q.  Good afternoon, Mr. Jones.

7    A.  Good afternoon.

8    Q.  Fair to say you would be here at the courthouse today

9    but for a COVID exposure?

10   A.  That's correct.  With the work procedure, I had to be

11   quarantined.

12   Q.  All right.  We talked about your background with BNSF,

13   but we haven't talked about your personal background.

14            Can you tell us, are you married?

15   A.  Yes.  Yes, I'm married, got three daughters.

16   Q.  Do you live in the Twin City metropolitan area?

17   A.  I do.  It's the Rogers area.  Otsego is the town,

18   actually, that I live in.

19   Q.  How long have you lived in Minnesota?

20   A.  I think -- our final move in October of 2013 is when we

21   got moved in in this area.

22   Q.  And did you have one other stay in Minnesota before you

23   moved here permanently?

24   A.  I did.  I come up here as the Division Assistant in this

25   area back in I believe it was January of '02 or January of

1    '03, and I left in September of '04.

2    Q.  And we won't go back through your BNSF history, but fair

3    to say you've been continuously employed since 1992 with

4    BNSF?

5    A.  That is correct.

6    Q.  All right.  We talked pretty extensively yesterday about

7    the inspector position, so I think we've got an

8    understanding of that, but I want to focus a bit on the

9    importance of reporting proper defects.

10           Let me ask you this:  If a defect is not -- a

11   proper defect isn't reported, what's the possible outcome to

12   that?

13   A.  Well, it could continue to escalate and get worse.  I

14   mean, some defects are minor in nature, maybe a loose bolt

15   or a clip off or something like that, but it could be a

16   series of -- if you don't report that and keep yourself

17   focused on that location, then it could spread over seven or

18   eight clips being off, you know, mud holes form, you know,

19   just things like that, so you want to do that.

20           And over time with our inspectors, some things

21   that we notice as we're getting better with our reporting

22   is, some inspectors are just doers, get things done, so they

23   would go out and they would find a minor defect, put a clip

24   on, and they wouldn't report it.  And we constantly

25   encourage them, like, "Make sure you report your defects,

1    because you want to get credit for the work you're doing."

2    Because FRA would look at it and say, "Well, you've

3    inspected this many miles of track and this much time, but

4    you're not writing any defects."  So you got to get credit

5    for the work you're doing and make sure these guys are

6    reporting accurately, it reflects that what we're doing out

7    in the field is accurate and FRA sees those details.

8    Q.  And if your inspectors weren't reporting defects, could

9    an FRA inspector come in and find the defects?

10   A.  Absolutely.

11   Q.  And what would happen then?

12   A.  Yeah.  Periodically, you know, they would call the

13   roadmaster and say, "Hey, I want to come and inspect your

14   territory."  So if they come, you know, naturally they're

15   going to find a few minor things, but if they come and see,

16   you know, defect after defect, things like that, and then

17   they look at your reports and they say, "Okay.  I'm finding

18   all this stuff, but your inspector didn't report anything,"

19   we've got a problem here.  Either it's an inspector or, you

20   know, this or that.  So they sync up with what they're

21   seeing in the field based off of what we're reporting in our

22   system.

23   Q.  And what role geometry cars play in the inspection

24   process?

25   A.  They -- one thing that they give us that the inspectors

1    don't is they give us rail -- like rail wear measurements,

2    so they have a laser that tells us, so that helps prescribe

3    our future rail relays.

4         But the important piece with defects is, the

5    inspectors do the best they can when they're out there

6    hi-railing and looking at stuff, but what they can't do is

7    get an accurate under load, so the weight of the train

8    actually drops the rails down.  So an inspector can do the

9    best that they can do, look under it, see what the under

10   load measurement is with the weight of the train or the car,

11   so they reaffirm what the inspector -- so he may see a

12   two-inch dip like I talked about where both rails are going

13   down.  He may see that and he may measure it at this, but

14   then the geo car goes over it and it may actually be worse

15   then, because it puts the weight of the train over it.  So

16   then he can say, "Okay.  Well, I thought I had it right, but

17   my measurement wasn't accurate," so it's just kind of a

18   safety or better overlay over what they identify.

19   Q.  Have geo cars been available on the Twin City Division

20   since you've been in that area?

21   A.  Yes.

22   Q.  There was a lot of talk about velocity.  How would a

23   derailment affect velocity?

24   A.  Yeah.  That's the most important thing to talk about.  I

25   understand slowing trains could potentially affect velocity,

1    but if my inspection team doesn't identify -- address its

2    defects or, you know, get the progression rate of things

3    that are deteriorating -- any time you have a train that

4    derails, I mean, it could be days, it could be weeks, it

5    could be anything. And any time a train is not moving,

6    that's the major negative on velocity.

7            So even though we can have a portion of the track

8    that may be a tenth of a mile or a mile long slowing down a

9    little bit, they're still moving through there. So the

10   velocity, even though it may not be perfect, they're still

11   moving. If we continue to overlook defects, not identify

12   things, not protect the railroad, we eventually would suffer

13   major derailments, which there would be no velocity going on

14   at all.

15   Q.  The loss of property, damage to property and person

16   potentially?

17   A.  Yes.

18   Q.  And a big impact on the company bottom line, I assume.

19   A.  Yeah. I mean, the communities -- you know, at certain

20   points we haul, you know, volatile oil trains and stuff like

21   that, so you have the safety of the communities.

22           And then a lot of times these things happen, you

23   know, at night, on the weekends, so then you're bringing

24   resources in, people into work in adverse conditions, late

25   at night when they're tired. So, you know, it's a huge

1    ripple effect to not protect your track and think that we

2    wouldn't report defects for velocity reasons.

3    Q.  We heard this morning some tapes that were played,

4    recordings, between you and Mr. Sanders, correct?

5    A.  Yes.

6    Q.  Did Mr. Sanders ever tell you that he was recording your

7    conversations?

8    A.  No.  I didn't have any idea.

9    Q.  Did he ask permission?

10   A.  No.

11   Q.  Were you surprised to learn he had recorded the

12   conversations?

13   A.  Yeah, it was kind of upsetting.  I mean, I -- you know,

14   me and Don had a great relationship and, you know, I'm very

15   candid and up front and obviously sometimes a little bit

16   heated and maybe over-passioned.  But, you know, I had a

17   good relationship with Don.  I needed his help and

18   expertise.  And, you know, it was -- it kind of maybe

19   changed a little bit, but, you know, I still needed his

20   help.

21   Q.  So explain to the jury what your relationship was.  You

22   describe it as a good relationship, yet some of the

23   conversations we heard may have suggested otherwise, so

24   explain that.

25   A.  Yeah -- you know, and out of context some of those --

1    you know, they played snippets of what it was.  There's

2    hours and hours of interaction between me and Don, whether

3    it's face-to-face while we're -- me and him actually

4    hi-railing together.  If he had concerns, him and I'd go

5    walk the track.

6           And just on a personal note, him and I were

7    outdoorsmen, so we would talk about hunting a lot.  I knew

8    his kids were into hunting.  He did a lot of bow fishing.

9    And then, you know, we just did a lot of deer hunting, so

10   we'd share deer hunting pictures.  And we just got really

11   close and had a lot of similarities and had a pretty good

12   relationship, and I understand work has a lot of pressures

13   and, you know, sometimes that gets in the way.

14   Q.  Did you respect his ability as a track inspector?

15   A.  Absolutely.  Don was -- you know, whether we disagreed

16   on how to measure a frog or whatever, he was dependable, he

17   was out there.  I think the records show, you know, that he

18   was -- he spent the time.  He knew that we were, you know,

19   short-handed.  He was willing to come in.  My job was -- is

20   to not take that for granted and overwork him.  So there was

21   times that, you know, him and I would talk and I'm like,

22   "Are you sure you're safe to be out there?  You're focused,

23   everything's good?"  You know.

24          And then there's all the time questions.  Looking

25   at defects is different from inspector to inspector in how

1    they relate to the EIs.  Nothing is cut-and-dried on how to

2    measure that or what measurements you come up with or how

3    to, you know, implement that into the field, so we were

4    constantly working hand in hand on, "Okay.  Maybe I don't

5    see this, but I respect that you're concerned about it.

6    What do you feel we need to do to fix it?"  So when we

7    talked about slow orders and removals, I can assure none

8    ever come off without repairing what his concerns were.

9    Q.  Can you explain that a little bit, because there was

10   discussion about slow orders and your expressing concern

11   about the slow orders he had placed.

12   A.  Yes.

13   Q.  Did you ever tell him to take a slow order off?

14   A.  That's not -- no, not correct at all.  And there was

15   times that my frustration was -- like in one of the

16   recordings I said we have geo car data that supports, which

17   is a higher level of inspection over maybe what he's doing.

18   We have defects -- data to show that that slow order didn't

19   need to be on there, but we're going to take it off.  We're

20   going to come with -- you know, that was my important piece.

21   Like I said earlier with all my inspectors across my whole

22   territory is, they're empowered to do the safe thing and I'm

23   not going to question them over, you know, a quarter of an

24   inch.  If they feel like that, you know, it's dipping down

25   more than what it is or they want to protect it through the

1     next class, I give them that empowerment.

2              Now, I'm going to call and question or ask them.

3     I'm going to say, "Okay.  What are you measuring, what are

4     you getting, and what do we need to do to fix it?  Is it

5     just bring a surface crew in there and fix it, or is it --

6     do we need to put ties in?  Is it bigger than that?  I mean,

7     what do we need to do to -- you know, to remediate that

8     thing so the slow order can come off?"

9     Q.  Did you from time to time go out and look at the defects

10    that were reported or the request for a slow order, go out

11    to the field?

12    A.  Yes, I was all the time in this area walking, just

13    putting plans together.  There was a lot of work that needed

14    to be done in this area, but Don did an amazing job down

15    there.  There was -- I mean, the proof is in the data and

16    there was minimal derailments that happened in this area

17    when he was inspecting.  Even if he was doing both yard and

18    mainline, things were kept up.

19             Some of our frequencies were getting tight and

20    that's when I was asking what do we need to get within

21    timelines.  Do I need to bring in other inspectors to help,

22    more welders?  But the data, the proof is there that we

23    didn't have a bunch of derailments for what Don did.  I

24    mean, he was out there and identifying to the best of his

25    ability what he was concerned with and we were working

1    together to make the area better.

2    Q.  Could you give the --

3              COURT REPORTER:  Ms. Ferguson, could you have him

4    slow down a little bit?

5              MS. FERGUSON:  Slow him down or slow me down, or

6    both of us?

7    Q.  Could you just slow down a little bit?  The court

8    reporter is taking everything down.

9    A.  Yes.

10   Q.  Okay.  Could you tell the jury a little bit about the

11   change in rail traffic after 2014 and 2015.  What was

12   happening?

13   A.  Yeah.  We were starting to see a little bit of a decline

14   in traffic.  You know, they were maybe starting to divert

15   oil trains based off of -- you know, through the pipelines,

16   so there was a little bit of downturn.  Not a whole lot,

17   but -- you know, what we were starting to do is just

18   starting to watch the money spend a little bit more.  You

19   know, there was practices in place like, you know, just

20   start watching how guys are spending, if we can do without

21   spending a bunch of overtime money that way and we can come

22   back and work on it, you know, during business hours.  There

23   was just a different change in, you know, how we managed the

24   money and things like that.

25   Q.  Was Mr. Sanders one of the top earning track inspectors?

1    A.  Yes.

2    Q.  Did he have the largest amount of overtime?

3    A.  Yes.

4    Q.  And when someone as a track inspector works overtime,

5    how are they paid?

6    A.  Well, that's time and a half.

7    Q.  Time and a half?

8    A.  Yes.

9    Q.  Okay.  So is there an incentive to work overtime?

10   A.  A personal incentive.  I mean, you just bring home more

11   money.

12   Q.  I want to talk a little bit about some of the

13   conversations we listened to.  There was one conversation

14   where you expressed concern that Mr. Sanders called the FRA

15   over a wrap bar.

16           Can you explain to the jury what your concern was,

17   or frustration.

18   A.  Yes.  Yeah.  And like I said, I never deter a call and

19   the FRA over things that they may have questions with, you

20   know, if I can't answer it or they feel like things are

21   going way bad or they're not getting the support.

22           This particular phone call when I said, "I don't

23   want you doing that" is Doug Jensen had put out an

24   expectation from his past knowledge and experience on the

25   railroad that you have a condition where you have a

1    defective weld based off of rail detectors that go over our

2    railroad and they scan.  They ultrasonically scan our rails.

3        So, where you weld these two pieces of rails

4    together, it kind of flares out the web of the rail, so down

5    below the head of the rail in the web it kind of flares out.

6    So if you have a potential defect starting in that weld, you

7    protect it with what's called a set of wrap bars.  So these

8    bars are flared out on the sides and then they come back

9    together and that's how you bolt the rail together around

10    these welds to protect them until you get them cut out.

11        Doug had put out kind of his personal thing about:

12    Any time you apply wrap bars, I don't want them out there

13    for more than -- it's either five days or a week.  And if

14    they were to go longer than that, we needed to have a

15    conversation with Doug and ensure that -- you know, that we

16    would have daily inspections on these specifics defects or

17    whatever.

18        The important piece is, FRA doesn't even mandate

19    wrap bars.  All they want to know is if you have this type

20    of defect in your weld, that you protect it with the right

21    speed for an amount of time before you get it cut out.  BNSF

22    goes above and beyond and we protect them with those wrap

23    bars.

24        The thing about Doug with the wrap bars is he's

25    seen some occasions in his previous roles that sometimes

1     those wrap bars might cause those welds to break faster and

2     it may create a bigger issue, so we just wanted more focus

3     on those.

4            And we had that particular condition down on the

5     low end of the St. Paul, so more towards the St. Croix end,

6     and I talked with Don.  He had called me earlier in the day

7     and said, "Hey, we've got one that, you know, is coming up

8     on the seven days."  And I said, "Well, what's the condition

9     of it?  What's it look like?"  He says, "Well, it's pretty

10    sound.  I don't see anything breaking."

11           So I talked with Doug.  I said, "Hey, we've got

12    this" -- "these wrap bars that are going to go potentially

13    past the seven days and, you know, I'll get it out.  We'll

14    get it in the plan ASAP."

15           So I talked with Mr. Sanders and I said, "Hey, you

16    know, we're" -- "I know what Doug's expectations are.  I

17    talked with him and, you know, the condition of this, you

18    know, we're fine."  And he didn't like that answer and

19    that's when he decided to call FRA.  And it -- you know, it

20    hurt my feelings because I -- you know, I followed the

21    protocol, I gave him all the details, and, you know, we knew

22    the condition was safe, and it wasn't even anything FRA even

23    mandates or has in their manual.

24    Q.  And did the FRA do anything as is it related to that

25    wrap bar?

1    A.  No.  I'm sure they told Don that it wasn't -- they

2    didn't have any jurisdiction over that condition.

3    Q.  There was another recording which you said, "I'm in

4    survival mode as usual."  What do you mean by that?

5    A.  You know, I was a little bit passionate back then where,

6    you know, I just was very prideful and wanting everything to

7    be good and a lot of pressures.  Like I said, maybe it was a

8    failed or a weak attempt to get some compassion from Don to

9    give me details and work with me.

10           So I just -- you know, I guess if I got one

11   question about what's going on with slow orders, maybe it

12   was too much in my mind because, you know, I'm competitive,

13   I want to be good, and, you know, I just got frustrated that

14   I had got that one question and I was just wanting Don's

15   help and just -- you know.

16   Q.  Did you swear and use profanity?

17   A.  I did.

18   Q.  Okay.  Was that appropriate?

19   A.  No.

20   Q.  Are you embarrassed by that today?

21   A.  Yes.

22   Q.  Okay.  As you indicated, there were hours and hours of

23   recordings made, but obviously those weren't played.

24           When you've listened to some of the recordings,

25   are there some that suggest that you wanted to work with

```
 1        Mr. Sanders as a team player?

 2        A.  I did.  I was constantly -- I mean, Don was the go-to

 3        guy, and I can remember conversations -- I mean, as you guys

 4        said, I'm not out to get you.  I'm not a head hunter.  My

 5        deal is teamwork and I need the workers a lot more than what

 6        they need me and that's been my motto since I've been here.

 7              I can remember before Blaine getting here I went

 8        to Don and said, "Hey, you're the expert.  You know this

 9        territory, you know where our priorities need to be," and I

10        said, "You're really going to have to help her, you know,

11        get over the territory, get familiar with it and then know

12        where we need to be with the resources, the windows, fixing

13        the repairs."  So, you know, before I even hired Blaine I

14        went straight to Don and said I need his help to continue to

15        improve down here.

16        Q.  Okay.  And she was a new roadmaster, correct, when she

17        started?

18        A.  Yes.  This would have been her first territory.

19              MS. FERGUSON:  Ms. Garrison, would you pull up

20        195, clip 2, toward the bottom.

21              (Exhibit 195 playback commences)

22        Q.  What did you mean by that:

23              "You'll be fine.  I've got your back.  I've had

24        your back, you've had my back.  We've worked through it and

25        that's part of it.  Don't be worried"?
```

1          What did you mean by that?

2      A.   Yeah.   There's times that if he didn't feel like by

3      running the mainline, that he couldn't stay up with that,

4      that I would bring in other inspectors, foremen, anybody

5      else qualified to inspect track, I was going to help him do

6      it or we would take yards out of service or whatever needed

7      to be done.   Right now the important piece was is I needed

8      his help on running mainline and he felt like that by me

9      doing that I was setting him up to not be able to do the

10     other yard tracks and I would have a plan and support him on

11     getting those caught up.   Right now I just looking for his

12     help on the mainline portions.

13          MS. FERGUSON:   Ms. Garrison, could you pull up

14     Exhibit 214, clip 1.

15          (Exhibit 214 playback commences)

16     Q.   What did you mean by:   "I'm not going to give up on this

17     relationship, Don"?

18     A.   Yeah.   Like I said, with an inspector it takes years and

19     years to have the knowledge that these guys do.   You know,

20     if they're not good at, you know, measuring a curve or this

21     and that, they're not replaceable.   I don't go to Walmart

22     and say I want two track inspectors.   It takes years and

23     years of training.

24          And all I knew Don was -- I don't know if past

25     relationships or past jobs, you know, he just felt like, you

1    know, if somebody was asking him to do something different

2    or maybe being a little bit passionate or being whatever, he

3    just felt like he was being set up or I was looking for

4    excuses or whatever.  And I just -- you know, we worked

5    together.  Him and I spent a lot of time and we were making

6    some pretty good headway and things were improving.

7           So I know it'd have been easy to sit here and say,

8    "You know what?  Him and I just don't get along, we argue,

9    whatever, I'm just going to pull back."  You know, I needed

10   Don and I needed his help and I spent the time and effort

11   down there and I wasn't just going to throw my hands up

12   because we, you know, looked at things a little bit

13   different every now and then.

14   Q.  Let's look at one more clip, Exhibit 200, clip 4.

15       (Exhibit 200 playback commences)

16   Q.  What's happening in that conversation?

17   A.  It was a picture of a frog, and like I said, based off

18   of that I just -- I couldn't tell if there was grease down

19   in it, what it was, and I was getting his follow-up on, you

20   know, how long of a job maybe it was going to be for the

21   welder or, you know, what traffic looks like, if he was

22   going to be able to maybe get a shot of time to get out

23   there and correct it, or the best thing was to leave slow

24   order on all night as opposed to block traffic and try to

25   repair it.  So just some follow-up and just getting some

1   clarity from Don based on what he sent me.

2   Q.  You say:  "Obviously we got to solve this as a group."

3   What do you mean by that?

4   A.  Yeah.  We were having a flare-up of a bunch of frogs

5   that were blowing out.  So like I said earlier when we

6   talked, you know, a frog is good for track speed, or if it

7   meets the condition, if it's measured appropriately, it goes

8   down to a ten mph.

9            So it seemed like we were trying to get ahead of

10  this condition and having this thing spark up on us, I was

11  trying to get welders in there, so that's what I meant.

12           It wasn't anything Don could do on his own,

13  because what he identified, I needed to bring resources in.

14  So, you know, it was a group effort to get ahead of this and

15  get caught up to where maybe it was just one frog in a day

16  instead of three or four of them either getting bad or

17  potentially being slow orders.

18  Q.  There are others, but I'll move on from there.

19           Fair to say you had many conversations with Don

20  where you were working together as a team?

21  A.  Yeah.  I mean, there was ups and downs.  There was times

22  where it was probably outside influences, there's other

23  things going on on my beat that maybe I was a little

24  agitated, but it was never out of disrespect for Don or not

25  to utilize his resources and his expertise to help me.

1    Q.  Were you grateful that he would work overtime?

2    A.  Yes.

3    Q.  And holiday hours?

4    A.  Yes.

5    Q.  Back in 2014, 2015, he was earning an average of about

6    $159,000?

7    A.  Yes.

8    Q.  Do any of your track inspectors earn that today?

9    A.  No.

10   Q.  What do you attribute that to?

11   A.  Today it's just the process of more efficient tracking

12   inspecting, better communication between the FLS and

13   inspectors on where they need to be.  Setting up better

14   plans with operating and transportation.  Capital work,

15   meaning just other expenditures or money to come in and put

16   more ties in, more rails in, things like that that just

17   improve the infrastructure, and not having inspectors just

18   work, you know, 300 days out of the year or whatever Don

19   was.  You know, we got different people, different

20   positions, better training, you know, things like that.  And

21   just better follow-up, utilizing their time, making sure

22   we're supporting them and not have to be out there all hours

23   of the night.

24   Q.  I'm going to shift gears now and talk a little bit about

25   the schedule or hours worked.

1          At some point was Mr. Sanders asked to work

2     instead of four ten-hour days, five eight-hour days?

3     A.  Yeah, and that's something -- at my level, I don't

4     really tell the roadmasters, you know, "Hey, this is what

5     your people need to work."  They customize their job based

6     off traffic, upcoming projects.  They may adjust their time.

7          I know with Bill Shoemake, earlier for some reason

8     Don was allowed to work 4/10s, so that meant, you know, you

9     work four days a week, ten-hour days.  As Blaine got there

10    and got comfortable with it and realized, you know, that

11    maybe trying to be out there on that part of the railroad

12    for ten hours a day wasn't as beneficial as being there five

13    days a week.  So, you know, we made the adjustment within

14    the bargaining agreement that, you know, we were going to

15    adjust Don's time back with what was consistent with the

16    rest of the workforce.

17    Q.  He wasn't happy about that, was he?

18    A.  You know, I don't think he was because he liked the

19    4/10s, but he was working, you know, a lot of days anyway,

20    so I don't know that it really mattered, because whether

21    you're there eight hours a day or ten-hour days, you get the

22    same amount of overtime if you work it.  It was irrelevant.

23    It was just more consistent for -- if Don was coming in

24    early and Blaine wasn't doing her morning briefing until 7,

25    you know, what was Don accomplishing in that early hours of

1   the day.  And so it just drove consistency and let us kind

2   of, you know, make sure Don was being productive as he could

3   and being where he needed to be at the right time and just

4   getting him to communicate a little bit better than previous

5   years.

6   Q.  Fair to say the track inspectors work very

7   independently?

8   A.  They do.

9   Q.  You rely upon them to properly report the time that

10  they've worked?

11  A.  That is correct.

12  Q.  Because you're not following them?

13  A.  That's correct.  And it's very, very important that they

14  have meticulous conversations throughout the day with their

15  FLS on, you know, "Hey, I'm not getting across or I may work

16  a little bit late," and just keep them -- inspectors don't

17  just come and go as they please and just work the hours that

18  they want.  It has to be agreed upon and communicated with

19  the supervisors.

20  Q.  FLS is front line supervisor?

21  A.  Supervisor.

22  Q.  And that's the same as roadmaster?

23  A.  That's correct.

24  Q.  And in this case Blaine Hoppenrath or Stephen Chartier,

25  correct?

1    A.  That is correct.

2    Q.  All right.  And at some point was Mr. Sanders told that

3    he couldn't drive his company vehicle home?

4    A.  Yeah.  You know, after we realized and we started making

5    different changes, there was some inspectors that run

6    mainline territories and they -- you know, if they get a

7    call out in the middle of the night they may have to drive

8    an hour to get their truck and then drive an hour past where

9    they were.  So we decided, hey, what locations make sense

10   that track inspectors may be able to drive their truck and

11   what ones do we need to park trucks.

12            For one, as we're cleaning up processes and doing

13   things differently, we start reducing some of our truck

14   fleet.  We had some older trucks that we were putting a lot

15   of money into and a lot of times they were just setting, so

16   we made decisions, hey, let's do away with maybe four or

17   five trucks that roll under this roadmaster.

18            So by doing that, if the track inspector really

19   didn't need to take a truck home, that freed up a truck if

20   Don or a track instructor wasn't able to come in and

21   somebody else was called in, that they could come in and

22   grab that resource or that asset and go hi-rail, go look at

23   something.

24            Plus, Don only lived, you know, roughly 15, 20

25   minutes, so it was minimal delay for him if he got called

1   out to come in and grab the truck and go look at what it was

2   as opposed to some of the other inspectors that had bigger

3   territories, so we made some decisions on several inspectors

4   parking trucks.

5   Q.  When he worked at Dayton's Bluff, what was the size of

6   his territory?

7   A.  I think it was 68 miles of mainline and then, you know,

8   like I said, I think on bulletin he had a couple of the

9   yards that were in that limit, so it wasn't spanned out very

10  far.  There was a few things in between that made it a

11  little bit more, but it was definitely the smallest

12  territory mileswise out of all of my direct reports.

13  Q.  As some point did he decide to try and bump to a

14  different territory?

15  A.  Yeah, I think he wanted maybe a change and he went over

16  to -- and he bid on a tracks inspector job in Northtown.

17  Q.  And stayed there until sometime in March?

18  A.  Correct.

19  Q.  Whatever the records indicate.  Okay.

20          MS. FERGUSON:  Ms. Garrison, could I see Exhibit

21  126, P-126.  Oh, I'm sorry.  That's the wrong one.  Let's

22  try D 44.  Okay.  Thank you.  Could you highlight "Timely

23  Reporting."

24  Q.  Mr. Jones, have you seen this document before?  At the

25  top it says "St. Paul Roadmaster Expectations" dated

1    October 9, 2015?

2    A.  Yes.

3    Q.  Okay.  Read the section on timely reporting.

4    A.  "All persons entering time in PARS and reporting for the

5    day must report daily and before they leave for the night.

6    Employees with this responsibility must also send a nightly

7    report to the roadmaster division engineer and manager of

8    best way."

9    Q.  Did Ms. Hoppenrath have the authority to issue

10   expectations that required timely reporting on a daily

11   basis?

12   A.  That's correct.

13   Q.  So that was the expectation at least as of October 9,

14   2015, correct?

15   A.  That is correct.

16   Q.  And there's another section right beneath that,

17   "Overtime."  It says:  "All overtime must be approved."  Why

18   was that important?

19   A.  To make sure that, you know, guys were efficiently

20   spending BNSF's dollars.  I mean, there's a lot of times

21   that -- you know, if we didn't manage it and have oversight,

22   you know, guys could be just setting two or three hours at

23   the end of the day and, you know, just getting the extra

24   pay.

25            Plus, this is in the bargaining agreement and the

1    union agreements that all overtime has to be approved by the

2    supervisor prior to working it.

3    Q.  Okay.  Let's talk now about the investigations and the

4    decision to investigate.

5         At some point in March of 2016, did Ms. Hoppenrath

6    express concern to you about her suspicion that Mr. Sanders

7    wasn't working the hours he was reporting?

8    A.  That's correct.

9    Q.  And what did you recommend, if anything?

10   A.  I just said, you know, if there's -- you just need to go

11   down and spend a little time with him, or, you know, if you

12   suspect that he's not doing that, just maybe observe him and

13   see where he's at, what time he's coming in and then, you

14   know, act accordingly.

15   Q.  And is it your understanding she in fact observed him on

16   March 19, 2016?

17   A.  That is correct.  I think it all began on the 18th.

18   They rode together knowing he was coming back from Northtown

19   back down to St. Paul.  They rode together and he'd made a

20   comment about wanting to leave early or not -- wanting to

21   get off.  And she had witnessed him leave maybe a little bit

22   early, nothing big, and so she was just like:  "Well, I just

23   want to come in and have a talk with him knowing he's coming

24   back."  It was going to be over the weekend.  So I said,

25   "You know, you have the authority and the right to do what

1    you need to do to make sure your people are working

2    accordingly. "

3    Q.  And following her observation of him on March 19, 2016,

4    did she report any concerns to you?

5    A.  Yes.

6    Q.  And what did you recommend?

7    A.  After she kind of gave me the details, I'm like, "Well,

8    Don's usually pretty much on time, this and that, you know.

9    Let's just keep this one, make sure that it wasn't just a

10   one off and let's see if things change throughout the week

11   or next weekend coming up.  Keep the information and we'll

12   just keep an eye on it from there."

13   Q.  Did you recommend that she contact Labor Relations?

14   A.  Yes.  I mean, once she was, you know, pretty set on that

15   she seen that, I said, "Well, maybe you reach out and just

16   see what they think this looks like, what their thoughts are

17   on it."

18   Q.  After the time was entered on March 19 and until

19   March 29, did Mr. Sanders ever attempt to change his time,

20   the hours worked, on March 19?

21   A.  No, I don't believe so.

22   Q.  So he didn't change it on the 20th, the 21st, 22nd,

23   23rd, 24th, 25th, is that correct?

24   A.  That's correct.  And if I remember, it was put in as a

25   "Save Final," meaning that these guys are -- you know,

1    that's when they say everything is in, accurate, and I'm

2    going to submit it through.

3    Q.  Mr. Sanders had been recording time in the time system

4    for years by this point in 2016, correct?

5    A.  That is correct.

6    Q.  Had he ever expressed any concerns to you about being

7    able to use that system properly?

8    A.  No, not that I was aware of.  I mean, he was very

9    efficient from what I could tell of putting his time in and

10   putting the right codes in and this and that, so I don't

11   understand why all of a sudden there was tough reporting

12   issues or why we needed training or something like that.

13   Q.  And did he claim any reporting issues until the time of

14   the investigation?

15   A.  No.

16   Q.  Ms. Hoppenrath again followed Mr. Sanders on March 25,

17   correct?

18   A.  That is correct.

19   Q.  And March 26, correct?

20   A.  That is correct.

21   Q.  And I assume she reported to you what her observations

22   were those two days?

23   A.  That is correct.

24   Q.  And a decision was made to conduct an investigation?

25   A.  That is correct.

1    Q.  So there was questions this morning about two separate

2    investigations.  Why two separate investigations for

3    Mr. Sanders?

4    Q.  I just think we kept them separate just for, you know,

5    the clarity of the details and not look like we're just

6    maybe, you know, just bringing in so much clutter in one

7    event, that we just tried to keep them separated.  That way

8    we can -- you know, if these are accurate on this one, then

9    it started the pattern of this and then it carried on into

10   these other days of doing the same activity.

11   Q.  A Collective Bargaining Agreement provides the terms

12   under which BNSF can discipline its employees, correct?

13   A.  Correct.

14   Q.  An employee can't be terminated without an

15   investigation?

16   A.  That is correct.

17   Q.  And is an employee entitled to representation at the

18   investigation?

19   A.  Yes.

20   Q.  Is an employee entitled to present evidence in the form

21   of witnesses?

22   A.  Yes.

23   Q.  Is an employee entitled to introduce documents?

24   A.  Yes.

25   Q.  Is an employee entitled to an appeal?

1    A.  Yes.

2    Q.  And all those things were done in this case, weren't

3    they?

4    A.  Yes.

5    Q.  Let's talk --

6              MS. FERGUSON:  If, Ms. Garrison, you could pull up

7    Exhibit P-108, please.

8    Q.  Mr. Sanders (sic), you weren't at the investigation

9    hearing, correct?

10   A.  Yes, he was.

11   Q.  No, you weren't.  I'm sorry.  Mr. Jones, you weren't at

12   the investigation, correct?

13   A.  No, I was not.

14   Q.  You weren't a witness?

15   A.  Correct.

16   Q.  But after the investigation you prepared a summary of

17   the transcripts, correct?

18   A.  That is correct.

19   Q.  Are these your bulletin points there?

20   A.  That is correct.

21   Q.  Okay.  Was it your understanding that no one observed

22   Mr. Sanders until 9:15 in the morning when he was at Bridal

23   Veil?

24   A.  Yeah.  There was no whereabouts of where he was at until

25   Ms. Hoppenrath comes back and sees the truck was gone.

1    Q.  And was there any evidence he had obtained track

2    authority before 9:18 that morning?

3    A.  No.

4    Q.  Okay.  Your recommendation was that -- dismissal based

5    on dishonesty and insubordination, correct?

6    A.  That is correct.

7    Q.  And if we could see Exhibit P-122, please.

8            You sent that recommendation to PEPA, correct?

9    A.  That is correct.

10   Q.  And PEPA is part of Labor Relations?

11   A.  That is correct.

12   Q.  Policy for Employee Performance Accountability?  Is that

13   what that stands for?

14   A.  Yes.

15   Q.  You also copied your boss, Doug Jensen, correct?

16   A.  That is correct.

17   Q.  Jason Randash, who was the hearing officer, correct?

18   A.  That is correct.

19   Q.  And then did you receive an email from PEPA, we see at

20   the top, April 27, 2016 at 3:25 p.m., e-mailed to you?

21   A.  That is correct.

22   Q.  And it says:

23           "Keith, I have read the record and have consulted

24   with HR and the law department.  I support dismissal on a

25   standalone basis for dishonesty/theft of time.  The rule

1    violations were proven.

2              "Please mention" -- "Please note you mentioned

3    insubordination in your below email.  We did not charge

4    Mr. Sanders with insubordination, so we cannot discipline

5    him for that."

6              And it's signed "Stephanie Detlefsen, Labor

7    Relations," correct?

8    A.  That is correct.

9    Q.  In addition to Ms. Detlefsen, did you consult with your

10   boss, Mr. Doug Jensen?

11   A.  I just kind gave him a high level of what we had

12   witnessed and what we had seen, and he said follow the

13   process and stay with -- you know, follow the agreement and

14   the process with BNSF and the proper channels.

15   Q.  You alone cannot make that decision to terminate?

16   A.  No.

17   Q.  And similar with the March 25 and March 26.

18             MS. FERGUSON:  Ms. Garrison, if you could pull up

19   P-109.

20   Q.  This appears to be an email from you, Mr. Jones, again

21   to PEPA, copying Doug Jensen, Jason Randash, and you say:

22   "Please review at your earliest convenience."

23             It appears to be the detail for March 25 and

24   March 26 from the hearing, correct?

25   A.  That is correct.

1    Q.  In addition to sending the email with your summary, it

2    appears you're also attaching the transcripts from that

3    hearing, correct?

4    A.  That is correct.

5    Q.  And you did that as well following the March 19

6    investigation, correct?

7    A.  Yes, all documents were sent to this PEPA group.

8    Q.  And again, you're recommending dismissal because he was

9    dishonest when he submitted his time roll on March 25 and

10   March 26, correct?

11   A.  That is correct.

12   Q.  And on each of those occasions he actually acknowledged

13   that his time entries were incorrect, correct?

14   A.  That is correct.

15   Q.  And he had a chance to go in and change the time and he

16   still didn't get it right?

17   A.  That is correct.

18   Q.  And Exhibit P-123, please.

19        And again, we have an email from PEPA, April 27,

20   2016 to you, and it says:

21        "Keith, I've read the record and consulted with HR

22   and law department.  I support dismissal on a standalone

23   basis for dishonesty/theft of time.  The rule violations

24   were proven.

25        "Stephanie Detlefsen, BNSF."

1          Did I read that correctly?

2    A.  That is correct.

3    Q.  So following that information you received from

4    Ms. Detlefsen, ultimately a dismissal letter was issued?

5    A.  That is correct.

6    Q.  And do you know, Mr. Jones, whether there was an appeal

7    of that dismissal decision?

8    A.  Yes, there was.

9    Q.  And was that dismissal upheld?

10   A.  Yes, it was upheld.

11   Q.  To this day Mr. Sanders hasn't returned to work at BNSF,

12   correct?

13   A.  That is correct.

14   Q.  He didn't prevail at any level, correct?

15   A.  That is correct.

16   Q.  Just a few more topics.

17          Comparators.  There was reference this morning to

18   comparators and Plaintiff's counsel suggested that you

19   didn't treat others the same as you did Don Sanders for

20   falsifying in one case log books.

21          How do you respond to that?

22   A.  Yeah.  We went through the same process.  So we issued

23   the notice, went through the investigation, followed the --

24   you know, the facts, let them present their case, explain

25   what it was.

1          And after, you know, the process was reviewed and

2     there was no egregious time theft -- there was inaccuracies

3     of filling out log books, which is, you know, a little bit

4     of a serious offense, but it's nothing like, you know, I'm

5     not here today, but I'm going to pay myself eight hours.

6     There was none of that.  It was just the log books didn't

7     sync up with the hours that he was working.

8          So based off of looking at log book records and

9     his time, he was doing it to keep his hours down where he

10    could drive more.  It wasn't that he was not at work and not

11    paying himself.  So we held him accountable on making sure

12    that he understood the importance of filling out log books.

13    There was no theft of time involved with that.

14    Q.  And how about the other comparator?

15    A.  With Mr. Kramer?

16    Q.  Yes.

17    A.  That was, you know, just -- blatantly just lying to me

18    as far as what his efforts were through the day.

19          I was in the area.  I'd asked him to weld on a

20    frog, which is what a lot of this problem was that, you

21    know, was causing a lot of these issues down there was a

22    frog that needed to be welded on.  We had an area that we

23    were working, so it meant that this frog was available to be

24    worked on.  And I was in that area.  I had my radio on and I

25    never heard anybody on the radio.

1              I go up there.  Mr. Kramer is setting on property

2     in his work truck next to the track, and I asked him, I

3     said, "How come we haven't welded on that frog?"  And he

4     told me that the DS wouldn't give him time.  And I said,

5     "Well, we got the track blocked with what we're doing here.

6     Why would" -- he goes, "Well, I asked and he wouldn't give

7     me time."

8              So as I left, I can't remember if Blaine was with

9     me or who was with me, and I'm like, okay, I've been in this

10    area all day.  I've had my radio on.  I don't recall

11    Mr. Kramer asking for the DS on the radio.  I said, "What I

12    want you to do is get the recordings between this time and

13    this time."  And we found out that Mr. Kramer had lied to

14    me.  He never tried to called the DS.  He never tried to

15    talk to him on the radio.  So he lied to me.  But it was no

16    time theft.  He was at work all day.  He just didn't use a

17    lot of his time wisely.  So he didn't steal time.  He just

18    wasn't accurate on his efforts on what he was trying to do

19    for the day.

20    Q.  And what about Mr. Johnson?

21    A.  The agreement states, like I said earlier, you have to

22    get approval for working overtime and he chose -- I mean, he

23    was on property, he was doing the work, so we had a little

24    bit of discrepancy on, you know, him claiming three hours of

25    overtime without approval.  So it wasn't that he went home

1    and just threw in two hours of overtime to pay himself extra

2    not being there.  He actually was working, but he didn't get

3    the proper authorization from his supervisor to work those

4    overtime, so we held him accountable, made sure he

5    understood what the agreement said, what our policy said and

6    corrected his behavior that way.

7    Q.  Almost the last topic:  compensation.

8                 You were asked about your performance review at

9    the end of 2016.  What was your overall rating?

10   A.  Just on target.

11   Q.  It wasn't exceeds?

12   A.  No exceeds, no far exceeds, nothing.

13   Q.  Lastly, there was discussion about the complaints to

14   Ms. Eggertsen about these recordings.  Do you recall that?

15   A.  Yes.

16   Q.  And you had discussions with Ms. Eggertsen or others,

17   Mr. Jensen, about your conduct or your use of profanity?

18   A.  Yeah.  After they did some follow-up with Mr. Sanders it

19   was -- you know they come to me and said they had listened

20   to the recordings, they weren't professional, and, you know,

21   I got a coaching letter on need to improve and change my

22   delivery in this approach.

23   Q.  Did that reporting to HR play any role in your

24   decision -- you as one of many -- decision to terminate

25   Mr. Sanders?

1    A.  Absolutely not, no.

2    Q.  And Mr. Sanders also reported concerns in February when

3    he wasn't able to use the truck, correct?

4    A.  Yeah.  I mean, that was his concern, but it was

5    something within our roles and responsibilities that we can

6    do.

7    Q.  Did that report in February of 2016 play any role in

8    your decision -- you as one of many -- to terminate

9    Mr. Sanders?

10   A.  No.

11   Q.  And finally, you're aware that after the first

12   investigation hearing is held, before any decisions are

13   issued, he again calls the hotline to report what

14   essentially he had reported earlier, but claims now that

15   he'd been complaining for two years about your behavior.

16        Were you contacted by Mr. Freshour as it related

17   to those complaints?

18   A.  Yeah.  He had some follow-up questions and I just

19   answered, you know, what he had asked.

20   Q.  Did that complaint play any role in your decision as one

21   of many decisionmakers to terminate Mr. Sanders?

22   A.  No.

23   Q.  Okay.  Thank you.

24        MS. FERGUSON:  Those are all the questions I have.

25        THE COURT:  Mr. Kaster?

```
 1              MR. LUCAS KASTER:  Thank you, Your Honor.

 2

 3                      RECROSS-EXAMINATION

 4   BY MR. LUCAS KASTER:

 5   Q.  Mr. Jones, let's pick up right where you left off.

 6          You just testified in response to questioning

 7   saying that Mr. Sanders' complaints to HR played no role in

 8   your decision to terminate him; is that what I understood?

 9   A.  That is correct.

10   Q.  Let's go to Exhibit 108, please.

11          Mr. Jones, this is your email we've looked at a

12   couple different times now to PEPA recommending termination,

13   right?

14   A.  Yes.

15   Q.  If we can blow up just the very top with the

16   From/Sent/To section.

17          You sent this email on April 19th of 2016 at

18   2:22 p.m.  Do you see that?

19   A.  Yes.

20   Q.  Let's go to Exhibit 109.

21          This is, again, your email to PEPA from March 25th

22   and 26th, if we can blow up that top section.

23          You sent this email on April 19th, 2016, at

24   2:23 p.m., right?

25   A.  2:22.
```

```
1     Q.  2:22 p.m.  Let's go to Exhibit 113.

2             Mr. Jones, we looked at this exhibit earlier this

3     morning.  This is your response to Mr. Freshour, who is the

4     HR person investigating Mr. Sanders' HR complaint, right?

5     A.  The hotline follow-up, yes.

6     Q.  The hotline complaint.  Again, I asked you this morning

7     is the red section what you wrote in response and it is,

8     right?

9     A.  That is correct.

10    Q.  Let's blow up the top section, the From/Sent/To section.

11            You sent this email in response to Mr. Sanders' HR

12    complaint on 4-19, 2016, at 3:07 p.m., right?

13    A.  Yes.

14    Q.  Thirty minutes after you had e-mailed PEPA terminating

15    Mr. Sanders for two separate allegations, right?

16            MS. FERGUSON:  Objection.  Misstatement of the

17    evidence.

18    Q.  Sorry.  Forty minutes after.

19            MS. FERGUSON:  Same objection.  Misstatement of

20    the evidence.

21            THE COURT:  We'll allow Mr. Jones to clarify that.

22    BY MR. LUCAS KASTER:

23    Q.  Right?

24    A.  Yes.  It was just the process of following up on emails

25    and in the timeline of the investigation on getting those --
```

1    that data to PEPA.  It was all about the procedure.

2    Q.  And are you still contending to this jury that despite

3    sending the emails to PEPA just 40 minutes before you

4    responded to Mr. Sanders' HR complaint, that it played no

5    part in your decision to recommend dismissal?

6    A.  Absolutely did not.

7    Q.  By the way, you testified, I believe, that Mr. Sanders

8    never told you he was recording.  Did I catch that

9    correctly?

10   A.  That is correct.  I --

11   Q.  Let's go to Exhibit 213, please.  If we can play from

12   6:25 to eight minutes.

13       (Exhibit 213 playback commences)

14   Q.  So you knew Mr. Sanders was recording you, didn't you?

15   A.  At that point.

16   Q.  Let's play ten minutes and six seconds to 11 minutes and

17   six seconds, please.

18       (Exhibit 213 playback continues)

19   Q.  Is that Mr. Sanders' voice on that recording?

20   A.  It is.

21   Q.  Telling you that he's just trying to keep people safe,

22   and if he can save one life, that's all that matters to him.

23   A.  I commend him for that every day, his passion for

24   safety, and it was never discredited.

25   Q.  Did I also catch on direct examination that you said

1    that you weren't trying to catch Mr. Sanders in a lie, that

2    you were focused on teamwork?  Did I catch that correctly?

3    A.  That is correct.

4    Q.  And then you approve your subordinate renting an

5    unmarked vehicle on three separate days to spy on

6    Mr. Sanders, and that's not trying to catch him in a lie?

7    A.  That's a morale and a work issue, and whenever we seen

8    that their pattern was beginning, there was something that

9    had changed, something that was going on, and we needed to

10   find out the details.

11   Q.  You also talked about this schedule issue, about

12   changing Mr. Sanders' schedule from 4/10s to 5/8s.  Do you

13   recall that?

14   A.  Yes.

15   Q.  And you I believe said that Mr. Sanders wasn't happy

16   about that change.  Do you recall that?

17   A.  I wasn't -- I wasn't certain if he was.  I mean, it's --

18   like I said, he has the authority that if we change the job

19   time he can bid off on something else or go somewhere else,

20   but that's what we decided was the best thing to do for this

21   area and that position.

22   Q.  Let me ask you:  We looked at some of Mr. Sanders' time

23   records and I specifically pointed out that all throughout

24   2015, Mr. Sanders was entering ten hours under pay code 1.

25   Do you recall seeing that?

1       A.  Yes.

2       Q.  So that was his regularly assigned scheduled time and he

3       was entering ten hours, right?

4       A.  For that timeline, yes.

5       Q.  Do you know when that change in his schedule from 4/10s

6       to 5/8s occurred?

7       A.  I don't know the exact date.  I just know that it was

8       sometime between Shoemake had allowed it and then Blaine

9       come and I think she allowed it for a little bit.  And as

10      she got her feet on the ground more comfortable, she

11      realized that Don was maybe coming in early and she wanted

12      more consistency with everybody, because they do a detailed

13      safety briefing where everybody's on the same page, and if,

14      you know, Don was not there on time or come in early or was

15      out on the track, you know, she wanted him to start at the

16      same time that everybody else was, so she made that decision

17      to make her whole work group consistent and start at the

18      same time.

19      Q.  Why don't we go to Exhibit 116, please.

20              Mr. Jones, this is a timeline that Mr. Sanders

21      submitted to HR as part of his complaint against you and

22      Ms. Hoppenrath for harassment and retaliation.  Do you see

23      this document?

24      A.  Yes.

25      Q.  Let's blow up the bottom section under December 2015.

1              And on December 10th, according to Mr. Sanders'

2      notes, he was told by Ms. Hoppenrath that she was changing

3      his working days from 4/10s to 5/8s starting 12-21 of 2015.

4      Do you see that?

5      A.  It's blocked behind it, but -- okay, yeah, 12-21, yes.

6      Q.  At any point -- let me back up.  December 10th is three

7      days after Mr. Sanders goes to HR to complain about you and

8      Ms. Hoppenrath, right?

9      A.  I didn't hear those dates.

10     Q.  Sure.  You recall looking at the HR complaint, that

11     Mr. Sanders went to HR on December 7th with Ms. Eggertsen.

12     That's when you send the email back on the 8th at 3:45 in

13     the morning.  Do you recall that?

14     A.  Yes.

15     Q.  So three days after Mr. Sanders goes to HR about

16     Ms. Hoppenrath, Ms. Hoppenrath changes his work schedule,

17     right?

18     A.  That's out of context.  That really didn't lead up to

19     that.  It was probably in the works prior to that.  She was

20     trying to get her work group scheduled.  This was not

21     punitive.  It was consistency in how she wants to operate

22     her work group.

23     Q.  Do you have any evidence that this was in the works

24     before December 7th to change Mr. Sanders' schedule from

25     4/10s to 5/8s?  Because we've seen all of his time entries

1    through the entire year where Mr. Sanders is entering ten

2    hours for his days.  Any evidence that you can prove to me

3    that your intention -- or Ms. Hoppenrath's intention was to

4    change Mr. Sanders' schedule before he went to HR on

5    December 7th?

6    A.  There's no evidence.  It's just that's what she decided

7    to do as a result of getting things back in order and

8    getting a teamwork environment where everything was

9    consistent, everybody was showing up at the same time.  It

10   was not punitive.  It's consistency and it's being accurate

11   with your work groups.

12   Q.  Let's go to the next page of this exhibit, please.

13        You also referenced through questioning from

14   Counsel that Mr. Sanders had his work vehicle taken away.

15   Do you recall that?

16   A.  I want to clear something.  It's not his work vehicle.

17   It is a BNSF-owned vehicle and he utilized it for his, but

18   it wasn't specifically assigned to him so we can allocate

19   those resources as seen fit and have them start and be

20   parked where we need to be.

21   Q.  Okay.  Let's provide that clarification.

22        Before Mr. Sanders was told to not be able to

23   drive a work vehicle to and from his residence to work, he

24   was allowed to do that, right?

25   A.  Over the years before we got the processes cleaned up,

1    understanding where everybody was at, what people were doing

2    and starting to get the right information, there was a lot

3    of things that were, you know, allowed to do.  And, you

4    know, as we got better understanding the territory, the

5    procedures, how things needed to go, make adjustments,

6    things were changed with several inspectors, not just Don

7    Sanders.

8    Q.  That wasn't my question, Mr. Jones.

9            Prior to December of 2015 when Mr. Sanders'

10   ability to drive a work truck to and from his residence was

11   changed, he was allowed to do that, right?

12   A.  That is correct.

13   Q.  Okay.  Let's look at the entry on December 17th.

14   Mr. Sanders writes to human resources:

15           "Blaine said I could no longer drive a company

16   vehicle to and from work."

17           Any evidence that you can provide to us right now

18   that demonstrates this thought about taking away

19   Mr. Sanders' ability to drive a vehicle to and from work was

20   in the works before he went to HR on December 7th?

21   A.  Parking the truck is not punitive.  It was a decision to

22   make adjustments to the work group for consistency and

23   everybody showing up on time and better communication from

24   the work group, not anything to do with Don not being able

25   to drive the truck.  He still was able to use the truck to

1    do his day-to-day prescribed duties.

2    Q.  And I'm asking is there anything in writing that

3    demonstrates that that was in the works before Mr. Sanders

4    went to HR on December 7th?  Can you point us to a written

5    document?

6    A.  There's no document that says that, that she has the

7    ability to make those adjustments and utilize the trucks how

8    she sees fit.  Don still utilized the truck throughout the

9    day.  It just didn't need to be at home every night.

10   Q.  Let's go to the entry on January 6th.  There was also

11   some testimony about Mr. Sanders' ability to start at a

12   separate location at a different time.  Mr. Sanders writes

13   in his timeline that on January 6, Ms. Hoppenrath told him

14   he could no longer start at Bridal Veil and he couldn't

15   start at 6:30.  He had to start at 7.

16        Any evidence that that change occurred or was even

17   considered before Mr. Sanders went to HR on December 7th?

18   A.  Like I said, this is all about consistency and having

19   all your people at the right place.  I don't even understand

20   where it was agreed upon for him to be at Bridal Veil.  I

21   never knew that and he was always at Dayton's Bluff, early.

22   Q.  Let's switch gears a little bit.

23        You talked about these investigations that

24   occurred in this case.  Do you recall that?

25   A.  Yes.

1    Q.  And you said that Mr. Sanders had representation there.

2    Do you recall that?

3    A.  That is correct.

4    Q.  It's not legal representation, right?  It's union

5    representation, right?

6    A.  He has a right to call any representation that he needs,

7    yes.

8    Q.  And the representative he had was a Mr. John Mozinski,

9    who is a union rep non-lawyer, right?

10   A.  That is correct.

11   Q.  So representation is not legal representation in these

12   hearings according to what Mr. Sanders had, right?

13   A.  Yes, and I am not a lawyer either.

14   Q.  Okay.  You also reference that Mr. Sanders has the

15   ability to introduce exhibits.  Do you recall that?

16   A.  That is correct.

17   Q.  And we've looked at some of the exhibits that the

18   company introduced, right?

19   A.  Correct.

20   Q.  Do you understand that in these investigations there's

21   no right to discovery, that the company shows up with

22   whatever records they want and they never give them to the

23   charged employee before the hearing?  Do you know that?

24   A.  That is correct.

25   Q.  You also talked about these emails to PEPA which we've

1    looked at, and I just want to make something clear.  This

2    PEPA department also works for BNSF, right?

3    A.  That is correct.

4    Q.  And they're within the Labor Relations department,

5    right?

6    A.  That is correct.

7    Q.  The same labor relations department that you reached out

8    to before you followed -- or approved Ms. Hoppenrath to

9    follow Mr. Sanders, right?

10   A.  That is correct.

11   Q.  By the way, when you were sending these emails to PEPA,

12   is there any reference in either of those emails that says:

13   "Hey, by the way, I just want to make you aware Mr. Sanders

14   filed an HR complaint against me just a couple months ago."

15          Did you ever say that to PEPA?

16   A.  No, I did not.

17   Q.  You reference some appeals that Mr. Sanders had with

18   respect to these administrative hearings and his

19   termination.  Do you recall that?

20   A.  Yes.

21   Q.  Most of these appeals are also decided by internal BNSF

22   managers, right?

23          MS. FERGUSON:  Objection.  Misstatement of the

24   evidence.

25          THE COURT:  Overruled.  I'll allow Mr. Jones to

1   clear that up.

2   A.   The first level of appeal does go back to I believe the

3   general manager of the Twin Cities Division.  He reviews the

4   case and if he feels like the details aren't -- you know, he

5   may overturn it, but in this case it was overturned.  They

6   didn't grant the appeal and it went to the next level of

7   appeals.

8   Q.   And they're only considering exactly what was introduced

9   during the investigative hearings, right?

10   A.   That's correct.

11   Q.   They're not reviewing all the evidence we're looking at

12   right now, right?

13   A.   It's about the case and the facts of what we observed,

14   not anything else related.

15   Q.   You reference in response to some of the comparators a

16   Mr. Kramer.  Do you recall that?

17   A.   Yes.

18   Q.   And you said that he was lying about -- to you about

19   what he was doing, right?

20   A.   About what he had did, yes.

21   Q.   Were you mad at Mr. Kramer for that?

22   A.   I wouldn't say mad.  I just -- once I found out that --

23   you know.  My follow-up was to find out if he did in fact

24   reach out to him and they said he couldn't have it, then,

25   you know, that would be the case.  I just -- all I knew was

1    I didn't hear him on the radio and I knew that the portion

2    of the track was available to be worked on without any -- so

3    I didn't understand why the DS -- so I was going to find out

4    if the DS told him that he could not work there, I was going

5    to take it up with the operating team on why we would be not

6    allowed.  And at this time, whenever, I found out that

7    Kramer had the opportunity to and never reached out.  You

8    know, I just wanted him to understand that we got to utilize

9    all the time out there available.

10   Q.  If we could go to Exhibit 205, please, and play the

11   start of the recording to one minute and 33 seconds.

12        (Exhibit 205 playback commences)

13   Q.  Mr. Jones, is that Kramer in this recording the same

14   person who you accused of lying?

15   A.  Yes.

16   Q.  And that's the person you said on this recording -- and

17   I apologize to everyone -- who you would make weld until he

18   fucking falls over, right?

19   A.  Yeah.  This is a whole different issue than the -- the

20   other event.

21        MR. LUCAS KASTER:  I have no more questions at

22   this time.  Thank you.

23        THE COURT:  Ms. Ferguson?

24        MS. FERGUSON:  I have just two questions.  Thank

25   you.

1        **REDIRECT EXAMINATION**

2    BY MS. FERGUSON:

3    Q.  Mr. Jones, I just want to clarify one very important

4    point, and that is, it was suggested to you that you're the

5    one who made the decision in this case to terminate.

6         Did you have the ability to terminate Mr. Sanders?

7    A.  No, that is not true.  And if you look at the follow-up

8    from PEPA, it says I reviewed it myself and I touched base

9    with the law department, so there's nothing the law

10   department is going to misconstrue or refabricate to support

11   me dismissing him if I was targeting Mr. Sanders.  It's all

12   about the facts --

13        MS. FERGUSON:  Ms. Garrison, could you pull up

14   Exhibit P-123, please.  And just highlight that portion that

15   says:  "Keith, I've read the record, have consulted with HR

16   and the law department."

17        That's the email you received from PEPA?

18   A.  That is correct.

19   Q.  Thank you.

20        MS. FERGUSON:  Nothing further.

21        THE COURT:  Thank you, Mr. Jones.  You're excused

22   as a witness.

23        MR. JAMES KASTER:  I'm going to go get our next

24   witness who's out in the hallway.

25        THE COURT:  I figured that's what you were doing,

1     Mr. Kaster.

2               MR. JAMES KASTER:  Thank you, Your Honor.

3               THE COURT:  Let me just check something here.

4          (Court confers with the deputy clerk)

5               THE COURT:  All right.  We'll take a short break

6     at this time, 15 minutes, and that will give Mr. Jones the

7     opportunity to sign off of Zoom and then sign back in on the

8     conference call system.

9               All right.  We'll adjourn.

10              MR. JONES:  Thank you.

11         (Recess taken at 2:37 p.m.)

12                              *     *     *     *

13         (2:50 p.m.)

14                          IN OPEN COURT

15         (Jury enters)

16              THE COURT:  All right.  Thank you, everyone.

17    Please be seated.

18              Mr. Kaster, is Plaintiff prepared to call his next

19    witness?

20              MR. JAMES KASTER:  Yes, Your Honor.  Plaintiff

21    calls Mat Scherbing.

22              THE COURT:  Sorry.  One more time with the last

23    name?

24              MR. JAMES KASTER:  Scherbing.

25              THE COURT:  Great.  Sir, I'll ask you to come up

1    here and stand between the railing and the chair in the

2    witness box and let's administer the oath.

3              COURTROOM DEPUTY:  Please state your full fame for

4    the record, spelling your first and last name.

5              THE WITNESS:  Yup.  Mathew, M-A-T-H-E-W; Charles,

6    C-H-A-R-L-E-S; Scherbing, S-C-H-E-R-B-I-N-G.

7         **MATHEW C. SCHERBING, PLAINTIFF'S WITNESS, SWORN**

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  Thank you, sir.  Please be seated.

10             MR. JAMES KASTER:  Mr. Scherbing, if you're

11   comfortable --

12             THE WITNESS:  Can I take it off?

13             MR. JAMES KASTER:  Yes, you can.

14             THE WITNESS:  Okay.  Thank you, guys.

15             MR. JAMES KASTER:  While you're testifying.

16             THE WITNESS:  What?  Sorry.

17             MR. JAMES KASTER:  Just while you're testifying.

18             THE WITNESS:  Oh.  Why am I testifying?

19             MR. JAMES KASTER:  No, no.  No.

20        (Laughter)

21             THE WITNESS:  Oh, "while."  I'm sorry, you guys.

22   I've never been to court.

23             MR. JAMES KASTER:  You can take the mask off while

24   you're testifying; otherwise; you have to have it on.  I'm

25   sorry.

1              THE WITNESS:  All right.  Thank you.

2              MR. JAMES KASTER:  I needed to be a little more

3      clear.

4

5                         **DIRECT EXAMINATION**

6      BY MR. JAMES KASTER:

7      Q.  Why don't you state your full name for the record,

8      please.

9      A.  Yup.  Mathew Charles Scherbing.

10     Q.  Where do you live?

11     A.  I live currently in Ely, Minnesota.

12     Q.  And you started work for BNSF when?

13     A.  It would be May 2nd, 2011, yes.

14     Q.  And what was your position when you you went to work for

15     BNSF?

16     A.  Oh, I hired as a sectionman they call it, track, did

17     truck driver Group 2, a grinder, a bunch of various roles.

18     Q.  So you were in the maintenance department, right?

19     A.  Yeah, the whole --

20     Q.  That would be maintenance of way, right?

21     A.  Correct.

22     Q.  And so the years that you worked for BNSF were what?

23     A.  Sorry.  Excuse me?

24     Q.  How many years did you work then directly for BNSF?

25     A.  Oh.  Till May of '18.  Then I got elected in my role

1   now.

2   Q.  Okay.  And what is your role now?

3   A.  They call it a vice general chairman with the union,

4   BURNOR Federation.  I cover mainly North Dakota and South

5   Dakota.

6   Q.  When you say BURNOR --

7   A.  Yeah, BURNOR, Burlington Northern System Federation it's

8   called.

9   Q.  Burlington Northern.  Okay.

10              So I just have a side question.

11  A.  Yeah.

12  Q.  For the purpose of making out a daily report for a

13  member of the maintenance of way, like a track inspector, is

14  that work time?

15  A.  Work time?

16  Q.  Is that -- do you get paid for that?

17  A.  Oh, yeah.  Yeah, absolutely.  I mean, when -- like when

18  you're entering time and then -- like foreman and track

19  inspector roles, you're saying?

20  Q.  Yes.  Like when you make out your detailed daily

21  report --

22  A.  Yes.  You get paid for that.

23  Q.  You get paid for that.

24  A.  Yeah.

25  Q.  You worked with Mr. Sanders?

1    A.  Yes, correct.

2    Q.  For how long?

3    A.  Well, I bounced around quite a bit, but last time I

4    worked for him was January of '16 I believe I was down in

5    the area.

6    Q.  Okay.  And what were you doing?  What was your job in

7    that time frame end of '15, beginning of '16?

8    A.  Yeah.  It was on the maintenance gang working under

9    Blaine.  I was a truck driver and Jessie Johnson was my

10   foreman as well.

11   Q.  When you say "Blaine," you're talking about Blaine

12   Hoppenrath --

13   A.  Correct, yeah, yeah.  She's like Dayton's Bluff I guess

14   you could say.

15   Q.  Yeah.  And --

16   A.  Roadmaster she was.

17   Q.  Okay.  Did you have a chance to go to Dayton's Bluff

18   then and observe what was happening there?

19   A.  Oh, yeah, yes.

20   Q.  And did that happen on a regular basis?

21   A.  The --

22   Q.  You being at Dayton's Bluff.

23   A.  Yeah.  Yeah.  I mean, when -- I bounced around a lot,

24   like less than 30-day jobs, but I was -- in the wintertime

25   that's pretty much all I could hold down in the Cities area.

1    So, yeah, I was always there, bounce back and forth.  I'd be

2    there.

3    Q.  Did you observe Mr. Sanders on the job?

4    A.  Yes, multiple times.

5    Q.  How would you describe him in terms of competence as a

6    track inspector?

7    A.  One of the best.

8    Q.  And in terms of his efforts when repairs were required,

9    did he personally also get involved in those repairs?

10   A.  He tried to, yeah.  Even -- last time I worked with Don

11   when he found some yard out of service.  It was like a

12   Friday or maybe it was a holiday weekend or something, but

13   it was the end of the work week and Don found it late in the

14   day and he felt bad, and he was going to actually help us

15   fix it.  It was a wide gauge in the yard in the Bluffs.  I

16   don't know if it's like Auto Cad Yard or whatever.

17   Q.  I'm sorry.  Did you say Auto Cad Yard?

18   A.  It was something like that.  It was Auto Yard.  I don't

19   know the names of the exact track that he found an exception

20   in, but he was going to help fix it.

21   Q.  Okay.  Would you describe Mr. Sanders as a hard worker?

22   A.  Oh, yeah.  Yeah, he was dedicated, you know, and he did

23   his job good I thought.

24   Q.  And what about safety issues?  Were you involved in

25   safety meetings where Mr. Sanders was present?

1    A.  Yeah, all the time, yeah.

2    Q.  And would Mr. Sanders speak up regularly about safety

3    issues?

4    A.  Yeah.  He was like a leader at the safety aspect, yeah.

5    Q.  And what do you mean by that?

6    A.  Well, for instance, like one time -- Don, you might be

7    able to remember the date or whatever, but we needed chaps

8    for cutting brush along the right-of-way.  Don went to I

9    think Acme Tools and bought us all chaps, and then like gas

10   for the stuff.  He just made sure we had everything to do

11   our job safely, you know.  He didn't want anybody getting

12   hurt.

13   Q.  With respect to -- and you weren't present and the

14   witnesses are sequestered, but there's an issue about

15   Mr. Sanders having -- being unable after a certain time to

16   drive the BNSF truck back and forth to work as a track

17   inspector.

18        Do you remember being involved in that issue at

19   the time?

20   A.  Yeah.  I was the local chairman adjoining to them, so

21   like the St. Cloud Lodge, or Minneapolis Lodge local

22   chairman.  It's an elected position.  I think it was in 2014

23   I was first elected on that, so I was always relatively in

24   the mix of it, yes, you know?

25   Q.  In terms of bringing your truck -- driving your truck

1    home or bringing it back to work, the work truck, that is,

2    was that a matter, as you understood it, of supervisor

3    discretion?

4    A.  I think every track inspector besides Don got to take

5    their vehicle home, along with like foremen as well, you

6    know, because that's just -- it was common practice for

7    foremen and track inspectors to take the vehicles home.

8    Q.  At the time.

9    A.  Yeah.  And the only one that didn't was when I was down

10   there on Jesse Johnson's crew, Keith took it away from Don.

11   You know, made him stop driving it completely outside of

12   hours for whatever reason.

13   Q.  You had mentioned this circumstance where Don took the

14   yard out of service or raised an issue about the yard on a

15   Friday afternoon?

16   A.  Yeah.

17   Q.  Do you remember seeing an interaction between Mr. Jones

18   and Mr. Sanders about that?

19   A.  Yeah.  Well, it was Keith and Blaine came up and they

20   were irate with Don for finding the defect.  Don was going

21   to help us fix it and we were going to just fix it and Keith

22   was sitting there yelling at him.  I seen it.  I was

23   probably from here to that doorway.  And I don't know

24   exactly verbatim what he said, but it was not a pleasant

25   convo.

1   Q.  Conversation, you mean.

2   A.  Yeah.  It was Keith doing what Keith kind of -- I don't

3   know if I can answer that openly.  Like he's hot-headed, I'd

4   say, you know, Keith was, especially towards Don for

5   whatever reason.

6   Q.  And do you remember anything about what he said?

7   A.  Yeah.  Like through the scream -- can I -- like

8   verbatim --

9   Q.  I'm asking you to tell us what he said.

10  A.  Okay.  What I've heard multiple times is, Keith would

11  say, "You're giving me a face-down fucking every chance you

12  get."  So that's verbatim what Keith told Don and I've heard

13  that before.

14          THE COURT:  Mr. Kaster, sorry to interrupt.  If

15  the two of you could work just a bit to avoid talking over

16  each other, it would make for a clearer record.

17          MR. JAMES KASTER:  Thank you, Your Honor.

18  Q.  I'm going to change subjects for you now and let's talk,

19  Mr. Scherbing, about the entry of time in what was called

20  the PARS system at the time in 2015, okay?

21  A.  Okay.

22  Q.  Was there any training, by the way, that you recall, on

23  entry of time in the PARS system --

24  A.  No.

25  Q.  -- in 2015 and 2016?

1   A.  No, none whatsoever that I'm aware of.

2   Q.  And what was the practice as you understood it at the

3   time in 2016 for the entry of time for maintenance of way

4   employees in the PARS system?

5   A.  They just told you to figure it out, and the only way

6   you really knew if you got it was you'd get a green X, you

7   know?  I mean, there's no -- I had to, like, regularly call

8   a foreman just because you'd get red Xs, you know?  I mean,

9   there was no training.  I wish there was because it caused a

10  lot of heartache for a lot of people.

11  Q.  You said a red X.  What was a red X?

12  A.  That's like -- so if you enter something incorrectly,

13  whether it be a paycode 55 time entry, anything like that,

14  it'd come up with a red X.  Or if after you, like, submitted

15  final, if a supervisor took exception anytime, they'd give

16  like a red X or it's a code:  "Please use AFE 12345."

17  Q.  So that supervisor review, was that a part of the

18  regular payroll process at the time?

19  A.  Yeah, I believe so.

20          MS. DONESKY:  Objection.  Foundation.

21          THE COURT:  Overruled.

22  BY MR. JAMES KASTER:

23  Q.  Go ahead.  You can answer.

24  A.  Oh.  Sorry.  What was the question?  I got sidetracked.

25  Q.  Was the supervisor review a part of the payroll process

1    as you understood it at the time?

2    A.  Yeah, because it'd always say approved like B-0 whatever

3    their number was, their B number.  That's employee number.

4    It would tell you, like, approved and then it would stay

5    green Xs.  It wouldn't be -- there'd be no, like,

6    exceptions.

7    Q.  And could the supervisor then put a red X in if the

8    supervisor did not approve of that particular time?

9    A.  Yeah.  You could get like an error code and then it

10   would say use AFE, or else a lot of times -- like if they

11   had an exception with it like when I was on the loader all

12   the time, the supervisor just called about it and asked, you

13   know, what took so long, or they'd have conversations with

14   you or why didn't you charge to this AFE, and then you'd go

15   back in and change it.

16   Q.  So the red X would indicate that a supervisor as a part

17   of the payroll process before payroll was actually

18   established had disallowed the time.

19   A.  Yes.

20   Q.  And as you understood it, that was a regular part of the

21   payroll process in effect in early 2016.

22   Q.  What I was asking you before was -- so let me drill down

23   here.

24            When employees entered time, were they obligated

25   or was it routine to expect the employee to enter time

1    before the end of the workday?

2    A.  Yeah, back in that time it was kind of flipped.  I don't

3    know what drove it or whatever, but a lot of times we'd

4    enter time in the morning for the day, you know, and then

5    you could go -- when I was on the loader and I didn't have a

6    laptop, I would go days in advance, and then after the fact

7    you'd just adjust it to whatever you actually worked, you

8    know?

9    Q.  And how long could you adjust it?

10   A.  I don't even know if there was a time frame, because I

11   mean, you could go back past the time it was closed and

12   change whatever you wanted to.

13   Q.  And as I understand it, you can Submit Draft and Submit

14   final, and what was your practice in that respect?

15   A.  They didn't want you doing the draft, because that

16   wouldn't be their timely reporting and it would hurt their

17   scorecard they call it.

18   Q.  "They" being who?

19   A.  Like your roadmaster, generally.  I don't know if it was

20   a DE level, like Keith Jones, or if it was just the

21   roadmasters, but the roadmasters always said "Save Final."

22   Q.  And if you "Save Final," was your time then submitted in

23   a timely way?

24   A.  In the morning, yeah, but then for some reason when you

25   "Save Final," the next day you could go in and edit it or

1     the week later and it would still accurately count as timely

2     reporting, or if you did "Save Draft," it would not qualify

3     as accurate, like timely reporting, if that makes sense.

4     It's kind of backwards, in my opinion.

5     Q.  You mean entering it before you worked.

6     A.  Yeah, yeah.

7     Q.  As you understood it, was that the practice, custom and

8     routine at the time?

9     A.  Yeah, as long as you got your time in, like in the

10    morning time especially, they loved that.

11    Q.  And then payroll was actually paid, I think, on the 16th

12    of the month and the 1st of the next month.  Do you recall

13    that?

14    A.  It probably is an accurate statement.  They switched it

15    probably four years ago, I'd say, just off the top of my

16    head.  Yeah.

17    Q.  Okay.  Could you always go in and edit your time before

18    the end of the pay half?

19    A.  Yes.

20    Q.  So before payroll was cut.  Was that freely allowed?

21    A.  Yeah, there was no problems with that.  As long as you

22    "Save Final," they were happy on the timely reporting.

23    Q.  But even if you did "Save Final," you could go in and

24    edit it before the pay half.

25    A.  Oh, yeah, yeah.  I think even after, actually.

1    Q.  What was a cut letter, as you understood it?

2    A.  I see them quite a bit in my current role.  They recoup

3    money that they see for -- they view it as excessive time,

4    travel, basically anything they can get their hands on, you

5    know, that they don't think the employee is entitled to, I

6    guess.

7    Q.  And are cut letters routinely issued to employess within

8    maintenance of way?

9    A.  Yeah, absolutely.

10   Q.  And is there any time limit for how long the company has

11   before they can not issue a cut letter anymore?

12   A.  No.  I think at that time, like up until within the last

13   couple years, actually, you'd see six-month old cuts even,

14   you know, which is crazy, because usually they'd wait till

15   right before Christmas, like now, and cut it, you know.

16   Q.  When you receive a cut letter, do you have some notice,

17   some opportunity to respond?

18   A.  Yeah.  They say on their -- on the cut letter you have

19   15 days to provide, like, additional documentation to, like,

20   cancel the declines or overturn them, I guess.

21   Q.  By the way, this timely reporting, as you understand it,

22   did that relate to the roadmasters' scorecards?

23   A.  Yes, directly, because you'd be getting talked to if you

24   didn't, you know?

25   Q.  What do you mean it did directly relate to their

1    scorecards.  How does it relate to their scorecards?

2            MS. DONESKY:  Objection.  Hearsay, foundation.

3            THE COURT:  Yeah, sustained.  We're going to need

4    some more foundation here before we'll allow this.

5            MR. JAMES KASTER:  Thank you, Your Honor.

6    Q.  In terms of your understanding of why this timely

7    reporting obligation of reporting your time every day, even

8    sometimes before you worked, as you understand it, did you

9    have conversations with supervisors, like roadmasters, about

10   why they were asking for that at the time?

11   A.  The only answer they'd give you is because of the

12   scorecard, and I don't know who it mattered to or whatever,

13   but I don't know if it went off their bonus or -- I honestly

14   don't know why they're so keen on their scorecard.

15           MS. DONESKY:  Same objections.

16           THE COURT:  The testimony is in.  I'll allow it.

17   I'm not going to strike it.

18   Q.  Following Mr. Sanders' termination, did you find

19   yourself on a business train?

20   A.  I did, yes.

21   Q.  And do you recall who was present on the business train

22   with you?  Can you describe the circumstances of that?

23   A.  Yeah.  I don't know who called for it, but they wanted

24   stronger relations between union and company.  That's why me

25   as a local chairman got to go on this business car they call

1    it, which is all, like, top executives at BNSF.  There was

2    Dave Hesterman.  He is an AVP.  There's Greg Dunaway.  He

3    was an AVP, still is.  Keith Jones is on there.  Craig

4    Rasmussen, Doug Jensen.  Pretty much a lot of heavy hitters,

5    I'd call them, you know, like top executives.  I'd say the

6    lowest people on there were myself and my roadmaster at the

7    time, Ben Peterson.

8    Q.  And the business train was going from where to where?

9    A.  The million-gallon tank by -- I think that's Northtown

10   Yard, and then I got dropped off in Fargo, North Dakota.

11   Q.  Do you remember any conversation on the business train

12   about Mr. Sanders?

13   A.  Yes, I --

14              MS. DONESKY:  Objection.  Hearsay.

15              THE COURT:  Overruled.

16   Q.  And you can go ahead.

17   A.  Yeah.  Actually, Dave -- Mr. Hesterman, the AVP,

18   actually congratulated Keith Jones for getting rid of -- his

19   words -- that lunatic Don Sanders, and he also said, "What's

20   good for BNSF isn't always an easy thing to do, but good

21   job," and I was -- I was disgusted.

22   Q.  Mr. Hesterman, you say, was an AVP.

23   A.  Yes.

24   Q.  And what does that mean?

25   A.  I think it's Assistant Vice President.  Don't quote me

1    on the "A" part, but it's like just below a VP.

2    Q.  And Mr. Hesterman was what in relation to Mr. Jensen at

3    the time?

4    A.  He would be Mr. Jensen's boss, or boss's boss, one of

5    the two.

6    Q.  He's a very high-ranking person.

7    A.  Yeah.  Yeah.  Like I thought -- I would thought he'd

8    been like a decent person, you know, but hearing that

9    sucked, you know?

10   Q.  That's all the questions I have for you.  Thank you.

11   A.  Yeah.

12           THE COURT:  Ms. Donesky?

13

14                      CROSS-EXAMINATION

15   BY MS. DONESKY:

16   Q.  Good afternoon.

17   A.  Hello.

18   Q.  I'd like to ask you a few questions here.

19           You never worked or reported to Stephen Chartier?

20   A.  I did, yes.

21   Q.  For what time period?

22   A.  You'd have to look at my work history because I bounced

23   around a lot.  It would have been before -- it would have

24   probably been in '15 and '16.

25   Q.  For a continuous time period?  How long do you believe

1    you did?

2    A.  No.  If -- I should pulled out my work history, but I'd

3    go like two weeks here, week there, month here, whatever the

4    less-than-30-day jobs I could hold and have the seniority to

5    get on to keep me working.

6    Q.  So short periods of time.

7    A.  Yeah, correct, yup.

8    Q.  You've never worked as a track inspector for BNSF?

9    A.  No.  No.

10   Q.  Have you ever worked under Blaine Hoppenrath?

11   A.  Yeah, that maintenance gang that I was at at the time,

12   that directly rolled up to her.

13   Q.  And for what time period?

14   A.  That would have been -- I want to say the last day was,

15   like, January 2016.

16   Q.  How long of a time period in total did you report to

17   her?

18   A.  Sorry.  Over a month I'd say.

19   Q.  But no more than a month?

20   A.  Possibly.

21   Q.  You've been employed with BNSF since 2011?

22   A.  Correct, yeah.

23   Q.  And all of that time period you reported to

24   Ms. Hoppenrath for about a month?

25   A.  I'd say that's a fair assertion, because a lot of times,

1    like the gangs I was on, would roll up to Keith Jones.

2    Q.  On average, though, would it be fair to say -- you live

3    in Foley, Minnesota, correct?

4    A.  Used to, yes.

5    Q.  Okay.

6    A.  I'm in Ely now.

7    Q.  And in that 2014-2015 timeframe, would it be fair to say

8    the locations you worked at, though, were more north of the

9    Twin Cities?

10   A.  For 2015, you're saying?

11   Q.  Correct.

12   A.  Yeah, I spent a lot of time on the loader, which is a

13   Hinckley loader, so you'd always bounce from here to --

14   that'd be actually Nickerson.

15   Q.  So Hinckley, Minnesota, was one of the locations you

16   worked at, correct?

17   A.  Yeah.

18   Q.  St. Cloud, Minnesota?

19   A.  Yep.

20   Q.  Little Falls, Minnesota?

21   A.  Yeah, I'm sure Little Falls, yeah.

22   Q.  Are you familiar with the St. Paul roadmaster

23   expectations?

24   A.  I'm sure it changes.  I've seen quite a different few

25   changes go on down there for expectations and roadmaster

1    expectations.

2    Q.  If you worked for a month with Ms. Hoppenrath in January

3    of 2016, would it be fair to say you were not reporting to

4    her as of October of 2015?

5    A.  October of '16?

6    Q.  2015, prior to that time period.

7    A.  You'd say I haven't --

8    Q.  Right.

9    A.  -- reported?  Well, I was down in the area.  I mean, I

10   was on machines on her beat.  I mean, I'd still listen in on

11   the calls and everything, yes.

12   Q.  But directly reporting to Ms. Hoppenrath.

13   A.  No, because machines were DEs, not, you know --

14   Q.  So you didn't report to Ms. Hoppenrath, she wasn't your

15   roadmaster.

16   A.  She was for that time frame I was on the Jesse Johnson

17   maintenance gang, yes.

18   Q.  Okay.  And that was in, you said, January of 2016,

19   roughly.

20   A.  Yeah, I believe it ended in January of '16, correct.

21   Q.  Can I have Defendant's Exhibit 44, please?  You can blow

22   up the top part of the document, please, first two lines.

23   Very good.  Thank you.

24           Do you see the title of this document, "St. Paul

25   Roadmaster Expectations," October 9th of 2015?

1    A.  Yes, ma'am, I do.

2    Q.  Is this a document that you -- were you ever subject to

3    this document?

4    A.  Not that I'm aware of, and St. Paul -- the roadmaster

5    expectations don't really hold any merit.  I mean, you're

6    governed by the agreement.

7    Q.  But you weren't reporting to Ms. Hoppenrath as of that

8    time period, correct?

9    A.  To my recollection on 10-9, I would say I was in the

10   area, but I didn't roll up to her at that time, I'd say.

11   Q.  I understand from your testimony you currently serve as

12   the BMWE local chairman?

13   A.  No, I'm a -- they call it a vice general chairman now.

14   It's a full-time union rep for North Dakota, basically.

15   Q.  Full-time union role.  Okay.  And you are still an

16   employee of the company, though, correct?

17   A.  Yeah, and I'm on, like, leave they call it from -- I

18   still hold track rates, but I'm on a leave from BNSF at the

19   time, right now.

20   Q.  So in your role and your current capacity, you'd be

21   familiar with the Collective Bargaining Agreement that's

22   between the maintenance of way union and the company,

23   correct?

24   A.  Yes, correct.

25   Q.  Fair to say that's an agreement that's contractually

1    negotiated between the union who you now work for full time

2    and the company, correct?

3    A.  Yes.

4    Q.  Can I see Exhibit 5, please.

5            I recognize this is a long document.  We're

6    certainly not going to spend the afternoon on it, but do you

7    generally recognize this as the front page of the Collective

8    Bargaining Agreement?

9    A.  Yeah.  This is like our bible, if you will, you know.

10   Q.  Quite -- over a hundred pages, fair to say?

11   A.  Oh, yeah.  Yeah.

12   Q.  You're familiar with the fact that a member who is

13   subject to the Collective Bargaining Agreement has various

14   contractual rights, correct?

15   A.  What do you mean, like contract --

16   Q.  Before they're formally disciplined.  We'll focus on

17   that in particular.  If they're formally disciplined prior

18   to that, they're entitled to a hearing, correct?

19   A.  Yeah.  Rule 40, yeah.

20   Q.  Correct.

21           MS. DONESKY:  If you can go to Rule 40, Jan,

22   please.

23           MR. JAMES KASTER:  This is beyond the scope, Your

24   Honor.

25           THE COURT:  No, I'll allow it.

```
1              MS. DONESKY:  It's Article 40 --

2    A.  I think it's page 135.  I might be wrong on that.

3    Q.  It's 200 pages, but it's Article 40.

4    A.  Page 41.

5    Q.  Rule 40, then, Investigations and Appeals, you're

6    familiar with this contractual provision, right?

7    A.  Yes.

8    Q.  And as we said, the employee as a union employee has a

9    right to a hearing prior to this one, correct?

10   A.  Yeah.  It's supposed to be fair and impartial but very

11   seldom is.

12   Q.  If we scroll up on the first -- Section A.

13             MS. DONESKY:  Thank you, Jan.

14   Q.  So before they're disciplined or dismissed, they're

15   entitled to an investigation.  They're entitled to a notice

16   of hearing before that to notify them of the hearing,

17   correct?

18   A.  Yes.

19   Q.  And that's a contractual provision that's negotiated as

20   part of this agreement, correct?

21   A.  Yes.

22   Q.  And there's time limits as well as to how quickly the

23   company has to issue the notice, correct?

24   A.  Yeah, if they follow it, yes.

25   Q.  Do you have any reason to believe they don't follow it?
```

1    A.  Quite a few instances.  Like, their first knowledge,

2    they got 15 days to investigate, but they seldom follow it.

3    Q.  In your capacity as a union representative, then, if

4    there was a procedural defect that you observed in your

5    role, you would have the opportunity to raise that

6    procedural objection, correct?

7    A.  Yup, at this fair and impartial hearing, always gets --

8    they just kick the can down the road and keep going with the

9    questioning.

10   Q.  But these are objections that you're entitled to raise

11   at the hearing, correct?

12   A.  Correct, yes.

13   Q.  And going to Section B then.

14           There's also a contractual right, is there not,

15   that employees might be removed from service pending

16   investigation, correct?

17   A.  Yeah.

18   Q.  And in this Section B, in the case of an employee who

19   may be held out of service pending investigations involving

20   serious infractions of rules, the investigation shall be

21   held within ten days after the date withheld from service.

22   That too, though, the removal from service, is actually a

23   contractual term of the agreement, fair to say?

24   A.  We don't want people pulled from service if that's what

25   you're asking, but the agreement allows for it,

1    unfortunately.

2    Q.  And the employee is notified and they're removed from

3    service under the agreement, correct?

4    A.  Yeah.  They lock them out of everything then when you

5    get pulled from service.

6    Q.  And then there's a hearing that's held and the employee

7    is entitled to union representation, correct?

8    A.  Correct, yeah.

9    Q.  In your capacity, you've served as that union

10   representative in other hearings for members of the union?

11   A.  Yeah, for other people, never Don, though.

12   Q.  No, not for Mr. Sanders, but for others, correct?

13   A.  Yes, correct.

14   Q.  And Mr. Sanders had Mr. Mozinski at the time in

15   question?

16   A.  I would imagine so, yeah.

17   Q.  And there's also a requirement to then decide the

18   decision following the hearing, correct?

19   A.  Yeah.

20   Q.  And there's a right to appeal that the employee has

21   after that decision's, made, correct?

22   A.  Yeah.

23   Q.  And ultimately that appeal is decided by the National

24   Railroad Adjustment Board, correct?

25   A.  Yeah, it goes to an arbitrator after.  We keep

1    progressing it, yes.

2    Q.  And that's a third-party federal arbitrator, correct?

3    A.  Yeah, to my knowledge, yes.

4    Q.  Mr. Scherbing, you have no personal knowledge regarding

5    Mr. Sanders' activities on March 19, 2016, do you?

6    A.  What do you mean by --

7    Q.  You weren't there?

8    A.  No, I wasn't.  I believe I was on the loader at the

9    time, so --

10   Q.  Not at Dayton's Bluff?

11   A.  No, not at that time.

12   Q.  You were not at Bridal Veil on the day in question,

13   March 19?

14   A.  I never -- I can't remember March 19th five years ago,

15   six years ago or whatever, but I don't remember being around

16   when Don was pulled out of service.

17   Q.  And likewise, you were not present or observing

18   Mr. Sanders' work activities on March 25th or March 26th of

19   2016, correct?

20   A.  I honestly can't remember.  To the best of my

21   recollection, no, you know.

22   Q.  You were not present at the union hearing that was held

23   on April 3rd concerning his alleged time theft?

24   A.  No.  No.

25   Q.  And you were not present at the hearing on April 8th

1    that investigated his alleged time theft on that day either,

2    correct?

3    A.  No, I wasn't at the investigation for him, no.

4    Q.  You have never personally observed or know about

5    Mr. Sanders' own personal practices for his time reporting,

6    do you?

7    A.  Can you ask --

8    Q.  You never watched him actually record his own time?

9    A.  Oh, we'd -- in the depot at Dayton's Bluff it was a

10    small area.  I think there's -- correct me if I'm wrong, but

11    I think three computers and you have ten people putting in

12    time.  Everybody kind of just did their time in turns.

13    You're right there.

14    Q.  But did you personally observe him do it?

15    A.  Like enter time?

16    Q.  Correct.

17    A.  Yeah, I'm sure I did at sometime during --

18    Q.  Over his shoulder observing him, that way?

19    A.  No, because it's like from here to -- the room in there

20    is tiny and you got the computers right there.  I mean, I

21    didn't watch him enter his -- every minute of time or

22    anything, if that's what you're asking.

23    Q.  Yes, it is.  You did not.

24    A.  Not to my knowledge, no.

25    Q.  You mentioned scorecards.  As a union employee, you're

1    not subject to scorecards, correct?

2    A.   No.   No.

3    Q.   As I recall, you're a union employee, right?

4    A.   Yeah, the Brotherhood pays my salary now, yes.

5    Q.   So those aren't -- you have no personal knowledge

6    regarding how they work or what they're used for.

7    A.   Around that time an old track inspector could pull it

8    up.   I don't know how you pull it up on the BN website, but

9    he could pull it up and he could see where, like, our

10   supervisor at the time was slacking, whether it be timely

11   reporting, or I think injuries was a big one, and then slow

12   orders and stuff like that.

13   Q.   And you've made reference to a supervisor generally.   Is

14   there a specific person who you were referring to?

15   A.   Like when I was -- whenever you roll up to somebody,

16   usually it would be that person, whether it be Ben Peterson.

17   I mean, there's -- I worked for quite a few if you look at

18   the history, you know.

19   Q.   So Ben Peterson was the person who made the comment

20   about scorecards?

21   A.   No, the guy that told me -- or taught me what they look

22   like, actually, and like what it stands for.   His name was

23   Tom Ronyo.   He worked for Ben Peterson.   He is an old track

24   inspector out of Brainerd.

25   Q.   And you are now -- you mentioned you're now the union --

1    what's your title again?

2    A.   It's vice general chairman with the BURNOR System

3    Federation.

4    Q.   Okay.  And is it fair to say that you are now paid

5    through the union?

6    A.   Yeah, full-time paid through the union, correct, yeah.

7    Q.   And the union members are the ones who pay the dues --

8    A.   Correct, yeah.  They pay --

9    Q.   Mr. Sanders is a union member?

10   A.   He was, yes.

11   Q.   I wanted to ask you about this cut letter that you made

12   reference to.  You said that you see it in your current

13   role.

14   A.   Correct, yeah.

15   Q.   And that current role is the role that you've been

16   holding since 2018?

17   A.   Yup, May of '18, yes.

18   Q.   And so does that mean that the cut letter that you're

19   familiar with now dates only from 2018 to the present?

20   A.   No, the cut letters -- even when I was on the tracks

21   ever since I got hired on the railroad, BN, they'd issue cut

22   letters all the time to you.  Like, that was pretty regular

23   to get cut letters.  Like, in my role as a full-time

24   officer, when the members get all the cut letters, they send

25   them to me to try to get -- recoup their money that they

1    should have gotten, you know?

2    Q.  Have you brought any examples with you today on what a

3    cut letter looks like?

4    A.  I could pull some up on my phone if you'd like.

5    Q.  No, that's fine.  And those cut letters, do they come

6    from the payroll department?

7    A.  Correct, yeah.  Usually it's -- like, Anushka Amin's her

8    name.  That's the lead timekeeper, I think.  That's who

9    usually signs them.

10   Q.  Not from a supervisor, but from payroll.

11   A.  Yeah, I'm sure.

12   Q.  I have nothing further.  Thank you.

13           MR. JAMES KASTER:  A few follow-up questions, Your

14   Honor.

15           THE COURT:  Mr. Kaster?

16

17                    **REDIRECT EXAMINATION**

18   BY MR. JAMES KASTER:

19   Q.  Mr. Scherbing --

20   A.  Yup.

21   Q.  You've mentioned timely reporting a couple times.

22   A.  Yeah.

23   Q.  Why don't you describe what your understanding of that

24   concept was.

25   A.  Like back then it was -- we always put it in in the

1    morning, so that way it was in and then you wouldn't have to

2    worry about getting any grief from a supervisor.

3    Q.  And was that considered timely reporting then?

4    A.  Yeah, as long as you had it in.  A lot of times we'd

5    just put it in in the morning and then adjust it later on.

6    Q.  And that was true whether it was submitted in draft or

7    final.

8    A.  Yeah.  You wouldn't really put it in draft mode, though.

9    Q.  Would it comply with the timely reporting requirement if

10   it was put in in draft?

11   A.  No, not to my knowledge.  That's why they always told us

12   to put it "Save Final" and then just go on and adjust it

13   later on, whether that be later that night, the next day.

14   If it was a weekend, you could wait till Monday.  Stuff like

15   that, you know.

16   Q.  You were asked some questions about this fair and

17   impartial hearing.

18   A.  Yeah.

19   Q.  The hearing that you were talking about, the union

20   hearing that's provided for by the Collective Bargaining

21   Unit.

22           Is there any discovery for the employee before the

23   hearing?

24   A.  No, you go in blind.  I mean, that's part of my problem.

25   Where they say it's fair, it's not.

1    Q.  Do you have a right to subpoena witnesses?

2    A.  No.  No, you do not.  Even in my current role I've tried

3    to get witnesses there to try to save them and they don't

4    ever -- BNSF doesn't have to supply any witnesses or the

5    actual principal.  They only supply their company witness.

6    And they don't pay for, like -- they don't pay for a

7    principal's witness for the day or mileage, anything like

8    that.  They don't even pay the principal during the

9    investigation.

10   Q.  And the principal is who?

11   A.  The person that's charged.

12   Q.  The principal is the person accused.

13   A.  Yeah, the accused, yeah.  Like, for the agreement we

14   call it the principal, but it's basically the member.

15   Q.  Nobody is put under oath, right?

16   A.  No.  No.  You just -- I think you're just expected to

17   tell the truth, you know?

18   Q.  There's no oath --

19   A.  No, this is the first time I ever did that, today.

20   Q.  The hearing officer, the decider for the hearing, is

21   who?

22   A.  That's usually a supervisor.  They call it a conducting

23   officer.  They're supposed to be neutral.  I've been on this

24   role three years and I haven't found one yet that's neutral.

25   Q.  The record that's created at this hearing is the same

1    record that -- the things that are supplied for that hearing

2    that constitute the record are the things that go up on

3    appeal for the arbitration, right?

4    A.  Yeah.  So, like that -- as soon as they close that out,

5    then -- I mean, we get to add stuff after, but not during --

6    like, if you -- say like a reasonable arbitration award

7    comes after the fact, timely reporting, like that, if you

8    get any of them awards, you can put it on what they call an

9    appeal.

10            So the way it goes is, the timeline is -- Rule 40,

11   you know, you got to have -- they got to render a decision

12   within 30 days of the date of the investigation.  Then you

13   appeal it to a general manager, which nowadays for the Twin

14   Cities I think it's Chad Sundem, and then they got I think

15   60 days to respond, usually.  You get it back in, like, 45.

16            And then we appeal it again to Joe Heenan, our LR

17   with BNSF.

18            So then after that within nine months, then you go

19   to Claims Conference with it where it's basically like a

20   mini-hearing where it's us and then LR, and then we just

21   discuss the case.  And then they'll nine times out of

22   ten -- I've only seen them overturn one discipline ever

23   during the Claims Conference, up to it.

24   Q.  What I was asking about, in terms of the factual record,

25   the testimony, the exhibits, that's closed when the

1    investigation is done, correct?

2    A.  Correct, yup.

3    Q.  Let me ask you -- if we could pull up that same exhibit

4    you were looking at, but instead we have it marked as

5    Plaintiff's 1, if we could pull up page 44.  I have a

6    different page 44, so let me look -- I think my page 44 is

7    actually page 60.  I was looking at the number in the middle

8    of the page.

9          MR. JAMES KASTER:  Thank you, Karla.

10   Q.  This is Rule 50.  It's on pay.  This is part of the same

11   Collective Bargaining Agreement, right?

12   A.  Mm-hm, yes, correct.

13   Q.  And 50(b) provides:

14         "Employee is required to make out time sheets and

15   sign same for themselves or gang ... will be promptly

16   notified in writing when said time is not allowed and the

17   reason therefor given, and such time roll maker will notify

18   the employees affected."

19         Right?

20   A.  Yup.  I personally file a lot of these 50(b) time

21   claims, yes.

22   Q.  And a cut letter, is that designed around this 50(b)?

23   A.  Correct, yes.  That's -- usually -- so when you combat a

24   cut letter with a time claim, you always cite Rule 50(b)

25   promptly, because usually the supervisor will tell you

1    promptly when they approve their time if it's allowed or

2    not, basically, you know.

3    Q.  Is it typical for supervisors to talk to the person

4    involved, the employee, about whether their time is allowed

5    or not allowed?

6    A.  Yeah, you can -- well, I've seen it several times on,

7    like, the PARS system.  You'd see like a red X if they had

8    exception.  But yeah, they'd have a lot of conversations

9    with you about your time.  A lot of times on -- like

10   different AFEs to charge different jobs to if they wanted

11   you -- like, if there's a leftover amount on one AFE, they'd

12   tell you to switch your time, like last two weeks, to that

13   AFE or adjust it accordingly.

14   Q.  And just for the record, what's an AFE?

15   A.  I should have started with that.  But it's almost like

16   a -- I know Keith and other DEs call it a different bucket

17   of money.  So they allot for, like, say, this railroad

18   crossing gets this AFE here with -- I don't -- put any

19   dollar amount on it, 50 grand in it, and then it's for that

20   supervisor and you pull -- when you're working on it, you're

21   supposed to pull off that then.

22   Q.  Okay.  That's all the questions I have for you.  Thanks.

23   A.  Am I good to go?

24            THE COURT:  One second.

25            MR. JAMES KASTER:  The Court will decide that.

```
 1              THE WITNESS:  Oh, okay.  Thank you, guys.

 2              THE COURT:  Ms. Donesky?

 3              MS. DONESKY:   Nothing further.

 4              THE COURT:  All right.  Mr. Scherbing, you are

 5      free to go.

 6              THE WITNESS:  Oh, perfect.  Thank you, guys.

 7              MR. JAMES KASTER:  I'm going to check on our next

 8      witness in the hall.

 9          (Pause)

10              MR. JAMES KASTER:  Your Honor, the witness may

11      have -- I may have forgotten to tell the witness which

12      courtroom to come and stand next to, so can we have a couple

13      minutes to see if we can find him?

14              THE COURT:  We will wait.

15              MR. JAMES KASTER:  I have his number.  I was

16      talking to him on the phone.

17              THE COURT:  We will wait.

18              MR. JAMES KASTER:  Thank you.

19          (Pause - witness enters courtroom)

20              THE COURT:  Good afternoon, sir.

21              COURTROOM DEPUTY:  Please state your full name for

22      the record, spelling your first and last name.

23              THE WITNESS:  Michael Heyer, M-I-C-H-A-E-L,

24      H-E-Y-E-R.

25
```

1          **MICHAEL HEYER, PLAINTIFF'S WITNESS, SWORN**

2               THE WITNESS:  I do.

3               THE COURT:  Thank you, Mr. Heyer.  Please be

4     seated.

5               THE COURT:  Mr. Kaster?

6               MR. JAMES KASTER:  Thank you, Your Honor.

7

8                         **DIRECT EXAMINATION**

9     BY MR. JAMES KASTER:

10    Q.  Mr. Heyer, why don't you state your full name for the

11    record, please.

12    A.  Michael Heyer.

13    Q.  You can -- if you're comfortable, you can take that off.

14    A.  Okay.  Michael Heyer.

15    Q.  Where do you work today?

16    A.  BNSF, Minneapolis, Minnesota.

17    Q.  How long have you worked at BNSF?

18    A.  Fifteen years.

19    Q.  Do you have a family, by the way?

20    A.  I do, yeah.  I've got a wife and two sons.

21    Q.  And how old are your sons?

22    A.  Six and four.

23    Q.  Why don't you describe the positions that you've held

24    for BNSF over the 16-year time frame.

25    A.  I was a laborer for the first three years of my career.

1    Since that time I've been a track inspector for I think

2    roughly ten years total, maybe eight to ten years, in that

3    range, and then I've operated machines, various sizes, and

4    I've also been a foreman.

5    Q.  And what's the position that you're holding today?

6    A.  The latest position I held was a foreman on a surface

7    crew.  I will be placing myself on a machine this coming

8    Monday.

9    Q.  What kind of a machine?

10   A.  An excavator.

11   Q.  And how long will you be doing that job, do you think?

12   A.  Thirty days.  It's a less-than-30-day position, and then

13   going to the mainline track inspector in Minneapolis.

14   Q.  Did you for a period of time work with Mr. Sanders?

15   A.  I did, yup.  Quite often on a -- or on and off

16   throughout his career in St. Paul, for two years we track

17   inspected together.

18   Q.  So you both worked as track inspectors and you worked

19   together.

20   A.  That's correct, yeah.  I was the mainline track

21   inspector and he was the yard inspector, and, yeah, we would

22   often work together.

23   Q.  And would you ride together when you worked?

24   A.  Yeah.  Oftentimes we would help each other riding in the

25   same truck.  He would come with me on the mains quite often.

1    Q.  And would you work with him in the yard as well?

2    A.  Yeah.  Not as much as he would help me in the mains, but

3    yeah, I'd help him in the yards as well.  It wasn't as much

4    work.  His position, it wasn't as much to get the yards done

5    as it was the mains.

6    Q.  The mains are a much larger area, right?

7    A.  Yeah.  More miles, more to cover.  I don't want to say

8    more important, but more priority.

9    Q.  More important maybe because there's a lot of other

10   train traffic and it's going faster.

11   A.  Right.  Freight trains as well as passenger trains,

12   higher speeds.  It's a higher class of track.

13   Q.  And in the Twin Cities, certain parts of this area, BNSF

14   actually owns the track, right?

15   A.  Yes, that's correct.  They own all their track.

16   Q.  And sometimes Amtrak trains ride on those tracks as

17   well, right?

18   A.  Yeah, that's correct.

19   Q.  I'm going to detour just a little bit.

20           Have you been allowed from time to time when you

21   worked as a track inspector to bring a BNSF truck home and

22   then drive it back to work?

23   A.  Yes, I have.

24   Q.  Did you give that up at some point?

25   A.  I did, yeah.  After a period of time driving my work

1   truck home, I was almost sideswiped by another vehicle near

2   my house and at that point I decided it wasn't worth it to

3   me anymore to drive the work truck home.

4   Q.  So you stopped driving the work truck home.

5   A.  Yes.

6   Q.  And that was your choice.

7   A.  That was my choice, yeah.

8   Q.  Let's talk about entering time.  Do you know what a

9   concept that might be called on-time reporting?

10  A.  Yeah.  On-time reporting, BNSF and our supervisors want

11  our time entered daily before the end of shift.

12  Q.  And did this practice exist back in 2015 and 2016, as

13  you recall?

14  A.  Yes, it did.

15  Q.  And was it a regular practice?  In other words, as you

16  understood it throughout that part of the workforce that you

17  were in contact with?

18  A.  Yeah, to the best of my recollection, it was about the

19  time Don and I were working together in St. Paul.  It was a

20  fairly new procedure.  I guess before then they didn't care

21  so much when your time was entered, or at least I didn't

22  feel the pressure, but they made it -- management made a

23  specific request that it be done before the end of shift

24  around that time period.

25  Q.  And so would people put their time in early sometimes?

1    A.  Yeah, sometimes people would.  At that point in time we

2    were working very long hours, oil traffic was very busy, so

3    sometimes people would enter payroll at the beginning of the

4    day and then go back and correct it and add overtime, say,

5    the next day so that at least the reporting was done on

6    time.

7    Q.  Do you remember a concept of submitting something in

8    draft or submitting it in final?

9    A.  Yeah.  You can submit a draft or you can submit final.

10   Draft is just basically you're not finished with your time

11   yet.  You want to make a change.  Final is you were happy

12   with it, but you still have the ability to go back and make

13   a change.

14   Q.  Was on-time reporting on time if it was submitted in

15   draft, do you recall?

16   A.  I heard that it was.  I can't say specifically.  I don't

17   know that it was or wasn't, but I'd heard that draft counted

18   as on time.

19   Q.  And who did you hear that from, do you recall?

20   A.  Just other co-workers.

21   Q.  You don't know whether it counted as on time for timely

22   reporting or not for sure.

23   A.  I'm not positive, yeah.

24   Q.  Could you change your time at any time before the end of

25   the pay half, do you recall?

1    A.  Yes, you can, yup.  And still can, yeah.

2    Q.  And whether you submit it in draft or final, could you

3    change it before the pay half?

4    A.  Yeah, you could go back and change it.  I've done that

5    before.

6    Q.  Your work as a track inspector, what is the role of a

7    track inspector as you understand it?

8    A.  The role of a track inspector, my feeling, is to protect

9    the track, the public and the trains.  So we go out every

10   day.  We inspect the tracks, look for defects, make sure

11   that everything's in compliance according to the FRA and the

12   EI, BN's personal standards.  And if it's not, then we're

13   supposed to put on slow orders, protect the track, take it

14   out of service if needed, report defects.

15   Q.  And when you see a track defect, do you have an

16   obligation as a track inspector to report that defect?

17   A.  Yes.

18   Q.  Is that obligation set out by the Federal Railway

19   Administration?

20   A.  Yes, it is.

21   Q.  And once reported, what is the company's obligation, as

22   you understand it?

23   A.  It depends on what the defect is.  We've got

24   nonclass-specific defects that have a timer that get set on

25   them for 30 days.  There's also class-specific defects that

1    require -- or can require a slow order or that the track be

2    removed from service.

3    Q.  The company has to address the defect then in some kind

4    of time frame.

5    A.  That's correct.

6    Q.  You can't simply remove or ignore the defect, right?

7    A.  No.

8    Q.  And that's also provided for by the FRA, right?

9    A.  That's correct.  Yeah, they're the ones that set out the

10   time frame.

11   Q.  In your observation of Mr. Sanders, what was his -- what

12   were his abilities as a track inspector?

13   A.  I thought he was a good track inspector.  It appeared to

14   me that -- you know, obviously we worked together frequently

15   and we both tried our very best to protect the track to the

16   best of our knowledge and ability.

17   Q.  Was there pressure at the time that you worked with

18   Mr. Sanders not to report defects?

19   A.  I'm sorry.  Could you ask that again?

20   Q.  Sure.  Was there any pressure not to report defects?

21   A.  Yes, there was, yeah.

22   Q.  And who did that pressure come from?

23   A.  From management, from roadmasters and division

24   engineers.

25   Q.  Was Mr. Sanders in terms of your time frame working

1   together a little more stubborn than you on that issue?

2   A.  Yeah, I would agree with that statement.

3   Q.  Were you ever involved in an incident, an issue

4   regarding the Stinson/Hennepin bridge?

5   A.  Yes.

6   Q.  And can you describe that incident for us, starting with

7   who was there.

8   A.  Myself, Don Sanders, Keith Jones, and Doug Jensen.

9   Q.  Doug Jensen being Mr. Jones' boss.

10  A.  That's correct, the GDLM.

11  Q.  And what does that stand for, GDLM?

12  A.  General Line Maintenance Director.

13  Q.  And it's pretty high up in the company, right?

14  A.  Yeah.  He was in charge of all -- we've got districts.

15  Our railroad's broken up into districts and he was in charge

16  of all maintenance for 300.

17  Q.  So he would at the time have been your boss's boss's

18  boss, right?

19  A.  That's correct.

20  Q.  And why were those people gathered at the

21  Stinson/Hennepin bridge?

22  A.  Don Sanders and I had concerns about the tie condition

23  on that bridge.  We didn't believe that the tie condition

24  was good for the class of track and the speed for the trains

25  there, and so we elevated it to our bosses to come up with a

1    plan of what we should do, how to handle it, as it wasn't

2    going to be an easy fix.

3    Q.  And when you say it wasn't going to be an easy fix,

4    describe what was wrong.

5    A.  So the ties were in poor condition.  They weren't

6    holding surface or gauge in some cases either, fasteners.

7    There weren't enough good ties in a 39-foot section for the

8    current class of track, and so to fix it you'd have to put

9    in new ties or panels, which is -- ended up being the

10   solution.

11   Q.  And putting in new ties and panels, how big a job is

12   that?

13   A.  It could be big, especially on a bridge like that.

14   There's no clearance to get the ties out or to put ties in,

15   so it's a bigger project on a bridge than it is, say, just

16   on a normal piece of track.

17   Q.  When you say -- you've referred a couple times to the

18   class of track.  I take it that that means the amount of

19   speed -- that would include the amount of speed that you can

20   travel on that track as a train, right?

21   A.  That's correct.

22   Q.  So what was the class of track?

23   A.  I think it was 45 mile an hour class four track there.

24   Q.  In terms of observing the condition that was in place at

25   the time, was there agreement about the condition of the

1    track and the ties?

2              MS. FERGUSON:  Objection.  Calls for hearsay.

3              THE COURT:  No, I'll allow it.

4    A.  Could you ask the question again?  I'm sorry.

5    Q.  Sure.  Among Mr. Jensen and Mr. Jones, what, if

6    anything, did they say about the condition of the track and

7    the ties at the time?

8    A.  We were all --

9              MS. FERGUSON:  Objection.

10             THE COURT:  Overruled.

11   A.  We were all in agreement that it didn't meet the current

12   class of track.

13   Q.  Which would mean what?

14   A.  Which would mean that that would be a class-specific

15   defect.  We all agreed that it probably wasn't even good for

16   class two or it was edging on class one track, which would

17   mean it's a class-specific defect and you have lower it to

18   the speed for that class of track.

19   Q.  And what would that speed have been if lowered?

20   A.  Ten mph.

21   Q.  Would that have been a problem for traffic in that area

22   for BNSF?

23   A.  Yeah, that would have been a problem.

24   Q.  Because?

25   A.  Because it would have slowed -- it would have slowed

1    traffic down and would have slowed their production down, I

2    guess, their ability to move trains and make money.

3    Q.  Were you instructed to make what you believed to be an

4    improper report to the FRA about the condition of that

5    track?

6    A.  Yes.  We were told -- we were told to walk the slow

7    order down slowly from a 40 mph down to a ten so that it

8    wouldn't look bad on reports.

9    Q.  Who was it who said that?  Do you recall?

10             MS. FERGUSON:  Objection.  Hearsay.

11             THE COURT:  Overruled.

12   A.  It would have been Keith Jones and Doug Jensen.

13   Q.  Did you decide at some point thereafter to leave

14   St. Paul as a track inspector?

15   A.  I did.  After some time, the pressure of track

16   inspecting in St. Paul just -- it got to me and so I

17   switched over to track inspecting Minneapolis, and I also

18   took other foreman roles that weren't track inspecting.  I

19   just -- I needed a change.

20   Q.  And specifically, why did you feel like you needed to

21   make that change?

22   A.  Because of the pressures being put on me as a track

23   inspector to overlook defects, not write them up, not

24   protect them correctly, being yelled at for finding too many

25   defects, just a general feeling that I wasn't able to do my

1      job to the best of my ability and that I wasn't protecting

2      the track the way I should have been.

3      Q.  You're a current BNSF employee, right?

4      A.  That's correct.

5      Q.  Were you concerned about coming in here today?

6      A.  Yeah.  I'd be lying if I said I wasn't.  You know,

7      it's -- I still work for the same people that I'm up here

8      talking about with the exception of Doug Jensen.  He's

9      retired.

10     Q.  That's all the questions I have for you.  Thank you.

11              THE COURT:  Ms. Ferguson?

12              MS. FERGUSON:  Thank you, Your Honor.

13

14                      **CROSS-EXAMINATION**

15     BY MS. FERGUSON:

16     Q.  Good afternoon, Mr. Heyer.

17              You said you had some concerns about coming here,

18     but you are a union employee that enjoys the protections

19     provided by the Collective Bargaining Agreement, correct?

20     A.  That's correct.

21     Q.  And before you could be disciplined, you would be

22     entitled to representation and a hearing if there were any

23     discipline issued, correct?

24     A.  Yes, that's correct.

25     Q.  So if you had concerns about that, you can certainly

1    contact your union representative, correct?

2    A.  That's correct.

3    Q.  All right.  Let's start first with:  You said that

4    things changed as it related to daily reporting of time.  Do

5    you recall when that was?  You said it used to be a little

6    looser?

7    A.  Yeah, that's a -- that's correct.

8    Q.  Okay.

9    A.  You know, I can remember not entering my pay until the

10   end of the pay half and entering two weeks at a time.  I

11   feel like it was probably brought to my attention when I was

12   over at St. Paul, probably that 2013 time frame.

13   Q.  And certainly by 2015, were you still there in 2015?

14   A.  Yes.  That's about when I left.

15   Q.  Did you work under Blaine Hoppenrath?

16   A.  No, I don't believe so.  She was just getting there

17   about the same time that I was leaving.  If I did, it was

18   for a very brief amount of time.

19   Q.  Could I see D-44, please.

20          One of the documents we've reviewed in this case

21   is this document called St. Paul Roadmaster Expectations

22   which was issued on October 9, 2015.

23          Is that something you ever saw?

24   A.  I don't know if I specifically saw this one, but I've

25   seen lots of expectation forms, yeah.

1  Q.  So there's a section "Timely Reporting," and it says

2  that all persons entering time in PARS -- which is your

3  reporting system, right?

4  A.  It was our old one, yeah.  We've got a different

5  reporting system now.

6  Q.  You have to do that daily before you leave for the

7  night, right?

8  A.  That's the expectation.

9  Q.  Okay.  So that was an expectation back even in 2013,

10 right?

11 A.  Yes.

12 Q.  So you did that.

13 A.  I'm a bit of a procrastinator, so I can't say that I

14 always did, but I tried my best.

15 Q.  Okay.  Because it was important for the roadmasters and

16 others to know what hours were being worked, what overtime

17 was necessary, so they could plan for budgets, correct?

18 A.  I could agree with that, yeah.

19 Q.  Okay.  So you tried to report each day before you left

20 your shift and you reported it as final?

21 A.  To the best of my ability, yeah.

22 Q.  And you had an understanding how to use that system?

23 A.  Yes.

24 Q.  If you didn't have an understanding, you could certainly

25 go to your union rep for that, correct?

1    A.  I don't think that's who you would go to.  We would talk

2    to timekeeping or the help desk.

3    Q.  Okay.  They were certainly readily available to help you

4    with that issue.

5    A.  Yeah, there were people available to help us with time

6    reporting.

7    Q.  And you'd had PARS for some time?

8    A.  Yes.

9    Q.  So let's switch now to defects.

10           You'd agree it's important to report defects,

11   correct?

12   A.  Yes.

13   Q.  Because if you don't report defects, you could end up

14   with derailments which would really affect velocity in terms

15   of damage to person and property, correct?

16   A.  Yes.

17   Q.  So fair to say that it's most important to report

18   defects that are actual defects, right?

19   A.  Yes.

20   Q.  You talked about pressure to not report.  Was there

21   pressure to accurately report defects; in other words, have

22   you measured this correctly, are you sure that's accurate?

23   A.  So, yeah.  There was pressure -- I think maybe what

24   you're alluding to -- maybe I'm wrong here, but our numbers

25   number of defects were getting to a point that wasn't able

1    to be fixed within the amount of time given, the 30 days,

2    for various reasons, so I think there probably were

3    questions, yes.  Roadmasters would go out with us to verify

4    defects.  It still happens today.

5    Q.  Because there can be some variation in the

6    interpretation of is this a defect or isn't it, fair to say?

7    A.  For some, yeah.  I would say the tie example I gave,

8    that can be open to interpretation, a good tie versus a bad

9    tie.  Two people looking at that, you know, might come up

10   with a different opinion.  But as far as gauge, there's no

11   question what is good and bad.

12   Q.  In addition to the track inspectors checking for

13   defects, you've also got geo cars that are going over the

14   tracks to check for defects, correct?

15   A.  Yes, that's correct.

16   Q.  So BNSF devotes a fair amount of resources to track

17   inspecting by geo cars or advanced analytics?

18   A.  Yes.

19   Q.  And if you might not find a defect, that geo car could,

20   correct?

21   A.  It could.

22   Q.  Similarly, there are FRA inspectors that do track

23   inspecting, correct?

24   A.  Yes.

25   Q.  So if you weren't to report a defect, it could be that

1    the FRA finds a defect and writes it up, correct?

2    A.  It could be.  That wouldn't be the goal.  Typically, we

3    can get fined if the FRA finds something that we are not

4    finding, so the goal is for us to find it first.

5    Q.  So there's no real incentive not to report a defect,

6    correct?

7    A.  Not in my mind.

8    Q.  Because it could be found by a geo car, the FRA,

9    correct?

10   A.  A geo car is only going to find geometry defects.  It

11   won't find a tie defect necessarily.  The ties could be

12   holding gauge still, but --

13   Q.  But certainly the FRA track inspector could find it.

14   A.  Yes, and they did, yeah.  They were at that time finding

15   tie defects.

16   Q.  You talked about you had some concerns about safety.

17   Fair to say that BNSF has methods or opportunities for you

18   to report safety concerns, correct?

19   A.  It doesn't feel like our department has that.  Other

20   departments turn in what are called SIRPs.

21   Q.  Safety Issue Resolution Process?

22   A.  Correct, and it's our job to fix those.  So typically --

23   or most of them.  I shouldn't say all of them.  Most of them

24   our department fixes, so typically, our department's not

25   going to be putting those in.  We would just take care of

1    it.

2    Q.  But you know as a union member that you have a right to

3    report your safety concerns, correct?

4    A.  Oh, yeah.  I always try to report my safety concerns.

5    Q.  In fact, there's safety meetings, right?

6    A.  Monthly, typically monthly they try.

7    Q.  So any concern you might have individually, you have an

8    avenue to report it, correct?

9    A.  Correct, yeah.  At most times we wouldn't wait that

10   long.  We would go directly to the roadmaster.  I can

11   remember going over my roadmaster's head directly to Keith

12   Jones in one instance because we didn't fee like it was

13   getting taken care of.

14   Q.  And you felt empowered to do that.

15   A.  That's correct, yeah.

16   Q.  Just a couple questions now about the issue that we're

17   here about today.

18          I assume you don't have any firsthand knowledge of

19   Mr. Jones -- I'm sorry -- Mr. Sanders' alleged falsification

20   of payroll records on March 19?

21   A.  Just rumors.  I don't know specifics.

22   Q.  You have no details about what hours he worked that day,

23   where he worked and what he reported?

24   A.  I don't know the specifics.  I just know that he was let

25   go because of -- well, they said falsifying time roll.

1    Q.  Same thing with March 25 and March 26.  I assume you

2    have no firsthand knowledge of the hours he worked that day

3    and the hours he reported working.

4    A.  No.

5    Q.  You weren't at the investigation hearing?

6    A.  No, I wasn't there.

7    Q.  Okay.  Thank you.  Those are all the questions I have.

8         MR. JAMES KASTER:  And I have no questions of the

9    witness.  Thank you, Mr. Heyer.

10        THE COURT:  Thank you, Mr. Heyer.  You're excused.

11        THE WITNESS:  Thank you.

12        THE COURT:  Thank you, sir.

13        Mr. Kaster?

14        MR. LUCAS KASTER:  Sure.  The plaintiff is going

15   to call Mr. Don Sanders.

16        COURTROOM DEPUTY:  Please state your full name for

17   the record, spelling your first and last name.

18        THE WITNESS:  Donald, D-O-N-A-L-D; Robert,

19   R-O-B-E-R-T; Sanders, S-A-N-D-E-R-S.

20        COURTROOM DEPUTY:  Please raise your right hand.

21        **DONALD R. SANDERS, PLAINTIFF'S WITNESS, SWORN**

22        THE WITNESS:  Yes.

23        THE COURT:  Thank you, sir.  Please be seated.

24        Mr. Kaster?

25        MR. LUCAS KASTER:  Thank you, Your Honor.

|    |                                                        |
|----|--------------------------------------------------------|
| 1  | **DIRECT EXAMINATION**                                 |
| 2  | BY MR. LUCAS KASTER:                                   |
| 3  | Q.  Mr. Sanders, let's start by talking a little bit about |
| 4  | your background.                                       |
| 5  | Can you just tell us how old you are and where         |
| 6  | you're from.                                           |
| 7  | A.  I'm 46 years old.  I'm from Minnesota.  I grew up in the |
| 8  | northern suburbs of Minneapolis.                       |
| 9  | Q.  And are you married?                               |
| 10 | A.  Currently, I'm still married, separated but married. |
| 11 | Q.  And what's your wife's name?                       |
| 12 | A.  Christine.                                         |
| 13 | Q.  And how long have you and Christine been married?  |
| 14 | A.  Since April 24th, 1998.                            |
| 15 | Q.  How long have you been separated?                  |
| 16 | A.  (No response).                                     |
| 17 | Q.  Several years?                                     |
| 18 | A.  Yes.  Three years.                                 |
| 19 | THE COURT:  Sorry to interrupt, Mr. Kaster.           |
| 20 | Mr. Sanders, if I could, could you move just a bit    |
| 21 | closer to that microphone, sir?                        |
| 22 | THE WITNESS:  Yes.                                     |
| 23 | THE COURT:  Thank you very much.                       |
| 24 | MR. LUCAS KASTER:  Thank you, Your Honor.             |
| 25 |                                                        |

1    BY MR. LUCAS KASTER:

2    Q.  And, Mr. Sanders, do you have any children?

3    A.  Four.

4    Q.  And how old are your kids?

5    A.  Michaela is 26, McLean is 24, I believe Courtney is 23,

6    and Justin is 21.

7    Q.  And do any of your kids live with you?

8    A.  I have two boys that reside with me still.

9    Q.  And where are your girls?

10   A.  Michaela lives with her fiance in Cambridge, Minnesota,

11   and Courtney is in Arizona.  I'm not sure on the exact city.

12   She just moved a little bit ago.

13   Q.  So you said your boys live with you.

14   A.  Yes.

15   Q.  Do you have any financial obligations for any of your

16   kids?

17   A.  I help a couple of my kids with their insurance still

18   and I pay the bills, obviously, where my boys live.

19   Q.  And what's your educational background?

20   A.  I have a GED.  Beyond that I only spent a little time

21   with BNSF and did a couple of welding college courses at

22   their campus in Overland Park that they share with a

23   college.

24   Q.  And so you did not graduate college -- I mean, graduate

25   high school initially?

```
 1    A.   No.

 2    Q.   And where did you attend high school?

 3    A.   Between Centennial and Forest Lake.

 4    Q.   And at some point you got your GED?

 5    A.   Yes.

 6    Q.   And how did that come about?  How did you get your GED?

 7    A.   I had taken a position at Ford Motor Company, the

 8    assembly plant in St. Paul.  They had built sort of a small

 9    community college for the employees and I took some courses

10    there and then I ascertained my GED through the Ford program

11    somehow.

12    Q.   And are you currently employed?

13    A.   Yes.

14    Q.   Where are you currently employed?

15    A.   I work for Mann, M-A-N-N, Companies.

16    Q.   And what's your job there?

17    A.   I'm a maintenance supervisor.

18    Q.   And have you been there for a few years?

19    A.   Yes.  I'm not exactly sure when I started.  Roughly two

20    years.

21    Q.   And are you currently actually working in your position?

22    A.   Not at the moment, no.

23    Q.   Why not?

24    A.   I just got back out of the hospital for heart failure.

25    Q.   And how long ago did you get out of the hospital?
```

1    A.  Sometime early November, within the last month.

2    Q.  And you said you had a heart failure issue?

3    A.  Yes.

4    Q.  And how long has that been going on?

5    A.  Roughly three years, maybe four.

6    Q.  Did you have heart issues prior to that?

7    A.  When I was 29 I -- actually, when I was born I had a

8    bicuspid valve -- aortic valve.  I didn't know about it

9    until I was 29.  I then had open-heart surgery and had a

10   valve put in.

11   Q.  And so this heart issue's been an ongoing issue for you

12   for awhile.

13   A.  For the valve, yes.

14   Q.  And at times have you had different medical surgeries or

15   appointments related to those heart issues over your years

16   since you were 29?

17   A.  I had to have open-heart surgery twice.  When they put

18   the first valve in it ripped and the stitches didn't hold,

19   so it was leaking again.  Beyond that I haven't had any

20   other surgeries for the valve.  Obviously I've had to have

21   appointments for checkups and stuff.

22   Q.  And despite that heart issue, have you continued to work

23   up until today?

24   A.  Yes.

25   Q.  And you're not contending that your termination from

1      BNSF caused your heart problems, right?

2      A.  The valve?

3      Q.  Yeah.  You're not --

4      A.  Not my valve.  I --

5              MS. FERGUSON:  I'm going to object to any

6      testimony relating his opinion to causing heart --

7              THE COURT:  Sustained.

8      BY MR. LUCAS KASTER:

9      Q.  Let's talk about your work history.

10             You said that you didn't finish high school.  What

11     did you do after that?

12     A.  I was roofing houses.

13     Q.  And what jobs have you held during those years after you

14     left high school?

15     A.  I worked at a car wash, oil change facility, couple of

16     gas stations at some point in my life, McGlynn's Bakery,

17     Ford -- Minar Ford, which was a dealership.  I can't recall

18     anything at the moment.

19     Q.  And what did you do at McGlynn's?

20     A.  McGlynn's, I was in frozen packaging, so we would box

21     produce -- or not produce -- biscuits for, like, KFC and put

22     it into a blast freezer and then wrap it up on a pallet.

23     Q.  And then you said you worked at Minar Ford?

24     A.  Yes.

25     Q.  And what did you do at Minar Ford?

```
 1      A.  Minor maintenance and mechanical work.

 2      Q.  And then you referenced earlier that at some point you

 3      went to the Ford Motor Company.

 4      A.  Yes.

 5      Q.  Was that right after Minar Ford?

 6      A.  Yes.  I left Minar Ford to go to the assembly plant.

 7      Q.  And what did you do at Ford Motor Company?

 8      A.  Various jobs.  I was in body build for the majority of

 9      my time there.  I worked as a utility person, which

10      basically, if anybody didn't come to work, you were told to

11      go to their job and do their job for the day, so it could be

12      hundreds of jobs that I would have to know.  And then beyond

13      that I did fit-and-finish for quite a while.  I made sure

14      that -- I was on the passenger side, so I made sure that the

15      passenger door opened and closed and that the tailgate

16      worked properly.

17      Q.  Do you remember approximately how long you worked at the

18      Ford Motor plant?

19      A.  Somewhere around '97 I started there and I left in 2007,

20      so I'd say just under ten years or somewhere in that range.

21      Q.  And why did you leave the Ford Motor Company?

22      A.  Well, Ford had decided to close the plant and they

23      offered us a package to leave or we could transfer to

24      another state.  I personally had already had open-heart

25      surgery and I had young children at the time and I did not
```

1    want to uproot my family and move to another state where I

2    didn't have any family for the wife and the kids if

3    something did happen to me.

4    Q.  Did you at that point look for other work?

5    A.  Yes.

6    Q.  And did you find a job?

7    A.  At some point thereafter I left Ford.  I ended up

8    securing a job with BNSF Railway.

9    Q.  And how did you come to find out about the job at BNSF?

10   A.  I think it was virtually through the internet before

11   they closed the plant.  My brother had taken a job with

12   Union Pacific Railway as an engineer and that's what kind of

13   gave me the idea to go there, because they were a company

14   that's been around for a long time.

15   Q.  And so you said you went to BNSF sometime in 2007?

16   A.  I believe that's correct.

17   Q.  If we can pull up Exhibit 156, please.

18           THE COURT:  Has this exhibit been admitted,

19   Mr. Kaster?

20           MR. LUCAS KASTER:  I was going to show -- it is

21   not.  It's the same one that we talked about earlier.  I can

22   show it just to Mr. Sanders.

23           THE COURT:  Terrific.

24   BY MR. LUCAS KASTER:

25   Q.  Mr. Sanders, do you see Exhibit 156 on your screen?

1    A.  Yes.

2    Q.  Do you recognize that as your employee transcript from

3    BNSF?

4    A.  Yes.

5    Q.  And do you see your start date on the top left-hand

6    corner there as June 11th, 2007?

7    A.  Yes.

8    Q.  Does that sound about right to you?

9    A.  Yes.

10   Q.  And what position did you originally apply for at BNSF?

11   A.  I don't know what position they had on the computer.

12   I'm assuming it was just maintenance of way engineering,

13   laborer or something.

14   Q.  And what job did you initially perform?  Do you recall?

15   A.  I was hired as a laborer.

16   Q.  And how long did you do that?

17   A.  It appears two months before I became a vehicle

18   operator.

19   Q.  Now, at some point in 2010 you become a track inspector.

20   Does that sound right to you?

21   A.  Yes.

22   Q.  And why did you make the change from a laborer to a

23   track inspector?

24   A.  Well, 90 percent of the time track inspectors are lower

25   seniority because of the job, of course, and less chance of

1    getting bumped.

2    Q.  Explain that to me.  What do you mean by "bumped"?

3    A.  There's only so many jobs within Minneapolis and

4    St. Paul or any section throughout BNSF.  A lot of BNSF's

5    employees are on gangs and they travel throughout the

6    territory.  When a gang shuts down, those people don't have

7    jobs, and if they have more -- if they were hired before you

8    or have a better seniority date on a specific job, then they

9    can bump you off of your job.

10   Q.  And so was there greater security in the track inspector

11   job?

12   A.  Yes.  It wasn't a very wanted job.

13   Q.  And why do you say that?

14   A.  It's very stressful.

15   Q.  When you first started as a track inspector, where were

16   you located?

17   A.  In Minneapolis at Northtown Yard.

18   Q.  And at some point did you transfer over to Dayton's

19   Bluff?

20   A.  Yes.

21   Q.  And why did you do that?

22   A.  I liked the 4/10 thought.

23   Q.  And what do you mean by 4/10?

24   A.  In Minneapolis I was working 5/8s and they had

25   previously set up a deal with whoever to work 4/10s on the

1    mainline and the yard.

2    Q.  When you say "they" had set up a deal, who are you

3    referring to?

4    A.  Roadmasters and whatever track inspectors at that time

5    made.  I think one of the track inspectors was Bryce

6    Birdsell (ph) and John Widstein (ph) maybe that had made the

7    agreement.

8    Q.  And how did you know when you were transferring to

9    Dayton's Bluff that the position you were coming into was

10   4/10s?

11   A.  Michael Bruberg was on the position and I had spoken

12   with him, but it was pretty well commonly known that those

13   guys worked 4/10s.

14   Q.  Prior to 2015, did anybody bring up an issue about you

15   working the 4/10 schedule?

16   A.  No.

17   Q.  And had you been working the 4/10 schedule since you

18   went to Dayton's Bluff?

19   A.  Yes.

20   Q.  And when you were working the 4/10 schedule, when was

21   your typical start time when you would start your day?

22   A.  I don't know.

23   Q.  You've seen some of the records that we've looked at

24   with Mr. Jones regarding your start time in 2015.  There was

25   an entry between 5 a.m. and 6:45.  Does that comport with

1    your memory about when you would typically start your shift?

2    A.  I don't know when things sort of changed.  I believe it

3    was -- it was fairly early on when I got there that I was

4    told to inspect main lines and help out with main lines, and

5    we rarely reported to the shack.  We would go directly to a

6    track and set on and it was at various times.

7    Q.  Let's talk a little about your training when you first

8    started as a track inspector.  What did you do for training

9    initially?

10   A.  I asked my roadmaster at the time for a written test.

11   It was either written or on the computer.  I don't recall

12   which one it was.

13   Q.  And how long was your initial training?

14   A.  After I passed that test, they set up a school date for

15   me in Overland Park, Kansas, and I believe I went there and

16   they showed me a couple of things and I did another

17   open-book test for maybe three days.

18   Q.  So three days training down in Kansas.

19   A.  Yes.

20   Q.  Do you know if those two parts of training are

21   considered tier one and tier two training?

22   A.  Yes, they are.

23   Q.  Did you have any other training at the start of your

24   assignment as a track inspector?

25   A.  No.

1    Q.  At some point later did you get more training?

2    A.  They did a part three, or tier three.  Sorry.

3    Q.  Sure.  Do you recall approximately how long after you

4    became a track inspector that you ended up having the tier

5    three training?

6    A.  Four to five years.

7    Q.  And what was your view of the tier three training when

8    you went through it?

9    A.  Tier three was a lot more detailed and they actually

10   came out and worked with the guys and showed them.  A lot

11   more detailed on how to actually find defects, whereas when

12   you go to the classroom in Overland Park, it's basically

13   open-book and they teach you how to find the answer in the

14   book.  So if they say the gauge is wide, they'd give you a

15   number and you would have to just look in the book and see

16   what the protection would be.

17   Q.  In tier three did you actually go out on the tracks and

18   inspect?

19   A.  Yes, we did classroom stuff and we would walk tracks.

20   Q.  And when you're saying "look in the book," what book are

21   you referring to?

22   A.  Well, as far as the classroom, it's strictly part 213-B,

23   part of the FRA.  There's no engineering instructions in

24   that class.

25   Q.  It's just the pink FRA regulations book that you're

1    referencing.

2    A.  Yes.

3    Q.  And then there's the separate engineering instructions

4    for BNSF as well.

5    A.  Yes.

6    Q.  Did you have a separate training on the engineering

7    instructions book, do you remember?

8    A.  I think we went over portions of it at different times

9    in safety meetings.

10   Q.  Did you also carry engineering instructions with you?

11   A.  Yes.

12   Q.  And how big are the engineering instructions?

13   A.  It's hard to say.  If it was in a folder, it would

14   probably be four to six inches.

15   Q.  Something like (indicating) this?

16   A.  Yes.

17   Q.  We've talked quite a bit already about track inspector

18   duties, but one thing I want to talk about is the frequency

19   at which track inspectors have to do their inspections.

20           Can you explain a little bit about how that works?

21   A.  The Federal Government has a regulated track speed that

22   they say has to be inspected within so many days.  I'm not a

23   hundred percent sure positive on how this goes.

24           Yard tracks I believe were once a month with a

25   20-day interval, so you couldn't inspect the same track

1  within 20 days.  You had to wait past 20 days to do it again

2  for the next month.

3       Mainline, we'd go on the tonnage of the train that

4  goes over it and the speed and the class of the track.  So

5  if the tonnage changes, even though it's stated in the book,

6  then you would have to inspect more often.

7       Also, your inspections go by if there's a tornado,

8  or flooding, or -- in the beginning of the summer you have

9  to run like every day while it's getting hot.  In the winter

10 you got to run every day while it's first getting cold on

11 top of your normal inspections, so it's a lot.

12 Q.  Does the weather in Minnesota make tracks -- more

13 difficult on the tracks than other locations, as far as you

14 know?

15 A.  Yeah.  I mean, as we could tell, it was almost 50, 60

16 degrees a week ago and now we're below freezing, so -- and

17 anytime in the spring the ground thaws and then it refreezes

18 and that causes some serious issues also.

19 Q.  We've heard a lot of testimony about defects, but as far

20 as you're concerned, when you were a track inspector in

21 Dayton's Bluff, is there ever a time when you should not

22 report a defect?

23 A.  No.

24 Q.  Is there ever a time you should delay reporting a

25 defect?

1    A.  No.

2    Q.  If a defect requires a slow order according to the

3    regulations, is there ever a time you should not enter a

4    slow order or delay entering a slow order?

5    A.  No.

6    Q.  When you find a defect or have to enter a slow order,

7    where do you have to report that?

8    A.  Legally, it has to go in TIMS.  Beyond that your

9    roadmaster would like to know, and then usually I would tell

10   the foreman and the roadmaster in an email, and then later

11   on I was starting to add the division engineer onto the

12   emails also.

13   Q.  And were those emails the nightly reports we've been

14   talking about?

15   A.  Well, they were before nightly reports were necessary.

16   Q.  And then at some point these nightly reports became

17   something that was necessary to do as well?

18   A.  Yes.

19   Q.  And who asked track inspectors to do the nightly

20   reports?

21   A.  Well, that was in St. Paul, so that would be Blaine

22   Hoppenrath.

23   Q.  And that was something that was required for your job?

24   A.  It was something that was not required for my job, but

25   asked as a direct order from my roadmaster.

1    Q.  Were you ever told you're not being paid for the time

2    you spend on working on your nightly reports?

3    A.  I don't recall being told not to be paid.  I think they

4    gave us, like, allotted time they said that we should get it

5    done in.

6    Q.  And there was just some testimony a little bit ago from

7    one of the earlier witnesses about when a defect is entered,

8    that there's a specific time frame in which it needs to be

9    fixed.  Do you recall that?

10   A.  Yes.

11   Q.  What happens if the defect isn't fixed within that

12   period of time?

13   A.  It's been a long time since I've done this, so depending

14   on the defect, I would say if it's in the yard and it's

15   wrote up, depending on the defect, I would say that that

16   track would come out of service.  If it's on the mainline

17   and it's still got room to be dropped down another class,

18   say I have a 25 mile an hour slow order on it, then I'm

19   guessing it's possible I could have dropped it to a ten

20   before it actually came out of service, but I don't fully

21   remember.

22   Q.  It's been five years since you were a track inspector?

23   A.  Somewhere in that range.

24   Q.  Fair to say you don't remember all the regulations or

25   rules now as you sit here?

1    A.  No, I do not.

2    Q.  By the way, is this (indicating) your FRA book that you

3    carried around while you were a track inspector in St. Paul?

4    A.  Yes.

5    Q.  Did you consider the track inspector position a

6    safety-sensitive position?

7    A.  Absolutely.

8    Q.  And why would you say that?

9    A.  I witnessed a lot of things happen when I first became a

10   track inspector in the yard, which at that time I did not

11   know much at all about track inspecting.  I learned every

12   day something new about track inspecting.  The FRA was very

13   instrumental walking around with us and teaching me about

14   track inspecting.

15        We had some very close calls and I witnessed what

16   derailments look like being in the yard at low speeds before

17   I was ever out on the mainline at a high-speed derailment.

18        So as far as safety and with the men and

19   equipment, the guys moving the trains and passengers that

20   are paying to be -- ride on the train and requiring us to

21   keep them safe, I feel that, yes, it's very important.

22   Q.  Did you experience or were you called out to situations

23   where people lost their lives?

24   A.  Yes.  I can remember some very gruesome instances.

25   Q.  And why would you be called out for those instances?

1    A.  Well, I was called out for any first responder incident

2    to protect the track and the people.  Let's say -- you asked

3    about people, right?  Okay.

4           Well, let's say somebody decided to commit

5    suicide, I'd be one of the first responders.

6           (Pause)

7           Excuse me.  Anyways, police got to respond,

8    firemen, so I would be the first one there to secure the

9    track and make sure no trains were coming.

10   Q.  Is it fair to say you saw some things that you wish you

11   would not have seen?

12   A.  Yes.  Yeah.  No, I was never qualified to have to be in

13   that situation, no.

14           MR. LUCAS KASTER:  If we can bring up and just

15   show Mr. Sanders Exhibit 160, please.

16   Q.  Are you okay to proceed, Mr. Sanders?

17   A.  Yes, sir.

18   Q.  Okay.  If we can scroll through Exhibit 160, can you

19   just say what these are?

20   A.  Those are pictures of a derailment on a washout at Rice

21   Creek on Staples sub.

22   Q.  Did you take these pictures during your employment with

23   BNSF?

24   A.  Yes.

25           MR. LUCAS KASTER:  Move for the admission of

1   Exhibit 160.

2              MS. FERGUSON:  Objection on relevancy, foundation.

3   There's no indication of when these were taken, which would

4   make them maybe irrelevant to this situation.

5              THE COURT:  Let's find out a little bit more about

6   it, Mr. Kaster.

7              MR. LUCAS KASTER:  Sure.

8   BY MR. LUCAS KASTER:

9   Q.  Do you have any recollection, Mr. Sanders, of when these

10  pictures -- or when this incident occurred?

11  A.  I don't remember the exact time.  I know the incident

12  very well.  I think it was July or August.  I don't recall.

13  Q.  Of what year are you referring to?  Was it while you

14  were in Dayton's Bluff?

15  A.  No, I was employed at Minneapolis as a track inspector.

16  Q.  And what incident are you referring to?

17  A.  As far as this here?

18  Q.  Yes.

19  A.  It's a derailment due to a washout on Staples sub.

20  Q.  And what happened before this incident?

21  A.  You want to start when I was called?

22  Q.  Sure.

23  A.  I was called in for flash flood runs, which is obviously

24  another weather-related situation that track inspectors

25  would have to be called in for.

1          As I approached the yard, which this is within a

2     mile out of the yard, roughly, the roads that I had to get

3     to the yard where I essentially would set on, they were

4     flooded.  Some portions of the road were four feet deep.

5          I communicated with the dispatcher and said that I

6     wanted to run this portion of the Staples sub.  The

7     dispatcher told me absolutely not, that he had trains

8     leaving and that I was supposed to go run another section of

9     truck that he wanted me to run.

10    Q.  And what happened?

11    A.  This derailment happened.

12    Q.  And after this derailment happened, were you worried

13    about your job?

14    A.  Yes.

15    Q.  And why?

16    A.  It's a large derailment.  At the time before I got there

17    I had no idea exactly what happened.  I was just told that

18    there was a derailment and that I needed to get my ass over

19    there.

20    Q.  Was this a section of track that you were responsible

21    for inspecting?

22    A.  Yes.

23    Q.  And I think you said before this was a section of track

24    that you had tried to inspect.

25    A.  Yes.

1    Q.  And somebody told you no.  Who was that?  Not the

2    person, but what was the person's title?

3    A.  Train dispatcher.

4    Q.  And why would that train dispatcher be telling you no,

5    to not get on that section of the track?

6              MS. FERGUSON:  Objection.  Foundation.

7              THE COURT:  Overruled.

8    A.  He wanted to run trains.

9    Q.  Is that something that as a track inspector in the Twin

10   Cities Division you encountered quite a bit?

11   A.  Yes.

12   Q.  Let's talk a little bit about your performance as a

13   track inspector, and let's focus on the time period before

14   2015, so before Ms. Hoppenrath is your roadmaster.

15             We looked at with Mr. Jones some -- remember

16   seeing those track inspector evaluation forms by

17   Mr. Shoemake --

18   A.  Yes.

19   Q.  -- and Mr. Butler?  Do you recall that?  I'm sorry.  It

20   was Babler, Luke Babler.

21   A.  Yes.

22   Q.  Prior to 2015, had any of your inspectors ever accused

23   you of not knowing how to measure track or report defects?

24   A.  I believe you meant roadmasters, but no.

25   Q.  Any of your managers prior to 2015 ever accused you of

1    reporting things that were not defects?

2    A.  No.

3    Q.  Prior to 2015, did any of your roadmasters ever take

4    issue with you working on a 4/10 schedule?

5    A.  No.

6    Q.  Prior to 2015, did any of your managers take issue with

7    you driving a company vehicle to and from work when you had

8    the ability to do that?

9    A.  No.

10   Q.  Again, let's talk about prior to 2015 when you were a

11   track inspector.  How would you keep track of your hours

12   that you worked, generally?

13   A.  I usually kept a notebook.

14   Q.  And then how would you report your time then to the

15   company?

16   A.  Sometimes it was at the end of the week.  Sometimes it

17   was that day or the end of the -- my days ranged from ten

18   hours to 16 hours on average, so depending on how busy I was

19   and how tired I was, I kept the notes and I would input them

20   towards the end of the week.

21   Q.  At times prior to 2015, did you have to go back and

22   change your time entries?

23   A.  I have.

24   Q.  Did any of your managers prior to 2015 take issue with

25   you changing your time?

```
 1    A.  Not that I recall.

 2    Q.  Do you recall at some point in 2015 the expectation

 3    changing around when time needed to be entered?

 4    A.  We were given a letter saying it was a nightly report

 5    type thing.

 6    Q.  Was that from Ms. Hoppenrath?

 7    A.  I believe she's the first one that I ever received one

 8    from.

 9    Q.  You're talking about an expectation, is that right?

10    A.  Yes.

11    Q.  If we could pull up Exhibit 27, please.

12              Is this the expectation sheet that you were just

13    referring to that Ms. Hoppenrath provided?

14    A.  It's one of them.

15    Q.  Do you recall receiving any other expectation sheets

16    before October of 2015 about entering your time on a daily

17    basis?

18    A.  I do not.

19    Q.  Did you try to comply with Ms. Hoppenrath's

20    expectations?

21    A.  I tried to comply, yes.

22    Q.  If we could go to Exhibit 28 -- actually, let's turn to

23    the second page of Exhibit 27 for a second just so we can

24    see.

25              So there's a second page to this expectations.  Do
```

1    you see that?

2    A.  Yes.

3    Q.  Kind of hard to see.  And there's a different -- a copy

4    of this second page that is Plaintiff's Exhibit 28, if we

5    could go there.

6           And this is an expectation sheet around the

7    nightly reports, right?

8    A.  Yes.

9    Q.  And under the "what" it says:  "Nightly report for every

10   person who is entering time to keep record of repairs made

11   and defects found throughout the day, right?

12   A.  Yes.

13   Q.  And the under the "information included" section for

14   track inspectors, it says that you have to include any

15   defects entered into TIMS and any slow orders with track

16   notes, recap of time traversed over territory, who, if

17   anyone, piloted across the territory, and what limits they

18   traversed, right?

19   A.  Yes.

20   Q.  Did you try to comply with Ms. Hoppenrath's

21   expectations?

22   A.  Yes.

23   Q.  If we could go to Exhibit 44, please.

24           Is this an example of a nightly report that you

25   would have sent?

1    A.  Yes.

2    Q.  And if we go to the -- just scroll through the second

3    and the third page, there's a long sort of detailed list of

4    what you did that day and the defects you saw?

5    A.  Yes.

6    Q.  And if we keep going, there's a number of pictures at

7    the end.  Do you see those as Karla is scrolling through?

8    A.  Yes.

9    Q.  And why would you include pictures?

10   A.  Those are defects and they're I guess evidence of what I

11   had measured.

12   Q.  At some point after you got this list of expectations

13   from Ms. Hoppenrath, did you voice a concern about it?

14   A.  I'm not aware if I did.  I don't recall.

15   Q.  Well, let's look at Exhibit 26.

16           This is an email from you.  I know it's kind of

17   hard to read because there's a bunch of information in the

18   "To" line, but it's from you to Mr. Jones and several other

19   people on October 9th of 2015.

20           Do you see that?

21   A.  Yes.

22   Q.  And you kind of have a long explanation over the next

23   couple pages.  Do you see that?

24   A.  Yes.

25   Q.  And why were you voicing concern or objection to the

1    expectations about the nightly reports?  Do you recall?

2    A.  They were focusing their efforts on something minimal

3    when we had larger defects and stuff that needed more

4    attention than what they were spending their time focusing

5    on.

6    Q.  What were some of those bigger issues that you thought

7    needed to be focused on?

8    A.  I don't recall.  I'm assuming they're track defects.

9    Q.  You referenced a minute ago a notebook that you often

10   carried with you to keep track of what you did.

11           Do you recall that?

12   A.  Yes.

13           MR. LUCAS KASTER:  If we could pull up Exhibit

14   165.  And, Karla, if we scroll through --

15   Q.  Mr. Sanders, is this a copy of some pages from one of

16   the notebooks you would use to keep track of what you did?

17   A.  Yes.

18   Q.  So just kind of rough notes of your activities.

19   A.  Yes.

20   Q.  Now, let's talk a little bit about -- I want to switch

21   gears and talk a little bit about your pay as a track

22   inspector.

23           When you first started, do you remember what your

24   hourly rate was as a track inspector?

25   A.  Just as a track inspector.

1    Q.  Yes.

2    A.  No.  It was somewhere around 28 to $29 an hour.

3    Q.  In your first few years as a track inspector, do you

4    recall what your average or approximate annual income was as

5    a track inspector?

6    A.  Maybe around sixty to 70,000.

7    Q.  If we can pull up Exhibit 174, please.

8              And this is a payroll report for you that BNSF

9    produced that shows your wages for various years, okay?  So

10   if we go to the first page, there's some total lines in

11   yellow if we go down to the second page, and there's a 2009

12   line in yellow that shows a total income of 41,952, and I

13   believe that that's after taxes.

14             Do you see that?

15   A.  Yes.

16   Q.  And then if we go down a little bit further, we see in

17   2010 it goes up to 68,000; 2011, it goes up to 69,000; 2012,

18   it goes up to sixty-three; 2014 -- sorry.  I think I skipped

19   2013.  It goes up to eighty-seven.  If we can go down to the

20   next page, I believe it's 2013.  Do you see that?  It goes

21   up to eighty-seven.  Then 2014, it goes up to about a

22   hundred and eight; and 2015, the bottom of that page, it

23   goes up to a hundred and two.

24             Do you see that Mr. Sanders?

25   A.  Yes.

1    Q.  Had your hourly rate gone up significantly over those

2    years?

3    A.  Minor.

4    Q.  And so what do you attribute the increase in your income

5    over those years to?

6    A.  Working more days.

7    Q.  And why were you working more days?

8    A.  I was instructed to.

9    Q.  Were you given additional assignments?

10   A.  Every day varied, but yes.

11   Q.  And when you were initially in Dayton's Bluff, you were

12   a yard inspector, is that right?

13   A.  Yes.

14   Q.  And what was your primary responsibility as a yard

15   inspector?

16   A.  Yard inspections.

17   Q.  Were there times when you did mainline inspections?

18   A.  When I was asked or if -- like, when Mike Heyer was

19   here, he said that if he asked me to help him, I would help

20   him do his inspections.

21          A lot of the times for Michael, that portion of

22   track they said is very small, but it's also very unable to

23   get on the track.  It has three different large railroads

24   that go -- kind of intersect not far from here at 7th

25   Street, Union Pacific and CP, and we switch off tracks back

1    and forth through there and it's very busy and a lot of

2    times you can't get track in time.  So I would go with Mike

3    and I would be a lookout while he looked at something, and

4    then we would take turns and verify defects as far as who

5    was watching for approaching trains.

6    Q.  And there's been some talk from Mr. Jones that there was

7    a period of 2015 when there was no mainline inspector.

8    A.  Correct.

9    Q.  And so what were you doing during that period of time?

10   A.  I believe 2014 through 2015 I had a lack of inspectors.

11   Mike was there quite a bit, but I was still on the yard, but

12   I was required to do mainline things also.

13   Q.  And what did that mean for your workload?

14   A.  Well, I mean -- so I had my inspections to do and then

15   essentially at some point I was doing the job of three

16   people, maybe five people, because I would have to pilot

17   grinding trains, rail detectors.  I would have to ride geo

18   cars.  I would have to support greasers when they came out.

19   I would have to do all the cold heat runs.  If it's a truck

20   or somebody hit the tracks, I was required to go and protect

21   that or, say, when accidents happened along the railway.

22   Anything that needed supervision by someone from BNSF when

23   there was a contractor, I was involved.

24   Q.  Explain to me this piloting concept.  What does that

25   mean?

1    A.  Well, it's a very simple thing.  So if a company other

2    than BNSF comes to the tracks, they're not qualified to be

3    on our tracks and not aware of the territory, so they need a

4    pilot.  A pilot would be me or somebody else throughout BNSF

5    that's qualified to get them from point A to point B.

6            So the way I like to explain point A to B is if

7    you're driving down a road and you have a signal light on

8    one side of the road and then you go another block or two

9    and another signal light, there that's a segment, so you

10   would get a track authority between each signal light which

11   would essentially protect you for being on the tracks.

12           So as a pilot you would get from signal light to

13   signal light, but it's not a signal light.  It's a mile post

14   or a junction or something, and you would ride with them 90

15   percent of the time in the vehicle that they're operating,

16   or sometimes you would pilot from your vehicle and they

17   would be directly behind you so that they couldn't go past

18   their limits.

19           And then after I was done with my day, depending

20   on where we went, I could track inspect the portion of track

21   that we were on, but that means that after their eight-hour

22   day was over, I still had to go and inspect the rest of my

23   duties.

24           THE COURT:  Mr. Kaster, is this a good time to

25   call it for the day?

1              MR. LUCAS KASTER:  It is, Your Honor.

2              THE COURT:  I don't mean to suggest this is the

3      time we're calling it for the day, but I'm asking if this is

4      an opportune moment --

5          (Laughter)

6              MR. LUCAS KASTER:  This is just fine.

7              THE COURT:  -- let's do that.

8              All right.  We will adjourn the jury for the day.

9      We will resume again tomorrow morning at 9 a.m. and we'll

10     see everybody then.

11         (Jury excused)

12             THE COURT:  And I wanted to just deal with two

13     issues before we wrap for the day just to make it clear,

14     close one out and make sure that how I was planning on

15     handling the other issue is fine with the parties.

16             I'm going to sustain the objection to the

17     derailment photos and to their admission, not because I

18     think they're irrelevant, but because I think they're unduly

19     prejudicial under the circumstances, so I am going to

20     sustain that objection and not admit those photographs.

21             Let's talk about the recordings.  My intention is

22     to admit any recordings that have been played.  I'm a bit

23     fuzzy as to -- I think at this point we have portions of

24     some recordings that have been played and perhaps not the

25     entire recording.

1              Is that fair, Mr. Kaster?

2              MR. LUCAS KASTER:  That is, Your Honor.

3              THE COURT:  Okay.  So my expectation is to only

4    admit then those portions of the recordings that have been

5    played.  I have no intention of sending the jury back with

6    something that they haven't heard here during the trial, so

7    please keep that in mind as you go forward from here.

8              Those have not been formally admitted yet.  I am

9    fine waiting to do that just as a formality once everyone's

10   done referring to them.

11             Does that make sense?  Does anyone -- Mr. Kaster,

12   let me ask you first.  Any objections to that process?

13             MR. LUCAS KASTER:  No, Your Honor.

14             THE COURT:  Okay.  Ms. Ferguson, any objections to

15   that process?

16             MS. FERGUSON:  Not to the process, just earlier

17   objection to the recordings totally.

18             THE COURT:  Understood.  Understood.

19             All right.  Then I will proceed in that fashion.

20   Anything else that we need to take care of here today before

21   I adjourn?

22             MR. LUCAS KASTER:  I just wanted to alert the

23   Court to the employee transcript issue.  I didn't ask again

24   for it to be admitted.  I'm not sure whether the Court's

25   version is redacted.  The version I was going to put up is

1    redacted.  It doesn't have the issue that -- the objection

2    regarding his prior discipline, so we redacted that out, but

3    I just didn't go there because I thought it would be better

4    handled outside the presence of the jury to try to resolve

5    that issue.

6              MS. DONESKY:  At whatever juncture it might be, we

7    intend to renew our request to have the prior discipline

8    come in.  I think it's been well-established the door's been

9    opened both in terms of Mr. Sanders' discipline history and

10   mentions of waivers, when Mr. Sanders had received one prior

11   discipline that includes a waiver.  I can certainly put that

12   argument together whenever the Court is ready to hear it,

13   but we'll be renewing the motion for -- that the door has

14   been opened and just it goes to this issue of the redaction.

15             THE COURT:  Would you be intending to

16   cross-examine Mr. Sanders on that issue?

17             MS. DONESKY:  Exactly correct, yes, Your Honor.

18             THE COURT:  And you anticipate Mr. Sanders' direct

19   concluding tomorrow, I assume.

20             MR. LUCAS KASTER:  Yes.

21             THE COURT:  Okay.  Then here's what we're going to

22   do.

23             I'm going to take a page out of my old boss's

24   notebook and I'd like a short brief addressing that issue on

25   ECF, or if it's not filed on ECF before it's delivered to

1    us, that's fine, but by 8 a.m. tomorrow.  And then let's

2    plan to convene at 8:30 tomorrow morning to deal with that

3    issue so I've got a half hour to read up on it, study up on

4    it, before we're back in here.  That puts you in a spot

5    where you're sort of responding a bit in the blind, but I

6    think you know what's coming.

7                THE MR. LUCAS KASTER:  Yeah.

8                THE COURT:  Okay.  So a brief from both sides.

9    I'd prefer it not exceed five pages.  If you think you can

10   get it done in pages, that's fine with me, but I want

11   something in writing so that I can at least do a responsible

12   study-up before we show up here in court on that.

13               Does that make sense?

14               MR. LUCAS KASTER:  Yes, so I just want to make

15   sure.  You want both of us to file our briefs by 8 a.m.

16   tomorrow.

17               THE COURT:  Correct.

18               MR. LUCAS KASTER:  Okay.  Great.

19               MR. JAMES KASTER:  I have a request relating to

20   logistics and I just want to tell the Court and counsel.

21               We have a witness coming from Fargo.  I think he's

22   coming tonight.  I would like to make sure that he's on and

23   off tomorrow.  It's Mr. Mozinski.  So I don't know if the

24   Court would entertain Mr. Sanders -- if at some point -- I'm

25   just concerned about making sure that he has time.  I think

1    he's about an hour witness, something like that.

2            THE COURT:  I would, yes.

3            MR. JAMES KASTER.  Okay.

4            THE COURT:  If it's necessary.  I hope it's not,

5    but if it's necessary to interrupt Mr. Sanders to do that,

6    I'm fine with that.  Like I say, though, I hope it's not.

7            MR. JAMES KASTER:  Okay.  Thank you.

8            THE COURT:  Anything further from BNSF?

9            MS. FERGUSON:  No.

10            THE COURT:  All right.  I'll adjourn for the day

11    and I'll see everybody tomorrow morning then at 8:30.  Thank

12    you.

13            (Proceedings concluded for the day at 5:10 p.m.)

14                    *      *      *      *

15

16

17

18

19

20

21

22

23

24

25

**I  N  D  E  X**

**W I T N E S S E S:**                                              **PAGE**

**KEITH D. JONES (RESUMED)**
    (Continued) Cross-Examination by Mr. Lucas Kaster  94
    Direct Examination by Ms. Ferguson                200
    Recross-Examination by Mr. Lucas Kaster           237
    Redirect Examination by Ms. Ferguson              250

**MATHEW C. SCHERBING**
    Direct Examination by Mr. James Kaster            253
    Cross-Examination by Ms. Donesky                  267
    Redirect Examination by Mr. James Kaster          280

**MICHAEL HEYER**
    Direct Examination by Mr. James Kaster            287
    Cross-Examination by Ms. Ferguson                 298

**DONALD R. SANDERS**
    Direct Examination by Mr. Lucas Kaster            306


* * * * *


**E  X  H  I  B  I  T  S**

| NUMBER | FOR ID | IN EVIDENCE |
|---|---|---|
| Plaintiff 222 | | 149 |
| Plaintiff 223 | | 151 |
| Plaintiff 218 | | 177 |
| Plaintiff 52 | | 181 |
| Plaintiff 57 | | 187 |
| Plaintiff 19 | | 189 |
| Plaintiff 56 | | 192 |
| Plaintiff 74 | | 196 |

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.

*/s/ Timothy J. Willette*

**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224