UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )  CIVIL FILE
Donald Sanders,               )  NO. 17-CV-5106 (ECT/KMM)
                              )
               Plaintiff,     )
                              )           **VOLUME III**
      vs.                     )
                              )
BNSF Railway Company,         )  Courtroom 3B
                              )  Wednesday, December 8, 2021
               Defendant.     )  St. Paul, Minnesota
                              )  8:25 A.M.
------------------------------------------------------------

                  <u>**JURY TRIAL PROCEEDINGS**</u>

            **BEFORE THE HONORABLE ERIC C. TOSTRUD**
               **UNITED STATES DISTRICT JUDGE**
                        **AND A JURY**

**A P P E A R A N C E S:**

**For the Plaintiff:**    **NICHOLS KASTER, PLLP**
                          By:  JAMES H. KASTER, ESQUIRE
                               LUCAS J. KASTER, ESQUIRE
                          4700 IDS Center - 80 South Eighth Street
                          Minneapolis, Minnesota  55402-2242

**For the Defendant:**    **ARTHUR CHAPMAN KETTERING SMETAK**
                          **& PIKALA, P.A.**
                          By:  SALLY J. FERGUSON, ESQUIRE
                          500 Young Quinlan Building
                          81 South Ninth Street
                          Minneapolis, Minnesota  55402-3214

                          **STINSON, LLP**
                          By:  TRACEY HOLMES DONESKY, ESQUIRE
                          50 South Sixth Street - Suite 2600
                          Minneapolis, Minnesota  55402


              **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
        Official Court Reporter - United States District Court
        Warren E. Burger Federal Building & U.S. Courthouse
              316 North Robert Street - Suite 146
                   St. Paul, Minnesota  55101
                          651.848.1224

1        (8:25 a.m.)

2              **P R O C E E D I N G S**

3              **IN OPEN COURT**

4        (Without the jury)

5              THE COURT:  Good morning, everyone.  Please be

6        seated.

7              I'm assuming you both had an opportunity to review

8        each other's briefs.  Let me give each of you a short

9        opportunity, if you'd like to take advantage of it, to get

10       anything on the record this morning on this issue that you'd

11       like to.  Mr. Kaster.

12            MR. LUCAS KASTER:  Thank you, Your Honor.  We

13       filed a response -- or an additional brief with respect to

14       the motion in limine to exclude prior discipline.  As I

15       stated in our brief, we don't have an objection to

16       introducing the 2015 discipline concerning the fact that it

17       occurred while Mr. Jones and Ms. Hoppenrath -- at least

18       Mr. Jones -- was Plaintiff's division engineer.  He was

19       offered -- Mr. Sanders was offered a waiver at that time.

20            And so we don't have an objection to introducing

21       that evidence *per se*, but we don't believe the 2012

22       discipline, because it occurred well before Mr. Jones or

23       Ms. Hoppenrath were even within the district, and so they

24       were nowhere near Mr. Sanders or his supervisors at that

25       time, and so that discipline does nothing to negate an

1    inference of retaliatory motive on the part of two of the

2    key decisionmakers.  We think that evidence would be

3    prejudicial, as well as the additional evidence Defendant

4    has sought to introduce related to those prior disciplines,

5    the witnesses to speak about it at the investigative

6    hearings, the transcripts, and so we're asking the Court to

7    exclude that 2012 discipline for that reason.

8              I will alert the Court that I do have a copy -- I

9    brought a copy of Plaintiff Exhibit 156, which is the copy

10   that we had put up on the screen that has Mr. Sanders' prior

11   discipline redacted.  We had produced that or given that to

12   defense counsel before the trial started.  I have a copy for

13   the Court.  That's what we would ask to introduce, and I

14   would specifically ask that the entire discipline section be

15   redacted, and so the jury doesn't see that that section

16   relates in any way to discipline, but they see the charge

17   letter and the waiver form from the 2015 cell phone.  I

18   think the charge actually occurred in 2014, the waiver

19   occurred in 2015.  So they would see that evidence, but I

20   think without on this exhibit, Plaintiff 156, unless we

21   redact the whole thing, the jury is led to believe that

22   there's other information behind that redaction related to

23   discipline history that they don't see and they'll be left

24   to guess about.  And so we would ask that that section be

25   entirely redacted but the jury can see that evidence related

1    to the 2014 and '15 incident.

2                THE COURT:  How far do you want to go with 2012?

3                MS. DONESKY:  Well, Your Honor, we think both

4    disciplinary events need to come in for multiple reasons,

5    but the fact of the 2012 discipline is -- not far to answer

6    your question directly.  There isn't a lot of questioning

7    that needs to happen other than the fact that it had -- it

8    did occur.  He was disciplined for whatever violation it is.

9    The document goes up as an exhibit.  It establishes it.  But

10   it absolutely has to come in, Your Honor, and now we have

11   cherry-picking by the plaintiff by picking and choosing

12   which prior discipline they --

13               THE COURT:  No, I get it.  Don't snatch the defeat

14   from the jaws of victory here.

15               MS. DONESKY:  Okay.

16               THE COURT:  Let me just ask, 2012, what does

17   concern me is this suggestion that Mr. Kaster's made that

18   you might be looking to admit additional administrative

19   proceedings, the transcripts, witnesses who will testify,

20   I'm getting the sense at some length.  Give me a sense of

21   that.

22               MS. DONESKY:  We don't, Your Honor.  We would

23   envision during the cross of Mr. Sanders introducing his two

24   disciplinary events.  There's the waiver he signed for each.

25   It would establish that he had prior discipline, it was for

1    whatever event it is, and whatever the discipline was that

2    he accepted.

3              And the 2012 would be directly relevant to the

4    fact that there was testimony earlier this week of his prior

5    supervisors and how there was lack of any criticisms, lack

6    of any negativity.  I mean, this would directly go to that,

7    in addition to all the other reasons that we've stated.

8              THE COURT:  What exhibits are you suggesting

9    introducing with respect to the 2012 discipline?

10             MS. DONESKY:  I believe it is either a notice of

11   investigation -- two documents, I believe.  Notice of

12   investigation, and I believe he signed a waiver on the 2012

13   as well and did not go to hearing, if I recall correctly.

14   I'm doing this by memory.  Sorry.

15             THE COURT:  Do you know what exhibit numbers they

16   are for your exhibits?

17             MS. DONESKY:  Yes.  They would be -- so there's

18   actually two events in 2012.  There's the October 2nd

19   investigation notice, which would be one page.  There would

20   be the waiver signed accepting the suspension in connection

21   with that.  So those are two -- it would be three pages, two

22   exhibits, 11 and 12.  And then there's a failure to be alert

23   and attentive on the train, Exhibit 13, with -- it did go to

24   hearing, that's Exhibit 14.  But aside from showing that

25   there was the process under the Collective Bargaining

1   Agreement that followed the normal course under the

2   Collective Bargaining Agreement, that's 14; and then 15

3   establishes what the discipline was following that hearing.

4   So 13, 14 and 15 go to that second 2012 disciplinary event.

5        (Pause)

6        THE COURT:  All right.  Let me just get the

7   exhibit piece out of the way, and then I'll back up and

8   dictate a ruling on the rest of the -- so the rationale for

9   my decision gets into the record here and you all have

10  something to quarrel with if you think that's appropriate.

11       I'll allow 11, 12, 13 and 15.  I will not allow

12  14.  Fourteen seems too voluminous and unnecessary to prove

13  the point.  I will allow, to that extent then, evidence of

14  Mr. Sanders' 2012 discipline in addition to 2015.

15       So my prior order on this issue balanced the

16  relevance of evidence regarding Mr. Sanders' past discipline

17  against its potential for prejudice.  I found that the

18  evidence was of modest relevance in light of how I

19  understood Plaintiff intended to present his case, but held

20  real potential for prejudice as explained in the order.

21       I also mentioned that Plaintiff could open the

22  door to this evidence as admission by, for example,

23  presenting Mr. Sanders as a model employee.  These are

24  strategic decisions that are made on the fly during trial.

25  I understand that.

1          Here I find that the evidence presented warrants

2     reconsideration of that decision, an admission of the

3     evidence as we've just discussed regarding Mr. Sanders' past

4     discipline.  I do think it's fair to say that Mr. Sanders

5     has been presented as a model employee.  I think it might be

6     different if Mr. Jones had just volunteered that information

7     without you ever asking about it, I get that, but I think

8     it's gone past that.  He was asked at some length and

9     several times about that issue.  Mr. Sanders' two co-workers

10    who testified yesterday, Mr. Heyer and Mr. Scherbing, said

11    the same thing in response to Plaintiff's questioning.

12          I think this alone is sufficient reason to

13    reconsider and grant BNSF's motion to admit this evidence to

14    the extent that I've already mentioned.  I think the waiver

15    issue is a separate reason and adds to the justification for

16    this decision.  I guess I'm also persuaded at this point,

17    based on the evidence admitted thus far, that this evidence

18    may be relevant to the jury's determination of whether the

19    comparators Mr. Sanders has identified are like him in all

20    material respects.

21          That is a question of fact for the jury, isn't it?

22          MR. LUCAS KASTER:  I believe it is, Your Honor.

23          THE COURT:  Yeah.

24          MS. DONESKY:  At this juncture.

25          THE COURT:  Okay.  So for those reasons I'll grant

1    BNSF's motion seeking the admission of Mr. Sanders' past

2    discipline to the extent that I've described.

3              All right.  Any questions -- any further questions

4    about that, Mr. Kaster?

5              MR. LUCAS KASTER:  No.  I had one other issue I

6    just wanted to address with the Court, but no other

7    questions on that issue.

8              THE COURT:  Okay.  Ms. Donesky, anything further?

9              MS. DONESKY:  Nothing further at this time.

10             THE COURT:  Okay.  Yes.

11             MR. LUCAS KASTER:  The only other issue I wanted

12   to address with the Court was with respect to, I think, what

13   ended up being the stipulated pretrial motion regarding

14   front wages and that we weren't going to present any

15   evidence regarding economic damages going forward, we don't

16   intend to do that at this point, but we did want to ask and

17   intended to ask Mr. Sanders how long he intended to work for

18   BNSF and how long he intends to work generally through

19   retirement.  We believe that issue is relevant to emotional

20   distress, but that would be the extent of the testimony.

21   We're not introducing economic evidence or anything to that

22   effect.

23             THE COURT:  How is it relevant to emotional

24   distress?

25             MR. LUCAS KASTER:  Because it evidences what his

1    emotional distress was after he lost his job, that he

2    intended to stay there for his entire career.

3                THE COURT:  I'm not seeing a connection right away

4    here, but let me invite BNSF to address that question.

5                MS. FERGUSON:  I don't think it has any

6    relationship.  The evidence will be that the emotional

7    distress has not prevented him from working.  He's been

8    working full time for years.  There's not even a single

9    medical record with a diagnosis of anxiety or depression

10   related to this.  That's why we thought the medical records

11   were important because they're completely absent.  So to

12   allow him to offer this information about planning to work

13   until retirement but for the anxiety and depression and

14   emotional distress simply is -- there's no evidence of that.

15               MR. LUCAS KASTER:  Your Honor, I expect Defendant

16   to go into in great detail Plaintiff's medical status, his

17   employment after to the extent allowed by the Court, his

18   employment post-BNSF.  And his emotional distress does not

19   stop the minute he leaves BNSF.  It continues forward.  And

20   that decision as to how far it goes is one for the jury to

21   consider.  And the fact that he would have remained employed

22   at BNSF, to the extent he says how long he would or intended

23   to stay, is relevant evidence to emotional distress.

24               This idea that his emotional distress or the

25   evidence related to his emotional distress stops the moment

1   he leaves BNSF is wrong and unsupported by the law.  His

2   emotional distress continues.  The jury should be able to

3   consider that issue.

4           THE COURT:  Okay.  So I'm going to tell you what

5   I'm going to do and give you sort of a sense of reaction to

6   this issue so that you know how relatively little, I'm

7   afraid, I probably understand about it.  I'll hold off

8   ruling on this until we deal with the issue in realtime.

9           But let me just say up front, I don't think the

10  question on emotional distress is how long you continued to

11  work.  I think the question is:  Tell me about your

12  emotional distress, right?  And then it's:  How has that

13  impacted your life?  I don't see how a previous plan bears

14  on that question as much as the prior question:  Tell me how

15  that emotional distress you contend has affected your life.

16  And if the answer to that question is:  Well, I intended to

17  continue -- it's impacted, it's inhibited my ability to work

18  on some level, then I think you can talk about that.  But I

19  don't think starting with -- if you get my drift, I don't

20  think with starting with how long did you intend to work is

21  appropriate.  Does that make sense?

22          MR. LUCAS KASTER:  I understand what the Court is

23  saying.  I mean, I think the evidence is relevant either way

24  it comes out because we're talking about it in the context

25  of his emotional distress testimony.  And so the manner in

1    which it comes out I think doesn't impact whether the

2    evidence itself is relevant.

3              THE COURT:  Yeah, okay.  I understand the point.

4              MR. JAMES KASTER:  Can I just ask a question about

5    this procedurally?

6              The Court will be deciding the front pay, so I'm

7    wondering if the Court wants to have testimony from

8    Mr. Sanders on his intent outside of the presence of the

9    jury as it relates to front pay or not.

10             THE COURT:  I don't know.

11             MR. JAMES KASTER:  All right.  Well, it's a

12   question -- I've seen it done both ways.  The Court may

13   decide that the evidence that is of record at the time

14   Mr. Sanders is done testifying is sufficient for the Court

15   to make that decision.  The Court may decide that you want

16   some additional questions from Mr. Sanders outside of the

17   presence of the jury.

18             We are appreciative of the fact that the Court

19   will be making this factfinding regarding front pay, so the

20   Court may have additional questions for Mr. Sanders or want

21   us to put on additional testimony outside the presence of

22   the jury.

23             THE COURT:  All right.  I'll deal with the issue

24   in realtime.  You expect that to come up today, I assume.

25             MR. LUCAS KASTER:  Yes.

1          THE COURT:  Let me ask this:  Where are we at on

2     time?  How do you think you're doing?

3          MR. LUCAS KASTER:  I think we -- I expect that we

4     have Mr. Sanders.  We have two or three other witnesses who

5     will be fairly short today.  We think we should hopefully,

6     depending on how long Mr. Sanders goes, finish those

7     witnesses by the end of the day.  And then we have our

8     economic expert who is flying in today who we intended to

9     call tomorrow.  And then outside of that, we don't have any

10     other witnesses other than Ms. Hoppenrath, who I believe is

11     coming on Friday.  And then the two witnesses in Defendant's

12     case.

13          THE COURT:  All right.  So my thinking here is

14     that we would work a full day today, give -- I think it's

15     Ms. Trevino -- Esposito, I'm sorry, Esposito -- an

16     opportunity to attend her closing on Thursday morning.  So

17     start at 1 o'clock on Thursday, perhaps 12:30, work through

18     at least 5:00, maybe a little later depending on where we're

19     at and then perhaps start Friday at 9:00 or 10:00 again,

20     depending on when Ms. Esposito is able to arrive.  It sounds

21     like she's moved that to 7:00 a.m., so we should be able to,

22     in theory, start at 9:00, but she is coming from a ways

23     away.  I'm not sure where the closing is at, but her

24     residence is far enough away where it does take her a bit of

25     time to get here, and then otherwise work a full day Friday.

```
1                 Does all of that make sense?

2                 MR. LUCAS KASTER:  Yes, Your Honor.

3                 MS. DONESKY:  It does, Your Honor.  That works

4      well.

5                 MS. FERGUSON:  Will you have anyone else on

6      Friday?  We're just trying to determine if we need someone

7      else.

8                 MR. JAMES KASTER:  I think you probably do, yeah.

9      We won't unless you have the two witnesses that we want to

10     examine.  We don't have anybody else in our case.

11                MS. DONESKY:  Those are the two coming from out of

12     town, so they're going to be here --

13                THE COURT:  This can be off the record.

14                (Discussion off the record among Court and counsel

15     in reference to scheduling; recess taken at 8:52 a.m.)

16                     *     *     *     *

17        (9:05 a.m.)

18                        IN OPEN COURT

19        (Jury enters)

20                THE COURT:  Thanks, everyone.  Please be seated.

21                Mr. Kaster?

22                MR. LUCAS KASTER:  Thank you, Your Honor.

23                     (Witness resumes the stand)

24                THE COURT:  Mr. Sanders, just a reminder you're

25     still under oath.
```

1      THE WITNESS:  Thank you, Your Honor.

2      THE COURT:  Thank you.

3                    **(DONALD SANDERS)**

4             **CONTINUED DIRECT EXAMINATION**

5   BY MR. LUCAS KASTER (contined):

6   Q.  All right.  Mr. Sanders, I want to kind of pick up right

7   off -- or where we left off yesterday afternoon.

8             We were talking about your hours and your income

9   in Dayton's Bluff while you were a track inspector.  Can you

10  explain to us why your income and your hours went up during

11  that period of time.

12  A.  Well, it was a lack of staff, and then the territory was

13  very worn down and beat up and there was a lot of things

14  that I was required to do as far as what my roadmasters and

15  DE were asking me to perform beyond my yard inspections.

16  Q.  And what are some of the examples of the things that you

17  were required to do beyond the yard inspections?

18  A.  Simply remove snow is one.  If one of the trainmen could

19  not throw switch, we're required to come in at all hours of

20  the day, whether it's 7 o'clock at night right after I get

21  home, or 2:00 in the morning they would call and I would

22  have to go shovel the switch and remove snow.

23            As we alluded yesterday, there was phone calls for

24  any people that may have hit the tracks; hit bridges that

25  belonged to the tracks with large trucks; bodily harm that

1   happened to certain people; broken rails; weather was a big

2   factor.  If there was tornadoes or heavy storms throughout

3   the day.

4        I was requested to perform multiple duties for

5   contractors.  Beyond that, also requested to do foreman jobs

6   as far as if someone was sick or didn't show up for the day,

7   I was required to play a foreman role for a gang that didn't

8   have supervision.  And then I would have to do my details

9   after them jobs were over.

10  Q.  And you heard Mr. Jones talk about yesterday, and

11  potentially the day before, there were times also when you

12  were doing the mainline inspections as well.

13  A.  Correct.  That would be one of the duties that they

14  directed me to do.

15  Q.  And did the mainline inspections take more time than the

16  yard inspections?

17  A.  They were more frequent.  There was not -- the frequency

18  was not as much, obviously, because of the speeds that were

19  allowed out in the -- I'm drawing a blank on exactly why,

20  but they're potentially more susceptible to derailments and

21  more damage.

22  Q.  So the speed the trains could travel was higher on the

23  mainline tracks versus the yards?

24  A.  Correct.

25  Q.  Do you remember what the speed limit generally was in

1     the yards?

2     A.  Most yards are ten miles per hour.  There are some

3     tracks that adjoin -- not adjoin, but they connect to

4     mainline tracks so they are allowed to pick up more speed on

5     those tracks.  And then in Minneapolis we have a -- they had

6     a hump tower, which is very similar to if you were to go

7     tobogganing or sledding.  It's a large hill and they would

8     push a car, and then the car would pick up speed.  No matter

9     whatever speed the car picked up, that would roll through

10    that yard.  And I believe they were, like, 25 miles an hour,

11    roughly, that they had on them track speeds.

12    Q.  And when you're doing inspections in the yard, do you

13    enter slow orders for defects?

14    A.  No, not in the yard.  As -- the only thing I would do in

15    the yard was talk to the hump tower or the yardmaster about

16    that hump section, whereas if there was a certain track we

17    would come up with a plan to, say, take that track and have

18    them use it for something else while we were deciding on how

19    to get it fixed.

20    Q.  And in 2015, why were you also doing the inspections on

21    the mainline?

22    A.  I was the only track inspector out of three positions.

23    Q.  Were your bosses asking you to do those inspections?

24    A.  I was asked.  I like to say I was more required to do

25    it, but I was asked, yes.

1    Q.  And we heard that your managers, the roadmaster in

2    Dayton's Bluff in 2015 was Ms. Hoppenrath, right?

3    A.  Correct, it was Hoppenrath.

4    Q.  And then the division engineer, so Ms. Hoppenrath's

5    boss, was Mr. Jones, right?

6    A.  Yes, that's correct.

7    Q.  And we talked a little bit yesterday about your schedule

8    as a track inspector in Dayton's Bluff, and I believe you

9    said that you, when you came there, you ** took over

10   someone's schedule as the 4/10s, is that right?

11   A.  That's correct.  I was working 4/10s.

12   Q.  If we can bring up summary Exhibit 21, the highlighted

13   version, please?  If we could just blow up the top half of

14   this exhibit as an example.

15        Mr. Sanders, this is your time entries from May

16   2015 to the end of your employment.  And you heard Mr. Jones

17   talk about yesterday how pay code 1 is your regularly

18   scheduled hours.  Do you recall that?

19   A.  Yes.

20   Q.  And we see in the yellow highlights that for number 1

21   your time entered for your regularly scheduled hours

22   throughout this exhibit is ten hours, right?

23   A.  That is correct.

24   Q.  And we can look at the bottom of the page.  Same thing

25   there, right?

1    A.  Yes.

2    Q.  And then if we could go to the next highlighted page and

3    blow up the section in yellow.  Thank you.

4          So this then shows time entries in November and

5    December of 2015, and again, your 1 entries are for ten

6    hours.  Do you see that?

7    A.  Yes, I do.

8    Q.  At one point were you told to change that work schedule?

9    A.  Yes, I was told I needed to be at work 5/8s, not 4/10s.

10   Q.  Who told you that?

11   A.  Blaine Hoppenrath.

12   Q.  Prior to Ms. Hoppenrath telling you that, had anybody

13   raised an issue about your time entry for 4/10s?

14   A.  No.

15   Q.  And did you comply with Ms. Hoppenrath's request?

16   A.  Yes.

17   Q.  If we can come out of this exhibit and show the green

18   highlighted sections.

19          On December 21st, you have an entry under "1" for

20   eight hours.  Do you see that?

21   A.  Yes.

22   Q.  Do you recall if that's approximately around the time

23   when Ms. Hoppenrath indicated to you that you needed to

24   change your schedule?

25   A.  I believe that's correct.

```
 1     Q.  And then if we can show the next page, please.  And just

 2     blow up the green section.

 3              These are all entries then through the next couple

 4     months, and under "1" you have the eight hours entered.  Do

 5     you see that?

 6     A.  Yes.

 7     Q.  You also heard yesterday --

 8              MR. LUCAS KASTER:  And we can take this exhibit

 9     down now.  Thank you, Karla.

10     Q.  Mr. Jones testified when I was asking him questions

11     about the cell phone policy, and Mr. Jones contended that

12     that cell phone policy that we looked at didn't apply to

13     managers or exempt people.  Do you recall that testimony?

14     A.  Yes, I do.

15     Q.  And what did you think when you heard that testimony

16     from Mr. Jones?

17     A.  I personally believe it's false.

18     Q.  And why do you believe that?

19     A.  I've never seen a rule book for management versus hourly

20     personnel.

21     Q.  Have you ever been told that those rules don't apply to

22     management?

23     A.  No, sir.

24     Q.  And, in fact, you had been previously, during your

25     employment with BNSF, disciplined for cell phone use, right?
```

```
 1    A.  Yes.

 2    Q.  Explain kind of briefly what happened in that incident.

 3    A.  I was dropping my vehicle off to be repaired at Bona

 4    Brothers.  I was at a stoplight and I was waiting for

 5    Mr. Michael Heyer to get back to me so he knew where I was

 6    to be picked up.  And my phone rang as I was in the vehicle.

 7    I picked it up to see if it was Michael Heyer, looked at it,

 8    and set it back down as my camera was going off.

 9    Q.  What do you mean the camera was going off?

10    A.  In the vehicles we're monitored by a camera situation.

11    Basically, it shows the inside of the truck to see --

12    essentially, I would guess, if there was an accident or

13    something, if we did something wrong during the accident.

14    So it shows a few seconds prior, maybe 12, 15 seconds prior

15    to what happened, outside of the vehicle and inside of the

16    vehicle.

17    Q.  And so when you're saying the camera went off, what

18    happened with the camera?

19    A.  Nothing happens to the camera.  A light just flashes and

20    you know you're being recorded.

21    Q.  So somebody presumably must be watching on the other

22    side of that camera?

23    A.  I think it's a recorded-type thing.  I don't know that

24    it's live, and I don't know that they have access to watch

25    you all the time.
```

1    Q.  And did you accept responsibility for that incident?

2    A.  Yes, because I had touched my phone.

3    Q.  Did you at some point during your employment also raise

4    concerns about managers using their phones in an unsafe way?

5    A.  Yes.

6    Q.  How so?  Can you explain?

7    A.  I was riding with one roadmaster and he was playing a

8    game called Candy Crush while we were on the tracks, and I

9    asked him not to do that while we were in the truck, and he

10   said that he was a roadmaster and he can do what he wanted.

11   Q.  You also were in the investigative hearing where it was

12   shown that Ms. Hoppenrath was on her phone posting on

13   Instagram?

14   A.  Yes.  I did not confront her about that.  I just brought

15   that to attention at my hearing.

16   Q.  Was anything done with respect to Ms. Hoppenrath's use

17   of her phone, as far as you know?

18   A.  I have no idea.

19   Q.  Outside of the cell phone issue, did you have any other

20   prior discipline from before that?

21   A.  Yes.

22   Q.  Explain that, if you would, kind of briefly.

23   A.  Okay.  I had started early one morning in Coon Rapids.

24   I had jumped on the Northstar commuter train because as a

25   track inspector you're supposed to ride a train often over

1    your territory.  I got to Northtown Yard.  My roadmaster at

2    that time was Dale Johnson.  He informed me that the service

3    crew foreman was a no-show at work and that I was to

4    supervise and take the service crew out on the track.

5            At that point I waited for the gentlemen, the two

6    machine operators, to come and pick me up.  I don't recall

7    their names off the top of my head.  One was driving and one

8    was in the passenger seat.  I got into the truck in the --

9    it would be the right side, so the passenger side rear of

10   the truck.  It was a four-door truck, so I was actually on

11   my own door to get in and out.

12           We proceeded to go through Northtown Yard, which

13   is -- it's the largest yard that we have around here.  It's

14   our hump facility.  There was maybe -- I don't know how many

15   tracks we had to cross.  I'm thinking we crossed six tracks.

16   I'm not completely sure.  In the yard (indicating) there's,

17   like I said, a lot of tracks; so each track would possibly

18   have trains on it and we were driving across the tracks and

19   you're unable to see any trains that might be coming due to

20   the other trains blocking your vision.  So you drive at a

21   slow pace.

22           And as we approached the last crossing, I heard a

23   train whistle blow.  I turned to my right.  At that time I

24   was struck in the passenger door where I was sitting by the

25   train and pushed about a football field down the tracks.

```
1    Actually, when it first happened, I heard the train.  I
2    looked and I yelled to the guy, "Punch it," and he floored
3    the truck, but at the same time we were pinned against the
4    front of the train and pushed down the tracks.
5            The truck felt like it was gonna roll like a pop
6    can and get crushed, and we came to a stop and there was a
7    lot of smoke.  I had to tell the driver to get his foot off
8    the gas because he was in panic mode.  His hands were
9    gripped tight and the throttle was pinned.  And the
10   passenger said he couldn't move, but he was just -- he was
11   not injured.  He just was in a panic state and didn't know
12   his seatbelt was on so he couldn't move.  So I took his
13   seatbelt off and got out of the vehicle.
14           And I was disciplined for --
15           MS. FERGUSON:  Go ahead.  I was just going to
16   object to the extended narrative.
17           THE COURT:  It's all right.  I'll allow it.
18   A.  I was taken out of service for 30 days for not being
19   alert and attentive, so I was punished for being in the back
20   seat.
21   BY MR. LUCAS KASTER:
22   Q.  Any other discipline -- let me back up.
23           This incident with the train accident, do you
24   recall what year that potentially happened?
25   A.  Between 2010 and '12.  I'm not a hundred percent sure.
```

1    Q.  And then outside of this train incident and the cell

2    phone issue, was there any other discipline that you can

3    recall?

4    A.  Yes.  I was a track inspector.  At this time I had

5    worked my day shift.  I was required to come in and work

6    nights for a grinding train.  A grinding train is

7    essentially what it sounds like.  It is a very large train.

8    It sits on the tracks and it has a bunch of grinding wheels

9    (indicating) that go on top of the rails.  So it grinds the

10   rail to remove imperfections.

11           There's a portion of track that is in Minneapolis

12   off of like Broadway and 65.  It's called the "Y" tracks.

13   So three different sections of track come in together and

14   they kind of look like a Y.  The dispatcher had been pushing

15   some authorities, and I cleared an authority after briefing

16   with the gentleman that I was with, and I cleared the

17   authority because it was included in what we were sitting on

18   and I made a mistake and we were out of our limits.  I

19   cleared the track underneath myself.

20   Q.  And did you accept the responsibility for that incident

21   as well?

22   A.  Yes, I did.

23   Q.  Do you recall timing-wise when that occurred,

24   approximately?

25   A.  No, sir.

1    Q.  I want to go back to 2015 now, and we were talking about

2    how much time you were spending working in Dayton's Bluff

3    and we heard some of the phone calls between you and

4    Mr. Jones yesterday.

5    A.  Yes.

6    Q.  Explain to us what that situation was like for you,

7    those interactions with Mr. Jones.

8    A.  Well, as Mr. Jones alluded yesterday, when he first came

9    to the territory I was very open with him.  We got along

10   extensively well, I believe.  Like he said, we talked about

11   our families.  I have four kids.  He has a couple of girls.

12           He walked into a territory just as I did that was

13   under distress and had been neglected, so we worked pretty

14   closely hand-in-hand to get them things done.  It was -- at

15   some point during my stint with Michael Heyer where I

16   decided to keep a lot more track notes, not necessarily

17   track notes in general, but track notes along with what I

18   was being told to do.

19   Q.  And when these phone calls occur, explain to me -- you

20   know, we heard some of the language what Mr. Jones was

21   telling you.  What was your thoughts at that time?

22   A.  I started to lose respect for the gentleman.  I -- I

23   could feel his pressure and I understand his job is a lot

24   different than mine.  My job, my sole job, was -- I took a

25   lot of pride just as he did in his job.  Obviously he has a

1    lot of pride in his job.  I believe the difference between

2    me and Keith is, my job, I take pride in safety and keeping

3    things safe.  He takes his pride as far as the way things

4    look on paper.

5    Q.  And we heard questioning from Mr. Jones where he said he

6    wasn't intending to ask you to not report defects or not

7    report slow orders.  What did you believe Mr. Jones was

8    asking you to do?

9    A.  Well, I was asked not to report defects or put up slow

10   orders.

11   Q.  And why do you think that that was what Mr. Jones was

12   asking you to do?

13   A.  Some of the times there were locations where they

14   couldn't afford to have a slow order because it would impede

15   the movement of the trains and a lot of them were just

16   really hard locations to get work done without large

17   windows, such as there's a tunnel in St. Paul that was

18   always flooded and muddy and it needed a lot of work.

19   Q.  For example, when Mr. Jones referenced that he was

20   potentially going to lose his job, what did you interpret

21   him to be telling you?

22   A.  Exactly what he was saying, that he was being

23   scrutinized by his upper management and that they were

24   essentially threatening him for not being able to get his

25   territory under control.

1   Q.  Did you believe Mr. Jones was telling you not to report

2   defects?

3   A.  He was asking me to conform to the way that he wanted to

4   get things done so that he would look good and not be able

5   to be scrutinized.  So yes, in partial there were some

6   points where he did not want me to report or put slow

7   orders.

8   Q.  Did you think that Mr. Jones was asking you to break FRA

9   rules and regulations?

10   A.  That's absolutely what he was doing.

11   Q.  What about slow orders?  Do you think Mr. Jones was

12   trying to get you not to enter slow orders that were

13   required?

14   A.  I think that at many times he tried to talk me down to

15   minimize things to make me conform to what he would want the

16   track to be running at.

17   Q.  And why were you entering the slow orders or entering

18   defects?

19   A.  I was required to.

20   Q.  By what?

21   A.  By BNSF and the FRA.

22   Q.  Now, we heard a recording yesterday between you and

23   Mr. Jones where you were asking him for something in writing

24   to work -- that you were being asked to work the mainline

25   tracks.  Why were you asking for something in writing?

```
 1    A.  Because our relationship at that time was not -- not --

 2    I don't want to say healthy, but it was unstable and I did

 3    not feel that I had the respect and -- not necessarily

 4    respect, but I felt like at any point that I was going to be

 5    thrown under the bus and I wanted to have something in

 6    writing to save myself so I was not responsible for the

 7    situation that I was force-assigned to do.

 8    Q.  Did you ever get something in writing that you were

 9    being assigned to do mainlines?

10    A.  No.

11    Q.  We also heard a section of a recording about you

12    contacting the FRA.  Do you recall hearing that yesterday?

13    A.  Yes.

14    Q.  And explain to us why you contacted the FRA and what

15    happened in that situation.

16    A.  Okay.  Well, like I stated before, I barely knew

17    anything about tracks when I first started on the railroad.

18    One of the instrumental people in teaching me about track

19    inspections and the ways to keep the railroad and the public

20    safe was the FRA.  His name was Chad Broski (ph).  He was

21    very constitutional in everything.

22            So as far as that relationship began, I felt like

23    me and the FRA were on the same page as far as we wanted to

24    make sure that things were safe.  And I communicated with

25    every FRA that ever came through the territory and the
```

1    Minnesota inspectors as far as what would institute a

2    defect, not where the defect was or anything like that.

3    Just help to get clarification on what needed to be done or

4    what was in fact a defect, if it was or was not.

5    Q.  And what was the result after you talked to the FRA?

6    A.  They said they had no bearing over that situation.  I

7    believe you're talking about the wrap bar.

8    Q.  So was Mr. Jones right in that instance?

9    A.  So we're talking about a direct order from his boss.

10   His boss gave him a direct order and they gave us a direct

11   order.  So essentially it wasn't right because his boss gave

12   him a direct order, but then I agreed with Keith because

13   Keith is my boss.

14             So yes, Keith was essentially correct.

15   Q.  And were you just trying to ensure that you were

16   following the FRA regulations?

17   A.  I was confused.  That's why I talked to the FRA, because

18   I was misunderstanding the information I was given by Doug

19   Jensen and Keith, and I wanted some clarification.

20   Q.  And you alluded to the fact that you had worked and

21   talked with the FRA many times before that.

22   A.  Yes.  Probably, I don't know, maybe three, four years

23   before Keith even showed up.

24   Q.  And we heard yesterday that at some point in early

25   December of 2015 you end up meeting with Magenta Eggertson

1   from HR.  Do you recall that?

2   A.  Yes, I had a meeting with her.

3   Q.  And why did you make that decision to go to HR?

4   A.  At that time I felt like things were hostile towards me,

5   and I wanted to control the situation because I felt like my

6   judgment on the railroad tracks and my actions, as far as me

7   keeping myself safe and the public, were being interrupted

8   by me being verbally harassed and told to do things that

9   were not right.

10  Q.  And during that meeting with Ms. Eggertson, did you play

11  some recordings that you had taken?

12  A.  Yes.

13  Q.  By the way, on these recordings, why did you record

14  those conversations with Mr. Jones?

15  A.  As I stated earlier, after the short period when things

16  were kind of starting to the point where me and Mike were

17  told not to report certain things and I had been writing

18  them down, things that started getting a little more verbal,

19  so I went to Walgreen's and purchased a voice recorder to

20  have more detailed versus just me writing it down

21  information about what I was being told.

22  Q.  I'd like to go to Exhibit 43, please.  If we can blow up

23  that bottom email again, please.

24          Now, Mr. Sanders, we looked at this email

25  yesterday with Mr. Jones.  And this is the email on

1    December 7th, the same day that you go to HR to talk to

2    Ms. Eggertson where he's asking you to get your yard tracks

3    up to date.

4            Do you see that?

5    A.  Yes.

6    Q.  And then if we can pull up Exhibit 41 and blow up the

7    bottom email.

8            And then this is that email that we also talked to

9    Mr. Jones about where the next day he's asking you about

10   mainline inspections.

11           What was your thought process when you got these

12   emails in back-to-back days right after you went to HR?

13   A.  I felt like they were insinuating that I was not doing

14   my job.  At this point I had already asked for a written

15   letter to not do the yard tracks, and then after I spoke

16   with them they came right at me and said, "Why are your yard

17   tracks not done?"

18   Q.  By the way, after you met with Ms. Eggertson on the 7th,

19   did you have any follow-up conversations with her or provide

20   more details, or did she ask for more details about what

21   happened?

22   A.  The only information she took is when I let her listen

23   to a couple of the recordings.  She never asked for any

24   more, and we didn't sit in an office.  She came to the shack

25   and I literally sat in her passenger seat and gave her a

1    couple of little incidences.  Nothing else.

2    Q.  Did she ever reach back out to you for more information?

3    A.  No.

4    Q.  Then if we could go to Exhibit 50, please.

5              THE COURT:  Mr. Kaster, maybe it would help if you

6    moved those microphones just a little bit out there, yeah.

7              MR. LUCAS KASTER:  Thank you, Your Honor.

8    BY MR. LUCAS KASTER:

9    Q.  Mr. Sanders, we haven't seen this letter before, but

10   this is a letter dated December 23rd, 2015, addressed to

11   you, and it's with respect to your HR investigation and

12   titled a "Notification of Completion of the Investigation

13   and Findings."  Do you see that at the top in bold?

14   A.  Yes.

15   Q.  And if we could blow up the second full paragraph.

16             And it says:

17             "BNSF's investigation reveals some evidence to

18   indicate Division Engineer Keith Jones's communication with

19   you on November 23, 2015 to December 3rd, 2015 was not

20   aligned with BNSF's leadership model and applicable company

21   policies."

22             And then going down one sentence it says:

23             "BNSF's investigation does not substantiate your

24   allegation that the Division Engineer and Roadmaster Blaine

25   Hoppenrath are mistreating and singling you out.  There is

1    no evidence to indicate local management evaluates your work

2    performance differently or more harshly than other

3    employees."

4              What was your thought when you got this letter?

5    A.  I was disappointed.  I felt like they didn't even want

6    to take the time to actually talk to me or go through the

7    situation.

8    Q.  Did you feel as though your complaint was taken

9    seriously?

10   A.  No.

11   Q.  Now if we can blow up the next paragraph, there's a

12   sentence three lines down that starts with "Moreover."  Do

13   you see that, Mr. Sanders?

14   A.  Yes.

15   Q.  It reads:

16             "Moreover, BNSF fosters a true speak-up

17   organizational culture that is the basis of a

18   prevention-oriented program that encourages raising and fair

19   resolution of issues.  All BNSF employees are encouraged to

20   report safety concerns and questions internally and

21   externally without reprisal."

22             Do you believe that that's true, that BNSF fosters

23   a true speak-up culture?

24   A.  No.

25   Q.  Why do you say that?

1    A.  Because I spoke up multiple times.

2    Q.  Then if we can go to the next page of this exhibit,

3    please, and if we could blow up the top paragraph.

4            Then the letter says:

5            "During a Human Resources factfinding

6    investigation, you shared multiple voice recordings of

7    conversations between yourself and Mr. Jones and

8    Ms. Hoppenrath.  Although state law does not prohibit

9    recording conversations without informing the other party,

10   you must comply with the maintenance of way operating Rule

11   1.10, Games, Reading or Electronic Devices."

12           Is that the rule that we were looking at yesterday

13   providing use of electronic phones?

14   A.  Yes.

15   Q.  "It is important to understand recording conversations

16   with employees, including management, does not foster trust

17   and may negatively impact relationships.  Please focus your

18   efforts on performing your duties in accordance with BNSF's

19   engineering and safety rules.  If you do, mutual trust will

20   develop."

21           Did you believe that trust existed between you and

22   Mr. Jones at that point?

23   A.  Not at that point, no.

24   Q.  What did you think when BNSF is writing a letter in

25   response to an HR investigation and telling you to stop

1    recording?

2    A.  It's pretty much exactly what I kind of alluded to

3    before, that it's another form of harassment, basically.

4    It's just them saying:  We didn't really do anything wrong

5    and that you're doing something wrong and you need to stop

6    this.

7    Q.  And after you go to HR, do things get better?

8    A.  No, they continue to get worse.

9    Q.  Explain that to us.

10   A.  I was -- they brought roadmasters in from other

11   territories to follow me daily and just constantly trying to

12   find me doing something wrong, whether it was my inspections

13   or anything.  You know, I was paranoid to step out of my

14   truck without my safety glasses.  We all make mistakes.  I

15   would have got wrote up for something as simple as that.  My

16   hard hat, my vest, spikes, which are just little rubber

17   things that go on your shoes, I was worried about.  Every

18   little mistake that a human could make.

19           So they followed me around for awhile.  At one

20   point I was told that I was working certain days, then I was

21   told not to work, even though it was my job, and my

22   roadmaster would do my job and send me home.  She would have

23   other maintenance way employees doing my job so that I

24   wasn't on the track, in the sense if I'm not on the track,

25   obviously I'm not going to locate a defect.  So that was

1    that situation.

2         I would be sent home at certain times of the day

3    depending on if I had wrote up, to her extent, too many

4    defects.  They would tell me to go home even though I was

5    obviously sent an email stating you need to get this stuff

6    done.  In the process you always most likely are going to

7    find a defect.  So I was sent home, even though they're

8    telling me to get the stuff done.

9         They switched my work location.  They switched my

10   hours.  At each one of those days when they did that was

11   after I had been yelled at for a defect.  I believe that

12   yesterday Matt Scherbing alluded to one of the situations

13   where I had been walking during the day with a couple of the

14   other roadmasters they had brought in from, say, Hinckley or

15   Superior to walk with me.  When they decided they wanted to

16   be done for the day, they left.  I continued working.

17        I was at Midway yard.  I had found a wide location

18   in a curve and I called the section and my roadmaster.  My

19   roadmaster then called Keith Jones.  I was there attempting

20   to help the guys get the Y gauge done.  Keith Jones and

21   Blaine came up to me, proceeded to say a few vulgar

22   things -- I don't remember the full detail -- about me,

23   about me being vindictive, and then told me that I was to go

24   home right then and not finish my day.  They told me to go

25   back to the shack and that they were going to have more

1    conversations with me.

2            So they followed me to Dayton's Bluff.  When I got

3    to Dayton's Bluff, Blaine informed me that I needed to park

4    the truck and that I was not taking the company truck

5    anymore, that I was not allowed to drive it.  And then I

6    asked how I was going to get home.  She then said it was my

7    responsibility.  But Ben Peterson was there, one of the

8    roadmasters that had been following me, and he offered to

9    give me a ride to my house that day, so that's how I got

10   home that day.

11           There was a day in between there where our PPE is

12   required by BNSF, and it's provided by BNSF.  I don't know

13   the full extent, whether I have to get it on my own time or

14   company time.  The usual practice was we always went to

15   Chet's Shoes, which is like a Red Wing dealer for boots.

16   All the guys go there.  I asked Blaine if I set off at Van

17   Buren, which is three miles from the boot place, if I could

18   run and get my PPE, and she told me absolutely not.  I was

19   not allowed to get my PPE on company time.  And I had at

20   that time explained to her that it's common practice and

21   all the other guys that are under her are getting their

22   boots also, and she just left it be that I was not allowed

23   to get mine at that time.

24           I was forced to work 24 hours in that period of

25   time that I'm talking about, somewhere in between

1    December and January.  I'm not exactly sure on the date.

2    There was -- when I was on the mainline and I had asked

3    Keith something in writing to not do the yard checks because

4    those were my responsibility, and I was told only to run

5    mainline.  When I finally did get back to the yard the

6    inspections were overdue, and I pulled tracks -- I pulled

7    the yard out of service.  I was informed by Blaine that I

8    would not be going home that day and I would be working

9    until it was done.  I believe we worked around 24 hours that

10   day.

11          She had Chartier come over and follow me through

12   the yard scrutinizing the way I did my inspections and

13   stuff.  I'd asked to call my union representative that day

14   because I felt like I was being harassed.  They told me

15   absolutely not while you're being paid by the company.  I

16   think maybe three or four different crews came to work all

17   night to help get the situation resolved.

18   Q.  Let me just ask you:  With all these things going on,

19   why did you believe that these things were happening?

20   A.  For doing my job the way it's supposed to be done and

21   for having a passion for doing it and making sure it's

22   properly done.

23   Q.  Were you surprised when these things happened after you

24   had gone to HR?

25   A.  No.

```
1    Q.  And why do you say that?

2    A.  I've seen firsthand some of the disrespect that if --

3    you can get as a track inspector.

4    Q.  Now, at some point did you end up filing another HR

5    complaint in April of 2016 with a Mr. Freshour?

6    A.  Yes.  So back to what I was just saying about me being

7    discriminated and harassed to conform to their situation.

8            I had went to Northtown.  We won't go into that

9    right now, but essentially I was fired for falsifying

10   payroll or payroll theft, as they said, while -- which I

11   believe was my last harassment because I was terminated at

12   that time.

13           So yes, at that time I had taken the hotline

14   number and called Dane.

15   Q.  Did you submit some documents to Mr. Freshour?

16   A.  I did.  I gave him a timeline.

17   Q.  If we could pull up Exhibit 99 first, please.

18   Mr. Sanders -- if we can blow up the summary section right

19   in the center -- this is a readout of your hotline complaint

20   on April 5th of 2016, and is this what you were complaining

21   about at the time that Mr. Jones and Ms. Hoppenrath had been

22   harassing you?

23   A.  Yes.

24   Q.  And then you say that you were alleging that Keith and

25   Blaine are retaliating against you for filing complaints to
```

```
 1    human resources, right?

 2    A.  Yes.

 3    Q.  Then you referenced -- you provided a timeline, and you

 4    indicated -- if we can pull up Exhibit 116 -- you indicated

 5    you weren't exactly sure on the dates of when these events

 6    took place.  Is this the timeline that you provided to

 7    Mr. Freshour back in April of 2016?

 8    A.  Yes, it is.

 9    Q.  And did you provide, to the best of your recollection,

10    the dates of when certain incidents occurred?

11    A.  Yes.

12    Q.  And if we can go down to the entry on December 10th, we

13    see that according to your timeline, that was the day when

14    you were told there was no more inspections because you were

15    told there were too many defects and your hours were

16    changed; right?

17    A.  Yes.

18    Q.  And then if we can go to the next page we see -- if we

19    can just blow up the whole December section on this.  Thank

20    you.

21            You say on December 11th that you were sent home.

22    December 13, that Blaine inspected the mainlines.  Do you

23    see those?

24    A.  Yes.

25    Q.  And then December 15th, you reference this incident
```

```
 1    about working 24 hours.  Do you see that?

 2    A.  Yes.

 3    Q.  Is that the incident that you were just referencing

 4    about taking the union yard out of service?

 5    A.  Yes.

 6    Q.  And why did you take the yard out of service at that

 7    time?

 8    A.  It was not in compliance with the FRA book.

 9    Q.  And what do you mean not in compliance?  Why not?

10    A.  The FRA book requires it to be inspected once every 30

11    days with a 20-day interval.

12    Q.  And those inspections hadn't been done?

13    A.  Correct.

14    Q.  Do you believe that there's any discretion or you have

15    the ability to ignore that FRA requirement?

16    A.  No, and that's why they made us stay 24 hours.

17    Q.  And then we see on, according to your note,

18    December 16th through the 18th, another individual did

19    inspections -- did your inspections?

20    A.  Yes.

21    Q.  And according to your notes, it was December 17th that

22    you were told that you could no longer drive a vehicle.  Do

23    you see that?

24    A.  Yes, I do.

25    Q.  And then if we can go down to the January section.
```

```
 1              And then on January 6th you were told you could
 2    not start at Bridal Veil and had to start at 7:00 and not
 3    6:30, right?
 4    A.  Correct.
 5    Q.  Prior to you going to HR on December 7th, had any of
 6    your managers raised any of these issues prior to
 7    December 7th?
 8    A.  No.
 9    Q.  Why did you believe these changes were occurring?
10    A.  Because they knew that I was keeping track of the
11    situation and they felt that -- I believe they felt that I
12    was trying to throw them under the bus which, in turn, I was
13    essentially trying to protect myself.
14    Q.  Did you think that these were, in your words, as the
15    complaint said, retaliation?
16    A.  Yes.
17    Q.  And then if we could go back to summary Exhibit 21, the
18    non-highlighted version, please.  And if we could scroll
19    down to 12-15.  If we could just blow up the entries.
20    There's a couple entries on 12-15.
21              Now, 12-15 is the date that you entered in your
22    timeline where Union yard was taken out of service.  Do you
23    recall that?  December 15th, the timeline we just looked at.
24    A.  I don't remember the exact date, but yes.
25    Q.  And your time entries on December 15th indicate you had
```

```
 1    ten hours under pay code 1, right?

 2    A.  Yes.

 3    Q.  Six hours under pay code 12, which was overtime, right?

 4    A.  Yes.

 5    Q.  And eight hours under double time under pay code 20.  Do

 6    you see that?

 7    A.  Yes.

 8    Q.  So you entered time for 24 hours on December 15th,

 9    right?

10    A.  Correct.

11    Q.  Did you believe you being required to stay 24 hours was

12    also retaliation?

13    A.  I do.

14    Q.  Now, at some point you also decide to meet with Doug

15    Jensen.  Do you recall that?

16    A.  Yes, I do.

17    Q.  And why did you decide to try to meet with Mr. Jensen?

18    A.  I felt like things needed to be addressed at his level

19    and that things were out of control.

20    Q.  And after you met with Mr. Jensen, did things get

21    better?

22    A.  No.

23    Q.  Okay.  Did things get worse?

24    A.  Yes.  Yes.

25    Q.  Okay.  And then you alluded to the fact that you at one
```

1    point transferred away from Dayton's Bluff?

2    A.  Yes.

3    Q.  If we could pull up Exhibit 172, please, and if we can

4    just show this to Mr. Sanders for the time being, Exhibit

5    172.

6              Do you see Exhibit 172?

7    A.  Yes.  It looks like my employment history.

8              MR. LUCAS KASTER:  And we would just move for the

9    admission of Exhibit 172, Your Honor.

10             MS. FERGUSON:  No objection.

11             THE COURT:  172 is admitted and may be published.

12   BY MR. LUCAS KASTER:

13   Q.  And if we can blow up just the final three lines in the

14   employment history section, the bottom three lines, please.

15   Thanks.

16             So the date on the left is when the change in your

17   job location occurred, and we see three lines up from the

18   bottom there's a change on January 25th of 2016 where you

19   become the inspector in Northtown.  Do you see that?

20   A.  Yes.

21   Q.  And why did you decide to transfer to Northtown?

22   A.  I felt like it would be beneficial for myself that maybe

23   I could work with a lot less pressure and essentially do my

24   job as I'm supposed to do and be more comfortable at my job.

25   (Coughing).  Excuse me.

1    Q.  Did Northtown end up being more comfortable for you?

2    A.  No.

3    Q.  Why don't you explain what happened when you got to

4    Northtown.

5    A.  The first day I was there I reported the truck was in

6    shambles, no tools.  I was track inspecting the first day

7    with a gentleman named Kevin.  We -- well, I won't say "we,"

8    but he was with me.  I placed a numerous number of slow

9    orders on frogs, and I got yelled at for it by Stephen

10   Chartier.

11   Q.  And what position was Stephen Chartier at the time?

12   A.  He was the roadmaster in Northtown.

13   Q.  And why did you enter the slow orders in Northtown?

14   A.  Because that track -- those frogs were in need of repair

15   and they were required by the FRA to be slow ordered.

16   Q.  And what did Mr. Chartier say to you in that

17   interaction?

18   A.  That he never had an issue with these frogs prior to me

19   showing up that day.

20   Q.  Anything else?

21   A.  I don't recall if it was that day.  At one point he told

22   me that my reputation precedes me, that there was a lot of

23   conversation that me and him had in my little stint there.

24   Q.  Was that the only negative interaction you had with

25   Mr. Chartier during your time in Northtown?

1    A.  No, sir.

2    Q.  Explain what else you're referring to.

3    A.  One day he said he was going to ride with me and show me

4    how to inspect track.  During that time he got out of the

5    vehicle numerous times without PPE on, and I asked him not

6    to do that in my presence.  He got very upset with me about

7    that.

8              And then, as I alluded to before, he was playing

9    Candy Crush on his phone while we were on a hi-railing,

10   while we were on the tracks.  I don't recall if I questioned

11   him about it when we were stopped or if we were moving, but

12   we were on the tracks in a hi-rail vehicle on a mainline and

13   he said he could do what he wanted and that does not pertain

14   to him.

15   Q.  Did at some point Mr. Chartier throw his hard hat at

16   you?

17   A.  That was at Pier Dotes (ph).  It's a Van Buren plant.

18   That's a track that runs Northstar Commuter.  There was some

19   wide gauge issues and some plates and some ties, and he

20   didn't like the fact that I wanted it fixed immediately

21   because of that situation.  And he threw his hard hat at me

22   and told me that he couldn't -- something to allude to the

23   fact he couldn't work with me, that I was impossible to work

24   with.

25   Q.  Then if we can go back to Exhibit 116, please, and go to

1    the second page, the very last entry.

2              This is your timeline again, and you have an entry

3    on January 19th where -- around 9:00 a.m. where

4    "Mr. Chartier threw his hard hat at me in the truck and

5    can't stand working with me at the Van Buren plant."

6              Is that the incident you're referring to.

7    A.  Yes.  I believe it should have said "hit the truck," but

8    yes.

9    Q.  So where were you located during this interaction?

10   A.  Standing next to the truck.  The truck was parked with

11   maybe -- depending how tight the area was -- six to seven

12   feet from the rails, and we were either -- I believe we were

13   off the track at that time standing between the truck and

14   the railroad.

15   Q.  And why would you say that Mr. Chartier threw his hard

16   hat at you?

17   A.  Because it went right by me and hit the truck, and he

18   said what he said.

19   Q.  If we could pull up Exhibit 72, please.

20             Mr. Sanders, this is a series of emails -- and I

21   apologize, it's somewhat hard to follow -- but if we can go

22   to the third page and blow up kind a quarter of the way down

23   the page, it says:  "On January 30th, 2016 at 1:17 p.m.,"

24   blow up the bottom half of that page.

25             This appears to be an overview of your day.  Is

1   this a nightly report that you would have sent to managers?

2   A.  Yes.

3   Q.  And then if we can go back to the second page, and in

4   the middle, again a quarter of the way down where the

5   little -- where it says:  "On January 31st, 2016," and blow

6   up that email down to Mr. Chartier's signature block.  Thank

7   you.

8            Now, Mr. Chartier responds to your email

9   referencing something called "beans."  What is "beans?"

10  A.  It was provided by the union agreement in the railroad

11  after you worked a certain amount of hours.  It was

12  essentially an extra meal, and they paid us for it.

13  Q.  Do you recall this incident now as you sit here today?

14  A.  I do not.

15  Q.  Do you recall why there would have been this beans issue

16  or this meal issue back then?

17  A.  If I worked a lot of time, that would have been what I

18  would've did.

19  Q.  Then if we can go back to the first page and blow up the

20  second email on the bottom of the page from Mr. Chartier.

21           And then Mr. Chartier says something in the first

22  line where he says:  "First time I've ever heard of beans

23  after six hours on rest days."

24           Then he goes on:  "If you are charging for both

25  and not working, then that is double dipping."  Do you see

1    that?

2    A.  I'm looking for it, sir.

3    Q.  Sure.  It's in the very top paragraph there.  It starts

4    with "First time."

5    A.  Okay.  Yes.

6    Q.  So he says:  "First time I've ever heard of beans after

7    six hours on rest days."  Do you recall whether this

8    additional meal period was allowed on rest days?

9    A.  I don't think it matters what days.  I'm not a hundred

10   percent sure.  It's in our union contract.

11   Q.  Okay.  And Mr. Chartier refers to double dipping.  Do

12   you have any idea why he's saying double dipping?

13   A.  No idea.

14   Q.  And then if we can just blow up the first email on the

15   page, which is your response.  And you say:  "I have no idea

16   what you're talking about, double dipping.  I only get paid

17   what I work, and as far as I'm concerned you are the boss

18   and free to make up whatever rules you want.  Just print

19   them up so I know what I need to follow.  Thanks, Don."

20           Is that what you said in response to Mr. Chartier?

21   A.  Yes.

22   Q.  Were you trying to "double dip" as Mr. Chartier said?

23   A.  No, sir.

24   Q.  As you sit here right now, do you recall filing a

25   separate HR complaint with Ms. Eggertson later in February

1    of 2016?

2    A.  I do not.

3    Q.  If we can pull up Exhibit 86, please.  If you can just

4    blow up the email now.

5          Now, this is an email from Ms. Eggertson to

6    Mr. Jensen and Mr. Jones and a Mr. Terry Morgan.  Do you see

7    that in the "To" line up on top?

8    A.  Yes.

9    Q.  And Ms. Eggertson details that after she had conducted a

10   harassment and discrimination training, that you followed up

11   with her after the meeting and alleged that Ms. Hoppenrath

12   was discriminating against you for not allowing you to take

13   your company vehicle home in the evening.  Do you see that?

14   A.  Yes.

15   Q.  And she says the allegation was not substantiated.  Do

16   you see that?

17   A.  Yes.

18   Q.  And if we go to Exhibit 87, this is a similar type

19   letter that you got from Ms. Eggertson in December.  This

20   one's dated March 22nd, 2017.

21          If we can blow up the second full paragraph,

22   please.

23          Do you recall receiving this letter at all?

24   A.  I remember getting letters.  I don't know that this one

25   specifically.

1    Q.  And Ms. Eggertson here says that its investigation does

2    not substantiate your allegation that Roadmaster Hoppenrath

3    discriminated against you by not authorizing your use of a

4    company vehicle to commute.

5            Do you see that?

6    A.  Yes.

7    Q.  Do you recall whether Ms. Eggertson ever followed up

8    with you for more questions or more details about your

9    complaint after you had talked to her after this training?

10   A.  No.

11   Q.  Now, at some point you make the decision to transfer

12   back to Dayton's Bluff from Northtown, right?

13   A.  Correct.

14   Q.  And why do you do that?

15   A.  I did not feel comfortable in the territory.  The

16   harassment was very similar to what I was receiving from the

17   other side.  So I waited until I had an opportunity to go

18   back to Dayton's Bluff because I was more familiar with the

19   territory, and I did not feel safe as far as my own while

20   being on the track, that I felt like I may get myself into a

21   situation for authority and stuff, so I went back to a

22   territory I was more comfortable with.

23   Q.  And we've seen on your employee transcript that you came

24   back to Dayton's Bluff on March 15th, 2016.  Does that sound

25   about right to you?

1   A.  Yes.

2   Q.  And what position did you come into when you transferred

3   back to Dayton's Bluff?

4   A.  Mainline.

5   Q.  And why did you come into the mainline position?

6   A.  I don't believe I could bump the yard, and I bumped into

7   the mainline.

8   Q.  Were you hoping that you would be able to drive a

9   company vehicle home again?

10  A.  When -- that was -- would have been one of my benefits

11  to bumping on the mainline, because when I left, Blaine had

12  told me that if I was a mainline inspector, I would be able

13  to drive the vehicle.

14  Q.  And when you got back to Dayton's Bluff, were you

15  allowed to take the vehicle home?

16  A.  No.

17  Q.  Now, there's been some testimony that you and

18  Ms. Hoppenrath were together on March 18th.  Do you recall

19  that?

20  A.  Yes.

21  Q.  So explain to us what's happening on March 18th.

22  A.  I believe that after her briefing with the gentlemen at

23  the shack, we proceeded to hi-rail the territory.  Once we

24  were on the tracks, we never left the tracks I don't think,

25  besides maybe having to set off and set back on in a

1     different location.

2              At some point in the morning during the briefing I

3     had asked her if I could leave early on Fridays.  When I say

4     "early," I mean like the end of my shift.  I didn't want to

5     have to stick around.  I had some personal things that I was

6     dealing with.

7              And we hi-railed.  I don't know the exact time

8     that we got back to the track.  I told her that I was going

9     to clean the truck out.  It was my second day there and I

10    was going to get some of the garbage that was left in the

11    truck out of the truck, and that I was going to go home.

12    Q.  Did Ms. Hoppenrath ever raise any type of issue with you

13    having to leave on time?

14    A.  No.

15    Q.  Did Ms. Hoppenrath ever ask you any questions about why

16    you left when you did on March 18th?

17    A.  No.

18    Q.  If we can go to Exhibit 165, please.

19             Now, Mr. Sanders, we talked yesterday about the

20    fact that you often carried a notebook with you, and I

21    believe you said that this was a photocopy of an example of

22    that notebook; right?

23    A.  Yes.

24    Q.  If we could go to page 5 of this exhibit and blow up

25    Friday, March 18.

```
 1              Now, the handwriting's a little hard to read.
 2   A.  I think it's good.
 3              (Laughter)
 4   Q.  But can you just tell us what this says on this date?
 5   A.  That I rode with Blaine.  Reassured her that I wanted to
 6   leave early on Fridays.  Something told me to -- out of the
 7   truck.
 8   Q.  It looks like -- I think I'm reading --
 9   A.  It's "No lunch."  Oh:  "Blaine told me to clear out the
10   truck.  No lunch."
11   Q.  Okay.  And then there's an entry further down around
12   3:00.  What does that say?
13   A.  "Done for the day."
14   Q.  Now, there's been some testimony about the following
15   day, March 19th, which is the day that Ms. Hoppenrath is
16   following you around while you were working.  Do you recall
17   that?
18   A.  I recall it, yes.
19   Q.  Did you know at the time that Ms. Hoppenrath was
20   following you around?
21   A.  No.
22   Q.  Has she ever raised an issue about the hours that you
23   reported on March 18th?
24   A.  I never spoke to her about my hours, no.
25   Q.  As you sit here right now, without looking at anything,
```

1   do you remember exactly what hours you worked on March 19th?

2   A.  No.

3   Q.  What about on March 25th and 26th?

4   A.  No.

5   Q.  If we could go to the following page of Exhibit 165,

6   page 6, please, and blow up Saturday, March 19th.  Sorry.

7   The one below that.

8           Now, there's a reference here to -- looks like

9   6:30.  Am I reading that right?

10  A.  Yes.

11  Q.  And you say something, and then "Bridal Veil."  Do you

12  see that?

13  A.  Yes.

14  Q.  By the way, on a Saturday, is there any type of group

15  meeting or phone call first thing in the morning?

16  A.  No.

17  Q.  Is there during the week?

18  A.  Yes.

19  Q.  And how does that phone call or meeting take place?

20  A.  Usually the roadmaster would be in their office on the

21  phone, and the group of gentlemen that were working that

22  territory would be -- it's not a kitchen table, but it's

23  kind of like a picnic table and there would be a conference

24  phone in the middle.  There was one at Dayton's Bluff and

25  one at Bridal Veil.

1    Q.  I'm just going to give you a little bit of a warning to

2    keep your voice up so Tim can hear what you're saying and

3    get it down.

4              So on March 19th on a Saturday, there would not

5    have been this group meeting in the morning?

6    A.  Not necessarily.  If there was a -- like if there had

7    been a plan worked, then we would have had some kind of

8    safety briefing then.  But not, no, when nobody was

9    scheduled to work.

10   Q.  And then according to your notes, there's you "sitting

11   on track around 9."  Is that what I'm seeing there?

12   A.  Yes, it's on the 9 slot there.

13   Q.  Roughly?

14   A.  Yes.

15   Q.  And then roughly going home around -- looks like around

16   2:00 according to your notes?

17   A.  Yes.

18   Q.  And we've seen records -- we saw yesterday with

19   Mr. Jones that you had entered eight hours for March 19th.

20   Do you have any recollection as to when exactly you entered

21   those hours?

22   A.  I don't know what day or time it was, no.

23   Q.  Okay.  Were you trying to accurately report your hours

24   at that time?

25   A.  I always did accurately report my hours as far as the

 1    end of the pay period goes.

 2    Q.  And then on March 25th and 26th you said that you don't

 3    remember exactly when you worked.  Is that what I recall?

 4    A.  Yes.

 5    Q.  And if we go to page 7 of Exhibit 165 and blow up

 6    Friday, March 25th, please.

 7              And here, what does that top note say?

 8    A.  It just says:  "At test at HLCS."  It's a hi-rail

 9    compliance system that tracks your hi-rail vehicle when it's

10    on the rails so you know if you're out of your limits, or

11    the dispatcher will know you're out of your limits, I guess.

12    Q.  So that's a computer that's in the truck?

13    A.  Yes.

14    Q.  Okay.  And then there's a note here around kind of 10:30

15    or so.  Can you read what that says?

16    A.  Yeah, "Head home for the day."

17    Q.  And then you say something about -- I think you said

18    something about holiday?  Am I reading that right?

19    A.  It was a holiday.  Says "Good Friday" on the top of the

20    paper.

21    Q.  Were there a lot of people working that day, do you

22    remember?

23    A.  I did not see anybody other than train crews.

24    Q.  So why were you working on Good Friday?  Do you

25    remember?

1    A.  Tracks had to be ran.  I was required to run the tracks.

2    Q.  And then if we go to page 8 of your notebook, and just

3    blow up Saturday the 26th, we don't see any notes here for

4    Saturday the 26th; right?

5    A.  Correct.

6    Q.  Do you have any recollection as you sit here now exactly

7    when you worked on the 26th?  I think you said no.

8    A.  No.

9    Q.  Do you remember when you entered time for the 26th?

10   A.  I believe it was after I came back from my weekend off.

11   Q.  Okay.  And explain what happened when you came back from

12   the weekend off.

13   A.  Well, previously on Thursday I had spoken with Adam -- I

14   can't think of his last name -- about helping me figure out

15   my hours, because Blaine had informed us that we had needed

16   to do -- well, not figure out my hours, but Blaine informed

17   us that we needed to change the way we did our pay codes.

18   And it was a holiday weekend and there was a new pay code

19   that I needed to input, so he said he would help me when I

20   came back after the holiday.

21         My first day back was Tuesday after that holiday.

22   I sat down to talk to him.  He was in the middle of doing

23   his.  I realized that I had not inputted any time.  I threw

24   a couple hours on the computer real quick; and then one of

25   the guys came in and said that -- there was people outside.

1    He informed me -- he informed everybody that it was Keith

2    Jones, Stephen Chartier and Jake Sherman.

3              I had not seen Blaine at all that morning.  I

4    closed my computer in the office there.  I went to walk out

5    to get my books out of the truck.  At that time they told me

6    to come back in and that they needed to talk to me in the

7    office, and informed me that I was being charged with

8    payroll theft.

9    Q.  And you said that you that morning had thrown some hours

10   in.  Do you -- was that for the 26th?

11   A.  Yes.  I put my hours in for the 26th on the morning of

12   the 29th, only because I was required to have hours in

13   period for that day.  And then I walked out -- I was walking

14   out to get my books as I was told that I needed to stay in

15   there while they were to talk to me.

16   Q.  And when you say your "books," you're talking about your

17   notebook?

18   A.  Yes.  And so I could see what authorities I had also,

19   because my authorities helped me determine what time I would

20   have left that day.  I was -- I probably shouldn't have been

21   at work on the 26th.

22   Q.  Why do you say that?

23   A.  I was having some family issues and some health issues

24   with -- other than myself at the time.  I was very

25   distracted.

```
1    Q.  Now, we've seen some evidence of time that you entered

2    on the 29th for the 26th.  Was that time accurate as you now

3    know?

4    A.  No, it was not accurate.

5    Q.  Were you -- what was your intention with respect to your

6    time?

7    A.  They were just placeholders.

8    Q.  Were you intending to go back and correct your time

9    later?

10   A.  Yes, correct.  That was a common practice.

11   Q.  Is that something you had done before?

12   A.  Many times.

13   Q.  Had anybody raised that as an issue for you?

14   A.  Not for me, no.

15   Q.  Okay.  Were you intending to steal time?

16   A.  No, sir.

17   Q.  I want to go back to one exhibit, Exhibit 90, please.

18            And what is Exhibit 90?

19   A.  It's another form of my end-of-the-day report.

20   Q.  That nightly report we've been talking about?

21   A.  Yes.

22   Q.  And this one on the email is for March 25th, and again,

23   this was something that was required for you to do as part

24   of your duties and responsibilities?

25   A.  Yes.
```

1  Q.  And the timestamp on the email is 2:39 p.m.  Do you see

2  that?  Up at the top?  It's kind of small.

3  A.  Oh, yes.

4  Q.  Had payroll closed yet for those hours?

5  A.  No, payroll closes on the 1st and the 16th -- or did at

6  that time.

7  Q.  Explain to us this interaction, what the individuals say

8  to you when you're pulled out of service on the 29th.

9  A.  I don't recall Steven or Jake saying anything to me.

10  Keith Jones said that -- is the one that told me we needed

11  to go, and they were having a conversation with me.  He

12  handed me a piece of paper saying that I needed to sign this

13  piece of paper and that I was being investigated for payroll

14  theft.  And then they walked me out of the building in front

15  of everybody and walked me to my truck until I drove away.

16  Q.  If we could go to Exhibit 91, please.  If we can just

17  blow up the text -- yeah -- just to make this a little bit

18  bigger.

19          Do you recall if this was the sheet of paper that

20  you were handed on March 29th?

21  A.  It looks familiar.

22  Q.  Do you recall whether you got one or two sheets of paper

23  on the 29th when you were pulled out?

24  A.  One sheet.

25  Q.  And what was your thought process when you get this

1    letter accusing you of payroll theft?

2    A.  It was for this day here that I -- and I worked that

3    day, so I was -- just felt it was another form of

4    retaliation against me to try and harass me because I had

5    worked that day.

6    Q.  And then if we could go to Exhibit 92, please.

7              This is a separate letter dated March 28th and

8    alleges -- accuses you of falsifying payroll beginning

9    March 25th, 2016.  Do you recall getting this letter on

10   March 29th when you were pulled out?

11   A.  No.

12   Q.  Do you have any recollection as to when you received

13   this exhibit, if at all?

14   A.  No, I do not.

15   Q.  Before you got to the investigative hearing, did you

16   have any idea that BNSF was also accusing you of alleged

17   payroll theft for March 26th?

18   A.  No.

19   Q.  Was that an issue that was raised during the

20   investigative hearing, that there was no notice for

21   March 26th?

22   A.  I believe it was brought to our attention during the

23   hearing, yes.

24   Q.  And did you or your union rep raise any issues around

25   that fact?

1    A.  Well, they didn't allot us any time to provide any

2    information or anything.

3    Q.  And when they bring up March 26th for the first time

4    during the hearing, what's your reaction to that?

5    A.  Essentially, I felt like I was just being harassed

6    because payroll was not closed.  I mean, there was nothing

7    else I could really assume the situation other than

8    payroll's open.  I don't know why I'm being accused of

9    payroll theft when I haven't been paid.  It hasn't closed.

10   Q.  And at some point after you're pulled out of service, do

11   you attempt to change your hours or correct your hours?

12   A.  I did that before I even knew about the 25th and the

13   26th because I wanted my payroll correct.  I went home after

14   being walked off the property.  I was never told that I was

15   locked out of the computers or anything.  I went home.  I

16   attempted to make an assumption, a little correction on my

17   pay.  I could not do that without any paperwork.  All my

18   stuff was in the company vehicle that I had been using.

19        So I contacted a gentleman named Matt Brisbois,

20   and I don't remember what day he brought me my -- I called

21   it a briefcase.  It was a bag that I carried a lot of my

22   notes in, computer and stuff in.  So he brought that to me.

23   I met him at a bar.  We had a beer and a burger.  I went

24   home and attempted to do my payroll correctly and I was

25   locked out of the system.  And this -- like I said, this was

```
1     all before my knowledge of anything about any other days.

2              THE COURT:  Mr. Kaster, is this a good time to

3     take a break?

4              MR. LUCAS KASTER:  It is, Your Honor.

5              THE COURT:  All right.  We'll adjourn and resume

6     just after 10:45.

7         (Recess taken at 10:32 a.m.)

8                            *     *     *     *

9         (10:47 a.m.)

10                            IN OPEN COURT

11        (Jury enters)

12             THE COURT:  Thank you, everyone.  Please be

13    seated.

14             Mr. Kaster?

15             MR. LUCAS KASTER:  Thank you, Your Honor.

16    BY MR. LUCAS KASTER:

17    Q.  Mr. Sanders, I want to move forward now to the -- you've

18    heard evidence about the two investigation hearings that

19    actually took place.  Do you recall those hearings?

20    A.  Some of it.

21    Q.  Do you recall them actually occurring?

22    A.  Yes.

23    Q.  Okay.  Did you feel like those hearings were fair and

24    impartial?

25    A.  No.
```

1    Q.  Why not?

2    A.  No proper time to bring evidence to light, and basically

3    just whatever evidence BNSF wanted to have was there.

4    Q.  Had you seen the documents that BNSF or Ms. Hoppenrath

5    introduced during the hearing prior to the hearing?

6    A.  No.

7    Q.  Now, we referenced before that in the midst of those

8    hearings you filed this additional HR complaint with

9    Mr. Freshour, the BNSF's HR department.  Do you recall that?

10   A.  Yes.

11   Q.  And if we could go to Exhibit 105, please.

12          This is an email from Mr. Freshour.  It looks like

13   it's to you.  It says "Donald" at the top.  Do you have any

14   recollection of receiving this email from Mr. Freshour?

15   A.  Not this exact email.  I do recall receiving emails from

16   him.

17   Q.  And it appears that Mr. Freshour's outlining in this

18   email to you what your complaints were.  Does that seem

19   fair?

20   A.  Yes.

21   Q.  Do you recall if you responded to this email at all to

22   Mr. Freshour?

23   A.  I do not.

24   Q.  Did you provide separate information to Mr. Freshour

25   regarding what you were experiencing at BNSF?

1    A.  I believe I provided him with a timeline.  Possibly he

2    got versions of the recordings.  I don't know how -- if he

3    did, I don't recall.  He got separate information that says

4    "see attached file," which was probably pictures or tracking

5    times or something in that manner.

6    Q.  If we could bring up Exhibit 111, please.

7              And on Exhibit 111 we see an email on the bottom

8    from Mr. Freshour to you regarding your statement.  Do you

9    see that?

10   A.  Yes.

11   Q.  And then the email above, right above that, you respond

12   with a bunch of names and numbers.  And who are these

13   individuals?

14   A.  It would be people that witnessed my said harassment

15   during my period there.

16   Q.  And one of them was Mr. Heyer who we heard from

17   yesterday?

18   A.  Yes.

19   Q.  Why did you provide the names and numbers to

20   Mr. Freshour?

21   A.  I believe in the last email, I didn't quite read

22   everything he wrote, but I believe he asked for something.

23   Q.  If we could go to Exhibit 114, please.  Exhibit 114

24   looks to be some additional emails between you and

25   Mr. Freshour regarding his investigation.  Does that seem

1    right to you?

2    A.  Yes.

3    Q.  And in that second email down from the top Mr. Freshour

4    thanks you for the documentation that you had provided.  Do

5    you see that?

6    A.  Yes.

7    Q.  And then we looked at Exhibit 116 which was that outline

8    that you had provided to Mr. Freshour?

9    A.  Correct.

10   Q.  If we could go to Exhibit 121.  The top email on Exhibit

11   121 is you asking if Mr. Freshour needs more information,

12   right?

13   A.  Correct.  I believe I was trying to wrap some stuff up

14   with my union rep, too.

15   Q.  And then if we can go to Exhibit 133, please.  This is

16   an email from you to Mr. Freshour with an attachment that

17   appears to be an MP3.  Do you see that?

18   A.  Yes.

19   Q.  Is that one of the recordings?

20   A.  I don't know for sure.  It looks to be a recording.

21   Q.  And if we go to page 2, another email with another MP3

22   attached and a Dropbox file, do you see that?

23   A.  Yes.

24   Q.  Page 3, another email with a recording right?

25   A.  Yes.

1    Q.  Page 4, another email with a recording?

2    A.  Yes.

3    Q.  And then page 5.  Is that another email with a

4    recording?

5    A.  Yes.

6    Q.  And then if we can go to Exhibit 137, please.  You sent

7    an email to Mr. Freshour asking for an update, right?  Do

8    you see that?

9    A.  Yes.

10   Q.  Do you recall whether you had heard anything from

11   Mr. Freshour about what was happening with your

12   investigation at that point?

13   A.  I don't recall hearing anything, and the people that I

14   had submitted as -- I don't recall them saying anything that

15   he had ever contacted them.

16   Q.  And by the way, this -- your email is May 27, 2016.  Do

17   you see that?

18   A.  Yes.

19   Q.  And a number of emails that we just looked at from May

20   of '16 as well.  Do you recall that?

21   A.  I recall seeing that just now, yes.

22   Q.  Had you ever been told that the investigation had been

23   concluded before May 27th, 2016?

24   A.  No, no.  That's why I was asking.

25   Q.  And then if we could go to Exhibit 128, please.  Exhibit

 1    128 is a dismissal notice to you dated April 29th, 2016,

 2    right?

 3    A.  Yes.

 4    Q.  And then if we could go to Exhibit 129, please.  You

 5    received a separate dismissal notice for March 25th.  Do you

 6    see that?

 7    A.  Yes.

 8    Q.  And then if we could go to Exhibit 139, please.  This is

 9    a letter dated June 21st, 2016, to you from Mr. Freshour,

10    right?

11    A.  Yes.

12    Q.  Mr. Freshour writes:

13         "This is the requested summary of my impressions

14    after listening to the recordings you forwarded of the

15    conversations you had with Division Engineer Keith Jones

16    last fall.  These appear to be the same messages that

17    Magenta Eggertson reviewed when responding to the

18    allegations of harassment and retaliation.  The review by

19    Human Resources made a determination that Mr. Jones had not

20    demonstrated appropriate leadership during the conversations

21    which resulted in formal handling with Mr. Jones."

22         Second paragraph:

23         "The allegation of harassment and retaliation was

24    not substantiated through the investigative process.  It is

25    apparent that there has been a strong difference in opinion

1   between you and the leaders in the engineering department

2   regarding what constitutes a defect and the need for

3   remedial action.  We discussed managerial discretion

4   regarding work assignments, work times, and work locations.

5   Managerial discretion also applies to the vehicle policy

6   regarding allowances for taking vehicles home so that

7   workers could shorten response times.  My findings do not

8   substantiate that managers violated policy by making these

9   decisions within the scope of managerial discretion."

10          How did you feel when you got that notice from

11  Mr. Freshour?

12  A.  I felt like he neglected to take into effect what had

13  happened after Keith and Blaine were told -- or I was given

14  a notice saying that they would not be harassing me, and I

15  felt like he ignored the fact that I was harassed repeatedly

16  after their investigation had closed -- or during the

17  investigation *per se*.

18  Q.  Did you feel like Mr. Freshour considered the fact that

19  the people who were now charging you with discipline were

20  the same people who you had filed a complaint against in

21  December?

22  A.  Yes, that was part of my complaint with Mr. Dane [sic].

23  Q.  And how did it feel to have or be told on three separate

24  occasions by human resources at BNSF that your allegations

25  were not substantiated?

1    A.  Well, the company policy is that you can speak up when

2    you feel harassed or any type of situation that makes you

3    feel unsafe or uncomfortable.  And I did so, and multiple

4    times.  And it made me feel that HR was basically neglecting

5    and ignoring situations, that there was no real safe way to

6    communicate if you are being harassed or felt unsafe in any

7    situation.

8    Q.  So after you're terminated from BNSF, what do you do at

9    that point?

10   A.  Well, I was depressed for a while.  I drank a lot, tried

11   to find some jobs.  I closed out my little bit of savings

12   that I had.  I tried to start a business and I couldn't make

13   that happen.  I don't think I had the ambition that I used

14   to have.  I ended up doing whatever job I could get at the

15   time, and worked to take care of the family the best I

16   could.

17   Q.  And we talked very early on in your testimony about how

18   you work for Mann Companies now.  What types of jobs have

19   you had since you left BNSF and since you got your job at

20   Mann?

21   A.  Different types of jobs.  I was a mechanic at a taxi

22   facility.  I was a mechanic for a bus company.  I had done

23   construction jobs.  I worked at the Maplewood Mall as a

24   building operations manager for a short stint.  The

25   construction jobs were -- they -- I think it was Emerald and

1   something construction.  I can't remember.  Minnesota -- no,

2   I don't recall the name of that one.  And I worked for

3   another realty company as a maintenance guy.  I bounced and

4   bar backed for a little while at a friend's bar.

5            I can't think of anything else off the top of my

6   head.

7   Q.  And why did you move around to so many different

8   employers?

9   A.  Well, a lot of the jobs were not great.  I was looking

10  for ways to support my family.

11  Q.  And how is the income at these other employers compared

12  to what you were earning at BNSF?  Not specifically, but was

13  it higher or lower?

14  A.  A lot of them were lower.  Hourly-wise, I make more

15  right now than I did at the railroad, but I have no

16  benefits.  So that's kind of a horse apiece.  There's no

17  benefits, so no health, no 401(k), no nothing.  The jobs

18  that I had benefits were like 20-dollar-an-hour jobs and

19  they offered minimal benefits.

20           Sometimes I worked two jobs at a time.  Oh, yeah.

21  I worked at Fleet Farm.  I changed oil, tires, as a means to

22  make some extra income on my days off I worked.  And then

23  when I was at Emerald Builders, I worked roughly from 5:00

24  in the morning till 1:00 or 2:00, depending, and then I

25  would go straight to the bus company and worked there for

1    awhile.

2    Q.  When you were at BNSF, did you have health insurance?

3    A.  Yes.

4    Q.  Did you have a pension or 401(k) account?

5    A.  Yes.  There's a railroad retirement fund, and then I

6    don't know on the 401(k) what it was called.  The railroad

7    would match up to 5 percent or something of whatever I put

8    in.

9    Q.  Besides the places where you were actually employed

10   since you left BNSF, did you apply other places as well?

11   A.  Yes.

12   Q.  Can you give us some examples of the places you've

13   applied since leaving BNSF?

14   A.  Well, when I first left I thought it would be easy to

15   get a job at a railroad.  It turns out it wasn't.  Never

16   worked at other railroads.  I did apply at, like, this

17   Minnesota Light Rail.  I applied there.  UP, CP.  Some

18   commercial gigs.  Minnesota Railway.  I applied at -- I

19   believe I applied at, like, a FedEx place.  It was like a

20   trailer mechanic-type job.

21        At some point I recall was going to apply at

22   Allianz Soccer Field as some kind of thing.  I don't know if

23   I did.  And then Minnesota Orpheum.  I don't recall if I

24   actually submitted it.  That was another job I was going to

25   apply for.

```
 1              Yeah.  I can't think of any more off the top of my
 2       head.
 3       Q.  And how is the difference in your wages since you left
 4       BNSF?  How has that affected you and your family?
 5       A.  Well, at first I had a solid income.  You know, I didn't
 6       have to worry about being paid weekly.  Obviously I was
 7       unemployed and I needed to find a job, so -- and I was
 8       getting -- had gotten accustomed to making 75-plus thousand
 9       dollars, depending.  I didn't ever really pay attention to
10       how much I made because I wasn't -- I wasn't at work to make
11       money.  I was at work because 90 percent of the time I was
12       required to be at the job.  Many times I'd asked that I did
13       not want to be at work.
14              But to go even, say, even if I went from 75,000, I
15       think I might have made like 40, 30, 40 my first year.  I
16       don't recall what I made other than maybe with an
17       unemployment-type situation from the railroad.
18       Q.  Did you get some railroad benefits for a period of time?
19       A.  Yeah.  I don't know what they paid.  It may be at
20       minimum was fifty to a hundred dollars a week.  I don't
21       recall what I got.
22       Q.  And how old were your kids at the time that you were
23       taken out of service?
24       A.  My youngest maybe was 16.  Roughly five years ago,
25       right?  He was probably 16.  I had a daughter that was in
```

1    college up in Duluth.  I had to have her come home after a

2    stint because I was unable to help her pay for her dorm and

3    stuff and so she came home.  She was right out of high

4    school, so she was probably around 18 maybe.  She's 23 now.

5    And Colleen was 19, and Michaela was 20, 21.

6    Q.  So what is like to make that phone call to your daughter

7    and tell her she needs to come home?

8    A.  As about as demeaning as it was to go home and tell the

9    wife I got fired for supposedly falsifying payroll.  It's

10   not something you want to tell people.  It's pretty

11   demoralizing.

12   Q.  This whole experience, what you experienced over a

13   couple years with BNSF and your managers Mr. Jones and

14   Ms. Hoppenrath, how did that affect you on a personal level?

15   A.  It didn't just affect me.  It affected my family.  Like

16   you just asked about how I felt about having to explain to

17   them.  One thing that has always stuck out is what my wife

18   had told me.  "I told you, you should just have done what

19   they told you to do," because essentially I got fired for

20   not complying with them about defects and stuff, so ...

21             I lost track there.

22   Q.  Sure.  How did it make you feel going through this

23   process?

24   A.  Well, I was depressed.  I felt like I had lost one of

25   the best jobs I've ever had.  Not that the job was the best

```
1    job.  Obviously the job was not great.  There was a lot of
2    things that made that job suck bad.  But I took great pride
3    in what I did, and I enjoyed the fact that I was able to
4    make a difference.  And I took great pride in that, so I
5    really enjoyed doing my job.  The pressures that came with
6    doing the job were not great.  They were tough.
7    Q.  And how did it impact your view of your managers who you
8    worked with at BNSF?
9    A.  Well, from the beginning of the railroad, I always had
10   great relationships with all my management.  You know, when
11   me and Keith first got together, things were good.  Like he
12   mentioned, he asked me to carry Blaine on my shoulders and
13   to get her through the process, and I was instructed as an
14   hourly employee to teach salary employees their job.

15            One of the things I did when Blaine first got
16   there was, we used to have, like, company parties, and me
17   and the wife and the kids had won a bunch of BNSF material
18   at a bingo, and I brought in a bunch of things, whether it
19   was like soap baskets, chess boards, playing cards, whatever
20   stuff that I didn't really care that I had.  And I gave it
21   to Blaine and I told her, "One thing you need to do when
22   you're here is earn the trust and the respect of the guys
23   that are here.  So when somebody goes above and beyond maybe
24   a situation that they don't normally do, give them this,"
25   and I gave her a bunch of stuff to hand out to the
```

1   gentlemen.  I don't know that she ever did.

2           But -- so what I'm trying to say is I was there to

3   support.  I was there to support and when they started

4   telling me that my job needed to be done differently than

5   required by BNSF and the FRA, I took great exception to that

6   and I started keeping track in notes, and I lost -- I guess

7   I lost respect for their -- the way that they cared about

8   the safety of the railroad and the public.

9   Q.  Did you feel like they respected the time and energy you

10  spent in your job?

11  A.  No, I feel like they used me.  They would say things to

12  me like, "Great job.  We need you here."  When I asked for

13  days off, I was never given the day off.  You know, they say

14  they helped me out.  I don't know how they ever helped me

15  out.

16          Yeah, I don't think they ever really respected me.

17  I think I was more of a tool in their bag.

18          MR. LUCAS KASTER:  I don't have any other

19  questions at this time, Mr. Sanders.  Thank you.

20          THE WITNESS:  Thanks.

21          THE COURT:  Ms. Ferguson?

22          MS. FERGUSON:  Thank you, Your Honor.

23                        **CROSS-EXAMINATION**

24  BY MS. FERGUSON:

25  Q.  Good morning, Mr. Sanders.

```
 1    A.  Good morning.
 2    Q.  2015 was not the first time you made complaints to HR
 3    about a roadmaster, correct?
 4    A.  I don't recall the circumstance, but there was probably
 5    a situation.
 6    Q.  More than one situation, right?  In fact, you didn't
 7    hesitate to contact HR if you had an issue and report an
 8    issue.
 9    A.  No, that was company policy to do that.
10    Q.  And that was well before Keith Jones or Blaine
11    Hoppenrath arrived, correct?
12    A.  Oh, yes.
13    Q.  Back in January of 2014 you complained about a
14    roadmaster Ben Peterson.  Do you recall that?
15    A.  Yes.
16    Q.  Could we see Exhibit 57, page 3, please.
17            And that's a letter to you dated January 17, 2014,
18    correct?
19    A.  Yes.
20    Q.  And you had reported to HR concerns that Ben Peterson
21    physically grabbed you, correct?
22    A.  Yes.
23    Q.  The conclusion was that that didn't actually happen, but
24    there was no -- as a result of that complaint, there was no
25    retaliation against you, correct?
```

1    A.  There was no retaliation from that, no.

2    Q.  And you continued working at BNSF, correct?

3    A.  Absolutely.

4    Q.  Okay.  Could we see Exhibit 57, page 5, please.

5         And this is a letter, March 18, 2014.  If you

6    scroll to the next page, please, and actually the last page

7    where we see a signature.  Thank you.

8         John Mozinski, the person who represented you in

9    the investigations here, also represented you as it related

10   to your claim of unjust treatment, correct?

11   A.  I'm not sure what time this was for.

12   Q.  Okay.  Could we scroll back to the first page -- or 57,

13   page 5, please.

14        So those events occurred while Keith Jones was

15   your -- a supervisor of yours, correct?

16   A.  I -- like I stated, I don't know what events we're

17   talking about here on this paper.

18   Q.  Did you bring a claim as it related to unjust treatment?

19   A.  I don't know against who or anything.

20   Q.  All right.  The fact of the matter is, after that

21   complaint you weren't retaliated against, correct?

22   A.  I can't answer that because I don't know who this was

23   against.

24   Q.  Okay.  Well, let's take whatever time you need to read

25   that.

```
 1    A.  (Witness complies).

 2    Q.  And maybe you could highlight that first paragraph,

 3    please.

 4              So it says that an unjust treatment was filed by

 5    you involving events from August 9 of 2013.

 6    A.  It doesn't say with whom.

 7    Q.  And it goes on to say you contacted -- or Mr. Jones

 8    contacted you to avoid an unjust treatment hearing.

 9    A.  Correct.  As I stated, it doesn't say with whom.

10    Q.  Okay.  We can continue on to the next paragraph and the

11    next page.

12              You don't recall the events surrounding this

13    letter from your union repetitive as it relates to your

14    claims of unjust treatment involving Keith Jones?

15    A.  Okay.  So this was with Keith Jones?  Because I've been

16    asking with whom.

17    Q.  Yes, his name appears in that first paragraph.

18    A.  It says that he asked to talk to me to resolve --

19    Q.  And there's reference there to Ben Peterson as well.

20    A.  Okay.  So this is about Ben Peterson?

21    Q.  You can take as much time as you want to read that.

22    A.  (Witness reading).  From my understanding, this is not

23    anything to do with Keith Jones, that me and Keith Jones

24    worked it out outside of a hearing.

25    Q.  Keith Jones was a supervisor.  At that time he was Ben
```

1    Peterson's boss; correct?

2    A.  Yes.

3    Q.  And as a result of that, the letter that was sent by the

4    union suggesting unjust treatment, nothing happened to you

5    in terms of retaliation or losing your job, correct?

6    A.  Me and Keith Jones worked it out and it was dropped.

7    Q.  But my question is, you weren't retaliated against and

8    you kept your job at BNSF despite the fact the union had

9    brought a claim on your behalf, correct?

10   A.  I was not retaliated against by Ben Peterson, no.

11   Q.  Or Keith Jones, correct?

12   A.  I have been retaliated by Keith Jones.  I don't know if

13   it pertains to this situation.

14   Q.  You were suggesting in your testimony that the

15   retaliation began when you filed a complaint with HR in

16   2015, correct?

17   A.  That is when I began taking notice and keeping

18   documents, yes.

19   Q.  But we know by looking at these that you didn't hesitate

20   to make complaints before that, and you didn't have any

21   problem keeping your job, correct?

22   A.  That was because Ben Peterson put his hands on me.

23   Q.  Do you recall filing a complaint with OSHA in 2013?

24           MS. FERGUSON:  And Counsel, may I ask you, are you

25   maintaining your objection to Exhibit 87?

```
1              MR. LUCAS KASTER:  We are.

2              THE COURT:  Any objection beyond that we've

3    already discussed?

4              MR. LUCAS KASTER:  Foundation, relevance.

5              THE COURT:  Overruled.

6    BY MS. FERGUSON:

7    Q.  Would you show Exhibit 87, please?

8              At the top there is a stamp on this that says

9    "January 14, 2014."  Do you see that?

10   A.  Yes.  Could I ask a favor of you?

11   Q.  Sure.

12   A.  This thing is really hard to read.  When you want me to

13   read something, could you have them highlight it for me,

14   please?

15   Q.  Sure.

16             MS. FERGUSON:  Could you highlight that, please?

17             THE WITNESS:  Thank you.

18   BY MS. FERGUSON:

19   Q.  And could you go on to the next page of that, please?

20             Do you recall filing this complaint with OSHA as

21   it relates to concerns you had about being able to get

22   medical treatment?

23   A.  I do not.

24   Q.  Okay.  Do you want to take time to read it further?

25   A.  Do you have -- is this -- I'm not good at figuring this
```

1    stuff out.  Is this my complaint?

2    Q.  Correct.

3    A.  Or is this their findings?

4            MR. LUCAS KASTER:  Objection.  Foundation.

5            THE COURT:  I agree.  At this point Mr. Sanders is

6    being asked -- let's take this down if we could.

7            Mr. Sanders is being asked to refresh his

8    recollection through this document, and until that's

9    accomplished and more foundation is established, we'll hold

10   off on admitting it.

11   BY MS. FERGUSON:

12   Q.  Do you recall, Mr. Sanders, complaining that following

13   an accident on November 21, 2012, you weren't allowed to get

14   medical treatment, and as a result you filed or your lawyers

15   filed a complaint with OSHA?

16   A.  I don't know the accident.

17   Q.  Do you recall being represented by Richard Carlson of

18   Hunegs Law Firm as it related to your complaint with OSHA?

19   A.  I do not.

20   Q.  You don't recall anything that related to an accident on

21   November 21, 2012?

22   A.  I have no idea what the accident is, no.

23   Q.  Isn't that the accident you were discussing earlier when

24   you received a discipline related to it?

25   A.  I don't know what accident we're talking about.

1    Q.  Do you recall reporting that you thought you engaged in

2    protected activity when you informed BNSF that you were

3    under treatment by a physician for stress and that your

4    management did not allow you time for the treatment?

5              MR. LUCAS KASTER:  Objection.  Foundation,

6    relevance.

7              THE COURT:  Overruled.

8    A.  I'd be speculating.  I don't know what accident we're

9    talking about.

10   Q.  Do you recall having stress following an accident?

11   A.  I did see a therapist, yes, at one point in my career

12   there.

13   Q.  Okay.  It sounds like you don't recall receiving the

14   letter from OSHA dismissing your complaint in January of

15   2014.

16   A.  I do not recall that.

17   Q.  But the fact of the matter is, you were never

18   discriminated against, retaliated against, or lost your

19   employment as a result of filing an OSHA complaint against

20   BNSF, correct?

21   A.  I'm confused with the question.

22   Q.  Well, my question is simply this:  You weren't

23   discriminated against as a result of filing an OSHA

24   complaint, correct?

25   A.  I was not discriminated against for my accident or

1    anything involved with that, that I can recall.

2    Q.  And you didn't lose your employment as a result of

3    making a complaint to a governmental entity about BNSF?

4    A.  As far as that situation goes, the railroad does not

5    have workmen's comp.  The only way to --

6    Q.  That's not my question.

7    A.  Okay.

8    Q.  My question is, you continued your employment at BNSF

9    despite the fact that complaint was filed with the EEOC in

10   January of 2014?

11   A.  Correct.  That's the process that we take because they

12   don't have workmen's comp.

13   Q.  So now you do have a recollection of filing that

14   complaint?

15          MR. LUCAS KASTER:  Objection.  Argumentative.

16          THE COURT:  Yeah, I agree.  Mr. Sanders has

17   testified he does not have a recollection at this point of

18   filing that complaint.  We're going to have to put something

19   different in front of him if you want to refresh his

20   recollection.

21          MS. FERGUSON:  I think we've got enough.  I think

22   he doesn't recall doing it.

23   Q.  But you admit that you weren't discriminated against,

24   retaliated against, or lost your employment as a result

25   filing a complaint?

1    A.  As far as my medical requirements for the railroad, no,

2    I was not harassed for my injuries.

3    Q.  But fair to say prior to December of 2015, you had

4    reported issues to HR?

5    A.  Yes.

6    Q.  Okay.  Now, I'm going to switch gears now and talk a

7    little bit about your job as a track inspector which you did

8    for six years, correct?

9    A.  Somewhere in that timeframe, yes.

10   Q.  2010 to 2016.  Your job as a track inspector is to do

11   just that, inspect the tracks; correct?

12   A.  No, it's above and beyond just track inspecting.

13   Q.  I think you've described for us what the duties are,

14   correct?

15   A.  Yes, I have described some duties.

16   Q.  You want to protect the tracks to ensure the safe

17   passage of the trains on the tracks, correct?

18   A.  Safe passage of the trains, yes, and as far as the men

19   and equipment, surrounding territories, and people on the

20   tracks.

21   Q.  Because if those tracks aren't protected, there could be

22   substantial damage to person and property, correct?

23   A.  Yes, life altering.

24   Q.  And that can be very costly in terms of lives and costly

25   to the railroad, correct?

1    A.  Yes.

2    Q.  So throughout the course of your time, you've removed

3    hundreds of tracks from service, correct?

4    A.  Yes.

5    Q.  Issued hundreds of slow orders, correct?

6    A.  Correct.

7    Q.  And reported thousands of minor defects, correct?

8    A.  Lots, yes.

9    Q.  And that's the job you were paid to do, correct?

10   A.  Yes.

11   Q.  Now, as a union member, you have an ability to contact

12   your union representative if you have concerns about what

13   you're being asked to do at the railroad, correct?

14   A.  Yes, I do.

15   Q.  And you have an ability to make safety complaints under

16   a process at BNSF that's called the SIRP process, correct?

17   A.  I'm familiar.  I've never filled out a SIRP, and I don't

18   know that pertains to maintenance of way.  I believe it

19   pertains to the transportation department, which is

20   operations.

21   Q.  You're familiar with the Safety Issue Resolution

22   Process?

23   A.  As far as it's required by operations, but as far as

24   maintenance of way engineering, we were the ones that

25   repaired those.  We never wrote them up.

1   Q.  You never tried to write up a SIRP?

2   A.  I don't think so.

3   Q.  You had safety meetings?

4   A.  Yes, we had safety meetings.

5   Q.  Okay.  Fair to say that before you began working under

6   Blaine Hoppenrath or Stephen Chartier, you had a lot of

7   anonymity?  In other words, you didn't have somebody

8   following you around, correct?

9   A.  I'm not sure what that means.

10  Q.  What I mean by that is you were able to work alone?

11  A.  I did work alone and I worked with my roadmasters and

12  other maintenance of way employees.

13  Q.  And the roadmasters typically weren't following you

14  around.  They were relying upon you to report the defects

15  and to enter your time appropriately; correct?

16  A.  Yes.

17  Q.  Fair to say you didn't like working under Blaine

18  Hoppenrath, is that correct?

19  A.  No, that's not correct.

20  Q.  She was a new roadmaster?

21  A.  That is correct.

22  Q.  She was a young roadmaster?

23  A.  Yes.

24  Q.  Did you respect her?

25  A.  Yes.  I offered her many times to help her.  I consoled

```
 1    her a few times when she got overwhelmed and began crying.
 2    I was there for her.
 3    Q.  But you left Dayton's Bluff, which is the area she
 4    supervised.  You said you were going to try something else,
 5    correct?
 6    A.  I said that I wanted a change because I felt
 7    uncomfortable in that situation.
 8    Q.  But you were actually bumped out of that position,
 9    correct?
10    A.  No.
11    Q.  You don't agree that you were bumped out of the position
12    at Dayton's Bluff?
13    A.  No, I don't.
14    Q.  You went to Northtown?
15    A.  I bid on the job in St. Cloud.
16    Q.  And then what happened from that?  Somebody bumped you
17    off that position?
18    A.  Somebody bumped me off that position before I reported
19    to it, and then I reported to the Northtown inspector.
20    Q.  Mr. Chartier?
21    A.  Well, under his authority, yes.
22    Q.  Right.  Worked under him for about six weeks?
23    A.  I'm unaware of the timeframe.
24    Q.  And if your transcript indicates you left sometime late
25    January and then returned to Dayton's Bluff March 15, call
```

1    it about six weeks?

2    A.  Yeah.  I'm unaware.  They re-bulletined that job and I

3    did not bid on that job, so somebody else got it on bid, and

4    so then at that point I had to place myself somewhere else.

5    Q.  You didn't like working under Mr. Chartier, did you?

6    A.  I did not care for that territory and I felt like

7    Chartier was part of the problem.  But I did not like that

8    territory.  I was uncomfortable, and with the pressures from

9    him harassing me, I did not feel that I was safe on the

10   railroad track.

11   Q.  And Mr. Chartier was in the field with you more often

12   than you were used to, correct?

13   A.  No.

14   Q.  That's not true?

15   A.  That's not true.

16   Q.  Well, he was in the field often with you, wasn't he?

17   A.  A couple of times.

18   Q.  And he required you to give measurements of the defects

19   you were reporting, correct?

20   A.  I always gave -- I always donated any information of my

21   measurements.

22   Q.  And that's one thing he required, correct?

23   A.  I don't know that he required.  I mean, he should.  It's

24   part of the policy as far as what -- when you take something

25   out of service, you have to.  It's required that you take

1    the measurements and put in what it is.

2    Q.  And you voluntarily went back to Dayton's Bluff in March

3    of 2016 despite the fact that you'd filed HR complaints

4    against Blaine Hoppenrath and thought you were being

5    retaliated against, correct?

6    A.  That's correct.

7    Q.  Actually, the complaint you made to the hotline says

8    that you thought you'd been harassed for two years, not

9    since December of 2015.  Do you recall that?

10   A.  I don't recall.

11   Q.  Well, let's maybe jump forward to that and it's Exhibit

12   57.  Oh, let me see here.  I think it is.  I'm sorry, it's

13   53.  We're jumping a little ahead of time, but I wanted to

14   go over this issue with you.

15        This is the complaint you make in April, April 5,

16   2016.  And under the summary it says that:  "Track Inspector

17   Donald Sanders alleges Division Engineer Keith Jones and

18   Roadmaster Blaine Hoppenrath have been harassing Donald for

19   over two years."  Is that what that says?

20   A.  Yes.

21   Q.  Okay.  So your claim actually just doesn't date back to

22   December of 2015.  You're claiming this harassment started

23   years earlier.

24   A.  Yes.

25   Q.  Okay.  Thank you.  That's all I wanted from that.

1         Mr. Sanders, you agree that your employment with

2    BNSF was subject to the Collective Bargaining Agreement?

3    A.  Yes.

4    Q.  There's been some discussion about that here today.  You

5    didn't think that that process provided for under the

6    Collective Bargaining Agreement was fair and impartial?

7    A.  No, because -- do I answer this or do I just say no?

8    Q.  You can go ahead and answer.

9    A.  I would say no, I do not feel it was fair and impartial

10   because I and myself, with my union representation, provided

11   the benefit of the knowledge of BNSF's rules and

12   documentation that I was in the right for what I did, and

13   they completely ignored their own rules.

14   Q.  Could we look at Exhibit 5, page 57, please?

15        And if we go to -- I think it's B.  Start with B.

16        So this is Rule 40 of the Collective Bargaining

17   Agreement.  Have you seen this before?

18   A.  I'm sure I have.

19   Q.  One of the issues you raised was you were taken out of

20   service, so this rule actually provides that you can be held

21   out of service pending the investigation, correct?

22   A.  That's what it says.

23   Q.  Okay.  And it allows for representation.  You have

24   representation at a hearing, correct?

25   A.  A union rep representation.

1    Q.  Right.  And (c) provides that you can present witnesses,

2    correct?

3    A.  We were not allowed to provide witnesses.

4    Q.  Did you ask to provide any witnesses?

5    A.  That's a question you'd have to ask Mozinski.

6    Q.  Okay.  Well, the rule says that you can produce

7    witnesses at the investigation hearing, correct?

8    A.  Correct.  The most that I was allowed to produce was a

9    written piece of paper from one of the gentlemen.

10   Q.  Well, I'm just asking what you rule says, and that is

11   what it says, correct?

12   A.  That is what the rule says.  It's not what was being

13   allowed.

14   Q.  And the rule also allows you to -- apparently you did

15   produce documents because you did produce evidence, correct?

16   A.  You just asked me about people.

17   Q.  Okay.  Well, let's go on to the next step.  You could

18   produce documents or evidence, correct?

19   A.  Yes.

20   Q.  And you did that.

21   A.  Yes, I did.

22   Q.  All right.  And then after the hearing is held, then

23   there's a timeframe for a decision to be issued, correct?

24   A.  Yeah.  There was a period after the hearing.  I don't

25   know what the timeframe is.

1    Q.  Okay.  And then even after the hearing, you have the

2    right to an appeal of that decision, correct?

3    A.  Yes.

4    Q.  And you exercised that right, correct?

5    A.  The appeal was exercised, that is correct.

6    Q.  And there was an appeal after that as well.

7    A.  Yes.  Unfortunately, they only allow the evidence that

8    BNSF allowed.

9    Q.  Okay.  And that appeal was denied as well; correct?

10   A.  That is correct.

11   Q.  And you also filed a complaint with the OSHA, correct?

12   A.  I don't recall that.

13   Q.  And that complaint was dismissed.  Are you aware of

14   that?

15   A.  I don't recall any of the OSHA part, no.

16   Q.  Have you seen the letter from OSHA addressed to your

17   lawyers?

18   A.  I'm unaware if they have shown me a letter.

19   Q.  Fair to say that as you sit here today, you've never

20   gotten your job back at BNSF through any of these appeal

21   processes, correct?

22   A.  Yes.

23   Q.  That's correct.

24             The first hearing, that was April 3, 2016,

25   correct, if the records indicate that?

1    A.  If that's what they say, yes.

2    Q.  Okay.  You were present during the entire hearing,

3    correct?

4    A.  Yes.

5    Q.  You heard Blaine Hoppenrath testify?

6    A.  Yes.

7    Q.  You heard her testify that she arrived at Dayton's Bluff

8    at 8 a.m. on March 19 and didn't see any sign of your

9    vehicle or hi-rail truck being used, correct?

10   A.  I don't recall anything that Blaine said in the

11   testimony.

12   Q.  Okay.  You don't recall that she said that the first

13   time she saw your truck or you that morning was after

14   9 o'clock?

15   A.  Just stuff that I read.  I do not recall it, no.

16   Q.  Okay.  Fair to say the records indicate you didn't

17   obtain any track authority until after 9 a.m. that morning,

18   correct?

19   A.  That's correct.

20   Q.  And do you recall what time you left that day?

21   A.  Somewhere between 2:00 and 2:40, I'm assuming.

22   Q.  Okay.  And did you enter your time that day?

23   A.  I don't know that.

24   Q.  You, at that time, were using the system called PARS,

25   correct?

```
1    A.  Yes.

2    Q.  And do you recall entering eight hours of time for that

3    day?

4    A.  I'm sure I entered something.  I don't recall what it

5    was.

6    Q.  You never tried to change your time entry from that day,

7    March 19, correct?

8    A.  I don't believe.  I did not.

9    Q.  So there would have been March 20th, 21st, 22nd, 23rd,

10   24th, all the way to March 29th.  You never tried to change

11   that time entry?

12   A.  My time is not wrong for that day.

13   Q.  Well, one of the things you said at the hearing was you

14   thought it wasn't wrong because you had an app on your phone

15   that tracked your vehicle; is that correct?

16   A.  That's not why I said it wasn't wrong.  It's because I

17   was at work.

18   Q.  Well, let me ask you about the document you did

19   introduce, which was a GPS tracking which was supposed to

20   show where your truck was going, correct?

21   A.  I don't know.  It had nothing to do with my truck.  I

22   think it had something to do with close variation of where

23   my phone was.  I don't recall the whole thing.

24   Q.  You'd agree that that app and those GPS records never

25   showed your truck at Bridal Veil that morning?
```

```
1    A.  My truck was -- I was in my personal vehicle at Bridal

2    Veil.

3    Q.  The records you introduced at the investigation hearing

4    never showed your vehicle at Bridal Veil that morning.

5    A.  I was in my personal vehicle.  It would not show the

6    company vehicle at Bridal Veil.

7    Q.  And didn't your wife have some tracking device to show

8    where you were?

9    A.  I don't know if she did.  I would assume that, at least

10   for sure nowadays, that I have enough apps on my phone it

11   knows where I'm at every second.

12   Q.  You have no evidence other than your testimony that you

13   were at Bridal Veil that morning.

14   A.  I mean, if BNSF would have pulled up their cameras, they

15   have cameras there, they could have seen there if they

16   actually wanted to pull out the footage.

17   Q.  My question is you have no evidence other than your

18   testimony that you were at Bridal Veil that morning.

19   A.  That's correct.

20   Q.  A location where you were not supposed to be?

21   A.  That is incorrect.  It was BNSF property, and I was

22   working.

23   Q.  And you were scheduled to be at Dayton's Bluff?

24   A.  I was scheduled to be at work on BNSF property that day.

25   Q.  Okay.  And Blaine Hoppenrath was looking for you at
```

```
 1    8:00 a.m. at Dayton's Bluff?

 2    A.  Yes.  I already been at work working.

 3    Q.  And that was evidence considered by those that made the

 4    decision to terminate you.  You're aware of that?

 5    A.  What's that?

 6    Q.  All of this evidence was considered by those who made

 7    the decision to terminate you?

 8    A.  It was -- yes, I was ultimately terminated.

 9    Q.  Okay.  You didn't have any trouble entering your time

10    that day, correct?

11    A.  I don't recall if I had trouble entering time on that

12    day or not.

13    Q.  Well, it sounds like you were pretty familiar with the

14    PARS system and knew how to enter time.

15    A.  Yes.

16    Q.  And had done that without difficulty every time you used

17    PARS?

18    A.  Yes.

19    Q.  Didn't have to call anyone to help you?

20    A.  No, I didn't that day, no.

21    Q.  It sounds like you weren't intending to change that time

22    entry, were you?

23    A.  As I stated, I was at work that day for the full time.

24    I was accused of not being at the location that she wanted

25    me at at a certain time.
```

1    Q.  And then there was another investigation held on

2    April 8, 2016, correct?

3    A.  It was a second, yes.

4    Q.  Again, you were represented by John Mozinski at that

5    investigation?

6    A.  Yes, I was.

7    Q.  And the claim in that event was on March 25.  You

8    charged 8.5 hours for working when the evidence indicated

9    you worked less than 5 hours.  Is that right?

10   A.  That's what -- that is what I was charged with, yes.

11   Q.  And you agree you didn't work 8.5 hours that day,

12   correct?

13   A.  I did not work 8.5 hours that day, no.

14   Q.  You actually did change your time for that time entry,

15   didn't you?

16   A.  Yes, as I stated in my previous statement about that

17   situation.

18   Q.  But you didn't change it to the right hours that you

19   worked?

20   A.  Like I said earlier when I stated I attempted to

21   recollect what hours I worked.  And this was before I knew

22   that I was being investigated for that day.  And I did not

23   know the exact hours, so I contacted one of my employees --

24   or not my employees -- a co-worker to see if he would

25   ascertain my briefcase or my documents.

1    Q.  So you arrived at work that morning at 7:00 a.m. and

2    left by 10:13?

3    A.  I don't recall what time I got to work.

4    Q.  You don't dispute that was about the time you worked

5    that day?

6    A.  I can't dispute or deny or agree.  I don't recall.

7    Q.  Okay.  But you don't disagree you entered 8.5 hours and

8    then changed it to 4.5 hours?

9    A.  I put a placeholder in because I was required to have

10   time in for that day.

11   Q.  Okay.  But the placeholder would be the 8.5 hours,

12   right?

13   A.  That's correct.

14   Q.  But then you changed it?

15   A.  Yes.

16   Q.  To 4.5?

17   A.  Yes.

18   Q.  Which didn't match with the hours that you worked?

19   A.  As I stated before, I did not have my documentation to

20   say what I worked.  And when I went to fix it, I was locked

21   out of the computer system.

22   Q.  And then on March 26, again you worked just part of the

23   day but charged for nine hours that day, which would include

24   one hour of overtime?

25   A.  Do you recall what day -- I don't recall -- what are you

1    asking?  I did this on the 26th?

2    Q.  Correct.  Do you remember working on the 26th, which was

3    a Saturday?

4    A.  I don't know what I did.  I know I was at work.  I don't

5    know.  I don't recall what I did.

6    Q.  Do you recall being at the investigation where there was

7    discussion regarding this?

8    A.  I was -- yes, I don't recall what the investigation was,

9    but I know I was at one.

10   Q.  Okay.  And there was testimony that while Ms. Hoppenrath

11   didn't see you arrive, initially she saw you leaving your

12   vehicle at 10:56 that morning but that you charged nine

13   hours of time.  Do you recall that testimony?

14   A.  That she said I put nine hours in on the 26th?

15   Q.  Yes.

16   A.  I do recall her saying that I put hours in on the 26th.

17   I don't recall that she said it was nine hours or what it

18   was.

19   Q.  And do you recall going into the time system and

20   changing that time entry, too, to remove one hour of

21   overtime?

22   A.  On the 26th I did not put my time in until on the 29th

23   when I came after my time off.  She charged me for something

24   on a day that she said I did when I didn't do it that day.

25   I did it on the 29th.

```
 1    Q.  Okay.  Well, let's just take it from there then.

 2             On the 29th you entered your time for the 26th,

 3    the nine hours, correct?

 4    A.  I walked into the Bluffs.  I turned on my computer.  I

 5    was going to do my payroll and I realized I hadn't submitted

 6    any hours, period, for the 26th because I was in not a good

 7    work place on the 26th.  I don't recall what I did on the

 8    26th.  I don't know.  I immediately threw in an early start

 9    and eight hours.  I logged out of the computer because

10    people said that Keith Jones and some other people were

11    outside.  I was walking out to get my briefcase and stuff

12    out of my truck and that's when Keith and them told me that

13    I had to sit down and they were going to talk to me.

14    Q.  At some point before the hearing you attempted to change

15    your time for that day as well, correct?

16    A.  The same day that I attempted to correct the 25th, which

17    was the same day that they walked me off the property for

18    the 19th.

19    Q.  And we talked about the appeal that Mr. Mozinski made,

20    correct?  You're aware that Mr. Mozinski appealed the

21    decision to terminate?

22    A.  I'm assuming he did.  I don't have full -- I don't fully

23    recall it.

24    Q.  And that decision was appealed to BNSF and that

25    dismissal was upheld.  You're aware of that?
```

1    A.  Yes.

2    Q.  Okay.  And we talked a little bit about the other

3    appeals that were taken and complaints filed?

4    A.  Yes, you did.

5    Q.  I want to touch briefly -- if I still have time, Your

6    Honor -- on some prior discipline.

7              THE COURT:  You do.  That's just fine.

8    Q.  Okay.  Could we see Exhibit 11?

9              The date on this is October of 2012.  Do we turn

10   something over?

11             THE COURT:  Let me just take a look at one thing.

12   Sorry.  Twelve was discussed this morning, wasn't it?

13             MS. FERGUSON:  Exhibit 11, 12, 13 and 15 were

14   allowed.

15             THE COURT:  Great.  Thank you.

16   BY MS. FERGUSON:

17   Q.  This document is dated October 2, 2012, correct?

18   A.  Yes.

19   Q.  Do you want to take a moment to read that?

20   A.  Yes.

21   Q.  That was some discipline you received as it related to

22   piloting a rail grinder exceeding the limits of authority,

23   correct?

24   A.  I haven't read it yet.

25   Q.  Oh, go ahead.  I'm sorry.

1    A.  (Pause - witness reading)  Yes.

2    Q.  And BNSF worked with you in regard to that issue;

3    correct?

4    A.  This is one of the ones that I spoke about earlier that

5    I'd worked all day.  This happened at 02:30 in the morning.

6    The dispatcher made us sit on track until my roadmaster

7    showed up and talked to me.  They then told me to get back

8    to work and drug tested and piss tested me at about

9    6 o'clock in the morning, maybe a little later after this,

10   so ...

11   Q.  And BNSF worked with you in regard to that charge or

12   allegation, correct?

13   A.  They did, because they left me in service without drug

14   testing me or piss testing me.

15   Q.  Could we go to Exhibit 12, please.

16           And that -- this is dated October 8, 2012.  Do you

17   see this?  It's entitled "Investigation Waiver."

18   A.  Yes.

19   Q.  Okay.  And it says:  "By signing below you acknowledge

20   acceptance of this Level S 30-day records suspension and

21   waive your right to formal investigation."  Correct?  Did I

22   read that correctly, the last paragraph?

23   A.  Yeah, I never denied what happened.

24   Q.  Okay.  And you can scroll down and look at the names

25   that are on there.  Is that your signature?

1    A.  Yes.

2    Q.  All right.  And then Exhibit 13, this is dated

3    November 21, 2012.  Do you want to take a moment to look at

4    that?

5    A.  (Witness complies).  I believe this is when I was hit by

6    the train.

7    Q.  Do you recall the allegations as it relates to you,

8    alleged failure to be alert and attentive to train movement

9    while riding in a vehicle across the yard?

10   A.  Yes.

11   Q.  And with this incident, you were actually pulled from

12   service, correct?

13   A.  Thirty days.

14   Q.  As the Collective Bargaining Agreement allows, correct?

15   If you look at paragraph 2 there it says:  "This is to

16   advise" -- I assume that's your name -- "is being withheld

17   from service pending results of investigation."

18           Correct?

19   A.  Correct.

20   Q.  Which was the same thing that happened in 2016, correct?

21   A.  When I was fired?

22   Q.  Before the investigation you were taken out of service,

23   correct?

24   A.  There's a slight difference in here.  Like, I wasn't

25   locked out of the computer program.

1    Q.  Okay.

2    A.  Like I was still allowed to do any BNSF stuff on the

3    computer at (indicating) this one, when at the other one I

4    was completely locked out of everything.

5    Q.  The letter indicates that you're being advised you're

6    being withheld from service pending results from the

7    investigation, correct?

8    A.  Yeah, that I wasn't allowed to come to work, correct.

9    Q.  And there was actually an investigation that was held,

10   correct, as it relates to this?

11   A.  I assume so.  I don't recall.

12   Q.  Okay.  And if we can look at Exhibit 15.  Does this look

13   familiar to you?

14   A.  (Witness reading).  I'm having a hard time to

15   comprehend.  I believe that it says that I was punished for

16   being a passenger in the vehicle.

17   Q.  It says, third paragraph down:  "It's been determined

18   through testimony and exhibits brought forth during the

19   investigation you were in violation MOWOR 1.20, Alert to

20   Train Movement."  And then it talks about the discipline.

21   It says:  "In assessing discipline, consideration was given

22   to your personnel record."

23   A.  Correct.  As I said, I was being punished for being a

24   passenger.

25   Q.  Okay.  Then one last discipline issue happened in early

```
1    2015, correct?  There was a discipline as it related to your

2    use of a cell phone while operating a vehicle.

3    A.  Yes, I was.

4    Q.  And BNSF worked with you regarding that discipline as

5    well, correct?

6    A.  They did not work with me.  I just said I touched my

7    phone.  I agreed that I touched my phone while I was in a

8    vehicle.

9    Q.  You weren't dismissed?

10   A.  No, it was a written -- they wanted to give me a

11   written -- I don't know -- reprimand, like a slap on the

12   hand.

13   Q.  And you didn't have an investigation.  There was a

14   waiver of investigation as it related to that?

15   A.  I believe me and Keith Jones discussed it at a safety

16   meeting.

17   Q.  And he was the division engineer at that time, correct?

18   A.  Yes.

19            MS. FERGUSON:  All right.  Is this a good time,

20   Your Honor?

21            THE COURT:  Certainly.

22            MS. FERGUSON:  Okay.

23            THE COURT:  All right.  We'll adjourn for a little

24   less than an hour.  We'll resume proceedings promptly at

25   1:00 p.m.  We're adjourned.
```

```
 1              (Lunch recess taken at 12:05 p.m.)

 2                          *       *       *       *

 3              (1:00 p.m.)

 4                              IN OPEN COURT

 5         (Without the jury)

 6              THE COURT:  Good afternoon, everyone.  Please be

 7         seated.  I'm told we have an exhibit to discuss.

 8              MS. FERGUSON:  We wanted to move for the admission

 9         of 85, 86 and 87, which are the 2016 OSHA findings and

10         complaint, and the 2014, as public records that are

11         self-authenticating.

12              (Pause)

13              THE COURT:  85, 86 and 87?

14              MS. FERGUSON:  Yes.

15              THE COURT:  Mr. Kaster?

16              MR. LUCAS KASTER:  Your Honor, we laid out our

17         objections to these exhibits in our pretrial motions.  The

18         documents are irrelevant, prejudicial, contain inadmissible

19         hearsay, and take the responsibility of the jury's decision

20         out of their hands by submitting partial findings from

21         bodies that do not have the evidence before them.  And we're

22         asking -- there's already been questioning about it, they've

23         already gotten into the details of them, they're asking to

24         introduce those documents through a witness who has no

25         foundation for the documents, they haven't laid a proper
```

1    foundation for them.  We're asking that these exhibits be

2    excluded.

3               THE COURT:  As to the pretrial motions piece of

4    this, my understanding or my recollection of that -- you all

5    will have to refresh my recollection if I'm wrong -- is that

6    we were dealing with a relevance objection at that time.

7    Nothing more, nothing less, correct?

8               MR. LUCAS KASTER:  I believe I addressed all of

9    these issues at the time, Your Honor.  I was trying to

10   remember as well in terms of all the proceedings, but I

11   remember raising foundation questions around who they were

12   going to have testify about these things.

13              THE COURT:  Well, I asked that question.  I'm not

14   raising that question to ding you.  I'm raising the question

15   because I think all I resolved at the pretrial stage was the

16   relevance of this, and I asked BNSF, "Who are you going to

17   get this stuff in through?"  And I think you said

18   Mr. Sanders, but I can't remember if that's the only witness

19   through whom you indicated you'd be getting these documents

20   admitted.

21              MS. FERGUSON:  We think that they don't require

22   foundation because they're a public record.

23              THE COURT:  All right.  Let's address that issue,

24   Mr. Kaster.

25              MR. LUCAS KASTER:  They still need to have

1    foundation that they are a document that they purport to be.

2            THE COURT:  Yeah.  I mean, in one of the cases

3    that I read on this issue there was a very specific -- maybe

4    I'm mixing up something here.  You're suggesting that the

5    law is just because something is a public document, no

6    witness here needs to be aware of it or familiar with it.

7            MS. FERGUSON:  That's correct.

8            THE COURT:  You got a case for that?

9            MS. FERGUSON:  I don't.  We could certainly look

10   at that and maybe deal with it later.  I wasn't trying to

11   get it in through this witness.  I was trying to get it in

12   because I think we have the foundation, so we can deal with

13   it later.

14           THE COURT:  Yeah, I'll need authority for that

15   legal proposition.  And if I'm persuaded that that's the

16   law, then they're coming in.  And just to be clear from the

17   pretrial hearing, I get it.  I share the concern.  We're

18   going to need some kind of limiting instruction here on this

19   question, but I -- is it *Gunderson*?

20           MS. FERGUSON:  Yes.

21           THE COURT:  Yeah.  I don't know what else to do

22   with that case.  And so for purposes of this record, I am

23   sort of throwing my ruling entirely, or almost entirely, on

24   that decision.  And I think I made that fairly clear at the

25   pretrial, so I'm not going to repeat it now.

```
 1                So let's get that legal question or legal
 2      authority issue solved, and again, solved to our
 3      satisfaction.  Then we're good.
 4                Mr. Kaster, obviously you're free to submit
 5      contrary legal authority.
 6                All right.  Is that the only issue that we needed
 7      to address?
 8                MS. DONESKY:  Yes, Your Honor.
 9                MS. FERGUSON:  Yes.
10                THE COURT:  Okay.
11                MS. FERGUSON:  Oh, and since we're off the
12      record --
13                (Discussion held off the record)
14                MR. JAMES KASTER:  I have the same objections that
15      we had to the other documents.
16                THE COURT:  Understood.  I'll overrule that,
17      assuming there's adequate foundation laid for it.
18      Somebody's seen it, understands what it is.
19                MS. FERGUSON:  I think the witness is going to
20      testify that authored it.
21                THE COURT:  Great.  Perfect.  Then I'll anticipate
22      that will be sufficient foundation.  I'll overrule the
23      objection.
24                MR. LUCAS KASTER:  Your Honor, sorry.  I just
25      wanted to bring up one issue.
```

1          We've addressed now a couple times these pictures

2     that Mr. Sanders took of the derailment.  Counsel again

3     asked questions, as has been asked of almost every witness

4     from defense counsel, about derailments, about what could

5     happen.

6          My understanding -- and I understand the Court's

7     ruling to this point -- but defense counsel has now opened

8     the door to derailments.  These are pictures taken by

9     Mr. Sanders regarding a derailment.  They informed his view

10    of why he took the stances that he did, and we're asking

11    that the Court reconsider its ruling and admit the pictures

12    that we referenced before.  I can grab the specific exhibit

13    number for the Court in a second here.

14         We believe it's Exhibit 160, 1-6-0.

15         THE COURT:  I am not going to reconsider or

16    revisit or undo that ruling at this time.  I get it, but I

17    have two or three sets of interrelated concerns that I think

18    I probably shared yesterday or whenever it was that we

19    talked about this.

20         The first is that the circumstances under which

21    the pictures are taken seem sufficiently distinct from the

22    kinds of problems and issues that Mr. Sanders has talked

23    about here and that he's claiming he's been -- that he is

24    claiming he has suffered retaliation for.

25         Second, I do think the pictures have minimal

1   relevance and I am concerned -- I mean, the jury can sort of

2   envision for itself what a derailment might look like.  And

3   I think those pictures under the circumstances risk undue

4   prejudice, so I'm going to stick with the ruling that I

5   issued yesterday on that.

6           Anything further?

7           MR. LUCAS KASTER:  No, Your Honor.  Thank you.

8           THE COURT:  Okay.  Thank you, Mr. Kaster.

9           All right.  We can bring the jury in at this time?

10  Great.

11          (Jury enters)

12          THE COURT:  Thank you, everyone.  Please be

13  seated.

14          Ms. Ferguson?

15          MS. FERGUSON:  Thank you, Your Honor.

16  BY MS. FERGUSON:

17  Q.  Good afternoon, Mr. Sanders.

18  A.  Hello.

19  Q.  Could I see Exhibit 165, please?  I think it's actually

20  Plaintiff 165.  And could you scroll forward into that --

21  no, another page that shows the calendar entries?  Yes.  And

22  if we go to March 19th.  Okay.

23          Mr. Sanders, we talked this morning about your

24  calendar entries.  When in time did you make these?

25  A.  On the days that they arrived on.

1    Q.  Could we go to the 25th and 26th?

2            So -- there's for the 25th.  Your testimony is you

3    made these notes on the 25th?

4    A.  Yes.

5    Q.  Okay.  Let's go to the 26th.  And no notes for that day.

6    A.  That is correct.

7    Q.  These calendar entries weren't submitted as exhibits at

8    the investigation hearing on April 8, 2016, correct?

9    A.  I don't know.  I don't recall.

10   Q.  If the complete hearing transcript and exhibits don't

11   contain any reference, you wouldn't have any reason to

12   disagree with that, I assume.

13   A.  I'm not sure of that question there for a minute.

14   Q.  Okay.  If the record of the investigation, including the

15   exhibits, do not contain these calendar entries, I assume

16   you wouldn't have any reason to disagree that these weren't

17   submitted at the investigation.

18   A.  I don't know if they were or not.  I don't recall.

19   Q.  Have you ever been fined by the FRA?

20   A.  No.

21   Q.  Okay.  We talked a little bit about there are FRA

22   inspectors.  Are there also inspectors from the State of

23   Minnesota that inspect tracks?

24   A.  Yes.  I personally know one is Luke Babler.

25   Q.  Okay.  So in addition to FRA inspectors out looking at

1        BNSF tracks, there would also be inspectors from the State

2        of Minnesota.

3        A.  Correct.  I'm not sure when they came on.  I think it

4        was something that was required after Northstar and the

5        light rail had become, because previous to that I don't

6        recall talking to any state inspectors.

7        Q.  So we've got other inspectors checking BNSF tracks,

8        we've got geometry cars checking BNSF tracks, correct?

9        A.  Other inspectors, you mean state and federal?

10       Q.  State and federal.  The Minnesota State and the FRA, two

11       other types of inspectors other than you that could be

12       checking BNSF tracks?

13       A.  Yeah.  I can't -- I would disagree with what you just

14       said, that a federal and state inspector does come out and

15       look at the tracks.  They are not there every day.  They

16       come out and make sure that we're performing our duties as

17       we're supposed to be, and we do walk the track, correct, but

18       they are not inspecting our tracks daily, no.

19       Q.  But they are check -- inspecting and they can fine you

20       if the defects aren't reported, correct?

21       A.  That is why I report my defects.

22       Q.  Let's talk a little bit about the recordings.

23               You will admit that you didn't tell Keith Jones up

24       front that you were recording your conversations with him,

25       did you?

```
1   A.  No, I did not.

2   Q.  There are more than 90 separate recordings that you

3   made, correct?

4   A.  I don't know a number.  I'm sorry.

5   Q.  Substantial, correct?

6   A.  Yes, it was a large number of conversations.

7   Q.  You'd been recording conversations for years, correct?

8   A.  Along with taking notes, yes.

9   Q.  Okay.  I want to talk now a little bit about your

10  damages claims in this case.

11           After you were terminated, you did obtain several

12  other jobs, correct?

13  A.  I did go through numerous amounts of jobs, yes.

14  Q.  From my count from your deposition and the records I

15  reviewed, it looks like you applied to two railroads, CP and

16  UP, correct?

17  A.  I did apply to those, yes.

18  Q.  You haven't applied in recent years to either of those

19  railroads?

20  A.  No.

21  Q.  Okay.  So the last time you would have applied would

22  have been close in time to when you were terminated?

23  A.  That's correct.

24  Q.  Okay.  Fair to say that you quit various jobs because

25  you didn't get along with your supervisors?
```

1    A.  One job.

2    Q.  Okay.  So that would be one of the jobs close in time to

3    your termination in 2017, Fleet Farm?

4    A.  That would be the job, yes.

5    Q.  You left that job because there was a disagreement with

6    your supervisor?

7    A.  The disagreement was not with me or with my supervisor.

8    He was verbally harassing a female employee and I walked up

9    to HR and I told him what was going on, and I said that I

10   wasn't going to be working with a gentleman like that

11   anymore and I resigned.

12   Q.  So once you left the railroad, you no longer had the

13   protections you did at the railroad, such as the union.

14   Have any of your jobs been union since you left?

15   A.  Yes.

16   Q.  Which ones?

17   A.  Emerald Builders was Local 563.  I'm not certain on the

18   bus company.  It's possible it was, but I'm not 100 percent

19   sure.

20   Q.  You worked there less than a year, right?

21   A.  I wasn't there for very long, no.

22   Q.  The Fleet Farm job wasn't a union job?

23   A.  No, not that I recall.

24   Q.  You left General Contractors of Minnesota because of a

25   dispute you had with your supervisor?

1    A.  That is incorrect.

2    Q.  Did you leave -- is it called GCN?

3    A.  I did.  There was no work available for me.

4    Q.  But there were also -- was that the employer where there

5    were discrepancies about your mileage submissions?

6    A.  Yes, me and -- Doug or Dave, I don't recall, we had a

7    difference on my mileage.

8    Q.  Okay.  Because when I took your deposition you told me

9    that that in fact was the case, that you had a disagreement

10   with him and your supervisor was Jason, and you told Jason

11   you were tired of going over your mileage every pay period.

12          MR. LUCAS KASTER:  Objection.  403, the Court's

13   pretrial rulings.

14          THE COURT:  Overruled.

15   A.  I'm still friends with Jason.  Obviously they would

16   fact-check everything.  For the instance that you're talking

17   about for the mileage, yeah, everybody knows in their

18   vehicle you have a reset button on your mileage.  Every time

19   I would leave a job site or the headquarters, I would reset

20   my mileage, and those are the miles I drove.  And Doug

21   simply said according to his GPS that my mileage was

22   different.  And I don't know the amount that the difference

23   was, but I simply stated these are the miles that I drove,

24   and this is how I get my miles.  So these are my actual

25   miles driven.

```
1    Q.  And you told me at the deposition that you told Jason

2    you were tired of going over your mileage every pay period.

3    A.  I possibly did say that.  It's not fun to do every pay

4    period, no.

5    Q.  Okay.  You worked at Washington Prime as a building

6    operations manager in 2019; correct?

7    A.  Yes.

8    Q.  And you left that job because you didn't get along with

9    management?

10   A.  No, I left that job because I didn't like the way they

11   ran things there.  It didn't have anything to do with

12   management.  It was just in general.  I was hired by a lady

13   that was fired; and the new guys, they were not taking the

14   time to show me, and I'm not computer literate and I just --

15   I didn't want to do the job.

16   Q.  Now, you've been at Mann Companies, which is where you

17   still are today, since about July of 2019, correct?

18   A.  Yes.  So when I left managing Maplewood Mall I went to

19   Mann Companies.

20   Q.  And I think you told us earlier today that you are now

21   earning at least the same, if not more, hourly as you earned

22   at the railroad.

23   A.  I make $33 an hour.

24   Q.  The answer to that is yes?

25   A.  Oh, sorry.  Then hourly?
```

1    Q.  Right.

2    A.  I make a little more.  As far as my full salary and

3    benefits, no.

4    Q.  That was my question.  You're earning hourly more than

5    what you did -- or you're earning more than you did at BNSF?

6    A.  That is correct.

7    Q.  It's your claim in this case that you suffered anxiety

8    and depression as a result of the termination?

9    A.  That is correct.

10   Q.  Just a few questions on that.  You have no medical

11   diagnosis of anxiety or depression, right?

12   A.  I took some pills.  I was prescribed some anxiety pills

13   from my doctors.  I did not see a counselor.

14   Q.  At the time I took your deposition you said you had not

15   taken any medication for depression.  Is that something

16   that's happened since?

17   A.  I don't know when I started taking them.

18   Q.  Are you claiming you're taking medication now?

19   A.  I have a prescription for them.  I -- I don't know when

20   it was given to me.

21   Q.  Are you taking medication now?

22   A.  No.  I don't like taking those pills.

23   Q.  Okay.  So you haven't taken medication in recent years

24   for anxiety or depression?

25   A.  In recent years, yes, I have.

```
1    Q.  Okay.  At least when I asked you that question at your
2    deposition you said no, you hadn't.  So your answer to that
3    has changed?
4    A.  That was when I gave my deposition, so yes.
5    Q.  And that was in 2020, February of 2020.  And you haven't
6    seen any doctors, counselors, for anxiety or depression?
7    A.  I got a prescription for anxiety, so I did see a doctor.
8    Q.  And what was that doctor's name?
9    A.  I'm not sure if it was Chad Olinger or Loren Wilkes.  It
10   would have been one of those two doctors.
11   Q.  And no idea when that would have been?
12   A.  That's what -- yeah, no, I don't know.
13   Q.  Now -- and one last question.  Did you ever refuse to
14   record a defect, track defect, because of Keith Jones'
15   instruction to you?
16   A.  That's a tricky question.  I'm not sure I completely
17   understand that question.
18   Q.  Well, this morning you suggested that you were told not
19   to record track defects.  Did you ever refuse to record a
20   track defect based on what Keith Jones told you to do?
21   A.  I'm still confused.  I'm not a hundred percent sure on
22   this answer, what you're asking.  I believe -- I'm not a
23   hundred percent sure.  So I believe my answer is yes, I did
24   refuse a direct order to not report defects.  I was told by
25   Keith many times not to report defects and I did.
```

1    Q.  You didn't record defects?

2    A.  I did report defects.

3    Q.  You did -- well, that was my question.  You did record

4    the defects.  You never refused to do it, correct?  You

5    recorded all the defects that you found.

6    A.  I'm still -- I'm really confused on your question.  I

7    believe what you're asking me is did Keith tell me not to

8    report defects?

9    Q.  No, that's not the question.

10   A.  Okay.  So I'm confused.

11   Q.  Did you ever not report defects because of what Keith

12   Jones told you?

13   A.  There may have been one time on the Stinson bridge.  I

14   don't recall the full details on what happened at that

15   moment, but I believe that we ended up putting on a slow

16   order.  I'm not a hundred percent sure.

17   Q.  Did you ever contact your union rep about that issue?

18   A.  I don't know.

19   Q.  Did you ever contact anyone at BNSF about that?

20   A.  Yes.

21   Q.  Who?  Who did you contact?

22   A.  I spoke with HR.

23   Q.  Oh, about the issues we talked about this morning?

24   A.  I spoke with her about a lot that she did not write down

25   on paper about being told to not report defects.

```
1    Q.  Did you ever refuse to put -- did you ever not put a

2    slow order in place when it was necessary because of what

3    Keith Jones told you?

4    A.  Not that I recall.  I'm 90 percent sure I always covered

5    my defects.

6    Q.  Because you were concerned about being safe.

7    A.  Yes.

8            MS. FERGUSON:  Thank you.  Those are all the

9    questions I have.

10           THE COURT:  Mr. Kaster?

11

12                   REDIRECT EXAMINATION

13   BY MR. LUCAS KASTER:

14   Q.  Mr. Sanders, do you think you were fired because you

15   refused to comply with Mr. Jones's instructions not to enter

16   defects and not to enter slow orders?

17   A.  I think that's correct.  I was harassed multiple times.

18   That was the last time that I was harassed, essentially.

19   Q.  So because you refused to follow Keith Jones's

20   instructions, you believe that's why you were fired?

21           MS. FERGUSON:  Object to the form.  Leading.

22           THE COURT:  Overruled.

23   A.  I believe that all the times that something happened to

24   me was because I reported defects.  So yes, the last -- my

25   essential punishment was termination.  Excuse me.
```

1    Q.  Counsel asked you some questions about an incident with

2    Mr. Ben Peterson.  Do you recall those questions?

3    A.  Yes.

4    Q.  What happened during that incident?

5    A.  At the hump facility, where I described the hill-like

6    bobsledding, there was a large number of defects that needed

7    to be addressed.  And I don't know the exact amount of hours

8    that the window was for.  I'm guessing it was roughly 36

9    hours.  Multiple crews would come in at different times.

10   There was contractors and just people from all over that

11   didn't know the territory or anything like that, and we were

12   supposed to have in between -- excuse me -- in between

13   different groups coming in, work groups, we were supposed to

14   have a job safety briefing so that the new people coming in

15   were aware of the protection and if anything changed

16   throughout the last time that they were there to be able to

17   safely work in the situation.

18          And I approached Ben and I told him we needed to

19   stop everything and have a job safety briefing so that

20   everybody would be aware of what was going on, and that's

21   when he grabbed me physically by the shoulder area.

22   Q.  Do the BNSF rules allow employees to stop work any time

23   there's a safety concern?

24   A.  Yes.  We need to address the situation, yes.

25   Q.  And that's what you were asking?

```
 1    A.  Yes.

 2    Q.  If we can bring up D-57, please.  Go to page 3.

 3              You were asked some questions about this letter

 4    because you filed a complaint with HR about what

 5    Mr. Peterson did to you, right?

 6    A.  Yes.

 7    Q.  If we can blow up the third paragraph that starts

 8    with -- exactly.  Thank you.

 9              So you filed a complaint with HR and then you get

10    this response from BNSF, right?

11    A.  Yes.

12    Q.  Did you feel like the BNSF HR department took this

13    complaint seriously?

14    A.  No.

15    Q.  Then if we can come out of this paragraph and go down to

16    the following paragraph at the bottom of the page.

17              BNSF claimed in its response that:

18              "The facts demonstrated that Roadmaster Peterson

19    attempted to treat Mr. Sanders with dignity and respect,

20    asking to speak with him privately and away from his peers.

21    There's no evidence to indicate Roadmaster Peterson's effort

22    to gain Mr. Sanders' attention by tapping him on the

23    shoulder was an aggressive or hostile act."

24              Did Mr. Peterson tap you on the shoulder?

25    A.  No.
```

```
1    Q.  What did he do?
2    A.  He physically grabbed my shoulder and pulled me to the
3    side and yelled at me.
4    Q.  Another example of BNSF's HR ignoring your complaint;
5    would you agree?
6              MS. FERGUSON:  Objection.  Argumentative.
7              THE COURT:  I'll allow it.
8    A.  I don't feel that it was addressed properly, no.
9    Q.  Counsel asked you some questions about the 2012 incident
10   where you were struck by a train.  You were a passenger in
11   that vehicle, right?
12   A.  I was in the back seat.
13   Q.  BNSF charged you with a rules violation, right?
14   A.  Yes.
15   Q.  Claiming you weren't alert and attentive, right?
16   A.  Correct.
17   Q.  Why do you believe BNSF charged you with a rule
18   violation after that incident?
19             MS. FERGUSON:  Objection.  Foundation.
20             THE COURT:  Sustained.
21   Q.  Did you file a claim after that?
22   A.  Yes.
23   Q.  Why?
24   A.  Well, obviously I was riding in the back seat, was not
25   my normal job duties for the day.  I was -- I don't want to
```

1    say forced to sign, but I was told that's what I was doing

2    for the day.  I was in the back of the truck doing what I

3    was supposed to be doing.  I was locating what tracks we

4    needed to get out of the yard for the mainline, which

5    required me to talk to the hump dispatcher, or the hump

6    tower and the mainline dispatcher, and I was looking through

7    our yard maps to see the road that was going.  So I wasn't

8    in the front seat.  I wasn't able to see past what the front

9    seat could see.  So I felt like I was unjustly treated.

10   Q.  Were you injured as a result of that incident?

11            MS. FERGUSON:  Objection.  Relevance.

12            THE COURT:  Allowed.

13   A.  I had some crushed -- something in my back was crushed,

14   and I have some nerve problems from it still.

15   Q.  Do you have medical bills?

16   A.  I did.

17   Q.  Did BNSF agree to pay those medical bills?

18            MS. FERGUSON:  Objection.  Relevance.

19            THE COURT:  Overruled.

20   A.  BNSF does not pay medical bills.  We do not have

21   workmen's comp.  In order to get reimbursed for anything

22   that you are injured by, you have to prove it yourself in a

23   court of law that you deserve it.

24   Q.  For example, that you didn't violate rules that day?

25   A.  I did -- I don't feel that I did.  They said I did.

1     Q.  Did BNSF pay your medical bills as a result of that

2     incident?

3     A.  They did not pay my medical bills.  I settled in a court

4     system.

5     Q.  By the way, you were at work while that incident took

6     place.

7     A.  Yes, I was on duty.

8     Q.  Doing your assigned job.

9     A.  Correct.

10    Q.  Counsel also asked you some questions about recordings.

11    Does the railroad record its employees as well?

12    A.  All the time.

13          MR. LUCAS KASTER:  I have no further questions at

14    this time.

15          THE COURT:  Ms. Ferguson.

16

17                    **RECROSS-EXAMINATION**

18    BY MS. FERGUSON:

19    Q.  I want to follow up on that last issue.  You're

20    suggesting BNSF doesn't have workers' compensation because

21    there is a different system that injured workers go to

22    called the FELA, Federal Employers Liability Act, if they

23    have an injury, correct?

24    A.  I'm not aware of the FELA.  Is that --

25    Q.  I just don't want you to leave this jury with the

1    impression that you had no recourse with an injury.

2              MR. LUCAS KASTER:  Objection.  Foundation.

3    Counsel is testifying.

4              THE COURT:  Put it in the form of a question and

5    I'll allow it.

6    BY MS. FERGUSON:

7    Q.  You went to court as it related to your injury?

8    A.  Correct.

9    Q.  And you resolved your claims, correct?

10   A.  I did.

11   Q.  And you received compensation for your injuries,

12   correct?

13   A.  I did.

14   Q.  Okay.  And that was because there's another system that

15   allows for injured railroad workers to recover damages when

16   they're injured.  It's not an administrative forum, but it's

17   a legal forum, correct?

18   A.  That's what I stated.  There's no workers' comp, that we

19   have to find a different way to be reimbursed or compensated

20   for our injuries outside of the railroad, yes.

21   Q.  And you were compensated for your injuries?

22   A.  Yes, of my own free will.

23             MS. FERGUSON:  Thank you.  Nothing further.

24             MR. LUCAS KASTER:  Nothing further, Your Honor.

25             THE COURT:  Mr. Sanders, you're excused.

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  Mr. Kaster, is Plaintiff prepared to

3     call his next witness?

4          MR. JAMES KASTER:  He is, Your Honor.  Plaintiff

5     calls John Mozinski.

6          THE COURT:  Good afternoon, Mr. Mozinski.  Why

7     don't you come up here, sir, please.  Stand between the

8     railing and the witness chair and the courtroom deputy will

9     administer the oath.

10          COURTROOM DEPUTY:  Please state your full name for

11     the record, spelling your first and last name.

12          MR. MOZINSKI:  John Mozinski, M-O-Z-I-N-S-K-I.

13          COURTROOM DEPUTY:  Please raise your right hand.

14          **JOHN MOZINSKI, PLAINTIFF'S WITNESS, SWORN**

15          THE COURT:  Thank you, Mr. Mozinski.  Please have

16     a seat.

17

18                    **DIRECT EXAMINATION**

19     BY MR. JAMES KASTER:

20     Q.  Mr. Mozinski, if you're comfortable, you can take your

21     mask off.

22          Why don't you state your full name for the record,

23     please.

24     A.  John Mozinski.

25     Q.  And where do you live?

1    A.   Barnesville, Minnesota.

2    Q.   What's your educational background?

3    A.   Went to high school at Midway K through 12 in North

4    Dakota, and then here college at Mayville State, at UND, and

5    a semester at NDSU.

6    Q.   And when did you -- you started working at BNSF at some

7    point, right?

8    A.   Yeah, got hired on at BNSF in 2006, worked the summer,

9    resigned, went back to school, and then got rehired in '07.

10   Q.   And you've been working in and around the railroad since

11   that time, right?

12   A.   Yep.  I went on a leave in 2012, and then I've been on a

13   leave since then from BNSF Railway.

14   Q.   We'll talk about that in a moment.  What positions did

15   you hold while you were at BNSF in the -- as a railroad

16   worker?

17   A.   In the craft I obviously started at, like, a sectionman

18   when you're first hired.  You work your way up to machine

19   operator, truck driver, foreman, track inspector.  And then

20   I did some grinding as well.  So everything except head

21   welder and Group I.

22   Q.   Everything -- I'm sorry?

23   A.   Everything except head welder and Group I machine

24   operator, which are the big cranes.

25   Q.   I see.  Did you also spend a brief time as an exempt

1    employee?

2    A.  I did.  How it worked is you have to take a test, pass

3    it.  Once you pass the test you can apply for jobs.  I

4    applied for the jobs.  They put us in a pool.  And then as

5    vacancies would come up on the big RSG gangs, you would be

6    asked to go and report to that.  You interviewed like in

7    January.  So I was the second out of like 25 people.  A

8    position came up, I went to it, but it wasn't for me so I

9    decided to come back.

10   Q.  And how soon after you went did you decide to come back?

11   A.  I completed the week out there.  It was a long time

12   from -- we interviewed in like January, and they called you

13   in like April, and so things had changed.

14   Q.  I see.  When you say "out there," what are you talking

15   about, "out there"?

16   A.  We had to fly down to Fort Worth to interview, and

17   that's where we had like interviews with other exempts and

18   stuff.

19   Q.  I see.  You said an RSG gang.  I'm going to ask you if

20   we use terms like that, that we define them, okay?

21   A.  Oh, okay.

22   Q.  What's that?

23   A.  It's a Regional Systems Gang.  It's entry level for

24   BNSF.  They're the big production gangs that travel around

25   the country.

```
1    Q.  I see.  You went on leave, you said, at one point in
2    time, right?
3    A.  Yup.
4    Q.  And when did you say that you went on leave?
5    A.  So I went on leave in October of 2012.
6    Q.  Okay.  And for what purpose?
7    A.  So obviously to work on the railroad you have to belong
8    to the union, and so I was our local chairman for a year
9    before from 2011 to 2012, and then I ran for an elected
10   position in 2012 and was elected as a vice-chairman, zone
11   four, for North Dakota.
12   Q.  And was that a full-time position then?
13   A.  Yep, full-time position.
14   Q.  And what did you do as the vice-chairman?
15   A.  So as the vice-chairman you deal with roadmasters, the
16   division engineers for the area that you cover, so eastern
17   Montana, North Dakota, up to Minnesota, down to South
18   Dakota.  Just making sure any claims, grievances, are
19   progressed, any pay issues, investigations, anything along
20   those lines.  Anything to do with the CBA; any safety
21   disputes, anything like that.
22   Q.  Did you say the CEA or the CBA?
23   A.  CBA.
24   Q.  The CBA, the Collective Bargaining Agreement?
25   A.  Yep.
```

```
1    Q.  Okay.  And presently you hold the position of what?

2    A.  Presently I'm the general chairman, so I cover from

3    Wisconsin out to the West Coast, District 100, 200 and 300;

4    and then a small short line in Montana, Montana Rail Link.

5    Q.  And since when have you been the general chairman?

6    A.  So I was elected to that in September of 2020.

7    Q.  And how frequently are those elections?

8    A.  Every four years we're elected to the positions.

9    Q.  What are your duties as general chairman?

10   A.  So I oversee and run our office.  Our office, we used to

11   be in Minneapolis, moved it to Moorehead because it's closer

12   to me.  We have two ladies that work out of our office, and

13   then we have 5 vices that cover each zone.  And so the

14   financial records, the tax stuff, and then overseeing all

15   claims and grievances; arbitration, contract negotiations.

16   Q.  So let's go back in time a little bit to when you were

17   working in the craft, as you put it.

18          You said you worked for a time as a track

19   inspector?

20   A.  Yeah, track inspector foreman, general foreman.

21   Q.  And how long were you a track inspector?

22   A.  Roughly from about 2009 till 2012.

23   Q.  And we've talked a lot about the duties of a track

24   inspector.  We don't have to go into great deal about that,

25   but what in your view does the job entail?
```

1    A.  So a track inspector, we have these little hi-rail

2    trucks that you set on.  You have a segment of track mile

3    post that you inspect and oversee and have to provide

4    reports to, complying with the FRA standards, complying with

5    the BNSF standards, and making sure you inspect for safe

6    operation of train traffic movements.

7    Q.  And if you detect a defect, if you observe a defect,

8    what is your obligation under the FRA and the engineering

9    instructions of BNSF, as you understand it?

10   A.  Your obligation is to report it.

11   Q.  Now, are there particular pressures on track inspectors?

12   A.  Yeah.  I mean -- and I even hate saying the -- but it's

13   like the terminology that we use on the railroad.  It's when

14   you're track inspecting, it's like traveling down the track

15   with a noose around your neck, because if anything happens,

16   you're the person that gets in trouble.  I mean, you're the

17   person that is responsible if anything would happen behind

18   you or a couple days ago if you inspect it.  And so it's

19   always -- and then also you're -- you know, you're in charge

20   of if you're inspecting late on a Friday and you come across

21   something and it has to be repaired, well, then not only is

22   your supervisor usually annoyed, but your guys that you work

23   with are annoyed because it's a Friday.  They were going to

24   get out of there.  So you're trying to make sure you juggle

25   that.

1    Q.  And you say you worked in that particular role for

2    several years?

3    A.  Yup.

4    Q.  What is -- did you for a period of time while you were

5    working in that job, in that particular job, buy job

6    insurance?

7    A.  Yeah.  So, I mean, I was -- obviously to get elected to

8    the position you have to be willing to talk to the managers,

9    you know, especially for the CBA and different stuff like

10   that; like the foreman and the track inspector jobs, in case

11   anything does happen and you would have to go to

12   investigation, you get job insurance.  So if you got 30 days

13   off or a certain amount of time, you would have income

14   coming in.  Because otherwise you would be suspended and not

15   have any money coming in to you while you were off of work.

16   Q.  When you were a track inspector, did you increase your

17   job insurance?

18   A.  Yeah.  When I held the position of track inspector you'd

19   increase it.  And then when I'd go to, like, a truck driver

20   or sectionman where you weren't in charge, you weren't the

21   boss, you could lower it down because obviously the pressure

22   wasn't the same in that.

23   Q.  Let's change subjects now.  The time entry system, the

24   PARS system.

25   A.  Okay.

1   Q.  You were entering time in that system for a period of

2   time when you were in the craft, right?

3   A.  Yeah.

4   Q.  And you were also familiar with that system in 2015 and

5   2016, at least as it related to Mr. Sanders' matter, right?

6   A.  Yes.

7   Q.  Now, BNSF at the time when you were entering time back

8   in 2015 and 2016, did they have a time clock?

9   A.  No.  We don't have a time clock.  It's not like a

10  traditional thing where you like scan or punch a clock, you

11  go in there, you enter your own pay.  You don't have any of

12  that.

13  Q.  And was there a particular time period when the

14  employees were supposed to enter their pay or their time for

15  given days of work?

16  A.  Yeah.  So how it works is, I was a general foreman and I

17  was the general foreman for our roadmaster, and so, like,

18  essentially was number two.  So that was one of my tasks

19  during my time was to look and make sure our guys were

20  entering it correctly.  And I was still on the schedule.  I

21  was in the craft at that time.

22          And so it all affects their scorecard.  And so

23  it's just like when you enter time, you have to make sure

24  you attach something to it like the work you did.  You have

25  to have a work order.  And so when you're entering payroll,

1    you were supposed to make sure that it was in the same day

2    or that way it would be green.  And obviously you had to

3    make sure it was in before the next morning.  That would be

4    yellow, because it wasn't timely reported.  And then after

5    that, it would be a red if it wasn't before 9 o'clock, I

6    believe it was.  It would be a red, a mark against, because

7    they went off percentages, you know.  Thirty days in a

8    month, how was each crew entering it, were they making sure

9    it was entered correctly.

10   Q.  So as I understand what you're saying, it was looked at

11   for the entire crew in terms of timely entering of time?

12   A.  Correct, each crew that rolled up to that specific

13   supervisor.

14   Q.  By the way, was there such a thing as entering time in

15   draft and entering time in final?

16   A.  Yeah.  I mean, you could -- I think there was like three

17   or four different options you could do.  I mean -- but how

18   the computer system, from my understanding, was -- even if

19   you entered a draft, it automatically kicked it through at

20   midnight the next day, but then that would be a yellow

21   because it wasn't the same day.  So draft, final, whichever

22   you wanted to use.

23   Q.  If you wanted to have a green, you would enter it in

24   final that same day that you worked, right?

25   A.  Correct, because then you weren't waiting till midnight

1    the next -- or midnight that night for it to automatically

2    kick it through.

3    Q.  How did it affect the scorecards of the roadmasters?

4    A.  So the way it affected it, obviously -- the scorecard

5    has a bunch of different things, but it would obviously be a

6    mark if you were having a percentage-wise of your crews

7    entering time correctly.

8            MS. FERGUSON:  I object on foundation to this line

9    of questioning.

10           THE COURT:  Overruled.

11   BY MR. JAMES KASTER:

12   Q.  Go ahead, Mr. Mozinski.

13   A.  Yeah.  So obviously, if it was a red mark, if your crews

14   are only entering 50 percent of the time, you're going to

15   have a red mark on you as a supervisor and it affects

16   your -- like, your bonus and your promotion opportunities if

17   you don't have a good scorecard.

18   Q.  In terms of the custom and practice that was in place at

19   the time in 2015 and 2016, you weren't entering time at that

20   point, right?

21   A.  No, I had stopped entering time in 2012.

22   Q.  Okay.  As it related to Mr. Sanders' investigation, you

23   took a look at whether other employees in different crews

24   who were working with Ms. Hoppenrath were entering and/or

25   changing their time after it was entered, right?

1   A.  Correct.

2   Q.  And what did you find in that respect?

3   A.  So when we did the investigation, that was one of our

4   arguments on top of many different arguments.  We showed

5   them, like, eight or nine different crews.  It's an exhibit.

6   I think -- it's 24 in the investigation.

7   Q.  Why don't we pull up -- I'll just pull up an example of

8   Exhibit 24 and we can talk about it.  I just picked one at

9   random.  It's Exhibit 103, page 148, and if need be we can

10  look at a different page.  I think we're talking about the

11  same document you were referencing.

12  A.  Yep.

13  Q.  Is that the document?

14  A.  Yep.

15  Q.  And what does this document show us?

16  A.  So obviously the rollup you see at the top, that's the

17  supervisor's number.  And then the title is the roadmaster,

18  St. Paul, and then who the name of the supervisor is and

19  then the gang.  I'm not sure what the role is, but the date,

20  that's the date for time -- sorry, I didn't mean to drag on

21  it.  So that's the date for the time when it's entered, so

22  for March 1st, 2nd, 3rd, 4th, 5th, and then the time, the

23  latest reporting.  That's when time has been changed or

24  edited in the document.  And so you can see obviously

25  March 1st, I'm guessing that there was time entered before,

1    but you can obviously see the last updated that it shows was

2    29 days later.

3              And then similar, you see like on the 2nd it was

4    edited the next day.  You know, the 10th, 11th.  And you can

5    just go down like the 18th, and then the 21st, three days

6    later, the time was changed and edited.  Three days later

7    the time was changed and edited.

8              And so we had done -- we had gotten a printout.

9    You can pull these printouts off from their website and we

10   had gotten a printout, as many as we could, and then we

11   requested in the investigation for all additional ones,

12   everybody under Keith Jones as well, just to show that it

13   was disparate treatment.  That, you know, he was the only

14   one having that happen to him when there were a ton of crews

15   that changed their time you can see from that.

16   Q.  So this document demonstrates that people went in and

17   either entered their time very late or changed their time,

18   right?

19   A.  Correct.

20   Q.  And as far as you know, were any of the people that were

21   on the spreadsheet disciplined?

22   A.  No, nobody was.  That's why we used it as an example to

23   be like how come it was acceptable for them to go back 29

24   days?  Because on the PARS screen you could see a calendar

25   for each of the months, and then you could go back and edit

1    it and run a report and make the corrections in the PARS

2    screen.

3    Q.  Was it custom and practice at the time for employees who

4    were a part of maintenance of way in 2015 and 2016 to modify

5    or change a time entry?

6    A.  Correct.  Yes, it was.  Because like it all depends.

7    We're not a punch clock.  So you may be at a different

8    location, something may have come up, and you don't want to

9    go sit in front of a computer at 9, 10 o'clock at night.

10             So you have to -- every time you do work out

11   there, you have to -- like, if you change a rail, you have

12   to put in rail attributes.  You have to put in everything

13   that you do.  And so the process sometimes takes a very long

14   time to do and so you don't want to sit and do it, so you'll

15   do it the next day.  Especially if you were working night

16   shift or something, you would do it a couple days later, you

17   know, or however you needed to adjust the time.

18   Q.  Could an employee always change his or her time before

19   the end of the payroll half?

20   A.  Correct.  The payroll closes the same time for -- it

21   closes on the 1st and the 16th, and then if it falls on a

22   Sunday or weekend, then it's the following Monday.  So you

23   have till that time to edit your payroll because it doesn't

24   pay out.  When it closes, you still have roughly a day after

25   it closes, and then that pays out.

1    Q.  Out of curiosity, let me ask you this question:

2             Prior to the time that payroll is actually cut, a

3    check is cut to the employee, do supervisors review that

4    payroll and approve it?

5    A.  Yeah.  So each time you submit payroll, it's approved by

6    your supervisor.  They have a way to deny it.  If they're

7    like, nope, didn't work it, you can kick it back out and

8    tell them, "Hey, you have to go enter it.  I don't agree

9    with this.  This isn't right.  Maybe you put in too much

10   mileage."  And they're like, "No, you didn't go that far.

11   You know, it's supposed to be 50 instead of a hundred."

12            So they can disapprove your time and then you have

13   to -- you get a red X and then you have to go and edit it

14   and resubmit it back.

15   Q.  So the supervisor merely can put in a red X on the

16   system and you will not get paid for those hours or that

17   day, right?

18   A.  Correct, because then your payroll -- it won't accept

19   it, so you have to go and re-edit it.

20   Q.  Is it typical standard routine practice for supervisors

21   to talk to an employee when there's an issue about time?

22   A.  Yeah.  I mean, we -- our industry is a very

23   male-dominated industry, and so you have a direct

24   supervisor.  Your guys are right there.  You can be out in

25   like remote locations.  And so the conversation is always

1    they approach people if there's problems because usually it

2    doesn't want to get escalated.  You don't want to have to

3    hear from the boss's boss on what's going on, so you handle

4    a lot of the stuff internally and just talk about it and

5    make sure that you squash it there and, you know, correct

6    anything that needs to be corrected.

7    Q.  What is a cut letter?

8    A.  So a cut letter is part of our Collective Bargaining

9    Agreement, Rule 50(b), where it says that they timely notify

10   you of any -- or promptly -- I can't remember off the top of

11   my head now -- that -- any disapproval of time.  And so,

12   like, in the investigation, we entered 200-plus cut letters

13   of how you could have handled it.  If you didn't want to

14   handle it, the first step of the supervisor denying it and

15   talking to him, you can send a cut letter saying you were

16   not -- you know, you weren't entitled to this.

17   Q.  Were cut letters routinely sent?

18   A.  Yeah.  As a vice and, like, as a general, I mean, it's a

19   major part of what we do with timekeeping.  The timekeeping

20   office is not in Fort Worth, Texas, at their main

21   headquarters, it's in Topeka, so they're kind of their own

22   animal in that area.

23   Q.  When an employee receives a cut letter, is there a

24   description of what the problem is with the time entered and

25   a period of time for the employee to respond?

1    A.  Yeah.  So there's a description, usually a couple of

2    lines or a paragraph depending on what it is, and then it

3    says that you have like fifteen days to respond.  Obviously

4    that's just what they put in the cut letter.  You have 60

5    days to respond from the time it was cut under our

6    Collective Bargaining Agreement.  They just say 15 days for

7    them, but, you know, we've gone back further and dealt with

8    different stuff like that.

9    Q.  By the way, can cut letters come far after the payroll?

10   A.  Yeah.  It's a dispute we currently have with the

11   railroad over the word "promptly," "timely."  What does it

12   mean when you only have 30 to 60 days, especially because

13   you say it's already approved."  They say no, we can go back

14   months, as far as we want.  So we get paid and all of a

15   sudden three months later you're trying to argue.

16        We just we went and picketed Topeka over this,

17   so ...

18   Q.  I see.

19        MR. JAMES KASTER:  I'm going to offer an exhibit

20   for which there is, as I understand it, no objection,

21   Exhibit 42, with the witness.

22        THE COURT:  I suspect, Mr. Kaster, if there's no

23   objection it's been pre-admitted, so you can publish that

24   right off.

25        MR. JAMES KASTER:  Thank you, Your Honor.

1    BY MR. JAMES KASTER:

2    Q.  Exhibit 42.  If we can just blow up the bottom of the

3    letter so everyone -- from December 11.

4    A.  How do I clear that arrow?

5    Q.  Oh, how do you clear the arrow?  You're talking to the

6    wrong guy.  Sorry.

7    A.  Oh, there we go.

8    Q.  Okay.  You got it, or almost.  I think we're okay.

9            I'm just asking you about this letter.  Do you

10   recognize the letter?

11   A.  Yeah, that's part of the email that I sent to Keith

12   Jones and then cc'd Blaine on.

13   Q.  This related to an issue of Mr. Sanders being changed

14   from 4/10s to 5/8s, right?

15   A.  Yes.

16   Q.  And you sent this on or about -- looks like you sent it

17   on December 11th of 2015, right?

18   A.  Yup.

19   Q.  Did you send it in response to Mr. Sanders communicating

20   with you that he had been sent home, as he describes it in

21   the first paragraph, and then moved from 4/10s to 5/8s?

22   A.  Yeah.  So from what my recollection of this, Don had

23   come in and worked to make sure he kept his inspections up

24   on Friday, and then they sent him home.  And so Don called

25   me after, and so I sent it because I didn't understand why

1    we were sending him home because they were going to make him

2    come in and work on a Sunday.

3            And then there was some confusion over the 4/10s,

4    5/8s because they never gave any notice in writing which the

5    agreement requires.  And then if you look up there, I even

6    responded back to him is he still on 4/10s then or what's

7    going on?  And I can't remember if there was another email

8    or not.

9    Q.  I'm going to take you through -- we spent a lot of

10   time -- and you haven't been here for that, but we've talked

11   a lot about the details of this, so I'm not going to go

12   through all of that.  I'm going to direct you to particular

13   parts of this so we can get to the important parts of your

14   testimony.

15           Did you know Mr. Sanders before you were involved

16   in a disciplinary matter?

17   A.  Yeah.  I mean, I was a rep in North Dakota and Don

18   mainly worked in Minnesota, but I had come over and helped

19   on the investigation on the Minnesota side when they were

20   struck by a train engine.  So that was roughly my first time

21   meeting Don, so I think two for three years before this one

22   happened, or whatever the timeline was.  And so then just

23   dealing with him at the section houses and different

24   meetings, things like that.

25   Q.  So were you contacted by him in the last few days of

1    March of 2016 related to a claim of payroll theft or time

2    theft?  Do you recall that?

3    A.  Yeah.  I believe -- I mean from my recollection is, we

4    talked a bunch because he had gotten a notice or -- we got

5    it in the mail.  I can't remember if there was an email sent

6    on it or not.  But we had got it on March 31st, but I think

7    Don had gotten it handed to him.  And so he called and

8    reaching out, and I said send a picture, send whatever, so I

9    could look at it.

10   Q.  All right.  So before we get into that, let me just ask

11   you, we're going to be talking about investigative hearings

12   and let me just run through some questions with you.

13          You've been involved in a number of investigative

14   hearings on behalf of employees over the years, right?

15   A.  Yup, from 2012 exclusively to 2020, and then for like

16   the more important cases now, I'll go fly in and sit in with

17   the guy or handle the cases.

18   Q.  Okay.  So how many do you think you've been involved in?

19   A.  I mean, hundreds I would say.  I mean, I'd have to pull

20   up exactly if this one went to an investigation.

21   Q.  Does the employee get any discovery before the hearing?

22   A.  No.  We call it the kangaroo court.  You have no

23   discovery, no ability to -- they don't have to honor any

24   request for any, you know, like in court here you can

25   request documents and stuff.

```
1              Witnesses.  You know, the railroad requires you to
2       be there.  For witnesses, they will only bring their
3       witnesses.  They won't pay for any of the witnesses to come.
4       And so --
5       Q.  Wait a minute now.  Don't you have subpoena power?
6       A.  Nope.  Nope.  No subpoena power.  There's no neutral
7       party.  A supervisor underneath them is a conducting
8       officer, like in a lower rank usually.  A lower-level
9       roadmaster, assistant roadmaster, is the conducting officer.
10      They don't make the decision.  The bosses make the decision,
11      and they just gather the evidence.  I always complained
12      that, you know -- I mean, they're trying to prove BN's case,
13      so it's a kangaroo court.  There's a judge, jury,
14      executioner is what we call it.
15      Q.  Are witnesses placed under oath?
16      A.  No.
17      Q.  And we've talked a little bit in this case so far about
18      the fact that there are appeals from that hearing.  Is the
19      appeal from the fact record that is developed under this
20      process that you described?
21      A.  Yep, yep.  So we write an initial claim.  They deny,
22      appeal, denial.  Argue at claims conference, confirm
23      conference letter, then a submission to arbitration, and
24      then arbitration.
25      Q.  But it's all based on the record that's created from
```

1    this initial hearing?

2    A.  Yep, yep.  From the initial investigation, that's how it

3    flows.

4    Q.  Of the hundreds of employees who you've represented in

5    these hearings, how many have gone without discipline after

6    a hearing?

7    A.  Probably less than -- less than five, I would say.  I

8    framed a couple when we did get that.

9    Q.  Let's go back to Mr. Sanders' matter.

10            So you've looked at his file in preparation for

11   your testimony here today, right?

12   A.  Yeah, I reviewed it last night.

13   Q.  There were actually two notices of investigation, both

14   dated March 28th, right?

15   A.  Yup.

16   Q.  One was for the 25th and 26th, right?

17   A.  One was for the 19th and 25th.  It didn't say anything

18   about the 26th.  They ended up adding the 26th in the

19   investigation.

20   Q.  I see.  So do you know when it was that Mr. Sanders

21   received any of these notices?  Do you know when he was

22   given them?

23   A.  I don't know when he was given them.  I mean, they were

24   dated March 28th is all I know.

25   Q.  You received them on the 31st, you believe.

1    A.  On the 31st, because we entered it wasn't timely for the

2    investigation.

3    Q.  Did you -- do you know whether or not Mr. Sanders

4    received -- and let me back up here.

5              Under the Collective Bargaining Agreement -- we've

6    seen this in -- it's in the record here.  50(b) requires

7    notice to the employee of any time deficiency or time

8    problem, right?  You're familiar with that.

9    A.  Yeah.

10   Q.  And that's, as I understand your testimony, that's what

11   a cut letter is based around, right, 50(b)?

12   A.  Yeah, a cut letter is 50(b), yup.

13   Q.  Had Mr. Sanders received any kind of notice under the

14   Collective Bargaining Agreement, to your knowledge?

15   A.  For cut time, no.

16   Q.  And with respect to this idea that we had two separate

17   notices, one for the 19th and 25th and the other for the

18   26th.  That's what you recall, right?

19   A.  Yeah.  They issued -- one of the notices had the 19th on

20   it and the second notice had the 25th.  And then when we got

21   in the investigation, they brought up the 25th and 26th.

22   The 26th wasn't originally listed on the notice.

23   Q.  So how did that happen?  What is your recollection of

24   how that happened that we went from the 19th and 25th, and

25   then to the 26th?

1    A.  I mean, I got a biased opinion.  I did the

2    investigation.  So, I mean, on the 19th, for that first

3    investigation I think we proved that they didn't really have

4    a leg to stand on.  And on the 25th, when we did the 25th,

5    we were -- after they had seen what we had did on the 19th,

6    they added an extra day.  Otherwise, why wouldn't they have

7    put that extra day on the notice?  I mean, they added it to

8    try to make more days and it look worse was their goal

9    behind it is my personal opinion.  Because we were able to,

10   I think, beat back the 19th day of alleged theft and we were

11   able to beat back on the 25th as well.  And then the 26th

12   was essentially the one day where they said that they --

13   that was the proof they needed.

14   Q.  Now, from the investigation, do you recall that

15   Mr. Sanders had gone in on the 29th to put in his time?  Do

16   you recall that, the 29th?

17   A.  I know -- I know there was some time stuff put in, but

18   then I remember getting a call that it was locked -- he was

19   locked out of the computer.  He couldn't go in and edit

20   anything anymore.

21   Q.  So Mr. Sanders had talked to you because he attempted to

22   modify his time and was blocked?

23   A.  Yeah.  I believe there might have been some submission

24   or, you know, when times change, I guess they get a

25   notification.  And so the time was changed and then he

```
 1    continued on to try and change it, and then all of a sudden

 2    there was an error that he couldn't submit -- that he

 3    couldn't submit any more time.  You were locked out of the

 4    computer.

 5    Q.  By the way, just for the record, what is 1500 Warner?

 6    Is that Dayton's Bluff?

 7    A.  The Dayton's Bluff shack.

 8    Q.  Recordings at the railroad.  Are you aware of -- are

 9    there recordings at the railroad of employees, including --

10    let me use a broad description -- video recordings, audio

11    recordings?

12    A.  Yeah, on the railroad you're recorded in everything.

13    You know, when we call the Manpower, that's like the job

14    center, like placing bids and bumps.  When we're driving, we

15    have a camera that sits there and records us.  When we're

16    working in like big yards, you have cameras that sit and

17    record you and you can like zoom in and see how people are

18    working.  They do audits that way.  Your conference calls

19    are recorded.  Different stuff like that.

20    Q.  How about at the station house, like Dayton's Bluff or

21    Bridal Veil?  Would there be a video recording in there?

22    A.  Each section house is a little bit different.  Some have

23    cameras on the outside recording stuff, other ones don't.

24    It all depends.

25    Q.  I think you said in your deposition that you would not
```

1   yourself record a member of management without letting them

2   know.  Do you recall that?

3   A.  Yup.

4   Q.  And so why is that?  In your particular role, why is

5   that?

6   A.  So my position is different than when you're in the

7   craft.  And so you have to have a lot of off-the-cuff

8   conversations going into a ton of different things and you

9   don't want -- I mean, you need to be able to wheel and deal

10  essentially over investigations, settlements, trying to

11  solve an issue and coming to common ground.

12          And so that's what I meant why I do that, because

13  then the next time you try to work out a deal to do an

14  agreement or something, they may be less likely to work with

15  you if they felt like -- if they felt like you weren't being

16  up front with them when you were talking and trying to work

17  out a deal.

18  Q.  Are you aware of other employees who worked for

19  Mr. Jones who were also charged with payroll theft?

20  A.  Yeah.  I was a rep up to 2020 covering the east side

21  under Keith.

22  Q.  Those employees treated same or differently than

23  Mr. Sanders?

24  A.  Differently.  We were able to get waivers for them.

25  That's why I talked about the disparate treatment, you know.

```
1     Q.  How many employees?

2     A.  I think it was like five.  I think maybe five to eight,

3     but I actually found -- we have our internal thing where we

4     go look at just different investigations and for alleged

5     theft of time, and that's what I was able to find were five

6     different ones on what the charge was and what the waiver

7     offer was.

8     Q.  Do you recall anybody in the circumstance like

9     Mr. Sanders being charged with time theft and terminated

10    before payroll even closed?

11    A.  Not before payroll even closed.  Usually it's after.

12    And the only -- I mean, I think I talked about this too.

13    The only other one was -- that's when I say five to eight.

14    I covered a couple DEs, not just one.  Five were under

15    Jones, eight in total.  And so I didn't have any ones where

16    they were dismissed before payroll had been closed, from my

17    recollection.

18    Q.  Mr. Sanders is the only one?

19    A.  Yes.

20              MR. JAMES KASTER:  That's all I have.  Thanks.

21              THE COURT:  Ms. Ferguson?

22              MS. FERGUSON:  Thank you.

23                        CROSS-EXAMINATION

24    BY MS. FERGUSON:

25    Q.  Good afternoon, Mr. Mozinski.
```

```
1    A.  Good afternoon.

2    Q.  Your position is as the general chairman of the union?

3    A.  Yup.

4    Q.  And it's your job to advocate for your union employees,

5    correct?

6    A.  Yeah, advocate, CBA stuff, negotiations, different

7    things like that.

8    Q.  And your employees, your union employees, can come to

9    you with safety concerns, correct?

10   A.  Yeah, any concern relating to safety, federal regs, CBA,

11   bargaining, anything, agreements.

12   Q.  If their supervisor is telling them not to report

13   defects and they think that's wrong, they can come to you,

14   correct?

15   A.  Yeah.  They can come if we need to talk about different

16   stuff and then I'll reach out to the supervisor.

17   Q.  It's really an extra level of protection that the union

18   employees have when they're working at BNSF, correct?

19   A.  Yeah.  I mean, yeah, you could say that, but I mean,

20   it's not -- they're the direct -- the FRA is the direct

21   people.  I mean, we don't supercede the Federal Government.

22   I mean, we deal in collective bargaining issues, have our

23   meeting group, and making sure the agreement's enforced and

24   things like that.

25   Q.  Right.  But to the extent an employee has a concern
```

1    about how he's being treated, you would be the person that

2    he could go to potentially?

3    A.  Yeah, us or their direct supervisor, either or.

4    Q.  So we've talked in this trial about that agreement, the

5    Collective Bargaining Agreement, and that's actually what

6    governed this whole investigation, or the two

7    investigations, correct?

8    A.  Yup, the two investigations that were combined into one.

9    Q.  And that was something that was negotiated between BNSF

10   and the union, correct?

11   A.  Yeah, before my time from 1982 and then updated in 2002.

12   Q.  Let's take a look at that agreement, Exhibit 5 --

13   Defendant Exhibit 5.  This is what you were talking about,

14   correct?

15   A.  Yes, '82 at the bottom, and then 2002.

16   Q.  And if we go to page 71 of that document.

17           So those are signatures of the parties agreeing to

18   the terms of this Collective Bargaining Agreement, correct?

19   A.  Yup.

20   Q.  Okay.  And if we go to page 57, this is the page that

21   talks about investigation and appeals, correct?

22   A.  Correct.

23   Q.  Okay.  So you called it a kangaroo court, but this was

24   something actually bargained for or agreed upon between BNSF

25   and the union; in other words, how an investigation would be

1    handled, correct?

2    A.  Yeah, correct.  But --

3    Q.  Thank you.

4    A.  But for you to just say that is mischaracterizing what

5    I'm saying, because just because it's written on paper

6    doesn't mean -- if you read that five-day notice, it says

7    see when I objected, it should be cancelled.  If you read

8    that, we weren't given five days' notice.  The investigation

9    should have been canceled.  They don't adhere to what they

10   agree to on paper and so that's why it makes it tough.

11   They're supposed to be fair and impartial.  How can it be

12   fair and impartial if I can't request any documents and they

13   say it's not supposed to be --

14   Q.  You'll have a chance to answer further to Mr. Kaster if

15   he asks you some more questions.

16   A.  Okay.

17   Q.  So this provides that an employee can call witnesses,

18   correct?

19   A.  So, yes, you can call witnesses.

20   Q.  Thank you.  Thank you.  That's the answer because that

21   appears in "C" of this, correct?

22   A.  Yeah, where they didn't give us a five-day notice as

23   well.  It appears there.

24   Q.  So it allows for the employee to be represented and you

25   were the representative at each of the investigations,

1    right?

2    A.  Yup, I was the representative.

3    Q.  And it allows for "the presence of necessary witnesses

4    he," meaning the employee, "may desire," correct?

5    A.  Yup.

6    Q.  Okay.  And as a matter of course, you submit exhibits or

7    documents that you want the hearing officer to consider,

8    correct?

9    A.  The ones that we're able to get without -- BNSF doesn't

10   have to supply us, as I said earlier.  We request documents

11   from them.  They don't provide it.  So whatever we're able

12   to get ourselves with the help of other people.

13   Q.  And in this case you did obtain documents which you

14   introduced, correct?

15   A.  Yup, some we did.

16   Q.  So the other thing the Collective Bargaining Agreement

17   provides is that an employee can be removed from service

18   pending the results of the investigation; correct?

19   A.  Repeat the question again.

20   Q.  An employee can be removed from service pending the

21   results of the investigation.

22   A.  Only for serious infractions they can be removed.

23   Q.  And that happened once before to Mr. Sanders.  You're

24   aware of that because you represented him at a prior

25   investigation, correct?

```
1    A.  So I don't actually believe I represented Don -- are you

2    talking about when they were hit by the vehicle?

3    Q.  2012.

4    A.  Yeah, I didn't represent Don.  I was there.  There were

5    four guys charged.  It wasn't just Don.  There were four

6    guys charged, and I represented one of the guys and the

7    three other ones were represented by John Gelano (ph).

8    Q.  So you're aware that he was removed from service in 2012

9    pending the results of an investigation?

10   A.  I never got the notice on that, so I would have to look

11   at the notice.  I'm not sure what they did there.

12   Q.  Okay.  And as we said earlier, this same Collective

13   Bargaining Agreement allows for an appeal, correct?

14   A.  Yeah, you get to appeal it.

15   Q.  And I think I wrote down that you said you appealed this

16   first to BNSF, Chad Sundem?

17   A.  The general manager, yup.

18   Q.  This isn't introduced yet, but could you take a look and

19   not publish to the jury Exhibit 88.

20   A.  Mm-hm.

21   Q.  And if you go to page 4 of that, is that your signature

22   there?

23   A.  Yup.

24   Q.  Did you author this letter of appeal to Chad Sundem?

25   A.  Yup.
```

1          MS. FERGUSON:  We would offer Exhibit 88.

2          MR. JAMES KASTER:  Same record as made in previous

3     motions *in limine*.  Without respect to that, Your Honor, we

4     have no objection.

5          THE COURT:  Thank you, Mr. Kaster.  The objection

6     is overruled.  This may be published and it is admitted.

7     BY MS. FERGUSON:

8     Q.  So maybe I'll get back to that later, but I wanted to

9     establish that this is the first stage of the appeal,

10    correct, your letter to Mr. Sundem?

11    A.  Yes.

12    Q.  And then you said, then there is another level, a claims

13    conference, correct?

14    A.  So we go -- that one that you just showed, 88 or

15    whatever, they write a denial, Chad Sundem's denial.  We

16    appealed it.  They deny again.  Then we go to claims

17    conference.

18    Q.  And were you part of that?

19    A.  Claims conference?

20    Q.  Yes.

21    A.  This was in '16, so by the time it progressed, '17, '18,

22    I would assume I was.

23    Q.  And that was denied at the claims conference?

24    A.  Yeah.  I think we've only ever had two overturned at

25    claims conference.

```
1    Q.  Then the next level is an appeal to the National

2    Railroad Adjustment Board?

3    A.  So the next level is to do a post-conference letter to

4    the railroad highlighting all what was said at the

5    conference to make sure there was no evidence added that

6    isn't part of the record.  And then we submit it to our

7    arbitration office in Chicago.  They either accept the case

8    or send it back to us.  They accepted the case, progressing

9    it, and then they write a submission and letter of filing to

10   the arbitration board.

11   Q.  Okay.  And that arbitration board is the National

12   Adjustment Board or the National Railroad Adjustment Board?

13   A.  Yeah.

14   Q.  And that's an independent third party, that's a

15   government arbitrator, correct?

16   A.  Yeah, an arbitrator is a person that is picked through a

17   strike list, depending on the process, laid out how the

18   boards are formed.

19   Q.  My point is it's not an BNSF employee, correct?

20   A.  It not an BNSF employee.

21   Q.  It's not a union employee?

22   A.  It's not a union employee.

23   Q.  And that appeal was denied at that level also, correct?

24   A.  It was.  I mean, they have a bunch of cases that they

25   hear and it's called splitting the baby.  They will not work
```

 1    in our industry if they give everything to the railroad or
 2    give everything to the union.  And so if you read the
 3    arbitration award, she also raises stuff in there, since you
 4    brought it up, that it is a little weird that he was charged
 5    six days after in it, and she says some of the timelines are
 6    concerning.  And so -- because I'm sure you have read it --
 7    it's not like she said, "Oh, yeah, guilty."
 8    Q.  Well, so it sounds to me like you read it.
 9    A.  I did read it.
10    Q.  Okay.
11         MS. FERGUSON:  Do you have any objection to
12    Exhibit 90?
13         MR. JAMES KASTER:  We have the same objections we
14    had earlier, Your Honor.
15         THE COURT:  Overruled.
16    BY MS. FERGUSON:
17    Q.  And we don't need to pull that up now, but I just wanted
18    to --
19         MS. FERGUSON:  Well, I offered and it was
20    accepted?
21         THE COURT:  It is.
22         MS. FERGUSON:  Okay.  Thank you.  All right.
23    BY MS. FERGUSON:
24    Q.  Let's go, though -- I want to talk just briefly because
25    we've talked about this a lot about the investigations.

1          Ms. Blaine Hoppenrath testified at that first

2     hearing, the April 3 for the March 19th time, that

3     Mr. Sanders was not at Dayton's Bluff until after 9:00 a.m.

4     on March 19, correct?

5     A.  I mean, I'd have to look.  Yeah, I mean, I don't recall

6     exactly what she said.

7     Q.  At any rate, there was a dispute.  Mr. Sanders claimed

8     that he worked over eight hours that day and BNSF contended

9     that he worked less than five.  Does that sound fair as to

10    what the dispute was?

11    A.  Yeah, and I think I highlighted in 88 what the dispute

12    was.  In the exhibit that you entered, if you pull up that

13    paragraph.  I think it was a -- we said he was there for

14    eight and a half hours, BN said that he was only there for

15    seven hours and 40 minutes.

16    Q.  And one of the things you mentioned both at the

17    investigation and in the appeal is that there were GPS

18    records on his phone that showed him at Bridal Veil.  But

19    there weren't any, were there?

20    A.  What do you mean there weren't any?

21    Q.  The GPS records showed him at -- I'm sorry, they didn't

22    show him at Bridal Veil.  They showed him at Dayton's Bluff?

23    A.  Not from my recollection.  They showed him at Bridal

24    Veil.  We entered -- we entered everything that we had there

25    and then we also presented a map detailing the route, I

1    think.  I mean, I'm sure you have it.

2    Q.  Did you look at that in preparation for today?

3    A.  Did I look?  No.  I mean, I read the transcript and read

4    my deposition and read the appeals.  I didn't look at all

5    the exhibits on it.

6    Q.  Okay.  So your testimony today is everything that you

7    had -- you entered as an exhibit as it related to the GPS

8    records?

9    A.  So whatever we had as part of the record on the exhibit,

10   on what I had, I entered in the investigation.

11   Q.  And you're aware that the considerations determined that

12   there was no evidence he was at Bridal Veil that morning?

13   A.  Where is that from?

14   Q.  Well, we can go through the records.  What evidence do

15   you have as you sit here today that he was at Bridal Veil on

16   March 19th?

17   A.  From my recollection on it, and that's where he said he

18   was.  He showed that he was in there.  We even testified in

19   there -- he testified and I explained -- how he traveled

20   along the path.  We made a map of it.  So why would we --

21   where are you saying that we conceded the point that he

22   wasn't at Bridal Veil?

23          THE COURT:  If I could just kindly remind counsel

24   and the witness not to talk over each other.  So allow the

25   question to be asked and completed before the answer, and

1    please allow the answer to be completed before the next

2    question.  Thank you.

3              MS. FERGUSON:  I'm just looking quickly at this.

4         (Pause)

5    BY MS. FERGUSON:

6    Q.  You're aware that Exhibit 90 -- and we can pull that up

7    to page 4.

8              And if you look at the second paragraph there --

9    and this is the finding of the National Railroad Adjustment

10   Board.  And that second paragraph midway through, they find:

11             "There's substantial evidence in the record upon

12   which to conclude that Claimant falsified his time records

13   by submitting payroll records claiming he worked more hours

14   than he had actually worked.  Specifically, there's

15   substantial evidence that Claimant submitted a payroll entry

16   for March 19, 2016, for eight hours when he actually worked

17   five hours, and then submitted an adjusted payroll entry for

18   March 25 for 4.5 hours when he only worked 3 hours and 13

19   minutes."

20             The National Railroad Adjustment Board that

21   reviewed this evidence made that conclusion, correct?

22   A.  Yeah.  I mean, that's what's written there.

23   Q.  All right.  And the investigation that took place on

24   April 8 related to March 25 and March 26.  Now, Mr. Sanders

25   received notice of that hearing as well, correct?

 1    A.  Yeah.  I mean, I don't know if he did.  I mean, what we

 2    got, we got the notices on March 31st.  We were mailed a

 3    copy of them.  And so that's what -- I don't -- Don has his

 4    own tracking number.  I don't remember when Don got them.

 5    Q.  Well, you don't have any dispute that there was no

 6    five-day notice there, correct?

 7    A.  Yeah, we -- I don't believe we entered a dispute on that

 8    because we got them both on March 31st, from my recall.

 9    Q.  And can we pull up D-49, please?  And if we could

10    highlight that first paragraph.

11         So what that says -- and this is dated

12    March 28th -- "falsifying payroll beginning on March 25,

13    2016."  It doesn't limit it to March 25, 2016, does it?

14    A.  Yes, it does.  It's supposed to specify the charges, and

15    when they list the date they would have listed multiple

16    dates.  Otherwise, they're just sandbagging, trying to trap

17    you later on.

18    Q.  Well, let me ask you this:  Do I read this correctly?

19         "An investigation has been scheduled" -- and I'll

20    leave out some of this -- "for the purpose of ascertaining

21    the facts and determining your responsibility, if any, in

22    connection with your alleged misconduct and alleged theft of

23    time when you allegedly falsified your payroll beginning on

24    March 25, 2016."

25         That's what the document says, correct?

1    A.  That's what it says, but they've already pulled him from

2    service.  They've already rendered him guilty by pulling him

3    out of service.  I mean, he was literally being withheld his

4    pay --

5    Q.  If you could just answer my question.  You'll get a

6    chance to expand on that, I'm sure.

7    A.  Okay.

8    Q.  As to the investigation that took place on April 8

9    regarding March 25, Mr. Sanders admitted he didn't enter the

10   time correctly, correct?

11   A.  Correct.  He said what he was going to do after and how

12   he was going to correct it.

13   Q.  And he tried to correct that, right?  Are you aware that

14   he tried to correct his time but didn't get it right?

15   A.  I mean, all I know is that there was time entries and

16   then they locked him out of the computer so he couldn't

17   change any time.

18   Q.  Okay.  You don't know about his efforts to change time

19   to time that was incorrect?

20   A.  Well, I mean, that's why he got -- from my understanding

21   is he said he was going to do some stuff on the computer,

22   and then he called and said, "I'm locked out of the

23   computer.  I can't change anything."

24   Q.  The Exhibit 90, the decision of the National Railroad

25   Adjustment Board, they take into account Mr. Sanders'

1    testimony on March 25 that he worked just 3 hours, 40

2    minutes, intended to adjust it but didn't adjust it until

3    after he got the notice of investigation.

4          If we could pull up Exhibit 90, and I think it's

5    page 3.  At that first paragraph toward the end it says:

6          "If he intended to reduce the numbers of hours to

7    conform with the supervisor's observation, it would have

8    been an admission that he did not work the hours he

9    claimed."

10   A.  What part are you referring to?  I was reading the whole

11   thing.

12   Q.  Okay.  If you -- I'm sorry.  We'll go on to the next

13   paragraph.  That was still as it relates to March 19th.

14          So, it says he submitted a payroll entry for eight

15   hours, but he only worked from 7:00 a.m. to 10:13, and after

16   he received a notice of investigation for the alleged

17   falsification, he submitted a revised entry for March 25

18   claiming to have worked 4.5 hours of overtime.  So that time

19   entry was still wrong after he submitted it, correct?

20   A.  I mean, if that's -- (reading) -- okay, yeah.

21   Q.  So this governmental arbitrator determined that based on

22   the investigation, they upheld the decision to terminate,

23   correct?

24   A.  They did uphold the decision to terminate.

25   Q.  Okay.

1    A.  Even though payroll wasn't closed.

2    Q.  Well, and that's another issue, though, that you raised.

3    You raised that at both the investigation and you raised

4    that in your letter to Mr. Sundem about the cut letters.  So

5    you raised that issue, correct?

6    A.  Correct.  The cut letter is one thing.  So payroll

7    wasn't closed.  Payroll didn't close for four days.

8    Q.  And those were all arguments you made at every level in

9    this case and it was never upheld, correct?

10   A.  Yeah.  I mean, we were arguing with the same people that

11   had already -- BNSF that had already rendered the decision.

12   Q.  Well, now by the time you get to the National Railroad

13   Adjustment Board, you're dealing with somebody who has

14   nothing to do with BNSF or the union, it's a government

15   arbitrator, correct?

16        MR. JAMES KASTER:  I'm going to object.  This is

17   argumentative.  We're way into 403.

18        THE COURT:  Overruled.

19   A.  An arbitrator is a person that -- I mean, do you want me

20   to give the whole explanation on an arbitrator?

21   Q.  No.  My question is that this decision was rendered by

22   an arbitrator.

23   A.  It was rendered by an arbitrator.

24   Q.  Okay.  Were you involved in the complaint filed with

25   OSHA or that OSHA process?

```
1    A.  No, the employee has to progress that.

2    Q.  Okay.  Were you advised as to what that decision was?

3    A.  No, I don't -- I have not seen any -- what are we here

4    today for?  This isn't an OSHA 2109.

5    Q.  This is not OSHA.

6    A.  Okay.  What's the case today then?

7    Q.  The case is Mr. Sanders' lawsuit against BNSF.

8    A.  Okay.

9    Q.  As I understand your background, you never reported to

10   Keith Jones, correct?

11   A.  I did not report to Keith Jones.

12   Q.  And you talked about others that you looked at that --

13   other individuals that worked under Mr. Jones that you said

14   had different results, correct?

15   A.  For entering time or for investigating?

16   Q.  For investigation.

17   A.  Yeah, for investigations, yeah.  I handled different

18   cases.  Mike Bigford (ph), Ben Klukas, Riley Privy (ph).

19   Q.  So let's go with Josh Kramer.  He's somebody that --

20   union employee that you represented, right?

21   A.  Yeah.  I couldn't find anything on Kramer.  So, I mean,

22   if you have stuff there, I'd --

23   Q.  A hearing was scheduled but was postponed several times,

24   correct?

25             MR. JAMES KASTER:  Objection.  The witness has
```

1    disqualified himself.  No foundation.

2              THE COURT:  Ms. Ferguson, I think that's right.

3              MS. FERGUSON:  Well, then I would ask that -- he

4    rendered an opinion that others were treated differently

5    than Mr. Sanders and Mr. Kramer was one of those.  So maybe

6    I can ask a question such as this:

7    BY MS. FERGUSON:

8    Q.  You actually don't know what happened with Mr. Kramer,

9    correct, as it related to his discipline?

10   A.  Well, if you have a notice or something, I can look at

11   it.  Was it during my time?  Because I was the North Dakota

12   rep, and then I moved over to the Minnesota side in like

13   '14.  So I covered North Dakota.  We had another rep on the

14   east side.  I wouldn't have known everything that happened

15   over on the east side.

16   Q.  So if Mr. Kramer received a waiver, you don't know the

17   details surrounding why that happened?

18   A.  Not if he wasn't -- each guy is assigned a specific area

19   with the guys in that area.  And so I was assigned the North

20   Dakota/South Dakota lodges.  The Kramer, the 144 guy on the

21   east side.  So I stayed on my side, he stayed on his.  And

22   we only came over to help if it was like four people -- we

23   investigated five -- where we needed additional people.  So

24   I wouldn't know -- and we didn't have an online process at

25   that time.

```
1     Q.  That's fine.  Ben Klukas, was that somebody you

2     represented as well?

3     A.  Yeah, I did Klukas's.

4     Q.  He had a hearing notice and he was withheld from service

5     as well?

6     A.  He was withheld from service, yup.  We postponed it

7     eight days between the investigation -- I mean, after a

8     break.

9     Q.  And a formal hearing was held?

10    A.  A formal hearing was.

11    Q.  And Mr. Klucas's case was regarding falsification of DOT

12    logbooks?

13    A.  And time.

14    Q.  You represented him at the hearing?

15    A.  Yup.

16    Q.  It was after the hearing that a waiver was negotiated?

17    A.  They called it offering a waiver, and so it's pretty

18    much you take the waiver.  Otherwise, if you don't take --

19    they have you -- when you're out of service, they have you

20    either take it or wait to see what their decision will be.

21    Q.  And he was given a suspension, 30-day suspension, and

22    assessed a one-year review period, correct?

23    A.  Yeah, if that's what the waiver says.

24    Q.  I assume you don't know the details of the others that

25    you referenced as having been treated differently than
```

1      Mr. Sanders?

2      A.  Mike Bigford alleged he was working from his house.

3      That was probably the most recent case under Keith.  They

4      offered a waiver after we did the investigation.

5      Q.  What year was that?

6      A.  I think '18 -- '19.

7      Q.  So well after Mr. Sanders is gone?

8      A.  Yes.

9              MS. FERGUSON:  Those are all the questions I have.

10     Thank you.

11             THE COURT:  Mr. Kaster?

12             MR. JAMES KASTER:  Yes, Your Honor.  Thank you.

13

14                    **REDIRECT EXAMINATION**

15     BY MR. JAMES KASTER:

16     Q.  With respect to witnesses, can you just describe for us,

17     Mr. Mozinski, what is the problem with bringing witnesses or

18     compelling witnesses on behalf of the charged party, the

19     employee?

20     A.  So we can't bring -- we have no power to bring any other

21     exempts.  Like even if we wanted to question Keith or

22     somebody else there, we don't have power to bring them in.

23     Yeah, sure, we can bring other scheduled guys there, but

24     they're not going to be paid, and so they would not be

25     compensated for that time.  And it's not like they can just

```
 1    come in, give testimony, and then they're okay.  They have
 2    to stay there the whole length of the time, sequestered, not
 3    getting paid.
 4            And so if you're trying to bring the people in,
 5    financially any time you would do it, like I said, you would
 6    spend hundreds, thousands of dollars trying to pay for it
 7    and it would bankrupt you.
 8    Q.  How far is Bridal Veil from Dayton's Bluff?  Do you
 9    recall?
10    A.  And that, like I said, on the map.  It's not very far.
11    I think I would say five to eight miles, maybe a little
12    less.  Depends on which way you go.  There's a BNSF highway
13    you can cut across or you can go on the roads.
14    Q.  And I think Counsel made reference to the GPS.  I want
15    you to assume for the sake of my question that for a period
16    of time on the 19th the GPS shows 1500 Warner.  That is
17    Dayton's Bluff, right?
18    A.  Okay.
19    Q.  That is --
20    A.  Yeah, that's the address for the Bluff.
21    Q.  And that would be a place of work for Mr. Sanders,
22    right?
23    A.  I mean, yeah, that's headquarters.
24    Q.  Right.  So if he's at 1500 Warner or he's at Bridal
25    Veil, those are both places of work for Mr. Sanders,
```

1    correct?

2    A.  Right.

3    Q.  And with respect to -- Counsel suggested to you in a

4    question that -- I think the question went like this:

5                The institution has proven that Mr. Sanders was

6    not at Bridal Veil.  Do you recall any proof that he was not

7    at Bridal Veil?

8    A.  No.  We never -- and that's why I was asking the

9    question.  We never said that he wasn't at Bridal Veil, and

10   we've always maintained that through our whole progression

11   of the case.

12   Q.  Mr. Sanders -- you are aware that Mr. Sanders had just

13   transferred back a few days before these events from

14   Northtown to Dayton's Bluff?  Do you recall that?

15   A.  I don't.  I mean, I'm not sure when he came back or

16   where he was.

17   Q.  Do you recall that Mr. Sanders, when he came back to

18   Dayton's Bluff, had no locker?

19   A.  Yeah, that's -- from my recollection is that's why he

20   had to go move different stuff.  They told him -- I don't

21   recall everything that went on with that.

22   Q.  Do you recall his supervisor, Ms. Hoppenrath, telling

23   him in fact that he had to move -- that he could not have a

24   locker at Bridal Veil?  Do you recall that?

25   A.  Yeah, I do, because our guys used to have lockers at

1    Bridal Veil because it's not at the main headquarters.  And

2    we have mechanics that meet over there, other section

3    houses.  And so now -- I remember there being a big deal

4    about where people's lockers were and you needed to be here

5    or "X" needed to be there.

6    Q.  So do you recall Mr. Sanders' testimony that he was

7    going to Bridal Veil to clear out his locker because he was

8    told by Ms. Hoppenrath he could not have a locker there?

9    A.  Yeah.  He -- even in the testimony he said he was

10   grabbing and cleaning it out, and then he track inspected

11   from his truck over to the Bluff.

12   Q.  That section of the arbitration award that was just read

13   suggesting that if he intended to change his payroll after

14   the entry, that that would be an admission of guilt, do you

15   recall that?

16   A.  Yeah, I was trying to read -- yeah, I mean, that's what

17   the arbitrator is saying, I guess.

18   Q.  And all of those employees that we looked at on the

19   Exhibit 103, all of those employees changed their time,

20   right?

21   A.  Well, they said that their time was incorrect and that

22   they had put too much in or it was improper.

23   Q.  And that was the routine at the time, right?

24   A.  To enter your time and then adjust it?

25   Q.  Right.

```
 1    A.  Yeah.  I mean, you would enter the time, like I said,

 2    earlier.  And then if you worked later, got called out, you

 3    could go in and adjust it.

 4    Q.  The arbitration award doesn't seem to account for the

 5    custom and practice at the time, right?

 6    A.  No, and arbitration is a hand apiece.  And that's, like

 7    I said, to be an arbitrator, anybody -- you get in the pool

 8    and they can decide -- you have to split so many each way,

 9    and there's dissents to the arbitration, stuff like that,

10    over the -- we believe their decision is wrong, things like

11    that.

12    Q.  You were asked this question when you were asked about

13    the OSHA determination at a lower level.  That's a standard

14    part of the 20109 process, right?

15    A.  Yeah.

16    Q.  This case actually arises from the administrative filing

17    that is made before the case starts, right?

18    A.  I don't know.

19    Q.  The OSHA process is a normal part of a 20109 case,

20    right?

21    A.  Yup.

22              MS. FERGUSON:  Objection.  Foundation.

23              THE COURT:  Overruled.

24              MS. JAMES KASTER:  That's all the questions I have

25    for the witness.  Thank you.
```

```
 1              MS. FERGUSON:  I have nothing further.

 2              THE COURT:  Mr. Mozinski, you're excused.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  Mr. Kaster, is this a good time to

 5      take a break?

 6              MR. JAMES KASTER:  It certainly is, Your Honor.

 7              THE COURT:  All right.  We will take a 15-minute

 8      break, return at about 3:05.  We're adjourned.

 9          (Recess taken at 2:50 p.m.)

10                      *      *      *      *

11          (3:05 p.m.)

12                          IN OPEN COURT

13          (Jury enters)

14              THE COURT:  Please be seated.  Mr. Kaster.

15              MR. JAMES KASTER:  Plaintiff calls Christine

16      Sanders to the witness stand, Your Honor.  Thank you.

17              THE COURT:  Ms. Sanders, if you could please stand

18      up between the railing and the witness chair, and the

19      courtroom deputy will administer the oath at that time.

20              COURTROOM DEPUTY:  Please state your full name for

21      the record, spelling your first and last name.

22              MS. SANDERS:  Christine Sanders.

23      C-H-R-I-S-T-I-N-E.  S-A-N-D-E-R-S.

24              COURTROOM DEPUTY:  Please raise your right hand.

25
```

Sanders - Direct

```
 1                 CHRISTINE SANDERS, PLAINTIFF'S WITNESS, SWORN
 2                 THE WITNESS:  I do.
 3                 THE COURT:  Thank you.  Please be seated.
 4                 Mr. Kaster.
 5                 MR. JAMES KASTER:  Thank you, Your Honor.
 6
 7                          DIRECT EXAMINATION
 8      BY MR. JAMES KASTER:
 9      Q.  Ms. Sanders, you can take off the mask if you are
10      comfortable.  That way the court reporter can take down your
11      testimony more easily.
12                 Thank you.  Good afternoon.
13      A.  Hello.
14      Q.  Why don't you identify yourself for the record?
15      A.  Christine Marie Sanders.
16      Q.  And your background.  Where did you grow up?
17      A.  Mounds View, Minnesota.
18      Q.  And where do you work?
19      A.  Sam's Club.
20      Q.  And how long have you worked there?
21      A.  Two months.
22      Q.  What is your relationship with plaintiff in this case,
23      Don Sanders?
24      A.  He is still legally my husband.
25      Q.  You are separated?
```

```
 1    A.  Mm-hm.

 2    Q.  You have to say yes if you mean --

 3    A.  Yes.

 4    Q.  You don't have to say yes, but you have to say yes if

 5    you mean yes, okay?

 6              And how long have you been separated?

 7    A.  I think roughly four years.

 8              THE COURT:  Ms. Sanders, if I could, could you get

 9    just a little closer to the microphone?  Thank you very

10    much.

11    BY MR. JAMES KASTER:

12    Q.  Did you live with Mr. Sanders when he was working at

13    BNSF as a track inspector?

14    A.  I did.

15    Q.  And what did you understand that his work entailed?

16    What did he do as a track inspector?

17    A.  Oh, drove on the tracks.  Checked them, make sure they

18    were safe for the commuters, the big cars.  I don't know

19    what they're called.

20    Q.  Did he often go out on calls for accidents?

21    A.  All the time.

22    Q.  Injuries?

23    A.  Mm-hm.

24    Q.  And you have to say yes if you mean yes.

25    A.  Yes.
```

```
1    Q.  And other kinds of tragedies?

2    A.  Yes.

3    Q.  Was that a frequent occurrence for him?

4    A.  Yes.

5    Q.  And how would you describe his work habits?

6    A.  He was a hard worker.

7    Q.  And how much did he work, by the way?

8    A.  Probably 364 days of the year.

9    Q.  That's what it felt like to you, right?

10   A.  Mm-hm.

11   Q.  You have to say yes if you mean yes.

12   A.  Yes.

13   Q.  Sorry.  Was he often called in on days off, holidays,

14   personal days?

15   A.  All the time.

16   Q.  Do you remember any particular examples?

17   A.  Christmases, Easters, anniversaries.  Our 15th wedding

18   anniversary.

19   Q.  Was that a renewal of vows for you?

20   A.  Yes.

21   Q.  Was he called in from anniversary dinners, that you

22   recall?

23   A.  We would be to dinner and he would have to drop me off

24   to go to work.  Sometimes didn't even order food yet.

25   Q.  I take it that was not a popular moment.
```

```
 1    A.  No.  No.

 2    Q.  Other family activities was he called away from?

 3    A.  Football games, my daughter's lacrosse game,

 4    conferences.

 5    Q.  By the way, was it his habit and routine to attend all

 6    kids' activities?

 7    A.  He was at everything.  It did not matter.  Come heck or

 8    high water, he was going to be there for his kids.

 9    Q.  Did you overhear phone calls with Mr. Jones and

10    Ms. Hoppenrath -- I apologize, Ms. Hoppenrath?

11    A.  All the time.

12    Q.  Mr. Sanders when he speaks on his cell phone, was it his

13    habit to take the phone out and put it on speaker?

14    A.  Yes, because he had developed a rash at one time from

15    the cell phone on his face.  After that, he never really put

16    the cell phone to his face.  I don't think he still does.

17    Q.  And so were you able to listen in and hear these calls?

18    A.  Oh, yes.

19    Q.  And what do you remember about the conversations with

20    Mr. Jones in particular?

21              MS. FERGUSON:  Objection.  Calls for hearsay.

22              THE COURT:  Overruled.

23    BY MS. FERGUSON:

24    Q.  What do you remember about Mr. Jones's conversations?

25    A.  Is he the accented one, like a heavy accent?
```

1    Q.  I don't know.  I'm not the best judge of accents.

2    A.  Very vulgar.  Constantly, constantly name-calling,

3    cussing.  It's just not what a boss should do.

4    Q.  What about Ms. Hoppenrath?  What do you remember about

5    the conversations?

6    A.  She was just flat-out rude.

7    Q.  Do you remember any of the substance of the calls?  Were

8    any of the calls about defects that Don had raised?

9    A.  They were all about them, everything to do with the

10   railroad.  Put the tracks back in service.  They're making

11   him look stupid.  They wanted him to lie, and Don took his

12   job very serious when it came to that.

13   Q.  When you say they're making him look bad, are you

14   talking about Mr. Jones?

15   A.  Yes.  Don is making Mr. Jones look bad because he's

16   taking the tracks out of service.

17   Q.  And what was the tone of these conversations with

18   Mr. Jones in particular?

19   A.  Screaming.  I mean, he was mad.  He was upset.

20   Q.  I'm going to take you then to the termination of

21   Mr. Sanders.  You recall that when he got fired from BNSF,

22   right?

23   A.  Yes.

24   Q.  And how long were you together after his termination?

25   Doing the math, it sounds like about two years?

```
1    A.  Yeah, I think so.

2    Q.  What do you remember about how he reacted to being

3    terminated?  How would you describe that?

4    A.  How he reacted?  I lost my husband, basically, that day.

5    Q.  Because?

6    A.  He went into a deep depression, didn't do anything but

7    sleep.

8    Q.  How about kids' activities?

9    A.  He didn't go to them.

10   Q.  Conferences, football games, lacrosse games?

11   A.  We had one son left in football and if he went, he

12   wasn't there, if that makes sense.

13   Q.  Sure.

14   A.  He's attending to attend, but it wasn't, you know, the

15   normal cheering his son on like he normally would have.

16   Q.  How about around the house, work around the house?  What

17   was the yard --

18   A.  He used to have an immaculate yard.  He carved me all

19   sorts of tikis around the fire pit.  He does chainsaw

20   carvings, and people around the neighborhood would always

21   stop and want him to do them.  I told them he couldn't

22   because they were mine.  He can't copy them.

23   Q.  What are tikis?  I'm sorry.

24   A.  Tiki guys.

25   Q.  Tiki guys.  I'm sorry.
```

```
1    A.  I don't know.  That's what I call them.  I don't know

2    what they are.

3    Q.  Okay.  Thank you.

4    A.  But after he lost his job, the yard doesn't -- nothing

5    mattered, really.  The yard didn't get done.

6    Q.  How about cutting the grass even?

7    A.  No, no.  I did that.

8    Q.  And he had always taken care of that?

9    A.  Didn't matter how long he worked.  He would always come

10   home and take care of the yard or fix anything in the house,

11   or work on the kids' trucks if they needed them.

12   Q.  And did this continue, this state for Mr. Sanders, did

13   it continue until you physically separated with him?

14   A.  He's still that way.  It's a struggle for him to do

15   much.  I mean, he's getting better, but not -- he's not the

16   man I knew ten years ago.

17            MR. JAMES KASTER:  That's all the questions I have

18   for you.  Thanks.

19            MS. FERGUSON:  I don't have any questions.

20            THE COURT:  Ms. Sanders, you're excused.  Thank

21   you.

22            MR. JAMES KASTER:  It will take us a moment, Your

23   Honor.  Our other witness is out in the hallway.

24            THE COURT:  Understood.

25       (Pause)
```

```
1              THE COURT:  Mr. Kaster, who does the plaintiff
2     call?
3              MR. JAMES KASTER:  Plaintiff calls to the witness
4     stand Kevin Gaylor.
5              THE COURT:  Mr. Gaylor, why don't you come up,
6     stand between the witness chair and the railing there, and
7     the clerk will administer the oath.
8              COURTROOM DEPUTY:  Please state your full name for
9     the record, spelling your first and last name.
10             THE WITNESS:  Kevin, K-E-V-I-N; Mark; Gaylor,
11    G-A-Y-L-O-R.
12             COURTROOM DEPUTY:  Please raise your right hand.
13         KEVIN M. GAYLOR, PLAINTIFF'S WITNESS, SWORN
14             THE WITNESS:  I do.
15             THE COURT:  Thank you, sir.  Please be seated.
16             MR. JAMES KASTER:  May I proceed, your Honor?
17             THE COURT:  Certainly.
18             MR. JAMES KASTER:  Thank you.
19
20                      DIRECT EXAMINATION
21    BY MR. JAMES KASTER:
22    Q.  Mr. Gaylor, if you're comfortable, you can take your
23    mask off.
24             Mr. Gaylor, you were employed for a period of time
25    by BNSF Railroad, correct?
```

 1    A.  Correct.

 2    Q.  And I think -- why don't you just tell us when did you

 3    start.

 4    A.  May of 2003.

 5    Q.  And you worked for a time as a track inspector, is that

 6    correct?

 7    A.  Several different periods of track inspecting, yes.

 8    Q.  And what was the first year that you started track

 9    inspecting, that you recall?

10    A.  Would have been 2005.

11    Q.  Are track inspectors governed by the Federal Railway

12    Administration?

13    A.  Yes.  They issue the rules and the guidelines by which

14    the track inspectors are required to inspect and report

15    defects.

16    Q.  And is that subject to discretion?  Once you see a

17    defect, do you have to report it?  Do you have a choice?

18    A.  According to the FRA you have no choice.  You are

19    required to report that and protect the track.

20    Q.  And are you qualified as a track inspector pursuant to

21    FRA guidelines, then?

22    A.  Yes.  Yeah, they set the guidelines for being qualified.

23    Q.  Can you get in trouble for ignoring a defect, by the

24    way?

25    A.  The FRA will level personal fines and can impose jail

```
 1    time.
 2    Q.  Is there such a thing as a willful failure to put in a
 3    defect?
 4    A.  Yes.  That generally needs to be a willful failure in
 5    order for the FRA to level personal fines.
 6    Q.  What's the obligation of the company, as you understand
 7    it, to fix something once a defect has been reported?
 8    A.  By the same FRA guidelines, they have a certain time
 9    period to either repair that defect or restrict the train
10    movement over it.
11    Q.  Are there particular pressures for track inspectors?
12    A.  Well, like any kind of inspection, you know, if you find
13    defects, it lowers profitability and increases, you know,
14    delay times, so there's pressures that go with that.  They
15    would rather not find defects.
16    Q.  "They" being?
17    A.  The company.
18    Q.  And with respect to -- did you hear of a concept called
19    a scorecard?
20    A.  Yes.
21    Q.  And did the slow orders or defects or taking tracks out
22    of service, did they affect scorecards as you understood it?
23    A.  Yes.
24              MS. FERGUSON:  Objection.  Foundation.
25              THE COURT:  Sustained.
```

1    BY MR. JAMES KASTER:

2    Q.  At some point in time did you give up your track

3    inspector rights?

4    A.  They expanded the requirements and I just didn't

5    continue on in order to keep the track inspection up to

6    date.

7    Q.  And when was that, do you recall?

8    A.  Probably around 2015, 2016, I'm guessing.

9    Q.  Was the pressure that track inspectors were under, was

10   that one of the reasons you didn't keep up with the expanded

11   requirements?

12   A.  Yes, that was probably the biggest negative to the job.

13   Q.  Why?

14   A.  Because of the pressure of, you know, if you report

15   defects and put out slow orders, that delays trains, that's

16   detrimental to the company, but it is your job to do that.

17   So you're -- you know, you have pressure on both sides.

18   Q.  Let's switch subjects on you now.  The timekeeping

19   system back in 2015, were you familiar with what was called

20   the PARS timekeeping system?

21   A.  Yes.

22   Q.  And with respect to the custom and practice of putting

23   in your time with respect to days worked and when the day

24   was worked, what was your understanding of when you put your

25   time in relative to your workday?

1    A.  That progressed throughout my career from when I was

2    hired.  It was not uncommon to enter all of the time for a

3    time period on the last day of the period, to currently they

4    insisted it has to be done the same day regardless of how

5    late it is.  If you work till midnight, they want time

6    entered that same day.

7    Q.  And when you say "currently," are you talking about time

8    periods in 2015, 2016?

9    A.  2015, it would have been somewhere in the middle of the

10   road there where it wasn't acceptable to put it in at the

11   end of the pay period.  They wanted it in every day.  I

12   believe in 2015 yet they didn't complain about it being

13   entered the next morning.

14   Q.  Do you remember on-time reporting, the concept called

15   "on-time reporting"?

16   A.  Yes.

17   Q.  What was your understanding of what that concept meant?

18   A.  Our roadmasters would remind us of what his territory's

19   on-time reporting percentage was because it affected his

20   scorecard.

21   Q.  And on his percentages of on-time reporting, what would

22   that entail as it was described to you?

23   A.  The best I understood it, because we weren't

24   well-trained on how the system kept track of these things,

25   my understanding was if every employee did not have their

1    time submitted before midnight, that counted as a day that

2    wasn't on-time reported.

3    Q.  Could employees change their time before the end of the

4    payroll period?

5    A.  Yeah.  In fact, it's even possible to change your time

6    after the end of the payroll period and the adjustment would

7    be made on the next paycheck.

8    Q.  Was that something that happened regularly?

9    A.  It was fairly regularly, especially when they started

10   insisting time was done the same day.  It started to become

11   common that we would enter our time in the morning before

12   the day started, and then adjust it that night or the next

13   day if we worked longer or quit earlier than expected.

14   Q.  Let me switch subjects on you to Mr. Sanders as a track

15   inspector.  Did you have a chance to work with him or

16   observe him?

17   A.  Yes.

18   Q.  And was he competent as a track inspector?

19   A.  Everything that I saw of his -- all my experience with

20   him was that he was very competent at determining defects.

21   Q.  You worked as a flagger for a period of time in an area

22   where Mr. Sanders had track inspected, correct?

23   A.  That's correct.

24   Q.  And for what period of time, do you recall?

25   A.  I know I was working that job from 2014 through 2017.

```
1     Q.  What is a flagger?

2     A.  They have a lot of different jobs, but basically it's

3     providing protection on the tracks, whether it's for our own

4     employees or equipment, or it could be outside contractors

5     that are doing work, you know, power lines going over the

6     tracks, bridges, but it's protecting the workers on the rail

7     so that, you know, there's not train traffic going through

8     while they're working.

9     Q.  Would a flagger come out to protect the track while

10    workers are working on a defect that had been reported, for

11    example?

12    A.  Occasionally.  We have certain forms of protection where

13    a flagger runs a Form B, or gets track in time.

14    Q.  Did you ever have the experience of coming on a defect

15    as a flagger and Mr. Sanders reported that was not a defect

16    at all?

17    A.  No.

18    Q.  Were you present in the area when Mr. Sanders

19    transferred from Dayton's Bluff to Northtown?

20    A.  Yes, I was.

21    Q.  And were you in fact with Mr. Sanders immediately after

22    he transferred to Northtown?

23    A.  Yeah.  Mr. Sanders had not worked the territory for

24    awhile.  There had been some track changes, and so I

25    accompanied him as a pilot, as a guide, through the
```

1    territory.

2    Q.  So this would have been when he first arrived at

3    Northtown?

4    A.  It was when he first came back to Northtown.  He had

5    worked there and came back several years later.

6    Q.  Sometime -- so this would have been in early 2016, as

7    you recall?

8    A.  That sounds about right.

9    Q.  Did Mr. Sanders report any defects on frogs, that you

10   recall?

11   A.  Yes.

12   Q.  And what do you recall happening that day with respect

13   to Mr. Sanders and a Stephen Chartier?

14   A.  Mr. Sanders had put out a couple of ten-mile-an-hour

15   speed restrictions for defective frogs, and Mr. Chartier

16   first called me asking what was going on and why Don,

17   Mr. Sanders, was putting out these slow orders.  And I said,

18   "Well, because the frogs are bad.  They need to be worked

19   on."

20   Q.  Let me stop you there.  Can you describe the

21   conversation in more realtime detail?

22   A.  Mr. Chartier has a tendency to be rather gruff with his

23   discussions.  There was quite a bit of swearing.  In fact,

24   the opening of the call was -- the first line was, "What the

25   hell's going on?"  And I asked, "What do you mean?"  And

1    then he proceeded to ask about these slow orders, and he

2    swore about, you know, "Why the hell do we have all these

3    damn slow orders and what's going on?"  That type of tone.

4    Q.  And did you respond about what the slow orders were

5    about or what did you say?

6    A.  Yeah.  He asked me about if I had measurements, and I

7    said, "I'm a pilot.  I'm not a track inspector.  I didn't

8    take measurements."  But I said, "I can see from the truck

9    they're that bad that I can see they're a defect from here."

10   Q.  What did he say when you said that?

11   A.  "I don't care what it looks like.  I have to have

12   measurements."  And I said, "Well, I know Don took pictures

13   of them."  And he said, "I don't give a shit about pictures.

14   I need measurements."

15            And then he hung up with me.

16   Q.  Did Mr. Sanders get a call shortly thereafter on his

17   phone?

18   A.  Yeah, immediately after that he called Mr. Sanders.

19   Q.  And was Mr. Sanders using a cell phone for that call, do

20   you recall?

21   A.  Yeah, we were stopped and he was using his cell phone on

22   speakerphone.

23   Q.  Were you in the truck with Mr. Sanders?

24   A.  Yeah, we were both in the truck.

25   Q.  So you could hear this conversation?

```
1    A.  Yes.

2    Q.  Can you describe that in realtime?

3    A.  It was pretty similar to -- my conversation was, you

4    know, about what the hell's with all these defects and slow

5    orders?"  And he proceeded to say something about, "You're

6    not going to pull, the same shit that you pulled at your

7    last territory," and that, "Tomorrow when I get back, you'll

8    be going" -- "you'll be spending tomorrow with me."

9    Q.  Did Mr. Chartier go out with Mr. Sanders the next day?

10   A.  Yes, he did.

11   Q.  By the way, do you remember any conversation after

12   Mr. Chartier said:  You're not going to pull the same shit

13   in this district that you did in the last?

14   A.  That was pretty much the end of that phone call.  I

15   guess I don't know where you want to go.

16   Q.  I just want to know was there any other conversation in

17   the truck, that you recall?

18   A.  Not -- not really any specifics.

19   Q.  Okay.  Let's go to the next day.  What do you remember

20   happening the next day?

21   A.  The next day Mr. Chartier accompanied Mr. Sanders on his

22   track inspecting route and they placed several more

23   ten-mile-an-hour slow orders for defects.  And we, of

24   course, the rest of the employees back at the headquarters

25   that evening, asked Mr. Sanders, it's like, "Well, he was so
```

1    mad yesterday.  Now he's with you and you're still placing

2    these ten-mile-an-hour orders.  What's going on?"  And he

3    said, "Well, that's different because I'm with you and I see

4    it myself."

5    Q.  How long did Mr. Sanders stay in that territory?

6    A.  It wasn't long at all.  It may have only been a few

7    days, to the best of my knowledge.

8    Q.  Are you familiar with the hotline complaint process at

9    BNSF?

10   A.  Somewhat, yeah.

11   Q.  By the way, did you make a complaint to Mr. Chartier

12   yourself with respect to cell phone use?

13   A.  I had reported a complaint to Labor Relations.

14   Q.  Okay.  So you reported the complaint to Labor Relations.

15   A.  Yes.

16   Q.  And what was that complaint about?

17   A.  Mr. Chartier and Mr. Jones had announced at one of our

18   safety meetings that they would no longer be paying cell

19   phone bills because everyone has unlimited plans.  However,

20   I didn't have an unlimited plan, and as a flagger, I'm on

21   the phone probably three to four hours a day.  And so I had

22   overage charges from my personal cell phone use, and --

23   Q.  So you made a complaint to Labor Relations?

24   A.  Yeah, they announced -- made that announcement at the

25   safety meeting and so I submitted that question to Labor

1    Relations.

2    Q.   What happened after that?

3    A.   The next day I received an abolishment notice of my job,

4    that my job was terminated.  And an hour or so after that,

5    Mr. Chartier called me and in his usual tone said, "What the

6    hell is this shit about reporting us not paying cell phone

7    bills?"  And I said, "Well, that's what you said, isn't it?"

8    And he said, "Well, have I ever not paid it?"  And I said,

9    "Well, you paid them in the past, but you just said

10   yesterday you're not going to pay them."

11   Q.   So the abolishment of the job, was that your job?

12   A.   Yes, the flagging foreman position.

13             MR. JAMES KASTER:  That's all the questions I have

14   for you, Mr. Gaylor.

15             THE COURT:  Ms. Ferguson?

16             MS. FERGUSON:  Thank you.

17                        **CROSS-EXAMINATION**

18   BY MS. FERGUSON:

19   Q.   Good afternoon, Mr. Gaylor.

20             Just so I understand, you worked as a track

21   inspector up until sometime in 2014?

22   A.   Yes.  With the railroad system, people get bumped out of

23   their positions by seniority, and so quite often I would

24   work a few months every winter as a track inspector.  My

25   first inspection job was at Northtown and was on that

1    position for about 18 months straight.

2    Q.  By 2014, 2015, you wanted to get out of that line of

3    work because of the pressure?

4    A.  There was several reasons.  The pressure.  Also, they

5    had a tendency to force assign you to a different territory

6    if they were short track inspectors, and so I was tired of

7    being forced to Sioux City, Iowa.

8    Q.  Was that also a period of time on the railroad when it

9    was very busy due to the oil traffic coming out of North

10   Dakota?

11   A.  It was a busy period, yes.

12   Q.  So there was more pressure at that time, fair to say?

13   A.  Probably.

14   Q.  You didn't work under Blaine Hoppenrath ever, correct?

15   A.  I did occasionally.  I was running a backhoe machine

16   that was shared between Ms. Hoppenrath's territory and the

17   Northtown territory.

18   Q.  Did you work with her, or under her, in 2015 or 2016?

19   A.  I don't recall that I would have worked there other than

20   on the backhoe.

21   Q.  Okay.  Could we see Exhibit D-44, please?  And I just

22   want to highlight "timely reporting."

23         This is a document -- at the top it says "St. Paul

24   Roadmaster Expectations."  And you talked a little bit about

25   in your testimony there became a time when roadmasters were

1    wanting reporting daily, correct?

2    A.  Yes.

3    Q.  And were you aware that Blaine Hoppenrath was one of the

4    roadmasters that wanted daily reporting?

5    A.  Yeah.  To my knowledge, it was a systemwide --

6    Q.  By 2015 that wasn't unusual?

7    A.  -- to all the roadmasters.

8    Q.  Okay.  I assume you're aware that Mr. Sanders was

9    terminated for theft of time.

10   A.  I knew he was terminated.  I never really knew the

11   specifics.  The railroad doesn't disclose that to other

12   employees.

13   Q.  Okay.  That was going to be my next question.  You don't

14   know the details about his reporting of time in March of

15   2016, correct?

16   A.  No.

17   Q.  Or anything about the process that followed, correct?

18   A.  No.

19   Q.  One of the things you did in this case is you signed a

20   declaration and said -- and you said this here today -- that

21   Mr. Chartier wanted measurements.  He wanted to make sure

22   things were measured accurately, right?

23   A.  Yeah.  And there were measurements.  The measurements

24   are -- to report a defect in the system, you have to enter

25   the measurements into the system.  That's the only way the

1    system will accept a defect.

2    Q.  Okay.  As a track inspector, you reported track defects,

3    correct?

4    A.  Correct.

5    Q.  And that was the reason -- that was your job, you were

6    paid to do that as a job, right?

7    A.  Yes.

8    Q.  And if you didn't do that, you could be fined by the

9    FRA?

10   A.  Correct.

11   Q.  BNSF had track inspectors to inspect tracks, but the FRA

12   also had track inspectors that would look at BNSF tracks

13   from time to time, correct?

14   A.  Correct.

15   Q.  And were you aware that the State of Minnesota also had

16   track inspectors that would look at their tracks from time

17   to time?

18   A.  Yes.

19   Q.  And another check on whether or not the track inspectors

20   were finding the defects were the geometry cars that were

21   used to find defects, correct?

22   A.  Correct.

23   Q.  So there really wasn't a way to hide the defects if

24   there was an actual defect because they could be caught

25   somewhere along the line, correct?

```
1    A.  Most of them.  I don't know whether the geometry cars

2    will pick up a defective frog.  I'm not that familiar with

3    their systems.

4    Q.  Okay.  When did you last work at BNSF?

5    A.  May of 2021.

6    Q.  Okay.  I understand you went to an investigation.

7    A.  Yes.

8    Q.  You were offered a waiver by Keith Jones, correct?

9    A.  He had talked about it, but a paper one was never

10   presented to me.

11   Q.  Have you seen the document submitted by your union rep

12   referencing the fact that Mr. Jones had offered a waiver?

13   A.  I did see the note in from the union rep.

14   Q.  Okay.  Thank you.

15          MS. FERGUSON:  I have no further questions.

16          MR. JAMES KASTER:  Briefly, Your Honor.

17

18                     REDIRECT EXAMINATION

19   BY MR. JAMES KASTER:

20   Q.  Mr. Gaylor, you were just asked about your termination

21   from BNSF and you indicated when that was, right?

22   A.  That's correct.

23   Q.  What happened?

24   A.  I was operating a road grader with a snow wing and

25   traveling under a low bridge, which is an abandoned
```

1    out-of-service bridge that we traveled quite frequently.

2    And that snow wing sticks up above the top of the grader and

3    frequently rubs on the bottom of the bridge.  And as I went

4    under that bridge, it rubbed on there and a weld on the

5    support of the snow wing broke.

6              And I called the mechanical supervisor, told him

7    about it.  He was on vacation.  He had me call the mechanic

8    filling in, told him about it, and I drove the grader up to

9    the shop.  And when I arrived at the shop, that's when I was

10   told that the grader was out of service for an

11   investigation.

12             And a month or so later we had an investigation

13   and the railroad claimed that there was $27,000 of damage to

14   a machine that has no damage other than five minutes' worth

15   of welding to repair a broken weld.

16   Q.  You grew up on a farm, right?

17   A.  Grew up on a farm.  I worked as a heavy equipment and

18   farm equipment mechanic for eight years.

19   Q.  How long would it have taken you to fix that weld?

20   A.  Not even five minutes.

21   Q.  So the claim was that there was $27,000 worth of damage

22   and the grader was out of service, right?

23   A.  Yes.

24   Q.  Was the grader ever fixed?

25   A.  No, nothing -- not a single thing has been repaired on

1    it since I left, and it's been operated by another employee

2    ever since.

3    Q.  Did Mr. Jones say to you anything about why you were

4    being terminated, what his view was of the reason?

5    A.  He said, "I need to set an example for the rest of the

6    employees."

7    Q.  Did Mr. Jones ever accuse you of calling the EPA?

8    A.  Yes.  He sat in the truck with me and Mr. Chartier, and

9    they both accused me of calling the EPA on what they were

10   doing at the time.

11   Q.  And what were they doing at the time?

12   A.  They were drilling holes in the ground to try and drain

13   away snow melt water out of the yard.

14   Q.  And what would be the problem with that?

15   A.  That water is pretty contaminated with diesel fuel and

16   oil and other railroad car byproducts and spills, which is

17   why we have a storm water system that collects it and it

18   gets treated before it's released.  And so to drill holes

19   and drain that water into the groundwater is just a really

20   bad idea.

21   Q.  Did you say, "That's a bad idea"?

22   A.  Yes.  Yes.

23   Q.  Did you call the EPA, by the way?

24   A.  No, I didn't.  I actually know of a couple other people

25   that did, but I did not.

```
 1    Q.  What did Mr. Jones say to you about whether he thought
 2    you did?
 3    A.  He was just very upset about it, and him and
 4    Mr. Chartier, the three of us in the pickup together, said
 5    that, "None of this is any of your business.  Your job is to
 6    go out there and protect the guys drilling the holes."
 7    Q.  Were you a flagger at the time?
 8    A.  Yes, I was a flagging foreman at the time.
 9    Q.  And when Mr. -- so earlier -- was that earlier this year
10    when you were terminated?
11    A.  In May, yes.
12    Q.  In May.  So after that Mr. Jones said to you:  I needed
13    to make an example of you to the rest of the crew?
14    A.  Yes.  I can't say that that's what he was referencing.
15    I'm not sure.
16              MR. JAMES KASTER:  That's all I have.  Thanks.
17              MS. FERGUSON:  Just one follow-up.
18              THE COURT:  Certainly.
19
20                     RECROSS-EXAMINATION
21    BY MS. FERGUSON:
22    Q.  Mr. Jones is the same person that had offered you the
23    waiver before you went to the investigation; correct?
24    A.  Correct.
25    Q.  I assume you've seen the appeal prepared by your union
```

1    rep that contained the text messages from Mr. Jones to your

2    union rep offering a waiver.  "You don't have to go to

3    investigation.  We'll waive it.  You won't be dismissed."

4              Correct?

5    A.  Correct.

6    Q.  And you chose not to accept that?

7    A.  That's correct.

8              MS. FERGUSON:  Thank you.

9              MR. JAMES KASTER:  Nothing else, Your Honor.

10             THE COURT:  Mr. Gaylor, you're excused.

11             MR. JAMES KASTER:  Thank you, sir.

12             Your Honor, we are going to examine

13   Ms. Hoppenrath, we have an expert for tomorrow, but for

14   today we are out of witnesses.

15             THE COURT:  All right.  Does BNSF have anybody it

16   could call to come in and testify this afternoon on short

17   notice?

18             MS. FERGUSON:  No.

19             THE COURT:  All right.  Then we will adjourn at

20   this time.  We will not resume tomorrow at the usual time.

21   We will resume tomorrow at 1:00 p.m.  My understanding is

22   that that works for all concerned.

23             Yes, Ms. Esposito.

24             JUROR ESPOSITO:  They were actually able to move

25   it till tonight, so I'm good at 9:00 if that's okay with the

1    Court.  I just found out over the lunch period and I hadn't

2    had a chance to tell Rachael.

3            THE COURT:  So I'll put this on the record.  Thank

4    you very much.  We are very grateful for that.

5            JUROR ESPOSITO:  I have seven other people to

6    think about.

7            THE COURT:  Well, that's very kind of you and it

8    is very much appreciated, so thank you.

9            So then I'll amend what I was going to say.  We

10   will resume tomorrow morning at 9:00 a.m., and I assume

11   everybody will be prepared to go at 9:00.

12           Mr. Kaster?

13           MR. JAMES KASTER:  Your Honor, I will certainly be

14   prepared to go at 9:00.  We will have an expert witness to

15   testify.  We will be out of witnesses other than the

16   witnesses that BNSF will supply at that point.

17           THE COURT:  All right.  So then BNSF will be

18   prepared -- well, let's just stop here.

19           At this time, Members of the Jury, I'll allow you

20   to go.  We will resume again, as I say, tomorrow morning at

21   9:00 a.m. and I'll stay here with the lawyers to discuss

22   some logistical things.  Thank you.

23           (Jury excused)

24           THE COURT:  All right.  Please be seated.

25           All right.  Will BNSF be prepared to go

1    immediately upon the conclusion of Plaintiff's expert

2    tomorrow?

3            MS. FERGUSON:  We weren't aware of that until this

4    moment.

5            MS. DONESKY:  We had secured Ms. Suanne Grobe for

6    Friday morning in light of the 1 o'clock, so we'll have

7    to -- the others are --

8            MS. FERGUSON:  She's not available.

9            MS. DONESKY:  No, I know that.

10           THE COURT:  Are others available tomorrow?

11           MS. DONESKY:  We'll see if Mr. Chartier can come.

12   The rest are out of town.

13           THE COURT:  Okay.

14           MS. FERGUSON:  There may be a deposition we could

15   read.

16           MS. DONESKY:  Had we decided on -- are you reading

17   any depositions?

18           THE COURT:  We can go off the record.

19           (Discussion held off the record)

20           THE COURT:  I just want to be sure before I

21   adjourn for the day, anything more from the plaintiff's

22   side?

23           MR. JAMES KASTER:  No, Your Honor.

24           THE COURT:  How about from the BNSF side?

25           MS. FERGUSON:  No, thank you.

1           THE COURT:  Okay.  I'm going to spend a little

2     time thinking tonight about scheduling from our end, getting

3     our charge conference done, scheduled and done, and I've

4     identified a couple of issues there that I have some

5     concerns about, but I don't think it would be worthwhile to

6     raise them today.  I think we will address those at the

7     charge conference.

8           If I think you need a head's up on either of those

9     or any issues, I will try to provide that to you over the

10    weekend, assuming we do that on Monday or Tuesday.  All

11    right?

12          MR. JAMES KASTER:  Okay.

13          THE COURT:  Thanks, everyone.  We're adjourned.

14       (Proceedings concluded for the day at 4:02 p.m.)

15                    *      *      *      *

16

17

18

19

20

21

22

23

24

25

**I N D E X**

                                                              **PAGE**

**Colloquy re:  Ruling on exhibits, other evidence**      343


**W I T N E S S E S:**

**DONALD R. SANDERS (RESUMED)**
        Continued Direct Examination by Mr. Lucas Kaster   355
        Cross-Examination by Ms. Ferguson                  418
        Redirect Examination by Mr. Lucas Kaster           464
        Recross-Examination by Ms. Ferguson                469

**JOHN MOZINSKI**
        Direct Examination by Mr. James Kaster             471
        Cross-Examination by Ms. Ferguson                  496
        Redirect Examination by Mr. James Kaster           515

**CHRISTINE SANDERS**
        Direct Examination by Mr. James Kaster             521

**KEVIN M. GAYLOR**
        Direct Examination by Mr. James Kaster             528
        Cross-Examination by Ms. Ferguson                  539
        Redirect Examination by Mr. James Kaster           543
        Recross-Examination by Ms. Ferguson                546


**\* \* \* \* \***


**E X H I B I T S**

| NUMBER | FOR ID | IN EVIDENCE |
|---|---|---|
| Defendant 11, 12, 13, 15 | | 347 |
| Plaintiff 172 | | 385 |
| Plaintiff 42 | | 486 |
| Defendant 88 | | 502 |
| Defendant 90 | | 504 |

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.

*/s/ Timothy J. Willette*

**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224