UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )  CIVIL FILE
Donald Sanders,               )  NO. 17-CV-5106 (ECT/KMM)
                              )
              Plaintiff,      )
                              )       **VOLUME IV**
     vs.                      )
                              )
BNSF Railway Company,         )  Courtroom 3B
                              )  Thursday, December 9, 2021
              Defendant.      )  St. Paul, Minnesota
                              )  9:00 A.M.
------------------------------------------------------------

**<u>JURY TRIAL PROCEEDINGS</u>**

**BEFORE THE HONORABLE ERIC C. TOSTRUD
UNITED STATES DISTRICT JUDGE
AND A JURY**

**A P P E A R A N C E S:**

**For the Plaintiff:     NICHOLS KASTER, PLLP**
                         By:  JAMES H. KASTER, ESQUIRE
                              LUCAS J. KASTER, ESQUIRE
                         4700 IDS Center - 80 South Eighth Street
                         Minneapolis, Minnesota  55402-2242


**For the Defendant:     ARTHUR CHAPMAN KETTERING SMETAK
                         & PIKALA, P.A.**
                         By:  SALLY J. FERGUSON, ESQUIRE
                         500 Young Quinlan Building
                         81 South Ninth Street
                         Minneapolis, Minnesota  55402-3214

                         **STINSON, LLP**
                         By:  TRACEY HOLMES DONESKY, ESQUIRE
                         50 South Sixth Street - Suite 2600
                         Minneapolis, Minnesota  55402


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

```
 1          (9:00 a.m.)

 2                    P R O C E E D I N G S

 3                       IN OPEN COURT

 4     (Without the jury)

 5          THE COURT:  Good morning, everyone.  Please be

 6     seated.

 7          Mr. Kaster.

 8          MR. JAMES KASTER:  Thank you, Your Honor.  Two

 9     matters.  One is a logistical matter.  We'll be offering a

10     new exhibit, that was not previously marked, as P-288 and

11     the exhibit is the supplemental report of Dr. Boisso.  We

12     have stripped out all reflections in the tables of front

13     pay, so that's pursuant to the Court's directive.

14          And my suggestion is that after Dr. Boisso

15     testifies, that I think we'll be cornering in on the morning

16     break; and if the Court wants to take a break and hear from

17     Dr. Boisso on the front pay calculation and any questions

18     the Court has.  My questions for Dr. Boisso at that point

19     will be brief, but the Court may have questions about his

20     calculation.  Obviously he's just extending out the

21     calculations with front pay.

22          So that is my suggestion about proceeding.

23     Obviously the Court can choose to do what the Court prefers.

24          THE COURT:  Was the doctor deposed?

25          MR. JAMES KASTER:  Was he deposed?
```

1          MS. FERGUSON:  Yes.

2          MR. KASTER:  Yes.

3          THE COURT:  Yes, was there cross-examination on

4   the front pay question?

5          MS. FERGUSON:  Yes.

6          THE COURT:  Do you anticipate that his testimony

7   today will be different from his deposition testimony or

8   additional?

9          MR. JAMES KASTER:  I don't recall, but I don't

10   think so.  I obviously -- I didn't look at his deposition

11   again last night, so I don't recall.  But I don't think so.

12   I think his deposition would be sufficient for the Court.

13          THE COURT:  Okay.

14          MR. JAMES KASTER:  I'd be happy to offer that if

15   the Court chooses that alternative.

16          THE COURT:  I think what I would prefer to do is

17   receive briefing on the question with citations to the

18   deposition and the report, as opposed to taking break time,

19   which is needed not just for the jury but for court staff as

20   well.

21          MR. JAMES KASTER:  Sure.

22          THE COURT:  You know, I guess I wouldn't be

23   opposed to, if there's time at the end of the day today,

24   keeping him around for that; but I don't want to do that if

25   the witness has other places to be or go.  That's an option,

1  but I think it's sufficient to deal with this on the

2  deposition testimony and the report.

3          MR. JAMES KASTER:  My understanding is based upon

4  my discussions with counsel is we will be done early today.

5  I think the witness will be able to stay if the Court has

6  questions for him at that point; and I'd be happy to proceed

7  that way.  And obviously I need to talk to the witness to

8  ensure -- he's from out of state.  He has a flight.  I

9  assume his flight is at the end of the day, but I'll just

10 confirm that.

11         THE COURT:  All right.  Let's confirm that and

12 then at least then we know that's an option in the event it

13 surfaces.

14         MR. JAMES KASTER:  Yeah.  Then I want to make a

15 record.  It's day four, Thursday, of the jury trial in this

16 matter.  It's 9 o'clock in the morning.  We haven't

17 started -- 9:05 actually -- we haven't started testimony yet

18 today.

19         I am concerned about evidence that's been admitted

20 in the case so far.  They are two.  We have evidence of a

21 report of -- or a finding from the labor body on the union

22 contract.  Yesterday during testimony we had

23 cross-examination of Mr. Mozinski using the actual reasoning

24 of a labor arbitrator.

25         On a different matter, with a different standard.

1          And we also heard examination of Mr. Mozinski on

2     the OSHA determination, which is not a determination but a

3     preliminary finding in this matter, which is -- this case is

4     a trial *de novo* by statute, which means as literally, we

5     start over.

6          So I'm very concerned.  I think -- I believe, Your

7     Honor, that the admission of these documents is error and I

8     believe that the allowance of examination of witnesses about

9     the reasoning of the labor arbitrator on a different matter

10    is misleading to the jury under 403.  I've objected.  I

11    understand the Court's ruling.

12         I would just say on **Gunderson,** I believe that case

13    is distinguishable.  I don't think that the Court of Appeals

14    creating a laundry list of why the plaintiff had a bad case

15    creates license to admit those items in front of a jury,

16    especially when the jury doesn't know the different

17    standards in a contract dispute under the labor contract

18    versus this case; nor does the jury understand that the OSHA

19    findings are an administrative step in the process and that

20    this trial is the trial *de novo*.  And that those findings

21    were not findings on the merits, and certainly the findings

22    of the labor arbitrator were not findings on the merits of

23    this case.  It has nothing to do with the merits of this

24    case.  The standards are different, the evidence is

25    different, the issue is different.

1              And I would just note I took a look at the public

2      records exception, which is how this was offered under

3      803(8), subdivision (8), and certainly it has those

4      standards of what can be admitted.  And on the face of it,

5      it appears that findings in a civil case, the Government in

6      a criminal case, factual findings from a legally authorized

7      investigation, certainly it fits that -- some of these

8      things fit that framework.

9              I would note in the comments section of the rule

10     it specifically talks about certain public records that are

11     excepted and admission denied, like a police report, for

12     example, because the police report contains evaluative

13     judgments that are intended if offered to do one thing,

14     which is to supplant the judgment of the jury.

15             And the Court -- and the comments go on on page

16     424 to say this:

17             "Factors which may be of assistance in passing

18     upon the admissibility of evaluative reports include the

19     timeliness of the investigation, the special skill or

20     experience of the official, whether a hearing was held and

21     the level at which it was conducted, possible motivational

22     problems."

23             It goes on in the comments to talk about the split

24     in terms of admissibility in some courts and on some issues

25     and in other courts and on other issues.

1          In this particular case, what we have with the

2     jury, and I believe we have a very smart jury so I give them

3     lots of credit.  Obviously we have a couple with legal

4     training.  I don't know that any of their training is going

5     to inform them that the OSHA findings are not a finding on

6     the merits but a determination that's a part of the

7     administrative process of this case, and that this case is a

8     trial *de novo*; and that the findings of the labor

9     arbitrator, when examined before a witness and asked about

10    whether he agrees or disagrees with those findings, are

11    fundamentally misleading.  They have one purpose and that is

12    to supplant the discretion and decision of the jury in this

13    case and have them defer to the administrative findings in a

14    different case with a different issue.

15          So fundamentally I say this:  I objected yesterday

16    on 403 grounds.  I don't believe these findings are

17    relevant.  They have one purpose, which is to distract the

18    jury from the evidence in this case.  And we are now

19    devolving into a case where the defense main argument is

20    that the jury's decision has already been made by a

21    different body, so I object.

22          I think further examination and evidence on this

23    topic magnifies the error, and I believe that we are getting

24    to the point where the plaintiff is being denied his trial

25    on these issues with this evidence.

1          THE COURT:  I think, Mr. Kaster, you've made that

2     record already, and I think -- you may have added to it here

3     method and I don't begrudge you the opportunity to do that,

4     but -- and I don't know that I disagree with -- I certainly

5     don't disagree with all of what you said.  But we've talked

6     about this and I don't think it serves much of a purpose to

7     continue to talk about it.

8          Where we need to spend our time at this point is

9     on a limiting instruction, and I'm confident we'll be able

10    to do that.

11         MR. JAMES KASTER:  All right.  Your Honor --

12         THE COURT:  If you've got a motion for a mistrial,

13    then that's something you need to get to and make.

14         MR. JAMES KASTER:  I understand that, Your Honor.

15         You understand also that we have all been waiting

16    for the trial of this case for a long time.

17         THE COURT:  As have I.

18         MR. JAMES KASTER:  I know that, and I know the

19    Court is accommodating that.  My hope is that the trial of

20    this case be decided on the evidence, the factual evidence

21    in this case.  So I appreciate the fact that the Court has

22    allowed me to make this record.  Thank you.

23         THE COURT:  Certainly.

24         Does BNSF wish to add to that record?

25         MS. FERGUSON:  I would like to comment first on

1    the Boisso supplemental report.  There are some things in

2    this that maybe we can work out that still refer to full

3    retirement age and calculations out to full retirement age,

4    and I would ask that those be removed because they're not

5    relevant to the back pay.  I've highlighted those and

6    hopefully we could just wipe those out or make some change.

7            MR. JAMES KASTER:  I'm happy to do that.  I did

8    talk to Dr. Boisso this morning to make sure that what we

9    were doing with any retirement calculation was bringing that

10   to this date.  So there is a retirement loss, but it's only

11   through this date.  So I believe if we can sit down with

12   Dr. Boisso for a few minutes and make sure.  If you want,

13   I'd invite a conversation to make sure that we stripped out

14   any front pay calculations, because that was the intent.

15           MS. FERGUSON:  I'm not as concerned about his

16   testimony, but if you intend to introduce what you gave me

17   this morning there are things that need to be taken out of

18   there.

19           MR. JAMES KASTER:  Okay.  Well, I'm happy to

20   discuss that.

21           MS. FERGUSON:  Okay.

22           THE COURT:  And I think you ought to get to that

23   promptly so we don't take too much longer here before we get

24   the jury in here.

25           MR. JAMES KASTER:  Can we have a few minutes with

1    the expert to go through this?

2            THE COURT:  Yes, right.

3            MR. JAMES KASTER:  If it's true that we have

4    things -- what I'd like the jury to have, just for their

5    convenience, is the actual table of calculation; because

6    otherwise they're screwing around talking about notes if

7    they find for the plaintiff.

8            MS. FERGUSON:  Is there one page that you want as

9    opposed to the packet?

10           THE COURT:  I think we're having a discussion

11   that's probably better between counsel than on the record if

12   that's all right.

13           MR. JAMES KASTER:  Fine.

14           MS. FERGUSON:  The only other comment I would make

15   as to the second discussion about the admission of the NRAB

16   report, that wasn't introduced as a public record.  It was

17   introduced through Mr. Mozinski because he was the union rep

18   who represented Mr. Sanders and was familiar with the

19   document, so that was how the document was introduced.

20           THE COURT:  Yeah, I understood the public records

21   exception question was a separate issue, that I don't think

22   I've seen any sort of briefing on yet, that I suggested

23   would be appropriate in the event someone thought that ought

24   to come in other than through a witness with personal

25   knowledge of the document.

562

```
 1          All right.  I'll adjourn at this time.  I'll allow

 2     you to take that time to reach that agreement.  As I said, I

 3     would really request that you --

 4          MR. JAMES KASTER:  I will be very brief, Your

 5     Honor.  Thank you.

 6          THE COURT:  Thank you.

 7        (Recess taken at 9:16 a.m.)

 8                    *      *      *      *

 9        (9:25 a.m.)

10                    IN OPEN COURT

11      (Jury enters)

12          THE COURT:  Thank you, everyone.  Please be

13     seated.

14          Mr. Kaster?

15          MR. JAMES KASTER:  Thank you, Your Honor.

16     Plaintiff calls Dr. Dale Boisso to the witness stand.

17          THE COURT:  Good morning, Dr. Boisso.

18          DR. BOISSO:  Good morning.

19          THE COURT:  Why don't you stand up between the

20     railing and the seat right there on the witness stand and if

21     you would, please, stand and face me.  Please state your

22     full name for the record, spelling your last name.

23          DR. BOISSO:  Dale Edward Boisso.  B, as in boy,

24     O-I-S-S-O.

25          THE COURT:  All right.  Please raise your right
```

1    hand to be sworn in.

2              **DALE EDWARD BOISSO, PLAINTIFF'S WITNESS, SWORN**

3              THE COURT:  Thank you, sir.  Please have a seat.

4                        **(DALE EDWARD BOISSO)**

5                        **DIRECT EXAMINATION**

6    BY MR. JAMES KASTER:

7    Q.  Dr. Boisso, if you are comfortable, you can take your

8    mask off.

9    A.  Thank you.

10   Q.  Thank you.  Why are you here today?

11   A.  I was -- or have been hired by Mr. Sanders' attorneys to

12   come in and explain to you how I have calculated

13   Mr. Sanders' financial losses.  I am an economist and I do

14   work like this in many different types of cases.

15   Q.  What's your educational background?

16   A.  I have a bachelor's degree in political science from

17   Eastern Illinois University, a master's degree in economics

18   from Eastern Illinois University, and a Ph.D. in economics

19   from Southern Methodist University in Dallas.

20   Q.  Dallas is actually where you live, right?

21   A.  A suburb, yes.

22   Q.  Yeah, okay.  Why don't you tell us about your relevant

23   professional experience.  First of all, start with this.  At

24   which schools have you taught?

25   A.  Over about a 30-year period, Parkland College in

1     Champagne, Illinois; and then Western Illinois University

2     which is in McComb, Illinois; and then now known as Missouri

3     State University in Springfield, Missouri; and then also at

4     Southern Methodist University in Dallas.

5     Q.  And what courses have you taught?

6     A.  Principles of microeconomics, principles of

7     macroeconomics, intermediate macroeconomics, intermediate

8     price theory, money and banking, statistics for economics,

9     trade policy and world trade systems, international trade,

10    cost benefit analysis, and public finance.

11    Q.  Tell us about your various areas of professional

12    consulting.

13    A.  Well, in addition to teaching over a 30-year period at

14    the university level, I have worn maybe four different hats

15    through my professional career.  One of them I have worked

16    with small start-up companies to prepare their financial

17    statements:  Their income statements, their cash balance --

18    pardon me -- their balance sheet, their cash flow

19    statements.  Then they would take that to, for example, the

20    Small Business Administration or a bank to get a loan to

21    start up their business.

22           I have worked on a *pro bono* basis with several

23    nonprofit organizations to try and help put a dollar value

24    on the benefit that they are hopefully bestowing upon their

25    patients, their clients; whether it's people or

1   environmental clients or even animals.  Since there's no

2   dollar value that they can measure in terms of profits, so

3   to speak, they are hopefully having some impact on the

4   people, so I try and estimate what that dollar value is.

5           I have worked for municipal governments and also

6   in the State of Texas to try and estimate what is a fair and

7   reasonable price for tow truck companies to tow your vehicle

8   when you're illegally parked.  A very contentious issue.

9   And then, of course, I've been doing work in various types

10  of litigation, the same reason that we're here today.

11  Q.  Have you done any -- you've talked about teaching at the

12  collegiate level.  Have you done any other kind of teaching?

13  A.  Yeah.  I used to do a lot of continuing education

14  training for attorneys.  Essentially it would be lunchtime

15  presentations of how to calculate financial losses in a

16  variety of different types of lawsuits, whether it's

17  wrongful employment termination or personal injury or patent

18  infringement or contract breach between two businesses.

19  Different ways of computing that financial loss, so I go in

20  and help the attorneys understand how that's done.

21  Q.  Now, usually when you do a financial analysis, it comes

22  in the form of what we call a report; right?

23  A.  Yes.

24  Q.  So how many reports have you calculated financial losses

25  for in wrongful employment termination cases, do you think?

1    A.  Well, I've been doing this for 26 years, and I have

2    records for only the last 16 because I was working for other

3    companies the first 10 so I don't know the numbers.  But in

4    the last 16 years, I've done about a hundred fifty cases

5    involving wrongful employment termination, and then of

6    course there's other types of cases.

7    Q.  How many reports in other types of cases have you

8    completed?

9    A.  In the last 16 years, it's over 500 total.

10   Q.  What percentage of cases are you hired by the plaintiff

11   as opposed to a defendant?

12   A.  My caseload has always been about 50/50 plaintiffs and

13   defendants.

14   Q.  And have you testified for both plaintiffs and

15   defendants in court proceedings like this?

16   A.  Yes.

17   Q.  And have you testified in federal as well as state

18   courts?

19   A.  Yes.

20   Q.  How many times, do you think?

21   A.  Actually, I had to count that the other day.  This is

22   number 39.

23   Q.  Are you affiliated with any professional organizations?

24   A.  Currently I am with two:  The National Association of

25   Forensic Economics and the American Academy of Economics and

1    Financial Experts.

2    Q.  And regarding these professional organizations, do they

3    have any control over work you do or how you do the work?

4    A.  No, not directly; but to be a member of both of those

5    organizations, I have to agree to or you might also say

6    accept certain statements ethics principles that they have

7    put forth.  So of course I do agree with those principles;

8    and generally speaking, there's like ten of each in each of

9    those.

10        The most important ones probably are that when I

11   prepare a report, I do it in a way that I have provided

12   enough description of how I've done the calculations and my

13   sources of information so that another competent economist

14   can come along and look at what I've done and replicate it

15   and be able to know exactly what I've done.

16        I do not work on a contingency basis.  I work

17   strictly by the hour, the time that I put in.  So if a jury

18   awards dollars to the plaintiff, I do not get a percentage

19   of that.

20        I agree to use generally accepted principles and

21   methods of calculating economic losses and valid and

22   reliable data.  That way we're sure that the estimate is as

23   valid and reliable as possible.  I know that there's others

24   that I'm just not recalling them right now, but I absolutely

25   adhere to them.

1    Q.  What were you asked to do in this case?

2    A.  Generally just asked to calculate the financial losses,

3    if any, of Mr. Sanders.  It's kind of a given if it gets to

4    the point I need to be deposed or come to trial and testify,

5    then of course I'll be there.

6    Q.  And were you able to reach an opinion on the value of

7    his financial losses?

8    A.  Yes.

9    Q.  And what information did you review for the purpose of

10   that opinion?  Just let me stop you there before we go into

11   that.

12          We'll be offering Plaintiff's 288 which I will do

13   now for the purpose of expediting your discussion of what

14   you review.  Do you have a listing of that, correct?

15   A.  Yes.

16          MR. JAMES KASTER:  So offer Plaintiff's 288.

17          MS. FERGUSON:  With the proposed revisions we

18   discussed, no objection.

19          MR. JAMES KASTER:  And those revisions will be

20   made and we'll honor those as we go through the testimony,

21   Your Honor.

22          THE COURT:  As agreed, then admitted and it may be

23   published.

24   BY MR. JAMES KASTER:

25   Q.  So, Karla, we're going to have to blow this up a little

TIMOTHY J. WILLETTE, RDR, CRR, CRC
(651) 848-1224

1    bit for people to see.

2              So this is a listing of what information that you

3    had for the purpose of doing the calculation.  We don't need

4    to run through everything, but why don't you just give us a

5    summary.

6              Karla, why don't you go to the bottom of the page

7    then before the witness just gives us just a summary so we

8    can see all of that.

9    A.  Okay.  Generally what we saw there at the top I looked

10   at Mr. Sanders' W-2 wage statements.  I also looked at his

11   pay stubs from his various employers.  I also did my own

12   research for certain statistical information that I would

13   need to do various calculations.

14             I read Mr. Sanders' deposition transcripts.  I

15   read the report and the deposition transcript of one of the

16   defendants' experts, Suanne Grobe Ranheim, I believe her

17   name is.

18             I spoke on several occasions with Mr. Sanders to

19   get clarification of about his wages and benefits.

20             I spoke with three different individuals in the

21   union to get information about wages over time and benefits;

22   and those individuals sent me union agreements that

23   contained wage information and benefit information, the cost

24   of benefits and so on.

25             Let's see.  What else.

1   Q.  All of which you looked at is listed here, right?

2   A.  What is listed here actually is what I either received

3   from your office or is a consequence of my own research.

4   Q.  And if we go to the second page of this document,

5   there's a continuation of all of what you reviewed for the

6   purpose of doing these calculations of financial loss;

7   right?

8   A.  Exactly, and is pretty much is what we just listed.

9   Q.  And then we actually have to go to the third page and we

10  can see finally what else you considered; and I think you

11  have listed at item 69 here or line 69 the Brotherhood of

12  Maintenance of Way Employees rates of pay; right?

13  A.  Correct.

14  Q.  Is that information that you obtained from the union

15  contacts that you made?

16  A.  Yes.

17  Q.  Did you have all the information you believe you needed

18  for the purpose of doing a calculation?

19  A.  Yes.

20  Q.  Is the methodology that you used generally accepted by

21  other economists and practitioners in your field?

22  A.  Yes, it is.  As I said, I've been doing this work for 26

23  years, and over those years I've read the journal articles

24  that are published by the two organizations that I mentioned

25  earlier.  I've also read books on how other economists like

1    myself have addressed calculating financial losses.

2            And over time, you know, it's come to kind of a

3    consensus as to how to calculate financial losses in

4    different types of cases, and what is appropriate data and

5    what is appropriate method, and what is not an appropriate

6    method.  So not only have I done all that reading, I have

7    also observed the best practices and the worst practices of

8    some other economists and have learned from that.

9    Q.  So the methods that you used are generally accepted in

10   your field?

11   A.  Absolutely.

12   Q.  You were asked to value Mr. Sanders's financial loss.

13   How did you go about estimating that value?  And let me stop

14   there before you answer that because I think it would be

15   helpful to walk through some of the information in your

16   tables.  We looked at the data that you reviewed, which are

17   pages 1 through 3 of plaintiff's 288.  Why don't we go to

18   the data that's contained on page what is numbered page 4

19   but is actually page 1 of 2.

20            This would be table 1-A.  Thank you.  So just

21   blowing up to there.

22            Now this was data that you had for the purpose of

23   doing the calculation; right?

24   A.  Yeah.  Obviously these are all dates and what

25   Mr. Sanders' age would be at each of those dates.  And then

1    the right-most column is, if you go to the table that we

2    were looking at previously, it simply shows you where I got

3    that information.

4    Q.  Okay.  And then let's go to the bottom of the page

5    because this shows us Mr. Sanders' earnings at BNSF;

6    correct?

7    A.  Correct.

8    Q.  And I'm going to stop you there because we heard some

9    numbers the other day in terms of Mr. Sanders' wages, I

10   believe that were different than these numbers and so let's

11   clarify.

12          When we go to -- let's look at 2012 through 2016,

13   or just 2012 through 2015.  Those numbers are based upon

14   what?  Is that his net pay or his gross pay?

15   A.  That's his net pay.

16   Q.  That's his gross wages, though; right?

17   A.  I apologize.  That is his gross pay before anything like

18   payment for benefits or whatever, or taxes is taken out.

19   Q.  Okay.  So the number in that column that starts out

20   gross wages is before taxes, before any removal of any

21   calculation of his contribution for benefits or whatever?

22   A.  That's correct.

23   Q.  Okay.  And that number that's in 2016, that's the number

24   through the date that -- of 4-29-2016; right?

25   A.  Correct.

1    Q.  All right.  Then if we go to the next page of the

2    document, table 1-A, page 2, why don't we blow up that

3    section of the report that begins "Estimated BNSF payments

4    toward insurance benefits, contributions," and then -- so if

5    we can just take that section of the page and blow it up,

6    please.

7            So what is this, Dr. Boisso?

8    A.  The first section there, BNSF's payments toward

9    insurance benefits, that's the total dollar value of medical

10   care, vision, dental, and maybe a few other minor types of

11   insurance that BNSF paid on -- or pays on behalf of its

12   employees.

13           Now, it is an average.  It's kind of averaged over

14   all of the employees, but I had, what, three years, 2016

15   through 2018 for the benefit amount.  So for example, in

16   2016 the total amount paid on behalf of the employees on

17   average was $18,957.  And that would be, again, for the

18   medical, health, vision, dental, and so on.

19   Q.  All right.  Let's go to the bottom of that page starting

20   with post April 29th, 2016 employment.  This shows us,

21   Mr. Sanders' mitigation -- what's called mitigation

22   earnings; right?

23   A.  Yes.

24   Q.  What does that mean, mitigation earnings?

25   A.  It is the amount -- in this case the companies that he's

1     worked for and the dollar amounts of his annual earnings for

2     those particular companies, so it would be after his

3     termination.

4     Q.  So that's the amount he's made sense he left BNSF;

5     right?

6     A.  Correct.

7     Q.  All right.  Let's go to table 2, because this is a

8     summary table; right?

9     A.  This is where I actually do the calculations of his

10    financial loss up to the date of the trial.

11    Q.  Okay.  And so why don't we pass on this and we'll walk

12    through rest of the calculation and come back; okay?

13    A.  Okay.

14    Q.  So let me take you to table 4-A, and why don't we blow

15    up a section of that that goes down to the total incremental

16    payments so everyone can see what you're talking about.

17         Why don't you tell us what this is.

18    A.  This is the first of four steps that I needed to do in

19    order to calculate any difference in his retirement benefits

20    from BNSF relative to what his retirement benefits would be

21    through Social Security.  Again, using the back pay period

22    that is all his earnings, up to the difference up to the

23    date of the trial on Monday.

24         So what I'm doing here in this first step is, if

25    you're going to participate -- if you're going to work,

1    you're going to be paying Social Security taxes; or if

2    you're working for the railway --

3    Q.  Let me stop you, Dr. Boisso.  I'm sorry, excuse me.

4    When you work at BNSF or other railroads around the country,

5    are you participating while you're working at BNSF in Social

6    Security?

7    A.  No.

8    Q.  So what happens to those workers?  What are they a part

9    of?  What is their world?

10   A.  The railroads have their own pension systems and they're

11   named, I don't know why, Tier I and Tier II.  They actually

12   have two pension systems, so they do not participate in the

13   Social Security system when they're working for the

14   railroad.

15   Q.  So that's what you're talking about comparing this

16   benefit to Social Security; right?

17   A.  Right.

18   Q.  So why don't you go ahead and describe what you did

19   here.

20   A.  Okay.  So what you see in columns D through H is I'm

21   calculating the estimated tax that Mr. Sanders would pay for

22   his Tier I retirement benefits and his Tier II retirement

23   benefits, during the period from when his employment

24   terminated to the date of the trial.  Again, if you're going

25   to participate in the pension system, you also have to pay

1    into it, and the railroad companies are also paying into it.

2    So this is essentially a cost to get the benefit at some

3    later date.

4              And what you see there in columns I through K is I

5    am estimating what his contribution or payment of Social

6    Security taxes would be based upon his earnings in the post-

7    termination period.  And so if I subtract what his taxes for

8    Social Security in the mitigating period, in the post-

9    termination period, from what the taxes that he would pay if

10   he had continued working for BNSF, that difference is the

11   extra cost it would be for him to receive retirement

12   benefits at some later date.

13   Q.  Through RRB you mean, or through Social Security, either

14   one?

15   A.  Right.  It's kind of a combination of the two.

16   Q.  Okay.  Let's go to page 1 of 2 of table 4-B.  First of

17   all, if we can blow up, please, just that top title, so when

18   we -- the title that Dr. Boisso has put on this.

19              The PIA, what is this?

20   A.  This is when you get -- when you get your Social

21   Security statement and it tells you what your benefit value

22   is going to be upon retirement, Social Security

23   Administration calls it your PIA, your Primary Insurance

24   Amount.  We just call it our benefit.

25   Q.  All right.  Let's go down to the bottom of the graph

1   then, please.  Not all the way to the bottom, I'm sorry.  If

2   we can blow up so people can read as much of the numbers?

3           Why don't you just tell us what you did here.

4   A.  Without going into too much detail, this is essentially

5   how Tier I benefits and Social Security benefits are

6   computed.  The Social Security Administration has a fairly

7   complicated way of determining what our benefits will be,

8   and the Tier I benefit that the railroad companies use uses

9   exactly the same formula.

10          So I'm simply computing what his benefits might

11  have been had he continued working -- his retirement

12  benefits had he continued working for BNSF up to the trial

13  date, and comparing that to what his retirement benefits

14  might be if he, you know, not only prior to his termination

15  and all of his jobs working before the railroad, but also

16  the jobs after the working for the railroad.

17  Q.  Again, to date of trial; right?

18  A.  Correct.

19  Q.  Let's go to the next page and tell us -- if we could

20  blow up that section right to the 2631 and 2423?  Thank you,

21  Karla.

22          Tell us what this is.

23  A.  This is kind of the final step in the calculation of the

24  PIA, or the benefit.  As you see, there's a series of

25  numbers there and I'm simply applying the Social Security

1    Administration's formulas in order to come up with the

2    benefit.

3              So as you see at the bottom of column G, G as in

4    goodness, the total PIA is based -- is value is $2,631.  So

5    if we're just measuring what his Tier I benefits would be

6    upon retirement and measuring it only up to the trial date,

7    then he would be getting $2,631 a month.

8              And then what you see over in column M, that

9    figure at the bottom, $2,423, using Social Security

10   Administration's method of calculation, this is what his

11   benefit will be on a monthly basis based upon his earnings

12   up to the date of trial.

13   Q.  All right.  If we can go -- thank you.

14             If we can go to the next table, table 4-D, step 3.

15   Why don't we blow that up as much as possible so it's a

16   longer page but so people can follow along.

17             So, Dr. Boisso, what is this?

18   A.  As I mentioned, the railroad companies have two

19   different pensions.  This is how you calculate the Tier II

20   pension value.  Again, it has a certain formula that you

21   have to apply and certain bits of information that have you

22   have to apply, and so all I'm doing is simply calculating

23   that.

24             So in columns B and C you see -- pardon me.  In

25   column B you see his actual earnings up until 2015, that's

1    in column B as in boy; and then columns -- pardon me -- rows

2    associated with 2016 through '21, that is a projection of

3    what his earnings might have been at BNSF had he continued

4    earning at the rate that he was prior to that and with some

5    growth in his wages.

6            And then what you see over in column D as in dog,

7    that's his actual wages through those years while working

8    for BNSF.

9            And then the calculations that are done below, I'm

10   simply following the Tier II formulas in order come up with

11   the dollar value of the benefit.  And that's what you see at

12   the very bottom, and it's bottom of column C.  Had he

13   continued working for BNSF, his monthly benefit would have

14   been $842.16, but since his employment with BNSF -- pardon

15   me -- ended, his Tier II benefits are only going to be

16   $447.07 upon retirement per month.

17   Q.  And those calculations, again, take this scenario

18   through date of trial; right?

19   A.  Correct.

20   Q.  And then finally one calculation before we go back to

21   the first table that we looked at, the summary table, you

22   have table 5.  Tell us what is table 5.

23   A.  As we will see in table 2 where I calculated his loss

24   backpay from the date of termination to the trial date,

25   since he lost monies in each year, would have earned more

1    had he stayed with BNSF than he has actually earned since

2    leaving BNSF.  He's not, as you see in column G, you see the

3    dollar amounts that he has lost each year.  And so he has

4    not had those monies available to him; but if he had had

5    those monies available to him, he could have earned

6    interest, put it some kind of investment opportunity,

7    whatever it might be, and earned interest on that.

8         So what we see the calculation in column I is the

9    value essentially lost interest on the differences in his

10   earnings since termination between -- the difference between

11   what his earnings might have been at BNSF and what they

12   actually have been in his various jobs since then.

13   Q.  And if we look at column H, you indicate the rate of

14   interest that is used for this purpose is 10 percent; right?

15   A.  Yes.

16   Q.  Now, in terms of if we were talking about a sum of money

17   in the future, like, for example, $10,000; and you were

18   going to receive that money five years from now, would you

19   conversely do a calculation to bring that value back to

20   present value?

21   A.  Right.  You would essentially -- if I want to have

22   $10,000 five years from now, how much money do I need to put

23   in some investment to get to the $10,000 as it earns

24   interest over those five nears.  It's going to be some

25   number less than 10,000.

1    Q.  So that's the time value of money, basically.

2    A.  Yes.

3    Q.  All right.  That is the last incremental step of the

4    calculation in table 2; right?

5    A.  Yes.

6    Q.  All right.  So let go back to table 2 and talk about

7    that.

8              We're going to need, Karla, if you would, please,

9    if we can go up to the very top before we go to the body of

10   the document.

11             So let's talk about what is projected here for

12   this time period through the date of trial.  You have listed

13   what is projected.  Why don't you describe that.

14   A.  Are you talking about the dollar amount?

15   Q.  I'm talking about the 160,201.  How do you get there?

16   A.  Okay.  I actually did two scenarios, two projections of

17   what Mr. Sanders' financial losses are.  And one is based

18   upon his average earnings in the last two full years prior

19   to his termination, so that would be 2014 and '15.  On

20   average in those two years he earned $160,201.

21             So I used that figure to project what his earnings

22   might have been had he continued his employment with BNSF up

23   until the trial date.  And so that projection of earnings is

24   what you see as column D, as in dog.

25             Again, this is the first scenario.  I did another

1    scenario which I presume we're going to look at that.

2    Q.  Yeah, we'll look at that too.  But I assume that there's

3    going to be a question raised about using those numbers

4    because I think we have evidence in this case Mr. Sanders

5    worked a lot of overtime in those years.  So why use those

6    years?  Why not cast them aside?

7    A.  Because I understand my role is to estimate his

8    capacity.  What he was capable of, what he was able and

9    willing to do in order to earn money.  And this apparently

10   is what he was doing.  So this identifies what his earning

11   capacity is.  So that's why I used the two figures in -- his

12   wages in 2014 and '15, the $160,000.  It showed what he's

13   capable of earning.

14   Q.  And right at the tail end of the discovery period, do

15   you understand we received some comparators, other

16   employees, at that time unidentified.  Apparently we have

17   them identified today.  People who were hired before

18   Mr. Sanders and after Mr. Sanders.  You've seen that

19   information as well; right?

20   A.  Yes.

21   Q.  So why not use these other people?

22   A.  Because we're here to measure what Mr. Sanders' loss is

23   not somebody else's loss.  That wouldn't make any sense.  He

24   was doing the hard work.  He was showing up and getting this

25   work done.  So that's what we're going to be estimating, not

1    somebody else who wasn't apparently -- or may not have been

2    working as hard as he was.

3    Q.  And what about during the years that Mr. Sanders -- do

4    we have information on those comparators?  I think it's

5    called three up and three down, people who were hired

6    immediately before Mr. Sanders and immediately after

7    Mr. Sanders.  Even during the period that he was working at

8    BNSF while he was still working there, how do those

9    comparator wages compare to Mr. Sanders?

10   A.  For the years that I've seen in the document that you're

11   referring to, Mr. Sanders earned more, apparently worked

12   harder in every year except one, and that was in comparison

13   to one person.  So each year we're comparing against six

14   other people, and there's maybe five or six years, seven

15   years, something like that, in which we're comparing his

16   earnings to everyone else's earnings, the three up and three

17   down in terms of seniority; and in every year he's earning

18   more than they are.  He's working harder and apparently

19   longer.

20   Q.  All right.  Let go to the bottom of this -- let's go to

21   the body of the scenario so everybody can see how you walked

22   through this.  And why don't you just tell us number in the

23   bottom right, $693,660, just tell us how you got there.

24   A.  That is the -- every year or time period that you see in

25   the left-most column, I'm calculating what the difference is

1    between what his wages and employee benefits might have been

2    had he stayed at BNSF compared to what he actually earned in

3    his subsequent employment.  So I'm calculating that

4    difference in each year, and then summing up those

5    differences and that's what you see at the bottom of column

6    K, the $693,660.  That is his total lost backpay.

7    Q.  And then if we go back to this calculation that you

8    described for us earlier on table 5, if we can pull up table

9    5.  This number is the interest.  Does that number get added

10   to the $600,000 number that we looked at in terms of total

11   loss?

12   A.  Yes, it is a component of loss.

13   Q.  And then if we go to table 6, please.  If we can just

14   look at the top.  And we won't walk through this calculation

15   all the way through again.  It's essentially the same

16   calculation; right?

17   A.  Yes.

18   Q.  But this time you're using a different -- a different

19   number for the purpose of that calculation, and the number

20   is based upon what?

21   A.  I took an average of Mr. Sanders' earnings over a

22   six-year period, 2010 through 2015; and that average

23   earnings is the $121,236 figure that you see.

24   Q.  And then if we do the -- looking at the body of the

25   calculation again, if you use that number, $121,236, then

1    your total lost backpay is what?

2    A.  $470,132.

3    Q.  In any case, the calculation -- the structure of the

4    calculation otherwise is the same; right?

5    A.  Yes.  The only difference is the -- in this case I used

6    $121,000; in the first scenario I used $160,000 as his

7    potential BNSF earnings.

8    Q.  All right.  And so we won't go through all of that

9    again.

10           If we can go -- looks like I lost this page -- bit

11   if we can go to table -- I believe it's table 8.  Why don't

12   we go to table 8, please?

13           And this is the total interest on lost backpay

14   using the same fundamentals of the calculation but a

15   different number for the purpose of the average; right?

16   A.  Right.  This is the lost -- the interest on the lost

17   backpay when I assumed that his earnings at BNSF would have

18   been $121,000, whatever the rest of that is.

19   Q.  Do these represent your opinion to a reasonable degree

20   of economic certainty as Mr. Sanders' loss to date of trial?

21   A.  Yes.

22   Q.  I'm going to ask you one more question or one more

23   series of questions, and that's -- just you're being paid

24   for your time here today; right?

25   A.  Yes.

1    Q.  And how much have you been paid in this case so far?

2    A.  $17,000.

3    Q.  And how does that compare to a normal wrongful

4    termination case for you?

5    A.  A normal wrongful termination case is maybe usually

6    around $5,000.  If it involves doing the Tier I and Tier II

7    calculations for retirement benefits, then it's usually a

8    little bit more.  Anywhere from six to seven thousand.  But

9    in this particular case, it's been going on awhile.  I have

10   issued four reports because new information came in, time

11   changed, I think we got delayed because of COVID, the trial

12   got pushed back and so on and so forth.  As more information

13   became available it was necessary to update the reports.

14              MR. JAMES KASTER:  That's all the questions I have

15   for you, Dr. Boisso.  Thank you.

16              THE COURT:  Ms. Ferguson?

17              MS. FERGUSON:  Thank you, Your Honor.

18

19                        **CROSS-EXAMINATION**

20   BY MS. FERGUSON:

21   Q.  Good morning, Dr. Boisso.

22   A.  Good morning.

23   Q.  Just to be clear, you're not here today to render any

24   opinions as to whether the termination by BNSF was

25   appropriate; correct?

1    A.  That's correct.

2    Q.  That's something that's left to the jury.

3    A.  As I understand it, yes.

4    Q.  And you are an economist so you are here to talk about

5    the numbers that you've run based on assumptions you've

6    made; correct?

7    A.  Assumptions and data, yes.

8    Q.  One of the assumptions you've made is that if

9    Mr. Sanders had stayed at BNSF, he would have earned between

10   120,000 and 160,000; correct?

11   A.  Correct.

12   Q.  And you relied for that 160,000 number on the wages he

13   earned in 2014 and 2016; correct?

14   A.  That's correct.

15   Q.  You're aware that those years were very high earning

16   years for track inspectors on the railroad because of the

17   oil boom that took place?

18   A.  I don't know if they were high for track inspectors?  I

19   have not seen any such information other than for

20   Mr. Sanders.

21   Q.  That wasn't something that you took into account in

22   calculating the losses here.

23   A.  I'm not certain what your question is.  What do you mean

24   by calculating?

25   Q.  Whether or not Mr. Sanders would have been able to

1    continue working those number of hours with a downturn in

2    the oil economy.  You didn't take that into account.

3    A.  Well, I do know that the railroad -- pardon me -- BNSF's

4    earnings or revenue and profit in the year that he was

5    terminated were relatively low.  So if there was a boom in

6    the oil industry at that point and BNSF was transporting

7    that, it's certainly not reflected in their lower revenues.

8    Q.  So my question really is your numbers don't take into

9    account the fact that in 2017, '18, '19, '20, '21, there

10   might have been less work available.

11   A.  There might have been less work available.  I don't know

12   that.  But I also know that BNSF's profits and revenues

13   increased dramatically during that time period.

14   Q.  So the answer to my question is you don't know whether

15   there would have been less work available in those years,

16   2017, '18, '19, '20 and '21?

17   A.  I cannot say that for Mr. Sanders or anyone else.

18   Q.  Well, are you aware of any track inspector in the Twin

19   Cities subdivision that earned a hundred thousand dollar in

20   the years 2017, '18, '19, '20 or '21?

21   A.  I have information only for Mr. Sanders.

22   Q.  So you don't have information that any track inspector

23   in the Twin Cities subdivision earned a hundred thousand

24   dollars in those years?

25   A.  No, I don't.

1    Q.  Okay.  You did say that you reviewed what were

2    referenced as comparator documents, or the three above and

3    three below on the seniority list; correct?

4    A.  I saw that table, yes.

5    Q.  Okay.  And are you generally familiar with how seniority

6    lists work for the railroad?

7    A.  I'm not certain what you're asking, but I do have an

8    understand what seniority is.

9    Q.  Okay.  Well, if you have a recollection of what that

10   three above and three below -- three above would be people

11   higher on the seniority list, three below people lower on

12   the seniority list.  Is that general understanding you have?

13   A.  Yes.

14   Q.  And you said you looked at those documents.  I'll just

15   reference one employee by a number.  Employee number 1.

16   You're aware that employee number 1 in the year 2016 earned

17   $74,313.36?

18   A.  I do not have that chart memorized.  If you want to show

19   it to me?

20            MS. FERGUSON:  I think there is an objection to

21   that chart?

22            MR. JAMES KASTER:  Yes, I maintain an objection to

23   the chart, hearsay.  No foundation.  We didn't even have

24   names before this day.

25            MS. FERGUSON:  I'll just ask him about numbers.

1   BY MS. FERGUSON:

2   Q.  So you don't have that recollection.  You did look at

3   the chart but you don't have that recollection?

4   A.  Correct.

5   Q.  Okay.  And following through with employee number 1 in

6   the year 2017, do you have a recollection that the reported

7   earnings for a track inspector in 2017, employee number 1,

8   $80,055?

9   A.  2017?

10  Q.  Correct.  I assume --

11  A.  I don't recall seeing anything after 2016 on that table.

12  Q.  Okay.  So you're not aware that in the year 2018,

13  employee number 1 earned $68,00.80 as a track inspector.

14          MR. JAMES KASTER:  Object to counsel testifying.

15  The witness has no foundation.

16          THE COURT:  Yes, sustained.

17          MS. FERGUSON:  These records were provided to

18  counsel, and whether or not he chose to provide them to the

19  expert --

20          THE COURT:  The expert's testified that he doesn't

21  have any recollection of this information.

22  BY MS. FERGUSON:

23  Q.  So you haven't done any independent investigation to

24  determine what other track inspectors earned during those

25  years.

TIMOTHY J. WILLETTE, RDR, CRR, CRC
(651) 848-1224

1    A.  No, because that would be proprietary information that

2    would not be available to me from BNSF or those individuals.

3    Q.  Did you do any research on your own as it related to

4    what opportunities there were in the railroad industry

5    post-termination as it related to track inspector jobs,

6    conductor training, yardmaster, other jobs in the railroad

7    industry?

8    A.  That's not my area of expertise, so I don't have an

9    opinion as to whether those positions were available or

10   whether he would be able to achieve one of them.

11   Q.  That would be more in the area of expertise of a

12   vocational expert?

13   A.  Yeah, or an HR person, yes.

14   Q.  BNSF isn't the only railroad in town, is it?

15   A.  Not that I'm aware of, no.

16   Q.  Okay.  Did you review -- I think you said you reviewed

17   Suanne Grobe Ranheim's deposition and her reports?

18   A.  Yes.

19   Q.  She's the vocational expert retained by BNSF?

20   A.  Yes.

21   Q.  And you're aware that she concluded in her reports and

22   deposition that there are jobs available in the railroad

23   industry, and there have been jobs available, and those jobs

24   pay in the range of $75,000 to $88,000?

25   A.  I remember reading that, yes.

1    Q.  Your calculation of backpay does not take into account

2    any periods of time that Mr. Sanders may have been unable to

3    work to do other issues, personal or health-related issues?

4    A.  Yes, actually it does.

5    Q.  So what number did you put on that for a period of time

6    he's unable to work?

7    A.  I did not include any calculation for what his BNSF

8    compensation might have been or what his earnings might have

9    been in mitigating.  If you would look at table 2 or 6

10   again, you will see a gap halfway through the table.  That's

11   the period when he was not medically available.

12   Q.  And what period of time is that if you look at your

13   table?

14   A.  It extends from November 1, 2017, through February 26,

15   2018.

16   Q.  And any other periods of time after that?

17   A.  No.

18           MS. FERGUSON:  Okay.  Thank you.  Those are all

19   the questions I have.

20           MR. JAMES KASTER:  A few follow-up, Your Honor.

21           THE COURT:  One second, Mr. Kaster.

22           MR. JAMES KASTER:  Sure.

23           (Pause)

24           THE COURT:  Mr. Kaster?

25           MR. JAMES KASTER:  Thank you, Your Honor.

1      **REDIRECT EXAMINATION**

2      BY MR. JAMES KASTER:

3      Q.  With respect to the -- I think it's Grobe deposition

4      that you were just asked about, you did review that;

5      correct?

6      A.  Yes.

7      Q.  What did you observe in that deposition about her

8      opinion about Mr. Sanders' earning capacity at the time of

9      his termination?

10     A.  She indicated that his earning capacity at the balance

11     was in the range of $160,000; same amount I did before I

12     even saw her report.

13     Q.  And in terms of Mr. Sanders, did she observe regarding

14     whether or not he was medically able to work?

15     A.  Yes, she made a statement in her first report that there

16     is no -- how did she put it -- objective medical issue that

17     would prevent him from working.  Something to that effect.

18     Q.  Let's go back to one fundamental about your report and

19     your analysis that we should make sure that we talk about.

20          The number that you have used for Mr. Sanders for

21     his earnings since the time of his departure from BNSF, what

22     is that number and how did you calculate it?

23     A.  Those, in each year since his termination, would be his

24     actual earnings, his wages.  And in only one instance for a

25     relatively short period of time with a particular employer

1    did he have medical benefits, or any kind of benefits.  None

2    of his ten employers during that time period paid into a

3    retirement system or matched a 401k.  So basically all he

4    had was wages during that time period, and those are the

5    figures I used.

6              And then his wages ranged anywhere from about

7    $40,000 to $82,000 over those years.  In the last year is

8    when he earned -- pardon me -- 2020 when he earned the

9    $82,000, and that is the figure that I used for what his

10   earnings might have been here in 2021.

11   Q.  So you've used, instead of an average of the numbers

12   going back, you've used the highest earnings that he made

13   previously before this year for the purpose of bringing us

14   to date; right?

15   A.  That's correct.

16             MR. JAMES KASTER:  That's all I have.  Thank you.

17             THE COURT:  Ms. Ferguson?

18             MS. FERGUSON:  Nothing further.

19             THE COURT:  Thank you.

20             Dr. Boisso, you may step down, sir.

21             THE WITNESS:  Thank you.

22             THE COURT:  Thank you.

23             MR. JAMES KASTER:  Your Honor, I'm going to

24   discuss with the witness the Court's request before he

25   leaves.

```
 1                   THE COURT:  All right.

 2                   MR. JAMES KASTER:  If I can just have a moment?

 3                   THE COURT:  Okay.

 4                   (Pause)

 5                   MR. JAMES KASTER:  Thank you, Your Honor.

 6                   THE COURT:  Thank you.

 7                   MR. JAMES KASTER:  Plaintiff has no further

 8      witnesses at this time, Your Honor.

 9                   THE COURT:  Understood.

10                   Ms. Ferguson?

11                   MS. FERGUSON:  Yes.  BNSF will call Magenta

12      Eggertsen by deposition.

13                   THE COURT:  All right.

14                   MS. FERGUSON:  Could we take just a moment to set

15      that up?  We have a witness here.

16                   MS. DONESKY:  Would it make sense to take a short

17      break perhaps to get all set up?

18                   THE COURT:  Okay.  We will take a ten-minute

19      recess at this time.  We will return at approximately 10:35

20      for the resumption of this testimony.

21                   (Recess taken at 10:23 a.m.)

22                           *      *      *      *

23                   (10:35 a.m.)

24                             IN OPEN COURT

25                   (Without the Jury)
```

1          THE COURT:  Please be seated, everyone.

2          Ms. Donesky?

3          MS. DONESKY:  Yes, thank you, Your Honor.  We've

4     been conferring together and since last evening just on

5     schedule, but we thought it would be beneficial to give you

6     an update.  So for today's purposes, and we tried to obtain

7     someone remotely for today but we weren't able to do that.

8     But we have a schedule set up and we've conferred and it

9     seemed like it's agreeable to the plaintiffs counsel, but

10    today we will have the deposition read for Ms. Magenta

11    Eggertsen, but that will be for today.  It likely will take

12    probably a good hour, I would think, it's quite lengthy,

13    maybe more.

14          For tomorrow though we have lined up Dr. Suanne

15    Grobe, Ms. Blaine Hoppenrath, Mr. Steven Chartier; and then,

16    time permitting, this Jason Randash who will testify

17    remotely.  He was going to come but we've rearranged it.

18    We've tried to -- he'll just do it remotely, because he can

19    either do it tomorrow, and if not then, he could still be

20    available Monday to complete.

21          And then Monday we have scheduled Mr. Freshour.

22    And then we anticipate reading Mr. Jensen and having

23    Mr. Shearer and then Ms. Detlefsen on Monday.  I don't want

24    to say that there isn't some minor witness or something else

25    in there.  I don't want to say that's the exclusive list.  I

1   don't know.  But this is what we anticipate having.

2           I'm very hopeful, perhaps I'm being overly

3   optimistic, but I'm very hopeful we actually could get these

4   all done by Monday and have closings on Tuesday.

5           THE COURT:  All right.  But am I correct in

6   understanding that BNSF is not prepared to call anybody

7   beyond Ms. -- is it Eggertsen or Eggerton?

8           MS. DONESKY:  Eggertsen, I believe.  That's it,

9   Your Honor, for today.

10          THE COURT:  Okay.

11          MR. JAMES KASTER:  And I'll just add, Your Honor,

12  at the Court's wish, Dr. Boisso, his flight is at 6:00.

13  He's around if the Court chooses to take testimony.  I

14  understand the Court may rather take -- might rather take

15  briefing on the subject of front pay.

16          THE COURT:  I appreciate that, Mr. Kaster.  I'll

17  make a decision on that here in the next hour or so, so that

18  we promptly let him know.  Is there any chance he would take

19  an earlier flight if he could get one?

20          MR. JAMES KASTER:  I don't know the answer to

21  that.  I didn't ask him if he could get an earlier flight.

22  He didn't delay his flight.  That was the flight that he's

23  on.

24          THE COURT:  All right.  I want to be respectful of

25  his time, as well.

```
 1              MR. JAMES KASTER:  Thank you.

 2              THE COURT:  All right.  Anything further that we

 3     need to cover with respect to any of these witnesses or

 4     Ms. Eggertsen's deposition, particularly from the

 5     plaintiff's side?

 6              MR. LUCAS KASTER:  I just wanted to say, Tracey, I

 7     wasn't sure if you mentioned Mr. Chartier.

 8              MS. DONESKY:  I did for tomorrow.  I thought I

 9     did.  Yeah, Chartier.  Maybe I didn't.  I just reversed

10     then.  Chartier, yes.

11              THE COURT:  I've got him down for tomorrow.

12              MS. DONESKY:  For tomorrow, yep.

13              THE COURT:  And the witnesses with respect to

14     Mr. Randash are in present -- are present and live, rather,

15     and Mr. Randash is live, though remote.  Do I have that

16     right?

17              MS. DONESKY:  That's correct.

18              THE COURT:  And then on Monday, did I hear right

19     that there's one -- Mr. Jensen would be by deposition?

20              MS. DONESKY:  That's correct.

21              THE COURT:  And the others would be live?

22              MS. DONESKY:  That's correct.

23              THE COURT:  And in person, I take it.

24              MS. DONESKY:  Correct.

25              THE COURT:  All right.
```

1          MS. DONESKY:  Your Honor, one request with respect

2      to the deposition.  Would it make sense, we've talked

3      earlier as well and we have designations and

4      counter-designations.  We've agreed I would just do the

5      question and the reader will answer.  But given that the

6      plaintiff took the deposition, just to avoid confusion,

7      would there be any sort of explanation that this was a

8      deposition taken by plaintiff's counsel of Ms. Eggertsen?

9          I'm just trying to avoid any kind of usual

10     perception the jury might have that they might be confused

11     that I'm the one asking the question but it was asked by

12     plaintiff's counsel.

13         MR. JAMES KASTER:  Your Honor, there's a standard

14     instruction.

15         THE COURT:  It doesn't include that, but I'm about

16     to include it.  I think that's worth mentioning.  Do you

17     agree?

18         MR. JAMES KASTER:  I don't, actually.  I don't

19     think it's relevant who took the deposition.  Not to the

20     witness's testimony.  It's the requesting -- asking

21     questions.  The lawyer's question is not evidence.  So I

22     don't think it's relevant.  I think the standard instruction

23     is appropriate.

24         THE COURT:  Well, Mr. Kaster has a point there.

25     I'm not going to mention that to the jury.  He's got a

1    point, both that the questions are not evidence, and he's

2    got a point that you're the one using this now, regardless

3    of who took the deposition to begin with.  And he's also

4    right, as I observed, that the standard instruction in the

5    Eighth Circuit as modified a bit by the Third Circuit

6    instruction, because I think it gives the jury a bit more

7    helpful information.  It does not include any mention of

8    that.

9            MS. DONESKY:  I would point out that this is one

10   of the witnesses who plaintiff's counsel, as part of the

11   motion that we took out prior to trial, is one of the

12   witnesses who they wanted in their plaintiff's

13   case-in-chief.

14           THE COURT:  No, I understand.  Is it your

15   intention to read the whole thing?

16           MS. DONESKY:  It's designated fairly thoroughly.

17   There's been a lot of clean up done.  Objections are removed

18   in various places, but it is a largely designated

19   deposition.

20           THE COURT:  All right.  So in category of things

21   that I probably should know and don't, are there outstanding

22   objections that are going to surface during this testimony,

23   or have you cleaned all of them up?

24           MR. LUCAS KASTER:  None from us, Your Honor.

25           MS. DONESKY:  Yes, there's none.  No issues there.

1          THE COURT:  Terrific.  Then let's get the jury in

2     here and let's proceed.

3          I do intend, by the way, to let the jury know that

4     there are no additional witnesses to be called today and

5     that we will resume tomorrow at 10:00 a.m.

6          MS. DONESKY:  That's fine.  Exactly why I thought

7     prior to bringing them back in that would be helpful to let

8     them know from a schedule standpoint.

9          THE COURT:  All right.  I'll let them know at the

10    conclusion of Ms. Eggertsen's testimony.

11         MS. DONESKY:  All right.

12         MR. JAMES KASTER:  Thank you, Your Honor.

13         (Jury enters)

14         THE COURT:  Thank you, everyone.  Please be

15    seated.

16         Ms. Donesky, am I correct that you've got someone

17    who will be in the witness box with us?

18         MS. DONESKY:  Yes, we do, Your Honor.

19         THE COURT:  Okay.  Let me just instruct the jury

20    now about what's about to happen.

21         Members of the jury, testimony is about to be

22    presented to you here at trial in the form of a deposition.

23    A deposition is the recorded answers a witness made under

24    oath to questions asked by lawyers before trial.  In a

25    deposition the witness is placed under oath and swears to

1    tell the truth, and lawyers for each party may ask

2    questions.  A court reporter is present and records the

3    questions and the answers so that there is a transcript, and

4    that is the transcript from which this deposition testimony

5    will be read here today.

6          The deposition testimony of Ms. Magenta Eggertsen,

7    which was taken on October 11th, 2018, is about to be

8    offered and will be read to you.

9          To make the deposition testimony somewhat

10   realistic, the party presenting the deposition testimony

11   here, BNSF, is having an individual play the role of

12   Ms. Eggertsen.  You should consider the deposition testimony

13   and judge its credibility as you would that of any witness

14   who testifies here in person.  You should not, however,

15   place any significance on the manner or tone of voice used

16   to read the witness's answers to you.

17         Ms. Donesky?

18         MS. DONESKY:  Thank you, Your Honor.

19         THE COURT:  You may be seated.

20         THE READER:  Thank you, Your Honor.

21                     **(MAGENTA ROBERSON)**

22                     **DIRECT EXAMINATION**

23   BY MS. DONESKY:

24   Q.  Good morning.  Can you state and spell your name for the

25   record?

```
 1    A.  Magenta, M-A-G-E-N-T-A.  Last name is Roberson,
 2    R-O-B-E-R-S-O-N.
 3    Q.  If you are comfortable, yes, you may remove your mask.
 4    Thank you.
 5            Ms. Roberson, my misunderstanding is you used to
 6    go by Eggertsen, your last name.
 7    A.  Correct.
 8    Q.  Can you spell that for me?
 9    A.  E-G-G-E-R-T-S-E-N.
10    Q.  Were there multiple emails and complaints that you
11    reviewed?
12    A.  Yes.  I reviewed two different complaints.
13    Q.  And what were the two complaints?
14    A.  The original complaint that I -- the first complaint I
15    reviewed was a complaint where I had met with Mr. Sanders.
16    Q.  And what was Mr. Sanders complaining about?
17    A.  How he was being treated by management.
18    Q.  Do you recall when that occurred?
19    A.  I wouldn't be able to give an exact date without looking
20    at my notes.
21    Q.  Do you recall approximately after reviewing your notes
22    when that occurred?
23    A.  It's December of 20 -- I would have to look at the year.
24    I believe 2015, but could have been 2016.
25    Q.  And then you said there was a second complaint?
```

```
 1    A.  Yes.

 2    Q.  And what was that?

 3    A.  Regarding being able to use the company vehicle.

 4    Q.  Do you recall when that happened, approximately?

 5    A.  It was the spring of the following year of the original

 6    complaint.

 7    Q.  I want to talk a little bit about your background.

 8    What's your current employment?

 9    A.  I'm an HR manager.

10    Q.  Where at?

11    A.  Vulcan Materials Company.

12    Q.  Falcon?

13    A.  Vulcan, V-U-L-C-A-N.

14    Q.  And where is that located?

15    A.  It's headquartered in Birmingham, Alabama.  I work here

16    out of Las Colinas.

17    Q.  How long have you been there?

18    A.  Since August of 2018.

19    Q.  And where were up employed before that?

20    A.  BNSF Railway.

21    Q.  When did you start with BNSF?

22    A.  In May 2013.

23    Q.  And then did you leave in August of 2018?

24    A.  Yes.

25    Q.  During that approximately five years, can you just tell
```

1    me what roles or what positions you held?

2    A.  I held multiple roles.  When I started, I started as a

3    management trainee, and then had promoted within the company

4    through different positions.  And then I went to a senior HR

5    generalist this summer, and that's when I was relocated to

6    Minneapolis.  And then I stayed there for 11 months, and

7    then I came back to Ft. Worth and was in an HR generalist

8    role with BNSF before moving into an HR manager role.

9    Q.  So you said you were in Minneapolis for 11 months,

10   approximately?

11   A.  Yes.

12   Q.  Can you give me the time frame when you were there?

13   A.  I always get this confused.  Started up there in

14   August of 2015 and then moved back to Texas in the summer of

15   2016.

16   Q.  I'll ask it in a broader sense.  Did you deal with Mr.

17   Sanders or his employment with BNSF in any respect after you

18   moved back to Texas in the summer of 2016?

19   A.  No.

20   Q.  Did you deal with Mr. Sanders at all, and with respect

21   to his employment with BNSF, prior to when you moved to

22   Minneapolis in August of 2015?

23   A.  No.

24   Q.  So fair to say that the only time you dealt with

25   Mr. Sanders with respect to his employment with BNSF was

1    during that approximately 11 months when you were in

2    Minneapolis?

3    A.  Yes.

4    Q.  Had you worked in an HR function prior to joining BNSF?

5    A.  No, I came right out of school.

6    Q.  Why don't you just detail for me what your educational

7    background is.

8    A.  I have a bachelor's in business administration from

9    Central Michigan University, with a major in human resources

10   management.

11   Q.  You said that you started with BNSF as a management

12   trainee in about May of 2013?

13   A.  Yes.

14   Q.  And then you became a senior HR generalist up in

15   Minneapolis in August of 2015, approximately?

16   A.  Yes.

17   Q.  Did you hold an HR role between those two times?

18   A.  Yes.

19   Q.  Were you always employed in the HR division or group?

20   A.  Yes.

21   Q.  What were your roles?  You said you kind of held

22   multiple of various roles between that time.  What were your

23   roles that you held between when you were a management

24   trainee and when you moved to Minneapolis?

25   A.  I started as management trainee in a group that was

1    responsible for the preemployment process for our hourly

2    employees, and then I moved into recruiting functionality.

3    And then I -- during that time I was promoted to a staffing

4    specialist.  And then I moved to a senior specialist role

5    supporting college recruiting, which included our management

6    trainees and our interns.  And then I moved to the

7    generalist role.

8    Q.  Do you remember when you moved -- first moved to

9    generalist role?

10   A.  When I moved to Minnesota.

11   Q.  In these initial positions before you moved to

12   Minnesota, it seems like most of them dealt with bringing

13   new employees on at BNSF.  Is that -- did I get that

14   correctly?

15   A.  Yes.

16   Q.  During that time, so still before you moved to

17   Minnesota, were you provided any training about how to

18   conduct an internal investigation regarding the complaint

19   from an employee at BNSF?

20   A.  Broadly, and it wasn't until I moved to my role that I

21   received more detailed training on the complaint process.

22   Q.  When you moved to the generalist role?

23   A.  Yes.

24   Q.  So when you moved to the generalist role, what training

25   were you provided in terms of investigating a complaint by a

1    BNSF employee?

2    A.  It was on-the-job training, discussing different

3    processes that we're expected to follow and where to be able

4    to find different policies or procedures that might be

5    helpful to be able to look into concerns.

6              THE COURT:  Mr. Donesky, sorry to interrupt.  Can

7    I ask the reader to move a little closer to the microphone?

8    Thank you.

9    BY MS. DONESKY:

10   Q.  Thank you.  Was there any type of policy or handout that

11   you were given about saying when you get a complaint from an

12   employee, here are the steps that you should take to conduct

13   an investigation?

14   A.  I can't recall.

15   Q.  Have you ever seen an internal policy that details the

16   steps that should be taken after a BNSF employee files a

17   complaint with HR?

18   A.  I can't say for certain.

19   Q.  During your employment, and let's just stick to your

20   time in Minneapolis, did you receive other complaints from

21   employees besides Mr. Sanders?

22   A.  Yes.

23   Q.  Did you have a standard protocol for how you went

24   going -- how you went about conducting an investigation?

25   A.  Could you rephrase it?

1     Q.  Sure.  Did you have a standard practice when somebody

2     would file a complaint about another -- let's just say it's

3     about another employee.  Did you have a standard practice or

4     procedure that you followed to do your investigation?

5     A.  I had an outline that I would follow in terms of

6     mentally what I knew I needed to be able to do.

7     Q.  Do you recall what was in that outline?

8     A.  It wasn't a formal document outline, but it would be

9     talking to the individual that had a concern; able to gather

10    additional details from them regarding their complaint; and

11    then it would be taking the information that I was given

12    with the original complaint; and then being able to reach

13    out or find different policies or information that would be

14    helpful to be able to do a complete investigation on the

15    complaint, which could include reviewing documents,

16    interviewing witnesses and different -- well, those would be

17    the two main things.

18    Q.  Did somebody at BNSF give you that type of outline or

19    explain to you that that was the steps that you should take

20    or is that just something you came up with as part of your

21    education and training?

22    A.  As -- as I was new to the role, it was on the job of my

23    superior explaining what a complaint would look like in

24    terms of the process that we would follow.

25    Q.  Who was your supervisor?

```
 1    A.  Terry Morgan.

 2    Q.  And what was his position?

 3    A.  He was an HR director.

 4    Q.  So he was your direct report?

 5    A.  My direct supervisor.

 6    Q.  So if you were doing an investigation regarding a

 7    complaint, most of your information was given to Mr. Morgan?

 8    A.  We would review what I found during an investigation,

 9    yes.

10    Q.  How about with respect to Mr. Sanders?

11    A.  My complaint that I worked with Mr. Sanders was mostly

12    discussed within -- with Terry.

13    Q.  Can you recall ever having a discussion with somebody

14    else within HR regarding Mr. Sanders' complaints besides

15    Mr. Morgan?

16    A.  Complaints in general or --

17    Q.  Correct.

18    A.  I would talk with Joe Spire.

19    Q.  And who is Mr. Spire?

20    A.  He was an HR manager reporting to Terry Morgan.

21    Q.  Did Mr. Spire do any of the actual investigation as far

22    as you know with respect to Mr. Sanders' complaints?

23    A.  The actual investigation I handled for the two

24    complaints.

25    Q.  Did you have an in-person meeting with Mr. Sanders at
```

1    some point?

2    A.  Yes.

3    Q.  And I just want to clarify something.  I'm assuming,

4    based on your previous testimony, that you don't recall how

5    that meeting came about, who initiated it, how that was

6    organized, but tell me if I'm wrong.

7    A.  Correct.  I don't recall how it was, the original

8    complaint of that he wanted to talk to HR.

9    Q.  So the first thing you kind of remember regarding his

10   complaint is having this sit-down in person with

11   Mr. Sanders; is that fair?

12   A.  Yeah.

13   Q.  Why don't you explain to me what happened during the

14   sit-down.

15   A.  I would have to review my notes for specific information

16   regarding how the meeting went, but I went to his work

17   location and met with him to discuss how he was being

18   treated and felt he was being treated by management.

19   Q.  Did he name any individuals?

20   A.  He named Keith Jones, and I can't recall if there was

21   other people that he named at that point.

22   Q.  Do you recall if he named Blaine Hoppenrath?

23   A.  I would have to look at my notes but that was his direct

24   supervisor.

25   Q.  When you say Mr. Sanders was complaining about how he

```
 1   was being treated, what was he saying in terms of what
 2   Mr. Jones or anybody else that complaining about was doing
 3   to him?
 4   A.  Would I be able to review my notes?
 5   Q.  Sure.  You've been handed what has been marked as
 6   Exhibit 42, which is four-page typed document.  Doesn't have
 7   anybody's name on it in terms of offering it.  Do you recall
 8   if this is your notes regarding your conversation with
 9   Mr. Sanders?
10   A.  Yes.
11   Q.  Do you recall when you created this typed-up document?
12   A.  The same day that I met -- close to or the exact same
13   day that I met with Don.  It was my notes during the
14   conversation.
15   Q.  And were you actually typing these up as you had the
16   conversation with Mr. Sanders?
17   A.  Yes.
18   Q.  Who is Mr. Freshour?
19   A.  He was Terry Morgan's supervisor.
20   Q.  Do you remember what his title was?
21   A.  Regional -- like regional HR director is what we called
22   him.
23   Q.  And so then we go -- the fourth entry is December 7th,
24   2015, where there's an overview of Mr. Sanders's contacting
25   you to talk about his complaints about Mr. Jones.  Is that
```

1    right?

2    A.  Yes.

3    Q.  Did Mr. Sanders provide you any documents during your

4    meeting with him on December 7th of 2015?

5    A.  No physical documents.  I did listen to recordings.

6    Q.  Do you remember how many recordings you listened to?

7    And you can take a second to review that if you need to.

8    A.  Five.

9    Q.  So let's just kind of -- I want to make sure we're on

10   the same page with respect to the five recordings.  So I see

11   kind of on the first page, and there's a Bates number on the

12   bottom right-hand corner.  It says BNSF Sanders.  It should

13   end in numbers 7084; is that right?

14   A.  Yes.

15   Q.  Okay.  That'll just help us as we go through to make

16   sure we're all on the same page because there's not separate

17   page numbers on here.

18            So on that page ending in 84, the first date after

19   December 7th which at the very top of the page is November

20   30th, 2000, and says:  "Conversation between Don and Keith

21   and it was okay."  Is that what you wrote?

22   A.  Yes.

23   Q.  Is the summary that follows a summary of a phone call

24   that you listened to between Mr. Sanders and Mr. Jones that

25   occurred on November 30th of 2015?

```
 1     A.   Yes.
 2     Q.   Okay.  And you actually physically listened to that
 3     conversation during your meeting with Mr. Sanders; is that
 4     right?
 5     A.   From my notes, yeah.
 6     Q.   Do you know how those recordings were played for you?
 7     Did Mr. Sanders play them from his phone?  Did he have a
 8     separate recording device?
 9     A.   I don't remember.
10     Q.   Did you ask for copies of the recordings?
11     A.   I don't remember if I did.
12     Q.   Did you ever provide any recordings to your bosses in
13     HR?
14     A.   No.
15     Q.   Why not?
16     A.   I didn't have the recordings.
17     Q.   Did any of your superiors ever ask for you to get copies
18     of the recordings?
19     A.   I don't know.
20     Q.   Are you aware if any of your bosses ever heard --
21     actually heard these recordings?
22     A.   I don't know.
23     Q.   As far as you can recall, did any of your bosses come to
24     you and say, "Can you go back to Mr. Sanders and get these
25     recordings and, you know, if he has any other recordings can
```

1   you get those too?"  Did anybody ever say that to you?

2   A.  I don't know.

3   Q.  So for -- we have the first phone call or one of the

4   phone calls that you listened to, November 30th of 2015.  Do

5   you see that?

6   A.  Yes.

7   Q.  And then the next, there seems to be a summary after

8   that.  And then the next date is November 23rd of 2015 and

9   you write:  "Conversation between Don and Keith regarding

10  the FRA."  Is that right?

11  A.  Yes.

12  Q.  Is that another phone call that you listened to between

13  Mr. Sanders and Mr. Jones that occurred on November 23rd of

14  2015?

15  A.  Yes.

16  Q.  And then there appears to be some handwritten note and

17  summary of that phone call.  Are those your notes regarding

18  tat phone call that you listened to?

19  A.  Handwritten?

20  Q.  Or typed up.

21  A.  Okay.  Yes.

22  Q.  That was the conversation that Don and I would have --

23  sorry.

24  A.  That was the conversation that Don and I would have had.

25  Q.  So the summary of the actual phone call that you

1    listened to is in the paragraph form and then the bullet

2    points are your discussion with Mr. Sanders.

3    A.  Yes.

4    Q.  Then the next date, which is near the bottom of that

5    second page, is December 3rd, 2015; and it says,

6    "Conversation between Don and Keith."  Do you see that?

7    A.  Yes.

8    Q.  Is that a third phone call that you listened to between

9    Mr. Sanders and Mr. Jones that occurred on December 3rd,

10   2015?

11   A.  Yes.

12   Q.  And then what follows there is again a description in

13   paragraph form.  Is that your summary of that phone call?

14   A.  Yes.

15   Q.  The December 3rd phone call?

16   A.  Yes.

17   Q.  And then same thing.  The bullet points under that are

18   now your conversation with Mr. Sanders during this meeting

19   on December 7th?

20   A.  Yes.

21   Q.  Then there's two more sort of headings on this third

22   page ending in 7086.  The first one says: "Conversation with

23   Keith and Don."  And the next one says: "Conversation with

24   Blaine and Don."  Were those also recordings?

25   A.  Yes.

1   Q.  Okay.  And then you have paragraph summaries of both of

2   those recordings that follow that; is that correct?

3   A.  Yes.

4   Q.  So those are the five recordings that you listened to

5   during your meeting with Mr. Sanders.

6   A.  Yes.

7   Q.  And then the last heading on the final page, which is

8   7087, says: "Conversation with Don after the conversations:

9   I'm assuming that after listening to the recordings, you had

10  further conversation with Mr. Sanders during your meeting?

11  A.  Yes.

12  Q.  And that's the summary of that that follows that

13  heading?

14  A.  Yes.

15  Q.  I want to kind of go back to the first page now and I'd

16  kind of like to take these in order; and so if you need to

17  review something you can just review that section, you don't

18  have to read the whole thing again.

19          With respect to the call on November 30th of 2015,

20  was there anything that you heard during that phone call

21  that you felt was inappropriate?

22  A.  And what was the original question you had asked?

23  Q.  Was there anything with respect to the conversation with

24  Mr. -- between Mr. Sanders and Mr. Jones that you felt was

25  inappropriate?  Let's just say on the part of Mr. Jones.

1    A.  Yes.

2    Q.  And what was that?

3    A.  Comments regarding another employee.

4    Q.  Is that with respect to I think it says Kramer.  Is that

5    Mr. Kramer or do you know?

6    A.  I don't remember who it is, but another employee

7    nonetheless.  And then I would also say inappropriate for

8    the overall communication of being able to say -- Keith

9    saying that "You're making me look like an idiot."

10   Q.  Do you have any sense of why Mr. Jones was telling

11   Mr. Sanders, "You're making me look like an idiot"?

12   A.  That would be out of my scope of responsibility.

13   Q.  Okay.  Did you ever have a conversation with Mr. Jones

14   about these phone calls?

15   A.  Me personally?  No.

16   Q.  So you didn't have any explanation in terms of -- from

17   Mr. Jones about why he might have been saying some of the

18   things that you reference in these phone calls?

19   A.  No.

20   Q.  And I want no try to clarify one thing.  With respect to

21   these recordings that you listened to during this meeting,

22   do you recall physically taking a copy of these at all from

23   Mr. Sanders?

24   A.  I couldn't -- I don't believe so, no.

25   Q.  So with respect to this call on November 30th of 2015

1   you said -- at least you identified two things that you felt

2   were inappropriate is referencing or talking about this

3   other employee, Mr. Kramer; is that right?

4   A.  About the other employee?  Yes.

5   Q.  And then Mr. Jones saying something to Mr. Sanders about

6   Mr. Sanders making Mr. Jones look like an idiot; right?

7   A.  Yes.

8   Q.  Anything else that you felt was inappropriate during

9   this phone call?

10  A.  No.

11  Q.  And I'm just -- my assumption is based on your reviewing

12  of this document.  Are you relying on, when you say you

13  think these two things were inappropriate, are you relying

14  upon your notes or do you have independent recollection of

15  actually listening to that recording?

16  A.  Relying on my notes.

17  Q.  So based, as far as you can recall right now, you don't

18  remember, for example, the tone of voice or other things

19  that may have been said that aren't reflected in your notes?

20  A.  No.

21  Q.  After each of -- let's just start with this one.  After

22  the call on November 30th of 2015, did you stop and have a

23  conversation with Mr. Sanders and ask him, you know,

24  "Explain to me what you felt was wrong about this call," or

25  anything like that.  I don't see anything in your notes.  Do

1    you recall having a discussion with Mr. Sanders about that?

2    A.  I don't recall.

3    Q.  I want to go to the second phone call on this page, to

4    November 23rd, 2015.  Call between Mr. Sanders and

5    Mr. Jones, and you say it's regarding the FRA.  Do you see

6    that?

7    A.  Yes.

8    Q.  Is there anything in that phone call, at least from your

9    review of your notes, that you felt was inappropriate?

10   A.  Yes.

11   Q.  And what was that?

12   A.  I recall this conversation being heated and then there

13   are several comments that I would take exception to.

14   Q.  Comments by whom?

15   A.  Mostly Keith Jones and then one comment by Mr. Sanders.

16   Q.  What's the one comment by Mr. Sanders?

17   A.  That, "I don't understand why everyone here hates me.  I

18   get absolutely no help from you or Blaine."

19   Q.  Why do you take exception with that or why do you think

20   it's inappropriate?

21   A.  From the context of the rest of the conversation.

22   Q.  What do you mean by that?

23   A.  The comment saying that he's getting no help, but then

24   there are additional notes that support that he did have

25   support by Mr. Jones and Ms. Hoppenrath.

1   Q.  When you say the exchange was heated, what do you mean

2   by that?

3   A.  It was a tense conversation between Mr. Jones and

4   Mr. Sanders.

5   Q.  Did you get the sense that either of them was upset?

6   A.  I just recall overall that there was -- it was heated,

7   so frustrations; and the notes support that there was

8   frustrations between the two parties.

9   Q.  And what I'm trying to decipher is based on what you

10  recall, I think you said before that you recall this

11  conversation actually listening to it; is that right?

12  A.  Yes, vaguely remember.

13  Q.  Sure, sure.  Do you recall in terms of with respect to

14  frustration or being heated, are you saying that there was

15  raised voices?

16  A.  I don't recall if there was raised voices.

17  Q.  Was there frustration from one party or both parties?

18  A.  My notes show for certain that there was frustration by

19  Mr. Jones.  I don't know on Mr. Sanders.

20  Q.  So you pointed out I think the one comment, at least

21  from your notes, that you recall from Mr. Sanders that you

22  thought was somewhat inappropriate; right?

23  A.  Yes.

24  Q.  Were what the comments, at least from your notes, and if

25  you recall anything else besides what's in your notes please

1    tell me.  But what from your notes do you recall or do you

2    observe that Mr. -- was inappropriate by Mr. Jones?

3    A.  The language.  So, "You're damn right that you do."

4    Keith's comment that, my notes show, "Obviously you don't

5    give two shits about BNSF."  Keith's -- my notes saying that

6    Keith said, "I don't understand why there's so much drama

7    with you," comment about motive.

8    Q.  Where do you see that?

9    A.  Towards -- seven lines up from the bottom.  "You have

10   your whole motive."  It's at the end of that.

11   Q.  Okay.

12   A.  Those were the notes that I would take exception with.

13   Q.  When they are talking about in your notes, there's some

14   reference to what appears to be speed:  25, 50, that sort of

15   thing.  Do you see that?

16   A.  Yes.

17   Q.  Do you know what they're referring to?

18   A.  It would have been the track speed.

19   Q.  What do you mean by track speed?  Are they talking about

20   the maximum speed that's allowable?  Are they talking about

21   a slow order?  Are they -- can you explain?

22   A.  Just the speed on the tracks.  Outside of that would be

23   outside of my scope.

24   Q.  Do you know how reporting of defects or slow orders

25   works?

```
 1    A.  That would be outside of my scope.

 2    Q.  Do you know what Mr. Sanders' job position was?

 3    A.  Yes.

 4    Q.  And what was that?

 5    A.  He was a track inspector.

 6    Q.  Do you know what track inspectors do?

 7    A.  In a broad overview of inspecting the track to look for

 8    defects.

 9    Q.  Do you know that they report defects then when they

10    observe them?

11    A.  Yes.

12    Q.  Do you know that if appropriate at times they can put a

13    slow order on a section of track because of a defect?

14    A.  Yes.

15    Q.  What's your understanding of what a slow order is?

16    A.  It's to authorize speed on the tracks.

17    Q.  Okay.  Do you recall outside of your notes ever getting

18    that impression from listening to the phone call that you

19    felt like Mr. Jones was trying to dissuade Mr. Sanders from

20    entering the slow order or reporting a defect?

21    A.  Not that I recall.

22    Q.  Did you -- you referenced earlier a section in

23    Mr. Jones's -- or your description of Mr. Jones's comment

24    where he says, "Obviously you don't give two shits about

25    BNSF."  Do you see that?
```

1    A.  Yes.

2    Q.  Sure.  What I'm wondering is, did you ever find out why

3    Mr. Jones was saying that to Mr. Sanders, why he was telling

4    Mr. Sanders, "I don't think you give two shits about BNSF."

5    A.  It would be the context of the conversation.

6    Q.  With respect to Mr. Sanders contacting the FRA?

7    A.  Yes, correct.

8    Q.  From your recollection of -- and I'm going to separate

9    from reading your notes -- from your recollection of

10   listening to that phone call, did you get the impression

11   that Mr. Jones was upset about Mr. Sanders contacting the

12   FRA?

13   A.  The context in which the FRA was contacted; not that the

14   FRA was contacted.

15   Q.  Contacted?

16   A.  Contacted.

17   Q.  What do you mean by the context?

18   A.  That from my recollection, that Mr. Jones wanted to be

19   able to be aware of the situation before going to the FRA.

20   Q.  Your impression of what was happening during the phone

21   call was that Mr. Jones was upset, not that Mr. Sanders had

22   actually called the FRA, but that Mr. Sanders had called the

23   FRA without including Mr. Jones?

24   A.  That Mr. Jones wanted Mr. Sanders to have an internal

25   conversation regarding the concerns before going directly to

1    the FRA.

2    Q.  Did you take exception or do you find appropriate

3    Mr. Jones swearing at Mr. Sanders?

4    A.  Do I take exception?

5    Q.  Correct.

6    A.  Yes.

7    Q.  And do you think that that's -- from your HR perspective

8    and training, do you think that that's an appropriate way to

9    act with a subordinate?

10   A.  No.

11   Q.  Did you understand that Mr. Jones was Mr. Sanders'

12   superior?

13   A.  Yes.

14   Q.  I'd like to turn to that second page, and in your first

15   full sentence on that page you indicate that Mr. Jones --

16   your notes indicate that Mr. Jones said to Mr. Sanders, "I

17   don't want you doing that," with respect to Mr. Sanders

18   calling the FRA.  Do you see that?

19   A.  I see my notes.

20   Q.  As far as you can recall, do your notes accurately

21   reflect what was discussed during these phone calls?

22   A.  Yes.

23   Q.  As far as you notes say, Mr. Jones didn't say, "I don't

24   want you doing that unless you come and talk to me first,"

25   right?

1    A.  The context of all the notes show that Mr. Jones is

2    wanting Mr. Sanders to come to him before going to the FRA.

3    Q.  That's your understanding?

4    A.  Correct.

5    Q.  Mr. Sanders, if we kind of go down on the second page

6    again, Mr. Sanders kind of in the third or fourth sentence

7    says something to the effect of, "Every time I have tried to

8    fix the track you shut me down."  Do you see that?

9    A.  Yes.

10   Q.  Does that statement concern you at all?

11   A.  It would raise a flag, but not concern.

12   Q.  Did you provide these written notes to any of your

13   superiors?

14   A.  Yes.

15   Q.  Do you recall who?

16   A.  I would have for sure provided it to Terry Morgan.

17   Q.  From an HR perspective with BNSF, does it concern you if

18   a track inspector says to his superior, "When I'm trying to

19   fix the track you shut me down."  Does that raise any red

20   flags for you?

21   A.  It would raise a flag in terms of making sure our

22   employees have the correct training to be able to do their

23   job.

24   Q.  Which employee?

25   A.  In this case Mr. Sanders.

1    Q.  Does it raise any concerns about Mr. Jones?

2    A.  If that was accurate, that would, yes.

3    Q.  I'm just saying does it raise a red flag for you with

4    respect to Mr. Jones's sort of interaction with Mr. Sanders?

5    A.  If Mr. Jones wasn't allowing Mr. Sanders to perform his

6    job, yes.

7    Q.  And then right after that you say, "Keith" -- is that

8    saying that Mr. Jones is speaking again?

9    A.  Yes.

10   Q.  And it says, "I don't understand why there's so much

11   drama with you."  Do you see that?

12   A.  Yes.

13   Q.  And I think that was one of the statements that you

14   identified as something you took issue with?

15   A.  Yes.

16   Q.  And one of the things I want to clarify is when you say

17   you took issue with something, or you find it inappropriate,

18   are you saying from an HR perspective you would say that

19   that statement's inappropriate?

20   A.  Correct.

21   Q.  Why do you find that that statement is inappropriate?

22   A.  Because it's not respectful.

23   Q.  Now, if we go down a little bit further, there is a

24   reference, I think to Mr. Jones, saying something about,

25   "You have your whole motive," referring to Mr. Sanders.  Do

1    you see that?

2    A.  Yes.

3    Q.  Do you have any understanding of what Mr. Jones was

4    saying there about Mr. Sanders' motive?

5    A.  I don't.

6    Q.  Why do you -- I think that was one of the things you

7    identified as that you thought was potentially

8    inappropriate.  Why did you say that?

9    A.  To tell somebody that they have another motive isn't

10   respectful.

11   Q.  Did you interpret that to mean that Mr. Jones was

12   slaying to Mr. Sanders, "I think you have an improper motive

13   or bad motive?"  Was that your interpretation?

14   A.  I don't know if that was my interpretation.

15   Q.  A little bit further down in that paragraph there's a

16   sentence that you write, which I think is Mr. Jones

17   speaking, where you write, "I have never felt more betrayed

18   when you called the FRA."  Do you see that?

19   A.  I see that.

20   Q.  Is that Mr. Jones speaking something to that effect?

21   A.  Yes.

22   Q.  Do you take issue with that?

23   A.  In the context of this entire conversation, not

24   necessarily, no.

25   Q.  And why is that?

1    A.  Because the conversation started with Mr. Jones wanting

2    Don -- wanting Mr. Sanders to have a conversation with him

3    and huddle within the team before going directly to the FRA.

4    Q.  Do you think that type of statement by a superior could

5    potentially dissuade a subordinate from contacting the FRA?

6    A.  In the context of the conversation, I wouldn't say so,

7    no.

8    Q.  So then there's the bullet points under the paragraph

9    form.  And I think you said before that this is sort of a

10   summary of a follow-up conversation with Mr. Sanders?

11   A.  Yes.

12   Q.  Okay.  Do you know if this is you speaking, Mr. Sanders

13   speaking?

14   A.  These notes would have been Mr. Sanders speaking.

15   Q.  Do you know if you had asked him a question about

16   explain something, anything like that.  What led Mr. Sanders

17   to go down this road?

18   A.  I'm not sure.

19   Q.  I want to go back to Exhibit 42, which is your notes

20   from your meeting with Mr. Sanders on December 7th of 2015.

21   And we kind of finished up with this conversation, or your

22   summary of a phone call that you listened to from November

23   23rd of 2015, and the next one is December 3rd of 2015.  Do

24   you see that?

25   A.  Yes.

1   Q.  Was there anything inappropriate from that phone call

2   from either your recollection or your notes?

3   A.  And you asked if I took exception to anything?

4   Q.  Correct.

5   A.  Yes.

6   Q.  And what is that?

7   A.  The language and Mr. Jones speaking regarding another

8   employee to another employee.

9   Q.  Whose language do you take exception to?

10  A.  Mr. Jones's.

11  Q.  Do you recall Mr. Sanders using any language that you

12  felt was inappropriate?

13  A.  Not from my quick glance at the notes.

14  Q.  Do you have any independent recollection of Mr. Sanders

15  doing so outside of what's in your notes?

16  A.  I don't recall.

17  Q.  And then if we go a little bit further it says "Keith--"

18  and then some summary later or that follows.  Is that

19  Mr. Jones speaking?

20  A.  Yes.

21  Q.  And Mr. Jones says something to the effect, according to

22  your notes, "I know that Kramer isn't working as much as he

23  should."  Do you see that?

24  A.  Yes.

25  Q.  Do you know if Mr. Jones is talking about the same

1    Kramer who he had referenced before in earlier

2    conversations?

3    A.  I don't know.

4    Q.  Do you have any knowledge of whether this Kramer

5    individual was -- was or was not working as much as he

6    should?

7    A.  I don't know.

8    Q.  Mr. Jones goes on and says -- I think with respect to

9    Mr. Kramer but you can tell me if you think differently

10   according to your notes -- that Mr. Kramer "is going to weld

11   until he fucking falls over."  Do you see that?

12   A.  Yes.

13   Q.  As far as you can recall, did Mr. Jones actually say

14   "fucking fall over"?

15   A.  According to my notes, yes.

16   Q.  Does that concern you at all?

17   A.  Yes.

18   Q.  Why?

19   A.  Because that's not appropriate for a leader and it's

20   disrespectful.

21   Q.  What's not appropriate about it?

22   A.  Using that language.

23   Q.  Any concerns about a manager saying that he's going to

24   make an employee work "until he fucking falls over"?

25   A.  I think that's taken out of context based on the notes.

632

1    Q.  What do you mean?

2    A.  So it says "Keith -- I know that Kramer isn't working as

3    hard as he should.  I'm going -- he is going to weld until

4    he fucking falls over."  Without listening to the recording

5    I don't see that -- my notes don't say that Mr. Jones said

6    he was going to work him until he falls over.

7    Q.  You don't interpret it that way?

8    A.  No.

9    Q.  Does it raise any concerns for you about Mr. Kramer's

10   health or safety when a manager says that?

11   A.  That's not what I was taking exception to.

12   Q.  You don't take exception to that at all?

13   A.  If there was something else going on, then that would be

14   a concern.

15   Q.  What do you mean "something else going on"?

16   A.  If Mr. Kramer was in a situation that he was going to

17   fall over, that would be a concern.

18   Q.  But nothing about Mr. Jones potentially saying I'm going

19   to have another employee work until he fucking falls over

20   about -- makes you concerned about that person, be concerned

21   about that employee's health and safety under this person's

22   direction?

23   A.  It goes back to context.  I don't say -- my notes don't

24   say that Mr. Jones said he was going to make Mr. Kramer fall

25   over.

1    Q.  Do you know if Mr. Jones is Mr. Kramer's supervisor?

2    A.  What was that?

3    Q.  Do you know if Mr. Jones is Mr. Kramer's supervisor?

4    A.  I don't know.

5    Q.  Does that impact your analysis at all?

6    A.  No.

7    Q.  Do you recall if Mr. Jones was angry or appeared or

8    sounded frustrated during this section of the call?

9    A.  I don't know.

10   Q.  Do you interpret this statement by Mr. Jones to be a

11   threat against Mr. Kramer in any respect?

12   A.  A threat?  No.

13   Q.  The top of the next page, which is the Bates number

14   7086, on the bottom right-hand corner there's some

15   discussion between Mr. Sanders and Mr. Jones about a frog

16   and something that night.  Did you understand the context of

17   what they were talking about?

18   A.  That they were going to put in a frog at night; but

19   outside of that, no.

20   Q.  Did you get the sense that Mr. Jones was giving

21   Mr. Sanders a hard time at all about putting on slow orders,

22   reporting defects at night or during the day?  Did you ever

23   get that impression?

24   A.  I don't know.

25   Q.  If we go a little bit further down you write a section,

```
1      I think of Mr. Jones speaking, where you said -- it says.

2      "I caught Kramer on a lying.  He is lying and is now up for

3      investigation."  Do you see that?

4      A.  Yes.

5      Q.  Do you have any knowledge of that investigation or that

6      accusation by Mr. Jones against Mr. Kramer?

7      A.  No.

8      Q.  Then you continue on, and I think this is your summary

9      again of Mr. Jones speaking, where it says something to the

10     effect of, "It is fucking bullshit.  I tried to call him and

11     won't come.  I don't give a shit."  Do you see that?

12     A.  Yes.

13     Q.  Is that Mr. Jones speaking?

14     A.  Yes.

15     Q.  When you were writing swear words, were those the words

16     that the -- were actually being communicated during the

17     call?

18     A.  Yes.

19     Q.  You weren't summarizing them or using different

20     language?

21     A.  No.

22     Q.  Does that raise a concern for you?

23     A.  Yes.

24     Q.  Why?

25     A.  Because it's disrespectful.
```

1    Q.  Does it raise any concerns for you that Mr. Jones could

2    be holding a grudge against Mr. Kramer for this

3    investigation?

4    A.  I wouldn't be able to make that assumption.

5    Q.  Did you investigate that at all, about whether Mr. Jones

6    was upset with Mr. Kramer?

7    A.  No.

8    Q.  And that he was potentially treating Mr. Kramer worse

9    because of this investigation?  Did you ever investigate

10   that?

11   A.  No.

12   Q.  Does this raise any concern for you, your notes or your

13   recollection of that conversation, that Mr. Jones could have

14   been retaliating against Mr. Kramer potentially?

15   A.  I wouldn't be able to say.

16   Q.  In your experience as an HR person, have you ever dealt

17   with a complaint about retaliation?

18   A.  Yes.

19   Q.  In those types of investigations, is it typical that the

20   person who's being accused of retaliation actually says,

21   "I'm retaliating against you right now."  Do people

22   typically say that?

23   A.  No.

24   Q.  Or do you have to interpret, as someone who's doing on

25   investigation, whether the context of when things are said,

1    how things are said, if that could be interpreted as

2    retaliation?  Is that something you do as an HR

3    investigator?

4    A.  Yes.

5    Q.  That's an opinion you have to form in a professional

6    capacity because people often don't say, "I'm actually

7    retaliating against you."  Right?

8    A.  Correct.

9    Q.  Sure.  When you're doing an HR investigation -- and

10   let's just say the complaint is retaliation.  What you have

11   to do in your capacity as an HR investigator is look at all

12   the circumstances, consider what people said, how they said

13   it, when they said it, the context in which things occurred,

14   and you make a determination based on all those facts and

15   circumstances whether you believe that retaliation is

16   happening.

17   A.  Yes.

18   Q.  There's a comment down the page a little bit from --

19   appears from Mr. Jones -- something to the effect of, "At

20   this point I am in survival mode."  Do you see that?

21   A.  Yes.

22   Q.  Do you have any sense of what Mr. Jones was referring

23   to?

24   A.  I don't know.

25   Q.  Then there's some bullet points a little bit further

1    down with respect to this call.  Is this a summary of a

2    discussion with Mr. Sanders after listening to the phone

3    call during this meeting?

4    A.  Yes.

5    Q.  The first bullet point appears to be, and you can tell

6    me if I'm wrong, appears to be some question to Mr. Sanders

7    from you about what bothered him about the call.  Is that

8    right?

9    A.  Correct.

10   Q.  And then I'm assuming after the dash is what Mr. Sanders

11   said, or something to that effect?

12   A.  Yes.

13   Q.  And Mr. Sanders, or your summary says, "The cursing and

14   that he was threatening us with contractors."  Do you see

15   that?

16   A.  Yes.

17   Q.  Do you have any idea what Mr. Sanders was referring to

18   when he said "threatening us with contractors?"

19   A.  No.

20   Q.  The second bullet point says something about writing up

21   a report on Monday, and within four days it was a 10.  And

22   then it kind of goes on in the next couple sentences talking

23   about frogs and when something's going to break.

24        Do you have any recollection of what Mr. Sanders

25   was referring to there?

1    A.  No.

2    Q.  The third bullet point is I think Mr. Sanders saying, "I

3    told Mr. Jones before that I don't like it when he swears at

4    me and he continues to do it."  Is that fair?

5    A.  "And it still happens."  Yes.

6    Q.  Does that raise any concerns for you?

7    A.  Yes.

8    Q.  The next conversation or recording that it looks like

9    you listened to was a conversation again between Mr. Jones

10   and Mr. Sanders; is that right?

11   A.  Yes.

12   Q.  Do you have any indication of when that occurred?

13   A.  I don't.

14   Q.  Assuming it must have been before December 7th of 2015?

15   A.  Yes.

16   Q.  How did you determine the dates of the other recordings;

17   do you recall?

18   A.  I don't recall.

19   Q.  Anything about this what would be the fourth

20   conversation now, or fourth recording, that you summarized

21   that you thought was inappropriate?

22   A.  My notes aren't as detailed on this one to be able to

23   get a full context, so I'm not sure if this is -- I would

24   imagine this is all the notes of the call.  But from what

25   I'm seeing, I'm not taking exception with much.  Just the

1    interaction between a supervisor and an employee.

2    Q.  There appears to be a comment it looks like, at least

3    from your notes, that it's made by Mr. Jones, something to

4    the effect of, "I put myself out on a limb and don't follow

5    all the rules."  Do you see that?

6    A.  Yes.

7    Q.  Is that, at least according to your notes, a comment by

8    Mr. Jones?

9    A.  Yes.

10   Q.  Does that raise any concerns with you?

11   A.  Without knowing what speaking of the rules, I wouldn't

12   be able to say.

13   Q.  A little bit further down there's a comment about, "We

14   aren't the only ones that cut the corners."  Do you see

15   that?

16   A.  Yes.

17   Q.  Is that Mr. Jones again, according to your notes?

18   A.  Yes.

19   Q.  And then there's a little bit further down it says, "I

20   wouldn't say that we are going to follow the EI book."  Do

21   you see that?

22   A.  Yes.

23   Q.  Do you know what the EI book is?

24   A.  I believe it's Engineering Instructions, but I can't say

25   for certain.

1    Q.  Does that raise any concerns for you?

2    A.  I would need more context to see what was being referred

3    to before I could make my assessment.

4    Q.  The last recording, or your summary of the last

5    recording, is on the bottom of this page and then continues

6    on to the next page.  Is it there anything from your notes

7    or your independent recollection that you find inappropriate

8    about this call?

9    A.  And then your question was if I took exception with

10   anything?

11   Q.  Correct.

12   A.  Yes.

13   Q.  And what is that?

14   A.  The context of the conversation concerns regarding if

15   we're protecting it or not, and then the interactions in

16   which Blaine is disclosing to Don her interactions with her

17   supervisor.  And then -- and then if there were comments

18   that we're actually making someone feel incompetent, that

19   would raise a flag about THE work environment would be the

20   main thing that I took exception to.

21   Q.  Are any of those comment by Mr. Sanders that you just

22   referenced, you referenced the context.  You referenced if

23   you're protecting the track or not.  The interaction or

24   disclosing the interaction with a supervisor, and making

25   comments that could potentially being interpreted as being

1    incompetent.  Are you saying that Mr. Sanders did any of

2    those things?

3    A.  Yes, he did.

4    Q.  And what are you saying?

5    A.  He had made the comment that -- Mr. Sanders made the

6    comment of, "I'm constantly being asked and it makes me feel

7    incompetent."

8    Q.  Are you saying that that's an inappropriate comment by

9    Mr. Sanders or it raises a concern for you that somebody

10   else might be treating Mr. Sanders wrong?

11   A.  It would raise a concern with me regarding how

12   Mr. Sanders would be treated.

13   Q.  Okay.  Is there anything from you can tell in your notes

14   or what you independently recollect that Mr. Sanders did

15   inappropriate during this phone call?

16   A.  Not that I'm seeing, no.

17   Q.  I think you said before that you understand that Mr. --

18   Ms. Hoppenrath was Mr. Sanders' direct supervisor.

19   A.  Correct.

20   Q.  Do you have any knowledge of that interaction between

21   Ms. Hoppenrath and this individual named Brian?

22   A.  No.

23   Q.  Kind of in the middle of -- we're now on page ending in

24   7087 -- there's the larger paragraph at the top of the page,

25   kind of, I don't know, a third of the way down from the top

1    in the middle.  It says -- appears Ms. Hoppenrath says

2    something to the effect of, "I have Keith yelling at me."

3    Do you see that?

4    A.  Yes.

5    Q.  Do you have any knowledge of why Keith -- or let me back

6    up.  Did you understand it to be Keith Jones?

7    A.  Yes.

8    Q.  Is Mr. Jones Ms. Hoppenrath's direct supervisor?

9    A.  Yes.

10   Q.  Do you have any knowledge of why Mr. Jones was yelling

11   at Ms. Hoppenrath?

12   A.  No.

13   Q.  Does that raise any concerns for you?

14   A.  It would raise a concern if it was accurate regarding

15   the treatment of employees, yes.

16   Q.  Are you aware of any investigation into Mr. Jones's

17   treatment of Ms. Hoppenrath?

18   A.  I can't recall.

19   Q.  Did Mr. Sanders complain to you during this conversation

20   that he felt like he was being harassed?

21   A.  The context of his conversation was mistreatment by

22   supervisors, and then he states that he feels he is being

23   harassed, yes.

24   Q.  Okay.  Did he explain why he felt he was being harassed?

25   A.  I would be making an assumption, but it would be the

1    conversations.

2    Q.  Did you ever make some type of conclusion about why --

3    let me ask you this:  Did you make any conclusion about

4    whether Mr. Sanders was being harassed or mistreated?

5    A.  I think there's a difference between harassed and

6    mistreated.

7    Q.  What's your definition of -- or what's your definition?

8    A.  Well, treatment of an employee is how they're being

9    treated.  Harassed is that they're just picking on him for

10   one reason.

11   Q.  And what conclusion did you come to?

12   A.  That Mr. Sanders wasn't being treated respectfully in

13   all situations.

14   Q.  Anything else?

15   A.  Not that I can recall.

16   Q.  Did Mr. Sanders ever explain to you or detail to you

17   that he felt like he was being harassed because he was

18   reporting defects or entering slow orders?

19   A.  I can't recall.

20   Q.  What about him complaining that he was being retaliated

21   against for doing those things?

22   A.  I can't recall.

23   Q.  Does this -- listening to these recordings that you did

24   in your summary, does that raise any concerns for you that

25   Mr. Sanders might have been being retaliated against by

1     Mr. Jones or Ms. Hoppenrath for reporting defects or

2     entering slow orders?

3     A.  No.

4     Q.  Not at all?

5     A.  Not without additional information.

6     Q.  Did you get additional information to make that

7     determination after you listened to these phone calls?

8     A.  I believe that there -- I reviewed another document with

9     my notes.  Could I be able to reference that?

10    Q.  Not sure what you're referring to.

11    A.  Because you had asked about my -- if I sent this to

12    anyone, and I did reference an email where I had sent it

13    to -- and my additional notes would be on there.

14    Q.  You've been handed what's been marked as Exhibit 43

15    which appears to be an email from you dated December 7th,

16    2015 at 5:09 p.m. to Mr. Morgan and Mr. Spire.  Do you see

17    that?

18    A.  Yes.

19    Q.  And the subject is, "Internal Complaint Don Sanders

20    discussion - December 7th."  Right?

21    A.  Yes.

22    Q.  Then there appears to be an attachment which is just

23    labeled Don Sanders.doc.  Do you see that?

24    A.  Yes.

25    Q.  Is -- do you know what that attachment was?

1    A.  It would have been this Exhibit 42.

2    Q.  Your typed up notes from the recordings and your

3    conversation with Mr. Sanders that day?

4    A.  Yes, sir.

5    Q.  And is this -- you made reference earlier to some

6    additional notes that you had.

7    A.  Uh-huh.

8    Q.  Are these in Exhibit 43 those additional notes that you

9    would have sent to your superiors within HR?

10   A.  Yes, sir.

11   Q.  Do you recall any additional emails, summaries, things

12   like this that you would have sent to your superiors

13   regarding any interaction with Mr. Sanders about this

14   complaint?

15   A.  I can't say for certain.

16   Q.  You kind of detail -- initially you have a "contact

17   section" about how the meeting with Mr. Sanders came about

18   on December 7th.  Is that fair?

19   A.  Yes.

20   Q.  Then there's a "summary section" which kind of

21   summarizes your notes and the phone calls in Exhibit 42.  Is

22   that fair?

23   A.  Yes.

24   Q.  And you indicate that Mr. Sanders was complaining that

25   he was unhappy with how he was being treated by management;

1     right?

2     A.  Yes.

3     Q.  You also reference that in the next sentence there that

4     Mr. Sanders indicated he had notes dated back to August 9,

5     2013.  Do you see that?

6     A.  Yes.

7     Q.  Do you recall seeing notes from Mr. Sanders?

8     A.  No.  I had asked for them and he did not have them.

9     Q.  Okay.  Do you know if he ever provided them to you?

10    A.  Not that I recall.

11    Q.  Do you know if you ever followed up with him to get the

12    notes?

13    A.  I can't say for certain.

14    Q.  Your summary then kind of goes on and indicates that

15    Mr. Sanders pulled out a recording device.  Does that

16    refresh your recollection about how you listened to the

17    phone calls?

18    A.  Yes.

19    Q.  Do you have any concerns about Mr. Sanders recording

20    conversations with his superiors?

21    A.  Yes.

22    Q.  How so?

23    A.  Because part of his concern was the treatment, and I had

24    explained that a relationship is based on trust and

25    communication; and if he's recording conversations, that's

```
1    not always trusting his leaders.
2    Q.  Is that a violation of any BNSF policy to record
3    conservations with your superiors?
4    A.  Not that I recall.
5    Q.  Did you ever investigate Mr. Sanders for recording
6    conversations with his superiors?
7    A.  Did I investigate?
8    Q.  Correct.
9    A.  No.
10   Q.  Did you ever review BNSF policy to determine whether
11   that was in fact a violation of policy or not?
12   A.  I can't say for certain.
13   Q.  Do you know if anybody else did?
14   A.  I can't speak to that.
15   Q.  Do you know if Mr. Sanders was ever disciplined for
16   recording conversations with his superiors?
17   A.  No, he wasn't disciplined.
18   Q.  You indicate in the next paragraph under the summary
19   section, it starts with a conversation on November 23rd.  Do
20   you see that?
21   A.  Yes.
22   Q.  And you describe that Mr. Jones was raising his voice
23   and was also cursing regularly in that conversation.  Is
24   that a fair description of that conversation, as far as you
25   can recall?
```

```
 1    A.  Yes.

 2    Q.  You also say, your next sentence says, "Although

 3    Mr. Sanders shouldn't have called the FRA and should have

 4    talked with Keith and Blaine first regarding his concerns,

 5    Keith did not communicate his concerns aligned with the BNSF

 6    leadership model."  Do you see that?

 7    A.  Yes.

 8    Q.  Why do you write, "Although Mr. Sanders shouldn't have

 9    called the FRA"?

10    A.  That was a conversation that would have -- should have

11    happened internally first to have his questions answered

12    before calling the FRA.

13    Q.  Is there any policy or instruction that tells

14    Mr. Sanders that anywhere that you've seen?

15    A.  I don't know.

16    Q.  Your third paragraph under the summary section is

17    referencing the December 3rd call between Mr. Jones and

18    Mr. Sanders, and you make reference to, "Mr. Jones comments

19    that he's embarrassed when he gets something from Ft. Worth

20    on a division that he's not aware of."  Do you see that?

21    A.  Yes.

22    Q.  And Mr. Sanders says, "Well, I report all the issues

23    with the frogs and TIMS," according to your notes; right?

24    A.  Yes.

25    Q.  Do you have any knowledge of whether Mr. Sanders is
```

1   supposed to do more than that, more than reporting it in

2   TIMS?

3   A.  That would be outside of my scope.

4   Q.  Do you know what TIMS is, T-I-M-S.

5   A.  I would be guessing if I said for certain.  It's an

6   engineering system, I know that.

7   Q.  Then you make reference to the fact that there was a

8   conversation, or during this conversation Mr. Jones was

9   talking about Kramer and included some very inappropriate

10  communication; right?

11  A.  Yes.

12  Q.  Then the next section you reference some information

13  that you shared with Mr. Sanders; right?

14  A.  Yes.

15  Q.  Do you recall any discussion with Mr. Morgan or

16  Mr. Spire before you sent this email?

17  A.  I don't know who exactly I talked to, but my notes at

18  the beginning of the email state, "per the discussion," so I

19  would imagine I talked to one or both of them but I can't

20  say for certain.

21  Q.  Is it typical that when you've done, you know, a similar

22  type of investigation like this, that you'll provide a

23  recommendation to your superiors?

24  A.  Yes.

25  Q.  And then do your superiors make the ultimate

650

1    determination about whether any discipline will be imposed?

2    A.  It's a collaborative effort.

3    Q.  Do you recall having any discussions with Mr. Morgan or

4    Mr. Spire after this email about whether discipline should

5    be imposed and at what level?

6    A.  A -- I don't know if a conversation had happened or if

7    it was this email, but I know that we did follow -- there

8    was follow-up from HR with Mr. Jones on his behavior.

9    Q.  Is it fair to say that the last thing at least you

10   recall from what you've seen thus far is sending this email?

11   A.  So there must have been a conversation because I know

12   Mr. Jones received discipline.  So I don't know who I talked

13   about that, whether it was Mr. Morgan or Mr. Spire.

14   Q.  Okay.  In your recommendation you also say, "I also

15   think a letter of anti-retaliation is important because

16   Mr. Sanders feels already that he is treated different."  Do

17   you see that?

18   A.  Yes.

19   Q.  Who would this anti-retaliation provision go to?

20   A.  Who would it go to?

21   Q.  Correct.

22   A.  What do you mean?

23   Q.  Who are you recommending receive a letter of

24   anti-retaliation?

25   A.  Mr. Jones.

1    Q.  Why would you provide that to Mr. Jones?

2    A.  The anti-retaliation letter is a preventive measure to

3    ensure that employees feel comfortable bringing forward

4    concerns to HR.  So when a concern is brought forward, that

5    is common to be able to share that with a supervisor, the

6    anti-retaliation.

7    Q.  Do you know what Mr. Sanders -- do you know that

8    Mr. Sanders was eventually terminated from BNSF?

9    A.  Yes.

10   Q.  Were involved in making that determination in any

11   respect?

12   A.  No.

13   Q.  Did you ever review any of the investigation

14   transcripts?

15   A.  No.

16   Q.  Were you ever involved in any of the discussions about

17   what discipline would be imposed as a result against

18   Mr. Sanders?

19   A.  Not that I recall, no.

20   Q.  Do you know who was involved in any respect about

21   recommending or making the decision about Mr. Sanders'

22   termination?

23   A.  I wouldn't be able to say for certain who was involved.

24   Q.  Do you know who charged with Mr. Sanders with a

25   violation initially?

1    A.  No.

2    Q.  From you raise concerns from you from an HR perspective

3    if the individual, or one of the individuals, who charged

4    Mr. Sanders with a violation was Mr. Jones just a couple

5    months after this complaint?

6    A.  The context would be an important piece of that.

7    Q.  Could it raise an issue for you?

8    A.  Not without context of the situation.

9    Q.  When you say "context," what do you mean?

10   A.  Without knowing details of why a dismissal happened, I

11   wouldn't be able to say if it would raise concerns or not.

12   That would have been vetted with other parties, not me.

13   Q.  Do you know what discipline Mr. Jones ultimately

14   received as a result of Mr. Sanders' complaint in

15   December of 2015?

16   A.  He received a coaching and counseling letter of some

17   kind.

18   Q.  Why did up make that recommendation that Mr. Jones

19   receive a coaching and counseling letter as opposed to some

20   other level?

21   A.  Because that was, from my knowledge, the first time he

22   had had an issue; therefore, that first step in discipline

23   would be providing a coaching and counseling letter and

24   resetting expectations for a leader.

25   Q.  Are there some violations that warrant discipline -- I

1    mean warrant suspension regardless of whether the person's

2    been disciplined before?

3    A.  That would be outside of my scope.

4    Q.  Why do you say that?

5    A.  In my role I wouldn't have been in the position to be

6    able to suspend a part of management.

7    Q.  What levels of discipline can you, as someone in HR,

8    recommend?

9    A.  It would depend on the situation in terms what I could

10   recommend.  Most instances would be coaching and counseling

11   or -- mostly coaching and counseling.

12   Q.  Can up recommend dismissal if you think it's

13   appropriate?

14   A.  That wouldn't have been a recommendation that I would

15   make in that level of my role within HR.

16   Q.  That's kind of what I'm trying to figure out.  And I'm

17   not saying just in this incident.  I'm saying when you're

18   doing an HR investigation, okay, during your time with BNSF,

19   was there a limit on what level of discipline you could

20   recommend?  Saying like this is the highest thing you can

21   recommend is a coaching counseling?  Or can you recommended

22   termination or suspension if you think it's appropriate?

23   A.  I would be able to make more recommendations.

24   Q.  So fair to say that you can recommend sort of any level

25   of discipline that you think is appropriate with the

654

 1    understanding that they might disagree, your supervisors?

 2    A.  Yes.

 3    Q.  Why did you settle on the coaching and counseling level

 4    of recommendation for Mr. Jones?

 5    A.  Based on the comments that I had previously made about

 6    the context of the conversation and the tone, and to my

 7    understanding he didn't have previous discipline, so

 8    coaching and counseling was appropriate.

 9    Q.  Exhibit 26 appears to be a letter from you to

10    Mr. Sanders dated December 16th of 2015 notifying him of the

11    completion of the investigation and findings regarding his

12    complaint on December 7th.  Is that fair?

13    A.  This would have been a draft since there's not a

14    certified letter number on it.

15    Q.  And who would this draft go to?

16    A.  It would go to Mr. Morgan.

17    Q.  For his approval?

18    A.  Yes.

19    Q.  Do you know if he had any edits that he suggested?

20    A.  I would imagine so; but without comparing the two, I

21    couldn't say for certain what he would make a change to.

22    Q.  Do you know if this is the language that was eventually

23    sent to Mr. Sanders?

24    A.  No, it -- this wouldn't be the final that was sent to

25    Mr. Sanders.

```
1    Q.  Do you know if there were any changes to the actual

2    wording before it was sent to Mr. Sanders?

3    A.  I wouldn't say -- be able to say without looking at the

4    other one.

5            THE COURT:  Ms. Donesky, sorry to interrupt.  We

6    need to take a break here within the next three or four

7    minutes, so if there's a good point --

8            MS. DONESKY:  It would be a good point now, I

9    believe.

10           THE COURT:  If now would be a good point, Members

11   of the Jury, we'll adjourn for about an hour break here.  I

12   realize that we haven't made the most efficient use of the

13   time this morning and I apologize for that.

14           I have other court business that I have to attend

15   to here over the lunch hour today, and so we're not going to

16   be able to make use of the next hour or so.  Let's plan to

17   reconvene at 1 o'clock and resume at that time, all right?

18           All right.  We're adjourned.

19           (Lunch recess taken at 11:57 a.m.)

20                   *     *     *     *

21       (1:00 p.m.)

22                         IN OPEN COURT

23       (Without the Jury)

24           THE COURT:  Let's excuse Mr. Boisso -- Dr. Boisso,

25   sorry.  Dr. Boisso.  Let's excuse Dr. Boisso.  We will deal
```

1    with the front pay issue separate from testimony.

2              MR. JAMES KASTER:  Very good.  Thank you.

3              THE COURT:  And then if I could add just one sort

4    of small caution, that the deposition transcript reading

5    slow down just a bit.  That would help Mr. Willette here

6    create an accurate record.

7              MS. DONESKY:  Will do.

8              THE COURT:  All right.  We can bring the jury in.

9    Thank you.

10             MR. JAMES KASTER:  Your Honor, we've agreed the

11   full report will go in for your review.

12             THE COURT:  Great.  Thank you.

13             MR. JAMES KASTER:  Thank you.

14             (Jury enters)

15             THE COURT:  Thank you, everyone.  Please be

16   seated.

17             Ms. Donesky?

18             MS. DONESKY:  Thank you.

19   BY MS. DONESKY:

20   Q.  And who would this draft go to?

21   A.  It would go to Mr. Morgan.

22   Q.  For his approval?

23   A.  Yes.

24   Q.  Do you know if he had any edits that he suggested?

25   A.  I would imagine so, but without comparing the two, I

```
 1    couldn't say for certain what he would make a change to.

 2    Q.  Do you know if this is the language that was eventually

 3    sent to Mr. Sanders?

 4    A.  No, it -- this wouldn't be the final that was sent to

 5    Mr. Sanders.

 6    Q.  Do you know if there were any changes to the actual

 7    wording before it was sent to Mr. Sanders?

 8    A.  I wouldn't say -- be able to say without looking at the

 9    other one.

10    Q.  Before this letter on December 16th of 2015, so from

11    December 7th when you have this conversation with

12    Mr. Sanders and then you send this follow-up email to your

13    superiors, to December 16th of 2015, do you recall if you

14    did anything else as part of an investigation into

15    Mr. Sanders' complaint?

16    A.  I can't recall.

17    Q.  Are you aware of whether any of your superiors did

18    anything else with respect to investigating Mr. Sanders'

19    complaint during that period of time, December 7th to

20    December 16th?

21    A.  I can't recall or I don't know.

22    Q.  Do you know if any other employees at BNSF were ever

23    interviewed to determine whether Mr. Jones had engaged in

24    similar interactions with them?

25    A.  I don't know.  The recordings spoke for themselves in
```

1    terms of me feeling that I had enough to be able to say that

2    Mr. Jones was out of line.

3    Q.  Your second paragraph there, the first sentence reads:

4    "The investigation does not substantiate your allegation

5    that the Division Engineer Keith Jones, and Roadmaster

6    Blaine Hoppenrath, are continually mistreating and singling

7    Mr. Sanders out."  Do you see that?

8    A.  Yes.

9    Q.  Why do you write that the allegation was not

10   substantiated if Mr. Jones was disciplined?

11   A.  The piece about singling out.

12   Q.  What did you rely upon to make that determination that

13   Mr. Sanders was not being singled out?

14   A.  I can't say for certain.

15   Q.  You go on to say that:  "There was evidence that

16   Mr. Jones used discourteous language on November 23rd, 2015

17   and December 3rd, 2015."  Do you see that?

18   A.  Yes.

19   Q.  I'm just wondering if your investigation -- if you

20   concluded that Mr. Sanders' allegation was not

21   substantiated, why was Mr. Jones disciplined in any respect?

22   A.  Because of the language that was being able to use and

23   being able to have appropriate respect for employees in the

24   workplace.

25   Q.  Doesn't that assume that Mr. Sanders' allegations were

```
 1    at least substantiated in part?

 2    A.  Well, it says that there was -- in this draft there was

 3    evidence that he used discourteous language.  Discourteous

 4    language doesn't necessarily mean being singled out.

 5    Q.  Could mean mistreatment, though; right?

 6    A.  Could be.

 7    Q.  Does this tell Mr. Sanders that Mr. Jones is being

 8    disciplined?

 9    A.  It has, "BNSF has taken timely, appropriate, corrective

10    action to resolve the issue."

11    Q.  Mr. Sanders wasn't told that Mr. Jones received a

12    coaching and counseling?

13    A.  No, I would never tell an employee how another employee

14    was disciplined.

15    Q.  Did you ever have a follow-up conversation with

16    Mr. Sanders about him receiving this letter or a similar

17    version of this letter?

18    A.  I can't recall.

19    Q.  Let's go to Exhibit 27.

20    A.  Okay.

21    Q.  This is a coaching and counseling letter that was sent

22    to Mr. Jones dated December 22nd of 2015.  Do you see that?

23    A.  Yes, sir.

24    Q.  Did you play any part in drafting this letter?

25    A.  I would have played a role given the specifics of this,
```

1    yes.

2    Q.  The letter was from Doug Jensen.  Do you see that?

3    A.  Yes.

4    Q.  Okay.  And then it says:  "Specifically, your use of

5    profanity while speaking with MOW Track Inspector Don

6    Sanders on November 23rd, 2015 regarding his recent contact

7    with the FRA to ask questions and discuss track conditions."

8    Do you see that?

9    A.  Yes.

10   Q.  Would you agree with me that that paragraph is

11   indicating to Mr. Jones that what he did wrong was this one

12   conversation on November 23rd, 2015?

13   A.  That's giving a specific example, yes.

14   Q.  No other examples were given; right?

15   A.  Correct.

16   Q.  I mean, you've -- would you agree with me that you found

17   inappropriate conduct in Mr. Jones's conversations with

18   Mr. Sanders outside of November 23rd, 2015?

19   A.  Yes.

20   Q.  Did you ever have a conversation with your superiors and

21   say, Hey, I think we need to tell Mr. Jones the full extent

22   of what we found to be inappropriate?

23   A.  I can't recall.

24   Q.  Were you involved at all in communicating this coaching

25   and counseling to Mr. Jones?

```
 1    A.  No.
 2    Q.  If we can turn to Exhibit 28.  This is a letter dated
 3    December 23rd, 2015, again to Mr. Sanders.
 4    A.  Uh-huh.
 5    Q.  And can you tell me what this is?
 6    A.  This would have been the formal letter that was sent to
 7    Mr. Sanders.
 8    Q.  Okay.
 9    A.  Regarding his complaint closeout.
10    Q.  So is this the final version that was sent to him?
11    A.  Yes.
12    Q.  Okay.  I didn't the difference between the two earlier.
13    Okay.  So that what we looked at before, Exhibit 1 -- well I
14    think 26 was your original draft?
15    A.  Yes, sir.
16    Q.  And then Exhibit 28 is what you understand to be the
17    final letter that was sent to Mr. Sanders?
18    A.  Yes, sir.
19    Q.  All right.  Do you know who made the edits?
20    A.  It would have been Terry Morgan.  I don't know as
21    though -- I can't say for certainty if someone else was
22    involved.
23    Q.  You indicated earlier on in your testimony that you were
24    involved in a second investigation regarding Mr. Sanders.
25    A.  Correct.
```

1    Q.  When is the next time you hear of Mr. Sanders?

2    A.  I -- Mr. Spire had approached me regarding his

3    conversation.  I would be speaking secondhand, so Mr. Spire

4    had approached me about providing some training to the MOW

5    group and said it would include Mr. Sanders.

6    Q.  Why was Mr. Sanders' name brought up, do you know?

7    A.  Because of my previous interaction, just letting me know

8    the work group that I would be talking to.

9    Q.  And what was the training you were supposed to do?

10   A.  It was going to be a combination training that would

11   include our standard presentation that we provide regarding

12   EEO, anti-harassment, and discrimination training.

13   Q.  And did you provide that training?

14   A.  Yes.

15   Q.  Do you recall when?

16   A.  It was in the spring of the following year, but I can't

17   say for certain the date.

18   Q.  And we looked at December 7th, 2015, which was your

19   discussion with Mr. Sanders.  Then December 15th of 2015

20   indicates that there was an anti-retaliation process

21   activated concerning Mr. Sanders' complaint and concern

22   about retaliation.  Do you see that?

23   A.  Yeah.

24   Q.  Do you know what that process was that was activated?

25   A.  It would have been the anti-retaliation letter.

1    Q.  To Mr. Jones?

2    A.  To Mr. Jones.

3    Q.  Okay.  Do you know who drafted that?

4    A.  It's a standard BNSF letter, and you make slight changes

5    based on what you have; but including the name, the

6    supervisor's name; but it's pretty standard.

7    Q.  Does BNSF have an anti-retaliation policy?

8    A.  Yes.

9    Q.  From your experience, do they take it seriously?

10   A.  Absolutely.

11   Q.  Then we see December 22nd, the coaching and counseling

12   letter to Mr. Jones.  December 23rd is your letter to

13   Mr. Sanders and the completion of the investigation; right?

14   A.  Yes.

15   Q.  Then there's this date of January 6 where Joe Spire

16   talks with Ms. Hoppenrath about Mr. Sanders' complaint about

17   use of a vehicle.  Do you see that?

18   A.  I see the notes but I don't see that Mr. Sanders is

19   making a complaint about it, use of company vehicle?

20   Q.  So then if we go down to the 8th and we go under what

21   kind of first description under the 8th we see, "Roadmaster

22   Hoppenrath contacted.  HR team to attend the safety meeting

23   on February 24th, 2016."  Do you see that?

24   A.  Yes.

25   Q.  Okay.  Did Ms. Hoppenrath contact you?

1   A.  Not that I recall.  It would have been Joe Spire, I

2   believe.

3   Q.  And then we see February 24th, 2016, there's a

4   description of Magenta, being you, and Mr. Spire lead an EEO

5   and Read presentation to cover -- and cover the BNSF vehicle

6   policy.  Do you see that?

7   A.  Yeah.

8   Q.  All right.  Is this the training that you were referring

9   to earlier that you did when you were notified that

10  Mr. Sanders would be there?

11  A.  Yes.

12  Q.  If we -- why don't we turn to Exhibit 31 in your book.

13  Did you have a file on Mr. Sanders that looked like this?

14  A.  I had pieces of it, but Mr. Freshour had requested any

15  documents that I had had regarding Mr. Sanders.  Therefore,

16  I sent him everything that I had, which a lot of this is

17  included in.

18  Q.  Okay.  And the first part of Exhibit 31 is two pages of

19  notes that are typewritten.  Are these your notes?

20  A.  Yes.

21  Q.  I see your signature on the bottom of the second page?

22  A.  Yeah.

23  Q.  All right.  Are these your notes regarding conversations

24  in early January, and then the training that eventually

25  occurred in February of 2016?

1    A.  Yes.

2    Q.  It indicates that in the beginning of January that there

3    was some conversations between Mr. Sanders and

4    Ms. Hoppenrath about using a vehicle.  Is that fair?

5    A.  Well, I don't know as though the conversations were

6    between Mr. Sanders and Ms. Hoppenrath.  I know that their

7    conversation was with Ms. Hoppenrath and Mr. Spire regarding

8    this situation.

9    Q.  We'll come back to your notes.  If you can flip in the

10   same exhibit to the Bates label that's ended 7201.

11   A.  The letter or the email?

12   Q.  Correct.

13   A.  Okay.

14   Q.  So this is a couple emails.  The first one in the bottom

15   of the page appears to be from Ms. Hoppenrath dated January

16   6th of 2016 regarding an interaction she had with

17   Mr. Sanders.  Do you see that?

18   A.  Yes.

19   Q.  And it looks like on the top of the page that Mr. Spire

20   then forwarded it to both Mr. Morgan and yourself --

21   A.  Yes.

22   Q.  -- later that day.  Do you see that?

23   A.  Yes.

24   Q.  Do you recall receiving this email at all?

25   A.  Yes.

1    Q.  Okay.  And Ms. Hoppenrath is detailing a conversation

2    she had with Mr. Sanders, at least in part, that dealt with

3    his ability to take a vehicle home.  That, at least in part,

4    that Ms. Hoppenrath is detailing that she had a conversation

5    with Mr. Sanders about being -- his ability to take a

6    vehicle home?

7    A.  Part of the conversation was regarding a vehicle use,

8    yes.

9    Q.  Did you have any discussions with Mr. Spire or

10   Mr. Morgan after receiving this email from Ms. Hoppenrath?

11   A.  A discussion would have happened, yes.

12   Q.  And do you recall anything that was discussed about how

13   to respond?

14   A.  No.  The only thing is that we would add vehicle --

15   discussion of vehicle to the training that we were providing

16   to the group.

17   Q.  So that was why that was added?

18   A.  Correct.

19   Q.  Okay.  Explain to me what happens during the training in

20   February of 2016?

21   A.  In what context?

22   Q.  Did Mr. Sanders do anything that you felt was

23   inappropriate?

24   A.  So as we were going through the presentation, which my

25   notes indicate he was asking -- there were a lot of

```
1    questions from the group as a whole, and Mr. Sanders had
2    asked multiple questions about the same issue that was very
3    personal to him.  So I had had to ask if we could have a
4    sidebar conversation following instead of in front of
5    everyone.
6    Q.  You indicated that a number of people had questions
7    regarding the training that you provided; is that right?
8    A.  My notes indicate that only two people had questions.
9    Mr. Sanders and someone else.
10   Q.  So there's -- on 7190 there appears to be a PowerPoint
11   presentation titled "Preventing Harassment and
12   Discrimination."  Do you see that?
13   A.  Yes, sir.
14   Q.  Is this the presentation that was provided during this
15   training in February of 2016?
16   A.  Yes.
17   Q.  And that's a series of, looks like, three pages of
18   slides with six slides on each page.  And then if we go to
19   7193, it appears that this could be a separate PowerPoint
20   presentation called "Respect Every Day" or "Read"?
21   A.  Yes.
22   Q.  And were both of these presentations given during the
23   training in February?
24   A.  Both were given during the training but not by me,
25   not -- both of them weren't by me.
```

1    Q.  Okay.  Did you give one of them and then Mr. Spire gave

2    a different one, do you recall?

3    A.  The -- I gave the first one.  The "Read" presentation

4    was given by Connie Swanson.

5    Q.  If we go back to your notes now in the front of Exhibit

6    31, the bottom of that first page seems to indicate that

7    after the presentations were made that Mr. Sanders came up

8    to you and asked to speak; is that right?

9    A.  Correct.

10   Q.  And then you have a conversation with Mr. Sanders sort

11   of outside the presence of everybody else.

12   A.  Correct.

13   Q.  And he again brings up this vehicle policy issue.

14   A.  Correct.

15   Q.  And I see in the second bullet point there that

16   Mr. Sanders asked to look into the vehicle policy because he

17   feels that he's being discriminated and harassed against

18   because he isn't allowed to take a company vehicle home.  Do

19   you see that?

20   A.  Yes.

21   Q.  Did you consider that to be an official complaint of

22   discrimination and harassment?

23   A.  Yes.

24   Q.  Can BNSF employees file such a complaint orally or in

25   writing?

1    A.  Yes.  It's preferred they do it in writing, but we'll

2    take it in verbal.

3    Q.  He then, Mr. Sanders then, at least according to your

4    notes, indicated in some respect that your investigation in

5    November/December was incorrect or wrong.  Do you see that?

6    A.  Correct.

7    Q.  The next bullet point indicates that you went back to

8    your office and then Ms. Hoppenrath comes in?

9    A.  Uh-huh.

10   Q.  Is that yes?

11   A.  Yes.

12   Q.  And you explain to her at some -- at that point that you

13   had a complaint.

14   A.  Correct.

15   Q.  Did you say what the complaint was, do you recall?

16   A.  I don't recall.

17   Q.  Did you explain who made the complaint?

18   A.  No.

19   Q.  There is at least some discussion about -- appears to be

20   from your notes -- about a vehicle issue?

21   A.  Uh-huh.

22   Q.  Did you explain to Ms. Hoppenrath that it pertained to

23   use of vehicles?

24   A.  Yes.

25   Q.  Did you explain that there must have been some

Edgar-Cervantes-Direct

1    discussion about it being a track inspector?

2    A.  Yes.

3    Q.  Who was complaining about the vehicle?

4    A.  Yes.

5    Q.  And then Ms. Hoppenrath gave you her practice regarding

6    that.  Is that fair?

7    A.  Correct.

8    Q.  Then it says you reviewed policy regarding vehicle

9    usage; is that right?

10   A.  Correct.

11   Q.  And then March 22nd, the second to last bullet point,

12   you have kind of a follow-up conversation with

13   Ms. Hoppenrath; is that right?

14   A.  Correct.

15   Q.  And then it looks like you drafted the closeout letter

16   to Mr. Sanders.

17   A.  Correct.

18   Q.  Your signature on the bottom is dated April 8th of 2016.

19   Do you see that?

20   A.  Correct.

21   Q.  So is it fair to assume that these notes go through at

22   least that day?

23   A.  Yes.

24   Q.  And if you had done additional investigation talking to

25   people, looking at other documents, would you have noted it

671

1    in here?

2    A.  I do not recall.

3    Q.  Did it raise any concerns to you that this vehicle issue

4    appeared to arise shortly after Mr. Sanders filed his

5    complaint against Mr. Jones and Ms. Hoppenrath in

6    December of 2015?

7    A.  No.

8    Q.  Never crossed your mind?

9    A.  No.

10   Q.  If we can turn to the next page --

11   A.  Okay.

12   Q.  -- which is 7184.  Do you see that?

13   A.  Yes.

14   Q.  This is an email from you dated March 22nd of 2016 to

15   Doug Jensen, Keith Jones, Terry Morgan, and it includes a

16   closeout -- appears to be a closeout letter as an

17   attachment.

18   A.  Yes.

19   Q.  Do you see that?  Okay.

20           The next page, 7185, appears to be that closeout

21   letter.  Is that right?

22   A.  Yes.

23   Q.  To Mr. Sanders?

24   A.  Yes.

25   Q.  I'm asking about conversations, like in-person

1    conversations.  So we saw that you gave the training at the

2    end of February?

3    A.   Yeah.

4    Q.   And that's when Mr. Sanders brought up this issue --

5    A.   Uh-huh.

6    Q.   -- about vehicle usage, and he thought he was being

7    discriminated, harassed about.  And then we see the closeout

8    letter or email regarding your closeout letter on March

9    22nd, 2016, so I'm talking about between these two periods

10   of time from February 24th, 2016 to March 22nd, 2016.  Did

11   you have any discussions with any of these people on this

12   email, Mr. Jensen, Mr. Jones, Mr. Morgan, about this issue?

13   A.   I can't say with certain, no.

14   Q.   Other what's detailed in your notes, I think you said

15   you don't recall doing anything else regarding this

16   investigation?

17   A.   I don't recall, no.

18   Q.   Then we go to the closeout letter, again dated March

19   22nd.  Do you recall did you have any follow-up

20   conversations with Ms. Hoppenrath regarding this complaint

21   that aren't detailed in your notes?

22   A.   I don't recall.

23   Q.   Did you discuss with her who was making the complaint?

24   A.   Not that I recall.

25   Q.   And you indicated in your closeout letter again, you

1   made the determination that Mr. Sanders' allegations were

2   not substantiated.  Is that fair?

3   A.  Correct.

4   Q.  Okay.  How did you come or why did you come to that

5   conclusion?

6   A.  I can't speak with certainty, but there would have

7   been -- something else would have happened in terms of

8   investigating the concerns, but I don't know what.

9   Q.  Would you agree with me that simply because a policy

10  says a supervisor can make a decision doesn't necessarily

11  mean that they're not retaliating against somebody?

12  A.  There would need to be more context to that.

13  Q.  Sure.  Let use this example.  So with respect to the

14  vehicle issue, it seems as though under the policy

15  Ms. Hoppenrath has the discretion to allow track inspectors

16  to use vehicles and to drive them home, right?  Is that your

17  understanding?

18  A.  Correct.

19  Q.  And my question is simply because the policy allows her

20  to make that decision, whether Mr. Sanders can drive a

21  vehicle home or not, that's not necessarily conclusive to

22  the issue of whether she's making that decision in

23  retaliation.  Would you agree with that?

24  A.  I wouldn't be able to speak to that.

25  Q.  Because Ms. Hoppenrath could decide that she's going to

1    take away Mr. Sanders' ability to drive a vehicle under the

2    policy.  Because she has the ability to do it, in

3    retaliation she could do that.  I'm not saying that she did

4    that here.  I'm just saying that that's possible she could

5    do that.  Is that fair?

6    A.  I don't know.

7    Q.  And so Mr. Jones sent an email to HR that same day

8    saying, Hey, I've had these discussions with Mr. Sanders

9    where he says I'm asking him to do things outside the rules.

10   Did that surprise you at all that Mr. Jones just sort of

11   brought that up without knowing why Mr. Sanders went to HR?

12   A.  No.

13   Q.  I think you said before that you are not, or was not,

14   involved in Mr. Sanders' termination in any respect; right?

15   A.  Correct.

16   Q.  When did you leave Minnesota again?

17   A.  July of 2016.

18   Q.  Okay.  Can we just turn to Exhibit 38 in that book for a

19   second?  This is an online complaint made by Mr. Sanders in

20   April of 2016.  Do you see that?

21   A.  Yes.

22   Q.  Have you seen this before?

23   A.  No.

24   Q.  Did you play any part in investigating this complaint by

25   Mr. Sanders?

```
1    A.  No.

2    Q.  Regarding the vehicle complaint and Mr. Sanders, was the

3    end of that investigation -- essentially was that concluded

4    with the closeout letter that was sent to Mr. Sanders?

5    A.  Yes.

6    Q.  You've been handed what's been marked has Exhibit 44.

7    Do you see that?

8    A.  Yes, sir.

9    Q.  If we look at the first email on the bottom of the page

10   from Mr. Freshour in April of 2016, he asks for you to

11   forward any complaints that you have regarding Mr. Sanders.

12   Do you see that?

13   A.  Correct.

14   Q.  Then you send Mr. Freshour an attachment later that day

15   with respect to Mr. Sanders.

16   A.  Correct.

17   Q.  Anybody else that you know of from Human Resources who

18   received Mr. Sanders' complaints about Ms. Hoppenrath and

19   Mr. Jones?

20   A.  Mr. Freshour.

21   Q.  With respect to the second complaint by Mr. Sanders

22   regarding the vehicle issue, we saw some notes and then your

23   closeout letter saying it was not substantiated.  Was that a

24   decision that you made?

25   A.  Yes.
```

676

1    Q.  If we can go to number 9, we've talked generally about

2    BNSF anti-retaliation discrimination policies throughout

3    this deposition.  Does BNSF have a handbook that applies to

4    their employees?

5    A.  We have corporate policies that are available for all

6    employees that would touch on the anti-retaliation policy,

7    as well as EEO and anti-discrimination and harassment.

8                 MS. DONESKY:  Nothing further.

9                 THE COURT:  Thank you.  You're excused.

10                And, Ms. Donesky, just to confirm and clarify,

11   BNSF has no other witnesses to call today?

12                MS. DONESKY:  Yes, Your Honor.

13                THE COURT:  Members of the Jury, we're going to

14   excuse you and adjourn for the day.  We will reconvene

15   tomorrow morning at 10:00 a.m., and I expect that we will

16   have full days tomorrow and Monday; and then we will see

17   where we're at.  I can give you -- or I should be able to

18   give you a better timetable or estimate of where we are at

19   at the end of the day tomorrow before we adjourn for the

20   weekend.

21                All right.  We're adjourned.

22                (Jury excused)

23                THE COURT:  We'll move our 8 o'clock start time in

24   the event there's something we need to deal with tomorrow

25   morning to 9:00.  Does the plaintiff anticipate that there's

1     anything we'll need to deal with before we start tomorrow?

2              MR. JAMES KASTER:  No, Your Honor.

3              THE COURT:  How about BNSF?

4              MS. DONESKY:  No, Your Honor.

5              THE COURT:  We will be here and available just in

6     case.

7              All right.  Thanks, everyone.  We're adjourned.

8              (Proceedings concluded for the day at 1:45 p.m.)

9                        *     *     *     *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### I N D E X

|  | **PAGE** |
|---|---|
| **Colloquy with counsel** | 553 |

**W I T N E S S E S:**

**DALE E. BOISSO**
Direct Examination by Mr. James Kaster ... 563
Cross-Examination by Ms. Ferguson ... 586
Redirect Examination by Mr. James Kaster ... 593

**MAGENTA ROBERSON**
(Via Deposition Designations) ... 602

\* \* \* \* \*

### E X H I B I T S

| **NUMBER** | **FOR ID** | **IN EVIDENCE** |
|---|---|---|
| Plaintiff 288 | | 568 |

**C E R T I F I C A T E**


I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.



*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224