UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                            )  CIVIL FILE
Donald Sanders,             )  NO. 17-CV-5106 (ECT/KMM)
                            )
              Plaintiff,    )
                            )     **VOLUME V**
     vs.                    )
                            )
BNSF Railway Company,       )  Courtroom 3B
                            )  Friday, December 10, 2021
              Defendant.    )  St. Paul, Minnesota
                            )  10:00 A.M.
------------------------------------------------------------

**JURY TRIAL PROCEEDINGS**

**BEFORE THE HONORABLE ERIC C. TOSTRUD**
**UNITED STATES DISTRICT JUDGE**
**AND A JURY**

**A P P E A R A N C E S:**

**For the Plaintiff:**   **NICHOLS KASTER, PLLP**
                          By:  JAMES H. KASTER, ESQUIRE
                               LUCAS J. KASTER, ESQUIRE
                          4700 IDS Center - 80 South Eighth Street
                          Minneapolis, Minnesota  55402-2242


**For the Defendant:**   **ARTHUR CHAPMAN KETTERING SMETAK**
                            **& PIKALA, P.A.**
                          By:  SALLY J. FERGUSON, ESQUIRE
                          500 Young Quinlan Building
                          81 South Ninth Street
                          Minneapolis, Minnesota  55402-3214

                          **STINSON, LLP**
                          By:  TRACEY HOLMES DONESKY, ESQUIRE
                          50 South Sixth Street - Suite 2600
                          Minneapolis, Minnesota  55402


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

1          (9:55 a.m.)

2                    **P R O C E E D I N G S**

3                         **IN OPEN COURT**

4          (Without the jury)

5                    THE COURT:  Good morning, everyone.  Please be

6     seated.

7                    I just wanted to take a minute to let all of you

8     know that we had to dismiss a juror yesterday.  It is not

9     COVID.  It is Mr. Newbloom, who is Juror No. 4, seated in

10    the second row closest to the law clerk.

11                   I don't think that I am at liberty to share

12    information regarding the dismissal other than to observe,

13    as I have, that it's not COVID.

14                   And then I guess I would add that as we dealt with

15    the issue last night, it occurred to me that this does

16    highlight the need that we talked about before trial began

17    to be efficient and expedient and move this case along for

18    fear that given the time of the year, even if it is not

19    COVID, in this moment when we are so sensitive to illness,

20    that we are always at risk of losing jurors.

21                   So, I'll leave it at that.  Let's keep it moving.

22                   All right.  Let's get the jury.

23                   MS. FERGUSON:  Could I bring the witness in so we

24    don't delay?

25                   THE COURT:  Certainly.

1          (Witness retrieved)

2          (Jury enters)

3               THE COURT:  Thank you, everyone.  Please be

4     seated.

5               Ms. Ferguson?

6               MS. FERGUSON:  Yes, Your Honor.  We will call

7     Suanne Grobe Ranheim.

8               THE COURT:  Ms. Grobe Ranheim, I'll invite you to

9     come up here and stand between the railing and the witness

10    chair and I'll ask the deputy clerk to administer the oath

11    at this time.

12              COURTROOM DEPUTY:  Please state your full name for

13    the record, spelling your first and last name.

14              THE WITNESS:  Suanne Grobe Ranheim, S-U-A-N-N-E,

15    G-R-O-B-E, R-A-N-H-E-I-M.

16              COURTROOM DEPUTY:  Please raise your right hand.

17         **SUANNE GROBE RANHEIM, DEFENDANT'S WITNESS, SWORN**

18              THE COURT:  Thank you, Ms. Grobe Ranheim.  Please

19    have a seat.  And make sure you're close to that microphone

20    so we can hear you.

21              Ms. Ferguson?

22              THE WITNESS:  May I remove my mask?

23              MS. FERGUSON:  Yes.

24              THE COURT:  Sure.

25              THE WITNESS:  Okay.  Thank you.

GROBE RANEHIM - DIRECT

```
 1                      DIRECT EXAMINATION
 2   BY MS. FERGUSON:
 3   Q.  Good morning.
 4   A.  Good morning.
 5   Q.  Please state your name.
 6   A.  Suanne Grobe Ranheim.
 7   Q.  And what is your office address?
 8   A.  3109 Hennepin Avenue, Minneapolis, Minnesota, 55408.
 9   Q.  What is your occupation?
10   A.  I'm a vocational expert.
11   Q.  What does a vocational expert do?
12   A.  I evaluate individuals' employability and earning
13   capacity following a result of a personal injury, workers'
14   compensation, FELA matter, employment, divorce cases, sexual
15   abuse cases, and product liability cases.
16   Q.  How long have you been involved in the vocational
17   industry?
18   A.  I've been in the vocational rehabilitation industry for
19   23 years.  I started my business in 2007 as a vocational
20   consultant, at which time I primarily conduct independent
21   vocational evaluations in the course of litigation.
22   Q.  Could you tell the jury something of your education and
23   background that led to your qualification as a vocational
24   expert.
25   A.  Yes.  I have a Bachelor's of Science in vocational
```

1    rehabilitation.  I have a Master's of Science in vocational

2    rehabilitation and counseling.

3    Q.  Did you work for a number of years assisting employees

4    to return to work or find work?

5    A.  Yes.  The first ten years of my career I was a qualified

6    rehabilitation consultant in the state of Minnesota, so I

7    managed the medical treatment and return to work for

8    individuals who had sustained workers' compensation

9    injuries.

10            And then for the next ten years I worked

11   internally at Andersen Windows, as well as a consultant for

12   Andersen Windows and Malt O Meal cereal to identify

13   alternative transitional return to work following injury

14   or -- personal injury or illness for both of those

15   employers.

16   Q.  Are you a member of any professional organizations?

17   A.  Yes.  I am a member, an associate member, of the

18   American Board of Vocational Experts.

19   Q.  And in your work as a vocational expert, do you get

20   involved in looking at the labor market to identify jobs and

21   industries that may be available?

22   A.  Yes.  That's part of the vocational evaluation or review

23   of records to assess the labor market, the qualifications,

24   whether physical or cognitive qualifications, that are

25   required, as well as just an understanding of what jobs are

1    available and present opportunities for individuals.

2    Q.  In this case were you asked to review records and

3    provide an opinion as to -- or to evaluate Mr. Sanders'

4    employability and earning capacity?

5    A.  Yes.

6    Q.  And were you also asked to look at the labor market to

7    tell us what railroad jobs have been available from 2018 to

8    the present in the railroad industry?

9    A.  Yes.

10   Q.  Did you prepare three separate reports regarding the

11   work you've done in this particular case?

12   A.  Yes.

13   Q.  Okay.  Was the first report dated August 2, 2018?

14   A.  Yes.

15   Q.  Okay.  Could you tell the jury what your understanding

16   was of the background related to Mr. Sanders.

17   A.  Mr. Sanders was employed as a track

18   inspector/welder/foreman for Burlington Northern from June

19   of 2007 up until April 29th of 2016.  He was terminated from

20   his employment and my understanding was since his

21   termination he had secured alternative employment from that

22   date to the present.  He's secured eight different positions

23   and is currently working full time.

24   Q.  Did you have an understanding of his employment

25   generally prior to BNSF?

1    A.  Yes.  Based upon the records, his deposition, as well as

2    other records, he worked at Ford Motor Company I believe as

3    a fitter/utility worker for approximately ten years, and

4    then, as indicated, he did a variety of positions as

5    mechanic, construction laborer, and maintenance technician

6    prior to securing his current position.

7    Q.  What was your understanding of his vocational activities

8    or job search?

9    A.  Based upon the records I had received, that Mr. Sanders

10   had performed a job search from November of 2016 through

11   March of 2018.  Based upon the documentation, he had applied

12   for 15 positions during that 17-month period, two of which

13   were for a railroad.  One was for Union Pacific and one was

14   for Canadian Pacific, although the job title and the date

15   that he applied was unknown or not provided in the records.

16   Q.  Based on your review of the records, did you reach

17   opinions regarding his employability as of that date,

18   August 2, 2018?

19   A.  Yes.

20   Q.  I'm going to ask you several questions regarding your

21   opinions, and would you state all of your opinions to a

22   reasonable degree of vocational certainty?

23   A.  Yes.

24   Q.  Okay.  First, what was your opinion of what Mr. Sanders'

25   transferable skills were?

1    A.  He had solid transferable skills particularly by

2    utilizing his experience, his ten years of experience -- or

3    nine years' experience, excuse me -- at the railroad as a

4    track inspector relative to safety, moving products by rail,

5    the understanding of equipment and policies and procedures,

6    as well as providing customer service in the sense of

7    meeting demand and timelines and so forth.

8    Q.  In your opinion, did he have any objective medical or

9    vocational barriers that would preclude him from working

10   full time?

11   A.  No.

12   Q.  Any vocational barriers that would preclude him from

13   working full time as a track inspector, welder, or foreman?

14   A.  No.

15   Q.  Do you have an opinion as of August 2, 2018 whether he

16   was underemployed?

17   A.  Yes, I do have an opinion.

18   Q.  And what is that opinion?

19   A.  That he was underemployed at the time, as he was --

20   although he was working full time, his earnings were not

21   consistent with his earning capacity, as well as he had not

22   exhausted all of the opportunities within a variety of

23   railroads that would likely have increased his earning

24   capacity.

25   Q.  In your opinion, did he perform a reasonable and

GROBE-RANEHIM   DIRECT

```
1    diligent job search?

2    A.  No.

3    Q.  Can you tell the jury what a reasonable and diligent job

4    search is.

5    A.  Well, typically if an individual is looking for a

6    full-time position, it requires a full-time job search, and

7    I had outlined parameters in my report which are kind of

8    standard guidelines, you know, six to eight hours a day,

9    four to five contacts daily, submitting one to two resumes

10   per day, registering with job search engines, and most

11   importantly documentation of the activities.  While those

12   are the parameters of a full-time job search, obviously with

13   technology it doesn't take six to eight hours a day to

14   perform a variety of job search contacts.

15            For example, a contact could be researching job

16   openings on Indeed, looking up an employer's website to

17   understand what they do, what kind of opportunities they

18   have, connecting with one of your personal networks.  So

19   there's a lot of avenues or contacts that can made in a very

20   short time period.

21   Q.  Then fast-forward a year and a half later to March 12,

22   2020.  Were you asked to perform a supplemental record

23   review and update your opinions regarding Mr. Sanders'

24   employability?

25   A.  Yes.
```

GROBE, KAREHIM   DIRECT

1    Q.  What additional information did you review or have

2    available at that time?

3    A.  At that time I received Mr. Sanders' deposition

4    transcripts, his -- the economist's report, a wage history

5    table, as well as his employment records from the recent

6    employers that he had secured employment.  I also received a

7    Union Pacific job application and the Canadian Pacific job

8    application that he had submitted.  I think those were the

9    primary records.

10   Q.  Was it your understanding he had applied just once to

11   Canadian Pacific and to Union Pacific?

12   A.  Yes, that was my understanding.

13   Q.  As of that date, March 12, 2020, did you identify any

14   objective medical or vocational barriers that would have

15   prevented Mr. Sanders from full-time employment or from

16   performing a diligent job search?

17   A.  No.

18   Q.  Based on those records, in your opinion, did he perform

19   a reasonable and diligent job search?

20   A.  No.  There wasn't any additional job search

21   documentation, so the last that had been reviewed was March

22   of 2018, so there wasn't any additional job search effort

23   made based upon the records.

24   Q.  And did you research what railroad jobs had been

25   available from 2018 until that date?

1    A.  I did.

2    Q.  What were the various railroads that had job openings

3    during that period of time?

4    A.  There was a variety of them.  Progressive Rail, Union

5    Pacific, Wisconsin and Southern Railroad, Amtrak, Canadian

6    National, Canadian Pacific, Minnesota Prairie, Transtar, and

7    Progressive Rail.

8    Q.  How did you identify those various railroads that had

9    job opportunities?

10   A.  I utilized the RRB, the railroad website, that has

11   specific links to all the individual railroads and then

12   specific job openings.  So that's a website that's available

13   to any individual, as well as based upon my experience

14   working with the railroads, what jobs had been available

15   during that time frame.

16   Q.  And what jobs, specific job titles, did you identify as

17   having been available?

18   A.  A few of the job titles were track inspector, conductor

19   trainee, trainmaster, car man and yardmaster, or related job

20   titles.  Each of the railroads have different job titles for

21   same or similar occupations.

22   Q.  In your opinion, does Mr. Sanders possess the physical

23   capacity, qualifications, knowledge and skills to work full

24   time as either a track inspector, a welder, foreman?

25   A.  Yes.

1    Q.  What did your research indicate as to what those jobs

2    paid?

3    A.  The research indicated the average annual salary was

4    75,000 to 88,000 per year.

5    Q.  Did you find any jobs in the railroad industry in your

6    research that indicated they were paying a hundred thousand

7    dollars?

8    A.  No.

9    Q.  The wages you found are substantially lower than what

10   Mr. Sanders was making at BNSF?

11   A.  Yes.

12   Q.  Do you have an explanation for that?

13   A.  It's my understanding that he worked overtime, as well

14   as the basis of the claim is that he falsified his time

15   cards, so the research does not indicate that there's

16   employees that are making that wage for the job that he was

17   doing at the time of the termination, as well as the

18   alternative occupations I outlined.

19   Q.  And then -- now, again fast-forward another about year

20   and a half to October 19, 2021, did you do again a

21   supplemental review, an update of your reports?

22   A.  Yes.

23   Q.  And what additional information did you have in October

24   of 2021?

25   A.  I had the supplemental report by the economist, paycheck

GROBE-KANEHIM - DIRECT

1   records from his current employer, Mann Companies, his W-2

2   from 2020.  Those were the three records I reviewed.

3   Q.  And what did the records indicate regarding his earnings

4   at Mann Companies in 2020?

5   A.  Mr. Sanders earned just over 82,000 a year.

6   Q.  And was that amount equal to or more than what the

7   railroad jobs were paying that you found based on your

8   research?

9   A.  Basically right in the middle of my salary that I

10   outlined was reasonable.

11   Q.  And did you do additional research to determine whether

12   the jobs remained available at various railroads at that

13   time, between the date of your last report and your most

14   recent report?

15   A.  Yes.

16   Q.  Okay.  And again, were those the same railroads?

17   A.  There were -- yeah, I think some of them are the same:

18   Canadian Pacific, Union Pacific, Canadian National and

19   Wisconsin and Southern Railroad, so the last one is

20   different then.

21   Q.  And did you find that there were positions as track

22   inspector, conductor trainee, yardmaster, car man,

23   trainmaster available?

24   A.  Yes.

25   Q.  Is there any indication in the records that Mr. Sanders

1   applied for any of those positions or at any of those

2   railroads except for the short time after his termination?

3   A.  No.

4   Q.  Is Mr. Sanders now earning wages similar to what he

5   could expect to earn in the railroad industry?

6   A.  Yes.

7   Q.  In your opinion, is he capable of performing essential

8   functions of the job of a track inspector, foreman, welder,

9   and the other job opportunities you identified?

10  A.  Yes.

11          MS. FERGUSON:  Thank you.  I don't have any

12  further questions.

13          THE COURT:  Mr. Kaster?

14          MR. JAMES KASTER:  Thank you, Your Honor.

15

16                    **CROSS-EXAMINATION**

17  BY MR. JAMES KASTER:

18  Q.  Ms. Grobe Ranheim -- did I say that correctly?

19  A.  You did.  Thank you.

20  Q.  Thank you.  Good morning.

21  A.  Good morning.

22  Q.  I want to follow up on something you just said.

23          You were talking about Mr. Sanders' earnings in

24  2015 and 2016 with BNSF, and there was a reference to him

25  earning a hundred and fifty-five thousand or substantially

1   more than the posted numbers that you referenced for

2   positions like his, and you made a reference to the claim

3   that Mr. Sanders falsified his time cards.

4           Do you recall saying that?

5   A.  Yes.

6   Q.  I want to know, are you implying to this jury that the

7   reason why Mr. Sanders earned what he earned was because he

8   had falsified his time cards?

9   A.  No.

10  Q.  Okay.  You've been working on this case for how long?

11  A.  Since August of 2018.

12  Q.  Are you familiar with the fact that the claim by BNSF

13  was that Mr. Sanders falsified less than seven hours of

14  time?  Are you aware of that?

15  A.  No.

16  Q.  You've never been aware of that.

17  A.  No.

18  Q.  I see in your report you say that Mr. Sanders was

19  terminated, according to BNSF, for wage theft.  Do you

20  recall that?

21  A.  Yes.

22  Q.  Do you realize that the time that Mr. Sanders, according

23  to BNSF, falsified was that he was actually accused of the

24  theft before the payroll was even paid?  Do you know that?

25  A.  No.

GROBE - KANHEIM - CROSS

```
1    Q.  Have you ever heard that?

2    A.  No.

3    Q.  Do you realize that the accusation of wage theft is a

4    serious matter for an employee in terms of trying to find a

5    new job?

6    A.  Well, Mr. Sanders has demonstrated the ability to secure

7    employment, so thus far it has not precluded him.

8    Q.  My question is different.  It isn't about the eight

9    different jobs that he's had.  Because as I understand the

10   centerpiece of your opinion, it's that Mr. Sanders should be

11   able to secure a job in the railroad industry, right?

12   A.  The essence of my opinion is that Mr. Sanders has not

13   exhausted all of the opportunities available by not seeking

14   out the available positions that could be matched based on

15   his experience and education within a railroad.

16   Q.  Within a railroad.

17   A.  Correct.

18   Q.  Because I think you told me at your deposition that the

19   centerpiece of your opinion was that he should be able to

20   get a job in the railroad industry.  Do you recall that?

21   A.  Yes.

22   Q.  And specifically, he was working as a track inspector.

23   A.  Correct.

24   Q.  And you've talked about the fact that he should be able

25   to secure a job as a track inspector with another railroad,
```

```
1    right?

2    A.  Correct.

3    Q.  Let's just cover a couple of things.

4            You don't have an opinion on Mr. Sanders' back pay

5    loss, right?

6    A.  Correct.

7    Q.  You agree that for the purpose of reviewing his

8    background and experience the primary position that he held

9    at BNSF was as a track inspector, right?

10   A.  Correct.

11   Q.  And I think we went through some of his qualifications

12   when I visited with you at your deposition.  You said you

13   agree he has good decisionmaking skills, right?

14   A.  Yes.

15   Q.  Critical-thinking skills.  He has good critical-thinking

16   skills, right?

17   A.  Yes.

18   Q.  Time management skills, right?

19   A.  Yes.

20   Q.  That he has complex problem-solving operation and

21   control, quality control, right?

22   A.  Correct.

23   Q.  And he has all those skills, right?

24   A.  Correct.

25   Q.  And then I asked you another question about whether --
```

1    well, maybe BNSF should hire him.  Do you recall that?

2    A.  I don't specifically.

3    Q.  I asked you if you had informed BNSF of these skills

4    that Mr. Sanders obviously has and I think you said, "Well,

5    not directly."  Do you recall that?

6    A.  I trust that if that's what was in my deposition.

7    Q.  I mean, the question is not really a serious one,

8    because BNSF isn't going to hire him, right?

9    A.  I don't know the answer to that question.

10   Q.  Well, you wouldn't recommend that he go apply for a job

11   at BNSF, would you?

12   A.  I don't have an opinion about it.

13   Q.  You don't have an about whether or not the fact that

14   they have accused him of wage theft would be a barrier to

15   entry at BNSF?

16   A.  That's fair.

17   Q.  You agree that he had a consistent job/work pattern

18   apparent since the time of his -- I mean, he had eight

19   different jobs since he's left BNSF, right?  Yes, he's had a

20   consistent work pattern.

21   Q.  You appreciate the fact that Mr. Sanders needs to work

22   for himself and his family.

23   A.  Of course.

24   Q.  And you agree with the fact that he applied for 15

25   different jobs between March of 2016 and March of 2018,

GROBE- KANHEIM - CROSS

```
 1     right?
 2     A.  According to the records, yes.
 3     Q.  And then we talked about whether he should tell
 4     prospective employers that he was terminated for wage theft,
 5     and I think you said, "I don't think so."  Do you recall
 6     that?
 7     A.  I believe I indicated that there are circumstances when
 8     employees leave an employer and they indicate on their
 9     application, they will explain at the time of interview, or
10     they just confirm the dates of employment without
11     specifically addressing the question.
12     Q.  So that as I understand it, you think that that would be
13     a thing that a person like Mr. Sanders should talk about in
14     the job interview as opposed to on the application.
15     A.  Certainly.  You know, it's not any different than an
16     individual that has a disability, and if they're able to
17     perform the essential functions of the job with or without
18     accommodations, it's reasonable that they apply and then
19     they discuss any barriers to them fulfilling the essential
20     functions at the time of an interview or a job offer.
21     Q.  And with respect to the jobs that he actually has had,
22     you don't have an opinion about whether or not he should
23     have obtained those jobs, or stayed at those jobs, or gone
24     to the next job among the eight that he's had, right?
25     A.  No.
```

1    Q.  Okay.  You agree with the proposition that being a

2    convicted felon is an objective barrier to entry for many

3    jobs, right?

4    A.  Correct.

5    Q.  And the accusation of wage theft against Mr. Sanders, am

6    I understanding you don't believe that's an objective

7    barrier to entry?

8    A.  It's my opinion that obviously he's demonstrated the

9    ability to secure employment, so whether those employers

10   have done a background check and disregarded the current

11   claim or it wasn't a factor in securing employment.

12   Q.  I mean, you agree with the proposition that most

13   employers do background checks, right?

14   A.  It's my understanding that a majority of employers do.

15   I think there's different --

16   Q.  I'm sorry.  I didn't mean to cut you off.

17   A.  That's okay.

18   Q.  Specifically as it relates to railroads, they do

19   extensive background checks.  You know that, right?

20   A.  That is my understanding.

21   Q.  And in fact, Mr. Sanders in terms of his application at

22   Union Pacific had a longer look.  Are you aware of that?

23   A.  No.

24   Q.  Do you think that employers do a public records search

25   when they do a background search?  Are you aware of that?

GROBE - KANHEIM - CROSS

```
 1    A.  Like I said, I think employers have different standards
 2    and levels of background checks that they perform given the
 3    nature of the position.
 4    Q.  Well, we've seen a document in this case that BNSF has
 5    shown that actually is a public record of the accusation of
 6    wage theft against Mr. Sanders (indicating) in the form of
 7    an arbitrator's award, an appeal from the investigative
 8    hearing.  Are you aware of the investigative hearing, how
 9    that went and the appeal?
10    A.  No, I have not reviewed that record.
11    Q.  So you haven't seen a public record of this acquisition
12    of theft against Mr. Sanders.  You're not aware of that.
13    A.  Correct.
14    Q.  Would you consider that to be an objective barrier to
15    entry?
16    A.  Possibly.
17    Q.  Now, as I understand it, you focused in particular --
18    we're focused in particular on the railroad industry and on
19    the position of track inspector, right?
20    A.  As one of the potential return-to-work opportunities,
21    yes.
22    Q.  In the railroad industry for Mr. Sanders, right?
23    A.  Correct.
24    Q.  Are you aware of the fact that a track inspector works
25    hand in hand with the Federal Railway Administration?  Are
```

1    you aware of that?

2    A.  Yes.

3    Q.  Are you aware of the fact that they have to be qualified

4    to work with the Federal Government in that role?

5    A.  Yes.

6    Q.  Do you think an accusation of wage theft against an

7    employee would be a problem in terms of working hand in hand

8    with the Federal Government in that role?

9    A.  Certainly could be.

10   Q.  You testified in your deposition that at the time of

11   Mr. Sanders' work with Union Pacific -- or I'm sorry, not

12   Union Pacific.  BNSF.  I apologize.  I'm getting my

13   railroads confused here -- with BNSF, that his earning

14   capacity was $155,000 dollar a year?  Do you recall that?

15   A.  Yes.

16   Q.  And I think you testified in your deposition that at the

17   time of the deposition his earning capacity was 75,000 to

18   88,000.  Do you recall that?

19   A.  Yes.

20   Q.  And in fact, Mr. Sanders, since he's making $82,000 a

21   year right now has maxed out his earning capacity, right?

22   A.  He's within the range that I outlined.  Certainly he

23   could increase to 88,000.

24   Q.  But he's earning exactly what you projected at the time

25   of your deposition to be his earning capacity today, right?

```
1     A.  Correct.

2     Q.  That's all the questions I have for you.  Thanks.

3               THE WITNESS:  You're welcome.

4               THE COURT:  Ms. Ferguson?

5               MS. FERGUSON:  Nothing further.

6               THE COURT:  All right.  Ms. Grobe Ranheim, you're

7     excused.  Thank you.

8               THE WITNESS:  Thank you.

9               MR. JIM KASTER:  Your Honor, I know we're going

10    back and forth between witnesses -- here, I'll take this

11    off -- but Plaintiff calls our next witness, who is Blaine

12    Hoppenrath.  I believe she's in the hall.

13         (Pause - witness retrieved)

14              THE COURT:  Good afternoon, Ms. Hoppenrath.  If

15    you would, please, stand there between the railing and the

16    witness chair and I'll invite the courtroom deputy to

17    administer the oath at this time.

18              THE CLERK:  Please state your full name for the

19    record, spelling your first and last name.

20              THE WITNESS:  Blaine Hoppenrath, B-L-A-I-N-E,

21    H-O-P-P-E-N-R-A-T-H.

22              COURTROOM DEPUTY:  Please raise your right hand.

23         **BLAINE HOPPENRATH, PLAINTIFF'S WITNESS, SWORN**

24              THE COURT:  Please have a seat.  Thank you.

25              Mr. Kaster?
```

```
 1              MR. JAMES KASTER:  Thank you, Your Honor.

 2

 3                      CROSS-EXAMINATION

 4    BY MR. JAMES KASTER:

 5    Q.  Good morning, Ms. Hoppenrath.

 6    A.  Good morning.

 7    Q.  If you're comfortable, you can take your mask off.

 8            Have you testified in court before?

 9    A.  No.

10    Q.  Okay.  I'm going to ask you to answer my questions to

11    the best of your ability, but if you don't understand my

12    question, just let me know that.  I'm happy to repeat it and

13    rephrase, okay?

14    A.  Okay.

15    Q.  As I understand it, when you went to work at BNSF you

16    had no prior experience with the railroad, correct?

17    A.  That is correct.

18    Q.  You started there in 2012?

19    A.  Yes.

20    Q.  As a management trainee.

21    A.  Yes.

22    Q.  Right out of college, I suspect.

23    A.  Yes.

24    Q.  As I understand it, you started in the office and then

25    it was time for you to go out and learn about the railroad
```

1    industry in the field, right?

2    A.  Roughly.  My first position was I did have roles in the

3    office, but I was also out in the field on a weekly basis.

4         THE COURT:  I'm sorry, Mr. Kaster, if I could just

5    interrupt.

6         MR. JAMES KASTER:  Sure.

7         THE COURT:  Ms. Hoppenrath, if you wouldn't mind,

8    could you move just a little closer to that microphone so we

9    can hear you a little better?

10        THE WITNESS:  (Complies).  Yes.

11        THE COURT:  Thank you very much.

12   BY MR. JAMES KASTER:

13   Q.  Then as I understand it, you took over a tie gang for a

14   little less than a year, like nine months or something,

15   right?

16   A.  I don't recall the exact dates, but between being an

17   assistant roadmaster on the production side and a

18   roadmaster, it was about a year, year and a half.

19   Q.  And it was at that point that you moved to St. Paul as

20   the district roadmaster, correct?

21   A.  Correct.

22   Q.  And that would have been, what, in about April of 2015?

23   A.  Roughly.  March is what I recall.

24   Q.  Okay.  And then you stayed in that position until when?

25   A.  Roughly April of 2017.

HOFFENRATH   CROSS

```
1    Q.  As I understand it, you as a roadmaster had
2    responsibility for about 30 miles of track.
3    A.  It was 30 physical miles and I want to say it was about
4    60 miles of mainline.
5    Q.  You actually supervised, as I understand it, three
6    different track inspectors during your stay there, right?
7    A.  I had three track inspector bid positions.  If they were
8    all full, then yes.
9    Q.  But for a lot of the time they weren't full.
10   A.  Correct.
11   Q.  And for some of the time it was only Mr. Sanders,
12   correct?
13   A.  Correct.
14   Q.  He was holding down the track inspector responsibilities
15   for the three different roles.
16   A.  Correct.
17   Q.  After you left St. Paul you went to Albuquerque,
18   New Mexico, right?
19   A.  Correct.
20   Q.  And you worked there as the manager of roadway planning,
21   right?
22   A.  Correct.
23   Q.  And that was actually a promotion from the district
24   roadmaster position, right?
25   A.  Correct.
```

1   Q.  It was a step up and a pay increase.

2   A.  Yes.

3   Q.  While you were in St. Paul, Mr. Jones was your

4   supervisor, right?

5   A.  Yes.

6   Q.  So he gave you instructions on a day-to-day basis; is

7   that how that worked?

8   A.  I wouldn't necessarily say that we talked every morning

9   before work, but there was a general vision for where we

10  wanted our -- or what we wanted our territory to be, so I

11  did my -- to the best of my ability performed my duties to

12  meet those expectations.

13  Q.  And some of those expectations were his expectations,

14  right?

15  A.  Yes.

16  Q.  I mean, he set out expectations for you as your

17  supervisor, right?

18  A.  Correct.

19  Q.  During the course of your employment at BNSF, you

20  received performance appraisals, correct?

21  A.  Performance reviews?  Correct.

22  Q.  And you received one in 2015, and if we could pull up

23  the exhibit just for the witness.

24          It should come up just on your screen.

25          Exhibit 16, please.  Can you see that?

1    A.  Yes.

2    Q.  And Mr. Jones would have performed this performance

3    appraisal for you at this time, correct?

4    A.  He would input some of the feedback after I had

5    performed a self-evaluation.

6    Q.  And this was the performance appraisal you received for

7    2015, correct?

8    A.  I can't see the -- oh, yeah.  Sorry.  2015, yes.

9            MR. JAMES KASTER:  Offer Plaintiff's 16.

10           MS. DONESKY:  No objection.

11           THE COURT:  Thank you.  It's admitted and may be

12   published.

13   BY MR. JAMES KASTER:

14   Q.  Let's go right to page 5 of 7.  We're looking at your

15   individual business objectives, and if we can blow up that

16   section at the very top of velocity productivity.  That's in

17   the middle of the page.  I'm sorry.  In the middle of the

18   page it says velocity productivity.

19           So velocity and productivity, velocity was one of

20   the things that you were measured on in your position as a

21   roadmaster, correct?

22   A.  Correct.

23   Q.  And one of the things that was an individual business

24   objective for you:

25           "Understand the reason of every slow order on your

HOFFENRATH - CROSS

```
 1     territory and have a plan in place to address the issue."
 2              That was one of your business objectives under the
 3     velocity and productivity heading, right?
 4     A.  Yes.
 5     Q.  Now let's go to Plaintiff's 17, and this is another
 6     performance review, and again, it's dated 2015.
 7              MS. DONESKY:  On 17, hearsay, relevance.
 8              THE COURT:  Sorry, Mr. Kaster.  I'm a bit lost.
 9     What's the exhibit number?
10              MR. JAMES KASTER:  It's 17, Your Honor.  I'm
11     sorry.
12              THE COURT:  Give me one moment if you would,
13     please.
14          (Pause)
15              THE COURT:  Mr. Kaster, go ahead and ask some
16     questions here and I'll allow some preliminary questioning
17     and see what the point of this is and decide the objection
18     here as we go.
19              MR. JAMES KASTER:  Okay.  Thank you, Your Honor.
20     BY MR. JAMES KASTER:
21     Q.  Actually, so we have some understanding since both of
22     these are dated in 2015, the first exhibit we looked at was
23     your mid-year performance evaluation or performance review,
24     correct?
25     A.  I don't know where it was specifically documented that
```

1    it was the mid-year, but I do recall that I had a mid-year

2    and an end-of-year performance review.

3    Q.  And this 17 would be the end-of-year for that time,

4    right?

5    A.  Again, I don't recall exactly where it says on the

6    document that it was the, end-of-year, but I know that there

7    was one.

8    Q.  And in particular during this performance review, you

9    were reviewed for your interactions with the people who

10   reported to you, as well as your performance on productivity

11   and velocity among other things, right?

12   A.  Yes.

13             MR. JAMES KASTER:  Offer Plaintiff's 17.

14             MS. DONESKY:  Same objections.

15             THE COURT:  What was the last question,

16   Mr. Kaster?

17             MR. JAMES KASTER:  I think the question as best I

18   can restate it was that this document contains her

19   evaluation on her work with respect to the people who

20   reported to her and, among other things, on the objectives

21   related to productivity and velocity that we just discussed.

22             THE COURT:  Do you intend to go into those

23   questions in some detail?

24             MR. JAMES KASTER:  Not great detail, Your Honor,

25   but some.  I mean, I have a couple questions on each point.

1              THE COURT:  I want to hear those questions before

2    I admit the exhibit.

3    BY MR. JAMES KASTER:

4    Q.  Do you recall -- and you may refresh your recollection

5    with the document if need be -- that you were specifically

6    reminded by Mr. Jones that being in your position was not a

7    popularity contest?

8    A.  I don't recall that specifically.  I would have to look

9    at the precise verbiage.

10   Q.  Well, if you take a look at the first page of the

11   document under "Appraisal by Mr. Jones," does that refresh

12   your recollection?

13   A.  I can see it here in the document.

14   Q.  I'm sorry.  Did you say you can see it or you can't?

15   A.  I can see it here in the document where he states that.

16   Q.  So does that refresh your recollection that's one of the

17   things -- in fact, that's the first thing that Mr. Jones

18   said to you, right?

19   A.  It's the first thing that's written down.

20   Q.  And in part of this performance evaluation process you

21   actually do a self-review as well, correct?

22   A.  Correct.

23   Q.  And do you recall saying in your self-review something

24   about having people at the Bluffs that are not afraid to

25   approach others about unsafe behavior, which you described

1    as a positive.  Do you recall that?

2    A.  If I could read it, I probably did state that.

3    Q.  All right.  If you take a look at page 4 of 8 under

4    "Appraisal by Blaine Nicole Hoppenrath."

5    A.  (Witness complies).  Okay.  What was the question?

6    Q.  Does it refresh your recollection to look at that

7    document?  That's what you described in your own

8    self-review.

9    A.  Yeah.

10   Q.  And do you recall Mr. Jones again reminding you in that

11   performance evaluation that you needed to know the basis

12   upon which every slow order was issued?

13   A.  It was -- yeah, I mean, I see it in the document.  It's

14   definitely a good practice to understand what's going on in

15   the territory.

16   Q.  Mr. Jones was particularly concerned about slow orders

17   throughout the time that you worked for him, correct?

18   A.  It was one of many different focuses.  It was something

19   that had high visibility in our department and on our

20   division.

21   Q.  Did you say it had high visibility?

22   A.  Yeah.

23   Q.  Thank you.

24             MR. JAMES KASTER.  Again offer Exhibit 17.

25             THE COURT:  I'll sustain the objection to this.  I

```
1     think you've gotten what you need through the questions
2     you've asked.
3               MR. JAMES KASTER:  Thank you, Your Honor.
4     BY MR. JAMES KASTER:
5     Q.  I'm going to change subjects on you a little bit on time
6     reporting.  Do you recall the system called PARS?
7     A.  Yes.
8     Q.  And do you recall issuing a directive at some point in
9     2015, a notice to the people who worked for you, that all
10    persons entering time in PARS had to report time daily?  Do
11    you recall that?
12    A.  Yes.
13    Q.  And did you -- when you indicated that, did you
14    indicate to the -- by the way, just so we have a sense of
15    this, how many employees reported to you?
16    A.  I had roughly 15.  That would vary on different times of
17    the year, but 15 was the average over the couple years that
18    I was there.
19    Q.  Did you direct employees as to whether or not they
20    should input their time in draft or final, do you recall?
21    A.  I don't recall exactly what I would have specified.
22    Again, I had sent out expectations that by the end of the
23    day that she should accurately report their time before they
24    leave.
25    Q.  So would that be a suggestion that the time should be in
```

HOFFENRATH - CROSS

```
 1    final?
 2    A.  Yes.
 3    Q.  And you actually were rated on making sure that the
 4    people who reported to you reported their time in a timely
 5    way, that was on-time reporting is what it was called,
 6    right?
 7    A.  Can you clarify what you mean by we were rated on?
 8    Q.  Were you -- I guess the question -- were you in any way
 9    reviewed or evaluated for ensuring that the people who
10    reported to you in turn reported their time?
11    A.  It was a metric that we used as a means to manage our
12    territory.
13    Q.  A metric on your scorecard?
14    A.  No.
15    Q.  A metric on what?
16    A.  I don't recall specifically how that report was -- I
17    don't know if it was like an auto-generated email or
18    something that we went in and looked at every day, but it
19    was a metric that we used -- I don't recall specifically how
20    often we discussed it.  If we did, it would have been on a
21    like division engineer type call.
22    Q.  Do you recall giving any of the employees or
23    participating in any training on entering time in PARS?
24    A.  I don't.
25    Q.  So do you know whether or not Mr. Sanders or other
```

HOFFENRATH - CROSS

```
 1    persons in positions like him would have had any specific
 2    training on how to enter time in PARS?
 3    A.  I don't know how that training occurred.
 4    Q.  If it did.
 5    A.  I don't know.
 6    Q.  Mr. Sanders had a laptop, correct?
 7    A.  Correct.
 8    Q.  As a track inspector, right?
 9    A.  Yes.
10    Q.  So he could effectively work remotely.
11    A.  Define remotely.  Do you mean off property or remotely
12    within his job description?
13    Q.  What I mean is -- so let me be clear.  There's a
14    physical station house, right?
15    A.  Correct, yes.
16    Q.  And in fact, if you go right down the street here to
17    Jackson and turn right and turn left and go a couple miles
18    along the river, you get to Dayton's Bluff.  It's right
19    there.
20    A.  Correct.
21    Q.  Mr. Sanders did not work at the station house, right?
22    A.  We reported to the station house.  We reported to
23    Dayton's Bluff.
24    Q.  Okay.  But the work that he did --
25    A.  The complexities of the job require to be out in the
```

1    field on the track which did require a laptop where you

2    could access our network remotely.

3    Q.  You agree Mr. Sanders could be a very hard worker,

4    right?

5    A.  He could be.

6    Q.  He worked seven days a week sometimes.

7    A.  Sometimes, yes.

8    Q.  And we talked about the fact that he inspected both the

9    mainline and the yard for a period of time, right?

10   A.  Yes.

11   Q.  In fact, as I understand your testimony here today, for

12   a period of time he was doing the job of three people.

13   A.  Correct.

14   Q.  And if you needed someone, he would come and help out,

15   right?

16   A.  Sometimes.

17          MR. JAMES KASTER:  May I provide a copy of the

18   deposition to the witness, Your Honor?

19          THE COURT:  Yes.

20   BY MR. JAMES KASTER:

21   Q.  Ms. Hoppenrath, I'm providing you with a copy of your

22   deposition.

23          If you take a look at -- this is a squish copy, so

24   you see four pages on one page.  I'm going to ask you to go

25   to page 46.

HOFFENRATH - CROSS

1    A.   (Witness complies).

2    Q.   Because you were asked the very same question in your

3    deposition, page 46, line 6:

4              "Was he generally willing to fill in and take on

5    extra duties and hours if requested?

6              And your answer was:  "If I needed someone, he

7    would help out."

8              Do you recall?

9    A.   I'm looking at the document, so I see what you're saying

10   there.   I guess when I said "sometimes" I was referring to,

11   like, there were probably instances where he needed time

12   off, so there were some times where he wouldn't have been

13   able to help out.

14   Q.   If he was physically able to help out, he would help

15   out, right?

16   A.   I don't know.   I mean --

17   Q.   I know you haven't been here for this trial, but let me

18   just ask you a question.

19              Did you often call Mr. Sanders at home and demand

20   that he come in?

21   A.   Per the union agreement when we had callouts from our

22   maintenance desk, there was a prescribed order that I would

23   have to follow to have people come in to address the issue.

24   So oftentimes because he was the track inspector, he would

25   be the first person on that call.

HOFFENRATH - CROSS

```
 1    Q.  So you did call him at home and demand that he come in.

 2    A.  I never demanded that he came in, but per the agreement

 3    I am required to call him.

 4    Q.  And in particular when Mr. Sanders was the only track

 5    inspector, he would be the one and only one receiving those

 6    calls, right?

 7    A.  Not necessarily.  If he was unavailable, then we would

 8    go to the next qualified individual.  That may or may not be

 9    a track inspector.  It depended on the roster at the time.

10    Q.  Did you also call Mr. Sanders at home and complain about

11    slow orders?

12    A.  I don't recall.

13    Q.  One of the reasons why Mr. Sanders would have to come

14    in, especially when he was the only track inspector, was to

15    perform the critical sequences for frequency for the FRA.

16    A.  Can you restate the first part of that statement?

17    Q.  Sure.  When he was in a position alone, in that position

18    alone, he might have had to do all the inspections for all

19    track to meet the frequency of BNSF and FRA inspection

20    requirements, right?

21    A.  The inspections were a requirement, like from our EI and

22    from the FRA.  As far as him solely doing it, he would be

23    the first option based on the Collective Bargaining

24    Agreement to complete those inspections.  That doesn't mean

25    it had to be him, but he was the first one to be offered the
```

1    overtime.

2    Q.  So you're saying he wasn't required to do it.

3    A.  He would have had the option to say no and then we would

4    have had to figure another alternative.

5    Q.  Take a look at your deposition, page 39, line 8, please.

6    A.  (Witness complies).

7    Q.  "Question:  During the periods when Mr. Sanders was the

8    only track inspector, is he required then to do inspections

9    on the entire section of track under your direction?

10           "Answer:  To meet BNSF and FRA inspection

11   frequencies, yes."

12           MS. DONESKY:  Objection.  Improper impeachment.

13           THE COURT:  Overruled.

14   BY MR. JAMES KASTER:

15   Q.  Now, one --

16           THE COURT:  Wait.  Hold it.  Is there a question?

17   You just read deposition testimony.  Is there a question of

18   the witness?

19           MR. JAMES KASTER:  No, Your Honor.  I'm moving to

20   the next question.

21   BY MR. JAMES KASTER:

22   Q.  Prior to March of 2016, you did not discipline

23   Mr. Sanders, correct?

24   A.  I don't recall.  I don't believe so.

25   Q.  If we go -- change the subject again back to the TIMS

1    system, this was a system that was a computer-based system,

2    correct?

3    A.  Correct.

4    Q.  Now, employees did not punch a clock at BNSF, right?

5    A.  Correct.

6    Q.  They were filling out their own time sheets, right, or

7    inputting their own time?

8    A.  Can you just go back?  You were talking about TIMS?  Is

9    that what you're saying they're entering their time?

10   Q.  PARS.  I'm sorry.

11   A.  Okay.

12   Q.  I misspoke, I think.  I'm sorry.

13   A.  I just wanted to clarify, but PARS was the time

14   reporting system.

15   Q.  Yes.

16   A.  TIMS was a different system.

17   Q.  Okay.  My mistake.  Sorry.

18          So PARS was the timekeeping system and we'll talk

19   about PARS a little bit, but the employee himself or herself

20   entered their own time, correct?

21   A.  Correct.

22   Q.  And so Mr. Sanders would have been responsible for

23   entering his own time, correct?

24   A.  Correct.

25   Q.  And you agree, as I understand your testimony, you

1    issued this request or requirement to the people reporting

2    to you that they do that daily, right?

3    A.  Correct.

4    Q.  Not everybody did it daily, right?

5    A.  I don't have any -- I mean, I don't have documents in

6    front of me, but I'm sure there were examples where that was

7    missed.

8    Q.  But that's what you wanted them to do was enter it

9    daily.

10   A.  That would have been the correct behavior.

11   Q.  And they could actually enter their time before they

12   completed work for that day, right?

13   A.  They could.

14   Q.  There was no prohibition against that.

15   A.  It was not a best practice, no.  It was never something

16   that I asked my employees to do.

17   Q.  But again, there was no specific training on that

18   subject, right?

19   A.  Correct.

20   Q.  And then employees could go back in before the end of

21   the pay half and modify or change their time if the time

22   that they worked ended up being more or less, right?

23   A.  They had that ability, but it was the expectation that

24   they accurately reported it on the day of their work.

25   Q.  They could modify their time before the end of the pay

```
 1    half, right?
 2    A.  Yes.
 3    Q.  There were no performance evaluations, so to speak, for
 4    track inspectors, correct?
 5    A.  Are you saying similar to like what we would go through?
 6    Q.  Right, yeah.
 7    A.  Correct.
 8    Q.  And in fact, what there were evaluation forms based upon
 9    a ride-along, right?
10    A.  Correct.
11    Q.  And if we direct your attention to Plaintiff's 84 -- if
12    we could pull up Exhibit 84.
13              This is actually a track inspector evaluation form
14    for Mr. Sanders for the date 3-18, 2016, and you evaluated
15    Mr. Sanders on that day, right?
16    A.  That's what this reflects.
17    Q.  I may have been missing something, but I don't see
18    another track inspector evaluation form filled out by you
19    for Mr. Sanders.  Are there others?
20    A.  I thought there were.  I don't recall specifically who I
21    filled them out for and the frequency of them.
22    Q.  In any case, this is the form that you would fill out
23    that would be the documentation of whatever evaluation you
24    were doing of a track inspector based upon you riding along.
25    A.  Correct.
```

HOFFENRATH   CROSS

1   Q.  And you would decide when you wanted to do that as the

2   roadmaster, effectively Mr. Sanders' supervisor, correct?

3   A.  Correct.

4   Q.  There were times where you went to check on Mr. Sanders

5   as his supervisor, correct?

6   A.  Yes.

7   Q.  And you can't recall a time when you came upon

8   Mr. Sanders and he was not being efficient, right?

9   A.  Can you repeat the question?

10  Q.  Sure.  You cannot recall a time when you came upon

11  Mr. Sanders and he was not being efficient.

12  A.  I can't recall a specific time.

13  Q.  And you never issued discipline to him for not being

14  efficient.

15  A.  No.  No, I didn't.

16  Q.  Mr. Sanders often reported defects or slow orders as a

17  part of his job as a track inspector, right?

18  A.  Right.

19  Q.  You do remember that he was good at identifying defects,

20  right?

21  A.  I think overall he was good identifying and detected

22  defects.

23  Q.  You never had the feeling from a hi-rail trip with him

24  that he was reporting things that were not defects?

25  A.  Sorry.  Can you say that one more time?

HOFFENRATH   CROSS

```
1    Q.  Sure.  I'm happy to do that.  It has that negative --

2    maybe double negative.

3    A.  Yes.

4    Q.  You don't recall a time when you rode along with

5    Mr. Sanders that he was reporting things that were not

6    defects.

7    A.  Correct.  I don't recall him reporting things that were

8    not defects.

9    Q.  You would get calls from your own supervisor, Mr. Jones,

10   when Mr. Sanders reported a defect or a slow order, from

11   time to time you would get those calls, right?

12   A.  From time to time, yes.

13   Q.  And when asked earlier in your deposition if Mr. Jones

14   called concerned about those defects, I think you said,

15   "Absolutely."  Do you recall that?

16   A.  So the question is do I recall Mr. Jones calling me

17   about slow orders from time to time?  Yeah.  I don't --

18   like, I don't recall a specific example, but I do remember

19   having conversations about slow orders.

20   Q.  And do you recall Mr. Jones raising his voice during

21   those conversations?

22   A.  I don't remember specifically.  There were times where I

23   think we were both frustrated where the voices would get

24   raised, but I can't identify one slow order that would have

25   a corresponding phone conversation.
```

1     Q.  Do you recall Mr. Jones cursing --

2     A.  Yes.

3     Q.  -- during those calls?

4     A.  Sometimes.

5     Q.  Do you recall that on one occasion you actually took a

6     slow order out of the system?  I think you described that as

7     a mistake.

8     A.  Like I made the mistake by removing the slow order?  I

9     don't recall specifically what you're referring to.  I know

10    there was a slow order that was put in place, so I do have

11    recollection of a time where a slow order was -- the slow

12    order was set for, let's say, 40 miles an hour and the

13    actual track speed was 25, so it doesn't make sense to have

14    a slow order that's above the original track speed.  Again,

15    those are just numbers for context.  I don't remember the

16    specifics.  And I do remember calling and removing that slow

17    order because it didn't need to be there.

18    Q.  Sure.  You were asked earlier if your supervisors were

19    frustrated about slow orders -- by that I mean in your

20    deposition -- and you said, "Frustration is not the right

21    word."  Do you recall that?

22    A.  Vaguely.

23    Q.  So what is the right word?

24    A.  I don't know if there's just one word that you could use

25    to describe it.  It was something we were going to have to

1   manage through.  So there's a slow order that goes in place

2   and I think there -- there's more than just one word, right?

3   It disrupts the daily plan, now we're changing plans and

4   we're going to go through a process and we're going to get

5   it done because it's the right thing to do, but I don't -- I

6   mean, I don't know if there's one specific word.

7   Q.  Why is it the right thing to do?

8   A.  Why is it the right thing to do to put a slow order on?

9   Q.  Right.

10   A.  So we don't derail a train, so we can protect the trains

11   getting from point A to B.

12   Q.  And in part because if a track inspector like

13   Mr. Sanders sees something justifying a slow order, he's

14   obligated under law to put that slow order in place, right?

15   A.  Correct.

16   Q.  I mean, you're aware of that, right?

17   A.  Yeah.

18   Q.  In any case, I think you said that with respect to these

19   slow orders that were put in place, Mr. Jones was frustrated

20   and you were frustrated, right?

21   A.  Are you talking in general about slow orders or a

22   specific slow order?

23   Q.  I'm talking in general.

24   A.  I think they're just a fact of life that we would

25   have to -- that was our job, like, we put slow orders, we

1    protected the track, and then we mitigated the risk and

2    created a plan to fix them.  So for every slow order to say

3    that we were frustrated, I don't necessarily think that

4    that's 100 percent accurate.

5    Q.  There were certainly times when you were frustrated or

6    he was frustrated, right?

7    A.  I think that would be accurate.

8    Q.  And these slow orders and defects were slow orders and

9    defects that were oftentimes reported by Mr. Sanders, right?

10   A.  Correct.

11   Q.  At some point in time in November and early December of

12   2015, Mr. Sanders made a human resources complaint about

13   you, right?

14   A.  I -- apparently.  I don't know if I've ever really seen

15   the final conclusion about that.

16   Q.  You are aware that he made a human resources complaint

17   against you, right?

18   A.  Yes.  Or let me rephrase that.  I'm aware that he called

19   the hotline.  I don't know unless like a document's put in

20   place that it was specifically about me.

21   Q.  It was the only complaint ever made that related to you

22   that you knew about, right?

23   A.  I -- I don't think so.

24             MR. JAMES KASTER:  If we can pull up Exhibit 103,

25   page 43.  If we can blow up on the bottom of the page from

HOFFENRATH - CROSS

```
 1    line 12.  Actually, line 10 to the bottom, please.  Thank
 2    you.
 3    BY MR. JAMES KASTER?
 4    Q.  Mr. Mozinski at the investigative hearing -- you recall
 5    being at the investigative hearing, right?
 6    A.  Yes.
 7    Q.  Asked you how many HR complaints have been ever filed
 8    against you and you said, "I know of one," right?
 9    A.  Correct.
10    Q.  And Mr. Mozinski asked you:  "And who was that by?"
11    A.  Mr. Sanders.  Yeah.  So at this time, like, I had been
12    formally interviewed and had been working with someone in
13    HR, with Mr. Spire.  I know that that was one.
14         I know there was an instance prior where he
15    contacted the hotline in HR.  So there were just several
16    instances and I just don't know which ones you're
17    specifically asking for.
18    Q.  Well, Mr. Sanders, I think the record reflects, made an
19    HR complaint in late November and met with human resources
20    on December 7th.  Did you know that at the time?
21    A.  I don't recall specifically.  I don't recall the
22    specifics, but I know based on, like, some records and
23    things that have been brought to my attention that I
24    arranged for him or had worked with our HR -- I believe it
25    was Magenta -- for them to talk, and that's --
```

```
 1    Q.  You arranged for Mr. Sanders to talk to HR?

 2    A.  I don't know if I specifically arranged for it, but I

 3    gave Magenta the leeway to set up a time.  That's what I

 4    recall.

 5    Q.  So we're talking back in November-December of 2015; is

 6    that your recollection?

 7    A.  Yes.

 8    Q.  So you're saying that Mr. Sanders talked to you --

 9    A.  I don't recall who talked to me or if it was Magenta

10    that reached out to me or, like, the exact progression of

11    events that led them to being able to have their

12    conversation.

13    Q.  But you found out about this conversation at the time.

14    A.  At some point in that general time frame.

15    Q.  Well, I'm not -- I'm being specific now.  I'm asking you

16    about late November, early December of 2015.  Is that the

17    time period you're describing?

18    A.  Yes.

19    Q.  Sometime in December of 2015, you took the right to

20    Mr. Sanders to drive his work truck home away from him,

21    right?

22    A.  I don't recall the exact dates.  I do recall that he was

23    going to go on vacation and so we had him leave his work

24    truck at the facility -- or at Dayton's Bluff in the event

25    that we would need to utilize that.
```

HOFFENRATH - CROSS

1    Q.  So sometime in that time frame you did in fact tell

2    Mr. Sanders that he could not take a BNSF truck home to do

3    his job, right?

4    A.  At some point, yes.

5    Q.  And do you think that some point was in or around

6    December of 2015?

7    A.  Yes.

8    Q.  And at some point in mid-December of 2015, you changed

9    Mr. Sanders' work hours from 4/10s to 5/8s, right?

10   A.  Yes.

11   Q.  Mr. Sanders for a period of time transferred away from

12   your district and went to work in Northtown, right?

13   A.  Yes.

14   Q.  And I think the record reflects that he transferred back

15   on March 15th of 2016.  Do you recall that?

16   A.  I recall him coming back, but I don't remember the exact

17   dates.

18   Q.  Well, I think the record is clear about this, that he

19   came back on the 15th.  You don't have a different

20   recollection, right?

21   A.  I don't have anything that would say otherwise.

22   Q.  And we looked at that Exhibit 84 before and I want to

23   clear up something here about the 18th, because the 18th was

24   the ride-along performance review -- I don't know if you

25   call it that, but that performance --

HOFFENRATH   CROSS

```
1    A.  The track inspector evaluation.

2    Q.  Correct.  Thank you.  That was the date on that Exhibit

3    84 that we just looked at.  Do you recall that?

4    A.  One more time.

5    Q.  Sure.  The date on that form that we were looking at,

6    the ride-along, was March 18th of 2016.  Do you recall that?

7    A.  I recall the exhibit.

8    Q.  Okay.

9              MR. JAMES KASTER:  Let's for the witness as a

10   courtesy, we'll pull that exhibit back up so you can see the

11   date on it.

12   A.  Yup.

13   Q.  Do you see the date March 18th?  You can look at your

14   screen.  You don't have to turn your head around.

15   A.  Yeah, March 18th of 2016.

16   Q.  And I think the record will reflect that that was a

17   Friday.  Do you recall that?

18   A.  I believe that it was.

19   Q.  I want to clear up something, because I'm going to show

20   you what you said in the investigative transcript.

21             If we can pull up -- let's pull up page 38 of

22   Exhibit 103, please.  And if we can just blow up the bottom

23   of the page for everyone, because we're talking about

24   your -- the day of your first suspicion about time

25   exaggeration or time theft, and I think you describe it here
```

1    as Thursday the 18th.  Do you see that?

2    A.  Yes.

3    Q.  But it actually was Friday.  The 18th was a Friday,

4    right?

5    A.  I don't have a calendar in front of me and I -- I

6    don't -- it's too far back.

7    Q.  Sure.  Let's pull up another exhibit and see if we can

8    make this clear.  If we can pull up Exhibit 165.  And not

9    all the exhibit, so it's just page 5.

10          We can see a calendar.  This is an actual

11    calendar.  We can see that the 18th was a Friday.  Do you

12    see that?

13    A.  Okay.

14    Q.  And this is Mr. Sanders' calendar, so I'll just tell you

15    that the calendar says:  "Ride with Blaine," and then it

16    says:  "Leave early on Friday" if I can read that

17    handwriting.  Do you see that?

18    A.  I do see that.

19    Q.  And so do you believe that that was the day that you

20    rode along with Mr. Sanders, it was a Friday the 18th?

21    A.  I couldn't say for certainty.  Looking back at it,

22    again, either I messed up the date and it should have been

23    the 17th or we were gone on the 18th.

24    Q.  Well, let me ask you the question this way, and I don't

25    want to cut you off if you have something more to say.

HOFFENRATH - CROSS

1           Do you have an independent recollection that it

2      was a Friday or a Thursday?

3      A.  Of the -- the day of the ride-along?

4      Q.  Right.

5      A.  I don't.

6      Q.  Okay.  So you would have to rely on the records to

7      refresh your recollection about what the date was, what day

8      it was.

9      A.  So at some point of those several days I had done a

10     ride-along.  As to what date I exactly entered that

11     ride-along and what day it actually happened I don't

12     specifically recall.

13     Q.  And as I understand it, that was the first day that you

14     had any specific suspicion that Mr. Sanders was exaggerating

15     his time, right?

16     A.  I had a suspicion that just something wasn't adding up

17     that I needed to explore further.

18     Q.  Would it be fair to say that there was nothing concrete

19     that you had before that day?

20     A.  I think it was -- concrete would a way to say it, yeah.

21     Q.  A way to say what?

22     A.  That I had nothing concrete.  I think that was the first

23     time where there was, like, a triggering moment.

24     Q.  So that was --

25     A.  Something wasn't adding up.

HOFFENRATH   CROSS

1    Q.  Something wasn't adding up.  That was the triggering

2    moment that day.

3    A.  Yes.

4    Q.  Okay.  And as I understand it, Mr. Sanders told you that

5    he needed to leave by 3:00.

6    A.  That was what I had understood.

7    Q.  And you looked around at 3 o'clock or something like

8    that and he was not there.

9    A.  It would have been a little bit before 3:00.

10   Q.  A little bit before 3:00.  Like how much?

11   A.  Like -- probably like 2:30, 2:45.

12   Q.  Do you have an independent recollection of when it was?

13   A.  I remember towards the end of the day everyone was at

14   the shack wrapping up for the day, and typically -- I mean,

15   not typically -- people don't leave until 3:00 on the nose,

16   and so for him to have left anytime before 3 o'clock -- I

17   remember it as somewhere between 2:30 and 2:45 looking

18   around and him not being there.

19   Q.  You don't have any documentation of that day, right?

20   A.  No.

21   Q.  Did you have notes at one point?

22   A.  As far as that specific day?

23   Q.  Right.

24   A.  No, I don't recall.

25   Q.  You don't have a recollection of when Mr. Sanders

1    started that day?

2    A.  I didn't take exception to when he started that day.

3    Q.  Not my question.  Sorry.  You don't have a recollection

4    of when he started that day.

5    A.  No.

6    Q.  You don't know how many hours he reported for the day.

7    A.  No.

8    Q.  You acknowledge that Mr. Sanders told you consistent

9    with his calendar entry that he had to leave early.

10   A.  Say that again?

11   Q.  Do you acknowledge that consistent with his calendar,

12   Mr. Sanders told you that he had to leave early?

13   A.  I see that in his calendar he says he has to leave at

14   3:00.  That is not what I understood.  That's not what I

15   believe that he told me.  I believe that he said he had to

16   leave by 3:00 and those are two totally different planning

17   aspects.

18   Q.  So he told you, according to what you understood, that

19   he had to leave by 3:00, and by your recollection without

20   notes you think you he may have left at early as 2:45.

21   A.  Correct.

22   Q.  And that was the triggering moment.

23   A.  Yes.

24   Q.  You've never surveilled -- pardon me -- at the time,

25   this was the first employee you ever surveilled.

HOFFENRATH - CROSS

1   A.  I mean, it was my job to observe my people doing their

2   jobs, so it wouldn't have been the first time I've checked

3   on my employees.

4   Q.  Sure.  Did you ever -- and just out of curiosity, I

5   think the record reflects-- and you can confirm this -- that

6   you got a rental car for that purpose, right?

7   A.  No.

8   Q.  You didn't?

9   A.  I had a rental car.  I did not get a rental car for this

10  purpose.

11  Q.  If we can pull up page 98 of Exhibit 98, please.  So why

12  don't we blow up from 11 down to the bottom of the page.

13  Oh, I'm sorry.  Let's go to the top of the page first.

14          It says:  "You were in an unmarked car?"  Do you

15  see that?  You said:  "Yes."

16  A.  Yes.

17  Q.  "So I'm guessing BNSF rented the unmarked car?"  The

18  answer was:  "Yes."

19  A.  Correct.  It was a BNSF rental, but I did not rent it

20  for the purposes of this weekend.

21  Q.  Okay.  Just stay with me for a moment if you would.

22          "And you would need your supervisor's approval for

23  that, correct?"  And your answer was:  "To rent a car?"  And

24  Mr. Mozinski said:  "Yeah."  And you said:  "Yes."

25          Do you see that?

HOFFENRATH - CROSS

```
 1    A.  Yes.

 2    Q.  So was there a specific design around having an unmarked

 3    car that day?

 4    A.  What do you mean?

 5    Q.  Was that a part of whatever conversation you had with

 6    Mr. Jones?  Was it with Mr. Jones that you talked about

 7    getting this car?

 8    A.  So I did have a conversation with Mr. Jones that was a

 9    result of that day that we previously talked about.  But as

10    far as like wanting to observe Mr. Sanders without being in

11    a BNSF marked vehicle, we had a conversation on the means to

12    do that.

13    Q.  And his suggestion was what?

14    A.  At the time his BNSF-marked car was in the shop, or at

15    least that's what I recall, and so he so happened to have a

16    rental.  And so he said that I could just take his for the

17    weekend and he would take my BNSF vehicle for the weekend.

18    Q.  Do you have a personal car at the time?

19    A.  Did I have a personal car?  Yes.

20    Q.  Why not use the personal car?

21    A.  Because it -- in my opinion, it was because it was

22    work-related and there's just risk of driving my personal

23    vehicle on railroad right-of-way.  It made sense to have a

24    vehicle essentially that -- I want to say company vehicle,

25    but that's not accurate because it was a rented vehicle, but
```

HOFFENRATH - CROSS

```
1   something that BNSF essentially provided.

2   Q.  Was the point that it was unmarked?

3   A.  Was the point that -- I mean, yeah, I wanted to be -- or

4   it made sense to be in an unmarked vehicle.

5   Q.  As I understand it, you actually sat in the unmarked

6   vehicle across the tracks.

7   A.  At one point.

8   Q.  There are multiple tracks, like six tracks there, right?

9   A.  Yeah.

10  Q.  And trains often pass back and forth.

11  A.  Yup.

12  Q.  So you were on the opposite side of six or more railroad

13  tracks from the station house.

14  A.  Yeah.  I don't know the exact number of tracks.

15  Q.  So had you ever done that before, where you sat in an

16  marked car watching an employee from a distance?

17  A.  Like specifically based on, like, a suspicion?  No.

18  Q.  By the way, you say -- so let's just focus in on this,

19  because it's 3 o'clock on a Friday afternoon when you have

20  this triggering moment, right?

21  A.  Yes.

22  Q.  So the next morning you're out in the unmarked rental

23  car across the tracks from Mr. Sanders' station house,

24  right?

25  A.  Correct.
```

HOFFENRATH - CROSS

1    Q.  Early in the morning.

2    A.  Correct.

3    Q.  You arrived at what time?

4    A.  And we're talking about the 19th, correct?

5    Q.  Correct.

6    A.  Roughly 8 a.m.

7    Q.  When you say "roughly 8 a.m." --

8    A.  I mean, I noted it to be 8 a.m. and that's I believe

9    what I said in my investigation.  So at 8 a.m. I didn't see

10   him.

11   Q.  You were actually posting on Instagram at 8:30 a.m.,

12   right?

13   A.  Yeah.  Yes, I was.

14   Q.  From your car?

15   A.  I don't recall specifically where I was at.  I think I

16   made several posts that morning.

17   Q.  Did you go to a coffee shop?

18   A.  I did.

19   Q.  What time did you go to the coffee shop?

20   A.  I don't recall the exact sequence of events.  I recall

21   at 8 being at the Bluffs and not seeing Mr. Sanders, at 8:30

22   being back at the Bluffs and not seeing Mr. Sanders'

23   personal vehicle, and then at 9:15 I came back and his

24   personal vehicle was there.  So I don't remember if it was

25   the first 30 minutes I wasn't there or the second 45 minutes

1   when I went to the coffee shop, but it was within one of

2   those two breaks.

3   Q.  So you can't tell us how long you were at the coffee

4   shop.

5   A.  No.

6   Q.  There's not a coffee shop down there in that area.  You

7   must have come back into St. Paul or something.

8   A.  Yeah, it was a little ways from St. Paul.

9   Q.  So what coffee shop did you go to?

10  A.  I think it's called Quixotic.

11  Q.  Which is where?

12  A.  It's in St. Paul.  I don't know the cross streets.

13  Q.  Was that where you did your posting?

14  A.  It might have been.  Again, I don't recall specifically

15  where I posted from.

16  Q.  Your entire job that day was to watch and observe

17  Mr. Sanders, right?

18  A.  That's what I had gone into work on my off day for.

19  Q.  And you can't tell us how long you spent that morning in

20  the coffee shop posting on Instagram?

21  A.  My recollection is it takes a couple, like maybe a

22  minute or two, to post.  So I know I went to the coffee

23  shop.  I didn't spend an extraordinary amount of time on it.

24  Q.  Well, the time that I'm curious about, really, is the

25  time at the coffee shop, not necessarily how long it took

1    you to post those posts.  You don't know how long you were

2    at the coffee shop.

3    A.  I know that I was at Dayton's Bluff at 8:00, 8:30, and

4    9:15.  As to the exact time I spent driving somewhere,

5    coming back, I don't have that.

6    Q.  I think you said in the investigative hearing you did

7    not physically see Mr. Sanders at 8:30.  Do you recall

8    saying that?

9    A.  Yes.

10   Q.  You were actually posting on Instagram exactly at 8:30,

11   right?

12   A.  That's what everything says.

13   Q.  If you go to Dayton's Bluff, you walk around -- and I

14   don't know if it was like this at the time, but there are

15   lights on big poles and cameras all around the station

16   house.  Do you recall that?

17   A.  Not specifically.

18   Q.  BNSF has cameras on its properties around its station

19   houses, right?

20   A.  I believe so.  Yeah.

21   Q.  I mean, there's a lot of expensive equipment at the

22   station houses, right?

23   A.  Yes.

24   Q.  So the cameras make sense for security purposes.

25   A.  I don't know what their intent was.

1    Q.  Did you ever check to see if the cameras reflected

2    Mr. Sanders' comings and goings?

3    A.  No.  Again, I don't know specifically or I don't recall

4    specifically where those cameras were, so I don't recall

5    looking into that.

6    Q.  Bridal Veil is the same.  There are cameras.

7    A.  I don't know specifically where these cameras are.  I

8    can't speak to that.

9    Q.  Mr. Sanders had just come back to Dayton's Bluff a few

10   days before that, right?

11   A.  According to the documents, yes.

12   Q.  Employees have a locker, right?

13   A.  There are lockers at Dayton's Bluff, yes.

14   Q.  I mean, Mr. Sanders did not have a locker because he

15   just came back to Dayton's Bluff, right?

16   A.  I don't recall specifically.

17   Q.  So you don't have a recollection of where his locker

18   was.

19   A.  I know at some point he had talked about having a locker

20   at Bridal Veil, so ...

21   Q.  Mr. Sanders is able to -- by the way, let's back up a

22   second.

23           Do you recall telling Mr. Sanders that he needed

24   to clean out his locker at Bridal Veil?

25   A.  I don't remember the specifics, but there was a

HOFFENRATH   CROSS

1    conversation about where he was reporting and that needed to

2    be to Dayton's Bluff.

3    Q.  Okay, but my question is a little different.

4         Do you recall telling him that, "I don't want you

5    to have a locker at Bridal Veil"?

6    A.  I don't recall phrasing it like that.  I recall if he

7    wanted to keep stuff at Bridal Veil, that was his

8    prerogative, but at the beginning of the day, like, we

9    needed to be at Dayton's Bluff.  That's where he was

10   reporting.  And again, I don't recall the specifics, but

11   like my interpretation was I wasn't going to provide time to

12   shuttle back and forth to get stuff out of a locker that

13   wasn't at their reporting location.

14   Q.  So let me ask the question this way:  Do you have an

15   independent recollection that you did not tell Mr. Sanders

16   to clean out his locker at Bridal Veil?

17   A.  I'm going to need you to you repeat that, and then, is

18   there any way I can get some more water?

19   Q.  I'm sure.

20      (Pause - water supplied)

21   A.  Thank you.

22   Q.  Whenever you're ready.

23   A.  Go ahead.

24   Q.  So let me rephrase the question or repeat it.

25        Do you have an independent recollection that you

1    did not tell Mr. Sanders to clean out his locker at Bridal

2    Veil?

3    A.  The negatives are confusing me.  I mean, I think at some

4    point I told him to or I might have.

5    Q.  All right.  And you don't have an argument that -- well,

6    let me put it this way:

7              You don't object to an employee like Mr. Sanders

8    cleaning out his locker on company time.

9    A.  Again, this was a long time ago, so if it was something

10   that needed to be done, I would think that I would have

11   allowed him to clean it out, to bring all of his stuff to

12   Dayton's Bluff, and it wasn't worth an argument over if it

13   was going to be on company time or personal time.  Again,

14   that's a long time ago and I don't have, like, specific

15   recollections of the conversation.

16   Q.  By the way, before you showed up there that morning on

17   the 19th, did you have conversations with anyone besides

18   Mr. Jones about what you were going to do?

19   A.  Not that I recall.  It might have come up with another

20   roadmaster, but I don't -- I don't specifically recall.  I

21   recall our conversation.

22   Q.  How about labor relations?  Did you talk to them?

23   A.  I don't think that prior to the 19th we had talked to

24   them.  I don't recall.  I know there were conversations

25   afterwards with labor relations, but I don't remember

HOFFENRATH - CROSS

1    anything.

2    Q.  How about HR?  Did you talk to them?

3    A.  No, I don't remember talking to HR.

4    Q.  You were sitting across the tracks in a rental car for

5    the time period that you were there some 50 yards away from

6    the station house, right?

7    A.  Roughly.

8    Q.  Were you looking for something specific from

9    Mr. Sanders?

10   A.  What do you mean, like --

11   Q.  Were you focused on whether or not he would be

12   committing some kind of time violations or was it broader

13   than that?

14   A.  I was curious to see when no one was watching what his

15   day looked like on a weekend.

16   Q.  So you weren't focused in specific on time issues.

17   A.  I was or was not?

18   Q.  You were not.

19   A.  I would say that I was focused on time issues.

20   Q.  Okay.  But you were looking in general for what his day

21   looked like when no one was watching.

22   A.  Right.

23   Q.  For any violation.

24   A.  I mean, if something were to have come to fruition, it

25   would have been addressed, but mostly when he was coming and

1     going.

2     Q.  But not exclusively when he was coming and going.

3     A.  No.

4     Q.  You had notes of that day, the 19th, right?

5     A.  I would imagine I wrote something down, but I didn't

6     keep them for very long.

7     Q.  You threw them out.

8     A.  At some point.

9     Q.  When you say "at some point," when did you throw out

10    your notes of that day?

11    A.  I had used the notes to compare them to other records

12    and then used those for the investigation, so I don't know

13    when I would have got rid of them, but I recall, like,

14    formalizing my data for the investigation.

15    Q.  And then you threw them out.

16    A.  At some point.

17    Q.  You don't have any idea what Mr. Sanders was doing

18    before you first saw him at Dayton's Bluff that day, right?

19    A.  Correct.

20    Q.  And you don't have any idea what he was doing after he

21    left your view at Dayton's Bluff that day, right?

22    A.  Correct.

23    Q.  You acknowledge, as I understand it, that Mr. Sanders

24    said that for part of that day he had inspected track from

25    his personal vehicle, right?

 1   A.  Can you repeat the first part?

 2   Q.  Sure.  You acknowledge that Mr. Sanders has said that

 3   for part of that day he inspected track from his personal

 4   vehicle.  Do you recall?

 5   A.  I believe that's what was testified in the

 6   investigation.

 7   Q.  This was after you had taken away Mr. Sanders' work

 8   truck for going back and forth to work, right?

 9   A.  Correct.

10   Q.  Let's just look at an exhibit so we can be clear about

11   the kind of tracking that exists of an employee like

12   Mr. Sanders.

13        If you could pull up -- I'm having a hard time

14   seeing the pages here.

15             (Mr. Kaster confers with technician)

16        I'm going to pull up a document from the

17   investigative file, and as I understand it, this is a

18   hi-rail document that shows us -- so it will be up here in

19   just a moment.

20             THE COURT:  I don't think we have an exhibit

21   number, Mr. Kaster.

22             MR. JAMES KASTER:  It's Exhibit 98.  It's already

23   in.  This would be --

24             THE COURT:  Thank you.

25             MR. JAMES KASTER:  -- specific pages of that

HOFFENRATH - CROSS

1    exhibit.  Thank you, Your Honor.  It's 124 and 125 of

2    Exhibit 98, and then I'll be going with the witness to page

3    132.

4    BY MR. JAMES KASTER:

5    Q.  Can you read this?

6    A.  Mostly.

7    Q.  Yeah.  We can blow up a little section for you.

8              This is actually a document that tracks exactly

9    when Mr. Sanders would have gotten on the tracks in the

10   hi-rail vehicle that day, right?

11   A.  This document shows a little bit more than that, but

12   yes, it does show when he would have been, like, in hi-rail

13   mode.

14   Q.  When you say it "shows a little more than that," what do

15   you mean, please?

16   A.  There's an ignition column, so the ignition column is

17   highlighted in blue.  That would have been when he first

18   turned the vehicle on.

19   Q.  So that shows us that he turned the vehicle on, it looks

20   like, or at least by what would be 9 a.m., right?

21   A.  Correct.

22   Q.  And when it says "True" in the ignition column, then

23   that shows that the vehicle is on, correct?

24   A.  Correct.

25   Q.  And then when it goes from "False" to "True" in the

HOFFENRATH - CROSS

```
 1    hi-rail mode, that's when it shows that it's actually in
 2    motion on the rails, right?
 3    A.  His HLCS is engaged.
 4    Q.  I'm sorry.  What do you mean by that?
 5    A.  HLCS is the tracking, so yeah.  So when he's on track,
 6    then that'll populate as "True."
 7    Q.  And then if we go to the last page, page 132.
 8           MR. JAMES KASTER:  Thank you, Karla.
 9    BY MR. JAMES KASTER:
10    Q.  That'll show you when he goes -- and we've highlighted
11    this -- when the hi-rail mode goes from "True" to "False"
12    that day is when he's getting off the rail.
13    A.  Correct.  He's no longer on the track, but the ignition
14    is engaged.
15    Q.  All right.  And then it shows a period of time from
16    18:23 -- I'm sorry, 13:23 -- that would be 1:23, right --
17    A.  Correct.
18    Q.  -- until 1:48 when the vehicle is engaged and in
19    ignition, but he's no longer on the track, right?
20    A.  Correct.  So that would be him just driving the vehicle
21    or it's on and idle.
22    Q.  And do you recall him saying that he was coming from
23    St. Croix coming back to Dayton's Bluff?
24    A.  So I don't recall him saying that, but based on his
25    track authorities, that's what that document said.
```

HOFFENRATH - CROSS

```
1    Q.  And that time from when he left the St. Croix to
2    Dayton's Bluff driving back on the road would certainly be
3    work time.
4    A.  Correct.
5    Q.  So then it goes into "False" in that column where we
6    have a little blue ink written around it and you can see
7    that the vehicle is off, correct?
8    A.  Correct.
9    Q.  And that's at 1:48, correct?
10   A.  Correct.
11   Q.  And if Mr. Sanders hadn't taken lunch that day, he was
12   entitled to take a lunch, right?
13   A.  Correct.
14   Q.  And you don't know what he did after that time, right?
15   A.  What he did after?
16   Q.  He got back at 1:48.
17   A.  Right.  Correct.
18   Q.  I mean, his lunchtime would be work time, right?
19   A.  I forget how the contract reads for lunch.
20   Q.  He's entitled to take a lunch.
21   A.  I believe so.
22   Q.  As I understand it, the amount of time that you believe
23   that he stole on the 19th was two and a half hours, right?
24   A.  That sounds correct.
25   Q.  And that would be the hour and a half in the morning
```

HOFFENRATH - CROSS

1    before you saw him the first time, right?

2    A.  Yeah.  So you're saying prior to 8:45.

3    Q.  When was the first time that you saw him that day?

4    A.  I saw his vehicle at 9:15.

5    Q.  Okay.  So what I'm saying is, prior to the time that you

6    saw him, you're counting that as stolen time.

7    A.  I had done it based on 8:45.  So I was on property at

8    8:45 and didn't see him and I left, so he could have shown

9    up at 8:46, 8:47.  I wouldn't have seen that.  So when I

10   presented the information at the investigation, the benefit

11   of the doubt was 8:45 just because I physically didn't see

12   him arrive on property.

13   Q.  Was that when you left and went to the coffee shop?

14   A.  Excuse me.  8:30, not 8:45.

15        Again, I think I testified earlier I don't

16   remember which break I went to the coffee shop, so I don't

17   know.  And I don't recall what I was doing in the other

18   30-minute or other 45-minute break.

19   Q.  When were those knows 30- and 45-minute breaks?

20   A.  I believe I testified that I was on -- I looked for him

21   at 8:00.  He wasn't there.  I left and I came back at 8:30,

22   he still wasn't there, and when I came back at 9:15 he was

23   there.

24   Q.  Well, you were posting on Instagram exactly at 8:30,

25   right?

1    A.  That's when it sent and that's when it time stamped.  It

2    can time stamp and I can look it up and it still be 8:30.

3    So I'm saying I was able to visibly see at 8:30 that he was

4    not there.

5    Q.  So back to my question.  Are you suggesting that

6    Mr. Sanders stole two and a half hours on the 19th?

7    A.  Yes.  That was what was in the investigation.

8    Q.  Well, I'm asking you.  Is that what you're saying?

9    A.  I am a visual person, so it would have been from I

10   believe -- I would have to write it out.  I apologize for

11   that, but when I did the math it was two and a half hours.

12   Q.  Do you think theft is a serious accusation?

13   A.  Yes.

14   Q.  Do you think it can be career altering?

15   A.  Yes.

16   Q.  Does theft require taking something?

17   A.  Physical?

18   Q.  Taking something.  Does theft require taking something?

19          MS. DONESKY:  Objection.  Calls for a legal

20   conclusion.

21          THE COURT:  Overruled.

22   A.  So I'm answering?

23   Q.  Please.

24   A.  I believe so.

25   Q.  On the 25th -- and by the way, you got clearance from

751

1    whom to do this again the next weekend?

2    A.   There were conversations with Mr. Jones and I believe at

3    that point we had talked to labor relations, so it would

4    have been labor relations and Mr. Jones.  And I don't recall

5    anyone else having an input, but that's my recollection.

6    Q.   And what did you tell the people at labor relations?

7    A.   I had observed something suspicious.  And I don't know

8    the specifics, but I think there was something along the

9    lines, like, if it was a pattern or it was just a one-off,

10   and so that was what kind of led to the decision of the

11   following weekend doing the same observance.

12   Q.   When you said you observed something suspicious, what

13   did you say was suspicious?

14   A.   Just that he -- I'm going to just use 8:45 for reference

15   on the 19th, because he came sometime between 8:45 and -- or

16   sorry, excuse me -- 8:30 and 9:15.  He wasn't there at 8:30

17   and he was there at 9:15.  When I say he was there, I mean

18   his personal vehicle was in the parking lot.  The work

19   vehicle was being utilized.  So his start time was 7:00.  I

20   didn't see him or his vehicle until 9:15, or theoretically

21   8:30, and then I saw him leave property a little bit before

22   2:00.  And so that was suspicious, because his work hours

23   were 7:00 to 3:00.

24   Q.   Well, did you give that long explanation to the people

25   at labor relations?

HOFFENRATH - CROSS

1   A.  I would imagine so.  Again, I don't recall the

2   specifics, but there was a discrepancy from his working

3   hours and what I had observed.  I --

4   Q.  Did you tell the people -- I'm sorry.  I don't mean to

5   cut you off.

6   A.  No, I was just -- I'm done.

7   Q.  Did you tell the people at labor relations that you

8   spent some of the time in the morning at the coffee shop?

9   A.  I -- I don't know if I was that specific, but again,

10  like -- I mean, again, like I never -- I also never held

11  those 45 minutes in the two and a half hours.  When I said

12  things weren't accounted for, the time that I was -- didn't

13  see him physically arrive at work, like, I gave him the

14  benefit of the doubt.  So did I clarify exactly where I was?

15  I don't know and I don't recall, but even when we went to

16  investigation, like, it was acknowledged that I was not on

17  site from 8:30 to 9:15.

18  Q.  Okay.  When you say you gave him the benefit of the

19  doubt, did you tell people at labor relations:  "I don't

20  have any idea if he was working before I saw him and I don't

21  know if he was working after I last saw him"?

22  A.  I would have told them that this is what I observed and

23  this is his scheduled time, and so I don't know where he

24  was, or I wouldn't have known.

25  Q.  Who did you speak to at labor relations?  Do you recall?

HOFFENRATH - CROSS

1    A.  I don't -- I don't recall specifically.  I think that

2    Zahn Reuther would have been our labor relations person.  I

3    believe it was him.  I don't recall if there was any

4    additional labor relations people.  I recall working with

5    him in some capacity.

6    Q.  How many conversations did you have?

7    A.  I don't recall.

8    Q.  More than one?

9    A.  I don't -- with labor relations specifically?

10   Q.  Well, let's back up.  How many conversations did you

11   have with Mr. Jones in that time frame, from the 19th to the

12   25th, about this subject?

13   A.  Probably a handful.  I know it's not exact, but maybe

14   four or five.  So I would imagine that there's more than one

15   call with Zahn just as we're working through everything, but

16   I don't have specifics.

17   Q.  Was Mr. Jones directing your efforts on the 19th and the

18   25th and the 26th?

19   A.  He wasn't directing.  It was not a directive from him.

20   It was something that I wanted to deep dive and understand,

21   but it was something that we had discussed.

22   Q.  You used the same rental car the next weekend on the

23   25th and 26th, right?

24   A.  Yes.

25              THE COURT:  Mr. Kaster, if this is a good time to

```
 1    break for lunch.  We've been going for just a little over

 2    two hours.

 3              MR. JAMES KASTER:  That would be great.

 4              THE COURT:  Okay.  Here's what we'll do.  We're

 5    going to shorten the lunch period up just a little bit today

 6    to account for the fact that we're starting a bit late and

 7    to keep an eye on the weather, so we will take 45 minutes.

 8    We will resume at ten minutes to the hour.

 9              We'll recess.

10              MR. JAMES KASTER:  Thank you, Your Honor.

11              (Lunch recess taken at 12:06)

12                   *      *      *      *

13       (12:50 p.m.)

14                      IN OPEN COURT

15              THE COURT:  Thank you, everyone.  Please be

16    seated.

17              Before we resume, let me just give everybody a

18    sense of what we're going to do.  Our chief judge has the

19    authority to make such decisions and he has made the

20    decision to close the courthouse at 3 o'clock today, so we

21    are going to 3 o'clock and then we're going to end at that

22    time and account for the weather.

23              So, just to put everyone's mind at ease if you're

24    concerned about that and to give everybody a firm idea of

25    the plan, that's what we'll be doing.
```

```
 1                  Mr. Kaster?  Is Ms. Hoppenrath here?

 2                  MR. JAMES KASTER:  Thank you.  I think we lost our

 3       witness.

 4                  (Discussion off the record)

 5                     (Witness retrieved)

 6                  THE COURT:  Mr. Kaster?

 7                  MR. JAMES KASTER:  Thank you, Your Honor.

 8       BY MR. JAMES KASTER:

 9       Q.  Ms. Hoppenrath, I think you have a fresh water there if

10       you need it.

11       A.  Perfect.

12       Q.  Whenever you're ready.

13       A.  Yeah.  I'm ready.

14       Q.  Okay.  I'm going to circle back on just a couple of

15       quick things.  Let's go to Exhibit 98 at 137, please.

16                  This is actually -- if we can blow up the bottom

17       under "changing time" or next to "changing time."  This is a

18       part of the PATS policy manual.  Do you recognize this?

19       A.  I recognize this.

20       Q.  And in fact, there's a specific directive in the PATS

21       policy manual about how you change your time, right?

22       A.  That's what this states.

23       Q.  And then if we go to 139, there's specific policies on

24       changing time for an employee which tells you the steps to

25       go through for changing your time, right?
```

1    A.  Yes.  And just for clarification, I don't recall my

2    people using PATS.  I think that was an earlier version of

3    PARS, but I specifically was in the PARS realm, so just for

4    clarification.

5    Q.  Fair enough.  In any case, were there specific

6    directions like this for PARS on changing your time, do you

7    recall?

8    A.  I don't recall.

9    Q.  In any case, there were steps an employee could take to

10   go into the system and change his or her time, correct?

11   A.  Correct.

12   Q.  And that was something that was regularly used by

13   employees at the time, right?

14             MS. DONESKY:  Objection.  Foundation.

15             THE COURT:  Overruled.

16   A.  I don't have any data to say that it was regular, so I

17   couldn't give you a complete answer.

18   Q.  All right.  Let's leave that for now.  Thank you.

19             Exhibit 85, if we can pull that up.  We're just

20   going to finish up one more question on the 19th.

21             This is Mr. Sanders' summary that he wrote

22   March 19th.  He says my day Sunday, March 19th.  You had

23   Thursday, he said Sunday.  I think we've established that

24   March 19th was actually a Saturday, right?

25   A.  Yes.

HOFFENRATH   CROSS

1   Q.  In any case, he sends this at 2:27 p.m., right?

2   A.  That's what it stated, yes.

3   Q.  And him doing this daily report was a part of his

4   regular work, correct?

5   A.  Correct.

6   Q.  Let's go to the 25th.  You use the same rental car from

7   the 19th, correct?

8   A.  Correct.

9   Q.  The 25th is actually Good Friday.  Do you recall that?

10  A.  Yes.

11  Q.  Mr. Sanders sends a summary email like the one we were

12  just looking at.  If we can pull up Exhibit 90.

13           He accepted this at 2:39 p.m. on the 25th, that

14  Friday, right?

15  A.  Correct.

16  Q.  There was an original submission of -- on the time logs

17  of eight hours and one hour of overtime, correct, for that

18  day?

19  A.  I thought that that was the following day.  I thought it

20  was eight and eight and a half, eight of the holiday pay and

21  eight and a half for the overtime for the 25th, but I'd have

22  to verify that with the document.

23  Q.  We'll actually go through the records.  He eventually

24  changes his time to about four and a half hours for that

25  day, right?

HOFFENRATH - CROSS

```
 1    A.  That sounds correct.

 2    Q.  And he does that on the 29th.

 3    A.  I believe so.  That was a Tuesday morning.

 4    Q.  That was a Tuesday.  I believe that's correct.

 5    A.  Yes.

 6    Q.  From the four and a half hours, you believe that he

 7    overbilled by an hour and 15 minutes, right?

 8    A.  I believe so.  Yes.

 9    Q.  We can pull up that testimony if you need to have your

10    recollection refreshed.

11    A.  I recall seeing him at 7:00 and leaving at -- I don't --

12    I know I've looked at it, but I forget exactly when I said

13    that he had left.  And I don't want to confuse my days, but

14    I believe it was like 10:15ish.  That's what I believe --

15    Q.  All right.  Let's pull up 103, page 45.

16            In the middle of that page, if you could blow up

17    from what appears to be line 8 -- well maybe -- why don't we

18    give the benefit of the whole question, which is on line 4.

19            So we're talking about the 25th.  You're asked:

20    "What was his time?  And all I'm asking -- he was paid for

21    four and a half on that paycheck.  What are you guys

22    charging him with stealing?"  And you answered:  "From the

23    four hours and 30 minutes, an hour and 15 minutes."

24            Do you recall that?

25    A.  Yes.
```

1    Q.  Now let's go to the 26th.  That is the Saturday before

2    Easter, right?

3    A.  Correct.

4    Q.  And as I understand it, the claim is that he stole three

5    hours of time on the 26th, right?

6    A.  Sorry.  I am thinking about the math in my head.  That

7    sounds to be correct.

8    Q.  All right.  Why don't we go to the next page, page 46 of

9    Exhibit 103, and blow up from line 9 to the bottom.

10            So look at that testimony and see if we are in

11    fact talking about the 26th.  If you look at line 23, I

12    think that's helpful.

13    A.  Yes, so the three hours for that day.

14    Q.  So we're talking about two and a half hours on the 19th,

15    right?

16    A.  Correct.

17    Q.  And an hour and 15 minutes, right?

18    A.  Correct.

19    Q.  And then three hours.

20    A.  Correct.

21    Q.  I'm going to -- this might get a little tedious, but

22    we're going to walk through some of the time entries, okay?

23    A.  Okay.

24    Q.  If we can go to Exhibit 98.  I believe it's 118 to 119.

25            Oh, I'm sorry.  I have the wrong exhibit reference

1     there.  It is 124 and 125, but let's start at 124.  If we

2     could go to 124.

3               Actually, I have this page.  Exhibit 14, page 124.

4               MR. JAMES KASTER:  This is my mistake, Your Honor.

5     I'm going to go back to the first exhibit.  I apologize.

6               There we are.  We're going to start at the 19th.

7     We can talk about how this works.  If we can go to page

8     98 -- or Exhibit 98, page 118.

9               So let's start with -- we're looking at March 19th

10    in the system, right, the payroll -- this would be the PARS

11    system, right?

12    A.  Correct.

13    Q.  And we can see according to this that there's an entry

14    that's been entered for the 19th, right?

15    A.  Correct.

16    Q.  And if we look past -- into the next week, as of this

17    point there's an entry for the 20th and 21st.  The 22nd,

18    23rd and 24th have little men standing up.  What does that

19    mean?

20    A.  I don't recall what the men standing up means.

21    Q.  Does it refresh your recollection that it means that

22    Mr. Sanders or whomever this is is scheduled to work that

23    day?

24    A.  It sounds right.

25    Q.  And if the little man is laying down, do you recall if

1      that's a scheduled rest day?

2      A.  It would be a rest day.

3      Q.  Okay.  But in any case, that entry on the 19th

4      indicates -- the way that's entered indicates that time has

5      been entered for that day, correct?

6      A.  Correct.

7      Q.  And if we look at the time on this particular exhibit,

8      we look in the right-hand corner, we can see that this is as

9      of 2:59 p.m. on the 21st, correct?

10     A.  Correct.

11     Q.  And then if we look at page 119 of this exhibit, that

12     appears to be what is entered for the 19th, correct?

13     A.  Correct.

14     Q.  By the way, in this PARS system, was a supervisor

15     entitled to go in and make an entry or modify an entry for

16     an employee?

17     A.  I don't know if I was able to actually edit.  I never

18     did, but I did have viewing capabilities.

19     Q.  You don't know whether or not someone other than the

20     employee could make an entry.

21     A.  I don't know.

22     Q.  In any case, this shows us the entry is in for that day

23     as of -- and we've gone to the right-hand corner again on

24     the bottom of the exhibit.  That's again at 2:58 p.m. on the

25     21st.  You can see the time is entered for the 19th,

1    correct?

2    A.  Correct.

3    Q.  All right.  Let's go to the next page.  This would be

4    page 121.  It's marked as Exhibit 4, just the top of the

5    page, "Timely Reporting."  Do you recall what this is?

6    A.  Yes.  This would be a printout for our timely reporting

7    metric.  This was one of the -- I don't think dropdown's the

8    right word, but you could go in and look at individual

9    gangs, so this would have been his gang, which was just a

10   single person.

11   Q.  So this is Mr. Sanders' entries, right, shows you is a

12   summary of his entries?

13   A.  Correct.

14   Q.  All right.  Let's go to Exhibit 103 and start out at

15   124.

16              And now we're looking at the 25th, right?

17   A.  Correct.

18   Q.  And we see, according to this, anyway, there's an entry

19   for the 25th that's been submitted, right?

20   A.  Correct.

21   Q.  And we can see that that is as of -- why don't we look

22   at the time.  It appears that that's as of 3:25 at

23   3:41 p.m., right?

24   A.  Correct.

25   Q.  And then if we look at the next page, it's Trial Exhibit

HOFFENRATH - CROSS

```
1     125, if we can blow up the top of the entry.
2              Now, there's an entry for holiday time, which is I
3     think the overtime, eight hours and 30 minutes.  That's not
4     the issue, right?
5     A.  I would have to double-check with the investigation, but
6     I'm pretty sure it was, like, the straight eight was their
7     holiday pay and then anything they worked was the overtime,
8     so he would have entered the overtime hours.
9     Q.  I see.  So you're saying the eight hours is not the
10    issue.
11    A.  Correct.
12    Q.  Because he was entitled to holiday pay.
13    A.  Correct.
14    Q.  So it's the eight hours and 30 minutes that is entered
15    as of --
16    A.  Correct.
17    Q.  Just so we're clear, this is for what day?
18    A.  The 25th.  It's at the top in the red header.
19    Q.  And we're looking at this as of?
20    A.  I can't see the exhibit --
21    Q.  Okay.  The bottom right-hand corner?
22    A.  -- but I believe it was that Saturday.
23    Q.  We're going to pull up this.  You're looking at that
24    again as of 3:40 p.m. on the 25th, right?
25    A.  Correct.
```

HOFFENRATH - CROSS

1   Q.  Now I'm going to go to page 127, because this has the

2   26th and it has the little guy standing up for the 26th.  Do

3   you see that?

4   A.  Yes.

5   Q.  And this is as of -- let's look at the date.  6:59 a.m.?

6   A.  So to my recollection, for whatever reason when I was

7   screen-printing these, it didn't grab that date.  It was not

8   intentional.  It was something that was brought up in the

9   investigation and it was brought up -- or like I had noticed

10  it when I was preparing for the investigation, but I -- as

11  of that Tuesday morning on the 29th at 6:59, I didn't see

12  any time that was entered.  So I recall looking at this

13  Tuesday morning, but again, like, it wasn't intentional.

14  There was no -- I didn't mean to do it.  So ...

15  Q.  Well, that's my question.  This is as of the 29th,

16  6:59 a.m.

17  A.  Correct, yes, on Tuesday the 29th.

18  Q.  On Tuesday the 29th.

19  A.  Yes.

20  Q.  He has not entered time for the 26th, right?

21  A.  Correct.

22  Q.  So let's go to page 143, and we may have to back up to

23  142.  Well, let's start at 142, Exhibit 142.

24          Because we can see at this point in time there is

25  time entered for the 26th, right?

HOFFENRATH - CROSS

1    A.  Correct.

2    Q.  And if we show the time, this is as of 7:26 a.m.?

3    A.  Correct.

4    Q.  Mr. Sanders actually comes in on the 29th for the first

5    time after the 26th, right?

6    A.  Correct.

7    Q.  And he's in in the morning at the station house on the

8    computer, right?

9    A.  Correct.

10                MS. DONESKY:  Objection.  Foundation.

11   BY MR. JAMES KASTER:

12   Q.  Did you hear this?

13   A.  Did I hear what?

14   Q.  That he was in the station house when Mr. Jones walked

15   in.

16   A.  Excuse me.  No.  I wasn't -- I'm sorry.  I was not there

17   physically on the 29th, so based on this, like, he was on

18   his computer entering time at some point, but I was not

19   physically there.

20   Q.  So if we go to the next page, 143, this appears to

21   be -- and we can show the time -- it appears to be an entry

22   for that day, the 26th, and it's at 7:25 a.m., correct?

23   A.  Correct.

24   Q.  So time is entered, according to this record, for the

25   26th on the morning of the 29th.

HOPPENRATH - CROSS

1   A.  Correct.

2   Q.  You are required to review payroll every two weeks and

3   approve it before it gets paid, right?

4   A.  I believe that was.  If it didn't get approved, they

5   would still get paid, but it was an expectation to approve

6   time.

7   Q.  To go through that system we just looked at it and

8   approve it.

9   A.  I don't think it was that system.  I wasn't physically

10   going into PARS.  I could if I wanted to, but I think the

11   time approvals came through a different mean.

12   Q.  All right.  Let's pull up Exhibit 103, page 50.  Go to

13   the top of the page.

14           You were asked the same question in the

15   investigatory hearing that I just asked you.

16           "Mr. Mozinski:  I do have a question.  Um, do you

17   review the time?  You're required to review the time roll

18   every two weeks, correct?"

19           And your answer was:  "Correct."

20   A.  Yes.

21   Q.  Would it be fair to say that you had a better

22   recollection of these events at the time of the

23   investigatory hearing than today?

24   A.  Sorry.  Can you repeat the question?

25   Q.  Did you have a better recollection of these events at

HOFFENRATH - CROSS

1    the time of the investigatory hearing than today?

2    A.  Yes, but I -- never mind.

3    Q.  You admit, as we've discussed at some length, that

4    employees could go back and change their time before the end

5    of the payroll half.

6    A.  Correct.

7    Q.  Were you aware of the fact that Mr. Sanders was entitled

8    to notice of any problem with his payroll or time entries?

9    Are you aware of that?

10   A.  I'm not a hundred percent sure what you're referring to.

11   Q.  All right.  Did you ever hear that an employee like

12   Mr. Sanders was entitled to notice of any problem with his

13   time entries or her time entries before someone suggested

14   that there was some wrongdoing involved?

15   A.  I don't recall that.

16   Q.  You had many conversations with different people as you

17   were going through this process in both labor relations,

18   Mr. Jones, and others, right?

19   A.  Yes.

20   Q.  Did anyone tell you that Mr. Sanders was entitled to

21   notice of any problem with his time entries?

22   A.  I don't recall anyone telling me that.

23   Q.  Let me ask you if you have a recollection of this,

24   Exhibit 98 at 145.  Now, this is actually before your time,

25   at least as of the date on this newsletter, but I'm

1   wondering if you ever saw something like this.

2          Did you ever -- let me ask this question before we

3   go into the newsletter:

4          Do you remember ever hearing about a cut letter?

5   A.  Yes.

6   Q.  What was a cut letter?

7   A.  I don't recall the specifics, it's been awhile, so I --

8   I know it was something -- or I think that it was something

9   that came from, like, the Manpower timekeeping office.  I

10  don't recall exactly how they came about or what would

11  trigger a cut letter or what the process was.  I'm

12  unfamiliar with how -- how or why something would be flagged

13  and why a cut letter would be sent.

14  Q.  Are you familiar with the fact that if you or a

15  supervisor like you contended that an employee had not in

16  fact worked a given day or a given amount of time on a given

17  day, that a cut letter would routinely be sent?

18  A.  So I'm not familiar.  Again, I don't know -- I don't

19  know how those cut letters are generated.  It wasn't a

20  well-known process to myself.

21  Q.  In the conversations that you had from 3 o'clock or

22  about 3 o'clock on the 19th until the investigatory hearing,

23  did anyone suggest that maybe Mr. Sanders should receive a

24  cut letter?

25  A.  I don't recall any conversation of that nature.

HOFFENRATH - CROSS

```
1   Q.  Or that maybe Mr. Sanders was entitled to notice.

2   A.  I don't recall anyone saying that.

3   Q.  Or that maybe Mr. Sanders was entitled to someone having

4   a conversation with him?

5   A.  I don't recall anyone saying that.

6   Q.  By the way, do you recall knowing about the red letter

7   "A"?  In other words, if a supervisor didn't approve the

8   time in the system, you could superimpose a red letter "A"

9   denying the time?

10  A.  It sounds familiar or plausible, but I never utilized

11  that.

12  Q.  So on the 29th, Mr. Sanders attempts to modify his

13  entries for the 25th and 26th, right?

14          MS. DONESKY:  Objection.  Foundation.

15          THE COURT:  Sustained.

16  BY MR. JAMES KASTER:

17  Q.  Well, did you become aware on the 29th that Mr. Sanders

18  had attempted to modify his entries for the 25th and 26th?

19  A.  Yes.

20  Q.  In fact, you testified about that in the investigatory

21  hearing, right?  If we go to Exhibit 103 at page 49.  And

22  you were asked in the middle of the page -- let's start at

23  line 10:

24          You're asked why you didn't have a conversation

25  with Mr. Sanders, and at line 12 you say:
```

1              "Well, we could have.  We decided to restrict his

2    access and it would come up in the investigation, and then

3    we would use this as a chance to gather all the facts of the

4    case."

5    A.  Is this a conversation referring about modifying his

6    time specifically?

7    Q.  It's a conversation about cutting him off.

8    A.  Cutting him off?

9    Q.  From access to his computer so he couldn't make any more

10   modifications.

11   A.  Yeah.  So like I testified, we could have.  We decided

12   to restrict his access.  That was from the conversations

13   that we had had with labor relations.  So that was not a

14   decision I solely made on my own.  We sought counsel from

15   our LR department.

16   Q.  All right.  So this is happening in realtime on the

17   morning of the 29th, right?

18   A.  Which part?

19   Q.  The conversations and the decision to restrict his

20   access.

21   A.  I don't recall if that was the morning of the 29th or if

22   that had been conversation either the -- like the Monday

23   before.  I don't know the specific timeframe of when we

24   talked about restricting access.  Yeah.

25   Q.  Who's "we"?

1   A.  It would have been me and Mr. Jones and the labor

2   relations team.  I don't know -- I don't recall really

3   anyone else extremely involved in it.  There might have been

4   conversations with Mr. Jones's boss, just like as a courtesy

5   to loop him in, but I don't recall -- I recall labor

6   relations and Mr. Jones specifically talking about --

7   talking about this particular matter.

8   Q.  Talking about the fact that Mr. Sanders was accessing

9   his time for the weekend of the 25th and 26th and a decision

10  was made to cut him off.

11  A.  I would say the decision about if -- because -- because

12  in the investigation notice we removed him from service, so

13  it was a conversation about what that was, like, going to

14  look like when he was actually removed from service.

15  Q.  What prompted the decision to restrict his access was

16  noticing that he had changed his time.

17  A.  No.

18  Q.  No?

19  A.  I don't believe so.  I don't recall that being it.

20  Q.  I want to go back to -- let's go to Exhibits 52 and 53,

21  please.  It's actually 91 and 92.

22          MR. JAMES KASTER:  I apologize, Your Honor.

23  Q.  Let's go to Exhibits 91 and 92.

24          So 91 is the notice of investigation for the 19th,

25  correct?

1    A.  Correct.

2    Q.  And this was actually prepared, it looks like, by

3    Mr. Jones on the 28th.

4    A.  I know it was Mr. Jones's name, but I don't know if he's

5    the one who physically prepared this.

6    Q.  Who do you think physically prepared this?

7    A.  I think it would have been one of the admins or the

8    SESes.  We all -- I mean, there's input that goes into it,

9    but typically the SES would.

10   Q.  Input from who?

11   A.  What do you mean?  Input like -- so I would say this is

12   what I -- this is what I need an investigation for, and then

13   from there it would get entered into our -- I can't even

14   think of the name, but the system that would generate the

15   notices.  And then typically would look at a draft and then

16   make adjustments as needed until it was what we wanted it to

17   reflect.

18   Q.  There were two notices.  We'll get to 93 in a moment,

19   but this 92 is for the 19th, correct?

20   A.  Correct.

21   Q.  And again, according to the date, it was prepared on the

22   28th, correct?

23   A.  Correct.

24   Q.  And that would be the Monday before the Tuesday that we

25   were just talking about, right?

HOFFENRATH - CROSS

```
1    A.  Yes.

2    Q.  Okay.  So let's take a look at the next notice.  This

3    would be Exhibit 93.

4              MR. JAMES KASTER:  I'm sorry.  Did I say that

5    wrong?

6              MS. PATHMANN:  92.

7              MR. JAMES KASTER:  92.  Thank you, Karla.

8    BY MR. JAMES KASTER:

9    Q.  And this is for the 25th, beginning on the 25th, right?

10   A.  Correct.

11   Q.  And there was some dispute in the investigatory hearing

12   about whether the 26th was something that was noticed and

13   part of this notice of investigation.  Do you recall that?

14   A.  I recall a little bit of that.

15   Q.  Yeah.  Was it your view that the 26th was supposed to be

16   included in this notice of investigation?

17   A.  Yes.

18   Q.  This was also prepared on the 28th of March.  Do you see

19   that?

20   A.  I would like to clarify that this was dated on the 28th.

21   As someone who's made notices before, it can be a multi-day

22   process.  So just for clarification, that the final date for

23   these was the 28th.  I just want to note that, that yes,

24   this is dated the 28th, but it could have been -- this one

25   wouldn't have been because of the weekend, but for the
```

1    previous one.

2    Q.  All right.  But one thing that the record is clear about

3    is that Mr. Sanders, or whomever, had not entered any time

4    for the 26th as of this date, right?

5    A.  Correct.

6    Q.  And now let's go back to Exhibit 98, Trial Exhibit

7    121 -- or page 121.  That is Exhibit 4 in the investigatory

8    hearing.  We looked at this before.

9            As you had testified, this was a reflection of

10   Mr. Sanders' entries in his time, or at least according to

11   the record that's what it's supposed to be, right?

12   A.  Can you say that one more time?

13   Q.  Yes.  As I understood your testimony earlier, this was a

14   reflection of Mr. Sanders' time entries, this document.

15   A.  It contained information, so again, it has, like, the

16   latest reporting, so there is information about when they

17   report time on this document.

18   Q.  Okay.  So let's take a look at this at the bottom of the

19   page, if blow up the whole bottom, because this is an

20   entry -- current viewing time is March 31st of 2016, right?

21   A.  Is that at the bottom of the page?

22   Q.  I'm sorry.  The very last sentence at the bottom of the

23   page --

24   A.  Oh, yes.

25   Q.  -- tells us that this is being looked at on March 31st,

1    2016.  Do you see that?

2    A.  Correct.

3    Q.  And according to this, is there an entry for the 25th?

4    A.  I don't see an entry for the 25th.

5    Q.  All throughout this time period you are having

6    conversations with Mr. Jones and labor relations, right?

7    A.  Correct.

8    Q.  About Mr. Sanders.

9    A.  Correct.

10   Q.  And this is before payroll is run for that time period,

11   you're having these conversations before payroll has been

12   run.

13   A.  Correct.

14   Q.  Let's take a look at Exhibit 173.  And I'll open this up

15   to the first page of the document and let's just hold this.

16            This is a run of payroll for Mr. Sanders.  So I

17   want to ask this question:

18            Was there a conversation with Mr. Jones and labor

19   relations about whether or not to pay Mr. Sanders for the

20   disputed time before payroll was run?

21   A.  I did not have that conversation with labor relations,

22   so I was not privy to anything about actually paying him.  I

23   don't recall anything.  I've never seen -- I don't recall

24   seeing a document that looks like this.

25   Q.  Did someone consult with you about whether or not he

```
1    should be paid?

2    A.  I don't remember any.

3    Q.  Do you think he should have been paid for the time that

4    you disputed?

5    A.  I would have deflected to labor relations for that kind

6    of question.  That's something so far out of the scope of my

7    job that I don't think it's fair for me to have an opinion.

8    Q.  At the time payroll was cut, you had made whatever

9    observations you were going to make about the 19th, the 25th

10   and the 26th, right?

11   A.  Correct.

12   Q.  And you had communicated your concerns and your dispute

13   about his time entries to Mr. Jones and labor relations,

14   right?

15   A.  Correct.

16   Q.  By the time payroll is cut.

17   A.  Correct.

18   Q.  So let's look at page 9, trial exhibit page 9, of

19   Exhibit 173.

20          Because we can see, I think, if we go to the

21   bottom of the page --

22          MR. JAMES KASTER:  Go to line 291, please, Karla.

23   Q.  We can see that someone decided to pay Mr. Sanders for

24   the 19th, right?

25   A.  Apparently.  I don't know what this document is and I've
```

1    never seen it.  So if that's what you're saying it is, then

2    yes, but I've never seen -- I don't remember seeing anything

3    like this or having access to something about what he was

4    physically paid.

5    Q.  Did you have a conversation with Mr. Jones or labor

6    relations, anyone, about the fact that you couldn't possibly

7    have payroll theft if Mr. Sanders wasn't paid?

8    A.  Can you say that question again?

9    Q.  Sure.  Did someone decide to pay him specifically?

10   A.  I don't know how the process works for this, so I don't

11   know if this is -- I don't know what the process is.  I

12   don't know if it was someone or the system that paid him.

13   That was beyond the scope of my job.

14   Q.  All these conversations are being had with labor

15   relations and Mr. Jones before Mr. Sanders is actually paid,

16   right?

17   A.  Yes.

18   Q.  So let's take a look at the next page, page 10.

19          Because if we look at the 25th, it looks like

20   Mr. Sanders is paid for the modified entry, four hours and

21   30 minutes, right?

22   A.  That's what this document appears to show.

23   Q.  Then he's paid for eight hours on the 26th, right?

24   A.  Again, that's what this document appears to show.

25   Q.  In your next performance appraisal, you were actually

HOPPENRATH - CROSS

```
1    commended for your part in Mr. Sanders' termination.
2              Do you recall that?
3    A.  I believe it was -- there was a comment about -- excuse
4    me.  Let me start over.
5              There's a comment in my performance review about
6    holding Mr. Sanders accountable.
7    Q.  You were personally commended for your courageous
8    leadership with holding Mr. Sanders accountable --
9              MS. DONESKY:  Objection.  Relevance, hearsay.
10   Q.  -- right?
11             THE COURT:  Overruled.
12   A.  Can you repeat the question?
13   Q.  You were personally commended for your courageous
14   leadership in holding Mr. Sanders accountable, right?
15   A.  I believe that's what the review says.
16             MR. JAMES KASTER:  That's all the questions I have
17   for the witness.  Thank you.
18             THE COURT:  Ms. Donesky?
19             MS. DONESKY:  Thank you.
20             THE COURT:  Mr. Kaster, I think you left your
21   water bottle there.
22             MR. JAMES KASTER:  I'm sorry.
23             THE COURT:  We just don't want them getting mixed
24   up.
25             MR. JAMES KASTER:  Oh, fine.  Thanks.  I
```

1    appreciate that, Your Honor.  Thank you.

2                    **DIRECT EXAMINATION**

3    BY MS. DONESKY:

4    Q.  Good afternoon, Ms. Hoppenrath.

5    A.  Hello.

6    Q.  We spent the morning discussing various exhibits,

7    portions of a record that was created back in 2016 when you

8    were a witness at these investigative hearings.  What I

9    would like to do for the benefit of the jury is to walk you

10   through each of the days of your observations and then your

11   testimony at the hearings with the exhibits consecutively

12   and we'll go through those, okay?

13   A.  Okay.

14   Q.  So let's begin with what led you, Ms. Hoppenrath, to

15   decide to observe Mr. Sanders at work on March 19th, 2016?

16   A.  So at some point a conversation was had with Mr. Sanders

17   and myself prior to that afternoon.  My interpretation was

18   that he needed to leave by 3:00, not necessarily early.  And

19   that's important, because there's so many things that go on

20   during the day that if I need to know he needs to leave by

21   3:00, I can still contact him if needed or if something

22   comes up, like he's an available to person to help run the

23   territory.  And he was someone who typically did work past

24   3 p.m., so it was like I need to make a conscious effort to

25   make sure that he can get out of here on time and support

HOPPENRATH - DIRECT

1    his need to take care of whatever it was that day.

2            So, I was under the impression that he was going

3    to stay till 3:00.  When I noticed that he had left early,

4    it just was something that didn't sit right with me.  Again,

5    it wasn't a lot of time, but typically, like, the guys would

6    leave at 3 o'clock on the button.  You'd see kinda everyone

7    filter out of the section house at that point in time.

8            And so it was just something that I wanted to look

9    into more and with the weekend coming up it provided an

10   opportunity to do so.

11   Q.  And at that point and based on that personal observation

12   that you just described, what did you do next?

13   A.  To the best of my recollection, at some point I had had

14   the conversation with Mr. Jones explaining, like, what I had

15   saw -- or what I had seen, and then at that point, like, he

16   said that it would be okay if I looked -- or if I observed

17   him over the weekend.

18           And I don't remember exactly how it came to

19   fruition, but there was just -- not the observation, but I

20   believe Mr. Jones had said, "Well, you know, my Suburban is

21   in the shop and I have a rental," so that just kind of made

22   sense and it fell into place a little bit.

23   Q.  And explain why in the situation in terms of your

24   observation why using a non-BNSF or your own personal

25   vehicle made sense to you to conduct the observation.

1    A.  Again, like, I just wanted to observe Mr. Sanders in a

2    manner where there wasn't a perception that he was being

3    watched, and being in a -- in my BNSF vehicle would -- he

4    would have known I was out there.  You kind of understand

5    whose work trucks belong to what people.

6            And again, I mentioned it earlier, but it was a

7    work-related -- it was a work-related function and I just

8    wouldn't have taken my personal car for something like that,

9    and so that -- so that's why I was not in my personal

10   vehicle either.

11   Q.  Was there a sense that if you didn't have a vehicle,

12   that the use of an unmarked vehicle would enable you to

13   observe him without modifying his conduct if he knew you

14   were looking on?

15   A.  Correct.  It was essentially to see, like, what would he

16   do if he believed that no one was watching.

17   Q.  And do track inspectors like Mr. Sanders during that

18   time period, are they employees who generally work on their

19   own?

20   A.  Generally.  I mean, the process of inspecting more often

21   than not is done on an individual basis.

22   Q.  Without supervision?

23   A.  Correct.

24   Q.  So by being in an unmarked car, you were creating that

25   similar type of environment?

HOPPENRATH - DIRECT

```
 1    A.  Correct.
 2    Q.  So let's move to Saturday of -- March 19th.  Was there a
 3    reason why you observed him on a Saturday?
 4    A.  Yeah.  So one of the advantages of being in on a
 5    Saturday was I -- I didn't have another work group that was
 6    scheduled to work that Saturday, so it was easier to manage
 7    exactly what -- or it was easier to observe without having
 8    to deal with phone calls, the transportation team, any other
 9    things that would come up.  I don't recall if I was on call
10    that weekend, but there's just less distraction.
11    Q.  You mentioned two reasons.  What was the other reason?
12    A.  I didn't have work groups, and then it was just less --
13    sorry.  Less work groups and then less, just other
14    day-to-day functions that I didn't have to manage.
15    Q.  So walk through what you personally observed regarding
16    Mr. Sanders on that Saturday.
17    A.  So I -- I know I've already testified a little bit about
18    this, but I drove down to Dayton's Bluff and I arrived the
19    first time around 8:00, didn't see anyone.
20    Q.  Let me stop you there, because you go at 8:00.  No
21    activity, you're saying?
22    A.  Yeah.  I guess when I say I didn't see anyone, I didn't
23    see Mr. Sanders' personal vehicle nor did I see the hi-rail
24    vehicle had been moved.
25    Q.  And what are his scheduled hours?
```

HOPPENRATH - DIRECT

1    A.  7 a.m. to 3 p.m.

2    Q.  So you arrived at 8:00 and don't see anything.

3    A.  Correct.

4    Q.  And the 7-to-3 hours, are those part of the union

5    position as to what those hours are defined to be?

6    A.  So his position was bid as 7 to 3.

7    Q.  Carry on.  Sorry.  I just wanted to clarify that.

8    A.  Yeah.  And then again, I had left the property and I

9    came back around 8:30 and still didn't see his personal

10   vehicle, and then I left again, and then at 9:15 he had come

11   back -- or excuse me -- I had come back at 9:15 and his

12   personal vehicle was in the lot and then the hi-rail vehicle

13   was getting ready to be used.

14   Q.  And what time was that again?

15   A.  It was roughly 9:30 was when I observed it.  Or let me

16   rephrase that.  Sorry.  I think I misspoke.

17          I remember seeing his vehicle at 9:15, and then I

18   looked to see if there was track and time and if he would

19   have been inspecting at that point.

20   Q.  Okay.  So track and time, can you explain for the jury

21   what that means.

22   A.  Yeah.  So track and time is a form of protection.  So

23   we're super concerned about safety, and if we're out

24   inspecting track, we want to make sure that we have the

25   correct authority to be on the track.

1          So, track and time is something that we work with
2     with the dispatcher, and once the dispatcher grants a
3     segment of track, it will essentially put up red signals
4     around the location that you have so trains don't enter into
5     your workspace.  So it's a safety measure.  It's a form of
6     authority to be on the track.  And so it's something that
7     the track inspectors will get when they first hi-rail.  So
8     if you're hi-railing on my territory specifically, track and
9     time was the most common way to protect yourself.
10    Q.  And it sounds like there's recordings of times as to
11    when that hi-rail vehicle gets into operation?
12    A.  Yeah.  So it's in, like, the TMDS system and essentially
13    you can see where their track and time is.  I can see a
14    visual representation of where my people are.  Like on a
15    normal day when there's several work groups out, you can see
16    where the authority is.  So in this instance it was only
17    Mr. Sanders, that I recall, being out there.  But then you
18    can also go in retroactively and get essentially like a
19    printout of all of their authorities for that day.
20    Q.  And was a hi-rail vehicle the method or the main method
21    in which Mr. Sanders conducted his inspections?
22    A.  It was the primary form of inspection.  You can cover a
23    lot of territory relatively quickly in a vehicle.  There
24    were other different frequencies where you would have a
25    walking inspection and things of that nature, but for the

1    primary function of a track inspector it was typically the

2    hi-rail.

3    Q.  Do you recall what track and time authority was obtained

4    on that morning?

5    A.  I would have to look to verify, but I want to say it was

6    around 9:20.

7    Q.  And we'll look at those records shortly.

8          So after that, once you see the track time

9    authority, did you determine he was going to start

10   working --

11   A.  Yeah.  So I -- I mean, he was there, he was getting

12   time, he was moving along efficiently.  I don't recall him

13   having any problems with the dispatcher getting track and

14   time that day, so he was essentially performing his job

15   functions.

16   Q.  And so what were your next observations related to

17   Mr. Sanders on that day?

18   A.  So I noticed that -- again, I have my laptop, so I'm

19   able to see this remotely -- that he ended up in St. Croix,

20   which is 25 minutes, give or take.  I forget the exact

21   distance, but it's about 20, 25 minutes away from Dayton's

22   Bluff yard or his reporting location.

23          And then I believe he gave up -- when we say "gave

24   up" his authority, it means they're off the track, they're

25   in the clear, the dispatcher can now safely run trains.  So

1    he gave up his time I want to say around 1:15, and then I

2    recall him coming back to the shack I want to say around

3    1:50, 1:55.  I think in the investigation I specifically

4    said 1:53.

5    Q.  So when you that the track authority was given up

6    roughly around 1:15, what did you do then as a result when

7    you -- you said you had a laptop that was -- were you not at

8    Dayton's Bluff at the time when you saw the --

9    A.  I don't --

10   Q.  -- track authority?

11   A.  -- recall exactly where he was when he gave track and

12   time up, but it was a pretty standard run.  He started at

13   Dayton's Bluff, you go towards Northtown and you go back out

14   towards St. Croix.  So I was able to, like, visually be --

15   or be in a position where I could visually see the depot.

16          And just for clarification, Dayton's Bluff, the

17   shack, the depot, they're all referring to our reporting

18   location, so if I interchange those, I apologize.  But I

19   just was curious to see when he got back what would he do,

20   and then I observed him leaving and I believe it was a

21   little bit before 2:00.

22   Q.  And he was leaving in which vehicle?

23   A.  His personal vehicle.

24   Q.  Did you see him at work at any other time after that

25   1:53 p.m. time?

1    A.  No.

2    Q.  So after observing him on that day, what did you do

3    next?

4    A.  After observing him that day, waited for time roll, what

5    would it look like in PARS, and then on Monday -- I think it

6    would have been Monday.  I don't recall having conversations

7    over the weekend.  I might have.  There would have been a

8    time where then Mr. Jones and I have further conversations

9    about our next steps.

10   Q.  Based on your observations of that day and knowing his

11   scheduled time was 7 to 3, based on the times that you

12   observed him visually and based on the track activity that

13   you had looked at at that time, did you notice then a

14   discrepancy -- or even though you didn't know his hours, did

15   you notice that he didn't work visually, your own

16   observation, from 7 to 3?

17   A.  Correct.  So like I was saying earlier, like I was not

18   on property from 8:45 to -- I'm so sorry to keep confusing

19   these, but 8:30 to 9:15 I wasn't on site.  I acknowledged

20   that.  So at best in my personal belief there was an

21   unexplained hour and 45 minutes in the morning and then

22   another hour in the afternoon, so from 7 to 8:45 and then

23   again from 2 to 3, roughly.  So that was a discrepancy that

24   we needed a further deep dive.

25   Q.  So you mentioned you spoke with Mr. Jones regarding

1    that?

2    A.  Correct.

3    Q.  And then what, if anything, did Mr. Jones suggest that

4    you do?

5    A.  I don't remember, like, the details of the conversation,

6    but there was conversation about how the following weekend,

7    it was going to be a holiday weekend.  I do -- I was on call

8    that weekend, so I essentially didn't have any plans.  And

9    there was just conversation about if it was a one-time thing

10   or if it was a pattern, so the decision was made between

11   myself and Mr. Jones and labor relations that I would

12   essentially perform the same observations the following

13   weekend.

14   Q.  So that decision to conduct further observations the

15   following weekend was made in conjunction with labor

16   relations.

17   A.  Correct.

18   Q.  So let's talk about March 25th then.  Why wait a week?

19   That would be one question that I'd have for you for

20   March 25.

21   A.  I'm sorry.  Can you repeat the question?

22   Q.  Sure.  So it's March 19th and you're speaking at the

23   beginning of the week.  Explain for the jury's benefit why

24   the decision was made to observe him the following weekend

25   rather than, you know, a weekday.

HOPPENRATH - DIRECT

1    A.  Right.  So part of it was just like the amount of work

2    and the amount of management that was going to go through in

3    a day, not -- like having a general outline of the plan,

4    kind of unsure where the day necessarily would unfold.

5    Again, it was just a way to have, like, the attention on one

6    individual and that was the primary reason.  And then again,

7    like, on the weekends there's just significantly less

8    roadmaster presence on the territory.

9    Q.  Now, March 25th of that week was a Friday.

10   A.  Correct.

11   Q.  Was there anything of note, though, regarding that

12   Friday?

13   A.  Yeah, it was Good Friday, which is a BNSF holiday.

14   Q.  And would that be similar to a day in which there'd be

15   less individuals around and less roadmasters?

16   A.  Yes.  It would have essentially functioned as like a

17   weekend day.

18   Q.  So that was the next day that you observed him.

19   A.  Correct.

20   Q.  Okay.  So let's talk about Friday March 25.  Explain and

21   walk through the personal observations you made on that day.

22   A.  I don't recall specifically what time I got to Dayton's

23   Bluff, but I do recall seeing him right around 7 a.m.

24          Again, I saw his personal vehicle.  He came in and

25   he grabbed the work truck and then he proceeded with his

1    normal functions.

2              And then I -- I think -- I recall him having a

3    pretty smooth day across the territory.  So when I say that,

4    he just -- not a lot of train traffic that would disrupt the

5    hi-rail inspection.

6              And then I know it's in the investigation, but I

7    recall him leaving roughly around 10:13.  I think that's the

8    exact time.  So what I just remember is him coming back,

9    driving back, dropping off that work truck and pretty

10   quickly turning around and leaving in his personal vehicle.

11   So there was a not a significant amount of time between when

12   he returned to Dayton's Bluff or when I saw him leave the

13   property for the day.

14   Q.  So on that day you personally observed him at the

15   beginning of the morning at 7 a.m.?

16   A.  Correct.

17   Q.  And then personally observed him depart around 10:13

18   after returning the company truck.  Did the hi-rail get

19   turned off?

20   A.  Yeah.  That would be in all the exhibits when it was

21   exactly turned off.

22   Q.  So the hours you would have observed him coming and

23   going for that day roughly were?

24   A.  Three hours and 15 minutes.

25   Q.  And are those hours obviously not the 7 to 3 that he's

1    scheduled to do?

2    A.  Correct.

3    Q.  So how about the March 26?  What did you observe on that

4    day?

5    A.  So March 26 was a little bit of an anomaly.  Again, I

6    was on call, so I know by the time I had made it down in

7    that general area, looking at track and time, he had gotten

8    track and time before 7 a.m., at 6:47 I think was the exact

9    time.

10            And I had to go directly to a location called

11   Oakland, which is maybe a three- or four-minute drive from

12   the shack.  They needed an engineering officer at the scene.

13   And by the time I was able to complete my duties at Oakland,

14   it was a little bit before 11:00, so I went back to the

15   shack and I didn't see Mr. Sanders' vehicle.

16   Q.  Okay.  So on that day, the beginning of the day, you

17   weren't personally there at Dayton's Bluff.

18   A.  Correct, and I was not personally there to see him

19   leave.

20   Q.  But you used -- reviewed the track time authority as you

21   had done, the prior two observations, around 6:47.

22   A.  Yes.

23   Q.  And then when you returned, his personal vehicle was

24   gone.

25   A.  Correct.

1    Q.  Did you observe any other activities, work activities,

2    by Mr. Sanders after that time, after you got back?

3    A.  I didn't see him on property.

4    Q.  After your observations, then, of those two additional

5    days, 25th, 26th, what then happened next?

6    A.  I don't recall conversations over the weekend.  I know I

7    was periodically seeing if the time would have been entered

8    for the 26th.

9            And on Monday -- again, I don't recall specifics,

10   but that was when we were doing the final preparation of the

11   investigation notices.  They were dated the 28th.  So there

12   was conversation about exactly, like, what I had witnessed,

13   things that I had pulled from PARS, and just kind of this is

14   what I have, an investigation's probably necessary, and then

15   working with Mr. Jones and labor relations to really hone

16   out the next steps.

17   Q.  So in the course of this process of putting the notices

18   together you were working with labor relations?

19   A.  Correct.

20   Q.  And this notice that you're referring to, is that

21   something that's a requirement under the CBA?

22   A.  Yes.  So there are certain timelines that we have to

23   meet.  I don't recall exactly, it's been awhile, but it was

24   like seven to ten days, somewhere in that timeframe, where

25   once you had your first knowledge of an instance, you had a

HOPPENRATH - DIRECT

1    timeline to provide a notice.  And so we were trying to

2    understand our timelines, what information we had at the

3    time, what the best course of action would be to use.  And

4    labor relations, they're our subject matter experts for that

5    CBA, so we rely on them to help guide us in the field.

6    Q.  So let's --

7        MS. DONESKY:  Jan, if you can pull up 98, P-98.

8    I'll give you page numbers as I go.  You need to go one page

9    in.

10   Q.  So, Ms. Hoppenrath, after the notice was issued, what

11   was your role then next in this timeline of events?

12   A.  So in this timeline of events, I am the witness, I'm the

13   company witness, so essentially I'll be presenting all of

14   the information in the investigation.  So these are

15   factfinding missions -- not missions, but it's a factfinding

16   investigation to understand all the aspects of the data that

17   I have and then -- yeah.

18        So over the course of -- from the time that we

19   issued the notice to the time of the investigation, as well

20   as, like, carrying on my normal functions, it was definitely

21   preparing this, understanding the data, whether that was

22   HLCS data, our track and time authorities, and then my

23   personal observations, to show what had happened over those

24   instances.

25   Q.  And you were personally and physically present at this

1    hearing, correct?

2    A.  Yes.

3    Q.  There was a hearing officer?

4    A.  Yes.

5    Q.  Was Mr. Sanders present?

6    A.  Yes.

7    Q.  And did he have union representation?

8    A.  Yes.

9    Q.  Was that Mr. Mozinski?

10   A.  Yes.

11   Q.  And during the course of the hearing, was Mr. Mozinski

12   able to cross-examine you?

13   A.  Yes.

14   Q.  And were exhibits presented at the hearing?

15   A.  Yes.

16   Q.  Including some by Mr. Mozinski?

17   A.  I believe so.

18   Q.  And a record was created of this hearing?

19   A.  Yes.

20   Q.  Looking at --

21   A.  This would be the transcript.

22   Q.  -- Exhibit 98, I'm not going to have Jan run through,

23   but the record from that hearing would be then recorded into

24   this hearing, correct?

25   A.  Yeah.  So we would record.  It would get transcribed.

1    Q.  And is that a requirement of the Collective Bargaining

2    Agreement that Mr. Sanders is under?

3    A.  Say that again?

4    Q.  Is that a requirement of the Collective Bargaining

5    Agreement?

6    A.  To have it transcribed?

7    Q.  Correct.

8    A.  I believe so.

9    Q.  And I would now like to go through the exhibits that

10   you've mentioned one by one so that you can walk the jury

11   through the evidence that relates to the observations you

12   made on those days.

13            We're going to start with the March 19th date,

14   which is this hearing, the subject of this April 3rd

15   hearing.

16            MS. DONESKY:  So if you can, Jan, please pull up

17   page 118.  You can enlarge it, please.  A little bit bigger

18   too, I think.  Can you make it just a little bigger and keep

19   the date on the bottom right-hand corner too?  It looks

20   pretty good, yeah.  I think the jury can probably see that.

21   Q.  So, Ms. Hoppenrath, what is this document?

22   A.  So this is, like, the home screen of PARS.  This

23   specifically shows the month of March and what time has been

24   submitted, so this is just, like, a high-level overview.

25   Q.  Can you walk the jury through what this exhibit reveals.

1    A.  Yeah.  So anything with an "A" means it's submitted as a

2    final draft.

3    Q.  And you're referring to the green --

4    A.  The green "A."  I'm sorry.  So a green "A" means that

5    it's -- they're done and it's ready to be processed for

6    payroll when it closes.

7    Q.  Okay.  And so that reflects that a final entry of time

8    was made on that highlighted day of the 19th, correct?

9    A.  Correct.

10   Q.  And then what does it reflect on the bottom right-hand

11   corner of that exhibit?

12   A.  The date which I, like, print-screened it, so the 21st.

13   Q.  Okay.

14          MS. DONESKY:  And is there a date at the top of

15   that exhibit, Jan, that you just might not be showing on

16   that that shows -- yeah.

17   Q.  So up top there, the work date, is that the March 19th?

18   A.  I don't recall exactly why it says "March 19th."  I

19   forget if I highlighted it or if it shows as yellow when you

20   click on it.  It's been awhile.  But it's a calendar for

21   gang ID, TINS 0815, which would have been his work group.

22   Q.  Okay.  Then let's move to the second page.  This is a

23   three-page report, so walk us through the second page,

24   please.

25          MS. DONESKY:  Jan, if you can go to the second.

```
 1    Sure.  Next one.  No, one more page down, please.

 2    Q.  Does that give you enough, Ms. Hoppenrath --

 3    A.  Actually, like, the pink line at top, the header,

 4    that'll show -- yeah.  So this would have been for

 5    March 19th as denoted in the header in that first --

 6    Q.  Up top in the pink you have the day underlined.

 7    A.  Yeah.

 8    Q.  You had --

 9    A.  Yeah.

10    Q.  For purposes of the hearing, I presume.

11    A.  Yeah, just for clarification that we're talking about

12    the 19th specifically, so then when you look at the time

13    below it makes a little bit more sense.  But this would show

14    that he entered eight hours of straight time, which is

15    denoted by the yellow highlight.

16    Q.  And does this document then also show the date that the

17    screenshot was made?

18    A.  I believe so.  It would be --

19    Q.  Okay.  Same date and time.

20         Okay.  Let's move to the third page then of this

21    report and please let us know what this reflects.

22    A.  So where the last page showed that it was eight hours,

23    this shows his specific start and end time, so here he

24    enters that he started work at 7 and left at 1500.

25    Q.  And 1500 is military time for 3 o'clock, correct?
```

1    A.  Correct.

2    Q.  And that's his scheduled bid position time.

3    A.  Correct.

4    Q.  And those are times that he enters as he's entering the

5    time into PARS?

6    A.  Yes.

7    Q.  Let's go to Exhibit 4 then.  Was this an additional

8    exhibit that you submitted at the April 3rd, 2016 hearing?

9    A.  Yeah.  This would the timely reporting note.

10   Q.  Okay.  Explain to us the March 19th entry.

11   A.  So the March 19th just denotes that -- so you'll see the

12   date column and it says 3-19-2016 and then there's a time

13   stamp immediately to the right that says 3-19, 13, 15, 33,

14   and so that indicates the last time that he updated time for

15   that specific date.  So he entered his time on the 19th at

16   1:15 p.m.

17   Q.  So he entered it on the same day that he worked.

18   A.  Correct.

19   Q.  And that would have been the 7 a.m. to 1500 time that we

20   looked at on the PARS report?

21   A.  Yes.

22   Q.  Next exhibit then, Exhibit 5.  Could you please explain

23   this exhibit to the jury.

24          MS. DONESKY:  Maybe get a little further in if we

25   could.  It looks pretty blurry.  We can move to the left

1    after.

2    A.  Yes.  This is his FRA inspection log.  So again, not

3    disputing anything, that he came to work and he made the

4    inspections.  At 1:26 p.m. was when he entered his

5    inspections for the day.

6              So just, again, trying to build the timeline

7    throughout the day.  This was one additional piece of data

8    that says at 1:30 he was working.  He did in fact input

9    these inspections.  So that was the purpose of this specific

10   document.

11   Q.  Remind me of your observations of when he departed on

12   that day, 1:53?

13   A.  Yeah.

14   Q.  So these are showing last inspection entries shortly

15   before that time, correct?

16   A.  Correct.

17   Q.  And on what date was this report pulled?

18   A.  It looks like it was on -- I don't know if it actually

19   says, unless it's --

20   Q.  In the left-hand corner, is that reflecting of the date

21   of these inspection reports, the highlighted portion?

22   A.  The highlighted was just the timeframe.  I pulled it

23   from the 19th to the 19th.

24   Q.  Okay.  Very good.  Let's move to Exhibit 6.

25              What is this document, Ms. Hoppenrath?

HOPPENRATH - DIRECT

1    A.  So like we were talking about before, this is the

2    printout of his track authority.  So that first one says

3    that at 9:18 was when he was granted track and time.

4              MS. DONESKY:  Jan, can we zero in on that top left

5    corner time, please.  Right there.  Yeah.

6    Q.  You're referring to the time here, the track and time

7    authority at 9:18 on 3-19?

8    A.  Yes, yeah.

9    Q.  And when we spoke earlier and you were describing your

10   observations on that day, does that match the time that you

11   had indicated that the first time that track time authority

12   was obtained?

13   A.  Yeah.  So again, like, his personal vehicle was in the

14   lot when he got time at 9:18, so not disputing -- I mean,

15   this says when he was working, and so this is to show how he

16   worked his way over the territory for the next several

17   hours.

18             So his first time was granted at 9:18 and then he

19   reports clear at 10:11.  And then you'll see overlap

20   throughout the day as they move along the track, so they'll

21   get some overlapping -- or maybe not overlapping, but

22   adjacent blocks and you can't clear until you're in the new

23   one, et cetera, et cetera.  So this just paints the picture

24   of how he actually inspected track that day.  Or when I say

25   how he inspected track, how he flowed across the system, or

1    across my territory.

2    Q.  And is the reason that the track authorities, you know,

3    straddle over various time because they're coordinating with

4    the trains that are going through as well?

5    A.  Yup.  So it would be unrealistic to say, "Hey,

6    dispatcher, I want my whole territory right now."  So

7    they're working and finding the most -- the dispatcher is

8    finding the most efficient manner of what sections SPEKZ DZ

9    of track they can give up.  So there will be days where they

10   get a really long portion of track and there'll be days

11   where they have to go, like, segment by segment by segment.

12   This was just a day where he made a good time on his run.

13   Q.  Okay.

14            MS. DONESKY:  And then as you scroll down then to

15   the bottom, if you can just highlight the end part of the

16   track authority portion, please.  Thank you.

17   Q.  And what does that last entry reveal?

18   A.  So that last entry reveals that 1:28 he said that he was

19   off the track and in the clear, and 1:28 he what we call

20   gave up his time, so he was no longer going to be protected

21   on track, so this is the final bit of track and time for

22   that day.

23   Q.  And again, this was the day that you personally observed

24   him depart from the Dayton's Bluff area around what time?

25   A.  Like 1:53, 1:56, somewhere in there.  A little bit

1    before 2:00.

2    Q.  So does this time align with that timeline?

3    A.  Yes.

4    Q.  So let's move to the next exhibit, Exhibit 7.

5         What is this document, Ms. Hoppenrath?

6    A.  So this is going to come from his vehicle, from the HLCS

7    system.

8    Q.  Sorry to interrupt you, but when you say "vehicle," just

9    because we've got company vehicles, personal vehicles,

10   hi-rail vehicles, which vehicle are you referring to?

11   A.  Yeah.  This is going to be from his hi-rail inspection

12   vehicle.  So I don't have access to these documents.  I had

13   to request them from our team in Fort Worth.  So I pulled --

14   I request them by day, so they will send me everything with

15   a time stamp from that day.  So the Central Time stamp is

16   the one that's pertinent to us, so it was received on 3-19,

17   2016.  The time stamp is 9:00 a.m.

18        And then if you go over into the hi-rail mode that

19   says False HR Mode, Hi-Rail, that means his -- that means --

20   it basically means he's not on track yet.  So the ignition

21   says that his vehicle is on.  That's why it says True.

22        So at 9:00 a.m. the truck is started.  That's what

23   that first line tells me.  The next important line is going

24   to be in between 9 and 10, and that's because there's a

25   change from false to true in that HR mode.  So 9:21 is when

HOPPENRATH - DIRECT

1    he sets on, which aligns with his track authority so that

2    those validate each other, and then again the ignition is

3    still on and the vehicle is still -- the vehicle is still

4    turned on.

5    Q.  And what about the last time that's reflected on this

6    report?

7    A.  At the very bottom?

8    Q.  Yeah.

9            MS. DONESKY:  And also, Jan, I think it's a

10   multipage document.  You just have to go to the --

11   Q.  I can show it to you.

12   A.  I think that's the beginning still.

13   Q.  Oh, yeah.  That is.  Let me give you the page.

14           Page 132.  What does that highlighted line show

15   then, Ms. Hoppenrath?

16   A.  So the important items to know between 526 and 527 is

17   roughly 1323, which is about 123.  The hi-rail mode goes

18   from true to false, so he's now off the track and in the

19   clear.  And then his vehicle is still on.  That has not

20   changed.

21           And then the last several lines, 543 we see in the

22   ignition column, which is, there's a rectangle around it,

23   that that is now false as well, so his vehicle is now off.

24           And then from what I recall, the individual in

25   Fort Worth who helps me understand these documents, is it

1    will just send out a series of pings, like four or five

2    after, so that's why there's several that say "False."  And

3    then we don't have any record of this vehicle being turned

4    on again that day.

5    Q.  So the starting of this vehicle and the turning off, is

6    that a manual thing that someone has to do?  It's not a --

7    you know, you can't do it remotely like --

8    A.  Yeah, it would be like turning the truck on and turning

9    it off.

10   Q.  So based on that report it would have been turned off

11   around that, roughly 13:52 time?

12   A.  Yes.

13   Q.  How does that align with your personal observations of

14   Mr. Jones and his departure from Dayton's Bluff that day?

15   A.  Mr. Sanders?

16   Q.  Mr. Sanders.  I'm sorry.

17   A.  It aligns with what I had observed.

18   Q.  Okay.  And then at the beginning -- I think you

19   mentioned 9 a.m. -- the ignition was turned on?

20   A.  Yeah, which makes sense because he arrived to work at

21   some point between 8:30 and 9:15.

22   Q.  So fair to say at least as of 9 o'clock he would have

23   presumably been there turning the vehicle on.

24   A.  Correct.

25   Q.  So then now we're looking at 9 a.m. to 1:53.

HOPPENRATH - DIRECT

```
 1   A.  Yeah.

 2   Q.  There was -- Counsel asked you earlier this morning and

 3   referred to a number of -- two or three Instagram photos.

 4   Do you recall that?

 5   A.  Yup.

 6   Q.  Was that made as an exhibit to the hearing?

 7   A.  I think that it was.

 8           MS. DONESKY:  And Jan, if you might go to 25,

 9   26 -- yeah, page 25, 26, page 25.  It's the testimony

10   portion first.  No, just 25.  If you go more towards the

11   bottom, there's some times 8:30, 9:59.  Yeah, there to the

12   bottom would be good.

13   Q.  Was this evidence that the union was entering into the

14   hearing?

15   A.  Yes.

16   Q.  And there were the pictures posting on Instagram

17   reflecting three different times?

18   A.  Yes.

19   Q.  8:30, 9:59 and 11:15?

20   A.  Yes.

21   Q.  At 8:30 -- you spoke of this earlier -- your

22   observations there, was there any activity at the Dayton's

23   Bluff that you were observing at that time?

24   A.  I didn't see any.  So to the best of my recollection, I

25   looked up, posted the picture, still no one was there.
```

1    Q.  And what you're observing or looking to observe is not

2    something of a fleeting second or moment.

3    A.  No.  It's essentially like is his vehicle parked in the

4    parking lot, is his work truck still in the working lot or

5    is it being in use.

6    Q.  And roughly, if you're in your car, if you posted a

7    photo, about how long would that take you to do?

8    A.  Maybe a couple of minutes.  Nothing substantial.

9    Q.  Okay.  Then the two other times, 9:59 and 11:15, by

10   those times what had you already observed and concluded by

11   those times?

12   A.  Again, I think I said this earlier.  I don't remember

13   where I was specifically, but he was on the track.  You

14   could even go back and look at, like, the TMDS about where

15   he was exactly.  There's a lot of information that I can get

16   from, like, the TMDS records, and it would have been on

17   certain parts of the territory just difficult to visually

18   maintain where he was at at all times, so I was concerned

19   with when he was coming and going.

20   Q.  At those particular times, though, you knew --

21   A.  I was confident that he was out working and inspecting.

22   Q.  If at the hearing on April 3rd Mr. Sanders claimed that

23   he was at a completely different location, specifically

24   Bridal Veil, would you have observed him at Dayton's Bluff

25   with these -- the posting have any relevance at all if he

HOPPENRATH - DIRECT

```
 1    was claiming he wasn't even at Dayton's Bluff?
 2    A.  I wouldn't have been able to see him.  So it's a couple
 3    miles.  I don't know the exact distance between Bridal Veil
 4    and Dayton's Bluff, maybe like a 15-minute drive.  It's been
 5    awhile since I've done it.
 6              So I was concerned with the primary reporting
 7    location where his hi-rail vehicle was.  Yeah.  If he was at
 8    Bridal Veil and I was looking at my phone for a couple
 9    minutes, I wouldn't have seen him anyways.  He was several
10    miles away.
11    Q.  Let's move on to the second hearing, if we move to
12    Exhibit 103.
13              And the date of this hearing -- I know it's kind
14    of small there -- April 8th of 2016, what was your role at
15    this hearing, Ms. Hoppenrath?
16    A.  It would have been very similar to the one previous as
17    the company witness, so I was there to present my findings
18    and my data and my observations and present those to -- or
19    for the record.
20    Q.  And like the first hearing, you were physically present?
21    A.  Yes.
22    Q.  Mr. Sanders, was he present?
23    A.  Yes.
24    Q.  Did he have union representation?
25    A.  Yes.
```

```
 1     Q.  Was there a hearing officer?

 2     A.  Yes.

 3     Q.  Were exhibits admitted?

 4     A.  Yes.

 5     Q.  Was a transcript made of the hearing?

 6     A.  Yes.

 7     Q.  Let's walk through the exhibits then that you presented

 8     at this hearing.

 9              First off, what day or days were being reviewed in

10     this investigation?

11     A.  I had information for the 25th and the 26th.

12     Q.  Okay.  Let's move to the first exhibit, Exhibit 11.

13              MS. DONESKY:  Which is at page 113, Jan.

14     Q.  You can walk us through this exhibit, Ms. Hoppenrath

15     when it's highlighted there.

16              What is this document?

17     A.  This is going to be his track and time authorities

18     again.  So he got time at roughly 7 -- well, not roughly, at

19     exactly 7:22, and then through the course of the day he's

20     working his way through the territory.  And then at 9:51,

21     which is the bottom right highlighted number, is when he

22     reports that he's in the clear for the day.

23     Q.  And do you recall what time based on your personal

24     observations on this day that you first observed him on

25     property?
```

```
 1    A.  I believe it was like 7 a.m.

 2    Q.  And then roughly 22 minutes later he's obtaining the

 3    track and time authority.  Does that align with your

 4    personal observations?

 5    A.  Yes.

 6    Q.  And then moving on then to Exhibit 12.

 7         Could we actually just quickly go back to the

 8    other one?  I forgot to do the end time.  Sorry.

 9         One page up, 123 still.  At the bottom there's a

10    highlight for the end of the track authority.

11         MS. DONESKY:  Thank you, Jan.

12    Q.  So then, Ms. Hoppenrath, can you then tell us what this

13    reflects in the highlighted line?

14    A.  Yeah.  So at 9:51 he reported clear and that was his

15    final track and time for the day.

16    Q.  And so his time frame of track and time authority runs

17    from 7:22 to 9:51 a.m.

18    A.  Correct.

19    Q.  And this is the Good Friday?

20    A.  Yes.

21    Q.  And this would be all overtime hours?

22    A.  Yes.

23    Q.  And does that end time align with the personal

24    observation you made on his departure?

25    A.  Yeah, again, it's about 20 minutes back to the shack.  I
```

1    don't know how he reported clear.  He can do that via a

2    dispatching screen or the radio, but I saw him get back

3    roughly 10, 11 -- I'm sorry, like 10:10, 10:11, and then he

4    had left for the day, so it aligns with what I had observed.

5    Q.  Exhibit 12, please.

6         What does this document reflect, Ms. Hoppenrath?

7    A.  So this also is just more information about his day and

8    what it looked like.  This one notes that 7:23 is when the

9    hi-rail mode was engaged.  That's about what time he set on

10   the track.

11        And then the first line which isn't highlighted

12   would have been when he started the vehicle.  We would have

13   to go back and rehighlight that.  But this specific snip

14   says that at 7:23 was when he started hi-railing.

15   Q.  And then does it reflect when it concluded its work on

16   the day?

17        MS. DONESKY:  Jan, you'll probably just need to

18   scroll through.

19   A.  This says at 9:47 he was clear --

20   Q.  Oh, yeah, page 141.

21   A.  Sorry.

22   Q.  No, that's okay.

23   A.  Do you want me to walk through this?

24   Q.  Please.

25   A.  Okay.  So 9:47 is the time stamp for when that hi-rail

1    mode goes from true to false, so that's essentially what

2    time he set off the track, and then at that point he'll have

3    to travel back to Dayton's Bluff.

4    Q.  And what does Exhibit 13 -- could we go to page 123,

5    please.

6              Please walk the jury through this document.

7    A.  So this again is, like, the FRA inspections.  I ran it

8    from 3:24 to 3:26.

9    Q.  And why did you do that?

10   A.  Because initially when I just put in 3:25 there was no

11   data, and so I ran it for extended dates just to show that

12   it wasn't, like -- it was to try and show there wasn't an

13   error in the system, that it was, like, bringing all the

14   information that it had.

15             So I essentially ran this so there wasn't going to

16   be a question if after he left or after I saw him leave that

17   he would say that he was entering inspections, because this

18   report says that they weren't any entered on that day.

19   Q.  Is it unusual to not have inspections reported nor a

20   particular day?

21   A.  This is the FRA inspection.  So if it was a BNSF

22   inspection because we had a higher frequency, then it would

23   be acceptable.  Typically -- or I don't even want to say

24   typically, but track inspectors could enter additional FRA

25   inspections.  There wasn't anything that said we could more

HOPPENRATH - DIRECT

```
1    stringent than the FRA guidelines.
2    Q.  And then the next exhibit, 14.
3              MS. DONESKY:  124, Jan.  Yup, there you go.
4    Q.  So walk us through this exhibit, please.
5    A.  So again, this is the overview for the month, so this
6    says when I looked at this report on the 25th, time was
7    submitted in a final status for the 25th of March.
8    Q.  And then why don't you go to the next page to identify
9    the hours that were entered for that day.  A little bigger?
10   There we go.
11             At the top in the pink-colored line, what does
12   that reflect?
13   A.  That's the date for the time, so this is the time for
14   3-25.
15   Q.  And that again was the Good Friday?
16   A.  Correct.
17   Q.  So walk us through the time that was entered for that
18   day.
19   A.  So we have the eight straight hours and then the eight
20   hours and 30 minutes of overtime pay.
21   Q.  And the eight hours would reflect what?
22   A.  The eight hours would reflect the holiday pay and then
23   the eight and a half would have been the time that he worked
24   that day for 16 and a half hours total.
25   Q.  And all the time he claimed to have worked for OT
```

HOPPENRATH - DIRECT

1    hours -- they were all overtime hours.  From minute one on
2    that particular day were all overtime.
3    A.  Right.  Because it was a BNSF paid holiday, it was
4    overtime.
5    Q.  And that's time and a half that's provided her hour?
6    A.  I believe so.
7    Q.  And then the third page of this PARS report then?
8    A.  That will be the specifics, so what are his start and
9    end times, so as soon as we pull that up.
10   Q.  Sure.
11          MS. DONESKY:  You can make that just a little
12   bigger, Jan, please.  Thanks.
13   A.  So here he claims that he started at 6 a.m. and then he
14   ended at 14:30.
15   Q.  Can we circle that.  Okay.  So the time of overtime
16   reported for hours worked was a 6 a.m. start time through to
17   14:30, which is 2:30.
18   A.  Correct.
19   Q.  And your observations in the documents we just went
20   through reflect what times?
21   A.  Roughly 7 to 10:15.
22   Q.  And on the left -- so 7 to 10:15, three hours and 15
23   minutes is what you observed.
24   A.  Correct.
25   Q.  And reported was eight hours and 30 minutes of overtime.

1    A.  Correct.

2              MS. DONESKY:  Jan, can you just move the line so

3    the hours and minutes show the 8:30 just on the time entry

4    next to the time?  That's page 3.  We were just there, but

5    it's okay.  Oh, yeah, there.  Very good.  And those are the

6    hours recorded.

7              So then let's -- I think that concludes the 25th

8    of March, so just walk us through the 26th, which I think

9    begins at Exhibit 16, so that would be 130, page 130, Jan.

10             Why don't we look at Exhibit 17 then.  I think

11   we're on the 26th on that day.  Yes.

12   Q.  So walk us through -- now we're now on March 26th.  If

13   you can walk us through those entries, please.

14   A.  Yup.  So on March 26th, this reflects that he had gotten

15   his first track authority at 6:47 a.m. and then he released

16   his final track authority at 9:29 a.m.

17   Q.  Okay.  And the next exhibit -- we've looked at these

18   exhibits, so we know, we're familiar with them now so we can

19   run through them.

20             The next one, Exhibit 18.  This is the hi-rail

21   vehicle?

22   A.  Yup.

23   Q.  False starts and finishes?

24   A.  Yes.  So this indicates that at roughly 6:37 is when he

25   started the vehicle, and then if you hop down to where it's

1    circled it's 6:47 when he begins his hi-rail.

2    Q.  And this aligns with -- this was the day that you

3    observed the track and time authority to determine when he

4    began?

5    A.  Yeah.  I was not there when he started, so I relied on

6    other documentations to put together, like, the general

7    outline.

8    Q.  Okay.  And then if we can go to the end of this exhibit.

9    A.  So this one will show that at roughly 9:48 was when it

10   went from -- this actually is when he turned the vehicle

11   off, I believe.  I don't have the headers, but that true to

12   false at 9:48 is when he turned the vehicle off.

13   Q.  So the vehicle would have been on from roughly 6:37

14   through 9:48 on that day.

15   A.  Correct.

16   Q.  Okay.  Next exhibit, 142.  Or I guess it would be 143.

17   There you go.

18           This is the PARS report we've been looking at?

19           MS. DONESKY:  Oh, 142, Jan.  Sorry.  Go one up.

20   Yup.  Thanks.

21   Q.  Now we're looking at the 3-26?  What does this reflect,

22   Ms. Hoppenrath?

23   A.  So this would show that his time was entered on the

24   26th.

25   Q.  Okay.  And then page 2 of the PARS report.

HOPPENRATH - DIRECT

```
 1    A.  Or excuse me.  It was the time for the 26th, not
 2    necessarily on the 26th.
 3    Q.  Because this is the day that the time was entered on
 4    March 29th.
 5    A.  Correct.
 6    Q.  And this is also the report that had the date --
 7    A.  Yes.
 8    Q.  -- cut off at the bottom.
 9    A.  Yes.
10    Q.  At the top, however, on the pink as we've been looking
11    at with the other exhibits, does that reflect the 3-26 --
12    A.  Yes, it reflects the 3-26 where he claims nine total
13    hours, eight hours of straight time and one hour of
14    overtime.
15    Q.  Okay.  And this was a day that your observations --
16    based on reviewing the records, track time authority, and
17    then you arrived at the depot just before 11?
18    A.  Yes.  So there was I want to say roughly four and a half
19    hours accounted for, roughly 6:30 to 11.
20    Q.  Giving him the benefit of the doubt --
21    A.  Correct, because I was not there to physically watch him
22    leave.
23    Q.  Right.  So between 9:47 when the hi-rail turns off until
24    you arrive, there's about an hour there --
25    A.  Correct.
```

```
 1      Q.  -- that it's unclear --

 2      A.  Correct.

 3      Q.  -- when he may have left.  Right.  Okay.

 4              But based on your 11 o'clock arrival and the car

 5      was gone, that would be roughly four and a half to five

 6      hours.

 7      A.  Correct.

 8      Q.  Okay.  And nine hours was reported.

 9      A.  Correct.

10      Q.  Okay.

11              MS. DONESKY:  Can you do the final page of that

12      exhibit that shows the start and end times?  Yes, thanks,

13      Jan.

14      A.  This one's just the overview.

15              MS. DONESKY:  One more down, please.  Thanks.

16      A.  This is not the start and end time, but this was after

17      Mr. Sanders went in and adjusted from eight hours of

18      straight time to one hour of overtime -- or from eight and

19      one to eight and zero.

20      Q.  Okay.  We can stay on this.  I think the other we can

21      look at the times later, begin and end times.

22              So explain what this document reveals then for

23      3-26.

24      A.  This, to the best of my recollection, was after

25      Mr. Sanders was given the notice of investigation, and so
```

1  there was modification to the time roll after he was given

2  the notice.

3           MS. DONESKY:  So can we scroll down to the bottom

4  right-hand corner of the screenshot then.

5  Q.  What time then was this report pulled?

6  A.  I had pulled it at 11:14.

7  Q.  Okay.  And when it was pulled at that time, it revealed

8  edited -- a different time then he had entered earlier that

9  morning.

10 A.  Correct.

11 Q.  Okay.  And the change was to remove the one overtime

12 hour --

13 A.  Correct.

14 Q.  -- so it went down from nine to eight?

15 A.  Correct.

16 Q.  And this is the same March 26 that your observations and

17 review of records reflected roughly, or on the high side,

18 four and a half to five hours.

19 A.  Yes.

20 Q.  So still an overage of at least three hours.  And as you

21 mentioned, timing on this day, on this edit, the edit

22 occurred by Mr. Sanders -- presumably he made the change,

23 but the change occurred after the hearing notices had been

24 issued to him?

25 A.  Correct.

HOPPENRATH - DIRECT

1   Q.  Were you the one to issue -- did you personally or were

2   those personally given to him?  How were those notices

3   given?

4   A.  They were personally given to him, but we had made a

5   decision to have Mr. Jones actually deliver the notice, so I

6   was not at the Bluff that morning.

7   Q.  Okay.  And those would have been earlier in the day

8   prior to 11:14 a.m.

9   A.  Yeah.  I don't recall the exact time.

10  Q.  And if we can scroll up to just -- was there a change

11  made for 3-25 as well?

12  A.  I believe that there was.  It had changed from eight and

13  a half to four and a half.

14  Q.  130, please.  Can you walk us through this document,

15  Ms. Hoppenrath.

16  A.  Yes.  So this -- we had originally looked at one where

17  there was the eight hours of the straight time for the

18  holiday pay and then eight and a half hours of overtime.

19  This one was edited I believe roughly the same time -- it'll

20  be time stamped -- back to the four and a half hours of

21  overtime, so significantly closer to what he actually

22  worked.

23  Q.  And then if you can scroll down to the bottom right

24  corner of that document just to show what the time was on

25  that day.

1        Similar.  We looked at 11:14 was the other one and

2    this one's 11:11.

3    A.  Correct.

4    Q.  Ms. Hoppenrath, did you have any role after these

5    hearings were held in the decision with respect to what

6    discipline or dismissal of Mr. Sanders afterwards?

7    A.  No.

8    Q.  So you were not involved as a decisionmaker afterwards?

9    A.  No.

10        MS. DONESKY:  This is actually a good break time

11    for me to go to a different section.  I can certainly begin

12    it.

13        THE COURT:  We can stop here.

14        MS. DONESKY:  Okay.

15        THE COURT:  All right.  As I indicated, Members of

16    the Jury, we're going to dismiss at this time on account of

17    the weather and the court's closure order.  I have two

18    admonitions for you.

19        The first is, please bear in mind and adhere to

20    the instructions that I gave you earlier about your conduct,

21    both when you're here, obviously, but those apply when

22    you're away from the courthouse as well.

23        And the second is just please drive safely today

24    on your way out.

25        I'm going to stick around and talk to the lawyers

1    about a couple things, but we will excuse you at this time.

2    See you Monday morning at 9 a.m.

3         (Jury excused)

4              THE COURT:  Thank you.  Please be seated.

5              Ms. Hoppenrath, you can step down if you like.

6              THE WITNESS:  I have to get my shoes.

7              THE COURT:  Oh, sorry.

8         (Laughter)

9              THE COURT:  Let me ask BNSF where you think we're

10   at with respect to time given the weather glitch that we've

11   encountered here today.

12             MS. DONESKY:  With Ms. Hoppenrath, or generally?

13             THE COURT:  Generally.

14             MS. DONESKY:  Generally.  We're going to try to

15   move it as best we can.

16             THE COURT:  I get it.  I'm just curious, trying to

17   figure it out.

18             MS. DONESKY:  Yeah.  I mean, I definitely think

19   we're into Tuesday with testimony still, because Mr.

20   Chartier -- yeah, we're definitely into Tuesday.

21             THE COURT:  Okay.  All right.  I appreciate

22   knowing that.

23             Let me ask the plaintiff:  Do you anticipate that

24   there's a need for us to gather before we convene Monday

25   morning at 9 a.m.?

1        MR. JAMES KASTER:  I don't think so, Your Honor.

2        THE COURT:  And how about the defendant?

3        MS. DONESKY:  I don't believe so either.

4        THE COURT:  All right.  We will get started then

5   Monday morning at 9 a.m.

6        Thanks, everyone.  Have a safe drive home here and

7   a good weekend.  We'll see you Monday morning.

8        MR. JAMES KASTER:  Thank you, Your Honor.

9        (Proceedings concluded for the day at 3:00 p.m.)

10                   *     *     *     *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I   N   D   E   X**

**Colloquy with counsel**                                          680


**W I T N E S S E S:**                                             **PAGE**


**SUANNE GROBE RANHEIM**

    Direct Examination by Ms. Ferguson                 682
    Cross-Examination by Mr. James Kaster              692

**BLAINE HOPPENRATH**

    Cross-Examination by Mr. James Kaster              702
    Direct Examination by Ms. Donesky                  779


\* \* \* \* \*


**E   X   H   I   B   I   T   S**

**NUMBER**                         **FOR ID   IN EVIDENCE**


    Plaintiff 16                                        706

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.


*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224