UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

--------------------------------------------------------------
                                )  CIVIL FILE
Donald Sanders,                 )  NO. 17-CV-5106 (ECT/KMM)
                                )
                 Plaintiff,     )
                                )       **VOLUME VI**
       vs.                      )
                                )
BNSF Railway Company,           )  Courtroom 3B
                                )  Monday, December 13, 2021
                 Defendant.     )  St. Paul, Minnesota
                                )  9:00 A.M.
--------------------------------------------------------------

                 **JURY TRIAL PROCEEDINGS**

        **BEFORE THE HONORABLE ERIC C. TOSTRUD**
           **UNITED STATES DISTRICT JUDGE**
                   **AND A JURY**

**A P P E A R A N C E S:**

**For the Plaintiff:**    **NICHOLS KASTER, PLLP**
                          By:  JAMES H. KASTER, ESQUIRE
                               LUCAS J. KASTER, ESQUIRE
                          4700 IDS Center - 80 South Eighth Street
                          Minneapolis, Minnesota  55402-2242


**For the Defendant:**    **ARTHUR CHAPMAN KETTERING SMETAK**
                               **& PIKALA, P.A.**
                          By:  SALLY J. FERGUSON, ESQUIRE
                          500 Young Quinlan Building
                          81 South Ninth Street
                          Minneapolis, Minnesota  55402-3214

                          **STINSON, LLP**
                          By:  TRACEY HOLMES DONESKY, ESQUIRE
                          50 South Sixth Street - Suite 2600
                          Minneapolis, Minnesota  55402


              **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
        Official Court Reporter - United States District Court
          Warren E. Burger Federal Building & U.S. Courthouse
               316 North Robert Street - Suite 146
                   St. Paul, Minnesota  55101
                         651.848.1224

Hoppenrath - Direct

```
 1              (9:00 a.m.)

 2                      P R O C E E D I N G S

 3                         IN OPEN COURT

 4         (Jury enters)

 5              THE COURT:  Good morning, everyone.  Please be

 6    seated.

 7              Is BNSF ready to continue?

 8              MS. DONESKY:  We are, Your Honor.

 9              THE COURT:  Great.

10              MS. DONESKY:  We'd like to continue the

11    examination of Blaine Hoppenrath.

12         BLAINE HOPPENRATH, DEFENDANT'S WITNESS, RESUMED

13              THE COURT:  Good morning, Ms. Hoppenrath.  Just a

14    reminder you're still under oath.

15              THE WITNESS:  Thank you.

16              THE COURT:  Thank you.

17              Ms. Donesky?

18              MS. DONESKY:  Thank you, Your Honor.

19                       (BLAINE HOPPENRATH)

20                       DIRECT EXAMINATION

21

22    BY MS. DONESKY:  (Continued)

23    Q.  Good morning, Ms. Hoppenrath.

24    A.  Good morning.

25    Q.  I'd like to just go back briefly on one point relating
```

1    to the -- one of the hearing transcripts from April 8th,

2    2016.

3            MS. DONESKY:  Jan, if you could pull up 103 and

4    specifically to 125.

5            Can you just make it slighter bigger, please, for

6    the jury's benefit?  The numbers are pretty small.  There

7    you go.  I think that would be great.  Thanks.

8    BY MS. DONESKY:

9    Q.  Ms. Hoppenrath, we spoke on Friday regarding these

10   various reports.  Is this a copy of the PARS report?

11   A.  Yes.

12           MS. DONESKY:  And, Jan, if you can go up a little

13   bit to show the date that this was -- what day this was for?

14   BY MS. DONESKY:

15   Q.  What day was this for the PARS report?

16   A.  This would have been for 3-25.

17   Q.  Okay.  And what the time that was entered -- Mr. Sanders

18   entered on that day was again how much?

19   A.  It was the 8 hours of straight time and then 8 and a

20   half hours of overtime.

21           MS. DONESKY:  And then if we can turn to Exhibit

22   16, which is page 130, Jan, please.

23   BY MS. DONESKY:

24   Q.  Then focusing in on the OT hours for that day, remind

25   the jury, please, what this document then reflected?

1    A.  So this was again his time for 3/25; and had been

2    altered from 8 and a half hours of overtime to 4 and a half

3    hours of overtime.  And then I believe if you were to look

4    at the timestamp, that was noted after the investigation

5    waiver had been given to Mr. Sanders.

6    Q.  And on the bottom right-hand corner please, Jan, the

7    time you're referring to, Ms. Hoppenrath, is an 11:11 a.m.

8    time?

9    A.  Yes.

10   Q.  And this was the one where it cut off of the 3/29?

11   A.  Correct.

12   Q.  You represented at the hearing that was the day that you

13   pulled that report?

14   A.  Yes.

15   Q.  So on 3/25, the PARS report were recorded 8.5 hours of

16   overtime; and on March 29th at 11:00 a.m. Mr. Sanders

17   revised it to 4 and a half.

18   A.  Correct.

19   Q.  So he made no changes to that 8 and a half hours of

20   overtime claimed on March 26?

21   A.  Can you repeat the question?

22   Q.  These records would reflect there was no change made on

23   the 26th?

24   A.  Correct.

25   Q.  Or the 27th?

Hoppenrath - Direct

```
 1    A.  Correct.

 2    Q.  Or the 28th?

 3    A.  Correct.

 4    Q.  And the change that was reflected 11:11 a.m., where did

 5    that sit in relation to when the hearing notices were

 6    issued?  Was it before or after that changed?

 7    A.  After.

 8    Q.  Thank you.  Ms. Hoppenrath, tell the jury a little bit

 9    about yourself.

10    A.  Yeah.  So I am originally from Kansas City, so I -- born

11    and raised in the Midwest, grew up in the suburbs with my

12    parents and little brother.  When I was about ten I started

13    swimming competitively, and then that consumed the rest of

14    my adolescence, as well as my schoolwork.

15    Q.  Were you able to continue your competitive swimming in

16    college?

17    A.  I did.  I accepted both an athletic and an academic

18    scholarship for swimming.

19    Q.  To what school?

20    A.  To the University of Nebraska.

21    Q.  What degree did you obtain from the University of

22    Nebraska?

23    A.  I obtained a Bachelor of Science in industrial

24    engineering.

25    Q.  Any hobbies or activities you like to participate in?
```

1    A.  Yeah.  So starting in my early days of the railroad when

2    I was living in Flagstaff, I started hiking a lot, and

3    that's just something that I've pursued and continued

4    through present day.

5    Q.  Ms. Hoppenrath, you took on the role as St. Paul

6    Roadmaster in March of 2015?

7    A.  Correct.

8    Q.  Was this your first roadmaster management position?

9    A.  It wasn't my first roadmaster position.  It was my first

10   district roadmaster position.  So of the year and a half or

11   so prior I was both an assistant roadmaster on the

12   production gangs, and then a roadmaster specifically on the

13   tie sets.

14   Q.  Can you describe to the jury kind of what the difference

15   is between the tie gangs and the roadmaster job you accepted

16   in March of 2015?

17   A.  Yeah.  So being on the tie gangs, I had roughly fifty

18   people that would report to me, as well as like about 22

19   machines.  And we would go around the network and install

20   railroad ties on district roadmaster's territories.  So we

21   did one thing every single day, and that was to go out and

22   solve ties.  So same thing day over day.

23           The production gangs were also unique in the sense

24   that they were highly visible and they would get six to

25   eight-hour windows to go and install ties.  So that was a

1    pretty large window that transportation was pretty dedicated

2    to granting us time to go out and work.

3              And then going to the district job, it's a little

4    different.  So I have fewer employees but we're doing a

5    multitude of different things.  So my team's responsible for

6    a set track, and so our job is to make sure that trains can

7    safely traverse over that territory.  So we're doing

8    everything from minor maintenance repairs to some larger

9    windows, daily inspections.  There's just a lot more -- or

10   there's a lot of different things going on over the course

11   of the day.

12   Q.  When you took the job in St. Paul, had you ever lived in

13   Minnesota before?

14   A.  I had not.

15   Q.  Have any family here in Minnesota?

16   A.  No.

17   Q.  How old were you when you took on the job?

18   A.  I was 24.

19   Q.  How would you describe the Dayton Bluff territory that

20   you began to supervise in March of 2015?

21   A.  So Dayton's Bluff was a shorter roadmaster territory as

22   far as track miles, but is probably one of the more complex

23   territories on the division.  So we were adjacent to

24   Northtown and Northtown Yard is a huge -- let me rephrase

25   that.  Northtown Yard is just a massive yard.  There's a lot

Hopper cross-Direct

1     going on.  You have trains that are ending, trains that are

2     starting, trains that are going through.  So our proximity

3     to Northtown added some complexities moving trains through

4     our subdivision.

5              I also had three yards, Dayton's Bluff, Midway and

6     Union Yard, so we had an intermodal yard which had a lot of

7     high-priority freight.  And then a pretty unique thing is my

8     territory was adjacent to the Canadian Pacific, so we would

9     we have mainline.  One mainline would be BNSF, one mainline

10    would be the CP.  We would alternate as you went down the

11    subdivision.  We would have control points which is where

12    you have a lot of switches and our territory would just end

13    halfway through the switch, halfway through the crossover.

14    So there was a lot of complexities with maintaining a

15    railroad so close to a foreign railroad.

16    Q.  How many direct reports did you have?

17    A.  It averaged out to about 15, more or less, just

18    depending on the time of the year.

19    Q.  Were they all unionized scheduled employees?

20    A.  Yes.

21    Q.  What kinds of positions worked under you Dayton's Bluff?

22    A.  So I had three track inspector positions, I had a

23    section gang, a maintain gang, a set of welders.  In the

24    winters I would have a maintenance gang for snow removal.

25    In the summers I would have a surfacing gang.  And then

Hopper-Swenson Direct

1    there were several work groups that didn't directly report

2    to me but primarily worked in the cities that would go back

3    and forth between the Northtown roadmaster and the St. Paul

4    roadmaster.

5    Q.  When you first arrived in Minnesota in March of 2015,

6    describe how business was going for BNSF at that time?

7    A.  So when I first got there we were in the middle of an

8    oil boom.  So the Bakken was causing just a lot of high

9    volume for the railroad.  So we were shipping a lot of oil,

10   a lot of freight.  And I don't recall specifically -- it was

11   some of the highest volumes that our territory had ever

12   seen.

13   Q.  And I know you're a manager and exempt, but how many

14   hours would you estimate you yourself were putting in on a

15   weekly basis?

16   A.  Yeah, so I was -- typically 50 to 60 hours depending on

17   the week.  And then I would also be on call Monday through

18   Friday night, and then every third weekend.

19   Q.  How would you describe those first months working as

20   St. Paul roadmaster?

21   A.  The first few months were extremely difficult.  It was

22   an extremely complex territory, like I mentioned earlier,

23   and it took some time to understand the best way to plan and

24   organize and work with our peers in transportation.  So

25   because it was so busy, there was just a lot of natural

Popper - Direct

```
 1     conflict between my department and the transportation
 2     department.
 3               So if work needs to be done on a track, we need
 4     time to fix it and that takes away from transportation's
 5     ability to move trains over that track.  So with volume
 6     being very high and a lot of trains to run, it was often
 7     difficult to get time to do our jobs and fix tracks to the
 8     best of our ability.
 9     Q.  So when you're talking about getting time, is this that
10     track and time authority that we looked at on Friday?
11     A.  Correct.
12     Q.  Because there's only one set of tracks; right?
13     A.  Correct.
14     Q.  Trains go through the tracks but maintenance has to get
15     on to do whatever work they're doing?
16     A.  Yes.
17     Q.  And would it be fair to say that in doing your work
18     then, planning, being able to plan for the work that you
19     need to do would be important?
20     A.  Yes.
21     Q.  How about working with Mr. Sanders.  You started, as you
22     said, in March of 2015.  Did you know Mr. Sanders before
23     this time?
24     A.  No.
25     Q.  Had you worked with or interacted with him before?
```

1    A.  No.

2    Q.  How would you describe Mr. Sanders' performance as a

3    track inspector?

4    A.  Generally speaking as a track inspector he was able to

5    perform his job functions.  He was able to identify and

6    correct defects.

7    Q.  And in your experience working with Mr. Sanders, were

8    there times when Mr. Sanders reported defects that were not

9    in fact defects at times when you weren't hi-railing,

10   separate from those times?

11   A.  So there was an example of a time where he had -- and I

12   forget the specifics and the nuances of the defect -- but he

13   had reported a defect.  I can't remember if there was

14   actually a slow order placed, but upon further conversation

15   it was noted that he had an outdated version of the

16   engineering instruction.  So while the track condition was

17   there, it was not considered a defect.  It wasn't considered

18   a defect and something that we would need to protect.

19   Q.  Were there other times when the time and manner in which

20   Mr. Sanders tended to report defects presented challenges?

21   A.  Yes.

22   Q.  Can you describe what you mean by that?

23   A.  So again, like the traffic is high we're trying to make

24   a cohesive work plan, communicate those plans to the

25   transportation department so they can then in fact plan

1    their trains; trying to build a relationship with that

2    department.  And there were some times where defects felt

3    suspect where we would identify them very late in the day.

4              There was one example where we identified a

5    defect.  It was a 10 MPH frog defect, and it was found at

6    the very end of the day, and it's our best practice not to

7    leave 10 MPHs on overnight.  So it just felt like because

8    defects would come -- and that's just one time I can

9    recall -- but defects would be identified very late in the

10   day, which then we would be struggling to get our crews out

11   there.  It impacted the team because we're trying to fix

12   these defects before we go home for the night.  And then it

13   really turned our railroading from like proactive defect

14   management into reactive defect management.

15   Q.  Was there an incident that occurred at Union Yard that

16   stands out to you?

17   A.  Yes.

18   Q.  When did that occur?

19   A.  I believe it was like December of 2015.

20   Q.  Can you describe more specifically what you recall from

21   that event?

22   A.  Yeah.  So Mr. Sanders -- I believe he had called me and

23   said like the yard -- the Union Yard needed to be pulled out

24   of service.  And upon my questioning a little bit further,

25   we didn't have like any data or track notes that would

0:17-cv-05106-ECT

1    dictate why the yard needed to be out of service.  And this

2    is critical yard, it's an intermodal yard.  We're in our

3    peek season.  So pulling this yard out of service would have

4    some pretty significant impacts to the operation.

5            I was with my neighboring roadmaster Mr. Chartier

6    at the time.  So between trying to understand why

7    Mr. Sanders wanted to pull tracks out of service without

8    notes, and I believe it revolved around lie -- it looked

9    bad.  It came to light that the frequency or the tracks

10   hadn't been inspected with frequency and didn't need to be

11   pulled out of service because we hadn't met the inspection

12   frequencies.  And so the tracks were pulled out of service

13   and then we spent the night inspecting and correcting

14   defects so that we met the frequency timelines, as well as

15   ensuring that, like, the track was good for the class of

16   track, which I don't recall exactly what it was.

17   Q.  So just to be clear, the tracks that were originally

18   identified that did not look good that Mr. Sanders believed

19   needed to be taken out of service, what were -- did the

20   measurements match up that required those tracks to be taken

21   out?

22   A.  I don't recall specifically what had happened.  The

23   tracks were removed from service due to the inspection

24   frequency, and then we did find some defects.  I don't have

25   the specifics, but we did keep a crew overnight to fix

Copperud - Direct

1    defects behind the inspection.

2    Q.  And when you're referring to the inspection frequency,

3    is that the so many -- every thirty days the yard needs to

4    be inspected?

5    A.  I believe so, but I don't recall the specific

6    frequencies.

7    Q.  Did you yourself stay overnight to work on the yard?

8    A.  Yeah.

9    Q.  There's been testimony of Mr. Sanders being the only

10   track inspector at times on your territory?

11   A.  Correct.

12   Q.  And you had mentioned I think three bid positions on

13   your territory for track inspectors; correct?

14   A.  Correct.

15   Q.  But those are bid Collective Bargaining Agreement

16   positions?

17   A.  Yeah.  So we bid three positions out that fall under the

18   CBA.

19   Q.  But it would require someone to bid into those roles;

20   fair to say?

21   A.  Yes.

22   Q.  And so were there times when there just wasn't anyone

23   bidding into the other two roles?

24   A.  Yes.

25   Q.  Are you able to force someone into those roles under the

0:17-cv-05106-ECT

1    CBA?

2    A.  There's very specific requirements that you can force

3    someone into a position, so at times we just -- we weren't

4    able to force anyone.  There was no one available to force

5    into those positions.

6    Q.  And that position as a track inspector requires

7    particular training as well to be able to do the job;

8    correct?

9    A.  Correct.

10   Q.  Were there efforts nonetheless that you tried to

11   undertake to try to help out Mr. Sanders?

12   A.  Yeah.  Just trying to overall manage the territory.  You

13   know, we're trying to do the best with what we can helping

14   him out.  I remember like one specific time I had brought a

15   foreman in to help catch up on some -- I forget actually

16   specifically what the inspections were.

17        We had some greasers on the territory that would

18   require pilot for certain situations, and try to have a

19   foreman that could help with those tasks.  So it wasn't

20   always feasible, but there were efforts to try and alleviate

21   the situation.  We definitely were -- or I was definitely in

22   contact with manpower to try and force people.  That usually

23   didn't come to fruition, but there were efforts made.

24   Q.  Did you yourself on occasion do some work?

25   A.  There was one time that I did on the weekend.

1    Q.  How did Mr. Sanders react to those efforts?

2    A.  So specifically I remember when -- when we -- when I had

3    a foreman come over.  He was very upset.  He claimed that it

4    was his work, he was entitled to it.  So that was very

5    frustrating, so it was like trying to help but then the help

6    wasn't wanted.  For -- like the time I ran the works, I was

7    time claimed, which is a process that the union employees

8    can go through with the union.

9    Q.  So a claim for time made under the Collective Bargaining

10   Agreement for the work that you had done, had initiated?

11   A.  Correct.

12   Q.  Overall, how would you describe your working

13   relationship with Mr. Sanders?

14   A.  It was very difficult.  A very difficult relationship.

15   It was a very tense relationship.  I know when I got there,

16   like, I really wanted to build a team.  That's something

17   I've prided myself on in my career is really working with

18   the people that work for me.  And with Mr. Sanders it

19   just -- it just -- it never felt like I could do anything

20   right.  I knew I was trying to make the best decisions for

21   my team and my territory, but it was a struggle to work with

22   him.  It was thinking that I'm trying to address his

23   priorities, and then you go to work and then his priorities

24   are in left field, or like the priority of that day had

25   changed.

1          So there wasn't a cohesive -- there's just wasn't

2     a cohesive working relationship where we were moving

3     forward.  It was chasing our tails again.  It felt like I

4     was trying to get us to a point where we were proactively

5     managing the territory, and it just turned into fire

6     fighting every single day.

7     Q.  As time progressed, did you begin to settle more into

8     your management role?

9     A.  Yes.

10    Q.  And as 2015 also progressed, did the rail traffic across

11    the territory begin to change at all?

12    A.  It did.  So in the later part of 2015 we did start

13    seeing a reduction in volume just due to a reduction in oil

14    coming out of the Bakken.

15    Q.  And how did either your comfort in settling into your

16    role, management, and changes in rail traffic, how did that

17    affect your ability to manage your team?

18    A.  It started to give me more time.  So instead of spending

19    a lot of time just trying to get track and time with the

20    transportation department, that relationship really started

21    to evolve and be more positive.  We were able to get more

22    time.  We were able to just start better managing our

23    territory because there was just more time available for us

24    to do our work.

25          So then it starts to give me a little bit more

 1     time to go back and continue becoming just a better

 2     roadmaster, so -- yeah, I think the biggest thing is just

 3     more time.

 4               MS. DONESKY:  Jan, if you can pull up Defendant's

 5     Exhibit 44, please.  If you can maybe focus on the top third

 6     of the document, please.

 7     BY MS. DONESKY:

 8     Q.  Ms. Hoppenrath, do you recognize this document?

 9     A.  Yes.

10     Q.  And what is it?

11     A.  These would be my roadmaster expectations.

12     Q.  Okay.  And it's dated when?

13     A.  10-9 of 2015.

14     Q.  Would this time period be consistent with around the

15     time that you felt you had more time to focus on managing

16     your team?

17     A.  Yes.

18     Q.  How do you recall communicating these expectations to

19     your group?

20     A.  I recall going over them in, like, a morning briefing.

21     Q.  And therefore, it would have been to all your direct

22     reports?

23     A.  Yes.

24     Q.  Let's take a quick look at a couple of these in

25     particular.

Copperman - Direct

```
 1                  At the top we've got the -- why don't you read for
 2     the jury the start time paragraph.
 3     A.  "Start time.  The morning briefing will start at 07:00.
 4     Everyone is expected to be at their designated start
 5     location by that time.  If an employee arrives after the
 6     start time, they will be sent home and it will be considered
 7     an unapproved absence."
 8     Q.  Why did you want the morning briefing to start
 9     altogether at 7:00 a.m.?
10     A.  So I wanted it start to 7:00 a.m. because my positions
11     were bid from 7:00 to 3:00.
12     Q.  And why did you see that as a benefit of having everyone
13     start at 7:00 a.m.?
14     A.  So having everyone start at 7:00 a.m., it just gave us
15     the ability to have all the employees have an efficient --
16     or an effective safety briefing.  Because everyone's there,
17     everyone can talk about priorities or safety issues, what
18     the plan is for the day, and it's a way to make sure
19     everyone is in alignment for the remainder of the shift.
20     Q.  Was it your preference to have a face-to-face
21     communication as opposed to by conference call?
22     A.  Yes.
23     Q.  And why was that important to you?
24     A.  I just think that you can build better relationships
25     when you're in the same building.  So at some point we had
```

1    had a conference call, and then we shifted away from that.

2    And then everyone report to Dayton's Bluff was kind of an

3    anomaly.  Other territories across the division were just so

4    large that they had people reporting to different spots, so

5    it was a luxury that we got to see each other face and face

6    and work on building a team and having effectively

7    communication.

8    Q.  Let's look down then to the paragraph on timely

9    reporting.  If you can read that paragraph for the jury,

10   please.

11   A.  "All persons entering times in PARS and reporting for

12   the day must report daily and before they leave for the

13   night.  Employees with this responsibility must also send a

14   nightly report to roadmaster, division engineer, and

15   manager."

16   Q.  So as of 2015, this was your expectation for your direct

17   reports for reporting time?

18   A.  Yep.

19   Q.  And why did you think it was important for employees to

20   report their time on the same day?

21   A.  Because they -- excuse me -- it's important for them to

22   report on the same day because it's the most accurate memory

23   that they're going to have of their time for the day.

24   Q.  And let's look at the overtime section, please.  If you

25   can read that, and just read a little slower for the court

Hoppenrath - Direct

1    reporter if you might.

2    A.  "All overtime must be approved.  A conversation with the

3    roadmaster before overtime starts every day is mandatory."

4    Q.  So that was your requirement also as of fall of 2015,

5    October specifically?

6    A.  Yes.

7    Q.  Was this expectation also in line with conversations you

8    might have been having as a division as a whole from a

9    budgetary or financial basis?

10   A.  Yeah.  Managing overtime is important.  There are times

11   when there's just no way around overtime, but if we can

12   manage our overtime effectively, that's a line item in the

13   budget and ultimately, like, if we can manage our overtime,

14   that keeps everyone working longer.  So we're trying to

15   keep -- we're just trying to balance everything.  And if our

16   overtime is through the roof, that might mean we're going to

17   look for other ways to cut our spend.

18   Q.  I want to talk next about the company vehicle policy?

19         MS. DONESKY:  Jan, if you could pull up 78-012.

20   Yeah, D.  Hang on.  No, I believe it is defendant.  It's

21   D-78.  And then it's 12.  Page 12.  Thank you.  And then if

22   you could highlight -- focus in on commuting, paragraph 1.

23   Perfect.

24   BY MS. DONESKY:

25   Q.  Ms. Hoppenrath, what is the company policy as it relates

TIMOTHY J. WILLETTE, RDR, CRR, CRC
(651) 848-1224

Coppock - Direct

1    to company vehicles?

2    A.  So specifically for commuting, do you just want me to

3    read it?

4    Q.  Sure.

5    A.  "Commuting between an employee's home and headquarter

6    location is permitted within a reasonable distance, provided

7    a legitimate company-related reason exists and is authorized

8    by supervisor.  A reasonable distance is fifty miles one

9    way."

10   Q.  And as far as you can recall, had this policy been in

11   place since you arrived in March of 2015?

12   A.  As far as I can, yes.

13   Q.  And so it has provisions of two things, it looks like.

14   Legitimate company-related reason; right?

15   A.  Correct.

16   Q.  And authorized by the supervisor?

17   A.  Correct.

18   Q.  And did the topic generally within the division come up

19   regarding this policy in that 2015 -- later fall of 2015

20   timeframe?

21   A.  Yeah.  So what I can recall is that there was

22   conversations about budget and this was a line item that we

23   could take a look at.  And this was under all of Mr. Jones's

24   direct reports, so it was looking internally at our vehicles

25   with our direct reports and if there truly was a business

Toppen - Cross - Direct

846

1   need for the people to be taking the vehicles home.

2   Q.  What were some of the reasons why you wanted to have the

3   company vehicles in the yard?

4   A.  So there were a couple of reasons.  So just as like as

5   far as budget goes, there is a cost of fuel.  There's also

6   just wear and tear on the hi-rail vehicles driving to and

7   from work.  There is times where, for my territory

8   specifically, to have the hi-rail vehicles there at night in

9   the event that someone needed it, someone got called in.

10  And my territory was short enough that I didn't see a

11  business need for people to take the vehicle home.

12  Q.  And so as a result of that review, were any of your

13  direct reports -- did any of them have your permission to

14  have the company vehicle and take it home?

15  A.  After we reviewed it?

16  Q.  Yes.

17  A.  So once we reviewed it, I determined that no one on my

18  territory needed to take a vehicle home.

19  Q.  And at some point you communicated that to Mr. Sanders

20  because prior to that he had been using the company vehicle?

21  A.  Correct.

22  Q.  As of late 2015, did anyone on your team then have

23  approval?

24  A.  No.

25  Q.  Let's talk about Mr. Sanders' schedule when you arrived

Copper v. BNSF-ECT

847

```
 1    in March of 2015.  What schedule or at some point as you
 2    began your role as roadmaster for St. Paul, what was
 3    Mr. Sanders' working in terms of hours and schedule?
 4    A.  So when I arrived to St. Paul, to the best of my
 5    recollection all of my track inspectors were bid in five
 6    eight manner.  So that was the way that it was bid out.  It
 7    had come to light at some point -- I don't recall exactly --
 8    that Mr. Sanders was working on a 4/10 schedule, which was
 9    not in line with what his position was bid as.
10    Q.  And so what did you -- upon learning that -- and when
11    you say "bid out" are you referring to it's bid under the
12    Collective Bargaining Agreement in that manner?
13    A.  Yeah.  So it's bid -- it's bid in a certain way where it
14    would be like 5/8s, start time, end time, specific days of
15    the week.
16    Q.  And that included the track inspector role?
17    A.  Correct.
18    Q.  And 5/8s, the hours of the day were 7:00 to 3:00?
19    A.  Correct.
20    Q.  And did that 7:00 to 3:00 coincide with what we just
21    looked at in the roadmaster expectations of your desire to
22    have everyone there at Dayton's Bluff at 7:00 a.m.?
23    A.  Yes.
24    Q.  At some point did you communicate to Mr. Sanders that
25    you were going to change him back to the bid position?
```

Copp - Cross - Direct

1    A.  Yes.

2    Q.  Okay.  And was he accepting of that change?

3    A.  No, he was frustrated with the change.

4    Q.  Was there anything you did subsequent to that to either

5    further inquire about the original basis for him to get on

6    4/10s and so forth?

7    A.  Yeah.  So I switched him back to 5/8s; and then I

8    believe I was, like, coming back from the holidays.

9    Mr. Sanders then started reporting at 6:30 to Bridal Veil,

10   which I don't know why.  It just felt like he didn't want to

11   be a part of the team and, you know, try and manipulate what

12   my directive was to -- I don't know why.  I can't speculate.

13        So then at that point I had to then again clarify

14   that it was 7:00 to 3:00 at Dayton's Bluff.  He was very

15   upset.  He said he needed like five days' notice.  So I told

16   him it was going to be like seven days per the agreement.

17   And then at that point, or maybe slightly before, I don't

18   exactly recall, but I had reached out to his previous

19   roadmaster just to ensure that there was no, like,

20   conversations about 4/10s or where he was reporting, just to

21   make sure that, you know, given the benefit of the doubt,

22   that he hadn't been misled by a different roadmaster.

23   Q.  And what did you learn upon making that inquiry?

24   A.  That that conversation had never happened; that the

25   previous roadmaster had stated that he never authorized

1    Mr. Sanders to work a four ten schedule.

2              MS. DONESKY:  Jan, if you could pull up P-63,

3    please.  If you can kind of highlight the third from the

4    half to the bottom.  Half towards the bottom, yeah, the

5    first two.  And go all the way down -- yeah, perfect.

6    BY MS. DONESKY:

7    Q.  Ms. Hoppenrath, is the email communication you were

8    referring to in contacting Mr. Sanders' prior supervisors to

9    inquire about the schedule?

10   A.  Yes.

11   Q.  And Mr. -- was it Bill Shoemake was his former

12   supervisor?

13   A.  Correct.

14   Q.  And his answer was that Mr. Sanders was the same as

15   everyone else?

16   A.  Correct.

17   Q.  7:00 a.m. was at the Bluffs?

18   A.  Yes.

19   Q.  Did you, Ms. Hoppenrath, did you at some point reach out

20   to Human Resources in connection with your working

21   relationship with Mr. Sanders?

22   A.  Yes.

23   Q.  And why did you do that?

24   A.  Because as time progressed, I personally wasn't making

25   any headway in improving our relationship.  And so I was

Opperman - Direct

1    looking for some additional advice on a path forward.

2             MS. DONESKY:  Could we maybe get the witness an

3    additional water?  Is there an extra one?  It looks like

4    there's a new one on the left.  Just want to make sure

5    you're okay.

6        (Water supplied)

7             MS. DONESKY:  Jan, if you could pull up P-61,

8    please.  Thank you.  Maybe I have the wrong number.  There

9    we go.  Thank you.

10            If you could highlight and enlarge from the

11   email -- yeah, the substance of that email.  Start with the

12   first full paragraph if you go up a little bit.  Great.

13   Thank you.

14   BY MS. DONESKY:

15   Q.  Does this reflect an email that you sent on January 6th

16   of 2016?

17   A.  Yes.

18   Q.  And who is Joe Spire?

19   A.  He was in HR.

20   Q.  Human Resources?

21   A.  Human Resources.

22   Q.  Why don't you start reading your email to him for the

23   jury.

24   A.  "At 9:19 on 1-5-2015," which should read '16, "I

25   received a phone call from Mr. Sanders.  Initially it was

1    about how the frog at the number 2 east end at Dayton's

2    Bluff Yard needed to be addressed.  I told him that we were

3    already making plans to repair, which led him to his next

4    conversation about if he was allowed to take the truck home

5    now that the holidays and vacation were over."

6    Q.  And just keep slowing down as you read for the court

7    reporter.  I know it's difficult.  Continue on.

8    A.  "Upon hearing that, he was upset and asked why if the

9    company policy that he take his truck home.  I told him that

10   it was company policy with supervisor approval and he no

11   longer had supervisor approval.  Still upset he told me it

12   was unfair that he was not allowed to take the truck home

13   when other people were.  I asked him who was taking the

14   truck home (I had no knowledge of this) and when asked to

15   provide names he stated that he wasn't a rat.  To note, I

16   have permitted one employees that I can recall to take the

17   truck home in an extreme case; i.e., this employee got off

18   work late, had a broke down car, and was due to arrive back

19   early the next morning.  He made other statements about how

20   he was unfairly treated and brought to light that I am

21   impossible to work with and bad at my hob.  He said he's

22   been trying to leave since the day he got here."

23   Q.  Let me stop you there for a moment, Ms. Hoppenrath.

24   When Mr. Sanders told you that you were impossible to work

25   with and bad at your job, how did that make you feel?

Hoppenrath - Direct

1    A.  It was super discouraging.  I'm someone who's generally

2    pretty easy to get along with.  I care about my people.  I'm

3    trying to do what's best for my people and the territory.

4    So to say that I was impossible to work with, it just --

5    it's disheartening.  And then, I mean, it's definitely hard

6    to hear that people think you're bad at your job.

7    Q.  Continue on with the rest of the paragraph.

8    A.  "He also asked why I am allowed to use the company phone

9    for personal reasons during work (in this case social media

10   which is not on my work phone) and why we as management got

11   to scrutinize every movement that he makes.  I told him that

12   the conversation was over and that I was sorry he felt that

13   I was impossible to work with.  He kept asking me what I was

14   going to do about it and at that point I knew the

15   conversation needed to end."

16   Q.  Moving down to the next paragraph, if you can highlight

17   that.  You documented these events contemporaneous with when

18   they occurred, Ms. Hoppenrath?

19   A.  Pardon me?

20   Q.  The email you wrote is contemporaneous to when these

21   events were occurring?

22   A.  Yes.

23   Q.  Read then what happened next.

24   A.  "Approximately one hour after that conversation he

25   contacted me to inform me that he had pulled two tracks out

1    of service in Dayton's Bluff Yard.  It's significant to note

2    in this case that these defects were past due on 12-31 and

3    12-17; and while I understand that it was the right call for

4    the railroad, he did have the whole working day on the day

5    upon his return from vacation to remove these from service,

6    which he did not do."

7    Q.  And then the last paragraph to your email.

8    A.  "It should also be noted on December 10th he was told

9    that he needed to change his work from 4/10s that he put

10   himself on with no supervisor approval, to 5/8s.  At that

11   point in time he drove to Midway Yard and pulled three

12   tracks out of service for wide gauge."  That's what the "S"

13   means.  "While the defects was still there, my instinct is

14   that he knew about this long before and he was able to

15   identify a spot where he knew an out-of-service condition

16   would exist as a form of retaliation."

17   Q.  Were the examples that you described in the email the

18   type of time and manner reporting that you were referring to

19   earlier?

20   A.  Yes.

21   Q.  Are you aware or familiar with steps that Human

22   Resources took to address some of the concerns that you

23   raised in early 2006 -- I'm sorry, 2016?  Sorry.

24   A.  I don't recall specifics.  We were continuing to try to

25   work towards making a better working relationship.  But

1    shortly thereafter -- or not shortly -- I believe it was

2    like the end of the month, he left my territory.

3              MS. DONESKY:  Jan, if you could go to Defendant's

4    Exhibit 78-08 and blow up the top part of that, top two --

5    three bullets there.  Perfect.  Yeah, thank you.

6    BY MS. DONESKY:

7    Q.  Showing you from Human Resources a timeline in the

8    various reports, this reflects the January 6th, 2016 email

9    we just read?  This is a notation referring to the email?

10   A.  Yes.

11   Q.  And then the second bullet reads:  "It was decided that

12   when" -- what is MOW?

13   A.  Maintenance of way.

14   Q.  "It was decided that when MOW did their safety meeting

15   that HR would come in and present on the EEO/RED training

16   and also the vehicle policy."  Did I read that correctly?

17   A.  Yes.

18   Q.  And then were you aware that a training then occurred in

19   February of '16?

20   A.  Yeah.  I don't recall it specifically happening, but

21   these were the notes.  So at some point we would have had

22   our monthly safety meeting.

23   Q.  And you mentioned, I think a few moments ago, that

24   shortly after your communications with Human Resources

25   Mr. Sanders bid or bid out of your territory; correct?

```
 1    A.  I believe so.  Again, I don't recall specific dates, but
 2    there was a period of time in early 2016 that he went to my
 3    neighboring roadmaster.
 4    Q.  Are you personally -- do you have personal knowledge
 5    regarding at least the circumstances that arose relating to
 6    Mr. Klukas in connection with a hearing, circumstances
 7    regarding an investigation hearing?
 8    A.  Yes.
 9              MS. DONESKY:  Jan, if you could pull up P-222.
10    BY MS. DONESKY:
11    Q.  Showing you a scheduled hearing notice from Mr. Klukas
12    in November of 2016 timeframe, you're copied on this hearing
13    notice; correct?
14    A.  Yes.
15    Q.  It indicates you would be arranging to attend as a
16    witness?
17    A.  Correct.
18    Q.  Is that -- what's the reason for them putting you as a
19    witness to this hearing?
20    A.  So Mr. Klukas was supposed to move two machines, so he
21    was a lowboy truck driver.
22    Q.  Did he report to you?
23    A.  He did not report to me.  He was supposed to move two
24    machines to my territory.  It was roughly a three-hour
25    roundtrip; so two machines would be about six hours total.
```

Foppe Direct

```
 1    And the following day both my machines were not moved; and
 2    so after talking to Mr. Klukas, he said something about he
 3    had to leave because it was Halloween.  And again, like it
 4    just didn't make sense that something that should have taken
 5    six hours didn't get done in an eight-hour day.
 6    Q.  What did you do as a result then?
 7    A.  So I started looking at his records.  And between his
 8    DOT logbooks, his time, and his telematics -- so like his
 9    electronic logbook -- started pulling records for
10    Mr. Klukas.
11    Q.  And did you recommend that a hearing be -- or were you
12    part of a noticing a hearing for alleged violations?
13    A.  Yes.  So I was able to put -- to piece together
14    timelines based off the several sets of data that we had
15    where there was something that just was not right.  It
16    looked like there may have been a manipulation of logbooks,
17    which led to some time discrepancies, which led to not
18    aligning with his telematics.  So in my opinion it looked
19    like there needed to be an investigation to understand all
20    of the facts in the matter.
21    Q.  And does this Exhibit 222 then reflect that a hearing
22    notice was scheduled and issued to Mr. Klukas?
23    A.  Yes.
24    Q.  And Mr. Klukas was withheld from service pending results
25    of the investigation?
```

1    A.  Yes.

2    Q.  And did you participate as a witness at that

3    investigative hearing?

4    A.  Yes.

5    Q.  And ultimately, do you know, did the hearing conclude or

6    was a recess taken?

7    A.  I know there was a recess taken.

8    Q.  And after that would you have had involvement then after

9    that?

10   A.  No, I was strictly there to answer questions and present

11   data.

12   Q.  And turning to the next page then of the exhibit, are

13   you aware of the suspension, though, that Mr. Klukas

14   ultimately received?

15   A.  Yeah, I was aware after the decision it be made.  I

16   didn't play a part of it, but I was copied on the

17   investigation waiver, as well as I think someone had

18   mentioned it in passing the results of the investigation.

19   Q.  I'd like to talk next about the Human Resources

20   complaints.  There was -- what, if any, recollection or

21   knowledge did you have in connection with the first

22   complaint Mr. Sanders brought around December of 2015?

23   A.  I believe we're referring to a hotline call.

24   Q.  That would have been in April.

25   A.  Okay.  I apologize.  I know there was a point that

Opperman - Direct

1    Mr. Sanders had brought some concerns with and spoke to

2    Magenta.  From my recollection, my role was strictly just

3    finding them time to meet.  I don't really remember any

4    follow-up or anything coming out of that.

5    Q.  Do you recall even being interviewed in connection with

6    that?

7    A.  I don't.

8    Q.  What about a complaint that was brought in February

9    after, where issues relating to the company vehicle policy

10    were raised?  Do you recall speaking with anyone in Human

11    Resources regarding that?

12    A.  I recall talking to Joe Spire at some point.

13    Q.  And what about you mentioned then the hotline complaint.

14    Are you familiar with that complaint?

15    A.  Yeah.  I believe then that was the last one where I

16    spoke to Dane Freshour.

17    Q.  Were you interviewed in connection with that complaint?

18    A.  Yes.

19    Q.  And you mentioned Dane Freshour --

20    A.  Yes.

21    Q.  -- conducted that?

22    A.  Yes.

23    Q.  And do you recall around when that was?

24    A.  I only recall because of the emails that were sent, but

25    it was sometime in April, I believe.

Hoppenrath - Direct

```
 1    Q.  April, you thought?

 2    A.  I mean, as I sit here today, I don't remember exactly

 3    when it was.

 4              MS. DONESKY:  Jan, if you could pull up P-118,

 5    please.  Perhaps enlarge the top half of the email.

 6    BY MS. DONESKY:

 7    Q.  Do you recognize this email, Ms. Hoppenrath?

 8    A.  Yeah.  So this was an email that Dane conducted the

 9    interview in person, so he had written out all of his notes

10    and sent them over just for me to review to make sure that

11    he understood what I was saying.

12    Q.  And so per your beginning email there you say, "Please

13    let me know if you need more information.  I added my

14    comments in red, and if something needed rewording I left

15    you original text with a strike through."  And those are

16    your initials?

17    A.  Yes.

18    Q.  So you participated in this investigation through

19    interviews with Mr. Freshour?

20    A.  Yes, and then this follow-up.

21    Q.  So structure-wise, how did it work -- so Mr. Sanders was

22    alleging a time period of how long in this complaint?

23    A.  So everything that's in black is what Dane had sent to

24    me.  So according to this, Don Sanders had alleged that over

25    the last two years myself had harassed him.
```

1    Q.  And what are you pointing out in red font there?

2    A.  Just that I had only been in my position for a year at

3    that point.

4    Q.  And so looking at the subparagraphs then, paragraph A,

5    so you mention in bold and underlined, that's Mr. Sanders's

6    allegation?

7    A.  I believe so.

8    Q.  And the first one is, "That was track work that needed

9    to be done and Blaine sent Don home in eight hours and

10   allowed others to work overtime to complete the work."

11   That's his allegation?

12   A.  Correct.

13   Q.  And then what is your response then?

14   A.  So Blaine.  "It depends on the work.  That is section

15   work that would require overtime.  I would send him home

16   because he is a track inspector."

17           I clarified saying:  "Mr. Sanders would be held if

18   a track inspector was needed to complete the work.  If the

19   work did not require a track inspector, then the overtime

20   would be granted the employee responsible for that

21   designated work."

22   Q.  When you say "would be held" meaning he would be given

23   overtime or allowed to work the time if it was needed as

24   track inspector?

25   A.  Yeah.  If the work required a track inspector, then he

Fopp7707cv-05106-ECT

1     would have been entitled to the work.

2     Q.  Going down to Section B then if we can highlight that.

3               So then same structure then as before, the

4     allegation in bold underlined.  "One time Don removed tack

5     from service; however, Blaine made you stay 27 hours in

6     order to complete the work when it could have been done more

7     evenly if spread over a period of several days."

8               And structure-wise, the black font under it is what

9     Mr. Freshour put together after you spoke with him; fair?

10    A.  Fair.

11    Q.  And then the red font and strikethroughs are what you --

12    how you added to or clarified in the answer?

13    A.  Correct.

14    Q.  And is this the Union Yard situation?

15    A.  Correct.

16    Q.  Okay.  Why don't you read that for the jury's benefit?

17    A.  "I know that once we were at Union yard Don called me at

18    the end of shift indicating the entire yard needed to be put

19    out of service.  I asked him why.  Don stated that the

20    tracks looked bad.  He had not walked the yard yet."

21              And then I add:  "He did not provide any details

22    as to why the tracks needed to be removed from service.

23    Union yard is an excepted track so the only reason that it

24    would be need to be out of service would be due to wide

25    gauge.  Upon the arrival of Steve and myself to Union Yard

Reporter's Transcript

1    he had no details to provide.

2              Don indicated it was out of frequently because the

3    yard had not been inspected within timeframes.  We called

4    another track inspector down to assist and called in another

5    crew to assist with repairs.  In order to get the tracks

6    back in service, he may have worked 27 hours.  I asked if he

7    needed a ride, specifically a ride home.  He declined.  It

8    was true that he did work around 27 hours.

9              We had to work around the clock to put these

10   tracks back in service due to the critical role Union yard

11   plays in our high-priority freight traffic, and this even

12   occurred during peak season."

13   Q.  Moving to the next allegation then, section C.  Next

14   allegation was:  "Blaine has completed Don's craft work."

15   What was the response to that?

16   A.  "I had set up a coverage plan for the weekend.  I went

17   out and hi-railed a section of track according to my monthly

18   hi-rail responsibilities.  The team had completed the FRA

19   inspections that week.  I went out and entered an

20   inspection.  However, it was a BNSF inspection, not an FRA

21   inspection.  The union put in a time claim, which it did,

22   and it was paid."

23   Q.  Okay.  And then the last section, section D.

24              "Allegation:  Blaine is given direction by Keith

25   to order Don to deviate from policy.  They are jeopardizing

1    the public through derailments which could result in death

2    or injury."

3             Your response?

4    A.  "Not to my knowledge.  I will challenge defects and slow

5    orders.  We work in a department where we have to protect

6    the track; but if there's not a valid reason, then it costs

7    the transportation team production if we place an

8    unjustified slow order.  Don has put in defects that are not

9    defects.  He has a different interpretation of the

10   engineering instructions.  He has used an outdated EI to

11   place slow orders, and he has even placed slow orders on a

12   track where the track speed is lower than the slow order

13   placed.  Everything that I have reviewed has been in

14   compliance with EI and FRA guidelines.  If there is a

15   legislate defect we fix them or protect them with a slow

16   order."

17   Q.  You were asked by counsel on Friday about a position you

18   took in New Mexico sometime in 2018?

19   A.  2017.

20   Q.  You applied for that position?

21   A.  Correct.

22   Q.  You competed for that job with other applicants?

23   A.  Correct.

24   Q.  Ms. Hoppenrath, you left BNSF a while ago, right?

25   A.  Correct.

1   Q.  About April of 2019?

2   A.  Correct.

3   Q.  You have no legal obligation to be here today?

4   A.  Correct.

5   Q.  But you chose to be here so the jury could hear your

6   side of the story?

7   A.  Yes.

8              MS. DONESKY:  I have nothing further at this time.

9              THE COURT:  Mr. Kaster?

10             MR. JAMES KASTER:  Thank you, Your Honor.

11                        **CROSS-EXAMINATION**

12  BY MR. JAMES KASTER:

13  Q.  Good morning.

14  A.  Good morning.

15  Q.  Mr. Sanders was never disciplined for insubordination;

16  right?

17  A.  Not that I recall.

18  Q.  And that would be never, not at any point?

19  A.  I couldn't speak to anything prior to me getting there.

20  Q.  All right, but let's start with you.  He was never

21  disciplined for insubordination by you; right?

22  A.  Correct.

23  Q.  In fact, he didn't have any discipline at all prior to

24  these events in March of 2016 from you?

25  A.  Correct.

Copper v. Cross

1    Q.  We just looked at a document where you said Mr. Sanders

2    has reported defects that are not defects.

3    A.  Correct.

4    Q.  He did that one time; right?

5    A.  That I recall, yes.

6    Q.  So he reported a defect that was not a defect, singular.

7    A.  Correct.

8    Q.  And that was a time when he had the wrong manual, you

9    say an outdated version of the engineering instructions;

10   right?

11   A.  Correct.

12   Q.  I want to make sure I understand what you just said.

13   This incident at Union Yard and the incident at Midway Yard,

14   those are two different incidents; right?

15   A.  So -- I guess so Union Yard was what we discussed.  And

16   them I guess I'm not a hundred percent sure what you're

17   talking about for Midway Yard.

18   Q.  Sure.  I think you mentioned that Mr. Sanders had taken

19   some tracks out of service or taken the yard out of service,

20   and I'm not sure what you said.  You referenced Midway Yard.

21   A.  I believe in one of the emails that I just read it

22   referenced Midway Yard, which was a different situation.

23   Q.  Right.  That's what I wanted to clarify.

24   A.  Okay.

25   Q.  And Mr. Sanders actually put in those defects or took

```
 1      the tracks out of service or imposed a slow order or

 2      whatever because of wide gauge; right?

 3      A.  Correct.

 4      Q.  Did someone go walk the gauge with him and verify

 5      whether or not it was in fact wide gauge?

 6      A.  I personally didn't.  We sent a section out there to fix

 7      it, so ...

 8      Q.  Did it actually require fixing?

 9      A.  To my knowledge, yes.

10      Q.  So it was actually a defect; right?

11      A.  Correct.

12      Q.  And under the FRA guidelines, that has to be fixed;

13      right?

14      A.  Correct.

15      Q.  Because if it's not fixed, you could have a derailment?

16      A.  Correct.

17      Q.  And that's one of the things that can cause a

18      derailment; right?

19      A.  Correct.

20      Q.  Wide gauge; right?

21      A.  Correct.

22      Q.  So were you at that Midway Yard at any point during that

23      event, do you recall?

24      A.  I don't believe so.

25      Q.  So let's go to Union Yard.  This is December of 2015;
```

1    right?

2    A.  Correct.

3    Q.  You say it was a Friday.  Do you recall that?

4    A.  I don't recall the specific day.

5    Q.  You say Mr. Sanders was there; right?

6    A.  Yes.

7    Q.  Were you there?

8    A.  Yes.

9    Q.  Mr. Chartier was there?

10   A.  Yes.

11   Q.  Was Mr. Jones there?

12   A.  I don't recall.  He may have come over at some point,

13   but it was mostly Mr. Chartier and I handling that

14   situation.

15   Q.  In any case, Mr. Sanders was required then to walk the

16   yard until midnight or something like that; right?

17   A.  I don't recall specifics, but we needed to get the track

18   operational.

19   Q.  Was Matt Scherbing there, do you recall?

20   A.  I don't recall.

21   Q.  Is it possible he was there?

22   A.  It is possible.

23   Q.  You admit the tracks did not look good; right?

24   A.  I did not.  That's what Mr. Sanders had stated.

25   Q.  Well, I thought you -- I just wrote down I thought you

Copperweld v. Crane

1    just said that the tracks did not look good.

2    A.  I didn't say that.

3    Q.  Okay.  Sorry.  In any case, the frequency wasn't up to

4    what was required by law; correct?

5    A.  Correct.

6    Q.  The tracks had not been inspected as required by the

7    FRA; right?

8    A.  Correct.

9    Q.  So the legally-obligated thing to do is exactly what

10   Mr. Sanders did at that point; right?  If you don't meet the

11   frequency, the tracks have to come out of service.

12   A.  Correct.

13   Q.  And people were angry about that.  They were angry about

14   Mr. Sanders taking the tracks out of service when in fact

15   that was required by law; right?

16   A.  Can you repeat the question?

17   Q.  Sure.  People were angry about Mr. Sanders taking the

18   tracks out of service when in fact taking them out of

19   service was what was required by the FRA because the tracks

20   had not been inspected as required by law; right?

21   A.  I -- I wouldn't -- I think angry might have been an

22   emotion.  I think frustration would probably be a more

23   accurate -- accurate statement.

24   Q.  Is my statement otherwise true if you insert the word

25   "frustration" for the word "anger"?

```
1    A.  Yeah.

2    Q.  In fact, in that timeframe, December of 2015, I think

3    you've said there was a reduction in volume at that point;

4    right?

5    A.  Correct.

6    Q.  And I'm a little confused because in one of your answers

7    to HR at the time, I think I read that there was high-

8    priority freight traffic that was being affected.

9    A.  Yes.

10   Q.  So this Union yard situation implicated high-priority

11   freight traffic.

12   A.  Yes.

13   Q.  Thus leading to more frustration; right?

14   A.  Not necessarily.  The whole situation was frustrating.

15   Q.  You mentioned that timely reporting, reporting your time

16   every day, would lead to accurate time reporting; right?

17   A.  Yes.

18   Q.  I think that's what you said this morning.  Actually,

19   timely reporting by your subordinates was a part of your

20   scorecard at the time; right?

21   A.  No.

22   Q.  It wasn't?

23   A.  No.

24   Q.  Were you graded on whether or not your subordinates put

25   their time in every day?
```

Copperman at Cross

870

```
1    A.  Again, it was a metric, but it had no bearing on my
2    scorecard.
3    Q.  It was a metric?
4    A.  Correct.
5    Q.  A metric pertaining to what?
6    A.  It was a metric that was emailed out and that we would
7    look at, and --
8    Q.  Emailed out by whom?
9    A.  It was -- to my recollection -- and I don't even know if
10   email is the right way.  It's been awhile.  It was a
11   computer-generated metric.  I don't know the nuances of the
12   tech team that would send out reports or where you would go
13   to access these reports, but it was a metric that was
14   available for us to look at.
15   Q.  How frequently was it emailed out?
16   A.  I don't know.
17   Q.  It was emailed to you?
18   A.  Again, I -- it's been years since I have dealt with the
19   timely reporting metric.  So I recall it being an email.  I
20   am not the expert in how that was communicated out.  I don't
21   remember frequency.  I know there was a way that you could
22   click into it.  I don't recall the specifics.
23   Q.  Mr. Jones sent the email?
24   A.  I don't think it was an email that came from Mr. Jones.
25   Q.  You don't recall who it came from?
```

Copper v. BNSF Case

1    A.  No.  I mean, again, like to the best of my recollection,

2    I recall timely reporting was one of like the auto-generated

3    emails that came into the inbox.  But again, that is my

4    memory six years later.  I don't recall specifics of

5    actually how it was presented.

6    Q.  Let's talk about Mr. Sanders' hours, so let me change

7    the subject on you now.

8              Mr. Sanders had been on 4/10s for how long?

9    A.  I don't know how long prior to me getting there, but I

10   got there in March of '15.  Again, at some point it was

11   mentioned in passing, but we changed it in December, so...

12   Q.  Mr. Sanders had been on -- I think the records in this

13   case will reflect that he had been on 4/10s since 2013.  Did

14   you know that?

15   A.  I -- I don't know what he was doing prior to when I got

16   there.  That was just a conversation that conflicts with

17   what the prior roadmaster had told me.

18   Q.  This prior roadmaster had been his roadmaster in that

19   timeframe if you include since 2013; right?

20   A.  All prior to me being here.

21   Q.  Well, you just talked about -- what was his name, the

22   prior roadmaster?  Mr. Shoemake?

23   A.  Mr. Shoemake.

24   Q.  He had been Mr. Sanders' roadmaster during that

25   timeframe to your knowledge; right?

1    A.  To my knowledge.  I don't know what time Bill arrived.

2    I don't know the turnover -- I don't recall the turnover of

3    roadmasters prior to me being there.

4    Q.  You don't dispute that the time records for Mr. Sanders

5    showed that he was on 4/10s since 2013?

6    A.  I don't think that I can say that because I have not

7    seen them to look at them.  So I don't think it would be

8    accurate for me though speak to that.

9    Q.  Okay.  Mr. Sanders' truck, his truck -- driving his

10   truck to and from work was something that you addressed with

11   him in mid-December of 2015; right?

12   A.  I believe so.

13   Q.  And you addressed the these hours on December 10th;

14   right?

15   A.  Correct.

16   Q.  Mr. Sanders went to HR on December 7th.

17   A.  If that's what the documents show.

18   Q.  Is it a coincidence that the issue of the truck and his

19   hours came up immediately after he went to HR?

20   A.  Is it a coincidence?

21   Q.  Yes, is it a coincidence?

22   A.  Yes.

23   Q.  Mr. Klukas.  You talked about Mr. Klukas.  You became

24   suspicious, I think you said, around Halloween?

25   A.  Correct.

1      Q.  Was that in 2015?

2      A.  No.

3      Q.  That was in what year?

4      A.  2016.

5      Q.  Because he had said that day he didn't have time for a

6      three-hour roundtrip, what would be six hours?

7      A.  Correct.

8      Q.  So my question is a little confusing.  It was three

9      hours each way; right?

10     A.  It was an hour and a half each way, two machines; an

11     hour and a half.  So three hours for one machine, three

12     hours for another machine.

13     Q.  Had he written down time for actually doing that job?

14     A.  I don't recall.

15     Q.  In any case, he falsified his time.  Hold on one second.

16     Let me just finish the question, please.  I know that was

17     confusing so let me start over.

18          He falsified his time and his logbooks, right?

19     A.  I presented evidence that showed that there was some

20     type of manipulation of time, some type of manipulation of

21     the logbooks, and that's why we went to investigation to

22     determine if it was falsified or not.

23     Q.  And your review of the records I think, according to the

24     testimony we've heard in this case from HR, indicated

25     manipulation of time and logbooks beginning on August 2nd,

Foppe, et al. - Cross

```
 1    2016 and continuing; right?

 2    A.  Correct.

 3    Q.  Over a period of many days; right?

 4    A.  Correct.

 5    Q.  A pattern of activity; right?

 6    A.  Yes.

 7    Q.  And the manipulation of the logbook by itself is a

 8    violation of law, right, as far as you know?

 9              THE COURT:  One second.

10              MS. DONESKY:  Objection.  Foundation.

11              THE COURT:  Let's get that microphone on.

12              MS. DONESKY:  Objection.  Foundation.

13              THE COURT:  I'll allow the witness to answer.

14              THE WITNESS:  Can you repeat the question?

15    BY MR. JAMES KASTER:

16    Q.  To your knowledge, is the manipulation of the logbook by

17    itself a violation of policy?

18    A.  It would be a violation of policy.

19    Q.  How many days did this involve?

20    A.  I don't recall.

21    Q.  Was it a period of months?

22    A.  It was a handful of days.  I don't -- I haven't seen the

23    investigation in a couple years, so it was over a course of

24    a couple months.  I don't recall specific -- it wasn't every

25    day starting October 2nd.  Again, I don't recall the
```

```
1    specific days.

2    Q.  I think you mean August 2nd; right?

3    A.  Yeah.  I apologize.

4    Q.  How many hours, do you recall?

5    A.  I don't recall.

6    Q.  He had actually submitted his time to payroll; right?

7              MS. DONESKY:  Objection.  Foundation.

8              THE COURT:  Overruled.

9              THE WITNESS:  I believe at that point he would

10   have.

11   BY MR. JAMES KASTER:

12   Q.  In other words, the time that was entered had gone

13   through payroll periods and he had been paid at the time

14   that you were investigating him; correct?

15   A.  Correct.

16   Q.  You went through some of the entries this morning and I

17   just want to clarify so we all have an understanding of the

18   precise timeline in March of 2019.  We went through some of

19   the entries today.  I'm going to put those in context, okay?

20             I think you said that you started watching him on

21   the 19th because you wanted to know -- or people wanted to

22   know -- what would he do if he didn't think anyone was

23   watching.  Do you recall that testimony?

24   A.  Yes.

25   Q.  As it related to March 19th, I think you said that you
```

1   left -- and I wrote this down -- I want to say around 1:15

2   p.m.

3   A.  For March 19th?

4   Q.  Correct.

5   A.  What was your question?

6   Q.  I just wanted to get a placeholder for my next question.

7   A.  Okay.

8   Q.  I think you testified that Mr. Sanders left, and I think

9   you said, "I want to say around 1:15."

10  A.  Okay.  That sounds correct.

11  Q.  You actually said the same thing in a hearing

12  transcript, right?  Do you recall that?

13  A.  I -- without it in front of me --

14  Q.  Okay.  Let's go to Exhibit 98, pages 10 and 11, please.

15          Go to the bottom of 10 and the beginning of 11.  I

16  think we can do that at one time.

17          Then you're talking, "I asked for Mr. Sanders to

18  do his daily inspection.  Um, from there he completed his

19  normal daily routine and 13:15 he had returned, returned to

20  the depot, and then left at 13:53 in his personal vehicle."

21          So you say that he came back to the area at 1:15.

22  13:15 is 1:15; correct?

23  A.  Correct.

24  Q.  In fact, if we look at page 132 of Exhibit 98, I think

25  we can clarify this.  So let's go to the bottom just above

1     the highlighting, the pink highlighting.

2              He actually doesn't finish driving the hi-rail

3     vehicle until what time?

4     A.  13:50.

5     Q.  13:48, right?

6     A.  Yes, sorry.  I was looking at the line below.

7     Q.  So it's not possible that he returned to the depot at

8     1:15 because he's in fact driving the hi-rail vehicle at

9     that point until 1:48; right?

10    A.  Correct.  And, like, I'm trying to do all this based off

11    my memory, and so like I think I've also testified that I

12    know he gave up track it is based on the track and time

13    records, and it's about a 20-minute drive.  So, I mean,

14    again --

15    Q.  All right.  Thank you.  You just said, "I'm doing all

16    this based upon my memory."  Of the 19th, right?

17    A.  Correct.

18    Q.  Because you have no notes of that day?

19    A.  No, I'm saying as I sit up here I know there's a lot of

20    evidence, and I know that I have gone through a lot of

21    different processes to get to this point.  And so when I say

22    I'm doing it based off my memory, like, I was in the

23    investigations of things; I was in a deposition; and so when

24    I'm up here, like, I am trying to accurately piece together

25    the story and understand and/or communicate those several

1   days.

2   Q.  You had actually contemporaneous notes of what happened

3   on that day; right?

4   A.  What do you mean by contemporaneously?

5   Q.  Contemporaneous notes means notes that you wrote down at

6   the time.  At the time of these events.

7   A.  At some point, yes.

8   Q.  Well, you took notes that day; right?

9   A.  Correct.

10  Q.  And you had those notes for a period of time thereafter.

11  A.  Correct.

12  Q.  Do you think those notes might refresh your recollection

13  about what actually happened that day?

14  A.  I mean, yes.

15  Q.  Did you show those notes to anyone before they were

16  thrown away?

17  A.  I don't recall who I showed them to.

18  Q.  Do you think you showed them to someone?

19  A.  I might have.  I don't recall.

20  Q.  Mr. Jones, it did you show them to Mr. Jones?

21  A.  Again, I don't recall who I showed my specific

22  handwritten notes to.

23  Q.  All right.  Let's go to the next weekend, March 25th and

24  26th.  Mr. Sanders has always said that those entries on

25  those days were incorrect; right?

1    A.  Pardon me?

2    Q.  I mean, since the investigative hearing since he was

3    first discussed, since the issue of the 25th and 26th was

4    first discussed with him, he said those entries are not

5    correct.

6    A.  I don't know.

7    Q.  So you said -- and I think I wrote this down -- that

8    after the 19th -- and I was trying to keep up with your

9    testimony -- after the 19th there were things that were just

10   unexplained in your mind.

11   A.  Sorry.  Can you repeat this?

12   Q.  Sure.  I think you said after the 19th, you and

13   Mr. Jones talked about what happened on the 19th, what you

14   observed, and that there were certain things that were

15   unexplained and you decided to do a deep dive.  Do you

16   recall saying that?

17   A.  Yep.

18   Q.  That deep dive did not involve talking to Mr. Sanders

19   about what had happened on the 19th; right?

20   A.  No.

21   Q.  Mr. Sanders has always contended he worked a full day on

22   the 19th; right?

23   A.  That's what I understand.

24   Q.  And in fact before you saw him and after you saw him,

25   you don't know what he was doing, whether he was working or

1    not?

2    A.  Correct.

3    Q.  You never thought to ask him what he was doing before

4    you saw him and after you saw him.

5    A.  Based on my conversations with Mr. Jones and labor

6    relations, that was the intent of an investigation is a fact

7    finding investigation.

8    Q.  On March 28th of 2016, the two notices of investigation

9    that we have already seen were prepared; correct?

10   A.  Again, I don't know when we started preparing those, but

11   that is the date that they are dated.

12   Q.  So the starting to prepare those would have happened

13   before that?

14   A.  One of them potentially could have been.  The second one

15   from the 25th and 26th, that would have been the first day

16   back to work.  So I know that they were finalized on the

17   28th.

18   Q.  I think you mentioned earlier in your testimony that

19   there was a team of people working on the notices.  Do you

20   recall saying that?

21   A.  So there are certain individuals that will compile a

22   notice.

23   Q.  I think when I asked you about the notice for the 25th,

24   and I think the language of the notice says something like

25   that and continuing, that you thought the 26th was included

```
 1    in the notice that was prepared on March 28th; right?

 2    A.  Correct.

 3    Q.  But in fact Mr. Sanders hadn't even entered time yet for

 4    the 26th; right?

 5    A.  Correct.

 6    Q.  All right.  Let's go to March 29th of 2016.  If we can

 7    pull up Exhibit 103 at page 127, please.

 8              So we can see at this moment, according to the

 9    little man in the 26th standing -- the little icon of a man

10    standing up -- on the 26th we can see that there is no time

11    entered at this time for the 26th; right?

12    A.  Correct.

13    Q.  This is actually on the 29th; right?

14    A.  Yes.

15    Q.  At 6:59 a.m.

16    A.  Correct.

17    Q.  You're watching this and taking this screenshot in

18    realtime; right?

19    A.  What do you mean by, like, realtime?  I mean, this is

20    the time when I took it, yeah.

21    Q.  That's what I mean.

22    A.  I wouldn't say I was, like, sitting there watching my

23    computer for things to change.

24    Q.  You weren't?

25    A.  I would periodically.  So I checked it before the start
```

1    of shift, and then I went back a little later and checked it

2    again.

3    Q.  But at 6:59 a.m. you don't see time entered for the

4    26th; right?

5    A.  Correct.

6    Q.  And you are watching and taking this screenshot at the

7    time.

8    A.  Yes.

9    Q.  All right.  Let's go to page 143.  This is when time is

10   entered then for the 26th; right?

11   A.  Correct.

12   Q.  And if we look down in the right-hand corner, you took

13   this shot at 7:25, 25 minutes later, basically?

14   A.  Yup.

15   Q.  You took another screenshot.

16   A.  Correct.

17   Q.  So sometime in that timeframe between just before 7:00,

18   6:59, and 7:25, time was entered.

19   A.  Correct.

20   Q.  Do you know whether or not Mr. Sanders had put in time

21   for as a placeholder and intended to go get his note so he

22   could correctly indicate the time?

23   A.  I do not know that.

24   Q.  Did you call Mr. Jones immediately after this entry,

25   7:25?

```
 1    A.  I don't recall on that day when I talked to Mr. Jones.

 2    Q.  Okay.  Well, let's take a look at your testimony in the

 3    investigation, page 32 of Exhibit 103, line 13.

 4            Let's just go up just a little bit.  I think if we

 5    looked at the next page, we'll see that you're having

 6    conversations with Mr. Jones at the time; right?

 7    A.  (No response).

 8    Q.  Let me just go to this point.  It says:  "Um, I did not

 9    personally deliver the notice.  Um, it was about 7:30 from

10    my knowledge.  So I don't have an exact time, but

11    approximately 7:30 in the morning."

12            You knew at the time that the notice was delivered

13    just a few minutes later; right?

14    A.  I don't -- I mean, I don't recall that morning.  I don't

15    have the exact timeline.  I know, like, based off the

16    screenshots when I looked at things, I don't recall

17    specifically like when Mr. Jones had told me that he had

18    given the notice.

19    Q.  So my question is this:  Did you do the screenshot at

20    7:25 and call Mr. Jones and tell him, "He's entered time for

21    the 26th.  Go ahead and deliver the notice"?

22    A.  I don't recall.

23    Q.  You were talking to Mr. Jones about these screenshots

24    you were taking; right?

25    A.  At some point I'm sure that I did, but I don't recall
```

1    the specifics of that day.

2    Q.  Well, let's talk about later that day.  I think you

3    saw -- we saw something that was about 11 o'clock in the

4    morning, 11:11 Mr. Sanders corrects or partially corrects

5    one of the entries; right?

6    A.  Correct.

7    Q.  This is after he's given a notice of investigation;

8    right?

9    A.  Correct.

10   Q.  But well before payroll had closed; right?

11   A.  I believe so.

12   Q.  Did you ever cut someone off from access to their

13   payroll before the close of payroll?

14   A.  So we had worked with labor relations and they told us

15   that -- that we would be able to remove access to the

16   systems once we removed him from service.

17   Q.  My question wasn't clear.  Had you ever before cut

18   someone off from access before the close of payroll, not

19   Mr. Sanders?

20   A.  I personally had not.

21   Q.  So the first time for that?

22   A.  Yes.

23           MR. JAMES KASTER:  If we can pull up Exhibit 93.

24   Let's start at the bottom of the page because I think this

25   email needs to be read from bottom up.

1    BY MR. JAMES KASTER:

2    Q.  So 2:09 p.m., in the afternoon, "I need help suspending

3    one of my employees, BNSF account, Don Sanders needs to have

4    his access to his computer, PARS, TIMS, email, suspended

5    until further notice."

6             You sent this email in response to Mr. Sanders

7    correcting or partially correcting one of his entries;

8    right?

9    A.  I don't recall the specific driver.  I don't even recall

10   when this initially had come up, um, but I know it was

11   something that labor relations had given us the okay to do,

12   and then that was just when I had sent the email.

13   Q.  Us.  Who was "us"?

14   A.  When I -- like, this is something that Mr. Jones and I

15   had been working on, so ...

16   Q.  All right.  Let's go to the next email, because

17   Mr. Jones seems to suggest that this is urgent.  "I need

18   confirmation ASAP that this individual's access has been

19   suspended."  Right?

20   A.  Correct.

21   Q.  Let's go up to the next email.  "Keith, ASAP provide

22   this information as a part of our daily update to this our

23   system.  If this request need to be processed immediately

24   because there is a potential security risk, please respond

25   with that information.  Otherwise it will be removed as part

```
 1    of our daily activities."

 2              In other words, this will be removed from the

 3    ordinary course; right?

 4    A.  Yes, that's what that says.  I don't know what their

 5    daily activities are, so -- or what that looks like.

 6    Q.  Mr. Sanders was a security risk?

 7              MS. DONESKY:  Objection.  Foundation.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  That was the verbiage that came from

10    user registration.  So I can't speak for their processes and

11    practices.  We had just made the request -- or I had

12    initially made the request.  Mr. Jones had responded to it,

13    and this is the verbiage that came back from an entirely

14    different department.

15    BY MR. JAMES KASTER:

16    Q.  Let's go to the next email.

17              Mr. Jones confirms that in fact his access was

18    suspended later that evening, 7:51 p.m.  This individual was

19    removed from service today and need all access removed ASAP;

20    right?

21    A.  What was the question?

22    Q.  Well, that's what the email says; right?

23    A.  That's what the email says, yes.

24    Q.  So Mr. Jones was successful in cutting off Mr. Sanders'

25    access.
```

Copperman v. United

```
 1    A.  At some point.  I don't know when the access was

 2    officially removed.

 3    Q.  Wasn't it removed on the 29th?

 4    A.  I don't know.

 5    Q.  Did you talk to Mr. Jones about that?

 6    A.  About?

 7    Q.  His access being removed on the 29th.

 8    A.  Again, I don't -- I'm sure we had conversations.  The

 9    way I guess I read this was he was responding to the user

10    registration asking for it to be suspended and for

11    confirmation.  I don't know if we ever actually got

12    confirmation or what that looked like.

13    Q.  Mr. Jones did not want him to get his entries correct

14    before the close of payroll; right?

15              MS. DONESKY:  Objection.  Calls for speculation.

16              THE COURT:  Overruled.

17              THE WITNESS:  Can you repeat the question?

18    BY MR. JAMES KASTER:

19    Q.  Sure.  Mr. Jones did not want him to get his payroll

20    correct, his hours correct for the 25th and 26th, before the

21    end of payroll, that payroll period, the end of the payroll

22    half.

23    A.  I don't -- I can't speak for him but we removed him from

24    all tech programs, not just PARS, but email, other

25    inspections.  So he was withheld from service.  So based on
```

1    conversations with labor relations, they said that was in

2    our parameter to remove access from all BNSF.

3    Q.  In your parameter meaning within your discretion?

4    A.  Labor relations said that we could and, when asked, so

5    that's a path that we went down.

6    Q.  That you could.  Not that you had to, that you could?

7    A.  Yes.

8    Q.  And when you say "labor relations told us," you're

9    talking about yourself and Mr. Jones; right?

10   A.  Correct.

11   Q.  You have a suspicion, you say, because Mr. Sanders left

12   on the 18th by 3:00, sometime immediately before 3:00;

13   right?

14   A.  Correct.

15   Q.  Then you spend full days on the 19th, 25th and 26th of

16   your time; right?

17   A.  Correct.

18   Q.  And then you prep and pull reports for calls with labor

19   relations and Mr. Jones; right?

20   A.  Correct.

21   Q.  Then you go through two investigative hearings; correct?

22   A.  Correct.

23   Q.  For a claim of incorrect hours of 6 hours and 45

24   minutes; right?

25   A.  Approximately.  I think it was a little bit more than

1    that.  It was two and a half hours one day.  It was four

2    another day and four -- I don't know -- I don't have the

3    exact amount of time in front of me, so...

4              MR. JAMES KASTER:  That's all the questions I have

5    for you.  Thank you.

6              THE COURT:  Ms. Donesky.

7              MR. JAMES KASTER:  I'm sorry, Your Honor.  I

8    missed one thing that I want to go to, okay?  I apologize.

9    BY MR. JAMES KASTER:

10   Q.  If we can pull up Exhibit 103, page 48, and go to line

11   7.  We were just talking about pulling his access and you

12   testified at the hearing about why that happened; right?

13   A.  Correct.

14   Q.  It was otherwise just a conversation that after the time

15   had been changed once, then we didn't, me and my supervisor,

16   didn't know what else was going to be altered between then

17   and the investigation.  Right?

18   A.  Right.

19   Q.  And when you say "altered," you mean entries of time

20   corrected.  That's what you mean.

21   A.  Changed, yeah.

22             MR. JAMES KASTER:  That's all the questions I have

23   for you.  Thank you.

24             THE COURT:  Ms. Donesky, do you have an estimate

25   for how long you think this will take?

1        MS. DONESKY:  Pretty short.

2        THE COURT:  Great.  Let's proceed.

3        MS. DONESKY:  Could we pull up P-93, please?

4                    **REDIRECT EXAMINATION**

5    BY MS. DONESKY:

6    Q.  Ms. Hoppenrath, you were just shown this exhibit with a

7    series of emails regarding removal or suspension of access

8    pending the investigation; correct?

9    A.  Correct.

10        MS. DONESKY:  Jan, can you highlight any of those,

11   the from, sent to lines of these e-mail chains?

12   BY MS. DONESKY:

13   Q.  Zahn Reuther, Ms. Hoppenrath, does he work in labor

14   relations?

15   A.  Yes.

16   Q.  He's copied on all these emails; correct?

17   A.  Correct.

18   Q.  Counsel also showed you 7:25 a.m. on March 29th, the

19   entry where Mr. Sanders had entered his time for March 26th.

20   Do you recall that?

21   A.  Yes.

22   Q.  Mr. Sanders did not at that time edit his time for

23   March 25, did he?

24   A.  I'm sorry.  Can you repeat that?

25   Q.  Sure.  You looked at the entry of 7:25 a.m. where

1   Mr. Sanders had entered the March 26th time that morning?

2   A.  Correct.

3   Q.  There was no edit to the time for his time he had

4   entered previously for March 25, was there?

5   A.  Not that I saw.

6   Q.  The edit there only occurred later at 11:00 a.m. after

7   the notices were issued?

8   A.  Correct.

9   Q.  When you're saying you're doing it by memory, I think

10  you explained this already, but you're speaking of today in

11  2021?

12  A.  Correct.  I know there's a lot of testimony and exhibits

13  and documents, and those are a lot of information.  And so I

14  want to be as accurate as possible, and so trying to recall

15  specifically March 25th, 26th and the 19th without, like, a

16  written timeline in front of me, I'm trying to recall as

17  best as I can and not misspeak.  So that's what I was

18  referring to.

19  Q.  And, in fact, there's a hearing record that exists from

20  2016 to the time you spoke then; correct?

21  A.  Correct.

22  Q.  And those are at Exhibits 98 and 103?

23  A.  I believe so.

24  Q.  And Union Yard, going back to that, who's responsible

25  for inspecting the yard within the required timeframes?

Copper v. Ed Meierhoffer

1    A.  Track inspectors.

2    Q.  And that would have been Mr. Sanders?

3    A.  I believe so.

4    Q.  And then when you were asked about high-priority freight

5    traffic during that time with respect to that evening where

6    you had to work the whole evening, that was in December;

7    correct?

8    A.  Correct.

9    Q.  That's an intermodal facility?

10   A.  Correct.

11   Q.  Around Christmastime?

12   A.  Yes.

13   Q.  Is that busy time for parcels and UPS?

14   A.  It's busy, but -- so there is traffic.  It's different

15   than what we were talking about earlier where like we have

16   this high-priority freight, so you might have one or two

17   trains that are the most important trains on the system, and

18   those trains -- I don't want to say "system."  That's kind

19   of a broad topic.  But you have these very high -- important

20   UPS trains, intermodal trains, and Union Yard is one of

21   their landing points.  So it becomes an important yard, not

22   necessarily an extreme amount of volume, but just very

23   targeted, important freight.

24            MS. DONESKY:  I have nothing further.

25            MR. JAMES KASTER:  No questions for the witness.

1           THE COURT:  Ms. Hoppenrath, you're excused.  Thank

2      you.

3           THE WITNESS:  Thank you.

4           THE COURT:  Members of the Jury, we will take our

5      morning break at this time.  We will resume shortly after --

6      let's say we'll resume at 11:05.

7           (Jury recessed)

8           THE COURT:  Ms. Ferguson, I understand there is an

9      issue that BNSF would like to raise outside the presence of

10      the jury.

11           MS. FERGUSON:  The issue relates to the foundation

12      of the OSHA exhibit and so we wanted to inquire of the

13      Court.  Our proposal is to submit a declaration from a

14      member of the law department who would have received the

15      OSHA finding.  If that's not acceptable to the Court, we're

16      prepared to call that individual by Zoom or, if necessary,

17      in person tomorrow.  So we just wanted to raise that.

18           I think your only reservation was the foundation.

19      We have the person who has received it in the law department

20      for BNSF.

21           THE COURT:  That was the first reservation that

22      occurred to me.  It might not be my only one, but that's the

23      first one.  Have youp talked this over with Plaintiff's

24      counsel?

25           MS. FERGUSON:  We mentioned it this morning and

1    the response was we're not going to have any stipulation.

2              THE COURT:  Okay.  All right.  One more time, the

3    exhibit is what exactly?

4              MS. FERGUSON:  It's Exhibit D-86.  It's the letter

5    from OSHA to Lucas Kaster with the decision from OSHA.

6              THE COURT:  And the proposal is to have an

7    individual testify to establish foundation for the exhibit

8    and then admit it?

9              MS. FERGUSON:  That's correct.

10             THE COURT:  Is there any intention on BNSF's part

11   to elicit testimony regarding the substance of the decision?

12             MS. FERGUSON:  I think it would be BNSF's intent

13   that if the exhibit was admitted, that they would be able to

14   read from it if appropriate in closing or through some other

15   witness.

16             MR. JAMES KASTER:  And let me clarify, if the

17   Court is prepared to hear from us on this issue.

18             THE COURT:  That's fine.

19             MR. JAMES KASTER:  And I don't mean to be

20   unnecessarily difficult.  I -- as far as the -- what I did

21   say was we aren't stipulating to these exhibits because the

22   fact that someone has seen it, in our view -- in my view,

23   doesn't establish foundation that's appropriate because the

24   foundation should be what is it?  What is the thing?  Not

25   that I received it or I saw it, but what is it?  And that's

1     where I think we're lacking.

2              I don't -- I'm not trying to force someone to come

3     in and say, "I received a copy of this in the mail."  I

4     mean, that much speaks for itself.  I agree with that.  If

5     the Court regards that as adequate foundation, then I guess

6     the Court will rule in that fashion.

7              My view is that specifically as it relates to the

8     foundation here, we are talking about something that has a

9     story behind the thing, and the concern that I have is

10    precisely as I mentioned the other day.  The testimony about

11    its contents, which I would regard as misleading, and

12    only -- and raises questions, serious questions, about

13    whether its relevance is substantially outweighed by the

14    chance of confusion of the issue and -- issues and

15    prejudice.

16             So my -- first of all, I don't think it -- other

17    than the fact that a notice was sent, I think maybe that's

18    relevant.  The actual notice and the findings are not

19    relevant because this is a trial de novo.  And so to the

20    extent that we've objected, I think allowing additional

21    testimony about this only serves to, in our view, exacerbate

22    the 403 issues.

23             THE COURT:  Okay.  Well, there's two or three

24    issues there.  Let me see if I can just sort of walk through

25    them, and then take the issue under advisement and let you

1     know how we're going to deal with this.

2          With respect to the foundation piece, I assume

3     that the witness isn't going to come in simply and say, "I

4     received this in the mail."  The witness would come in and

5     testify as to their position, as to her or his position, as

6     to her or his responsibilities that would then in turn

7     trigger receipt of something like this.  The fact perhaps

8     that this is something with which they are familiar, and

9     that they are competent to testify as to what it is and why

10    it ought to be admitted -- or well, what it is and what

11    bearing it might have -- well, I don't want to overstate

12    that point.  What it is.  I'll stop there.

13         The second objection, which is the relevance

14    objection, as we discussed at some length now, is a concern

15    that I certainly share but one that I think I've been told

16    how to handle by the Eighth Circuit quite clearly, and I'm

17    doing what I understand the Eighth Circuit to be telling me

18    to do.

19         The solution I think to that problem is a limiting

20    instruction, and I'm not sure that we've received that yet.

21    I don't want to wait until the last minute to deal with

22    that.  I don't know that we've received a limiting

23    instruction on that specific issue yet.

24         MR. JAMES KASTER:  Your Honor, we sent one, I

25    think.  I prepared one.

1          MS. DONESKY:  We both have our respective limiting

2     instructions.  We can certainly provide them to Your Honor.

3     We haven't spoken together if there's a way to resolve it,

4     but we have each drafted our respective limiting

5     instructions.  Happy to provide them.

6          THE COURT:  And you disagree regarding what it

7     should say?

8          MR. JAMES KASTER:  In part.  Both instructions

9     contain language from the Court's decision -- the decision

10    the Court referred us to and is modeled after that.  The

11    difference is that we put in our instruction that it was

12    different issues and different evidence, or something like

13    that.  They don't have that language.  So there are bits and

14    pieces of differences in the limiting instruction.

15         THE COURT:  Okay.  I get it.  If you can't agree,

16    you can't agree.  I'll deal with it.  If it's been submitted

17    and it's just something that I haven't seen yet or was

18    unaware of that fact, then I apologize.  If it hasn't been

19    submitted yet, then please go ahead and do so.

20         MR. JAMES KASTER:  And, Your Honor, as to the --

21    like I said, I don't want to be unnecessarily difficult.  We

22    are maintaining our objection to this.  I think the Court

23    appreciates that and understands that.  I think the record

24    is clear about that.

25         But with respect to someone -- if the Court

1    regards what the Court recited as testimony that the Court

2    would think would be adequate foundation, then I'm not going

3    to force a witness to come in here and say those things.  We

4    can rely on a declaration for that part.

5           My concern about whether it is what it purports to

6    be is that someone with knowledge would testify that this

7    thing is a preliminary finding in a case that is in fact a

8    *de novo* review and that this case is that *de novo* review.

9           In any case, if the Court -- if the Court regards

10   the foundation as adequate, like I said, I'm not going to

11   force someone to come in here and say those things.

12           THE COURT:  If you can stipulate to something

13   along the lines that I described, if you believe that that's

14   sufficient, terrific.  Obviously, in my view it's possible

15   for the plaintiff to stipulate to something like that and

16   yet preserve his objection to the relevance; and if

17   relevant, then the prejudicial nature of the evidence.  I

18   understand that.  So I think that would be terrific if the

19   stipulation -- or if no objection at least on foundation

20   grounds is possible to a declaration like that.

21           MR. JAMES KASTER:  And Counsel is correct that I

22   did say I wouldn't stipulate to anything related to those

23   exhibits this morning, and I've had a slightly more

24   reasonable moment since then.

25           THE COURT:  Well, we all have those from time to

1      time, and we all have the opposite from time to time, and we

2      can be forgiven for that.

3              All right.  Anything further on that then from me?

4              MS. FERGUSON:  Nothing from BNSF.

5              MS. DONESKY:  Can I just preview, Your Honor, we

6      do have one exhibit that we were thinking at the conclusion

7      of today we could take up with Your Honor, which is our

8      Exhibit 93, and it relates to a witness who will be coming

9      tomorrow relating to summaries that are prepared as related

10     to other employees.  Your Honor has ruled on the motion

11     *in limine*, but the foundation issue is outstanding.  So we

12     thought we could bring that up at the end of today to see if

13     we could square that away before tomorrow.

14             THE COURT:  All right.  Then that's fine.  We can

15     take that up at the end of the day once today's testimony

16     has been submitted.

17             I'll just give you one suggestion as I've been

18     working on jury instructions here.  I think it would be

19     worth everyone's while if you haven't in some time -- and I

20     would understand if you haven't in some time -- to go back

21     and read our summary judgment decision prior to the charge

22     conference.  Because I do think that there are -- there is

23     at least one feature of that decision that I -- I shouldn't

24     say -- I am inclined at this point to think that it needs to

25     be incorporated into the instructions and I am concerned

1    perhaps that there are others.  I am also concerned,

2    perhaps, that I am overthinking things.  So I think it would

3    be helpful for you all to look at that.

4              MR. JAMES KASTER:  Your Honor, I spent a good part

5    of the weekend working on a brief on the jury instructions

6    issues.  I don't know if the Court is speaking of footnote

7    11 in the Court's order which addressed, I believe, the

8    honest-belief doctrine, and I might be misremembering, but

9    our brief should be filed before noon today.

10             THE COURT:  Okay.  I will take a look at that.

11   That's not the only thing I'm thinking of.  I'm thinking of

12   some other things as well, too many things that are worth

13   bringing up at this point.  I think it will be a lot more

14   productive and efficient if everyone's familiar or

15   re-familiarizes themselves with that decision at this point.

16             Okay.  I'll adjourn.  We'll resume, as I said

17   originally, at 11:05.

18        (Recess taken at 11:00 a.m.)

19                       *     *     *     *

20        (11:05 a.m.)

21                       IN OPEN COURT

22             THE COURT:  Thank you, everyone.  Please be

23   seated.

24             Is BNSF prepared to call its next witness?

25             MS. DONESKY:  We are, Your Honor.  We call Stephen

1    Chartier.

2          THE COURT:  Mr. Chartier, I'll ask you to just

3    wait back there for one second while we clean up the witness

4    stand.

5        (Pause)

6          THE COURT:  All right, sir.  If you could come up

7    and stand between the railing there and the witness chair,

8    I'll invite Ms. Morton, the courtroom deputy, to administer

9    the oath.

10          THE CLERK:  Would you state your full name,

11    spelling your first and last name for the record.

12          MR. CHARTIER:  Stephen, S-T-E-P-H-E-N; Joseph

13    Chartier, C-H-A-R-T-I-E-R, Jr.

14          THE CLERK:  Please raise your right hand.

15          **STEPHEN CHARTIER, DEFENDANT'S WITNESS, SWORN**

16          THE WITNESS:  I do.

17          THE COURT:  Thank you, sir.  Please be seated.

18          Ms. Donesky?

19          MS. DONESKY:  Thank you.

20

21                         **(STEPHEN CHARTIER)**

22                         **DIRECT EXAMINATION**

23    BY MS. DONESKY:

24    Q.  Good morning.

25    A.  Good morning.

 1    Q.  Who do you currently work for?

 2    A.  BNSF Railway.

 3    Q.  And how long have you worked for BNSF?

 4    A.  Nine years.

 5             THE COURT:  Mr. Chartier, sorry to interrupt.

 6    Mr. Chartier, if you're comfortable removing your mask, you

 7    can feel free to do so.  If you'd prefer to keep it on,

 8    that's fine, too.

 9             THE WITNESS:  All right.  Thank you, sir.

10    BY MS. DONESKY:

11    Q.  Thank you.  Why don't you run through your employment

12    history with the company.

13    A.  So I started out as an intern for BNSF Railway in 2011.

14    Worked on the Montana North between Minot, North Dakota and

15    Sand Point, Idaho.  2012 I came back as a management

16    trainee.  After my program, I was placed in Seattle where I

17    was a project engineer for about three months; and then I

18    was referred to our field side for construction.  I was

19    moved to Vancouver, Washington.  From there I went to our

20    production gang side.  I ran tie gangs across several of our

21    divisions:  Twin Cities, Northwest, Southwest, Texas, Red

22    River divisions.

23             From there I took a roadmaster position in

24    Everett, Washington; was there for about 15 months before I

25    transitioned over to the roadmaster in Northtown in

1    Minneapolis here, would be December 15 -- or December 1st of

2    2015.

3    Q.  Okay.  Thank you for taking us through that journey.

4          So starting in December of 2015, you arrived at

5    the Northtown roadmaster position here on the Twin Cities

6    division.

7    A.  Correct.

8    Q.  Do you hold any kind of bachelor's degree?

9    A.  I do.

10   Q.  In what field?

11   A.  In construction management with a focus in railroad

12   engineering and transportation engineering.

13   Q.  From what school is that from?

14   A.  Michigan Tech University.

15   Q.  I'd like to focus your attention on the 2015-2016

16   timeframe.  You started in December of 2015 in Minneapolis

17   Northtown; correct?

18   A.  Correct.

19   Q.  Can you describe for the jury what you do as a

20   roadmaster for the Northtown territory?

21   A.  As a roadmaster for the Northtown territory, I was in

22   charge of several sections of mainline, of branch line, and

23   a small industrial yard, and then the hump yard facility

24   here in Minneapolis that kind of automatically sorts cars.

25   Q.  And how many employees reported to you, approximately?

```
 1    A.  At that time I had about 65.

 2    Q.  And those were union employees?

 3    A.  Correct.

 4    Q.  What kinds of positions, union positions, reported to

 5    you?

 6    A.  Track inspectors, foremen, truck drivers, sectionmen,

 7    laborers -- or, well, sectionmen and laborers are the same.

 8    Welders, grinders, machine operators and truck drivers.

 9    Q.  You mentioned the track inspector job.  What does a

10    track inspector do?

11    A.  A track inspector inspects the track, make sure there's

12    safe passage for our transportation operations.

13    Q.  Are defects something that you want reported?

14    A.  Yes.

15    Q.  Why is that?

16    A.  Well, it's the main focus of that position.  They're out

17    there to ensure proper safety, regulations are upheld, and

18    to make sure there's safe travel for our traffic.

19    Q.  In 2015 and 2016, how many track inspectors did you have

20    reporting to you?

21    A.  So when I got there in 2015 I had three.  I did bump it

22    to five.

23    Q.  And who made the request to get more track inspectors?

24    A.  I did.

25    Q.  And why did you do that?
```

1    A.  Because that's a valuable position for me.  It's kind of

2    a position that they're my eyes and ears in the field.  And

3    with my expectations for the quality of inspections and to

4    ensure we were properly doing those inspections, I felt the

5    addition of a couple more positions were definitely

6    beneficial into making those expectations happen.

7    Q.  And were you ultimately successful in securing those

8    additional positions?

9    A.  Yes.

10   Q.  Are there other measures that BNSF employs, other than

11   track inspectors, for detecting and reporting defects?

12   A.  Yes, we have several different types of test vehicles.

13   Our geometry cars, which mainly test our main lines.  We

14   have rail detectors; geometry trucks, both BNSF owned and

15   contract owned, that come on property.  Star cars, which is

16   a contract car, to test gauge.

17   Q.  In the 2015-16 timeframe, just staying with that

18   timeframe, how many geometry cars that you referenced were

19   being used on the territory that you supervised?

20   A.  We had two main ones, one on the northern corridor that

21   would be primarily that would come through our area, and we

22   had one that would come up from the Chicago division

23   periodically.

24   Q.  Are there requirements or processes that you, as

25   roadmaster, put in place to facilitate the reporting of

1     defects and concerns?

2     A.  Can you ask that again?

3     Q.  Sure.  Did you have processes, as roadmaster, that you

4     asked your reports to provide to you each day in order to

5     find out about defects and concerns?

6     A.  Yes.  So I had a night report requirement from all my

7     personnel.  That would give me a summary of the day work,

8     any issues, what they did for the day, any hours worked

9     overtime, anything of that notion.

10    Q.  Okay.  And why did you want those night reports?

11    A.  Two reasons.  It was to help me to keep up.  So for my

12    traffic inspector side, use them to supplement with our

13    defect list to ensure like any conditions or anything that

14    they had or found could be rolled into our repair plan

15    preemptively before they hopefully get to a defect.  And

16    then it would also help me with time.  With that many

17    people, especially trying to improve time roll, have a

18    reference to go back to when necessary to compare the time,

19    make sure it's correct.

20    Q.  Is planning on how you're going to repair defects and

21    address issues an important part of your role as a

22    roadmaster?

23    A.  It's a big part of my role, yes.

24    Q.  Why is that?

25    A.  Because everything we do is line out.  I line out all my

1    crews.  I have to set the windows for the transportation

2    department to make sure we get blocks of time to be able to

3    do that.  Even with our yard we don't have plan windows, but

4    setting up our yard windows to ensure that we can get proper

5    time to correct and repairs defects if necessary.

6    Q.  And when you refer to windows, you're referring to the

7    track and time authority that you need to obtain in order to

8    get on the tracks and make the repairs?

9    A.  Correct.  It would be protection for that timeframe.

10   Q.  Was it your practice as a roadmaster in your prior

11   positions to have your track inspectors provide you with

12   these types of daily reports?

13   A.  Yes.  Actually, it went back to when I became the

14   assistant roadmaster for construction, really overseeing

15   field staff that was -- that was incorporated in for all my

16   work groups.

17   Q.  And then aside from night reports, is there another

18   reporting mechanism that the track inspectors use?

19   A.  Yes.  At that time they were using PARS for time and

20   TIMS for their daily inspections.

21   Q.  And that was an additional resource you consulted for

22   managing and addressing defects that were reported?

23   A.  Correct.

24   Q.  Do you ever report defects yourself, Mr. Chartier?

25   A.  I have, yes.

1      Q.  When do you do that?

2      A.  Any time I find them, as a FRC qualified individual, and

3      that's by the FRA.  I'm also Tier II and Tier III qualified

4      by BNSF for inspection.  That by the FRA book, anybody

5      that's FRC qualified, you have to protect the track, so if

6      we find a defect, we have to protect it as necessary per the

7      requirements.

8      Q.  We've been talking now over a week about defects.  Are

9      there different types of defects?

10     A.  Yes.  There's three main classes of types of defects.

11     Q.  For the jury's benefit, can you walk us through the

12     three different types?

13     A.  So the first type is called a nonclass defect.  It's a

14     30-day timeline defect.  It's just kind of a general, like

15     if you find a missing clip, loose bolts, kind of just some

16     smaller items, they would go into that classification.

17              The second one is speed-defined defect.  So this

18     is a type of defect where you have a track speed, and with

19     like a frog.  So if a frog meets the parameters of a defect,

20     it is only good for a max speed of ten miles an hour.  So if

21     you have a 45 mile an hour track, you find a frog that meets

22     the requirements and the measurements to be a defect, you

23     can run no traffic over it no faster than ten mph until that

24     condition is repaired.

25              And then what we have, the third one is

1    class-defined defects, which the railroad has five main

2    classes of track:  Class one -- and they're all going in

3    accordance with speeds.  So Class one is 10 mile an hour

4    freight, 15 mile an hour passenger.  Class two is 25 mile an

5    hour freight, 30 mile an hour passenger.  Class three is 40

6    mile an hour freight, 60 mile an hour passenger.  Class four

7    gets up to 60 mile an hour freight; almost up to 80 mile an

8    hour passenger.

9           So with these certain types of defects, as a

10    noncompliant distribution of ties is the prime one for this

11    type of defect that we deal with in certain parameters where

12    certain classes of track have to have a certain number of

13    good ties on a 39-foot segment.  So, like, Class two and

14    three track have to have in tangent section a minimum of

15    eight good ties.  So in that 39-foot segment you have to

16    have eight good ties distributed effectively.  If you don't,

17    then you would have to bump that down to a class of track

18    where it meets that distributed factor.

19    Q.  Thank you for that.  And when you -- sounds like then

20    Class one track, the max speed they can go is ten miles per

21    hour class.  Up to Class four and five, greater speeds up to

22    60 miles per hour for freight.  Fair to say, are there

23    locations where those 10 miles per hour tracks, Class ones,

24    might exist more frequently than the Class four or five; in

25    other words, in the city versus out of the city?

1    A.  Correct.  So our mainline is broken up into several

2    different classes.  I've had everything from Class two to

3    Class four on my territory.  Like all our yard tracks are

4    considered Class one or excepted track status, and those are

5    all 10 mph or lower tracks.

6    Q.  You mentioned "your territory."  Why don't you describe

7    the characteristics and what your territory is known for.

8    A.  All right.  So at that time I had three different

9    subdivisions that consisted part of my mainline, Staples sub

10   from mile post 21.36 to mile post 11.4, which was double

11   main track.

12          I had about a mile and a half of our Midway sub.

13   That was from 11.4 to 10.2, and that then connected to our

14   Wayzata sub, which I had from mile post 9 to mile post 24.4.

15          I had a branch line that branched off the Wayzata

16   sub and went 39 miles up to Monticello, Minnesota.

17          And then I had, as I said before, one small yard

18   and then the major hump yard facility.

19   Q.  And your mainline miles were about how long?

20   A.  About 66.

21   Q.  Speeds could range depending on class of track as you

22   just described?

23   A.  Correct.  So my Wayzata sub, I had two different

24   classifications, Class two and Class three.  For my Staples

25   sub, part of it around the terminal was a Class four --

1    yeah, Class four, 45 mile an hour, but then right after the

2    terminal it bumped up to 60 mile an hour freight, 79 mile an

3    hour passenger, with one curve that was restricted to 75.

4    Q.  Mr. Chartier, there are two sets of instructions that

5    are at the company, right, when it comes to the track

6    inspectors, the engineering instructions and then those that

7    are the FRA.  Is that fair to say?

8    A.  Correct.

9    Q.  Okay.  Generally speaking, can you describe kind of how

10   those two types of rules and instructions interact with each

11   other.

12   A.  So the FRA is minimum regulations for any railroad to

13   operate.  BNSF can meet or exceed those -- exceed or meet

14   those parameters with our engineering instructions that

15   further address the branch off the FRA with further

16   instructions on how to handle certain things, parameters on

17   certain things, where if we're more stringent it would be

18   then documented in our engineering instructions.

19   Q.  So is it possible then that there might be a defect

20   under the engineering instructions per company policy, but

21   otherwise a satisfactory from the federal regulations

22   standpoint?

23   A.  Correct.

24   Q.  And do the federal FRA regulate wrap bars?

25   A.  No, they do not.

1    Q.  Who did you report to as roadmaster?

2    A.  Keith Jones.

3    Q.  Was that true throughout your time working in that

4    position?

5    A.  Yes.

6    Q.  So let's talk about Mr. Sanders.  How did he come to

7    work for you?

8    A.  So he bumped in onto my territory.  He bumped out one of

9    my existing track inspectors about the last week of January

10   2016.

11   Q.  Okay.  So January 2016, roughly.  You mentioned he got

12   bumped out from his role?

13   A.  Yes.  So on seniority basis, there's only three ways you

14   can move around for a scheduled employee.  You can either

15   bid a position that has a vacancy; you can 19A, which is a

16   temporary relief where if I have a vacant position, an

17   employee could 19A that position, but I would have to

18   approve.  And then that would only be -- most likely only

19   about a couple-week temporary spot on that position.

20         And then as Mr. Sanders was, he was bumped out of

21   his position by seniority off the St. Paul sub, and then he,

22   staying with the track inspector roster, bumped an employee

23   that was currently on a track inspector position to myself.

24   Q.  And your position that he bumped into on seniority, you

25   mentioned, right?

```
 1    A.  Correct.

 2    Q.  Was that a mainline track inspector job or a yard

 3    inspector position?

 4    A.  One of my mainline inspectors, yes.

 5    Q.  Who did he bump off?

 6    A.  Arnold Peterson.

 7    Q.  And you said he started working for you, Mr. Sanders

 8    did, roughly the last week of January?

 9    A.  Looking back at his bump notice, it was for January

10    25th.

11    Q.  How long did he work for you?

12    A.  Till March 4th of that year.

13    Q.  And according to your records, that date -- was that --

14    how -- why do you believe it was March 4th?

15    A.  So he 19A'd back to St. Paul, and then I had another

16    employee backfill his position the following Monday.

17    Q.  That would have been March 7th?

18    A.  Correct.

19    Q.  Who was that employee?

20    A.  Kyle Cobb.

21    Q.  So according to your knowledge and familiarity,

22    Mr. Sanders took a voluntary role back to Dayton's Bluff on

23    March 4th of 2016?

24    A.  Yes, he would have 19A'd, so that's a voluntary transfer

25    back to St. Paul.
```

1    Q.  There's an employee service record that indicates a date

2    of March 15th for Mr. Sanders.  Do you have any knowledge or

3    reason why that might not reflect that March 4th date?

4    A.  So a 19A doesn't go on an employee's record because it's

5    a temporary relief of service.  The March 15th date that

6    you're referring to would be when he won his bid and to

7    report to St. Paul.

8    Q.  And that was a bid that he voluntarily made back to

9    Dayton's Bluff?

10   A.  Correct.

11   Q.  And who would he be reporting to when he returned in

12   March of 2016?

13   A.  That would have been Blaine Hoppenrath.

14   Q.  Prior to Mr. Sanders beginning to report to you

15   beginning in late January of 2016, did you have any

16   interactions with him?

17   A.  Yes, I had a few.

18   Q.  A few, you think?

19   A.  Yes.

20   Q.  Do any of them stand out to you?

21   A.  The biggest one would have been at Union Yard prior to

22   him coming to me.

23   Q.  Describe for the jury what happened at Union Yard?

24   A.  So I was with Ms. Hoppenrath one day and Don called

25   Blaine saying he was taking Union Yard out of service for

1    gauge.  There was some confusion on what he was trying to

2    explain.  So Ms. Hoppenrath and I went down to Union Yard to

3    see what was happening.  As we got there we found Don kind

4    of bouncing around the tracks.

5           So we went out, met with Don, briefed with him on

6    what was going on.  He then said he's got several tracks out

7    of service for gauge.  Okay.  So let's go look at them.

8    Let's see what the problem is.

9    Q.  And I'll just stop you there just so you can explain the

10   gauge.  When something's potentially wide gauge, what is it

11   you do to determine whether it's wide gauge and needs to be

12   pulled out or not?

13   A.  So we require for any measurement that would -- it's

14   called measuring under load.  So you have a static

15   measurement or a flat measurement of what the existing

16   structure is without anything on top of it.  Measuring under

17   load is you take all the gaps into play, so anything that

18   would be between, like, the end of the plate and the base of

19   the rail, if there's like an eighth inch there, and say you

20   had another quarter inch of plate movement between the plate

21   and the tie, if your static measurement is 57 inches, then

22   you would add that eighth and that quarter inch for a 57 and

23   3/8th inch measurement overall.

24   Q.  And then what -- in this instance, what did your

25   measurements come out as?

1   A.  We were all under the parameter for the accepted track

2   class, which is 58 by BNSF policy.

3   Q.  And so the wide gauge didn't require it being pulled out

4   of service?

5   A.  Correct.

6   Q.  What else then occurred?

7   A.  So we had an alignment issue a trainman took a track out

8   of service for that they were concerned with.  After

9   checking out the gauge measurements, I asked Mr. Sanders if

10  he looked at the alignment issue and he said, "It's out of

11  service."  I'm like, "Well, what is the measurement of it?"

12  And he said, "I didn't measure it."

13          I'm like, "Well, let's get our tools, measure it,

14  see if it's truly out of service or not."

15          After some kind of further push for him to get his

16  tool, he came out and set it up and he set it up improperly.

17  I asked him, you know, why he set it up that way, why he was

18  taking his measurement that way.

19          So at this time I took it as a development

20  opportunity to say, "Hey, this is how you're supposed to use

21  this tool.  This is how you're to set it up."  He said,

22  "Well, this is how I've always used it."

23          Okay.  Well, again, develop opportunity.  I'm

24  showing you how to properly use it.

25          So we got the measurement.  It was a little over

1    three inches.  I asked Mr. Sanders, "So what is the allowed

2    for class of track for Class one and that standard?"  He

3    said, "It's accepted track.  It's good."

4            I'm like, "I'm not asking you if it's good or not

5    at this point.  I was asking you for a measurement."  Which

6    anybody else I've interacted with is just -- reference the

7    FRA book, that's all it was, to make sure we had a valid

8    measurement in there.  And if the condition warranted out of

9    service, then as such.

10           So on our way back to the truck, Mr. Sanders was

11   then threatening to call the union on harassment on us

12   because we were not in agreement with him.  And then while

13   we were at the vehicle after he was done calling his union

14   rep, he then made mention that the Union Yard hasn't been

15   inspected for a month and a half, which is out of

16   compliance.  Per the FRA and per our engineering

17   instructions, those tracks have to be inspected at least

18   once a month, so every 30 days.

19           At this time I reconfirmed what I heard from

20   Mr. Sanders, and then I told him that he needs to call the

21   yardmaster and take the yard out of service.  That this

22   needs to be inspected before we do any more operational

23   moves over it.

24           So at that time I instructed him to call the

25   yardmaster and remove it from service.  Blaine and I then

1    contacted Keith in our operations department to let him know

2    what was going on.  And at that time I also called a track

3    inspector and a couple more crews from my side to come over

4    and help assist to get the yard inspected and back in

5    service for our remote facility.

6    Q.  Were you able to do so?

7    A.  Correct.

8    Q.  Is that the incident that required working through the

9    evening or the night?

10   A.  Yes.

11   Q.  Was there another incident prior to Mr. Sanders

12   reporting to you that involved an argument with some

13   welders?

14   A.  I was privy to it.  I was visiting Blaine down at the

15   Bluffs and there was some large conflict around several of

16   the 10 mph frog defects Mr. Sanders was putting out there.

17   There was a heated exchange between him and the welders in

18   the conference area of the section house, and then which

19   kind of ended abruptly as Mr. Sanders telling them to go "f"

20   themselves and walking away.

21   Q.  And these welders, they were disputing the measurements?

22   A.  Correct.

23   Q.  And the welders, they're union employees?

24   A.  Correct.

25   Q.  During the time Mr. Sanders worked for you, how would

1       you describe him as a track inspector?

2       A.   Lackluster.

3       Q.   What do you mean by that?

4       A.   So Mr. Sanders -- in this position as a track inspector,

5       the majority of your job can be very technical.  Anybody can

6       kind of kick a brace or a bolt and say, "Hey, that's loose."

7       But where it comes down to is we've got 13 core areas that a

8       track inspector has to know, and that ranges everything from

9       how to use a switch point board to measure switch points, to

10      how to measure a frog properly, how to take gauge, how to

11      handle surface defects properly, how to regulate speed on a

12      curve, measure alignment and profile deviations.

13             My initial evaluation with Mr. Sanders towards the

14      end of January, which that evaluation I do with all my

15      incoming track inspectors to kind of get a baseline of where

16      they're at, there was several items on that that Mr. Sanders

17      was not up to par on.

18      Q.   And how did you address that?

19      A.   So I addressed it with him.  And like any other track

20      inspector, there's kind of a development plan of, like, hey,

21      this is going to be a focus for the next month of -- I want

22      you -- every switch you inspect, use your switch point

23      board.  And any help he needed or materials he needed as far

24      as that, I would assist with him.  And then it would be an

25      evaluation on the next month when I would do his track

1    inspector evaluation if he was getting better or if it was

2    continuing as such.

3    Q.  Based on your experience and observations, Mr. Sanders"

4    accuracy rate for correctly identifying defects, how would

5    you -- what was your perception of that?

6    A.  For our technical aspect, it was right around 30

7    percent.  There was a lot of discrepancies in how he was

8    measuring things or how he was using the tools.

9    Q.  How would you discover that?

10   A.  So I'm a very hands-on individual with my territory.

11   Obviously, my name is on it, so everything falls to me.  So

12   my big thing in going back to, like I said, the development

13   of all my track inspectors is, they're my right-hand person,

14   so I need to have faith when something's found or I send

15   them out to evaluate a condition that they're doing

16   everything properly, measuring it properly, so I can get

17   that feedback back, so we know if we have to do anything or

18   correct that condition, that I can take and pass that along

19   to my other crews that would be repairing it.

20   Q.  What, if any, observations did you make in terms of the

21   time or manner in which Mr. Sanders reported defects?

22   A.  He would take extremely a lot longer than anyone else to

23   enter in his anything found.

24   Q.  Anything further on that?

25   A.  Well, so the first week he was -- I gave him

1    expectations.  They were the same expectations I gave for

2    all my employees.  Per the union agreement, you wouldn't

3    have -- or I don't have to technically pay an employee to do

4    reporting, but I felt as a need to make sure the proper

5    reporting was done that I'd allow them up to 30 minutes a

6    day I'd pay them to complete that reporting.  The first week

7    and into especially the second week, we struggled with

8    Mr. Sanders on him taking several hours to try to enter

9    defects in.

10   Q.  Any other challenges that you experienced?

11   A.  Attitude would be a big one.

12   Q.  Was he receptive to expectations that you laid out as

13   manager?

14   A.  No, very much not so.  The more you defined for him --

15   just like everybody else, first day on my territory, he got

16   a paper copy of our expectations -- or my expectations

17   that -- some mirror the company's policies, some were my

18   territory policies.  And he would -- he just wouldn't follow

19   a lot of them.

20        And trying to give him the benefit of the doubt,

21   trying to work with him and trying to reiterate several

22   times and several of these, he would just constantly every

23   time say, "Well, I'm not sure.  I don't understand what you

24   mean."  And I'd again explain what the expectation was, like

25   timely reporting.  Like I said, "I'll give you up to 30

1    minutes."

2             A lot of his time reporting was done during his

3    natural workday, in which he would take -- he'd be done

4    running track around 1 o'cook, they get off at 3:00, and

5    there'd be a two-hour envelope there that he said his whole

6    time would be trying to enter reports.

7    Q.  During the time he reported to you, were there any

8    issues with time reporting that arose?

9    A.  Yes.  A big one we had, especially with weekends, was --

10   we call it 11th hour meal.  So if an employee works 11 hours

11   straight, he's entitled to a second meal period.  At that

12   time between the BMWE and BNSF, we had a gentleman's

13   agreement where instead of taking a second meal period and

14   charging the meal to the company, the company would give you

15   an hour of overtime, but you would have to meet that

16   requirement of working 11 hours and one minute-plus.

17            Mr. Sanders on weekends would work -- 6 to 7 hours

18   is what he was putting in, and he'd claim a no-lunch meal

19   period and then 11th hour lunch -- or 11th hour meal period,

20   in which, again, expectations on the no lunch were

21   reiterated to him that he was to take a lunch, and that the

22   11th hour meal he was not entitled to because he didn't work

23   11 hours-plus.

24   Q.  Was any discipline assessed in connection with his

25   reporting of the 11th hour meal?

```
 1   A.  So at that time I consulted our labor relations

 2   department.

 3   Q.  And what did they recommend or suggest to you?

 4   A.  They recommended sitting down with him and reiterating

 5   the expectations, explain the 11th hour meal policy, and

 6   then state to him that going forward if this continued, then

 7   it could lead into disciplinary action.

 8          MS. DONESKY:  If you can pull up Defendant 33.  I

 9   think the one -- the larger part of the email, just so you

10   can see it, Mr. Chartier.

11   BY MS. DONESKY:

12   Q.  Is this communications with Mr. Sanders in connection

13   with this issue of the 11th hour meal break that you had

14   with him?

15   A.  Correct, it is.  So I had a verbal conversation and then

16   I have this email to him to further explain and note so

17   going forward there would be no confusion.

18   Q.  I'd like to turn to the company vehicle policy.

19          MS. DONESKY:  Jan, if you could pull up D-78-012.

20   And the same (e)(1) paragraph, please.

21   BY MS. DONESKY:

22   Q.  Mr. Chartier, are you familiar with the company vehicle

23   policy?

24   A.  I am, yes.

25   Q.  Is this the policy as you understand it?
```

1    A.  Correct.

2    Q.  Was it the policy that was in existence when you arrived

3    in December of 2015?

4    A.  Yes.

5    Q.  Are you familiar with any management discussions with

6    yourself and others on the division regarding use of company

7    vehicles?

8    A.  Correct.  So, actually, Northwest, it was the same

9    conversation we were having when I was transitioning from

10   the Northwest division to the Twins Cities division toward

11   the end of '15.  With precision scheduled railroading, there

12   was a larger look at our expenses and where we could help

13   manage better to lower those expenses, and vehicles was one

14   of them.  When I came to the Twin Cities it was already kind

15   of a conversation we were having in help managing because in

16   our budgets fuel was a very high over-budget expense.

17   Vehicle repairs was a very high over-budget expense.

18           So it was kind of looking at some different

19   options we had around our vehicles.  And in coordination

20   with that, in our area, since they're so kind of condensed

21   within the Cities, between the St. Paul roadmaster location

22   and the Northtown location, to help kind of utilize -- since

23   a lot of our callouts were in the yard and to make sure we

24   had vehicles readily for employees to use as they reported,

25   is to keep all vehicles on property.

```
 1    Q.  And in fact in your territory, the callouts for issues,

 2    what percentage were actually from the yard, from your

 3    knowledge and experience?

 4    A.  About 90 percent of my callouts were from the yard

 5    itself.

 6    Q.  Prior to any changes, as you just described, was there

 7    anyone under your direction that was allowed to take the

 8    company vehicle home?

 9    A.  So currently -- when I first started at Northtown we had

10    one, and that was Arnold Peterson, a mainline track

11    inspector.

12    Q.  And why did he have permission to take the company

13    vehicle home?

14    A.  So he ended at the end of my branch line or lived at the

15    end of my branch line.

16    Q.  And where was that?

17    A.  Albertville area, Albertville, Minnesota area.  So he

18    would actually hi-rail towards the end of the day to do his

19    branch line inspection on his way home.

20    Q.  So there was a business need that was identified?

21    A.  At that time, yeah.

22    Q.  As you were transitioning the company vehicle policy,

23    was Mr. Peterson affected by the change?

24    A.  Correct.  So it was already talked about with Jason --

25    which is Arnold, he goes by Jason -- but it was already
```

1    talked about with Jason the last week of January as we were

2    transitioning into February, would be he would have to leave

3    his truck on property and take his personal vehicle to and

4    from home as just a -- something we were doing

5    division-wide.

6              At that time was when the time Mr. Sanders bumped

7    Mr. Peterson out of his position.  So instead of waiting

8    towards the end of the week, we just enacted that with the

9    personnel change to make it a little more effective.

10   Q.  There's a hotline complaint that was made in April 2016.

11   Did you become familiar or aware of that?

12   A.  Yes.

13   Q.  Were you interviewed?

14   A.  Yes.

15   Q.  Who interviewed you?

16   A.  Dean Freshour.

17   Q.  And was there follow-up with Mr. Freshour after the

18   interview?

19   A.  Correct.

20   Q.  Was that in the form of an email back and forth

21   reflecting to your interview that you had with him?

22   A.  Yeah.  So I met with him, we discussed the questions he

23   had, and then after the interview he sent me just kind of a

24   synopsis and just kind of instructed to -- so we had

25   everything correct that he was going to be submitting in the

```
 1    file -- to make any additions that we talked about and he

 2    would review before submittal.

 3              MS. DONESKY:  If you can pull up, Jan, 076.  This

 4    is Defendant 76-01.

 5    BY MS. DONESKY:

 6    Q.  Does this appear to reflect the email exchange you had

 7    with Mr. Freshour?

 8    A.  Correct.

 9              MS. DONESKY:  Jan, if you could start at the

10    bottom half of the email, we'll go through.  Actually, start

11    a little bit up above.  There we go.  Very good.

12    BY MS. DONESKY:

13    Q.  Is this Mr. Freshour sending you after your interview

14    sort of a summary of what you discussed and offered you the

15    opportunity to add or correct anything?

16    A.  Correct.

17    Q.  And the structure here, is it fair to say that in bold

18    black has under the A, or whatever paragraph it is, the

19    allegation that's made and then your response underneath it?

20    A.  Correct.

21    Q.  Okay.  Let's just walk through it.

22              The first allegation is -- Mr. Sanders was making

23    is:  "The first time Don met Steve Chartier he told him that

24    no one wants to work with you and that your reputation has

25    preceded you in a derogatory fashion."
```

1            Read for the jury what your response was at that

2       time.

3       A.  "I did tell him that his reputation preceded him.

4       During a safety part of our call, he made it into a circus

5       act by challenging everything brought up on the call and

6       trying to bring in several union issues.  He asked several

7       questions on, well, another roadmaster did this or wasn't

8       doing this, trying to throw Blaine under the bus.  My

9       response was this is not another roadmaster's territory and

10      I was not going to address things that didn't need to be

11      brought up or items that were not warranted for my

12      territory.

13            "There were several employees that were concerned

14      when they learned Don was bumping into the work group,

15      requesting to have as little interaction as possible because

16      of his reputation and previous interactions.  I did tell him

17      several people in the work group did not want to work with

18      him, and I found him to be disruptive to the safety call and

19      oppositionally to our daily briefing process."

20      Q.  In section B, if we go to that next:  "Mr. Sanders

21      brought up that he believed you were playing Candy Crush on

22      your phone while Don was operating a company vehicle.  When

23      Don confronted him a heated exchange occurred."

24            What response then did you -- information did you

25      provide in response to that allegation?

1    A.  So we were stopped on the auxiliary track waiting to

2    meet a train.  So the vehicle was stopped, which within our

3    rules you can use a phone while the vehicle's stopped while

4    on hi-rail.  It's when the vehicle is in motion you could

5    operate a cell phone at that time.

6         I was actually checking my personal email and news

7    on my phone while we just kind of had a short break.  About

8    an hour later Mr. Sanders and I stopped to look at an

9    alignment deviation that was in track that he was concerned

10   about.  At that time Mr. Sanders was trying to put a 10 mph

11   on the defect.  When we measured it, it was far within the

12   parameters for the class of track it was.  But he persisted,

13   and it actually wasn't until we were on our way back to the

14   section house, set off track even further after that, that

15   he was upset because I wouldn't let him put a slow order on,

16   so he brought up the cell phone issue.

17   Q.  And did you include additional information also

18   regarding expectations that you went over with him in the

19   red font?

20        MS. DONESKY:  If you can highlight it, Jan, it's

21   just above the C, the first full paragraph there on the

22   second page.  Yeah, right there.  Thank you.

23        THE WITNESS:  Correct.  So do you want me to read

24   this?

25

1    BY MS. DONESKY:

2    Q.  Sure.

3    A.  All right.  "We went over expectations that morning and

4    several times while he was on my territory.  Mr. Sanders

5    could not grasp these expectations and continued to

6    disregard several of them.  This included overtime approval,

7    taking hours to do his reports, defects reporting and

8    expenses.  He also tried to state that I was targeting him

9    because I would not let him take his company truck home.  He

10   also had this issue on Blaine's territory with not being

11   allowed to take the company truck home."

12   Q.  The next allegation in section C alleged that you had

13   left the truck without your spikes on, which was a safety

14   concern.  What information were you able to provide to

15   Mr. Freshour?

16   A.  Correct.  So I had a spikey fall off -- which a spikey

17   is a supplemental slip-on cover on our shoes that has little

18   spikes to help us with traction during the winter -- slip

19   off when I came out of the truck.  I didn't realize it was

20   off at the time.  But I did tell him thank you and that it a

21   problem and I'll have them on in the future, that this was

22   approaching others' response.

23            "The ride from Wayzata back to the section house

24   was very little conversation.  Then he tried to continue his

25   earlier conversation on he should be putting a slow order

1    out on the defect we looked at, going over again that either

2    they were not defects or didn't measure to be one.  Don

3    continued to disagree.  I mentioned to Don that there was no

4    need to continue the conversation since he already had his

5    mind made up.

6              "When we got back to the shack, he said I was

7    disrespecting him and I needed to change my attitude."

8    Q.  And under section D when he alleged you were rude, what

9    was your reaction?

10   A.  Just simply, if you disagreed with Don at any point, you

11   would be classified as rude to him.

12   Q.  And then what else did you say?  Any interaction?

13   A.  Well, every day was definitely a challenging interaction

14   with Don.

15   Q.  And you prepared these responses at the time in April of

16   2016; correct?

17   A.  Correct.

18   Q.  Contemporaneous to your speaking with Mr. Freshour?

19   A.  Yes.

20   Q.  In the last allegation and your response there, the

21   allegation being:  "Mr. Chartier threw his hardhat at the

22   truck at Purity Oats, stating that he couldn't work with

23   Donald."

24   A.  So this interaction:  "Don called me because he had a

25   concern on a condition.  I went down to meet Don on it.  Don

1    reported that he had a tie condition at Harrison Street.  I

2    met with Don at Harrison Street to go over his concern on

3    the tie condition.  This was the second or third

4    conversation I had with Don at this point on the location

5    with ties.  I explained to him that this was not a 10 mph

6    restriction.  Another inspector had cleared this area.

7         "We walked the track.  I counted the good ties per

8    segment.  He did also.  We had different counts, but both

9    counts were within the Class two standard and meet the Class

10   two requirement for the speed of track.

11        "He did put in a defect for tie cluster in

12   February, which took me over to Purity Oats, and he argued

13   that he was going to take the mainline out of service, or

14   that it at least needed to be a 10 mph because two ties had

15   broken spikes in the S-curve.

16        "We took gauge measurements, and again, the gauge,

17   even with movement, were within gauge limits for the class

18   of track.  It did not measure out.  Don was not convinced.

19   He took a load test device and tested at the 5,000 pounds,

20   which is for that device over the allowed PSI.  You're only

21   supposed to do about 4,000 to 4200 pounds for that device.

22   This is more than required and the section under

23   consideration tested out appropriately.

24        "I told him that if he were concerned, that he

25   could spike the two ties in question.  Don indicated that

1    the old spikes were broken off in the ties.  I pointed out

2    that he could still spike them going in the alternate

3    corners of the tie.  This was a heated argument.  He told me

4    that I was disregarding the safety of the railroad and the

5    public and that I would not let him put a slow order on.

6            "I did not throw my hard hat.  This was not a 10

7    mph defect by BNSF or FRA rules.  Don is not as familiar

8    with the EI or FRA standards as he should be.  His knowledge

9    is often outdated."

10   Q.  There was testimony last week where someone had stated

11   that you had once said that you didn't want photos.  You

12   wanted measurements.  What did you mean by that?

13   A.  So we have a saying on the railroad:  "Ugly track can do

14   its job."  Which it may not look pretty, but if it meets all

15   the parameters and classification of the track, then it is

16   within the parameters and classification for operation.

17           So for pretty much everything in the FRA manual

18   and our engineering instructions is quantified by defect

19   limits, so there's got to be a measurement.  Like a frog,

20   there's two main measurements on a frog.  One is the tread

21   can be no more than 3/8th chipped out, or it can be a 10 mph

22   defect where the point, or the middle section of the frog,

23   can be no more than 5/8th and 6 inches back chipped out to

24   be a 10 mph defect.

25           So everything we have has tolerances.  So with

1    that is just because you send me a picture of something that

2    doesn't look pretty doesn't mean it quantifies as a defect,

3    so knowing the parameters of it can distinguish is this a

4    defect or not.

5    Q.  Do you know what cut letters are?

6    A.  Yes.

7    Q.  What are they?

8    A.  So our timekeeping department out of Topeka, Kansas does

9    a pay code time review, so it's about 30 days-plus after an

10   employee submits his time.  They kind of review based on the

11   union agreement pay codes used in accordance with how

12   employees were paying themselves.

13        So an example of this would be like a training

14   day.  So say we had a safety meeting during the day.  Per

15   the agreement, any training day you're paid at your straight

16   time rate no matter how long that meeting goes.  So if it

17   goes eight hours, ten hours, you don't get an overtime rate,

18   you just get a straight pay rate.

19        So they would review those types of things and if

20   they found an exception, like someone trying to charge

21   overtime for a day they have training on, they would mail a

22   letter to the employee saying:  "Hey, this was found on this

23   date.  Subsequently, you're not entitled to this.  And for

24   any further instructions, you can call or get a hold."  And

25   at that time, like for me, most employees would bring me

1    that letter and say, "Hey, I got this.  Can you help me

2    out," in which usually I would make a call to the

3    timekeeping office and we'd get it figured out or corrected

4    as needed.

5    Q.  Mr. Chartier, what, if any, role did you have any role

6    in Mr. Sanders' dismissal?

7    A.  I did not.

8    Q.  Were you a decisionmaker at all?

9    A.  No.

10              MS. DONESKY:  I have nothing further at this time.

11              THE COURT:  Mr. Kaster?

12

13                        **CROSS-EXAMINATION**

14   BY MR. LUCAS KASTER:

15   Q.  Good afternoon, Mr. Chartier.  My name's Lucas Kaster.

16   I am one of the attorneys who's representing Mr. Sanders,

17   okay?

18   A.  Good afternoon.  Yes.

19   Q.  I'm going to ask you a few questions, and I want to pick

20   up right where you left off, and you were going through this

21   statement that you gave to HR.

22              Fair to say that you believe Mr. Sanders had,

23   appears to be, multiple performance-related issues?

24   A.  Correct.

25   Q.  And you were his direct manager for a period of about

1    two months; right?

2    A.  Six weeks about, yes.

3    Q.  And he had been a track inspector for upwards of five

4    years at that point; right?

5    A.  I couldn't tell you exactly.

6    Q.  Do you know if a single manager before you ever raised

7    those performance issues with Mr. Sanders?

8    A.  To me personally?

9    Q.  Correct.

10   A.  Yes.

11   Q.  You're aware of that?

12   A.  Well, it was after we were -- there was some issues

13   brought up where one of his former bosses, Bill Shoemake,

14   said yeah, he was doing that stuff there, and there was

15   always confusion and with standards and policies with

16   Mr. Sanders.

17   Q.  What specifically did Mr. Shoemake say?

18   A.  It was in the realm of that, sir.

19   Q.  I'm asking you, what specifically did he say?

20   A.  That there was issues with Mr. Sanders and how he would

21   measure things, read things, interpret things.

22   Q.  When did he say that?

23   A.  That would have been first quarter of 2016.  I can't

24   give you a specific date to the conversation.

25   Q.  First quarter of 2016?

```
1    A.  Correct.

2    Q.  So you reached out to Mr. Shoemake after he had retired,

3    or left?

4    A.  Mr. Shoemake was the MRP on the division, so I seen him

5    quite frequently.

6    Q.  So now you're saying that you reached out to

7    Mr. Shoemake in the first quarter of 2016 regarding

8    Mr. Sanders, is that right?

9    A.  I didn't reach out to Mr. Shoemake.  Mr. Shoemake was

10   visiting my territory for capital plans and it was a

11   conversation we had.

12   Q.  Is that written anywhere in any documentation that you

13   can show me, that Mr. Shoemake raised these concerns?

14   A.  No, it was  --

15   Q.  Because we've looked at performance evaluations that

16   Mr. Shoemake --

17              THE COURT:  Mr. Kaster, one second.

18              MR. LUCAS KASTER:  Sure.

19              THE COURT:  Mr. Chartier, were you completed with

20   your answer?

21              THE WITNESS:  Correct.  Yes, I was, sir.

22              THE COURT:  All right.  Thank you.

23              Mr. Kaster?

24              MR. LUCAS KASTER:  Sorry, Your Honor.  Thank you.

25
```

1   BY MR. LUCAS KASTER:

2   Q.  We've looked at track inspector evaluation forms that

3   Mr. Shoemake did for Mr. Sanders, and no concerns were

4   raised.  So now you're saying new concerns were raised the

5   first time in the first quarter of 2016; is that what you're

6   saying?

7   A.  It wasn't new concerns.  I did see the evaluations prior

8   on Mr. Sanders, which those evaluations are incomplete,

9   because there is -- or are even policies for a track

10  inspector evaluation.  You are supposed to detail comments

11  in there what you did with Mr. Sanders, his performance, his

12  reviews, and that goes with any track inspector, not just

13  Mr. Sanders.

14  Q.  So if Mr. Shoemake did have concerns about Mr. Sanders

15  at the time he was Mr. Sanders' supervisor, those should

16  have been listed in the track inspector evaluation forms,

17  right?

18  A.  Well, he should have, yes.

19  Q.  We can go back to Exhibit 110, which I believe is the

20  same exhibit you were just looking at with Counsel, which

21  was your statement to human resources.

22          MR. LUCAS KASTER:  If we can go to the second page

23  and blow up that last paragraph under E.

24  Q.  So under this paragraph you're referencing two separate

25  suspected defects; right?

1    A.  Yes.

2    Q.  And both times you told Mr. Sanders it wasn't a defect.

3    A.  Because it wasn't.

4    Q.  Okay.  Let's go to paragraph C.  This is another example

5    of when Mr. Sanders says something was a defect and you said

6    it wasn't; right?

7    A.  No, this was related to my spikey, and yeah, it fell off

8    and to be more conscious of it.

9    Q.  Okay.  But then in the red section you go down further

10   and you write that during a conversation in the car,

11   Mr. Sanders brought up these defects which you were saying

12   were not; right?

13   A.  Correct.

14   Q.  Another example of when you're telling Mr. Sanders what

15   he sees is not accurate.

16   A.  It's not what he sees.  It's what the measurements give.

17           MR. LUCAS KASTER:  If we can go to the bottom of

18   the first page under section B and blow that up, please.

19   Q.  This is another example of a situation where Mr. Sanders

20   said something was a defect and required a slow order and

21   you said no; right?

22   A.  Because it didn't require a slow order by measurements.

23   Q.  By the way, Mr. Sanders' job is to be a track inspector;

24   right?

25   A.  Correct.

1    Q.  That's the job he had been hired for?

2    A.  No.

3    Q.  Or bid into?

4    A.  Bid into would be, yes.

5    Q.  Trained for?

6    A.  Certain trainings he's gone through, yes.

7    Q.  Okay.  And that was his job.  His assignment was to look

8    for track defects; right?

9    A.  Correct.

10   Q.  It's not your job.  You're a roadmaster.  You're

11   handling bigger things; right?

12   A.  It still is part of my position.

13   Q.  But that's not your exclusive job; fair?

14   A.  Not exclusively, no.

15   Q.  That's why, as you said, you created five track

16   inspector positions in your division because you think that

17   position is so important; right?

18   A.  Correct.

19   Q.  Okay.  Can you point me and give me any example of a

20   defect where Mr. Sanders was saying it wasn't and you were

21   saying it was?  Can you point to me any documentation where

22   you tell Mr. Sanders that?

23   A.  No.

24   Q.  And when Mr. Sanders was under your direction, you

25   actually told him not to report defects; right?

```
 1    A.  Incorrect, no.

 2    Q.  Mr. Chartier, do you remember being deposed in this

 3    case?

 4    A.  I do.

 5    Q.  Do you remember being placed under oath?

 6    A.  I do.

 7    Q.  Was your testimony true and accurate during your

 8    deposition?

 9    A.  Yes.

10            MR. LUCAS KASTER:  May I approach, Your Honor?

11            THE COURT:  You may.

12    BY MR. LUCAS KASTER:

13    Q.  Mr. Chartier, if you could turn to page 81 of your

14    deposition, please.

15    A.  (Witness complies).  Okay.

16    Q.  Line 9.  Do you see that?

17    A.  Yes.

18    Q.  You were asked the question:

19            "When you disagreed with Mr. Sanders about

20    whatever he was seeing in terms of a defect or a slow order,

21    did you change it?"

22            Your answer was:  "When he worked for me, nothing

23    would be put in.  The issue would be looked at, period."

24            That was your testimony at the time; right?

25    A.  Correct.
```

```
1    Q.  Next question:
2              "Would you tell him not to put it in?"
3              Your answer was:  "Yes -- or yeah."
4              Do you see that?
5    A.  Yes.
6    Q.  That was your testimony during your deposition; right?
7    A.  That was in correlation to if it's not a defect, it
8    wouldn't go in.
9    Q.  By the way, are you aware of the federal regulations
10   requiring qualified people to track inspect?
11   A.  By what manner, sir?
12   Q.  By their -- their regulations require people to be
13   qualified to do track inspections.
14   A.  By the FRA, anybody that's FRC qualified.
15   Q.  And when you're FRC qualified, you have the discretion
16   as to whether something is a defect or not; right?
17   A.  What do you mean by "discretion"?
18   Q.  If you're qualified and you think something is a defect,
19   then it should be reported as a defect.
20   A.  Defects don't go on feelings.  That's why we have
21   parameters in place to say if they're a defect or not.
22   Q.  I want to go to this Union Yard incident and I want to
23   clarify something, and I just want to make sure I have your
24   testimony correctly.
25              Is it your testimony that you and Ms. Hoppenrath
```

1     showed up because Mr. Sanders raised issues about wide

2     gauge?

3     A.  He called Ms. Hoppenrath, yes.

4     Q.  And the concern was wide gauge.

5     A.  Correct.

6     Q.  And then you showed up with Ms. Hoppenrath.

7     A.  Yes.

8     Q.  And addressed this issue around wide gauge.

9     A.  We looked at his concerns, yes.

10    Q.  And you and Ms. Hoppenrath said it wasn't wide gauge.

11    Did I catch that correctly?

12    A.  Majority of the spots he had listed were not wide gauge.

13    There was two that would have met the parameters for a wide

14    gauge.

15    Q.  And then I think you said at that point is when

16    Mr. Sanders raised this concern about the track inspection

17    frequencies of the yard.

18    A.  Well, it was a little bit after that, yes.

19    Q.  And then you testified that you told Mr. Sanders to call

20    the track -- or the yardmaster to take the tracks out of

21    service.

22    A.  That's correct.

23    Q.  So your testimony is it was your decision to remove the

24    yard out of service.

25    A.  Correct.

1    Q.  Do you know Ms. Hoppenrath was just here right before

2    you and she testified that Mr. Sanders was the one who said

3    the yard needed to be taken out of service.

4    A.  I was the one that instructed Don to take it out.

5    Q.  And your testimony is that Ms. Hoppenrath never told you

6    when you got there that she had been told by Mr. Sanders

7    that the yard needed to be taken out of service because of

8    the track frequency issue.

9    A.  We were together prior to when Mr. Sanders called.

10   Frequency wasn't brought up until after Mr. Sanders was

11   questioned about the other items.

12          MR. LUCAS SANDERS:  If we can play -- I'm going to

13   ask to play a recording, Exhibit 199, as part of our

14   rebuttal.

15          MS. DONESKY:  Objections on relevance and hearsay.

16          THE COURT:  I'll overrule it for the moment.

17          MR. LUCAS KASTER:  So can we play the recording?

18          THE COURT:  Yes.

19          MR. LUCAS KASTER:  Thank you, Your Honor.

20      (Exhibit 199 playback attempted)

21          MR. LUCAS KASTER:  We may have to look at that at

22   the break.  It's not playing through the speakers for some

23   reason.

24   BY MR. LUCAS KASTER:

25   Q.  I just want to clarify one thing.  So Mr. Sanders was

```
 1    not terminated or disciplined for any of these alleged

 2    performance issues that you've raised in court; right?

 3    A.  What discipline would I assess on a performance issue?

 4    Q.  A formal discipline.  You start an investigation.

 5    A.  There's nothing in our rules.  It's a development

 6    opportunity, and it's what I viewed it as of Mr. Sanders,

 7    not a disciplinary action.  He didn't break any rules or

 8    violate anything in the performance of anything.

 9    Q.  So he wasn't terminated for any of the reasons you

10    brought up today.

11    A.  Correct.

12    Q.  Did you ever attempt to take him out of the track

13    inspector position?

14    A.  There was a conversation we had.

15    Q.  Is that documented anywhere?

16    A.  No, it was a verbal conversation.

17    Q.  You understand and I think you just testified that you

18    weren't involved in the termination proceedings at all.

19    A.  Correct.

20    Q.  You weren't even around him on those days.

21    A.  No.

22    Q.  You weren't involved in the decision to charge him.

23    A.  No.

24    Q.  Or the decision to eventually terminate him; right?

25    A.  No.
```

1    Q.  And I think you said in your statement to HR that you

2    did admit that you had told Mr. Sanders that his reputation

3    preceded him.  Did I catch that correctly?

4    A.  Correct.

5    Q.  You talked about some nightly reports and that that was

6    a requirement for people under your direction.  Do you

7    recall that?

8    A.  Yes.

9    Q.  And I think you testified that Mr. Sanders was for the

10   first time under your supervision in or around mid-January.

11   A.  January 25th.

12   Q.  If we can pull up Exhibit 161, please.

13          Mr. Chartier, do you recognize this front page

14   here?

15   A.  Yes.

16   Q.  What is this file?

17   A.  It's Mr. Sanders' night reports.

18   Q.  Are they the night reports that you had in a file on

19   your desk?

20   A.  Correct.  Well, they're not -- they're just in a file.

21   All my night reports go in the same file.

22   Q.  And you pulled these out and produced them to us in this

23   case.

24   A.  Correct.

25   Q.  If we can go to the second page of this exhibit, please.

```
 1            This is an example of one of the nightly reports
 2     you have in your file for Mr. Sanders; right?
 3     A.  Well, this one wouldn't be for me.  This is dated
 4     December 8th, 2015.
 5     Q.  This is an email Mr. Sanders sent on December 8th, 2015
 6     to several people including yourself; right?
 7     A.  Yes, I was on it.
 8     Q.  And this is the first night report you had for
 9     Mr. Sanders in your file.
10     A.  This is what I had.  I can't say if this was directly.
11     Q.  And you alluded to the fact that this nightly report is
12     on December 8th of 2015; right?
13     A.  Yes.
14     Q.  A month before Mr. Sanders is even under your direction;
15     right?
16     A.  Over, yes.
17     Q.  It also happens to be a day after Mr. Sanders went to HR
18     to report your boss and Ms. Hoppenrath for harassment and
19     retaliation.  Do you know that?
20     A.  I did not know.
21     Q.  So is it your testimony that your first night report
22     happens to be the day after he goes to HR is a coincidence?
23     A.  He wasn't on my territory.  There's no reason for him to
24     include me on this.  That -- he included me on various
25     emails I don't know the reason for, but until he reported to
```

1    me January 25th, that was the start of -- would be his

2    requirement to give me a nightly report.

3    Q.  So you're saying it's a coincidence that the first night

4    report that you have for Mr. Sanders is the day after he

5    reports your boss to HR.

6    A.  You would have to ask Mr. Sanders on that, because I

7    have no involvement around that incident or this day.

8    Q.  So why did you have his nightly report?

9    A.  You would have to ask Mr. Sanders of why he copied me on

10   it.

11   Q.  Do you know or were you asked my Mr. Jones to keep tabs

12   of Mr. Sanders?

13   A.  No.

14   Q.  By the way, you brought up this incident between

15   Mr. Sanders and these welders, this argument?

16   A.  Correct.

17   Q.  You've raised your voice toward subordinates; right?

18   A.  I have, yes.

19   Q.  You've sworn at subordinates?

20   A.  I have.

21   Q.  You were required to take an anger management course?

22   A.  I was, yes.

23   Q.  You told one of your subordinates to get his head out of

24   his ass and run his territory; right?

25   A.  An assistant roadmaster, yes.

```
 1   Q.  By the way, did you tell Mr. Sanders the first day he

 2   showed up on your territory after he reported some defects

 3   and slow orders that he wasn't going to pull the same shit

 4   he did at Dayton's Bluff?

 5   A.  I don't recall that, no.

 6   Q.  Despite swearing at subordinates, yelling at

 7   subordinates, never been demoted.

 8   A.  No.

 9   Q.  You got one formal reprimand.

10   A.  One formal reprimand, yes.

11   Q.  You've never been investigated for anything else.

12   A.  I have not.

13   Q.  Never gotten any other coachings or counselings.

14   A.  I have not.

15   Q.  You're still a manager.

16   A.  I am.

17   Q.  You're still supervising employees.

18   A.  Correct.

19   Q.  You're still overseeing track inspectors.

20   A.  Correct.

21           MR. LUCAS KASTER:  Outside of the recording issue,

22   Your Honor, I have no other questions for Mr. Chartier.

23           THE COURT:  Ms. Donesky?

24           MS. DONESKY:  Could I reserve my questions until

25   that plays in case I were to have a question?
```

1          Are you planning to play it, Lucas?  Are you

2     planning to play the recording?

3          MR. LUCAS KASTER:  Yes.  We don't have to play it

4     while he's here.

5          THE COURT:  We'll deal with the recording issue

6     offline.

7          MS. DONESKY:  Okay.

8                    **REDIRECT EXAMINATION**

9     BY MS. DONESKY:

10    Q.  I was just going to ask you a quick question on that.

11    This is an email you were shown that you were copied on from

12    Mr. Sanders, and he's the one who copied you in; correct?

13    A.  Correct.

14    Q.  And this is at a time when Ms. Hoppenrath was his

15    supervisor; correct?

16    A.  Correct.

17    Q.  And she's copied on this; correct?

18    A.  Yes.

19    Q.  And there were other individuals as well who were copied

20    on?

21    A.  Yes.

22    Q.  You don't have any knowledge as to why Mr. Sanders would

23    have copied multiple people on this email?

24    A.  To the list that was on there, no.

25    Q.  And December 8, you had just started at the company

1      then, or at least in St. Paul; correct?

2      A.  Or Minneapolis.

3      Q.  In the Northtown facility.

4      A.  Yes.

5              MS. DONESKY:  Okay.  I have nothing further at

6      this time.

7              MR. LUCAS KASTER:  I have nothing further, Your

8      Honor.

9              THE COURT:  Mr. Chartier, you are excused.

10             THE WITNESS:  Thank you, sir.

11             THE COURT:  Counsel, is this a good time for a

12     lunch break?

13             MS. DONESKY:  It would be, Your Honor.

14             THE COURT:  Mr. Kaster?

15             MR. LUCAS KASTER:  Yes, Your Honor.

16             MR. JAMES KASTER:  Always a good time for lunch.

17         (Laughter)

18             THE COURT:  All right.  Members of the Jury, we

19     will take actually just a touch more than an hour today.  We

20     will adjourn at this time.  We will recommence proceedings

21     at 1:30.

22         (Lunch recess taken at 12:28 p.m.)

23                          *     *     *     *

24

25

1          (1:30 p.m.)

2                          IN OPEN COURT

3               THE COURT:  Thank you, everyone.  Please be

4     seated.

5               Is BNSF prepared to call its next witness?

6               MS. FERGUSON:  Your Honor, I think that Mr. Kaster

7     was going to do something before that.

8               MR. LUCAS KASTER:  Your Honor, I believe we have

9     the recording issue resolved, so we were going to play

10    Exhibit 199 if it's okay with Your Honor.

11              THE COURT:  Not without a witness.

12              MR. LUCAS KASTER:  Do we want to put Mr. Chartier

13    back on the stand?  I think he's still outside.

14              MS. DONESKY:  He is.

15              THE COURT:  That's fine.

16              (Mr. Chartier resumes the stand)

17              THE COURT:  Mr. Chartier, thanks for sticking

18    around.

19              THE WITNESS:  No problem, sir.

20              THE COURT:  Why don't you have a seat and I'll

21    just remind you, sir, that you're still under oath.

22              THE WITNESS:  Yes, sir.

23              THE COURT:  Mr. Kaster?

24              MR. LUCAS KASTER:  Thank you, Your Honor.

25

1          **RECROSS-EXAMINATION**

2     BY MR. LUCAS KASTER:

3     Q.   Mr. Chartier, I just have a couple follow-up questions

4     for you regarding the recording, but at first we're going to

5     play that recording that we alluded to before, so why don't

6     we go ahead and play Exhibit 199.

7               (Exhibit 199 playback commences)

8     BY MR. LUCAS KASTER:

9     Q.   Mr. Chartier, there were two voices on that recording,

10    right?

11    A.   Correct.

12    Q.   The voice of Mr. Sanders and Ms. Hoppenrath?

13    A.   Correct.

14    Q.   And they were talking about this incident where Union

15    Yard was pulled out of service.

16    A.   Yes.

17    Q.   There was nothing referencing gauge as the reason why

18    Union Yard was taken out of service on the call; right?

19    A.   Well, I don't know when that call was.

20    Q.   I didn't ask you when it was.  There was nothing

21    referenced about gauge being the reason why Union Yard was

22    pulled out of service on the recording.

23    A.   I guess I don't know how to answer that for reference,

24    because I don't know what the reference to that call in

25    correlation to the incident you're referring to.

1   Q.  And I'm just asking you, did you hear any reference on

2   the recording to gauge being the reason why Union Yard was

3   taken out of service?

4   A.  In that instance, no.

5   Q.  And Ms. Hoppenrath indicates on the recording that it

6   was Mr. Sanders who pulled the yard out of service.  On the

7   recording that's what she says; right?

8   A.  On there, yes.

9   Q.  And she says that Mr. Sanders pulled it out because of

10  inspection frequencies; right?

11  A.  That's what he mentioned, yes.

12  Q.  And accepted track standards mean that the yard has to

13  be inspected at least once every 30 days.

14  A.  Correct.

15  Q.  Mr. Sanders says:  That hasn't been done, so the rules

16  require me to take it out of service.

17  A.  Per the FRA, yes.

18          MR. LUCAS KASTER:  I have nothing further.  Thank

19  you for sticking around.

20          THE COURT:  Ms. Donesky?

21          MS. DONESKY:  Thank you.

22

23                  **FURTHER REDIRECT EXAMINATION**

24  BY MS. DONESKY:

25  Q.  Mr. Chartier, that's a call with Ms. Hoppenrath and

1    Mr. Sanders from what you could discern from those voices;

2    correct?

3    A.  Correct.

4    Q.  You're not on that call.

5    A.  I'm not, no.

6    Q.  You have no idea when that call occurred.

7    A.  That's correct.

8    Q.  In fact, that call could have happened in conjunction

9    with any part of that day, isn't that fair?

10   A.  Correct.

11   Q.  The call could have occurred after you and Mr. Sanders

12   had had the conversation that you referenced in your

13   testimony earlier when he offhand referenced that the yard

14   was out of frequency and you identified that the yard needed

15   to come out of service; fair?

16   A.  Correct.

17   Q.  There's no timestamp on that recording?

18   A.  Not that I heard, no.

19   Q.  No date?

20   A.  Not that I heard, no.

21   Q.  And who had the responsibility for inspecting Union

22   Yard?

23   A.  Mr. Sanders.

24   Q.  And who let the yard go without inspection in the

25   required timeframe?

```
1    A.  That would have been Mr. Sanders.

2              MS. DONESKY:  I have nothing further.

3              THE COURT:  Thank you.

4              MR. LUCAS KASTER:  Nothing further, Your Honor.

5    Thank you.

6              THE COURT:  Mr. Chartier, you're excused.

7              THE WITNESS:  All right.  Thank you.

8              THE COURT:  Yes.  Thank you.

9              Is BNSF prepared to call its next witness?

10             MS. FERGUSON:  Yes, Your Honor.  We would call

11   Douglas Jensen by deposition.

12       (Pause)

13             THE COURT:  Ms. Ferguson?

14             MS. FERGUSON:  Thank you, Your Honor.

15             (DOUGLAS J. JENSEN VIA DEPOSITION)

16   (BY MS. FERGUSON):

17   Q.  Can you just say and spell your name for the record,

18   Mr. Jensen?

19   A.  Douglas, D-O-U-G-L-A-S; J -- that's my initial for

20   Jerome -- Jensen, J-E-N-S-E-N.

21   Q.  Mr. Jensen, we met briefly off the record.  My name is

22   Lucas Kaster.  I'm one of the attorneys who's representing

23   Mr. Sanders in this case against BNSF.  Do you understand

24   that?

25   A.  Mm-hm, yes.
```

1          MS. FERGUSON:  And if we turn to page 8.

2     Q.  Okay.  You were placed under oath a minute ago.  What

3     does that mean to you?

4     A.  I must tell the truth --

5     Q.  Is there any --

6     A.  -- the whole truth and nothing but the truth.

7     Q.  My understanding is you're currently retired, is that --

8     A.  Plan on staying that way, yes.

9     Q.  Okay.  And was your last employer with BNSF?

10    A.  Yes.

11    Q.  What was your position?

12    A.  I was GDM, General Director of Line Maintenance for the

13    Twin Cities division.

14    Q.  How long were you in that position?

15    A.  From July of 2012 until October 31st of 2016.

16    Q.  When did you first start with BNSF?

17    A.  June 25th, 1974.

18    Q.  It sounds like most, if not all, of your career was with

19    BNSF?

20    A.  All of it.

21    Q.  Okay.  Can you just give me a rundown of the different

22    positions that you've held?

23    A.  Do you want me to start from the beginning to the end or

24    the end to the beginning?

25    Q.  Let's go in reverse order.  So we got the last one was

1  General Director of Line Maintenance, and why don't you just

2  give us like the last ten years.

3  A.  Okay.  Would be July of 2012 to June of 2010.  I was the

4  Assistant Director of Planning, or just call it the Director

5  of Roadway Planning.  Just write that down.  Director of

6  Roadway Planning.  From 2010 -- June of 2010 to April of

7  2006 I was the Division Engineer in Alliance, Nebraska on

8  the Powder River division.  And prior to that, from -- I was

9  the ADMP, I was the gang guy, Assistant Director of

10  Maintenance Production from -- it would be October of 2004

11  to the DE job in --

12  Q.  April of 2006?

13  A.  Yeah.  And prior to that I was MRP, Manager of Roadway

14  Planning, and that was going backwards up until I started

15  that July of 2000, I believe.

16  Q.  You're saying "roadway planning" a lot.  What does that

17  mean?  I'm not familiar with that term.

18  A.  I planned the capital projects across the division here.

19  And when I was in Ft. Worth it was across the system.

20  Q.  Okay.  I guess I'm thrown off by the word "roadway."

21  Are you just talking about tracks?

22  A.  Yeah.

23  Q.  Okay.

24  A.  Yeah.  I was in the engineering department the whole

25  time; and, yeah, those were the fun jobs, the planning jobs.

1    Q.  Okay.  And as I understand it from some of the previous

2    testimony in this case, that capital projects are things

3    that are outside of a specific maintenance budget.  Is that

4    right?

5    A.  Yeah, it's a different budget.

6    Q.  Okay.

7    A.  And as far as being the General Director of the Twin

8    Cities, that was one of my jobs was to ensure that we got

9    capital money to fix up the rails, the ties, the -- just

10   really the infrastructure, the bridges, things like that.

11   So, you know, there's a lot of justifications that we had to

12   go through, but really that was one of my bigger jobs.

13   Q.  Okay.  And that is separate from sort of a general

14   maintenance budget?

15   A.  General maintenance budget, yeah.  There's two different

16   budgets.  There's an operating budget and then there's a

17   capital budget.  Your operating budget is given to you

18   with -- they have a bunch of metrics and I forget what they

19   call it.  You've got to excuse me.  It's been a couple of

20   years and I've tried to block most of this out.  But there

21   was some metrics that they used taking into consideration

22   every switch you had, every crossing you had, number of

23   miles you had, the number of branch lines you had, number of

24   yards you had; and then give you X amount of points or,

25   *per se*, dollars for each metric or asset; and then that

1    would be the operating budget.

2          And then you would be -- you would need to stay

3    within that operating budget, or try to.  A little tougher

4    in the north when you had to deal with snow and you never

5    know when it's gonna snow.  And that's probably a head

6    count.  Give us a head count of 450 people.

7          And then there was the capital budgets, and

8    there's two different kinds of capital.  There's division

9    capital that would -- I would take care of my surfacing

10   sets, grade crossing upgrades.  It was normally about, I

11   think -- well, it would be a mistake if I told you what I

12   would get, but it was substantially less than the capital

13   budget of gang maintenance.

14   Q.  So that's the second category.

15   A.  Mm-hm, second category.  Two different capitals.

16   Division capital and then system capital.

17   Q.  All right.  Okay.  When you were the General Director of

18   Line Maintenance, how would you describe your job

19   responsibilities?

20   A.  Massive.  I had a standard work force off the operating

21   budget of about 450 people to 500 people.  And then we had a

22   capital budget, and that would -- depending on how much

23   money you received, would pertain to how many gains you had.

24   So my job was to supervise the supervisors of all that work

25   that was going on.  And sometimes -- I know one summer we

1    had about 850 people.  We had close to 21 gangs on us at

2    about 50 people per gang.  So it really added up, and I

3    would supervise that.

4             My job really, I looked at it as being the

5    go-between between Fort Worth and here.  It was my job here,

6    I was the leader and to set, you know, goals.  We have

7    certain goals, you know, in safety and budget, in just

8    safety meetings, attend at safety meetings.  Time in the

9    field with the troops, just -- I was just kind of the

10   overseer of all that.  And then when I did get a directive

11   from Ft. Worth, then we would initiate it.  That's how it

12   goes.

13   Q.  And so just in terms of kind of the organizational

14   structure of this Twin Cities kind of division -- is that

15   what it's called, a division?

16   A.  Mm-hm.

17   Q.  Is that a yes?

18   A.  Yes.  Twin Cities division, yes.

19   Q.  So you would be the top person in this division during

20   your employment?

21   A.  On the engineering side.

22   Q.  Okay.  Is there another side beside engineering?

23   A.  Operating side, and the operating side was run by the

24   general manager, and that's the trains, the train crews,

25   that kind of stuff.

1    Q.  Gotcha.  So in terms of the engineering department and

2    this territory division, it's you; and then who's underneath

3    you during the time when you were the general director?

4    A.  I had -- what they call them is managers.  I had three

5    DEs, division engineers, and they took care of the track

6    side.  I had a structure supervisor or manager.  He took

7    care of the bridges and the buildings.  And then I had a

8    signal manager that took care of the signals.  And then I

9    also had a manager of roadway planning.  He would go out

10   and, you know, inspect things and get the capital

11   presentation ready for the next year.  And then I had the

12   ADMP, who's the manager of gangs.  But they really, the

13   people directly underneath me, that would be -- a grade 32

14   would be the managers, and those five managers -- signal,

15   structures, and the three DEs, yeah.

16   Q.  It seems like to me that the track department is the

17   biggest considering you had three managers; is that right?

18   A.  Yeah.  That was -- and each division has different --

19   are different sizes.  The Twin Cities is one of the biggest

20   divisions on the system, so I had a few more managers, a few

21   more people.

22   Q.  Who was your boss?

23   A.  David Hesterman.  He was AVP of engineering north, and

24   he was out of Ft. Worth.

25   Q.  In your position as general director, you know, are you

1    graded at all based on the performance of your entire sort

2    of crew underneath you?  Do you have performance reviews?

3    A.  Yes.

4    Q.  Okay.

5    A.  PMPs.

6    Q.  And how are you graded?  What are the different metrics

7    in the performance reviews?

8    A.  Oh, there was numerous metrics.  You know, I'd almost

9    need a scorecard to go over them all, you know, but ...

10   Q.  When you say "scorecard," are you talking about the

11   scorecard rankings?

12   A.  Yeah.  There's several different levels of scorecard

13   rankings.

14   Q.  Okay.

15   A.  But really, yeah -- ask the question again.

16   Q.  Sure.  With respect to, you know, performance

17   evaluations, is one of the factors in terms of whether

18   you're performing your job effectively the performance of

19   those underneath you?

20   A.  Yeah.  Yeah.

21   Q.  Okay.

22   A.  See, my scorecard was a little different.  My scorecard

23   engulfed everything; whereas you worked your levels down,

24   your scorecard has lesser values to it.

25   Q.  Sure.  What's included in your scorecard?  Do you recall

1    any of the metrics?

2    A.  I wish I had it in front of me.

3    Q.  Okay.

4    A.  You know, safety, frequency ratio, safety meetings.  And

5    this is on the scorecard.  Plus I had other goals in my PMP.

6    You know, we had slow order goals, we had cost of welds, we

7    had cost of grinding, we had cost of surfacing per foot, tie

8    costs per tie, cost per rail foot.  I was graded on a lot of

9    things.

10   Q.  And I'm assuming that all of those metrics come from the

11   work that the crews are doing underneath you?

12   A.  Mm-hm.  Mm-hm.

13   Q.  Is that a yes?

14   A.  Yes.

15   Q.  We were talking initially about your performance reviews

16   and you referenced the scorecard rankings.  Are your

17   scorecard rankings used in those PMPs I think is what you

18   called it?

19   A.  Mine?

20   Q.  Yeah.

21   A.  Mine would be.

22   Q.  Do you do performance reviews for any of your

23   subordinates?

24   A.  No.

25   Q.  So they don't have PMPs?

1  A.  You're talking my -- oh, my subordinates.  Yeah.  Oh,

2  yeah, yeah.

3  Q.  Your direct reports?

4  A.  Yeah, my direct reports, yeah.

5  Q.  And did those people under you also have a scorecard

6  ranking?

7  A.  They have a scorecard and there's automatically a

8  ranking.  I mean, when you have 26 division engineers and

9  you have 20 signal managers, yeah, there's -- there's

10  rankings, yeah.

11  Q.  And I just want to make sure that when we're talking

12  about rankings, I want to focus on the scorecard.  That they

13  actually have these independent scorecard rankings for each

14  person.  Those managers that we're talking about under your

15  direction --

16  A.  Mm-hm.

17  Q.  -- they all have independent scorecard rankings?

18  A.  Yeah, that are bumped up against every other division

19  engineer across the system.

20  Q.  Sure.  So they're compared with other people on their

21  level?

22  A.  Correct.

23  Q.  Sure.  Okay.  When you were doing reviews for those

24  managers under your direction, did you look at their

25  scorecard rankings as part of the consideration?

 1    A.  You know, I would snoop at them from time to time.  But

 2    you know what, I knew what they were doing.  I would be a

 3    substandard supervisor, leader, if I didn't.  So no, not

 4    really.

 5    Q.  Were there any other metrics that were used to evaluate

 6    the performance of the managers underneath you?  I know you

 7    said the scorecard ranking.  Were there any other metrics

 8    that were used?

 9    A.  Yeah, and I don't know that the scorecard ranking was

10    really used for that.  I mean, the scorecard is a thing that

11    the railroad developed to ensure that, you know, we were all

12    on the same page with the -- with the priority of the

13    company in mind.  That's what the scorecard is about, so I

14    really didn't use it for a lot.

15    Q.  Are you aware of BNSF having sort of harassment,

16    discrimination, retaliation policies?

17    A.  Yeah, about retaliation, yeah.

18    Q.  Okay.

19    A.  Yeah.

20    Q.  Do you think it's important that they have those

21    policies?

22    A.  Oh, absolutely.

23    Q.  Why do you say that?

24    A.  Well, I mean, you have to have -- you have to have --

25    when you're a company this size, you have to have rules,

1    policies, procedures.  You've got thousands and thousands of

2    employees.  You have to have guidance.

3    Q.  You were obviously employed with BNSF around 2007;

4    right?

5    A.  Yeah, I was in Alliance, Nebraska.

6    Q.  Do you recall anything about there being an amendment to

7    the Federal Railway Safety Act to try to protect employees

8    from retaliation?

9    A.  You know, I don't know that I know the year, but there's

10   been different things that have come up --

11   Q.  Okay.

12   A.  -- even prior to then.

13   Q.  Did you hear any discussion about some of the rationale

14   for that being a belief that there was sort of a long

15   history of retaliation in the railroad industry?

16   A.  I don't recall.

17   Q.  Have you ever experienced or seen someone be retaliated

18   against for reporting an injury?

19   A.  Reporting an injury?

20   Q.  Yes.

21   A.  Absolutely not.

22   Q.  What about, you know, reporting a track defect?

23   A.  Well, a traffic defect -- I mean, there's traffic

24   defects out there every day.  I mean, that's why -- that's

25   why we go out, and that's why we have the jobs we have is

1     for track defects.  Our job on the engineering side -- and

2     I'll just speak for the engineering side -- is to make sure

3     that we have the safe passage of trains on a daily basis;

4     that we protect the trains, the train crews and the general

5     public and our employees.  There's nothing more important to

6     me than -- and the railroad as safety.

7     Q.  If you ever learned that somebody under your direction

8     was being harassed for, you know, doing their job trying to

9     report defects, would you take that seriously?

10    A.  I don't think that anybody would ever be harassed for

11    reporting defects.

12    Q.  You've never heard of that?

13    A.  No.

14    Q.  Have you ever heard an employee say, "I feel like my

15    managers are trying to dissuade me from reporting a defect"?

16    A.  Not to me they haven't.

17    Q.  Okay.  Have you ever heard anyone talk about that

18    generally?

19    A.  No.  Why would we do that?

20    Q.  You tell me.

21    A.  Yeah.  I mean, we pay people to find defects.  You know,

22    it's the three Rs.  It's the three Rs when it comes to track

23    inspection.  You restrict it if you find a defect; you

24    repair it or you remove it from service; and then I added a

25    fourth R.  You report it.

1    Q.  Tell me those again.  You restrict it?

2    A.  Restrict, remove, repair.

3    Q.  And then you added a fourth, which was report?

4    A.  Report it, yeah.

5    Q.  Okay.

6    A.  Because it doesn't do you any good to find defects if

7    you're not going to report them because the railroad keeps

8    track of defects and that's how you get capital money.  So

9    if you're not reporting defects, in their mind everything is

10   hunky dory.  So I can't go -- and I would tell my people I

11   can't go to Ft. Worth and say, "Hey, I think we need this

12   rail."  And Ft. Worth says, "Well, why do you need rail?"

13   And I'll say, "Well, because that's what the guys want."

14   No, I have to have facts and that's where you get it.

15   Q.  So what do you mean by "restrict"?

16   A.  Restrict -- restrict the speed.  Okay.  So I find --

17   let's say I find an open joint.  So the first thing I'm

18   going to do is see if I can repair it while I'm there.

19   Well, I can't repair it.  So then I have to restrict it if

20   it's safe enough to walk a train over.  If I don't, then I

21   remove it from service.

22   Q.  If you don't feel it's safe enough to have a train go

23   over it, then you remove it?

24   A.  Correct, yeah.

25   Q.  Okay.

1    A.  I'll give you a little for instance on the -- and this

2    is -- this is some extra about the reporting is when I was a

3    division engineer in Alliance, Nebraska we had a gold-plated

4    railroad.  It was a nice railroad and my track inspectors,

5    even though they had defects, they weren't reporting them.

6    Well, Ft. Worth has all kinds of reports that they can run

7    and they started -- I'd get questions about, well, you know

8    why do you need money?  Because nobody's reporting anything.

9         So it's very important.  That's where I learned my

10   lesson as a rookie manager is that you need to report.

11   Q.  Would you agree with me that managers under your

12   direction are graded, at least in part, based upon the

13   efficiency that trains run over their rails?

14   A.  Ask it again.

15   Q.  Sure.  I'll use an example.  That managers under your

16   direction, when you're talking about trains moving that

17   they're on schedule.

18   A.  Yeah.  The trains that are on a schedule are on the

19   schedule, yeah.

20   Q.  Can taking a rail out of service or putting in a slow

21   order impact whether things are on schedule?

22   A.  If that specific train is in the vicinity, but again,

23   most of the time there's very few defects that you can't

24   walk a train over.  So that's how we move the trains, but it

25   doesn't affect them in any way.

1    Q.  I just want to make sure I clarify something.  When you

2    say "walk," you mean go very slowly?

3    A.  Yeah.

4    Q.  Okay.

5    A.  I'll give a visual, actually a person standing at the

6    site with a handheld portable radio in his hand

7    communicating directly to the engineer on the train.  And

8    we're going to walk you at walking sped over this defect so

9    we can get you moving down the road, and we'll bring the

10   troops in and we'll get it repaired.

11   Q.  Do you know whether there's any type of, you know,

12   snowball effect to trains moving, if you know, something

13   gets backed up because there's a defect or a slow order,

14   that that impact trains moving up this way?

15   A.  Well, I mean, that's just common sense.  That if you

16   have -- let's just say in a 100-mile segment, you have 20

17   trains and you're on single track and you find a defect.  Is

18   it going to affect them?  Impact them?  Yeah.  Heck, yeah

19   it's going to impact them, but there's other scenarios.

20           I mean, it's where are you taking the track out of

21   service?  Are you taking the track out of service on the

22   mainline?  Are you taking the track out of service in the

23   yard?  I mean, there's always options of moving trains.  Is

24   it next to a siding?  Can we move trains through the siding?

25   Really, you know, it has to be a very unique situation where

```
1    the track is taken out of service, but there are some cases.
2    Q.  Can you think of any reason why a roadmaster or division
3    engineer would pressure a track inspector not to report a
4    defect?
5    A.  I don't think that -- it sounds ludicrous that anyone
6    would pressure anybody not to report a defect as long as it
7    is truly a defect.
8    Q.  What about a slow order?  Is there any reason you can
9    think of why someone pressures someone not to put a slow
10   order on?
11   A.  Absolutely not.  Our job is to make sure that there's a
12   safe passage of trains.  Now, let's just make sure we have a
13   plan to fix it.  You know, put some resources together.  Let
14   me know what you need, you know, communication.  It's all
15   about communication and -- and having a plan.
16   Q.  Have you ever heard of the -- let's say a roadmaster, a
17   division engineer, removing a defect that wasn't fixed after
18   it was entered into the system?
19   A.  Why would he do that?
20   Q.  I don't know.  I'm just asking have you ever heard of
21   that?
22   A.  No.
23   Q.  Have you ever heard of a roadmaster or division engineer
24   moving or altering a slow order after it's been entered?
25   A.  Yeah.  Yeah, that could happen.
```

1    Q.  In what --

2    A.  It depends on the track and who the track inspector is.

3    How well educated is the track inspector?  Does the track

4    inspector need training?  You know, some track inspectors

5    aren't so sure of themselves, so they may put out a slow

6    order and they may want you to go out and look.  As a

7    division engineer, I'd go out with roadmasters and track

8    inspectors and look at things, and they'd say, "Hey, Doug,

9    what do you think?" you know, and I'd give them some

10   guidance.

11           Yeah, I've heard of them do that, but just

12   blatantly go out and take it off?  Unless the geocar goes

13   over it, and the geocar, which measures the track geometry,

14   says that there's no defect there and the track inspector

15   says there's no -- or claims there's a defect there, you

16   know, yeah, let's go back out and look at it.  Let's take

17   some track notes.  Let's get out our string line.  Let's do

18   our job to ensure that it is a defect or a track condition

19   that's out of the parameters and needs a slow order.

20   Q.  If there's a -- let me ask you this:  Do you think

21   people can disagree about whether something's a defect or

22   not?

23   A.  Well, there's -- a defect is a defect.  It's a specific

24   thing.  Now, I don't know.  I suppose people could interpret

25   what a defect is and what a defect isn't, but I would say

1    that they'd probably need some training if they were doing

2    that.

3    Q.  If there's a disagreement between a track inspector and

4    a roadmaster or a division engineer about whether something

5    is a defect, does one overrule -- outrule or outrank the

6    other?

7    A.  No.  I would suggest that they get out there and

8    collaborate about what they've got going and come to a

9    consensus on what they have and speak with facts.

10   Q.  I want to ask you a few questions kind of generally

11   about, you know, how a track inspector goes about reporting

12   a defect.

13           Do you have knowledge of the system that track

14   inspectors use?

15   A.  High level, no.

16   Q.  Okay.  Then I won't spend a bunch of time on it.  Do you

17   get any type of reports?

18   A.  At my level, no.

19   Q.  Okay.  Do the managers underneath you get reports about

20   defects or slow orders entered under their --

21   A.  Yes.  The MEC would put out reports, I believe; plus I

22   think the FRA generates reports.

23   Q.  Okay.  How often do they get notice or a report about

24   those kinds of things?

25   A.  I would say they would be realtime.

1    Q.  But you don't see those?

2    A.  I -- no, I had other things to do.

3    Q.  Okay.  In terms of the specifics about how you enter a

4    defect and who it goes to, I think what you're saying is you

5    don't really know that.

6    A.  No.  And I used to be a track inspector.  It was

7    different then; so no, I don't know.

8    Q.  All right.  I want to talk to you a little bit about

9    Mr. Sanders.  Do you recall Mr. Sanders being employed?

10   A.  Yeah, I know Don.

11   Q.  What do you think of Don?

12   A.  We had a good relationship.

13   Q.  Okay.

14   A.  Believe it or not, Don and I had a good relationship.

15   And I didn't see him very often, but when I did I would

16   always go say hello to Don and thank Don for what he was

17   doing, and I think Don would reiterate that.

18   Q.  Do you have any knowledge of Mr. Sanders' performance as

19   a track inspector?

20   A.  Well, I really didn't deal with Don as a track

21   inspector.

22   Q.  It was more just a personal level or --

23   A.  Yeah.  Yeah.  He'd be over at the building and I'd say

24   hello, or he'd go by or he'd be at a meeting, a divisional

25   safety meeting, and we'd have a breakout session and Don

1   would be there sometimes and we would talk, yeah.

2   Q.  Did you ever have any concerns about Don's performance?

3   A.  I really didn't know Don enough to ask about his

4   performance.

5   Q.  In your interactions with Mr. Sanders, did you ever view

6   him as rude or unprofessional?

7   A.  To me?

8   Q.  Yeah.

9   A.  No.

10  Q.  Did you ever observe him to be rude or unprofessional to

11  anybody else?

12  A.  I never observed it, but I heard it.

13  Q.  Okay.  Who did you hear it from?

14  A.  Various people.

15  Q.  Can you give me any examples?

16  A.  Directly to me, no, I can't give you examples.

17  Q.  Do you remember any of the descriptions that people told

18  you about what Don was apparently doing?

19  A.  I heard that he was just hard to get along with

20  sometimes to some people.

21  Q.  Any other basis for why he was hard to get along with

22  that you remember?

23  A.  No.  Like I said, I got along with him okay.

24  Q.  Did that surprise you when you heard those things,

25  considering your relationship with him?

1   A.  Well, I can't say I really had a true relationship with

2   him.  It was a, "Hello, how are you doing, Don?"

3   Q.  Sure.

4   A.  "Hey, Doug, how are you doing?  I haven't seen you in

5   awhile."  That's the relationship we had.  So no, I can't

6   say I was surprised or not.

7   Q.  I'm assuming you never sat down with Don and any of his

8   managers or other people he might have been having an issue

9   with?

10  A.  I sat down with Don one time, yeah.

11  Q.  Okay.  When was that?

12  A.  He had asked for a meeting and, you know, I probably sat

13  with him -- sat down with him and just talked a little bit.

14  But he asked for a meeting in -- sometime in 2016 and we had

15  a meeting.

16  Q.  What was it about?

17  A.  Well, the gist of it was -- and I can't remember the

18  details of it, but I know it was in the afternoon.  And he

19  sat down, we closed the door, and we just started talking.

20  And, you know, the cordial stuff first; and then he started

21  telling me about things.  And what I really got out of the

22  thing was -- and I can't remember the details -- but that he

23  wanted me to override some of the decisions that were being

24  made by the managers and the roadmaster.

25  Q.  With respect to what?

```
 1    A.  Things that they were doing, and I don't know what it
 2    was.
 3    Q.  You don't remember?
 4    A.  You know, it could have been -- well, let me think a
 5    little bit.  Let me think a little bit.  I really don't know
 6    the details.  I just remember the meeting.  You know, it
 7    would be unfair for me to answer that question because I
 8    just have -- I don't have any real specifics.
 9    Q.  Do you remember Don expressing any concerns that he had
10    been feeling like he was being harassed by managers?
11    A.  No.
12    Q.  How about feeling like he was being retaliated against?
13    A.  No.
14    Q.  Any other knowledge that you potentially have about
15    Mr. Sanders' performance during his employment with BNSF?
16    A.  No.  Like I said, I probably ran into Don maybe ten
17    times in four years.  That's really it.
18    Q.  Do you get any type of indication for, you know, I'm
19    assuming with the number of people under your direction,
20    you're not necessarily looking at each individual's
21    performance reviews and that type of stuff.  Is that fair?
22    A.  As far as the officers' performance reviews?
23    Q.  No, like all the people.
24    A.  They don't have performance reviews.
25    Q.  Track inspectors don't?
```

```
 1    A.  No.

 2    Q.  Okay.

 3    A.  No union employee does.

 4    Q.  Okay.  With respect to Mr. Sanders, did you ever look at

 5    anything that would have indicated how he was performing

 6    from a statistical standpoint or a review or --

 7    A.  I didn't look at anything, no.

 8    Q.  Okay.  Did Mr. Sanders complain to you in any respect

 9    about how he felt his managers were interacting with him?

10    A.  Like I said, I really don't remember the details of the

11    meeting except for the high level, what I took out of that,

12    was that he felt that I should override some of the

13    decisions that they were making.

14    Q.  You understand that Mr. Sanders was terminated -- at

15    some point was terminated?

16    A.  Yes.

17    Q.  Do you understand why?

18    A.  Yes.

19    Q.  Okay.  What's your understanding of why he was

20    terminated?

21    A.  Falsifying payroll, stealing, theft.

22    Q.  In what respect?

23    A.  Payroll.

24    Q.  Do you remember what specifically he was doing or do you

25    know?
```

1    A.  He was putting in time worked that was not worked.

2    Q.  Do you recall anything about how that was discovered?

3    A.  Yeah.  We have -- we have a -- we have a My Spend Tool

4    and it tracks budgets, all kind of different metrics of

5    budgets, your overtime, your straight time, the number of

6    people, your average number of people, the cost of a

7    vehicle, the cost -- the annual cost to maintain a vehicle,

8    overtime, highest paid overtime employees, and Don was on

9    that list.  Keeping in mind when we did this it was in 2016,

10   and as a company it became -- finances became a real focus.

11            We had some good years in 2012.  Busy years.  Too

12   busy of years of 2012, 2013, 2014.  It was huge.  We had the

13   largest capital budget on the system.  We hired 650

14   employees in three years to help us with that.  2015 was

15   huge.  Oil trains were running heavy.  It was just kind of

16   a -- it was a trying time.  It was tough on everybody

17   because we just didn't have the manpower to handle all of

18   this as far as supporting the gangs and -- and the gangs,

19   you know, we had to man the gangs.  We just had to hire a

20   lot of people.

21            But in 2016 the -- and it started probably in

22   November of 2015, the train traffic started to totally drop

23   off.

24   Q.  And why was that?

25   A.  Because of the price of oil.  The Arabs putting --

1    dropping the price of oil, putting the fracking business out

2    of -- or putting the frackers out of business.  You know,

3    our trains went from probably 20 oil trains a day to maybe 5

4    to 3, okay?

5              Also, on the coal side, our trains went from 45 to

6    50 loads a day to 20.  It just dropped.  So finances became

7    very important.  You know, there's a couple places you --

8    you know, you can make reductions and that's material and

9    head count, or you can look at your budgets and make sure

10   that everything is up to snuff.

11             So Don consistently -- I shouldn't say

12   consistently.  Don was on the top ten and I can't tell you

13   how many months he was on the top ten wage earners.  Traffic

14   was down.  Track time was a lot easier to get.  So

15   realistically in our eyes, you know, overtime should be

16   down.

17             So what that created was we had -- with less

18   trains we had a little more time to watch the computer

19   stuff, and we started looking at, you know, what we need to

20   do and where we need to watch.  And then people that are

21   making this money, why are they making this money, and what

22   can we do to maybe alleviate the cost or make some

23   adjustments, things like that, to ensure we stayed within

24   budget and could actually give money back to Ft. Worth

25   because Ft. Worth was looking for money.  I mean, this

1    caught everybody off guard.  It just happened.

2    Q.  The dropoff, you mean?

3    A.  Yeah, the dropoff.  It was crazy.

4    Q.  So when you say the top ten earners, are you saying in

5    this division?

6    A.  Yeah.

7    Q.  Okay.

8    A.  Yeah.  Yeah.  I could run a query and see the top ten

9    earners on the system, which the system does, but I'm not

10   interested in that.  I'm interested in the top ten earners

11   and that was just kind of the cut-off point.  I could have

12   went even deeper than that, but, you know, let's -- let's

13   figure out the top ten or top five first and figure out what

14   we can do differently and what's going on and why are they

15   that way.

16   Q.  Okay.  Did you -- I mean, what steps did you take to

17   figure out why Don and other people were earning so much?

18   A.  Well, you start -- you start managing things a little

19   bit closer.  You start watching.  You start watching are

20   people really out there at the times they say.  Do they need

21   help?  Do they need a shorter track inspection territory?

22   What do they need to do?  But, yeah, when you first see

23   that, you've got to take a deep dive into it.  You've got to

24   get out in the field and you've got to start, you know,

25   observing physically.

1    Q.  Was there any type of directive from you to your

2    subordinates about monitoring these ten people?

3    A.  Oh, yeah.  We'd have a conference call.  We'd have a

4    budget call once a month and, you know, we would -- that was

5    part of the agenda was to go over the -- we'd have our

6    budget manager on from Ft. Worth and we'd go over the top

7    ten earners and why -- why is that and what can we do to

8    alleviate it and is it really necessary.

9            And then they had direction from me.  I mean,

10   yeah, we're all on the call.  "Hey, guys and gals, let's --

11   we need to look into this because, I mean, you've got people

12   out here making more money than what you're making so, you

13   know, why is that?"

14   Q.  Do you know if there was any type of conclusion about

15   why Don was working so much or reporting so much time?

16   A.  You know, I don't recall.  I'm sure there was, but I

17   don't recall to this day.

18   Q.  Do you know that Don was working for periods of time

19   seven days a week?

20   A.  A lot of people were.

21   Q.  Okay.  Does that -- if somebody's working seven days a

22   week, does that necessarily result in them working overtime?

23   A.  Absolutely.  That's why I said you have to get out in

24   the field and you have to observe and you have to ask these

25   questions and look at the facts.  Let's work out the facts

1    here.  Let's not be pointing fingers at people.  Let's

2    figure out exactly what's going on and see if we can't do

3    something about it.

4    Q.  Do you believe that, you know, reporting time that you

5    didn't work is a serious violation?

6    A.  It's theft.

7    Q.  Do you think it's an immediately dismissible offense?

8    A.  Yes, always has been.

9    Q.  Does it matter how much time it is?

10   A.  Not to me.

11   Q.  Should any employee who engages in that conduct, you

12   know, reporting time or getting extra pay for time that they

13   didn't work, should they be subject to the same discipline?

14   A.  Yes.  Again, that's theft.  Here's the thing about the

15   railroad is the railroad is so huge and we're spread out

16   across the entire country, so each section, each track

17   inspector, they're not directly supervised.  This whole

18   thing is run on trust.  That's why we have to have specific

19   start times and specific end times.  We have to have

20   specific lunch periods from point A, or from this time to

21   that time, is because we have to be able to trust our

22   people.

23   Q.  And what about when somebody's, you know, working

24   overtime on a weekend?  Are they supposed to follow that

25   same schedule, do you know?  Let's just say a track

1    inspector, if they have to work seven days a week, do they

2    have to work eight hours and take a lunch or how does that

3    work?

4    A.  Well, overtime is straight time straight through.  There

5    is no lunch period in overtime.  You just eat when you can.

6    It's all overtime, or time and a half, or double time and a

7    half.  But, you know, the first -- let's just say time and a

8    half.  Now, if they were to change their hours, I would

9    expect them to communicate with their supervisor.

10   Q.  And when you say "change hours," do you mean change

11   their start time or end time?

12   A.  Correct.  So what you're telling me is someone's going

13   to work from 7 o'clock to 15:00 Monday through Friday, or

14   whatever their five days are, and then when it comes to the

15   weekend or they're working overtime, they can do whatever

16   they want is what you're saying.  No.  We -- overtime needs

17   to be approved, changing your time needs to be approved by

18   the supervisor so we know where you're at.

19          You know, there's a lot of things that can happen

20   here.  You know, if we have a defect or we have something

21   that needs to be fixed, we need to know, kind of know, where

22   you're at because we know you're out there.  We want to know

23   what time you're out there.

24   Q.  Okay.  Were you involved at all in the decision about

25   whether to terminate Mr. Sanders?

1    A.  Yes.

2    Q.  How so?

3    A.  Well, I'm the general director and, you know, we discuss

4    these things.  I always would request that the managers get

5    guidance from me, but get guidance from labor relations.

6    And then whatever labor relations had to do, talk to the law

7    department or whatever, because it was imperative that we

8    were consistent, not only on the division but across the

9    system, and that any discipline that we assessed was going

10   to be some day challenged and that labor relations was on

11   board with what we did.  So everything on a major

12   infraction, like removing people from service or dismissing

13   people, was always ran through labor relations.

14   Q.  Okay.  Do you -- I mean for Mr. Sanders -- did you have

15   to say yes or nay to the dismissal?

16   A.  Well, not really, because -- yes and no, and let me

17   explain.

18   Q.  Okay.

19   A.  Everything is run through labor relations, okay, and I

20   take the recommendation of labor relations.  Let's say we

21   thought that it was a dismissible offense and they said it

22   wasn't.  Then it's not.

23   Q.  Okay.  For Mr. Sanders, did you review any of the

24   investigation transcripts or exhibits?

25   A.  I reviewed some of the investigation transcripts, yeah.

1    Q.  Okay.

2    A.  I tried to do that at a high-level.  I didn't really dig

3    into the details of anyone that we ever -- was going to be

4    dismissed.

5           Now, investigation notices or transcripts of like

6    a level S or something like that, something what I would

7    call minor, no, I didn't bother with that.

8    Q.  Okay.  Do you specifically recall reviewing

9    Mr. Sanders'?

10   A.  Briefly, yes.  Keep in mind, it's been a couple years

11   now.

12   Q.  Sure.

13   A.  And, you know, there was a lot.  You know, there was a

14   lot of things going on.

15   Q.  Sure.  And you're just kind of -- I'll describe it as

16   kind of skimmed through?

17   A.  Right.  Because the first blankety-blank pages is the

18   union and the opening and all this other stuff; and then

19   there's breaks, and so you just kind of try to skim through

20   this thing, pick out the highpoints.

21          And in addition to that, I would always have a

22   conversation with maybe the investigating officer or the

23   manager about, you know, we'd always talk about this before

24   we had an investigation.  I would challenge them.  I would

25   give them guidance.  But, you know, this is what you want to

1   do, so I'm going to challenge you because this is a man, he

2   has a family, he has kids, and we're affecting his life, so

3   you better be right.

4   Q.  Do you recall having any discussion with any managers

5   about Mr. Sanders?

6   A.  I'm sure that, yeah, Keith Jones and I talked about it,

7   yeah.

8   Q.  Can you explain what was discussed during that

9   conversation?

10  A.  Well, I cannot remember the details.  On a high level,

11  it was, we think, Don stealing time or he's working time --

12  or he's paying himself for time that is not being worked.

13  He's on a yard inspector's job, and we don't feel the

14  overtime he's getting he should probably be getting, and

15  we're going to look into that.  And I gave them some

16  guidance and I say, "Well, you probably better surveil it."

17  Q.  Did you know at the time that Mr. Sanders had just a

18  couple months earlier filed a complaint against Mr. Jones?

19  A.  Yes.

20  Q.  Did that impact your analysis of whether Mr. Jones was

21  treating Mr. Sanders fairly?

22  A.  Did it impact my decision on whether -- no, no.

23  Q.  Okay.  What was your understanding of the complaint that

24  Mr. Sanders filed against Mr. Jones?

25  A.  I -- I believe that -- and I don't know if I got this

1    from Keith or HR -- but I believe he swore at him.

2    Q.  That's the extent of what you remember?

3    A.  Yeah.

4    Q.  Do you remember anything about the complaint being that

5    Mr. Sanders was saying that Mr. Jones was harassing him

6    every time he tried to report a defect or enter a slow

7    order?

8    A.  No.  I just remember the -- and like I said, I don't

9    remember if I got it from Keith.  I most likely got it from

10   HR.  So here again I'm speculating, so I'll just stop.

11   Q.  Who from HR, do you recall?

12   A.  It would be Terry Morgan or Joe Spire.

13   Q.  Did you ever speak to Dane Freshour?

14   A.  Dane's a friend of mine, but we don't talk business.

15   Q.  Not about Mr. Sanders?

16   A.  No, not that I recall.

17   Q.  Did you ever speak to any other employees besides

18   Mr. Sanders with respect to his complaints about Mr. Jones?

19   A.  Like I say, when I had that meeting with him, I'm not so

20   sure he was complaining about Jones or what he was doing.

21   It was just, you know, "Doug."  It was just kind of like I

22   was supposed to overrule whatever they were doing, and I

23   don't remember what they were doing.

24   Q.  And I'm just talking, so outside of Mr. Sanders and

25   Mr. Jones, we've talked about the discussions you had with

1    them as far as you can recall?

2    A.  Yeah.

3    Q.  Did you talk to any other employees who were under

4    Mr. Jones' direction and say, "Hey, is this an issue"?

5    A.  No, no.  I would have turned that over to HR.

6    Q.  If Mr. Jones was harassing Mr. Sanders, do you think

7    that's a serious thing?

8    A.  Absolutely.  Anytime anybody is harassed or anybody for

9    any reason is serious.

10   Q.  What if Mr. Jones was trying to, you know, dissuade

11   Mr. Sanders from reporting defects?

12   A.  That's speculation and I can't answer that.

13   Q.  What if Mr. Jones was telling Mr. Sanders on the phone,

14   "You're going to make me lose my job because you're

15   reporting so many defects."  Do you think that would be

16   harassment?

17   A.  That's a "what if."

18   Q.  Well, I'll represent to you that there's some phone

19   calls where that happened in this case.

20   A.  Okay.

21   Q.  Is that an issue?

22   A.  He was -- say it again.

23   Q.  Saying, "You're going to make me lose my job.  I've got

24   a family."

25   A.  And?

1    Q.  "Stop reporting so many defects."

2    A.  I can't believe that he'd say that.

3    Q.  If he did, is that an issue?

4    A.  Yeah.  Yeah, I'd say that somebody needs to, you know,

5    they need to get tougher together and have a talk.

6    Q.  That's it, have a talk?

7    A.  Well, that's where you start.  You always start with a

8    communication first, and then you get the facts, and then

9    you -- there's other steps you take after that if you need

10   to.

11   Q.  Did you ever hear anything about Mr. Jones saying

12   something to that effect to Mr. Sanders?

13   A.  No.

14   Q.  Okay.

15   A.  Not that I recall.

16   Q.  If HR knew about that, is that something you'd want to

17   know?

18   A.  If HR came in and told me about it, yeah, yeah.  That's

19   where I'd learn it from, yeah.  I would expect them to tell

20   me.

21   Q.  If HR knew about other employees saying that they felt

22   when they were track inspectors that they were being

23   harassed every time they tried to report a defect, is that

24   something you would want to know?

25   A.  If they had -- if they had went and talked to HR, yeah,

 1    I would expect HR to come talk to me.

 2    Q.  Did HR ever talk -- ever tell you that?

 3    A.  Other employees?  No.

 4    Q.  You've been handed what's been marked as Exhibit 25.

 5    A.  Okay.

 6    Q.  And this -- in the first email here is an email from

 7    Mr. Freshour to a few other people about a complaint by

 8    Mr. Sanders, and you're not on this initial email but who is

 9    Eric Weisman (ph) and Hannah Stadheim (ph), do you know?

10    A.  I think -- no, I can't tell you for sure.  Hannah's name

11    sounds familiar and she was with HR.  Eric Weisman, you

12    know, I've seen the name, but I don't recall.

13    Q.  And I want to look at this kind of first paragraph.

14    Under it says:  "Hotline number and allegation summary," the

15    bolded on the top.  Do you see that?

16    A.  Okay, mm-hm, yeah.

17    Q.  And Mr. Freshour writes there that:

18              "Mr. Sanders has alleged that Division Engineer

19    Keith Jones and Roadmaster Blaine Hoppenrath have been

20    harassing him for two years and that they were retaliating

21    against him for filing complaints to Human Resources."

22              Did you ever hear about this complaint by

23    Mr. Sanders?

24    A.  You know, I would have thought that I would have seen

25    this hotline, but I don't recall it, no.

```
 1    Q.  I want to turn to -- there's a couple pages, and this
 2    first few pages is Mr. Freshour's email where he kind of
 3    goes through a timeline, a list of interviews, kind of
 4    summarizes the investigation that happened after
 5    Mr. Sanders' complaint.
 6    A.  Okay.
 7    Q.  Do you recall ever seeing this summary?
 8    A.  No.
 9    Q.  Okay.  If we go to the second-to-last page -- and
10    there's numbers on the bottom right-hand corner which should
11    end in 7174 -- it's called a Bates number in the bottom
12    right-hand corner.
13    A.  Okay.  7174.  Yeah.
14    Q.  Kind of three-quarters of the way up that page there's
15    an email from Hannah on April 7 of 2016 which appears to be
16    to you and Dane Freshour about the initial complaint or
17    call.  Do you see that?
18    A.  Where it says "Doug and Dane"?
19    Q.  Correct.
20    A.  "Attached is the hotline call for your handling."  Okay.
21    Q.  And then the call summary is from Hannah where she kind
22    of essentially says what was in that initial allegation
23    summary.  Do you see that?
24    A.  Okay.  "Call summary."
25    Q.  Yeah.
```

1     A.  Okay.

2     Q.  You can take a second to read that if you'd like.

3     A.  Okay.

4     Q.  Do you recall receiving this email at all?

5     A.  I really don't.

6     Q.  All right.

7     A.  You know, obviously I did, but I don't recall.  Yeah,

8     there's Hannah right here.

9     Q.  Human Resources?

10    A.  Mm-hm.

11    Q.  Were you involved at all, as far as you can recall,

12    about the steps that should be taken during this

13    investigation?

14    A.  I don't recall.

15    Q.  All right.  Do you know anything about what HR did to

16    complete the investigation?

17    A.  I don't recall.

18    Q.  I'm assuming then you don't recall any of the results of

19    the investigation, the outcome?

20    A.  Is this the same investigation where he was swearing?

21    Q.  Where who was swearing?

22    A.  Where Don alleged that Keith swore at him or -- this is

23    different.  This is different.  Yeah, I don't -- yeah, I

24    don't remember this.

25    Q.  Okay.  And do you think an allegation by an employee

1    that his two managers are harassing him or retaliating

2    against him is a serious complaint?

3    A.  Well, that's why I went to HR, obviously.

4    Q.  So I'm going to turn to the second page of this exhibit.

5    A.  Okay.

6    Q.  And this is kind of a timeline of different dates that

7    Mr. Freshour lays out.  Do you see that?

8    A.  Yeah.

9    Q.  All right.  The second day down, August 29 of 2013,

10   talks about Mr. Sanders lodging an unjust treatment hearing

11   against BNSF.  Do you recall anything about that?

12   A.  I don't remember the specific dates or anything like

13   that, no.

14   Q.  Okay.  Do you remember anything about him saying --

15   wanting an unjust treatment hearing?

16   A.  I don't recall.  It was a long time ago.

17   Q.  Okay.  And then we see December 7 of 2015 is I think

18   what you were referring to about when Mr. Sanders complained

19   about how Keith Jones was talking to him.  Does that comport

20   with your recollection?

21   A.  I mean, when you start looking at dates and you start

22   asking questions about dates, it's a big blur.

23   Q.  Sure.  And I'm asking you less about the date and more

24   about the substance of Mr. Jones getting a coaching and

25   counseling after that incident.

1    A.  And this is the incident where he swore?

2    Q.  That's sort of about what I'm asking you.

3    A.  I don't know.

4    Q.  Okay.  Do you remember Mr. Jones getting a coaching and

5    counseling for --

6    A.  For that incident?

7    Q.  Correct.

8    A.  For swearing?

9    Q.  Yes.

10    A.  Absolutely.

11    Q.  Okay.  Did you make the decision to administer the

12    coaching and counseling against Mr. Jones?

13    A.  HR did, and then I -- HR wrote the letter and then I

14    went with what their recommendations were.  Again,

15    consistency.

16    Q.  Sure.  Then we see kind of right in the middle of this

17    page halfway down, January 8 of 2016, is a discussion that

18    you and Mr. Sanders intended to meet January 11th, 2016.  Do

19    you see that?

20    A.  Yup.

21    Q.  I'm assuming you don't know whether it happened on that

22    date or not.

23    A.  No, but I know we met.

24    Q.  Okay.

25    A.  And if it -- if it was that date that Don picked out,

```
 1    that's the date we did it.  I made the time.

 2    Q.  All right.  And he says:  "To discuss issues with Blaine

 3    Hoppenrath."  Do you see that?  Does that refresh your

 4    recollection at all about what Don was talking about?

 5    A.  Well, like I said, he wanted me to overrule what the

 6    road -- or the -- his roadmaster and the manager were doing.

 7    So that was -- Blaine would be his supervisor.

 8    Q.  Okay.  And Dane writes, at least in April of 2016, that

 9    he doesn't know if that meeting occurred.  Do you recall

10    whether you ever talked with somebody from HR about that

11    meeting after --

12    A.  About Don and my's meeting?

13    Q.  Yes.

14    A.  I don't recall if I did.

15    Q.  Okay.  Did you ever hear about Don filing an HR

16    complaint about not being able to drive a company vehicle?

17    A.  I know I heard Don complaining about -- back up.  Re-ask

18    that question.

19    Q.  Did you ever hear about Mr. Sanders filing a complaint

20    that he wasn't allowed to drive a company vehicle home?

21    A.  Home.  I don't know if he filed a complaint; but yeah,

22    he wasn't allowed to drive a company vehicle home when he

23    became a yard inspector.  We don't do that.

24    Q.  Okay.  Do you know if he ever complained, like filed a

25    complaint with HR about that?
```

```
 1    A.  That I don't know.

 2    Q.  All right.  Who -- you understand that eventually

 3    Mr. Sanders was alleged to have had some time thefts and

 4    sent two separate investigations -- sent to two separate

 5    investigations.  Do you understand that?

 6    A.  Yes.

 7    Q.  Okay.  Do you know who made the decision to issue that

 8    notice of investigation?

 9    A.  Keith and I would have after consulting and talking

10    about what they found and, you know, is it sure?  Are you

11    sure about this?  Yeah.

12    Q.  And was Keith the one kind of giving you the information

13    about what he observed or found?

14    A.  Yeah.  I think he probably was, you know, unless I ran

15    into Blaine.  But again, speculation.  But Keith's office

16    was right next to mine and we would -- I would quiz him on

17    it.  Yeah, I'm sure I did.

18    Q.  Was he giving you information -- was he giving

19    information also to HR, do you know?

20    A.  That I don't know.

21    Q.  All right.  Were you giving information to HR?

22    A.  No.

23    Q.  Okay.  All right.  Does it make you concerned at all

24    that Keith Jones is the one who's alleging that Mr. Sanders

25    engaged in this time theft a couple months after he was
```

1    subject to a complaint?

2    A.  No, I have absolutely no concerns whatsoever.  Stealing

3    is stealing whenever it happens.  You have to react to it.

4    Q.  Do you know whether Mr. Sanders had actually submitted

5    his time that they allege he stole or inaccurately reported?

6    A.  No.

7    Q.  Does that matter to you?

8    A.  Well, I heard that he had -- yeah, in the transcript he

9    had said he went and changed -- or somebody said he went and

10   changed it.

11   Q.  Okay.

12   A.  But yeah.

13   Q.  Can you input time into the time system and not submit

14   it?

15   A.  I don't know.  I have no idea.

16   Q.  Okay.

17   A.  One thing I did stress, though, going back to the

18   question, was on time reporting, on time reporting when I

19   first got to the division.  And on time reporting is

20   reporting your time that night or by 9 o'clock the next day,

21   and there was a lot of deficiencies across the division on

22   on time reporting.

23           I'm a budget fanatic.  And I think that if I'm

24   given X amount of money, we're going to make sure that we

25   come in.  Otherwise, I need to have some justification.  And

1    I made it clear with everyone that there would be on time

2    reporting.  That way my spend was accurate on a daily basis,

3    and I knew where my budget stood from day to day, up to the

4    end of the month.

5    Q.  Was that a sort of recurring issue about people actually

6    putting their time in on a regular basis?

7    A.  I was hoping that they did, and we could actually track

8    which roadmasters were getting it done and which weren't.

9    Q.  Okay.  So there were some that weren't even after that

10   directive?

11   A.  Yeah, there were some that weren't.  We re-communicated

12   the expectations.

13   Q.  Were there other employees underneath roadmasters who

14   continued to not report their time?

15   A.  Yeah, that's who we're talking about is scheduled

16   people.  Scheduled people report their time on a daily

17   basis.  Any company officer is paid by the month so they

18   don't enter time.

19   Q.  Do you know if -- you know, when an employee enters time

20   into the system, and let's say they put an hour amount in

21   and then they later change it, can you see if it's being

22   changed?

23   A.  I believe you can.  Again, I don't mess with it.  I'm

24   just going by what I've heard.  And through past

25   investigations in my career, I believe that they can go back

1    in and change it at any time up until the time they submit

2    it.

3    Q.  Did that --

4    A.  Why they -- why they would put in extra time or, you

5    know, maybe extra time or not enough time, I have no idea.

6    You report your time at night at the end of your shift, and

7    the only deviation should be if you're called out at night

8    and you work overtime and you get back in the next morning,

9    because you don't feel like doing it that night -- and I

10   don't expect that.  You take the time and I want you to go

11   home, get some sleep, spend some time, you know, at home and

12   come submit it the next day.  But I would expect it be

13   submitted next day.

14        But again, at that point you would -- you would be

15   short your time and you would just be adding time.  I've

16   never heard of a lot of people -- I mean, why would you put

17   in more time at sometime during the day and take it out?

18   You're doing double work.

19   Q.  What about -- it seems like to me that at least the

20   entering of time on a daily basis was kind of a recurring

21   issue, at least for some people.  Is that fair?

22   A.  Well, we corrected that.  We would correct that.

23   Q.  Sure.

24   A.  We're looking for 100 percent compliance, at least 95

25   percent compliance.  I can live with the five percent of

1    mistakes in overtime, you know, work and not being able to

2    do it, but yeah.

3    Q.   Did you ever achieve 95 percent?

4    A.   Some we did.  Some roadmasters we did.

5    Q.   Okay.  Some roadmasters; is that right?

6    A.   Or some roadmasters' territories we did, yeah.

7    Q.   But not across all roadmasters?

8    A.   Very unlikely.

9    Q.   Okay.  You've been handed what's been marked as Exhibit

10   26.  This is a letter that was sent to Mr. Sanders dated

11   December 16 of 2015 by a Ms. Magenta Eggertsen.

12   A.   Okay.

13   Q.   Do you see that on the second page?

14   A.   Yeah, Magenta right here.

15   Q.   And you were cc'd on the letter, I'm assuming indicating

16   that you got a copy of it.  Do you recall getting a copy of

17   this?

18   A.   No.

19   Q.   Okay.  And this is just an indication to Mr. Sanders

20   saying the investigated has been completed about Keith Jones

21   and Roadmaster Blaine Hoppenrath "mistreating you and

22   singling you out."  Do you see that in the second paragraph?

23   A.   This paragraph right here?

24   Q.   Correct.

25   A.   Okay.  Let me read it.  Okay.

1    Q.  Do you recall anything about this investigation?

2    A.  I don't know a lot about the investigation.  I just

3    remember there was -- you know, he had sworn.

4    Q.  Okay.  Do you know why it says in the letter that the

5    allegation was not substantiated if Mr. Jones was given

6    discipline as a result?

7    A.  I don't know what they couldn't substantiate.  I

8    don't --

9    Q.  Okay.  You've been handed what's been marked Exhibit 27

10   which we talked about a formal coaching and counseling for

11   Mr. Jones that resulted from what you described as the

12   swearing.  Is that your recollection of that coaching and

13   counseling?

14   A.  I remember having a conversation with -- vaguely having

15   a conversation with Mr. Jones and told him, you know, we

16   just can't be doing that.

17   Q.  Do you see on the first paragraph there that this letter

18   says, "Specifically your use of profanity while speaking

19   with MOW Track Inspector Don Sanders on November 23, 2015

20   regarding his recent contact with the Federal Railroad

21   Administration to ask questions and discuss track

22   conditions."  Do you see that?

23   A.  Yeah.

24   Q.  Does that concern you at all that Mr. Jones was using

25   profanity in response to Mr. Sanders' contacting the FRA?

```
 1    A.  Well, it would bother me that he's using profanity.  You
 2    know, I don't know about -- I'd heard rumors about the
 3    Federal Railroad Administration, but, I mean, it refers back
 4    to this discipline.  I mean, I wouldn't want profanity used.
 5    Q.  Does that raise any concerns that Mr. Jones was
 6    retaliating against Mr. Sanders?
 7    A.  I'm not -- I don't know where it says he was
 8    retaliating.
 9    Q.  Well, it's saying he's using profanity --
10    A.  Okay.
11    Q.  -- towards Mr. Sanders in response to Mr. Sanders'
12    contacting the FRA.
13    A.  I wasn't there, so I'd have to have been there to get
14    the context of the conversation.
15    Q.  But based on this, that doesn't raise any concerns with
16    you?
17    A.  Well, I didn't say that.  Any time somebody uses
18    profanity toward an employee, that concerns me.  As far as
19    the recent contact with the Federal Railway, I mean, I don't
20    know anything about that.  You know, I heard that he was
21    going to do it or did do it, but...
22    Q.  Is there anything wrong with Mr. Sanders contacting the
23    FRA?
24    A.  Mr. Sanders can do anything he wants to do.  We have
25    absolutely as a railroad nothing, absolutely nothing, to
```

1    hide.  We -- we emphasize safety.  We emphasize compliance.

2    We emphasize the three Rs.  No, he can knock himself out.

3    In fact, if employees had questions, I would recommend that

4    they talk to the railroad, the Federal Railroad

5    Administration, for clarification.

6    Q.  So I guess what I'm trying to figure out is why would

7    Mr. Rindy be upset about Mr. -- oh, not Mr. Rindy --

8    A.  Yeah.

9    Q.  -- Mr. Jones be upset about Mr. Sanders contacting the

10   FRA?

11   A.  I don't know why he contacted the FRA.

12   Q.  Did you ever in your discussion with Mr. Jones ask him

13   why he apparently swore at Mr. Sanders regarding Mr. Sanders

14   contacting the FRA?

15   A.  I don't recall.  The one thing I do remember that caught

16   me off guard was that Mr. Sanders was taping Mr. Jones, and

17   that threw me for a loop because I didn't realize that that

18   was not against the law.

19   Q.  You've been handed what's been marked as Exhibit 28.

20   This is a letter dated December 23rd, 2015 from

21   Ms. Eggertsen again.  You were again cc'd on this letter.

22   Do you recall ever receiving a copy of this?

23   A.  Well, if I was cc'd, I'm sure I did, but I don't recall

24   it.

25   Q.  Okay.  This time, this letter says that:

1       "BNSF's investigation reveals some evidence to

2    indicate Division Engineer Keith Jones's communication with

3    you on November 23, 2015, and December 3, 2015, was not

4    aligned with BNSF's leadership model and applicable company

5    policies."

6            Do you see that?

7    A.  Where are we at?

8    Q.  The second paragraph.

9    A.  Okay.

10   Q.  I'm sorry.  I should have told you that.

11   A.  Okay.

12   Q.  Did you ever listen to the phone calls from those days?

13   A.  The phone calls?  What phone calls?

14   Q.  These communications on --

15   A.  No, not that -- no, not that I can remember.

16   Q.  So you didn't hear any interaction where Mr. Jones was

17   apparently swearing at Mr. Sanders?

18   A.  Absolutely not, not that I can recall.

19   Q.  That paragraph goes on to reiterate what we saw a minute

20   ago, and from the letter just about eight days earlier where

21   it says that the investigation does not substantiate the

22   allegation that Mr. Sanders was being mistreated or singled

23   out.  Do you see that?

24   A.  Yeah.  BNSF "does not substantiate."  Yeah, got it.

25   Q.  Okay.

1    A.  Fourth line up, second paragraph; is that correct?

2    Q.  Correct.  Do you recall any basis for why they -- this

3    letter says it was not substantiated?

4    A.  I don't recall.

5    Q.  All right.  Do you recall at all a complaint -- I can't

6    remember if I asked you this with respect to Mr. Sanders --

7    do you recall him filing a complaint about not being able to

8    drive his vehicle home?

9    A.  I know he had complained about it.

10   Q.  Okay.

11   A.  But he never came, that I can recall, filing a complaint

12   or coming directly to me about it.

13   Q.  You've been handed what's been marked Exhibit 29.  This

14   is an email from Ms. Eggertsen to a couple recipients, one

15   of whom is you, on March 22, 2016, where she is talking

16   about a HR closeout letter regarding Mr. Sanders' harassment

17   and discrimination complaint.

18          Do you see that?

19   A.  Well, let me read this.  I'm a little confused here.  It

20   says:

21          "For not allowing him to take the personal vehicle

22   home in the evening."  I don't know what that means.  "I

23   wanted to let you know that HR has closed out this

24   complaint, sent the attached letter to Mr. Sanders today.

25   The allegation was not substantiated."  Okay.

1    Q.  Okay.  I'm going -- I just wanted to stop you, and I

2    didn't do a very good job of that, but just remember if

3    you're speaking when you're reading, she has to write that

4    down.  So if you want to read something, just read it.

5    A.  I was asking you.

6    Q.  No, I know.  I'm just telling you that.  What don't you

7    understand about the email?

8    A.  "Take the personal vehicle home in the evening."

9    Q.  Do employees -- do track inspectors typically have a --

10   A.  "Not allowing him to take the personal."  I would say

11   not allowing him to take the work vehicle home in the

12   evening.

13   Q.  Okay.

14   A.  Yeah.

15   Q.  That's what we're confused about.

16   A.  Yeah.

17   Q.  That's what you're confused about.

18   A.  Yeah.

19   Q.  Okay.  Do track inspectors typically have a work vehicle

20   that they're assigned?

21   A.  Some.

22   Q.  Okay.  How is that decision made about who gets it and

23   who doesn't?

24   A.  Well, I leave a lot of it up to the roadmaster and the

25   division engineer.  The company does have a policy about

1    track inspectors taking vehicles home over X amount of

2    miles.  I give permission for the roadmaster to make those

3    decisions because a lot of times it works best for the

4    employee and for the railroad for a mainline track inspector

5    to take his vehicle home with him.  That way if he gets --

6    and when he gets -- called out in the middle of the night,

7    he has one vehicle to warm up and that's his -- instead of

8    warming -- or his work vehicle instead of warming up his

9    personal vehicle, driving in to however far he lives from

10   work, and then, you know, warming that vehicle up and

11   getting it ready to go.

12          Yard inspection, it has been my policy throughout

13   my career, is that they do not take their vehicles home.

14   And the reason is if there's a service interruption or

15   something in a yard, most of the time it's -- we can work

16   around it.

17   Q.  Are there times when, you know, for example, under the

18   scenario that you're talking about, when someone's a

19   mainline inspector and they get called out kind of in the

20   middle of the night.  If they have their work vehicle, do

21   they just drive directly to where the issue is?

22   A.  Correct.

23   Q.  Okay.  So that saves them time being able to go directly

24   there to --

25   A.  Saves them time, saves the company time.  They can get

 1    done and they can go back home.  Good deal.

 2    Q.  Okay.  I'm assuming from your testimony that you don't

 3    recall much about any actual HR investigation about this.

 4    A.  I don't know.  I don't recall the HR, but my policy is

 5    yard inspectors don't take their vehicles home.

 6    Q.  You've been handed what's been marked Exhibit 30.  Why

 7    don't you take a second to review that.

 8    A.  Okay.

 9    Q.  So this is a letter to Mr. Sanders kind of indicating

10    the investigation has been done, saying what the findings

11    are.  Do you see that in the "Re" line at the top in bold?

12    A.  Yes.

13    Q.  Okay.  Do you recall receiving this at all?

14    A.  No.

15    Q.  This doesn't refresh your recollection at all about

16    knowing about the investigation?

17    A.  No.

18    Q.  All right.  Did you ever hear about Mr. Sanders filing a

19    subsequent compliant after he was charged with time theft

20    about retaliation and harassment?

21    A.  No.

22    Q.  Okay.  Is that something you would want to know if

23    Mr. Sanders had done that?

24    A.  I would expect HR to inform me if they thought it was

25    important.

1    Q.  So you've been handed what's been marked Exhibit 31.

2    It's a big exhibit.  I'm not going to ask you review the

3    whole thing.

4            I'll represent to you this was produced to us as

5    part of this case and it was produced to us with the heading

6    that this is the HR file regarding Mr. Sanders' complaints

7    regarding harassment and those types of things, okay?

8    A.  Okay.

9    Q.  And I have just a couple of questions.

10           One, do you remember ever seeing this type of HR

11   file with respect to Mr. Sanders' complaints?

12   A.  I don't recall.

13   Q.  Okay.  There is a page -- and I'm going to ask you to

14   look at that number at the bottom right-hand corner again

15   that ends in 7202.

16   A.  Okay.  7202?

17   Q.  Yes.

18   A.  Okay.

19   Q.  It should be an email.

20   A.  Yeah.

21   Q.  All right.  And if we look at this document, they go in

22   reverse chronological order, so the first one is on the

23   bottom.  Do you see that?

24   A.  Yep.

25   Q.  And this is an email from Don to a -- it says Brian Law.

```
 1     Do you see that?

 2     A.  Yeah.

 3     Q.  And then there happens to be, if you go right above

 4     that, where Don forwards this to you?

 5     A.  Yeah.

 6     Q.  Is this the email that you recall receiving when Don

 7     asked to meet with you?

 8     A.  I don't recall this email, but I do know that he sent me

 9     an email to request time to meet.

10     Q.  Okay.  Don references in his email that there's rumors

11     going around from management that he's being vindictive.  Do

12     you see that?

13     A.  Where at?

14     Q.  Third line of his email.

15     A.  Okay.

16     Q.  Do you recall ever hearing about rumors about

17     Mr. Sanders being vindictive?

18     A.  No.

19     Q.  Do you remember any?

20     A.  I don't recall.

21     Q.  And do you recall any discussion about that?

22     A.  I remember --

23     Q.  Okay.  So that was actually one of the things I forgot

24     to ask you in the very beginning with respect to what you

25     did to prepare.  I don't want to, again, know what you guys
```

1   talked about, but did you look at documents in preparation?

2   A.  I looked at a few documents and this was one of the

3   documents, just mainly for a refresher.

4   Q.  Okay.  What other documents do you recall looking at?

5   A.  I looked at a document or two on the investigation

6   transcript.  I don't remember what it was.  I looked at some

7   other documents that were redacted about other folks that

8   had been dismissed for falsifying their payroll.

9   Q.  Okay.

10  A.  Other than that, I don't recall after that.

11  Q.  Okay.  You said -- going back to Exhibit 32, you said

12  that you'd seen this first page?

13  A.  Yes.

14  Q.  And this was an email, at least the bottom of that page

15  is an email, from Mr. Jones to PEPA, P-E-P-A.  What is that?

16  A.  The PEPA Board, labor relations.

17  Q.  And is this Mr. Jones giving them a recommendation about

18  what he thinks should happen after the investigation?

19  A.  He's -- yeah, he's looking for a recommendation.  He's

20  looking for guidance.

21  Q.  If we go to the second page, the last sentence in

22  Mr. Jones' email actually says:  "Recommend dismissal based

23  on his dishonesty and theft of time."  Do you see that?

24  A.  Yeah.

25  Q.  So Mr. Jones is telling the PEPA board, "This is what I

1   think should happen."

2   A.  Mr. Jones is telling the PEPA board what I think that --

3   Q.  That you --

4   A.  -- Mr. Jones thinks about theft.

5   Q.  Right.  What he thinks about what should happen.

6   A.  We both.

7   Q.  Okay.  All right.  Because had you talked to Mr. Jones

8   before this email was sent to PEPA?

9   A.  I don't know if I talked to him.  Obviously, we had

10  talked about it.  We all know we -- how I feel about -- how

11  the company feels about theft and it's a dismissible

12  offense.  We always talked and I would guide, ask questions,

13  challenge.  Again, these are people's lives you're dealing

14  with.  You better be sure.

15  Q.  Okay.  And then there's the next two pages, another

16  separate email from Mr. Jones again to PEPA and I think it's

17  a different date.  The second one is dealing with March 19.

18  Do you see that?

19  A.  Right.  Right down at the bottom.

20  Q.  And the first one's dealing with March 25.

21  A.  Okay.  The first one's dealing with March 25th and 26th.

22  The second one is dealing with March 19th.

23  Q.  And Mr. Jones says in the email again that he recommends

24  "dismissal based on dishonesty and insubordination."

25  A.  Mr. Jones again is communicating both of our feelings.

1    Q.  Okay.  Do you know what the allegation of the

2    insubordination was?

3    A.  I don't recall, no.

4    Q.  Do you see Ms. Detlefson's email, if you go back to the

5    first page of the second email that we're talking about?

6    A.  Okay.

7    Q.  Yeah.  We see Ms. Detlefson responds to Mr. Jones's

8    email.  Do you see that in the middle of the page there?

9    A.  Yeah.

10   Q.  And she says to Mr. Jones toward the end of that

11   paragraph:  "You mentioned insubordination in your below

12   email.  We did not charge Mr. Sanders with insubordination,

13   so we cannot discipline for him for that."

14            Do you see that?

15   A.  Yeah.

16   Q.  Does that concern you at all that Mr. Jones was adding

17   things to the discipline that weren't there?

18   A.  No.  He was throwing some things at labor relations in

19   order to get some guidance, and they told us -- or told him

20   that they can support -- what they can support and what they

21   can't.

22   Q.  Did you ever see a summary from the PEPA board or

23   anybody from labor relations about what happened during the

24   investigation for Mr. Sanders?

25   A.  I don't recall.

1    Q.  Do you know anything about the steps the PEPA board

2    takes to determine whether discipline is warranted?

3    A.  No, I do not.

4    Q.  Does -- or do you get any training about what steps to

5    take to determine whether a termination is warranted when

6    you're charging somebody with a violation?

7    A.  That's what we use the labor relations for.

8    Q.  Okay.  My question is slightly different.  Have you

9    gotten, during your employment with BNSF, did you actually

10   get training on, you know, if you're going to try to figure

11   out whether there's a violation, here are the steps that you

12   should take?

13   A.  I could say I would assume that I did, but I can't

14   definitely tell you the date and the time, so I don't

15   recall.

16   Q.  All right.  I'm assuming based on your testimony that

17   you agreed with Mr. Sanders' termination?

18   A.  For theft?  Yes.

19   Q.  All right.  Is there anything that you specifically

20   remember you talked about earlier with respect to

21   Mr. Sanders' termination that at some point you at least

22   skimmed the investigation that occurred?

23   A.  That is correct.

24   Q.  Do you recall anything specifically about what you

25   learned from those transcripts or exhibits that made you

1    feel like termination was warranted?

2    A.   The -- just the deviation of time and differential in

3    how the time was entered and how much time and when and

4    things like that.

5    Q.   Okay.  Did it concern you at all that Ms. Hoppenrath was

6    following Mr. Sanders around?

7    A.   I knew she was.

8    Q.   How do you know that?

9    A.   We had talked about, Keith and I and Blaine, and there

10   was speculation that we had theft going on and the only way

11   you can do that is to observe.  Again, the railroad is set

12   up on trust.

13   Q.   Okay.  Did you know at the time that you told

14   Ms. Hoppenrath and Mr. Jones, or had a discussion with them

15   about watching or observing Mr. Sanders, that he had filed

16   complaints against them?

17   A.   You know, going over these, I know he had the complaint

18   about the swearing, yeah.

19   Q.   And that didn't concern you at all?

20   A.   Why would it?

21   Q.   Well, whether Blaine and Keith could be honest about

22   what they observed?

23   A.   We had an employee stealing if you want to talk about

24   honesty.

25   Q.   Okay.  But my question is a little bit different,

1    whether they could be honest.

2    A.  I have no doubt they could be honest.

3    Q.  You have no concerns about Ms. Hoppenrath's honesty, her

4    job performance?

5    A.  Anything that I knew of, no.

6    Q.  What about Mr. Jones?

7    A.  Anything that I knew of, no.

8               MS. FERGUSON:  I think those are all the questions

9    I had for you.

10              THE COURT:  Thank you.

11              All right.  We will take a break of 15 to 20

12   minutes, and we will return and resume at between 3:15 and

13   3:20.

14        (Recess taken at 3:00 p.m.)

15                      *      *      *      *

16        (3:20 p.m.)

17              THE COURT:  Thank you, everyone.  Please be

18   seated.

19              Is BNSF prepared to call its next witness?

20              MS. DONESKY:  Yes.  BNSF calls Dane Freshour.

21              THE COURT:  Mr. Freshour, why don't you come up

22   here and stand between the rail and the witness box seat

23   there, and I'll invite the courtroom deputy to administer

24   the oath.

25              THE CLERK:  Please state your full name and spell

```
 1    your first and last name for the record.

 2             MR. FRESHOUR:  Dane Freshour.  D-A-N-E,

 3    F-R-E-S-H-O-U-R.

 4             THE CLERK:  Please raise your right hand.

 5        DANE FRESHOUR, DEFENDANT'S WITNESS, SWORN

 6             THE COURT:  Thank you, sir.  Please have a seat.

 7             Ms. Donesky?

 8             MS. DONESKY:  Thank you, Your Honor.

 9                     (DANE FRESHOUR)

10                    DIRECT EXAMINATION

11    BY MS. DONESKY:

12    Q.  Mr. Freshour, if you're comfortable, you can take the

13    mask off for your testimony.

14    A.  Okay.  Thank you.

15    Q.  Who do you currently work for?

16    A.  Say that again?

17    Q.  Yes.  Who do you currently work for?

18    A.  I work for the Burlington Northern and Santa Fe

19    Railroad.

20    Q.  What is your job title?

21    A.  I'm the Regional Director of Human Resources for the

22    North Region.

23    Q.  How long have you held this position?

24    A.  Since 2011.

25    Q.  Where are you based out of?
```

1    A.  I'm in Denver, Colorado.

2    Q.  How long have you been based in Denver?

3    A.  Since 2011.

4    Q.  And what region is the Twin Cities division located in?

5    A.  The Twin Cities would be in the North Region.

6    Q.  Which is the region that you are responsible for?

7    A.  Yes, that is correct.

8    Q.  And was that true in the 2016 timeframe?

9    A.  Yes, that is correct.

10   Q.  I'd like to focus this afternoon on the 2015-2016

11   timeframe.  Who were your direct reports for the Twin Cities

12   division at that time?

13   A.  Yes.  The director would have been Terry Morgan, the HR

14   manager would have been Joe Spire, and the generalist would

15   have been Magenta Eggertsen.

16   Q.  Tell the jury a bit about yourself.

17   A.  I was born in northwest Montana -- born and raised on a

18   ranch in northwestern Montana.  Eventually my parents sold

19   that ranch and we moved to Colorado, and I graduated from

20   high school in Syrah, Colorado.

21        Being raised in the country, I pursued a degree in

22   agriculture and agribusiness.  However, when I graduated in

23   1979, the farm crisis had hit and there were not a lot of

24   agribusiness positions open at that time, so I pivoted and

25   pursued a degree, which I accomplished, at Nebraska

1    Christian College, and that degree was in pastoral

2    ministries.  Probably the most significant thing about

3    Nebraska Christian College is I met my wife of 41 years

4    there and we're blessed with three children.  I have two

5    sons who have followed me into the railroad as well.

6         And from there I pastored a church for about four

7    years and then I had the opportunity to seek employment with

8    Nebraska State Patrol and went through the process and was a

9    state trooper, worked in law enforcement for approximately

10   three years.

11        Due to the risk involved and having very small

12   children, my wife was not a fan, and so I fell back on my

13   degree as a pastoral minister and began to do chaplaincy

14   work at Valley Hope Association.  Valley Hope Association is

15   much like Hazelden here in Minnesota, dealt with alcohol and

16   drug abuse, and they saw that I had potential and encouraged

17   me to pursue my degree, which I did, became -- got a

18   master's degree in counseling psychology and was a therapist

19   at Valley Hope and eventually worked my way into

20   administration, which took me to Alliance, Nebraska.

21        And in Alliance, Nebraska, there were a fair

22   amount of railroad employees that I worked with in that

23   domain.  And I also set up an EAP program with the hospital

24   I worked in there, and BNSF had a -- or BN at the time had

25   an opening for an employee assistance manager for the

1    railroad, and that is where I hired into BN in 1995 as an

2    EAP manager.

3            I was in that role about five years and then moved

4    into the HR role.  There was an opening in Alliance,

5    Nebraska for an HR manager and I was awarded that position.

6    I was promoted in November of 2000 to a director of HR role

7    in Kansas City, Kansas, covering the Kansas -- panhandle of

8    Texas, the Kansas division, and was in that role until 2007.

9            I was then promoted to regional director of the

10   West Region at that time, which would have been California,

11   New Mexico, Arizona; the Northwest division, and moved to

12   Seattle, Washington.

13           I was in Seattle, Washington about four years and

14   then was promoted to my current position in Denver,

15   Colorado.

16   Q.  Do you have any certifications to work as a human

17   resources professional?

18   A.  Yes.  I've been certified a little over 20 years by the

19   Society of Human Resource Management.  I'm a senior

20   certified professional and my certification has extended to

21   2024.

22   Q.  What is required to attain a senior professional

23   certified status?

24   A.  There is a requirement for a certain number of years of

25   HR practice.  You also have to sit for an HR exam.  And then

1   to maintain that, you do need to constantly upgrade your

2   knowledge through work events, seminars, CEUs, much like

3   attorneys or other professional groups.

4   Q.  Is a master's degree required for that status as well?

5   A.  Not for that specific status, no.

6   Q.  And your continuing education requirements are, you

7   said, every three years to recertify?

8   A.  Yes, every three years, correct.

9   Q.  How many total years of human resources experience would

10  you say you have?

11  A.  I would say 20 or more.

12  Q.  As regional director, North Region, what are your

13  primary duties and responsibilities?

14  A.  My roles and responsibilities are to provide oversight

15  and guidance to the HR professionals in the North Region.

16  Basically, it falls into three buckets.

17          The first bucket would be recruiting.  We do all

18  of the staffing for our craft employees, which would be

19  scheduled or union employees.  Those are individuals who

20  would work in train service.  They start out as conductors

21  and can move up to engineers.

22          We also staff all of the engineering employees.

23  That would be -- engineering would cover anything regarding

24  the construct of the railroad:  signals, systems,

25  maintenance of the track, the bridges, all of those

1  constructs that the railroad runs on.

2          And then the third big operation is mechanical,

3  and they are responsible for the reliability of the

4  locomotives, car, car repair.  And so we staff for those

5  craft positions.

6          Secondly, we're also the -- the big area that we

7  cover is employee relations.  Employee relations would cover

8  a lot of issues regarding complaints.  This would be

9  internal complaints.  There are many ways that our employees

10  can raise concerns.  One would be just to simply stop in,

11  send you an email or give you a call, and you would handle

12  that as an internal complaint.

13          They can go to an outside agency such as the EEOC

14  or the Human Rights Commission or OSHA, and we would

15  investigate those concerns as well.

16          And we also have a system hotline, which we had

17  since probably the late '90s.  This is an external vendor

18  who would take in calls.  They would -- the caller can

19  remain anonymous or they can give their name on that call.

20  They can report anything.  It could be a safety issue, it

21  could be fraud, it could be a criminal complaint, or it

22  could be a complaint of harassment, discrimination.  It

23  could be anything.

24          And so that call comes into a hotline

25  administrator in Ft. Worth who then looks over the nature of

1    the call and makes the decision about where or who would be

2    best positioned to investigate that for the railroad.  If it

3    is an environmental issue, it goes to the environmental

4    department.  If it is a safety issue, it goes to the safety

5    department.  If it is a human resource type issue, it would

6    come out to the field team.

7            And on the Twin Cities, since we're speaking about

8    the Twin Cities, the hotline would be sent to the director

9    whom would then provide oversight, either perform that

10   investigation himself or assign that to one of his HR

11   managers or generalists.

12           And then the third area we cover is talent

13   development.  Talent development revolves around

14   professional development for our leaders.  We have many

15   field leaders, as I talked about the three big departments:

16   transportation, engineering, or mechanical.  We provide

17   support for the training.  Every exempt officer goes in for

18   training on an annual basis, and we support those trainings

19   and provide follow up and support in the field.

20           We also are involved in their performance

21   management aspect.  So if an exempt employee has discipline,

22   we're involved in that discipline.  Sometimes that may

23   result in an action plan and they're required to participate

24   in certain activities in order to remediate a certain area.

25   Or they could get a coach and counsel.  We would manage and

1      provide oversight for those processes.

2              And then twice a year, every exempt officer goes

3      through a PMP discussion, a performance management

4      discussion.  They would sit down with their leader and talk

5      about how they progressed against the goals and objectives

6      that that department has, as well as their own development

7      plan for the following year, and we provide support for

8      those individual development plans.

9              So those are the three big areas that we would

10     cover on the HR field team.

11     Q.  Is there annual training for employment policies that

12     employees like Mr. Sanders go through on an annual basis?

13     A.  Yes.  Our craft employees are required to upgrade their

14     knowledge on an annual basis for rules compliance, so they

15     cover all the rules.  Involved in that is a computer module

16     that deals with EEO and other kinds of issues.

17             Exempt officers must certify every year that they

18     have read the professional code of conduct.  The code of

19     conduct is the expectations the company has of exempt

20     officers and their personal deportment and interactions, and

21     this would include EEO and harassment laws, reporting.

22     There are many areas that are covered in the code of conduct

23     as well.

24             And we do some one-off training occasionally

25     within the division, so we might touch on EEO or harassment

1   training, 20109 training with our field officers during the

2   year at annual staff meetings.

3   Q.  When did you first become aware of Mr. Sanders?

4   A.  My first knowledge of Mr. Sanders would have been a

5   hotline call that I received, and it was assigned to me.

6   Q.  Do you recall approximately when that was?

7   A.  I believe it was April the 5th of 2016.

8   Q.  And why did this complaint come to you?

9   A.  If I recall, the complaint was that he had been

10  suffering harassment for two years, and that he was not --

11  or I can't remember exactly.  I think he was alleging

12  retaliation because he had complained to the HR department

13  on a couple other occasions.

14          MS. DONESKY:  Jan, if you could please pull up

15  Exhibit 53, defense, D-53, please.  And if you could

16  highlight the middle of the page roughly around the summary

17  area.

18  BY MS. DONESKY:

19  Q.  You have the full document in front of you there,

20  Mr. Freshour.  Do you recognize this document?

21  A.  Yes.  This is a hotline document.

22  Q.  Is that the hotline document that was submitted by

23  Mr. Sanders?

24  A.  Yes, that is correct.

25  Q.  And there's an option to do so anonymously in this

1  hotline option, correct?

2  A.  Yes, there is.

3  Q.  In this situation he identified himself?

4  A.  Yes, Mr. Sanders gave a name and phone number.

5  Q.  Okay.  And just highlight or I guess read through the

6  summary that was provided in the document.

7  A.  "Track Inspector Donald Sanders alleges Division

8  Engineer Keith Jones and Roadmaster Blaine Hoppenrath have

9  been harassing Donald for over two years.  Donald also

10  alleges that Keith and Blaine are retaliating against him

11  for filing complaints to human resources.  Donald alleges

12  Roadmaster Stephen Chartier violated company policy and was

13  rude to Donald when approached."

14  Q.  So the time period alleged in this complaint was for how

15  long?

16  A.  Two years.

17  Q.  And when you received the complaint then for handling,

18  what did you first do?

19  A.  The first thing I did was identify that we do have a

20  name that I could contact.  Sometimes they are anonymous,

21  but in this case Mr. Sanders left his name and phone number,

22  so I set up an interview with Mr. Sanders and took a

23  statement.

24          Secondly, because it alleges that there were two

25  other complaints with human resources within a two-year

 1    period, I requested -- sent a request to Terry Morgan and

 2    his team requesting all documentation or complaints that

 3    might have been received in the last two years.

 4         MS. DONESKY:  And then if you might, Jan, if you

 5    could pull up Exhibit 55, please.  You can go to the bottom

 6    email, first one of the chain.  Yep.

 7    BY MS. DONESKY:

 8    Q.  You reference that you first, prior to speaking with

 9    Mr. Sanders, collected some materials and reached out to

10    human resources.  Is this your email then to Magenta and

11    Terry Morgan on April 8th?

12    A.  Yes.  This would have been stating that I was

13    investigating a Twin Cities issue, and then I requested that

14    any complaints about Mr. Jones or Ms. Hoppenrath be

15    forwarded to me.

16    Q.  And why did you want to collect those materials?

17    A.  That was a very good starting point to understand what

18    might have happened or had happened in the past.

19         MS. DONESKY:  And then if you go up the chain

20    there, Jan.

21    Q.  Did you receive anything from Ms. Eggertsen in response

22    to your email?

23    A.  Yes.  In fact, I sent it out on the 8th.  She responded

24    immediately and said:

25              "Hi, Dane:  I've compiled a file for all my

 1    interaction with Mr. Sanders.  Is there a certain timeframe

 2    that you're looking for?  I've worked a couple of complaints

 3    and want to make sure that I am providing exactly what you

 4    need.  Do you want me to send you the file or email you all

 5    the traffic that I have?"

 6    Q.  And then you responded as follows.

 7              MS. DONESKY:  Jan, if you can just highlight it.

 8    Great.

 9    A.  Yes, I was looking at two years because that was the

10    bracketed timeframe within the hotline call.

11    Q.  Okay.

12              MS. DONESKY:  And then, Jan, if you want to take

13    that top email.

14    Q.  And then ultimately you received -- there's a PDF

15    attachment that Ms. Eggertsen included on the same day, it

16    looks like, that you requested the information?

17    A.  Yes.  She was very prompt.  So she sent her PDF file,

18    the internal complaint from December of 2015.  She also

19    sent, looks like, her harassment, her EEO and

20    anti-harassment training and the RED training that was

21    provided on the 24th of February.  And then she was going to

22    send me the physical file it looks like as well.

23              Terry and Joe were also reviewing their files for

24    any follow-up information over the last two years.

25    Q.  And the reason for that is Magenta had been there for

1    just eight months.

2    A.  Right, Magenta had only been on-site there for eight

3    months.

4    Q.  What is the "RED policy" reference there to the training

5    that was provided in February?

6    A.  Yes.  That is a homegrown policy.  We have our EEO and

7    diversity law.  That's very -- pretty generic and follows

8    the state, federal, and local laws that govern that.

9         R-E-D, RED, is "Respect Every Day."  This actually

10   was brought forward by one of our fellow employees who

11   worked in Galesburg, Illinois, and in the military they had

12   used a process to put people on notice if they were crossing

13   a line.  And one of the elements that they brought forward

14   was to call out "RED."  RED would mean that they were

15   inappropriate.

16        As our society has experienced a lot of social

17   awareness in the last few years certainly, at that time

18   there was also a lot, and so we were trying to get ahead of

19   that with our diversity councils.  We also have business

20   resource groups, affinity groups for Hispanics,

21   African-Americans, American Indians, a variety of

22   individuals, as well as our women en route as well.

23        So RED is a way to communicate when someone is

24   talking about something that is bordering a sensitivity that

25   an individual might have.  And with proper training, once

1    somebody calls "RED," it allows people to back off and not

2    continue that line of questioning/teasing communication.

3    Q.  Following your receipt of materials from Ms. Eggertsen,

4    did you receive anything then from either Joe or Terry?

5    A.  Yes, I believe Mr. Morgan sent me a file.

6         MS. DONESKY:  Jan, if you can go to Defendant's

7    57.  Sorry, 5-7.  Thank you.  Top email, please.

8    BY MS. DONESKY:

9    Q.  Is this materials then that Mr. Morgan provided to you

10   in response to your request?

11   A.  Yes, it was.

12   Q.  And what materials did he include?

13   A.  It looks like he had an internal complaint notification

14   of 1-17 of '14.  D. Sanders/Mozinski response, 3-18 of '14.

15   He said:

16        "Dane, Attached please find my response to an

17   internal complaint filed by Don Sanders a couple years ago.

18   Also attached is some correspondence from the BMWE.  We were

19   able to resolve Mr. Sanders' issues without conducting an

20   unjust treatment hearing.

21        "Mr. Sanders also filed a 20109 case.  I suggest

22   touching base with Law to get an update on his whistleblower

23   case.  I'm not sure if it's still active.

24        "Please let me know if you have any questions."

25   Q.  And attached in the attachments are materials in

1   connection with those prior complaints.

2   A.  Yes, that is correct.

3   Q.  So following collection of these materials then, can you

4   describe what you did next.

5   A.  The material was probably incoming.  It's been a number

6   of years, but I believe at some point I would have

7   interviewed Mr. Sanders, spoke to him by phone, took a

8   statement, and then I emailed his statement back to him for

9   clarification, any edits that he would make, or just to

10  provide further context for me to investigate.

11  Q.  Do you recall if you had multiple phone calls with

12  Mr. Sanders?

13  A.  Yes, I'm sure over the period of time we had.  It's been

14  a while, so I don't recall how many.

15  Q.  And you mentioned you then sent him a statement

16  presumably by email?

17  A.  I did, yes.

18  Q.  And is that consistent with your practice when you're

19  conducting these investigations?

20  A.  Yes, it is.

21  Q.  And why do you do that?

22  A.  There are times that things can be lost in transposing

23  information over the phone, and this gives the individual a

24  full opportunity to respond, add clarification.  Once in a

25  while -- I wear hearing aids, so I may not hear things

 1    correctly, and it allows them then to respond back and make

 2    sure that I have an accurate picture of what was trying to

 3    be communicated.

 4            MS. DONESKY:  Jan, if you can pull up Exhibit 58,

 5    please.  Top part of the email, please.  Thanks.

 6    BY MS. DONESKY:

 7    Q.  And would this email reflect, consistent with your

 8    practice, the email to the complainant summarizing your

 9    notes from the conversation and asking them to respond?

10    A.  Yes.

11    Q.  Is there anything else in addition to asking them to, as

12    you say, review the notes, see if I've captured under each

13    item and correct any misunderstandings that may exist and

14    fill in any gaps?  Did you request anything else in

15    connection with this communication?

16    A.  Yes.  It's helpful -- it's always good to have one

17    person's perspective, but if there are witnesses that will

18    corroborate or begin to support that viewpoint, it's very

19    helpful in the scope of the investigation to establish

20    facts.  So if we have factual underpinning, that is very

21    helpful in the investigation to understand what the facts

22    are, and other people's perspective.  I've conducted many

23    investigations and everybody has a perspective, so it's

24    important to get as many different viewpoints as you can to

25    understand what probably happened.

1            MS. DONESKY:  And, Jan, if you can go to the

2  second paragraph.

3  Q.  And is this consistent with -- what you just testified

4  to consistent with that where you asked Mr. Sanders to

5  indicate any witnesses to each concern?

6  A.  Yes.  I said -- I asked him to please review each

7  section, make any corrections or additions.  Also, please

8  indicate any witnesses to each concern.  Once we have made

9  the additions and corrections, please return the statement

10  to me for further investigation.

11  Q.  And then looking at the document, the body of the

12  document, you've got -- it looks like you've got a structure

13  there where you've placed allegations kind of in bold

14  underline and then notes underneath; would that be fair?

15  A.  That is fair, correct.

16  Q.  Okay.  And the date that you sent this email to

17  Mr. Sanders looks like about 4-12, April 12?

18  A.  Yes, that is correct.

19  Q.  Okay.  When did you next -- did you hear then from

20  Mr. Sanders in response to this email and your statement?

21  A.  I don't think I heard back for a while.  There were --

22  in the life cycle of work a lot of things happen, but it had

23  been a number of days.  But I did reach back out to him at

24  some point, I think maybe six -- six days or so later, asked

25  him if he had had a chance to receive the email, number one,

1   to make sure he got it, and then asked for any clarification

2   and so forth.  And he did respond with some witnesses and

3   some names and numbers.

4   Q.  Okay.  So you followed up -- you didn't hear from him

5   but followed up with him subsequent.

6   A.  Yes, that is correct.

7           MS. DONESKY:  And, Jan, if you can pull up Exhibit

8   59.  At the bottom there, yes, please.

9   BY MS. DONESKY:

10  Q.  Is this your email following up with Mr. Sanders on

11  April 18th after forwarding the statement on the 12th to

12  him?

13  A.  Yes, that is correct.

14  Q.  And you're asking him to review the statement and send

15  it back and provide any witnesses.

16  A.  Yes, I asked him to return it.

17  Q.  You mentioned he provided witnesses.  So in the next --

18  looks like he responded with some witness names, correct?

19  A.  Yes, he did.

20  Q.  Okay.  And then did you ever receive a response to the

21  statement that you had asked him to review?

22  A.  No, I never received a response back.

23  Q.  Now --

24          MS. DONESKY:  Jan, if you could stay there,

25  please.  That's okay.

1  BY MS. DONESKY:

2  Q.  Okay.  It looks like he provided six or seven names --

3  actually eight or nine names, it looks like, of other

4  individuals?

5  A.  Yes.

6  Q.  And what did you do then after receiving the names of

7  these individuals?

8  A.  These are all working individuals, so it's difficult to

9  contact them because they're spread over a large geographic

10  area, so I would have made phone calls and talked to each

11  one of them if I could.  Not all of them responded, but I

12  did reach out to everyone.

13          MS. DONESKY:  Okay.  And if we could go to Exhibit

14  73, please.  Before we blow anything up, let me just ask a

15  few questions.

16  BY MS. DONESKY:

17  Q.  So, you made phone calls to the numbers you had for

18  these individuals?

19  A.  Yes, that is correct.

20  Q.  And then what is your practice then when you speak with

21  them in terms of any kind of documentation?

22  A.  What I do is take down what their responses are.  And I

23  would have asked some general questions, leaving them

24  open-ended questions to allow those individuals to discuss

25  whatever they wanted to discuss about that situation.

```
 1    Q.  And then do you record those impressions and notes

 2    somewhere?

 3    A.  What it is, I did a summary, yes.

 4         MS. DONESKY:  Okay.  Looking at Exhibit 73 then,

 5    and, Jan, if you could highlight again the body of that

 6    email.  I would go down, Donald Sanders up top, results.

 7    Right there.

 8    BY MS. DONESKY:

 9    Q.  So would this reflect -- for the record and for the

10    jury's benefit, the name of the employee is redacted for

11    confidential reasons, but would this reflect an example of a

12    phone call with one of the individuals and the notes you

13    took?

14    A.  Yes, that is correct.

15         MS. DONESKY:  And then, Jan, if you can scroll

16    down to the bottom half of that document.  Yeah, that's

17    great.  Thank you.

18    BY MS. DONESKY:

19    Q.  So you have a couple references there, Mr. Freshour,

20    where you have -- I'm going to translate.  I think it's:

21    "Left voicemail on 4-20.  Left another voicemail 4-22."

22         Are those your efforts to try to reach out to each

23    of those individuals?

24    A.  Yes, exactly.  Yes, I left a voicemail with those two

25    redacted individuals on two occasions, correct.
```

1    Q.  And this next individual looks like you've got about

2    five bullets of notes in connection with a call with them.

3    Do those reflect your notes with one of the conversations

4    with one of the employees?

5    A.  Yes, that is correct.

6    Q.  And then looking at -- let's focus on the third bullet

7    where it says:  "Don and I inspected a lot of track together

8    and bounce ideas off each other about the EI."  What is the

9    EI?

10   A.  EI would be Engineering Instructions.  The railroad is

11   pretty good to break out protocols for different actions,

12   and so EI would refer to Engineering Instructions for it

13   looks like defects.  That's my guess.

14   Q.  And then that individual referenced that there was room

15   for interpretation regarding the instructions and the gray

16   area was not always clear-cut.

17   A.  Yes, that there's always room for discussion on what is

18   a defect, and the EI is there to be kind of like the Bible

19   to understand whether it falls within tolerance or not.  And

20   there's a dynamic tension between management and inspectors

21   often when it comes to looking at these defects, making a

22   determination; because, again, it's individual perspective

23   and measurements are often what we fall back on to determine

24   the veracity of the defect.

25   Q.  And then the last bullet, your conversation with that

1   individual, what was his or her opinion that sort of related

2   to the tension with Mr. Sanders and management?

3   A.  Right.  He said:

4            "I get along with Keith and Blaine.  Don was

5   always at odds with both of them.  There seemed to be

6   animosity between them.  In my opinion, after Don got hit by

7   a train, a personality conflict grew into more animosity.

8   I've been with Don listening to the call on the speakerphone

9   and there would be some profanity at times that would get

10  out of control."

11  Q.  And then do you have another page of notes?

12            MS. DONESKY:  Jan, if you can ould go to the next

13  page, please.  No, I'm looking a little bit further down.

14  Yep, towards the middle.  Sort of the middle of the page

15  there.  Let's see then.  Actually, it's one more down, it

16  looks like.

17  BY MS. DONESKY:

18  Q.  So would this reflect another conversation with one of

19  the employees who you spoke with?

20  A.  Correct.

21  Q.  Why don't you read the bullets to that conversation.

22  A.  Right.  "Redacted advised that there was a conflict

23  between Don and the supervisor regarding how the job was

24  done.  They wanted it done one way and Don would want it

25  done another way.  Conflict arises because they see defects

1  differently.  No harassment but a difference in

2  expectations.  Did not feel anyone was out of line."

3  Q.  And then after speaking with employees, what, in

4  addition, if at all, did you also do in connection with your

5  investigation?

6  A.  Once I took the statements, then I looked at Magenta's

7  file.  Magenta had sent quite a large file with lots of her

8  documentation regarding interactions that had started clear

9  back in 2015 and had progressed up until February.  So I

10  would have weighed that out.

11      I took a look at Terry Morgan's documentation.  He

12  had produced the unjust treatment hearing which indicated

13  Mr. Sanders had conflicts with another exempt back in 2013,

14  a couple years earlier, and they had reached an agreement to

15  resolve that issue outside of the unjust treatment hearing

16  it looked like.

17  Q.  Okay.  And as part of your investigation, did you also

18  communicate with any of the managers who Mr. Sanders had

19  named in his hotline complaint?

20  A.  Yes, of course.  I interviewed -- would have been

21  Mr. Jones, Ms. Hoppenrath, and Mr. Chartier.

22  Q.  And do you recall when you spoke with these individuals?

23  A.  Would have been -- I don't recall the exact date off the

24  top of my head as I sit here.

25  Q.  Were you able to meet any of them face-to-face?

1    A.  If I recall correctly, I was -- in my regular travels I

2    was going to be in the Twin Cities.  I don't believe I met

3    all of them face-to-face.  I think Mr. Jones might have had

4    a conflict.  I think we spoke by phone, and then I had him

5    respond and kind of fill out the conversation in an email.

6    And then I did meet with Ms. Hoppenrath in person, and I

7    believe Mr. Chartier in person as well.

8    Q.  Okay.

9         MS. DONESKY:  Could we pull up Exhibit 74, please.

10   Q.  Can you identify this document?

11   A.  Yes.  This is a statement from Blaine Hoppenrath.

12   Q.  And is this also consistent with your practice in

13   investigating these types of concerns?

14   A.  Yes, that is correct.

15   Q.  And we've looked at the detail of that earlier today so

16   I won't have you go through it in detail, but is it

17   something you reviewed and considered as part of your

18   review?

19   A.  Yes, I did add this in for consideration, correct.

20   Q.  And then Exhibit 75.

21        Now, what does this reflect?

22   A.  This is a statement from Mr. Jones.

23   Q.  Okay.  Let's take a look at that one.  Was this -- how

24   did you go about, then, communicating with Mr. Jones?

25   A.  I would have called all three -- I contacted all three

1    to see if they would be available when I was in the Twin

2    Cities.  I don't think Mr. Jones was, to the best of my

3    knowledge and memory.  So we would have talked about the

4    points, and then I said, "I'll send you these questions.

5    Would you please fill those out, respond," and he did.

6    Q.  So similar to what -- with Mr. Sanders, you spoke by

7    phone and then followed up with the statement?

8    A.  Very similar.

9         MS. DONESKY:  Okay.  Let's take a look at the top

10   two-thirds of the page, please, Jan.  You can go all the way

11   down to C, I think.

12   Q.  So again, your practice is to put the allegation in and

13   then responses after it?

14   A.  Right.  I pulled the allegations right out of the

15   hotline calls, concerns.  And basically looks like the

16   questions were in black and Mr. Jones responded in red.

17   Q.  Okay.  So the first allegation is:  "Have you ever

18   instructed Mr. Sanders to break policy or violate FRA rules

19   to complete work the way you wanted it completed?  Please

20   describe."

21        Can you read Mr. Jones' answer there?

22   A.  He states:  "No.  Mr. Sanders has had trouble in the

23   past several years understanding what a defect is from a

24   non-class to a 213.9B classification.  He has been using old

25   dated EIs and other reference material to make his decisions

1    in the field.  I brought in several people to help train and

2    educate Mr. Sanders on his duties of defect remediation and

3    track inspection.  There are times Don and I have met in the

4    field to discuss locations and make decisions together on

5    remedial actions to repair, and even though Mr. Sanders

6    didn't always agree, we still made decisions based on the EI

7    and the data from the geo test cars."

8    Q.  And then the second allegation reads:  "What was the

9    reason that Mr. Sanders was restricted from taking a company

10   vehicle home?"  And Mr. Jones's answer was what?

11   A.  Yes.  He states:  "This is a business decision based on

12   budget management and inspector accountability in Northtown

13   and St. Paul area.  Over the past several years with

14   business and track issues being at high level, it made sense

15   to have certain track inspector positions have the ability

16   to take a BNSF company vehicle home to improve on response

17   time to service interruptions.  Now that traffic volumes and

18   service interruptions are down, there's not a business

19   reason to allow BNSF vehicles to be driven home by the

20   inspectors."

21   Q.  And the last allegation reads:  "Was Mr. Sanders forced

22   to work a position that he did not bid on?"

23   A.  Right.  Mr. Jones responds:  "Mr. Sanders was always

24   very willing to fill in on the mainline position when it was

25   vacant.  There was a period of time that Mr. Sanders had to

1   work on the mainline position for a longer period of time

2   due to the fact that no other employees were available to

3   work the mainline job.  I personally talked with Mr. Sanders

4   and asked him to please cover the mainline until we found a

5   mainline inspector, and he said no problem, but he felt he

6   would have a hard time keeping up with the yard job.  I told

7   him to communicate to myself and Blaine if he was having a

8   difficult time and we would come up with a plan to help him

9   get caught up."

10  Q.  And were these responses also something you considered

11  as part of your review?

12  A.  Yes, yes.

13         MS. DONESKY:  And then going to the third of the

14  exhibits relating to the manager interviews, Jan.  It's the

15  next one, which is 76.  76, please.

16  BY MS. DONESKY:

17  Q.  And then would this reflect the conversation and then

18  your follow-up email response with Mr. Chartier?

19  A.  Yes, that is correct.

20  Q.  And this, too, is part of your review and consideration?

21  A.  Yes, it was.

22  Q.  Was Mr. Jones' response with respect to the company

23  vehicle in responding or in your review of that, did you

24  find his reasoning to be of a sound rationale as to the

25  reason the company vehicles were not being allowed to be

1   taken home any longer?

2   A.  Yes, I did take a look at that.  Mr. Jones had a good

3   business reason.  I think Ms. Hoppenrath also indicated that

4   same reasoning.

5          MS. DONESKY:  And could we go back to 76 for a

6   moment, Jan, please.  And just from a timing perspective, if

7   you can highlight Mr. Freshour's email when he sent it to

8   Mr. Chartier.  Yeah, if you can just highlight that portion.

9   Thank you.

10  BY MS. DONESKY:

11  Q.  Looks like you sent that email to Mr. Chartier on

12  April 19th at 8:30 in the morning?

13  A.  Yes, 8:30 a.m., yes.

14         MS. DONESKY:  And then, Jan, if you could just

15  highlight on top.

16  Q.  Was Mr. Chartier prompt in getting back to you?

17  A.  Very prompt, yes, same day.

18         MS. DONESKY:  And then if you could go back, Jan,

19  to 74 just quickly.  And then the same thing with -- is

20  there a second page on that Jan, by chance?  Oh, there

21  isn't?  Okay.  We don't have it reflected.

22  BY MS. DONESKY:

23  Q.  And, Mr. Freshour, at some point in your investigation,

24  did you come to learn that Mr. Sanders had investigations

25  that were being conducted for alleged time theft?

1    A.  Yes, I believe Mr. Sanders advised me of that.  I think

2    he sent me a picture of the investigation notice.

3    Q.  And what, if anything, did you do to review those

4    matters?

5    A.  Once a formal investigation is held, there is a

6    transcript that's generated.  It was attached to the hotline

7    call.  So to the best of my memory, I think I probably

8    looked at the investigation transcripts.

9    Q.  In the course of looking at the -- those hearing

10   transcripts in connection with the hotline complaint, did

11   you note at all the timing of the hearings of when they were

12   held in relation to the hotline complaint?

13   A.  Yes.  The hearing was a little unique.  Any time there

14   is scheduled discipline, it goes to labor relations, so

15   that's a little bit different process than the HR

16   investigation.

17        So I did take a look at the proximity.  I think

18   the first investigation was held in early April.  The

19   hotline call came after that.  So the first investigation

20   would have been held maybe the 3rd or 4th, and the hotline

21   call came in on the 5th, and then the second investigation

22   was held on the 8th.  And so there was -- the formal

23   investigations and the hotline call were in close proximity.

24   Q.  But they were made -- one was made after the first

25   hearing on the time theft was --

1    A.  Yes, the hotline call came in after the first hearing,

2    correct.

3    Q.  Once you completed your review and various interviews,

4    did you ultimately then reach various conclusions upon your

5    review?

6    A.  Yes.  Once I read, looked at all of the evidence, read

7    Magenta's file, considered her actions that had been taken

8    on the concerns in 2015, and then also again in February, I

9    wrote a draft summary that I sent back on the hotline call

10   that I submitted back to the hotline administrator.

11   Q.  And is the preparation of such a report consistent with

12   your practice in reviewing these type of investigations?

13   A.  Correct.

14   Q.  And the report, was it made contemporaneous in

15   connection with your review of these materials?

16   A.  Yes.

17   Q.  And you had just recently spoken with a number of these

18   individuals; correct?

19   A.  Yes, that is correct.

20   Q.  Including Mr. Sanders, at least by phone.

21   A.  Yes.

22   Q.  Looking at --

23        MS. DONESKY:  Jan, if you could pull up Exhibit

24   77, please.

25   Q.  Does this reflect the summary report that you prepared

1    in connection with this hotline complaint?

2    A.  Yes, that is.

3          MS. DONESKY:  If you can, Jan, just highlight it

4    from there to about halfway down.  That's good to start

5    with.

6    Q.  Why don't you walk us through this document then, or at

7    least these first couple paragraphs.

8    A.  Okay.  Do you want to start with the heading?

9    Q.  So the first part, it looks like you're summarizing the

10   allegation that was made.

11   A.  Okay, right.  And so I would have sent this summary,

12   which is our practice, back to the hotline administrator,

13   Eric Weisman and Hannah Stadheim.  And then you can see all

14   the attachments, which would have included the statements,

15   the unjust treatment hearing, the testimony from the formal

16   investigations, their transcripts are attached, and all the

17   other documents are attached to the summary.

18          So the first one is a restatement of the

19   allegation.  The second area is the status, which is

20   unsubstantiated management follow-up.  And then response to

21   the caller.  The response to the caller basically says:

22   "Thank you for reporting your concerns and helping BNSF

23   maintain a respectful environment.  BNSF's investigation

24   does not substantiate your allegations of harassment and

25   retaliation.  If you have further questions or concerns

1    regarding this matter, please contact Regional HR Director

2    Dane Freshour at," and my phone number.

3    Q.  Looking back up then under "status unsubstantiated

4    management follow-up," is there -- are there various types

5    of responses you can select from or is that one that, you

6    know, you crafted yourself?

7    A.  There are only three.

8    Q.  Okay.  Explain what the three are then.

9    A.  Right.  Substantiated, which they do -- are

10   substantiated.  We have about -- probably 10 percent of them

11   are substantiated.  So those would mean that the facts line

12   up and the allegation is confirmed.

13           Unsubstantiated would mean that the review process

14   did not substantiate the allegation.

15           Unsubstantiated with management follow-up

16   indicates that while the allegations were unsubstantiated,

17   there was still a concern that needed to be addressed, and

18   that is why the follow-up was added to unsubstantiated with

19   follow-up.

20   Q.  And that's the one you selected?

21   A.  That is correct.

22   Q.  And why did you select the unsubstantiated management

23   follow-up?

24   A.  It depends on what the remedial action required is.  It

25   varies based on the findings.  So in this case I believe

1    there were follow-up requirements with Stephen Chartier.

2    Q.  And pertaining to what?

3    A.  To his management leadership style.

4    Q.  And will those be reflected -- do you typically put what

5    you're noting as follow-up in the summary report as well for

6    others to follow up with?

7    A.  Yes, ma'am, that is correct.

8    Q.  And then if we could move our way down the rest of the

9    page.

10            Then your report continues.  Why don't you read

11   your closeout summary.

12   A.  "Interviews reveal no evidence of harassment or

13   retaliation.  However, improved leadership communication

14   over the interpretation of EI and FRA defect handling is

15   necessary.  HR to provide coaching and training.  Formal

16   investigations were held over separate issues regarding

17   discrepancies in Mr. Sanders' time roll reporting and were

18   not retaliatory."

19   Q.  So that final sentence you read there that the

20   investigations -- your conclusions were they were separate

21   issues and not retaliatory.

22   A.  My conclusion is there's no link between the actions

23   Mr. Sanders took that actually brought about the formal

24   investigation on time theft.

25   Q.  Then the next section of your report basically

1    summarizes who all you spoke with, and it looks like on the

2    bottom you've got a sentence there.  Is that something you

3    added as well?

4    A.  Correct.  So, yes, you can see I also attached each

5    statement connected to the person and the summary for the

6    witnesses on the craft employees.  And then I gave a summary

7    statement of findings which says:  "There appears to be a

8    long history of ongoing personality conflict between

9    Mr. Sanders and the engineering management team in

10   Minneapolis."

11   Q.  And upon what basis did you reach that conclusion?

12   A.  From looking at the total record from Magenta, from

13   Terry Morgan, from the witness statements, and Mr. Sanders'

14   statement.

15          MS. DONESKY:  And then continuing on, Jan, if you

16   could go to the next page, please.  Can you go to the top

17   part of the report then?  The top half -- sorry -- of this

18   next page.  Great.  Thank you.  Yeah, about halfway down.

19   Great.

20   BY MS. DONESKY:

21   Q.  And then this next page, Mr. Freshour, looks to be a

22   timeline.  Would you have put that together?

23   A.  Yes.  Because the allegation was that there was

24   harassment over two years, I began to construct a timeline,

25   just to give a perspective and to help understand when

1   things happened and when -- the temporal proximity of each

2   of those events.

3   Q.  And looking at the first three entries, are those dates

4   correct that the first three entries reflect claims or

5   allegations Mr. Sanders was alleging dating back to 2013?

6   A.  Yes, they are.  Correct.  Yeah, it was 2013.

7   Q.  Actually, they were other complaints also that

8   Mr. Sanders made in that time period.

9   A.  Yes.

10  Q.  Unjust treatment claim and --

11  A.  Correct, yes.  The disrespectful exchange between

12  Mr. Sanders, three crew members and Assistant Roadmaster

13  Muelner, and then the lodging of the unjust complaint.  And

14  then by September, it looks like, there was communication

15  back and forth.  The unjust treatment hearing was cancelled,

16  and a remedy involving apologies and coaching and counseling

17  was mutually accepted.  And then I attached the unjust

18  treatment documentation to that.

19  Q.  Those were materials you received from Mr. Morgan?

20  A.  Yes, Terry Morgan was in charge of that process.

21       MS. DONESKY:  Then if we can scroll out to the

22  bottom half of the page, Jan, please.

23  Q.  And then basically you concluded -- or completed the

24  timeline all the way through where you perceived the

25  timeline -- up until the second investigation.

1    A.  Yes.  It's helpful just to have a perspective on when

2    things happened.  And so this one, I guess, demonstrates

3    January 8th, the meeting set up by Mr. Jensen and Don

4    planned for January the 11th, as well as all the way down to

5    the formal investigation.  It looks like the first formal

6    investigation was held April the 3rd, and then the hotline

7    call came in on April the 5th, and then the second formal

8    investigation was held on April the 8th.

9         MS. DONESKY:  And then, Jan, can you go to the

10   next page of the report.

11   Q.  And then describe what you're seeking to accomplish here

12   in I think it's the last page of your report, Mr. Freshour.

13   A.  Okay.  So we still -- we had a couple things going on.

14   We still had the LR investigation that was still -- just

15   because the transcript was developed, it does not mean

16   discipline was yet assessed.  So that still had to be

17   adjudicated and worked through the LR process.  So I

18   indicated that no discipline had yet been assessed.

19        And then I summarized the investigative process,

20   the findings, leadership behaviors.  And because the union

21   had made the allegation that retaliation might be connected

22   to the HR investigation, I did cover a section on

23   retaliation specifically.

24   Q.  So is it fair to say you independently reviewed that

25   issue of whether the hearings were being done for a

1    retaliatory reason?  You looked at that independently

2    yourself?

3    A.  I was looking for linkage, correct.

4    Q.  And did you find any?

5    A.  I did not.

6    Q.  And then on the last page of the report you have various

7    recommendations?

8    A.  Yes, at the top.  It would have been the final

9    recommendations.

10              "Although the findings did not substantiate

11   harassment or retaliation in Mr. Sanders' complaint, there

12   were some areas where leadership interactions could be

13   improved to eliminate complaints of this nature.  Provide

14   coaching and training to Stephen Chartier in the following

15   areas:

16              "Number 1.  Interpersonal interactions.  Actively

17   self-monitor to eliminate profanity from his communication.

18              "Number 2.  Avoid sharing your personal opinion

19   with other employees about employees.

20              "Number 3.  Be aware of being overly critical of

21   employees without a factual basis.  Address performance

22   issues as they arise and the current merits, not past

23   history or reputation."

24   Q.  And when you completed this review then, where did you

25   submit it to?

1    A.  This was then submitted back to the hotline

2    administrator, which would have been Hannah Stadheim.

3    Q.  Okay.  And then after you concluded your report and

4    review, were there any further communications that you

5    received from Mr. Sanders?

6    A.  Yes, he did shoot me a couple emails.  I believe we had

7    some phone conversations.  I don't recall exactly what those

8    were regarding.  He did send some audio files that had been

9    previously reviewed by Magenta.

10   Q.  And what did you do upon receipt of that additional

11   information?

12   A.  The additional -- I did due diligence on the audio

13   files.  They were consistent with Magenta's summaries that

14   she provided as she walked through her investigation.  I was

15   listening primarily to tone from Mr. Jones.  I listened to

16   see if I heard anything different than Magenta might have

17   identified regarding any animus or hostility between them.

18   Each one of the calls seemed to end amicably between

19   Mr. Jones and Mr. Sanders.

20   Q.  Was there a determination that you were able to make as

21   to whether those recordings were reviewed previously?

22   A.  Yes.  As I listened to them, I began to recognize that

23   these were also summarized in Magenta's work earlier, I

24   think in December of 2015.

25   Q.  And did this additional information that Mr. Sanders

1    provide, had you already gone through the process and

2    collected information and concluded the report that we just

3    looked at in Exhibit 77?

4    A.  Yes, that report had already been submitted by the time

5    I got the audiotapes.

6    Q.  Did you nonetheless provide further follow-up response?

7    A.  Yes, I did.  I did listen to the audiotapes.  I then did

8    send a separate letter to Mr. Sanders probably toward the

9    end of June.

10         MS. DONESKY:  Can you pull up, Jan, Exhibit 80,

11   please.  And if you could focus -- yeah, top half of the

12   letter.

13   Q.  And so in June you wrote to Mr. Sanders directly?

14   A.  Yes, I did.

15   Q.  And the purpose of that response was to address the

16   additional information that he had provided you.

17   A.  That is correct, specifically telephone recordings as

18   noted in the letter.

19   Q.  Okay.  And do you make reference that they appear to be

20   the same messages that Magenta had reviewed when responding

21   to the allegations of harassment and retaliation?

22   A.  That is correct.  I state that in the first paragraph.

23   Q.  Okay.  And in the last sentence of that paragraph you

24   make reference that in that prior review there had been some

25   formal handling with Mr. Jones, you communicate that to

1   Mr. Sanders; correct?

2   A.  Yes, that is correct.

3         MS. DONESKY:  Now, Jan, if you can go to the last

4   two full paragraphs, please.  Yes, please.

5   Q.  And the purpose -- and you've got your next paragraph

6   that you write to Mr. Sanders.  Why don't you read that for

7   the record, the -- that paragraph on top there.

8   A.  Do you want me to read it?

9   Q.  Starting with that first paragraph there.

10  A.  Okay.

11        THE COURT:  And sorry, Mr. Freshour, slowly if you

12  could so our court reporter has a --

13        THE WITNESS:  Yes, sir.

14        THE COURT:  Okay.  Thank you.

15        THE WITNESS:  Thank you.

16  A.  "The allegation of harassment and retaliation was not

17  substantiated through the investigative process.  It is

18  apparent that there has been a strong difference in opinion

19  between you and the leaders in the engineering department

20  regarding what constitutes a defect and the need for

21  remedial action.  We discussed managerial discretion

22  regarding work assignments, work times, and work locations.

23  Managerial discretion also applies to the vehicle policy

24  regarding allowances for taking vehicles home so that

25  workers could shorten response times.  My findings did not

 1    substantiate that managers violated the policy by making

 2    these decisions within the scope of managerial discretion."

 3    BY MS. DONESKY:

 4    Q.  Thank you.  And then your last full paragraph makes

 5    reference to an anti-retaliation process.  What is that

 6    specifically?  Can you describe that for the jury?

 7    A.  Yes.  The anti-retaliation process is activated when an

 8    employee brings forth a concern of possible retaliation.

 9    This process is instituted so that leaders of leaders of

10    leaders can review whether or not to pursue discipline in a

11    certain situation.

12          So, for example, if an employee feels like they're

13    being retaliated against, they are scheduled for a formal

14    investigation.  The vice president and so forth have to

15    review to make a determination whether or not to pursue with

16    that or if there are elements of concern within that.  And

17    they may refer with Law to make that final decision on

18    whether or not to pursue discipline.

19    Q.  And as part of that review, as you mentioned, there

20    is -- the December 15th reference would refer back to the

21    anti-retaliation letter that Mr. Jones received; correct?

22    A.  Correct, that, yes, Magenta had set that up once she

23    identified the potential for possible retaliation.

24    Q.  And as part of the process, then, as you mentioned, a

25    review is conducted prior to assessing any discipline

1    decision.  And read for the jury the last sentence, then, of

2    that paragraph.

3    A.  "A review is conducted prior to assessing any discipline

4    decision.  The charge regarding the theft of time was an

5    entirely separate issue from the allegations of retaliation

6    due to removing track from service."

7    Q.  And then your last sentence of the letter to Mr. Sanders

8    references the labor relations appeal process for any

9    discipline assessed?

10   A.  Correct.  I believe he understood that, but I did

11   summarize and say appeals to the disciplinary findings and

12   assessment are completed through the labor relations

13   process.

14   Q.  Separate from your review, were you consulted at any

15   time with respect to those investigation hearings to have

16   human resources weigh in as part of the labor relations were

17   reviewing his investigative transcripts?

18   A.  No.

19   Q.  Do you recall, as part of the multilevel review that was

20   conducted in the investigations, do you recall Ms. Detlefson

21   contacting human resources?

22   A.  I don't recall.

23   Q.  Okay.  And with respect to scorecards, in your position

24   as director of human resources, are scorecards applicable to

25   you in your position at all?

1    A.  No, they're unique to engineering.

2              MS. DONESKY:  I have nothing further at this time.

3              THE COURT:  Mr. Kaster?

4              MR. LUCAS KASTER:  Thank you, Your Honor.

5                        **CROSS-EXAMINATION**

6    BY MR. LUCAS KASTER:

7    Q.  Good afternoon, Mr. Freshour.  My name's Lucas Kaster.

8    I'm going to ask you some questions, okay?

9    A.  Yes, sir.

10   Q.  And I want to pick up right with one of the topics that

11   you left off on, this topic of discretion.  And you had said

12   in your letter to Mr. Sanders in June of 2016 that the

13   decisions around his vehicle usage and his hours and his

14   reporting location were within managerial discretion; right?

15   A.  That is correct, yes, sir.

16   Q.  Just because something is within managerial discretion

17   doesn't mean it's not retaliatory; right?

18   A.  Depends upon the circumstances involved of that

19   discretion.

20   Q.  Sure.  Because it's the discretion itself that permits

21   retaliation; right?

22   A.  Not necessarily.  You have to look at the context.

23   While there may be some latitude to manipulate that, if it

24   violates the policy, the policy overrides the discretion.

25   Q.  Sure.  So if, for example -- let's use the vehicle issue

1    as an example, okay?

2          If, for example, there was a policy at BNSF that

3    specifically said track inspectors are always guaranteed to

4    be able to use a vehicle to drive home, right, and there was

5    a violation of that policy, you could say that's potentially

6    retaliatory; right?

7    A.  Correct, if I'm following you.  It's a hypothetical, but

8    yes, based on that that you've explained, if they directly

9    violated what was guaranteed, that then would easily be

10   identified as retaliatory.

11   Q.  Sure.  But it can also be retaliatory if the policy says

12   it's in managerial discretion and I gave you the ability to

13   use the vehicle before, but now I'm taking it away.  That

14   can also be retaliation; right?

15   A.  Depends on business drivers, what is the rationale

16   behind that decision.

17   Q.  And my only question is it's possible that it's still

18   retaliation even though it's within managerial discretion.

19   A.  So you're talking about possibility.

20   Q.  Correct.

21   A.  It could be possible, yes.

22   Q.  So your rationale that those decisions were within

23   managerial discretion isn't conclusive on the issue; right?

24   A.  It is conclusive based on the facts that were presented.

25   Q.  Okay.  Well, we'll talk about those facts here in a

1    minute.

2          I think you went over your position.  You're the

3    regional director for the Northern Region of human

4    resources, right?

5    A.  Yes, sir, that is correct.

6    Q.  So you're the highest person in the Northern Region in

7    HR?

8    A.  Yes, that would be correct.

9    Q.  And your subordinates are Mr. Morgan, Mr. Spire and

10   Ms. Eggertsen at the time of these events?

11   A.  At the time, yes, that is correct.

12   Q.  And BNSF has anti-retaliation and anti-discrimination

13   policies; right?

14   A.  Yes, sir, we do.

15          MR. LUCAS KASTER:  Can we bring up Exhibit 5 at

16   page 6.

17   Q.  Mr. Freshour, are you familiar with BNSF's PEPA policy?

18   A.  This is a labor relations policy, so they probably

19   handle this on a more frequent basis, but I'm familiar with

20   it, correct.

21   Q.  And what is the PEPA policy?

22   A.  The PEPA policy is the Policy for Employee Performance

23   Accountability.

24   Q.  And it lays out here on page 6 in Appendix B types of

25   conduct that are standalone dismissible violations.  Do you

1    see that in bold at the top?

2    A.  Yes, sir, I do.

3              MR. LUCAS KASTER:  So let's go down to number 7,

4    if we could.  I'm sorry, number 6.  Sorry, Karla.

5    Q.  And under this policy:  "Conscious or reckless

6    indifference to the safety of themselves, others, or the

7    public; indifference to duty; intentional destruction of

8    company property; malicious rule violation; and

9    insubordination" can be considered standalone violations,

10   right?

11   A.  Yes, sir, that is correct.

12   Q.  Would you consider telling a track inspector to not

13   enter a defect in violation of the law as a violation of

14   this policy?

15   A.  Not necessarily.  You'd have to look at the

16   circumstances involved in that situation.

17   Q.  If the law says a defect is required, do you understand

18   that it has to be reported to the company?

19   A.  Are we speaking about FRA violations?

20   Q.  I'm talking about track inspections, looking at a track

21   defect on a track.

22   A.  If the track inspection is an FRA violation and is not

23   reported, that could, yes, have serious implications.

24   Q.  And is that what the law requires when there is a

25   traffic defect, it must be reported?

1    A.  To the best of my knowledge, you'd have to ask an

2    engineering person because that's the scope of their world

3    and their expertise, but as far as my understanding, that

4    would be required to follow the FRA rules.

5    Q.  And if a manager is telling a subordinate who is a track

6    inspector, "Don't report defects," is that a violation of

7    this policy?

8    A.  It depends on how they measure it out.  Was it really --

9    I think many of the conflicts that existed around

10   interpretation of what was a conflict or not, what was a

11   defect, and that is the gray area that led to a lot of the

12   contention.

13   Q.  Okay.  Let's talk about something that's not gray.

14            You said you looked at some of these recordings;

15   right?

16   A.  Correct.

17   Q.  Is telling an employee, "I got fuckin' people coming in

18   from all over the place and double-checking what I'm doing,"

19   is that a violation of this policy?

20   A.  No.

21   Q.  How about telling an employee, "I'm going to make you

22   weld until you fucking fall over," is that a violation of

23   this policy?

24   A.  There was a dead spot.

25   Q.  Sure.

1    A.  They have to do what until they fall over?

2    Q.  Is telling an employee that you're going to make them

3    weld until they fucking fall over --

4    A.  Weld.  Okay.

5    Q.  Weld.  Is that a violation of the policy?

6    A.  That would be a concern that would fall under the code

7    of conduct.

8    Q.  You have no opinion about that.

9    A.  I do have an opinion about that.  I think it's

10   inappropriate.

11   Q.  Should it be an immediately dismissible offense?

12   A.  Not necessarily.  It depends on the circumstances.

13   Q.  What about telling an employee, "The EI says this.  Big

14   fucking deal.  We have other bigger fish to fry."  Do you

15   think that's a violation of the policy?

16   A.  Not a violation of policy, but definitely a concern.

17            MR. LUCAS KASTER:  Let's go to Exhibit 25, please.

18   Q.  Mr. Freshour, what is Exhibit 25?

19   A.  It appears to be the Internal Control Plan by the Safety

20   Department.

21   Q.  Have you seen this document before?

22   A.  Not to my knowledge, no.

23            MR. LUCAS KASTER:  Let's go to page 6, please.

24   Q.  This is an overview of the BNSF hotline; is that right?

25   A.  This looks to be, yes, a summary of the BNSF hotline,

1    correct.

2              MR. LUCAS KASTER:  And if we could blow up the

3    second full paragraph that starts with "The BNSF hotline,"

4    that whole paragraph.  Thanks, Karla.

5    Q.  So according to this document, the hotline provides a

6    confidential and anonymous communication channel; right?

7    A.  That's what it says, correct.

8              MR. LUCAS KASTER:  And then if we can go down to

9    the bold print right underneath this section, Karla.

10   Q.  It says:  "BNSF has a no-retaliation policy for the

11   good-faith reporting of an apparent or actual violation of

12   law, BNSF's code of conduct, or any BNSF policy"; right?

13   A.  Correct.

14   Q.  So anytime an employee files a complaint with HR, any

15   type of retaliation is prohibited?

16   A.  That is correct.

17   Q.  If there's a violation of that policy, is it a

18   standalone dismissible offense?

19   A.  It certainly could be.

20   Q.  It could be or it is?

21   A.  Could be.  It depends again on circumstances involved in

22   the case.

23             MR. LUCAS KASTER:  If we could go to page 29 of

24   this document, please.

25   Q.  Mr. Freshour, do you see at the top of this page it

```
 1   says:  "BNSF's Internal Complaint and Hotline Procedure"?

 2   A.  Yes, that's what it says.

 3   Q.  Have you seen this document before?  And we can blow it

 4   up if you --

 5   A.  Again, I just had to look a little --

 6   Q.  Sure.

 7   A.  Yes, this looks to be familiar, yes, sir.

 8   Q.  And there's two paragraphs in the middle of the page,

 9   one that starts with "Harassment" and the next one starts

10   with "Retaliation."

11           MR. LUCAS KASTER:  If we could blow those two up.

12   Thank you.

13   Q.  The second paragraph says:  "Retaliation against anyone

14   who reports harassment or discrimination or who participates

15   in an investigation of harassment or discrimination is

16   strictly prohibited."  Right?

17   A.  Yes, sir.

18   Q.  And then if we go down to the bottom of the page there's

19   a step one.  Do you see that, Mr. Freshour?

20   A.  I do now, yes, sir.

21   Q.  And then if we go to the second page there's steps two,

22   three and four.  Is this the complaint investigation

23   process?

24   A.  Yes.

25   Q.  Under step two it says:  "Information provided to human
```

1   resources or the employee hotline is confidential and will

2   only be discussed with other employees as necessary and

3   required to thoroughly investigate and resolve the

4   complaint."  Right?

5   A.  That is correct.

6           MR. LUCAS KASTER:  If we can go to Exhibit 48,

7   please.

8   Q.  Mr. Freshour, this is a letter sent to Mr. Jones.  You

9   referenced before that Mr. Jones got a coaching and

10  counseling for some swearing.

11  A.  That is correct.

12  Q.  And if we go to the second page of this exhibit, we see

13  on the bottom that a cc is to human resources; right?

14  A.  I do.

15  Q.  That's your department.

16  A.  That would be, yes.  Probably went to personnel records

17  is my guess, but ...

18          MR. LUCAS KASTER:  And then if we can go back to

19  the first page, please, and blow up the first full

20  paragraph.

21  Q.  So this is a letter to Mr. Jones from his boss, Mr. Doug

22  Jensen.  Do you see that on the bottom?

23  A.  I did see that on the bottom, yes, sir.

24  Q.  The second sentence reads:  "Specifically, your use of

25  profanity while speaking with MOW Track Inspector Don

 1   Sanders on November 23rd, 2015 regarding his recent contact

 2   with the Federal Railroad Administration to ask questions

 3   and discuss track conditions."

 4          Do you see that?

 5   A.  I do.

 6   Q.  Is this telling Mr. Jones that Mr. Sanders filed a

 7   complaint against him with HR?

 8   A.  No, this has to do with his contact with the FRA.

 9   Q.  Do you think it's appropriate to put Mr. -- name

10   Mr. Sanders by name in this letter?

11   A.  It probably was referencing the event.  I don't know

12   Mr. Jensen's thoughts about that.  You'd have to ask him.

13   Q.  You said that you have 20 or more years of HR

14   experience.

15   A.  Correct.

16   Q.  In your experience as an HR professional, is it

17   typically best practice to identify the person who the

18   interaction occurred with or who filed the complaint when

19   you're notifying the person of discipline?

20   A.  If known, it's not unusual to have that in the summary;

21   that is correct.

22   Q.  Why would you not provide the person's name who made the

23   complaint?

24   A.  Because of concerns of retaliation.  However, typically

25   when you're interviewing someone, there are elements that

1    they're able to trace and identify people that have

2    complained, and if Mr. Sanders gave his name as a person

3    that complained, he would already have knowledge of that.

4    Hence, we have the anti-retaliation process that we put in

5    place in December.

6    Q.  By the way, this anti-retaliation process --

7              MR. LUCAS KASTER:  Why don't we pull up Exhibit

8    46.

9    Q.  When you say "anti-retaliation process," this is what

10   you're referring to, a letter?

11   A.  This is correct, yes.

12   Q.  Nothing else?

13   A.  No, this is the first step of that process.

14   Q.  No training?

15   A.  Oh, they all get training.

16   Q.  I'm talking about in response to this specific incident.

17   No training for Mr. Jones?

18   A.  There's a discussion with Mr. Jones about what

19   constitutes retaliation, what things to avoid, yes.  And the

20   letter is a summary or a follow-up to that conversation.

21   Q.  I was asking about training.  Specific training?

22   A.  Is training done one-on-one?  I mean, that's the whole

23   nature of the conversation.

24   Q.  So a letter and a conversation.

25   A.  Correct.

```
1     Q.  Anything else?

2     A.  He's responsible to follow those guidances.

3     Q.  What happens if he doesn't?

4     A.  He could have severe complications.  I've had people

5     terminated because they failed to follow this guidance.

6     Q.  You referenced on direct examination a training that

7     Ms. Eggertsen did in February of 2016.  Do you recall that?

8     A.  I do, yes, sir.

9              MR. LUCAS KASTER:  If we can pull up Exhibit 170.

10    Q.  Now, Mr. Freshour, this is a large document.  I think

11    this is the discipline file you were referring to from

12    Ms. Eggertsen.  It's not just this first page.  It's about a

13    30-page document.  Do you recall that?

14    A.  I do now that you mention it, yes.

15             MR. LUCAS KASTER:  If we can go to page 13,

16    please.

17    Q.  Mr. Freshour, is this the PowerPoint for the training

18    that was done by Ms. Eggertsen in February of 2016?

19    A.  Yes, sir, this would be a standard training that we were

20    using at that time.  This has been updated over the years,

21    but in 2016 this would have been the appropriate document.

22             MR. LUCAS KASTER:  If we can blow up the bottom

23    right-hand side that says:  "Types of Harassment."

24    Q.  On this slide, hostile work environment is defined as:

25    "Harassment itself can be a discriminatory behavior.
```

1    Harassment is behavior that creates a hostile, intimidating,

2    or offensive environment that interferes with an

3    individual's job performance is a hostile work environment."

4          Do you see that?

5    A.  I do, yes, sir.

6    Q.  Do you agree with that?

7    A.  I do, yes.

8          MR. LUCAS KASTER:  Why don't we go to the second

9    page of this exhibit, please, and blow up the bottom

10   right-hand slide.

11   Q.  This is an overview of BNSF's workplace harassment

12   policy; right?

13   A.  Yes.  We've updated that also, but at the time this

14   looks appropriate.  90.2 looks appropriate.

15   Q.  Top section reads:  "BNSF Railway Company does not

16   tolerate verbal or physical conduct by any employee which

17   harasses, disrupts or interferes with another's work

18   performance, or which creates an intimidating, offensive or

19   hostile environment."  Right?

20   A.  Yes, sir.  That is correct.

21   Q.  And then the bottom line:  "All BNSF employees will

22   treat others with dignity and respect."  Right?

23   A.  That is also correct.

24          MR. LUCAS KASTER:  We can go to the next page and

25   blow up the first slide on the upper left-hand side.

1   Q.  "Preventing workplace harassment."  There's a number of

2   bullet points, and then there's a note on the bottom that

3   says:  "BNSF has zero tolerance for retaliation against

4   anyone that files a complaint or participates in an

5   investigation."

6           Do you see that?

7   A.  I do, yes, sir.

8   Q.  Okay.

9           MR. LUCAS KASTER:  And then if we can blow up the

10  middle slide on the right-hand side.  Thank you.

11  Q.  This is a slide about investigating workplace

12  harassment.

13  A.  Correct.

14  Q.  It says:  "All complaints are to be investigated under

15  BNSF's internal complaint procedure and complaints will be

16  investigated promptly, impartially, and confidentially as

17  possible."  Right?

18  A.  You've read that correctly.

19          MR. LUCAS KASTER:  Why don't we go to page 18 of

20  this same exhibit, please.  Then if we can blow up the

21  actual written names.

22  Q.  Mr. Freshour, I'm going to show you a couple pages, and

23  these are all the people who attended this training in

24  February of 2016.

25  A.  Okay.

```
 1    Q.  Okay.  Here we see Mr. Sanders.  He was required to

 2    attend?

 3    A.  Correct.

 4    Q.  And then we see Ms. Hoppenrath at the bottom.

 5    A.  That is correct.

 6    Q.  Mr. Jones anywhere?

 7    A.  He may not have attended.  I don't know.

 8              MR. LUCAS KASTER:  Let's go to the next page, blow

 9    up these names.

10    Q.  Do you see Mr. Jones' name anywhere?

11    A.  No, sir, I don't at this point.

12              MR. LUCAS KASTER:  Let's go to the next page, blow

13    up these names.

14    Q.  Mr. Jones' name anywhere?

15    A.  No.

16              MR. LUCAS KASTER:  Let's go to the next page, blow

17    up these names.

18    Q.  Mr. Jones' name anywhere?

19    A.  Does not appear so, no.

20              MR. LUCAS KASTER:  Let's go to the next page, blow

21    up these names.

22    Q.  Mr. Jones' name anywhere?

23    A.  I don't see Mr. Jones.

24              MR. LUCAS KASTER:  One more page, blow up these

25    names.
```

```
 1    Q.  Mr. Jones' name anywhere?

 2    A.  No.

 3    Q.  I want to talk to you a little bit about this

 4    April hotline complaint that Mr. Sanders made; okay?

 5    A.  Okay.

 6              MR. LUCAS KASTER:  And let's go to Exhibit 117 if

 7    we could.

 8    Q.  And this is that overview that you talked about that you

 9    sent back to the hotline after you were done.

10    A.  Correct.  This is the summary.

11    Q.  Okay.  And I want to go back, actually, to the fourth

12    page of this exhibit if we could.

13              And in the middle of the page down to Hannah --

14    Ms. Stadheim's name, there appears to be an email.  Do you

15    see that?

16    A.  I do.  This is the email that comes out when the

17    administrator first sends it to the field.

18    Q.  And this is the initial complaint by Mr. Sanders.

19    A.  That is correct.

20    Q.  So when that complaint's received, this email goes out

21    alerting people that a complaint has been made.

22    A.  That is correct.

23    Q.  Okay.  And the recipients of this email are Mr. Doug

24    Jensen; right?

25    A.  Yes, sir.
```

```
 1     Q.  Yourself, Mr. Freshour?

 2     A.  Correct.

 3     Q.  Mr. Hesterman?

 4     A.  Correct.

 5     Q.  And he's the AVP in the maintenance department.

 6     A.  At that time probably, yes.

 7     Q.  Who's Steve Anderson?

 8     A.  He would be the vice president.  Mr. Anderson was a vice

 9     president.

10     Q.  So he's above Mr. Hesterman.

11     A.  Absolutely, yes.

12     Q.  What about Monique Robinson?

13     A.  Monique Robinson is a talent director for the

14     engineering department.

15     Q.  How about Holly Morgan?

16     A.  Holly Morgan would be my boss.  She supervises field

17     operations.

18     Q.  How about Caroline Richie?

19     A.  Caroline is an employment attorney.

20     Q.  So we have a vice president, your boss from HR, someone

21     from the legal department, all on this complaint.

22     A.  Yes, that is correct.

23     Q.  And then who's Eric Weisman?

24     A.  Eric would have been a counterpart of mine who also

25     provides supervision for Hannah Stadheim, so he would be a
```

1   corporate HR contact.

2   Q.  So fair to say as of April 7, 2016 at 7:49 a.m., or at

3   least thereabouts, these people are aware of Mr. Sanders'

4   complaint?

5   A.  If they got the email, correct.

6        MR. LUCAS KASTER:  Then if we could go to Exhibit

7   99, please.

8   Q.  And we see on the first page it says the complaint was

9   opened on April 5th of 2016; right, Mr. Freshour?

10  A.  April 5th, yes.

11  Q.  And we saw in the summary that Mr. Sanders has alleged

12  that Keith and Blaine were retaliating against him for

13  filing complaints to human resources; right?

14  A.  That is the summary, correct.

15  Q.  Then if we go to the second page, there's a:  "Provide a

16  brief description of the matter" kind of about

17  three-quarters of the way down.  I'm sorry, a quarter of the

18  way down, bottom of the gray section, right above "specific

19  location."

20        So the nature of the complaint was retaliation and

21  harassment; right?

22  A.  Yes, sir.

23  Q.  And then I would like to go down to the second-to-last

24  paragraph in the detail section where it starts with "Human

25  Resources."  So Mr. Sanders is -- is this a summary of what

```
1    Mr. Sanders complained to?

2    A.  Yes.  When you look at details, this would have been the

3    details of the call Mr. Sanders made to the hotline.

4    Q.  So Mr. Sanders is detailing in this call that his

5    allegation of time theft is retaliation.

6    A.  Yes, that is correct.

7    Q.  And he specifically says that he's been accused of time

8    theft four days before timekeeping closed.  Right?

9    A.  I'm not sure how that process works, but --

10   Q.  But look at the last line in the paragraph.  It says:

11   "This was four days prior to timekeeping closing, so

12   timekeeping was not finalized at that point."

13        Do you see that?

14   A.  Yes, I do see that.

15   Q.  Did you ever look into that?

16   A.  That had to go through the LR investigative process

17   because that's where those decisions would be weighed,

18   analyzed.  Mr. Sanders would be able to provide witnesses in

19   his own support at that point in time.  So it is a separate

20   process from the HR investigation.

21   Q.  And I believe you said -- and we looked at a minute ago

22   on direct -- that your ultimate conclusion was that his

23   allegations were unsubstantiated; right?

24   A.  Yes, that is my conclusion.

25   Q.  And you said it was a long-standing personality dispute.
```

```
 1    A.  Had been for several years, yes, sir.

 2              MR. LUCAS KASTER:  If we could go to Exhibit 119,

 3    please.

 4    Q.  Mr. Freshour, we looked at this during your direct

 5    examination and this is you speaking with a number of

 6    third-party employees as part of your investigation; right?

 7    A.  That is correct.

 8    Q.  And I think you said that it's important to talk to

 9    third-party employees as part of the investigation.

10    A.  I did say that, yes.

11    Q.  Why is that important?

12    A.  You want to confirm or get another perspective, any

13    support that can come from other viewpoints, and then those

14    are factored into the overall decision when a conclusion is

15    made.

16    Q.  Would you agree with me that when a manager or any

17    employee is accused of retaliation, that they don't often

18    just admit that they're retaliating?

19    A.  I would agree with that, yes.

20    Q.  And so your job is to look at the circumstances, to talk

21    to witnesses and make a conclusion about whether retaliation

22    is occurring; right?

23    A.  Yes, sir.

24    Q.  So that's why third-party witnesses are so important,

25    because they can provide an objective view of things.
```

```
 1    A.  Their own perspective of things, correct.

 2    Q.  Sure.  Not the person who's making the complaint and not

 3    the accused.

 4    A.  Correct.

 5              MR. LUCAS KASTER:  So why don't we blow up the

 6    first section under the redacted name.  There's four bullet

 7    points.

 8    Q.  So these are all your conversations with these

 9    third-party witnesses; right?

10    A.  This is a summary of those conversations, correct.

11    Q.  And the person under the first bullet point says that

12    Mr. Jones has yelled at both Mr. Sanders and him, and he was

13    a frog welder; right?

14    A.  Correct.

15    Q.  And that Mr. Jones had yelled at them saying that they

16    were making him look bad when writing up defects; right?

17    A.  Correct.

18    Q.  That they advised that that's their job.

19    A.  Yes.

20    Q.  And that he did not use any profanity at that time, but

21    he recalls:  "Keith will use words like 'hell,' 'damn,' and

22    'shit,' and is not very professional"; right?

23    A.  Yes, that is correct.

24    Q.  And then the third bullet point says:  "This individual

25    was offended because he and Don Sanders were accused of
```

1    finding defects to bolster overtime and slow down train

2    traffic"; right?

3    A.  That's what he stated.

4    Q.  And that in August, Mr. Jones had accused them of

5    conspiring to make him look bad; right?

6    A.  That's what he said.

7    Q.  And that this individual was so disgusted that he bid

8    off the mobile gang to remove himself from the situation;

9    right?

10   A.  That's what he said.

11   Q.  And this individual said that Don was being sent home

12   after eight hours and that Ms. Hoppenrath was doing his

13   inspections.

14   A.  That's what he stated, yes.

15   Q.  And this individual says:  "That violates union rules,"

16   right?

17   A.  Correct.  Yeah, it does.

18   Q.  If somebody's violating union rules, can that be

19   retaliation?

20   A.  No, not necessarily.  Could be to expedite traffic.  It

21   could be for a variety of different reasons.  Could be

22   business reasons behind that.

23            MR. LUCAS KASTER:  Well, let's blow up the next

24   interview that has bullet points on it, bottom of the page.

25   Q.  This is a separate individual; right?

1    A.  Yes, sir, that is correct.

2    Q.  This person writes -- or you write as a summary of this

3    person's comments under the first bullet point, that:  "This

4    person has been a track inspector in the Bluff territory,

5    but gave it up to work as a flagger due to the pressure

6    placed on inspectors to approve track"; right?

7    A.  That's what he said.

8    Q.  By the way, do you understand that Mr. Sanders had filed

9    a complaint in December of 2015 specifically stating that

10   Mr. Jones and Ms. Hoppenrath were harassing him to not

11   report defects?

12   A.  I understand that's his position, correct.

13   Q.  Do you think that these statements from these

14   third-party employees support Mr. Sanders' complaint?

15   A.  Not necessarily.  I think that there was a broad tension

16   between management and inspectors and determining what the

17   conditions are, whether or not they measure out, and that

18   dynamic tension exists between the transportation department

19   and engineering, actually.  So this tension is what I -- I

20   was able to ascertain it.  It was not just Mr. Sanders.  It

21   also applied, as you point out, to other inspectors who felt

22   similar pressure and similar tension because of the way

23   engineering reviews and discusses defects.

24   Q.  Well, let's go on and read your summary of this person's

25   statement.  This person goes on:  "There has been pressure

1    to postpone grading defects or placing slow orders.  There

2    is pressure to underreport so that the transportation team

3    can run trains."

4          That's what this person said; right?

5    A.  That's what he said.  I put it in there, yes.

6    Q.  Next bullet point:  "There are always a lot of questions

7    when removing track from service, which I understand;

8    however, this comes with questions and pressure to be sure."

9          That's what this person said, right?

10   A.  That's what he said.

11   Q.  This person says:  "I took tracks out of service at

12   Northtown diesel shop and caught a lot of flak from the

13   foreman there, and then Stephen Chartier indicates that they

14   could go back in service and it took six weeks to fix the

15   defects."  Right?

16   A.  That's what he said.

17   Q.  Do you understand that the FRA rules and regulations

18   require a defect to be fixed before it's put back into

19   service?

20   A.  If it does not measure out, that's correct, so that's

21   why you have a supervisor reviewing each one of those

22   defects.  And I'm not sure why it took six weeks.  I don't

23   know whether they didn't have track and time or how they got

24   that, but that is what he said.

25   Q.  Do you know why it went back into service before the

```
 1    defect was fixed?

 2    A.  It probably was safe to run traffic or he would not have

 3    put it back into service.

 4    Q.  That's an assumption you're making; right?

 5    A.  Because he's responsible.  Ultimately, he is

 6    responsible, not the track inspector.

 7    Q.  Did you talk to Mr. Chartier about this incident?

 8    A.  I can't recall if this specific incident came up, but

 9    that is the process.

10    Q.  Next bullet point:  "Don and I inspected a lot of track

11    together and bounced ideas off each other about the EI.

12    There's a lot of room for interpretation regarding

13    instructions.  The gray area is not clearcut.  I think Don

14    was singled out because he is more verbal and outspoken

15    about his perception of the EI and the pressure placed on

16    inspectors."

17             That's what this person said; right?

18    A.  Correct.

19    Q.  This person is specifically saying that Mr. Sanders is

20    singled out; right?

21    A.  That's what he stated, correct.

22    Q.  Is being singled out retaliation?

23    A.  Not necessarily.  It's because he was more verbal.  I

24    think this goes to being contentious.  He was contentious.

25    This is not the only time he was contentious.
```

1    Q.  Next bullet point:  "Don was concerned about fairness

2    and not being able to drive the company vehicle was a

3    problem.  Other territories are able to drive company

4    vehicles home.  However, we are not."

5            Do you see that?

6    A.  Right, exactly.

7            MR. LUCAS KASTER:  Let's go to the next page.  If

8    we can blow up the top two bullet points, please.

9    Q.  Last bullet point:  "Overall, I think Don tries to hold

10   the company to a high standard and they don't like it."

11           Do you see that?

12   A.  He has different standards than what the supervisors

13   have, correct.

14   Q.  What do you mean "different standards"?

15   A.  It's exactly right.  He has a standard and they have a

16   different standard and their need to run traffic over

17   condition-based track when he thinks it has to be pristine.

18   He's fairly rigid in the way that he was interpreting the

19   EI.

20   Q.  That's what you get out of this statement?

21   A.  Correct, when I look at the totality of all of the

22   information.

23   Q.  Did this person say anything about the railroad being

24   pristine?

25   A.  No, but when I looked at all of the statements, that's

1   how I got to that conclusion.

2   Q.  And I'm asking you about this person's statement.

3   A.  You see what he said and that's what he told me.

4          MR. LUCAS KASTER:  If we can go to the next

5   statement, please, and blow up these bullet points.

6   Q.  Second bullet point:  "This individual works as a

7   foreman position."

8          Right?

9   A.  Yes, sir, that's what he said.

10  Q.  "He is not a qualified track inspector.  He gave up his

11  rights as an inspector because there was always 20 questions

12  when he placed a slow order and completed his job.  He is

13  currently a flagger."  Right?

14  A.  That's exactly what he said.

15  Q.  The second individual to tell you during your

16  investigation that they gave up being a track inspector

17  because of the pressure.

18  A.  Correct.  And as I explained, there's a dynamic tension

19  between placing slow orders, the interpretation, and how we

20  get things done.  Condition-based maintenance is a focus

21  point for management.

22  Q.  Fourth bullet point:  "Don applied a couple of slow

23  orders, 10 miles per hour, and Stephen," talking about

24  Mr. Chartier, "called," redacted, "and said, 'What are you

25  doing?'  There was a lot of yelling and swearing."

```
1              Is that appropriate?

2    A.  No, it's not appropriate.

3    Q.  Could that be retaliation for entering a slow order?

4    A.  That's definitely an area of concern.

5    Q.  Did you ever investigate that?

6    A.  When I looked at all of the information, that was

7    balanced in my response.

8    Q.  It goes on a couple lines down:  "Don had him on

9    speakerphone because Mr. Chartier," after hanging up with

10   this person, "then called Mr. Sanders," according to your

11   notes, right?

12   A.  That's what I understood, correct.

13   Q.  "Stephen began to yell at him using profanity.  He said,

14   'I don't give a shit about pictures.  I want measurements.'

15   His tone was very negative.  Probably the one thing that

16   bothered," blank, "the most was that Stephen told Donald,

17   'You are not going to pull the shit you did at Dayton's

18   Bluff!'"

19              Do you see that?

20   A.  I do see that, yes.

21   Q.  Could that be retaliation?

22   A.  Possibly.  It needs to be considered.

23   Q.  So why did you say it was unsubstantiated?

24   A.  Because there was not a bulk of evidence that went that

25   direction.
```

1    Q.  This isn't a bulk of evidence from multiple third-party

2    people?

3    A.  No.  There are several people that had that opinion.

4    There's several that had a more balanced approached.

5    Q.  The next bullet point down the person says that he --

6    you say:  "He made the point that this was the reason he

7    gave up his inspector rights a year ago.  There is always

8    pressure and pushback when the inspectors apply slow orders.

9    However, it is their job to do so."  Right?

10   A.  Correct.

11   Q.  In fact, the federal regulations require slow orders;

12   right?

13   A.  If they measure out, that is correct.

14   Q.  Do you have any knowledge as to whether these defects

15   that these third-party people are talking about measured out

16   and required a slow order?

17   A.  That would be an engineering question.

18   Q.  You never asked during your investigation?

19   A.  No, that is ultimately the engineers' responsibility,

20   engineering department.

21   Q.  You assumed that if management was questioning the

22   people, that management was right.

23   A.  My assumption was they are ultimately responsible, and

24   if they override a defect, their name is associated with

25   that track and responsible, so ultimately theirs is the

1    responsibility.

2              MR. LUCAS KASTER:  Let's go to the bottom of the

3    page, please.

4    Q.  By the way --

5              THE COURT:  Mr. Kaster, sorry to interrupt.  Just

6    checking in.  How much longer do you expect to have?

7              MR. LUCAS KASTER:  Ten minutes.

8              THE COURT:  All right.  Let's get through that.

9              MR. LUCAS KASTER:  Thank you.

10   BY MR. LUCAS KASTER:

11   Q.  So we have looked at now the top two bullet points on

12   the page, the next section, right?

13   A.  Correct.

14   Q.  And then Counsel looked with you on the small four

15   bullet point ones kind of three-quarters of the way down the

16   page; right?

17   A.  Okay, yes.

18   Q.  And that person said not harassment, but a difference in

19   expectations.

20   A.  Correct.

21   Q.  And when you say there were multiple people who

22   expressed that, did you see that in the other bullet points?

23   A.  Could you restate that question?

24   Q.  Sure.  You said a minute ago that there were multiple

25   people who had a different view than what we've been looking

1    at here.

2    A.  Correct.

3    Q.  I see that person.

4    A.  I see that person.  I put that together with Blaine's

5    explanation, Stephen's explanation, Mr. Jones' explanation.

6    So you have to look at all of the information.

7              MR. LUCAS KASTER:  Let's go down to the bottom of

8    the page and blow up this last person.

9    Q.  First bullet point:  "Yes, I think Don Sanders was asked

10   to do things that other inspectors were not required to do,

11   such as contact the DE or roadmaster before placing a remedy

12   like a slow order."

13             Do you see that?

14   A.  I do see that.

15   Q.  Could that be retaliation?

16   A.  No, because obviously there was such a conflict over his

17   reading and understanding of the EI that they wanted to

18   ensure that it actually was going to measure out and

19   actually would be a violation.  That is why they placed that

20   extra requirement upon him.  They had no confidence in his

21   ability to make that decision.

22   Q.  Do you know Mr. Jones has testified in this case that

23   Mr. Sanders was the go-to track inspector in Dayton's Bluff?

24   A.  I wasn't here.  I don't know.

25   Q.  Did you ever ask Mr. Jones about his view of

1    Mr. Sanders' ability to track inspect?

2    A.  That question did not come up.

3    Q.  Last bullet point:  "I have heard them ask Don to send

4    pictures of the defects and then argue with him about the

5    nature of the defect when clearly it was a defect and we

6    were certain it would measure out."

7              Do you see that?

8    A.  I do see that, yes.

9    Q.  So now this is another employee telling you:  There's a

10   defect and management argues with us and pressures us not to

11   put it in; right?

12   A.  They argued the point, correct.

13             MR. LUCAS KASTER:  Let's go to the final page.

14   Q.  Last bullet point:  "To me it seemed that management did

15   not trust Don's judgment.  They would question write-ups and

16   kind of accuse him of making up the numbers or fabricating

17   defects.  I heard them ask:  'There were not so many defects

18   before.  Why are you finding all of the defects now that you

19   are inspecting?'  That is the kind of accusations that were

20   made."

21             Do you see that?

22   A.  I do, yes, sir.

23   Q.  Is this the sum and substance of your interviews with

24   third-party people?

25   A.  Of the craft employees, correct.

 1    Q.  And your conclusion after hearing this from multiple

 2    people was unsubstantiated.

 3    A.  It was, because it looked like it was a lack of

 4    confidence in his judgment, it looked like all of the

 5    inspectors experienced that kind of pressure, so it was not

 6    unique to Mr. Sanders.

 7    Q.  Could it be that the retaliation and harassment isn't

 8    unique to Mr. Sanders, that they do it to everybody?  Is

 9    that possible?

10    A.  That's very possible, yes.

11    Q.  Did you consider that?

12    A.  I did.

13    Q.  And what was your conclusion there?

14    A.  That there was not retaliation.

15    Q.  You testified on direct examination that when you were

16    doing this investigation and when you looked at Mr. Sanders'

17    investigation transcripts, you were looking for a link

18    between the two and you said you couldn't find one; right?

19    A.  Correct.

20    Q.  How about the link that Mr. Jones was the subject of

21    Mr. Sanders' complaint and Mr. Jones is the one charging him

22    with discipline or alleging time theft?

23    A.  It goes over his letterhead.  There are many, many

24    review processes in the PEPA process, so it is not

25    arbitrary.  So any of that is administrative, and then it

1    goes through a process of appeals and has to be proven

2    separately.

3    Q.  So despite the fact that Mr. Jones was the subject of

4    his complaint --

5    A.  Correct.

6    Q.  -- and also the same person who's charging him with

7    discipline, you believe that is no link.

8    A.  I don't believe it's a strong link.  I think it needs to

9    be looked at and considered.

10   Q.  What do you mean "looked at and considered"?  Isn't that

11   your job?

12   A.  It's what I did.

13   Q.  Have you ever heard of another manager using an unmarked

14   vehicle to surveil an employee before payroll even closed?

15   A.  Not necessarily the payroll, but obviously we've used a

16   lot of surveillance with employees, correct.

17   Q.  In an unmarked vehicle.

18   A.  Correct.

19   Q.  Is that something BNSF does typically, surveil its

20   employees?

21   A.  Correct.  Yes, they do.

22   Q.  Do they tell them, "Hey, by the way, we're going to

23   surveil you tomorrow"?

24   A.  For example, if you're speeding through a town, you

25   don't put your patrol car right on the main street.  You're

1    usually tracking somewhere else.  So no, they are assessing

2    to see if employees are actually complying with rules and

3    they frequently will rent another vehicle that's unmarked

4    and observe.  That way you know whether or not the veracity

5    if either an ops test or ops failure.  And it could be in

6    this case if an individual was leaving the worksite before

7    he put in time and then he puts in time for time he's not

8    there, separate issue.  But that is frequently used,

9    correct.

10   Q.  Did I understand your testimony before that you took

11   issue with the fact that Mr. Sanders had recordings?

12   A.  Say that again?

13   Q.  Did I catch your testimony before that you took issue

14   with Mr. Sanders having recordings of conversations?

15   A.  I knew that he recorded conversations.

16   Q.  Did you take issue with that?

17   A.  Do I take issue with that?

18   Q.  Yes.

19   A.  No, it's a state law.

20   Q.  By the way, did you ever ask Mr. Jones, "Hey, have you

21   ever disciplined other people for similar violations like

22   this?"

23   A.  That question did not come up.

24   Q.  Do you know that Mr. Jones has three other employees who

25   he charged with some sort of time reporting issue, none of

1    whom were terminated?

2    A.  I don't know the circumstances of those cases.  So no, I

3    don't know.  Every one has to be weighed on its own basis.

4    Q.  And because you never asked, you don't know.

5    A.  That is correct.

6    Q.  Does that differing treatment raise any concerns for

7    you, that Mr. Jones has three other employees who are

8    charged with similar violations who aren't terminated, but

9    Mr. Sanders is?

10            Does that differing treatment raise any concerns

11   for you as a 20-year HR professional?

12   A.  Right.  You'd have to look at the circumstances in each

13   of the cases to determine whether they're similarly

14   situated.

15            MR. LUCAS KASTER:  If we can go to Exhibit 120,

16   please, and if we can blow up the middle email.

17   Q.  This is an email from PEPA, or Ms. Detlefson, to Terry

18   Morgan; right?

19   A.  It looks like it, correct.

20   Q.  Terry is one of your subordinates?

21   A.  Excuse me.

22   Q.  Terry's one of your subordinates.

23   A.  Yes, sir.  Yes, sir, that's correct.

24   Q.  And Ms. Detlefson raises the issue that during the

25   investigations, Mr. Sanders and his union rep complained

1    that the allegations against him were retaliation; right?

2    A.  She says that, yes.

3    Q.  For making complaints to HR.

4    A.  Correct.

5    Q.  So Ms. Detlefson was aware, at least as of this date,

6    that Mr. Sanders had filed complaints against Mr. Jones and

7    Ms. Hoppenrath to HR.

8    A.  Yeah.  This must have come up in -- she reviews the

9    transcripts, so my assumption is that she pulled that out of

10   the transcripts.

11           MR. LUCAS KASTER:  Then let's go up to the first

12   email, please.

13   Q.  Now, this is an email back to Ms. Detlefson from

14   Mr. Terry Morgan.

15   A.  Correct.

16   Q.  And this time you're cc'd on the email; right?

17   A.  It looks like it, yes, sir.

18   Q.  And in the email they tell Ms. Detlefson:

19           "Regional HR Director Dane Freshour and I are very

20   familiar with Mr. Sanders' allegations of harassment and

21   retaliation.  There is no evidence to substantiate his

22   allegations.  Please consider this case on the merits of the

23   facts and evidence brought forth during the formal" -- I'm

24   assuming -- "investigations."

25   A.  The formal process it appears, correct.

1    Q.  So you and your subordinate are telling Ms. Detlefson,

2    "Don't pay attention."

3    A.  No, they have their own review process.  This is what I

4    mean by the multiple layers of review.

5              So what this actually is, is Terry Morgan

6    indicating that we're aware of it, but she wanted to make

7    sure that there were eyes on this so that we were aware at

8    our level.  They're going to review at her level for

9    consistency and application.

10   Q.  I want to make sure I'm understanding what you're

11   saying.  When you're saying, "They're doing their review,"

12   they're reviewing the transcripts; right?

13   A.  Yes.

14   Q.  Labor relations or Ms. Detlefson doesn't do a separate

15   review of the HR complaint; right?

16   A.  Oh, okay.  I see what you mean.  No, they do not, no.

17   Q.  So when you're telling Ms. Detlefson there's no evidence

18   to substantiate his allegations, it's not like Ms. Detlefson

19   then says, "Well, I'm going to go out and do my own

20   investigation into his complaints."

21   A.  Yeah, her concern is on the HR side and Mr. Morgan knew

22   my conclusion and that's what he's reporting back.  So she

23   is deciding the merits of the case based on the evidence

24   before her on whether or not it's theft.

25   Q.  And you told her, basically, "Don't pay attention to the

 1    HR side.  There's no evidence to support it."
 2    A.  We said there's no evidence of harassment or retaliation
 3    is what we state.
 4    Q.  Mr. Freshour, I just have a couple more questions.
 5              MR. LUCAS KASTER:  If we can go to Exhibit 113,
 6    please.
 7    Q.  You looked at this on direct examination.  This is
 8    Mr. Jones' HR statement to you.
 9    A.  Correct.
10    Q.  And it's dated April 19th, 2016 at 3:07 p.m.; right?
11    A.  That's what it says.
12              MR. LUCAS KASTER:  And why don't we pull up
13    Exhibit 122.
14    Q.  If we go to the bottom of the page, this is an email
15    from Mr. Jones to PEPA about the discipline; right?
16    A.  That's what it appears to be, correct.
17    Q.  And this is dated April 19th at 9:22 a.m.  Do you see
18    that?
19    A.  I do see that.
20    Q.  So the exact same day that Mr. Jones is recommending to
21    PEPA that Mr. Sanders be terminated, he is also responding
22    to you as part of your HR investigation; right?
23    A.  That's what the dates say, correct.
24    Q.  And you believe that's not a link?
25    A.  It would have to be looked at.  I was unaware of this

```
1    email, correct.

2    Q.  You never made that connection.

3    A.  I did not make that connection, no.

4    Q.  By the way, we looked at that letter you sent to

5    Mr. Sanders in June closing out the investigation.

6    A.  Yes, that is correct.

7    Q.  You told your managers in April, we saw that email,

8    right, that his allegations were unsubstantiated?

9    A.  Yes, that is correct.

10   Q.  But you didn't tell Mr. Sanders that you made your

11   conclusion until two months later?

12   A.  That's not accurate.

13   Q.  It's not accurate?

14   A.  No, no.  The hotline process -- you saw the response to

15   caller.  That is where he gets his response to the hotline

16   and whether or not it's substantiated or not.  And it was

17   clearly stated when I sent that back in on the 22nd, the

18   callers are advised to call back in for the status of their

19   case, and that is the methodology they have to receive

20   information regarding the hotline conclusion.

21   Q.  So it's the caller's responsibility.

22   A.  To call back on their claim, correct.

23   Q.  So HR doesn't even have a responsibility to notify the

24   employee?

25   A.  Not in that scenario, correct.
```

```
 1              MR. LUCAS KASTER:  I have no further questions at

 2       this time, Mr. Freshour.  I appreciate it.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  All right.  We will adjourn for the

 5       day.  We will resume proceedings tomorrow morning at

 6       9:00 a.m.

 7              Members of the Jury, we will see you in the

 8       morning in time to get started at 9:00 a.m.  I'm going to

 9       stay and work with the lawyers for a little bit here to make

10       sure we're staying on track.

11              THE JUROR:  Question?

12              THE COURT:  We'll get to it, yes, first thing

13       tomorrow morning.  All right.

14              THE CLERK:  All rise for the Jury.

15              (Jury excused)

16              THE COURT:  Thank you.  Please be seated.

17              Mr. Freshour, you're free to step down.  Sorry.

18              THE WITNESS:  Thank you.

19              THE COURT:  All right.  Let me start with BNSF.

20              Tim, we can go off the record now.

21         (Discussion off the record among Court and counsel

22       concerning scheduling)

23         (Proceedings concluded for the day at 5:30 p.m.)

24                     *     *     *     *

25
```

**I  N  D  E  X**

**W I T N E S S E S:**                                          **PAGE**


**BLAINE HOPPENRATH, RESUMED**

    Continued Direct Examination by Ms. Donesky      825
    Cross-Examination by Mr. James Kaster            864
    Redirect Examination by Ms. Donesky              890


**STEVEN J. CHARTIER, JR.**

    Direct Examination by Ms. Donesky                901
    Cross-Examination by Mr. Lucas Kaster            935
    Redirect Examination by Ms. Donesky              950
    Recross-Examination by Mr. Lucas Kaster          953
    Further Redirect Examination by Ms. Donesky      954


**DOUGLAS J. JENSEN (BY DEPOSITION)**                     956


**DANE FRESHOUR**

    Direct Examination by Ms. Donesky                1019
    Cross-Examination by Mr. Lucas Kaster            1061



*  *  *  *  *

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.


*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224