UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )  CIVIL FILE
Donald Sanders,               )  NO. 17-CV-5106 (ECT/KMM)
                              )
             Plaintiff,       )
                              )       **VOLUME VII**
     vs.                      )
                              )
BNSF Railway Company,         )  Courtroom 3B
                              )  Tuesday, December 14, 2021
             Defendant.       )  St. Paul, Minnesota
                              )  8:05 A.M.
------------------------------------------------------------

                  <u>**JURY TRIAL PROCEEDINGS**</u>

            **BEFORE THE HONORABLE ERIC C. TOSTRUD**
                **UNITED STATES DISTRICT JUDGE**
                        **AND A JURY**

**A P P E A R A N C E S:**

**For the Plaintiff:**    **NICHOLS KASTER, PLLP**
                      By:  JAMES H. KASTER, ESQUIRE
                           LUCAS J. KASTER, ESQUIRE
                      4700 IDS Center - 80 South Eighth Street
                      Minneapolis, Minnesota  55402-2242


**For the Defendant:**    **ARTHUR CHAPMAN KETTERING SMETAK**
                            **& PIKALA, P.A.**
                      By:  SALLY J. FERGUSON, ESQUIRE
                      500 Young Quinlan Building
                      81 South Ninth Street
                      Minneapolis, Minnesota  55402-3214

                      **STINSON, LLP**
                      By:  TRACEY HOLMES DONESKY, ESQUIRE
                      50 South Sixth Street - Suite 2600
                      Minneapolis, Minnesota  55402


              **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
       Official Court Reporter - United States District Court
        Warren E. Burger Federal Building & U.S. Courthouse
             316 North Robert Street - Suite 146
                    St. Paul, Minnesota  55101
                         651.848.1224

1       (8:05 a.m.)

2                    **P R O C E E D I N G S**

3                       **IN OPEN COURT**

4       (Without the jury)

5            THE COURT:  Good morning, everyone.  Please be

6       seated.

7            Has everybody had a sufficient opportunity to go

8       through the jury instructions?

9            MR. JIM KASTER:  We have, Your Honor.

10           MS. DONESKY:  Yes.

11           THE COURT:  Okay.  Great.

12           Let's start with -- obviously I intend to --

13      Instructions 1 through 7 are instructions that I've given

14      before trial and during trial, so following closing

15      arguments I would intend to pick up with Instruction No. 8.

16      Let me just confirm that with respect to these first few

17      there are no objections.

18           So how about Instruction No. 8?  Any objections on

19      the plaintiff's side?

20           MR. JIM KASTER:  No, Your Honor.

21           THE COURT:  BNSF?

22           MS. DONESKY:  No.

23           THE COURT:  And 9?

24           MR. LUCAS KASTER:  Your Honor, if I could, I just

25      wanted to raise one issue.  I just saw this.

1          THE COURT:  Yeah.

2          MR. LUCAS KASTER:  In Instruction 7 you reference

3     Ms. Eggertsen's depo being read, but I think Mr. Jensen's

4     depo was also read.

5          THE COURT:  So I'm getting to that.

6          MR. LUCAS KASTER:  Okay.

7          THE COURT:  That instruction I read during trial,

8     and one of the things I'm going to do is give the jury

9     everything that I read already.  I have a separate

10    instruction that comes later that is redundant of that, I

11    understand that, but I don't know as I have much of a choice

12    if I'm going to follow my usual practice, and I'm not sure

13    quite how to handle that otherwise.  I mean, I suppose in

14    theory we could take Instruction 7 just out completely, but

15    if I'm telling the jury I'm giving them everything that I've

16    given them so far, I suspect I ought to leave that in.

17          All right.  But let's revisit that issue when we

18    get to the -- what I'm labeling the redundant instruction.

19          All right.  So how about 9?  Plaintiff?

20          MR. JAMES KASTER:  No objection, Your Honor.

21          THE COURT:  BNSF?

22          MS. DONESKY:  No, not to 9.

23          THE COURT:  Ten.  Plaintiff?

24          MR. JAMES KASTER:  No objection, Your Honor.

25          THE COURT:  BNSF?

```
 1              MS. DONESKY:  Ten is fine.

 2              THE COURT:  How about 11?

 3              MR. JAMES KASTER:  No objection, Your Honor.

 4              THE COURT:  BNSF?

 5              MS. DONESKY:  That's fine.

 6              THE COURT:  And then 12.  That's the more generic

 7   deposition at trial which would account for Mr. Jensen.  And

 8   I don't know that anybody's intending to appear by

 9   deposition today, but it would account for that in the event

10   that that happens.

11              MR. JAMES KASTER:  We have no objection, Your

12   Honor.

13              THE COURT:  BNSF?

14              MS. DONESKY:  That's fine.  Yeah, other than it

15   being slightly redundant, I don't think there's harm in

16   putting another one in.

17              THE COURT:  All right.  13.  Let's start with

18   Plaintiff.

19              MR. JAMES KASTER:  Your Honor, our objection to 13

20   is as to the last sentence on page 19.  I believe that is

21   argument.

22              THE COURT:  The last sentence on page 19?

23              MR. JAMES KASTER:  That's correct.

24              THE COURT:  Okay.

25              MR. JAMES KASTER:  It begins:  "You may not,
```

1    however, find that BNSF firing Mr. Sanders was due in whole

2    or in part to every single one of the track defects he

3    reported," and the sentence goes on.  I don't need to read

4    the rest of it, but I believe that is argument and they will

5    make that argument and are free to make that argument.

6             THE COURT:  The reason it's there -- so not

7    objecting that it's argumentative, objecting that it's

8    argument and unnecessary.

9             MR. JAMES KASTER:  Correct.

10            THE COURT:  Okay.  The reason it's there is

11   because as to that piece of the case, I entered summary

12   judgment.  You argued at summary judgment that every one of

13   the track defects Mr. Sanders ever entered, that a jury

14   should get to decide whether BNSF retaliated against

15   Mr. Sanders for a career-long, a BNSF career-long practice

16   of entering these slow orders, reporting track defects,

17   et cetera, and I very clearly in one paragraph said that's

18   out of the case.

19            And I think it's important for me to make sure the

20   jury understands that that theory of the case is out.  I

21   don't intend to tell them I entered summary judgment against

22   it, I don't intend to tell them anything more, but I think I

23   need to include it for that reason.

24            MR. JAMES KASTER:  I understand what the Court is

25   saying and your explanation is -- it seems fair to me.  It

1    does feel to me like argument -- argument that counsel may

2    make.  And the thing that -- I think the Court could handle

3    that same issue by not allowing us to make an argument to

4    the jury that would be inconsistent with the summary

5    judgment ruling, which I think would also be fair.  This

6    sentence strikes me as surplusage.

7            THE COURT:  So I thought about that and I have to

8    sort of call to mind why I thought that was not as wise an

9    alternative.  I think the reason I thought that wasn't as

10   wise an alternative is because as the evidence has come in

11   and I have listened to it, it seems to me that the evidence

12   has been presented in such a way, regardless of what you

13   argue at closing, that unless the jury's instructed

14   otherwise, they would sense that that is an acceptable basis

15   upon which to find BNSF liable.

16           MR. JAMES KASTER:  I have nothing further to add

17   on that, Your Honor.

18           THE COURT:  Okay.  So I understand the objection

19   and I'll candidly admit that, you know, I'm not sure this is

20   the -- I am not absolutely certain that this is the best way

21   of handling it.  I have given the matter some thought and

22   I've come to the judgment that it is, but as I say, I'll --

23   so I'm going to leave that sentence in there.  It is the

24   reason, by the way, that I cite the summary judgment order

25   at the end of the thing for authority.

1          Apart from that, does Plaintiff have objections to

2     this instruction?

3               MR. JAMES KASTER:  No, Your Honor.

4               THE COURT:  Okay.  How about BNSF?

5               MS. DONESKY:  Thank you, Your Honor.

6          Our objection begins with -- and it flows through

7     the instructions, so I'll sort of compartmentalize it in one

8     objection, but it flows to other instructions as well -- is,

9     the first element as to good-faith protected activity, we do

10    not believe that it conforms with the statute, 20109, in the

11    sense that it appears to be broadening the types of

12    protected activity that would qualify as legally protected

13    activity under the statute.

14         I don't believe that the mere entering of a slow

15    order, removing a track from service, refusing to violate

16    any safety-related law, I don't believe that's the law of

17    the statute.  I believe the standard is higher than that.

18         And I would add that refusing to violate a

19    safety-related law -- I'm just trying to pull it up on my

20    computer.  I don't think they pled the refusal claim in the

21    beginning, so I don't know that that's even been exhausted.

22    But our primary objection is that the mere reporting of a

23    track defect, entering a slow order, or removing track from

24    service could -- it's far broader than the statute's

25    requirements, including reporting concerns to BNSF human

1    resources about the same.

2           And I'll give an example of that to Your Honor and

3    testimony regarding that came in yesterday.  The reporting

4    of a track defect or even a slow order could arise from

5    engineering instructions that BNSF has.  That's company

6    policy that goes over and above federal law, rule,

7    regulation.  It has to be tied to legally protected

8    activity.  It doesn't have wording under a (b)(1)(A) for

9    hazardous safety condition.  There's no requirement under

10   (b)(1)(A) in this proposed instruction that encompasses

11   that.  But if it's under an (a)(1)-type claim, the statute

12   speaks of federal -- a violation of federal law, rule, or

13   regulation, and so I think that broadens it far beyond the

14   statute.

15           THE COURT:  Where does (b)(1)(A) say it has to

16   violate the law?

17           MS. DONESKY:  I'm trying to pull it up.  Does it

18   refer to a federal rule, regulation?

19           THE COURT:  No.

20           MS. DONESKY:  No?

21           THE COURT:  "A railroad carrier," et cetera, et

22   cetera, "shall not ... discriminate for (A) reporting, in

23   good faith, a hazardous safety or security condition."

24           MS. DONESKY:  Oh, yeah.  That's (b)(1)(A),

25   correct.  No, that's true, that's right.  I'm thinking of

1    the (a) under the (A) sections.

2              And that was the second point I was making, is,

3    there isn't language of a hazardous safety condition in this

4    instruction such that it's assuming that the mere entering

5    of a slow order, reporting a defect, or removing track from

6    service.  It's concluding under this instruction that it is

7    a hazardous safety condition and we believe the jury has to

8    make that determination rather than listing them out in this

9    regard.  So that would be my objection to the (b)(1)(A).

10             THE COURT:  Well, here's the thing.  The pattern

11   instruction says that I should include in that piece of the

12   element, within that element, the specific protected

13   activity in which Plaintiff's alleged to have engaged by

14   reference to facts; in other words, not generically.  And on

15   the one hand, I guess I thought that that seemed important

16   from the perspective that there have been activities that

17   have been referred to here that -- let me take that back.

18             Well, put it this way:  How would BNSF revise that

19   to then fix that problem --

20             MS. DONESKY:  Well --

21             THE COURT:  -- and still incorporate facts?

22             MS. DONESKY:  Right.  And no, it's a challenge

23   because in part there has been no identification of -- I

24   mean, read this way, it could be read to the jury that the

25   day before he was removed from service on the hearings, if

1    he reported a track defect or entered a slow order, which he

2    probably did because that was his job, there's no time frame

3    on what the protected activity is here.  Normally you have a

4    defined and identified legally protected activity, and here,

5    the mere fact of him reporting any of these things every

6    single day up until he was removed from service.  And so I

7    think it's very confusing and risks prejudice to the jury

8    because.  I mean, I understand the challenge in part because

9    the way, obviously, that this part of the case has been --

10    there aren't defined identified activities aside from him

11    doing his job.  There aren't dates at which he reported a

12    particular slow order that has been argued that it was the

13    protected activity.

14         MR. JAMES KASTER:  Your Honor, can I be heard on

15    this?

16         THE COURT:  Yes.

17         MR. JAMES KASTER:  As the Court notes, the guide

18    suggests incorporating facts in here, not just giving the

19    jury statutory language.  The Court has already instructed

20    the jury that the panoply of protected activity, or arguable

21    from the plaintiff's perspective protected activity, is not

22    at issue.  Then that informs this specific instruction and

23    the jury needs to appreciate what it is we're talking about.

24         Obviously, as it relates to the hazardous safety

25    or condition, subdivision (a) says reporting in good faith a

1    hazardous safety or security condition, and specifically,

2    that's -- the evidence is crystal clear.  Every witness who

3    was asked said that these requirements are provided for by

4    the FRA and that when there is a defect and when a slow

5    order has to be entered or a track has to be removed from

6    service, that Mr. Sanders is acting pursuant to law by doing

7    that.  That is protected activity.  That's the specific

8    protected activity at issue, and I think this -- and going

9    to human resources is also protected activity as long as

10   Mr. Sanders has done that in light of the Court's

11   restriction about that, about pressure he received not to

12   enter slow orders or report defects.

13           That's exactly consistent with the evidence and

14   provides the jury a factual context under which they can

15   decide what is protected activity here.  Instead of just

16   reading the statutory language, this informs the jury about

17   how they make that decision.  I think that's appropriate

18   given the context of the court limiting earlier the

19   instruction that's not every single time, as Counsel has

20   said.

21           THE COURT:  Let me just make one point and then,

22   Ms. Donesky, I'll come back to you.

23           MS. DONESKY:  Certainly.

24           THE COURT:  The point is that with respect to the

25   concern everything Mr. Sanders did is protected activity and

1    that forming a basis for his claim here, I think I cover

2    that in the last sentence on page 19, the last sentence of

3    the fourth element.

4            I am inclined to stick with what's there in the

5    description of the first element.  If you have some path or

6    suggested revision to it, that would be faithful to the

7    factual basis for Mr. Sanders' claim and the law.  I'd

8    certainly consider it.  But without more -- I really had a

9    hard time figuring out how else to draft that first element

10   and I spent a fair amount of time with the statute here and

11   with our summary judgment order going back and reminding

12   myself of what we concluded was at issue in this trial.

13           MS. DONESKY:  One remark to Counsel's remarks that

14   any track defect, or slow order, or removing track from

15   service is automatically a hazardous safety condition, I

16   think the facts of the record would dispute that and I think

17   the statutory language requires the jury to determine

18   whether the activity he engaged in constitutes a hazardous

19   safety condition.

20           FRA provides minimum standards, but just because

21   there's minimum standards out there does not mean it's a

22   hazardous dues safety condition necessarily.  I think that's

23   a jury question as to whether what he reported were in fact

24   hazardous safety conditions.  And so that was the wording we

25   had proposed and -- I mean, certainly at minimum, to the

1   extent the refusal to violate any safety-related law -- and

2   I'm trying to pull up the complaint, because I want to make

3   sure they've exhausted this claim, if it's an (a)(2) claim,

4   I believe at the minimum it would have to say "to refuse to

5   violate any federal law, rule, or regulation relating to

6   railroad safety or security," because I don't believe any

7   safety law is 20109.  I think it only applies to, as the

8   statute says, any federal law, rule, or regulation.  So that

9   was the reference I was trying to refer to earlier.

10              THE COURT:  (a)(2) says that.

11              MS. DONESKY:  Correct.  It's the -- right.

12              MR. JAMES KASTER:  Your Honor, as it relates to

13   the definition of a hazardous safety or security condition.

14   Nothing needs to be proven more than the fact that the FRA,

15   the Federal Railway Administration, has a regulation that

16   governs this.  Those regulations are designed to identify

17   and define what is a hazardous safety condition on the

18   railroad.  If you have a violation of the FRA, by virtue of

19   that fact alone, you have a hazardous safety condition as

20   defined by law, or rule, or regulation pursuant to law.

21       (Pause)

22              THE COURT:  The model instruction gives as an

23   example of inserting protected activity.  Example, quote,

24   "notify defendant of Plaintiff's work-related personal

25   injury."

1           MS. DONESKY:  That's an (A)(4) claim.  That was

2     part of the amendment to the statute back in -- it's a

3     specific -- yeah, (A)(4) provides for that.

4           THE COURT:  Got it.

5           MS. DONESKY:  Yup.

6           THE COURT:  So one thing I noticed that that does

7     is it does quote the statute.

8           MS. DONESKY:  Correct, which is why our proposed

9     instruction simply says for reporting a hazardous safety

10    condition under (b)(1)(A), because that's for the jury to

11    determine if that person has in fact reported a hazardous

12    safety condition or -- I think -- it matches the wording of

13    the statute.  And I interpreted the pattern instruction to

14    be getting at that, which provision, which portion of 20109

15    has been pled.  And so it's either -- to your point, Your

16    Honor, did they report a work-related injury that's an

17    (A)(4) claim.  If it's reporting a hazardous safety

18    condition, that's a (b)(1)(A) claim.  And I believe that's

19    all of it that that pattern is getting at, as opposed to the

20    more specific factual details here.

21          THE COURT:  Okay.  Then let's say that I'm going

22    to contemplate that edit.

23          MR. JAMES KASTER:  Your Honor --

24          THE COURT:  Just one second.  Let me ask a

25    question and get an answer to that and then give you an

 1          opportunity, Mr. Kaster.

 2                  What subdivisions are at issue here?  As I

 3          understand it, it's (a)(1), (a)(2), and (b)(1)(A).

 4                  MR. JAMES KASTER:  That's exactly what I was just

 5          going to say, Your Honor.  Those are all pleaded claims in

 6          the complaint.  They were also pleaded in the OSHA

 7          complaint.

 8                  MS. DONESKY:  Mr. Kaster, can I just ask, is your

 9          (a)(1) where you're deriving the complaints to human

10          resources?  It's never been clearly defined under what

11          provision are the concerns brought to human resources fall

12          under the statute.

13                  THE COURT:  We addressed that in the summary

14          judgment order.

15                  MS. DONESKY:  Okay.

16                  THE COURT:  Which is why I suggested everybody

17          take -- one reason among many that I suggest everybody take

18          a careful look at -- sorry, Tim -- take a look at that

19          before today, but let me get it out here.

20                  All right.  So let me just be sure that I

21          understand this, and then, Mr. Kaster, I want to give you an

22          opportunity to raise a concern about what I think I may do

23          here.

24                  We've got (a)(1), (a)(2), and (b)(1)(A).  Anything

25          further?

1    MR. JAMES KASTER:  (a)(1), (a)(2), and (b)(1)(A).

2    Those are the counts in the complaint.

3    THE COURT:  Perfect.  All right.

4    Sorry, Mr. Kaster.  Go ahead.

5    MR. JAMES KASTER:  Well, Your Honor, you know, I

6    haven't scrutinized what protects the complaint to human

7    resources.  I'm just looking at the language of (a)(1) and

8    it clearly falls within the ambit of that.

9    As the Court said -- and I don't have that

10   language right in front of me and don't recall what the

11   Court said on summary judgment, but clearly this has been an

12   issue and we've litigated the question of whether or not

13   that -- certainly the jury has heard about his complaints to

14   human resources about being retaliated against for entering

15   track defects, slow orders or removing tracks from service.

16   And clearly it falls within the "provid[ing]

17   information [or] directly caus[ing] information to be

18   provided ... in any investigation regarding any conduct

19   which the employee reasonably believes constitutes a

20   violation of any Federal law, rule, or regulation."

21   We just heard from Dane Freshour yesterday about

22   the fact that the plaintiff complained and he investigated

23   whether or not there were pressures being put -- undue

24   pressures being put on Mr. Sanders because of the fact that

25   he was reporting slow orders.  That was the essence of the

1    complaint to human resources both in December and April.  So

2    this language is exactly consistent with the factual record

3    that's been developed, and, you know, I'm going to --

4    especially in light of the Court's language in the last

5    sentence, I object to any revision of the language.

6              THE COURT:  So two things.  One, as to the first

7    concern that you're expressing, I'm all but certain that we

8    addressed in the summary judgment order an argument that the

9    report to human resources was not protected activity within

10   the plain meaning of the statute and we rejected that

11   argument, so that is in play here and I've always understood

12   it to be in play here.  I for some reason brought everything

13   else and I didn't bring the darn orders, so let me -- it's

14   okay.  I will go back and confirm that.  If I am wrong about

15   that -- I want to say that we concluded it fell within --

16   well, I'm not going to guess.  I'll look at that and figure

17   it out.

18             All right.  So with the proviso that I am

19   contemplating revising the first element of Instruction No.

20   13 to fall more in line with what I upon more careful

21   reflection understand what the model instruction is telling

22   me to do, and in light of BNSF's concerns, I understand,

23   Mr. Kaster, then your objection to that last sentence

24   becomes heightened.  I still think that that last sentence

25   is important, but I'll continue to consider that concern in

 1    light of the amendment to the first element.

 2              Any other objections to -- beyond that issue, any

 3    other objections to Instruction No. 13 from BNSF?

 4              MS. DONESKY:  I'm just reading the fourth element.

 5              THE COURT:  It would need to be revised as well,

 6    obviously.

 7              MS. DONESKY:  Yes, in the middle part.

 8              THE COURT:  If I revise the first element.

 9              MS. DONESKY:  Mm-hm.  We would request

10    "intentional" be included again at the end, "but is a

11    pretext to hide [intentional] retaliation."

12              THE COURT:  It's in there enough.  It's in there

13    once.  I'm not going to add it again.

14              MS. DONESKY:  I don't see other objections at this

15    time as I'm reading it.

16              THE COURT:  Okay.  How about 14?  Plaintiff?

17              MR. JAMES KASTER:  Your Honor, I confess I didn't

18    see that *Monohon* decision.  This does doesn't track the

19    language of the statute exactly, but I don't have that

20    *Monohon* decision.  I'm not sure where the language comes

21    from.

22              The only objection I have that I would note at

23    this point is saying that "without any intent of fraud"

24    implies to me pristine motives and I think he needs to act

25    in good faith.  So I'd just strike the word "any," "without

1   intent to defraud."  Other than that, like I said, I haven't

2   seen that decision, so I can't comment on the Court's

3   citation to the **Monohon** case.

4           THE COURT:  I don't think "any" is -- "honestly

5   and frankly, without any intent to defraud" is I think a

6   direct quote from that case, in turn quoting Black's Law

7   Dictionary, so for that reason I'm not inclined to take

8   "any" out.  I understand the concern.  It adds -- the strict

9   grammarian would say that it doesn't add anything.

10          MR. JAMES KASTER:  I understand, Your Honor.

11          THE COURT:  How about from BNSF?

12          MS. DONESKY:  Aside from the same concern on the

13  type of protected activity listed there, we would just

14  reserve our objections which I think we've put on the record

15  regarding just the standard of good faith, as it seems to be

16  in flux on that issue.  And **Monohon** isn't finished just yet,

17  but I think we've put our points out there in our proposed

18  instruction and otherwise as to the subjective and objective

19  elements of that and so forth in our other briefing, either

20  -- in our proposed instruction, so I would just preserve our

21  objections on that point.

22          THE COURT:  Is there some objection to how **Monohon**

23  has defined good faith?

24          MS. DONESKY:  No, I believe that is -- I don't

25  have the decision in front of me, but I believe you've used

 1     the same language from that decision.

 2               THE COURT:  But I mean, is there -- when you say

 3     *Monohon* isn't finished yet, is good faith or the panel's

 4     definition of good faith an issue that is continuing to be

 5     contested?

 6               MS. DONESKY:  Yes, it is continuing to be

 7     contested and I just want to preserve that objection.

 8               THE COURT:  Okay.

 9               MS. DONESKY:  Given that the good faith standard,

10     it's a decision that has just been issued, I don't know if

11     it will go *en banc* or to the Supreme Court, but there's a

12     circuit split on the issue, and what good faith is is still

13     at issue, but I understand the Court is adopting or using

14     the current decision, the most recent articulation of the

15     Eighth Circuit law, on that point.

16               THE COURT:  Okay.  Just curious maybe as much as

17     anything then.  Is it BNSF's position in *Monohon* that the

18     good faith standard should be more lenient?  In other

19     words --

20               MS. DONESKY:  No, I think it would be that -- as I

21     recall, *Monohon* talks about the -- not requiring the

22     subjective element -- or objective and subjective, only

23     subjective is found, and I believe that BNSF would argue --

24     and there is case law supporting it -- that it requires both

25     an objective reasonable concern and subjective.  So to that

 1     issue, we're just preserving our objections on that.

 2              THE COURT:  Understood.  How about 15?  Plaintiff?

 3              MR. JAMES KASTER:  We put -- part of our brief

 4     addressed this issue and I think my concern is the

 5     "unreasonable or unfair" given the fact that essentially

 6     what we're arguing in part is that the pretext is derived

 7     from unfair treatment in part based upon how he was treated

 8     with respect to others that we say are similarly situated.

 9     So to that extent, the instruction, the business judgment

10     instruction, is misleading here, I think, and I'm concerned

11     about that.

12              THE COURT:  How about from BNSF's side?

13              MS. DONESKY:  I was just pulling up our proposed

14     instruction.  I believe that follows the instruction we had

15     proposed for this rule.  I was just --

16              THE COURT:  It's a bit different.

17              MS. DONESKY:  A little different.  Okay.  I'm just

18     going to pull them up here.

19              THE COURT:  I've seen different versions of the

20     instruction.  Some are quite detailed.  On the other end of

21     the spectrum you have some that just observe:  "You should

22     not concern yourself whether BNSF's decision was ...."  This

23     is intended to focus the jury's attention on the idea that

24     it's not enough for Mr. Sanders merely to establish.

25              MR. JAMES KASTER:  And, Your Honor, I would

1   suggest that the language that -- and, you know, obviously

2   I've been in these debates for quite a while about the

3   business judgment rule and what iteration of it and whether

4   an instruction is necessary at all.

5          The only thing that I would say about the

6   instruction is, I feel like the word "unwise" is really what

7   the business judgment rule is designed to address.  The

8   wisdom of a business decision is not the issue.  When you

9   say "unreasonable or unfair," that encompasses how

10  Mr. Sanders was treated with respect to others and that's

11  where I'm concerned that it might give rise to confusion

12  about how the court -- or the jury, rather -- evaluates this

13  evidence, because it's obviously a pivotal point for

14  Mr. Sanders that he was treated differently than others.

15         THE COURT:  I get it.  Does BNSF have anything it

16  wants to get on the record with respect to that instruction?

17         MS. DONESKY:  I'm just pulling up our proposed

18  instruction.

19         To respond to the three-wording, I think that's

20  consistent with the case law.  Just trying to find it here.

21         THE COURT:  The ***Blackorby*** case approved of the

22  quite shortened version of the instruction.  I think given

23  that, this instruction goes a little further and would be --

24  I don't know if more compliant -- more likely to be

25  accepted, or at least as likely to be accepted I guess I

1    should say.

2              MR. JAMES KASTER:  Your Honor, I'm familiar with

3    cases that suggest that a defendant at least in a Title VII

4    context is entitled to a business judgment rule.  The issue

5    is how does that -- and I don't know whether that transfers

6    automatically to a 20109 case.

7              THE COURT:  *Blackorby* is that.

8              MR. JAMES KASTER:  Yeah.  Okay.  Fair enough.

9    That's fair enough.  The issue to me is language.

10             THE COURT:  Right.  So *Blackorby* approved of a

11   business judgment rule instruction, uncertain of the

12   verbiage of the instruction because it's not in the panel

13   opinion.  We went and actually pulled it from the docket in

14   the Eastern District of Missouri.  It's the one sentence,

15   sort of generic:  "You should not concern yourself with

16   whether BNSF's decisions were" --

17             MS. DONESKY:  Wise.

18             THE COURT:  -- "wise," et cetera --

19             MS. DONESKY:  Or fair.

20             THE COURT:  -- and I thought let's put it in terms

21   of Mr. Sanders' burden and make it clear that it's not

22   enough for Mr. Sanders merely to show, et cetera, et cetera,

23   which is the same as the temporal proximity approach or the

24   approach to that instruction, but I'm still sort of waiting

25   here to make sure that BNSF doesn't -- or if it has an

1   objection it has a chance to articulate it to Instruction

2   15.

3           MS. DONESKY:  Aside from -- you know, we had

4   proposed language of a sentence:  "It is not unlawful for a

5   company to make employment decisions based on erroneous

6   information and evaluations" in addition to what's there.

7           THE COURT:  Yeah.  I'm not inclined to include

8   that.

9           MS. DONESKY:  Okay.  And likewise, I presume the

10   Court is not -- or it considered but did not incorporate

11   the -- rather, your concern is only whether there was

12   intentional retaliation against him for his claim to

13   protected activity.

14           THE COURT:  Correct.  I think with the inclusion

15   of that intentionality requirement and the basic FRSA

16   elements instruction were covered there.

17           MS. DONESKY:  Then just subject to preserving

18   those objections, we don't have anything further.

19           THE COURT:  All right.  How about 16?  Plaintiff?

20           MR. JAMES KASTER:  Your Honor, I don't think the

21   instruction is necessary at all.  Obviously -- we've put

22   this in our brief, but temporal proximity is a causation

23   feature by itself under certain circumstances.  If it

24   doesn't apply, then it doesn't apply.  It doesn't create an

25   outside barrier for causation to be proven.

1          THE COURT:  How about BNSF?

2          MS. DONESKY:  Well, our suggestion was slightly

3     more worded, but I think gets at the point -- again, subject

4     to how our proposed instruction is preserving that, we don't

5     have further objections to the proposed instruction the

6     Court is offering.

7          THE COURT:  All right.  Mr. Kaster, I'll just say

8     two things or maybe three in response to your concern.

9          I don't believe that I would err by not including

10    a temporal proximity instruction.  I agree with you on that.

11    Its inclusion is intended to address two issues.

12          The first is that as we go about in our ordinary

13    daily lives and we see things happen immediately or tomorrow

14    in reaction to what we think happened today, we presume

15    causation, we presume that relationship, and the law is

16    different here.

17          Second, I do think the Eighth Circuit's made it

18    relatively clear -- and it said this in a number of

19    differently employment contexts, the FRSA included -- that

20    it has concerns about district courts -- and then I presume

21    juries -- being tempted to draw that temporal line, or being

22    tempted to find causation merely based upon a temporal

23    relationship, and so I'm trying to address that issue as

24    well.

25          MR. JAMES KASTER:  I understand that, Your Honor.

1    I think that the "after that, therefore because of that," is

2    a logical common sense conclusion that people draw and I

3    think it's a fair conclusion to draw.  There may be

4    circumstances where it's not a fair conclusion.

5              But yesterday I fell going to my car in the

6    parking lot.  Today my knee is sore.  I think that

7    connection is logical, and when I wake up at 3 in the

8    morning and my knee is pounding, I think that's probably

9    because I feel today.

10             THE COURT:  Well, careful now.  You're making my

11   point, right?

12             (Laughter)

13             MR. JAMES KASTER:  Well, I --

14             THE COURT:  I get it.  You're preserving your

15   objection, but you're making my point.

16             MS. DONESKY:  But for the fact I was born I

17   wouldn't be sitting here.

18             THE COURT:  Yeah.  No, I get it.  If there's

19   anything else you want to get on the record to preserve that

20   objection, I understand.

21             MR. JAMES KASTER:  No.

22             THE COURT:  And as I say, maybe the next time

23   around I'll decide that that instruction's not necessary.

24   It seems like a relatively close call, but this time around

25   I'm going to include it for the reasons I've described.

1       Seventeen.  Plaintiff.

2       MR. JAMES KASTER:  Yeah.  Your Honor, this feels

3   like a "What's good for the goose is good for the gander" on

4   similarly situated, so that the instruction should be more

5   clear.  And I didn't get a chance to rewrite it, but to the

6   extent that they offer evidence -- and they intend to

7   today, as I understand it -- about others being treated the

8   same as Mr. Sanders when they are reporting to different

9   supervisors in different parts of the country and have

10  different circumstances, I think the instruction needs to be

11  clear that for the jury to consider similarly situated and

12  different treatment, it needs to be applicable to both

13  sides.

14      I also -- and I don't have the language of

15  *Gunderson* right in front of me.  In our brief I cited to a

16  quote from the *Ebersole* decision which includes this

17  language:  "The comparators need not have committed the

18  exact same offense but must have engaged in conduct 'of

19  comparable seriousness.'"

20      So, I understand the Court's -- and I don't

21  have -- like I said, I don't have *Gunderson* right in front

22  of me.

23      THE COURT:  Okay.  So I'm fine with that provided

24  the law says that if BNSF is going to rely on comparator

25  evidence, it's its burden to show that those comparators are

1    similarly situated.

2          MR. JAMES KASTER:  And both sides to the extent

3    that they rely on comparator evidence should have to meet

4    the same threshold.  That's our view.  And I think I

5    commented in the brief that if the Court is going to give an

6    instruction, that we would ask that it square up with the

7    *Ebersole* decision.  This *Gunderson* language may or may not,

8    I just don't recall, but it should be, as the Court

9    indicates, applicable to both sides.

10         THE COURT:  Okay.  How about BNSF?

11         MS. DONESKY:  We object to that.  The case law

12   does not impart the same similarly situated analysis or

13   requirement on the defendant.  It is more of consistency of

14   policy and procedures that the case law speaks of in the

15   discipline of other employees.  So we would very much object

16   to revision of the instruction to that -- for that point.

17   We believe the instruction as worded is proper as to the

18   plaintiff, but we do not believe it applies to the defense

19   in the manner in which Plaintiff's counsel has indicated for

20   the affirmative defense.

21         MR. JAMES KASTER:  Your Honor, I'd like to respond

22   to that.

23         They have the burden once we meet our initial

24   burden to show that they would have made the same decision

25   anyway, and that burden is by clear and convincing evidence.

1    Nothing more needs to be said about their reliance on

2    similarly situated people who are from different parts of

3    the country.  That burden clearly informs that this

4    instruction, if given, must be applicable to them as well.

5         MS. DONESKY:  We maintain our objection on that.

6         THE COURT:  Understood.  All right.  So I'm

7    inclined -- here's what I'm inclined to do on this one.

8         I'm inclined to do what I'll admit I was somewhat

9    surprised a number of the Eighth Circuit model instructions

10   do, which is instruct in the passive voice, so put the

11   instruction passive voice and in that way make it applicable

12   to any party that seeks to introduce comparator evidence.

13   And I will put together something along those lines and get

14   it out to everyone so that you've got an opportunity to

15   review it and get objections on the record.

16        All right.

17        MS. DONESKY:  Can I just include one additional

18   objection, that there's affirmative defenses case law met

19   without any other employee evidence whatsoever, and I would

20   think that this instruction almost leads that requirement to

21   require that.  And as I said before, I think it's a

22   consistency of policy rather than the similarly situated

23   requirement that's reflected in this instruction for

24   preserving the record.

25        MR. JAMES KASTER:  That might be true in a

1    hypothetical sense.  They're offering evidence today about

2    other people from different places around the country and

3    different circumstances.

4            THE COURT:  Understood.

5            All right.  How about Number 18?  Plaintiff.

6            MR. JAMES KASTER:  The only -- the Court added

7    this language which I think is actually helpful, the

8    "independent obligation" language, and that wasn't in our

9    proposed instruction.

10           The thing that I was concerned about with respect

11   to the OSHA, my language was intended -- the language in our

12   limiting instruction was intended to be short so that it

13   didn't, you know, consume too much space, but I included

14   language from the case the Court cited us to:

15           "They are merely steps in the procedure and not

16   findings by a preponderance of the evidence on the issues

17   before you."

18           I included that even though it's the OSHA

19   determination that's merely a step in the procedure and the

20   union grievance procedure, that is not a decision on the

21   issue before you.

22           So the language might be too all-inclusive, but I

23   do think it's helpful for the jury to know that.  And given

24   that and given where we are in the record in terms of

25   offering this evidence, that's the only thing I would add, a

1    sentence that just explains that.

2              I think the record is clear that as it relates to

3    the union grievance procedure, the record that is the part

4    of the investigative hearing is the record that goes up

5    through these various steps and then to the arbitrator to

6    make a decision.  It's not a new record.  And so that

7    record, I think is clear, is not governed by the rules of

8    evidence, it's not governed by the rules of procedure, not

9    the rules that govern this proceeding.

10             So that's why I thought a sentence about

11   preponderance of the evidence, but it might be simply that

12   we'd say that it's not governed by the rules of procedure or

13   the rules of evidence.  The OSHA determination is in fact

14   merely a step in the process.  So I tried to encapsulate

15   that in one sentence, but I do think it's important that the

16   jury understand that.

17             Having said that, I appreciate the Court's

18   language in the last sentence about an independent

19   obligation.

20             THE COURT:  How about BNSF?

21             MS. DONESKY:  No objection to the proposal.

22             THE COURT:  Okay.  I'm going to stick with it as

23   is.

24             Mr. Kaster, I understand your concerns.  We could

25   go on for a couple of pages to describe the differences and

1    I'm sort of expecting you all will do that in closing.

2            MR. JAMES KASTER:  Your Honor, I will want to make

3    sure that we don't have to object during closing argument to

4    what I would consider to be an improper argument; that is

5    that the decision that the jury has made is somehow -- that

6    it has before it has somehow been decided in some other

7    forum, because it's not the same decision and I would object

8    to that kind of an argument.

9            THE COURT:  If the argument is that a decision's

10   been made and you don't have anything to add to it or

11   something that suggests to the jury that they really don't

12   have any sort of independent obligation here to review this

13   issue *de novo*, then I think that objection would be

14   well-taken.

15           MR. JAMES KASTER:  And I think it would be our --

16           THE COURT:  It's a gray line, right?  Sorry to

17   interrupt, but it's not a bright line.

18           MR. JAMES KASTER:  I understand what the Court is

19   saying.  The independent -- what we would intend to argue

20   consistent with the evidence is that the only hearing that

21   the plaintiff has had where he has been allowed to even

22   appear and examine witnesses was this investigatory hearing,

23   that there has been no other hearing on the evidence.

24           THE COURT:  All right.  Nineteen.  Plaintiff?

25           MR. JAMES KASTER:  We don't object to 19.

1          THE COURT:  And BNSF, I assume you object for the

2     same reasons as before and, as I said, I'm reconsidering

3     that.

4          MS. DONESKY:  Correct.

5          THE COURT:  Apart from that, any objection?

6          MS. DONESKY:  I was just tracing it.  We had

7     requested that the -- "would identify that BNSF would have

8     fired Mr. Sanders for misconduct and theft of time" to give

9     a description of what the dismissal was for "even if

10    Plaintiff had not engaged in the alleged protected

11    activity."

12         THE COURT:  I did not see that in the pattern

13    instruction, so I didn't include it for that reason, but I

14    understand that objection and it's on the record.

15         MS. DONESKY:  Aside from preserving our objections

16    to the proposed instruction that had more language in terms

17    of what the factors were, we'll just preserve those

18    objections in the proposed instructions.

19         THE COURT:  All right.  How about 20?

20         MR. JAMES KASTER:  We have no objection.

21         THE COURT:  BNSF?

22         MS. DONESKY:  I don't believe that the last

23    sentence is necessary.  It seems like more than necessary to

24    add the sentence of:  "Clear and convincing evidence

25    requires a higher degree of persuasion than the greater

 1    weight of the evidence."  It seems to be self-evident from

 2    the definition itself above it.

 3              THE COURT:  That's right out of the pattern

 4    instruction, so I'm going to leave that in.

 5              I will observe just real briefly about that

 6    instruction.  Many include it before a discussion of the

 7    elements of the claim and the affirmative defense.  I think

 8    it makes more sense.  At least yesterday and at this moment

 9    I think it makes more sense to include it at the end where

10    after we've already sort of described the various burdens in

11    the context of the instructions than putting it up front

12    before we get there.

13              All right.  Actual damages, the last instruction,

14    Number 21.  Plaintiff?

15              MR. JAMES KASTER:  No objection from the

16    plaintiff.

17              THE COURT:  Defendant?

18              MS. DONESKY:  It seems to model after the

19    instruction.  None here.

20              THE COURT:  Okay.  Great.  Here's what I will do.

21              We will work as expeditiously as we can on any

22    edits, push those out so that everyone can see them either

23    on morning break or at noon and then discuss these over the

24    lunch hour prior to closing, prior to when I anticipate

25    you'll be doing closings and try to keep it moving as best

1    we can that way.

2            MS. DONESKY:  Has the Court rejected emotional

3    distress damages as a separate instruction?

4            THE COURT:  I have.  Apart from emotional distress

5    being mentioned specifically and what's required to support

6    it being mentioned in the context of Instruction 21, yes.

7            MS. DONESKY:  So we'd be able to -- or do you want

8    me to make argument now on that, that it should have

9    additional language?

10           THE COURT:  I think if you've got an objection to

11   the non-inclusion of that instruction, you should get that

12   on the record now.

13           MS. DONESKY:  Language such as:  "Plaintiff must

14   prove that he has suffered a specific discernible injury

15   with credible evidence, hurt feelings, anger, and

16   frustration are a part of life and are not the types of harm

17   that could support a mental anguish award."

18           MR. JAMES KASTER:  Your Honor, that language --

19           THE COURT:  Correct.  I'm not going to include

20   that.

21           MS. DONESKY:  We'll preserve our objections on

22   that.

23           THE COURT:  Okay.

24           MR. JAMES KASTER:  I'm not even sure that's the

25   law in the Fifth Circuit anymore, but it's a citation to a

1    Fifth Circuit pattern instruction that I think is quite

2    dated.

3              THE COURT:  Okay.  Well, I appreciate the

4    thoughtful discussion on this.  We'll get to work so that

5    we're in a position to keep this moving.  We'll just recess

6    for just a couple of minutes for us to get back, plot a

7    couple things out, and we'll get the jury back in here.  I

8    expect we'll start up at ten after 9:00, if that's all

9    right.

10             MR. JAMES KASTER:  Certainly.

11             MS. DONESKY:  Your Honor, just for the record, can

12   I presume that any, like, honest belief instruction or other

13   instructions we proposed have been rejected by the Court

14   such that I can just make a record that we preserve those

15   objections?

16             THE COURT:  Yes.

17             MS. DONESKY:  Thank you.

18             THE COURT:  We will discuss logistics for tomorrow

19   morning at the end of the day today.  As you might expect,

20   you know, this courthouse could be -- will be inundated with

21   folks tomorrow morning, but as I say, we'll discuss that in

22   the presence of the jury at the end of the day today and

23   we'll sort of see where we're at.

24             MR. JAMES KASTER:  Your Honor, can I ask, do we

25   have an issue with one of the jurors?

1       THE COURT:  No, I do not -- not as far as I know.

2       MR. JAMES KASTER:  Okay.  I just was -- there was

3  some movement yesterday that made me think that we had --

4  one of the jurors had an issue, but --

5       THE COURT:  What kind of an issue?

6       MR. JAMES KASTER:  Like a scheduling issue or

7  something like that.

8       THE COURT:  She -- we can go off the record.

9       (Discussion off the record)

10       MS. DONESKY:  Your Honor, the only other thing, I

11  think, is the special verdict form, if I can just at least

12  lodge an objection.  But I believe the special verdict form

13  would typically be divided between the claim of the

14  plaintiff and then only if found to have met his claim that

15  a separate question, as our proposed verdict form suggested,

16  where the defendant -- there'd be a Q and A for the jury to

17  answer if the defendant has met its affirmative defense, as

18  two separate questions.  We think that is a manner in which

19  we would have more informative answers to what the jury --

20  how the jury decided as related to the two different claims.

21       THE COURT:  Okay.  I will think about that.

22       MS. DONESKY:  Okay.  Thank you.

23       MR. JAMES KASTER:  And we like the verdict form.

24       THE COURT:  Understood.  Okay.

25       All right.  We'll recess for just a few minutes.

1    We will recommence here just a little bit before 9:15.

2         (Recess taken at 9:08 a.m.)

3                        *     *     *     *

4         (9:15 a.m.)

5                        IN OPEN COURT

6         (Jury enters)

7              THE COURT:  Please be seated, everyone.

8              Members of the Jury, good morning.  I had the

9    opportunity to confer with the lawyers following our

10   business yesterday and here is where I understand that we

11   are at.

12             We expect to complete witness testimony today, we

13   expect the lawyers to have an opportunity to present closing

14   arguments today and I also expect to be able to instruct you

15   today.  Whether we'll have enough time for you to begin your

16   deliberations today or not I can't say for sure, but that is

17   where we are at, so I think things are on schedule.  The

18   train is running on time, so to speak.

19             (Laughter)

20             THE COURT:  All right.  Is BNSF prepared to call

21   its witness?

22             MS. FERGUSON:  Yes, Your Honor.  We would call

23   Andrew Shearer.

24             THE COURT:  Mr. Shearer, why don't you come up

25   here and if you could, sir, stand in between that railing

```
 1    and the witness chair, and if you could face the courtroom
 2    deputy, I'll invite her to administer the oath at this time.
 3             COURTROOM DEPUTY:  Please state your full name for
 4    the record, spelling your first and last name.
 5             THE WITNESS:  Andrew Lee Shearer.  Andrew is
 6    A-N-D-R-E-W, Shearer is S-H-E-A-R-E-R.
 7             COURTROOM DEPUTY:  Please raise your right hand.
 8         ANDREW L. SHEARER, DEFENDANT'S WITNESS, SWORN
 9             THE COURT:  Thank you, Mr. Shearer.  Please
10    have a seat.
11             Ms. Ferguson?
12             MS. FERGUSON:  Thank you.
13
14                      DIRECT EXAMINATION
15    BY MS. FERGUSON:
16    Q.  Good morning, Mr. Shearer.  If you're comfortable, you
17    can take off your mask for the testimony.
18    A.  I'm comfortable.
19    Q.  Thank you.  Where do you work?
20    A.  I work in our Fort Worth headquarter campus for BNSF
21    Railway.
22    Q.  And what is your position there?
23    A.  I'm the director of engineering planning.
24    Q.  What does that mean?
25    A.  What that means is I do a lot of things for our
```

SHEAVER - DIRECT

1    engineering team, so track signal structures that is

2    involved in reviewing our business process, and then I get

3    involved with our technology team to build applications that

4    we use to report to do the work.  I get involved with the

5    reporting team to be able to take the information that we

6    take out and produce information that our field teams will

7    be able to use to fix conditions in the track.  And then I

8    also have a liaison job with our government agencies, so

9    federal regulations for FRA, Transport Canada, et cetera,

10   and I also lead our engineering vehicle team, so I have a

11   thousand vehicles that roll up to me.

12   Q.  When did you begin your career at BNSF?

13   A.  I'm just shy of 18 years with the company, so I began in

14   early 2004.

15   Q.  Okay.  Tell us your various stops along the way to your

16   current position.

17   A.  Sure.  Yeah, it's been a very interesting journey.

18           I came in through what's called our EFLS, or

19   Experience Front Line Supervisor program.  My first job was

20   assistant roadmaster of new track construction and I built a

21   lot of track out in the coal fields.

22           And then from there I became what's called a

23   roadmaster, which is responsible for the maintenance of a

24   given territory, probably three, four or five subdivisions.

25   I did that at two separate locations.  I was a roadmaster in

SHEARER - DIRECT

1    Wyoming and a roadmaster up in Grand Forks, North Dakota.

2              From there I took a job with what's called MRP, or

3    Manager of Roadway Planning.  That's the position that we

4    use that looks at a lot of the data, does a lot of things

5    from geometry cars and builds a capital program for the next

6    couple of years of the capital maintenance that we'll do on

7    a territory.

8              From there I took a job as a division engineer, or

9    a DE role.  And what that is, is the next level of manager

10   over the roadmasters, or over the FLS, and responsible for a

11   larger component of the territory, and sometimes that'll

12   span two, three states in some locations.

13             And then from there I went to the Fort Worth

14   campus and I did a job called Director of Best Way

15   Engineering, and that one was involved in planning the

16   maintenance cycles that we would do, so I did a lot on the

17   planning front.

18             And from there I got into this now reporting and

19   building processes and tools to continue that part of my

20   career.

21   Q.  Thank you.  I want to talk with you today about two

22   topics.  The first topic is scorecards.  That's a term

23   that's been talked about throughout this trial.

24             Can you tell the jury what is a scorecard?

25   A.  Sure.  Yeah, okay.  So a scorecard is one of the many

SHEARER - DIRECT

```
 1    tools that we use at BNSF, and I would explain it this way
 2    to somebody that's not familiar with it.
 3            It's kind of a one-stop shop report that we use to
 4    give to the managers so they can understand basically the
 5    health of a part of a territory, how well that portion of
 6    the railroad is performing, and it has a lot of the key
 7    metrics that we feel are important, that if you manage those
 8    and watch those and understand what's going on behind those,
 9    that you're going to do okay and the territory will be just
10    fine.
11    Q.  Just generally, how does BNSF use a scorecard?
12    A.  So generally how we use it is, it's one of many
13    documents that we look at like I talked about.  It's a tool
14    that pulls together those key metrics.  And then probably
15    once, twice a year as a typical average, that folks would
16    look at that to understand kind of how the territory is
17    running.
18    Q.  Have you had a chance to look at the scorecard for the
19    Twin Cities division in 2016?
20    A.  Yes, I have.
21            MS. FERGUSON:  Could we see Exhibit P-149, please.
22            THE WITNESS:  We'll be able to blow that up,
23    right?
24            THE COURT:  Has it been admitted?
25            MR. LUCAS KASTER:  We have no objection.
```

SHEANER - DIRECT

```
 1                THE COURT:  All right.  It's admitted and may be
 2       published.
 3                MS. FERGUSON:  Maybe you could highlight the first
 4       category beginning "Safety" down to "Final Score."  Thank
 5       you.
 6       BY MS. FERGUSON:
 7       Q.  So we see categories here:  "Safety," "Budget,"
 8       "Service."  What's the significance of those categories?
 9       A.  Those categories would be the top three things that we
10       considered as being most important to managing a territory.
11                The safety -- and I'm sure we'll get into it here,
12       so I won't go too far, but it's just really the safety
13       component.  There's nothing more important than what we do
14       day-to-day that impacts safety.
15                Budget is on the scorecard there.
16                And then, of course, service, comprised of those
17       various components.
18       Q.  So under "Service" we see "Corridor," "Slow Order
19       Delays," correct?  What's the significance of that?
20       A.  So slow order delays from a high-level on the railroad,
21       we sell a business of moving freight, and I like to always
22       use the analogy of like Chicago to Pacific Northwest.
23                So between those two large cities, all the tracks
24       that comprise that would be made up of the corridor.  That's
25       the corridor from Chicago to Pacific Northwest.  We sell
```

SHEARER - DIRECT

1    business to move freight at a certain number of days between

2    those two points.  So that's based on the track speed that

3    we maintain on those segments of tracks, and then the slow

4    orders would be conditions on the tracks that don't meet the

5    class of track, which would mean it's not good for the

6    posted speed and we would have to put a slow order on to

7    protect that condition.

8            So the number of delay minutes is what that's

9    measuring to the train.  Everything in slow order is done in

10   minutes, and so we would measure how many slow order minutes

11   you have on that corridor.

12   Q.  In this particular scorecard there doesn't appear to be

13   an entry there.

14   A.  Yeah, correct.  If it was not highlighted yellow, it

15   looks like -- I think it's a gray color all the way across

16   there, which would indicate on the scorecard that at that

17   time there either was an issue with that particular

18   measurement or it did not apply at that location.

19   Q.  What about the other metrics below "Service"?  What, if

20   any, is the significance of those?

21   A.  Can you repeat that question or clarify, please?

22   Q.  Sure.  The other items under "Service," for example,

23   "Unprotected Red Tag Defects."  What's the significance of

24   that?

25   A.  Okay.  Sure.  Unprotected red tags.  So a red tag is

1    when our geometry cars go across a piece of the railroad.

2    They're measuring constantly for the health of that track,

3    and if there's any condition that car finds that's not good

4    for that particular speed on the track or the health, it's

5    called a red tag defect.

6              And then what we do is we look at from the morning

7    the car ran was there a slow order already in place covering

8    that track defect or that red tag.  If there was a slow

9    order in place covering it, it's considered protected.  If

10   there was no slow order there, it would be considered

11   unprotected.

12   Q.  So, for example, if a track inspector hadn't found that

13   defect and put a slow order on it, that would appear then as

14   an unprotected red tag defect.

15   A.  That's correct, yes.

16   Q.  Okay.  The other categories, "Reportable Rail

17   Incidents,"  What's that?

18   A.  Sure.  A reportable rail incident, that's any time that

19   we have an incident that would be on-rail, like a

20   derailment.  Could be significant, large number of cars,

21   locomotives involved, could be minor.  One single car

22   involved, one wheel drop off.  The fact it's reportable

23   means the damage that we incurred met a certain FRA

24   threshold.  It was either at that level or above.  If it was

25   nonreportable, it would be below that threshold.

SHEARER - DIRECT

1    Q.  Okay.  Fair to say BNSF would be concerned about things

2    such as a derailment and that would factor into the

3    scorecard under that metric?

4    A.  Absolutely, yes.

5    Q.  And then below the information, anything there of

6    significance that the jury should know?

7    A.  So I think just from a high level to understand how the

8    scorecard works is you see the final score at the top -- or

9    excuse me -- before the "Informational."

10           The Informational are things that we're interested

11   in, things that may have been on the scorecard in the past,

12   but we said we want to focus on safety, budget and service.

13           Then I mentioned this is kind of that one-stop

14   shop report that we use to understand a territory and what's

15   going on in the territory.  So some of those things down

16   below there are what we consider important, but just not

17   things that we would focus on at the highest level, but

18   they're certainly on there.

19           And just because we spoke about red tags, I'll

20   highlight this, Repeat Red Tag Defects, which would be one,

21   two, three, four, four lines down is where I'm at.  So the

22   repeat red tag is every time a geometry car runs across the

23   railroad, we're always, again, monitoring the health of the

24   railroad and what's going on.  If we find the same type of

25   condition, the same defect type, from one run to the next

1    run, we'll call it a "repeat."  If it's within a hundred

2    feet and within a one-year time frame of the original

3    defect, we'll call that a repeat and start to drill down

4    and:  Okay, what's going on?  Do we know what we're doing is

5    we're fixing the track at this location?  Is there something

6    else going on at that location?  So that's a key thing that

7    we look at.

8    Q.  You talked about derailments may have an impact on the

9    scorecard.  What other kinds of things may impact a

10   scorecard?  For example, what role would weather play,

11   potentially?

12   A.  Yeah.  So everything that you see on here, this is the

13   scorecard, all of it collectively that's on there.

14           Specific to the question what would weather impact

15   on here, weather would have the potential to drive up our

16   overtime.

17           So we see down underneath "Informational," if

18   we're working a bunch of overtime on the territory, that

19   would drive that metric up.  Certainly weather is going to

20   impact your service that's out there, because as the

21   dispatcher, the person in Fort Worth who's running the

22   trains, trying to throw the switches that would change a

23   train from one track to the next one, switches can become

24   bound up, so you see "Switch Reliability" and "Remedy

25   Tickets" under your service metrics.

1    Just the sheer fact that you got all kinds of rain

2    and things going on, the railroad like a road, like a dirt

3    road, would be getting softer over time, so it would impact

4    slow orders and things of that nature as well.

5    Q.  Is a scorecard intended to discourage the reporting of

6    track defects?

7    A.  No, it's not.

8    Q.  Can you explain that?

9    A.  It actually would have the opposite effect.  If you were

10   not reporting track defects, the geometry car that comes

11   around would be finding those defects for you that were out

12   there.  If there was any defect entered and we didn't have a

13   slow order on the location, it would actually be hitting

14   your scorecard metric for unprotected red tags, which from a

15   corporate standpoint, or a division engineer, or a general

16   director, kind of managers of managers, that's one of the

17   key indicator lights that go off that say what's going on in

18   this territory that I've got all these unprotected red tags

19   that allegedly we're not finding with our local team and we

20   have to wait for the geometry car to come and find that

21   defect?  There's something wrong with that.

22   Q.  Same question as it relates to slow orders.  Is a

23   scorecard intended to discourage the reporting or recording

24   of slow orders?

25   A.  No, it's not.

SHEARER - DIRECT

1    Q.  For the same reasons you said?

2    A.  Yeah, same reasons.  And I would add on a slow order

3    standpoint, that's one of the reasons or one of the things

4    that we look at as we're planning the capital maintenance.

5    If we don't believe there's a problem in an area, why would

6    we spend the money to fix that area.  So it's defects, it's

7    slow orders that tell that health picture of that piece of

8    the railroad and one of the key planning things that we need

9    that's out there, so we encourage slow orders, defects.  We

10   want to know what the health of that piece of the railroad

11   is relative to everything else.

12   Q.  In your role, do you know how the scorecard rankings are

13   impacted by the reporting of track defects?

14   A.  So can we clarify track defects on that question?  Are

15   we talking about red tag defects like we've been speaking

16   about, or are we talking about, like, inspector-found

17   defects?

18   Q.  Good question.  Inspector-found track defects.

19   A.  One second here.  Let me just review the scorecard.

20       (Pause)

21           Track inspector-found defects are not on the

22   scorecard.  The slow order that would be issued on top of

23   the track inspector defect, if appropriate, would be there,

24   but not all track inspector-found defects require a slow

25   order.

SHEARER - DIRECT

1   Q.  All right.  In your experience -- I think you said you

2   were an assistant roadmaster, a roadmaster, a division

3   engineer.  In your experience, does BNSF discourage

4   reporting of track defects?

5   A.  No, we do not?

6   Q.  And what about the reporting or recording of slow

7   orders?

8   A.  No, we do not.

9   Q.  If track defects were not reported where the defects

10  actually exist, what's a possible outcome?

11  A.  Could you repeat the question for me?  I'm sorry.

12  Q.  Sure.  If a track defect is not reported by a track

13  inspector where a track defect actually exists, what's a

14  possible outcome?

15  A.  Yeah.  So lots of things.  Depending on the severity of

16  the defect, if the track inspector saw something, did not

17  report it, depending on the severity, the worst-case

18  scenario would be a derailment would occur and have

19  catastrophic impacts to -- obviously our ability to run

20  trains through that particular location is out because

21  there's one track and in some locations there's multiple,

22  in some locations everything stops.  Huge, huge impact to

23  the railroad to do something like that.

24  Q.  That would impact the scorecard significantly, a

25  derailment?

1    A.  Yes.

2    Q.  Okay.  Same question with slow orders.  I assume the

3    same thing.  If slow orders aren't reported or recorded

4    where they're actually needed, catastrophic outcomes could

5    occur?

6    A.  Catastrophic outcomes could occur, yes.  It would be the

7    same condition.  Ultimately, we want to ensure the track is

8    safe for the passage of trains at the speed that they go

9    over it, both slow orders and defect work together to do

10   that.

11   Q.  Now, the second and last topic I want to talk with you

12   about geometry cars.  We've heard discussion about those as

13   well.  You have some familiarity with geometry cars?

14   A.  Yes, I do.  As an assistant roadmaster, as an MRP, as a

15   division engineer and as a roadmaster, all my time in the

16   field, so about nine, ten years collectively, was always

17   riding the car, using the information that's on there and

18   helping to plan the division maintenance as I got up there,

19   so multiple roadmaster territories, multiple DE territories,

20   and then my own territory, so many, many times on the car.

21   Q.  What is a geometry car?

22   A.  So a geometry car, we got a couple different versions of

23   them, but at a high-level, a geometry car is like a

24   passenger train, like you would see almost on an Amtrak

25   train that goes across territory.  Very, very highly

SHEARER - DIRECT

```
 1    specialized equipment, all kinds of sensors on there between

 2    lasers, accelerometers, tachometers, and systems that

 3    measure the track exactly.  And it's a big deal for us,

 4    because it measures the surface so I understand how that

 5    track is sitting in terms if there's cross-level or a

 6    condition called a warp or a twist.  It measures all of that

 7    and it measures it at speeds of up to 70 miles an hour.  And

 8    with all the technology in the sensors, it measures

 9    everything foot by foot across the railroad, so very, very

10    handy piece of equipment for us.

11    Q.  Is it meant to be a supplement to the work of the track

12    inspectors who go out and look at the tracks?

13    A.  Yeah, absolutely.  So a geometry car -- from a corporate

14    standpoint, a geometry car is that -- I'll just call it the

15    normalized data, right?

16         So if I was to teach any one of you how to inspect

17    track and look at it, you may do things differently than the

18    person next to you that's on there.  But when that geometry

19    car runs across the territory, it's kind of that single

20    source of truth, if you will, to understand what's happening

21    on this territory versus this territory and we know

22    everything's measured exactly the same way.

23    Q.  We have some photographs.

24         MS. FERGUSON:  Jan, could you show us D-184,

25    page 2.
```

SHEARER - DIRECT

1   Q.  Do we see a geometry car in this photograph?

2   A.  Yes, you do.  Obviously the locomotive, the orange

3   thing, is first and then there's what's called a next gen,

4   or a power car, that does some optical pictures -- that's

5   the other thing I haven't spoken about yet -- that will take

6   pictures, high-speed, high-definition pictures.

7        And then the geometry car is the last car on the

8   train with a big picture window out the back, and that's the

9   one that's got all the sensors across it.  And the very back

10  portion where you see the large picture window with the

11  stadium seating is where people would sit.  And then the

12  front half of that car is where all the computers sit.

13        So, I mean, to give you an idea of the size and

14  the technology running on that thing, the computers that are

15  analyzing the track and doing that are taking up almost half

16  of that car that's in there.

17  Q.  What does the middle car do that you referenced?

18  A.  Yeah.  So it's one of the cars I mentioned.  It's a

19  power car, so it's got a lot of the equipment that runs the

20  power to run the geometry car that's on there, and then

21  sometimes they've got what's called the optical technology

22  on that one, so lots of cameras looking down taking pictures

23  of tracks, looking for things like broken rails and so forth

24  that's on there.

25  Q.  Is that yet another way to supplement the work of the

1    track inspector to find problems with the track?

2    A.  Yes, it is, yeah.  BNSF, we do a lot of things and

3    always pushing the envelope of technology there, so optical

4    recognition is one of the additional pieces that we're

5    continuing to improve upon.

6            MS. FERGUSON:  Could we see page 3 of that same

7    exhibit.

8    Q.  What do we see here?

9            THE COURT:  Sorry, Ms. Ferguson.  Before we go on,

10   can I just make sure, is there any objection to this

11   exhibit?

12           MR. LUCAS KASTER:  No objection, Your Honor.

13           THE COURT:  Okay.  It's admitted.

14           MS. FERGUSON:  We discussed that ahead of time.

15   A.  Okay.  So this particular picture is of another geometry

16   car.  You see the locomotive again.  Then there's the power

17   car and then another geometry car in the background.  That

18   particular one's a little hard to see, but it looks like

19   that may be one of the ATIP, which is the FRA's version of a

20   geometry car, but it does the same thing.

21   Q.  And then page 5 of that same exhibit.  What do we see

22   here?

23   A.  That's just -- that's one of the sensors on the back of

24   the car.  That's the one that I was speaking about that's

25   looking at and measuring the surface of the rail and whether

1   or not there's dips or valleys in it and collecting all that

2   foot-by-foot data that we were talking about.

3   Q.  So in addition to -- we have the track inspector's doing

4   the track inspecting, correct?

5   A.  Mm-hm.

6   Q.  We have geometry cars that are supplementing the work of

7   the track inspectors to find defects, correct?

8   A.  Correct.

9   Q.  Do we also have the FRA doing their own inspections of

10  BNSF tracks from time to time?

11  A.  Yes, we do.  We have federal FRA inspectors that'll come

12  out and periodically check the railroad, as well as some

13  states even now have state inspectors that will do that.

14  Q.  And if they find defects, they in fact can issue fines

15  for not having found those defects?

16  A.  Yes, they do.

17  Q.  So was there any incentive for BNSF not to have defects

18  reported?

19  A.  No.  There's no incentive to BNSF not to report defects.

20  And one of the key measures that the FRA uses on those state

21  inspectors and federal inspectors that come out is, they

22  will pull all of our defect records and try to understand

23  does the number of defects they found during their

24  inspection match the number that BNSF has found during our

25  inspections to understand if we're accurately recording the

1   condition of the track.  So the FRA actually measures us

2   against that as well.

3                MS. FERGUSON:  Thank you.  Those are all the

4   questions I have.

5                THE COURT:  Mr. Kaster?

6                MR. LUCAS KASTER:  Thank you, Your Honor.

7

8                        **CROSS-EXAMINATION**

9   BY MR. LUCAS KASTER:

10  Q.  Good morning, Mr. Shearer.  My name's Lucas Kaster.  I'm

11  one of the lawyers who's representing Mr. Sanders.  I'm

12  going to ask you a few questions, okay?

13  A.  Okay.  Good morning.

14  Q.  I want to pick up where you just left off regarding

15  these geo cars.  Even though you run geo cars, a track

16  inspector or someone qualified under the FRA regulations has

17  to come go out and confirm any defects found by the geo car,

18  right?

19  A.  Yes.  We do go out and confirm behind the geometry car.

20  Q.  But that's something that's required according to BNSF

21  rules, right?

22  A.  We require to inspect the red tags behind the geometry

23  car.  We do have other tags like orange tags and yellow tags

24  that are not at that safety threshold yet.  Those are not

25  required to do the inspection behind, but red tags, we will

1    go out and validate the geometry car.

2    Q.  If we can go to Exhibit 228 at page 12, please.

3         Mr. Shearer, this is a copy or a section of BNSF's

4    engineering instructions, right?

5    A.  That is correct.

6    Q.  And this section talks about employees inspecting

7    track, when they're doing that they have to have a copy of

8    the last geo car, right, report?

9    A.  That is correct.

10   Q.  And by the way, geo cars don't run as often as track

11   inspectors are out inspecting the track, right?

12   A.  That is correct.  A geometry car, if we can Zoom out, I

13   believe this was 2012, right?  Yeah.

14        So down in the lower right, the revision

15   January 1, 2012 is what I was looking at.  In 2012, we had I

16   believe it was four geo cars and we would average two to

17   three runs across any given part of the network at a time,

18   so call that what, every three months, four months.

19   Q.  So two, three times per year.

20   A.  Yeah -- I'm sorry -- per year, correct.

21   Q.  So, for example, in Dayton's Bluff, a section of track

22   that Mr. Sanders might have been inspecting, the geo car

23   would only travel along that section of track two or three

24   times per year ?

25   A.  That would be a fair assumption in 2012, yes.

SHEARER - CROSS

```
1    Q.  I'm assuming that the geo car doesn't run inside of a
2    yard.
3    A.  It'll run in a yard.  It just will cover the tracks that
4    are open at that time.  So if there's trains parked on
5    certain tracks in the yard, obviously we won't be able to
6    cover those, but it will run in the yard tracks that are
7    open at that time.
8    Q.  And the federal regulations regarding -- around track
9    inspection require that a person actually do the
10   inspections, right?
11   A.  Correct.
12   Q.  The geo car doesn't satisfy the federal regulations.
13   A.  The geometry car does not meet the federal regulations
14   for individuals inspecting track, yes, I would say that.
15   Q.  Because, for example, the federal regulations depending
16   on the class of track may require an inspection once a week.
17   A.  Correct, yes.  Depending on class of track, you could be
18   up to once-a-week inspections.
19   Q.  Now I want to switch gears and I want to talk to you
20   about this scorecard issue.
21           BNSF has a scorecard for every manager in the
22   maintenance department, right?
23   A.  Yes, we do.
24   Q.  From -- what's the highest person in the maintenance
25   department?  What's their title?
```

SHEAFER - CROSS

```
1    A.  So the highest department that we would have would be
2    vice president of engineering, who would have the total
3    engineering umbrella, and then it would work down from there
4    to assistant vice president, or chief engineer is another
5    title for those, and then on down from there.
6    Q.  So that highest vice president has an overall scorecard.
7    A.  Yes.
8    Q.  For the entire maintenance department.
9    A.  Yes.
10   Q.  And then that person's scorecard is broken down to each
11   geographic region within the maintenance department.
12   A.  Yes.
13   Q.  How many regions are there?
14   A.  In 2012, I don't remember right off top of my head.
15   We're about ten right now, to give you idea.
16   Q.  And I'm assuming there's a head of each of those
17   divisions.
18   A.  Yes, each division would have a maintenance head, which
19   would be our General Director of Line Maintenance, or GDLM.
20   Q.  And in Minneapolis or the Twin Cities, that was
21   Mr. Jensen back in 2015.  Do you recall that?
22   A.  Yes, I do.
23   Q.  And then each of those areas under each general director
24   are then broken down to division engineers, right?
25   A.  That is correct, yes.
```

SHEARER - CROSS

1    Q.  And roadmasters, right?

2    A.  Among others, yes.

3    Q.  So there's other departments as well that are included

4    in the scorecard besides those positions.

5    A.  Yes, such as structures and signal.  Those would also

6    roll up to your general director of line maintenance.

7    Q.  How many employees, or how many managers, how many

8    exempt employees in the maintenance department are subject

9    to the scorecards at BNSF?

10   A.  So every manager would have it, and ten divisions --

11   this is an approximation -- call it 300, 400 exempt

12   employees would all be a part of the scorecard.

13   Q.  And some of those metrics on the scorecard are broken

14   down to each individual's geographic area, right?

15   A.  Yes.

16   Q.  And when you get to a roadmaster, it's broken down to a

17   pretty small geographic area, right?

18   A.  Yeah.  It would be the roadmaster's territory, so

19   whatever subdivisions or portion of the network they're

20   responsible for, yes.

21   Q.  And then there's a ranking based upon the score that

22   comes out of the scorecard, right?

23   A.  Yes.

24   Q.  And there's a ranking for all of those levels of

25   managers, right?

1    A.  Yes.

2    Q.  And so, for example, the general director of line

3    maintenance in the Twin Cities is put in a ranking with all

4    of the general directors across the network.

5    A.  Yes.  They're all on the one scorecard report, yes.

6    Q.  And they're ranked one through I think you said eight,

7    something to that effect?

8    A.  Yeah, somewhere -- I think we're at about ten divisions

9    now, so somewhere ten, 11, 12, depending on the time frame

10   that we were looking at.

11   Q.  Same goes down the line.  Each division engineer is put

12   in a ranking with their 20 or 25 counterparts and division

13   engineers, right?

14   A.  Yes, that is correct.

15   Q.  And ranked from one to whatever the number is.

16   A.  Yes.

17   Q.  Same for roadmasters.

18   A.  Yes.

19   Q.  And those scorecards and those rankings are maintained

20   and updated throughout the year.

21   A.  Yes.

22   Q.  And they're posted on BNSF's intranet.

23   A.  Yes.

24   Q.  So an employee or a manager can go on at anytime and see

25   where they stand from a scorecard perspective, right?

1   A.  Within reason.  So the scorecard being a one-stop

2   shop -- I'll say it this way:  If I come in and look at any

3   point in time, some of the metrics would be updated weekly,

4   some updated monthly, some updated at a different frequency,

5   but at that snapshot you would get a ballpark idea of where

6   you were at.

7   Q.  And then the rankings themselves are updated as well,

8   right?

9   A.  Yes.

10  Q.  On a similar type of schedule.

11  A.  Yes, correct.

12  Q.  And so, for example, if a manager wants to see where

13  their subordinates are ranking against their counterparts,

14  they can go on the intranet and pull it up.

15  A.  They could do that, yes.

16  Q.  There's also a dictionary for a scorecard, right?

17  A.  That is correct, yes.

18          MR. LUCAS KASTER:  If we could pull up Exhibit 24.

19  This is not in evidence yet, so just show it to the witness,

20  please.

21  Q.  Mr. Shearer, do you see that on your screen?

22  A.  Yes, I do.

23  Q.  Is this the 2015 Engineering Scorecard Metric

24  Dictionary?  Do you see that at the top?

25  A.  Yes, I do.

1    Q.  A bit hard to read?

2    A.  No, I see it.  The title hasn't changed year over year

3    on it.  We don't update the title.  So the last revision

4    date was March 27 of 2015, so I was just looking to see if

5    there was anywhere the year was identified, but it's not.

6    Yeah, I'll say it's 2015 Engineering Scorecard Metric

7    Dictionary.

8    Q.  And by my count this dictionary is 20 pages long.  Does

9    that sound about right to you?

10   A.  Yes.  And it's -- I don't have my glasses, but I believe

11   it says 1 of 20 on the lower right-hand side there.

12   Q.  And throughout this page, it provides an explanation for

13   how the various metrics on the scorecards are calculated.

14   A.  That is correct, yes.

15   Q.  And this dictionary is also available on the intranet?

16   A.  That is correct, yes.

17              MR. LUCAS KASTER:  Move for the admission of

18   Exhibit 24.

19              MS. FERGUSON:  No objection.

20              THE COURT:  It's admitted.

21   BY MR. LUCAS KASTER:

22   Q.  Thank you.  If we could pull up Exhibit 24 just briefly.

23   And why don't we just blow up the frequency metric on the

24   first page, the S-10 right under Safety.  I'm just using

25   this as an example.

1    Okay.  Mr. Shearer, so each metric that we were

2    just looking at when you were asked questions by Counsel

3    that's listed there has a separate section on here, right,

4    that lays out this information, is that right?

5    A.  Yes, that's correct.

6    Q.  And then it says "Sponsor," and here it says a

7    Mr. Anderson, right?

8    A.  Correct.

9    Q.  And so there's an individual person at BNSF who's

10    responsible for each separate metric, right?

11    A.  So that one is a little bit different answer.

12    We have one sponsor identified that would gather

13    information about that particular metric that we're

14    measuring, but we do -- everybody in the engineering team

15    gets together about once a year at an event called a Team

16    Week where we would talk about what's going on with the

17    scorecard, are we heading in the right direction, would

18    there be tweaks.  And if I had a concern about, let's just

19    say, this frequency or the way it was being measured, I

20    didn't feel it was fair, apples-to-apples comparisons, I

21    would take my concerns to Mr. Anderson and he'd say -- he'd

22    explain how it was set up, why it was set up that way, and

23    if he'd agreed with me, we would then bring it to that Team

24    Week where we could all talk about it.

25    Q.  So there's a team of people that is dedicated to

1   deciding what metrics are included on the scorecards --

2   A.  Mm-hm.

3   Q.  -- is that right?

4   A.  Yes, correct.

5   Q.  Sorry.  You have to say yes.

6   A.  Yes.

7   Q.  And then there's also a team of people or individuals

8   who are responsible for maintaining each of the metrics

9   throughout the year.

10  A.  That's correct.

11  Q.  And I think I caught testimony from you earlier that

12  said people look at the scorecard once or twice a year.  Did

13  I catch that correctly?

14  A.  Yes.

15  Q.  Is that accurate?

16  A.  From my -- from my understanding of the scorecard that's

17  out there and how often people look at it, it is one to two

18  times a year.

19          MR. LUCAS KASTER:  If we could pull up Exhibit

20  106, which is not in evidence.

21     (Counsel confer)

22          MR. LUCAS KASTER:  My understanding is Counsel is

23  not objecting to Exhibit 106, 115 or 127.

24          MS. FERGUSON:  That's correct.

25          THE COURT:  Terrific.  They're admitted.

1    BY MR. LUCAS KASTER:

2    Q.  If we could pull up Exhibit 106.

3              Mr. Shearer, this is an email an Erin Smith.  If

4    we can blow up that top, just the email section of it.

5              Do you know who Ms. Smith is?

6    A.  No, I do not.

7    Q.  You referenced before there's a "To" line that one of

8    the recipients is Mr. Doug Jensen.  Do you see that?

9    A.  Yes, I do.

10   Q.  And then another recipient is Mr. Keith Jones, right?

11   A.  Yes.

12   Q.  And the subject in the attachment is "Engineering

13   Scorecard Detail As of April 13th, 2016."  Do you see that?

14   A.  I do.

15   Q.  Why don't we go to Exhibit 115, please.  If we can blow

16   up that top section again.

17              Same type of email, one week later, 4-20, 2016,

18   same sender, same recipient, right?

19   A.  Mm-hm.

20   Q.  Is that a yes?

21   A.  Yes.  Sorry.

22   Q.  If we can go to 127.  I'm sorry.  I must have the wrong

23   exhibit.  If we can go back to 115, please.

24              It's 124.  And if we can blow up that top section

25   again.

1      This is same email, same recipients, one week

2   later again, right?

3   A.  Yes.

4   Q.  So this is an email to managers in the Twin Cities with

5   updated scorecard detail on a weekly basis.

6   A.  It appears so.  I don't see the attachment or if anybody

7   was actually opening and reading the email, but yes, it

8   appears so.

9   Q.  Okay.  Well, why don't we go to the second page, please.

10  It's a little bit hard to follow because most of the

11  information is redacted, but you see on the top it says

12  "2016 GDM-TC," General Director of Line Maintenance in the

13  Twin Cities, right?

14  A.  That's correct, yes.

15  Q.  And if we go down to page 6 of this exhibit, here it

16  actually shows in the Twin Cities East the updated metrics

17  for that week, right?

18  A.  So based on whenever this was pulled, I don't see it

19  there, but I mean, it could have been pulled at anytime.

20  It's a 2016 Year Snapshot For General Director of Twin

21  Cities -- and looks like Twin Cities East, the TWCEW.

22  Q.  So at least in the Twin Cities, these updated scorecards

23  were being sent on a weekly basis according to these

24  exhibits.

25      MS. FERGUSON:  Objection.  Foundation.

```
 1    A.  There was an email going out, yes, but I haven't seen
 2    the attachments or any of that stuff.  But yes, there was an
 3    email going out with that subject line.
 4    Q.  You also testified that you don't believe the scorecard
 5    in some way incentivizes people not to report the things
 6    that are on the scorecard.
 7    A.  That's correct.
 8    Q.  If we could pull up Exhibit 107, and I believe --
 9              MS. FERGUSON:  Objection.  Relevance.
10              THE COURT:  I'll take a look at it.
11              (Exhibit displayed to the Court and witness)
12              THE COURT:  I'll allow the witness to be
13    questioned about it for the moment and then decide the
14    separate question of its admissibility after I hear that.
15              MR. LUCAS KASTER:  Great.  Thank you, Your Honor.
16    BY MR. LUCAS KASTER:
17    Q.  So, Mr. Shearer, if you look at your screen here, and if
18    we can blow up the bottom email just so Mr. Shearer can read
19    it okay.  I know it's probably small.
20              This is an email back in April of 2016 regarding
21    some type of derailment that occurred, is that fair?  In
22    summary.
23    A.  Yes, I'd say that's fair.
24    Q.  And then if we go back up to the top email, there's an
25    email from Mr. Jensen dated April 16th of 2016.  Do you see
```

1    that?

2    A.  I do, yes.

3    Q.  To Mr. Jones.

4    A.  Yes.

5    Q.  Regarding the derailment at 28th Street, right?

6    A.  Yes.

7    Q.  And Mr. Jensen writes:  "Keep it nonreportable if

8    ours ... shooting for a great year and scorecard points ...

9    let's kick butt."

10   A.  Yes.

11   Q.  Do you interpret Mr. Jensen's email to be encouraging

12   Mr. Jones to somehow classify this derailment as

13   nonreportable so it doesn't show up on the scorecard?

14             MS. FERGUSON:  Objection.  Foundation.  Calls for

15   speculation.

16             THE COURT:  I'll overrule those objections and the

17   prior relevance objection.  I'll allow the document to be

18   admitted.

19   A.  Can you repeat your question then?

20   BY MR. LUCAS KASTER:

21   Q.  Sure.  If we can show Exhibit 107, this top email.

22             This is the email from Mr. Jensen to Mr. Jones

23   saying:  "Keep it nonreportable if ours," because reportable

24   incidents show up on the scorecard, right?

25   A.  Yes, reportable incidents show up on the scorecard.

1    Q.  And Mr. Jensen is saying:  "Keep it nonreportable if

2    ours ... shooting for a great year and scorecard points,"

3    right?

4    A.  That's what it says, yes.

5    Q.  Do you interpret that to be Mr. Jensen telling Mr. Jones

6    to classify an incident as nonreportable so it doesn't show

7    up on the scorecard?

8             MS. FERGUSON:  Objection.  Foundation.

9             THE COURT:  Overruled.

10   A.  I do not.  I know what it says on the screen here, but

11   if you'll just give me time to explain on this.

12            Whether or not a derailment is reportable or

13   nonreportable is set by the FRA with a dollar threshold.

14   There's no control.  If I walk out to a derailment and

15   something is damaged beyond repair and has to be replaced,

16   it is what it is.  It meets a dollar threshold.

17            Sometimes there are cases where you look at

18   something and is this damaged beyond repair.  It's a

19   judgment call.

20            And sometimes you could have an individual out

21   there that says, "You know what?  I want the best

22   gold-plated territory I could possibly have as a roadmaster

23   and I want all brand-new things."

24            Your job as a manager over a younger supervisor is

25   to help them see the big picture, right?  Not everybody is

SHEARER - CROSS

 1   going to have a brand-new turnout at every location on the

 2   territory.  So a statement like this from a GDM to a DE

 3   could be, as you go out there and you talk to your

 4   front-line supervisors, make sure they're making the right

 5   call for the right reasons.

 6   Q.  And I think you were just saying that whether something

 7   is reportable or nonreportable is not a judgment call.  It

 8   either is or it isn't, right?

 9   A.  Correct.  There's a dollar value that controls that,

10   correct.

11   Q.  So Mr. Jensen shouldn't be able to tell Mr. Jones, "Keep

12   it nonreportable."  It either is or it isn't, right?

13   A.  Correct.

14   Q.  When you say that people only look at the rankings

15   once -- the scorecard once or twice a year, are you also

16   saying that with respect to the rankings?

17   A.  Yes.  Most people I've talked to, most people I've

18   worked around with it, had not seen these emails that was

19   out there.  Most people align scorecard with two periods of

20   review that we do as a company called performance management

21   review.  They're our P&P process.

22   Q.  The performance reviews.

23   A.  Yup, correct.

24   Q.  So managers look at the scorecards and the rankings as

25   part of the performance reviews.

1    A.  That's typically the time they would look at it, yes.

2    Q.  If we can pull up Exhibit 140 as well.

3            MR. LUCAS KASTER:  Counsel can let me know if

4    they're maintaining their objection.

5            MS. FERGUSON:  My objection would remain.

6    Foundation.

7            THE COURT:  Let's see if the witness can establish

8    the foundation.

9    BY MR. LUCAS KASTER:

10   Q.  If we can pull up Exhibit 140, please.

11           Mr. Shearer, this is an email from Mr. Jensen, who

12   you testified before was the general director of Twin

13   Cities, right?

14   A.  Correct, yes.

15   Q.  To Mr. Jones.  Do you know Mr. Jones was a division

16   engineer in the Twin Cities division?

17   A.  Yes, I do, that's correct.

18   Q.  And it was dated June 24th of 2016, right?

19   A.  Yes, correct.

20   Q.  And there's a subject line, but no other message in the

21   email, right?

22   A.  Correct, yes.

23           MR. LUCAS KASTER:  Move for the admission of

24   Exhibit 140.

25           MS. FERGUSON:  Objection.  Foundation.

SHEARER - CROSS

```
1                   THE COURT:  Overruled.
2      BY MR. LUCAS KASTER:
3      Q.  If we can bring up Exhibit 140.
4              This is an email from Mr. Jensen to Mr. Jones
5      congratulating Mr. Jones on the fact that he moved into
6      third place on the scorecards, right?
7      A.  Yes, correct.
8                   MR. LUCAS KASTER:  And then if we could go to
9      Exhibit 142 and just show this to the witness, please.
10     Q.  Again, this is an email from Mr. Jensen to various
11     recipients, including Mr. Jones, on July 18th of 2016,
12     right?
13     A.  Could I ask for the top to be blown up on this one?  I'm
14     sorry.
15     Q.  Yes, certainly, certainly.
16     A.  Okay.  Could you repeat the question just to make sure
17     I'm answering that?
18     Q.  Sure.  This is an email from Mr. Jensen to various
19     recipients, including Mr. Jones, on July 18th of 2016.  Do
20     you see that?
21     A.  Yes, I do.
22     Q.  And there's a couple paragraphs.  I want to focus on
23     the -- it's kind of the bottom half of this top email.
24     There's one that starts with "Score care" -- do you see
25     that -- "will remain the same"?
```

1    A.  Yes, I do see that.

2    Q.  It says:  "Score care will remain the same (green) as

3    long as we don't overspend."  Is that a reference to the

4    scorecard?  It's just a spelling error as far as understand?

5              MS. FERGUSON:  Objection.  Foundation.

6              THE COURT:  Overruled.

7    A.  I would -- I'm going to have to make an assumption that

8    I would assume he meant scorecard on that.

9    Q.  And then the next paragraph says:  "I want each of you

10   to be at the top of the scorecard by year's end."

11             Do you see that?

12   A.  I do, yes.

13   Q.  This is another reference by Mr. Jensen to various

14   individuals, including Mr. Jones, about performance on the

15   scorecard and the rankings.

16   A.  Yes, it appears that way.

17             MR. LUCAS KASTER:  Move for the admission of

18   Exhibit 142.

19             MS. FERGUSON:  Objection.

20             THE COURT:  Overruled.  It's admitted.

21             MR. LUCAS KASTER:  Then if we could go to Exhibit

22   146 and just show this to the witness, please.

23   BY MR. LUCAS KASTER:

24   Q.  Mr. Shearer, there's two mails on this front page.  The

25   bottom one appears to be one of those example emails that I

SHEAFER - CROSS

1    was showing you before where the scorecards are sent out on

2    a weekly basis with an updated scorecard.

3              Do you see that on the bottom for Ms. Smith?

4    A.  Yes, I do.

5    Q.  And then Mr. Jensen replies to Mr. Jones and a few other

6    recipients, right?

7    A.  Yes.

8    Q.  And then if we go to the sixth page of this exhibit in

9    an attachment -- it's kind of hard, because it's the wrong

10   direction, at least on my page it is, but this is another

11   example of the attachment of the updated scorecard metrics,

12   right?

13   A.  It appears that way, yes.

14             MR. LUCAS KASTER:  Move for the admission of

15   Exhibit 146.

16             MS. FERGUSON:  Objection.  Foundation.

17             THE COURT:  I'll overrule it.  We're getting

18   cumulative.

19   BY MR. LUCAS KASTER:

20   Q.  Mr. Jensen says -- and I just have one question on this,

21   if we can go back to the first page.

22             Mr. Jensen's first line is:  "Looking good.  By

23   the end of the month you should all be in the top five."

24             Do you see that?

25   A.  Yes, I do.

1    Q.  You understand that end-of-the-year performance reviews,

2    the grades that managers receive on their end-of-the-year

3    performance reviews, also impacts to some degree the level

4    of their bonus under the Incentive Compensation Plan.

5    A.  Yes, I do.

6    Q.  Mr. Shearer, I think you testified that in your view

7    there was no reason for a manager to dissuade an employee

8    from reporting a defect at BNSF.

9    A.  That's correct, yes.

10   Q.  No reason to dissuade an employee from entering a slow

11   order.

12   A.  That's correct, yes.

13   Q.  Have you listened to the recordings in this case?

14   A.  I have not, no.

15   Q.  Do you know that Mr. Jones was swearing and yelling at

16   Mr. Sanders after he entered track defects and after he

17   entered slow orders?

18   A.  No, I do not.

19   Q.  Have you ever asked Mr. Jones, "Why did you do that?"

20   A.  To my knowledge, I have not listened to the recording,

21   so I didn't know he was doing that.  I have not asked any

22   questions on that.

23           MR. LUCAS KASTER:  I have no further questions,

24   Mr. Shearer.  Thank you.

25           THE COURT:  Ms. Ferguson?

1           MS. FERGUSON:  Just briefly.

2

3                        **REDIRECT EXAMINATION**

4      BY MS. FERGUSON:

5      Q.  Just following up on that last question, if a track

6      inspector doesn't report a track defect or a slow order,

7      BNSF has other means by which to find those defects and slow

8      orders, correct?

9      A.  Yes, we do.

10     Q.  And is that the reason there would be no incentive not

11     to report track defects?

12     A.  Yes, it is.

13     Q.  That coupled with potential catastrophic outcomes for

14     not reporting track defects or slow orders.

15     A.  That is correct, yes.

16     Q.  Thank you.

17           MS. FERGUSON:  Nothing further.

18           THE COURT:  Mr. Kaster, I assume nothing further.

19           MR. LUCAS KASTER:  Nothing further, Your Honor.

20     Thank you.

21           THE COURT:  Thank you.  Mr. Shearer, you're

22     excused.  Thank you, sir.

23           THE WITNESS:  Thank you.

24           THE COURT:  Ms. Ferguson, is BNSF prepared to call

25     its next witness?

DETLEFSEN - DIRECT

```
 1              MS. FERGUSON:  Yes.  I believe the next witness is
 2     out in the hall.
 3          (Pause - witness retrieved)
 4              MS. FERGUSON:  And the next witness is Stephanie
 5     Detlefsen.
 6              THE COURT:  Good morning, Ms. Detlefsen.  I'll
 7     invite you to come up here and stand between the railing and
 8     the witness seat, if you would, and I'll invite
 9     Ms. Morton to administer the oath at this time.
10              THE CLERK:  Please state your full name for the
11     record, spelling your first and last name.
12              THE WITNESS:  Stephanie Marie Detlefsen.  I'll
13     first spell the first name.  S T E P H A N I E; Detlefsen is
14     D-E-T-L-E-F-S-E-N.
15         STEPHANIE M. DETLEFSEN, DEFENDANT'S WITNESS, SWORN
16              THE COURT:  Thank you.  Please be seated.
17              Ms. Donesky?
18              MS. DONESKY:  Thank you, Your Honor.
19
20                      DIRECT EXAMINATION
21     BY MS. DONESKY:
22     Q.  Good morning, Ms. Detlefsen.
23     A.  Good morning.
24     Q.  Who do you currently work for?
25     A.  BNSF Railway Company.
```

DETTLEFSEN - DIRECT

1    Q.  And how long have you worked for BNSF?

2    A.  Since 2002.

3    Q.  So nearly 20 years?

4    A.  That's right.

5    Q.  What is your current position?

6    A.  Director, Labor Relations, Employee Performance.

7    Q.  And what department is this position in?

8    A.  Labor relations.

9    Q.  Is there any reporting relationship between labor

10   relations and the engineering department?

11   A.  No.

12   Q.  How long have you held your position, your current

13   position?

14   A.  Since 2014.

15   Q.  So you were in this position in 2016.

16   A.  That's right.

17   Q.  In your position, what are your primary duties and

18   responsibilities?

19   A.  So what I do in my position is I help manage the

20   discipline policy for union employees, and specifically,

21   somebody on the team that I'm on will review any potential

22   dismissal before that discipline is issued.

23   Q.  Where are you located in terms of your office?

24   A.  Fort Worth, Texas.

25   Q.  Do you have any direct reports?

```
 1    A.  No.

 2    Q.  Do you have any reporting relationship to Doug Jensen?

 3    A.  No.

 4    Q.  Any reporting relationship to Keith Jones?

 5    A.  No.

 6    Q.  Who do you report to?

 7    A.  I report to -- at the time or now?

 8    Q.  Oh, sorry.  Yes, let's be clear.  Those questions were

 9    as of 2016, and who did you report to in 2016?

10    A.  In 2016, I reported to Derek Cargill.

11    Q.  What is PEPA?

12    A.  So PEPA's an acronym.  It just means Policy for Employee

13    Performance Accountability.

14    Q.  And is there a policy that's entitled that?

15    A.  That's right.

16         MS. DONESKY:  Jan, if we could pull up Exhibit 10,

17    Defendant's 10.

18    Q.  We'll look at this document here in a moment.  If you

19    could describe, then, your role, there's reference I think

20    to a PEPA team.  What is the PEPA team?

21    A.  So the PEPA team is the team that I've described that

22    I'm a part of that helps ensure that our policy for our

23    union employees, discipline, is handled consistently

24    throughout the system, and we review potential dismissals

25    before the discipline is issued.
```

DETLEFSEN - DIRECT

1   Q.  Does the PEPA team review all discipline matters?

2   A.  No.

3   Q.  Which ones does it review?

4   A.  Potential dismissals.  We're there to help if somebody

5   has questions about lesser discipline, but we don't read

6   those cases.

7   Q.  How long have you served on the PEPA team?

8   A.  Since 2014.

9   Q.  Seven years.

10  A.  Yes.

11  Q.  Looking then at the PEPA policy on your screen, which is

12  Exhibit 10, was this policy in effect in 2016?

13  A.  Yes.

14  Q.  What generally does this policy provide?

15  A.  So it spells out the levels of discipline.  They're

16  standard discipline, serious discipline, and then a section

17  called standalone dismissals.

18              MS. DONESKY:  And, Jan, if you can go to 03, page

19  3.

20  Q.  You just referred to three categories of discipline, one

21  being the standard violations you mentioned?

22  A.  That's right.

23  Q.  And that's on this first category.

24              MS. DONESKY:  And then, Jan, if you could go to

25  04, the next page, and the second category, Series

1   Violations.

2   A.  Yes.

3   Q.  And then third is the standalone dismissible violations

4   that you referenced.

5   A.  Right.

6   Q.  Can you read that section of what that provides under

7   the Section 3?

8   A.  "A non-exhaustive list of standalone dismissible

9   violations is provided in Appendix B.  The violations

10  identified in Appendix B may result in immediate dismissal."

11  Q.  Does every standalone dismissible violation always

12  result in dismissal?

13  A.  No.

14  Q.  And why is that?

15  A.  Oh, there could be different reasons.  The record itself

16  could have some sort of procedural flaw because we have to

17  follow collective bargaining agreements, or the record

18  itself just might not be strong enough to support a

19  dismissal ultimately, because it has to go to arbitration

20  later.

21  Q.  That said, this category falls within those types of

22  violations that may result in immediate dismissal.

23  A.  Yes.

24  Q.  And when you say "immediate dismissal," does that mean

25  it doesn't progress through a progression?  Is that the

1   distinction?

2   A.  Yes.  So standalone isn't part of a progressive

3   discipline policy.  This category, the rule violations are

4   so egregious that even if you had been employed for 40 years

5   and had no discipline on your record, you could stand for

6   dismissal.

7   Q.  And then it references an Appendix B.

8          MS. DONESKY:  Jan, could you go to 06, please.

9   And if you could highlight the top part to one, the title

10  and -- thank you.

11  Q.  Is one of the categories of potential standalone

12  dismissible violations theft, according to this?

13  A.  Yes.

14  Q.  "Or any fraudulent act which may be evidenced by the

15  intent to defraud BNSF or by the taking of BNSF monies or

16  property not due"?

17  A.  That's right.

18  Q.  Prior to the review that you conducted in 2016 -- now,

19  were you involved as a part of the PEPA team in reviewing

20  Mr. Sanders' hearings of investigation?

21  A.  Prior to -- I got lost in your question.

22  Q.  Sorry.  Yeah.  On the PEPA team, were you involved in

23  reviewing Mr. Sanders' investigative hearings?

24  A.  Yes.  I'm the one that reviewed the dismissals.

25  Q.  Okay.  And prior to that time, were you aware of or

1   familiar with Mr. Sanders?

2   A.  No.

3   Q.  Ever met him?

4   A.  No.

5   Q.  How did you first come to review the hearing transcripts

6   with respect to Mr. Sanders?

7   A.  I just assigned them to myself.  What we do when the

8   cases come in, it's a team, so you just try to balance the

9   workload.  So his cases came up, I was available to do the

10  work, so I did.

11  Q.  And would that case come to you typically by email?

12  A.  It did back then, yes.

13  Q.  Okay.

14          MS. DONESKY:  Jan, if you can go to Exhibit 81,

15  please.

16  Q.  Looking at Exhibit 81, does that reflect at the bottom

17  part --

18          MS. DONESKY:  Jan, if you can highlight that

19  middle part, please.  Thank you.

20  Q.  Is this how the first hearing investigation came to your

21  attention relating to Mr. Sanders?

22  A.  Yes.

23  Q.  And so it goes -- is it an email then?  Does the PEPA

24  team have its own email?

25  A.  That's right.  The PEPA email account is a shared inbox,

DETLEFSEN - DIRECT

1    so at the time emails would just come in and you would just

2    assign them to yourself.

3    Q.  How many were on the team at the time?

4    A.  Three people.

5    Q.  And then did you receive an additional email from

6    Mr. Jones with respect to Mr. Sanders?

7    A.  Yes.

8            MS. DONESKY:  Jan, if we can go to Exhibit -- I

9    think it's 83 -- 82, please.  Sorry.  My D-82 looks

10   different.  Then if you can highlight the middle part,

11   please.

12   Q.  Would this reflect a second email you received from

13   Mr. Jones then?

14   A.  Yes.

15   Q.  And what is typically attached then with the email?

16   A.  Just the investigation transcript and exhibits and the

17   employee's transcript.

18   Q.  And upon receiving each of these emails, what did you do

19   next?

20   A.  I reviewed the record, reviewed Mr. Sanders' employee

21   transcript to see if he had any active discipline, read the

22   investigation transcript testimony and then reviewed the

23   exhibits.

24   Q.  And what, if any, weight would you give to or did you

25   give to Mr. Jones' summary that he provided in these emails?

1    A.  None.

2    Q.  And why is that?

3    A.  Because I do my own independent review.

4    Q.  And then looking at after you conducted the

5    investigative hearings, you got two emails with two

6    different transcripts, right, two different hearings?

7    A.  That's right.

8    Q.  Is that unusual to receive for one employee hearing

9    transcripts more than one at one time?

10   A.  No.

11   Q.  So that's happened before?

12   A.  Yes.

13   Q.  And once you review those, then what did you do next?

14   A.  I reached out to the law department and human resources.

15   Q.  Why did you do that here?

16   A.  Mr. Sanders and his local chairman alleged retaliation,

17   and anytime there's an allegation like that I involve the

18   law department, and in this particular case he said HR

19   complaints, so I looped in HR as well.

20          MS. DONESKY:  Jan, if you could pull up Exhibit

21   83, please, middle of the page, please.

22   Q.  Ms. Detlefsen, does this reflect the email that you

23   would have sent to human resources to request their review

24   of the matter concerning Mr. Sanders?

25   A.  Yes.

DITLEFSEN - DIRECT

```
 1    Q.  And then do you also conduct any kind of -- do you
 2    prepare any kind of summary or report after you reviewed the
 3    investigative hearing?
 4    A.  After I've reviewed the record, if I support dismissal,
 5    then I will write a synopsis.
 6    Q.  With respect to --
 7           MS. DONESKY:  Oh, if you can stay on 83.
 8    Q.  With respect to the review from HR, what response did
 9    you receive back from human resources?
10    A.  Do you want me to read it or?
11    Q.  Yes, please.
12    A.  So Terry Morgan responded:
13           "Thank you for asking.  Regional HR Director Dane
14    Freshour and I are very familiar with Mr. Sanders'
15    allegations of harassment and retaliation.  There is no
16    evidence to substantiate his allegations.  Please consider
17    this case on the merits of the facts and evidence brought
18    forth during the formal."
19    Q.  When he writes to "please consider the case on the
20    merits of the facts and evidence brought forth during the
21    formal," what did you understand that to mean?
22    A.  He meant just read the investigation for what it is,
23    that there was no indication that it was evidence of
24    retaliation of any kind, and so just read for the rule
25    violations itself.
```

DETLEFSEN - DIRECT                                                    1190

1    Q.  And did you do so?

2    A.  Yes.

3           MS. DONESKY:  Looking at, then, Exhibit 84, Jan,

4    if you could pull that up.

5    Q.  You referenced that you prepare a report upon reading of

6    the transcript.  Does this Exhibit 84 reflect the synopsis

7    that you prepared in Mr. Sanders' separate investigations?

8    A.  Yes.

9    Q.  Why don't we walk through this document, then.

10          MS. DONESKY:  If you can just start with the top

11   half, Jan, please.

12   Q.  You have two backgrounds, then, separated out.  What is

13   your purpose there of doing that?

14   A.  All right.  So this part I don't actually write.  This

15   is auto-populated from our EPTS systems so we might go in

16   there and just change if there was grammar or something

17   incorrect, but I didn't write the background one and two.

18   The information that I input starts down below.

19   Q.  Okay.  With respect to --

20          MS. DONESKY:  Jan, if you can just --

21   Q.  Is the policy justification something you populate?

22   A.  The policy justification is, yeah.  It's only the

23   background that I don't write.  That's just the

24   investigation notice language and it notes who the

25   investigating officer was and then who the discipline

DETLEFSEN - DIRECT

```
 1    officer was.
 2              MS. DONESKY:  So, Jan, if you can highlight the
 3    hire date, discipline, policy justification section, please.
 4    Q.  Can you explain this section, then?
 5    A.  Right.  So the hire date is simply when Mr. Sanders was
 6    employed.  The discipline shows any active discipline.
 7    There could be more discipline on his record, but if it was
 8    not active, then I would not list it there.  And in this
 9    case that standard discipline didn't have anything to do
10    with the justification to dismiss because that was a
11    standalone.  Both of them were standalone dismissible
12    events.
13    Q.  And are they each separate and apart, each standalone
14    dismissals separate and apart from each other?
15    A.  Yes.
16    Q.  So let's focus on the first hearing, then, that you
17    reviewed.  What was ultimately upon your review the basis
18    for your decision?  What did you ultimately decide with
19    respect to the hearing in terms of the rule violations?
20    A.  That they had clearly been proven.
21    Q.  And why did you conclude that?
22    A.  The testimony and the exhibits, the totality of the
23    record, was convincing that Mr. Sanders did dishonestly
24    claim time for pay -- claim time -- claim pay for time not
25    worked.
```

DETLEFSEN - DIRECT

1    Q.  Were there -- there was some arguments made at the

2    hearing with respect to the fact that payroll had not

3    closed.  What, if any, weight did that have on your review?

4    A.  None.

5    Q.  And why is that?

6    A.  Well, one of the main reasons is his local chairman said

7    we wouldn't have changed anything anyway, so I didn't really

8    understand that argument that he said throughout the hearing

9    this isn't fair, you know, payroll hasn't closed yet, but

10   then he would say in the next sentence:  But we wouldn't

11   change any time anyway, because we don't think anything is

12   wrong here.

13          But the second reason is, I see that defense a

14   lot, that payroll hasn't closed; therefore I'm not guilty of

15   stealing, and to me that's not persuasive, because as long

16   as the intent to steal was there, then I'm glad that you,

17   you know, didn't get paid money that you weren't due, but

18   that doesn't mean that you didn't try to steal it.

19   Q.  There was also an argument in the first hearing that

20   Mr. Sanders argued that he went to Bridal Veil during part

21   of that day.  What, if any, weight did that argument have on

22   your review.

23   A.  None.

24   Q.  And why not?

25   A.  Because that was another argument that didn't make

1      sense.  He brought in his own GPS records to show us, hey, I

2      was working that day, you've got it all wrong, but his own

3      GPS records never put him at Bridal Veil.

4                So there was a lot in the record, it wasn't just

5      that, but that was one of the things that was pretty

6      persuasive.

7      Q.  In the first hearing as well as the second hearing, it

8      reflected that the supervisor had observed Mr. Sanders --

9      call it surveillance or reviewing him from afar.

10               Do you encounter in your review as part of the

11     PEPA team, are there other instances where surveillance

12     occurs?

13     A.  Yes.

14     Q.  Moving on, then, to the second hearing that you

15     reviewed, what conclusion did you draw upon reviewing the

16     record with respect to the second hearing?

17     A.  That Mr. Sanders again falsified his time.

18     Q.  And upon what basis did you reach that conclusion?

19     A.  Well, this one he actually said that he did.  He just

20     said that he was going to go back in later and change it,

21     but even when he do go back later and change it, he didn't

22     accurately claim his time.

23     Q.  There were also arguments made in that case with respect

24     to payroll hadn't closed, other types of arguments.  Were

25     any of those given any weight by you in your review?

DETLEFSEN - DIRECT

```
 1    A.  No.  Again, payroll not closing doesn't mean -- like,
 2    you're not supposed to falsify time and then go back in
 3    later and change it if you get caught.  Like, payroll
 4    closing is more for:  Oh, gosh.  I forgot.  I'm due a
 5    penalty claim for something and I need go back in there and
 6    put that.  Or:  Oh, gosh.  I forgot I need to claim holiday
 7    pay, or overtime, or whatever.  But it doesn't mean that you
 8    put in false time with a notion of going back later and
 9    changing it.  Because as Mr. Sanders even said in that
10    investigation when he went to do that, he couldn't remember
11    what times were right anyway.
12              MS. DONESKY:  If we can go to the second page,
13    Jan.
14    Q.  At the bottom of your synopsis -- Jan, at the very
15    bottom, the last portion, please, thank you -- there's
16    something there that references -- called "Arbitration
17    Estimates."  What is that?
18    A.  So it's a risk assessment for arbitration.  Once we
19    discipline an employee, the relationship employee/employer
20    isn't over yet.  It has to go through arbitration.  So
21    there's stages of appeal, and if the company declines the
22    union's appeals, it ultimately goes to a third-party
23    neutral.  So this is my assessment.
24              We would never give it a zero percent chance,
25    because you never know what's going to happen at
```

DETLEFSEN - DIRECT

1  arbitration.  So five percent is the lowest rating I could

2  give it.  So the "R" means I think there's a five percent

3  chance that he would be reinstated.

4        And the "B" is back pay.  So again, the lowest

5  rating I could give it was -- this is me saying I don't

6  think he's going to be reinstated and I don't think there

7  would be any back pay if he were reinstated.

8  Q.  And then going to the last page of your review, then, or

9  the document.

10        MS. DONESKY:  If you can, Jan.  Thank you.

11  Q.  Ultimately, then, was a determination made for -- what

12  level of discipline was determined?

13  A.  Dismissal.

14  Q.  And was it under the policy -- under what level was it

15  under the categories?

16  A.  Both of his dismissals were standalone.

17  Q.  And according to that review, it looks like also the

18  general manager, Chad Sundem, also reviewed the matter?

19  A.  Yeah.  After I write my synopsis, we'll send the records

20  out to the employee's chain of leadership and have their

21  general manager or EVP write some comments.

22  Q.  So that additional review was conducted as well.

23  A.  That's right.

24  Q.  And the synopsis we just we want through and that you

25  prepared, was that done contemporaneous with your review of

DETLEFSEN - DIRECT

1    the hearing transcripts?

2    A.  Yes.

3    Q.  Are you familiar, Ms. Detlefsen, with other instances of

4    maintenance of way employee dismissals in the Twin Cities

5    division over the last five years?

6    A.  Yes.

7    Q.  Looking at Exhibit 93.

8              MS. DONESKY:  Jan, please.  Thank you.  Defendant.

9              THE COURT:  Is there an objection to 93?

10             MR. LUCAS KASTER:  No objection, Your Honor.

11             THE COURT:  All right.  It's admitted.  It may be

12   published.

13   BY MS. DONESKY:

14   Q.  If we could blow up the first half, please.

15             Can you describe what this document is and how it

16   came about, or the -- is this one of your reviews for PEPA?

17   A.  Yes, I reviewed this case.

18   Q.  And so you're familiar with the circumstances.  Can you

19   please describe generally what was involved in this matter.

20   A.  So this employee had been talked to before about

21   accurately recording his time, so when he asked for time off

22   for a dentist appointment, his supervisor said okay, but

23   then he decided to follow up and make sure that the employee

24   was actually just going to the dentist.  And what he learned

25   by observing the vehicle was that it didn't move.  It was

1   parked at his house, I think it was, yeah, his residence for

2   four days, then the employee claimed that he had actually

3   worked.

4   Q.  And the references of the four days are listed there and

5   the amounts of time not worked?

6   A.  That's right.

7   Q.  And surveillance was conducted in that situation?

8   A.  Yes.

9   Q.  And what ultimately did you conclude upon review of the

10  hearing record in this situation?

11  A.  That the rule violations were proven and that he stood

12  for dismissal.

13          MS. DONESKY:  If you blow up that middle paragraph

14  there, Jan, where the cursor is.

15  Q.  It appears from this hearing that this individual also

16  claimed to have inputted his hours incorrectly, but planned

17  to correct them at a later date?

18  A.  That's right.

19  Q.  And what weight, if any, did give to the argument?

20  A.  None.

21  Q.  And why is that?

22  A.  Because again, the intent that you're able to edit your

23  time is predicated on the notion that you're being honest

24  when you're putting it in to begin with.  It isn't for you

25  to put in false times and then go back later and change.

1          MS. DONESKY:  And if we can go to the next

2    paragraph underneath that, Jan, please.  Thank you.

3    Q.  Looking at this paragraph that you prepared, it looks

4    like the additional defense was that he had also, according

5    to his local chairman, entered into evidence screenshots of

6    unofficially amended records that this individual worked up

7    on the eve of the investigation, and what was your

8    conclusion with respect to that defense?

9    A.  That it didn't matter, that he was trying to change it

10   after the fact, that he knew when he put it in that it was

11   false.

12   Q.  And it looks like also in the summary here that this

13   individual was removed from service pending investigation?

14   A.  That's right.

15          MS. DONESKY:  In the last paragraph, Jan, if you

16   could highlight, please.

17   Q.  Were there arguments made in this hearing as well that

18   the individual claimed that the supervisor was out to get

19   him?

20   A.  Yes.

21   Q.  And then you reached your conclusions with respect to

22   that argument and rejected it?

23   A.  That's right.

24   Q.  And ultimately you said dismissal was your -- you

25   supported dismissal.

DETLEFSEN - DIRECT

```
 1    A.  Yes.
 2              MS. DONESKY:  Then moving on to the next page,
 3    please, 02.  One more, please.
 4    Q.  Are you familiar with the circumstances with respect to
 5    employee CM?
 6    A.  Yes.
 7    Q.  Can you describe for the jury what the circumstances
 8    were there.
 9    A.  So he is a bridges and buildings foreman, and over the
10    course of three days his supervisor did surveillance on him
11    and again saw that he was falsifying his payroll by claiming
12    overtime that he didn't actually work.
13    Q.  And referenced in the summary are the dates on which the
14    surveillance was conducted, times were recorded, and
15    ultimately the discrepancies were noted.
16    A.  That's right.
17    Q.  And upon your review of the record, what were your
18    conclusions?
19    A.  That the rule violations were proven and I supported
20    dismissal.
21    Q.  And was that supported as a standalone dismissal?
22    A.  Yes.
23    Q.  And then if we can move on to 05, are you familiar with
24    circumstance of a dismissal with an employee with initials
25    of JT?
```

1    A.  Yes.

2    Q.  What were the circumstances with respect to this

3    individual?

4    A.  So this one was a case about dishonesty.  He was signal

5    maintainer and said that he had done a 90-day test when all

6    the records show that he had not.

7    Q.  And upon review of the record, what did you conclude

8    there?

9    A.  The rule violations were proven and I supported

10   dismissal.

11   Q.  And was that too as a standalone dismissal?

12   A.  Yes.

13   Q.  And then moving on to the 07, the circumstances here

14   with respect to RM, what were the circumstances relating to

15   this hearing?

16   A.  So this one I didn't actually review, but the

17   circumstances were that he was on a surfacing crew and

18   reported that he had left at the end of his shift and his

19   supervisor had noted that he hadn't worked for hours.  So he

20   left early and didn't have permission to do so and claimed

21   that he'd worked the entire time.

22   Q.  And upon review of the record, what did you conclude --

23   or what did the PEPA team conclude then?

24   A.  The employee was dismissed.

25            MS. DONESKY:  And then the last one in 09, Jan,

1    page 9.

2    Q.  What were the circumstances with respect to the

3    dismissal of SR?

4    A.  Okay.  This one wasn't one of mine either, but SR was

5    actually not a union employee.  He was what we call an

6    officer of the company or exempt.  It's like what I am.

7    You're at-will.  But he had craft seniority.  So when he

8    lost his exempt status for falsifying his expense reports,

9    he wanted to exercise his craft seniority, so then they had

10   to have an investigation to dismiss him altogether from the

11   company.

12   Q.  And ultimately, what was the conclusion reached then?

13   A.  That dismissal was supported.

14   Q.  Going back, then, just a last question for you.

15        MS. DONESKY:  Jan, if you could go back to

16   eighty -- we'll start with 81, please.

17   Q.  Just returning briefly to Mr. Sanders' situation, in

18   closing out the loop in your correspondence on that, if you

19   can look at the top half there.

20        MS. DONESKY:  And, Jan, highlight that, please.

21   Thank you.

22   Q.  Once you've completed your review and reach your

23   conclusion, what do you -- then how do you finish out your

24   review?

25   A.  So I send back my recommendation to the field, either

DETLEFSEN - DIRECT

1    explaining that I support dismissal or that I don't support

2    dismissal or, like in this case, I support dismissal, but

3    not for every charge that you might have thought.

4    Q.  And in this circumstance you reference that you have

5    read the record and you've consulted with HR and the law

6    department, correct?

7    A.  That's right.

8    Q.  And you support dismissal on a standalone basis for

9    dishonesty/theft of time.

10   A.  Yes.

11   Q.  And you indicate that the rule violations were proven.

12   A.  Right.

13   Q.  And then the last part you mention just what the

14   charge -- is that what you're explaining there, the last

15   part?

16   A.  That's right.  Some people -- insubordination wasn't

17   even one of the charges, so we couldn't discipline an

18   employee for something that we didn't charge him with.

19   Q.  That's what you were explaining there.

20   A.  Yes.

21   Q.  And the date of your concluding review is what?

22   A.  The date --

23   Q.  Yes.

24   A.  -- is April 27th, 2016.

25   Q.  And then looking at Exhibit 82 then.

DETLEFSEN - DIRECT

```
 1              MS. DONESKY:  First half of it again, please.
 2    Q.  Now, just to be clear, on the email we just looked at,
 3    was that to the investigative hearing, the first one?
 4    A.  Yes.
 5    Q.  And then this is to the second one, correct?
 6    A.  Right.
 7    Q.  Okay.  And what did you write to Mr. Jones?
 8    A.  "Keith, I have read the record and have consulted with
 9    HR and the law department.  I support dismissal on a
10    standalone basis for dishonesty/theft of time.  The rule
11    violations were proven."
12    Q.  And the date of that email was?
13    A.  April 27th, 2016.
14              MS. DONESKY:  I have nothing further at this time.
15              THE COURT:  We'll take a break, Mr. Kaster, at
16    this point.  I think it makes some sense.  We will break at
17    this point and we will resume at roughly between 11:05 and
18    11:10.  We'll pick up there.
19              All right.  We're adjourned.
20        (Recess taken at 10:50 a.m.)
21                         *    *    *    *
22        (11:10 a.m.)
23                         IN OPEN COURT
24        (Jury enters)
25              THE COURT:  Please be seated.
```

```
 1              Ms. Detlefsen, you can return to the witness
 2      stand, please.
 3              THE WITNESS:  (Complies).
 4              THE COURT:  Mr. Kaster?
 5              MR. LUCAS KASTER:  Thank you, Your Honor.
 6
 7                        CROSS-EXAMINATION
 8      BY MR. LUCAS KASTER:
 9      Q.  Ms. Detlefsen -- is that how you pronounce your name?
10      A.  Detlefsen.
11      Q.  My name's Lucas Kaster.  I'm one of the attorneys who's
12      representing Mr. Sanders.  I'm going to ask you a few
13      questions, okay?
14      A.  Okay.
15      Q.  The administrative hearings that you were referencing
16      with Counsel, do the Rules of Evidence apply in those
17      hearings?
18      A.  The administrative hearing.  You're talking about our
19      disciplinary process?
20      Q.  Correct.
21      A.  And you're asking what applies?
22      Q.  The Rules of Evidence.
23      A.  I don't know what you mean by the Rules of Evidence.
24      The Collective Bargaining Agreement applies.
25      Q.  What about the Rules of Civil Procedure?
```

DETERSEN - CROSS

1    A.  No, I don't think so.  It's not a legal proceeding.

2    It's an internal company --

3    Q.  And the person who's overseeing the proceeding is a BNSF

4    manager.

5    A.  Yes.

6    Q.  And you reference various objections that were brought

7    up during the hearing by Mr. Sanders and his union

8    representative, right?

9    A.  Yes.

10   Q.  Are those objections ruled on in any way, shape, or form

11   during the hearing?

12   A.  No.  Again, this isn't a legal proceeding, so we're not

13   lawyers.  We're just complying with the Collective

14   Bargaining Agreement to have this disciplinary process so

15   the employee can come and give us their side of the story.

16   If we think that there are rules that could have been

17   violated, the employee has a chance to explain it.  So they

18   have a union representative and -- I'm sorry.  I forgot your

19   question now.

20   Q.  Sure.  I was asking you about the objections that were

21   made.

22   A.  Oh.  So ruled on?  If it's something that can be

23   addressed, like:  I think we should cancel this

24   investigation because the time limits have been blown or

25   something like that, then they would address that, but if

DEFLEPSEN - CROSS

```
 1    it's just sort of an ongoing objection that can just be
 2    noted for the record, that's usually what the conducting
 3    officer says, is, "Your objection's noted" and then they
 4    just move on.
 5    Q.  For example, Mr. Sanders and his union representative
 6    raised during the hearings that they believed the charges
 7    were retaliation.
 8    A.  Right, that was one of their defenses, yes.
 9    Q.  Did anybody make a determined as part of that hearing
10    process whether those allegations by Mr. Sanders and his
11    union rep had any validity?
12    A.  Well, they raised that as a defense and then I took it
13    upon myself when I reviewed the record to escalate it to the
14    law department and the HR department because of those
15    allegations.
16    Q.  And the extent of your review is that email that we
17    looked at.
18    A.  That was the result of my review, not the extent of my
19    review.
20    Q.  Did you do something else to determine whether Mr.
21    Sanders' allegations of retaliation had any merit?
22    A.  No.  Like I said, I reached out to the law department
23    and the human resources department.
24    Q.  And they emailed you back saying there's no evidence to
25    support that.
```

DETLEFSEN - CROSS

1   A.  They said that there was no evidence that Mr. Sanders

2   had been singled out or retaliated against and that I should

3   just review the record for its merits.

4   Q.  And that was the extent of what you did?

5   A.  Right.  I reviewed the exhibits and there was a letter

6   in there in which the human resources department responded

7   to Mr. Sanders and said that his allegations against his

8   supervisor's communication style or something about his

9   communication had been had substantiated and that they had

10  rectified that situation, but that they found no evidence to

11  support that he was being singled out or retaliated against.

12  Q.  This PEPA department, it's a department within BNSF,

13  right?

14  A.  I wouldn't really call it a department.  It's just a

15  team in labor relations.

16  Q.  But all of the PEPA team is employed by BNSF.

17  A.  Yes.

18  Q.  Internal employees.

19  A.  That's right.

20  Q.  If we could go to Exhibit 169, please.

21          Ms. Detlefsen, this is Plaintiff's version of your

22  written-up summary from Mr. Sanders' cases.

23  A.  This is what?

24  Q.  Your written-up summary?

25  A.  Yes.

DETLEFSEN - CROSS

1    Q.  It's just a different exhibit number.

2    A.  Okay.

3    Q.  It's our marked exhibit as opposed to Defendant's.  And

4    if we could blow up the in the middle of the page, there's a

5    paragraph that starts with "Synopsis 1" in bold.

6            This is what you wrote, right, this synopsis is

7    your writing?

8    A.  That's right.

9    Q.  And you write in your synopsis:

10           "Although not well-developed on the record, his

11   supervisor had talked to Mr. Sanders many times about

12   working the hours of his shift and correctly accounting for

13   his time."

14           Where in the record did it say that?

15   A.  Like I said, it  wasn't really well-developed.  There's

16   something at the beginning of the first investigation about

17   how his supervisor noticed on the 18th that he had left

18   early, so she decided to conduct surveillance on the 19th.

19   I don't know on the record where it was discussed about --

20   that they had had previous discussions.

21   Q.  So you can't point to us any part of the transcript that

22   supports your summary that Mr. Sanders had been spoken to

23   many times before the allegations.

24   A.  No.  It was not well-developed.

25   Q.  And you just testified that Ms. Hoppenrath determined

DETLEFSEN - CROSS

```
 1    the day before on March 18th.
 2    A.   That's how I remember it, that she saw on the 18th that
 3    he had left early, so she decided to watch what he did on
 4    the 19th.
 5    Q.   Do you know how far early Mr. Sanders allegedly left?
 6    A.   No.
 7    Q.   Do you know Ms. Hoppenrath has testified in this case it
 8    was approximately 15 minutes?
 9    A.   Like I said, I didn't know.
10    Q.   Do you think that justifies surveilling an employee for
11    three separate days?
12    A.   I don't know what led up to Mr. Sanders being
13    surveilled.
14    Q.   Your decision was based solely upon the transcripts and
15    the exhibits, right?
16    A.   That's right.
17    Q.   And I believe you testified before that any prior
18    discipline that Mr. Sanders had didn't factor into your
19    determination.
20    A.   That's right.
21    Q.   And at the time you made the determination, you knew
22    that Mr. Sanders had filed complaints with HR.
23    A.   Yes.
24    Q.   About Mr. Jones and Ms. Hoppenrath.
25    A.   Whatever was on the record I read, that he had
```

DETTLEFSEN - CROSS

1    complained about his supervisors.

2    Q.  The same two people who are now alleging that he engaged

3    in payroll theft.

4    A.  Yes.

5    Q.  Did that raise any concerns for you?

6    A.  No.

7    Q.  You believed, I think you said, that the evidence was

8    overwhelming, something to that effect.

9    A.  Yes.  I think I said clearly proven or something, yes.

10   Q.  We've seen evidence in this case that Ms. Hoppenrath

11   testified that on March 19th, the first day, that

12   Ms. Hoppenrath testified that Mr. Sanders got back to the

13   Dayton's Bluff shack at 1:15 p.m.

14            Do you recall that?

15   A.  That sounds about right.

16   Q.  Do you know BNSF's own demonstrates that Mr. Sanders was

17   driving the company vehicle until 1:48?

18   A.  No, I don't remember the exact times.

19   Q.  You never looked at that.

20   A.  I looked at everything.  I just -- as I'm sitting here,

21   I don't remember the exact times that you're saying.

22   Q.  Do you think that that's important when you're making a

23   determination about somebody's job whether the evidence the

24   company is putting forward actually makes sense.

25   A.  Yes.

1    Q.  And despite the fact that Ms. Hoppenrath's testimony

2    about when Mr. Sanders got back conflicts with its own

3    records, you thought the evidence was -- what did you say?

4    A.  I thought that the -- a case was clearly proven.

5    Q.  You also referenced something about time entry and how

6    Mr. Sanders and his union representative indicated that

7    Mr. Sanders had put in time as a placeholder, right?

8    A.  Mr. Sanders said that he put in time with the intent to

9    go back later and change it?

10   Q.  Yes.

11   A.  Yes.

12   Q.  Did you talk to any other employees in the Twin Cities

13   division to determine whether that was a common practice?

14   A.  No.

15   Q.  You also referenced the fact of -- you said something

16   about the fact that Mr. Sanders simply because he hadn't

17   gotten paid yet, that doesn't mean his hours weren't

18   inaccurate or shouldn't matter.

19   A.  Right.

20   Q.  Do you know that BNSF actually paid Mr. Sanders then for

21   the hours that he reported?

22   A.  I don't understand your point.

23   Q.  The hours that BNSF contends were false were actually

24   paid to Mr. Sanders.  Do you know that?

25   A.  I did not know that.  It doesn't change my opinion.

DETLEFSEN - CROSS

1    Q.  Are you contending that BNSF always terminates employees

2    for alleged dishonesty or payroll issues?

3    A.  No.

4    Q.  At the time you made the decision for Mr. Sanders, did

5    you look at any comparators to determine whether BNSF made

6    similar decisions in other cases?

7    A.  No.

8    Q.  Did you ask Mr. Jones whether he's dismissed any other

9    employees for similar-type violations?

10   A.  No.  My job is to ensure consistent application of the

11   policy, and in this case the charges were proven, so as part

12   of consistently applying that policy, I supported dismissal.

13   Q.  How do you determine consistent application of policy if

14   you don't look at how it's been applied in other

15   circumstances?

16   A.  I do know how it's been applied in other circumstances

17   because that's my job.  I do it every day.

18              MR. LUCAS KASTER:  If we can bring up Exhibit 218,

19   please.  I'm sorry.  Before we go there, Karla, could we go

20   book to Defendant Exhibit 93.

21   Q.  Ms. Detlefsen, before I move on, I just want to ask you

22   a few questions about this exhibit.

23              This first synopsis -- or let me ask you generally

24   before I get into the specifics.

25              None of these individuals listed here were

1  supervised by Mr. Jones, right?

2  A.  Right.

3  Q.  None of them were supervised by Ms. Hoppenrath.

4  A.  I don't know who they were supervised by.

5  Q.  Looking at this first summary -- and if we could blow up

6  the paragraph in the middle of the page that starts with

7  "During the investigation."

8      And I think you said -- when you were summarizing

9  this synopsis, you said something about the fact that the

10  employee had been talked to before about time entries.

11      Do you recall that?

12  A.  Well, it's blown up now kind of blocking it, so if

13  that's what I says, then that's what I said.

14  Q.  Do you know that Mr. Sanders wasn't talked to about how

15  he was reporting time?

16  A.  It was my understanding he had been, but I don't know.

17  Q.  Based upon?

18  A.  I don't recall.

19  Q.  In this summary you reference that the person in

20  response to the allegations claimed that they were

21  distraught because they had witnessed a recent crossing

22  accident or fatality, right?

23  A.  That's right.

24  Q.  Have you ever witnessed a railroad fatality?

25  A.  No.

```
 1    Q.  Would you agree with me that witnessing someone being
 2    killed on the railroad would be a traumatic incident?
 3    A.  Absolutely.
 4    Q.  And BNSF's response to the claim of trauma by an
 5    employee who witnessed somebody being killed was to accuse
 6    them of theft and fire them?
 7    A.  No.
 8    Q.  If we could go to page 3 of this exhibit.  This is a
 9    synopsis where the supervisor admitted to surveil the
10    employee, right?
11    A.  That's right.
12    Q.  Taking pictures of them, right?
13    A.  Yes.
14    Q.  Let's go to page 7 of this exhibit.
15          This is an incident where a manager placed a
16    quarter on one of the vehicle's tires that the employee was
17    supposed to use --
18    A.  That's right.
19    Q.  -- to determine whether it had been moved or not.
20    A.  Yes.
21    Q.  In your experience, is that something you commonly see
22    is managers surveilling employees under their direction?
23    A.  I would say I've seen it before.
24    Q.  BNSF's okay with that.
25    A.  Yes.
```

DETLEFSEN - CROSS

```
 1    Q.  If we could go to Exhibit 218, please.

 2              Ms. Detlefsen, Exhibit 218 is a charge letter to a

 3    Mr. Kramer.  Do you see that?

 4    A.  Yes.

 5    Q.  This is a standard form that's sent out to an employee

 6    when they're accused of some type of violation.

 7    A.  That's right.

 8    Q.  And it tells them what the nature of the violation is

 9    and on what approximate date or time.

10    A.  Right.

11    Q.  This person was accused to have been lying about track

12    and time, right?

13    A.  That's what it says.

14    Q.  The manager who issued the letter was Keith Jones,

15    right?

16    A.  Yes.

17    Q.  If we can go to the second page, this person was offered

18    a waiver, right?

19    A.  Yes.

20    Q.  And a waiver means you're not terminated, you're

21    accepting responsibility, you can continue to be employed.

22    A.  That's right.

23    Q.  Do you know if Mr. Sanders was ever offered a waiver?

24    A.  I don't know that.

25    Q.  If we go to Exhibit 222, please.
```

DETTLEFSEN - CROSS

1        Another notice of investigation to an individual

2    Mr. Klukas.  Do you see that?

3    A.  Yes.

4    Q.  "Alleged theft of time when you allegedly falsified your

5    falsely your payroll beginning on August 2nd, 2016 and

6    continuing while working as a truck driver."

7        Do you see that?

8    A.  Yes.

9    Q.  So theft of time, falsifying payroll, on multiple days.

10   A.  Yes.

11   Q.  Issued by Keith Jones.

12   A.  Yes.

13   Q.  If we go to the next page, this individual received a

14   waiver and was given a 36-day suspension, right?

15   A.  36-day actual suspension, yes.

16   Q.  Not terminated.

17   A.  No.

18   Q.  If we go to Exhibit 223, Mr. Johnson alleged to have

19   entered unapproved overtime on multiple days, right?

20   A.  Right.

21   Q.  Issued by Mr. Jones.

22   A.  Yes.

23   Q.  If we go to the second page, the person was given a

24   waiver, right?

25   A.  That's right.

1    Q.  And given a one-year review period.

2    A.  Yes.

3    Q.  Did you review any of these documents to determine how

4    Mr. Jones had handled these types of violations before?

5    A.  No.

6    Q.  If we go to Exhibit 217.

7                MR. LUCAS KASTER:  And I don't believe this is in

8    evidence, so I'm going to show it to the witness.

9    Q.  Ms. Detlefsen, this is a notice of a level S actual

10   suspension to a Mr. Metzinger, M-E-T-Z-I-N-G-E-R.  Do you

11   see that?

12   A.  Yes.

13   Q.  June 15th, 2015 was the date of the investigation,

14   right.  Yes?

15   Q.  Allegation:  Falsification of time.

16   A.  Yes.

17   Q.  This person was not terminated, right?

18   A.  Right.

19   Q.  This is a record maintained in the regular course of

20   BNSF's business?

21   A.  Yes.

22               MR. LUCAS KASTER:  Move for the admission of

23   Exhibit 217.

24               MS. DONESKY:  Relevance objections.

25               THE COURT:  Overruled.

```
 1    BY MR. LUCAS KASTER:

 2    Q.  If we go to Exhibit 219, please.

 3              Another issuance of a notice to an employee on

 4    February 8, 2016.  Do you see that?

 5    A.  Yes.

 6    Q.  "Failure to comply with instructions and unauthorized

 7    overtime" on two separate days, right?

 8    A.  Right.

 9    Q.  This person was offered a waiver, right?

10    A.  I don't know.

11    Q.  This is a document maintained in the regular course of

12    business by BNSF?

13    A.  This investigation charge letter?  Yes.

14              MR. LUCAS KASTER:  Move for the admission of

15    Exhibit 219.

16              MS. DONESKY:  Relevance objection.

17              THE COURT:  Sustained.

18    BY MR. LUCAS KASTER:

19    Q.  If we could go to Exhibit 220.  Sorry.  If we can go

20    back to Exhibit 219, please.  Sorry.  I skipped over this

21    part.

22              If we go to the second page, this is the waiver

23    form that's actually signed by the employee, right?

24    A.  Right.  Now I can agree that there's a waiver.

25    Q.  So this person was offered a waiver, agreed to it.
```

DETERSEN - CROSS

```
 1    A.  Yes.

 2    Q.  Wasn't terminated.

 3    A.  Right.

 4            MR. LUCAS KASTER:  Move for the admission of

 5    Exhibit 219.

 6            MS. DONESKY:  Same objections.

 7            THE COURT:  Sustained.

 8    BY MR. LUCAS KASTER:

 9    Q.  Go to Exhibit 220.

10            This is a notice of an investigation "for failure

11    to comply with instructions, failure to input payroll and

12    production reports accurately."

13            Do you see that?

14    A.  And on time, yes, I see that.

15    Q.  The notice is dated August 17th, 2016?

16    A.  Yes.

17    Q.  There's a cc person Doug Jensen.  Do you see that on the

18    bottom?

19    A.  I see it.

20    Q.  Second page is a waiver where the person signed off and

21    remained employed.

22    A.  Yes.

23            MR. LUCAS KASTER:  Move for the admission of

24    Exhibit 220.

25            MS. DONESKY:  Relevance objection.
```

1         THE COURT:  Sustained, and 403.

2    BY MR. LUCAS KASTER:

3    Q.  Exhibit 221, please.

4         Notice dated September 28th of 2016 for a

5    Mr. Knutson.  Do you see that?

6    A.  Yes.

7    Q.  Allegation of "falsifying your payroll."  Do you see

8    that?

9    A.  Yes, mm-hm.

10   Q.  Is that a yes?

11   A.  Yes.

12   Q.  Go to the second page.  The person was offered a waiver,

13   right?

14   A.  Yes, the employee got a waiver.

15   Q.  And you see on the third page there's a signature where

16   the person accepted the waiver?

17   A.  Yes.

18   Q.  Not terminated.

19   A.  Right.

20        MR. LUCAS KASTER:  Move for the admission of

21   Exhibit 221.

22        MS. DONESKY:  Relevance objection.

23        THE COURT:  Overruled.

24

25   BY MR. LUCAS KASTER:

1    Q.  Ms. Detlefsen, we've looked at your synopsis and all of

2    these records that we just went over where employees are

3    accused of violations on multiple days and not a single one

4    went through two separate investigations, right?

5    A.  I don't know.

6    Q.  But Mr. Sanders went through two separate

7    investigations.

8    A.  Yes.

9    Q.  And you believe he should be terminated, you know,

10   solely, separately, for each of those allegations.

11   A.  That's right.

12   Q.  Even though all of these other employees had similar

13   allegations on multiple days and weren't terminated.

14   A.  Right.

15   Q.  Ms. Detlefsen, did you listen to the recordings in this

16   case?

17   A.  I don't remember listening to any recordings.

18   Q.  Do you know the recordings show Mr. Jones, the same

19   person who charged Mr. Sanders with these violations,

20   swearing at him, yelling at him, threatening him for doing

21   his job?

22   A.  No.

23              MR. LUCAS KASTER:  I have no further questions.

24              THE COURT:  Ms. Donesky?

25              MS. DONESKY:  Thank you.  Just briefly.

DETLEFSEN - REDIRECT

1

2                         **REDIRECT EXAMINATION**

3    BY MS. DONESKY:

4    Q.  In your experience, Ms. Detlefsen, are there times when

5    a waiver may be agreed upon between the parties either

6    during a hearing or post-hearing of the investigation?

7    A.  Yes.

8    Q.  Why might that be?

9    A.  Well, if it's after the hearing, it's usually because

10   there was something wrong with the record, so either there

11   was a fatal flaw, which means it wouldn't go past

12   arbitration because of some sort of procedural error, like

13   time limits, or sometimes there's an exchange of exhibits

14   that's supposed to happen 48 hours ahead of time, and if

15   that step wasn't taken, then that could be a fatal flaw, so

16   there could be procedural errors with the record.

17           Or it could just be sort of a weak record.

18   Generally speaking, our company witness might not have done

19   a good job testifying about the rule violations or how the

20   behavior was connected, or maybe the employee himself gave

21   plausible reasons that could maybe explain away things.  So

22   just generally the weakness of the record.

23   Q.  And is that part of -- as you're reviewing the record,

24   you conduct that risk assessment analysis that we looked at

25   at the bottom of your synopsis?

DETLEFSEN - RECROSS

```
 1    A.  Yes.

 2    Q.  And Counsel mentioned recordings at the very end of his

 3    questioning of you and you did not review those, correct?

 4    A.  No.

 5    Q.  In fact, you did not review anything outside of the

 6    hearing record, exhibits, and the employee transcript,

 7    correct?

 8    A.  Right.

 9    Q.  And that's exactly why you conduct an independent review

10    of that record.

11    A.  That's right.

12              MS. DONESKY:  Nothing further.

13              MR. LUCAS KASTER:  I just have a quick follow-up.

14              THE COURT:  Certainly.

15

16                    RECROSS-EXAMINATION

17    BY MR. LUCAS KASTER:

18    Q.  Ms. Detlefsen, I believe you testified initially with

19    Counsel that you review allegations when they're going to be

20    dismissed, right?

21    A.  I review investigations if the employee stands for

22    dismissal.

23    Q.  You don't review when the employee gets a waiver.

24    A.  I could have if we suggest a waiver after the fact.

25    Q.  After the investigation.
```

1    A.  After the investigation, that's right.  If an employee

2    stands for dismissal, they need to work with PEPA, but

3    otherwise I wouldn't be involved in the waiver.

4    Q.  Would you agree with me that according to your

5    interpretation of policy, these other employees who were

6    accused of falsifying payroll could have stood for

7    dismissal?

8    A.  I would have to know more about the -- each indi -- you

9    showed me a lot of different cases and they seem to be

10   slightly different, but I did see some allegations of

11   falsifying payroll in there.

12   Q.  But none of those things that I showed you showed up in

13   your synopsis, right?

14   A.  I don't understand your question.

15   Q.  The documents we just looked at that I went through with

16   you, none of those incidents appear in your synopsis.

17   A.  No.

18   Q.  So you didn't even know about them.

19   A.  No.

20           MR. LUCAS KASTER:  I have nothing further.  Thank

21   you.

22           THE COURT:  Ms. Detlefsen, you're excused.  Thank

23   you.

24           THE WITNESS:  Thank you.

25           THE COURT:  Let me ask just a couple questions to

1    make sure I understand where we're at.

2            Is that the last witness BNSF intends to call

3    here.

4            MS. DONESKY:  It is, Your Honor.

5            THE COURT:  Does Mr. Sanders rest?

6            MR. JAMES KASTER:  Yes, Your Honor, with notation

7    for the record.  There's a Court Exhibit A that I will -- or

8    1 that I will offer that's consistent with the conversations

9    that we've had on that issue.

10           THE COURT:  And that's admitted.

11           MS. DONESKY:  And then we have one evidentiary

12   matter to take up on a break.

13           THE COURT:  Great.  All right.  Thank you.

14           Members of the Jury, here's what we're going to

15   do:

16           We're going to break.  I realize it's a bit early,

17   but to make things continue to move along, I need to meet

18   with the lawyers now and take care of some business.

19           Why don't you take an hour for lunch at this time.

20   As I said, I know it's early, but it works now, so we'll do

21   it.

22           Plan to resume proceedings at 12:45, so it will be

23   just a bit over an hour, but we should be able to get going

24   at 12:45 and continue on with our business today.

25           All right.  The jury will adjourn at this time.

```
 1              (Jury excused)

 2              THE COURT:  Thank you.  Please be seated.

 3              Ms. Donesky?

 4              MS. DONESKY:  Yes.  I'll let Ms. Ferguson address

 5     the --

 6         (Defense counsel confer)

 7              MS. DONESKY:  We'd like to move for judgment as a

 8     matter of law under Rule 50.

 9              THE COURT:  That motion is denied.

10              Ms. Ferguson?

11              MS. FERGUSON:  Yes, Your Honor.  I'm not sure if

12     the Court has received -- I know it's been filed -- the

13     declaration of Paul Balanon, together with the motion

14     related to the request to admit the OSHA record.  I have a

15     copy of the declaration if that would be helpful.

16              THE COURT:  It's been filed on ECF?

17              MS. FERGUSON:  Yes, it has.

18              THE COURT:  All right.  And is there an objection

19     to that?

20              MR. JAMES KASTER:  Yes, there is, Your Honor.  I'd

21     like to be heard on it.

22              THE COURT:  Okay.  Why don't we hear from you,

23     Mr. Kaster, at this time on that issue then.

24              MR. JAMES KASTER:  All right.  Thank you, Your

25     Honor.
```

1    Specifically, we've talked about a couple of

2    objections to this.  With respect to what Mr. Balanon states

3    in his declaration, as I mentioned, if the Court regards

4    that as sufficient foundation, then the objection really

5    goes beyond foundation.

6    It specifically -- and I will note this:

7    First of all, there's two letters that are

8    attached from OSHA.  One gives the complainant the right to

9    appeal, so clearly indicates that his complaint with OSHA

10   has been dismissed.  The second one is more of an

11   articulation of the basis upon which that occurred.

12   And I would just note that the Court will find a

13   letter attached to Lucas Kaster dated October 16th of 2017,

14   and I'm going to read from the letter in part:

15   "The evidence supports that Respondent has

16   established a credible defense justifying actions against

17   Complainant.  FRSA does not protect an employee from

18   disciplinary actions for misconduct.  OSHA finds that there

19   is no reasonable cause to believe that Respondent violated

20   FRSA.  Therefore, this Complaint is dismissed."

21   This language about a credible defense is

22   completely misleading and does nothing to establish or

23   enhance the relevance of the fact that a complaint was

24   dismissed.  If the Court is going to admit this document at

25   all, I submit that the first page, which is a letter to

1    Ms. Smith dated October 16th of 2017, or the second page,

2    redacting all of the findings, would be all that could

3    possibly be relevant, but having paragraphs in there that

4    announce the wrong standard for determining the viability of

5    a defense in this case, can only serve to mislead.

6         So, I object as I have in the past on the basis

7    that this document, if relevant at all -- and I doubt that

8    it is relevant at all -- is clearly -- its relevance is

9    substantially outweighed by any likelihood of confusion of

10   the issues.

11        So, that's my objection and I think further

12   elaborating on this record with this specific document --

13   and I would just note that I think this one is more

14   dangerous than the union grievance procedure, because the

15   union grievance procedure is clearly about a violation of

16   the union contract.  This document is about a violation of

17   the FRSA, which is what the issue is in this case.  So

18   having an announcement from OSHA on the wrong standard that

19   doesn't control the evidence in this case would clearly

20   mislead the jury and lead to, if it's argued at all, what

21   would be a completely improper argument.

22        THE COURT:  Sorry, Mr. Kaster.  I'm listening and

23   trying to read at the same time and I do believe that I

24   understand your concern, certainly at a high level.  Let me

25   just read this letter if I could, please.

1          MR. JAMES KASTER:  Sure, and I apologize if I was

2     going on while the Court was --

3          THE COURT:  You were not.

4       (Pause - Court is reading)

5          THE COURT:  Mr. Kaster, are you suggesting the

6     incorrect statement of the standard is the first -- which of

7     the three sentences in the last paragraph on the first page

8     of that letter are contending is legally incorrect, the

9     second?

10         MR. JAMES KASTER:  The first sentence is legally

11    incorrect.  The second sentence is arguably legally

12    incorrect because it doesn't account for pretext.  And the

13    issue about whether there is reasonable cause is not before

14    the jury at all.  The OSHA findings of reasonable cause give

15    rise to a hearing.  There was no hearing here.  So it's just

16    completely inapposite.

17         THE COURT:  Let me hear from BNSF on this.

18         MS. FERGUSON:  We argued this issue already in

19    response to Plaintiff's motion to exclude both the National

20    Railroad Adjustment Board and the OSHA findings, and I think

21    this Court ruled on this issue and we continue to take the

22    position we did in our briefings.  The **Gunderson** case we

23    believe allows it, the declaration that we've submitted,

24    because our argument should come in under the public records

25    as simply an effort to show how this was received.  The

1    letter to Ms. Smith can certainly be removed, but that's

2    just establishing how Mr. Balanon got it and what capacity

3    he received it.  But again, as to the admissibility of this,

4    we rely upon the position taken in response to Plaintiff's

5    motion *in limine* to exclude this.

6         THE COURT:  Mr. Kaster, is there anything else you

7    want to get on the record on this?

8         MR. JAMES KASTER:  Yes, Your Honor.  If relevant

9    at all, I do not understand the relevance of the last two

10   paragraphs on page 1 of the October 16th, 2017 letter and

11   why they would not be redacted.  The simplest way to address

12   the potential prejudice is to remove what are confusing and

13   incorrect legal arguments on the facts as applied by OSHA in

14   their proceeding, and that accomplishes all of what could

15   possibly arguably be relevant about this.

16        THE COURT:  I understand Plaintiff's position on

17   this, I do think we've been over it, and I am not inclined

18   to change my mind about the admissibility or -- well, the

19   admissibility of the document.  I also believe that if

20   I'm -- just give me one second here and I can review this

21   affidavit one more time.

22        (Pause - Court is reading)

23        THE COURT:  I'll overrule the objection and I'll

24   admit the exhibit.

25        MR. JAMES KASTER:  Your Honor, one more thing for

1    the record.

2                THE COURT:  Sure.

3                MR. JAMES KASTER:  I am presuming that the Court

4    will not permit argument that goes to these last two

5    paragraphs, that that logic is somehow applicable here, the

6    last two paragraphs on page 1 of the October 16th, 2017

7    letter.

8                THE COURT:  I certainly won't permit argument

9    suggesting to the jury that they face the same task that the

10   agency faced in adjudicating this matter.

11               As I indicated earlier when we talked about this

12   this morning, it's easy for me to see gray area there pretty

13   quickly.  But I am going to be sensitive to that and we do

14   have an instruction on it and I will have my ears perked up

15   and take I guess what I would call a plan to take going in,

16   at least, a fairly conservative line with respect to how

17   hard or how much folks can argue the impact of these

18   decisions beyond relevance on these proceedings.

19               MR. JAMES KASTER:  Your Honor, I also presume the

20   Court would allow us to argue what is in fact true, which is

21   that Mr. Sanders did not have a hearing before OSHA, that no

22   one evaluated the credibility of witnesses, that this was a

23   paper determination at this point and that Mr. Sanders

24   pursuant to the law has a right to then exercise a right to

25   appeal, which is this trial.

1    THE COURT:  *De novo* review.

2    MR. JAMES KASTER:  *De novo*.  Thank you.

3    THE COURT:  Anything further from BNSF?

4    MS. FERGUSON:  Nothing further.

5    THE COURT:  All right.  Why don't we take five.  I

6  have revised jury instructions ready to go.  We can

7  distribute those, you can review them.

8    I'll give you a preview.  The revisions are to the

9  protected activity description consistent with BNSF's

10  concerns.  I modified the comparator instruction a bit, but

11  not to its substance, and here's why.

12    There's plenty of law out there that tells me what

13  I'm supposed to do if I'm reviewing comparators for pretext.

14  I don't understand that that's what BNSF is doing when it's

15  introducing -- I'll call it comparator, but that's an

16  imprecise term -- evidence of others as it did just now with

17  Ms. Detlefsen on the stand.  And I haven't found a case or

18  anything that comes to mind that suggests that that evidence

19  faces the same standard as comparator evidence in the

20  context of a pretext argument.  So that's the reason I've

21  sort of stuck with the gist of the initial draft of the

22  instruction.  And since I was reconsidering that and since I

23  did go through a couple of additional drafts of it, I

24  thought I would share those previews, at least, before I

25  distribute those instructions.

 1          So, take five.  Well, let's say ten minutes.  I'll

 2     come back in about noon, we'll go over those, give everybody

 3     an opportunity to get any objections on the record that they

 4     have, and then we will -- and a revised verdict form and we

 5     will continue on from there.  Make sense?

 6          MR. JAMES KASTER:  I understand what the Court has

 7     said.

 8          THE COURT:  I don't mean to -- you'll have an

 9     opportunity to get objections on the record and I'm not

10     confessing certainty about that.  I'm just saying I've

11     looked into it, I've done my best just to try to figure out

12     what law applies in that situation, and at least to the best

13     I can determine it's not the same standard that Plaintiff

14     faces, thus the instruction.  But you'll see.

15          All right.  So let's take ten.  We'll get those

16     distributed and plan to start up right after noon on that

17     piece of it.  Thanks, everyone.

18          (Recess taken at 11:50 a.m.)

19                         *     *     *     *

20          (12:10 p.m.)

21                         IN OPEN COURT

22          (Without the jury)

23          THE COURT:  Please be seated everyone.

24          Let me start with BNSF first.  Apart from the

25     objections that you raised earlier and that I've overruled,

1    are there any additional objections to the material that's

2    been amended?

3              MS. DONESKY:  No, Your Honor.

4              THE COURT:  All right.  Let me give Plaintiff an

5    opportunity to get on the record objections that they may

6    have to any of the revisions or anything that I did not

7    revise that we discussed earlier this morning.

8              MR. JAMES KASTER:  Your Honor, the protected

9    activity description is not as particularized as the Court's

10   initial version.  It's broader.  I mean, it tracks the law

11   and the subdivisions that were claimed, so it's not in any

12   sense misleading.  It's just not as helpful to the jury in

13   understanding what is factually applicable, but I don't have

14   any objection to it *per se*.

15              I also don't object to the verdict form being more

16   specific.  This tracks how many courts will handle exactly

17   this kind of matter.

18              With respect to the similarly situated issue, I'd

19   just say this, Your Honor:  I heard, I think I understood

20   what the Court said.

21              With respect to the exclusion of Exhibits 219 and

22   220, it wasn't clear to me if the Court was saying that the

23   plaintiff has an evidentiary standard that is this

24   (indicating) big and they have an evidentiary standard

25   that's this (indicating) big.

```
1        It can't possibly be true that they offer evidence
2   of other people under different supervisors and with
3   different circumstances, that that does not open the door.
4   If they're cherry-picking the evidence to demonstrate that
5   everyone gets terminated, it seems to me that that opens the
6   door to an argument that no, they don't.  You're
7   cherry-picking.  So the evidentiary standards for
8   consideration of the evidence have to be the same.  Both
9   sides have the same strike zone.  There might be different
10  arguments for why one comes in or the other one doesn't, but
11  the strike zone has to be same.
12       THE COURT:  I think different issues.  That's
13  where I'm -- and I guess that's what I'm saying.  That's
14  where I'm looking for help.  On the one hand, Mr. Sanders is
15  alleging that BNSF's termination decision was pretextual and
16  in support of that argument he is identifying two or
17  three --
18       MR. JAMES KASTER:  Actually, Mr. Mozinski
19  testified that there were five people.  We have three
20  specific examples.
21       THE COURT:  Three comparators, and the law there
22  is clear.  It seems to me that there is a different issue,
23  which is does BNSF's PEPA department terminate -- does
24  BNSF's PEPA department -- maybe it's broader than the PEPA
25  department -- terminate every employee who engages in time
```

1  theft, or is it aware that every employee who engages in

2  time theft is terminated.

3          I guess rightly or wrongly I'm seeing that as

4  something of a different issue, and I agree with you that

5  strike zone needs to be the same, but the two exhibits as to

6  which I sustained an objection, as best as I could tell in

7  realtime, didn't have anything to do with time theft.  They

8  had to do with different issues.  So that was the reason --

9  and then the reason I overruled the objection to the one

10 after that was it was payroll theft which I understood to be

11 time theft.  Now, I may have been wrong about that, but

12 that's the call I made in realtime and that's the way it's

13 going to be.

14          MR. JAMES KASTER:  Sure.  I understand that, Your

15 Honor.  I think I've been heard --

16          THE COURT:  Okay.

17          MR. JAMES KASTER:  -- so I'll shut up now.

18          (Laughter)

19          THE COURT:  All right.

20          MR. JAMES KASTER:  Maybe I won't.  Hold on one

21 second.

22          THE COURT:  Right, yeah.

23          MS. DONESKY:  Your Honor, if I may be heard on the

24 special verdict form briefly.

25          THE COURT:  Yes.

1    MS. DONESKY:  The only remark I noted -- let me

2  find it again.  If they reach damages, it strikes me that it

3  should have "if any" or "none."  It reads -- it's a little

4  misleading in that it almost reads that there has to be some

5  number put in there, and so typically the verdict form

6  should have either "if any" in the sentence or "none"

7  underneath a line, either of which we would request.

8    MR. JAMES KASTER:  I'm not hearing what's going on

9  here.

10    MS. DONESKY:  I made a comment on the special

11  verdict form, that if the jury were to reach damages, it

12  should have "if any" or "none" under the line so that -- you

13  still have to prove damages, and it reads currently as

14  though --

15    THE COURT:  Understood, yeah.  So here's what I'm

16  going to do.  I will add:  "through the date of our verdict,

17  if any, in the following amount."

18    MS. DONESKY:  Thank you.

19    THE COURT:  And then with respect to "emotional

20  distress, if any, in the following amount."  So preceding

21  "in the following amount, I'll put:  "if any,."

22    Okay.  Any other comments on the special verdict

23  form from BNSF?

24    MS. DONESKY:  No, Your Honor.

25    THE COURT:  Okay.  Mr. Kaster, let's return to the

1    other issue for a moment.

2          MR. JAMES KASTER:  Well, my smarter co-counsel

3    pointed out to me that the language that the Court has put

4    in the *prima facie* case instruction does not exactly track

5    the statute and doesn't provide for protection for

6    assisting.  "To provide information" -- I'm reading from the

7    statute now -- "directly cause information to be provided.

8    Or otherwise directly assist in any investigation regarding

9    any conduct," blah, blah, blah.

10         THE COURT:  I didn't think that was at issue here,

11   but let me just make sure that I'm understanding where

12   you're looking at.

13         Yeah.  So we addressed this in our -- I think we

14   addressed this in our summary judgment decision and we were

15   not under the impression that assisting in an investigation

16   within the ambit of the statute was at issue here.  If I'm

17   wrong about that, tell me.

18         MR. JAMES KASTER:  I'll let -- Luke, you go ahead

19   here.

20         MR. LUCAS KASTER:  Your Honor, I don't

21   specifically recall that issue, but I know there was

22   significant briefing on the fact that Mr. Sanders had filed

23   several complaints with human resources and participated in

24   those investigations.  And so I don't recall off the top of

25   my head the specific language from the Court's order, but

1    I'm not sure how it wouldn't be at issue when it has been a

2    subject of the briefing and was part of what we pled in the

3    initial complaint was that he had participated in these

4    various investigations with human resources.

5            THE COURT:  Into complaints that he had filed.

6            MR. LUCAS KASTER:  In our complaint and the

7    briefing.  I was talking about our -- the complaint in this

8    case as opposed to his HR complaints.

9            THE COURT:  Understood.  So he participates --

10   well, he otherwise directly assists in any investigation,

11   but how?

12           MR. LUCAS KASTER:  By providing the recordings, by

13   providing a statement, by providing evidence, the names of

14   the individuals who --

15           THE COURT:  In connection with his own complaints.

16           MR. JAMES KASTER:  Correct.

17           THE COURT:  Okay.  Is BNSF opposed to adding that

18   verbiage into the definition of protected activity?

19           MS. DONESKY:  We are.  I don't know that you can

20   wear both hats in that regard.  I mean, he was the person

21   who brought the report.  I don't believe the assisting

22   element or prong of that applies here.

23       (Pause)

24           THE COURT:  All right.  I'll include it.  I'm not

25   sure how it's different from providing information and I do

1    think it adds to the cumbersomeness of what is sort of an

2    already cumbersome definition given the breadth of activity

3    here that Mr. Sanders claims is at issue, but I'll do it.

4          MR. LUCAS KASTER:  I think it provides clarity.  I

5    understand what the Court is saying in terms that it's not

6    only the providing of the information, but I also think the

7    contact with the FRA as well falls under this potentially

8    assisting section, and I think it provides some clarity to

9    the jury that it's not just the providing of the

10   information, but it's going through with the investigation

11   and assisting in that investigation as well.

12         THE COURT:  Let me make the edit on the fly here

13   on the bench.  Sorry to make everybody sit here while I do

14   this.

15       (Pause)

16         THE COURT:  So that subpart (a) in the description

17   of protected activity which now shows up in three places in

18   the instruction would include the following after "providing

19   information":  "or otherwise directly assisting in any

20   investigation regarding any conduct which Mr. Sanders

21   reasonably believed," et cetera.

22         Mr. Kaster?

23         MR. LUCAS KASTER:  That sounds good, Your Honor.

24         THE COURT:  I think it tracks the statute.

25         I understand BNSF has concerns about adding that

1    or I guess I should just say objects to adding that, but let

2    me ask just as a matter of verbiage, I think I've got that

3    in the right spot.

4         Do you have an objection about the inclusion of

5    that relative to statutory language?

6         MS. DONESKY:  We just maintain the objection we've

7    made earlier.

8         THE COURT:  Okay.  Great.

9         All right.  Anything further on the jury

10   instructions that we need to deal with?

11        MR. JAMES KASTER:  Nothing from Plaintiff, Your

12   Honor.  Thank you.

13        MS. DONESKY:  No, Your Honor.

14        THE COURT:  Okay.  Great.  Then we will get those

15   finalized.  Here's my intent with respect to the jury

16   instructions:

17        Each member of the jury will receive a copy.  I

18   will leave -- my intention unless somebody raises a good

19   objection here, my intent is to leave in the title of each

20   jury instruction; however, my intent also is to take out

21   references to authority for the instruction.  Let me stop

22   there and ask:  Is the plaintiff good with that?

23        MR. JAMES KASTER:  Sure, Your Honor.

24        THE COURT:  Okay.  BNSF?

25        MS. DONESKY:  That's fine.

1           THE COURT:  And then just a heads-up.

2           When I instruct the jury and they're sitting there

3   with the instructions in hand, one of the prefatory comments

4   that I typically try to make as eloquently as I am able

5   under the circumstances is that I appreciate how unusual it

6   might be for them to be holding something that I am about to

7   read to them.  That's not something most people have done or

8   have had done for them since they were quite young and it is

9   a bit jarring for folks.  But apart from any instruction

10   that's written here, I do like to explain to them just the

11   fact that this is important, that we need to get it on the

12   record, that I can't just let them read it, and that's the

13   reason this procedure is the way it is and it has been so

14   for quite some time.

15           I assume nobody has a problem with that.

16           Okay.  I'm seeing shaking heads, for the record.

17           Okay.  In terms of closing arguments, have you all

18   discussed how you would like to do this, or have you agreed

19   upon a procedure, or can we just follow the local rule?

20           MR. JAMES KASTER:  I don't know that we've

21   discussed it, Your Honor.

22           THE COURT:  If we follow the local rule, BNSF goes

23   first and you go second with no opportunity for rebuttal.

24           MR. JAMES KASTER:  Right.

25           THE COURT:  Okay.

1     MR. JAMES KASTER:  And that's the convention.

2     THE COURT:  Yes.

3     MR. JAMES KASTER:  And yes, that's what we'll do.

4     MS. DONESKY:  With no opportunity for rebuttal?

5     THE COURT:  Correct.

6     MR. JAMES KASTER:  Is the Court inclined to take a

7  break between the arguments or not?  I mean, it's up to you,

8  obviously, Your Honor, but sometimes --

9     THE COURT:  Very brief.

10     MR. JAMES KASTER:  Very brief would be good just

11  so people don't have a distraction.

12     THE COURT:  Very brief.

13     MR. JAMES KASTER:  Okay.

14     THE COURT:  Actually, let me put a caveat on that.

15     If Plaintiff's argument -- or if Defendant's

16  argument, I guess I should say, does not occupy the entire

17  hour that the local rule allows and happens to be quite less

18  than an hour, then I do not intend to take a break.

19     MR. JAMES KASTER:  Fair enough.

20     THE COURT:  But if it's north of 45 minutes, yes,

21  in all likelihood we'll take a very brief break.

22     MR. JAMES KASTER:  It will allow for setup anyway.

23     THE COURT:  Okay.

24     MR. JAMES KASTER:  So are we coming back at

25  quarter to?

1    THE COURT:  Yes, we will resume proceedings --

2    actually, let's do this:  Let's resume proceedings at ten to

3    promptly.  We will begin then.  My intention, for what it's

4    worth, would be that I begin to instruct the jury

5    immediately upon the conclusion of Plaintiff's closing

6    argument.

7         MR. JAMES KASTER:  Okay.  Thank you, Your Honor.

8         THE COURT:  All right.  We'll recess until ten to.

9    (Recess taken at 12:28 p.m.)

10                         *     *     *     *

11   (12:50 p.m.)

12                        IN OPEN COURT

13   (Without the jury)

14        THE COURT:  Please be seated, everyone.

15        Ms. Donesky?

16        MS. DONESKY:  Yes, Your Honor.  We wanted to

17   clarify just so we don't enter into arguments and have

18   issues with objections.  But as to the issue we've been

19   addressing with the NLRB and OSHA decisions, I just want to

20   be up front that I do plan to read from each decision an

21   excerpt from it, and I would rather address it up front in

22   advance of argument so that it doesn't compel the plaintiff

23   to object at that time and disrupt with the jury.

24        THE COURT:  Reading from it is fine.  Arguing in

25   any way, shape or form that it absolves this jury of their

1    independent duty to make a *de novo* determination regarding

2    Mr. Sanders' claim is a problem.

3              MS. DONESKY:  It's going to be read in the context

4    of this decision has been reviewed at multiple levels and

5    these are two of the levels in which it's reviewed.

6              THE COURT:  I don't see a problem with that.

7              MS. DONESKY:  Okay.

8              THE COURT:  Mr. Kaster, you look like you're

9    contemplating.

10             MR. JAMES KASTER:  I always look like that, Your

11   Honor.  It doesn't mean anything.

12             We maintain our objection to any discussion or

13   argument about the exhibits.  I understand what the Court

14   has said.

15             THE COURT:  Okay.  Terrific.  Can we get the jury

16   in here?

17             MR. LUCAS KASTER:  Your Honor, I wanted to just

18   raise one issue.

19             There is an unclarity about in particular

20   Plaintiff's Exhibit 22, which is a very long Excel file that

21   spans I think 30 pages or something like that and is broken

22   up over multiple -- the spreadsheet is -- basically the

23   first, for example, 10 or 12 pages are, you know, the first

24   ten or 12 columns.  Then you have to sort of connect it to

25   the next columns.

 1          We created a summary exhibit which we had provided

 2     to defense counsel before trial.  We're asking that that be

 3     admitted as well, along with that exhibit, because the

 4     exhibit itself is just extremely hard to understand and

 5     grasp.

 6          And so my understanding is there hasn't been an

 7     objection to the underlying exhibit, that it was admitted at

 8     the start of trial, and there hasn't been an objection to

 9     the summary that we had provided to defense counsel.  So

10     just for ease of reference we're asking that the summary be

11     provided to them as well.

12               THE COURT:  Where is the summary?

13               MS. PATHMANN:  I'm pulling it up right now.

14               (Exhibit displayed)

15               THE COURT:  Is there an objection to providing the

16     summary to the jury?

17               MS. FERGUSON:  I don't see any basis to provide

18     that.  There's been testimony about it.  They've sort of put

19     it in the way they want it viewed by the jury, so I don't

20     think it's appropriate.

21               THE COURT:  Who testified about this?  Can you

22     remind me, Mr. Kaster?

23               MR. LUCAS KASTER:  There was testimony from

24     Mr. Jones about the number of days that he had worked.  My

25     recollection is that we had gone through this exhibit.  We

1  checked.  It didn't appear as though it was -- this specific

2  exhibit was referenced.  We couldn't find -- at least in the

3  record.  It's in my notes.  My recollection is that we went

4  through it and I showed it to Mr. Jones to indicate how many

5  days he had worked, how many days of overtime he had worked,

6  but just in a brief search with the court reporter we

7  weren't able to locate testimony specific to this exhibit at

8  this point.  And so if the Court's not going to admit it to

9  provide to the jury, it is in my closing as an illustrative

10  exhibit, a summary of that exhibit.

11        THE COURT:  You can use it during your closing as

12  a summary, a demonstrative, but I'm not going to allow it to

13  be admitted.

14        MR. LUCAS KASTER:  Understood.

15        THE COURT:  Thank you.

16        MR. LUCAS KASTER:  Thank you.

17        THE COURT:  That cover everything?  One more

18  opportunity here, everyone.

19        (Laughter)

20        MR. JAMES KASTER:  I think that's everything.

21        MR. LUCAS KASTER:  Nothing from Plaintiff, Your

22  Honor.  Thank you.

23        THE COURT:  How about from BNSF?

24        MS. DONESKY:  No, not at this time.

25        THE COURT:  Who will be doing the closing on

1    behalf of BNSF?

2              MS. DONESKY:  I will be.

3              THE COURT:  Okay.  And Mr. Lucas Kaster, I

4    assume -- it sounds like you'll be doing the closing on

5    behalf of Mr. Sanders?

6              MR. LUCAS KASTER:  I will.

7              THE COURT:  Okay.  Terrific.  Let's bring the jury

8    in.

9              (Jury enters)

10             THE COURT:  Please be seated.

11             Ms. Donesky?

12             MS. DONESKY:  Thank you.

13                    **DEFENDANT'S CLOSING ARGUMENT**

14             MS. DONESKY:  This case is about time theft,

15   stealing from the company.  And not just once, but on three

16   separate days, three days observed, and on all three days

17   Mr. Sanders stole time by claiming more hours than he

18   actually worked.

19             That's a hundred percent violation, right, a

20   hundred percent.  It's like batting a thousand in baseball.

21   It was stealing.  And not for insignificant amounts of time

22   and nothing gray about it, nothing ambiguous about it.  You

23   saw the records.  You've seen the evidence, Ms. Hoppenrath's

24   direct personal observations of Mr. Sanders on those three

25   days, objective irrefutable evidence that he sought to be

1     paid for more hours than he actually worked.

2              You saw the track and time authority records, you

3     saw the PARS records, you saw the vehicle date records of

4     time stamps.  They aligned.  They aligned each time with

5     what Ms. Hoppenrath had observed.

6              On March 19th he was observed working shy of five

7     hours, but reported working eight.  His own GPS records

8     don't even place him at the Bridal Veil location that he

9     claimed to have been to account for the early morning hours

10    that he stole.

11             March 25.  He claimed 8.5 hours of time, all

12    overtime hours from minute one, but only worked three hours

13    and fifteen minute.  Indeed, Mr. Sanders admits he entered

14    that 8.5 hours of time knowing it was wrong, but yet never

15    sought to change his time on March 26th, on March 27th,

16    March 28th, or even in the morning of March 29th.  Indeed,

17    he did not seek to change it until he knew he had been

18    caught.

19             The same with March 26.  He claimed nine hours of

20    time, but only worked about five hours.  Even with changing

21    the time to eight, he still stole three hours.  And even the

22    changes he made, he made those after he received those

23    hearing notices for alleged time theft, after he knew, and

24    even then he didn't report his time correctly.

25             Mr. Sanders had layers upon layers of review and

1    process.  As a unionized employee, he had tremendously more

2    process and review than the average American.  Mr. Sanders

3    was afforded two separate hearings held in accordance with

4    his collective bargaining agreement to review the facts and

5    circumstances of his alleged conduct and for which he had

6    union representation throughout.

7         Following these hearings a multilevel review

8    process was undertaken which included review by a labor

9    relations representative who had no skin in the game to

10   retaliate against Mr. Sanders.  She did not know Mr. Sanders

11   and knew nothing about his alleged protected activity.  It's

12   her job to conduct an independent review of the hearing

13   record, and you heard from her this morning and she said

14   exactly that.  She did not rely on Mr. Jones'

15   recommendation.  She wanted the record, and that's what she

16   reviewed and that's what she based her decision on.

17        And when you hear later when I speak of our

18   affirmative defense of whether BNSF would have reached the

19   same decision regardless of any protected activity, you

20   think of Ms. Detlefsen and her independent review and the

21   independent review conducted by others in the process.  That

22   is establishing that affirmative defense.

23        But Mr. Sanders had even more than a labor

24   relations review.  He had more beyond that.  He had the law

25   department who reviewed.  Human resources looked at it, the

1    general manager looked at it, and two governmental bodies

2    looked at Mr. Sanders' dismissal for time theft.  They all

3    concluded dismissal was proper.

4            In May of 2019, a neutral government arbitrator

5    held -- if you can bring up the slide.

6            The NARB concluded on May 17th of 2019:

7            "There is substantial evidence in the record upon

8    which to conclude that the Claimant falsified his time

9    records by submitting  payroll records claiming that he

10   worked more hours than he actually worked.  Specifically,

11   there is substantial evidence that the Claimant submitted a

12   payroll entry for March 19, 2016 for eight hours when he

13   actually worked five hours, and that he submitted an

14   adjusted payroll entry for March 25th, 2016 for 4.5 hours

15   when he actually worked three hours and 13 minutes.

16           "There is substantial evidence in the record that

17   the Claimant acted dishonestly by falsifying his payroll

18   entries.  Under PEPA, dishonesty is a standalone dismissible

19   offense, so the Claimant's dismissal was within the

20   parameters set by the policy and, therefore, was not

21   excessive."

22           In 2017, OSHA also reached the following

23   conclusion:

24           "The evidence supports that BNSF has established a

25   credible defense justifying the actions taken against

1    Mr. Sanders.  FRSA does not protect an employee from

2    disciplinary actions for misconduct.  OSHA finds that there

3    is no reasonable cause to believe that BNSF violated FRSA;

4    therefore, this Complaint is dismissed."

5            Aside from the record before you establishing the

6    violations in question and even beyond all the levels of

7    review, you also have before you what are two separate and

8    unrelated events.  There is on the one hand what Mr. Sanders

9    claims to be his protected activity and over here

10   (indicating) the separate and unrelated misconduct of

11   stealing time.  There is no connection between the two,

12   nothing, zero.  All Mr. Sanders has sought to do is weave

13   together a disjointed and speculative theory that BNSF

14   managers were somehow motivated to get rid of Mr. Sanders

15   for reporting defects he made while working as a track

16   inspector.  But consider this:  He raises this conjecture

17   despite having admittedly reported hundreds and thousands of

18   defects over six years, six years of track inspecting, and

19   moreover having never been disciplined or suffered any

20   adverse consequence for making such reports, in fact

21   identifying and reporting defects.  That's the very reason

22   for the purpose of his job.

23           No matter how hard he tries, Mr. Sanders simply

24   cannot connect the dots between his unrelated track

25   reporting activities and the time theft that he

1    independently committed in March of 2016.  Even if he could,

2    BNSF would have reached the same decision regardless.

3         Let me address the recordings.  You heard only

4    snippets of a handful of recordings from, keep in mind, some

5    70-plus recorded conversations that were not played to you.

6    But as to the snippets that were played, that was hard to

7    listen to.  I was cringing in my seat and I'm sure you were

8    as well.  Profanity of that kind has no place in the

9    workplace, but BNSF addressed it.  They took it seriously,

10   they assessed Mr. Jones formal counseling, coaching, which

11   as a manager is formal discipline.  It's a disciplinary

12   event and it went permanently into his personnel file, and

13   if it continued, it would lead to more discipline, including

14   dismissal.  And it activated an anti-retaliation process at

15   that time, as of December 15th, after which he was

16   informed -- and his letter indicates -- if action against

17   someone who brought a complaint could lead to discipline,

18   there needed to be additional levels of review.  Why?  To

19   ensure that the action that was taken was not for

20   retaliatory reasons.  And you saw the evidence come through

21   over these last few days, the independent reviews that were

22   done to ensure that retaliation was not what was the reason

23   for the dismissal.

24        Engaging in protected activity under the law does

25   not immunize an employee from discipline.  It doesn't.  But

1    what BNSF undertook and to ensure that the discipline was

2    done for non-retaliatory reasons were these different levels

3    of review.

4         But let me tell you, Ladies and Gentlemen of the

5    Jury, why knows snippets were played for you.  They were

6    played early in trial.  They were played to try to gin up

7    your emotions and focus your attention elsewhere, away from

8    the fact that Mr. Sanders (indicating) engaged in time

9    theft, and he was dismissed for time theft, but let me also

10   remind you of another couple points regarding those

11   recordings or the contents of them, and I want to just JUCHT

12   touch on the FRA call from November of 2015.

13        As the jury instructions will explain, to be

14   protected, protected activity has to be done in good faith.

15   Mr. Sanders called FRA in November 2015.  It was not done in

16   good faith.  It was undisputed the FRA does not regulate

17   wrap bars.  Mr. Sanders already knew that when he contacted

18   the FRA about the issue and he admits that.  He also admits

19   that FRA said BNSF was right in what they were doing.

20        Consider too the time and manner in which a number

21   of the reports and track defects were reported, only after

22   individuals like Mr. Chartier or Ms. Hoppenrath were trying

23   to manage, instill policy and practices in late 2015.

24        You also recall there are two sets of

25   instructions.  There are the FRA track rules, but then there

1    are also the BNSF engineering instructions.  FRA, as you

2    heard Mr. Chartier speak to, is the bare minimum.

3    Engineering instructions go over and above that.  They go

4    over and above what the federal rules and regulations

5    provide.  And so as he explained, there might be a situation

6    or a defect that perhaps isn't in compliance with BN's own

7    engineering instructions, but that they aren't violating the

8    FRA, which are the bare minimum below, and you can have

9    defects that did not even implicate federal law, rule, or

10   regulation.

11        And has Plaintiff identified for you even a single

12   federal law, rule, or regulation that BNSF supposedly told

13   Mr. Sanders or instructed him to violate?  They have not.

14   In fact, they only want to speak in general terms of issuing

15   slow orders and identifying track defects without specifics

16   or details.  But just like measurements, track defects,

17   they're not based on feelings as Mr. Chartier said.  They're

18   parameters and there are measurements, and the same holds

19   true here.  For protected activity to be protected there has

20   to be some identification of a rule or regulation that was

21   violated.  They have not done that.

22        It's also important, Members of the Jury, to not

23   forget common sense.  Throughout your proceedings, consider

24   the common sense here.

25        Safety is paramount at BNSF.  It wouldn't be in

1    business without it.  Yes, BNSF is a company in business to

2    make profit, but what for-profit company isn't?  Mr. Sanders

3    would have you believe that BNSF is singularly focused on

4    making money at the expense of safety, but that is simply

5    not true, its top priority.  In fact, BNSF employs hundreds

6    of inspectors just like Mr. Sanders to ensure the safety of

7    the tracks on which the trains operate.  Mr. Sanders himself

8    worked as a track inspector whose very job it was to report

9    defects, issue slow orders where necessary, and then to get

10   them fixed, but BNSF goes beyond that in its safety

11   measures.

12           As you've heard many witnesses testify, they have

13   geometry cars.  The very purpose of geometry cars are to

14   inspect cars and pull them by train and to identify even

15   other defects and track defects that the inspectors might

16   not identify.  They use them why?  To make sure the trains

17   run on safe track and that if there are defects, they

18   identify them, protect them and repair them.

19           Separately, there's FRA track inspectors.  There's

20   state inspectors.  There's multiple layers of checks and

21   balances for the very reason to identify defects, issue slow

22   orders and repair the track as needed.

23           You heard about this tension that exists between

24   the need to -- it's only one track and transportation runs

25   the trains on those tracks, and maintenance has to get on

1    those tracks to make those repairs.  It's a natural tension,

2    but that doesn't mean that they were not looking to report

3    slow orders when necessary or identify defects.  So please

4    do not forget your common sense in regard to how BNSF

5    engages in the safety measures that are necessary.  And

6    think about it.  Having unsafe tracks?  How risky and costly

7    that could be.  A derailment is costly and costs impact

8    revenue and profit.  BNSF cannot make money without

9    operating safely.  The two go hand in hand.  They are not

10   mutually exclusive as Mr. Sanders would have you believe.

11          Timing.  I'd like to talk about timing, because at

12   the end of the day that is all Mr. Sanders claims to have,

13   but as you will hear when the judge instructs you, timing

14   alone is not enough.  He has to prove more.  In fact,

15   Mr. Sanders is required to prove to you that BNSF acted with

16   the intent to retaliate for his protected activity -- let me

17   repeat that -- the intent to retaliate, and he has not met

18   that burden.

19          First off, five months.  That's the time period

20   when even giving Mr. Sanders the benefit of the doubt of his

21   December 5 complaint to HR and his April 29th dismissal,

22   that alone is too attenuated of a timing.

23          So how does Mr. Sanders try to overcome this fatal

24   defect?  He points to various actions taken into the interim

25   period, but none of these actions show intentional

1    retaliation.  Let's look at some of those.

2         The 4/10 schedule.  Mr. Sanders seeks to rely on

3    the fact Mr. Sanders met with HR, Magenta Eggertsen, on

4    December 7th, and when Ms. Hoppenrath communicated to

5    Mr. Sanders to return to his bid schedule of 5/8s, that

6    there was some timing of only three days and that somehow

7    those two are connected, but have they produced any evidence

8    that Ms. Hoppenrath had any specifics, or information, or

9    knowledge regarding that first HR complaint that Mr. Sanders

10   made?  Ms. Eggertsen and Mr. Sanders met on the 7th

11   according to the record.  She wasn't in the meeting.  She

12   hadn't been interviewed.  There's no evidence of what

13   details whatsoever she knew of that complaint.

14        And keep in mind the change that was made.

15   Mr. Sanders had changed on his own to 4/10s.  The bid

16   schedule was a 5/8 schedule.  She was simply trying to align

17   her team with the others who all were on a 5/8 schedule.

18   Mr. Sanders' position was a CBA-governed position.  They

19   were just beginning in October to think about when

20   Ms. Hoppenrath had started to implement the roadmaster

21   expectations.  Those date back to October of 2015, well

22   before the December 1st complaint.  She had wanted to start

23   meeting the crew at 7 a.m. that morning, and for good

24   reason.  She wanted face-to-face meetings with her team.

25        The change was aligning with the Collective

1    Bargaining Agreement and what it had not -- and she even

2    took extra steps to contact the former supervisor to make

3    sure she hadn't made a mistake, to see if maybe he had given

4    him permission, but it turned out not to be the case.  It

5    was a legitimate change.

6          Same with the company vehicle policy.  Plaintiff

7    also relies on this change or a difference that affected

8    Mr. Sanders is somehow connecting the dots to the various

9    attenuated, unreated events.

10          First off, the company policy is clear.  It

11   requires a good business need and supervisor approval.  And

12   back when the oil boom was going and there was need for

13   greater and quicker response times, it made sense.  But you

14   heard the testimony from Ms. Hoppenrath, Mr. Chartier and

15   Mr. Jones.  In the fall of 2015 that oil traffic began to

16   slow down.  They had more time.  They had time to look at

17   policies, they had time to review those, but they also were

18   looking much more closely at budgets, fuel costs, all

19   legitimate things that they have the right to and were

20   looking at.

21          But moreover, it was across the board.  The idea

22   that the company vehicles were going to go back to the yards

23   wasn't just against Mr. Sanders.  It was the division.  All

24   the roadmasters had to look at the use of company vehicles

25   and who it impacted, and you heard from Mr. Chartier.  His

1   trackmaster, Mr. Petersen, also had to return his company

2   vehicle and have it be at the yard.  He lost it too.

3   Mr. Sanders was not the only one.

4         The timing and reliance on that information simply

5   does not create any inference that Mr. Jones or

6   Ms. Hoppenrath were out to retaliate against him.  The

7   observation of four days only had passed when Mr. Sanders

8   returned to Ms. Hoppenrath's territory.  I think that's

9   another timing window that the plaintiff, I anticipate, will

10  rely on.

11        But by the way, let's pause on that for a moment.

12  Mr. Sanders wants you to believe that Ms. Hoppenrath and

13  Mr. Jones were out to get him, but with respect to

14  Ms. Hoppenrath in particular, if things were so bad, how is

15  it that Mr. Sanders voluntarily elects in March of 2016 to

16  return to Dayton's Bluff.  Who supervises Dayton's Bluff?

17  Blaine Hoppenrath.  He elected to go back to report to her

18  in March.  Again, common sense.

19        In March of 2016, turning -- and then also, think

20  about that four-day timing.  It's not necessarily four days.

21  You heard Mr. Chartier explain that there's a bid, a

22  voluntary 19A voluntary return, and he, Mr. Sanders, bid off

23  his territory March 4th, two weeks earlier than that.  And

24  so the reliance on this March 15th date and short time

25  period indicates for Mr. Chartier that that was not in fact

1    the case.

2           But regardless, Ladies and Gentlemen of the Jury,

3    even if it was four days following his return, it is

4    undisputed that Mr. Sanders engaged in his own intervening

5    conduct.  And there's a principle in the law where a causal

6    connection that is attempted to be created is severed.  It's

7    severed when the plaintiff engages in intervening

8    unprotected conduct of his own accord such that any attempt

9    to create a timing connection is lost as a result, and that

10   conduct is the conduct that Mr. Sanders engaged in in March

11   of 2016.

12          Consider what made Ms. Hoppenrath choose to go

13   observe Mr. Sanders on March 19th.  It was March 18th, the

14   day before, he indicated to her that he was going to leave

15   and could not stay past 3 o'clock, and she observed that he

16   had left early and it caught her suspicion.  That's not

17   Ms. Hoppenrath's conduct.  That's not Mr. Jones' conduct.

18   That's Mr. Sanders who did so, and that is why she ended up

19   watching him.  The indicia, therefore, that Plaintiff then

20   seeks to rely on to then further suggest there's a

21   retaliatory intent here also does not prevail.  Let's look

22   at each of those.

23          This idea of the surveillance.  Plaintiff claims

24   that that was so suspect for BNSF to personally observe

25   Mr. Sanders on March 19th and the subsequent days in a

1    vehicle.  They didn't go rent a vehicle for that purpose

2    alone.  You heard Ms. Hoppenrath explain that that was a

3    vehicle -- it was a rental, but it was from Mr. Jones having

4    had his company vehicle in the shop.  It was used for that

5    purpose to observe him, but they didn't go off and rent it

6    for that purpose alone.

7             And think about surveillance.  I mean, how else

8    are you supposed to view an employee in their conduct when

9    they don't believe somebody's watching?  And BNSF does

10   conduct surveillance.  You saw the records this morning.

11   They've surveilled other employees.  And it's what cameras

12   are for, surveillance cameras.  They're in our world.  They

13   have a purpose.  There's nothing suspect by the fact that

14   they did surveillance.

15            You also heard the fact about there were two

16   hearing notices that were issued for Mr. Sanders.  This is a

17   collective bargaining agreement.  There are different timing

18   and timing time limits that apply depending on the

19   circumstances, but you also heard Ms. Detlefsen testify that

20   she has seen many instances where multiple hearings are

21   issued to employees for alleged violations.  That too was

22   not so unique and so unusual that it would create any

23   inference of a retaliatory intent.

24            They walked him off the property, another supposed

25   indicia of intent to retaliate.  It is not.  Look at the

1    Collective Bargaining Agreement.  The agreement that

2    Mr. Sanders' union and negotiated and agreed to includes a

3    provision that employees can be held out of service pending

4    an investigation.  That's the same provision under which

5    Mr. Sanders was held out of service.  Look at other

6    employees in the record, Mr. Klukas, who the plaintiff

7    relies on.  Look at his notice letter.  Same type of notice

8    letter that Mr. Sanders received.  He too was held out of

9    service.  Look at the multiple dismissals we looked at this

10   morning.  Several of them were held out of office.  There's

11   nothing sinister in those facts.

12        They removed Mr. Sanders' access from the systems,

13   another supposed indicia of retaliatory intent.  No, it's

14   not.  You heard Mr. Scherbing testify.  He's a union

15   employee, he's the local chairman, and he said that BNSF

16   takes away employees' access when such investigations are

17   pending.  He wasn't referring to just Mr. Sanders.  He

18   understood that that was part of the process.

19        No waiver.  You're going to hear about the fact

20   that Mr. Sanders supposedly was not offered a waiver.

21        First of all, the waiver, again, is a provision of

22   the Collective Bargaining Agreement.  Look at the agreement.

23   It contains a provision in which employees can waive their

24   right.  It's their right to a hearing.  They can choose to

25   waive that right and agree to discipline.  It needs to be

1    signed and agreed to, but it's a provision of the CBA.  And

2    it's not true that Mr. Sanders had never been offered a

3    waiver before.  He signed two of them.  Not in connection

4    with his dismissal, but he still received waivers in the

5    course of his employment.

6           Timing in this case does not support an intent to

7    retaliate.  It belies it.  Look at Mr. Sanders' prior

8    discipline.  The dismissal of Mr. Sanders, which are two

9    separate, independent dismissals, only one of which you as a

10   jury to find in BNSF's favor has to find supportable, but

11   look at his prior discipline.  He has multiple prior

12   disciplinary events that are in the record.

13          And there's a principle in the law that where an

14   employee has been disciplined before engaging in protected

15   activity, it negates an inference that the actions that the

16   company took after protected activity was somehow motivated

17   or prompted because of it.  Again, it goes to that principle

18   that employees can't immunize themselves from discipline for

19   their misconduct.  One of those prior events Mr. Jones was

20   involved in.  Those predate the protected activity that

21   Plaintiff relies on.

22          Prior reports.  The record also establishes that

23   Mr. Sanders had engaged in protected activity long before

24   the claims of the particular protected activity he's been

25   relying on here in this case.  You saw the record Mr. Dane

1    Freshour had collected for the prior two years of

2    complaints.  It included a 2013 complaint, it included an

3    unjust treatment allegation, and it included another report

4    to HR.  Those long predated the reports that he brought

5    here.  And he did not incur any discipline in connection

6    with that protected activity and his employment continued.

7    Those facts negate any inference of retaliatory intent.

8              Consider the timing of the hotline complaint.

9    Mr. Sanders is now held to a hearing on April 3rd.  He's

10   concluded one of the two hearings for alleged time theft.

11   He brings it right after that hearing, but before the

12   second.  Again, the law does not immunize an employee from

13   discipline.

14             And consider the nature and the length of time

15   that he actually claimed harassment in that hotline

16   complaint.  Two years.  He claimed that harassment was going

17   on by Mr. Jones, Ms. Hoppenrath, and Mr. Chartier for two

18   years.  Well, Ms. Hoppenrath hadn't even been there for two

19   years.  She'd only been there for a year.

20             And two years, where were the complaints before?

21   Two years is a long time and were two years alleged in the

22   December complaint or the February complaint?  They were

23   not.  And how much of that April complaint contained issues

24   and allegations that had already been looked at by HR and

25   reviewed?

1         Plaintiff will also look to various employees.  We

2    call them comparators, or you may have heard that phrase

3    used in the last ten days.  Your instructions will speak to

4    similarly situated and Plaintiff needing to show for

5    individuals to be similarly situated they must be similar in

6    all material respects without distinguishing factors.  There

7    are differences with the employees that Mr. Sanders seeks to

8    rely on.

9         Mr. Kramer, for instance.  Yes, he had a coaching

10   and counseling but his allegation, his violation, it was for

11   failing to follow instructions.  It wasn't for time theft.

12   Mr. Kramer had another incident where he's alleged not to be

13   honest about track time and authority.  Yes, he did take a

14   waiver.  He received formal discipline.  But again, this

15   goes back to the plaintiff suggests that Mr. Sanders never

16   got a waiver, but we've established and the record shows

17   that isn't in fact the case.

18        Then look at Mr. Klukas, another employee who

19   Mr. Sanders relies on.  Ms. Hoppenrath had facts similar and

20   she engaged in the same conduct that she had with

21   Mr. Sanders in the sense that something tipped her off.

22   Something tipped her off as not right about Mr. Klukas and

23   how he reported his time.  So what did she do?  She

24   conducted an audit.  Just like she looked further at

25   Mr. Sanders' activities, she did so with Mr. Klukas.  And

1    what happened with Mr. Klukas?  Well, just like Mr. Sanders,

2    notified for a hearing under the Collective Bargaining

3    Agreement, removed from service just like Mr. Sanders.

4         A hearing was held.  Ms. Hoppenrath, you heard her

5    yesterday speak.  She testified at that hearing.  The

6    hearing didn't conclude and yes, a waiver was ultimately

7    reached, but you heard Ms. Detlefsen explain this morning

8    that, one, standalone defenses -- standalone defenses may

9    result in dismissal, but each case looks at its facts.  But

10   you also heard her explain that at times a post-hearing

11   waiver may be entered into.  Maybe there's a procedural

12   defect.  Maybe the record just isn't so close, and for risk

13   management or assessing that, a waiver, some form of

14   discipline is at least reached.  They are different.  They

15   are not the same.

16        By contrast you saw evidence of at least five

17   employees that Ms. Detlefsen spoke to where the PEPA policy

18   was consistently applied as to these five individuals.  They

19   all went through the PEPA team that you heard about.  The

20   PEPA team's role is to review records solely for purposes of

21   is this dismissal supported, does the record support the

22   violations, and a standalone dismissal, and for each of

23   those individuals that was the case.

24        You heard about an employee with the initials DR.

25   He like Mr. Sanders had been alleged to engage in payroll

1    theft.  They conducted surveillance on him too just like

2    Mr. Sanders.  He had multiple days of time where he reported

3    additional hours of time not worked.  He was removed from

4    service also, just like Mr. Sanders.  He had a lot of the

5    same arguments that he raised in his hearing as well, all of

6    which did not carry the day and he was dismissed under a

7    stand-alone defense dismissal.  He claimed that the

8    supervisors were out to get him.  The other three of the

9    five employees also supported standalone dismissals in those

10   cases.

11        And you will hear me speak shortly about our

12   affirmative defense, and one of the factors of that

13   affirmative defense is has BNSF consistently applied its

14   policy, the PEPA policy and Ms. Detlefsen's testimony, and

15   these standalone dismissals are clear and convincing

16   evidence that that is in fact the case.

17        The investigative hearings.  You saw the record

18   that Ms. Hoppenrath went through on each individual hearing.

19   They had the PARS reports indicating the time Mr. Sanders

20   had put in.  They had the record evidence of when

21   Mr. Sanders was visually observed when Mr. Sanders had

22   started the hi-rail vehicle, when he had done his

23   inspections, when the hi-rail vehicle was turned off, and

24   personal observations of when he left the property.

25        In the second hearing he admitted that he did not

1    enter his time correctly at that time.  The record evidence

2    was clear and irrefutable that the time that he had put in

3    for time was more than the hours he had in fact worked.

4         Mr. Sanders' reasonings that he has come up with

5    and spoke of in the last week, they do not work.  Let's go

6    over some of those.

7         He claims, for instance, that edits could be made

8    until payroll was closed.  But as the first hearing,

9    Mr. Sanders always claimed that he reported his time

10   correctly, thus the whole issue about being able to make

11   changes before the end of payroll is immaterial.  He claimed

12   throughout that he had entered his time correctly for that

13   hearing.

14        And as to the second hearing, take a look at

15   Mr. Sanders' own conduct, which belies the idea that he ever

16   had any intent to change the time that he overreported.

17   March 25th, he enters the time.  And he admits he wrote it

18   down wrongly, but he didn't change it on the 26th, 27th,

19   28th, 29th in the morning, in the morning when Mr. Sanders

20   was in the PARS system entering his time for March 26.  Yet

21   he didn't change his time for March 25th at that time.  He

22   only did it after he received those hearing notices.  There

23   was no intent to ever change that time.

24        He wasn't yet paid, another argument Plaintiff has

25   raised, but that's the shoplifting example, right?  You get

1    caught on your way out the door having tried to take some

2    piece of property.  It's still theft.  Theft is theft.

3    Whether he was paid or not is not material.

4            Cut letters.  You've heard about cut letters.

5    Mr. Sanders' claim in that regard is misplaced also.

6    Mr. Chartier explained that's a process that comes through

7    the payroll timekeeping system for pay code issues and

8    different matters, not for someone looking to get paid for

9    more hours than they worked.

10           And by the way, all these arguments and all this

11   evidence, they've all been submitted and reviewed.  The

12   hearing officer in the hearings that Plaintiff wants to

13   characterize as a monkey court or, you know, whatever, that

14   fails to have proper process, all that evidence was allowed

15   in.  The hearing officer gave Mr. Mozinski ever break he

16   asked for.  He asked for more time to look at the records.

17   There were a lot of records that Ms. Hoppenrath submitted,

18   but the hearing officer gave him time to review it.  All

19   that information has been considered and reviewed.

20           The multilevel review process.  I spoke of this at

21   the beginning of my remarks, but it cannot be disregarded if

22   it shows no retaliatory intent and it also establishes our

23   affirmative defense that even if, even if you were to

24   conclude that the plaintiff established his case, BNSF --

25   the verdict should be for the defendant if we've shown by

1    clear and convincing evidence that BNSF would have reached

2    the same decision regardless of that protected activity, and

3    this is a textbook case of that.  Why do we know that?  The

4    evidence is clear.

5          Look at what Stephanie Detlefsen did.  Look at

6    what she said.  Her entire job is to review the record

7    independently and all she reviews is the record.  She

8    conducts an independent review on the affirmative defense

9    that is evidence that regardless of the protected activity,

10   BNSF would have reached the same decision.  And she even

11   said she did not consider Mr. Jones' recommendation.  She

12   reviews the record.  She doesn't rely on the recommendation.

13         Look at what Terry Morgan had said in review of

14   the HR review.  He told her look at the review.  Look at the

15   facts of the record of the formal hearing.  What does that

16   mean?  It means the same decision defense.  It means set any

17   protected activity aside and review the facts of the record

18   of the misconduct on its own, separate and apart from that,

19   and that's what Mr. Morgan told Ms. Detlefsen to do.  That

20   is a textbook case of the affirmative defense.

21         Look at the anti-retaliation process that was

22   activated.  Mr. Jones, he ensured that it went up the chain.

23   He sent the record for review to PEPA and his letter advised

24   him:  If you do look to engage -- have to assess discipline

25   or look at that, you have to have it reviewed above you and

1    independently, and he did that. Dave Freshour, he conducted

2    an independent review through the hotline complaint.  Law

3    looked at it.

4         You have the hearing record that shows

5    Ms. Hoppenrath, her observations along with the GPS track

6    time and authority, and Mr. Sanders got an appeal of that,

7    also another independent review, and you have the PEPA

8    review with the dismissals that I spoke of.  All of that

9    evidence together provides clear and convincing evidence

10   that regardless of the protected activity the same decision

11   would have been reached.

12        Also consider this:  Consider back on March 18th

13   when Ms. Hoppenrath was looking, and the day occurred and

14   Mr. Sanders had left early and she wanted to observe

15   Mr. Sanders.  She went and spoke with Mr. Jones.  She

16   observed on the 19th and after she went back and spoke with

17   Mr. Jones about her observations.  What did Mr. Jones do?

18   Look at his actions.  Where did he send her?  He sent her to

19   labor relations for consultation on what to do next.  He

20   made sure labor relations was involved to ensure the issues

21   were being reviewed from that department.  Is that evidence

22   of an attempt to retaliate?  Absolutely not.

23        And five months.  If Ms. Hoppenrath and Mr. Jones

24   were so intent on looking to retaliate against Mr. Sanders,

25   why didn't they act sooner?  I mean, there was Union Yard.

1     That was Mr. Sanders' responsibility to inspect the yard.

2     He let that yard go out of frequency compliance.  They could

3     have disciplined there.  They could have disciplined much

4     sooner.  They did not.  And Mr. Jones' actions in ensuring

5     that additional and other people were reviewing the matters

6     belies any intent that he sought to retaliate against

7     Mr. Sanders in this case.

8           Mr. Sanders did not incur any discipline in

9     connection with the call to FRA or any other protected

10    activity.  And when he engaged in protected activity years

11    earlier, he continued his employment, even when he was

12    reporting to Mr. Jones.

13          You will receive when you go back for your

14    deliberations a special verdict form.  You'll have various

15    questions on there for you, the first question asking you if

16    Mr. Donald Sanders has proven by a greater weight of the

17    evidence all elements of his claim, and you'll look at

18    Instruction 13 for that.  We submit that you answer that

19    that question no, because he has not proven that the actions

20    that were taken were done for intentional retaliation.  We

21    are talking about separate and independent unrelated events,

22    protected activity and his unrelated intervening conduct in

23    his engagement of the time theft.

24          But even if you were to answer that question yes,

25    you will then be asked:  "Did Defendant BNSF prove its

1    affirmative defense by clear and convincing evidence as

2    [stated] in Instruction 19?"

3          And as I went through all the evidence that

4    establishes that, yes, indeed.  When you think of the

5    multilevel reviews and independent reviews that have been

6    conducted as to Mr. Sanders' dismissal, you look at the

7    other standalone dismissals that have occurred, you look at

8    the hearing records that were established, even just one of

9    the dismissals is sufficient to find that his dismissal was

10   proper.

11         You will be given an instruction about the

12   business judgment rule.  It is not enough, Ladies and

13   Gentlemen of the Jury, it is not enough for Mr. Sanders to

14   show that -- to merely establish that BNSF's actions were

15   unwise, unreasonable, or unfair.  That's not enough.  And

16   here you clearly have enough evidence in the record.  And

17   when you consider all the additional reviews that were

18   conducted, all of whom reached the same conclusion, that the

19   time theft had occurred, you cannot find in favor of the

20   plaintiff.

21         I will just conclude very briefly with a brief

22   discussion of damages.

23         We have proven, we believe, BNSF has proven, that

24   it has not violated the FRSA, but if you were to reach the

25   damages portion, we would say that there are no damages

1    permitted or that have been proven.

2            I would note that Mr. Sanders himself has fully

3    mitigated his wage loss, as he stated, that he's making more

4    or at least as much in the last few years through other

5    employment, and any other employment that he received would

6    have to be subtracted from any backpay loss.  There's no

7    evidence of benefits losses.

8            And on the emotional distress, you need actual,

9    tangible, credible evidence.  There's no evidence of

10   receipts for mental health treatment.  He has admitted he

11   has not sought formal mental treatment.  He hasn't received

12   a diagnosis.  He has received prescriptions, but not taking

13   them.  There is not sufficient evidence of any emotional

14   distress damages, but even if you were to find any, they

15   should be minimal.

16           Thank you so much for your time and patience and

17   attention over the last few weeks.  We ask that you find in

18   favor of BNSF and find against the plaintiff to the first

19   question and/or answer yes, that BNSF has met its

20   affirmative defense in the second question.

21           Thank you.

22           THE COURT:  Members of the Jury, we'll take a

23   five-minute recess at this point to allow Counsel to set up.

24   We will resume proceedings at five minutes to 2:00 p.m.

25           (Recess taken at 1:50 p.m.)

```
 1                    *      *      *      *

 2         (1:57 p.m.)

 3                      IN OPEN COURT

 4         (Jury enters)

 5              THE COURT:  Please be seated, everyone.

 6              Mr. Kaster?

 7              MR. LUCAS KASTER:  Thank you, Your Honor.
```

 8                    **PLAINTIFF'S CLOSING ARGUMENT**

```
 9              MR. LUCAS KASTER:  Ladies and Gentlemen of the

10    Jury, Counsel:

11              Do the right thing.  It's a phrase we've all heard

12    our entire lives.  Our parents said it to us when we were

13    growing up.  My parents taught it to me.  It's a phrase that

14    we tell our children when we raise them.  Do the right

15    thing, even when it's hard, even when it's unpopular.  Do

16    the right thing.

17              And that's what Don Sanders did.  He followed the

18    law, he followed BNSF's internal rules, and he made sure

19    everyone around him was safe.  And he did it even when it

20    was hard, even when it was unpopular.  You heard on one of

21    the recordings Mr. Sanders saying, "I don't care if people

22    laugh at me.  If I can save one life, that's what I care

23    about."  Do the right thing.

24              You know, that phrase reminds me of a movie called

25    A Few Good Men.  It's one of those lawyer movies.  I'm a big
```

1    fan.  A lot of lawyers don't like legal movies, but I like

2    it.  My wife gives me a hard time because I watch the same

3    movies over and over and over again.  And that movie is

4    famous for Jack Nicholson's line at the end about, "You

5    can't handle the truth."

6         But there's an earlier scene in that movie that

7    exemplifies what's going on here.  And there's two lawyers.

8    There's Kevin Pollak, who's one of the three lawyers, along

9    with Demi Moore and Tom Cruise.

10        And Demi Moore is walking out of the courtroom and

11   Kevin Pollak's character turns to her and he says, "Why do

12   you like them so much?"  And she turns around,

13   straight-faced, and looks him dead in the eye and says,

14   "Because they stand on a wall and they say, 'Nothing's going

15   to hurt you tonight, not on my watch.'"

16        And that's what Don Sanders did.  When he went to

17   work, he said, "Nothing's going to hurt anybody around me

18   tonight, not on my watch, not today."  It didn't matter how

19   many times he was screamed at, or yelled at, or sworn at by

20   Mr. Jones, or how many times his schedule was changed, or

21   how many times his work conditions changed.  He wasn't going

22   to give up, because if he could save one life, that's what

23   mattered to him.  "Not on my watch, not today."

24        And you heard at one point in the recordings

25   Mr. Sanders asked Mr. Jones, "How many derailments have

1    occurred while I've been track inspector in Dayton's Bluff?"

2    And Mr. Jones says in response, "I know.  I can't replace

3    you."  Because he made sure that everyone was safe, because

4    he had seen what happens when corners are cut, when safety

5    is no longer the top priority.  He saw in realtime in his

6    job the consequences:  the derailments, people being killed,

7    and he wanted to make sure that never happened on his watch.

8            I want to show you an exhibit.  We've looked at it

9    several times during the trial, but I want to look at it a

10   little bit differently right now.

11           This was the email that we have seen where

12   Mr. Sanders sends his boss a nightly report saying, "I went

13   to HR."  It's the email that Mr. Jones responds to at 3:34

14   in the morning.  But written right above where he goes to

15   HR, he talks about being called out for a body.  Someone had

16   died that day.  And who got the call?  Don Sanders.  And who

17   showed up?  Don Sanders.  And who made sure that everyone

18   was safe?  Don Sanders.

19           And when Mr. Jones responds, he doesn't say

20   anything about the fact that somebody just died on his

21   railroad.  What his concern is, is "Don Sanders went to HR

22   and is reporting me."  That's his concern, not that somebody

23   died on BNSF property.

24           Mr. Sanders refused to give in.  He stood his

25   ground.  He made sure everyone around him was safe.  He

1    refused to let a train pass over a section of track, trains

2    that can be a mile long going 79 miles an hour, if he didn't

3    think it was safe.  If the federal regulations and BNSF's

4    internal rules said it wasn't safe, he wasn't going to let

5    it happen.  "Not on my watch, not tonight."

6             So let's back up a little bit, kind of give you a

7    full view of the case.

8             You've heard Mr. Sanders started with BNSF in

9    2007, and after a few years he became a track inspector in

10   2010.  And initially he was -- when he came to Dayton's

11   Bluff he was mainly focused on the yard inspections and

12   you're inside of an enclosed area.  And as Mr. Jones and

13   other witnesses acknowledged, when you're doing track

14   inspections in the yard you're not entering slow orders,

15   because the max speed in a yard is ten miles an hour.

16   There's no reason to enter a slow order, because ten miles

17   an hour is the slowest slow order you can enter.  So it's a

18   less pressure position because you're not slowing trains

19   down.  You're not telling the company, "I'm prioritizing

20   safety over your ability to make money."  He just has to

21   report the defects.  And for the most part we looked at his

22   reviews.  There was no real issues.  He performed his job

23   and continued to work with BNSF as a track inspector in

24   Dayton's Bluff.

25             But then 2015 comes around, and though Mr. Sanders

1    is the yard inspector, the mainline inspector has now left

2    Dayton's Bluff, and so he's being asked by Mr. Jones and

3    Ms. Hoppenrath to do both, come out of the yard and do the

4    mainline inspections.  Go out and do inspections on the

5    sections of track where we're moving freight.  And he

6    continues doing the same job he's done for the last couple

7    years.  When there's a defect, he enters it.  When it

8    requires a slow order, he enters it.

9         And in 2015 he works 311 days, and out of those

10   311 days he works 300 days of overtime.  Counsel

11   referenced -- she said, "It's like batting a thousand."

12   Three hundred days of overtime and they're accusing him --

13   and let me make this clear.  They're saying he's

14   individually terminated, which means on March 19th he's

15   being terminated for two and a half hours that they claim he

16   stole.  The evidence suggest he didn't steal anything.  Two

17   and a half hours out of 300 days of overtime.

18        And then we look at the bottom, the last part,

19   because on their pay records they indicate when days are

20   supposed to be rest days, when Mr. Sanders should be home

21   with his family enjoying anniversary dinners or going to

22   kids' sports games.

23        A hundred and 46 rest days in total.  And how many

24   of those days did Mr. Sanders come to work or was asked to

25   come to work?  A hundred and eight.  A hundred and eight

1    days when he was supposed to be off he came in, he showed

2    up, because he said, "Not on my watch, not today," and they

3    were asking him to do that.

4         He didn't show up on his own.  He didn't just

5    decide when he woke up in the morning when he wasn't

6    scheduled, "You know what?  I feel like going to work today,

7    so I'm just going to randomly show up."  That's what they

8    want you to believe.  A hundred days?  And they claim he

9    just made the decision on his own.  They knew exactly what

10   he was doing because they were asking him to do it.

11   Otherwise, he wouldn't have been there.  He wasn't scheduled

12   to be there.  They were asking him to work.  They were

13   requiring him to work.  That's why he showed up.

14        And when he's working that much and he was

15   entering slow orders on the mainline, he's now taking trains

16   that are moving from here to Chicago and delivering freight

17   that has BNSF has admitted they put on a schedule.  And

18   they're paid based upon how trains arrive on schedule, which

19   means the more they're delayed, the less money they earn.

20   And so he can take a train down from 79 miles an hour to ten

21   miles an hour when the regulations require it, and when he

22   did that, Mr. Jones yelled at him, swore at him, threatened

23   him, and when that didn't work he spied on him and accused

24   him of time theft and ultimately got rid of him.

25        And we see in the evidence that it's more than

1    just slowing freight down, that BNSF also rates and pays its

2    employees based upon slow orders.  You heard from

3    Mr. Shearer this morning that the scorecard specifically

4    lists corridor slow order minutes, and they have a scorecard

5    for the highest person in the maintenance department all the

6    way down to local roadmasters.  They have an entire team

7    dedicated to it at BNSF, it's always accessible on their

8    intranet, and it ranks all of their employees by position

9    from one to whatever the number is, and employees can go on

10   in realtime and see where they rank.

11           Those rankings and scorecards then factor into

12   their performance reviews.  We saw that in Mr. Jones'

13   reviews by Mr. Jensen and Mr. Rindy.  They're specifically

14   looking at these metrics and the rankings to determine how

15   people are performing, and one of those specific metrics are

16   corridor slow order minutes.  So the more times Mr. Sanders

17   enters a slow order, the lower the managers' scorecards, the

18   lower their scorecard ranking, the lower their review.  And

19   guess what?  Their review grade impacts their bonus.  And it

20   impacts it two ways when you enter a slow order, because

21   there are two bonuses.

22           I read a section of deposition testimony from the

23   corporate witness about BNSF's incentive compensation plan,

24   and that witness says that there's an overall company bonus

25   that is based upon overall company performance, and one of

1    the three main metrics in that overall company performance

2    is velocity, how trains move from point A to point B and

3    whether they're on time.  So his job impacts overall company

4    performance.

5            And then there's a kicker for bonuses.  That's

6    impacted by individual performance.  And so if somebody gets

7    a higher grade on their annual performance review, they get

8    an additional kicker of their bonus.  And so Mr. Jones and

9    his counterparts are incentivized by BNSF's own policies and

10   practices to dissuade Mr. Sanders and other employees like

11   him from reporting defects and entering slow orders, because

12   it impacts their pay.

13           So what happens?  In 2015, Mr. Sanders starts

14   working almost every day of the year and is now being asked

15   to do multiple jobs.  And I'm going to show you some of the

16   text from the recordings.  And Counsel's right about one

17   thing.  It makes you cringe.  It's offensive.  It has no

18   place in a work environment or outside of a work

19   environment.

20           And Counsel made reference to the fact that there

21   were 70-some recordings.  I think the record reflects there

22   was 40-some.  They were all given to Counsel.  They could

23   have played them for you.  They chose not to.  And why?

24   Because they support Don Sanders.  That's why.

25           This is what the recordings show.  On

1    November 9th, Mr. Sanders gets a call from Mr. Jones because

2    he has just entered a slow order on a section of track.  And

3    Mr. Jones' response to Mr. Sanders doing his job and

4    entering a slow order is:

5           "I got fucking people coming in from all over the

6    place that are double-checking how I manage the railroad.

7    And they're almost wanting to take me off this fucking job

8    and put me on another one.  So I'm about to lose my job, my

9    family's welfare, because I can't get a team of people who

10   want to work with me."

11          Work with him how?  The rules and regulations are

12   clear.  If it's a defect, it's reported.  If it requires a

13   slow order, it's put on immediately.  Mr. Jones even

14   admitted that.  I asked him, "Is there ever a time you

15   should not report a defect?"  "No."  "Ever a time you should

16   delay reporting a defect?"  "No."  "Ever a time you should

17   delay putting on a slow order?"  "No."

18          Then he says:

19          "But I guess -- I guess you gotta do what you

20   gotta do, but I guess I'll just fucking pack my bags and

21   tell my family, 'Fuck it.'  I'll just go back."

22          He's threatening Mr. Sanders, that if Mr. Sanders

23   doesn't comply, he's going to lose his job because of the

24   pressure his managers are putting on him about slow orders.

25   This case isn't about Mr. Jones.  This case is about BNSF's

1    entire company and the pressure they put on managers like

2    Mr. Jones to stop people from doing what the law requires.

3    That's what this case is about.

4              Later in that call there's a reference to the EI,

5    the Engineering Instructions, the rules that require and

6    dictate to Mr. Sanders what he can and cannot do.

7    Mr. Jones' statement?  "Okay.  We know what the EI says,

8    that there's critical joints at a location.  You know what?

9    Big fuckin' deal."  If that's not an indication that

10   Mr. Sanders shouldn't follow the rules, I don't know what

11   is.

12             The next day -- oh, by the way, this is the defect

13   they were talking about on that call on November 9th.

14   Remember I showed you the nightly report with the email

15   Mr. Sanders sent to Mr. Jones attaching this picture, and

16   then Mr. Jones calls Mr. Sanders.  This isn't, you know, a

17   minor chip in the rail.  This is for two-foot long, two-inch

18   thick bolts that aren't just loose.  They're out.  And he's

19   arguing with Mr. Sanders about whether this is a defect,

20   whether a train a mile long should go 79 miles an hour over

21   this because his bosses won't let up.

22             The next day Mr. Sanders, because he's being asked

23   to do two jobs and doesn't want to be thrown under the bus,

24   asks for something in writing and you heard it on the call.

25   "Boss, I'll do whatever you want me to do.  I just would

1   like something in writing in case something happens."  And

2   Mr. Jones' immediate response is, "That would be like me

3   asking you to never enter another slow order out here."

4   It's nothing like that.  Mr. Sanders is doing his job.  He's

5   doing what the law, the rules -- their rules require.  And

6   he's doing something his bosses are asking him to do and

7   he's just asking for some writing confirming that, and they

8   refuse.

9          And then at the end Mr. Jones says this:  "Don't

10  be worried.  We're not coming to get you."  And four months

11  later they do exactly that.  The person who's telling

12  Mr. Sanders, "Don't be worried" does exactly that.

13         November 23rd there's a call with the FRA.

14  Mr. Sanders says:  "I don't know what's going on.  Why am I

15  always being criticized for what I'm doing out here?  I'm

16  just trying to do my job."  Mr. Jones' response:  "You're

17  damn right you do, because you all the time have a way that

18  you want to go about stuff and it never includes me until

19  it's to your benefit.  Why in the world would we ever call

20  FRA about anything?"

21         This isn't about Mr. Sanders contacting Mr. Jones

22  before he goes to the FRA.  That's not what this is about.

23  Because then he says:  "The maddest I've ever been in my

24  life is when I found out you and other people were providing

25  information to Mr. Mozinski and there was a threat about

1  contacting the FRA."  The maddest he's ever been in his

2  life.  That's what Mr. Jones said.

3          By the way, Counsel represented that Mr. Sanders

4  admitted that the FRA doesn't regulate wrap bars.

5  Mr. Sanders never said that.  He said there was a directive

6  from his bosses about wrap bars and he was confused, and who

7  better to reach out than the people in charge of putting out

8  the regulations.  "I've been working with them my whole

9  career.  It's never been an issue.  Why is it now?"  And he

10  admits after talking with the FRA, Mr. Jones was right.

11  There's no reason to not contact the FRA.  To Mr. Sanders

12  their objective is the same, to keep people safe.

13          November 30th, another call about a slow order

14  after Mr. Sanders has entered one.  Jones' response:  "This

15  is where I need your help.  This right here, in the middle

16  of peak season, it's just -- and I know it's not your

17  fault -- you don't have to deal with all the questions."

18          The questions from who?  If BNSF is so worried

19  about safety, why are there questions about slow orders?  If

20  safety is number one, people should be standing up and

21  cheering him.  "Why are there questions every time a slow

22  order is entered?  You got to understand, this is just

23  making me look like an idiot.  I just hate leaving a ten out

24  on peak season.  That's not good.  I don't want to be the

25  work group that causes us to fail on peak.

1       Incentives, peak, slow orders impact that and

2   that's what Mr. Jones is saying:  I don't want to have our

3   group be responsible, so stop entering slow orders.

4       December 3rd, again there's a call about a slow

5   order that Mr. Sanders put on, and this time Mr. Jones just

6   goes off.  He's mad at Mr. Sanders.  He's mad at welders.

7   And what he says about a Mr. Kramer is that he's "going to

8   make him weld until he fucking falls over."  That's a direct

9   threat to the health and safety of another employee.  And

10  you know what BNSF does about it?  Nothing.  Because the

11  letter that he gets references calls in November, one call,

12  not this one.  They never talked to Mr. Kramer.  They never

13  make sure he's okay.  And you heard in Ms. Eggertsen's depo

14  that was read, I asked her during her deposition:  "Does

15  this concern you at all?"  And her response was this:  "If

16  Mr. Kramer was actually in a position to fall over, then I

17  would be concerned."  That's the extent to which this

18  company will go to protect its managers.  They'll deny a

19  direct threat.

20      You know, Mr. Jones has said in this case and he

21  said it in his testimony that he wasn't trying to dissuade

22  Mr. Sanders from reporting defects or entering slow orders.

23  Then what was he trying to do?  Did he provide any

24  explanation?  Anything.  What's the reason for the swearing,

25  or the yelling, or the threats, or, "I'm going to lose my

1    job?"  There was no explanation.  The only thing he could

2    say is, "I just wanted him to be a team player, to work with

3    me."

4              You know, I like books and recently I've been

5    listening to a lot of audio books, and there's one by an

6    organizational psychologist named Simon Sinek.  He's got a

7    very famous TED Talk.  But he's got a new book called *The*

8    *Infinite Game*.  In one of the chapters he talks about a

9    concept called ethical fading and how people, in particular

10   businesses, large groups of people, a culture, starts to

11   slowly, incrementally, ethically fade into conduct we would

12   all agree is unethical and unlawful.

13             And one of the things he talks about is the use of

14   euphemisms, the changing of language.  Companies don't talk

15   about spying on customers or on social media or Facebook.

16   They don't spy on customers.  What do they do?  They data

17   mine, or they provide services to customers.  It's the

18   slight changing of language to make something that we feel

19   is unethical approachable.  It's a form of self-deception.

20             And what Mr. Sinek talks about is that in

21   companies that engage in this behavior, it happens slowly

22   over time.  There are these small incremental moments.  And

23   he references the Wells Fargo scandal and how there had been

24   internal people who raised concerns within the company who

25   said, "I can't meet these objectives that you're setting out

1    for me unless I do something that is unethical."  And what

2    did they get back from their managers?  Perform or you're

3    gone.  Sound familiar?  And that slow, incremental, ethical

4    fading resulted in Wells Fargo employees opening thousands

5    of bank accounts without customers knowing.  And then the

6    CEO stands up in front of Congress and says:  "I apologize.

7    That's not our culture.  That's not what we believe in."

8    And I say in response I beg to differ.  That's exactly what

9    your culture is.

10           This isn't a culture about team playing or getting

11   along or contacting me first.  That's not what this is

12   about.  It's about performance and that's it.  Meet your

13   objectives or you're out.  Perform on your scorecard or

14   fucking pack your bags.  He's saying it.  He's admitting it.

15   We don't have to guess about what's happening in this case,

16   because we can all hear it.

17           He's telling you:  "My bosses are pressuring me to

18   perform."  Not to put safety number one, to perform.

19           So what does Mr. Sanders do?  He does what any

20   reasonable person would do, what their policies request and

21   require and ask employees to do.  Go to HR, bring this up.

22   Tell us.  Just like Wells Fargo's policies said:  Tell us.

23   Do they listen to him?  Once, ever?  He goes to HR three

24   separate times:  December 7th, February 24th, and April 5th,

25   and each time he's told your allegations are

1   unsubstantiated.

2           And they want to talk about a link between the

3   two, and we'll talk a little bit more about this here in a

4   minute, a link between the two things.  Well, there's no

5   connection between Mr. Sanders' HR complaints and the

6   ultimate discipline.  The exact same person who is the

7   subject of the complaints, who is on the recordings, is now

8   charging Mr. Sanders with discipline.  This isn't rocket

9   science.  This isn't doing some -- you know, a hundred-page

10  internal investigation about what happened.  It's looking at

11  a face of a document and saying the exact same person is

12  involved.  This is easy.  And they ignore it each and every

13  time.

14          And then there's (indicating) this.  This is the

15  upper half of that email we looked at a minute ago where at

16  3:56 a.m. the day that Mr. Sanders goes to HR when he's

17  called out for a dead body, Mr. Jones responds without

18  knowing why Mr. Sanders went to HR and tries to counter what

19  he thinks Mr. Sanders went to HR for.  I would call this a

20  Freudian slip.  He knows exactly what's going on.  He

21  doesn't need to guess, because he knows what he's done.

22          So what did Mr. Jones do?  With Ms. Hoppenrath in

23  tow, he changes Mr. Sanders' days of work, his start time,

24  his start location, his vehicle.  He sends him home.  He has

25  other people do his job.  Suddenly all these things that

1    Mr. Sanders had been doing for several years without anybody

2    saying a peep are an issue in rapid, consecutive fashion.

3              BNSF also claims that nobody else was allowed to

4    drive a vehicle.  Where are these people they're talking

5    about?  Where are all these employees they say don't get to

6    drive vehicles home?  Did they call a single one?  They're

7    their employees.  They have control over them.  A single

8    one, a single track inspector who says, "I don't get to

9    drive a vehicle home."  Not one.

10             And when none of that works and Mr. Sanders

11   continues to do what the rules and regulations require, they

12   step up their game.  Mr. Sanders goes to Northtown for a

13   couple months and comes back on March 15th, and by March

14   19th they're following him around in an unmarked car and

15   accusing him of time theft before payroll has ever closed.

16             They issued two separate investigations, two

17   separate charges, they make him go through two separate

18   hearings, and they say it was to find out the facts.  No, it

19   wasn't.  They had their mark.  They knew exactly what they

20   were doing.  And that's why they issued two separate notices

21   of investigation and two separate charges, because they

22   wanted to be sure.  They wanted to leave no doubt, because

23   they knew, as Ms. Detlefsen said, that it could eventually

24   be overturned by an arbitrator.  And so they don't want to

25   put it all in one.  They don't want to take that chance.

1    They need to double down.  They need to make sure.  And

2    that's why Mr. Jones issued two separate notices when he had

3    never done that before, at least we didn't see any evidence

4    of him doing that before, because they wanted to be sure.

5             And they can't even get their story straight about

6    why they started to follow Mr. Sanders.  They said

7    initially, Mr. Jones said and Ms. Hoppenrath said, well, it

8    started on the 18th.  "Mr. Sanders left 15 minutes early,

9    and so I decided the next day because of that that I'm going

10   to use an unmarked vehicle and follow him around, 15

11   minutes."

12            And then we heard deposition testimony from

13   Mr. Jensen, who gave a vastly different story.  Mr. Jensen

14   is Mr. Jones' boss, and Mr. Jensen says, "No, we've been

15   talking about it for a long time.  Mr. Sanders is in the top

16   ten of earners and we had been talking about surveilling him

17   for several months.  Vastly different stories.  They can't

18   even get that story straight.

19            And then they say he's terminated separately for

20   March 19th and March 25th and 26th.  So let's look at

21   March 19th.

22            The evidence demonstrates that Mr. Sanders worked

23   eight hours that day.  They may not like the evidence, but

24   that's what the evidence demonstrates.  It also demonstrates

25   that Ms. Hoppenrath's testimony is not possible.  She

1    testifies in the hearing that Mr. Sanders got back to the

2    shack at Dayton's Bluff at 13:15, 1:15 p.m.  This is the

3    vehicle record.  As of 1:48, Mr. Sanders is going 55 miles

4    an hour and he's going on the freeway this (indicating)

5    whole time.  There's no possible way according to the

6    records he's back at the shack at 1:15, and not a single

7    person acknowledges that or even looked at it.  They're

8    deciding somebody's job and livelihood and they can't even

9    pick out this fact.

10              March 25th and 26th.  They gave him a notice

11    that's dated March 28th, 2016, and as of the date of that

12    notice, Mr. Sanders hasn't even entered time for the 26th.

13    It's undisputed that he doesn't enter time until the 29th.

14    They're already talking about charging him with a violation

15    when they don't even know what time he's reported and

16    payroll hadn't even closed yet.  And Mr. Sanders had said in

17    the investigation:  "I intended to go back and change my

18    time.  I put them in as place holders."  And they shut him

19    off.  They didn't care.  They didn't let him change it.

20              And you saw the emails by Ms. Hoppenrath and

21    Mr. Jones where they were urging ASAP, we need it right

22    away.  We don't want to give him opportunity to correct his

23    time.

24              And I want to reference this because it's in the

25    investigation.  Counsel referenced the GPS coordinates.

1    Mr. Sanders and his union rep put in the GPS coordinates and

2    Counsel kept referencing the fact that it didn't show him at

3    Bridal Veil.  The records demonstrate according to the GPS

4    coordinates that he was at 1500 Warner from 6:19 to 8:21.

5    That's Dayton's Bluff.  They didn't tell you that.  They

6    don't tell you that that's what the records show.  He's

7    working.  They ignore it.

8              He sends an email at 2:27 on the 19th, so he shows

9    up at 6:30 and works till 2:30 on the 19th.

10             And then the 25th and 26th.  And I'm showing you

11   this because we didn't really look at it, but you heard

12   testimony from Mr. Sanders that he intended to go back and

13   needed help with a pay code for lunch, because it was a

14   holiday weekend and he needed some help understanding it.

15   This was in the transcript submitted by Mr. Sanders and his

16   union rep from a Mr. Setnar, who said, "I intended to help

17   Mr. Sanders correct his time to make sure it was accurate

18   and use the right pay codes."  They ignore that.

19             You heard from Mr. Mozinski, who testified that he

20   had never seen someone charged before payroll closed, ever.

21   This was the first time.  And that's unrebutted evidence.

22   They've given you nothing to indicate that that's not true.

23   And even more than that, they then decide to pay him for the

24   hours they claim were incorrect.  They stuck the money in

25   his pocket as he walked out the door and then claimed he

1    robbed the bank.  They're saying the hours are wrong, but

2    they paid him for it and it required Ms. Hoppenrath's

3    sign-off.  They were trying to make sure.  That's what this

4    is about.

5            And in total, the separate investigations, the

6    total time that they're claiming that Mr. Sanders reported

7    over 311 days of work is six hours and 45 minutes, total.

8    Counsel made reference to it being all overtime.   It was

9    all overtime because March 25th was a holiday.  It was Good

10   Friday.  And when you work on a holiday, all of your time

11   is overtime pay per the union contract.  It wasn't that he

12   was claiming it was all overtime pay when it shouldn't have

13   been.  It's what the union contract requires.  And it was

14   Good Friday and he was working and other people are at home

15   with their families.

16           And then it's separated, so it's two and a half

17   hours for March 19th and four hours for March 25th and 26th,

18   and they say both of them warrant dismissal.

19           But you look at comparators:  Mr. Klukas,

20   Mr. Kramer, Mr. Johnson, Exhibits 218, 222 and 223.  All

21   employees under Mr. Jones's direction, all around the same

22   period of time, all accused of dishonesty and misreporting

23   time.  And Mr. Johnson's allegation is specifically payroll

24   theft.  None of them are terminated.  They're all given a

25   waiver by Mr. Jones.  And I asked him:  Had any of those

1    people filed an HR complaint against you?  No.  And by the

2    way none of them were track inspectors.

3          When you also look at the documents, each of those

4    people were charged with allegations on multiple days, yet

5    they got one investigation, not multiple like Mr. Sanders.

6    That's an indication of retaliation, a retaliatory motive,

7    together with the screaming and yelling and swearing

8    directly related to his protected conduct.  That's motive to

9    retaliate when you see different people who are treated

10   differently despite having similar conduct.  That's motive.

11         Now, BNSF brought up some comparators that

12   Ms. Detlefsen talked about and you can look at them.

13   They're from Iowa, they're from South Dakota, they're

14   from -- it's one manager who was accused of using a credit

15   card to buy meals at a restaurant.  Don't look at actual

16   people under Mr. Jones' direction.  Look over (indicating)

17   here, look over here, look over here (indicating).  It's one

18   distraction after the next.  Did they even bring up the

19   three comparators who are under his direction?  Did

20   Ms. Detlefsen even look at them or ask him?  No.  They just

21   want to present to you information from all around the

22   country.

23         And then let's talk about the time entry issue.

24   Did BNSF call a single witness to talk to you about how

25   employees put in time?  Zero, not a single one.  We brought

1   in four separate employees who all talked about the custom

2   and practice of putting in place holders and it would be

3   edited, especially for people in Mr. Sanders' position who

4   was called out in the middle of the night at all times, that

5   there were constant adjustments before payroll was closed.

6   Not a single witness, and it's more than that.  Not a single

7   question to their witnesses about how employees typically

8   put in time, because they know how it works and it works

9   just like our witnesses said.

10          And then let's talk about these administrative

11  decisions, the OSHA determination, the NRAB decision.  It's

12  undisputed.  Those decisions are based on no live testimony.

13  None of -- most of the records you saw were never included

14  in those investigations.  There are no recordings.  They

15  never had the documents you have seen.  There's no evidence

16  of the scorecards.  Mr. Jones never testified.

17  Distractions.  Don't look at the evidence in this case.

18  Don't look at what you heard and saw live with your own eyes

19  and ears.  Look at a piece of paper from some person who

20  made a decision hundreds of thousands of miles away.

21          And did they even ask witnesses to describe what

22  those decisions were based upon, what information those

23  people had at the time?  Not a single question, because they

24  don't want you to know.  Because what it demonstrates is

25  they don't have the information we have.  This is the very

1    first time in five years that Mr. Sanders has a hearing like

2    this where all of the evidence comes out, where people are

3    sworn and put under oath on a witness stand and asked

4    questions, the very first time.  They don't want to talk

5    about that.  They want to talk about distractions.  Look

6    over (indicating) here, look over (indicating) here, look

7    over (indicating) here.

8            Look at the evidence.  That's all we ask.  Take

9    into account what you heard and saw in this courtroom.

10   That's what we're asking.

11           And then let's talk about this link.  I was asking

12   Mr. Freshour yesterday and he kept saying, "I kept looking

13   for a link, a connection between the two things, and I

14   couldn't find anything.  You know, I did an investigation.

15   I couldn't find anything."

16           And that link is what's called a contributing

17   factor and you'll see that in the jury instructions.  It's

18   saying that BNSF and Mr. Jones took action in part by

19   his -- because of his protected conduct that at least played

20   some part in the decision.  And his protected conduct is the

21   safety complaints, the defects, the slow orders, the HR

22   complaints, the call with FRA.

23           And like I said before, this isn't a hard case to

24   figure out the link, because the same person who's the

25   subject of the complaints and who's on the recordings

1    yelling and screaming at Mr. Sanders is the same person who

2    charged him and recommended he be terminated.  This isn't a

3    hard case to find a link.  But again, that's the links BNSF

4    will go to.  The head HR person over this entire region will

5    stand up here under oath and claim, "I don't see a

6    connection.  What do you mean?  That doesn't concern me at

7    all."

8           There's also a part about knowledge.  In a basic

9    form these are the elements of an FRSA claim:  protected

10   conduct, those safety concerns, the defects, the slow

11   orders, knowledge.  The people who are making the

12   determination know about his protected conduct.  And adverse

13   action, there's no dispute about that.  He clearly was

14   terminated.  And contributing factor, that there's a

15   connection between the two.  And really the knowledge

16   element and the contributing factor are the issues.

17          So let's talk about knowledge.  Obviously,

18   Mr. Jones knew about everything that Mr. Sanders did, as did

19   Ms. Hoppenrath.  Counsel represented that Ms. Hoppenrath

20   didn't know about the HR complaints.  She's the one who set

21   up the meeting with Ms. Eggertsen.  You saw that in an

22   email.  It's Exhibit 39.  You can look at it.  It's

23   Ms. Eggertsen's summary.  She specifically says she reached

24   out to Ms. Hoppenrath about setting up a meeting with

25   Mr. Sanders.  She knows that day.  He knew about it at

1    3:57 a.m.

2         We saw the email in April, the HR hotline

3    complaint that goes all the way up to Mr. Freshour's boss in

4    Fort Worth, including the law department, other individuals

5    in corporate headquarters.  Doug Jensen knew about it that

6    day.  Ms. Detlefsen agreed she knew about it at the time she

7    made the determination.  Every single person knew about his

8    complaints.  There's really no dispute about it.

9         And then there's that connection.  An animus or

10   anger is one of the key factors, is there any anger around

11   Mr. Sanders' protected conduct.  And I'm not going to go

12   over all of the recordings again, because it's clear.  There

13   is clear anger and frustration around what Mr. Sanders is

14   doing.

15        And then there's temporal proximity or timing, and

16   you'll get an instruction that that alone by itself isn't

17   enough, and that's right, but timing is still an issue.  If

18   one things short in time after the first, you can use that

19   to establish a connection between the two, and here there's

20   a mountain of other evidence as we've talked about, but

21   here's the timing:

22        December 7th, the first complaint.  December 8th

23   Jones sends the email to HR trying to counter the complaint.

24   December 10th Mr. Sanders' schedule is changed from 5/8s to

25   4/10s.  December 11th he's sent home.  December 15th he's

1     required to work 24 hours at Union Yard.  December 17th his

2     vehicle is taken away.  January 6th his start time and

3     location are changed.  The second complaint occurs on

4     February 24th after the training that Ms. Eggertsen did.

5     The closure of that complaint occurred on March 22nd.  She

6     sends the letter to Mr. Sanders.  On March 19th

7     Ms. Hoppenrath spies on Mr. Sanders.  On March 25th and 26th

8     they spy again.  And on April 19th they recommend his

9     termination.  And then on April 5th Mr. Sanders files the

10    hotline complaint and on April 19th Mr. Jones provides a

11    statement to Mr. Freshour.  On the exact same day he's

12    sending the email to PEPA recommending termination, the

13    exact same day.

14            Again, it's not hard to make this connection.  And

15    you saw when Mr. Freshour was on the stand yesterday I asked

16    him some questions about that and I put those two exhibits

17    up on the board and he hesitated, because he hadn't seen

18    that before and he had never put it together, that the same

19    day Mr. Jones is recommending termination and responding to

20    the HR complaint.  And this evidence, what we have to

21    establish is by the greater weight of the evidence, which

22    means we just have to tip the scales 51 percent to establish

23    that connection.  It's overwhelmingly established in this

24    case.

25            And when you add on top of that it's a culture of

 1    harassment and retaliation.  We called multiple employees to

 2    talk about that.  Matt Scherbing came up here and talked

 3    about Mr. Jones -- and again I apologize -- giving what

 4    Mr. Jones called a face-down fucking because they entered a

 5    slow order.  Kevin Gaylor came in and said he filed a

 6    complaint with labor relations about the cell phone usage

 7    and the next day his manager knew about it and eliminated

 8    his job.

 9          Labor relations, the department that's supposed to

10    be confidential, the next day Mr. Chartier knew about it.

11          THE COURT:  Mr. Kaster, I'm sorry to interrupt.  I

12    really am.  I just wanted to give you a heads-up.  You've

13    got about five minutes left.

14          MR. LUCAS KASTER:  Mr. Heyer talks about a Stinson

15    bridge.  We saw the recording from Mr. Kramer about welding.

16    And then we heard from Mr. Chartier, his admission that he

17    told employees to get their head out of their ass and run

18    their territory.  This is a cultural problem.  This isn't

19    Mr. Jones.  He's a symptom of a larger problem at this

20    company.

21          So let's talk about the verdict form.  This form

22    is the most important thing you'll look at.

23          Under Question (1), did Mr. Sanders prove by a

24    greater weight of the evidence his FRSA claim, we would

25    submit to you the answer to that is yes.

1          And then the affirmative defense, did BNSF prove

2     that they would have made the same decision.  The answer to

3     that is no.

4          And here's the central question:  If you take

5     Mr. Sanders' protected conduct off the table, if he would

6     have, for example, just gone along with what Mr. Jones

7     wanted, agreed with him, would that decision have been made?

8     Would he have been terminated?  The answer to that is no.

9     And we see that with the comparators, because none of those

10    people filed HR complaints and none of them were terminated

11    and none of them were track inspectors.

12         Looks like I jumped ahead on accident.  Apologies.

13         So now let's talk about damages.  There's economic

14    damages and emotional distress.  These are the economic

15    damages scenarios that Mr. Boisso detailed to you.  And the

16    scenario on A references his last two years as a track

17    inspector.  His mitigating wages, the wages he's earned,

18    Mr. Sanders has earned since then, were subtracted out and

19    that's the difference.

20         And Ms. Grobe or Ms. Grobe admitted that

21    Mr. Sanders' earning capacity at BNSF was $155,000, almost

22    exactly what Mr. Boisso claimed, and these are his damages.

23         Now let's talk about emotional distress.  Three

24    hundred and 11 days, late-night calls, interruption of

25    anniversary dinners, and Mr. Sanders came in even when he

1    maybe should not have.  And what does he get in return?

2    Swearing, berating, all of the things we've heard.  When he

3    tries to stop it, it just gets worse.

4         And after all of this he's still coming in.  He's

5    coming in on Good Friday in March of 2016, doing his job,

6    and how do they repay him for that?  By tracking him and

7    following him around for a guy that worked 300 days and 108

8    days of overtime, they spy on him.  And he has to go home

9    and tell his daughter that she has to come home from college

10   because her dad lost his job.  Not because the plant closed

11   or business shut down, because they accused him of theft.

12   And you heard from Ms. Sanders, who said, "I lost my husband

13   that day."  They destroyed him.  They took his dignity away

14   from him.

15        It's been five years, eight months and 15 days

16   between when Mr. Sanders was terminated and today, and this

17   is the first time he's getting a hearing.

18        And what's happening at BNSF in the mean time?

19   They're being congratulated for getting rid of Mr. Sanders

20   and they're calling him a lunatic, a lunatic, and the only

21   person who suffers any consequences out of this scenario is

22   Mr. Sanders.  So I submit to you that his emotional distress

23   damages are far greater than his economic damages, far

24   greater.

25        And the last thing I would say is this:  This is

1    what's really going on in the fall of 2015.  This is

2    Mr. Jones' 2015 end-of-the-year review, and there's a

3    comment from Mr. Rindy about a hundred million dollar deal

4    of new business that BNSF has, and the St. Paul sub is key

5    to that.  That's what's on the managers' minds, a hundred

6    million dollars, at BNSF, where velocity is number one and

7    profit is king.

8            I ask that you find in favor of Mr. Sanders and

9    award him damages.  Thank you.

10           THE COURT:  Members of the Jury, we've come to

11   that point in the trial where I am going to give you

12   instructions, and before I begin that I'll describe that

13   process just a little bit for you so you understand what I'm

14   about to do and why we're about to do it.

15           I'm going to invite the law clerk at this time to

16   hand out copies of the instructions and the special verdict

17   form so that each of you has those in front of you as I read

18   these instructions.

19           The instructions that you're being given include

20   not just the instructions that I'm about to read now, but

21   also instructions that I've given to you before and during

22   trial so that you have all of them in one spot.

23           I appreciate that it's probably been awhile since

24   you've held a document and had somebody read it to you, but

25   given the process that we follow here in court, it is not

1    sufficient for me to trust that you will read this on your

2    own.  It is vitally important that we get these instructions

3    read to you and recorded on the record so that we all know

4    that we're all quite literally on the same page.

5            So the Instructions 1 through 7 are instructions

6    that have been given to you previously and I am not going to

7    reread those.  We will begin with Instruction No. 8, which

8    is at page 13.  It's a page that is through a clerical error

9    unmarked.  I'll begin there.

10

11                 **COURT'S INSTRUCTIONS TO THE JURY**

12           THE COURT:  Members of the Jury:

13           The instructions that I gave you at the beginning

14   of the trial and during the trial are still in effect.  Now

15   I am going to give you some additional instructions.

16           You have to follow all of my instructions -- the

17   ones I gave you earlier and those I give you now.  Do not

18   single out some instructions and ignore others, because they

19   are all important.

20           You will have copies of the instructions I am

21   about to give you now, along with the instructions I gave

22   you after you were selected and sworn in as jurors and any

23   instructions I gave you during trial in the jury room.

24           There are rules you must follow when you go to the

25   jury room to deliberate and return with your verdict.

1        First, you will select a foreperson.  That person

2    will preside over your discussions and speak for you here in

3    court.

4        Second, it is your duty, as jurors, to discuss

5    this case with one another in the jury room.  You should try

6    to reach agreement, if you can do this without going against

7    what you believe to be the truth, because all jurors have to

8    agree on the verdict.

9        Each of you must come to your own decision, but

10   only after you have considered all the evidence, discussed

11   the evidence fully with your fellow jurors, and listened to

12   the views of your fellow jurors.

13       Do not be afraid to change your mind if the

14   discussion persuades you that you should.  But, do not come

15   to a decision just because other jurors think it is right,

16   or just to reach a verdict.  Remember you are not for or

17   against any party.  You are judges of the facts.  Your only

18   job is to study the evidence and decide what is true.

19       Third, if you need to communicate with me during

20   your deliberations, send me a note signed by one or more of

21   you.  Give the note to the court security officer and I will

22   answer you as soon as I can, either in writing or here in

23   court.  While you are deliberating, do not tell anyone --

24   including me -- how many jurors are voting for any side.

25       Fourth, your verdict has to be based only on the

1    evidence and on the law that I have given to you in my

2    instructions.  Nothing I have said or done was meant to

3    suggest what I think your verdict should be.  The verdict is

4    entirely up to you.

5            Fifth, the verdict form is your written decision

6    in this case.  You will take this form to the jury room, and

7    when you have all agreed on the verdict, your foreperson

8    will fill in the form, sign and date it, and tell the Court

9    security officer that you are ready to return to the

10    courtroom.

11            Finally, after you reach a verdict, please know

12    that you may be called upon to decide an additional question

13    in this case that is not before you at this time.

14            In deciding what the facts are, you may have to

15    decide what testimony you believe and what testimony you do

16    not believe.  You may believe all of what a witness said, or

17    only part of it, or none of it.

18            You may consider a witness's intelligence; the

19    opportunity the witness had to see or hear the things

20    testified about; a witness's memory, knowledge, education,

21    and experience; any reasons a witness might have for

22    testifying a certain way; how a witness acted while

23    testifying; whether a witness said something different at

24    another time; whether a witness's testimony sounded

25    reasonable; and whether or to what extent a witness's

1     testimony is consistent with other evidence you believe.

2              In deciding whether to believe a witness, remember

3     that people sometimes hear or see things differently and

4     sometimes forget things.  You will have to decide whether a

5     contradiction is an innocent misrecollection, or a lapse of

6     memory, or an intentional falsehood.  That may depend on

7     whether it has to do with an important fact or only a small

8     detail.

9              You have heard testimony from experts who

10    testified to opinions and the reasons for their opinions.

11    This opinion testimony is allowed because of the education

12    or experience of this witness.

13             You should judge this opinion testimony just as

14    you would any other testimony.  You may accept it or reject

15    it and give it the weight as you think it deserves,

16    considering the witness's education and experience, the

17    reasons given for the opinion, and all other evidence in

18    this case.

19             Testimony was presented to you twice in the form

20    of a deposition.  A deposition is the recorded answers a

21    witness made under oath to questions asked by lawyers before

22    trial.  In a deposition, the witness is placed under oath

23    and swears to tell the truth, and lawyers for each party may

24    ask questions.  A court reporter is present and records the

25    questions and answers.  Here, to make the deposition

1    testimony somewhat realistic, the party presenting the

2    testimony had an individual play the role of the witness.

3    You should consider the deposition testimony, and judge its

4    credibility, as you would that of any witness who testifies

5    here in person.  You should not, however, place any

6    significance on the manner or tone of voice used to read the

7    witness's answers to you.

8              Your verdict must be for Plaintiff Donald Sanders

9    and against Defendant BNSF Railway Company on Plaintiff's

10   claim under the FRSA if all of the following elements have

11   been proved by the greater weight of the evidence:

12             First, Plaintiff Don Sanders in good faith engaged

13   in protected activity by (A) providing information or

14   otherwise directly assisting in any investigation regarding

15   any conduct which Mr. Sanders reasonably believed

16   constituted a violation of any federal law, rule, or

17   regulation relating to railroad safety or security to a

18   person with supervisory authority over Mr. Sanders or such

19   other person who had the authority to investigate, discover,

20   or terminate the violation, (B) refusing to violate or

21   assist in the violation of any federal law, rule, or

22   regulation relating to railroad safety or security, or (C)

23   reporting a hazardous safety or security condition;

24             Second, BNSF fired Mr. Sanders;

25             Third, a BNSF official or officials responsible

1   for firing Mr. Sanders knew or perceived that Mr. Sanders

2   engaged in protected activity; and

3          Fourth, BNSF intentionally retaliated against

4   Mr. Sanders by firing him due, in whole or in part, to

5   Mr. Sanders' protected activity or activities.  You may find

6   that the BNSF's firing of Mr. Sanders was due, in whole or

7   in part, to Mr. Sanders' protected activity or activities if

8   it has been proved that BNSF's stated reason for

9   Mr. Sanders' firing is not the real reason but is a pretext

10  to hide retaliation.  You may not, however, find that BNSF's

11  firing of Mr. Sanders was due, in whole or in part, to every

12  single one of the track defects he reported or every single

13  one of the times he pulled tracks out of service or entered

14  a slow order throughout his BNSF employment.

15         If any of the above elements has not been proved,

16  or if you find that BNSF is entitled to a verdict under

17  Instruction No. 19, then your verdict must be for Defendant

18  BNSF.

19         For activity to be protected under the FRSA, it

20  must be done in good faith.  This requires Mr. Sanders to

21  prove by the greater weight of the evidence that, if he

22  engaged in protected activity by (A) providing information

23  or otherwise directly assisting in any investigation

24  regarding any conduct which Mr. Sanders reasonably believed

25  constituted a violation of any federal law, rule, or

1    regulation relating to railroad safety or security to a

2    person with supervisory authority over Mr. Sanders, or such

3    other person who had the authority to investigate, discover,

4    or terminate the violation, (B) refusing to violate or

5    assist in the violation of any federal law, rule, or

6    regulation relating to railroad safety or security, or (C)

7    reporting a hazardous safety or security condition, then he

8    undertook such activity honestly and frankly, without any

9    intent to defraud.

10              For Mr. Sanders to show that BNSF intentionally

11   retaliated against him by firing him due, in whole or in

12   part, to Mr. Sanders' protected activity or activities, it

13   is not enough for Mr. Sanders merely to establish that

14   BNSF's actions were unwise, unreasonable, or unfair.

15              For Mr. Sanders to show that BNSF intentionally

16   retaliated against him by firing him due, in whole or in

17   part, to Mr. Sanders' protected activity or activities, it

18   is not enough for Mr. Sanders merely to establish that his

19   protected activity and his firing occurred close in time to

20   one another.

21              Mr. Sanders may prove retaliation by pointing to

22   evidence of differential treatment of another employee if

23   the employee is similarly situated to Mr. Sanders.  To

24   establish that another employee is similarly situated to

25   Mr. Sanders, it is necessary to show that he and the other

1   employee were similarly situated in all relevant respects.

2   This means that the individual used for comparison must have

3   dealt with the same supervisor, have been subject to the

4   same standards, and engaged in the same conduct without any

5   mitigating or distinguishing circumstances.  Furthermore, to

6   be probative evidence of pretext, the misconduct of a more

7   leniently disciplined employee must be of comparable

8   seriousness.

9          You have heard evidence of findings of the

10  National Railroad Adjustment Board ("NRAB") and the

11  Occupational Safety and Health Administration ("OSHA") about

12  Mr. Sanders' termination from BNSF.  You may consider these

13  determinations as relevant evidence.  However, these

14  determinations are not binding on you.  You, as the jury,

15  have an independent obligation to decide whether the matters

16  presented here for your determination have been proved or

17  not.

18         Only if Mr. Sanders proves the essential elements

19  described to you in Instruction No. 13, then you must also

20  consider whether BNSF would have fired Mr. Sanders

21  regardless of Mr. Sanders engaging in protected activity.

22  Your verdict must be for BNSF if it has been proved by clear

23  and convincing evidence that BNSF would have fired

24  Mr. Sanders even if Mr. Sanders had not engaged in protected

25  activity by (A) providing information or otherwise directly

1    assisting in any investigation regarding any conduct which

2    Mr. Sanders reasonably believed constituted a violation of

3    any federal law, rule, or regulation relating to railroad

4    safety or security to a person with supervisory authority

5    over Mr. Sanders or such other person who had the authority

6    to investigate, discover, or terminate the violation, (B)

7    refusing to violate or assist in the violation of any

8    federal law, rule, or regulation relating to railroad safety

9    or security, or (C) reporting a hazardous safety or security

10   condition.

11        Plaintiff Donald Sanders must prove his claim by

12   the "greater weight of the evidence."

13        A fact has been proved by the greater weight of

14   the evidence if you find that it is more likely true than

15   not true.

16        Defendant BNSF's defense must be proven by "clear

17   and convincing evidence."  Clear and convincing evidence

18   means that the thing to be proved is highly probable or

19   reasonably certain.  Clear and convincing evidence requires

20   a higher degree of persuasion than the greater weight of the

21   evidence.

22        You probably have heard the phrase "proof beyond a

23   reasonable doubt."  That is a stricter standard than both

24   the "greater weight of the evidence" standard and the "clear

25   and convincing evidence" standard.  The "proof beyond a

1   reasonable doubt" standard applies in criminal cases, but

2   not in this civil case, so put it out of your mind.

3          If you find in favor of Plaintiff under

4   Instruction No. 13 and if you do not find in favor of

5   Defendant under Instruction No. 19, then you must award

6   Mr. Sanders such sum as you find will fairly and justly

7   compensate him for any of the following damages you find he

8   sustained as a result of BNSF's firing of Mr. Sanders.

9   Mr. Sanders' claim for damages includes the following types

10  of damages, and you must consider them separately.

11         First, you must determine the amount of wages and

12  fringe benefits Mr. Sanders has proved by the greater weight

13  of the evidence he would have earned in his employment with

14  BNSF if he had not been discharged on April 29th, 2016,

15  through the date of your verdict, *minus* the amount of

16  earnings and benefits Mr. Sanders received from other

17  employment during that time.

18         Second, you must determine the amount of damages

19  for emotional distress, if any, that you find Mr. Sanders

20  has proved by the greater weight of the evidence were caused

21  by BNSF's termination of him.  Emotional distress must be

22  supported by competent evidence of genuine injury.

23  Emotional distress damages need not be supported by medical

24  or other expert evidence.  A plaintiff's own testimony,

25  along with the circumstances of a particular case, can

1    suffice to sustain the plaintiff's burden in this regard.

2            You must enter these amounts as separate items on

3    the verdict form and must not include the same items or

4    amounts in more than one category.

5            Remember, throughout your deliberations, you must

6    not engage in any speculation, guess, or conjecture, and you

7    must not award damages under this instruction by way of

8    punishment or through sympathy.

9            You are also instructed that Mr. Sanders has a

10   duty under the law to "mitigate" his damages -- that is, to

11   exercise reasonable diligence under the circumstances to

12   minimize his damages.  If you find that BNSF has proven by

13   the greater weight of the evidence that Mr. Sanders failed

14   to seek out or take advantage of an opportunity that was

15   reasonably available to him, then you must reduce his

16   damages by the amount he reasonably could have avoided by

17   taking advantage of such an opportunity.

18           Thank you for your attention to those

19   instructions.

20           Ms. Morton, at this time should we invite the

21   court security officer up to --

22           MR. JAMES KASTER:  Your Honor, can I be heard

23   briefly?

24           THE COURT:  Certainly.

25           MR. JAMES KASTER:  Just on page 21, Instruction

1    14, I believe there's -- in the second sentence that the

2    word "if" was inserted and doesn't belong there.

3              THE COURT:  Sorry, Mr. Kaster.  Where did I put

4    "if"?

5              MR. JAMES KASTER:  "This requires Mr. Sanders to

6    prove by the greater weight of the evidence that he engaged

7    in protected activity by ...."  The "if" is --

8              THE COURT:  Correct.

9              MR. JAMES KASTER:  So a small point, but I thought

10   it should be corrected.  Thank you.

11             THE COURT:  Thank you for correcting that and

12   catching it.

13             Members of the Jury, if you would, please, note

14   that correction on your copy of the instructions.

15             MR. JAMES KASTER:  Thank you, Your Honor.

16             THE COURT:  Thank you.

17             All right.  At this --

18             A JUROR:  Your Honor (inaudible) --

19             THE COURT:  Certainly.  Can I repeat it, did you

20   say?  Yes.  It's at page 21, second line.  It should read:

21   "[R]equires Mr. Sanders to prove by the greater weight of

22   the evidence that he engaged in protected activity ...," so

23   the comma and the "if" can be removed.

24             (Pause - Court is reviewing)

25             THE COURT:  All right.  Mr. Kaster, I'm going to

1    disagree with you.

2              MR. JAMES KASTER:  Oh.

3              THE COURT:  There's an "if" and a "then" there --

4              MR. JAMES KASTER:  Oh, oh --

5              THE COURT:  And that was deliberate on my part.

6              MR. JAMES KASTER:  -- my misreading then.

7              THE COURT:  There's an "if" and a "then," "if he

8    engaged in protected activity ... "then," second to the last

9    line there.

10             MR. JAMES KASTER:  Okay.  I misunderstood.  My

11   fault.

12             THE COURT:  All right.  So, Members of the Jury,

13   the easy way to do this is for me to say never mind --

14        (Laughter)

15             THE COURT:  -- but let's all be on the same page

16   here.  Make sure that -- just leave it as it was originally,

17   or make a note to yourself on your copy of the instructions

18   that that instruction was correct as originally read.  Thank

19   you.

20             MR. JAMES KASTER:  And I'm sorry for that, Your

21   Honor.

22             THE COURT:  That's all right.  It happens.

23             All right.  Ms. Morton, let's call up the court

24   security officer and swear him in if we could, please.

25             (Oath administered to the court security officer by the

1    courtroom deputy)

2              COURT SECURITY OFFICER:  I do.

3              THE COURT:  Thank you.  Mr. Marshal, if you would

4    escort the jury to the jury room, please.

5              (Jury excused)

6              THE COURT:  All right.  Please be seated,

7    everyone.  Do we all have a way to contact you and you've

8    all got instructions on --

9              MR. JAMES KASTER:  Yeah, we all filled that out.

10   How long will the jury go today?  Is that up to them?

11             THE COURT:  It's sort of up to them.  My plan was

12   to at least keep them here until 5 o'clock, but we'll let

13   you know when they're excused.  And I can't -- unless

14   something strange happens, I can't imagine keeping them past

15   5:30.

16             Let's talk about tomorrow morning for just a

17   second.  What we've asked the jury to do because it's what

18   we've been instructed to do by the marshal is that they

19   report to the employee entrance downstairs after 9:10 or so,

20   9:05, 9:10 and before 9:20.  That way they're there after

21   the rush of folks.  So I do not expect them to begin their

22   deliberations tomorrow morning until some point after about

23   9:20 or so.

24             MR. JAMES KASTER:  What time is the plea?

25             THE COURT:  9 a.m. if it's on time.

1    And I'm informed also that the skyway entrance

2    tomorrow morning will be closed, so if that's how you

3    typically arrive at the courthouse, just know that that will

4    not be an option.  If you arrive about that time, you'll

5    have to go through the front door.

6    MR. JAMES KASTER:  Thank you.

7    THE COURT:  All right.  Depending on the verdict,

8    I'm going to get back here to work on the punitive damages

9    question.  And I guess one thing that we haven't talked

10   about -- but I'm going to ask the parties if they have a

11   preliminary view of at this point -- is:  If they come back

12   with a verdict for Mr. Sanders and if I allow that punitive

13   damages question to go to the jury, what's your expectation

14   as to how much time or argument or what have you that you

15   would need before we present that to them?

16   MR. JAMES KASTER:  My expectation based on past

17   practice, Your Honor, is that the jury would get the

18   financial condition additional information and we would

19   argue.  How much time would that be?  Half hour, 45 minutes

20   a side.  That's it.  There's no additional testimony that we

21   would ask for.

22   THE COURT:  And does BNSF agree, again, provided

23   those two conditions are met?

24   MS. DONESKY:  I will just estimate about an hour,

25   I suppose, in time.

1          THE COURT:  For total or for you?

2          MS. DONESKY:  Well, you said 45 each side, right,

3     Jim?

4          MR. JAMES KASTER:  I said a half hour, 45 minutes

5     a side.

6          MS. DONESKY:  A side, correct, yeah.  So I'd be

7     around -- I guess we'd be 45 or so, similar, to an hour.

8          THE COURT:  All right.  That's helpful to know in

9     advance just for our planning purposes.

10         All right.  We will stay in touch then and I'll

11    adjourn at this point.  Please feel free to contact to

12    Ms. Morton if you have any questions.

13         Thanks, everyone.

14         MR. JAMES KASTER:  Thank you.

15       (Jury excused to deliberate at 3:31 p.m.)

16          (Recess)

17    (Jury adjourns deliberations at 5:30 p.m. for the day)

18                    *      *      *      *

19

20

21

22

23

24

25

**I N D E X**

|  | PAGE |
|---|---|
| **Jury Instructions Conference** | 1104 |
| **Defendant Rule 50 Motion** | 1226 |
| **Argument re:  Request to Admit OSHA Record** | 1226 |
| **FURTHER Jury Instructions Conference** | 1232 |
| **DEFENDANT'S Closing Argument** | |
| By Ms. Donesky | 1248 |
| **PLAINTIFF'S Closing Argument** | |
| By Mr. Lucas Kaster | 1307 |
| **JURY INSTRUCTIONS** | |
| By the Court | 1307 |

**W I T N E S S E S:**

| | |
|---|---|
| **ANDREW L. SHEARER** | |
| Direct Examination by Ms. Ferguson | 1141 |
| Cross-Examination by Mr. Lucas Kaster | 1158 |
| Redirect Examination by Ms. Ferguson | 1179 |
| | |
| **STEPHANIE M. DETLEFSEN** | |
| Direct Examination by Ms. Donesky | 1180 |
| Cross-Examination by Mr. Lucas Kaster | 1204 |
| Redirect Examination by Ms. Donesky | 1222 |
| Recross-Examination by Mr. Lucas Kaster | 1223 |

* * * * *

**E X H I B I T S**

| NUMBER | FOR ID | IN EVIDENCE |
|---|---|---|
| Plaintiff 149 | | 1145 |
| Defendant 184 | | 1156 |
| Plaintiff 24 | | 1165 |
| Plaintiff 106, 115, 127 | | 1167 |
| Plaintiff 107 | | 1171 |
| Plaintiff 140 | | 1175 |
| Plaintiff 142 | | 1176 |
| Plaintiff 146 | | 1177 |
| Defendant 93 | | 1196 |
| Plaintiff 217 | | 1217 |
| Plaintiff 221 | | 1220 |
| Court 1 | | 1225 |

C E R T I F I C A T E


I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.



*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224