UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                            )  CIVIL FILE
Donald Sanders,             )  NO. 17-CV-5106 (ECT/KMM)
                            )
              Plaintiff,    )
                            )      **VOLUME VIII**
      vs.                   )
                            )
BNSF Railway Company,       )  Courtroom 3B
                            )  Wednesday, December 15, 2021
              Defendant.    )  St. Paul, Minnesota
                            )  11:00 A.M.
------------------------------------------------------------

<u>**JURY TRIAL PROCEEDINGS**</u>

**BEFORE THE HONORABLE ERIC C. TOSTRUD**
**UNITED STATES DISTRICT JUDGE**
**AND A JURY**

**A P P E A R A N C E S:**

**For the Plaintiff:**   **NICHOLS KASTER, PLLP**
                  By:  JAMES H. KASTER, ESQUIRE
                       LUCAS J. KASTER, ESQUIRE
                  4700 IDS Center - 80 South Eighth Street
                  Minneapolis, Minnesota  55402-2242


**For the Defendant:**   **ARTHUR CHAPMAN KETTERING SMETAK**
                     **& PIKALA, P.A.**
                  By:  SALLY J. FERGUSON, ESQUIRE
                  500 Young Quinlan Building
                  81 South Ninth Street
                  Minneapolis, Minnesota  55402-3214

                  **STINSON, LLP**
                  By:  TRACEY HOLMES DONESKY, ESQUIRE
                  50 South Sixth Street - Suite 2600
                  Minneapolis, Minnesota  55402


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

1        (11:00 a.m.)

2                    **P R O C E E D I N G S**

3                    **IN OPEN COURT**

4        (Jury enters)

5                THE COURT:  Good morning, everyone.  Please be

6    seated.

7                Members of the Jury, have you elected a

8    foreperson?

9                VARIOUS JURORS:  Yes.

10               THE COURT:  And would that person raise his or her

11   hand.

12               THE FOREPERSON:  (Complies).

13               THE COURT:  Terrific.  Have you reached a verdict?

14               THE FOREPERSON:  We have.

15               THE COURT:  And do you have that verdict with you?

16               THE FOREPERSON:  We do.

17               THE COURT:  Could you please hand that down to the

18   court security officer at this time.

19               (Verdict handed to the Court via court security

20   officer)

21               (Pause - Court retrieving verdict from envelope)

22               THE COURT:  At this time I'll read the verdict.

23               "We, the Jury in the above-entitled action, for

24   our Special Verdict, answer the questions submitted as

25   follows:

1    "(1)  Did Plaintiff Donald Sanders prove, by the

2    greater weight of the evidence, all elements of his FRSA

3    retaliation claim, as set forth in Instruction No. 13?

4    "ANSWER:  Yes.

5    "(2)  Did Defendant BNSF prove its affirmative

6    defense by clear and convincing evidence, as set forth in

7    Instruction No. 19?

8    "ANSWER:  No.

9    "(3)  We assess Mr. Sanders damages for lost wages

10   and benefits, from April 29, 2016, through the date of our

11   verdict, if any, in the following amount:

12   "$ 611,797.00.

13   "(4)  We assess Mr. Sanders emotional distress

14   damages, if any, in the following amount:

15   " $ 250,000."

16   Signed by the jury foreperson, Mr. Grimwood,

17   today.

18   I'll now poll the jury.  Members of the Jury, I'm

19   going to ask each of you individually to begin with if this

20   is your true and correct verdict going by number.

21   Mr. Grimwood, is this your true and correct

22   verdict?

23   JUROR GRIMWOOD:  Yes, Your Honor.

24   THE COURT:  Ms. Esposito, is this your true and

25   correct verdict?

```
 1                 JUROR ESPOSITO:  Yes, Your Honor.

 2                 THE COURT:  Mr. Williams, is this your true and

 3      correct verdict?

 4                 JUROR WILLIAMS:  Yes, Your Honor.

 5                 THE COURT:  Mr. Bonk, is this your true and

 6      correct verdict?

 7                 JUROR BONK:  Yes, Your Honor.

 8                 THE COURT:  Ms. Lafleur, is this your true and

 9      correct verdict?

10                 JUROR LAFLEUR:  Yes, Your Honor.

11                 THE COURT:  Ms. Urick, is this your true and

12      correct verdict?

13                 JUROR URICK:  Yes, Your Honor.

14                 THE COURT:  And finally, Mr. Clauer, is this your

15      true and correct verdict?

16                 JUROR CLAUER:  Yes, Your Honor.

17                 THE COURT:  Members of the Jury, so say you one,

18      so say you all, is this your true and correct verdict?

19                 JURY IN UNISON:  Yes, Your Honor.

20                 THE COURT:  All right.  Members of the Jury, one

21      of the instructions that I gave you was something of a heads

22      up, which is that after you reach a verdict depending on the

23      nature of the verdict that you reach, you may be called upon

24      to decide an additional question in this case that was not

25      before you at the time you rendered this verdict.
```

1    I'm going to excuse you at this time to go back to

2    the -- well, permit you to recess.  I'm not excusing you

3    from service just yet.  I'm going to permit you to recess to

4    return to the jury room at this time for a brief period so

5    that I may discuss with the lawyers next steps in the case

6    and we will let you know promptly how that is going to

7    proceed.  All right?

8    All right.  I'll allow you to recess at this time.

9    (Jury excused)

10    THE COURT:  Thank you, everyone.  Please be

11    seated.

12    All right.  I am going to submit the punitive

13    damages question to the jury.  At this time I am going to

14    provide you with both the instruction that I propose to

15    submit to the jury and the second -- I guess what we're

16    captioning the Second Special Verdict Form that we would

17    give them with respect to that question.

18    I think the instruction largely parrots the

19    instructions that you all have given me with a couple

20    perhaps changes.  It certainly tracks the model instruction

21    that the Eighth Circuit proposes we use in this situation.

22    I think we have more than enough copies for everybody.

23    Given how brief the instruction and verdict form

24    are, what I would ask is that you just take a couple of

25    moments to review it now, discuss it amongst yourselves and

1    then let me know whether you approve or whether you have any

2    concerns or objections to the instruction and the verdict

3    form.  I understand BNSF's position thus far with respect to

4    submission of the punitive damages question.  I will

5    certainly give you an opportunity to get anything on the

6    record on that you'd like to.

7                   (Pause - counsel reviewing documents)

8                   MR. JAMES KASTER:  We've had a chance to look at

9    the instructions and the verdict form, Your Honor.

10   Plaintiff has no objection.

11                  THE COURT:  All right.

12                  MS. DONESKY:  With respect to the Special Verdict

13   Form, we would request because the statute has a $250,000

14   amount that underneath the amount it should be "Not to

15   exceed" or a "maximum of $250,000" so that the jury is

16   awarding pursuant to the statute and in line with the

17   statute an amount between O and $250,000.

18                  MR. JAMES KASTER:  Your Honor, if I can be heard

19   on that question.

20                  THE COURT:  I don't think you'll want to be heard

21   on that question.

22                  MR. JAMES KASTER:  Fine.

23                  THE COURT:  I've decided not to include that for

24   the simple reason that the Jury Instruction Committee in the

25   Eighth Circuit recommends that it not be included, and I am

1     not going to second-guess the wise judgment of my

2     predecessors on that committee.  I understand that's an

3     objection.

4               MS. DONESKY:  Yes, so now I have it on the record.

5               THE COURT:  Yes.  Beyond that, does BNSF have --

6     and if you need more time, let me know, but beyond that does

7     BNSF have any objections to the instruction or the verdict

8     form?

9               MS. DONESKY:  If I could just have one moment.

10              THE COURT:  Certainly.  Take all the time you

11    need.

12         (Pause)

13              MS. DONESKY:  I have a few remarks, Your Honor.

14              THE COURT:  Okay.

15              MS. DONESKY:  We would request on the Defendant's

16    side, our proposed jury instruction had -- we had "willful"

17    in addition to the "malice" or "reckless," but we also had

18    definitions to help guide what those requirements or

19    elements would suggest, so we had included some definitions

20    of what those terms mean.  That would be one request.

21              The other is that if on the back page of the

22    instruction regarding the decision what they consider, I

23    don't think I see any language -- and we would request to

24    have it -- of something along the lines that we had proposed

25    in consideration of the amount of any punitive damages -- or

1    sorry -- that punitive damages, if any, should be in an

2    amount sufficient to fulfill their purposes, but should not

3    reflect bias, prejudice, or sympathy toward any party.

4            And my last request, just to put them all out

5    there, is, in the Special Verdict Form we would also request

6    "if any" be included in Question 2 like the other verdict

7    form was.

8            THE COURT:  All right.  Let's deal with those one

9    at a time --

10           MS. DONESKY:  Sure.

11           THE COURT:  -- to make sure that I understand

12   what's being asked for.

13           I confess that I do not have a copy of your

14   proposed jury instructions handy.  What terms did you

15   propose defining in your punitive damages instruction?

16           MS. DONESKY:  Our proposed instruction was that it

17   included:  "If Defendant's conduct that harmed the plaintiff

18   was willful, malicious, oppressive, or in reckless disregard

19   of Plaintiff's rights.  Conduct is malicious if it is

20   accompanied by ill-will or spite or if it is for the purpose

21   of injuring the plaintiff.  Conduct is in reckless disregard

22   of the plaintiff's rights if under the circumstances it

23   reflects complete indifference to the plaintiff's safety or

24   rights, or if the defendant acts in the face of a perceived

25   risk that its actions will violate the plaintiff's rights

1    under federal law.

2           And I have a definition of "oppressive" if the

3    Court wants that as well, but there are at least a few

4    definitions in there that we believe are warranted.

5           THE COURT:  I'm getting a copy of your proposed

6    instructions right now, I think.

7        (Pause)

8           THE COURT:  To the extent BNSF is asking for

9    material that is in its Instruction No. 22 to be included

10   wholesale either as a substitute for the Eighth Circuit's

11   model instruction -- well, let's start there -- as a

12   substitute for the Eighth Circuit's model instruction, I'm

13   going to deny that request.  I'm going to stick with the

14   Eighth Circuit's model instruction.  Defendant's Proposed

15   Instruction 23 makes its way into the model instruction, or

16   into the draft instruction because it's included in

17   substance, if not word for word, in the last paragraph -- in

18   the last sentence of the second paragraph of the

19   instruction.

20          MS. DONESKY:  Yes, I notice that and understand

21   that that's incorporated.

22          THE COURT:  Okay.  So I'll confess that I did not

23   include Instruction No. 24 for a couple of reasons.  Let me

24   articulate those and then see if -- Defendant's proposed

25   instruction includes a phrase that "intentional retaliation

1    does not give rise to punitive damages liability where the

2    employer is unaware of the relevant federal prohibition."

3    And with respect to that piece of this proposed instruction,

4    my understanding of all of the evidence that's come in thus

5    far is that BNSF has not disputed its knowledge and

6    awareness of the prohibition.  The first piece of evidence

7    that comes to mind is the retaliation letter that was sent

8    to Mr. Jones, so I don't think that piece would serve a

9    purpose here based on the evidence that's been submitted.

10            Let me stop there and see if BNSF disagrees.

11            MS. DONESKY:  We don't object.

12            THE COURT:  Okay.  Then the second clause is

13   "retaliates with a distinct belief that its retaliatory act

14   is lawful," and I think that that is subsumed within the

15   good-faith effort to comply with the law prohibiting

16   retaliation clause at the end of the second paragraph of the

17   instruction that I've proposed.

18            MS. DONESKY:  Yes.  We would just preserve the

19   record in the sense that we did propose it as an instruction

20   and understand that the Court has not included it and --has

21   decided not to include it, but we would just -- I'm not

22   making a request for anything further or for that

23   instruction to be incorporated.

24            THE COURT:  Okay.  Sorry.

25            MS. DONESKY:  No, no.  That's okay.  That's fine.

1   And I presume, then, the Court is denying the request for a

2   sentence that the amount should not reflect bias, prejudice

3   or sympathy toward any party to the end of the instruction.

4           THE COURT:  No, I am not denying that request.

5           MS. DONESKY:  Oh, okay.

6           MR. JAMES KASTER:  Your Honor, I would --

7           THE COURT:  I do not intend to deny that request

8   yet.  I want to hear about that.

9           Mr. Kaster?

10          MR. JAMES KASTER:  And I apologize, Your Honor.  I

11  started to speak before the Court was finished with your

12  sentence and I don't mean to talk over the top of the Court.

13  I just want to apologize.

14          I have never seen that separately instructed in a

15  damage instruction, including punitive damages.  The jury

16  was already instructed not to let bias, prejudice or

17  sympathy get in the way of their verdict.  That is a part of

18  the general instructions.  I've never seen that repeated as

19  it relates to a particular item of damages.

20          So the jury doesn't need to be reminded about all

21  of their duties unless the Court is intending to read all

22  the general instructions again.  I don't think that's

23  necessary either.

24          So I think -- I object to a separate advisory to

25  the jury now not to let bias, prejudice, or sympathy get in

1    the way of a verdict, because I think that would by

2    necessity given the circumstances and the context be a

3    gentle reminder to the jury not to fulfill the purposes, the

4    full purposes of punitive damages under the circumstances.

5    So I object to that.

6          MS. DONESKY:  To be clear, we weren't asking for a

7    separate instruction if that helps, Your Honor, just to have

8    the language included within the instruction.

9          THE COURT:  That's what I understood you were

10   asking for.

11         MS. DONESKY:  Sure.

12         THE COURT:  Okay.  I'm going to deny the request.

13   I think Mr. Kaster's got a point.  I think both of you have

14   a point, to be honest with you.  BNSF's concern, if I'm

15   understanding it correctly, is that that's a particular

16   feature or aspect of the instructions that might have some

17   bearing on this question and I think that's a reasonable

18   request.  We did for what it's worth include in the actual

19   damages instruction not just an instruction that you're not

20   supposed to award actual damages by way of punishment.  We

21   also said "or through sympathy," so we did sort of repeat

22   that concept there.

23         But I do think that reminding them of one of their

24   duties when they have been put under a host of duties places

25   undue emphasis on one to the exclusion of others.  And I do

1   not intend to read all of the instructions again.  I do

2   intend, however, to remind them that they continue to be

3   bound by all of the instructions that I have given them

4   previously, so I will do that.

5           MR. JAMES KASTER:  And we don't object to that,

6   Your Honor.

7           THE COURT:  Okay.  So that leaves us with the

8   instruction as drafted.  I appreciate everyone's input on

9   that.

10          Okay.  Next question is -- oh, sorry.  BNSF had a

11  concern about the verdict form.

12          MS. DONESKY:  Well, I was requesting the "if any"

13  language that was in the same -- which was added to the

14  verdict form in the other manner of the amount.

15          THE COURT:  I think dividing it into two questions

16  takes care of that.

17          MS. DONESKY:  Right.  I see that.

18          THE COURT:  Okay.  But objection noted.

19          Next question is how do the parties propose to

20  present the punitive damages question to the jury.

21          Mr. Kaster, let me hear from you first, and I want

22  to know how and how much time.

23          MR. JAMES KASTER:  You know, we've talked about

24  this, Your Honor, overnight and with the possibilities

25  involved.

1    How we would like to proceed is we would like to

2    put the 2016, which we think is the most relevant, financial

3    condition statement in evidence and add that by stipulation.

4    I understand they'll preserve their objections to any

5    consideration of punitive damages, but this is a public

6    record and I don't think there's any dispute that this is

7    their 10-K for 2016.  So we'd add one exhibit.  We would

8    propose that no additional evidence is necessary from the

9    plaintiff's perspective and arguments on that additional

10   question of punitive damages, we think that a half hour per

11   side would be plenty.

12            THE COURT:  Let me ask BNSF that question.

13            Let me ask first of all, is it correct that you've

14   stipulated to the admission of that exhibit certainly over

15   BNSF's objection, I understand, to the jury's consideration

16   of punitive damages.  However, is that an exhibit to which

17   you have stipulated?

18            MS. DONESKY:  Sorry.  I was just looking at -- I

19   just realized that good faith isn't a separate question on

20   the verdict, so I'll make that point.  Sorry.  Could you

21   repeat the question?  Are we opposed to the stipulation?

22            THE COURT:  Certainly.  Sorry.  Let me ask this

23   question and then we'll get to the good-faith piece.

24            So the question is, Mr. Kaster has suggested that

25   the 2016 -- is it their --

1    MR. JAMES KASTER:  I believe it's their 10-K,

2    their publicly filed 10-K.

3         THE COURT:  Has BNSF stipulated to that document's

4    admission?

5         MS. DONESKY:  What exhibit number is it?

6         MR. LUCAS KASTER:  283.

7         MR. JAMES KASTER:  It's 283.  There was only a

8    relevance objection, Your Honor.  At this point it is not

9    only relevant, but it is necessary.  I think there are cases

10   that suggest that a failure to give the jury financial

11   condition information would be problematic.

12        THE COURT:  I don't intend to sustain a relevance

13   objection at this time certainly.

14        MS. FERGUSON:  Could we just state something for

15   the record?  I don't think there's any issue about BNSF's

16   ability to pay, so therefore that's the basis for the

17   relevance objection.

18        THE COURT:  And I'll overrule that.  I spent some

19   time last night in the case law on that question and I'm

20   satisfied that I'm right about that, or at least that that's

21   the better answer on that, the better exercise of

22   discretion.

23        Okay.  Ms. Donesky, you had another question about

24   the verdict form and I wanted to give you an opportunity

25   to --

1    MS. DONESKY:  If we stick on the -- just for terms

2    of proceeding on the evidence from our perspective, I guess

3    what I would propose or what we envision -- and I don't know

4    if Your Honor envisioning sort of separate closing, but what

5    I would appreciate the opportunity to do is refer to

6    exhibits and go up and explain to the jury -- basically

7    make -- provide evidence to the exhibits that they should be

8    referring to and make some type of -- I guess another type

9    of argument relating to the evidence that would show that

10   the burden hasn't been met, but I think all the exhibits

11   that we would be referring to have all been put into the

12   record already, but that would be what I would envision.

13        MR. JAMES KASTER:  And, Your Honor, our view is

14   that all the evidence of record is properly referred to in

15   this closing.  Anything that was in the underlying record

16   can be referred to in this second stage of the bifurcated

17   trial.

18        MS. DONESKY:  But do you envision making

19   additional argument to the jury?

20        MR. JAMES KASTER:  Yes.

21        MS. DONESKY:  Yeah.  Okay.

22        MR. JAMES KASTER:  Yes.

23        THE COURT:  You both envision making additional

24   argument to the jury, so let me ask the hard question.

25   Mr. Kaster said a half hour.

1    MS. DONESKY:  Twenty minutes to a half hour, yeah.

2    I don't think it would take longer than 30 minutes from my

3    perspective.

4    THE COURT:  Okay.  Then here's what I propose to

5    do.  We're going to check on one thing here.

6    (Pause)

7    While we're checking on that, Ms. Donesky, let me

8    go back to the special verdict form.  I think what you were

9    getting at is a second question that said:  Do you find that

10   BNSF has proved by the greater weight of the evidence that

11   it made a good-faith effort?

12   MS. DONESKY:  As a separate question to preserve

13   the record.  I'm assuming you've rejected that, but I did

14   want to make note -- okay.

15   THE COURT:  No, I hadn't thought about it and I

16   think it -- I think it makes sense.  I'm fine with that.  I

17   don't see a problem with that.

18   MR. JAMES KASTER:  And the question would be what,

19   Your Honor?

20   THE COURT:  "Did BNSF prove by the greater weight

21   of the evidence that BNSF made a good-faith effort to comply

22   with the law prohibiting retaliation?"  So if the answer is

23   yes to 1, then that's an out that BNSF has almost along the

24   lines of an affirmative defense if I'm understanding the

25   instruction correctly.

1    MR. JAMES KASTER:  Your Honor, that question is

2    subsumed within Question 1.  It's redundant.  And I object

3    to a separate question on this issue of proof of punitive

4    damages.  It's essentially two questions that ask the same

5    question of the jury as to whether or not the standard for

6    punitive damages has been met.  I don't understand that to

7    be a shifting burden of proof under the circumstances.

8        I mean, we have to prove -- "If you find" -- I'm

9    reading from the instruction.

10       "If you find that BNSF acted with malice or

11   reckless indifference ... and did not make a good-faith

12   effort to comply with the law, then, in addition to any

13   other damages to which you find Mr. Sanders is entitled, you

14   may, but are not required to, award Mr. Sanders an

15   additional amount HAMENT as punitive damages ...."

16       We have to effectively prove in that sentence a

17   negative.  Giving them an additional opportunity to prove

18   this as an affirmative defense is duplicative and

19   unnecessary and I think it's confusing.

20       MS. DONESKY:  I was referring to the sentence

21   above it which would suggest that BNSF has to prove by the

22   greater weight of the evidence that it made a good-faith

23   effort.

24       THE COURT:  I think if BNSF's got something that

25   is its burden to prove, then it justifies a second question.

1    I don't think it means we need to change the first question.

2    I don't think it's confusing.  I'm going to overrule

3    Plaintiff's objection on this one and I will include a

4    second question that is along the lines of:  "Did BNSF prove

5    by the greater weight of the evidence that BNSF made a

6    good-faith effort to comply with the law prohibiting

7    retaliation?"  If yes, stop; if no, then continue to the

8    next question.  I'll edit the form.  I will get you drafts

9    of the form so that you can take another look at it once

10   more before we submit it to the jury.

11          MS. DONESKY:  Your Honor, I'm going to make one

12   more plea for the "if any" in the last question, because the

13   instruction reads, to the point Mr. Kaster just read:

14          "If you find that BNSF acted with malice or

15   reckless indifference" and so forth, "then, in addition to

16   any other damages to which you find Mr. Sanders is

17   entitled," which actually maybe needs to be struck because

18   they already found damages, because that's referring to an

19   instruction that they're given not in a bifurcated way --

20   "you may, but are not required to, award Mr. Sanders an

21   additional amount as punitive damages ...."  Therefore, I

22   believe that the "if any" is appropriate based on that

23   language.

24          THE COURT:  I'll think about it.  I understand you

25   object.  I'll think about it.  It's in the instruction and I

1   think it's pretty clear from the instruction, but I'll think

2   about that one.

3            MS. DONESKY:  Okay.

4            THE COURT:  It does have the virtue of consistency

5   with the prior Special Verdict Form.  They are used to

6   seeing it.

7            Okay.  All right.  Then here's what we're going to

8   do.  The jury's got their lunches,  they're being delivered

9   now, which is serendipitous, so that gives us an hour.

10  We'll give them an hour to eat lunch and begin promptly then

11  with closings on the punitive damages question at 12:35.  I

12  will give each side 35 minutes to make its punitive damages

13  argument and given -- do you want the clock on or not?

14           MR. JAMES KASTER:  Luke, do you want the clock on?

15  Do you want a reminder that you're almost out of time?

16     (Laughter)

17           MR. LUCAS KASTER:  Sure.

18           THE COURT:  Or do you want me to interrupt you

19  again?

20           MR. LUCAS KASTER:  I appreciate the Court doing

21  that yesterday.  I had taken the wrong time down as my

22  start, so I appreciate the Court giving me that reminder.

23           THE COURT:  Then we'll do it.  We'll put 35

24  minutes up there.  We'll tilt it in a way where the jury has

25  a little harder time seeing it.

1    Can we do that?  I've been given a look as though

2    that will be a difficult thing to do.  We'll do our best.

3    So keep an eye on the clock and you'll have the lights and

4    so forth that give you some indication of what time you've

5    got left.

6          Upon the conclusion of that hour and ten minutes

7    of argument, no break in between, my intention then would be

8    to instruct the jury and permit them to return to deliberate

9    on that question.  Is Plaintiff okay with that?

10          MR. JAMES KASTER:  Yes.

11          MR. LUCAS KASTER:  Yes.

12          THE COURT:  Okay.  BNSF?

13          MS. DONESKY:  Yes.

14          THE COURT:  All right.  I will get to work on the

15   Second Special Verdict Form right now.  I'll get whatever

16   revised version of that I decide on in to you as

17   expeditiously as possible so that you may review that.  I'll

18   be in here for just a couple of minutes before we call the

19   jury in to deal with any outstanding objections on that and

20   then we'll proceed.

21          MR. JAMES KASTER:  Thank you, Your Honor.

22          THE COURT:  Thanks, everyone.

23      (Recess taken at 11:37 a.m.)

24                    *      *      *      *

25

1      (12:35 p.m.)

2                        IN OPEN COURT

3          (Without the jury)

4              THE COURT:  Please be seated, everyone.

5              All right.  Let me start with the plaintiff.  Is

6      there anything that the plaintiff thinks we need to address

7      here before we get the jury in?

8              MR. JAMES KASTER:  I think I previously made a

9      record regarding the addition of Question 2.  I'm sorry.  Do

10     I have the wrong Special Verdict Form?  Is it Question 3 was

11     the new one?  No, it's Question 2.  So I just note our

12     objection to Question 2.

13             THE COURT:  Understood.

14             MR. JAMES KASTER:  Also, Your Honor, I don't know

15     that we need to do this in front of the jury, but I think

16     having -- the court having ruled on the relevance objection

17     to 283, we just want the record to reflect that 283, that we

18     move its admission.

19             THE COURT:  And over BNSF's objection it's

20     admitted.

21             MR. JAMES KASTER:  Thank you.

22             THE COURT:  How about from BNSF's side?

23             MS. DONESKY:  Nothing further.

24             THE COURT:  Okay.  I'll give the jury just a short

25     preview of what they're here to do and then I'll turn it

1    over to the defendant to argue first.  We'll keep the same

2    order.  Any objection to that?

3              MR. JAMES KASTER:  No, Your Honor.

4              MS. DONESKY:  No, Your Honor.

5              THE COURT:  Okay.  Great.

6         (Jury enters)

7              THE COURT:  Please be seated, everyone.

8              Members of the Jury, as I indicated earlier after

9    you reached a verdict on the questions with respect to which

10   you have reached a verdict, I gave you a heads up that you

11   may be called you upon to decide an additional question in

12   the case that was not before you then, and that question is

13   before you now.  It is the issue of punitive damages.

14             We will not be taking any additional testimony

15   with respect to that issue.  Instead, what the lawyers will

16   do is argue each for 35 minutes or so, or less, each side,

17   and then I will give you one instruction on that question

18   and then I will ask you to deliberate on that question.

19             BNSF will present their argument first.  Plaintiff

20   will present his argument second.

21             Ms. Donesky?

22             MS. DONESKY:  Thank you, Your Honor.

23             THE COURT:  Let's wait one second so the jury can

24   get notepads in front of them.

25        (Pause)

1        THE COURT:  Ms. Donesky?

2        MS. DONESKY:  Thank you.

3

4        **DEFENDANT'S ARGUMENT ON PUNITIVE DAMAGES**

5        MS. DONESKY:  Ladies and Gentlemen of the Jury,

6    Counsel:

7        As the judge just previewed for you, you now have

8    one additional verdict form to complete and evidence and

9    decisions to make.  This relates to the punitive damages.

10       And I want to start by focusing on what the

11   instruction to you will be and the high standard required

12   for the plaintiff to meet in order for him to meet this high

13   burden, and it will read as follows:

14       "You now must decide whether Defendant BNSF acted

15   with malice or reckless indifference to Mr. Sanders' right

16   not to be terminated on the basis of his engaging in

17   protected activity."

18       The standard requires a showing of "malice or

19   reckless indifference if it has been proved that BNSF or a

20   BNSF official or officials responsible for firing

21   Mr. Sanders (A) knew that the firing of Mr. Sanders was in

22   violation of the Federal Railroad Safety Act or [] acted

23   with reckless disregard of that law. However, you may not

24   award punitive damages if BNSF has proved by the greater

25   weight of the evidence that BNSF made a good-faith effort to

1     comply with the law prohibiting retaliation."

2          That is the standard or standards that you will be

3     asked to review against the evidence that was presented.

4     Plaintiff bears the burden of proving malice or reckless

5     indifference and we have the burden to show you good faith,

6     and we believe the evidence shows the plaintiff can not be

7     meet his burden and at minimum that this evidence shows that

8     BNSF acted with good faith to comply with the law.

9          And I want to begin with Exhibit 30 and it'll come

10    up on the screen for you.  I want you to consider that as of

11    December 15th of 2015 when HR reviewed the complaint, the

12    first complaint that Mr. Sanders brought, in addition to the

13    disciplinary measure that was taken, they also gave to

14    Mr. Jones an anti-retaliation letter, and I'd like to focus

15    on a couple of those provisions that were advised to

16    Mr. Jones at that time.

17          MS. DONESKY:  The last three paragraphs, please.

18          And I will read them to you.  This letter from

19    BNSF advised and reminded Mr. Jones:  "Retaliation is

20    prohibited and will not be tolerated.  You are advised to

21    treat a person as if he or she has never complained of

22    discrimination or opposed perceived discriminatory company

23    practices.  As a people leader, it is also your

24    responsibility to ensure that others continue to treat the

25    person as if he or she had never complained of

1    discrimination.

2         "The employee should be held accountable for the

3    same behavior/conduct for which other employees are also

4    held accountable.

5         "In order to ensure you are not retaliating

6    against an employee" -- oh, sorry.  I'll go to the next

7    page.  He's advised of these two paragraphs, but I want to

8    focus then too on the last paragraph of this letter.  He was

9    given various guidances.

10        And this paragraph ends -- thank you -- "Prior to

11   terminating or suspending the employee, the decision must be

12   reviewed, underlined, must be reviewed with a supervising

13   AVP or above to ensure the decision is based on valid

14   business reasons and is not intended to be retaliatory."

15        This was provided to Mr. Jones.  This is a

16   preventive measure that BNSF instituted and provided as of

17   December of 2015.  This is the opposite to retaliation.  It

18   is intended to prohibit and prevent retaliation, and that

19   was its purpose and that was its intent and it was issued.

20        And it also shows, the record also shows, that

21   those provisions were followed and the guidances were taken,

22   and I'd refer to the multilevel review process that was

23   undertaken prior to Mr. Sanders' dismissal.

24        Consider that Mr. Jones prior to even initiating

25   the hearing notices under the Collective Bargaining

1   Agreement, they consulted and worked with labor relations.

2   They sought additional guidance.  Consider that prior to the

3   termination itself, even prior to observing Mr. Sanders,

4   Mr. Jones advised Ms. Hoppenrath to go to labor relations

5   and seek their consultation.

6          Consider that after Mr. Jones, given his role as

7   Mr. Sanders' supervisor and consistent with their practice,

8   reviewed the hearing transcript, provided his review of the

9   record, but look at what he did after that.  He sent the

10   recommendation, the hearing transcripts, to Ms. Detlefsen.

11   They got labor relations.  And Ms. Detlefsen, her testimony:

12   I conduct an independent review of the record to determine

13   if termination is supported.

14          This is process far above what normally happens in

15   America when at-will employees have decisions that are made.

16   We have labor relations independently looking at the hearing

17   record.  And she also said, "I don't consider the

18   recommendation.  I look at the record."

19          On top of that you then have Ms. Detlefsen who

20   sees that retaliation has been argued in the hearing

21   transcripts, and what does she do?  She takes additional

22   protective measures.  She goes and she consults with human

23   resources and legal before making the decision and before

24   advising back to the field that she supports dismissal.

25   Those two are additional protective, preventive measures

1    that were taken to ensure that retaliation wasn't the reason

2    for the dismissal.

3              Beyond that, you have labor appeals that were

4    taken from that.  You have two governmental bodies who

5    independently looked at the facts and concluded that

6    Mr. Sanders' dismissal was proper, as additional reason that

7    the decision that was made and that Plaintiff cannot show

8    decision was made in reckless disregard for the law.  The

9    actions that were taken belie that.

10             Consider as well the policies BNSF has in place

11   within the company.  Mr. Freshour touched on some of that in

12   his testimony, but at Exhibits 94, 95, 96, 97.  They have a

13   hotline complaint that's advised through a completely third

14   party.  It's not even BNSF-affiliated.  It's run through a

15   third party, all the measures they have for reporting

16   concerns of discrimination and addressing them.  You can go

17   to your manager, you can go to human resources, you can go

18   to hotline.  They have multiple mechanisms to bring concerns

19   of retaliation to the forefront and to be reviewed.

20   Exhibits 98, 99, 100, even a posting on the Federal Railroad

21   Safety Act, Exhibit 101.  They have those posted in the

22   workplace.

23             These are all measures to advise employees that

24   you have rights and you have rights to not be discriminated

25   against or retaliated against.  They're posted at the

1    company.

2           They do annual trainings.  Mr. Freshour spoke of

3    that.  Mr. Freshour spoke of the fact that employees each

4    year have an annual training, anti-discrimination,

5    anti-retaliation training, and you saw it in action.

6           Magenta Eggertsen, February of 2016.  What was she

7    doing?  She was providing the annual training to the

8    maintenance of way employees.  Mr. Sanders was there,

9    Ms. Hoppenrath was there.  There's a long sign-in sheet of

10   many individuals who attended that annual training provided

11   by Ms. Eggertsen.  These are measures and steps and efforts

12   made by the company to ensure that actions are taken, not

13   for discriminatory and not for retaliatory purposes.

14          I would ask based on the information that's

15   provided in the record and the information that I've just

16   gone through that both -- you'll have the verdict form.

17   You'll be shown a verdict form.  It will have two questions.

18          The first question will ask whether the plaintiff

19   has met the high burden to show reckless disregard or malice

20   in the actions in question.  We submit that the plaintiff

21   cannot meet that high burden and that that question would be

22   answered with no.

23          And at minimum, we would submit that the second

24   question, which provides and discusses BNSF's good-faith

25   effort, that at minimum the evidence that I have just

1    outlined provides that BNSF did act in good faith and that

2    that question should be answered that it has met it and

3    should be answered as yes and that no damages, no punitive

4    damages, should be awarded in this case.

5              Thank you.

6              THE COURT:  Mr. Kaster?

7              MR. LUCAS KASTER:  Thank you, Your Honor.

8

9              **PLAINTIFF'S ARGUMENT ON PUNITIVE DAMAGES**

10             MR. LUCAS KASTER:  Ladies and Gentlemen of the

11   Jury, Counsel, Your Honor:

12             I want to walk through like Counsel did the

13   question that you need to answer, and the first thing you

14   need to answer is did BNSF know its conduct was illegal or

15   did they act in reckless disregard of the law.  The record

16   demonstrates that they have a number of written policies

17   that specifically state this type of conduct, this type of

18   retaliation, is illegal, because this law prohibits it.  We

19   looked at the policy that specifically prohibited

20   retaliation, we looked at their hotline process or their

21   hotline overview, we looked at their complaint process, all

22   of which indicated to their employees that any type of

23   retaliation for reporting safety concerns or reporting HR

24   complaints is prohibited.  So BNSF clearly knew and its

25   managers clearly knew that this conduct was illegal.

1          So then the next question is as Counsel

2     referenced, did they make good-faith efforts to comply with

3     that law, to comply with their knowledge of what they knew

4     the law prohibited.

5          And Counsel just referenced this letter that was

6     sent out, and you heard testimony about an anti-retaliation

7     retaliation process and that process was comprised of that

8     one letter that was sent to Mr. Jones.

9          And by the way, Counsel just referenced and

10    brought up on the screen the fact that any employment

11    decision that was going to be made by Mr. Jones needed to be

12    reviewed by the AVP, and if you remember, the AVP is

13    Mr. Hesterman, not Mr. Jensen.  That's the general director.

14    The AVP is Mr. Jensen's boss.  And there's zero evidence in

15    the record that Mr. Hesterman was involved in any meeting

16    regarding Mr. Sanders' employment decision.  So BNSF failed

17    to even follow its own written policy.  The one letter that

18    they sent indicating what their process is they failed to

19    follow.

20         And by the way, that individual who was supposed

21    to be a part of that meeting, Mr. Hesterman, you heard from

22    Mr. Scherbing, who was on a train with Mr. Hesterman later

23    in 2016, that AVP calls Mr. Sanders a lunatic.  And

24    Mr. Jensen then rewards and congratulates Mr. Jones in his

25    2016 annual review, saying all of our metrics are up, our

1    scorecards are good, our relationships are good, and Don

2    Sanders no longer works for BNSF.  They knew it was

3    unlawful, they didn't even follow their own policies and

4    they surely didn't follow the law.

5            So the answer to Question 1 is yes.  We have

6    proven that punitive damages are necessary.  And the answer

7    to Question 2 about whether they made good-faith efforts to

8    comply with the law or comply with even their written

9    policies is no.

10           So then the question becomes what do you look at

11   for damages, and you'll see on the second page of the

12   instruction there's three factors that you look at:  the

13   reprehensibility of their conduct, the harm caused to

14   Mr. Sanders, and BNSF's financial condition.  And we look at

15   the financial condition to determine what amount of punitive

16   damages is necessary to punish the company, but also deter

17   them and other companies from engaging in this type of

18   conduct, so let's walk through those.

19           The reprehensibility of BNSF's conduct.  As we

20   heard throughout the case, Mr. Sanders filed multiple

21   complaints with HR.  Those complaints went to multiple

22   people within the HR department, all the way up to

23   Mr. Freshour's boss, who's an AVP in human resources, who

24   did nothing to stop what was happening.

25           And then we hear from multiple people who took the

1    witness stand and spoke to Mr. Freshour during his

2    investigation into Mr. Sanders' complaints who said shade

3    this type of conduct happens all the time and this is the

4    reason I left that job, and each and every one of those

5    complaints went ignored.  The highest HR official in the

6    Twin Cities or this region said that was no indication of

7    harassment or retaliation, none.

8         That's what BNSF believes, that's what BNSF thinks

9    of employees like Mr. Sanders, and the multiple people who

10   supported his story in terms of what was happening in this

11   company, and each and every one went ignored.

12        And then there's the multi-review process that

13   Counsel referenced.  This is an opportunity for the company

14   to say: "Hold on a second.  Let's stop.  Let's think about

15   this.  Let's make sure that our decisions make sense and are

16   following our policies, our practices, that we're complying

17   with the law.  Multiple steps, multiple people within the

18   company, and nobody raised the concern at all, that the same

19   individual who was the subject of the complaint is the

20   person attempting to terminate him.  The light bulb never

21   went off for anybody.  And maybe it did behind closed doors,

22   but we didn't hear about it and nobody stopped it and nobody

23   raised a concern.

24        You see in their policies and we brought it up in

25   their hotline in the internal control plan that overviewed

1    their complaint process, they talked about a speak-up

2    culture.  This isn't a speak-up culture.  This is a shut up

3    culture.  Go to work, do your job, and that's it.  That's

4    what this culture is.

5            The second element, the harm to Mr. Sanders.

6    We've talked about it to some extent, but I want you to

7    think about this:

8            You heard from Ms. Grobe, you heard from

9    Mr. Sanders, you heard from Dr. Boisso, who talked about

10   what it's like to be an employee when you've been branded as

11   a liar, as a cheat, as someone who steals, and how hard that

12   is to then carry with you through your lifetime of work.

13   Mr. Sanders has had to carry that already for five years and

14   he's going to have to carry that for a long period of time

15   still, because there are going to be companies who see the

16   public documents that are out there who don't learn the

17   whole story and believe he's still that person, because they

18   branded him.  They put a scarlet letter on his chest and

19   they said this person can't be trusted.

20           Then they sent him home to have to tell his family

21   about what happened.  That's the harm to Mr. Sanders.

22           And then the final factor is what's the financial

23   condition of the company, what amount of money is going to

24   deter the company from engaging in this conduct again and

25   punishing them.

1          So if we can bring up Exhibit 283, please.

2          This is the 10-K filing, so this is the public tax

3     document that is filed by BNSF, and it's for the year 2016.

4          And so if we can go to page 48 of this exhibit.

5          And on the bottom there are some quarterly

6     figures, and I wanted to give you some quarterly figures to

7     give you a sense of the amount of income the company is

8     generating.

9          And so this is for 2016 and these numbers are in

10    millions.  What I want you to look at is in the first

11    quarter of 2016, so in the quarter that they're

12    investigating and terminating Mr. Sanders, BNSF made

13    $784 million as a company in that quarter.

14         And then we heard Mr. Shearer testify that at the

15    time there was about eight to ten divisions throughout the

16    company.  So using the higher number ten, in part because

17    it's easier to do math, when you divide 784 million by ten,

18    you get $78 million.  $78 million is what the company earned

19    from the Twin Cities division in the first quarter of 2016.

20         So the question you all need to answer is what

21    amount of money is going to stop this culture, because it's

22    not a decision, it's not a one-off.  You heard that from

23    employees.  What amount of money is going to stop this

24    culture of retaliation.  I give you these numbers to give

25    you some type of benchmark for your consideration and also

1    the number we ended on yesterday, that in the fall of 2015,

2    BNSF was focused on slow orders because they got a new

3    hundred million dollar contract, and this area in the

4    St. Paul sub, it was key to the success of that contract.

5    So I give you those numbers as a benchmark.

6         We believe the answer to Question 1, whether we've

7    proven by the greater weight of the evidence that punitive

8    damages are necessary under the standard would be yes.  The

9    answer to Question 2 about whether they've proven good faith

10   should be no, and that figure about what is going to stop

11   this culture of retaliation.  I give you these numbers as

12   benchmarks, but you all have to determine based upon the

13   evidence you've heard what that figure is.

14        So we ask that you rule in Mr. Sanders' favor and

15   award him punitive damages.  Thank you for your time.

16        THE COURT:  All right.  Members of the Jury, at

17   this time I will invite Ms. Morton to pass out the

18   instruction that I'll be reading to you along with the

19   Second Special Verdict Form.

20        (Documents distributed to the jury)

21        THE COURT:  As that's happening, I will caution

22   you that all of the instructions that I have given you to

23   this point remain in effect.  This is an additional

24   instruction, not a replacement.  It is in addition to the

25   instructions that you have received already which, as I say,

1    remain in effect.

2

3              **COURT'S INSTRUCTION ON PUNITIVE DAMAGES**

4         THE COURT:  Turning to Instruction No. 22.

5              In addition to the damages mentioned in other

6    instructions, the law permits the jury under certain

7    circumstances to award punitive damages.  Plaintiff Don

8    Sanders has the burden of proving by the greater weight of

9    the evidence that punitive damages should be awarded and, if

10   so, the amount of any such damages.

11             You now must decide whether Defendant BNSF acted

12   with malice or reckless indifference to Mr. Sanders' right

13   not to be terminated on the basis of his engaging in

14   protected activity.  BNSF acted with malice or reckless

15   indifference if it has been proved that BNSF or a BNSF

16   official or officials responsible for firing Mr. Sanders (A)

17   knew that the firing of Mr. Sanders was in violation of the

18   Federal Railroad Safety Act, ("FRSA") or (B) acted with

19   reckless disregard of that law.  However, you may not award

20   punitive damages if BNSF has proved by the greater weight of

21   the evidence that BNSF made a good-faith effort to comply

22   with the law prohibiting retaliation.

23             If you find that BNSF acted with malice or

24   reckless indifference to Mr. Sanders' rights and did not

25   make a good-faith effort to comply with the law, then, in

1    addition to any other damages to which you find Mr. Sanders

2    is entitled, you may, but are not required to, award

3    Mr. Sanders an additional amount as punitive damages for the

4    purposes of punishing BNSF for engaging in such misconduct

5    and deterring BNSF and others from engaging in such

6    misconduct in the future.  You should presume that

7    Mr. Sanders has been made whole for his injuries by the

8    damages awarded under Instruction No. 21.

9           If you decide to award punitive damages, you

10   should consider the following in deciding the amount of

11   punitive damages to award:

12          1.  How reprehensible BNSF's conduct was.  In this

13   regard, you may consider whether the harm suffered by

14   Mr. Sanders was physical or economic or both; whether there

15   was violence, deceit, intentional malice, reckless disregard

16   for human health or safety; whether BNSF's conduct that

17   harmed Mr. Sanders also posed a risk of harm to others;

18   whether there was any repetition of the wrongful conduct and

19   past conduct of the sort that harmed Mr. Sanders.

20          2.  How much harm BNSF's wrongful conduct caused

21   Mr. Sanders in the past and could cause him in the future.

22   You may not consider harm to others in deciding the amount

23   of a punitive damages award.

24          3.  What amount of punitive damages, in addition

25   to the other damages already awarded, is needed, considering

1    BNSF's financial condition, to punish BNSF for its wrongful

2    conduct toward Mr. Sanders and to deter BNSF and others from

3    similar wrongful conduct in the future.

4           The amount of any punitive damages award should

5    bear a reasonable relationship to the harm caused to

6    Mr. Sanders.

7           And again, each of you has been provided with a

8    copy of the Second Special Verdict Form which is

9    self-explanatory.

10          At this time I'll invite the court security

11   officer forward to escort the jury back to the jury room

12   under the oath that was previously administered.

13          And please deliberate consistent with the

14   instructions that are being provided already.

15          (Jury excused)

16          THE COURT:  Please be seated.

17          All right.  Just to make sure, is there anything

18   further that we need to deal with at this time from the

19   plaintiff's perspective?

20          MR. JAMES KASTER:  No, Your Honor.  I'll just note

21   that we're likely to stick around here.

22          THE COURT:  How about from BNSF's perspective?

23          MS. DONESKY:  Nothing further.

24          THE COURT:  I'll adjourn and we'll let you know

25   when we have a verdict.

1        MR. JAMES KASTER:  Thank you.

2        (Jury begins second deliberations at 1:12 p.m.)

3                      *      *      *      *

4        (2:10 p.m.)

5                           IN OPEN COURT

6        (Jury enters)

7             THE COURT:  Please be seated, everyone.

8             Mr. Foreperson, has the jury reached a verdict?

9             THE FOREPERSON:  We have, Your Honor.

10            THE COURT:  Do you have that with you?  I'll

11   invite you to hand that to the court security officer at

12   this time, please.

13        (Verdict handed to the Court via court security officer)

14            THE COURT:  Thank you.

15            And, Members of the Jury, we'll go through the

16   same routine that we did the last time.

17        (Pause - Court retrieving verdict from envelope)

18            I'll read the verdict at this time.

19            "We, the Jury in the above-entitled action, for our

20   Special Verdict, answer the questions submitted as follows:

21            "(1)  Did Plaintiff Donald Sanders prove, by the

22   greater weight of the evidence, that he is entitled to

23   punitive damages, as set forth in Instruction No. 22?

24            "ANSWER:  Yes.

25            "(2)  Did Defendant BNSF prove, by the greater

1     weight of the evidence, that it made a good-faith effort to

2     comply with the law prohibiting retaliation, as set forth in

3     Instruction No. 22?

4              "ANSWER:  No.

5              "(3)  We assess Mr. Sanders punitive damages, if

6     any, in the following amount:

7              "$ 8,600,000.00"

8              Dated December 15th and signed by the Foreperson.

9               All right.  At this time I will poll the jury as I

10    did before.

11              Mr. Grimwood, is this your true and correct

12    verdict?

13              JUROR GRIMWOOD:  Yes, Your Honor.

14              THE COURT:  Ms. Esposito, is this your true and

15    correct verdict?

16              JUROR ESPOSITO:  Yes, Your Honor.

17              THE COURT:  Mr. Williams, is this your true and

18    correct verdict?

19              JUROR WILLIAMS:  Yes, Your Honor.

20              THE COURT:  Mr. Bonk, is this your true and

21    correct verdict?

22              JUROR BONK:  Yes, Your Honor.

23              THE COURT:  Ms. Lafleur, is this your true and

24    correct verdict?

25              JUROR LAFLEUR:  Yes, Your Honor.

1   THE COURT:  Ms. Urick, is this your true and

2   correct verdict?

3   JUROR URICK:  Yes, Your Honor.

4   THE COURT:  And, Mr. Clauer, is this your true and

5   correct verdict?

6   JUROR CLAUER:  Yes, Your Honor.

7   THE COURT:  And I'll ask you all together:

8   Members of the Jury, is this your true and correct

9   verdict, so say you one, so say you all?

10   JURY IN UNISON:  Yes, Your Honor.

11   THE COURT:  All right.  Thank you.

12   Members of the Jury, you are excused at this time.

13   I'll invite you to return to the jury room.  Ms. Morton will

14   follow you back and give you just a couple of additional

15   instructions, and on behalf of all here I'll stay and talk

16   with the lawyers for just a moment.

17   (Jury excused)

18   THE COURT:  Thank you.  Please be seated.

19   Do the parties have suggestions for how best -- or

20   a timeline for addressing post-trial motions?

21   MR. JAMES KASTER:  I think it would be -- given

22   the holidays coming up, I think that possibly a conversation

23   between the lawyers about how to accommodate that, as well

24   as whatever scheduling the Court has in mind.

25   THE COURT:  Okay.  Why don't I let the parties

1   talk and discuss the timetable for scheduling post-trial

2   motions and submissions and so forth.  If you can agree,

3   terrific.  I would be inclined given our schedule after

4   January 1st, frankly, to go along with whatever schedule you

5   suggest is appropriate.

6          We have now more than a trial a month between now

7   and the end of June, so we are going to be rather busy,

8   meaning I don't think it would do you any good to establish

9   a schedule expecting that I would be able to look at it

10  immediately, but obviously we will give those motions

11  attention in due course and as expeditiously as we're able,

12  but you get the point.  I'm not asking you to submit

13  something on a rocket docket here.

14         MR. JAMES KASTER:  Your Honor, we will have to

15  assemble our fee petition as well, so that will be a part of

16  the entourage of post-trial motions.

17         THE COURT:  All right.  What I'll invite you to do

18  then is put your heads together on those issues, come up

19  with a stipulation and submit it.  If you're not able to do

20  that, let me know and I can resolve any disputes in that

21  regard.

22         Is there anything that the plaintiff would like to

23  get or thinks it needs to get on the record here today

24  before we adjourn?

25         MR. JAMES KASTER:  No, Your Honor.  I would

1  inquire -- and I apologize if I have ignored this in the

2  Court's -- any advisories from the Court, but what, if any,

3  advisory does the Court have for us on speaking with the

4  jury?

5      THE COURT:  I'm going to get back to you on that.

6  How about BNSF?

7      MS. DONESKY:  Yes, that was one of the questions

8  we had as well.  And then the other one, though, however, is

9  that BNSF would make a motion for the Court to make an

10 instant remittitur of the amount per law to the statutory

11 amount of $250,000 to the Second Special Verdict Form.

12     MR. JAMES KASTER:  And we would like to review

13 that before agreeing to any kind of -- I understand that

14 that will eventually happen, but I don't know that it

15 happens instantaneously.

16     THE COURT:  I don't see a reason why not to do it,

17 but I'll give you time deal with it.

18     MR. JAMES KASTER:  What I recall, Your Honor, is

19 this --

20     THE COURT:  Let's just do it this way.

21     MR. JAMES KASTER:  Fine.  Fair enough.

22     THE COURT:  We'll deal with it as part of the

23 post-trial motions.

24     MS. DONESKY:  Well, I do -- given the statute

25 states what it is, there really isn't any determination to

1    be made, and given that, you know, this would be as stated

2    when it's not going to be by statute, that we believe that

3    an instant remittitur is appropriate and required.

4    Otherwise, I think there's a significant concern of

5    prejudice as to the impression that that would leave, so we

6    would ask for it to be instantly adjusted.

7              MR. JAMES KASTER:  The judgment is entered on the

8    verdict.  It's a public verdict.  The remittitur as a matter

9    of law is a part of post-trial motions.  But the verdict is

10   a public verdict and it needs -- it needs to conform to the

11   award from the jury.

12             THE COURT:  I'll deal with remittitur as part of

13   post-trial motions.

14             So to the extent the motion is that I make that

15   judgment immediately, that's denied, but it's without

16   prejudice, obviously, to dealing with that issue as part of

17   the parties' post-trial motions.

18             Anything further from BNSF at this time?

19             MS. DONESKY:  Nothing further at this time.

20             THE COURT:  Okay.  All right.

21             Thank you, everyone.  I will get back to you in

22   some fashion on jury contact.  I'm going to make a note to

23   remind myself of that right now, and we are adjourned.

24   Thank you.

25             (Proceedings concluded at 2:21 p.m.)

**I  N  D  E  X**

                                                          **PAGE**


**DEFENDANT'S Argument on Punitive Damages**
        By Ms. Donesky                                    1347


**PLAINTIFF'S Argument on Punitive Damages**
        By Mr. Lucas Kaster                               1353


**COURT'S Instruction on Punitive Damages**
        By the Court                                      1360



                          * * * * *



                    **E  X  H  I  B  I  T  S**

        **NUMBER                      FOR ID   IN EVIDENCE**

        Plaintiff 283                        1345

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE,** Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.

*/s/ Timothy J. Willette*

**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224