UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Don Sanders,                                         File No. 17-cv-5106 (ECT/JFD)

      Plaintiff,

v.                                                   **OPINION AND ORDER**

BNSF Railway Co.,

      Defendant.

---

James H. Kaster and Lucas J. Kaster, Nichols Kaster PLLP, Minneapolis, MN, for Plaintiff Don Sanders.

Tracey Holmes Donesky, Stinson LLP, Minneapolis, MN, for Defendant BNSF Railway Co.

---

The Federal Railroad Safety Act, 49 U.S.C. § 20109 ("FRSA"), forbids a rail carrier from taking adverse action against an employee because the employee reported violations of, or refused to violate, any federal law relating to railroad safety. In this case, Plaintiff Don Sanders alleges that Defendant BNSF Railway Company violated the FRSA when it terminated his employment as a track inspector in April 2016. Sanders says essentially that BNSF fired him for reporting track defects, for refusing to stop reporting track defects, and for reporting his concerns about the pressure he had received to ease up on his reporting of track defects. BNSF denies violating the FRSA and says it terminated Sanders for falsifying his payroll records.

Following the denial of BNSF's summary-judgment motion, *Sanders v. BNSF Ry. Co.*, No. 17-cv-5106 (ECT/KMM), 2019 WL 5448309 (D. Minn. Oct. 24, 2019), and

delays caused by the COVID-19 pandemic, the case was tried to a jury, and it found for Sanders. In an initial liability phase, the jury found that BNSF had unlawfully retaliated against Sanders and awarded Sanders $611,797 in backpay and benefits and $250,000 in emotional distress damages. ECF No. 225. In a second punitive-damages phase, the jury awarded Sanders an additional $8.6 million, far in excess of the FRSA's $250,000 punitive damages cap. ECF No. 226.

Two issues require resolution prior to the entry of final judgment. First, the parties agreed before trial that Sanders's entitlement to front pay was an equitable issue to be resolved, if necessary, after the jury's verdicts, and Sanders has since filed a motion for front pay. ECF No. 243. Second, immediately following the return of the jury's punitive-damages verdict, BNSF moved orally for a reduction of that award to the FRSA statutory cap. Tr. 1367–68. BNSF has since filed an additional written motion seeking that relief. ECF No. 249. These two issues have been the subject of additional briefing and are ripe for decision. The short answer is that Sanders's motion for front pay will be granted, though in an amount less then Sanders seeks, and BNSF's motion to reduce the punitive damages award will be granted.

I

A prevailing FRSA plaintiff is "entitled to all relief necessary to make the employee whole," 49 U.S.C. § 20109(e)(1), including "reinstatement, or front pay in lieu of reinstatement," *Monohon v. BNSF Ry. Co.*, 17 F.4th 773, 784–85 (8th Cir. 2021) (citation omitted). "The choice between the two equitable remedies of reinstatement and front pay clearly belongs to the court," as does the amount of front pay to award. *Newhouse v.*

2

*McCormick & Co.*, 110 F.3d 635, 642 (8th Cir. 1997). "In making a front pay award, the district court is not free to reject or contradict findings by the jury on issues that were properly submitted to the jury." *Olivares v. Brentwood Indus.*, 822 F.3d 426, 430 (8th Cir. 2016) (citation omitted). But a district court otherwise "retains its discretion to consider all the circumstances in the case when it determines what equitable relief may be appropriate." *Mathieu v. Gopher News Co.*, 273 F.3d 769, 778 (8th Cir. 2001) (quoting *Newhouse*, 110 F.3d at 641).

A

Front pay is an exceptional remedy that is awarded only when extraordinary circumstances render reinstatement "impracticable or impossible." *Newhouse*, 110 F.3d at 641 (citation omitted). Reinstatement may be impracticable or impossible when there is no comparable position available for the employee or when "there is such hostility between the parties that a productive and amicable working relationship would be impossible." *Olivares*, 822 F.3d at 429–30 (quoting *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 501 (8th Cir. 1998)). Only "[s]ubstantial hostility, above that normally incident to litigation, is a sound basis for denying reinstatement." *Id.* (quotation omitted); *see, e.g.*, *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1066 (8th Cir. 1988).

The parties agree, and the trial record shows, that Sanders's reinstatement as a BNSF track inspector would be impracticable due to substantial hostility between the parties. *See* ECF No. 244 at 6–8; ECF No. 258 at 4. Sanders made several reports with BNSF's human resources department documenting "over two years" of harassment and retaliation—largely concerning division engineer Keith Jones, but also against roadmasters Blaine

3

Hoppenrath and Stephen Chartier.  Trial Exs. P-39, P-50, P-87, P-99, P-139, D-58.  Sanders covertly recorded dozens of conversations with Jones and Hoppenrath to evidence his claims, and the Jones recordings in particular reveal substantial hostility.  Sanders shared some of these recordings with BNSF's human resources department.  *See, e.g.*, Tr. 613–17; Trial Exs. P-39, P-50, D-80.  Jones and other BNSF employees questioned Sanders's track-inspection and reporting abilities and later accused him of time theft.  BNSF's time-theft investigations prompted Sanders's termination, and the jury credited his claim that time theft was a pretextual basis for his termination.  Sanders's HR reports and time-theft complaints led to wide-ranging investigations and proceedings that involved interviews and testimony from many BNSF employees.  *See, e.g.*, Trial Exs. P-99 at 4, P-119, D-77, D-78.  Jones, a prominent figure in Sanders's claims, remains employed as division engineer in BNSF's Twin Cities East Division.  Tr. 41–42, 198.  Chartier remains the roadmaster in the division's Northtown yard.  Tr. 902–04.  BNSF's final investigation into Sanders's complaints documented a "long history of an ongoing personality conflict between [] Sanders and the Engineering management team in Minneapolis."  Trial Ex. P-99 at 4.  Jones's superiors congratulated him for his role in Sanders's termination.  Trial Ex. P-56 at 9; Tr. 198–99.  Finally, it's important to note that the COVID-19 pandemic has caused significant delays during this case, and it has now been over six years since Sanders's employment at BNSF.  Since then, Sanders has not worked in a similar role or for another railroad.  This lengthy period during which Sanders has not had comparable railroad employment reinforces the impracticality of reinstatement.  In sum, the evidence

shows that restoring the parties to a productive and amicable relationship through restatement is not a viable solution.

B

"An equitable award of front pay is generally appropriate when reinstatement must be denied." *Miller v. Bd. of Regents of Univ. of Minn.*, No. 15-cv-3740 (PJS/LIB), 2019 WL 586674, at *2 (D. Minn. Feb. 13, 2019) (quoting *United Paperworkers Int'l Union, AFL-CIO v. Champion Int'l Corp.*, 81 F.3d 798, 805 (8th Cir. 1996)). "[C]ourts will presume for the purposes of awarding relief that an illegally discharged employee would have continued working for the employer until he or she reaches normal retirement age," but this presumption is rebuttable by contrary evidence. *Belk v. City of Eldon*, 228 F.3d 872, 883 (8th Cir. 2000) (quoting *MacDissi v. Valmont Indus., Inc.*, 856 F.2d 1054, 1060 (8th Cir. 1988)); *see also Curtis v. Elecs. & Space Corp.*, 113 F.3d 1498, 1504 (8th Cir. 1997). "Front pay is calculated to begin at the date the verdict is entered. After a plaintiff proves a basis for a front pay award, the burden shifts to the defendant to disprove the prima facie case." *Olivares*, 822 F.3d at 430 (citations omitted). "In determining the amount of front pay, courts consider such factors as (1) the plaintiff's age; (2) the length of the plaintiff's employment with the defendant; (3) the likelihood that the plaintiff's employment would have continued absent the unlawful conduct; (4) the length of time it will take the plaintiff to secure comparable employment; (5) the plaintiff's work and life expectancy; (6) whether the plaintiff was an at-will employee; (7) the length of time other employees typically hold the position; and (8) the plaintiff's ability to work." *Miller*, 2019 WL 586674, at *2; *see also Dollar v. Smithway Motor Xpress, Inc.*, 710 F.3d 798, 810 (8th

5

Cir. 2013). "Some degree of speculation is inescapable" when considering these front pay factors, but there are "limits to the amount of speculation that such an award may embody." *Dollar*, 710 F.3d at 809.

Sanders seeks $597,155 in front pay. ECF No. 244 at 1. Sanders reaches this figure by assuming his retirement from BNSF in March 2033, at age 57.74, and projecting his mitigation of damages during that period and for another four years at Mann Companies, where he now works and earned $82,178 in 2020. Boisso Report §§ IV.B.i–ii, IV.C & Table 6.[1] Sanders projects a 2.18% annual wage growth at Mann until his retirement, or the "compound annual growth rate of mean (average) annual wages of 'Maintenance and Repair Workers, General'" in the greater Twin Cities region between 2010 and 2020. *Id.* § IV.B.ii. In calculating what he would have earned at BNSF, Sanders works from an annual wage of $121,236 at the time of his termination, which he says is the mean annual wage for the years he worked as a BNSF track inspector (2010-2015) after adjusting those years to their purchasing-power equivalent in 2016 using the consumer-price index. *Id.* §§

---

[1] During trial, and instead of live front-pay testimony in the jury's absence, Sanders submitted "Court Exhibit 1," which contains a September 2021 supplemental report by his damages expert, Dr. Dale Boisso, and a transcript of Boisso's deposition testimony. This exhibit was admitted without objection. Tr. 1225. Boisso testified at trial for backpay purposes, and he was subject to cross-examination on his sources and methodology. Besides applying a present-value reduction in his front pay analysis, Boisso applied identical methods to calculate front pay as he did backpay. *See* Boisso Report §§ IV.B.iii, IV.C. Neither side demanded a front-pay hearing nor objected to a decision on the papers that relies on these materials. *See* Tr. 553–55, 597, 655–56, 1225. Boisso's report and deposition testimony are therefore considered here. *See Salitros v. Chrysler Corp.*, 306 F.3d 562, 570–71 (8th Cir. 2002); *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1141-42 (7th Cir. 1994) ("[I]t would be somewhat incongruous to require evidence of front pay to be presented at trial when the issue of front pay is not . . . before the jury but is the subject of an equitable determination by the court.").

IV.B.i, IV.B.ii. He then applies a compound annual growth rate of 2.81% derived from Dr. Boisso's review of documents published by the Brotherhood of Maintenance of Way Employees Division that identify general wage increases for 2010-2019. *Id.* Sanders assumes (conservatively) that the cost of various benefits he received from BNSF would have remained constant for the rest of his working life. *Id.* § IV.B.ii. Sanders has not received health insurance, retirement contributions, or other benefits from Mann, asserts there is "no prospect" that Mann will offer such benefits in the future, and assumes as much in his front pay calculations. *Id.* Finally, Sanders reduces future amounts to present value using the September 2021 yields on U.S. Treasury bonds in effect when Dr. Boisso prepared his report. *Id.* §§ IV.B.iii, IV.C.

BNSF advances two arguments to support the conclusion that Sanders's motion for front pay should be denied entirely, but neither argument is persuasive. First, BNSF argues that Sanders has "already sufficiently mitigated his damages" by working on a "continuous, full-time basis over the last two years making $82,000 in 2020 and earning $33.00/hour as of the time of trial last December." ECF No. 258 at 4. The jury's verdict answers this argument. At trial, the jury was instructed that it "must reduce his damages by the amount he reasonably could have avoided." ECF No. 223 at 29. The jury then awarded the exact total of backpay, interest, and benefits requested under one of two alternative analyses in Dr. Boisso's report. *Compare* Trial Ex. P-288, Tables 6–8 (calculating $470,132 in back wages, $137,875 in interest, and $3,790 in retirement benefits under Scenario II), *with* ECF No. 225 at 2 (awarding $611,797 for lost wages and benefits through the date of verdict). "As juries are presumed to follow their instructions, the jury must necessarily have found

7

that [Sanders] met [his] duty to mitigate [] damages up to the date of the verdict," and this finding is binding here. *Miller*, 2019 WL 586674, at *3 (citations omitted). While the jury determined that Sanders's mitigation efforts were reasonable, it also found he was entitled to lost wages that exceed what he has since earned—including during his employment with Mann. BNSF doesn't describe changed circumstances in the months since the jury rendered its decision. Thus, Sanders's Mann employment is not a basis to find he has wholly mitigated his damages or to deny him front pay altogether.

Second, BNSF argues that Sanders should not receive front pay because the COVID-19 pandemic delayed this case "by over 1.5 years" and that, consequently, he recovered about 5.5 years of backpay—or a "longer than normal period." ECF No. 258 at 4–5. BNSF cites no authority supporting the proposition that this sort of delay is reason alone to deny a front-pay award. And the argument cannot be squared with decisions affirming awards of more than 5.5 years of front pay (including to plaintiffs who had recovered backpay). *See, e.g.*, *Belk*, 228 F.3d at 883 (affirming 10-year front-pay award); *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Loc. No. 101*, 3 F.3d 281, 285–86 (8th Cir. 1993) (same). In other words, if the Eighth Circuit has affirmed 10-year front pay awards, it can't be right that Sanders's receipt of 5.5 years of backpay renders him ineligible for front pay as a matter of law. Instead, the passage of time since Sanders's employment is but one factor comprising "all the circumstances" to be considered when fashioning his equitable award.

Returning to the front-pay factors: (1) Sanders was 46 years old when the jury returned its verdicts. Trial Ex. P-288. (2) At the time of his termination, Sanders had

worked for BNSF for roughly nine years. Tr. 312–13; Boisso Report, Table 1-A. That is close to the longest he'd worked in any job. Sanders worked for a slightly longer time in a prior job with Ford Motor Company. Tr. 311. (3) Sanders testifies that, before his termination, he intended to work at BNSF until his retirement. Sanders Decl. ¶ 3 [ECF No. 247]. But absent BNSF's unlawful conduct, there is reason to think that Sanders's BNSF employment would have terminated for lawful reasons well before retirement age. The trial record showed that Sanders committed three discipline-worthy rule violations. Tr. 444–48; Trial Exs. D-11–13, D-15. Though Sanders received little criticism in his written performance evaluations, *see* Tr. 74–82, he failed at times to meet his supervisors' legitimate performance expectations, *see, e.g.*, Tr. 832–36, 839–40, 846–49, 852–53, 914–33. And the record shows, and Sanders's trial testimony and demeanor confirm, that he is predisposed to heightening workplace discord. Putting BNSF's unlawful conduct aside, the record still includes examples of Sanders's unwillingness to accept constructive criticism, Tr. 838–39, 850–53, 914–33, and when asked at trial about his non-time-theft-related rule violations, Sanders's attitude remained defiant and self-acquitting, *see* Tr. 360–64, 389–90, 444, 447–48. This same predisposition to workplace conflict has surfaced in subsequent jobs. Tr. 457–60.[2] (4) It is not obvious how long it might take Sanders to

---

[2] There is no conflict between the jury's finding of wrongful termination on the one hand and, on the other, inferring from Sanders's performance issues that his BNSF employment would not have lasted to retirement age absent BNSF's unlawful conduct. *Cf. Olivares*, 822 F.3d at 430 (recognizing that, although jury rejected employer's justification for termination, it "made no findings as to whether [plaintiff] had in fact violated the safety rules or whether [employer]'s trust concerns were genuine"); *see also Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056-57 (7th Cir. 1990) ("[A]lthough there was sufficient evidence to support the jury's conclusion that [plaintiff's] discharge was age-based, the evidence

secure "comparable employment" if one understands that term to mean a track-inspector or like position that paid a wage comparable to what Sanders earned (or would have earned) at BNSF.  On the one hand, the jury's determination that Sanders partially mitigated his damages suggests Sanders was not likely to find truly comparable employment.  On the other, Sanders applied with only two railroads after his BNSF termination.  Tr. 414, 685.  Those two applications don't say very much.  (5) BNSF does not seem to dispute Dr. Boisso's determination that Sanders's likely retirement age with respect to his BNSF track-inspector position would have been age 57.74.[3]  Regardless, Sanders acknowledged at trial that he suffers from an apparently serious heart condition that has caused him to miss work.  Specifically, Sanders testified that he had just experienced "heart failure" and that the particular condition that caused this episode had been present for the roughly three or perhaps four years preceding trial.  Tr. 308–09.  (6) Sanders was a union member and enjoyed the job protections associated with that status.  (7) Again, Dr. Boisso's determination that 57.74 represents a likely retirement age for Sanders's BNSF position seems undisputed.  The record includes no data, for example, showing the average length

---

regarding complaints from advertisers, tension with management, and other performance-related problems should not be ignored in making the front pay determination."); *Gotthard v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1157 (9th Cir. 1999) ("A plaintiff's past work history may be relevant to calculating a front pay award when it suggests that the plaintiff might not have been employed steadily in the future.").

[3]   Dr. Boisso calculated Sanders's work-life expectancy—a concept he considers in "just about every case"—using a report distributed by the Association of American Railroads and raw data that is "associated strictly with railroad workers," including facts like age and years of railroad employment.  Boisso Dep. 27–31; *see* Boisso Report § IV.B.i & Table 1-A.

of BNSF track inspectors' tenure or other evidence that might show the length of time BNSF employees typically hold the position. The record, however, includes testimony that the track-inspector position is unusually challenging and stressful. Union representative John Mozinski, who testified at trial for Sanders, worked as a BNSF track inspector from "roughly" 2009 until 2012. Tr. 475. Asked whether there are "particular pressures" on track inspectors, Mozinski responded:

> Yeah. I mean -- and I even hate saying the -- but it's like the terminology that we use on the railroad. It's when you're track inspecting, it's like traveling down the track with a noose around your neck, because if anything happens, you're the person that gets in trouble. I mean, you're the person that is responsible if anything would happen behind you or a couple days ago if you inspect it.

Tr. 476. (8) There is no evidence showing that Sanders was incapable of working in the BNSF track inspector position.

On balance, these factors show that Sanders is entitled to front pay, though in an amount less than he seeks. By the time of his termination, Sanders already had served in the track inspector job for nearly as long as he had worked in any other occupation before or since. Disregarding BNSF's unlawful conduct, there remained other performance issues—including rule violations and a predisposition to workplace conflict—suggesting it would have been unlikely for Sanders to serve in the position to retirement age. Finally, Sanders's testimony concerning his heart condition, combined with Mozinski's testimony about the stressfulness of the track-inspector position, cast substantial doubt on Sanders's ability to perform the job long term. Based on all these considerations, I conclude that Sanders should be awarded front pay for two years—a present value sum of $78,010.24. I

reached this amount by using the difference between two years of BNSF wages ($242,472) and two years of Mann wages ($164,356), or $78,116. I reduced that to present value applying today's U.S. Treasury two-year bond yield (3.10%), *see Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537–38 (1983) (instructing that courts should use the "safest available investment" to calculate front pay), and assuming Sanders received payments at monthly intervals.

It is true that this calculation uses the $121,236 annual wage figure underlying Dr. Boisso's front pay calculations, an amount BNSF argues is too high. But BNSF's arguments on this issue are not persuasive. BNSF points out that its vocational expert, Suanne Grobe Ranheim, researched railroad job openings, including for track inspector positions, and found the average annual salary of those available jobs was $75,000-$88,000, and that none offered a salary of $100,000. Tr. 689–90. As Sanders notes, however, the goal of front pay is not to compensate Sanders for what he would earn elsewhere in the industry, but to restore his lost wages at BNSF. That available positions with other employers pay less than what Sanders would have earned at BNSF is beside the point. *See Wooten v. BNSF Ry. Co.*, 819 F. App'x 483, 487 (9th Cir. 2020). BNSF argues that Dr. Boisso's analysis includes amounts earned by Sanders in 2014 and 2015 when there was "increased oil and gas traffic" and a resulting boon in overtime for him to benefit from. For this reason, says BNSF, a $121,236 wage is not representative of a number that Sanders "would necessarily earn 8 years later in 2022 and beyond." ECF No. 258 at 5. By taking the mean average annual wage from the six years Sanders worked as a track inspector, Dr. Boisso's number already accounts for 2014 and 2015 being busier-than-

average years. *See* Boisso Report § IV.A, Tables 1-A, 6. The number used is well below what Sanders earned in 2014 and 2015, and other conservative aspects of Dr. Boisso's calculations help justify this number. For instance, rather than averaging Sanders's post-BNSF earnings to calculate his expected annual wage at Mann, Dr. Boisso used the single highest annual wage Sanders has earned since he was terminated, greater reducing his front-pay award. *See* Tr. 593–94. Finally, the jury accepted Dr. Boisso's $121,236 wage figure when awarding Sanders backpay. The jury's finding that $121,236 is a figure reflective of Sanders's annual track-inspector earnings, if not binding, is added reason to accept it for calculating front pay. *Cf. Kim v. Nash Finch Co.*, 123 F.3d 1046, 1065 (8th Cir. 1997) (affirming district court's front pay award at monthly rate equivalent to jury's backpay award); *Luu v. Seagate Tech., Inc.*, No. 99-cv-220 (JRT/FLN), 2001 WL 920013, at *7 (D. Minn. July 5, 2001) (calculating front pay using "same approach and evidence adopted by the jury in awarding plaintiff's back pay award").

II

BNSF has moved to reduce the jury's $8.6 million punitive damages award to FRSA's $250,000 punitive damages cap. *See* 49 U.S.C. § 20109(e)(3). Sanders opposes the motion. Sanders doesn't argue that the statutory cap shouldn't ultimately apply; he argues that it shouldn't apply *yet*. In Sanders's view, reducing his punitive damages before judgment is entered will "change the landscape" of BNSF's post-trial motions by enabling it to "argue for remittitur from the statutory cap number, rather than the jury's significantly

higher verdict."[4]  ECF No. 256 at 2.  This argument is unpersuasive.  A remittitur analysis asks whether an award is "so grossly excessive that there is plain injustice or a monstrous or shocking result." *Eckerberg v. Inter-State Studio & Publ'g Co.*, 860 F.3d 1079, 1087–88 (8th Cir. 2017) (citation and quotation marks omitted).  A district court must not order remittitur "for an amount less than the jury could reasonably find." *Taylor v. Otter Tail Corp.*, 484 F.3d 1016, 1019 (8th Cir. 2007) (citation omitted).  No matter the starting point, the answer to this hypothetical legal inquiry—at what amount a punitive damages award becomes "unreasonable on the facts" presented at trial—will remain the same.

Sanders also cites several decisions that adjusted damages awards to track statutory caps after judgment had been entered.  *See* ECF No. 256 at 3.  None of those cases discuss when such action must occur, decline to apply a statutory cap before judgment is entered, or suggest that doing so would be improper.  In other words, Sanders has not cited authority that his punitive damages award must be reduced post-judgment.

Finally, Sanders lodges a textual argument under the Federal Rules of Civil Procedure.  He asserts that the jury's punitive damages verdict "is properly characterized as either a general verdict, or a general verdict with answers to written questions under Fed.

---

[4]  BNSF's instant request to apply FRSA's statutory damages cap is not a motion for remittitur.  "[R]emittitur is not required where the court is permitted to adjust the award and enter judgment in the statutory maximum amount." *MacGregor v. Mallinckrodt, Inc.*, No. 01-cv-828 (DSD/SRN), 2003 WL 23335194, at *9 (D. Minn. July 21, 2003); *cf. Ross v. Kan. City Power & Light Co.*, 293 F.3d 1041, 1049–50 (8th Cir. 2003) (distinguishing constitutional reduction of punitive damages, or "a determination that the law does not permit the award," from remittitur, which asks whether "the jury's award is *unreasonable* on the facts") (quoting *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331–32 (11th Cir. 1999)).

R. Civ. P. 49(b)." ECF No. 256 at 3. Here, the jury returned general verdicts containing answers to written questions of fact. *See* ECF Nos. 225, 226 (labeled as "special verdict" forms). Such a verdict is subject to court approval, Fed. R. Civ. P. 58(b)(2), and the judgment entered must be "appropriate," Fed. R. Civ. P. 49(b)(2). Nothing in the Federal Rules of Civil Procedure, or cases interpreting them, requires judgment be entered on a verdict awarding punitive damages that exceed a statutory cap. BNSF's motion to apply FRSA's punitive damages cap and for a corresponding reduction of Sanders's punitive damages award will be granted.

## ORDER

Based on the foregoing, the jury's verdicts, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1. Plaintiff Don Sanders's Motion for Front Pay [ECF No. 243] is **GRANTED in part**.

2. Defendant BNSF Railway Co.'s Motion for Application of the Statutory Maximum for Punitive Damages [ECF No. 249] is **GRANTED**.

3. Sanders shall recover from BNSF the total sum of $1,189,807.24, consisting of: (1) $78,010.24 in front pay and future benefits; (2) $611,797 in backpay and past benefits; (3) $250,000 in emotional distress damages; and (4) $250,000 in punitive damages.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: June 29, 2022                s/ Eric C. Tostrud
                                    Eric C. Tostrud
                                    United States District Court