## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Donald Sanders,

<div style="margin-left: 2em;">Plaintiff,</div>

v.

BNSF Railway Company,

<div style="margin-left: 2em;">Defendant.</div>

Civil File No. 17-cv-5106-ECT-JFD

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS**

Plaintiff Donald Sanders, through counsel, Nichols Kaster, PLLP, provides the following memorandum of law in support of his Motion for Attorneys' Fees and Costs.

## **INTRODUCTION**

Donald Sanders ("Sanders") brought this claim for retaliation under 49 U.S.C. § 20109, a violation of the Federal Railways Safety Act ("FRSA"). His claim for retaliation survived summary judgment and proceeded to trial. Sanders prevailed at trial, and the jury awarded him all of his back pay, as well as compensatory and punitive damages totaling more than thirty (30) times the statutory cap.

A prevailing plaintiff under the FRSA is entitled to recover reasonable attorneys' fees and litigation expenses. The degree of the plaintiff's success is an important factor in deciding the magnitude of the fee award that will be considered reasonable. Here, Sanders' victory was total: he won at summary judgment, he won at trial, and he won on damages. That success more than justifies his request for attorneys' fees and warrants a finding that his attorneys be compensated at least at their normal hourly rates for their work on the case.

As such, Sanders respectfully requests that the Court award fees in the total amount of $1,194,674.50, and litigation expenses and nontaxable costs in the amount of $68,290.55.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Sanders was hired by Defendant BNSF Railway Company ("BNSF") in 2007 and became a Track Inspector in the Twin Cities division in 2010. As a Track Inspector, Sanders was responsible for identifying and reporting track defects or imperfections. Under Federal Railway Administration ("FRA") regulations, certain defects also must be accompanied by a "slow order," which reduces the speed limit on that section of track and can result in the track having to be taken out of service entirely until the defect is repaired.

Unbeknownst to Sanders, his managers compensation, performance reviews, and promotional opportunities were negatively impacted by the number of defects and slow orders he entered as a Track Inspector. At BNSF, managers are rated, ranked, and paid based upon "scorecard rankings," which are a series of performance metrics which are tabulated to create a score and ranking for each manager. Managers were then ranked against each other, and the rankings are posted on the BNSF intranet for all to see.

In the Twin Cities division, each manager's scorecard metrics and rankings are used to determine their annual performance grades which, in turn, impacts their annual salary increases and bonuses. Where managers rank on the scorecard is also crucial to whether they will be considered for promotion. As a result, being in the top 10 of the scorecard

---

[1] Sanders is filing a separate Bill of Costs seeking $15,510.41 concurrently with this motion.

rankings "is a big deal," according to former Twin Cities Division General Director, Doug Jensen.

In 2015, Sanders' direct managers were Roadmaster Blaine Hoppenrath ("Hoppenrath") and Division Engineer Keith Jones ("Jones"). Both Hoppenrath and Jones were subject to the scorecard rankings, and as of early 2015, both ranked low within their respective positions. Around the same time, BNSF's train traffic slowed significantly from prior years due to lower levels of oil traffic from the Dakotas. As a result, BNSF's management focused on controlling costs and improving profitability.

With the increased focus came pressures to perform. In the fall of 2015, Jones and Hoppenrath, but particularly Jones, began harassing Sanders for reporting track defects and slow orders. During recorded phone calls with Sanders, Jones can be heard screaming and swearing at Sanders, pleading with him to be a "team player" and not report federally mandated defects. Jones even threatened Sanders that if he did not play along, Jones would lose his job.

As a result of the persistent harassment, Sanders filed complaints with BNSF's Human Resources Department. Each one, however, went overlooked and not seriously investigated. In the end, Jones was simply given a coaching and counseling letter and Sanders was told that his complaints were unsubstantiated. In making his report, Sanders provided his recorded calls with Jones to Human Resources.

Unable to get help from Human Resources, Sanders transferred to a different work location. When he arrived, however, the new manager, Stephen Chartier, told Sanders that his reputation preceded him and that he would not be able to report defects as he did in his

previous location. Unable to escape harassment, Sanders transferred back to his previous location, which he knew better and posed less concern for errors.

Within two weeks of his return, Jones and Hoppenrath decided to spy on Sanders to support allegations of misconduct. On three occasions, Hoppenrath dedicated her entire day to spying on Sanders in an unmarked car. After observing Sanders for a few hours on March 19, March 25 and 26, 2016, Hoppenrath accused Sanders of time theft, even though Sanders had neither submitted his time for payment nor actually been paid for the time that he had entered.

Sanders, like others, routinely entered his time prior to working the day in question, both because he was required to enter time on a daily basis and because his schedule was erratic and often required him to be on the tracks doing inspections late in the day or evening. Under BNSF written policy, employees like Sanders were allowed to amend time entries at any time within thirty (30) days after the entry of the time. It was routine for Sanders and others to go back into the "shack" to modify their time entries before payday. Sanders was doing just that on March 29, 2016, when he was marched off of the property and terminated.

Following Sanders' termination, BNSF rewarded and congratulated Jones and Hoppenrath for their termination of Sanders in their respective performance reviews, and both received hefty bonuses when their scorecard rankings improved after Sanders' termination.

Sanders hired Nichols Kaster, PLLP ("Nichols Kaster") based on "word of mouth" within the community. *See* Declaration of Donald Sanders at ¶ 3. Nichols Kaster was

retained on a contingent fee basis by Sanders. In fact, there was no other feasible way for him to retain counsel to bring litigation against BNSF. *Id*. at ¶ 6. He lacked the resources to engage in a protracted battle with BNSF on his own. *Id*. at ¶ 6.

After prevailing over Defendant's summary judgment motion, and the jury's finding of liability, the jury issued a verdict in Sanders' favor of $611,797.00 for backpay and past benefits, $250,000.00 for emotional distress, and $8,600,000 in punitive damages. Afterward, the Court entered judgment in accordance with the FRSA's statutory caps on June 29, 2022. Sanders brings the present motion for an award of attorneys' fees and costs and disbursements. He also contemporaneously filed a Bill of Costs seeking recovery of taxable costs.

## **ARGUMENT**

Under 49 U.S.C. § 20109, subd. e(1), "[a]n employee prevailing in any action under subsection (d) shall be entitled to all relief necessary to make the employee whole." 49 U.S.C. § 20109(e)(1). Such relief shall include "compensatory damages, including compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees and reasonable attorneys' fees." *Id.* at 20109(e)(2)(C).

Fee-shifting statutes like Section § 20109 serve "an important public purpose by making it possible for persons without means to bring suit to vindicate their rights." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 559 (2010); *see also Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (fee-shifting provisions ensure "effective access to the judicial

process" for civil rights plaintiffs).[2] For this reason, the Supreme Court has recognized that a "prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley*, 461 U.S. at 429 (internal quotation marks omitted). Therefore, "a district court's discretion in denying attorney's fees to prevailing parties is narrow[,]" and fee awards should be the rule rather than the exception. *Hatfield v. Hayes*, 877 F.2d 717, 719 (8th Cir. 1989).

Awarding attorneys' fees entails a three-part analysis. First, the plaintiff must be the prevailing party. *See Simpson v. Merchants & Planters Bank,* 441 F.3d 572, 580 (8th Cir. 2006) (*citing Hensley,* 461 U.S. at 433). Second, the court calculates the "lodestar" figure by multiplying a reasonable rate by the number of hours reasonably expended. *Hensley,* 461 U.S. at 433. Finally, the court considers whether the lodestar amount should be enhanced or reduced, depending on the "important factor of the 'result obtained.'" *Id.* at 434 (citations omitted). Each part of the analysis supports awarding Sanders' counsel their requested lodestar fees..

## A.    Sanders prevailed.

A plaintiff under 49 U.S.C. § 20109 may be awarded fees if he or she is the "prevailing party." A plaintiff is a prevailing party where he or she "succeed[s] on *any* significant issue in litigation which achieves *some* of the benefit" sought by bringing suit.

---

[2] The *Hensley*, *Perdue*, and *Hatfield* cases were decided under a different statute allowing fees to the prevailing party—42 U.S.C. § 1988. But the analysis is the same regardless of which "prevailing party" fee-shifting provision is at issue. *Hensley*, 461 U.S. at 433 n. 7 ("The standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'")

*Hensley*, 461 U.S. at 433 (emphasis added). The standard is easily satisfied, and it "does not turn on the magnitude of the relief obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992); *see also Piper v. Oliver, 69 F.3d 875, 876 (8th Cir. 1995) (citing Farrar,* 506 U.S. at 112) ("A party who recovers even nominal damages is a prevailing party.")

Here, Sanders was the prevailing party. He brought a single Count under 49 U.S.C. § 20109, which survived Defendant's summary judgment motion (ECF No. 92), and the jury later returned a substantial verdict in his favor. (ECF Nos. 225, 226). Sanders was awarded two years of front pay, back pay in the entire amount he requested, emotional distress damages equaling $250,000.00, and punitive damages far exceeding the statutory cap (*see* ECF Nos. 225, 226, 265).[3] Sanders not only achieved *some* of the benefit he sought in bringing suit, he achieved *all* of it. Sanders satisfies the first step of the analysis.

### B.    Sanders' requested lodestar amount is reasonable.

After determining that a prevailing party is entitled to fees, the Court must determine what fees are reasonable. *Hensley,* 461 U.S. at 433. This analysis requires multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *See Fish v. St. Cloud State Univ.*, 295 F.3d 849, 851 (8th Cir. 2002). There is a strong presumption that the resulting "lodestar" figure is a reasonable fee award. *Perdue*, 559 U.S. at 552; *see M.B. by Eggemeyer v. Tidball*, 18 F.4th 565, 569 (8th Cir. 2021). The "most

---

[3] In a case under 49 U.S.C. § 20109, the sum of punitive damages is capped at $250,000.00 *See* 49 U.S.C. § 20109 (e)3. Sanders was awarded over thirty times the statutory cap. (ECF No. 226.)

critical factor" in determining the reasonableness of a fee award is "the degree of success obtained."[4] *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (*quoting Hensley*, 461 U.S. at 436).

"Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified."[5] *Hensley*, 461 U.S. at 435.

Sanders' requested lodestar of $1,194,674.50 is reasonable, particularly in light of Sanders' stunning success at trial. His attorneys' rates should be approved, as should the amount of time they spent litigating this matter. The requested hourly rates and number of hours worked are summarized in the Declaration of James H. Kaster at ¶ 18, filed contemporaneously with this memorandum of law. These rates listed are the current rates used by Sanders' counsel, and they are higher in some instances than the rates used when

---

[4] Some courts in this Circuit have applied a multi-factor test to determine reasonableness of the fee, including "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform legal services properly; (4) preclusion of employment by attorney to accept the case of someone; (5) customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *See e.g., Allen v. Amalgamated Transit Union Local 788*, 554 F.2d 876 (8th Cir. 1977).

[5] Some case law has considered the degree of success in determining whether to grant an enhancement. But the Eighth Circuit has made clear that "'[a] fee award should not be reduced merely because a party did not prevail on every theory raised in the lawsuit.'" *Casey v. City of Cabool, Mo.*, 12 F.3d 799, 806 (8th Cir. 1993) (citing *Hendrickson v. Branstad*, 934 F.2d 158, 164 (8th Cir. 1991).

the case began in 2017. It is appropriate for the Court to award fees at current rates, rather than historic rates, to compensate for the delay in payment. *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 284 (1989); *Little Rock Sch. Dist. v. State of Ark.*, 127 F.3d 693, 697 (8th Cir. 1997).

<div align="center">1.    <u>Sanders' attorneys' rates are reasonable.</u></div>

In determining reasonable rates, the court may consider such factors as the attorney's regular hourly rates, the skill of the representation, the difficulty of the work performed and counsel's experience and reputation. *See Blum v. Stenson*, 465 U.S. 886, 895, n.11 (1984). The court should also use its own knowledge, experience and expertise in determining the fee to be awarded. *Gilbert v. City of Little Rock, Ark.*, 867 F.2d 1063, 1066-67 (8th Cir. 1989). Here, the requested rates are reasonable for multiple reasons.

First, the case involved a complex regulatory scheme and challenging litigation issues. To succeed, Sanders had to prove that he reported, in good faith, a hazardous safety or security condition. 49 U.S.C. § 20109(b)(1)(A). The alleged safety or security condition involved track defects and slow orders  regulated by the Federal Railway Administration ("FRA"). Determining what constitutes a track defect is a challenging endeavor  and involves analysis of hundreds of pages of FRA and BNSF rules and regulations.

Throughout the case, BNSF sought to justify its unlawful actions by claiming that the defects Sanders was reporting were "minor" and "not a violation of a federal law, rule or regulation." *See* Defendant's Memorandum in Support of Summary Judgment at 26 (ECF No. 67). Thus, Sanders was confronted with the highly specific and challenging task

of proving that each of his alleged defects was reported in good faith, and that the condition was subject to FRA and BNSF rules and regulations.

The FRA's complex regulatory scheme, therefore, complicates the already specialized area of whistleblower representation. *See United States v. Boston Scientific Corporation*, No. 11-cv-2453 (JNE/TNL), 2021 WL 4030274 at 5 (D. Minn., Sept. 3, 2021) (largely awarding requested fees when "the attorneys in this case are skilled and experienced at representing whistleblowers . . . which is a specialized area of practice"); *see also, generally,* Bowman, *Whistleblower Protections of the Federal Rail Safety Act: An Overview*, 8 Wm. Mitchell Journal of Law and Practice: Vol. 8, 1 (2015) (detailing the challenges of litigating claims under 49 U.S.C. § 20109).

Further complicating prosecution of the case, throughout discovery, BNSF delayed or altogether refused to produce relevant and responsive evidence, forcing Sanders' counsel to move to compel. (*See* ECF Nos. 44-46). In the process, BNSF obstructed the regular discovery of key policies and practices, such as its Scorecards, manager performance reviews, and Incentive Compensation Plan. (*Id*). Then, at trial, BNSF objected to and sought to exclude those very same policies, even though they provided its managers like Jones and Hoppenrath, clear motivation to retaliate against Sanders for his protected conduct. In spite of the objections, Sanders' counsel secured the relevant information and skillfully presented this evidence to the jury.

BNSF also argued that it was not liable because of what it called a multi-layer review process that involved an internal review, as well as a union grievance process, both

of which upheld Sanders' termination. Indeed, BNSF focused its closing argument on the union rulings, suggesting that the fundamental issues had already been decided.

Meeting these arguments required Sanders' counsel to understand and counter each aspect of the internal review, demonstrating that the internal reviewers were not independent actors, but merely supported management's earlier determination. In each step, counsel was required to persuade the jury that it should judge the claims based on the evidence at trial rather than deferring to a union grievance procedure based on incomplete evidence, initially decided by a company manager, and where Sanders lacked discovery, subpoena power or the right to counsel.

Finally, there were over eight hours of recorded calls between Sanders and his supervisors, and the surgical use of this evidence at trial, even when Defendant's main witness appeared remotely on the first day of trial, involved significant skill and judgment. Given these and other factors complicating the trial, the case's challenges weigh in favor of Sanders' fee requests.

Second, Sanders sought counsel's help because of their special skills and experience in representing plaintiffs in whistleblower and employment cases. Nichols Kaster's unique history and involvement in such employment cases, plus their trial experience and skill, makes them uniquely qualified to represent plaintiffs such as Sanders. More specifically, Sanders' counsel has decades of success on behalf of plaintiffs in employment disputes. *See* Declarations of James H. Kaster, Lucas J Kaster, Robert Bennett, Brian Rochel, and M. William O'Brien.

Third, Sanders received extremely high-quality representation on a contingent fee. This kind of representation involves a substantial dedication of time and effort, in this case almost five (5) years between initial case filing and the verdict. For the lawyers, there is the necessary opportunity cost of working on this case, and not on other more lucrative matters. As Justice Roberts remarked in his concurrence in *Hensley*:

> Furthermore, on many occasions awarding counsel fees that reflect the full market value of their time will require paying more than their customary hourly rates. Most attorneys paid an hourly rate expect to be paid promptly and without regard to success or failure. Customary rates reflect those expectations. Attorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate. The difference, however, reflects the time-value of money and the risk of nonrecovery usually borne by clients in cases where lawyers are paid an hourly rate. Courtly applying § 1988 must also take account of the time-value of money and the fact that attorneys can never be 100% certain they will win even the best case.

*Hensley*, 461 U.S. at 448.

In the end, this Court has presided over the case since its outset, including the trial, and can judge for itself the quality of the representation. *See e.g. Ortiz v. Citibank, N.A.*, No. LACV-17-7886-VAP (MRWx), 2018 WL 6930889, at *5 (C.D. Cal. Jan. 10, 2018) (the court may rely on its own knowledge in determining the reasonableness of a rate).

As stated above, Sanders obtained a complete recovery of the back pay requested, $250,000.00 in emotional distress damages, two (2) years of front pay, and punitive damages up to (but well in excess of) the statutory cap. This was one of the largest awards under 49 U.S.C. § 20109 known to lawyers who practice in this area. *See* Declaration of

M. William O'Brien at ¶ 12.  By any measure, Sanders obtained a terrific result in this case, "again, the most critical factor is the degree of success obtained." *Hensley*, 461 U.S. at 436.

        2.      <u>Sanders' rates are in line with reasonable rates in the marketplace</u>.

Sanders' attorneys are entitled to a fee award based upon the rates requested. As demonstrated by the record evidence, Sanders attorneys' rates are reasonable. The rates of the lawyers are supported by their knowledge, experience and expertise, as well as the Declarations from other preeminent plaintiff's lawyers in the community. They are also supported by other court decisions awarding Nichols Kaster attorneys' fees at reasonable market rates, as well as the Valeo Report, which compiles nationwide attorney rates.

The Valeo Report demonstrates that the rates charged by Plaintiff's counsel are at or below those charged nationally by other employment lawyers. (*See generally* Declaration of James H. Kaster, Ex. 3.)  The Valeo Report is "the most comprehensive and detailed . . . legal pricing tool available." (*Id.* at 21.) To compile the report, Valeo "researches, reviews and analyzes hourly rates that are publicly disclosed of attorneys and support staff." (*Id.*) Other courts have held that the Valeo Report is "an appropriate way to demonstrate that the attorneys' rates 'are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation.'" *Route1 Inc. v. AirWatch LLC*, No. 17-CV-331 (KAJ), 2020 WL 1955436, at *3 (D. Del. Apr. 23, 2020) (quoting *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 987 (Fed. Cir. 2000)).

The most applicable rates in the Valeo Report are those of firms in Amlaw's 1-100 group practicing General Labor and Employment law in 2021. (*See* Declaration of James

H. Kaster, Ex. 3.) The rates charged by those firms are significantly higher, across the board, than those requested by Nichols Kaster. The following table demonstrates this:

| Professional | Position | Valeo Report Rate | Requested Rate |
|---|---|---|---|
| J. Kaster | Senior Partner | $987 | $775 |
| M. Helland | Partner | $835 | $700 |
| D. Schlesinger | Partner | $835 | $550 |
| L. Kaster | Partner | $835 | $475 |
| C. Delbridge | Senior Associate | $638 | $475 |
| M. Frank and N. Pederson | Associates | $516 | $375 |
| L. Baures | Associate | $516 | $400 |
| N. Thompson | Associate | $516 | $350 |
| A. Wise | Support Staff | $433 | $225 |
| K. Pathmann, A. Smith, and others | Support Staff | $433 | $195 |

(*See id.* at 31.) Because the rates sought by Sanders' counsel are significantly below the rates charged by employment lawyers of similar experience nationwide, those rates are reasonable and should be awarded.

Second, the declarations Sanders' counsel submits in support of this motion further demonstrate the reasonableness of his counsel's rates. *See* Declarations of Brian Rochel, Robert Bennett and M. William O'Brien. These declarants—each with impressive resumes and substantial experience—all agree that the rates sought by Sanders' counsel are reasonable given their skill and experience.

The fact that other courts have awarded Sanders' counsel fees at rates in line with those requested here is strong evidence of the reasonableness of those rates. Attorney James Kaster was awarded fees at his then-current rate of $650.00 per hour in 2016 in *Koziara v. BNSF Railway Company*, Court File No. 3:13-cv-00834-JDP, ECF No. 255 (Aug. 19, 2016). (Declaration of James H. Kaster ¶ 13.) That rate in August 2016 is equivalent to

roughly $799.68 as of June 2022, putting it above the range of the rate requested by the present motion. (*See* https://www.bls.gov/data/inflation_calculator.htm (last visited July 15, 2022).)

Moreover, Lucas Kaster is a partner at Nichols Kaster and demonstrated for the Court his expertise in trial in this matter. His rate is supported by his skill and experience, his exceptional representation in this case, the declarations of experienced lawyers in the community, the Valeo Report, as well as this Court's own judgment and expertise.

For these reasons, Sanders' should be awarded at least his lodestar, based upon his counsel's regular rates in their employment law practice.

3.    <u>Sanders' attorneys dedicated a reasonable number of hours to the case.</u>

Over the course of nearly five years, Sanders' counsel did what was necessary to prevail. The time dedicated to this case, including three separate trial settings, totals 2,856 hours.[6]  The hours were spent reasonably, were necessary, and should be approved. *See Champagne v. Columbia Dental, P.C.,* No. 3:18-cv-01390 (VLB), 2022 WL 951687 at 1 (D. Conn. Mar. 30, 2022) (awarding all hours billed in Title VII case where jury trial reset multiple times with at least one re-setting due to the COVID pandemic). (*See also* Declaration of James H. Kaster Ex. 4).

Once the prevailing party has submitted documentation of the hours worked and evidence supporting their reasonableness, the burden shifts to the opposing party to submit

---

[6] This case was first set to start trial "date certain" on Monday, April 6, 2020 (ECF No. 94).  Due to the COVID-19 pandemic, it was later reset to start date certain on Tuesday, February 16, 2021 (ECF No. 110) and then again reset for the final time to start on Monday, December 6, 2021 (ECF No. 113).

evidence "challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Blum v. Stenson*, 465 U.S. 886, 892 n.5 (1984). When deciding the reasonableness of expended hours, the winning lawyer's judgment deserves deference. *See Monohon v. BNSF Ry. Co.*, No. 4:14-CV-00305, 2022 WL 2129134, at *2 (S.D. Iowa June 14, 2022) ("when an attorney represents to the court that he or she has searched his client's files and has produced all documents responsive to a discovery request, we accept the representation at face value, as we do other representations of counsel throughout the trial process. Why do we not treat the Plaintiffs' attorneys' representations that the work was done for the benefit of the class in the same manner?");  *See M.B. v. Tidball*, No. 2:17-CV-4102-NKL, 2020 WL 1666159, at *14 (W.D. Mo. Apr. 3, 2020), *aff'd sub nom. M.B. by Eggemeyer v. Tidball*, 18 F.4th 565 (8th Cir. 2021) ("Because Plaintiffs did not know if they would be compensated for their efforts in this case, they had an incentive to be efficient."); *see also Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("It must also be kept in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee… By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker.").

Here, Sanders has supported his request with detailed records of the number of hours worked, and evidence of the necessity and reasonableness of those hours. (*See* Declarations of James H. Kaster and Lucas J. Kaster, *generally*.) Sanders' counsel began representing

Sanders before the administrative agency in 2016. (*See* Declaration of Lucas J. Kaster at ¶ 10.)  Then, in the fall of 2017 and early 2018, Nichols Kaster drafted Sanders' Complaint, drafted initial discovery requests, collected recordings and other documented evidence, and filed suit. (*See id.*) The case proceeded through discovery, including fifteen (15) depositions, a motion to compel discovery, a motion for summary judgment, repeated meet-and-confer conferences on discovery and trial matters, as well as requests to the court to compel witnesses at deposition, and finally a full seven-day trial that spilled into an eighth day The challenges involved in the case are outlined in detail in Sanders' Motion to Compel Discovery, and Sanders' Trial Brief, which are found at ECF Nos. 45, 118.

Some of the challenges relate to how BNSF chooses to litigate. For example, in this case, BNSF refused to produce the names of the most obvious comparators in responses to discovery, including two employees who reported to the same supervisor and who had more severe allegations of so-called "time theft" than did Sanders. Those employees were not terminated and received little, if any, discipline. Plaintiff's counsel, Lucas Kaster, discovered these comparators during depositions. *See* Declaration of Lucas J. Kaster in support of Motion to Compel Discovery (ECF No. 46.)

As detailed above, BNSF also contended that scorecards either did not exist or were not important, and had no bearing on bonuses or promotions. *Id.* This discovery battle alone involved more than a year-long fight, which in turn included denials, failures to show for noticed depositions, a motion to compel, and more.  *See* Declaration of Lucas J. Kaster in support of Plaintiff's Motion to Compel (ECF No. 46).

The many challenges in this case were exacerbated by many other factors, including the multistep union grievance process, the many hours of tape-recording conversations, which required pairing down and memorializing for trial, and a persistent effort by BNSF in pleadings, motions and arguments to change the law for § 20109 whistleblower claims, including the attempt to insert an honest-belief doctrine, a job duties exception, and other defenses into the statute by judicial interpretation. *See* Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment (ECF No. 67.)

The trial was also delayed for more than a year due to the COVID pandemic. As a result, Plaintiff's counsel was required to prepare the case for trial on three separate occasions. Each of those settings involved time reasonably spent in anticipation of trial. *See e.g.*, *Champagne v Columbia Dental*, No. 3: 18-cv-01390 (VLB), 2022 WL 951687, at *1(D. Conn., Mar 30, 2022) (awarding all hours billed in a Title VII case where jury trial reset multiple times with at least one setting related to the pandemic). Once the case finally came up for trial, BNSF brought extensive motions in limine, challenging the introduction of much of Plaintiff's evidence and damages. BNSF also proposed Jury Instructions repeating many of the same arguments this Court and the Eighth Circuit had already rejected. The trial lasted seven full days, and part of an eighth day, and, as yet another example of BNSF's approach, began the trial with a dispute over whether BNSF would produce its main witnesses at trial.

As Plaintiff's counsel undertook the case, they did so with a sober understanding of what it takes to win against BNSF and the significant risk. With that in mind, Nichols Kaster hired the National Jury Project to do a mock trial with two separate juries, making

sure that they understood the arguments that could and should be made at trial. This time is reasonable and compensable. *See, e.g.*, *Lewis v. Heartland Inns of Am., L.L.C.*, 764 F. Supp. 2d 1037, 1048-49 (S.D. Iowa 2011) (rejecting defendants' argument, in Title VII and Iowa Civil Rights Act (ICRA) case, that expenses for mock jury trial were "luxuries" and finding that, because the focus-group exercise "contributed to the litigation ... and benefitted [plaintiff's case]" by preparing plaintiff to testify shortly before trial, expenses were recoverable); *see also Gilster v. Primebank,* 884 F.Supp.2d 811, 881 (N.D. Iowa 2012) (witness preparation and jury consultant services recoverable in Title VII and ICRA case), *rev'd on other grounds,* F.3d, 2014 WL 1356814 (8th Cir.2014).

Further, when the supervisor who was the main actor in the retaliation claim was unable to appear in person at trial for his testimony because he was exposed to someone with COVID, Lucas Kaster conducted the cross-examination by remote appearance, under the guidance of the Court, orchestrating the key documents and recordings, with the witness appearing on the video screen.

Along the way, BNSF's aggressive litigation strategy necessarily caused Sanders' counsel to devote substantial time to all stages of the case. All of that time is compensable. *See Wiley v. Portfolio Recovery Assocs., LLC,* --- F. Supp. 3d ---, 2022 WL 903207, at *18 (D. Minn. Mar. 28, 2022) ("The Court declines to reduce Plaintiffs' fee award based on [Defendant's] argument that [Plaintiff's counsel] could have performed his work more

expeditiously or in a more streamlined fashion. As the Court has observed, this litigation was hard-fought, which resulted in increased attorney's fees.")[7]

Throughout this time, counsel adequately documented their time on the case, and all of the time was reasonably and necessarily spent. Any contrary argument would simply award BNSF for its aggressive litigation tactics. Chief Justice John Roberts commented on the disincentive such a result would create in the *Hensley* case when he said: "[t]he more obstacles that are placed in the path of parties who have won significant relief and then seek reasonable attorney's fees, the less likely lawyers will be likely to undertake the risk of representing civil rights plaintiffs . . . ." *Hensley*, 461 U.S. at 456.  As another court said in rejecting an argument for reduction of plaintiff's fees, "Defendant cannot choose an aggressive litigation and then claim it [the resulting work] was not necessary."  *Reid v. LVNV Funding, LLC*, 2016 WL 4532107, at *2 (D. Utah 2016).

The same logic applies here.  The amount of hours Plaintiff's counsel committed to his case are reasonable.

**C.    Sanders is entitled to recover expert witness fees and other non-taxable costs.**

In addition to attorneys' fees, Sanders is entitled to recover his costs in the amount of $68,290.55 by virtue of the language of 49 U.S.C. § 20109(e)(2)(C) (stating "litigation costs" and "expert witness fees" are a remedies under the FRSA). The litigation expenses and costs recoverable include, for example, expert witness fees and transcripts among other

---

[7] Time preparing the petition for attorneys' fees is also compensable.  *Gerling v. Waite*, 2022 WL 558083, at 5 (E.D. Mo. 2022).

things. *Zotos v. Lindbergh Sch. Dist.,* 121 F.3d 356, 363 (8th Cir. 1997). "When an expense is taxable as a cost, . . . there is a strong presumption that a prevailing party shall recover it in full measure." *Concord Boat Corp. v. Brunswick Corp.*, 309 F.3d 494, 498 (8th Cir. 2002).

Again, Sanders is unquestionably the prevailing party. As such, he is entitled to recover his costs. Sanders is contemporaneously filing a Bill of Costs to recover those costs that are taxable under Fed. R. Civ. P. 54(d)(1) and D. Minn. LR 54.3. Sanders seeks the remaining costs that are not taxable under those rules—but which Sanders may recover under 49 U.S.C. § 20109—with this motion. Those costs are detailed in Exhibits 5, 9-16, and ¶¶ 29-40, in the Declaration of James H. Kaster. They are also summarized here:

| Cost Category | Amount |
|---|---|
| Audio Recording Transcription Fees | $1,892.49 |
| Courier Fees (Total $4,027.65 – Bill of Costs amount of $893.41) | $3,134.24 |
| Expert Witness Fees | $23,210.13 |
| Medical Records | $600.12 |
| Mock Trial | $28,498.22 |
| PACER/Westlaw Research Fees | $1,393.91 |
| Postage/Federal Express | $60.00 |
| Relativity | $1,638.07 |
| Travel/Meals/Parking/Mileage | $3,423.79 |
| Trial Transcript | $2,803.33 |
| Video Deposition Fees | $1,636.25 |
| **Total** | **$68,290.55** |

These costs were necessary and were reasonably incurred and paid by counsel in order to prosecute Sanders' claims. Accordingly, Sanders' counsel is entitled to recover these costs.

## <u>CONCLUSION</u>

For all the foregoing reasons, Sanders respectfully requests that the Court award fees in the amount of $1,194,674.50, and litigation expenses and nontaxable costs in the amount of $68,290.55.

Respectfully Submitted:

Dated: July 27, 2022                NICHOLS KASTER, PLLP

<u>s/James H. Kaster</u>
James H. Kaster #53946
    kaster@nka.com
Lucas J. Kaster #396251
    lkaster@nka.com
80 South Eighth Street
4700 IDS Center
Minneapolis, MN 55402-2242
Telephone: (612) 256-3200

ATTORNEYS FOR PLAINTIFF