UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Don Sanders,                                    File No. 17-cv-5106 (ECT/JFD)

        Plaintiff,

v.                                              **OPINION AND ORDER**

BNSF Railway Co.,

        Defendant.

---

Lucas J. Kaster and James H. Kaster, Nichols Kaster, PLLP, Minneapolis, MN, for Plaintiff Don Sanders.

Tracey Holmes Donesky, Stinson Leonard Street LLP, Minneapolis, MN, for Defendant BNSF Railway Co.

---

Following the denial of Defendant BNSF Railway Co.'s summary-judgment motion, *Sanders v. BNSF Ry. Co.*, No. 17-cv-5106 (ECT/KMM), 2019 WL 5448309 (D. Minn. Oct. 24, 2019), and delays caused by the COVID-19 pandemic, this case brought under the Federal Railroad Safety Act ("FRSA") was tried to a jury, and it found for Plaintiff Don Sanders.

In an initial liability phase, the jury found that BNSF had unlawfully retaliated against Sanders and awarded Sanders $611,797 in backpay and benefits and $250,000 in emotional distress damages. ECF No. 225. In a second punitive-damages phase, the jury awarded Sanders an additional $8.6 million, far in excess of the FRSA's $250,000 punitive damages cap. ECF No. 226. In subsequent orders, the punitive-damages award was

reduced to the $250,000 cap, and Sanders was awarded front pay and future benefits in the amount of $78,010.24. *Sanders v. BNSF Ry. Co.*, No. 17-cv-5106 (ECT/JFD), 2022 WL 2339859 (D. Minn. June 29, 2022). Adding these figures, Sanders's total recovery is $1,189,807.24.

Three motions require adjudication: (1) BNSF has filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and, (2) alternatively, BNSF seeks a new trial under Rule 59. ECF No. 284. (3) Sanders has filed a motion for attorney fees and costs pursuant to FRSA's fee-shifting provision, 49 U.S.C. § 20109(e)(2)(C). ECF No. 272.

BNSF's motion for judgment as a matter of law will be denied because there is sufficient evidence to support the jury's verdict. BNSF's alternative motion for a new trial also will be denied. BNSF's challenges to specific jury instructions and evidentiary rulings, as well as its argument that the jury's emotional-distress damages award was against the weight of the evidence, are not persuasive. Sanders's motion for attorney fees will be granted.

I

A

Federal Rule of Civil Procedure 50(b) allows a party to "file a renewed motion for judgment as a matter of law [which] may include an alternative or joint request for a new trial under Rule 59." A court may only grant a renewed motion for judgment as a matter of law if there is no legally sufficient basis for a reasonable jury to return the verdict it reached. *Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 805 (8th Cir. 2017); *Asset Mktg.*

*Servs., LLC v. JAM Prods., Inc.*, No. 19-cv-2113 (SRN/TNL), 2021 WL 5905697, at *2 (D. Minn. Dec. 14, 2021). "In ruling on a renewed motion for judgment as a matter of law, a court analyzes 'whether the record contains sufficient evidence to support the jury's verdict.'" *Holmberg v. Stealth Cam, LLC*, No. 11-cv-248 (DWF/LIB), 2015 WL 5286750, at *4 (D. Minn. Sept. 10, 2015) (quoting *Bass v. Gen. Motors Corp.*, 150 F.3d 842, 845 (8th Cir. 1998)). "The law imposes a high standard on a party seeking to interfere with a jury verdict." *Asset Mktg. Servs.*, 2021 WL 5905697, at *2. When considering whether to grant a renewed motion for judgment as a matter of law, the trial court should

> (1) consider the evidence in the light most favorable to the prevailing party, (2) assume that all conflicts in the evidence were resolved in favor of the prevailing party, (3) assume as proved all facts that the prevailing party's evidence tended to prove, and (4) give the prevailing party the benefit of all favorable inferences that may reasonably be drawn from the facts proved. That done, the court must then deny the motion if reasonable persons could differ as to the conclusions to be drawn from the evidence.

*Bavlsik*, 870 F.3d at 805; *Bombardier Recreational Prods., Inc. v. Arctic Cat Inc.*, 331 F. Supp. 3d 902, 906–07 (D. Minn. 2018).

## B

### 1

Sufficient evidence supported the jury's verdict in favor of Sanders. Under the FRSA, "a rail carrier 'may not discharge . . . or in any other way discriminate' against an employee because he lawfully and in good faith provided information relating to, or directly assisted investigation of, conduct the employee reasonably believed violated a

3

Federal law relating to railroad safety," *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 788 (8th Cir. 2014) (quoting 49 U.S.C. §§ 20109(a)(1) and (b)(1)(A)); for "reporting, in good faith, a hazardous safety or security condition," *id.*; or for "refus[ing] to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security," 49 U.S.C. § 20109(a)(2).

To prevail on an FRSA claim, Sanders "must establish a prima facie case by showing (i) he engaged in a protected activity; (ii) BNSF knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Id.* at 789 (citing 49 U.S.C. § 42121(b)(2)(B)(i); 29 C.F.R. § 1982.104(e)(2)); *see also Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1296 (10th Cir. 2022).

In determining whether an employee's actions constitute "protected activity" as required under § 20109(b)(1)(A), the objective reasonableness of an employee's actions is immaterial. *Monohon v. BNSF Ry. Co.*, 17 F.4th 773, 780–81 (8th Cir. 2021). To be protected under that provision, a safety report need only be "*in good faith,*" 49 U.S.C. § 20109(b)(1)(A) (emphasis added)—in other words, subjectively reasonable. *Monohon*, 17 F.4th at 780–81 ("Congress purposefully omitted a reasonableness requirement from the reporting provision."); *see Samson v. U.S. Dep't of Labor*, 732 Fed. App'x 444, 446 (7th Cir. 2018) (distinguishing (b)(1)(A)-protected activity from (b)(2)-protected activity on that basis); *see also Monohon v. BNSF Ry. Co.*, No. 4:14-cv-00305-JAJ-SBJ, 2016 WL 7426581, at *4 (S.D. Iowa May 11, 2016) (recognizing that reports need not be "reasonable" or "correct," so long as they are made "in good faith," a term which requires

no more than subjective honesty); *Fresquez*, 52 F.4th at 1302 (holding that there was sufficient evidence to support a reasonable jury's finding that plaintiff employee engaged in protected activities under § 20109).

The jury reasonably determined that Sanders engaged in FRSA-protected conduct in good faith. These actions included reporting track defects, entering slow orders, or removing a track from service, implicit refusals to concede to Jones's reporting instructions, and reporting concerns to Human Resources. The additional arguments BNSF advances in moving for judgment as a matter of law (that were not presented at summary judgment) are that the timing of Sanders's third HR report and his call to the Federal Railroad Administration ("FRA") indicate bad faith and thus are unprotected activities. ECF No. 289 at 5. Both arguments lack merit. BNSF does not explain why the timing of the third HR report indicates bad faith as a matter of law. *See id.* The same goes for Sanders's call to the FRA. The good-faith-versus-bad-faith question is inherently a credibility determination, and a reasonable jury could reject the idea that these reports were made in bad faith. Indeed, faced with that issue, I would have decided that the reports were in good faith. Mr. Sanders was a credible witness. BNSF's remaining argument is one that was previously rejected at summary judgment—that Sanders has not specified which federal law, rule, or regulation was being violated. *Id.* Section 20109(a)(2) protects railroad employees when they refuse in good faith to violate *any* safety-related law, and I already decided that a jury reasonably could find that this provision applies to Sanders's refusals to bypass normal safety-reporting procedures.

It is undisputed that Sanders reported track defects and entered slow orders in good faith. It is also undisputed that Sanders genuinely believed Jones, his supervisor, was asking him to adjust his work activity in a way that violated federal law—*i.e.*, by not entering slow orders or reporting track defects where Sanders thought such an action appropriate and by ignoring instructions in the EI. And it is undisputed that Sanders reported his legitimate concerns to HR. Sanders sufficiently proved he engaged in FRSA-protected conduct in good faith.

2

In addition to proving the employee engaged in FRSA-protected activity, the employee must also prove "the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Kuduk*, 768 F.3d at 789. A contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Hess v. Union Pac. R.R. Co.*, 898 F.3d 852, 857–58 (8th Cir. 2018) (citing *Kuduk*, 768 F.3d at 791). The protected conduct need not be the only reason for the adverse action: "two causes being non-mutually exclusive is the very essence and definition of a 'contributing' factor." *Blackorby v. BNSF Ry. Co.*, 936 F.3d 733, 737 (8th Cir. 2019), *reh'g denied* (Oct. 11, 2019). Thus, even if an employer honestly believed its employee engaged in misconduct or violated company rules, it nevertheless could be held liable under the FRSA if a retaliatory motive played a part in its decision to terminate the employee. *Id.*

The contributing-factor standard is a "lenient" one, but it requires employees to show that their protected activity was a proximate cause of the adverse action. *BNSF Ry.*

*Co. v. U.S. Dep't of Labor Admin. Rev. Bd.*, 867 F.3d 942, 946 n.2 (8th Cir. 2017).  The

employee "must demonstrate more than a mere factual connection between his [protected

activity] and his discipline," but need not "conclusively demonstrate [the company's]

retaliatory motive to establish a prima facie case."  *Heim v. BNSF Ry. Co.*, 849 F.3d 723,

727 (8th Cir. 2017) (internal quotation marks omitted).  "Absent sufficient evidence of

intentional retaliation, a showing that protected activity initiated a series of events leading

to an adverse action does not satisfy the FRSA's contributing factor causation standard."

*BNSF v. U.S. Dep't of Labor*, 867 F.3d at 946.

A plaintiff may satisfy this element through direct or circumstantial evidence.  *Hess*,

898 F.3d at 858.  Circumstantial evidence includes things such as "the temporal proximity

between the protected activity and the adverse action, indications of pretext such as

inconsistent application of policies and shifting explanations, antagonism or hostility

toward protected activity, the relation between the discipline and the protected activity, and

the presence of intervening events that independently justify discharge."  *Id.* (quoting *Loos*

*v. BNSF Ry. Co.*, 865 F.3d 1106, 1112–13 (8th Cir. 2017), *rev'd on other grounds*, 139 S.

Ct. 893 (2019)); *Al-Birekdar v. Chrysler Grp., LLC*, 499 Fed. Appx. 641, 647 (8th Cir.

2013) (affirming district court's denial of employer's motion for judgment as a matter of

law because employee presented sufficient evidence to support the verdict under a

contributing factor standard) ("One Chrysler employee testified that he could not remember

a skills-trade person ever being terminated for violating the [policy at issue].").

The jury reasonably determined that BNSF terminated Sanders for engaging in

protected conduct.  Sanders's FRSA-protected activity created an obviously hostile and

7

adversarial relationship between Sanders and his supervisor.  In his supervisor's view, Sanders's protected conduct negatively affected the supervisor's performance metrics and potentially the company's bottom line.  In response to Sanders's track-related conduct and hostile-work-environment reports, BNSF treated him more harshly than other employees who were accused of the same time theft violation, which eventually resulted in Sanders's termination.

Here, there is evidence of an intentional retaliatory motive that contributed to the decision to terminate Sanders.  First, it is clear that Jones, Sanders's supervisor, disapproved of the way Sanders carried out his job responsibilities.  Jones did not want Sanders to continue making track-defect reports of the quantity or quality Sanders had reported.  Second, Jones communicated this disapproval through intense, aggressive, and hostile language towards Sanders.  Third, after Sanders reported Jones's behavior and the accompanying hostile work environment to HR, he immediately received backlash (switching his work schedule from 4/10s to 5/8s, moving his start location, and relinquishing his ability to drive a company vehicle to and from his residence).  Fourth, despite any performance concerns, Jones and Hoppenrath rented an unmarked vehicle and decided to observe Sanders for three days, claiming he was misreporting his time.  Fifth, Jones wrote an unprecedented and extensive termination recommendation to the leader, Detlefsen, and team, PEPA, that decided disciplinary actions.  Sixth, BNSF terminated Sanders after nearly a decade of employment based on alleged time theft in which Sanders had not officially submitted his time.  Seventh, and finally, other similarly situated

employees who were not involved in FRSA-protected conduct were accused of the same violation and were not terminated.

There is a strong inference that Sanders's reporting activity, which is covered by the FRSA, contributed to the adverse action of termination. His protected conduct was the reason Jones was hostile toward him. There is no evidence that Jones had a problem with Sanders's work ethic or competence; the problem was with his protected conduct. Sanders's situation is very different than *Kuduk*, where "BNSF [gave] a consistent basis for its decision to terminate Plaintiff's employment, and . . . Plaintiff can point to no evidence of pretext, shifting explanations, antagonism or hostility toward Plaintiff's protected activity, or a change in attitude toward Plaintiff after he engaged in protected activity." 768 F.3d at 790 (quoting and affirming the district court's finding in favor of BNSF). Here, Sanders's two supervisors were the same individuals who accused him of time theft and issued the termination recommendations.

The jury reasonably rejected BNSF's argument that the decisions to surveille Sanders and terminate him based on time theft were not retaliatory. There is evidence that Detlefsen and the PEPA team had actual knowledge of Sanders's protected activity and that Jones influenced the disciplinary decision. BNSF managers specifically congratulated *Jones* for terminating Sanders, which casts doubt on BNSF's claim that Jones was uninvolved with the termination decision. *See* Tr. [ECF No. 236] at 265–267; Tr. Ex. P056 at 9. It was reasonable for the jury to find that BNSF terminated Sanders for engaging in protected conduct.

3

Even if a plaintiff employee makes a *prima facie* showing, the defendant employer nevertheless may avoid liability.  This occurs if the defendant employer "demonstrates, by clear and convincing evidence, that [it] would have taken the same unfavorable personnel action in the absence of [employee's] protected activity."  *Kuduk*, 768 F.3d at 789 (citing § 42121(b)(2)(B)(ii)); *Loos*, 865 F.3d at 1112 ("We analyze FRSA retaliation claims in two steps. First, the plaintiff must make a *prima facie* case. If the plaintiff satisfies this requirement, the railroad has the opportunity to demonstrate by clear and convincing evidence that it would have discharged the employee even if he had not engaged in protected activity."); *Blackorby*, 936 F.3d at 736–38 (confirming "the statutory 'clear and convincing evidence' standard for BNSF's burden of proving that it would have taken the same action regardless of [plaintiff employee's] protected activity").  This defense may fail if the disciplinary charge "was false, pretextual, and motivated by discriminatory animus," or if the decisionmakers were not independent from the bad actors.  *Fresquez*, 52 F.4th at 1310–11 (concluding "BNSF has failed to demonstrate by clear and convincing evidence that it would have discharged [track inspector employee] from his position even absent his involvement in activities that are protected under § 20109.")

In analyzing a defendant's affirmative defense, the following factors are considered: "(1) whether the railroad has written policies addressing the alleged misconduct, (2) whether the railroad followed applicable investigatory and disciplinary procedures, (3) whether the dismissal was approved by others in senior management, (4) whether the dismissal was upheld on appeal, (5) the temporal proximity between the non-protected

conduct and the adverse actions, (6) whether the railroad consistently enforces the policies and rules at issue, and (7) the independent significance of the non-protected activity." *Dafoe v. BNSF Ry. Co.*, 164 F. Supp. 3d 1101, 1115–16 (D. Minn. 2016) (citations and quotations omitted).

The jury reasonably determined that BNSF did not prove by clear and convincing evidence that it would have dismissed Sanders in the absence of his claimed protected activity. BNSF did not meet this standard for reasons that overlap with the contributing–factor analysis. Because BNSF's basis for Sanders's termination is time theft, it must have proven the alleged time theft to be of such a nature that, combined with BNSF's regular business practices, it clearly and convincingly rose to a level requiring termination—totally apart from his protected activity. That is not the case here. The evidence cutting against BNSF's affirmative defense is primarily that similarly situated employees were treated less harshly than Sanders and the disciplinary review by Detlefsen and PEPA was insufficiently independent of Jones's influence. ECF No. 92 at 37–38. In addition to meeting the clear and convincing standard, BNSF must also show there is no legally sufficient evidentiary basis for a reasonable jury to find otherwise after drawing all evidentiary conflicts in favor of Sanders in accordance with Rule 50(b). That is a high bar.

BNSF contends the only reason it terminated Sanders was because he committed time theft, which is wholly independent of his protected activity. ECF Nos. 286-31 (NRAB finding for BNSF), 286-29 (OSHA finding for BNSF). BNSF also argues it gave Sanders his full due process, unspoiled by Jones, as required by the applicable CBA and included a multi-level review process. ECF No. 289 at 15–22. The problem with these arguments is

11

that other similarly situated BNSF employees also committed time theft and also went through the disciplinary process but were not terminated. What makes Sanders's termination additionally unique is that the other employees were not engaging in FRSA-protected activity and did not have Jones, their same supervisor, writing a detailed summary of his opinions supporting their terminations. The jury reasonably determined that BNSF did not provide clear and convincing evidence that materially distinguished B.K. and J.K. from Sanders that, in turn, would support the disparate disciplinary treatment. In other words, the jury reasonably determined that BNSF did not prove by clear and convincing evidence that it would have dismissed Sanders in the absence of his claimed protected activity.

4

BNSF next challenges the jury's punitive damages award. The FRSA allows for "punitive damages in an amount not to exceed $250,000." 49 U.S.C. § 20109(e)(3). "Plaintiffs seeking punitive damages have a formidable burden." *BNSF v. U.S. Dep't of Labor*, 867 F.3d at 949 (quoting *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1035 (8th Cir. 2008)) (quotations omitted). The FRSA does not articulate the standard that governs punitive damages under that statute, but courts have awarded punitive damages where the employer has acted with reckless or callous disregard for the plaintiff's rights or intentionally violated federal law. *BNSF Ry. Co. v. U.S. Dep't of Labor*, 816 F.3d 628, 642 (10th Cir. 2016). Applying this standard in the Title VII context, the Supreme Court has held that employers may be liable for punitive damages based on the discriminatory conduct of lower-level management, but that punitive damages will not be awarded where

12

"the discriminatory employment decisions of managerial agents . . . are contrary to the employer's good faith efforts to comply" with the law.  *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999).  In other words, a defendant who makes good-faith efforts to comply with the FRSA is not liable for punitive damages.  *BNSF v. U.S. Dep't of Labor*, 867 F.3d at 949.  An employer that adopts policies and rules that explicitly prohibit retaliation, maintains a hotline or website for reporting concerns, and follows an internal review process in which the person ultimately responsible for reviewing the evidence and making a decision had no prior knowledge of the plaintiff or his protected activity has "strong evidence of [its] good-faith efforts to prevent retaliation."  *Id.*; *Fresquez*, 52 F.4th at 1320–21 (upholding punitive damages award of $250,000, finding the jury reasonably could have found (1) the lower-level managers actually guided the investigatory process, (2) "Detlefsen has always upheld charges leveled by BNSF management and never found in favor of a union employee," (3) the managers "created and promoted a workplace culture that encouraged the flouting of federal safety regulations, and openly discouraged employees, by way of intimidation and fear of reprisal, from objecting to these practices, all for the purpose of allowing trains to continue to run," and (4) "taking tracks out of service reduces a railroad's profits, and that, because of that, BNSF's managers were effectively motivated to misreport or underreport track defects").

Here, the jury reasonably awarded punitive damages.  The jury reasonably concluded that Jones acted with reckless or callous disregard for Sanders's rights and intentionally violated federal law by repeatedly pressuring Sanders to refrain from entering legitimate slow orders and retaliating by advocating for Sanders's termination when he

would not do so.  It is undisputed that BNSF has many of the protections the Eighth Circuit has described as "strong evidence" showing that it was trying in good faith to prevent retaliation.  At the same time, one of the key aspects of this determination is whether BNSF did not merely have but followed an internal review process in which the person ultimately responsible for the decision was disconnected from the assertedly bad actor.  Here, there is evidence—that must be construed in Sanders's favor—that Detlefsen and the PEPA team were not independent of Jones and that Jones influenced the termination decision.  Similar to *Fresquez*, there is evidence to support a reasonable jury's conclusion that Detlefsen always upheld management charges, there was a culture to flout safety protocol in order to keep tracks moving, and there was a financial incentive for managers to underreport track defects.  There is also evidence that BNSF did not follow its own policy, which required that any adverse action against Sanders be reviewed by the Assistant Vice President for the Twin Cities Division, Dave Hestermann.  Tr. Ex. P046.  No review ever occurred prior to Sanders's termination.  For these reasons, the jury's award of punitive damages was reasonable.

## II

## A

Federal Rule of Civil Procedure 59 permits a party to move for a new trial following a jury trial.  Fed. R. Civ. P. 59(a)(1)(A).  The district court may grant a motion for a new trial on all or some of the issues.  *Id.*  The court should only disturb a jury verdict if the first trial "resulted in a miscarriage of justice, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial."  *Trickey v. Kaman Indus.*

*Tech. Corp.*, 705 F.3d 788, 807 (8th Cir. 2013); *Howard v. Missouri Bone & Joint Ctr., Inc.*, 615 F.3d 991, 995 (8th Cir. 2010) ("[T]he court should only grant a new trial to avoid a miscarriage of justice."). "A 'miscarriage of justice' occurs only when the movant demonstrates prejudicial error, not mere inaccuracies or errors at trial." *Asset Mktg. Servs.*, 2021 WL 5905697, at *4. An erroneous ruling must have substantially influenced the jury's verdict to constitute a miscarriage of justice. *Littleton v. McNeely*, 562 F.3d 880, 888 (8th Cir. 2009) (quoting *Harris v. Chand*, 506 F.3d 1135, 1139 (8th Cir. 2007)); *Harrison v. Purdy Bros. Trucking Co., Inc.*, 312 F.3d 346, 351 (8th Cir. 2002) ("An allegedly erroneous evidentiary ruling does not warrant a new trial unless the evidence was so prejudicial that a new trial would likely produce a different result.") (quotation omitted).

"Where the movant contends the verdict is against the weight of the evidence, it must be against the 'clear weight,' 'overwhelming weight,' or 'great weight' of the evidence in order to grant a new trial." *Asset Mktg. Servs.*, 2021 WL 5905697, at *4 (quoting *Beckman v. Mayo Found.*, 804 F.2d 435, 439 (8th Cir. 1986)). "A new trial is merited when the verdict is so contrary to the preponderance of the evidence as to imply that the jury failed to consider all the evidence, or acted under some mistake." *Gyamtso v. New Metro Trucking Corp.*, No. 11-cv-3457 (DWF/JSM), 2014 WL 3012907, at *2 (D. Minn. July 3, 2014) (quotation omitted).

BNSF contends it is entitled to a new trial on three grounds: (1) the jury instructions were missing key instructions, (2) the scorecard-data and incentive-compensation plan were irrelevant and unduly prejudicial evidence, and (3) the emotional distress damages were excessive and against the weight of evidence. ECF No. 289 at 24–31.

B

Defendant first seeks a new trial on the basis of improperly omitted jury instructions. "A district court possesses broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity." *Am. Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 467 (8th Cir. 2013) (quotation and citation omitted). The question is "whether the jury instructions, taken as a whole, fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case." *Id.* at 468 (quotation and citation omitted). "Many errors in jury instructions are harmless," and a new trial should only be ordered "if the error 'misled the jury or had a probable effect on its verdict.'" *Acuity v. Johnson*, 776 F.3d 588, 595–96 (8th Cir. 2015) (quoting *Burry v. Eustis Plumbing & Heating, Inc.*, 243 F.3d 432, 434 (8th Cir. 2001)).

BNSF argues that several of its proposed instructions were incorrectly omitted: 11–13 (intervening event, adverse action unrelated to protected activity, no inference of retaliation); 14 (not super-personnel department); part of 15 (business judgment: reasonableness of defendant's actions); and 8, 16, 17 (honest belief instructions). ECF No. 289 at 25. To start, BNSF never expands on instructions 11–13 or 16, so they should be dismissed from consideration at the outset. That leaves proposed instructions 14, part of 15, 8, and 17 at issue. BNSF did not show the jury instructions were prejudicially erroneous, and even had it done so, there is insufficient proof that it affected the jury verdict. Thus, a new trial is not warranted on this ground.

16

1

BNSF argues a new trial is warranted because of the improper exclusion of its Proposed Jury Instruction No. 14, "Not Super-Personnel Department."  The proposed instruction stated,

> It is not your role as a jury to sit as a super-personnel department that reexamines an employer's disciplinary decisions. In the absence of evidence connecting Plaintiff's protected activity to the discharge, Plaintiff is not entitled to a verdict in his favor even if Defendant inaccurately concluded that he committed the rule violations at issue.

ECF No. 136 at 16.

BNSF argues that omission of its Proposed Jury Instruction No. 14 led the jury to improperly act like a super-personnel department.  ECF Nos. 136 at 16, 289 at 26.  The problem is that BNSF does not supply legal authority that would require the instruction's inclusion and lacks evidence of the omission's prejudicial effect.  For example, BNSF contends that "[p]roposed instruction 14 sets forth one of the most seminal principles in FRSA law," yet cites no authority to support the separate idea that the (admittedly correct) principle must be given to the jury.  ECF No. 306 at 10.  Without establishing why the instruction should have been included, BNSF then claims "[i]t is evident . . . that [proposed jury instruction 14's] absence led the jury to do what the Eight Circuit has repeatedly and consistently admonished courts and juries from doing: to re-examine and re-litigate a company's disciplinary decisions."  ECF No. 289 at 26.  BNSF makes this assertion without any explanation or evidence that the jury improperly invaded the territory of BNSF's personnel department.  If that weren't correct, as Sanders points out, Jury

17

Instruction No. 15, which essentially communicates the same "business judgment rule" that BNSF claims it was deprived of in its proposed instruction No. 14, was given to the jury. ECF No. 223 at 22. BNSF did not sufficiently prove why a super-personnel instruction was appropriate in this case, nor did it show how the omission substantially influenced the jury's verdict.

2

Second, BNSF contends that omitting part of its Proposed Jury Instruction No. 15 improperly withheld law derived from Eighth Circuit FRSA law, and thus, the jury was uninformed of the correct law. ECF No. 289 at 26–27 (referring to *Foster v. BNSF*, 866 F.3d 962, 969 (8th Cir. 2017)). The Final Jury Instruction No. 15, titled "Business Judgment Rule" read:

> For Mr. Sanders to show that BNSF intentionally retaliated against him by firing him due, in whole or in part, to Mr. Sanders's protected activity or activities, it is not enough for Mr. Sanders merely to establish that BNSF's actions were unwise, unreasonable, or unfair.

ECF No. 223 at 22. The omitted portion of Defendant's Proposed Jury Instruction No. 15 included a final sentence that stated, "[i]t is not unlawful for a company to make employment decisions based upon erroneous information and evaluations." ECF Nos. 136 at 17, 289 at 25.

Rather than providing argument on how this was prejudicial error that resulted in a miscarriage of justice, BNSF only states that the proposed sentence is derived from Eighth Circuit FRSA law and was not included in the final instructions. ECF Nos. 289 at 26, 306 at 11. That is not enough to warrant a new trial. To start, BNSF's assertion is substantively

18

wrong.   The holding in the single case BNSF cites is different than the proposition conveyed in the proposed sentence—*Foster* only holds that an employer's erroneous findings are not enough *on their own* to prove retaliation.   866 F.3d at 969.   Even if the proposed sentence accurately conveyed Eighth Circuit law, BNSF still had the burden to show the omitted sentence substantially influenced the jury's verdict.   BNSF failed to do so and in fact, did not discuss jury effect at all.   Also, it is notable that a business judgment rule instruction was still given over Sanders's objection.   ECF No. 223 at 22.

3

Third, BNSF asserts it was entitled to an honest-belief instruction.   ECF No. 289 at 27.   BNSF's Proposed Jury Instruction No. 17 stated the following:

> BNSF cannot be held liable under the FRSA if you conclude that BNSF dismissed Plaintiff based on its honestly held belief that Plaintiff engaged in the conduct for which BNSF states he was dismissed.

ECF No. 136 at 19.

BNSF also challenges the omission of its Proposed Jury Instruction No. 8, "Contributing Factor – Intentional Retaliation," but only discusses the second half of the instruction which concerns BNSF's honestly held belief.   That portion of the instruction stated the following:

> In addition, this element is not satisfied if you conclude that the Defendant dismissed Plaintiff based solely on its honestly held belief that the Plaintiff engaged in the conduct for which he was dismissed.

ECF No. 136 at 10.

In support of these arguments, BNSF cites *Blackorby*. 936 F.3d at 737 n.5; ECF No. 289 at 27. *Blackorby* does not establish BNSF's proposition that an honest-belief instruction must be included in an FRSA case. Instead, it explains in a footnote that there is nothing "inherently impermissible about using an 'honestly held belief' instruction in the context of an FRSA retaliation claim." *Blackorby*, 936 F.3d at 737 n. 5. The footnote goes on to include several limiting instructions that must accompany an honest-belief instruction if one is given. That footnote, as BNSF's main authority, is insufficient support for BNSF's claim that exclusion of the instruction was prejudicially erroneous leading to a miscarriage of justice. *Blackorby* simply says that inclusion of an honest-belief instruction is permissive under the right conditions—it does not require inclusion. *Id.*

Also, BNSF's contention that the jury could reject Sanders's *prima facie* case if it found that BNSF in good faith, honestly believed he was guilty of time theft was already rejected at summary judgment and is a misstatement of the law. ECF No. 92 at 26–27; *see Blackorby*, 936 F.3d at 737. BNSF argues its proposed instruction No. 8 remedies the issue previous courts identified in this type of instruction because it included the word "solely" in its explanation. ECF No. 306 at 12. This would correctly allow the plaintiff to establish the fourth element of its FRSA claim even if the disciplinary decision was based partly on the employer's honestly held belief of a violation. It is true that "if an employer acts solely because it believed an employee violated its rules, it cannot also be acting with retaliatory intent because of his alleged protected activity." *Id.* at 12–13. This idea logically flows from the requirements of the *prima facie* FRSA case. The fourth element requires the employee to prove intentional retaliation was a contributing factor, and so it necessarily

follows that if the jury found BNSF's sole reason for terminating him was alleged time theft, then the fourth element would not be met. The *prima facie* case would fail. BNSF's claim that "[t]he jury was not informed that it could reject his *prima facie* case if it found that BNSF solely believed in his misconduct" assumes that the jury did not understand the requirements of the *prima facie* case. *See id.* at 13. A separate honest belief instruction was unnecessary and not required.

Further, Defendant's Proposed Jury Instruction No. 17 misstates the law. It would incorrectly allow dismissal based on an employer's honestly held belief, even if intentional retaliation was a contributing factor in the termination decision. It also improperly communicates, and essentially disposes of, the clear and convincing standard that is required for BNSF to prove its affirmative defense. In addition to both substantive errors, BNSF did not sufficiently show that these two omissions had any effect on the jury, let alone one that was substantial. A new trial is not warranted on these grounds.

## C

### 1

BNSF's request for a new trial on the basis of alleged evidentiary errors will also be denied. The admissibility of evidence is a question of law. *Keller Farms, Inc. v. McGarity Flying Serv., LLC*, 944 F.3d 975, 982 (8th Cir. 2019). "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (quoting

*United States v. Abel*, 469 U.S. 45, 54 (1984)).  Evidence is relevant when "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  "[I]nsofar as federal law is concerned, evidence is admissible if relevant, and it is relevant if it has any tendency to make the existence of a consequential fact more or less probable than it would be without the evidence."  *Greenwood Ranches, Inc. v. Skie Const. Co., Inc.*, 629 F.2d 518, 523 (8th Cir. 1980).  Even if evidence is relevant, the court may exclude it "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  Evidence is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  *Trotter v. Lawson*, 997 F.3d 819, 821 (8th Cir. 2021) (quoting *Walker v. Kane*, 885 F.3d 535, 540 (8th Cir. 2018)).  Rule 403 "does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case."  *Krekelberg v. City of Minneapolis*, 991 F.3d 949, 956 (8th Cir. 2021) (quoting *Wade v. Haynes*, 663 F.2d 778, 783 (8th Cir. 1981)).  Instead, "[u]nfair prejudice speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  *United States v. Iron Hawk*, 612 F.3d 1031, 1040 (8th Cir. 2010).  In the context of a Rule 59 motion, and as noted above, the alleged legal error warrants a new trial only when it was "so prejudicial that it likely affected the jury's verdict."  *Asset Mktg. Servs.*, 2021 WL 5905697, at *6; *Littleton*, 562 F.3d at 888–90.

2

BNSF claims that the scorecard-data and incentive compensation plan were irrelevant and unduly prejudicial, and thus, their admissions were legal error that resulted in a miscarriage of justice.  This is not persuasive.  This evidence was relevant.  It tended to show that BNSF managers had a financial incentive to discourage reporting of track defects or the entry of slow orders.  BNSF claims that the scorecard-data was irrelevant since corridor-slow-order-delays are only one of ten components in the scorecard metrics. ECF No. 289 at 28.  Similarly, BNSF argues the incentive compensation plan was irrelevant because the bonus is based primarily on company-wide performance, which includes many variables, so the data is disconnected from an individual manager's intent. *Id.* at 29.  BNSF has a point.  But it was a point BNSF made at trial, and there is nothing to suggest that the jury failed to appreciate BNSF's point.

Along these same lines, this evidence was not unduly prejudicial.  BNSF does not explain how this evidence prompted the jury to decide the case on an improper basis, nor does it show how this evidence was unfair to an extent requiring omission.  In addition, these two items of evidence were a relatively minimal portion of the trial evidence, which further minimizes its likelihood of unfair prejudicial effect.  *See* ECF No. 298 at 37.  BNSF argues "Sanders was able to misleadingly present scorecard data in a prejudicial manner to advance its 'profit over safety' theme."  ECF No. 306 at 14.  But taking issue with the way in which something was used once admitted is different than claiming the evidence's *admission* was prejudicial.  Just because Sanders used the evidence to support a trial theory with which BSNF disagreed does not mean the evidence was unduly prejudicial.

23

If the admission of this evidence was error, BNSF has not shown that this evidence substantially affected the jury verdict.  Under Rule 59, the moving party, BNSF, has the burden to prove *how* an alleged legal error improperly affected the jury's verdict.  A sentence asserting the admission of evidence was unduly prejudicial without any explanation of its unduly prejudicial effect on the jury is not enough to warrant a new trial.

## D

### 1

In addition to claiming legal error, a party may also move for a new trial based on the claim that the verdict was against the weight of the evidence.  This is a high bar.  As previously mentioned, the movant must prove the verdict is "against the 'clear weight,' 'overwhelming weight,' or 'great weight' of the evidence" for a new trial to be warranted. *Asset Mktg. Servs.*, 2021 WL 5905697, at *4.  "On a motion for new trial, the district court is entitled to interpret the evidence and judge the credibility of witnesses, but it may not usurp the role of the jury by granting a new trial simply because it believes other inferences and conclusions are more reasonable." *Van Steenburgh v. Rival Co.*, 171 F.3d 1155, 1160 (8th Cir. 1999); *see Vang v. Prataya*, No. 12-cv-1847 (JNE/SER), 2017 WL 3732106, at *2 (D. Minn. Aug. 29, 2017) (finding the verdict was not against the weight of the evidence in its award for pain and suffering).  A jury's verdict should be rejected "only where, after a review of all the evidence giving full respect to the jury's verdict, the court is left with a definite and firm conviction that the jury has erred." *Ryan by Ryan v. McDonough Power Equip., Inc.*, 734 F.2d 385, 387 (8th Cir. 1984).

Emotional distress awards "are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms." *Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1193 (8th Cir. 2000). A jury verdict regarding damages for pain and suffering "may not be considered to be excessive unless there is 'plain injustice' or a 'monstrous' or 'shocking' result." *Jenkins v. McLean Hotels, Inc.*, 859 F.2d 598, 600 (8th Cir. 1988) (citation omitted); *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 552–53 (8th Cir. 2013) (affirming that an emotional distress award of $300,000 was not so grossly excessive as to shock the judicial conscience). "Medical or other expert evidence is not required to prove emotional distress," and a plaintiff's own testimony and the circumstances of the particular case may be sufficient. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1065 (8th Cir. 1997); *Mathieu v. Gopher News Co.*, 273 F.3d 769, 783 (8th Cir. 2001) (affirming that an emotional distress award does not require medical expert testimony and upholding a $165,000 award where the plaintiff "lost his job of thirty four years, was forced to reduce his standard of living, and had become depressed"); *Fresquez*, 52 F.4th at 1316–18 (upholding jury's emotional damages award of $800,000 for reasons such as "being terminated under false pretenses," "hav[ing] to search for other available work" with lower pay and benefits, "losing his BNSF-provided health insurance benefits," and the resulting stress that caused him "to gain a significant amount of weight and diminished his overall enjoyment in the daily activities of life").

2

The jury's award of $250,000 in emotional-distress damages does not warrant a new trial.  *See* ECF No. 225 at 2.  BNSF challenges the emotional-distress award on two grounds: first, that Sanders did not provide medical or psychological testimony, and second, that the award is against the weight of the evidence.  ECF No. 289 at 29–31.  These arguments are not persuasive.  First, medical or psychological testimony is not a prerequisite for obtaining emotional-distress damages.  Second, the jury's award is not against the *clear*, *overwhelming*, or *great* weight of the evidence.  Sanders's testimony about his life towards the end of his employment and post-termination indicated facts that are emotionally distressing.  For example, Sanders testified that he had to switch between several jobs to support his family financially, he brought his daughter home from college because he could not afford tuition payments, he lost his health insurance and pension, and he felt depressed.  Tr. [ECF No. 237] at 412–17.  His wife also testified to the negative effects the retaliation and subsequent termination had on Sanders, his marriage, and their family.  She stated that she lost her husband the day he was terminated.  *Id.* at 524–27.  The bottom line is that the evidence supports the emotional-distress damages award, and the granting of a new trial based on this issue is unwarranted.

III

A

Sanders seeks attorneys' fees and costs.  The FRSA's remedies for a prevailing employee "include[e] litigation costs, expert witness fees, and reasonable attorney fees." 49 U.S.C. § 20109(e)(2)(C).  Success "on any significant issue in litigation which achieves

some of the benefit" sought by the plaintiff constitutes a prevailing party. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Gill v. Maciejewski*, 546 F.3d 557, 565 (8th Cir. 2008). The standard "does not turn on the magnitude of the relief obtained," such that even a party who receives nominal damages is a prevailing party. *Farrar v. Hobby*, 506 U.S. 103, 114 (1992).

The party seeking attorneys' fees has the burden of establishing that the fees sought are reasonable and should submit evidence supporting the rates claimed and hours worked. *Hensley*, 461 U.S. at 433–34, 437. "To calculate attorney's fees, courts typically begin by using the lodestar method, which multiplies the number of hours reasonably expended by reasonable hourly rates. When determining reasonable hourly rates, district courts may rely on their own experience and knowledge of prevailing market rates." *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 529 (8th Cir. 2019) (cleaned up); *see In re RFC*, 399 F. Supp. 3d 827, 846 (D. Minn. 2019) ("Generally, to determine whether an hourly rate is reasonable, courts look at the rates 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'") (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)). After the lodestar amount is determined, the court should consider whether it should be enhanced or reduced, which depends on the "important factor of the 'results obtained.'" *Hensley*, 461 U.S. at 434 (citation omitted); *Fish v. St. Cloud State Univ.*, 295 F.3d 849, 852 (8th Cir. 2002) ("The most critical factor in assessing fees is the degree of success obtained."). Trial-court judges need not "become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of

27

a suit, and may use estimates in calculating and allocating an attorney's time." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

## B

Sanders seeks attorneys' fees in the amount of $1,194,674.50 and costs in the amount of $62,913.57, for a total of $1,257,588.07. In opposition, BNSF contends that Sanders overstates his success, the hourly billing rates are unreasonably high, and the amount of hours billed is unreasonable. ECF No. 294 at 2. BNSF also challenges several of Sanders's requested costs. ECF No. 294 at 15.

## 1

Sanders is the prevailing party, and he does not overstate his degree of success. The jury's verdict was essentially entirely in his favor. He was awarded front pay, back pay, emotional distress damages, and punitive damages. BNSF's argument that Sanders mischaracterizes his degree of success lacks merit. It simply does not matter that Sanders was awarded amounts less than he requested.

## 2

Sanders's requested hourly rates are reasonable. BNSF advances two main arguments to the contrary: current rates should not be applied to the entirety of the litigation and the requested rates are unreasonable. ECF No. 294 at 4–8. Both arguments are unconvincing. First, it is appropriate to apply current rates. The U.S. Supreme Court has held "the application of current rather than historic hourly rates" is "an appropriate adjustment for delay in payment" when determining what constitutes reasonable attorneys' fees. *Missouri v. Jenkins*, 491 U.S. 274, 282–84 (1989). This adjustment is permissive,

though, not mandatory. But here, especially considering delays in the case caused by the COVID-19 pandemic, using current rates makes sense.

Second, the requested rates are reasonable. Sanders provided sufficient support outlining his counsel's experience, as well as submitting affidavits of similarly situated practitioners in the community. James and Lucas Kaster were the main attorneys on the case, billing a combined 1,592 hours (56 percent of total hours; 91 percent of attorney hours). ECF No. 276 at 7. James Kaster is a senior partner specializing in labor and employment law and has been practicing for 40 years. *Id.* at 1–4. He charges $775 per hour. *Id.* at 7. Lucas Kaster is a junior partner with just over 10 years of experience and was the primary attorney billing the most hours. *Id.* at 7; ECF No. 277 at 1. He specializes in plaintiff employment and civil rights law and charges $475 per hour. ECF No. 276 at 7; ECF No. 277 at 5. Besides James and Lucas Kaster, the next highest billing employees were two paralegals, Karla Pathmann and Alexandra Smith, who both charged $195 per hour and spent a combined 822.6 hours working on this case (29 percent of total hours). ECF No. 276 at 7. There were also two other partners who very briefly worked on the case (.4 hours each), charging $550 and $700 per hour; five associates charging between $350–475 per hour; and 13 additional law clerks/paralegals/support staff that uniformly charged $195 per hour. *Id.* at 7–8. Sanders's counsel at Nichols Kaster, PLLP worked on a contingent fee basis and agreed to receive 40 percent of any amounts recovered as compensatory and punitive damages. *Id.* at 5. James and Lucas Kaster claim that the hourly rates charged are reasonable, based on their experience and familiarity with the market. *Id.* at 4–5; ECF No. 277 at 5.

29

Three additional declarations were submitted in support of Sanders's Motion for Attorneys' Fees and Costs by local attorneys: Robert Bennett [ECF No. 280], M. William O'Brien [ECF No. 281], and Brian Rochel [ECF No. 282]. These declarations stated that both the amount of hours billed and the billing rates for the various individuals were reasonable. BNSF does not challenge the hourly rate for any one lawyer. It does not offer competing expert testimony. BNSF did not respond in any way to the declarations of these local attorneys, but argues the rates are inflated and unreasonable.[1] ECF No. 294 at 4–8. It cites two recent BNSF cases that awarded lower hourly rates, but both of these cases are from foreign jurisdictions—Montana and Colorado. Because this issue is based on contemporaneous *local* market rates, a comparison to Montana and Colorado rates is not helpful. On this record, informed by my own experience and knowledge of the market, the better conclusion is that the rates sought by Sanders's counsel are reasonable considering the attorneys' experience and prevailing market rates.

3

Sanders's requested hours are for the most part reasonable. The requested lodestar amount is $1,194,674.50 based on a total of 2,856.40 hours of work. ECF No. 276 at 7–8. The number of hours—2,856.40—represents work on this matter from its inception through its current post-trial motions. *Id.* at 8. BNSF argues the size of Sanders's legal team and total hours billed were excessive, and it claims Sanders should not receive the fees incurred during the OSHA proceedings. ECF No. 294 at 8–10.

---

[1]    BNSF's counsel disclosed its billing rate at the hearing. Counsel stated her rate was $410 for the first three years of litigation and is now $475.

a

Sanders's legal team was not excessively large.  There was one main billing partner, and a second partner became more involved as trial neared.  Outside of these two partners, most of the work was done by two paralegals.  Eighty-five percent of the hours billed in this case is attributed to two attorneys, James and Lucas Kaster, and two paralegals, Karla Pathmann and Alexandra Smith.  ECF No. 276 at 7.  More so, the size of the legal team on its own is not particularly relevant—the number of hours billed is not adjusted based on the "n" number of attorneys or staff on the case.  *Jenkins v. Univ. of Minnesota*, No. 13-cv-1548 (JRT/SER), 2017 WL 4657853, at *3–4 (D. Minn. Oct. 13, 2017) (citing *A.J. by L.B. v. Kierst*, 56 F.3d 849, 863–64 (8th Cir. 1995)).  The bottom line is determined based on "the number of efficient hours worked on non-duplicative services," not on number of attorneys or staff.  *Id.*  Either way, BNSF cites no authority to support any of its arguments.  *See* ECF No. 294 at 9.

b

BNSF argues the total hours billed was excessive and asks for several other reductions.  Its request for a rough percentage reduction is unwarranted and will be denied, but the hours associated with the mock trial will be subtracted from the overall award.  To start, BNSF asks for a 55% reduction across the board without explaining why or how it reached that percentage.  ECF No. 294 at 9–10.  BNSF argues certain work billed during a stalled period due to COVID-19 should not be included.  ECF No. 294 at 11–14.  Specifically, BNSF challenges the inter-office meetings.  *Id.* at 12–13.  Sanders argues that his counsel's response to the COVID-19 delay was appropriate.  The trial was set for

February 16, 2021, but on December 8, 2020, all pretrial and trial deadlines were postponed (a second time) due to COVID-19. ECF Nos. 110, 112. At that time, the length of the trial delay was uncertain, so Sanders's counsel needed to remain prepared. ECF No. 299 at 14. About two months later, on February 18, 2021, a new trial date was scheduled for December 6, 2021. ECF No. 113. Upon that rescheduling, Sanders's counsel paused its preparations and did not meaningfully resume work until the Parties' status conference in July 2021; there was minimal work done between February and August 2021. ECF No. 299 at 14. In fact, only about 12 hours were billed from February 18, 2021 (rescheduling order) [ECF No. 113] to September 8, 2021 (status conference) [ECF No. 115]. ECF No. 276-4 at 71–73. Consistent trial team meetings did not occur during the months in which trial was delayed, contrary to BNSF's assertions, and they only picked up about a month and a half before trial began. *See* ECF No. 276-4 at 73–77. Also, BNSF contends there should be a reduction for block billing and vague entries. ECF No. 294 at 14. BNSF did not cite any specific entries it found problematic, and Sanders notes that alleged block billing is not a prohibited practice and does not itself require reduction of a fee award. ECF No. 299 at 16; *Nassar v. Jackson*, 779 F.3d 547, 554 (8th Cir. 2015). Thus, a rough percentage reduction is unwarranted on these grounds.

A reduction of hours is warranted, however, on the basis of attorneys' fees related to the mock trial. The purpose in conducting a mock trial is the main factor in determining whether the inclusion of the accompanying fees is reasonable. *Roswick v. Mid Dakota Clinic, P.C.*, No. 17-cv-44 ADM/ARS, 2019 WL 5964553, at *14 (D.N.D. Nov. 13, 2019) ("When determining whether fees incurred for focus groups or mock trials are reasonable,

courts focus on the purpose of these activities."). Where the mock trial's purpose is to prepare a client or witness, the fees may be reasonable. *Id.* In contrast, the fees may be unreasonable where the purpose is to better the attorneys' preparation and presentation. *Id.*; *Lewis v. Heartland Inns of Am., L.L.C.*, 764 F. Supp. 2d 1037, 1049 (S.D. Iowa 2011) (awarding focus group-related fees ($3,558.10) and costs ($330.60) where the purpose of the focus group was not "to polish their trial skills" but for "preparing their client—and main witness—for trial").

Another factor in determining the reasonableness of mock trial fees is the complexity of the case—the more complicated the case, the more reasonable the mock trial. *Koziara v. BNSF Ry. Co.*, No. 13-cv-834-jdp, 2016 WL 4435299, at \*4 (W.D. Wis. Aug. 19, 2016) (explaining the general rule is to reduce awards for mock trials if the case is factually and legally straightforward; finding the FRSA case to be relatively straightforward; disallowing attorneys' fees related to the mock trial ($40,195)); *Axel v. Griffin*, No. 12-cv-1019 (DSD/AJB), 2014 WL 896727, at \*2 (D. Minn. Mar. 6, 2014) (finding the focus group "expense was not necessary in this relatively simple case"); *Montanez v. Chicago Police Officers Fico*, 931 F. Supp. 2d 869, 881–82 (N.D. Ill. 2013) (rejecting mock trial fees where "the issues presented in [the] case were not sufficiently complex to justify a mock trial"); *Gilster v. Primebank*, 884 F. Supp. 2d 811, 881 (N.D. Iowa 2012), *rev'd on other grounds*, 747 F.3d 1007 (8th Cir. 2014) (finding plaintiff's use of witness preparation and jury consultant services reasonable based on the difficult nature of the case and awarding the requested amount of $3,379.35).

33

Sanders relies on *Ludlow v. BNSF Ry. Co.* as the Eighth Circuit precedent that approved mock trial fees and costs.  788 F.3d 794, 804 (8th Cir. 2015) ("There is federal case law upholding awards for this type of preparatory work if it is reasonable.").  In that case, the plaintiff used two focus groups and was awarded the associated attorneys' fees and costs, $23,737.50 and $3,682.00, respectively.  *Id.*  *Ludlow* is different from this case.  The plaintiff in *Ludlow* submitted expert opinions to support the use and reasonableness of the consultants and focus groups.  That didn't happen here.  Also, the awarded focus group fees and costs in that case totaled $23,737.50, much lower than Sanders's request of $88,894.00.[2]  *Id.* at 804; ECF Nos. 274 at 21; 294 at 15.  Finally, Sanders's purpose in using the mock trial was not to prepare a witness or client but rather to "mak[e] sure that [the jury] understood the arguments that could and should be made at trial."  ECF No. 274 at 18–19.  Sanders's attorneys' fee award will be reduced by $88,894.00, which is the fee amount for the hours associated with the mock trial.  To be sure, disallowing the mock trial fees does not negate the labor-intensive nature of this case, which was heavily litigated and factually expansive.

---

[2]     After a review of Sanders's submitted billing records, ECF No. 276-4, it was determined that 185.2 hours were spent on work related to the preparation, attendance, and review of the mock trial, including work with the mock trial's jury consultant, which totaled $88,894.00.  This is roughly comparable to BNSF's claim that Sanders spent 173.80 hours on work related to the mock trial totaling $84,071.  ECF No. 294 at 15.  Sanders does not necessarily dispute BNSF's number and only argues BNSF did not provide insight on what entries the number includes.  ECF No. 299 at 16.

c

Sanders is entitled to attorneys' fees for the OSHA FRSA proceedings despite BNSF's objection. BNSF argues that he is not entitled to these fees because he lost before OSHA and different attorneys in the firm worked on the case at that time. ECF No. 294 at 10–11. BNSF cites no authority to support the exclusion of the OSHA hours. *See id.* Instead, BNSF points to a handful of billing entries post-OSHA proceedings that it claims are duplicative, which is a different argument than claiming the OSHA fees are unrecoverable because it was a separate proceeding on which Sanders lost. *Id.* Furthermore, the FRSA requires plaintiff employees to exhaust all administrative remedies, so Sanders was required to pursue the OSHA process before coming to court. 49 U.S.C. § 20109(d)(1). The fact that other attorneys in the firm were his primary counsel at the time of the OSHA proceedings is irrelevant to the inclusion of those hours. The hours associated with the OSHA proceedings will not be subtracted.

4

Sanders seeks recovery of non-taxable costs, and for the most part, they are reasonable and will be awarded. As noted above, 49 U.S.C. § 20109(e)(2)(C) provides for recovery of "litigation costs" and "expert witness fees." Sanders filed a separate Bill of Costs to recover costs that are taxable under Fed. R. Civ. P. 54(d)(1) and D. Minn. LR 54.3. Otherwise, he seeks non-taxable costs for the following:

| Cost Category | Amount |
|---|---|
| Audio Recording Transcription Fees | $1,892.49 |
| Courier Fees (Total $4,027.65 – Bill of Costs amount of $893.41) | $3,134.24 |
| Expert Witness Fees[3] | $20,865.13 |
| Medical Records | $600.12 |
| Mock Trial | $28,498.22 |
| PACER/Westlaw Research Fees[4] | $0 |
| Postage/Federal  Express | $60.00 |
| Relativity[5] | $0 |
| Travel/Meals/Parking/Mileage | $3,423.79 |
| Trial Transcript | $2,803.33 |
| Video Deposition Fees | $1,636.25 |
| **Total** | **$62,913.57** |

*See* ECF No. 274 at 21.  Sanders argues that these costs were necessary and reasonably

incurred in order to prosecute his claims.  *Id.*

BNSF objects to several of the requested costs.  It first takes issue with the mock

trial costs of $28,498.22 and follows the same reasoning as its objections to the mock trial

attorneys' fees—the mock trial was unnecessary to sufficiently try the case.  *See* ECF No.

294 at 15–16.  BNSF also cites several cases where courts reduced cost awards for mock

trials as unnecessary.  *Id.*; *see Roswick*, 2019 WL 5964553, at *15 (disallowing mock trial

costs for the same reasons the related attorneys' fees were disallowed); *Denesha v. Farmers*

*Ins. Exch.*, 976 F. Supp. 1276, 1291–92 n.9 (W.D. Mo. 1997), *aff'd in part, rev'd in part*

---

[3]     Sanders does not object to a reduction of his original request by $2,345 due to a typographical error.  ECF No. 299 at 17.  The correct time spent on a call with Dr. Boisso on 1/13/2021 is 0.33 hours, not 7.33 hours.  *Id.*

[4]     Sanders does not object to subtracting this cost from his original request.  ECF No. 299 at 17.

[5]     Sanders does not object to subtracting this cost from his original request.  ECF No. 299 at 17.

*on other grounds*, 161 F.3d 491 (8th Cir. 1998) (deducting expenses related to the mock trial from the amount awarded); *Gerling v. Waite*, No. 4:17-CV-2702 JAR, 2022 WL 558083, at *5–6 (E.D. Mo. Feb. 24, 2022) (subtracting focus group costs ($2,760) for the same reasons the related attorneys' fees ($4,442.50) were disallowed); *Koziara*, 2016 WL 4435299, at *4 (disallowing mock trial costs ($2,334.42) for the same reasons the related attorneys' fees were disallowed). For essentially the same reasons as the fees associated with the mock trials will not be awarded, the costs associated with the mock trial will be disallowed.

BNSF also challenges the video deposition fees. Without citing any authority, BNSF claims "video depositions are a luxury, not a necessity," and because they were rarely used at trial, they were unnecessary. ECF No. 294 at 17. This is not correct. Electronically recorded transcript costs may be recoverable. *See Stanley v. Cottrell, Inc.*, 784 F.3d 454, 466–67 (8th Cir. 2015) (upholding district court's award for cost of both printed and electronically recorded transcripts of a deposition because it was not unnecessarily obtained); *Lewis*, 764 F. Supp. 2d at 1049 (finding video deposition was necessarily obtained for use in the case and awarding its cost). The challenged video recordings pertained to two witnesses, Blaine Hoppenrath and Robert Rindy. ECF No. 299 at 17–18. The video deposition of Hoppenrath was necessary because it occurred through a remote videoconference. *Id.* at 17. Sanders argues that the Rule 30(b)(6) video deposition of Rindy "was necessary because Plaintiff anticipated that Defendant would potentially refuse to produce witnesses at trial given its litigation strategy." *Id.* at 18. Plaintiff was correct in its inference as it had to file a motion "to secure the appearances of

corporate witnesses at trial." *Id.*; ECF Nos. 173, 173-01.  Just because a video deposition was not ultimately used at trial does not mean its cost was unreasonable.  For these reasons, the video deposition costs will be included in the total award for costs.

After subtracting the mock trial costs, incorrect expert fees, and Relativity, PACER, and Westlaw research fees, the non-taxable costs total $34,415.35.  These requested costs are reasonable and will be awarded to Sanders.

## ORDER

Based on the foregoing, the jury's verdicts, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.     Defendant BNSF Railway Co.'s Motion for Judgment as a Matter of Law [ECF No. 284] is **DENIED**.

2.     Defendant BNSF Railway Co.'s Motion for a New Trial [ECF No. 284] is **DENIED**.

3.     Plaintiff Don Sanders's Motion for Attorneys' Fees and Costs [ECF No. 272] is **GRANTED in part**.  Sanders shall recover from BNSF:

     a.     Attorneys' fees in the amount of $1,105,780.50; and

     b.     Litigation expenses and nontaxable costs in the amount of $34,415.35.

## LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: December 5, 2022                    s/ Eric C. Tostrud
                                              Eric C. Tostrud
                                              United States District Court